No. 26-1793

# In the United States Court of Appeals for the Fourth Circuit

KELLY DAWSEY,

*Plaintiff-Appellee*,

v.

BMW MANUFACTURING CO., LLC,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of South Carolina

**JOINT APPENDIX**
**VOLUME I OF VI**

Charles E. Johnson
Brendan P. Biffany
Aryana Ainolhayat
ROBINSON, BRADSHAW & HINSON, P.A.
600 South Tryon Street
Suite 2300
Charlotte, North Carolina 28202
704.377.2536

*Counsel for Defendant-Appellant BMW Manufacturing Co., LLC*

Brian P. Murphy
STEPHENSON AND MURPHY, LLC
207 Whitsett Street
Greenville, South Carolina 29601
864.370.9400

*Counsel for Plaintiff-Appellee Kelly Dawsey*

## TABLE OF CONTENTS

**Page**


**Volume I**

Judgment (DE 217) .................................................................. JA1

Amended Judgment (DE 236) ........................................................ JA2

Order Awarding Backpay (DE 238) ................................................ JA3

Second Amended Judgment (DE 239) ............................................JA22

May 13, 2026 Post-Trial Motion Hearing Transcript (DE 272) ........JA23

**Volume II**

District Court Docket Sheet .........................................................JA112

Plaintiff's Amended Complaint (DE 20) ........................................JA142

BMW MC's Answer to Amended Complaint (DE 40) ......................JA158

BMW AG's Answer to Amended Complaint (DE 96).......................JA171

Report of Magistrate Judge (DE 113) ............................................JA182

Order (DE 119) ...............................................................................JA200

February 12, 2026 Strikes for Cause Transcript (DE 246) ............JA219

February 17, 2026 Trial Transcript, Volume I (DE 247) ................JA247

Opening Statement by Counsel for Plaintiff ..........................JA316

Opening Statement by Counsel for Defendant BMW MC .....JA319

Opening Statement by Counsel for Defendant BMW AG ......JA315

Kelly Dawsey, Direct Examination.......................................JA334

February 18, 2026 Trial Transcript, Volume II (DE 248) ..............JA452

Kelly Dawsey, Direct Examination (cont'd)...........................JA457

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC ....................................JA562

**Volume III**

February 19, 2026 Trial Transcript, Volume III (DE 249).............JA684

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC (cont'd) ...........................................................JA688

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW AG.........................................................................JA754

Robert Englehorn, Direct Examination by Counsel for Defendant BMW MC ........................................................JA797

Robert Englehorn, Cross Examination by Counsel for Defendant BMW AG ........................................................JA851

Robert Englehorn, Cross Examination by Counsel for Plaintiff...........................................................................JA859

Robert Englehorn, Redirect Examination by Counsel for Defendant BMW MC ........................................................JA906

Robert Englehorn, Recross Examination by Counsel for Plaintiff...........................................................................JA910

February 20, 2026 Trial Transcript, Volume IV (DE 250).............JA942

Christine Petrasch, Direct Examination by Counsel for Defendant BMW MC ........................................................JA946

Christine Petrasch, Cross Examination by Counsel for Defendant BMW AG ......................................................JA1032

Christine Petrasch, Cross Examination by Counsel for Plaintiff.........................................................................JA1056

Christine Petrasch, Redirect Examination by Counsel for Defendant BMW MC ......................................................JA1133

Christine Petrasch, Recross Examination by Counsel for Defendant BMW AG ....................................................... JA1138

**Volume IV**

February 23, 2026 Trial Transcript, Volume V (DE 251) ............ JA1164

Corey Epps, Direct Examination by Counsel for Defendant BMW MC ................................................................... JA1169

Corey Epps, Cross Examination by Counsel for Defendant BMW AG ................................................................... JA1194

Corey Epps, Cross Examination by Counsel for Plaintiff .... JA1198

Corey Epps, Redirect Examination by Counsel for Defendant BMW MC ................................................................... JA1210

Corey Epps, Recross Examination by Counsel for Defendant BMW AG ................................................................... JA1211

Sherill Miller, Direct Examination by Counsel for Defendant BMW MC ................................................................... JA1276

Sherill Miller, Cross Examination by Counsel for Plaintiff ................................................................... JA1297

Sherry McCraw, Direct Examination by Counsel for Defendant BMW MC ....................................................... JA1304

Sherry McCraw, Cross Examination by Counsel for Defendant BMW AG ....................................................... JA1383

Sherry McCraw, Cross Examination by Counsel for Plaintiff ................................................................... JA1384

Sherry McCraw, Redirect Examination by Counsel for Defendant BMW MC ....................................................... JA1419

February 24, 2026 Trial Transcript, Volume VI (DE 252)............JA1460

Clarence Edward Bailey, II, Examination by Deposition Testimony.............................................................................JA1465

Neal Gilmore, Examination by Deposition Testimony.........JA1478

Eva Burgmeier, Examination by Deposition Testimony......JA1484

Charge Conference ........................................................JA1622

**Volume V**

February 25, 2026 Trial Transcript, Volume VII (DE 253) ..........JA1666

Charge Conference (cont'd) ................................................JA1669

Closing Argument by Counsel for Plaintiff ..........................JA1678

Closing Argument by Counsel for Defendant BMW MC......JA1723

Closing Argument by Counsel for Defendant BMW AG ......JA1766

Rebuttal Closing Argument by Counsel for Plaintiff ..........JA1788

Jury Charge.........................................................................JA1794

Verdict ...............................................................................JA1830

Jury Polled..........................................................................JA1832

Verdict Form (DE 216) .............................................................JA1862

March 13, 2026 Post-Trial Damages Hearing Transcript (DE 254)....................................................................................JA1868

Kelly Dawsey, Direct Examination ...................................JA1874

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC ..........................................................JA1855

Kelly Dawsey, Redirect Examination.................................JA1904

John E. Gibson, Jr., Direct Examination by Counsel for

Plaintiff........JA1909

John E. Gibson, Jr., Cross Examination by Counsel for Defendant BMW MC........JA1926

John E. Gibson, Jr., Redirect Examination by Counsel for Plaintiff........JA1983

Closing Statement by Counsel for Defendant BMW MC.....JA1989

Closing Statement by Counsel for Plaintiff........JA2003

Consent Motion to Amend/Correct Judgment (DE 231) ........JA2031

Order Granting Consent Motion to Amend/Correct Judgment (DE 235)........JA2034

Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial (DE 237) ........JA2036

Joint Proposed Jury Charges (DE 240-1) ........JA2059

Notice of Appeal (DE 265) ........JA2062

Amended Notice of Appeal (DE 275)........JA2064

**Vol VI**

Trial Exhibits

Plaintiff's Exhibit 1 (Plaintiff's Resume, Dec. 2021) ........JA2066

Plaintiff's Exhibit 2 (Plant Spartanburg Organization Chart) ........JA2069

Plaintiff's Exhibit 3 (Petrasch Jan. 10, 2022 email to HR network)........JA2070

Plaintiff's Exhibit 4 (Petrasch Dec. 3, 2021 email)........JA2074

Plaintiff's Exhibit 5 (TX-6 Organization Structure Development Step 2 – for April 2021)........JA2077

Plaintiff's Exhibit 6 (TX-6 and TX-60 Info-Share Documentation, Sept. 29, 2021) ........................................ JA2078

Plaintiff's Exhibit 7 (T-Vorhalt Request) ............................ JA2080

Plaintiff's Exhibit 8 (TX-60 Job Function Data Sheet, Rev. April 1, 2019) ........................................................ JA2081

Plaintiff's Exhibit 9 (TX-61 Job Function Data Sheet, Rev. March 1, 2020) ....................................................... JA2085

Plaintiff's Exhibit 10 (Exempt Organizational Structure, Aug. 2021) ............................................................ JA2088

Plaintiff's Exhibit 12 (Exempt Organizational Structure, Sept. 2021) ........................................................... JA2100

Plaintiff's Exhibit 14 (Plaintiff's Portfolio 2020) ................. JA2112

Plaintiff's Exhibit 15 (Plaintiff's Portfolio 2019) ................. JA2117

Plaintiff's Exhibit 16 (Plaintiff's Portfolio 2018) ................. JA2122

Plaintiff's Exhibit 17 (Expat Guidelines for Plant Spartanburg, Jan. 8, 2016) ............................................. JA2126

Plaintiff's Exhibit 18 (TX-6 Organizational Overview) ........ JA2141

Plaintiff's Exhibit 19 (Plaintiff's Compensation Change Statement, March 20, 2021) ............................................. JA2142

Plaintiff's Exhibit 20 (Overview on Reference Partner input during the promotion procedure, Oct. 2010) ...................... JA2143

Plaintiff's Exhibit 21 (Petrasch Text to Plaintiff, Oct. 1, 2021) ................................................................. JA2144

Plaintiff's Exhibit 22 (International Grading FLIV Approval Committee TS Spartanburg) ............................................ JA2145

Plaintiff's Exhibit 24 (June 3, 2021 email from Plaintiff to Epps, Suber and Sanders attaching Project Misaligned PG Overview PowerPoint)....................JA2146

Plaintiff's Exhibit 25 (Jan. 1, 2021 email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian re: "as discussed" topics)....................JA2152

Plaintiff's Exhibit 26 (March 19, 2021 email from Petrasch to Belinski attaching 2021 Review TX-60 Org)....................JA2154

Plaintiff's Exhibit 27 (April 8, 2021 email from Petrasch to Plaintiff re: draft job descriptions for VP HR and Manager of Recruiting)....................JA2161

Plaintiff's Exhibit 28 (Email from Petrasch to Plaintiff re: HR Compact submittals)....................JA2163

Plaintiff's Exhibit 29 (TX-61 Job Function Data Sheet, rev. date Oct. 24, 2021)....................JA2166

Plaintiff's Exhibit 31 (March 3, 2021 email from Petrasch to Plaintiff re: P&S TX-6)....................JA2169

Plaintiff's Exhibit 37 (Sept. 23, 2021 email from Petrasch to Koepnick and Burgmeier re: PE-TAG PE-Kreis)....................JA2170

Plaintiff's Exhibit 39 (Jan. 4, 2022 email from Petrasch to Hacker)....................JA2173

Plaintiff's Exhibit 41 (Jan. 5, 2022 email from Petrasch to Burghardt re: Plaintiff's resignation)....................JA2174

Plaintiff's Exhibit 46 (TX-60 Job Function Data Sheet, Feb. 1, 2022)....................JA2175

Plaintiff's Exhibit 47 (HRIS Screenshots re Epps Employment)....................JA2179

Plaintiff's Exhibit 48 (Personnel Development Succession Planning, June 19, 2020)....................JA2183

Plaintiff's Exhibit 49 (BMW Group Plant Spartanburg, Memo to Eddie Bailey re: Compensation Statement, April 19, 2023) ........................................................................JA2185

Plaintiff's Exhibit 50 (BMW Group Plant Spartanburg, Memo to Neal Gilmore Compensation Statement, April 19, 2023) ........................................................................JA2186

Plaintiff's Exhibit 52 (Portfolio 2022 – Eddie Bailey, March 2023)........................................................................JA2187

Plaintiff's Exhibit 63 (April 21, 2021 Burgmeier email re: P-Circle) ........................................................................JA2191

Defendant's Exhibit 1 (BMW MC Job Offer Letter, April 25, 1995) ........................................................................JA2192

Defendant's Exhibit 2 (Morse & Savage copy of Plaintiff's Resume) ........................................................................JA2194

Defendant's Exhibit 3 (BMW MC Implementation of Exempt Grading, Salary, Bonus and Benefits Structure Effective Aug. 2001)........................................................................JA2197

Defendant's Exhibit 4 (Personnel Development/Succession Planning PowerPoint, June 2021) ......................................JA2209

Defendant's Exhibit 5 (TX-6 Organizational Overview PowerPoint, Jan. 2022) ......................................................JA2221

Defendant's Exhibit 6 (Documents related to promotions, salary increases, and bonuses (2014-2021)) .........................JA2226

Defendant's Exhibit 7 (HR Records re: Plaintiff's Position/Pay History) ......................................................JA2236

Defendant's Exhibit 9 (HR Records on Scott Medley Position/Pay History, 2007 – 2025)......................................JA2240

Defendant's Exhibit 10 (July 19, 2021 Email from Petrasch to Koepnick re: Succession)................................................JA2242

Defendant's Exhibit 11 (TX-60 Job Function Data Sheet, Feb. 1, 2022) ....................JA2244

Defendant's Exhibit 12 (TX-61 Job Function Data Sheet, Oct. 24, 2021 ....................JA2252

Defendant's Exhibit 13 (TX-64 Job Function Data Sheet, May 1, 2019) ....................JA2261

Defendant's Exhibit 14 (June 3, 2021 Email from Plaintiff to Epps re: "Project Misaligned" PowerPoint) ....................JA2265

Defendant's Exhibit 15 (Jan. 21, 2021 Email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian with Topics for Network to HR Team)....................JA2271

Defendant's Exhibit 16 (Substructure HR Plant Spartanburg, TX-6, Nov. 2019)....................JA2273

Defendant's Exhibit 17 (Sherry McCraw BMW MC Position History)....................JA2277

Defendant's Exhibit 18 (Sept 23, 2021 Email from Petrasch to Englehorn attaching PowerPoint for PE Tax TX-6 Presentation) ....................JA2278

Defendant's Exhibit 19 (TX-6 and TX-60 Info-Share Documents for Plaintiff and Petrasch with Handwritten Notes, Sept. 29, 2021)....................JA2280

Defendant's Exhibit 20 (Oct. 1, 2021 Email from Petrasch to Koepnick with Org. Chart)....................JA2284

Defendant's Exhibit 21 (Sept. 23, 2021 Email from Petrasch to Sanders re: Epps' Promotion) ....................JA2288

Defendant's Exhibit 22 (Oct. 1, 2021 Email from Petrasch to McCraw re: Upgrading Epps to G11) ....................JA2290

Defendant's Exhibit 23 (TX-6 - HR Workshop VI / Management Workshop Agenda, Nov. 11, 2021) ....................JA2291

Defendant's Exhibit 24 (TX-6 Reorganization PowerPoint, Aug. 2019)....JA2293

Defendant's Exhibit 25 (Dec. 10, 2021 Email from Petrasch to HR Team re: Meeting on TX-6 Organization)....JA2308

Defendant's Exhibit 26 (Dec. 13, 2021 Email from Petrasch to Plaintiff and Medley attaching TX-6 PowerPoint)....JA2309

Defendant's Exhibit 27 (Documents Produced by Miller in response to Subpoena issued to Morse & Savage)....JA2323

Defendant's Exhibit 28 (Morse & Savage Consultant Agreement signed by Plaintiff, Sept. 2021)....JA2354

Defendant's Exhibit 29 (Plaintiff's Check to Morse & Savage, Sept. 16, 2021)....JA2355

Defendant's Exhibit 30 (Madewell Concrete Offer Letter to Plaintiff, Dec. 10, 2021)....JA2356

Defendant's Exhibit 31 (Dec. 9, 2021 Email from Petrasch to all HR Team re: TX-6 Circle)....JA2370

Defendant's Exhibit 32 (Plaintiff's Notes, Sept. 27, 2021)....JA2371

Defendant's Exhibit 33 (Jan. 3, 2022 Email from Petrasch to McCraw attaching Plaintiff's Resignation Notice)....JA2372

Defendant's Exhibit 34 (Plaintiff's Resignation letter, Jan. 3, 2022)....JA2374

Defendant's Exhibit 36 (GSP International Airport Offer of Employment, July 1, 2022)....JA2375

Economic Damages Hearing Exhibits

Plaintiff's Exhibit 53 (BMW Salary History)....JA2377

Plaintiff's Exhibit 54 (BMW RSA Statement)....JA2379

Plaintiff's Exhibit 55 (Summary Page Regarding Retirement Contributions.....JA2380

Plaintiff's Exhibit 56 (Madewell 2022 W-2).....JA2381

Plaintiff's Exhibit 57 (GSP Annual Compensation Statements).....JA2382

Plaintiff's Exhibit 58 (2022 GSP W-2).....JA2390

Plaintiff's Exhibit 59 (2023 GSP W-2).....JA2391

Plaintiff's Exhibit 60 (2024 GSP W-2).....JA2392

Plaintiff's Exhibit 61 (2025 GSP W-2).....JA2393

Plaintiff's Exhibit 62 (Dec. 22, 2025 Expert Report of John E. Gibson).....JA2398

Defendant's Exhibit 38 (Jan. 18, 2023 Expert Report of John E. Gibson).....JA2413

Defendant's Exhibit 39 (Oct. 31, 2025 Expert Report of John E. Gibson).....JA2427

Defendant's Exhibit 40 (Dec. 1, 2025 Expert Report of John E. Gibson).....JA2441

Defendant's Exhibit 41 (Dec. 22, 2025 Expert Report of John E. Gibson).....JA2456

Defendant's Exhibit 42 (Nov. 20, 2025 Expert Rebuttal Report of Nicholas R. Harris).....JA2471

Defendant's Exhibit 55 (Plaintiff BMW MC Earning Statement 2019-2022).....JA2501

AO 450 (SCD 04/2010) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | | |
|---|---|---|
| Kelly Dawsey<br>*Plaintiff*<br>v.<br>Bayerische Motoren Werke Aktiengesellschaft, and BMW Manufacturing Co., LLC<br>*Defendant* | ) | Civil Action No. 7:22-cv-3738-TMC |

**JUDGMENT IN A CIVIL ACTION**

The court has ordered that *(check one)*:

❒ the plaintiff Kelly Dawsey recover from the defendant BMW Manufacturing Co., LLC the amount of One Hundred Thousand dollars ($100,000.00) in compensatory damages and Five Million dollars ($5,000,000.00) in punitive damages, which includes plus postjudgment interest at the rate of 3.5%, along with costs.

:

This action was *(check one)*:

❒ tried by a jury, the Honorable Timothy M. Cain presiding, and the jury has rendered a verdict.

Date: February 25, 2026

*CLERK OF COURT*

s/ Amy Ruttgers, Deputy Clerk

*Signature of Clerk or Deputy Clerk*

AO 450 (SCD 11/2011) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

Kelly Dawsey
*Plaintiff*
v.
Bayerische Motoren Werke Aktiengesellschaft, and BMW Manufacturing Co., LLC
*Defendant(s)*

Civil Action No. 7-22-cv-3738-TMC

**AMENDED JUDGMENT IN A CIVIL ACTION**

The court has ordered that:

❒ the plaintiff Kelly Dawsey recover from the defendant BMW Manufacturing Co., LLC the amount of Three Hundred Thousand dollars ($300,000.00) plus post judgment interest at the rate of 3.5 % along with costs.

This action was:

❒ decided by the Honorable Chief Judge Timothy M. Cain on a consent motion to amend/correct the judgment (ECF 217).

Date: March 25, 2026

*ROBIN L. BLUME, CLERK OF COURT*

s/L. K. McAlister

*Signature of Deputy Clerk*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Kelly Dawsey,<br><br>Plaintiff,<br><br>v.<br><br>Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC,<br><br>Defendants. | Civil Action No. 7:22-cv-3738-TMC<br><br>**ORDER** |

### I. Introduction

Plaintiff Kelly Dawsey ("Plaintiff") brought this action against her former employer Defendant BMW Manufacturing Co. LLC ("BMW MC"), which is based in Spartanburg, South Carolina, and its parent company Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), a German corporation headquartered in Munich. Plaintiff asserted claims against Defendants for national origin, race and sex discrimination in violation of Title VII, and race discrimination in violation of 42 U.S.C. § 1981. On February 17, 2026, Plaintiff's case against Defendants proceeded to trial before a jury. (ECF No. 198). On February 25, 2026, the jury returned a verdict in favor of Defendant BMW AG on all claims, concluding that it was not an integrated employer and, therefore, was not liable on the employment discrimination claims asserted by Plaintiff. (ECF No. 216). As to Defendant BMW MC, the jury returned a verdict in favor of Defendant BMW MC on Plaintiff's claims for race and sex discrimination under Title VII and race discrimination under § 1981. *See id.* However, on Plaintiff's claim against Defendant

BMW MC for national origin discrimination in violation of Title VII, the jury returned a verdict in favor of Plaintiff and awarded compensatory damages in the amount of $100,000 and punitive damages in the amount of $5 Million. *See id*.

Following trial, BMW MC, with the consent of Plaintiff and BMW AG, filed a motion to amend the $5,100,000 judgment amount to conform to the damages cap set forth in 42 U.S.C. § 1981a. (ECF No. 231). For companies with more than 500 employees, non-economic damages in a Title VII action are capped by statute at $300,000. 42 U.S.C. § 1981a(a)(1) and (b)(3)(D). The parties agreed the statutory cap applies in this case. The court entered an order finding that the award of compensatory and punitive damages must be reduced to a total of $300,000 and granting BMW MC's consent motion to amend the judgment to apply the statutory damages cap under 42 U.S.C. § 1981a. (ECF No. 235). The court then entered an amended judgment consistent with the ruling. (ECF No. 236).

**II. Economic Damages Hearing**

This matter is now before the court on the issue of whether, and to what extent, Plaintiff should be awarded economic damages. The question of attorneys' fees and costs is the subject of a separate motion, (ECF No. 225), which the court shall address after the parties have completed briefing as to all post-trial motions in this case. *See* (ECF Nos. 230, 232).

Prior to trial, the parties agreed that, should the jury return a verdict in favor of Plaintiff as to liability on one or more claims against Defendants, the question of the amount of economic damages to award to Plaintiff, if any, should be decided by the court rather than the jury. (ECF No. 182). Back pay and front pay are equitable remedies to be determined by the court. *See Hylind v. Xerox Corp.*, 481 F. App'x 819, 824 (4th Cir. 2012) (noting that "determination of back pay is an equitable matter for the judge"); *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) (noting

that, like Title VII, the award and amount of front pay under the ADEA is a question "for the court sitting in equity to consider and not the jury"). As noted, the jury determined that BMW MC is liable to Plaintiff for national origin discrimination in violation of Title VII. Accordingly, on March 13, 2026, the court conducted a hearing on the question of economic damages. (ECF No. 226).

Summary of Evidence Presented as to Economic Damages

At the hearing, Plaintiff offered her own testimony as well as the testimony of her economic damages expert John Gibson. In making a determination on this issue, the court also considers relevant evidence presented during the jury trial.[1]

Plaintiff began her employment with BMW MC in 1995 as an employee relations representative. (Pl. Ex. 1). In 2015, Plaintiff became the Department Manager for Human Resources (HR) Planning Compensation and Benefits Organization and Associate Well-Being-Medical Facilities (i.e., the TX-60 position). Plaintiff remained in this position until she resigned from her employment at BMW MC in January 2022. On December 10, 2021, while still employed at BMW MC, Plaintiff accepted an offer to become Director of Human Resources for Madewell Concrete at a reduced salary. On January 3, 2022, Plaintiff gave BMW MC a formal two-week notice of her resignation. Plaintiff testified that she resigned and accepted employment elsewhere because, as the jury found, BMW MC had discriminated against her. Plaintiff indicated she had planned to continue her employment at BMW MC until retirement at age 60. Plaintiff conceded, however, that she first made contact with Ms. Miller, an employment recruiting agent, in September 2021 before she learned BMW MC intended to transfer her to a position that she

[1] At the economic damages hearing, the parties consented to the court considering the evidence presented at the jury trial.

considered less desirable and replace her with a German national. Plaintiff indicated at that time, she was looking for job that would permit her to maintain a better work-life balance. Trial testimony established that in late September 2021, Plaintiff learned that Sherry McCraw, an American, would be moving to Vice President of HR, triggering an internal "guideline" that the next line in the HR leadership structure would be German. More specifically, Plaintiff learned that Eva Burgmeier, a German employed by BMW AG at that time, would be coming to take Plaintiff's TX-60 position.

Plaintiff testified that her last day at BMW MC's Spartanburg plant was January 14, 2022, and that her last day of employment was January 17, 2022. At the time Plaintiff left her employment at BMW MC, her salary was $202,450 per annum. (Pl. Ex. 53). Plaintiff explained that other forms of compensation she received from BMW included certain bonuses, including a plant bonus, an individual bonus and a discretionary high-performer bonus, all of which she received in 2021 for performance in 2020 (Pl. Ex. 19); an automobile allowance; a 401K plan with matching funds paid by BMW MC; and a retirement investment account. (Pl. Ex. 19, 53, 54); (Def. Ex. 55).

Plaintiff agreed that BMW MC never reduced her salary, her personal grade or her job function level during her employment. Two weeks after she left BMW MC, Plaintiff began her job with Madewell Concrete as Head of HR at a starting annual salary of $150,000. (Tr. 3/13/26 at 24). Plaintiff worked for Madewell Concrete for only part of 2022; in August 2022, Plaintiff began new employment as Vice President and Chief Human Resources Officer at Greenville Spartanburg International Airport ("GSP"), with a starting annual salary of $175,000. (Def. Ex. 36). Plaintiff agreed that her position at GSP constitutes a higher-level position than she ever attained while employed at BMW MC. Plaintiff agreed her total compensation at GSP—which

would include bonus compensation, vehicle allowance and 401K employer match—had grown to $298,416.80 by 2024 and that she earned more at GSP in 2025 than she did in 2024. (Pl. Ex. 57).

Plaintiff next offered the testimony of John Gibson, a certified public accountant retained to determine the earnings Plaintiff might have if she had stayed in the same position at BMW versus the compensation or earnings she had after she left BMW. Mr. Gibson testified that he holds a bachelor's degree in accounting and economics from Wofford College and is a member of the American Institute of Certified Public Accountants and the South Carolina Institute of Certified Public Accountants. *See* (Pl. Ex. 62). Recently retired in 2025, Mr. Gibson last worked as a shareholder in Elliott Davis LLC where he led the forensic valuation litigation support team. The litigation support team performed business appraisals, income analysis, retirement account valuations and asset assessments for tax cases, merger and acquisition disputes, shareholder disputes, and family law cases. Mr. Gibson indicated that he has previously been qualified as an expert in the area of economic damages, and he presented a list of ten (10) cases in which he testified as an expert witness. (Pl. Ex. 62). Mr. Gibson testified that no court has ever refused to qualify him as an expert. He conceded that, prior to the instant litigation, he had never given expert testimony in an employment discrimination case; however, Mr. Gibson noted that he had previously been retained and offered opinions on cases that involved calculating lost income and lost wages and that there was nothing unique to calculating lost income that requires any special or additional training other than what Gibson acquired during his career.

BMW MC objected to Plaintiff's motion to qualify Mr. Gibson as an expert on the purported economic losses Plaintiff incurred in connection with the cessation of her employment at BMW, arguing that Mr. Gibson had "never been offered or testified as an expert in employment

litigation." The court overruled BMW MC's objection and found Mr. Gibson to be qualified to testify as an expert in the field for which he was proffered. In finding Mr. Gibson qualified, the court confirmed that the type of calculations he made and the methods he used to develop his report are consistent with and similar to the types of calculations Mr. Gibson made and presented in other cases for which he has been qualified to testify.

Mr. Gibson then testified about the findings and conclusions contained in his Report. (Pl. Ex. 62). With respect to back pay, Mr. Gibson measured Plaintiff's purported damages from January 18, 2022, the day following Plaintiff's last day of employment at BMW MC, to February 17, 2026, the first day of trial in this case. (Pl. Ex. 2 at 4). According to Mr. Gibson, Plaintiff's lost compensation totaled $1,246,952. *Id*. Mr. Gibson arrived at this amount using Plaintiff's base salary at BMW MC and applying an annual increase of 3.27% derived from the historical growth of her salary from 2017 through 2021. *Id*. at 5. Also included in this amount was "additional compensation" based upon annual bonuses received each year by Plaintiff; the BMW vehicle benefit for employees; BMW MC's 401(k) match of up to 6.00% of Plaintiff's base salary; and the employer-funded Retirement Income Account to which BMW MC contributes 8.00% of base salary for employees aged 50-54, 9.00% for employees aged 55-59, and 10.00% for employees aged 60 and above. *See id*. at 5–6. Mr. Gibson determined that this "additional compensation" averaged 30.36% of Plaintiff's base salary from 2017 through 2022. *Id*. at 5.

Mr. Gibson then reduced the lost compensation amount by $857,045 in compensation earned at Madewell Concrete and GSP. (Pl. Ex. 62 at C-1). In calculating this mitigating compensation, Mr. Gibson used Plaintiff's base salary at Madewell Concrete in 2022 and at GSP from 2022-2026. *Id*. Ultimately, Mr. Gibson opined that Plaintiff's lost compensation for purposes of back pay totaled $389,907. *Id*.

With respect to front pay, Mr. Gibson divided Plaintiff's claim into two components: "pre-retirement" front pay and "post-retirement" front pay. For his "pre-retirement" calculation, Mr. Gibson, assuming Plaintiff would retire at 60 years of age, measured Plaintiff's expected future compensation from February 18, 2026, to July 5, 2028, the date on which Plaintiff would turn 60 years of age. (Pl. Ex. 62 at ex.C-1). Mr. Gibson determined her future total compensation at BMW during this "pre-retirement" period would be $798,873; this amount was reduced by $621,737 in total compensation that Mr. Gibson determined Plaintiff would earn at GSP during this period, yielding a figure of $177,136 in lost future "pre-retirement" income. Mr. Gibson then discounted this total to present value for a final amount of $169,851. In making the "post-retirement" future income calculation, Mr. Gibson used the same methodology to make projections for a five-year period starting July 6, 2028, and concluding July 5, 2033. *Id*. This five-year period was intended to capture retiree medical payments that would have been paid by BMW MC which, discounted to present value, amounted to $45,360 according to Mr. Gibson.

BMW MC did not present any evidence during the economic damages hearing. BMW MC's case consisted of the cross-examination of Plaintiff and Mr. Gibson. During cross examination, Mr. Gibson conceded that he had issued multiple revised reports during the litigation of this matter. He indicated that there were several reasons for the revised preliminary reports, including the receipt from Plaintiff of supplemental information, his discovery of errors, and his substantial revision of his calculations after reviewing a report issued by BMW MC's economic expert. As BMW MC did not call its economic expert at the hearing, his report is not in evidence and is not before the court. Mr. Gibson agreed that he did not factor "causation" into his calculations but noted that, for his analysis, it did not matter whether Plaintiff was fired or voluntarily resigned because he had been engaged solely to determine what Plaintiff would have

received had she stayed in the same position at BMW versus what she made in alternative employment. As for front pay, Mr. Gibson acknowledged that he assumed an uninterrupted BMW MC career path and did not include risk for voluntary departure, restructuring or performance changes in his model; agreed the bonuses he projected Plaintiff to receive in the future are discretionary in nature; conceded that his front pay determination did not account for employment risk; and agreed that he did not take into account the mitigating effect of income from the South Carolina Retirement System because, based on the information Mr. Gibson received, he concluded Plaintiff would not be eligible to receive it at age 60— the age she gave for her intended retirement from BMW.

Plaintiff seeks to recover a total of $605,118 in economic damages, consisting of $389,907 in back pay; $109,851 in pre-retirement front pay; and $45,360 in post-retirement front pay. BMW MC, on the other hand, contends that Plaintiff is not entitled to any back pay because she resigned voluntarily and that she should not be awarded front pay because such an award would amount to a windfall and would be based on unreasonable speculation.

**III. Discussion**

**A. Back Pay**

Title VII provides that if a court finds that a defendant has intentionally engaged in an unlawful employment practice, "the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer . . . ), or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). "Title VII's philosophical purpose is to provide remedies to make victims of discrimination whole." *Banks v. City of Virginia Beach*, No. 2:24-cv-149, 2025 WL 2856523, at *1 (E.D. Va. Oct. 8, 2025). Back pay should "make the victims of unlawful

discrimination whole" by restoring them, "so far as possible . . . to a position where they would have been were it not for the unlawful discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).

"[B]ack pay is a core component of make whole relief, and is presumptively available to those injured by an unlawful employment practice." *United States v. Baltimore Cnty., Maryland*, Civ. No. CCB-19-2465, 2021 WL 2000480, at *8 (D. Md. May 19, 2021); *Banks,* No. 2:24-cv-149, 2025 WL 2856523, at *1 ("The United States Supreme Court has recognized that back pay should presumptively be awarded to prevailing plaintiffs in Title VII cases." (citing *Albemarle Paper Co*., 422 U.S. at 421)). Back pay should only be denied for reasons which "would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co*., 422 U.S. at 421. An award of back pay, however, should not result in a "windfall" to the plaintiff. *See, e.g*., *McMurray v. Tallant*, No. 20-cv-0919-TDC, 2025 WL 1489636, at *10 (D. Md. May 23, 2025) (citing *Cline v. Roadway Exp., Inc*., 689 F.2d 481, 490 (4th Cir. 1982)), *appeal dismissed*, No. 25-1782, 2025 WL 4038019 (4th Cir. Aug. 29, 2025). Accordingly, a back-pay award is subject to a plaintiff's duty to mitigate damages and must be offset by the amount of any "earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1); *see Brady v. Thurston Motor Lines, Inc*., 753 F.2d 1269, 1273 (4th Cir. 1985) ("[T]he right of a successful Title VII plaintiff to claim back pay is limited in degree by the statutory duty to mitigate employer damages, and . . . [42 U.S.C. § 2000e–5(g)].").

Back pay is calculated by totaling the employee's lost wages and benefits, less amounts earned through other employment or wages that could have been earned through "reasonable diligence." *EEOC v. Key Mgmt. Partners, Inc*., No. 21-cv-02496-PX, 2024 WL 4569875, at *2

(D. Md. Oct. 24, 2024) (quoting 42 U.S.C. § 2000e-5(g)(1)). Typically, a back pay award is calculated by determining "the difference between what the employee would have earned had the wrongful conduct not occurred . . . and the actual earnings during that period." *Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730, 760 (E.D. Va. 2016) (internal quotation marks omitted). In determining back pay, "the Court should include other kinds of employment compensation, such as fringe benefits and reasonably anticipated salary increases, in addition to plaintiff's base wages or salary." *Id.* at 747 (citing *Long v. Ringling Bros.-Barnum & Bailey Combines Shows, Inc.*, 9 F.3d 340, 343 (4th Cir. 1993). The back pay period is ordinarily calculated from the date the discrimination occurred until the date the discrimination is remedied—typically the date judgment is entered. *Crump*, 205 F. Supp. 3d at 742. In cases where, as here, the plaintiff was not terminated or constructively discharged but voluntarily resigned, courts have "[begun] the back pay calculation at the point when [the] plaintiff begins to suffer financial loss" as a result of the unlawful employment practice. *Id.* at 743; *see Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651–52 (4th Cir. 2002) (affirming award of backpay for plaintiff who quit voluntarily immediately after being denied a promotion). Significantly, the Fourth Circuit Court of Appeals has declined to follow the majority rule barring an award of back pay for an employee who voluntarily quits his job unless the circumstances amounted to a constructive discharge. *See Dennis*, 290 F.3d at 651 ("In reviewing awards of back pay, the Fourth Circuit does not apply the 'constructive discharge rule' denying such pay to persons who leave an employer who has committed intentional discrimination unless it is under conditions of a constructive discharge."); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir. 1981). Instead, the Fourth Circuit "simply appl[ies] the general statutory duty located at 42 U.S.C. § 2000e–5(g) to mitigate employer damages." *Dennis*, 290 F.3d at 651.

Plaintiff bears the burden of proving the amount of back pay to which she is entitled. *Crump*, 205 F. Supp. 3d at 761. Damages under Title VII must be established with reasonable certainty, *Pittington v. Great Smoky Mountain Lumberjack Feud*, LLC, 880 F.3d 791, 799 (6th Cir. 2018) (internal quotation marks omitted), but mathematical certitude is not required, *MacGregor v. Mallinckrodt, Inc., et al*., No. 01-828, 2003 WL 23335194, at *5 (D. Minn. July 21, 2003), *aff'd*, 373 F.3d 923 (8th Cir. 2004) ("[Title VII] damages need only be proven to a reasonable degree of certainty and mathematical precision is not required."). The employer "bears the burden of demonstrating that the plaintiff has failed to fulfill the duty to mitigate." *Miller v. AT & T Corp*., 250 F.3d 820, 838 (4th Cir. 2001).

The jury in this case found that BMW MC discriminated against Plaintiff on the basis of her national origin. Plaintiff testified at the economic damages hearing that she ultimately resigned her long tenure at BMW MC because she had been discriminated against. The court found her testimony to be credible and consistent with the evidence presented at trial and the economic damages hearing. Although the evidence reflected that Plaintiff had engaged a recruiter to identify potential jobs shortly before learning that she would be replaced in her TX-60 position by a German, the court finds that Plaintiff would not have resigned from BMW MC absent the discriminatory conduct.[2]

**_Dennis_ and _Spagnuolo_**

As *Dennis* and *Spagnuolo* both make clear, in this circuit an employee who suffers discrimination and then voluntarily resigns may still be entitled to recover back pay; constructive

[2] In so concluding, the court is mindful that "[w]hen a party exercises their right to a jury trial on an issue, courts must resolve any equitable claim in light of the jury's determination of the legal claim." *Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am*., 16 F.3d 410, at *3 (4th Cir. 1994), *cert. denied*, 464 U.S. 826 (1983). "The facts on which the judge bases his equitable relief must not contravene the facts as found by the jury." *Id*. at *3 (4th Cir. 1994).

discharge is not required. *See Dennis*, 290 F.3d at 651; *Spagnuolo*, 641 F.2d at 1114. BMW MC's position, however, seems to be that *Dennis* and *Spagnuolo* are limited to the fact patterns presented in those cases. In *Dennis*, the plaintiff resigned her position immediately after she did not receive a promotion to a supervisory position that was awarded instead to a male applicant. After quitting her job, the *Dennis* plaintiff sought and obtained comparable alternative employment where she earned more than she would have earned in her old job over the three-year period leading up to trial. The Fourth Circuit concluded that the *Dennis* plaintiff had *reasonably mitigated* Defendant's damages and affirmed an award of back pay. *Id*. at 652–51. In doing so, the *Dennis* court noted that the facts before it were parallel to those in *Spagnuolo*—where the plaintiff had voluntarily resigned his position for higher pay—and, as a result, found the plaintiff in *Dennis* also to have mitigated the defendant's damages. *See id*.

BMW MC argues that because Plaintiff here did not leave BMW for a higher paying job and, therefore, does not present an identical fact pattern to those presented in *Dennis* and *Spagnuolo*, she may only recover back pay by establishing constructive discharge. This court cannot agree. BMW MC reads these opinions too narrowly. *Dennis* makes clear that the question is simply whether a plaintiff has fulfilled the duty to mitigate the defendant's damages; it does not state that the Fourth Circuit follows the constructive discharge rule outside of the circumstances presented in those cases. Thus, Plaintiff does not have to establish constructive discharge to recover back pay. Rather, she must show that she discharged her duty to mitigate economic damages resulting from the discrimination.

**Mitigation**

The duty to mitigate requires a plaintiff to be reasonably diligent in "seeking and accepting new employment substantially equivalent to that from which he was discharged." *Duvall v. Novant*

*Health, Inc.*, 95 F.4th 778, 793 (4th Cir. 2024) (internal quotation marks omitted). BMW MC argues that Plaintiff failed to mitigate damages here because she accepted a job paying an annual salary of approximately $50,000 less than she had been making at BMW MC. Instead, BMW MC contends Plaintiff could have fully mitigated her damages by remaining in the Department Manager level position to which BMW MC intended to transfer her until comparable employment became available.

"Comparability in salary," however, "is only one fact to be considered" in determining the reasonable comparability of alternative employment for purposes of mitigation. *Williams v. Albemarle City Bd. of Ed.*, 508 F.2d 1242, 1243 (4th Cir. 1974). "Comparability in status is often of far more importance—especially as it relates to opportunities for advancement or for other employment—than comparability in salary." *Id.* BMW MC has not offered any authority indicating Plaintiff was required to remain employed at BMW MC where she experienced discrimination rather than accept the top HR position at Madewell Concrete in order to mitigate damages. BMW MC did not present any vocational or market evidence demonstrating that Plaintiff could have earned more elsewhere than she did at Madewell Concrete from the time she resigned at BMW MC until she began working at GSP. And, there is no evidence establishing that GSP would have hired Plaintiff had she not previously been head of HR— a position she held only at Madewell Concrete. Based on the testimony and evidence presented both at trial and at the damages hearing, the court finds that BMW MC has not carried its burden of showing that Plaintiff failed to mitigate damages.

**Calculation**

As noted, the court qualified Mr. Gibson as an expert in the area for which he offered testimony. The court concludes that the methodology he employed was reasonable and generally

accepted. Mr. Gibson's conclusions with respect to *back pay* accurately calculate Plaintiff's damages to a reasonable degree of certainty and are not unduly speculative. BMW MC has not offered opposing evidence or testimony, expert or otherwise, challenging Mr. Gibson's back pay calculations or suggesting an alternative amount besides arguing Plaintiff was entitled to no damages. Accordingly, the court adopts the back pay amount determined by Mr. Gibson of $389,907 and awards Plaintiff back pay in that amount.

**B. Front Pay**

As noted herein, the purpose of the remedies available for a violation of Title VII are intended to "place a plaintiff in the position she would have occupied but for the discriminatory conduct." *Saulsberry v. Savannah River Remediation, LLC*, CA No. 1:16-cv-02792-JMC, 2020 WL 264259 at *5 (D.S.C. Jan. 17, 2020) (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1422–23 (4th Cir. 1991)). "Reinstatement and front pay provide ways for a court to achieve that goal by rectifying losses that will be realized from the time of judgment moving forward." *Id*.

Reinstatement is the preferred remedy in this Circuit. *Duke*, 928 F.2d at 1245. However, reinstatement is not always a viable, particularly where "intervening historical circumstances . . . make it impossible or inappropriate." *Id.* at 1243. The Fourth Circuit has noted that reinstatement may be inappropriate when the employer has demonstrated 'such hostility that, as a practical matter, a productive and amicable working relationship would be impossible'"; "when the litigation itself created such animosity between the parties that any potential employer-employee relationship was irreparably damaged[;] . . . or where there is no comparable position available." *Id*. (quoting *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir. 1985), *cert. denied*, 474 U.S. 946 (1985)).

In her Amended Complaint, Plaintiff requested "make whole relief such as reinstatement to her former position and level" along with other forms of relief. (ECF No. 20 at 16). However, such Amended Complaint was filed in February 2023, several years before the multiple failed mediations and contentious week-and-a-half-long jury trial. At the juncture of trial and post-trial hearings, neither party asserted that reinstatement would be amenable or practical. As a practical matter, it has now been over four years since Plaintiff worked for Defendant. In that time, though there has been a lot of turnover in the HR Department at BMW MC, several individuals that were at least tangentially involved in the factual scenario that lead to this lawsuit are still employed with Defendant in high level positions – Dr. Robert Englehorn (President and CEO) and Sherri McCraw (VP of HR). If Plaintiff was to be reinstated in a comparable position from which she resigned in January 2022, she would directly report to Ms. McCraw, who would directly report to Dr. Englehorn. However, the adversarial nature of trial and of the testimony presented to discredit each side's theory of the case undoubtedly created some hostility between Plaintiff and these individuals, which would make reinstatement impracticable. From Defendant's perspective, Dr. Englehorn and Ms. McCraw both testified at trial that following Plaintiff's resignation, the company was left in a lurch due to unexpectedly losing Plaintiff's many years of insight and experience, and according to both witnesses, it took months for the company to recover from Plaintiff's abrupt departure. From Plaintiff's perspective, she testified that she suffered physically and mentally as a result of the Defendant's discrimination against her, and the jury ultimately determined that she did suffer and awarded her compensatory damages to that effect. Additionally, testimony at trial indicated that Plaintiff's former position, or one with a comparable function level and personal grade, may not be available for her to fill. Accordingly, the court finds that based on the facts and circumstances of this case, reinstatement is not an appropriate remedy.

As reinstatement is not a viable option, the court may consider an award of front pay, and such "award, as an adjunct or an alternative to reinstatement, must rest in the discretion of the court in shaping the appropriate remedy." *Duke*, 928 F.2d at 1424 (4th Cir. 1991). "[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). While it is in the discretion of the district court whether to award front pay and, if so, in what amount, the Fourth Circuit has cautioned that the district courts "must 'temper' the use of front pay by recognizing the 'potential windfall' to the plaintiff." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009) (quoting *Duke*, 928 F.2d at 1424)). Accordingly, because of the potential for front pay to have an "unfair windfall for the plaintiff, it must be granted sparingly." *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 392 (D. Md. 1997).

As with other equitable remedies, front pay is intended simply to make the plaintiff whole. Accordingly, such relief may be awarded to "bridge a time gap when the court concludes the plaintiff is reasonably likely to obtain other employment." *Duke*, 928 F.2d a5 1424. In other words, when deemed appropriate, an award of front pay should be "for a reasonable future period required for the victim to reestablish her rightful place in the job market." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984). Additionally, while front pay is intended to give the plaintiff the time needed to seek and obtain other employment, such employment need not be identical to the plaintiff's prior employment; instead, courts have considered the time needed for plaintiffs to secure comparable employment opportunities. *See, e.g. Saulsberry*, 2020 WL 264259 at *9 (D.S.C. Jan. 17, 2020) (concluding that the duration of front pay represented sufficient time for the plaintiff to "obtain comparable employment" or " 'retraining … if that course is the one more suited to making . . . her whole[]") (quoting *Duke*, 928 F.2d at 1424)); *Ford*, 984 F. Supp. At 392

(determining that the duration of front pay gave the plaintiff time to "seek reasonably comparable employment").

Plaintiff's last day of employment with Defendant was January 17, 2022. The jury returned its verdict, and judgment was entered on February 25, 2026. (ECF Nos. 216, 217). Prior to leaving her position with Defendant, Plaintiff secured a position with Madewell Concrete, and she began working for Madewell on January 31, 2022. It is undisputed that her salary at Madewell was a reduction in pay in relation to her position with Defendant. However, on July 1, 2022, she received an offer for a position with GSP as the Vice President—Chief Human Resources Officer. (Def. Ex. 36). According to Plaintiff's testimony at trial and at the damages hearing, she accepted this position and began working at GSP in August 2022. Plaintiff still remains employed with GSP.

At the March 13, 2026, hearing, the court heard evidence regarding Plaintiff's compensation packages both during her last year with BMW and over her last three years with GSP. The evidence reflects that in 2021, Plaintiff's last full year with BMW MC, her total compensation package was $266,999.73. (Def. Ex. 55 at Bates No. BMW MC 001914). In 2023, her total compensation at GSP amounted to $266,608.88, with $203,631.85 being her total earnings not including her employer-paid benefits and taxes. (Def. Ex. 52). In 2024, her total compensation at GSP amounted to $298,416.80, with $221,864.84 being her total earnings not including her employer-paid benefits and taxes. (Dev. Ex. 52). For 2025, the evidence presented included information only through November 26, 2025, with such showing that Plaintiff's total compensation at GSP amounted to $271,676.88, with her total earnings not including her employer-paid benefits and taxes being $195.322.40. (Def. Ex. 52). However, at the hearing, Plaintiff confirmed that her earnings for 2025 were greater than her earnings in 2024. Additionally, the table provided as Exhibit C-3 to Plaintiff's Expert's Report indicated that Plaintiff's total

mitigating compensation (earnings) for 2025 was $245,989. (Def. Ex. 41, Ex. C-3; Pl. Ex. 62, Ex. C-3). Accordingly, compensation-wise the court finds that Plaintiff's present position with GSP represents comparable employment to her position she held with BMW MC, at least as of February 18, 2026, the date listed in Plaintiff's expert's final report as the beginning of his front pay analysis, (Def. Ex. 41 at 4). Additionally, from a human resources perspective, it is uncontested that Plaintiff now holds the highest position in her department—the Vice President of Human Resources—which is at least comparable, if not more esteemed than her position as a manager in human resources with Defendant. In fact, at the March 13 hearing, Plaintiff confirmed that her current position is a higher-level position than she ever attained while under BMW MC's employ. Accordingly, the court finds that Plaintiff has already obtained comparable employment to that which she held with Defendant at the time of her departure.

By their very nature, front pay awards are forward-looking, as they seek to make the plaintiff whole for the time "between judgment and reinstatement or in lieu of reinstatement." *Pollard*, 532 U.S. at 846. However, as noted herein, by the time of judgment in this case, Plaintiff had already secured comparable employment with GSP Airport. Accordingly, the court finds that an award of front pay in this case would result in an unfair windfall for Plaintiff, as any discrepancy between her pay status with BMW MC from the time of her departure and up until the time she found comparable employment is already included in the award of backpay. Therefore, the court declines to award front pay in this case.

## IV. Conclusion

For the reasons set forth above, the court **AWARDS** Plaintiff $389,907 in **BACK PAY** and **ORDERS** that the Amended Judgment (ECF No. 236) be further **AMENDED** to reflect this amount.

The court **DECLINES**, however, to award **FRONT PAY**. As noted herein, the court will address attorneys fees and costs by way of a separate order once all briefing has concluded on post-trial motions.

**IT IS SO ORDERED**.

s/Timothy M. Cain
Chief United States District Judge

Anderson, South Carolina
April 6, 2026

AO 450 (SCD 11/2011) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | | |
|---|---|---|
| Kelly Dawsey<br>*Plaintiff*<br>v.<br>Bayerische Motoren Werke Aktiengesellschaft, and BMW Manufacturing Co., LLC<br>*Defendant(s)* | ) ) ) ) ) | Civil Action No. 7-22-cv-3738-TMC |

**SECOND AMENDED JUDGMENT IN A CIVIL ACTION**

The court has ordered that:

❒ the plaintiff Kelly Dawsey recover from the defendant BMW Manufacturing Co., LLC the amount of Three Hundred Thousand dollars ($300,000.00) plus post judgment interest at the rate of 3.5 % along with costs.

the plaintiff Kelly Dawsey recover from the defendant BMW Manufacturing Co., LLC the amount of Three hundred eighty-nine thousand, nine hundred seven and 00/100($389,907.00) in BACK PAY plus post judgment interest at the rate of 3.69% along with costs.

This action was:

❒ decided by the Honorable Chief Judge Timothy M. Cain, judgment amended by order (ECF 238) following a post-trial hearing on economic damages. (ECF No. 226).

Date: April 6, 2026

*ROBIN L. BLUME, CLERK OF COURT*

s.A. Marler

*Signature of Deputy Clerk*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KELLY DAWSEY, | ) | Ca. NO. 7:22-CV-3738 |
| | ) | GREENVILLE, SC |
| Plaintiff, | ) | MAY 13, 2026 |
| VERSUS | ) | |
| BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP | ) | |
| DEFENDANTS. | ) | |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
JURY TRIAL
VOLUME III

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

(Whereupon, the hearing commenced at 10:43 a.m.)

THE COURT: Good morning.

All right. Let's go on the record. This is the matter of Dawsey v BMW, case 7:22-3738. This matter is before the Court for a hearing on the post-trial motion of BMW MC for a judgment as a matter of law, and in the alternative for a new trial, and also Ms. Dawsey's motion for production of invoices from defense counsel. We will take up the motion of BMW first and I will be glad to hear from you.

MR. MOODY: Thank you, Judge Cain, may it please the Court; Randy Moody on behalf of BMW MC. As this Court introduced, we are here today for the hearing on a motion for judgment as a matter of law and new trial. Judge, I will try to be brief because I know you have allowed us to brief these issues extensively, so I will try to be brief and simple.

In aiding that brevity and simplicity, instead of projecting what Randy thinks about what a case says, I would like to pass up to Your Honor and your clerk the Duvall case, which I am going to look at page 12 specifically. And I also have just an outline instead of shooting it up on the board, I am old-fashioned and like to touch stuff, so if I may approach to hand these.

THE COURT: You provided this to Mr. Murphy?

MR. MOODY: Yes, yes, Your Honor.

THE COURT: I don't usually keep a cough drop, but I am doing that today, so I hope you will forgive me.

MR. MOODY: No worries, Your Honor. Think I had to take asthma medicine in the midst of an argument, so I completely understand.

Thank you, Your Honor.

BMW's post-trial issues, this would be on the first slide, Your Honor, essentially we have summarized as four quick and unique issues for this Court, which as indicated, have been briefed extensively. For purposes of this morning, the overview of the arguments are number one the punitive damages; number two, discrimination; the third issue is the admission of the Expat Guidelines; and then the fourth issue is adverse action jury instruction. Judge, for the majority of my brevity this morning, it is going to be on the first two issues, punitive damages and discrimination, as I know the others have been briefed extensively, the remaining two.

So, Judge, on the punitive damages issue, this is an issue that you have heard from Mr. McCoy several times during the trial, but we want to focus on the issue of perceived risk and how the Fourth Circuit has outlined the standards for punitive damages in Title

VII cases. And what we have tried to do on the third slide in the slide deck is to just provide the Black Letter guidance from the *Kolstad* decision, at the United States Supreme Court, and then the *Duvall* decision from the Fourth Circuit that came down in 2024 and we think is the decision that is controlling for purposes of our Circuit.

But, Judge, as you know, in Kolstad, the Court stated:

"An employer can be liable for punitive damages only through proof that it acted, quote, in the face of a perceived risk that its actions would violate federal law."

And that is from the United States Supreme Court in 1999 *Kolstad*.

What we also have recently in the past several years from the Fourth Circuit is the *Duvall* decision and we have included some operative language from that decision that says:

"Where a Plaintiff, quote, never elicited from" -- and we added the bracketed term "the decision-maker" end bracket, "testimony establishing his personal knowledge of federal

anti-discrimination law, let alone that he perceived a risk that his decision to fire, bracketed, the plaintiff, would violate it," the Fourth Circuit reversed an award of punitive damages.

So, this issue of perceived risk is language that comes from the United States Supreme Court applied by the Fourth Circuit in the *Duvall* decision. Your Honor, I did hand up the *Duvall* decision and this, for purposes of the decision I handed up, it is, of course, 95 F.4th 778, and it is a 15-page printout that I have provided to the Court, but the operative language on punitive damages occurs on the paginated printout page 12 at the bottom and goes into page 13. And I think that is at 792, it would be 95 F.4th 792. And that language, basically after the Court affirmed a jury award of intentional discrimination from an executive at Novant Health due to what appeared to be DEI initiatives and his replacement and termination because of that, that decision speaks at length about that intentional discrimination. But when it gets to punitive damages, the Court pivots and the language says:

"The jury's award of punitive damages, however, is a different

matter."

And the Court says:

"A successful Title VII plaintiff may only recover in limited circumstances."

And they bracket and cleanup their test, and the first one is unlawful intentional discrimination. But the second factor, Judge, the Court says, in quoting Auto Zone -- *Ward* versus *Auto Zoners:*

"The Plaintiff must show that the employer engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. That is, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law."

Now, the rest of that page reminds us that punitive damages are an extraordinary remedy, that the Court does not water down this high standard imposed on the plaintiff, and that Congress's clear directive is that punitive damages are, quote, not to be awarded automatically in every successful Title VII suit.

So, as we look at this case and the record in this case, the documents and the testimony, what is the evidence of a perceived risk by the decision makers here? The only testimony that we could find in the record, Your Honor, from a decision-maker at BMW MC came from Christine Petrasch on direct examination, and we have cited that trial transcript, it was on the 20th of February located at pages 43, lines 2 through 7. And essentially the question was, did you have access to the policies that were in place at BMW MC? And her response on line 6 and 7 was, "we have an associate handbook and the associate handbook is what we normally use for policy."

Now continuing on, regarding Ms. Petrasch, we have on that same day, pages 87 through 88, and that is 87, line 17 through page 88, lines 11. And we have given the Court the actual pictures from the transcript Ms. Bull provided for us and the question is:

"Ms. Petrasch, you testified earlier that when you -- during the time period you were at BMW MC you had access to policies and I believe you referenced the associate handbook."

She responds, "yes."

"Question: Did BMW Manufacturing have a policy that prevents discrimination?

Answer: Yes, it is part of the associate handbook.

Question: And do you know if that policy prevents discrimination based on national origin?

Answer: Yes.

Question: Does it prevent discrimination based upon race?

Answer: Yes.

Question: Does it prevent discrimination based on sex?

Answer: Yes.

Question: When you were at BMW MC, did the Human Resources Department conduct training on the nondiscrimination policy?

Answer: Yes, we got training. HR did it together with the legal department."

So, the testimony here is, yeah, we have policies, but it is not getting to the second element of malice, reckless indifference in the face -- and the

perceived risk.

THE COURT: Did you make this argument in your Rule 50(a) motion?

MR. MOODY: Yes, Your Honor. I believe Mr. McCoy did incorporate this in the 50 motion regarding that this is not a punitive damages case.

THE COURT: All right. Go ahead.

MR. MOODY: Yes, sir. And as to the perceived risk issue, the remaining evidence cited by Plaintiffs to establish the perceived risk came from the Plaintiff's testimony herself. And Judge in the trial transcript on the 18th, this is also on page 88, line 15 through 89, line 15, this was the Plaintiff's testimony, and not any testimony from a BMW decision-maker, whether it be Dr. Englehorn, Ms. Petrasch or Ms. McCraw.

So we have given you that cutting and Ms. Dawsey recognizes that there are policies there. Your Honor may recall that she never made a complaint nor walked down to legal to discuss this issue and so she affirms in that cutting that HR has policies and training was done by the legal department. So, and she says that Christine Petrasch was ultimately responsible for administering those policies.

So, Judge, when we look at the law in *Duvall*,

*Duvall* in the Fourth Circuit requires evidence of the decision maker's personal knowledge. Plaintiff's own testimony is not sufficient to establish the risk perceived by the decision makers. And what we have from a record standpoint is a lack of evidence of the risk perceived by the decision makers. And Plaintiff's counsel did not elicit any testimony from the decision makers at BMW MC related to the personal knowledge of federal anti-discrimination law as it pertains to this case or that they perceived a risk that the transfer of Plaintiff would violate federal anti-discrimination law. And based on the holding in *Duvall*, Your Honor, we maintain that Plaintiff has not met the high burden to prove punitive damages and that the award must be set-aside because that second element of the punitive damages of malice, reckless indifference and essentially that the courts apply the standard of perceiving the risk that that burden has not been met here.

THE COURT: All right.

MR. MOODY: As to the second issue, Title VII discrimination. As Your Honor knows under 42 USC 2000e-2 sub-paragraph (a)(1), the Plaintiff must show discrimination as to, quote, his compensation, terms, conditions, or privileges of employment, and that is end

quote.

Your Honor is aware that this Court set-aside the R&R in this case and in that period of time that the *Muldrow* decision came down from the U.S. Supreme Court also in 2024. And in that case, specifically on page 144 Supreme Court 974, the Court stated, quote:

"To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment," period end quote.

Your Honor, we all recognize that we are all plowing ground here under the *Muldrow* standard, and cases are popping up here and there as time passes from that decision and as the Supreme Court has given us all of the task of figuring this out. But as we look at this case in the context of *Muldrow*, what is the identifiable, in quotes, what is the identifiable term or condition of employment here? Your Honor provided us a Summary Judgment Order, it is ECF 119 at page 14, and we have supplied that cutting from Your Honor's Order. And that cutting, as we have highlighted in the slide deck says:

"By contrast, there is sufficient evidence to show that the TX-64 was

an established position with an assigned FL and compensation range."

And then the opinion goes on to state:

"No speculation is required to determine that a transfer from TX-60 to TX-64 would be a demotion."

So, let's look at what was the assigned function level of TX-64 in the next slide. The assigned function level of TX-64 and the guidance provided by this Court in the Summary Judgment Order, the evidence in this case shows that during the operative period before Ms. Dawsey's resignation in her direct exam, the trial transcript of the 18th, page 66, lines 7 through 12, it establishes that the position as of May 1st, 2019, Scott Medley was in it. And my question to her was, what function level is it provided or perhaps that was Mr. Murphy? And the answer was, function level 3. And we look at trial exhibit 13, which I am sure this Court is aware those exhibits were used extensively, we have the function level three and the department code at 64.

So, it is an assigned function level, but at the operative time was a function level three. And then so we get to the question of the identifiable term or condition of employment, we have the function level at

three, the loss of compensation on the next slide. On Plaintiff's direct exam, the trial transcript of the 18th, page 53, lines 16 through 24, the question was:

"What effect would this policy have on your compensation at BMW?"

And this is an important answer, Your Honor, we highlighted several segments of what Ms. Dawsey -- how she responded. And she responded:

"So, I would have either applied to row two or row three. I would go to a salary impact column where there would have been no change during the retention period. Retention period would have either been one year or three years and it depends on where my salary was in the range as to what the impact was. And that I cannot answer."

So, Plaintiff testified essentially, Your Honor, that she could not answer about the impact on the loss of compensation and that it would be a retention period of one to two -- or three years. So, that takes care of the loss of compensation issue.

So, what about impaired prospects for promotion? And is that an identifiable term or

condition of employment that is recognized by the *Muldrow* decision and at play here? On Plaintiff's cross-examination, the trial transcript from the 19th on pages 61, line 11, through page 62, line 1, we have discussion of the promotion. And I know Your Honor recalls that in this case we have an issue that was testified to extensively about the validation process at BMW regarding promotion from a level three to promotion to a level two. And that there are very few level twos at play here. So, the question on line 23 was, in her cross-examination:

"To reach the high level of function level two, you said there were around ten or so in Spartanburg that you had to go through this validation process, right?"

The answer was, "correct."

And, again, the testimony before that deals with the validation process and function level two employee issue.

On the next page, again, regarding testimony and/or evidence regarding prospects for promotion in the trial transcript on the 19th during Plaintiff's cross-examination on page 46, lines 20 through 21, the question was:

"Ma'am, did you expect to be in
TX-60 forever?"
The answer was.
"I expected to be in TX-60 until I
retired, yes."

And, again, the trial transcript on the 19th, pages 62, lines 12 through 15, give us additional information, as you may recall Your Honor about the invitation to the office of the prior CEO, her answer was:

"I didn't consider an invitation to
his office as an invitation for
validation. Validation is a formal
process."
Question: "And you didn't -- okay.
So the President and the CEO, you
didn't view this as an invitation
comma, fine. You didn't pursue
the validation process with
Christine Petrasch, did you?"
Answer: "I did not."

So, regarding the prospects for promotion, Your Honor, there is a validation process that she did not pursue. So, we have uniqueness here that there is no harm to an identifiable term or condition in this case.

We maintain, as we have continuously, Your Honor, that Plaintiff has failed to meet her burden under *Muldrow* to establish, quote, unquote, some harm to an identifiable term or condition of employment.

So, three quick points on that: At the time of her resignation, it is undisputed that Plaintiff was still in the TX-60 position, so there was no actual harm to her. Second point, at the time of her resignation, TX-64 position was designated as function level three. Third point, Plaintiff was unavailable to identify when or if she would suffer any change to her compensation upon a transfer to TX-64, and we provided that testimony from the Plaintiff herself.

And essentially, Your Honor, we continued to maintain that Plaintiff's allegations of, quote, unquote, some harm, all require speculation. And we believe, as does the courts have stated, that the jury and this Court is not permitted to speculate about harm that might have occurred had Plaintiff not resigned.

So, Judge, that addresses the discrimination issues. Happy to address any questions about that subject.

THE COURT: Go ahead.

MR. MOODY: All right. The additional issues that are addressed in the motion, Your Honor, that we will

just rely on the written work, would be the admission of the Expat Guidelines, just some quick ones to incorporate what we have written. First, they were prepared by the Plaintiff in January of 2016; second, there is no evidence that any decisionmaker was aware of the document in 2021; third, the document makes no reference to national origin of employees, it references, quote, unquote, domestic versus, quote, unquote, international; and the fourth point that we incorporate from our writings would be that it is prejudicial to BMW MC to admit it into evidence, it was drafted by her in 2016, it wasn't evidence that the decision-makers even knew that this existed.

And as to the fourth issue, the adverse action jury instruction, we would rely on our writings there, as well, with just two quick points. We believe that the instruction misstated the legal standard under *Muldrow*, and the jury -- secondly, the jury question during deliberation evidenced that confusion.

And I am happy to address any questions that the Court may have.

THE COURT: Thank you. You have talked about the *Muldrow* case extensively today and at one point the Magistrate Judge asked the parties to brief what impact, if any, the *Muldrow* case would have on this action and

I am looking at the supplemental brief of BMW Manufacturing filed at ECF 111, and the brief acknowledges the invitation by the Magistrate Judge to address the applicability of the *Muldrow* case, and BMW said quote:

"As set forth below, the *Muldrow* decision is inapplicable to this case because Plaintiff was never transferred by BMW MC."

It went on to say that:

"The facts in *Muldrow* are fundamentally different than those presented in this case."

And, of course, reiterated the Defendant's position. But, again, in that brief, BMW said the *Muldrow* decision is not applicable to this case and the facts in *Muldrow* are fundamentally different than those presented in this case. So, how do you square that?

MR. MOODY: I will do my best, Your Honor. We still maintain that notice of a potential future action is not an adverse employment action. So, in the *Muldrow* case, the facts indicated, and I believe it was a police or fire situation --

THE COURT: You said facts in *Muldrow* don't have anything to do with the facts of this case.

MR. MOODY: Because they are different. In the *Muldrow* case she was losing a vehicle, she was being transferred to a different position that took away authorities that she had and they were able to elicit and put, here is how I am being impacted, boom, boom, boom. In this case, Ms. Dawsey resigned before anything happened. Yes, there was a plan to -- part of a reorganization, a complete departmental reorganization, that didn't happen because she resigned. So, we believe that these are fundamentally different type cases. And, you know, we disagree with the fact that *Ricks* and *Chardon* stand for the position that notice of something is an adverse employment action for all of the reasons that we have stated before. Those are Constitutional cases involving public education and the contractual rights that arise there. Those were notices of an actual termination. So, that is the operative difference, Your Honor. It is a notice of an adverse employment action in the *Ricks Chardon* situation versus a notice of a reorganization and transfer and how we want the department to look in the future but never occurred.

THE COURT: Thank you.

MR. MOODY: Thank you, Your Honor.

THE COURT: Mr. Murphy.

MR. MURPHY: Thank you, Your Honor, good morning.

THE COURT: Good morning.

MR. MURPHY: Your Honor, what you just heard is sort of a continuation of the defense strategy in this case and that is to try to just flip the burden of this case completely on its head. Their arguments all boil down to, if they have got some evidence or they put up some testimony to support their case then they must win and that gets it completely backwards. But as I go through the evidence that he is pointing to today, it doesn't rally help them. But if it is a fact that doesn't go BMW's way, they just ignore it. I mean, they got up here and we will go through, he said there is absolutely no evidence of perceived risk. We recounted the evidence of the perceived risk, he just won't address it. Like he won't address the law, like *Herkert*. You didn't hear him say *Herkert* one time in this case, but that goes right to the *Muldrow* issue, which he says is so key, but they don't address facts that go against them and they don't agrees the law that goes against them.

When I point out they don't preserve an issue, they say, yes, we did because we say we did. And I will go through that because your question was that, they did

not preserve this punitive damage, they just gave you a stream shot of pages, and I am going to go through those pages because something isn't so just because they come into court and saying it is so.

For example, Kelly Dawsey created the Expat Guidelines; no, she didn't. There is no evidence of that. They just keep coming into court and keep saying it, and that is not the basis of any valid judgment as a matter of law.

Let me start with the punitives and I will start right with the preservation issue. BMW's punitive damage argument was limited to the arguments as to whether it intended for Dawsey to resign, that is the only argument they made about punitive damages on their 50(a) motion. So, they give you cites to different pages, and I think it is interesting that they handed up to you excerpts of these transcripts to show you what was said because if I was accused of not addressing an argument to this Court and I had a transcript, I would quote myself and say, look, here is where I did it, but they don't do that, do they?

First they cite page 116 of that February 24th transcript. On page 116, the only person talking about *Duvall* is me. They cite the pages 96, 97, 121 to 123 of the argument that day. Let's go through those. On

page 96, there is no mention whatsoever of *Duvall* or its principle. On page 97, there is no mention of *Duvall* or the principle in *Duvall*. They were arguing on page 97 that they wanted to keep her, that was their argument on page 97. Pages 121 to 123, you are going to see some *Duvall* discussion. Guess what? That is me talking, not them. At the bottom of page 123, Mr. McCoy starts addressing, and he does mention *Duvall*, but his argument was, there was no mention of Dr. Englehorn wanting to bring in a German. Nothing about the *Duvall* principle about whether -- what their knowledge was in terms of whether there was a law, that wasn't his argument. So, no, they did not preserve this issue whatsoever.

In terms of perceived risk and the evidence, they criticize me for not asking Ms. Petrasch a particular question as if Ms. Petrasch's testimony is the only thing that matters in this case. BMW continues to be of the belief that if they don't say something is true, then it must not be true because nothing else can matter, but we have laid out the evidence, and you will see in it my discussion on the *FedEx* case. The four things that led the Fourth Circuit in *FedEx* to say that that that manager had rudimentary knowledge of law, I covered all of those bases, I

tried. There is evidence BMW maintains policy against national origin discrimination, it is in their employee handbook, they didn't have that in *Duvall*. Okay. The Plaintiff's lawyer in *Duvall* had no evidence whatsoever of a policy or that anybody knew about it. Petrasch knew about the policy against discrimination based on national origin, that is in the record, so we touched that base. Petrasch acknowledged that her department and BMW's legal department conduct the anti-discrimination training; that is in the record. Petrasch agreed she was ultimately responsible for enforcing BMW's anti-discrimination policy. And they identified her all along as the decision maker in this case. Now, none of that existed in *Duvall*, but it is exactly what got into court in FedEx. *FedEx* is not some outline, the *Duvall* court cites *FedEx* for what the appropriate inquiry is. *FedEx* gives four factors, I introduced evidence on all four factors. Petrasch was also responsible for handling the discrimination matters, such as EEOC charges. Also, BMW knew its policy was unlawful because Dawsey told them so.

Now, as I also say -- point out, this standard is not a high one. In addition to *FedEx,* we have cited the *Anderson v GVC* case, that is the poster glancing case where a guy agreed he had seen the discrimination

poster, but then denied he knew what was in it. And the Fourth Circuit said, one, that is enough; two, jury doesn't have to believe him when he says he didn't know. And that is everything that BMW is relying on, if we don't come into court and admit something, then the Plaintiff didn't prove it. And *Anderson* gives you the best direct statement from the Fourth Circuit of, no, jury doesn't have to believe the defense witnesses, you can piece it together through any type of evidence. So, we certainly have more than what was in *Anderson*, we certainly have at least as much that was in *FedEx*, which is what the *Duvall* Court said is an example of the proper standard.

Now, on the issue of whether there was an adverse employment action, you heard Mr. Moody hammer on pay. Both *Muldrow* and *Herkert* say that is not the issue, pay is not the touchstone to whether there is an adverse action when you move from one position to another. Both of those cases cite a host of other factors, all of which are met, but in this case there was testimony that the move from function level three to function level four, I will get into that, because of the existing policy, subjected her to a pay cut, but I don't have to prove her pay was cut. On the function level three to function level four, it is almost hard

for me to believe that they still believe the evidence is only one way on this, so let's walk back through the evidence.

First, Petrasch told Ms. Dawsey that she was going into a position and it would become function level four. Mr. Moody doesn't mention that. Ms. Petrasch also wrote a memo to the execs in Germany saying, we have several options, but regardless of whatever we are going to do, it is going to be a function level four job; Mr. Moody didn't mention that.

Mr. Moody also didn't mention that both individuals who occupied TX-64 testified it is a function level four job. Mr. Epps said, it is a function level four job. We introduced the job offers to those two gentlemen, it says, function level four. Everybody understood it was a function level four job. Yes, it was being treated as a function level three while Mr. Medley was in it, but when they made the decision to move Kelly Dawsey to TX-64, they also made the decision it was going to be a function level four, they announced it at that time, and BMW can continue to ignore that all at once, but that is not the standard. The standard isn't, can they argue that there is evidence to support their narrative? The issue is, is there any evidence to support mine? I have testimony

from the incumbents. From -- in fact, Ms. McCraw even acknowledged it is a function level four, so I have the VP of HR, I got the former VP of HR, I got the two people who are in the job, and I have Mr. Epps all saying it is function level four.

Now, as to Ms. Dawsey's statement about what she would have been paid, she can't speculate to that. Of course she can't answer the question, they didn't tell her what she was going to be paid. How can she tell the jury, after taking an oath, my salary was going to be X when they didn't tell her what her salary was going to be? But again, look at *Herkert*, look at *Muldrow*, pay is not the issue. Because *Herkert*'s pay wasn't cut either, neither was *Muldrow*s, I don't believe.

Now, in terms of the level three and level four, there are significant differences in stature that -- and we briefed all of this. You look at Kelly Dawsey's position, it required ten-plus years of Human Resource Management. The TX-64 job was an entry level job. One of the individuals who got it had no HR experience whatsoever, the other guy had not had experience in the one area that they said they were focusing the position on. The exempt guidelines, which we put up before the Court, go into detail as to the

difference in stature between function level three and function level four. And you may remember the testimony, function level three is basically the manager of managers. Function level four is a manager. There is a table in there that delineates between function level three and function level four and talks about the difference in the level of responsibility, and that is *Muldrow* and *Herkert. And* that is BMW making those distinctions, that is not me. That is not Kelly saying, here is how I view it, we are using their published guidelines.

Relegation to function level four also affects one's opportunity to advance. That is also a key factor in both *Muldrow* and *Herkert*. Now, Ms. Dawsey testified to that, but Ms. Burgmeier agreed with her. When you are a three, you can be a candidate for the function level two level positions, fours can't be; and Ms. Dawsey wanted to be a two. And even Ms. Burgmeier emphatically denied that you can go from a function level four to a function level two.

When we briefed this, BMW said its witnesses uniformly rejected that assertion. No, they didn't. The only testimony they cited was McCraw, who didn't even active on that point. She testified that BMW based its promotions on personal grades, that is a whole

completely different issue. BMW certainly has never offered any evidence of anybody going from function level four up to a function level two.

Now, the other issue they have about the announcement of a decision can't be an adverse employment action, that is -- I am not addressing questions the Court might have on that, but that was the Summary Judgment Order, that is Ricks and Chardon, they can't fix that here, that can't be fixed in Richmond, if they don't like it, they are going to have to go to DC with that argument because that law is very settled and it would make no sense to say that the Plaintiff's time for bringing a claim starts to run, but she can't bring a claim. And that is exactly why this Court properly reversed the Summary Judgment Report and Recommendation, nothing has changed. They don't cite any cases which try to distinguish those authorities, and they are not limited to Supreme Court or Constitutional issues, we have all briefed that at great extent already.

The other point I would make is *Muldrow* is not the change that they are now claiming it is. Of course, we brought this case before *Muldrow*, we all knew *Muldrow* was making its way up through, but the changes that were made satisfied even the old standard of what

constitutes an adverse action. Transferred to a lower level position was always an adverse action the Fourth Circuit under *Holland*.

On the Expat Guidelines, the third issue, again, those were not created by Kelly Dawsey, those were created by the Vice President of Human Resources and approved by the executive team at BMW MC. It was not some hidden document that nobody knew about. When Petrasch was explaining the moves to Kelly Dawsey, she said, there is a rule that when an American is in TX-6, a German has to be in TX-60, that is the rule, that is where the rule is. And if you remember, they started at the beginning of trial, Mr. Moody said, well, that is some document she took with her to prove her case. I guess he didn't look at the bate stamp on it because they are the only ones who produced that document. And on the stand, Ms. McCraw finally admitted, yes, we had it.

THE COURT: Was there ever any evidence or testimony that Ms. Dawsey took that document or anything else with her?

MR. MURPHY: No, sir. No, sir. She didn't take -- I mean, she had her personal journals and everything, but there has never been an issue in this case of purloined documents.

THE COURT: Well, it was represented to the Court that she took it with her.

MR. MURPHY: It was represented to the Court.

THE COURT: I didn't recall any testimony or proof of that.

MR. MURPHY: There was none because they produced it. I would have -- I produced -- oh, with her diaries and everything probably thousands of pages of stuff, we produced everything we had. I would have loved to have seen that document before I filed this case. We didn't have it. We asked for it, they properly produced it. But, no, the issue of purloined documents was never an issue in this case and there is no evidence whatsoever she took it with her.

The argument that there is no reference to national origin in those Expat Guidelines is kind of curious. It uses terms that are defined in the record that everybody agreed to, everybody agreed to what a domestic means here, everybody agreed to what an Expat means here, and those are the terms that are used directly in that document. So we defined the terms in the record, and that wasn't even disputed, Dr. Englehorn agreed, you may remember I asked him, do when you are talking about domestic here, what are you talking about? Somebody from Spartanburg. An Expat? Somebody from

Germany. So, there is no dispute about what any of this meant.

On the jury charge --

THE COURT: Let me go back to these Expat Guidelines, if you will let me. I believe there was some testimony, and this is from my memory so you all can help clean it up if I am wrong, I believe there was some testimony that the guidelines were developed, Ms. Dawsey did this pursuant to instructions with her then superior, and they were presented at some big management meeting with all of the upper level management people. Was there ever any evidence or testimony that someone with BMW looked at that at some point and said, whoa, wait a minute, we can't do this? This could be potentially violating the law? Is there any evidence anybody ever refuted that? Said let's get rid of this? Let's send out a bulletin? Let's send out a memo saying that was for discussion only, do not follow this, any evidence of that whatsoever?

MR. MURPHY: No, sir. Kelly Dawsey told them, you can't do this, and they were having -- they were hearing none of it. She told them, you can't do this, you can't classify people by national origin. They went and did it anyway. There is no dispute about what

they were doing. As we point out, they tried to make a point, well, there aren't that many Germans, maybe one or two in the whole department of a hundred. Well isn't it amazing that five times in a row that one or two German happens to be in either TX-6 or TX-60, five times in a row, they are doing it to this day. You heard the testimony, Bianca Siemens is in that position while Ms. McCraw is the Vice President. They have been following this policy since its existence, which I believe was like in 2015, five times in a row. They want to deny its existence.

On the --

THE COURT: You were going to talk about the jury charge.

MR. MURPHY: On the jury charge, Your Honor, I was incredibly confused what they were talking about in terms of the discussion on the jury charge, but they keep citing the colloquy on February 24th. Well, as the Court may remember, you gave us draft charges, both sides fussed about it some, we had a pretty long, extended discussion about it, then you changed the charge. And on the morning of the 25th, we came in and we got a new copy of the charge and you had added some language on -- where they were pushing for about something not being speculative, you changed the

language and everybody said okay. Everybody said okay at that point, so they haven't preserved any argument. The fact they were arguing about the prior draft on the 24th doesn't preserve when you came in on the 25th and said, okay, I heard you both, here is what I am going to read, that is the time that we have to say, well, you know, respectfully, I appreciate, you know, you listening to us, but I still must respectfully take exception to this for this reason. That is what you do if you need to preserve an argument. No, everything is fine. There was no objection whatsoever. So all of these cites to the 24th do not address the fact that this Court changed the charge on the 25th and nobody objected.

THE COURT: Was anything said about it after the jury went back but before I let them begin deliberating?

MR. MURPHY: There was no objection to that charge.

THE COURT: Thank you.

MR. MURPHY: And on the note, they agreed to the note, the response to the note. The jury sent out the note, and as I briefed, the note -- you never said the words that were in the note. You pointed the jury back to your charge, they agreed to that, and now they want to complain about it. The only verbiage from that

note, as I point out, was probably from their closing argument, and that is maybe what confused them. I am not saying there is anything improper about their closing argument, but that terminology that was in that note was not anything that ever came from this Court. So once the Court pointed them back to the proper instruction, which, by the way, again, both sides agreed to, they rendered their verdict. So, there is no issue preserved and there is no authority that this whole case can be overturned because of the way the Court handled a note when everybody agreed to it.

There are a lot more issues and I think we briefed them all. I am just trying to hit on some of Mr. Moody's points and I will be happy to address any questions you might have.

THE COURT: I don't think I have any right now, thank you.

MR. MURPHY: Thank you, Your Honor.

THE COURT: Thank you.

Anything else?

MR. MOODY: Your Honor, I will be very brief. One of the difficulties we experience as Defendants is having to disprove a statement or a negative and go pull stuff quickly to try to disprove it, but I want to focus on just time line here. Mr. Murphy, in his arguments

talked about Ms. Dawsey told them so and that it was unlawful. When we were addressing the issue of moving in the face of the perceived risk, Your Honor, you may recall that Johannes Trauth was the Vice President of Human Resources with these Expat Guidelines. Ms. Dawsey did testify that she put them together. She is the one that complied everything. Your Honor may also recall that there was a term on there called "Gesprach," which is German for conversation or meeting. We do contest his characterization that senior management approved these Expat Guidelines, they didn't have any proof of that. The Plaintiff spitballed, but I think there was a senior leadership meeting on that.

When Ms. McCraw testified she said I have never seen these before. And she also said, I was in senior leadership during the time that these deadline -- these alleged guidelines were out there. So, I want to just reply in kind to those assertions by Mr. Murphy about what was going on.

Another issue where he conflates the time line is this function level stuff. Mr. Murphy is talking about what happened after Ms. Dawsey resigned. He says everyone knows that says TX-64 is now a function level position. If you apply that same logic, then it is also logical to look at Scott Medley and the fact that

he moved from 64 to a special project and he is now back at 64. And Your Honor is aware that Mr. Medley has not suffered any degradation of his compensation, that his job duties continue to evolve as it is a dynamic organization. So, there have been no change in terms and conditions of Scott Medley's employment now that he is in TX-64 and we were able to put into evidence his compensation.

So, I wanted to just reply to that briefly and focus on what happened in 2021, not what has happened all the way using the benefit of hindsight to 2026.

THE COURT: About these Expat Guidelines --

MR. MOODY: Yes, Your Honor.

THE COURT: -- as you point out, there is conflicting testimony about these guidelines and what, if anything, they meant, whether or not they were followed. Isn't the jury in the best position to listen to that testimony and make a decision about who is credible and who is not?

MR. MOODY: Your Honor, I think -- they asked you the question is, if it was properly admissible? Yes. We don't believe it was properly admissible and we briefed that because none of the decision-makers here knew of these guidelines. So, again, Mr. Murphy tries to conflate these guidelines and the fact they

were done back in 2016 under Johannes Trauth with the Plaintiff as the -- I call it author because she put together the presentation, but none of the folks involved in the decision as to her knew of these guidelines, that is the issue.

THE COURT: Well, senior management, who sat through the meeting when they were put up on the screen, knew about them.

MR. MOODY: Your Honor, all we have for evidence that there was a senior management meeting where this was put up on the screen is she made a reference to the fact. The person in senior management who testified in this case says I have never seen this.

THE COURT: Conflicting testimony about a document that is in BMW's record that BMW produced and there is conflicting testimony about that document. So, I am not going to go back and rehash the admissibility of the document, I heard arguments about that ad nauseam and I ruled on it, but I am just trying to make sure I understand where you are coming from.

MR. MOODY: Yes, sir. And where I am coming from is that none of the decision-makers in this case knew of the existence of this document.

THE COURT: That is what they said.

MR. MOODY: It is highly contested as to whether

it was a policy or whatever because it says it is conversation, it was a meeting. And she says senior management addressed it. The document itself says TX-60, we don't have a record of senior management addressing this document. Nor --

THE COURT: You also don't have a record of anybody saying, wait, this may be a good idea in one respect, but it is a bad respect in this respect because it may violate U.S. law.

MR. MOODY: You are exactly right, Your Honor, and that is the evil of this document because our decision-makers didn't know about it. Legal didn't know about it.

THE COURT: There is testimony that your decision-makers didn't know about it, but there is conflicting testimony that they did because it was -- because Ms. Dawsey's superior knew about it, there is testimony he knew about it, and there is testimony that it was presented at a senior leadership management meeting. So, there is conflicting testimony. So under your theory, we don't need to have any more trials because we aren't going to have any more exhibits.

MR. MOODY: No, Your Honor, that is not my theory.

THE COURT: It is fine, move on.

MR. MOODY: I just want to note for the record

that any conflicting testimony is Plaintiff's own testimony, which we would say is self-serving and things she didn't know. She wasn't in a senior management meeting when it was presented. That is where the dots don't connect, respectfully, Your Honor. That is what I wanted to say.

THE COURT: Okay. Tell me about your evidence that she took purloined documents and took those, I believe it was you that said she did.

MR. MOODY: Your Honor, I think that was a side discussion among the lawyers and Your Honor and I could be --

THE COURT: It was on the record.

MR. MOODY: It is on the record. Well, he stood up and said this is a document that BMW produced, so I think that was corrected. If I made a misstatement, I apologize. She did have a number of BMW documents, Your Honor, that she produced, a lot. And she journals so that was there, as well, but it is correct, the document that was an exhibit was produced -- it was asked, we did a search, we found it, and we produced it.

THE COURT: It was in BMW's records?

MR. MOODY: We did produce it, it was sitting on a server. So we did what we are supposed to do, we

found it, we produced it. And she had a lot of our stuff and we didn't go after her about taking our documents, keeping her computer --

THE COURT: I didn't hear a word about it.

MR. MOODY: We didn't make an issue out of it.

THE COURT: Don't talk about it now, it is too late.

MR. MOODY: Don't want to.

THE COURT: Go on. Go ahead.

MR. MOODY: So, as to the issue, you know, we asked, you know, let's focus back on 2021, you know, Judge, and let me respond briefly to this issue of the charge. Your Honor sets forth a extensive system to provide jury charges, the verdict form, et cetera, which we all were engaged in. We provided objections as to that charge. And when Your Honor was considering the charges, we received it, we went back I think for 30 minutes, came back I tried to quickly put on the record our concerns about the charge. We didn't want an adverse employment charge, but if you did, here are some suggestions. So, we had continually lost that issue about the position we were taking with *Ricks* and *Chardon* and the adverse employment action being a summary judgment standard that there is no reason to charge on. So, we had continued loss.

My recollection, as he states, we didn't do anything the next morning. There was an issue regarding the jury verdict form and the issue of segmenting out the 1981 that didn't have cap damages and the Title VII that did. Your Honor declined to entertain changing that verdict form and then we quickly moved from that point.

So, it is correct the jury sent a note, we were trying to work with everyone to get to a verdict on that, and, you know, we didn't stand up and protest about where the charge was at that point because Your Honor did not agree with us on our position on the charge. So, that is how I would address the charge issue. It moved really fast as you may recall, Your Honor, because we were at the end of the trial. And Your Honor was gracious to give us time beforehand to make all of our positions known, you allowed us to address it verbally, we did, you didn't agree, and we moved forward from that point. So, as to the position of Plaintiff as I have to remind the Court multiple times that we continued to disagree and although you have ruled and we have lost before then I guess, you know, we did everything we could to guide the charge and make it one that mitigated the issues and the decisions that were made.

THE COURT: Well, the record will be clear about what was said about the charge and the jury's note. It is in the record.

MR. MOODY: Thank you, your honor.

And then, finally, I know there is a lot of issues out there, I would like to address just two quick things. I found it interesting that Mr. Murphy said that Ms. Dawsey wanted to be a two and that is where sometimes he turns the light on when it is good for him and sometimes he doesn't when it is not. We provided her testimony, Your Honor, on trial transcript 219 page 46, lines 22 and 21.

"Ma'am, did you expect to be in
TX-60 forever?
Answer: I expected to be in TX-60
until I retired, yes."

And in his statement, he said Ms. Dawsey wanted to be a two and, you know, because she was getting moved to 64 she never could promote. Well, her testimony was I expected to be in TX-60 until I retired. Her testimony is also she never went to talk to the CEO about validation, and that was the prior CEO that said my office is always open to you, my cellphone is open. She testified I didn't take that invitation, nor did she continue to pursue a validation to function level two.

So, that is -- I just want to point out that inconsistency between her testimony and the evidence in this case and then the position that somehow moving to 64 impacts her prospects for promotion because she said she was going to stay in 60 until she retired.

Lastly, Judge, I would just point back to the precedent from the Fourth Circuit that says it is the Plaintiff's burden to come forward with sufficient evidence at trial that the decision-maker acted in the face of perceived risk that his actions would violate federal law. It is the burden of the Plaintiff to show the perceived risk, it is not our burden about that perceived risk. So, for that reason, we believe that punitive damages standard has not been met because Plaintiff did not meet the burden of the perceived risk of the decision-makers in this case.

Thank you, Your Honor.

THE COURT: Thank you.

THE COURT: Anything else?

MR. MURPHY: Let me just sew up one issue, Your Honor, the knowledge of the decision-makers: Four words Ms. Petrasch said when she was announcing the decision, there is a rule, the guidelines are the rule. She recited exactly what is in the guidelines. She knew. Where was she getting that from? But there is no space

between what she said the rule was and what the guidelines say, so that is evidence the jury could have used to reject their position. But the whole issue of wanting to go to a two, there is separate testimony on that, that is not part of their motion, I think that is just another distraction being thrown up here. The question for *Muldrow*, *Herkert* purposes is, does the move hurt your chances for progress? She did not expect to be promoted into the TX-6 the time Ms. McCraw was because there is a process you have to go through before you get to that. She testified separately her desire to be TX-6 and the discussion she had on that, but that is a separate issue. That is all I am going to say.

THE COURT: All right. Thank you.

Let's take a break and come back and finish up.

(Whereupon, a short recess was held.)

THE COURT: I appreciate your indulgence. This will be my ruling on this motion: Under Rule 50(a), the Court may grant a motion for judgment as a matter of law for parties who have been fully heard on an issue during a trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.

Rule 50(b) provides that if the Court does not grant a motion for judgment as a matter of law made

under Rule 50(a), that is, before it is submitted to the jury, the Court is to consider to have submitted the action to the jury subject to the Court's later deciding on the legal questions raised by the motion.

Thereafter, no later than 28 days after entry of judgment or if the motion addresses a jury issue not decided by a verdict no later than 28 days after the jury was discharged, the movant may file a renewed motion for judgment as a matter law and may include an alternative or joint request for a new trial under Rule 59.

A Rule 50(b) motion for judgment as a matter of law follows the same standard as a Rule 56 motion for summary judgment as noted in the *Dennis* versus *Columbia Colleton Medical Center Case*, a Fourth Circuit 2002 opinion. So, when a jury verdict has been returned, judgment as a matter of law may be granted only if viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party. This standard was cited in the *Drummond* case, a Fourth Circuit 2021 case, which cited *International Ground Transportation versus Mayor and City Council of Ocean City Maryland* case, a 2007 Fourth Circuit case

and the *South Atlantic Limited Partnership of Tennessee LP versus Riese* case, from 2002.

A District Court should grant a Rule 50(b) motion only if the Court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings. Such a motion is properly granted if the non-moving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof as noted in *Wheatley will versus Wicomico County Maryland,* a Fourth Circuit 202 -- excuse me 2004 case. But if reasonable minds could differ, a Court must affirm the jury's verdict as noted in the *Pitrolo* P-i-t-r-o-l-o, case, Fourth Circuit 2011 case.

When ruling on a motion for judgment as a matter of law, the district court is fully empowered to reverse its evidentiary rulings post-trial and to reconsider that evidence's effect on the trial as noted in the *Connor* case, Fourth Circuit 2000; however, the Judge is not to weigh the evidence or appraise the credibility of witnesses as noted in the *Anheuser-Busch, Inc.*, case, Fourth Circuit 1992 decision.

Alternatively, under Rule 59(a) a Court may, on motion, grant a new trial on all or some of the issues after a jury trial for any reason for which a new trial

has heretofore been granted in an action at law in Federal Court. That is Rule 59(a)(1)(A).

Despite the permissive language of this rule, the Fourth Circuit has construed it to require district courts to set-aside the verdict and grant a new trial where the verdict is against the clear weight of the evidence or is based upon evidence which is false or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict as noted in the *Doe versus Fairfax County School Board* case from 2021 quoting other cases.

In considering a motion for a new trial, the trial judge may weigh the evidence and consider the credibility of witnesses as noted in *King versus McMillan*, a 2010 Fourth Circuit case. The decision to grant or deny a motion for a new trial is within the sound discretion of the district court and will not be disturbed absent a clear showing of abuse of discretion.

I have carefully reviewed your briefs and considered the arguments. BMW asserts that it is entitled to judgment as a matter of law or a new trial on Plaintiff's claim for punitive damages. BMW cites to the *Safeco Insurance* case, the *Duvall* case, the *Muldrow* case, and the *Kolstad* case, and asserts the

jury's verdict as to punitive damages was against the clear weight of the evidence; however, as noted by the Plaintiff, *Kolstad* does not stand for the proposition that a jury cannot make a determination as to the appropriateness of punitive damages if an employer claims there was no discrimination. The Defendant's reliance on *Kolstad* is misplaced given the testimony and evidence presented in this case. The jury heard extensive testimony and reviewed significant documentary evidence regarding what BMW management did and did not do and why it was done or not done. The jury was in the best position to assess this evidence when evaluating what the BMW managers did and why they did it.

As to BMW's argument that BMW could not have known its actions violated the law with respect to the *Muldrow* decision, this is a new argument not previously raised in Rule 50(a) motion made at trial, BMW makes this motion in a brief filed post-trial for the first time. Rule 50(a)(2) requires that the moving party in a motion made pursuant to the Rule to specify the judgment sought and the law and facts that entitled the movement -- movant to judgment. BMW was required to raise the reasons for which it is entitled to judgment as a matter of law before the case was submitted to the

jury and reassert those reasons in its post-trial motion. A Rule 50(a) motion is a prerequisite to a Rule 50(b) motion after trial if the Rule 50(a) motion is not successful. Accordingly, BMW was required to apprise the Court of the alleged inch sufficiency of Plaintiff's claims before the case was submitted to the jury.

Here, Defendant's motion for a judgment as a matter of law was argued extensively at trial and this issue was not raised. The rule is not a mere technical point as noted by the court in *Tights Inc. versus Acme*, a Fourth Circuit 1976 case quoting Moore's Federal Practice, a litigant may not gamble on a jury's verdict and then later raise issues not previously presented to impute error to the trial judge. One purpose of this Rule is to avoid sandbagging opposing counsel and the court.

Throughout the course of the trial, BMW had at least four attorneys, five if you count the lawyer for BMW AG, and this issue was not raised on behalf of BMW MC. In fact, at the summary judgment stage in response to the Magistrate Judge's Order inviting the parties to brief the issue of what impact *Muldrow* would have on this case, BMW MC submitted a brief asserting that the *Muldrow* decision is not applicable to this

case, and the facts in *Muldrow* are fundamentally different than those presented in this case. This was at ECF 111.

However, even if BMW's newly raised issue is considered, the result would be the same as evidence was submitted that the Plaintiff was going to be removed from her longstanding position at BMW to another lower-level position that would have constituted an adverse employment action. The jury was in the best position to consider any evidence of BMW MC's efforts to prevent discrimination in the workplace and the appropriateness of punitive damages. Here there was evidence of at least a rudimentary knowledge of the import of federal anti-discrimination statutes by BMW. To hold otherwise would mean that a company can have an anti-discrimination policy in its handbook and can conduct training with its legal team on anti-discrimination laws and still claim no knowledge of the requirements after the law. This would be akin to condoning willful blindness on the part of the company of the requirements of the law and this Court finds it hard to believe that this would be what the *Muldrow* Court intended.

BMW also asserts that the Plaintiff failed to produce evidence -- sufficient evidence of harm to an

identifiable term or condition of employment and that Plaintiff's case was based solely upon speculation about harm the Plaintiff might have suffered had she remained at BMW. However, evidence was presented at trial that BMW told the Plaintiff -- or representatives of BMW told the Plaintiff that she would be removed from the TX-60 position before she was informed that she would be demoted to the function level four position or level.

The Court finds that *Muldrow* was correctly applied in this case and that it was appropriate for the jury to make the determination as to whether the plaintiff was subjected to an adverse employment action. The law is clear that a reduction in pay is not required for an employee to be subjected to an adverse employment action. The adverse action does not necessarily have to be implemented. BMW, through its management, informed the Plaintiff that she was going to be moved from the TX-60 to TX-64 position and evidence was submitted that moving the Plaintiff to the new position would have adverse impacts on her. Much of this evidence consisted of BMW's own records and its function level descriptions and other documents.

Additionally, evidence was submitted evidencing the custom, practice, policy, and course of dealing that being placed at a function level four position would

impact an employee's ability to advance to the function level two level.

I also find that BMW's reliance on the *Zienni* case is faulty. The facts of that case are distinguishable from the evidence submitted to the jury in this case. Unlike in this case, in the *Zienni*, the Plaintiff was never told that an adverse employment action would take place. In this case, evidence was presented that Ms. Dawsey was going to suffer an adverse employment action. The jury weighed the evidence and arguments, including the arguments of BMW that no such action was going to occur or did occur.

BMW also asserts that it was error to allow the admission of the Expat Guidelines into evidence at trial. I find it striking that BMW now asserts that the Plaintiff's primary evidence of national origin discrimination was the Expat Guidelines. Evidence was presented that the Expat Guidelines were prepared by plaintiff at the direction of Johannes Trauth, Plaintiff's superior at the time. BMW asserts these guidelines were never formally implemented; however, the testimony and evidence that was presented did make a showing that the Expat Guidelines, again prepared at the direction of Plaintiff's then superior, were presented to and reviewed by the senior management group. These

guidelines indicate which positions may be held by domestic or local employees or Expat international employees. BMW presented no evidence that these guidelines were ever disavowed, stricken, or revoked by BMW management. Of interest was the testimony of Mr. Petrasch (sic), Plaintiff's superior, who testified that consistent with the Expat Guidelines, there was an understanding or a rule that if the Vice President of Human Resources is a domestic or local, the next in line would have to be a German. There is also evidence that BMW continues to adhere to this policy.

Thus, the Expat Guidelines are not the only evidence of BMW's national origin discrimination, the record contains other evidence that dovetails with the Expat Guidelines, which also serve to corroborate the Plaintiff's testimony.

The jury was entitled to review the evidence of the Expat Guidelines and weigh it along with other testimony as to BMW's policies, practices, and course of dealing, and that is what they did.

Finally, the Court finds that under a Rule 403 analysis, the probative value of this evidence outweighed any potential prejudicial effect.

BMW also asserts the jury instructions on adverse employment action was improper and confusing.

After hearing from all parties on the proposed jury instructions, the Court prepared the instructions about which BMW now complains. BMW did not object to the modified instruction crafted by the Court as to when a cause of action accrues. The instruction was prepared specifically to address BMW's concerns. The Court agrees with the Plaintiff that after expressing satisfaction with the amended instruction, BMW cannot now complain post verdict and request a new trial based on that.

Likewise BMW ascended to the Court's response to the jury's second note and thus cannot now complain about that. BMW had the obligation to assert errors in the amended instruction prior to submission to the jury and it did not do so. Assuming that the charge was somehow in error, counsel has the duty and obligation to alert the Court to an alleged error in the jury instruction, not consent, thereby inviting error.

Finally, I have reviewed the instructions provided to the jury and conclude that, construed as a whole, considering the testimony and evidence presented, find these instructions appropriately inform the jury of the applicable principles of law controlling in the case without causing confusion. Accordingly, upon application of this standard I have cited and after

careful consideration of the record in the case, Defendant's motion for judgment as a matter of law or in the alternative for a new trial filed at ECF number 237 is denied in all respects.

I am happy to take up the motion on the request for documents from BMW's defense counsel.

MR. MURPHY: By way of clarification, I know you said that these are the two motions, I thought, and I may be wrong, I thought the notice of the hearing was on -- also included the fee petition itself. If you don't want to address it we don't need to. If you don't need argument on it, you don't need argument on it. I just wanted to point that out. And I am happy -- I am fine not addressing it, I just wanted to point that out, I haven't pulled it up, but I thought it was the three motions, but I will focus just on the discovery issue if you like.

MR. MCCOY: I did not reference. It referenced in that your subsequent motion referenced back to it.

MR. MURPHY: I think he is telling me I confused myself.

MR. MOODY: Your Honor, we viewed it as a motion on his request for our bills and that the docket entry just referenced a cross reference back to his initial filing for attorney fees. So, we viewed it as the

motion where he is asking for our billing records.

THE COURT: Well, my plan was to only address the motion for production of invoices of defense counsel, and I apologize for any confusion that the docket entry may have caused, but that is the way I plan to proceed today.

MR. MURPHY: That is fine. From what I am understanding from them, confusion is all on my side.

That said, the motion for discovery is a very simple one and the cases come down to a very simple dividing line. If a party is going to sit there and tell another party your rate is too high, you spent too much time on something, you are not doing this properly, it opens up the door to seeing whether they can back that up.

BMW is taking the position -- it has challenged me on every one of those fronts. First it says my rate is too high, they won't say what their rates are. They say I spent too much time on matters and we said, okay, and under those cases, which apply to when that specific allegation is made, we said, then let's see how you do it. They said, I am top heavy. I staff -- my one-man operation here has staffed the case improperly. And they make the assertion that 70 percent of billing should be from associates. Can we take that seriously?

Let's see. Those are the assertions that the Court is going to take seriously that they ought to be able to back up because I take personal offense to some of those assertions that were made and I don't believe them. And if this Court is going to take representations to this Court seriously, then the least the Defendant can do is show that it is living by its word. If they are going to say I need to do things their way, then let's look at what their way is, but what actually happened is as soon as I raised that challenge, they went the opposite direction and said, well, we are less efficient by choice, we are less efficient for a reason, here is this reason, here is that reason. They have already gutted their arguments. And I know you don't want to get into substance of the fee petition, but I think in all fairness to the Plaintiff because there is a lot at stake here, I think the Court should make -- respectfully, the Court should make one of two decisions: Either reject those arguments or make them substantiate them.

Now they keep coming back and saying, well, Murphy has got the burden, Murphy has got the burden. I will gladly carry that burden, but I am going to carry the burden, I need information. If I have to carry the burden of showing that my way is more efficient than

that way, I would love to carry that burden because we will have a lot of fun with those bills. But the Court can't take seriously representations of a party that runs away and then contradicts its own assertions after it makes them.

So, again, I am asking for one of two things, either reject those arguments or give me the information so I can address them. It is that simple.

THE COURT: All right. I will be glad to hear from you.

MR. MOODY: Thank you, Your Honor, I will be brief, as well. Thank you for the opportunity to be heard on this.

Your Honor, four points to hit, old Baptist boy, so going beyond the three points the preacher normally does. So, first, this is procedurally improper for him to ask for defense fees, there is no rule that provides for this. There is no rule, no discovery has been done. We all agreed on how to handle this, and rule one of the Federal Rules of Civil Procedure that says that this -- all proceedings should be done in a just, speedy, and inexpensive determination of every action and proceeding. And, you know, Mr. Murphy said he had a lot of fun with this, what we view as a side escapade. The *Hensley* case says that fee

matter should not create a new round of litigation, and I think he revealed that that is what part of the purpose of this is. So, number one, procedurally improper.

Number two, our billing is not relevant. We have provided extensive briefing with many, many cases. Many cases were omitted to show that our billing is not relevant and the massive weight of authority throughout this country is that it is not.

Mr. Murphy is right, his burden is reasonableness, and that is what we did when we addressed his petition for fees, we looked at reasonableness. The rate and the time spent. Can't compare what we have to do in response to allegations to what he is doing. There is no correlation there. We have provided cases where courts have said that the ratio is at least three to one and maybe more.

This issue has been addressed by the Johnson factors, the 12 factors, we have noted that in our brief, Your Honor. I think that would be located on page six of entry number 264, they are all footnoted there. None of the factors of the 12 factors deal with the fees and invoices of defense.

He cites to the *Stastny* case, which is a 1978 decision out of the Western District of North Carolina

as actually doing this, but I think we showed in writing that the *Stastny* case that Court misunderstood the factors and applied that as a factor when it is just not a Johnson factor.

Judge, what we did is we used his prior fee petitions and fee petitions of other practitioners in this space for employment law, and if it is an employment law matter we used those fee petitions for comparison and what other courts have done. And so what we also see in the briefing is Mr. Murphy cited to some cases that are pre- amendment on Rule 26. We also have the third issue of proportionality. And Rule 26 in proportionality has been applied by courts recently to say, hey, this is not proportional to the needs of the case. The focus, rightfully so, is the 12 Johnson factors, the time spent by the attorney seeking the fees and the rate.

So, lastly, the issue of privilege is a very real issue. Judge, our records and our billings are privileged. It shows the inside the mental impression, strategies, et cetera. I had a case in a state -- in Anderson County that went all the way to the Supreme Court, it is the *Wilson versus Preston* case, and it was a County Council member that wanted to see all of the billings by attorneys. That was my case that went up

and the South Carolina Supreme Court says, hey, the narratives are privileged a County Council member who was adverse at that time to, you know, the administrator and rest of council, you know, it is a privilege of the client what the billing narrative is. So, I know that comes from our neck of the woods and you may recall that instant that occurred whatever it was okay.

THE COURT: Did you ever get finished with that case?

MR. MOODY: Yes, sir, I am done with that one. I know the Supreme Court helped us with that one and wrapped it up because they said that the council member, Ms. Cindy Wilson, was not entitled to do what she wanted to with those records, that was an entertaining oral argument.

So, again to the extent he says, well, if there is privilege, we can redact, this just creates more litigation, more of a side show. This Court has addressed the issues, the post-trial motions this morning. This case is packaged up getting ready to move to the next phase. And, Judge, I would add, you know, Mr. Murphy is a walking encyclopedia of cases that is favorable to his position. I would add on reply he didn't cite any cases, it was a lot of projection as to us, and I know he may be offended, but we have a job to

do, and fortunately for Mr. McCoy and myself we have others in our firm who have done these kinds of things, so, you know, had some resources in order to respond to this. But he doesn't cite the cases he cites to his own arguments as authority, and in one point he uses the time spent for comparison purposes. What those cases deal with, if there is a dispute about a particular task and the time spent on a particular task, he didn't complete the clause. So, it is a dispute over time spent on a particular task, he says most courts and extreme sites. Most courts this century do not allow this kind of a side show. We did not mean any offense to Mr. Murphy, he obviously achieved a jury verdict, did well for his client, all we did was point to Johnson type factors, the rate that was charged, the hours that were extended we compared to Judge Coggins *Buie* case, and I think Mr. Murphy may have been involved in that, he asked for defense fees in that one, Judge Coggins declined to do that from what we see from the docket. Judge Coggins did do a 15 percent reduction based upon results achieved. In this case, we have multiple parties, we have AG, et cetera, so we focused on all of those factors and asked the Court to consider those factors in light of what has happened in other courts and what we saw as comparable situations,

and to consider his fee petition there. And I thought we asked for very modest adjustments based upon the results achieved, seven out of eight of the claims were for Defendants, one out of eight was for Plaintiff. So, we ask for, you know, a blend rate and ten percent reduction here, and a ten percent reduction there, which we thought were modest. Trying to compare to our fees is not part of the calculus and would be needless side show litigation, which is going to cause all of the parties to spend more time, effort on matters that are not pertinent to the motion pending before Your Honor.

THE COURT: You point to the possibility of privileged information being contained in your billing records, couldn't that be addressed by redaction, appropriate redaction?

MR. MOODY: Your Honor, that would just create massive amounts of additional work for us, for the client to approve, et cetera, it would be massive.

THE COURT: So, you are saying privileged information regarding communications between BMW and its lawyers or mental impressions or work product would be contained in the invoices?

MR. MOODY: Yes, sir. That is what other courts have held, as well. South Carolina Supreme Court held that in *Wilson versus Preston*.

THE COURT: Why would it be so hard to redact it if it is contained?

MR. MOODY: I think it would be hard because it is a lot of additional work that is not necessary, Your Honor. It requires multiple levels of approval.

THE COURT: How many lawyers worked on this for the two corporations?

MR. MOODY: Mr. McCoy and I, Ms. Gantt, we had a paralegal Ms. Fowler. We would push research and other issues to other attorneys throughout the course of this case to push to someone who didn't have to -- we didn't have partner-level research type things going, Judge, to someone with a lesser rate. And so when you ask for numerosity on behalf of MC, it was primarily myself, Mr. McCoy, Ms. Gantt, and then there would be others who would assist on project-related bases.

THE COURT: I can't remember if I saw this in the filings related to the motion for fees or the filings related to the motion for production of invoices, but it appeared that BMW MC was paying the fees for BMW or BMW MC was paying the fees for BMW AG, Mr. Rozelsky's fees; is that right?

MR. MOODY: I don't know the answer to that, Judge.

THE COURT: Well, you got your corporate lawyer

sitting right there, go over there and ask him.

THE COURT: I have MC.

MR. MOODY: Your Honor, I will respond with what I know: AG does not have United States bank accounts, so there is some internal cross charging there. As for me, I don't know how that was done. And I don't recall anything being filed in the Court about AG's fees and I apologize.

THE COURT: Okay. Whatever that means, thank you.

MR. MOODY: Yes, Your Honor. I just don't know.

THE COURT: Okay. I believe you. That is it.

MR. MOODY: Yes, sir.

THE COURT: Unless you have something else?

MR. MOODY: No, Your Honor, thank you.

THE COURT: Mr. Murphy.

MR. MURPHY: Your Honor, just, to me, a little bit of irony that they keep talking about, we don't want to make this a huge production and a second type of litigation, and while that is true, they are the ones causing it. They, for example, give two exhibits to their opposition, which I think were 182 separate entries that they made allegations of block billing, never explained how they were. I had to go through every one of those lines and respond how that billing

was proper. I am not the one blowing this up. They want to take the position of, hey, our billing doesn't relate to Murphy's billing. If that was their first position, I could respect that. But they didn't. They are playing ding dong ditch, they run up, ring the bell, and they run away. As soon as you say who is it, what is it, they are not there. If they had taken the position that their billing is irrelevant to mine and had not made the accusations they made in their opposition, we wouldn't be here because guess what? You didn't see that issue in Carter. And they didn't see that issue in Buie either.

That brings me back to their other response: They sit there and said Judge Coggins deemed my request for discovery of the other side's fee unworthy to even address. I didn't ask for them because as contested and as bloody as the Buie case was for everybody involved, they didn't make these arguments. They didn't throw the rocks that BMW is throwing at me right now and then as soon as you say, all right, put up, they are nowhere to be found.

In terms of massive weight, I have already addressed this massive weight that the authority they claim. They are citing cases that are not about a party in a fee dispute challenging the other sides time

spent, rate, or what they were doing and how they stacked the case. The closest they came was that one that was a very early decision and the Court said it wasn't necessary.

But here is why the stuff is very important. You know, I don't want to get into the weeds or even as much as Mr. Moody did about the underlying dispute, but they said Murphy shouldn't be doing these kind of activities. Murphy shouldn't be doing this, Murphy shouldn't be doing that, that is grunt work, that is associate work. Well, we need to see the bills because I will tell you there is a lot of things that we were doing together, I am in the same room with them, but they are going to say it is not partner level or senior level work. Well, let's test that because they are the ones who threw that rock, not me.

On the Buie case, Judge Coggins, because she only got I think it was something like 200,000, he imposed a success determination, 15 percent reduction. He still awarded 1.5 times the judgment in attorney's fees, and I will take that, they don't look at that side. They don't look at the fact that Judge Coggins did what they don't want you to do and that is to look at the actual time spent, which wasn't even contested, and he still awarded 1.5 times the amount of the

judgment.

On the issue of privilege, the case they cited said these aren't privilege. And I don't remember them citing *Preston versus Wilson,* but they did cite Chaudhry. Chaudhry says, typically, the attorney-client privilege does not extend to billing records and expense reports.

Now, what I said in my brief is if there something in there, which we have all seen these bills, nobody writes conference with client where I told them you better not do this because, those aren't in bills, but if they were, it is no more a massive undertaking for them to review the bills than I had to 182 specific responses to their allegations about my billing. I had to do it because of the rocks they threw, but they are saying, you know what, we don't want to make a big issue out of this. Well, the only way it doesn't become a big issue for me is for you to just outright reject those arguments because it is a big issue for me.

And they can't make that allegation, make me do all of that work, and I am sure you didn't appreciate seeing that declaration and motion to have me go through 182 lines of me explaining every one of these entries, which by the way turned up a lot of entries where there are more than one entry on one day. They are the ones

who are blowing this up, not me. For them to sit there and hide behind *Hensley* and say, well, we don't want to make a big deal out of this after we make a big deal out of it, that can't be taken seriously.

On the issue, Your Honor, I know the statement you are talking about with the AG bills. And just because the Court asked the question, I said, in my motion, that I wanted to see those bills if MC processed and paid those bills. If AG sent -- if Mr. Rozelsky sent his bills off to Germany and AG cut him a check, then I think that is beyond the scope of this hearing, but if MC is getting the bills and saying, hey, we think these are appropriate, we will pay these, and they have them, then they should turn them over. That is the distinction I was making and I think that is where you got that from.

THE COURT: Well, I apparently confused myself.

MR. MURPHY: I confused myself because I just looked at the ECF and in no way did this Court notice a hearing on the fee petition. I think that touches all of the grounds.

THE COURT: Well, everybody is looking at a lot of stuff every day, every hour.

Okay. Anything else?

MR. MURPHY: Nothing, sir. Thank you.

THE COURT: Okay, Mr. Moody. In BMW's response to Plaintiff's motion for fees and expenses, and we are not arguing that motion, but I did read all of that so that I would have at least some rudimentary understanding of all of the issues here. So BMW says on page nine of its response to Mr. Murphy's motion for fees and expenses at ECF 255 and footnote 5, it says in part:

"The private sector requires use of competent lower-level attorneys to perform lower-level work and a fee applicant cannot charge the opponent for a more expensive business model."

And that was relating to the fact that Mr. Murphy doesn't have associates in his firm.

And so why shouldn't it be appropriate for us to see how much of the work by the attorneys for BMW was performed by associates because I expect your firm has a bunch of associates. So, that is what you are saying, that is your allegation, that is your assertion, so why shouldn't you have to sort of put up or shut up? I don't mean to be crude about it, but why shouldn't you have to come forth and say, hey, look, this is what we did. A lot of this stuff we used attorneys charging a

lot less than, you know, our partners, and we did that for the benefit of the client, you know, to keep the bills down. Why shouldn't you be willing to do that?

MR. MOODY: Because that doesn't relate in any way to the activities he was doing, Judge. What we have associates doing for us in defending four different claims doesn't tie to what Mr. Murphy does as a plaintiff. And I had the benefit of being a Plaintiff's counsel and they are totally different. The difference here is that citation on footnote five is just referencing what other courts have done and what they have recognized before. Our ask of the Court was, he is asking for 500 dollars an hour for all activities, and what we were asking is, hey, Your Honor, you know, other courts have looked at this and saying having one partner do all the work is not the most cost efficient, perhaps a lower rate should be blended in to reflect the fact that he does not have -- that he does all of the work himself. That is our only ask is the consideration of the rate and a reduction of his $500 ask per hour. What we have associates doing doesn't correlate on any of that. It is a simple approach, he asks for $500 an hour, our response is, okay, he has asked for 500 an hour, but other courts, when they look at this, say, hey, you know, you should have used

different resources. He didn't have it, so the solution, we suggested, was lowering the rate or blending it a little bit due to the fact he didn't have those resources and we didn't. We didn't ask for a large cut or anything, it was just a blend. And for the block billing issues that he apparently got upset about, all we did was a ten percent. And to his credit he noticed a couple of things where he had, you know, some extra entries and he corrected that. So, that is what they ask is, blend the rate and a small reduction for block billing.

He referenced the *Charter* case. Judge, all we went off was entry 228 of that *Charter* case where the other side did their filing and he says it wasn't addressed and we have that entry that we went by there.

So, I know that was a long answer, but it doesn't correlate. All we were saying was, hey, if he chose to do the work, fine, he did it, and the jury agreed with him on one of his claims. And all we are saying is, in light of the fact that he did the work there should be a blended rate that is a small reduction off of his ask. That is it.

THE COURT: Give me your best argument against the proposition that since BMW has raised the reasonableness of Mr. Murphy's billings, his billing

practices, his rates, that BMW shouldn't say this is what we are saying is right, and fair, and appropriate, and what you should have done, and to prove it, here is the way we did it. Give me your best argument, your one best argument as to why the Court shouldn't say, okay, put up, let's see your invoices, redact anything that is privileged, or confidential, or contains mental impressions of counsel, or advice to the client or statements of the client, or work product, and even issue a protective order that it can't be shared outside the course of this litigation with any third parties, tell me what is wrong with that.

MR. MOODY: Your Honor, because all of these other courts have looked at it, it is not a factor in the Johnson factors. We provided all of our case law to show that other attempts have been made to do this and the Courts rejects that because it is not a factor. And, you know, I hate to go to equity, but this would be a slippery slope that would be a weapon of every Plaintiff's lawyer in every case to see what the defense is doing after a case is over. And that -- so, my best argument is all the other courts have looked at this, it is not a Johnson factor, and Rule 26 post those amendments, this is not proportional to the needs of the case at all. What we did was very confined. We cited

cases where other courts looked at this and they said it is not what you do, you look at the results achieved, the time spent, the rates, and you put that together. And, Your Honor, we believe you have everything you need to make a decision as to the reasonableness of his fees. What we have done is not relevant to that decision. That is my best argument.

THE COURT: Okay. I will give you the last word, Mr. Murphy.

MR. MURPHY: Just using his associate example, he said we farm stuff out to associates, at what rate? Now, I fully recognize that labor and employment is a different market than some other firms, but there are firms with the associate first year rate now hits a thousand dollars an hour, I don't know what their first rate is. I am sure it is not a thousand dollars. But if they are going to sit there and say, and I don't want to get into the meat of it because -- but he keeps doing that, but there is no authority for this blended rate idea to begin with, but if he is going to say this is associate level work, then what do their associates charge? The Court should take that into consideration. He is saying I should be down to 400 dollars an hour, is that what Ms. Gantt is billing, I don't know? Let's get it on the table and let's have at it. And I agree

if I get this information, and you know what else I am dealing with right now, you know some of it, I will turn this around in the shortest period that the Court wants to give and provide my response once I have the information. Thank you, Your Honor.

THE COURT: All right. I will take this under advisement and be in touch with you with a ruling as soon as I am able.

Moving forward, we will look at the underlying motion itself and determine whether or not we need to have a hearing on that. It is not my intention to make everybody come up here and pay for a parking place and all that and run up more bills, but I just felt like it would be beneficial to me to sort of flesh this out before I moved on to the motion for fees. And I appreciate your patience and indulgence. It is good to see y'all.

(Whereupon, the hearing concluded at 1:09 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR May 28, 2026
Date

## $

**$500** [2] - 71:20, 71:23

## 1

**1** [1] - 14:4
**1.5** [2] - 67:20, 67:25
**10:43** [1] - 2:1
**11** [2] - 7:16, 14:4
**111** [2] - 18:2, 50:3
**116** [2] - 21:22, 21:23
**119** [1] - 11:20
**12** [7] - 2:21, 5:14, 12:14, 15:7, 59:19, 59:22, 60:15
**121** [2] - 21:24, 22:5
**123** [3] - 21:24, 22:5, 22:7
**13** [3] - 1:4, 5:15, 12:18
**14** [1] - 11:20
**144** [1] - 11:6
**15** [6] - 1:19, 9:13, 15:7, 62:20, 67:19
**15-page** [1] - 5:12
**16** [1] - 13:3
**17** [1] - 7:16
**182** [3] - 65:22, 68:13, 68:23
**18th** [3] - 9:12, 12:13, 13:3
**1976** [1] - 49:12
**1978** [1] - 59:24
**1981** [1] - 41:4
**1992** [1] - 46:22
**1999** [1] - 4:16
**19th** [3] - 14:3, 14:23, 15:6
**1:09** [1] - 75:18
**1st** [1] - 12:14

## 2

**2** [1] - 7:8
**20** [1] - 14:24
**200,000** [1] - 67:18
**2000** [1] - 46:19
**2000e-2** [1] - 10:23
**2002** [2] - 45:15, 46:2
**2004** [1] - 46:12
**2007** [1] - 45:25
**2010** [1] - 47:16
**2011** [1] - 46:14
**2015** [1] - 32:10
**2016** [3] - 17:4, 17:12, 37:1
**2019** [1] - 12:15
**202** [1] - 46:11
**2021** [5] - 17:6, 36:10, 40:11, 45:23, 47:11
**2024** [2] - 4:5, 11:5
**2026** [3] - 1:4, 36:11, 76:11
**207** [1] - 1:15
**20th** [1] - 7:7
**21** [2] - 14:24, 42:12
**219** [1] - 42:12
**22** [1] - 42:12
**228** [1] - 72:13
**23** [1] - 14:10
**237** [1] - 55:3
**24** [1] - 13:3
**24th** [4] - 21:22, 32:18, 33:4, 33:12
**255** [1] - 70:7
**25th** [3] - 32:22, 33:4, 33:13
**26** [3] - 60:11, 60:12, 73:23
**264** [1] - 59:21
**28** [3] - 45:5, 45:7, 76:11
**29601** [2] - 1:16, 1:20
**29624** [1] - 1:22

## 3

**3** [1] - 12:17
**30** [1] - 40:18
**315** [1] - 1:22

## 4

**400** [1] - 74:23
**403** [1] - 53:21
**42** [1] - 10:22
**43** [1] - 7:8
**46** [2] - 14:24, 42:12

## 5

**5** [1] - 70:7
**50** [1] - 9:5
**50(a** [7] - 9:3, 21:15, 44:18, 45:1, 48:18, 49:2, 49:3
**50(a)(2** [1] - 48:20
**50(b** [4] - 44:24, 45:12, 46:3, 49:3
**500** [2] - 71:13, 71:24
**53** [1] - 13:3
**56** [1] - 45:13
**59** [1] - 45:11
**59(a** [1] - 46:23
**59(a)(1)(A)** [1] - 47:2

## 6

**6** [1] - 7:11
**60** [1] - 43:5
**61** [1] - 14:4
**62** [2] - 14:4, 15:7
**64** [5] - 12:21, 36:1, 36:2, 42:19, 43:4
**66** [1] - 12:13

## 7

**7** [3] - 7:8, 7:11, 12:13
**70** [1] - 56:24
**700** [1] - 1:19
**778** [1] - 5:12
**792** [2] - 5:16
**7:22-3738** [1] - 2:4
**7:22-CV-3738** [1] - 1:3

## 8

**87** [2] - 7:15, 7:16
**88** [3] - 7:15, 7:16, 9:12
**89** [1] - 9:13

## 9

**95** [2] - 5:11, 5:16
**96** [2] - 21:24, 22:1
**97** [4] - 21:24, 22:2, 22:4, 22:5
**974** [1] - 11:6

## A

**a)(1** [1] - 10:23
**a.m** [1] - 2:1
**ability** [1] - 52:1
**able** [4] - 19:4, 36:7, 57:2, 75:8
**above-entitled** [1] - 76:6
**absent** [1] - 47:19
**absolutely** [1] - 20:15
**abuse** [1] - 47:19
**access** [2] - 7:9, 7:22
**accordingly** [2] - 49:4, 54:24
**accounts** [1] - 65:4
**accrues** [1] - 54:5
**accusations** [1] - 66:9
**accused** [1] - 21:18
**achieved** [4] - 62:13, 62:21, 63:3, 74:2
**acknowledged** [2] - 23:8, 26:2
**acknowledges** [1] - 18:3
**Acme** [1] - 49:11
**acted** [2] - 4:12, 43:9
**action** [25] - 3:16, 17:14, 17:25, 18:20, 18:21, 19:13, 19:19, 24:15, 24:18, 28:6, 29:1, 29:2, 40:23, 45:3, 47:1, 50:9, 51:12, 51:15, 52:8, 52:10, 52:12, 53:25, 54:5, 58:23
**actions** [4] - 4:13, 6:18, 43:10, 48:16
**active** [1] - 27:24
**activities** [3] - 67:9, 71:5, 71:13
**actual** [4] - 7:17, 16:7, 19:17, 67:24
**ad** [1] - 37:19
**add** [2] - 61:21, 61:23
**added** [2] - 4:22, 32:23
**addition** [1] - 23:23
**additional** [4] - 15:7, 16:24, 63:17, 64:4
**additionally** [1] - 51:23
**address** [16] - 16:21, 17:20, 18:4, 20:17, 20:20, 33:12, 34:14, 41:13, 41:18, 42:6, 54:6, 55:11, 56:2, 58:8, 66:16
**addressed** [8] - 16:25, 38:3, 59:12, 59:18, 61:19, 63:14, 66:23, 72:15
**addresses** [2] - 16:20, 45:6
**addressing** [6] - 21:18, 22:8, 28:6, 35:2, 38:5, 55:14
**adhere** [1] - 53:11
**adjustments** [1] - 63:2
**administering** [1] - 9:24
**administrator** [1] - 61:3
**admissibility** [1] - 37:18
**admissible** [2] - 36:21, 36:22
**admission** [3] - 3:15, 17:1, 52:14
**admit** [2] - 17:11, 24:5
**admitted** [1] - 29:17
**advance** [2] - 27:13, 52:1
**adverse** [21] - 3:16, 17:14, 18:21, 19:13, 19:19, 24:15, 24:18, 28:5, 29:1, 29:2, 40:20, 40:23, 50:9, 51:12, 51:14, 51:15, 51:20, 52:7, 52:9, 53:25, 61:3
**advice** [1] - 73:8
**advisement** [1] - 75:7
**affects** [1] - 27:12
**affirm** [1] - 46:13
**affirmed** [1] - 5:17
**affirms** [1] - 9:20
**AG** [7] - 49:20, 62:22, 64:21, 65:4, 69:6, 69:9, 69:10
**AG's** [1] - 65:7
**aggrieved** [1] - 6:15
**agree** [3] - 41:12, 41:18, 74:25
**agreed** [13] - 23:11, 23:25, 27:15, 30:18, 30:19, 30:23, 33:20, 33:24, 34:7, 34:11, 58:19, 72:19
**agrees** [2] - 20:21, 54:7
**ahead** [3] - 9:7, 16:23, 40:9
**AIDED** [1] - 1:24
**aiding** [1] - 2:18
**akin** [1] - 50:19
**alert** [1] - 54:17
**allegation** [3] - 56:21, 68:20, 70:21
**allegations** [4] - 16:15, 59:14, 65:23, 68:14
**alleged** [3] - 35:17, 49:5, 54:17
**allow** [2] - 52:13, 62:11
**allowed** [2] - 2:16, 41:17
**almost** [1] - 24:25
**alone** [1] - 5:1
**alternative** [3] - 2:7, 45:10, 55:3
**alternatively** [1] - 46:23
**amazing** [1] - 32:4
**amended** [2] - 54:8, 54:14
**amendment** [1] -

60:11
**amendments** [1] - 73:24
**American** [1] - 29:10
**amount** [1] - 67:25
**amounts** [1] - 63:17
**analysis** [1] - 53:22
**AND** [1] - 1:15
**ANDERSON** [1] - 1:22
**Anderson** [4] - 23:24, 24:6, 24:10, 60:22
**Anheuser** [1] - 46:21
**Anheuser-Busch** [1] - 46:21
**announced** [1] - 25:21
**announcement** [1] - 28:5
**announcing** [1] - 43:22
**answer** [15] - 8:4, 8:9, 8:15, 12:17, 13:6, 13:18, 13:20, 14:17, 15:3, 15:9, 15:21, 26:8, 42:15, 64:23, 72:16
**Answer** [2] - 8:12, 8:20
**anti** [8] - 5:1, 10:9, 10:11, 23:10, 23:12, 50:14, 50:16, 50:18
**anti-discrimination** [8] - 5:1, 10:9, 10:11, 23:10, 23:12, 50:14, 50:16, 50:18
**anyway** [1] - 31:25
**apologize** [3] - 39:17, 56:4, 65:8
**APPEARANCES** [1] - 1:13
**appeared** [2] - 5:19, 64:20
**applicability** [1] - 18:4
**applicable** [3] - 18:16, 49:25, 54:23
**applicant** [1] - 70:12
**application** [1] - 54:25
**applied** [5] - 5:8, 13:9, 51:10, 60:3, 60:13
**apply** [3] - 10:17, 35:24, 56:20
**appraise** [1] - 46:20
**appreciate** [4] - 33:7, 44:17, 68:21, 75:16
**apprise** [1] - 49:5
**approach** [2] - 2:24, 71:22
**appropriate** [6] - 23:17, 51:10, 63:15, 69:13, 70:17, 73:2
**appropriately** [1] - 54:22
**appropriateness** [2] - 48:5, 50:12
**approval** [1] - 64:5
**approve** [1] - 63:18
**approved** [2] - 29:7, 35:10
**area** [1] - 26:23
**argue** [1] - 25:23
**argued** [1] - 49:9
**arguing** [3] - 22:3, 33:3, 70:3
**argument** [25] - 3:5, 9:2, 21:12, 21:14, 21:19, 21:25, 22:4, 22:9, 22:13, 28:11, 30:15, 33:2, 33:10, 34:2, 34:4, 48:15, 48:17, 55:12, 61:15, 72:23, 73:4, 73:5, 73:22, 74:7
**arguments** [14] - 3:13, 20:7, 21:12, 34:25, 37:18, 47:21, 52:11, 57:14, 57:19, 58:7, 62:5, 66:18, 68:19
**arise** [1] - 19:16
**AS** [1] - 1:8
**ascended** [1] - 54:11
**aside** [3] - 10:15, 11:2, 47:5
**assert** [1] - 54:13
**asserting** [1] - 49:24
**assertion** [3] - 27:22, 56:24, 70:21
**assertions** [4] - 35:18, 57:1, 57:4, 58:4
**asserts** [7] - 47:21, 47:25, 50:24, 52:13, 52:15, 52:20, 53:24
**assess** [1] - 48:12
**assigned** [4] - 12:2, 12:7, 12:8, 12:22
**assist** [1] - 64:16
**associate** [8] - 7:11, 7:12, 7:23, 8:5, 67:11, 74:10, 74:14, 74:21
**associates** [8] - 56:25, 70:16, 70:19, 70:20, 71:6, 71:21, 74:11, 74:21
**assuming** [1] - 54:15
**asthma** [1] - 3:5
**Atlantic** [1] - 46:1
**attempts** [1] - 73:16
**attorney** [3] - 55:25, 60:16, 68:6
**attorney's** [1] - 67:20
**attorney-client** [1] - 68:6
**attorneys** [6] - 49:19, 60:25, 64:10, 70:10, 70:18, 70:25
**author** [1] - 37:2
**authorities** [2] - 19:4, 28:17
**authority** [5] - 34:9, 59:8, 62:5, 66:23, 74:19
**Auto** [2] - 6:9
**automatically** [1] - 6:25
**avoid** [1] - 49:16
**award** [4] - 5:5, 5:17, 5:24, 10:14
**awarded** [3] - 6:24, 67:20, 67:25
**aware** [4] - 11:2, 12:19, 17:5, 36:2

**B**

**backwards** [1] - 20:10
**bad** [1] - 38:8
**bank** [1] - 65:4
**Baptist** [1] - 58:14
**base** [1] - 23:8
**based** [11] - 8:7, 8:11, 8:14, 10:12, 23:6, 27:25, 47:7, 51:2, 54:9, 62:21, 63:2
**bases** [2] - 22:25, 64:16
**basis** [2] - 21:8, 44:23
**bate** [1] - 29:15
**become** [2] - 25:5, 68:17
**BEFORE** [1] - 1:11
**beforehand** [1] - 41:16
**begin** [2] - 33:16, 74:20
**beginning** [1] - 29:13
**behalf** [3] - 2:12, 49:20, 64:14
**behind** [1] - 69:2
**belief** [1] - 22:19
**bell** [1] - 66:6
**below** [1] - 18:6
**beneficial** [1] - 75:14
**benefit** [3] - 36:11, 71:2, 71:8
**best** [10] - 18:19, 24:7, 36:17, 48:12, 50:9, 72:23, 73:4, 73:5, 73:21, 74:7
**better** [1] - 68:11
**between** [5] - 27:1, 27:5, 43:2, 44:1, 63:20
**beyond** [2] - 58:15, 69:11
**Bianca** [1] - 32:7
**big** [6] - 31:10, 68:16, 68:18, 68:19, 69:3
**billing** [17] - 56:1, 56:24, 59:5, 59:7, 61:5, 63:13, 65:23, 65:25, 66:2, 66:3, 66:8, 68:6, 68:14, 72:6, 72:11, 72:25, 74:24
**billings** [3] - 60:19, 60:25, 72:25
**bills** [13] - 55:23, 58:2, 67:11, 68:9, 68:11, 68:13, 69:6, 69:8, 69:9, 69:10, 69:12, 71:3, 75:13
**bit** [2] - 65:18, 72:3
**Black** [1] - 4:2
**blend** [3] - 63:5, 72:5, 72:10
**blended** [3] - 71:17, 72:21, 74:19
**blending** [1] - 72:3
**blindness** [1] - 50:20
**block** [3] - 65:23, 72:6, 72:11
**bloody** [1] - 66:17
**blowing** [2] - 66:1, 69:1
**BMW** [80] - 1:7, 1:7, 1:8, 1:17, 2:4, 2:6, 2:9, 2:12, 7:5, 7:10, 7:21, 8:1, 8:16, 9:14, 10:8, 13:5, 14:8, 17:11, 18:1, 18:4, 18:9, 18:15, 22:18, 23:1, 23:20, 24:4, 25:21, 27:8, 27:21, 27:24, 28:1, 29:7, 31:13, 37:15, 39:15, 39:17, 47:21, 47:23, 48:10, 48:13, 48:15, 48:18, 48:23, 49:4, 49:18, 49:20, 49:24, 50:7, 50:10, 50:14, 50:24, 51:4, 51:5, 51:16, 52:11, 52:13, 52:15, 52:20, 53:3, 53:5, 53:11, 53:24, 54:3, 54:8, 54:11, 54:13, 56:16, 63:20, 64:20, 64:21, 66:19, 70:5, 70:18, 72:24, 73:1
**BMW's** [16] - 3:8, 20:13, 21:11, 23:9, 23:12, 37:15, 39:23, 48:15, 50:4, 51:21, 52:3, 53:13, 53:19, 54:6, 55:6, 70:1
**Board** [1] - 47:11
**board** [1] - 2:23
**boil** [1] - 20:7
**boom** [3] - 19:5, 19:6
**bottom** [2] - 5:15, 22:7
**boy** [1] - 58:15
**bracket** [2] - 4:24, 6:6
**bracketed** [2] - 4:23, 5:3
**break** [1] - 44:15
**brevity** [2] - 2:18, 3:17
**BRIAN** [1] - 1:14
**brief** [14] - 2:15, 2:16, 2:17, 17:24, 18:1, 18:2, 18:15, 34:21, 48:19, 49:23, 49:24, 58:12, 59:20, 68:8
**briefed** [8] - 3:11, 3:19, 26:18, 27:21, 28:19, 33:22, 34:13, 36:23
**briefing** [2] - 59:6, 60:10
**briefly** [2] - 36:9, 40:12
**briefs** [1] - 47:20
**bring** [2] - 22:10, 28:14
**bringing** [1] - 28:13
**brings** [1] - 66:13
**brought** [1] - 28:23
**Buie** [4] - 62:17, 66:12, 66:17, 67:17
**bull** [2] - 7:18, 76:11
**BULL** [1] - 1:21
**bulletin** [1] - 31:17
**bunch** [1] - 70:20
**burden** [16] - 10:13, 10:18, 16:2, 20:6, 43:8, 43:11, 43:12, 43:15, 46:10, 57:22,

57:23, 57:24, 57:25, 58:1, 59:10
**Burgmeier** [2] - 27:15, 27:18
**Busch** [1] - 46:21
**business** [1] - 70:13
**BUSINESS** [1] - 1:8

### C

**Ca** [1] - 1:3
**Cain** [1] - 2:11
**CAIN** [1] - 1:11
**calculus** [1] - 63:8
**candidate** [1] - 27:16
**cannot** [5] - 13:18, 48:4, 54:8, 54:12, 70:12
**cap** [1] - 41:4
**care** [1] - 13:22
**careful** [1] - 55:1
**carefully** [1] - 47:20
**CAROLINA** [1] - 1:1
**Carolina** [3] - 59:25, 61:1, 63:24
**carry** [4] - 57:23, 57:24, 58:1
**Carter** [1] - 66:11
**Case** [1] - 45:15
**case** [100] - 2:4, 2:19, 2:21, 7:1, 7:2, 9:6, 10:10, 11:3, 11:5, 11:17, 12:11, 14:6, 15:25, 17:23, 17:25, 18:4, 18:8, 18:13, 18:16, 18:18, 18:22, 18:25, 19:2, 19:6, 20:6, 20:7, 20:9, 20:19, 22:18, 22:23, 23:14, 23:24, 23:25, 24:20, 28:23, 29:14, 29:25, 30:11, 30:13, 34:10, 37:13, 37:22, 43:3, 43:16, 45:22, 45:23, 45:25, 46:2, 46:9, 46:12, 46:14, 46:19, 46:22, 47:11, 47:16, 47:24, 47:25, 48:8, 48:25, 49:6, 49:12, 49:24, 50:1, 50:2, 51:2, 51:10, 52:4, 52:6, 52:8, 54:24, 55:1, 56:23, 58:25, 59:24, 60:2, 60:15, 60:21, 60:23, 60:25, 61:9, 61:20, 62:17, 62:21, 64:11, 66:17, 67:2, 67:17, 68:2, 72:12, 72:13, 73:15, 73:20, 73:21, 73:25
**cases** [19] - 4:1, 11:14, 19:11, 19:15, 24:19, 28:17, 47:12, 56:10, 56:20, 59:6, 59:7, 59:16, 60:11, 61:22, 61:24, 62:4, 62:6, 66:24, 74:1
**caused** [1] - 56:5
**causing** [2] - 54:24, 65:21
**cellphone** [1] - 42:23
**Center** [1] - 45:15
**century** [1] - 62:11
**CEO** [4] - 15:9, 15:16, 42:21, 42:22
**certainly** [3] - 24:10, 24:11, 28:1
**CERTIFICATE** [1] - 76:3
**certify** [1] - 76:4
**cetera** [4] - 40:14, 60:21, 62:22, 63:18
**challenge** [1] - 57:10
**challenged** [1] - 56:16
**challenging** [1] - 66:25
**chances** [1] - 44:8
**change** [4] - 13:12, 16:11, 28:22, 36:5
**changed** [4] - 28:16, 32:21, 32:25, 33:13
**changes** [1] - 28:24
**changing** [1] - 41:5
**characterization** [1] - 35:10
**Chardon** [4] - 19:12, 19:19, 28:8, 40:22
**charge** [22] - 31:3, 32:14, 32:15, 32:17, 32:22, 32:23, 33:13, 33:18, 33:24, 40:13, 40:16, 40:19, 40:20, 40:24, 41:11, 41:13, 41:23, 42:2, 54:15, 70:12, 74:22
**charged** [1] - 62:15
**charges** [4] - 23:20, 32:19, 40:14, 40:17
**charging** [2] - 65:5, 70:25
**Charter** [2] - 72:12, 72:13
**Chaudhry** [2] - 68:5
**check** [1] - 69:10
**CHIEF** [1] - 1:11
**choice** [1] - 57:12
**chose** [1] - 72:18
**Christine** [3] - 7:6, 9:23, 15:20
**Cindy** [1] - 61:13
**Circuit** [22] - 3:24, 4:5, 4:7, 4:18, 5:5, 5:9, 10:1, 22:23, 24:2, 24:7, 29:3, 43:7, 45:15, 45:23, 45:25, 46:11, 46:14, 46:19, 46:22, 47:4, 47:16, 49:12
**circumstances** [1] - 6:5
**citation** [1] - 71:10
**cite** [7] - 21:22, 21:24, 24:19, 28:16, 61:24, 62:4, 68:4
**cited** [10] - 7:7, 9:9, 23:23, 27:23, 45:22, 45:23, 54:25, 60:10, 68:2, 73:25
**cites** [6] - 21:15, 23:16, 33:12, 47:23, 59:24, 62:4
**citing** [3] - 32:18, 66:24, 68:4
**City** [2] - 45:24, 45:25
**Civil** [1] - 58:20
**claim** [6] - 11:8, 28:13, 28:14, 47:23, 50:18, 66:24
**claiming** [1] - 28:22
**claims** [5] - 48:6, 49:6, 63:3, 71:7, 72:19
**clarification** [1] - 55:7
**classify** [1] - 31:24
**clause** [1] - 62:9
**clean** [1] - 31:7
**cleanup** [1] - 6:6
**clear** [6] - 6:23, 42:1, 47:6, 47:19, 48:2, 51:13
**clerk** [1] - 2:20
**client** [8] - 61:5, 62:14, 63:18, 68:6, 68:10, 71:2, 73:8, 73:9
**closest** [1] - 67:2
**closing** [2] - 34:1, 34:4
**CO** [2] - 1:7, 1:17
**code** [1] - 12:20
**Coggins** [6] - 62:16, 62:19, 62:20, 66:14, 67:17, 67:22
**COLLECTIVELY** [1] - 1:7
**Colleton** [1] - 45:15
**colloquy** [1] - 32:18
**Columbia** [1] - 45:14
**column** [1] - 13:11
**coming** [4] - 21:7, 37:20, 37:21, 57:21
**comma** [1] - 15:18
**commenced** [1] - 2:1
**communications** [1] - 63:20
**company** [2] - 50:15, 50:20
**comparable** [1] - 62:25
**compare** [2] - 59:14, 63:7
**compared** [1] - 62:16
**comparison** [2] - 60:9, 62:6
**compensation** [9] - 10:24, 12:2, 13:1, 13:5, 13:21, 13:23, 16:11, 36:3, 36:8
**competent** [1] - 70:10
**complain** [3] - 33:25, 54:9, 54:12
**complains** [1] - 54:3
**complaint** [1] - 9:19
**complete** [2] - 19:8, 62:9
**completely** [4] - 3:6, 20:7, 20:10, 28:1
**complied** [1] - 35:7
**computer** [1] - 40:3
**concerns** [2] - 40:19, 54:6
**conclude** [1] - 54:20
**concluded** [1] - 75:18
**conclusion** [1] - 45:20
**condition** [7] - 11:10, 11:19, 12:25, 14:1, 15:25, 16:4, 51:1
**conditions** [2] - 10:25, 36:6
**condoning** [1] - 50:20
**conduct** [3] - 8:18, 23:9, 50:17
**conference** [1] - 68:10
**confidential** [1] - 73:7
**confined** [1] - 73:25
**conflate** [1] - 36:25
**conflates** [1] - 35:20
**conflicting** [6] - 36:15, 37:14, 37:16, 38:16, 38:20, 39:1
**confused** [5] - 32:16, 34:2, 55:20, 69:17, 69:18
**confusing** [1] - 53:25
**confusion** [4] - 17:19, 54:24, 56:4, 56:8
**Congress's** [1] - 6:23
**connect** [1] - 39:5
**Connor** [1] - 46:19
**consent** [1] - 54:18
**consider** [6] - 15:11, 45:2, 47:14, 50:10, 62:24, 63:1
**consideration** [3] - 55:1, 71:20, 74:22
**considered** [2] - 47:21, 50:5
**considering** [4] - 40:16, 46:5, 47:13, 54:21
**consisted** [1] - 51:21
**consistent** [1] - 53:7
**constituted** [1] - 50:8
**constitutes** [1] - 29:1
**Constitutional** [2] - 19:15, 28:19
**construed** [2] - 47:4, 54:20
**contained** [3] - 63:13, 63:22, 64:2
**contains** [2] - 53:14, 73:7
**contest** [1] - 35:9
**contested** [3] - 37:25, 66:16, 67:24
**context** [1] - 11:17
**continually** [1] - 40:21
**continuation** [1] - 20:5
**continue** [3] - 25:21, 36:4, 42:25
**continued** [3] - 16:14, 40:25, 41:21
**continues** [2] - 22:19, 53:11
**continuing** [1] - 7:14
**continuously** [1] - 16:1
**contractual** [1] - 19:16
**contradicts** [1] - 58:4
**contrast** [1] - 11:24
**controlling** [2] - 4:6, 54:23
**conversation** [2] -

35:9, 38:2
**copy** [1] - 32:23
**corporate** [1] - 64:25
**corporations** [1] - 64:7
**correct** [4] - 14:17, 39:19, 41:8, 76:4
**corrected** [2] - 39:16, 72:9
**correctly** [1] - 51:9
**correlate** [2] - 71:22, 72:17
**correlation** [1] - 59:15
**corroborate** [1] - 53:15
**cost** [1] - 71:16
**cough** [1] - 3:2
**Council** [3] - 45:24, 60:24, 61:2
**council** [2] - 61:4, 61:12
**counsel** [8] - 2:8, 10:7, 49:16, 54:16, 55:6, 56:4, 71:9, 73:8
**count** [1] - 49:19
**country** [1] - 59:9
**County** [5] - 46:11, 47:11, 60:22, 60:24, 61:2
**couple** [1] - 72:8
**course** [9] - 5:11, 18:14, 26:8, 28:22, 49:18, 51:24, 53:19, 64:10, 73:11
**court** [9] - 21:4, 21:7, 23:15, 23:16, 24:5, 46:16, 47:18, 49:11, 49:17
**Court** [77] - 2:5, 2:12, 2:13, 3:11, 4:4, 4:8, 4:15, 5:8, 5:13, 5:17, 5:23, 6:2, 6:8, 6:22, 7:17, 11:2, 11:4, 11:6, 11:15, 12:10, 12:19, 16:18, 17:21, 21:19, 24:12, 26:25, 28:7, 28:15, 28:18, 30:1, 30:3, 32:19, 33:13, 34:5, 34:6, 34:11, 41:20, 44:19, 44:21, 44:24, 45:2, 46:3, 46:4, 46:13, 46:23, 47:2, 49:5, 50:21, 50:23, 51:9, 53:21, 54:2, 54:4, 54:6, 54:17, 57:1, 57:5, 57:6, 57:17, 57:18, 58:2, 60:2, 60:23, 61:1, 61:11, 61:18, 62:23, 63:24, 65:7, 67:3, 69:7, 69:19, 71:12, 73:5, 74:22, 75:3
**COURT** [64] - 1:1, 1:11, 1:21, 1:21, 2:2, 2:25, 3:2, 9:2, 9:7, 10:20, 16:23, 17:22, 18:24, 19:23, 19:25, 20:3, 29:19, 30:1, 30:4, 31:4, 32:13, 33:15, 33:19, 34:16, 34:19, 36:12, 36:14, 37:6, 37:14, 37:24, 38:6, 38:14, 38:24, 39:7, 39:13, 39:23, 40:4, 40:6, 40:9, 42:1, 43:18, 43:19, 44:14, 44:17, 56:2, 58:9, 61:8, 63:12, 63:19, 64:1, 64:6, 64:17, 64:25, 65:2, 65:9, 65:12, 65:14, 65:16, 69:17, 69:22, 70:1, 72:23, 74:8, 75:6
**Court's** [2] - 45:3, 54:11
**courts** [16] - 10:17, 16:17, 47:5, 59:16, 60:9, 60:13, 62:10, 62:11, 62:25, 63:23, 71:11, 71:15, 71:24, 73:14, 73:22, 74:1
**Courts** [1] - 73:17
**covered** [1] - 22:25
**crafted** [1] - 54:4
**create** [2] - 59:1, 63:16
**created** [3] - 21:5, 29:5, 29:6
**creates** [1] - 61:17
**credibility** [3] - 46:5, 46:21, 47:15
**credible** [1] - 36:19
**credit** [1] - 72:7
**criticize** [1] - 22:16
**cross** [5] - 14:3, 14:11, 14:24, 55:24, 65:5
**cross-examination** [3] - 14:3, 14:11, 14:24
**CRR** [2] - 1:21, 76:11
**crude** [1] - 70:23
**curious** [1] - 30:17
**custom** [1] - 51:24
**cut** [5] - 24:23, 24:24, 26:14, 69:10, 72:5
**cutting** [4] - 9:17, 9:21, 11:21, 11:22

### D

**D/B/A** [1] - 1:7
**damage** [2] - 21:1, 21:12
**damages** [21] - 3:13, 3:18, 3:21, 3:25, 4:11, 5:6, 5:14, 5:22, 5:25, 6:21, 6:24, 9:6, 10:14, 10:16, 21:14, 41:4, 43:14, 47:23, 48:1, 48:5, 50:12
**date** [1] - 76:11
**Dawsey** [22] - 2:4, 9:17, 13:7, 19:6, 21:5, 21:13, 23:21, 25:4, 25:19, 27:14, 27:18, 29:5, 29:9, 29:20, 31:9, 31:21, 35:1, 35:5, 35:22, 42:8, 42:17, 52:9
**DAWSEY** [1] - 1:3
**Dawsey's** [5] - 2:7, 12:12, 26:6, 26:19, 38:17
**days** [2] - 45:5, 45:7
**DC** [1] - 28:11
**deadline** [1] - 35:16
**deal** [4] - 59:22, 62:7, 69:3
**dealing** [3] - 51:24, 53:20, 75:2
**deals** [1] - 14:18
**DEBRA** [1] - 1:21
**decided** [1] - 45:7
**deciding** [1] - 45:4
**decision** [46] - 4:3, 4:4, 4:6, 4:18, 4:20, 4:23, 5:3, 5:9, 5:10, 5:11, 5:21, 7:3, 7:5, 9:15, 10:2, 10:4, 10:6, 10:7, 11:4, 11:15, 14:2, 17:13, 18:7, 18:16, 23:13, 25:19, 25:20, 28:5, 36:18, 36:23, 37:4, 37:22, 38:12, 38:15, 43:9, 43:16, 43:21, 43:22, 46:22, 47:16, 48:17, 49:25, 59:25, 67:3, 74:5, 74:6
**decision-maker** [4] - 4:23, 7:5, 9:15, 43:9
**decision-makers** [7] - 17:13, 36:23, 37:22, 38:12, 38:15, 43:16, 43:21
**decisionmaker** [1] - 17:5
**decisions** [2] - 41:25, 57:19
**deck** [2] - 4:2, 11:23
**declaration** [1] - 68:22
**declined** [2] - 41:5, 62:19
**deemed** [1] - 66:14
**Defendant** [1] - 57:6
**Defendant's** [4] - 18:14, 48:6, 49:8, 55:2
**Defendants** [2] - 34:22, 63:4
**DEFENDANTS** [1] - 1:9
**defending** [1] - 71:6
**defense** [9] - 2:8, 20:5, 24:8, 55:6, 56:3, 58:17, 59:23, 62:18, 73:20
**defined** [2] - 30:17, 30:21
**degradation** [1] - 36:3
**DEI** [1] - 5:19
**deliberating** [1] - 33:16
**deliberation** [1] - 17:19
**delineates** [1] - 27:5
**demoted** [1] - 51:8
**demotion** [1] - 12:6
**denied** [3] - 24:1, 27:19, 55:4
**Dennis** [1] - 45:14
**deny** [2] - 32:11, 47:17
**Department** [1] - 8:17
**department** [7] - 8:22, 9:22, 12:20, 19:21, 23:8, 23:9, 32:3
**departmental** [1] - 19:8
**descriptions** [1] - 51:22
**designated** [1] - 16:9
**desire** [1] - 44:11
**despite** [1] - 47:3
**detail** [1] - 26:25
**determination** [4] - 48:4, 51:11, 58:22, 67:19
**determine** [2] - 12:5, 75:10
**determines** [1] - 46:4
**developed** [1] - 31:8
**diaries** [1] - 30:8
**differ** [1] - 46:12
**difference** [4] - 19:18, 27:1, 27:7, 71:9
**differences** [1] - 26:17
**different** [13] - 5:25, 18:12, 18:17, 19:1, 19:3, 19:10, 21:15, 28:1, 50:2, 71:6, 71:9, 72:1, 74:13
**difficulties** [1] - 34:22
**ding** [1] - 66:5
**direct** [4] - 7:6, 12:12, 13:2, 24:7
**direction** [4] - 47:10, 52:19, 52:24, 57:11
**directive** [1] - 6:23
**directly** [1] - 30:21
**disagree** [2] - 19:11, 41:21
**disavowed** [1] - 53:4
**discharged** [1] - 45:8
**discovery** [4] - 55:16, 56:9, 58:19, 66:15
**discretion** [2] - 47:18, 47:19
**discriminate** [1] - 6:16
**discrimination** [29] - 3:14, 3:19, 5:1, 5:18, 5:22, 6:7, 8:3, 8:7, 8:11, 8:14, 10:9, 10:11, 10:22, 10:24, 11:8, 16:20, 23:2, 23:6, 23:10, 23:12, 23:19, 23:25, 48:6, 50:11, 50:14, 50:16, 50:18, 52:17, 53:13
**discriminatory** [1] - 6:11
**discuss** [1] - 9:20
**discussion** [8] - 14:5, 22:6, 22:22, 31:18, 32:17, 32:21, 39:11, 44:12
**disprove** [2] - 34:23, 34:24
**dispute** [6] - 31:1, 31:25, 62:7, 62:9, 66:25, 67:7
**disputed** [1] - 30:22
**distinction** [1] - 69:15
**distinctions** [1] - 27:9
**distinguish** [1] - 28:17
**distinguishable** [1] -

52:5
**distraction** [1] - 44:6
**DISTRICT** [3] - 1:1, 1:1, 1:11
**District** [2] - 46:3, 59:25
**district** [3] - 46:16, 47:4, 47:18
**disturbed** [1] - 47:19
**ditch** [1] - 66:5
**dividing** [1] - 56:11
**DIVISION** [1] - 1:2
**docket** [3] - 55:23, 56:5, 62:20
**document** [17] - 17:6, 29:8, 29:14, 29:16, 29:20, 30:10, 30:21, 37:15, 37:16, 37:18, 37:23, 38:3, 38:5, 38:11, 39:15, 39:20
**documentary** [1] - 48:9
**documents** [8] - 7:2, 29:25, 30:13, 39:8, 39:17, 40:3, 51:22, 55:6
**Doe** [1] - 47:10
**DOING** [1] - 1:8
**dollars** [4] - 71:13, 74:15, 74:16, 74:23
**domestic** [5] - 17:8, 30:19, 30:24, 53:2, 53:9
**DONALD** [1] - 1:17
**done** [13] - 9:22, 37:1, 48:11, 58:19, 58:22, 60:9, 61:10, 62:2, 65:6, 71:11, 73:3, 74:6
**dong** [1] - 66:5
**door** [1] - 56:14
**dots** [1] - 39:4
**dovetails** [1] - 53:14
**down** [8] - 4:5, 6:22, 9:20, 11:4, 20:8, 56:10, 71:3, 74:23
**Dr** [3] - 9:15, 22:10, 30:22
**draft** [2] - 32:19, 33:3
**drafted** [1] - 17:12
**drawing** [1] - 45:19
**drop** [1] - 3:2
**Drummond** [1] - 45:22
**due** [2] - 5:19, 72:3
**during** [8] - 3:23, 7:20, 12:11, 13:12, 14:23, 17:19, 35:16, 44:21
**duties** [1] - 36:4
**duty** [1] - 54:16
**Duvall** [21] - 2:21, 4:4, 4:18, 5:9, 5:10, 9:25, 10:1, 10:12, 21:24, 22:1, 22:2, 22:3, 22:6, 22:8, 22:11, 23:3, 23:4, 23:14, 23:16, 24:12, 47:24
**dynamic** [1] - 36:4

E

**early** [1] - 67:3
**ECF** [6] - 11:20, 18:2, 50:3, 55:3, 69:19, 70:7
**education** [1] - 19:15
**EEOC** [1] - 23:20
**effect** [3] - 13:4, 46:18, 53:23
**efficient** [4] - 57:11, 57:12, 57:25, 71:16
**effort** [1] - 63:10
**efforts** [1] - 50:10
**eight** [2] - 63:3, 63:4
**either** [7] - 13:9, 13:14, 26:14, 32:5, 57:19, 58:7, 66:12
**element** [3] - 8:24, 10:15, 46:9
**elicit** [2] - 10:7, 19:4
**elicited** [1] - 4:22
**ELLISON** [1] - 1:18
**emphatically** [1] - 27:19
**employee** [3] - 14:19, 23:2, 51:14
**employee's** [1] - 52:1
**employees** [3] - 17:7, 53:2, 53:3
**employer** [4] - 4:10, 6:11, 6:16, 48:5
**employment** [24] - 10:25, 11:11, 11:19, 12:25, 14:1, 16:4, 18:21, 19:13, 19:19, 24:15, 28:6, 36:6, 40:20, 40:23, 50:9, 51:1, 51:12, 51:14, 52:7, 52:10, 53:25, 60:7, 60:8, 74:12
**empowered** [1] - 46:16
**encyclopedia** [1] - 61:22
**END** [1] - 76:1
**end** [4] - 4:24, 10:25, 11:11, 41:15
**enforcing** [1] - 23:12
**engaged** [2] - 6:11, 40:15
**Englehorn** [3] - 9:15, 22:10, 30:22
**entertain** [1] - 41:5
**entertaining** [1] - 61:14
**entitled** [6] - 47:22, 48:22, 48:24, 53:17, 61:13, 76:6
**entries** [4] - 65:23, 68:23, 68:24, 72:9
**entry** [8] - 26:20, 45:5, 55:23, 56:5, 59:21, 68:25, 72:13, 72:15
**Epps** [2] - 25:13, 26:4
**equity** [1] - 73:18
**error** [5] - 49:15, 52:13, 54:16, 54:17, 54:18
**errors** [1] - 54:13
**escapade** [1] - 58:25
**ESQ** [3] - 1:14, 1:17, 1:18
**essential** [1] - 46:9
**essentially** [5] - 3:9, 7:9, 10:17, 13:19, 16:14
**establish** [3] - 9:10, 10:3, 16:3
**established** [1] - 12:1
**establishes** [1] - 12:14
**establishing** [1] - 4:24
**et** [4] - 40:14, 60:21, 62:22, 63:18
**evaluating** [1] - 48:13
**evidence** [72] - 7:3, 9:9, 10:1, 10:5, 11:25, 12:10, 14:22, 17:5, 17:11, 17:12, 20:8, 20:11, 20:15, 20:16, 21:6, 22:15, 22:22, 23:1, 23:4, 23:18, 24:9, 25:1, 25:3, 25:24, 25:25, 28:2, 29:19, 30:14, 31:12, 31:16, 31:19, 36:7, 37:9, 39:7, 43:2, 43:9, 44:2, 45:18, 46:5, 46:6, 46:20, 47:7, 47:9, 47:14, 48:2, 48:8, 48:10, 48:12, 50:5, 50:10, 50:13, 50:25, 51:4, 51:18, 51:20, 51:23, 52:5, 52:8, 52:10, 52:14, 52:16, 52:17, 52:22, 53:3, 53:10, 53:13, 53:14, 53:17, 53:22, 54:21
**evidence's** [1] - 46:18
**evidenced** [1] - 17:19
**evidencing** [1] - 51:23
**evidentiary** [2] - 44:22, 46:17
**evil** [1] - 38:11
**evolve** [1] - 36:4
**exactly** [4] - 23:15, 28:14, 38:10, 43:24
**exam** [2] - 12:12, 13:2
**examination** [4] - 7:6, 14:3, 14:11, 14:24
**example** [4] - 21:5, 24:12, 65:21, 74:10
**exception** [1] - 33:9
**excerpts** [1] - 21:17
**excuse** [1] - 46:11
**execs** [1] - 25:7
**executive** [2] - 5:18, 29:7
**exempt** [1] - 26:24
**exhibit** [2] - 12:18, 39:20
**exhibits** [3] - 12:19, 38:22, 65:21
**existed** [2] - 17:13, 23:14
**existence** [3] - 32:9, 32:11, 37:23
**existing** [1] - 24:23
**Expat** [20] - 3:15, 17:2, 21:5, 29:4, 30:16, 30:19, 30:25, 31:4, 35:5, 35:11, 36:12, 52:14, 52:17, 52:18, 52:23, 53:2, 53:7, 53:12, 53:15, 53:18
**expect** [4] - 15:1, 42:13, 44:8, 70:19
**expected** [3] - 15:4, 42:15, 42:20
**expense** [1] - 68:7
**expenses** [2] - 70:2, 70:7
**expensive** [1] - 70:13
**experience** [3] - 26:22, 26:23, 34:22
**explained** [1] - 65:24
**explaining** [2] - 29:9, 68:23
**expressing** [1] - 54:7
**extend** [1] - 68:6
**extended** [2] - 32:21, 62:16
**extensive** [3] - 40:13, 48:9, 59:6
**extensively** [7] - 2:16, 3:12, 3:20, 12:19, 14:7, 17:23, 49:9
**extent** [2] - 28:20, 61:16
**extra** [1] - 72:9
**extraordinary** [1] - 6:21
**extreme** [1] - 62:11

F

**F.4th** [2] - 5:11, 5:16
**face** [5] - 4:12, 6:17, 8:25, 35:3, 43:10
**fact** [14] - 19:11, 20:12, 26:1, 33:3, 33:12, 35:25, 36:25, 37:12, 49:21, 67:22, 70:15, 71:18, 72:3, 72:20
**factor** [7] - 6:8, 27:14, 60:3, 60:4, 73:14, 73:17, 73:23
**factors** [13] - 23:17, 23:18, 24:20, 59:19, 59:22, 60:3, 60:16, 62:15, 62:23, 62:24, 73:15
**facts** [9] - 18:11, 18:17, 18:22, 18:24, 18:25, 20:20, 48:22, 50:1, 52:4
**failed** [3] - 16:2, 46:8, 50:24
**fair** [1] - 73:2
**Fairfax** [1] - 47:11
**fairness** [1] - 57:16
**false** [1] - 47:7
**farm** [1] - 74:11
**fashioned** [1] - 2:23
**fast** [1] - 41:14
**faulty** [1] - 52:4
**favor** [2] - 45:20, 45:21
**favorable** [2] - 45:18, 61:23
**February** [3] - 7:8,

21:22, 32:18
**federal** [7] - 4:14, 4:25, 6:18, 10:9, 10:11, 43:11, 50:14
**Federal** [3] - 47:2, 49:12, 58:20
**federally** [1] - 6:14
**FedEx** [8] - 22:23, 22:24, 23:15, 23:16, 23:17, 23:23, 24:11
**fee** [11] - 55:10, 57:15, 58:25, 60:5, 60:6, 60:8, 63:1, 66:15, 66:25, 69:20, 70:11
**fees** [17] - 55:25, 58:17, 59:12, 59:23, 60:16, 62:18, 63:7, 64:18, 64:20, 64:21, 65:7, 67:21, 70:2, 70:7, 74:5, 75:15
**felt** [1] - 75:13
**few** [1] - 14:9
**figuring** [1] - 11:16
**file** [1] - 45:8
**filed** [5] - 18:2, 30:10, 48:19, 55:3, 65:7
**filing** [2] - 55:25, 72:14
**filings** [2] - 64:18
**finally** [4] - 29:17, 42:5, 53:21, 54:19
**findings** [1] - 46:7
**fine** [6] - 15:18, 33:11, 38:24, 55:14, 56:7, 72:18
**finish** [1] - 44:15
**finished** [1] - 61:8
**fire** [2] - 5:3, 18:23
**firm** [3] - 62:2, 70:16, 70:19
**firms** [2] - 74:13, 74:14
**first** [13] - 2:9, 3:9, 3:18, 6:7, 17:3, 21:22, 25:4, 48:19, 56:17, 58:16, 66:3, 74:14, 74:15
**five** [5] - 32:4, 32:5, 32:10, 49:19, 71:10
**fix** [1] - 28:9
**fixed** [1] - 28:9
**FL** [1] - 12:2
**flesh** [1] - 75:14
**flip** [1] - 20:6
**focus** [6] - 3:23, 34:24, 36:10, 40:11, 55:16, 60:15
**focused** [1] - 62:23
**focusing** [1] - 26:24
**folks** [1] - 37:3
**follow** [1] - 31:19
**followed** [1] - 36:17
**following** [1] - 32:9
**follows** [1] - 45:13
**footnote** [2] - 70:7, 71:10
**footnoted** [1] - 59:21
**FOR** [2] - 1:1, 1:14
**foregoing** [1] - 76:4
**forever** [2] - 15:2, 42:14
**forgive** [1] - 3:3
**form** [3] - 40:14, 41:3, 41:6
**formal** [1] - 15:13
**formally** [1] - 52:21
**former** [1] - 26:3
**forth** [3] - 18:6, 40:13, 70:24
**fortunately** [1] - 62:1
**forward** [3] - 41:19, 43:8, 75:9
**four** [28] - 3:10, 22:23, 23:17, 23:18, 24:22, 24:25, 25:6, 25:9, 25:13, 25:14, 25:15, 25:16, 25:20, 26:2, 26:5, 26:17, 27:2, 27:4, 27:6, 27:12, 27:20, 28:3, 43:21, 49:19, 51:8, 51:25, 58:14, 71:6
**fours** [1] - 27:17
**fourth** [3] - 3:15, 17:9, 17:14
**Fourth** [21] - 3:24, 4:5, 4:18, 5:5, 5:9, 10:1, 22:23, 24:2, 24:7, 29:2, 43:7, 45:15, 45:23, 45:25, 46:11, 46:14, 46:19, 46:22, 47:4, 47:16, 49:12
**Fowler** [1] - 64:9
**fronts** [1] - 56:17
**fully** [3] - 44:20, 46:16, 74:12
**fun** [2] - 58:2, 58:24
**function** [44] - 12:7, 12:9, 12:16, 12:17, 12:20, 12:22, 12:23, 12:25, 14:12, 14:19, 16:9, 24:21, 24:22, 24:24, 24:25, 25:5, 25:9, 25:13, 25:14, 25:15, 25:16, 25:17, 25:20, 26:2, 26:5, 27:1, 27:2, 27:3, 27:4, 27:5, 27:6, 27:12, 27:17, 27:19, 27:20, 28:2, 28:3, 35:21, 35:23, 42:25, 51:8, 51:21, 51:25, 52:1
**fundamentally** [4] - 18:12, 18:17, 19:10, 50:1
**fussed** [1] - 32:20
**future** [2] - 18:20, 19:21

**G**

**gamble** [1] - 49:13
**Gantt** [3] - 64:8, 64:15, 74:24
**gentlemen** [1] - 25:15
**German** [5] - 22:10, 29:11, 32:5, 35:9, 53:10
**Germans** [1] - 32:2
**Germany** [3] - 25:7, 31:1, 69:10
**Gesprach** [1] - 35:8
**given** [4] - 7:17, 9:17, 11:15, 48:7
**glad** [2] - 2:10, 58:9
**gladly** [1] - 57:23
**glancing** [1] - 23:24
**gracious** [1] - 41:16
**grades** [1] - 27:25
**grant** [6] - 44:19, 44:25, 46:3, 46:24, 47:5, 47:17
**granted** [3] - 45:17, 46:7, 47:1
**great** [1] - 28:20
**GREENVILLE** [3] - 1:3, 1:16, 1:20
**ground** [1] - 11:13
**Ground** [1] - 45:24
**grounds** [1] - 69:21
**GROUP** [2] - 1:8, 1:8
**group** [1] - 52:25
**grunt** [1] - 67:10
**guess** [4] - 22:6, 29:15, 41:22, 66:10
**guidance** [2] - 4:3, 12:9
**guide** [1] - 41:23
**guidelines** [14] - 26:24, 27:11, 31:8, 35:17, 36:15, 36:24, 36:25, 37:5, 43:23, 43:24, 44:2, 52:21, 53:1, 53:4
**Guidelines** [17] - 3:15, 17:2, 21:6, 29:4, 30:16, 31:5, 35:5, 35:11, 36:12, 52:14, 52:17, 52:18, 52:23, 53:7, 53:12, 53:15, 53:18
**gutted** [1] - 57:14
**guy** [2] - 23:25, 26:22
**GVC** [1] - 23:24

**H**

**hammer** [1] - 24:15
**hand** [2] - 2:24, 5:10
**handbook** [6] - 7:12, 7:24, 8:5, 23:3, 50:16
**handed** [2] - 5:11, 21:16
**handle** [1] - 58:20
**handled** [1] - 34:11
**handling** [1] - 23:19
**happy** [5] - 16:21, 17:20, 34:14, 55:5, 55:13
**hard** [4] - 24:25, 50:22, 64:1, 64:3
**harm** [8] - 11:9, 15:25, 16:3, 16:7, 16:16, 16:18, 50:25, 51:3
**hate** [1] - 73:18
**head** [1] - 20:7
**Health** [1] - 5:19
**hear** [4] - 2:10, 20:18, 40:4, 58:9
**heard** [9] - 3:22, 20:4, 24:15, 32:7, 33:5, 37:18, 44:20, 48:8, 58:13
**hearing** [10] - 2:1, 2:5, 2:13, 31:23, 54:1, 55:9, 69:11, 69:20, 75:11, 75:18
**heavy** [1] - 56:22
**held** [4] - 44:16, 53:1, 63:24
**help** [2] - 20:12, 31:7
**helped** [1] - 61:11
**Hensley** [2] - 58:25, 69:2
**heretofore** [1] - 47:1
**Herkert** [7] - 20:18, 24:16, 26:12, 27:8, 27:14, 44:7
**Herkert's** [1] - 26:13
**herself** [2] - 9:11, 16:13
**hidden** [1] - 29:8
**hide** [1] - 69:2
**high** [6] - 6:22, 10:13, 14:12, 23:23, 56:12, 56:18
**highlighted** [2] - 11:22, 13:7
**highly** [1] - 37:25
**himself** [1] - 71:19
**hindsight** [1] - 36:11
**hit** [2] - 34:13, 58:14
**hits** [1] - 74:14
**hold** [1] - 50:15
**holding** [1] - 10:12
**Holland** [1] - 29:3
**honor** [1] - 42:4
**Honor** [67] - 2:20, 3:1, 3:4, 3:7, 3:9, 5:9, 7:5, 9:4, 9:18, 10:12, 10:22, 11:2, 11:12, 11:19, 13:6, 13:19, 14:5, 15:8, 15:23, 16:1, 16:14, 16:25, 18:19, 19:18, 19:24, 20:1, 20:4, 32:15, 34:18, 34:21, 35:3, 35:7, 36:2, 36:13, 36:20, 37:9, 38:10, 38:23, 39:5, 39:10, 39:11, 39:18, 40:13, 40:16, 41:5, 41:12, 41:15, 41:16, 42:11, 43:17, 43:21, 55:22, 58:11, 58:14, 59:20, 63:11, 63:16, 64:5, 65:3, 65:11, 65:15, 65:17, 69:5, 71:14, 73:13, 74:4, 75:5
**Honor's** [1] - 11:21
**HONORABLE** [1] - 1:11
**hope** [1] - 3:3
**host** [1] - 24:19
**hour** [7] - 69:23, 71:13, 71:21, 71:23, 71:24, 74:15, 74:23
**hours** [1] - 62:16
**HR** [5] - 8:20, 9:21, 26:3, 26:21
**huge** [1] - 65:19
**Human** [5] - 8:17, 26:19, 29:6, 35:5, 53:9
**hundred** [1] - 32:3
**hurt** [1] - 44:8

**I**

**idea** [2] - 38:7, 74:20
**identifiable** [8] - 11:10, 11:18, 12:24, 13:25, 15:25, 16:3, 51:1

**identified** [1] - 23:13
**identify** [1] - 16:10
**ignore** [2] - 20:13, 25:22
**II** [1] - 1:17
**III** [1] - 1:12
**impact** [6] - 13:11, 13:17, 13:20, 17:24, 49:23, 52:1
**impacted** [1] - 19:5
**impacts** [2] - 43:4, 51:20
**impaired** [1] - 13:24
**implemented** [2] - 51:16, 52:21
**import** [1] - 50:14
**important** [2] - 13:6, 67:5
**imposed** [2] - 6:22, 67:19
**impression** [1] - 60:20
**impressions** [2] - 63:21, 73:8
**improper** [4] - 34:3, 53:25, 58:17, 59:4
**improperly** [1] - 56:23
**impute** [1] - 49:15
**IN** [1] - 1:1
**inapplicable** [1] - 18:7
**Inc** [2] - 46:22, 49:11
**inch** [1] - 49:5
**include** [1] - 45:9
**included** [2] - 4:19, 55:10
**including** [1] - 52:11
**inconsistency** [1] - 43:2
**incorporate** [3] - 9:5, 17:3, 17:10
**incredibly** [1] - 32:16
**incumbents** [1] - 26:1
**indicate** [1] - 53:1
**indicated** [2] - 3:11, 18:22
**indifference** [3] - 6:13, 8:25, 10:16
**individual** [1] - 6:15
**individuals** [2] - 25:12, 26:21
**indulgence** [2] - 44:17, 75:16
**inexpensive** [1] - 58:22
**inference** [1] - 45:19
**inform** [1] - 54:22
**information** [7] - 15:8, 57:24, 58:7, 63:13, 63:20, 75:1, 75:5
**informed** [2] - 51:7, 51:17
**initial** [1] - 55:24
**initiatives** [1] - 5:19
**inquiry** [1] - 23:17
**inside** [1] - 60:20
**instant** [1] - 61:7
**instead** [2] - 2:18, 2:22
**instruction** [9] - 3:16, 17:15, 17:17, 34:7, 54:4, 54:5, 54:8, 54:14, 54:18
**instructions** [6] - 31:9, 53:24, 54:2, 54:19, 54:22
**Insurance** [1] - 47:24
**intended** [2] - 21:13, 50:23
**intention** [1] - 75:11
**intentional** [3] - 5:18, 5:21, 6:7
**interest** [1] - 53:5
**interesting** [2] - 21:16, 42:7
**internal** [1] - 65:5
**international** [2] - 17:9, 53:2
**International** [1] - 45:23
**introduced** [3] - 2:13, 23:18, 25:14
**invitation** [6] - 15:9, 15:11, 15:12, 15:17, 18:3, 42:24
**inviting** [2] - 49:22, 54:18
**invoices** [6] - 2:8, 56:3, 59:23, 63:22, 64:19, 73:6
**involved** [3] - 37:4, 62:17, 66:18
**involving** [1] - 19:15
**irony** [1] - 65:18
**irrelevant** [1] - 66:8
**issue** [61] - 3:14, 3:16, 3:21, 3:22, 3:24, 5:7, 9:9, 9:20, 10:21, 13:23, 14:6, 14:20, 17:14, 20:19, 20:23, 21:11, 22:14, 24:14, 24:17, 25:24, 26:13, 28:1, 28:4, 29:4, 29:24, 30:12, 30:13, 34:9, 35:2, 35:20, 37:5, 40:5, 40:10, 40:12, 40:21, 41:2, 41:3, 41:14, 43:20, 44:3, 44:13, 44:20, 44:23, 45:6, 49:10, 49:20, 49:23, 50:4, 55:16, 59:18, 60:12, 60:18, 60:19, 66:11, 66:12, 68:2, 68:16, 68:18, 68:19, 69:5, 73:10
**issues** [16] - 2:16, 3:8, 3:10, 3:18, 16:21, 16:24, 28:19, 34:12, 41:24, 42:6, 46:24, 49:14, 61:19, 64:10, 70:5, 72:6
**itself** [3] - 38:3, 55:10, 75:10

J

**JACKSON** [1] - 1:18
**January** [1] - 17:4
**job** [10] - 25:10, 25:13, 25:14, 25:16, 26:4, 26:20, 26:21, 36:4, 61:25
**Johannes** [3] - 35:4, 37:1, 52:19
**Johnson** [6] - 59:18, 60:4, 60:15, 62:15, 73:15, 73:23
**joint** [1] - 45:10
**journals** [2] - 29:23, 39:18
**judge** [2] - 47:14, 49:15
**Judge** [27] - 2:11, 2:15, 3:16, 3:21, 4:8, 6:8, 9:11, 9:25, 16:20, 17:24, 18:3, 40:12, 43:6, 46:20, 60:5, 60:19, 61:21, 62:16, 62:18, 62:20, 64:12, 64:24, 66:14, 67:17, 67:22, 71:5, 72:12
**JUDGE** [1] - 1:11
**Judge's** [1] - 49:22
**Judgment** [4] - 11:20, 12:10, 28:8, 28:15
**judgment** [21] - 2:6, 2:14, 21:8, 40:24, 44:19, 44:25, 45:6, 45:9, 45:12, 45:14, 45:17, 46:15, 47:22, 48:22, 48:23, 48:24, 49:8, 49:21, 55:2, 67:20, 68:1
**JURY** [1] - 1:12
**jury** [47] - 3:16, 5:17, 16:17, 17:15, 17:18, 24:2, 24:8, 26:10, 31:3, 32:13, 32:15, 32:17, 33:16, 33:21, 33:23, 36:17, 40:14, 41:3, 41:8, 44:2, 44:22, 45:2, 45:3, 45:6, 45:8, 45:16, 45:21, 46:25, 48:4, 48:8, 48:11, 49:1, 49:7, 50:9, 51:11, 52:5, 52:10, 53:17, 53:24, 54:1, 54:14, 54:17, 54:20, 54:23, 62:13, 72:18
**jury's** [7] - 5:24, 42:2, 46:7, 46:13, 48:1, 49:13, 54:12
**justice** [1] - 47:8

K

**keep** [8] - 3:2, 21:7, 22:4, 32:18, 57:21, 65:18, 71:2
**keeping** [1] - 40:3
**keeps** [1] - 74:18
**Kelly** [7] - 21:5, 25:19, 26:18, 27:9, 29:5, 29:9, 31:21
**KELLY** [1] - 1:3
**key** [2] - 20:20, 27:13
**kind** [4] - 30:16, 35:18, 62:12, 67:8
**kinds** [1] - 62:2
**King** [1] - 47:15
**knowledge** [8] - 4:25, 10:2, 10:8, 22:12, 22:25, 43:21, 50:13, 50:18
**known** [2] - 41:17, 48:16
**knows** [2] - 10:22, 35:23
**Kolstad** [6] - 4:3, 4:8, 4:16, 47:25, 48:3, 48:7

L

**labor** [1] - 74:12
**lack** [1] - 10:5
**laid** [1] - 22:21
**language** [8] - 4:19, 5:7, 5:13, 5:16, 5:23, 32:24, 33:1, 47:3
**large** [1] - 72:5
**last** [1] - 74:8
**lastly** [2] - 43:6, 60:18
**late** [1] - 40:7
**law** [37] - 2:6, 2:14, 4:14, 5:1, 6:19, 9:25, 10:9, 10:11, 20:17, 20:21, 21:9, 22:12, 22:25, 28:11, 31:15, 38:9, 43:11, 44:20, 44:25, 45:9, 45:13, 45:17, 46:16, 47:1, 47:22, 48:16, 48:22, 48:25, 49:9, 50:19, 50:21, 51:13, 54:23, 55:2, 60:7, 60:8, 73:15
**laws** [1] - 50:18
**lawyer** [4] - 23:4, 49:19, 64:25, 73:20
**lawyers** [3] - 39:11, 63:21, 64:6
**leadership** [3] - 35:13, 35:16, 38:19
**least** [7] - 6:16, 24:11, 49:19, 50:13, 57:6, 59:17, 70:4
**led** [1] - 22:23
**legal** [8] - 8:21, 9:20, 9:22, 17:17, 23:9, 38:12, 45:4, 50:17
**legally** [1] - 44:22
**legitimate** [1] - 45:19
**length** [1] - 5:21
**less** [3] - 57:11, 57:12, 71:1
**lesser** [1] - 64:13
**Letter** [1] - 4:3
**level** [64] - 12:8, 12:9, 12:16, 12:17, 12:20, 12:22, 12:23, 12:25, 14:8, 14:9, 14:12, 14:13, 14:19, 16:9, 24:21, 24:22, 24:25, 25:5, 25:9, 25:13, 25:14, 25:15, 25:16, 25:17, 25:20, 26:2, 26:5, 26:16, 26:20, 27:1, 27:2, 27:3, 27:4, 27:6, 27:7, 27:12, 27:17, 27:20, 28:3, 29:2, 31:11, 35:21, 35:23, 42:25, 50:8, 51:8, 51:21, 51:25, 52:2, 64:12, 67:14, 67:15, 70:10, 70:11, 74:21
**levels** [1] - 64:5
**LEWIS** [1] - 1:18
**liable** [1] - 4:10
**light** [4] - 42:9, 45:18, 62:24, 72:20
**likewise** [1] - 54:11
**Limited** [1] - 46:1

USCA4 Appeal: 26-1793 Doc: 16-1 Filed: 09/03/2026 Pg: 118 of 123 Total Pages:(118 of 123)


**limited** [3] - 6:4, 21:12, 28:18
**line** [11] - 7:11, 7:16, 9:12, 9:13, 14:4, 14:10, 34:25, 35:20, 53:9, 56:11
**lines** [9] - 7:8, 7:16, 12:13, 13:3, 14:24, 15:7, 42:12, 65:25, 68:23
**listen** [1] - 36:18
**listening** [1] - 33:8
**litigant** [1] - 49:13
**litigation** [5] - 59:1, 61:18, 63:9, 65:20, 73:11
**living** [1] - 57:7
**LLC** [2] - 1:7, 1:17
**local** [2] - 53:2, 53:9
**located** [2] - 7:8, 59:20
**logic** [1] - 35:24
**logical** [1] - 35:25
**longstanding** [1] - 50:7
**look** [21] - 2:21, 7:1, 9:25, 11:16, 12:7, 12:18, 19:21, 21:20, 26:12, 26:18, 29:15, 35:25, 57:9, 67:21, 67:22, 67:23, 70:24, 71:24, 74:2, 75:9
**looked** [7] - 31:13, 59:12, 69:19, 71:15, 73:14, 73:22, 74:1
**looking** [2] - 18:1, 69:22
**losing** [1] - 19:2
**loss** [4] - 13:1, 13:20, 13:23, 40:25
**lost** [2] - 40:21, 41:22
**love** [1] - 58:1
**loved** [1] - 30:10
**lower** [5] - 29:1, 50:8, 70:10, 70:11, 71:17
**lower-level** [3] - 50:8, 70:10, 70:11
**lowering** [1] - 72:2
**LP** [1] - 46:2

**M**

**ma'am** [2] - 15:1, 42:13
**Magistrate** [3] - 17:24, 18:3, 49:22
**MAIN** [1] - 1:19
**maintain** [4] - 10:13, 16:1, 16:15, 18:20
**maintains** [1] - 23:1
**majority** [1] - 3:17
**maker** [5] - 4:23, 7:5, 9:15, 23:13, 43:9
**maker's** [1] - 10:2
**makers** [11] - 7:3, 10:4, 10:6, 10:8, 17:13, 36:23, 37:22, 38:12, 38:15, 43:16, 43:21
**malice** [3] - 6:12, 8:25, 10:16
**man** [1] - 56:23
**management** [14] - 31:11, 31:12, 35:10, 37:6, 37:10, 37:12, 38:3, 38:4, 38:19, 39:3, 48:10, 51:16, 52:25, 53:5
**Management** [1] - 26:20
**manager** [3] - 22:24, 27:3, 27:4
**managers** [2] - 27:4, 48:13
**MANUFACTURING** [2] - 1:7, 1:17
**Manufacturing** [2] - 8:1, 18:2
**market** [1] - 74:13
**Maryland** [2] - 45:25, 46:11
**massive** [6] - 59:8, 63:17, 63:18, 66:22, 66:23, 68:12
**matter** [20] - 2:4, 2:6, 2:14, 6:1, 21:9, 22:21, 44:19, 44:25, 45:9, 45:12, 45:17, 46:15, 47:22, 48:25, 49:9, 55:2, 59:1, 60:8, 76:6
**matters** [4] - 22:18, 23:20, 56:19, 63:10
**MAY** [1] - 1:4
**Mayor** [1] - 45:24
**MC** [18] - 2:6, 2:12, 7:5, 7:10, 7:21, 8:16, 10:8, 17:11, 18:9, 29:7, 49:21, 49:24, 64:14, 64:20, 64:21, 65:2, 69:8, 69:12
**MC's** [1] - 50:10
**McCoy** [6] - 3:22, 9:4, 22:8, 62:1, 64:8, 64:15
**MCCOY** [2] - 1:18, 55:18
**McCraw** [7] - 9:16, 26:1, 27:23, 29:17, 32:8, 35:14, 44:9
**MCDUFFIE** [1] - 1:22
**McMillan** [1] - 47:16
**mean** [5] - 20:13, 29:23, 50:15, 62:12, 70:23
**means** [3] - 30:19, 30:20, 65:9
**meant** [2] - 31:2, 36:16
**meat** [1] - 74:18
**Medical** [1] - 45:15
**medicine** [1] - 3:5
**Medley** [4] - 12:15, 25:18, 35:25, 36:2
**Medley's** [1] - 36:6
**meet** [2] - 16:2, 43:15
**meeting** [8] - 31:11, 35:9, 35:13, 37:7, 37:10, 38:2, 38:20, 39:4
**member** [3] - 60:24, 61:2, 61:12
**memo** [2] - 25:7, 31:18
**memory** [1] - 31:6
**mental** [3] - 60:20, 63:21, 73:7
**mention** [7] - 22:1, 22:2, 22:8, 22:9, 25:6, 25:10, 25:11
**mere** [1] - 49:10
**met** [4] - 10:13, 10:18, 24:20, 43:14
**midst** [1] - 3:5
**might** [4] - 16:19, 28:7, 34:15, 51:3
**minds** [1] - 46:12
**mine** [2] - 25:25, 66:8
**minute** [1] - 31:14
**minutes** [1] - 40:18
**miscarriage** [1] - 47:8
**misplaced** [1] - 48:7
**misstated** [1] - 17:17
**misstatement** [1] - 39:16
**misunderstood** [1] - 60:2
**mitigated** [1] - 41:24
**model** [1] - 70:14
**modest** [2] - 63:2, 63:7
**modified** [1] - 54:4
**Moody** [1] - 2:12
**MOODY** [41] - 1:17, 2:11, 3:1, 3:4, 9:4, 9:8, 10:21, 16:24, 18:19, 19:1, 19:24, 34:21, 36:13, 36:20, 37:9, 37:21, 37:25, 38:10, 38:23, 38:25, 39:10, 39:14, 39:24, 40:5, 40:8, 40:10, 42:4, 55:22, 58:11, 61:10, 63:16, 63:23, 64:3, 64:8, 64:23, 65:3, 65:11, 65:13, 65:15, 71:4, 73:13
**moody** [7] - 24:15, 25:6, 25:10, 25:11, 29:13, 67:7, 70:1
**moody's** [1] - 34:14
**Moore's** [1] - 49:12
**morning** [8] - 2:2, 3:12, 3:17, 20:2, 20:3, 32:22, 41:2, 61:20
**most** [4] - 45:18, 62:10, 62:11, 71:16
**motion** [48] - 2:5, 2:8, 2:9, 2:14, 9:3, 9:5, 16:25, 21:15, 44:5, 44:18, 44:19, 44:25, 45:4, 45:6, 45:9, 45:12, 45:13, 46:4, 46:7, 46:15, 46:24, 47:13, 47:17, 48:18, 48:19, 48:21, 49:2, 49:3, 49:8, 55:2, 55:5, 55:19, 55:22, 56:1, 56:3, 56:9, 63:11, 64:18, 64:19, 68:22, 69:8, 70:2, 70:3, 70:6, 75:10, 75:15
**motions** [3] - 55:8, 55:16, 61:19
**movant** [2] - 45:8, 48:23
**move** [6] - 24:18, 24:21, 25:19, 38:24, 44:7, 61:20
**moved** [7] - 36:1, 41:6, 41:14, 41:19, 42:18, 51:17, 75:15
**movement** [1] - 48:23
**moves** [1] - 29:9
**moving** [8] - 35:2, 43:3, 45:19, 45:21, 46:8, 48:20, 51:19, 75:9
**MR** [59] - 2:11, 3:1, 3:4, 9:4, 9:8, 10:21, 16:24, 18:19, 19:1, 19:24, 20:1, 20:4, 29:22, 30:3, 30:6, 31:21, 32:15, 33:17, 33:20, 34:18, 34:21, 36:13, 36:20, 37:9, 37:21, 37:25, 38:10, 38:23, 38:25, 39:10, 39:14, 39:24, 40:5, 40:8, 40:10, 42:4, 43:20, 55:7, 55:18, 55:20, 55:22, 56:7, 58:11, 61:10, 63:16, 63:23, 64:3, 64:8, 64:23, 65:3, 65:11, 65:13, 65:15, 65:17, 69:18, 69:25, 71:4, 73:13, 74:10
**Muldrow** [32] - 11:4, 11:13, 11:17, 14:2, 16:2, 17:18, 17:23, 17:25, 18:4, 18:6, 18:11, 18:16, 18:17, 18:22, 18:24, 19:2, 20:19, 24:16, 26:13, 27:8, 27:14, 28:21, 28:23, 28:24, 44:7, 47:25, 48:17, 49:23, 49:25, 50:1, 50:22, 51:9
**Muldrows** [1] - 26:14
**multiple** [3] - 41:20, 62:22, 64:5
**Murphy** [23] - 2:25, 12:17, 19:25, 34:25, 35:18, 35:21, 36:24, 42:7, 57:22, 58:24, 59:10, 60:10, 61:22, 62:13, 62:17, 65:16, 67:8, 67:9, 70:15, 71:7, 74:9
**MURPHY** [20] - 1:14, 1:15, 20:1, 20:4, 29:22, 30:3, 30:6, 31:21, 32:15, 33:17, 33:20, 34:18, 43:20, 55:7, 55:20, 56:7, 65:17, 69:18, 69:25, 74:10
**Murphy's** [3] - 66:3, 70:6, 72:25
**must** [9] - 6:10, 6:16, 10:14, 10:23, 11:9, 20:9, 22:20, 33:8, 46:13

**N**

**narrative** [2] - 25:24, 61:5
**narratives** [1] - 61:2
**national** [8] - 8:8, 17:7, 23:2, 23:7, 30:16, 31:24, 52:16, 53:13

**nauseam** [1] - 37:19
**necessarily** [1] - 51:15
**necessary** [2] - 64:4, 67:4
**neck** [1] - 61:6
**need** [10] - 33:10, 38:21, 55:11, 55:12, 57:8, 57:24, 67:11, 74:4, 75:10
**needless** [1] - 63:8
**needs** [2] - 60:14, 73:24
**negative** [1] - 34:23
**never** [15] - 4:21, 9:19, 18:8, 19:21, 28:1, 29:24, 30:13, 33:22, 35:14, 37:13, 42:19, 42:21, 52:7, 52:21, 65:24
**new** [15] - 2:7, 2:14, 32:23, 45:10, 46:24, 46:25, 47:5, 47:13, 47:17, 47:22, 48:17, 51:19, 54:9, 55:3, 59:1
**newly** [1] - 50:4
**next** [6] - 12:8, 13:1, 14:21, 41:2, 53:9, 61:21
**nine** [1] - 70:6
**NO** [1] - 1:3
**nobody** [3] - 29:8, 33:13, 68:10
**non** [2] - 45:19, 46:8
**non-moving** [2] - 45:19, 46:8
**nondiscrimination** [1] - 8:19
**none** [7] - 23:14, 30:6, 31:23, 36:23, 37:3, 37:22, 59:22
**normally** [2] - 7:12, 58:16
**North** [1] - 59:25
**note** [13] - 33:20, 33:21, 33:22, 33:23, 34:1, 34:5, 34:11, 38:25, 41:8, 42:2, 54:12
**noted** [10] - 45:14, 46:10, 46:13, 46:18, 46:21, 47:10, 47:15, 48:2, 49:11, 59:19
**notes** [1] - 76:5
**nothing** [4] - 22:10, 22:21, 28:16, 69:25
**notice** [6] - 18:20, 19:13, 19:18, 19:20, 55:9, 69:19
**noticed** [1] - 72:8
**notices** [1] - 19:17
**Novant** [1] - 5:18
**nowhere** [1] - 66:21
**number** [7] - 3:13, 3:14, 39:17, 55:3, 59:3, 59:5, 59:21
**numerosity** [1] - 64:14

**O**

**oath** [1] - 26:10
**object** [1] - 54:3
**objected** [1] - 33:14
**objection** [2] - 33:11, 33:17
**objections** [1] - 40:15
**obligation** [2] - 54:13, 54:16
**obviously** [1] - 62:13
**occupied** [1] - 25:12
**occur** [2] - 52:12
**occurred** [3] - 16:19, 19:22, 61:7
**occurs** [1] - 5:14
**Ocean** [1] - 45:25
**OF** [3] - 1:1, 76:1, 76:3
**offended** [1] - 61:25
**offense** [2] - 57:3, 62:12
**offered** [1] - 28:2
**offers** [1] - 25:14
**office** [3] - 15:9, 15:12, 42:23
**old** [3] - 2:23, 28:25, 58:14
**old-fashioned** [1] - 2:23
**omitted** [1] - 59:7
**once** [3] - 25:22, 34:6, 75:4
**one** [43] - 3:13, 6:7, 13:14, 13:22, 17:23, 20:18, 23:23, 24:2, 24:18, 25:2, 26:21, 26:23, 32:2, 32:4, 34:22, 35:6, 38:7, 41:24, 43:20, 45:21, 49:15, 56:10, 56:17, 56:23, 57:18, 58:6, 58:20, 59:3, 59:17, 61:10, 61:11, 62:5, 62:18, 63:4, 65:25, 66:1, 67:2, 68:23, 68:25, 71:15, 72:19, 73:5
**one's** [1] - 27:13
**one-man** [1] - 56:23
**ones** [5] - 17:2, 29:16, 65:20, 67:16, 68:25
**open** [2] - 42:23
**opens** [1] - 56:14
**operation** [1] - 56:23
**operative** [5] - 4:19, 5:13, 12:11, 12:23, 19:18
**opinion** [2] - 12:3, 45:16
**opponent** [1] - 70:12
**opportunity** [2] - 27:13, 58:12
**opposing** [1] - 49:16
**opposite** [1] - 57:11
**opposition** [2] - 65:22, 66:10
**options** [1] - 25:8
**oral** [1] - 61:14
**Order** [5] - 11:20, 11:21, 12:10, 28:8, 49:22
**order** [2] - 62:3, 73:10
**organization** [1] - 36:5
**origin** [8] - 8:8, 17:7, 23:2, 23:7, 30:16, 31:24, 52:16, 53:13
**otherwise** [1] - 50:15
**ought** [1] - 57:2
**outline** [2] - 2:22, 23:16
**outlined** [1] - 3:25
**outright** [1] - 68:18
**outside** [1] - 73:10
**outweighed** [1] - 53:23
**overturned** [1] - 34:10
**overview** [1] - 3:12
**own** [5] - 10:2, 39:1, 51:21, 58:4, 62:5

**P**

**p.m** [1] - 75:18
**packaged** [1] - 61:20
**page** [23] - 2:21, 5:14, 5:15, 6:20, 7:16, 9:12, 11:5, 11:20, 12:13, 13:3, 14:4, 14:21, 14:24, 21:22, 21:23, 22:1, 22:2, 22:3, 22:5, 22:7, 42:12, 59:21, 70:6
**pages** [10] - 7:8, 7:15, 14:4, 15:7, 21:2, 21:3, 21:16, 21:24, 22:5, 30:8
**paginated** [1] - 5:14
**paid** [3] - 26:7, 26:9, 69:9
**paragraph** [1] - 10:23
**paralegal** [1] - 64:9
**parking** [1] - 75:12
**part** [7] - 8:4, 19:7, 44:5, 50:20, 59:2, 63:8, 70:8
**particular** [4] - 22:17, 62:7, 62:8, 62:10
**parties** [7] - 17:24, 44:20, 49:23, 54:1, 62:22, 63:10, 73:11
**partner** [3] - 64:12, 67:14, 71:16
**partner-level** [1] - 64:12
**partners** [1] - 71:1
**Partnership** [1] - 46:1
**party** [9] - 44:23, 45:19, 45:22, 46:8, 48:20, 56:11, 56:12, 58:3, 66:25
**party's** [1] - 45:20
**pass** [1] - 2:20
**passes** [1] - 11:14
**past** [1] - 4:17
**patience** [1] - 75:16
**pay** [9] - 24:16, 24:17, 24:23, 24:24, 26:13, 51:13, 69:13, 75:12
**paying** [2] - 64:20, 64:21
**pending** [1] - 63:11
**people** [3] - 26:4, 31:12, 31:24
**per** [1] - 71:21
**perceived** [20] - 3:24, 4:13, 5:2, 5:7, 6:17, 7:3, 9:1, 9:8, 9:10, 10:4, 10:6, 10:10, 20:15, 20:16, 22:15, 35:3, 43:10, 43:12, 43:13, 43:15
**perceiving** [1] - 10:18
**percent** [6] - 56:24, 62:20, 63:5, 63:6, 67:19, 72:7
**perform** [1] - 70:11
**performed** [1] - 70:19
**perhaps** [2] - 12:16, 71:17
**period** [8] - 7:21, 11:3, 11:11, 12:11, 13:13, 13:21, 75:3
**permissive** [1] - 47:3
**permitted** [1] - 16:18
**person** [2] - 21:23, 37:12
**personal** [6] - 4:25, 10:2, 10:8, 27:25, 29:23, 57:3
**pertains** [1] - 10:9
**pertinent** [1] - 63:11
**petition** [5] - 55:10, 57:15, 59:12, 63:1, 69:20
**petitions** [3] - 60:6, 60:8
**Petrasch** [16] - 7:6, 7:14, 7:19, 9:16, 9:23, 15:20, 22:16, 23:5, 23:8, 23:11, 23:18, 25:4, 25:6, 29:9, 43:22, 53:6
**Petrasch's** [1] - 22:17
**phase** [1] - 61:21
**pictures** [1] - 7:17
**piece** [1] - 24:9
**Pitrolo** [1] - 46:14
**PITROLO** [1] - 46:14
**pivots** [1] - 5:23
**place** [3] - 7:10, 52:8, 75:12
**placed** [1] - 51:25
**Plaintiff** [31] - 4:21, 6:10, 10:11, 10:13, 10:23, 13:19, 16:2, 16:6, 16:10, 16:13, 16:19, 17:4, 18:8, 24:6, 35:12, 37:2, 41:20, 43:11, 43:15, 48:3, 50:6, 50:24, 51:3, 51:5, 51:6, 51:17, 51:19, 52:7, 54:7, 57:16, 63:4
**plaintiff** [7] - 1:4, 5:4, 6:3, 6:23, 51:12, 52:19, 71:8
**PLAINTIFF** [1] - 1:14
**Plaintiff's** [23] - 9:11, 9:13, 10:2, 10:6, 13:2, 14:2, 14:23, 16:15, 23:4, 28:13, 39:1, 43:8, 47:23, 49:6, 51:2, 52:16, 52:20, 52:24, 53:6, 53:16, 70:2, 71:8, 73:20
**Plaintiffs** [1] - 9:9
**plan** [3] - 19:7, 56:2,

56:5
**play** [2] - 14:2, 14:10
**playing** [1] - 66:5
**plowing** [1] - 11:13
**plus** [1] - 26:19
**point** [25] - 16:8, 16:10, 17:9, 17:23, 20:23, 23:22, 27:24, 28:21, 31:14, 32:1, 32:2, 33:2, 34:1, 36:14, 41:7, 41:11, 41:19, 43:1, 43:6, 49:11, 55:13, 55:14, 62:5, 62:14, 63:12
**pointed** [2] - 33:23, 34:6
**pointing** [1] - 20:11
**points** [5] - 16:5, 17:16, 34:14, 58:14, 58:15
**police** [1] - 18:23
**policies** [7] - 7:10, 7:22, 8:24, 9:18, 9:21, 9:24, 53:19
**policy** [16] - 7:13, 8:2, 8:7, 8:19, 13:4, 23:1, 23:5, 23:6, 23:12, 23:21, 24:23, 32:9, 38:1, 50:16, 51:24, 53:11
**popping** [1] - 11:14
**position** [34] - 12:1, 12:14, 16:7, 16:9, 18:15, 19:3, 19:12, 24:18, 25:5, 26:19, 26:24, 29:2, 32:7, 35:24, 36:17, 40:22, 41:12, 41:19, 43:3, 44:3, 48:12, 50:7, 50:8, 50:10, 51:7, 51:8, 51:18, 51:19, 51:25, 56:16, 61:23, 66:2, 66:4, 66:8
**positions** [3] - 27:17, 41:17, 53:1
**possibility** [1] - 63:12
**post** [8] - 2:5, 3:8, 46:17, 48:19, 49:1, 54:9, 61:19, 73:23
**post-trial** [6] - 2:5, 3:8, 46:17, 48:19, 49:1, 61:19
**poster** [2] - 23:24, 24:1
**potential** [2] - 18:20, 53:23
**potentially** [1] - 31:15
**Practice** [1] - 49:13
**practice** [2] - 6:12, 51:24
**practices** [2] - 53:19, 73:1
**practitioners** [1] - 60:6
**pre** [1] - 60:11
**preacher** [1] - 58:15
**precedent** [1] - 43:7
**prejudicial** [2] - 17:11, 53:23
**prepared** [5] - 17:4, 52:18, 52:23, 54:2, 54:5
**prerequisite** [1] - 49:2
**presentation** [1] - 37:3
**presented** [15] - 18:13, 18:18, 31:10, 38:19, 39:4, 48:8, 49:14, 50:2, 51:4, 52:9, 52:18, 52:22, 52:24, 53:3, 54:22
**preservation** [1] - 21:11
**preserve** [5] - 20:23, 21:1, 22:13, 33:4, 33:10
**preserved** [2] - 33:2, 34:9
**President** [5] - 15:16, 29:6, 32:8, 35:4, 53:8
**Preston** [3] - 60:23, 63:25, 68:4
**pretty** [1] - 32:20
**prevent** [4] - 8:10, 8:13, 47:9, 50:11
**prevents** [2] - 8:2, 8:7
**previously** [2] - 48:17, 49:14
**primarily** [1] - 64:14
**primary** [1] - 52:16
**principle** [3] - 22:2, 22:3, 22:11
**principles** [1] - 54:23
**printout** [2] - 5:12, 5:14
**private** [1] - 70:9
**privilege** [6] - 60:18, 61:4, 61:17, 68:2, 68:3, 68:6
**privileged** [5] - 60:20, 61:2, 63:13, 63:19, 73:7
**privileges** [1] - 10:25
**probative** [1] - 53:22
**procedurally** [2] - 58:16, 59:3
**Procedure** [1] - 58:21
**proceed** [1] - 56:6
**proceeding** [1] - 58:23
**proceedings** [1] - 58:21
**process** [7] - 14:7, 14:16, 14:19, 15:14, 15:19, 15:23, 44:10
**processed** [1] - 69:8
**produce** [2] - 39:24, 50:25
**produced** [11] - 29:16, 30:6, 30:7, 30:9, 30:12, 37:15, 39:15, 39:18, 39:20, 39:21, 40:1
**product** [2] - 63:21, 73:9
**production** [4] - 2:8, 56:3, 64:19, 65:19
**progress** [1] - 44:8
**project** [2] - 36:1, 64:16
**project-related** [1] - 64:16
**projecting** [1] - 2:19
**projection** [1] - 61:24
**promote** [1] - 42:19
**promoted** [1] - 44:9
**promotion** [7] - 13:25, 14:5, 14:8, 14:22, 15:22, 43:4
**promotions** [1] - 27:25
**proof** [4] - 4:11, 30:5, 35:11, 46:10
**proper** [3] - 24:13, 34:6, 66:1
**properly** [6] - 28:15, 30:12, 36:21, 36:22, 46:7, 56:13
**proportional** [2] - 60:14, 73:24
**proportionality** [2] - 60:12, 60:13
**proposed** [1] - 54:1
**proposition** [2] - 48:3, 72:24
**prospects** [4] - 13:24, 14:22, 15:22, 43:4
**protected** [1] - 6:14
**protective** [1] - 73:10
**protest** [1] - 41:10
**prove** [5] - 10:14, 24:6, 24:24, 29:14, 73:3
**provide** [3] - 4:2, 40:14, 75:4
**provided** [13] - 2:25, 5:12, 7:18, 11:19, 12:9, 12:16, 16:12, 40:15, 42:11, 54:20, 59:6, 59:16, 73:15
**provides** [2] - 44:24, 58:18
**public** [1] - 19:15
**published** [1] - 27:11
**pull** [1] - 34:23
**pulled** [1] - 55:15
**punitive** [22] - 3:13, 3:18, 3:21, 3:25, 4:11, 5:6, 5:13, 5:22, 5:24, 6:21, 6:24, 9:6, 10:14, 10:15, 21:1, 21:11, 21:14, 43:14, 47:23, 48:1, 48:5, 50:12
**punitives** [1] - 21:10
**purloined** [3] - 29:25, 30:13, 39:8
**purpose** [2] - 49:15, 59:3
**purposes** [5] - 3:12, 4:6, 5:10, 44:7, 62:6
**pursuant** [2] - 31:9, 48:21
**pursue** [3] - 15:18, 15:24, 42:25
**push** [2] - 64:9, 64:11
**pushing** [1] - 32:24
**put** [13] - 19:5, 20:8, 26:25, 35:6, 36:7, 37:2, 37:7, 37:11, 40:18, 66:20, 70:22, 73:6, 74:3

**Q**

**questions** [5] - 16:21, 17:20, 28:7, 34:15, 45:4
**quick** [5] - 3:10, 16:5, 17:2, 17:16, 42:7
**quickly** [3] - 34:24, 40:18, 41:6
**quote** [13] - 4:12, 4:21, 6:24, 10:24, 11:1, 11:6, 11:11, 16:3, 16:15, 17:8, 18:5, 21:20
**quotes** [1] - 11:18
**quoting** [3] - 6:8, 47:11, 49:12

**R**

**R&R** [1] - 11:3
**race** [1] - 8:11
**raise** [2] - 48:24, 49:14
**raised** [7] - 45:4, 48:18, 49:10, 49:20, 50:4, 57:10, 72:24
**rally** [1] - 20:12
**RANDLE** [1] - 1:17
**Randy** [2] - 2:12, 2:19
**range** [2] - 12:2, 13:16
**rate** [17] - 56:12, 56:17, 59:13, 60:17, 62:15, 63:5, 64:13, 67:1, 71:17, 71:20, 72:2, 72:10, 72:21, 74:11, 74:14, 74:16, 74:19
**rates** [3] - 56:18, 73:1, 74:3
**ratio** [1] - 59:17
**reach** [1] - 14:12
**reached** [1] - 45:21
**read** [2] - 33:6, 70:3
**ready** [1] - 61:20
**real** [1] - 60:19
**really** [1] - 41:14
**reason** [7] - 33:9, 40:24, 43:13, 46:25, 57:12, 57:13
**reasonable** [3] - 44:21, 45:20, 46:12
**reasonableness** [4] - 59:11, 59:13, 72:25, 74:5
**reasons** [3] - 19:14, 48:24, 49:1
**reassert** [1] - 49:1
**received** [1] - 40:17
**recently** [2] - 4:17, 60:13
**recess** [1] - 44:16
**recited** [1] - 43:24
**reckless** [3] - 6:13, 8:25, 10:16
**recognize** [2] - 11:12, 74:12
**recognized** [2] - 14:1, 71:12
**recognizes** [1] - 9:18
**recollection** [1] - 41:1
**Recommendation** [1] - 28:16
**reconsider** [1] - 46:18

**record** [19] - 2:3, 7:1, 7:5, 10:5, 23:7, 23:10, 30:17, 30:22, 37:15, 38:4, 38:6, 38:25, 39:13, 39:14, 40:19, 42:1, 42:3, 53:14, 55:1
**records** [7] - 39:23, 51:21, 56:1, 60:19, 61:14, 63:14, 68:7
**recounted** [1] - 20:16
**recover** [1] - 6:4
**redact** [3] - 61:17, 64:1, 73:6
**redaction** [2] - 63:14, 63:15
**reduction** [8] - 51:13, 62:20, 63:6, 67:19, 71:20, 72:10, 72:21
**reference** [5] - 17:7, 30:15, 37:11, 55:18, 55:24
**referenced** [5] - 7:23, 55:18, 55:19, 55:24, 72:12
**references** [1] - 17:8
**referencing** [1] - 71:11
**reflect** [1] - 71:17
**refuted** [1] - 31:16
**regarding** [9] - 7:14, 9:5, 14:8, 14:21, 14:22, 15:22, 41:2, 48:10, 63:20
**regardless** [1] - 25:8
**rehash** [1] - 37:17
**reiterated** [1] - 18:14
**reject** [4] - 44:3, 57:19, 58:7, 68:18
**rejected** [1] - 27:22
**rejects** [1] - 73:17
**relate** [2] - 66:3, 71:4
**related** [4] - 10:8, 64:16, 64:18, 64:19
**relating** [1] - 70:15
**relegation** [1] - 27:12
**relevant** [3] - 59:5, 59:8, 74:6
**reliance** [2] - 48:7, 52:3
**rely** [2] - 17:1, 17:15
**relying** [1] - 24:4
**remained** [1] - 51:3
**remaining** [2] - 3:20, 9:9
**remedy** [1] - 6:21
**remember** [6] - 27:2, 29:12, 30:23, 32:19, 64:17, 68:3
**remind** [1] - 41:20
**reminds** [1] - 6:20
**removed** [2] - 50:6, 51:6
**rendered** [1] - 34:8
**renewed** [1] - 45:8
**reorganization** [3] - 19:8, 19:9, 19:20
**replacement** [1] - 5:20
**reply** [3] - 35:18, 36:9, 61:23
**Report** [1] - 28:15
**REPORTER** [3] - 1:21, 1:21, 76:3
**reports** [1] - 68:7
**representations** [2] - 57:5, 58:3
**representatives** [1] - 51:5
**represented** [2] - 30:1, 30:3
**request** [5] - 45:10, 54:9, 55:5, 55:23, 66:14
**REQUESTED** [1] - 76:1
**require** [2] - 16:16, 47:4
**required** [5] - 12:4, 26:19, 48:23, 49:4, 51:13
**requirements** [2] - 50:19, 50:21
**requires** [4] - 10:1, 48:20, 64:5, 70:9
**research** [2] - 64:9, 64:12
**resign** [1] - 21:13
**resignation** [3] - 12:12, 16:6, 16:8
**resigned** [4] - 16:19, 19:6, 19:9, 35:22
**Resource** [1] - 26:20
**resources** [3] - 62:3, 72:1, 72:4
**Resources** [4] - 8:17, 29:6, 35:5, 53:9
**respect** [6] - 38:8, 46:9, 48:16, 66:4
**respectfully** [4] - 33:7, 33:8, 39:5, 57:18
**respecting** [1] - 11:9
**respects** [1] - 55:4
**respond** [4] - 40:12, 62:3, 65:3, 65:25
**responded** [2] - 13:8
**responds** [1] - 7:25
**response** [10] - 7:11, 33:21, 49:22, 54:11, 59:14, 66:13, 70:1, 70:6, 71:23, 75:4
**responses** [1] - 68:14
**responsibility** [1] - 27:7
**responsible** [3] - 9:23, 23:11, 23:19
**rest** [2] - 6:20, 61:4
**result** [2] - 47:8, 50:5
**results** [3] - 62:21, 63:3, 74:2
**retention** [3] - 13:13, 13:21
**retired** [4] - 15:5, 42:16, 42:20, 43:5
**returned** [1] - 45:16
**revealed** [1] - 59:2
**reverse** [1] - 46:17
**reversed** [2] - 5:5, 28:15
**review** [2] - 53:17, 68:13
**reviewed** [4] - 47:20, 48:9, 52:25, 54:19
**revoked** [1] - 53:4
**Richmond** [1] - 28:10
**Ricks** [4] - 19:12, 19:19, 28:8, 40:22
**rid** [1] - 31:17
**Riese** [1] - 46:2
**rightfully** [1] - 60:15
**rights** [2] - 6:14, 19:16
**ring** [1] - 66:5
**risk** [21] - 3:24, 4:13, 5:2, 5:7, 6:17, 7:3, 9:1, 9:9, 9:10, 10:3, 10:6, 10:10, 10:18, 20:15, 20:16, 22:15, 35:3, 43:10, 43:12, 43:13, 43:15
**rock** [1] - 67:16
**rocks** [2] - 66:19, 68:15
**room** [1] - 67:13
**round** [1] - 59:1
**row** [5] - 13:10, 32:4, 32:6, 32:10
**Rozelsky** [1] - 69:9
**Rozelsky's** [1] - 64:21
**RPR** [2] - 1:21, 76:11
**rudimentary** [3] - 22:24, 50:13, 70:4
**rule** [12] - 29:10, 29:11, 29:12, 43:23, 44:1, 47:3, 49:10, 53:8, 58:18, 58:20
**Rule** [21] - 9:3, 44:18, 44:24, 45:1, 45:10, 45:12, 45:13, 46:3, 46:23, 47:2, 48:18, 48:20, 48:21, 49:2, 49:3, 49:16, 53:21, 60:11, 60:12, 73:23
**ruled** [2] - 37:19, 41:22
**Rules** [1] - 58:20
**ruling** [3] - 44:18, 46:15, 75:7
**rulings** [1] - 46:17
**run** [4] - 28:13, 66:5, 66:6, 75:13
**runs** [1] - 58:4

**S**

**s/Debra** [1] - 76:11
**Safeco** [1] - 47:24
**salary** [4] - 13:11, 13:16, 26:10, 26:11
**sandbagging** [1] - 49:16
**sat** [1] - 37:6
**satisfaction** [1] - 54:8
**satisfied** [1] - 28:25
**saw** [2] - 62:25, 64:17
**SC** [4] - 1:3, 1:16, 1:20, 1:22
**School** [1] - 47:11
**scope** [1] - 69:11
**Scott** [3] - 12:15, 35:25, 36:6
**screen** [2] - 37:7, 37:11
**search** [1] - 39:21
**second** [8] - 6:8, 8:24, 10:15, 10:21, 16:8, 17:4, 54:12, 65:19
**secondly** [1] - 17:18
**sector** [1] - 70:9
**see** [15] - 22:5, 22:22, 56:21, 57:1, 60:10, 60:24, 62:19, 66:11, 67:11, 69:8, 70:18, 73:6, 73:20, 75:17
**seeing** [2] - 56:14, 68:22
**seeking** [1] - 60:16
**segmenting** [1] - 41:3
**segments** [1] - 13:7
**self** [1] - 39:2
**self-serving** [1] - 39:2
**send** [2] - 31:17, 31:18
**senior** [12] - 35:10, 35:13, 35:15, 37:6, 37:10, 37:12, 38:2, 38:4, 38:19, 39:3, 52:25, 67:15
**sense** [1] - 28:12
**sent** [4] - 33:21, 41:8, 69:9, 69:10
**separate** [3] - 44:4, 44:13, 65:22
**separately** [1] - 44:11
**seriously** [5] - 56:25, 57:2, 57:6, 58:3, 69:4
**serve** [1] - 53:15
**server** [1] - 39:25
**serving** [1] - 39:2
**set** [4] - 10:15, 11:2, 18:6, 47:5
**set-aside** [3] - 10:15, 11:2, 47:5
**sets** [1] - 40:13
**settled** [1] - 28:12
**seven** [1] - 63:3
**several** [4] - 3:23, 4:17, 13:7, 25:8
**sew** [1] - 43:20
**sex** [1] - 8:14
**shared** [1] - 73:10
**shooting** [1] - 2:23
**short** [1] - 44:16
**shortest** [1] - 75:3
**shot** [1] - 21:2
**show** [12] - 6:10, 10:23, 11:9, 11:25, 21:17, 43:11, 57:7, 59:7, 61:18, 62:12, 63:9, 73:16
**showed** [1] - 60:1
**showing** [4] - 46:8, 47:19, 52:23, 57:25
**shows** [2] - 12:11, 60:20
**shut** [1] - 70:22
**sic** [1] - 53:6
**side** [8] - 39:10, 56:8, 58:25, 61:18, 62:12, 63:8, 67:22, 72:14
**side's** [1] - 66:15
**sides** [3] - 32:20, 34:7, 66:25
**Siemens** [1] - 32:7
**significant** [2] - 26:17, 48:9

**simple** [5] - 2:17, 56:10, 58:8, 71:22
**simplicity** [1] - 2:18
**sit** [4] - 56:11, 66:14, 69:1, 74:17
**sites** [1] - 62:11
**sitting** [2] - 39:24, 65:1
**situation** [2] - 18:23, 19:19
**situations** [1] - 62:25
**six** [1] - 59:21
**slide** [6] - 3:9, 4:2, 11:22, 12:8, 13:1
**slippery** [1] - 73:19
**slope** [1] - 73:19
**small** [2] - 72:10, 72:21
**solely** [1] - 51:2
**solution** [1] - 72:2
**someone** [3] - 31:13, 64:11, 64:13
**sometimes** [2] - 42:9, 42:10
**soon** [4] - 57:10, 66:6, 66:20, 75:8
**sort** [3] - 20:5, 70:22, 75:14
**sought** [1] - 48:22
**sound** [1] - 47:18
**South** [3] - 46:1, 61:1, 63:24
**SOUTH** [3] - 1:1, 1:19, 1:22
**space** [2] - 43:25, 60:7
**SPARTANBURG** [1] - 1:2
**Spartanburg** [2] - 14:14, 30:25
**speaks** [1] - 5:21
**special** [1] - 36:1
**specific** [2] - 56:21, 68:13
**specifically** [3] - 2:22, 11:5, 54:6
**specify** [1] - 48:21
**speculate** [2] - 16:18, 26:7
**speculation** [3] - 12:4, 16:16, 51:2
**speculative** [1] - 32:25
**speedy** [1] - 58:22
**spend** [1] - 63:10
**spent** [10] - 56:12, 56:19, 59:13, 60:16, 62:6, 62:8, 62:10, 67:1, 67:24, 74:3
**spitballed** [1] - 35:12
**square** [1] - 18:18
**stacked** [1] - 67:2
**staff** [1] - 56:22
**staffed** [1] - 56:23
**stage** [1] - 49:21
**stake** [1] - 57:17
**stamp** [1] - 29:15
**stand** [4] - 19:12, 29:17, 41:10, 48:3
**standard** [14] - 6:22, 10:17, 11:13, 17:17, 23:22, 24:13, 25:22, 25:23, 28:25, 40:24, 43:14, 45:13, 45:22, 54:25
**standards** [1] - 3:25
**standpoint** [1] - 10:5
**start** [2] - 21:10
**started** [1] - 29:12
**starts** [2] - 22:8, 28:13
**Stastny** [2] - 59:24, 60:2
**state** [2] - 12:3, 60:21
**statement** [5] - 24:7, 26:6, 34:23, 42:17, 69:5
**statements** [1] - 73:9
**states** [1] - 41:1
**STATES** [3] - 1:1, 1:11, 1:21
**States** [4] - 4:4, 4:15, 5:8, 65:4
**stature** [2] - 26:17, 27:1
**statutes** [1] - 50:14
**stay** [1] - 43:5
**stenographic** [1] - 76:5
**STENOTYPE/ COMPUTER** [1] - 1:24
**STENOTYPE/ COMPUTER-AIDED** [1] - 1:24
**STEPHENSON** [1] - 1:15
**still** [7] - 16:7, 18:20, 25:1, 33:8, 50:18, 67:20, 67:25
**stood** [1] - 39:14
**strategies** [1] - 60:21
**strategy** [1] - 20:5
**stream** [1] - 21:2
**STREET** [3] - 1:15, 1:19, 1:22
**stricken** [1] - 53:4
**striking** [1] - 52:15
**stuff** [9] - 2:24, 30:9, 34:24, 35:21, 40:2, 67:5, 69:23, 70:25, 74:11
**sub** [1] - 10:23
**sub-paragraph** [1] - 10:23
**subject** [2] - 16:22, 45:3
**subjected** [3] - 24:23, 51:12, 51:14
**submission** [1] - 54:14
**submitted** [9] - 45:1, 45:2, 48:25, 49:6, 49:24, 50:6, 51:19, 51:23, 52:5
**subsequent** [1] - 55:19
**substance** [1] - 57:15
**substantial** [2] - 46:6, 47:9
**substantiate** [1] - 57:20
**success** [1] - 67:19
**successful** [3] - 6:3, 6:25, 49:4
**suffer** [2] - 16:11, 52:9
**suffered** [2] - 36:3, 51:3
**sufficiency** [1] - 49:5
**sufficient** [5] - 10:3, 11:24, 43:8, 44:22, 50:25
**suggested** [1] - 72:2
**suggestions** [1] - 40:21
**suit** [1] - 6:25
**SUITE** [1] - 1:19
**summarized** [1] - 3:10
**Summary** [4] - 11:20, 12:10, 28:8, 28:15
**summary** [3] - 40:23, 45:14, 49:21
**superior** [5] - 31:10, 38:17, 52:20, 52:24, 53:6
**supplemental** [1] - 18:1
**supplied** [1] - 11:21
**support** [4] - 20:9, 25:24, 25:25, 46:6
**supposed** [1] - 39:25
**Supreme** [11] - 4:4, 4:15, 5:8, 11:4, 11:6, 11:15, 28:18, 60:22, 61:1, 61:11, 63:24
**system** [1] - 40:13

**T**

**table** [2] - 27:5, 74:25
**talks** [1] - 27:6
**task** [4] - 11:16, 62:7, 62:8, 62:10
**team** [2] - 29:7, 50:17
**technical** [1] - 49:10
**ten** [5] - 14:14, 26:19, 63:5, 63:6, 72:7
**ten-plus** [1] - 26:19
**Tennessee** [1] - 46:1
**term** [9] - 4:23, 11:10, 11:18, 12:24, 13:25, 15:25, 16:4, 35:8, 51:1
**termination** [2] - 5:20, 19:17
**terminology** [1] - 34:4
**terms** [10] - 10:24, 22:12, 22:15, 26:16, 30:17, 30:20, 30:21, 32:17, 36:5, 66:22
**test** [2] - 6:6, 67:15
**testified** [11] - 7:19, 13:19, 14:7, 25:12, 27:15, 27:24, 35:14, 37:12, 42:24, 44:11, 53:6
**testify** [1] - 35:6
**testimony** [47] - 4:24, 7:2, 7:4, 8:23, 9:11, 9:14, 10:3, 10:7, 14:18, 14:21, 16:12, 20:9, 22:17, 24:21, 25:25, 27:3, 27:23, 29:20, 30:4, 31:6, 31:8, 31:13, 32:7, 36:15, 36:18, 37:14, 37:16, 38:14, 38:16, 38:18, 38:20, 39:1, 39:2, 42:11, 42:19, 42:21, 43:2, 44:4, 48:7, 48:9, 52:22, 53:5, 53:16, 53:19, 54:21
**THE** [64] - 1:1, 1:1, 1:11, 1:14, 2:2, 2:25, 3:2, 9:2, 9:7, 10:20, 16:23, 17:22, 18:24, 19:23, 19:25, 20:3, 29:19, 30:1, 30:4, 31:4, 32:13, 33:15, 33:19, 34:16, 34:19, 36:12, 36:14, 37:6, 37:14, 37:24, 38:6, 38:14, 38:24, 39:7, 39:13, 39:23, 40:4, 40:6, 40:9, 42:1, 43:18, 43:19, 44:14, 44:17, 56:2, 58:9, 61:8, 63:12, 63:19, 64:1, 64:6, 64:17, 64:25, 65:2, 65:9, 65:12, 65:14, 65:16, 69:17, 69:22, 70:1, 72:23, 74:8, 75:6
**theory** [2] - 38:21, 38:23
**thereafter** [1] - 45:5
**thereby** [1] - 54:18
**thinks** [1] - 2:19
**third** [7] - 3:14, 4:1, 16:10, 17:6, 29:4, 60:12, 73:11
**thousand** [2] - 74:15, 74:16
**thousands** [1] - 30:8
**three** [20] - 12:20, 12:23, 13:1, 13:10, 13:15, 13:22, 14:8, 16:5, 16:9, 24:21, 24:25, 25:17, 26:16, 27:1, 27:3, 27:6, 27:16, 55:15, 58:15, 59:17
**threw** [2] - 67:16, 68:15
**throughout** [3] - 49:18, 59:8, 64:10
**throw** [1] - 66:19
**throwing** [1] - 66:19
**thrown** [1] - 44:6
**tie** [1] - 71:7
**Tights** [1] - 49:11
**TIMOTHY** [1] - 1:11
**Title** [6] - 3:25, 6:3, 6:25, 10:21, 11:7, 41:4
**today** [5] - 2:13, 3:3, 17:23, 20:11, 56:6
**together** [6] - 8:21, 24:9, 35:6, 37:3, 67:13, 74:3
**took** [7] - 19:3, 29:14, 29:20, 30:2, 30:14, 39:8
**top** [1] - 56:22
**totally** [1] - 71:9
**touch** [2] - 2:24, 75:7
**touched** [1] - 23:7
**touches** [1] - 69:20
**touchstone** [1] - 24:17
**training** [5] - 8:18, 8:20, 9:21, 23:10,

50:17
**TRANSCRIPT** [1] - 76:1
**transcript** [12] - 7:7, 7:17, 9:12, 12:13, 13:2, 14:3, 14:23, 15:6, 21:19, 21:23, 42:12, 76:5
**TRANSCRIPTION** [1] - 1:24
**transcripts** [1] - 21:17
**transfer** [4] - 10:10, 12:5, 16:12, 19:20
**transferee** [1] - 11:8
**transferred** [3] - 18:9, 19:3, 29:1
**Transportation** [1] - 45:24
**Trauth** [3] - 35:4, 37:1, 52:19
**treated** [1] - 25:17
**TRIAL** [1] - 1:12
**trial** [41] - 2:5, 2:7, 2:14, 3:8, 3:23, 7:7, 9:11, 12:13, 12:18, 13:2, 14:3, 14:23, 15:6, 29:13, 41:15, 42:11, 43:9, 44:21, 45:10, 46:17, 46:18, 46:24, 46:25, 47:5, 47:13, 47:14, 47:17, 47:22, 48:18, 48:19, 49:1, 49:3, 49:9, 49:15, 49:18, 51:4, 52:15, 54:9, 55:3, 61:19
**trials** [1] - 38:21
**tried** [4] - 4:1, 23:1, 32:1, 40:18
**tries** [1] - 36:25
**true** [3] - 22:20, 65:20
**try** [5] - 2:15, 2:17, 20:6, 28:17, 34:24
**trying** [4] - 34:13, 37:19, 41:9, 63:7
**turn** [2] - 69:14, 75:3
**turned** [1] - 68:24
**turns** [1] - 42:9
**two** [30] - 3:14, 3:18, 3:20, 13:10, 13:22, 14:9, 14:13, 14:19, 17:16, 24:2, 25:15, 26:3, 27:17, 27:18, 27:20, 28:3, 32:3, 32:5, 42:6, 42:8, 42:18, 42:25, 44:4, 52:2, 55:8, 57:18, 58:6, 59:5, 64:7, 65:21
**twos** [1] - 14:9
**TX-6** [4] - 29:10, 32:5, 44:9, 44:12
**TX-60** [12] - 12:5, 15:2, 15:4, 16:7, 29:11, 32:5, 38:4, 42:14, 42:15, 42:20, 51:6, 51:18
**TX-64** [12] - 11:25, 12:6, 12:8, 12:9, 16:9, 16:12, 25:12, 25:19, 26:20, 35:23, 36:7, 51:18
**type** [5] - 19:11, 24:9, 62:15, 64:12, 65:19
**typically** [1] - 68:5

**U**

**U.S** [2] - 11:4, 38:9
**ultimately** [2] - 9:23, 23:11
**unavailable** [1] - 16:10
**under** [14] - 10:22, 11:13, 16:2, 17:17, 29:3, 37:1, 38:21, 44:18, 45:1, 45:10, 46:23, 53:21, 56:20, 75:6
**underlying** [2] - 67:7, 75:9
**understood** [1] - 25:16
**undertaking** [1] - 68:12
**undisputed** [1] - 16:6
**uniformly** [1] - 27:22
**unique** [1] - 3:10
**uniqueness** [1] - 15:24
**United** [4] - 4:3, 4:15, 5:8, 65:4
**UNITED** [3] - 1:1, 1:11, 1:21
**unlawful** [3] - 6:7, 23:21, 35:2
**unless** [1] - 65:14
**unlike** [1] - 52:6
**unquote** [4] - 16:3, 16:16, 17:8, 17:9
**unworthy** [1] - 66:15
**up** [38] - 2:9, 2:20, 2:23, 5:10, 5:11, 11:14, 20:8, 20:14, 21:16, 26:25, 28:3, 28:24, 31:7, 37:7, 37:11, 39:15, 41:10, 43:20, 44:6, 44:15, 55:5, 55:15, 56:14, 56:15, 57:3, 60:25, 61:12, 61:20, 66:1, 66:5, 66:20, 68:24, 69:1, 70:22, 73:6, 75:12, 75:13
**upper** [1] - 31:11
**upset** [1] - 72:6
**USC** [1] - 10:22
**uses** [2] - 30:17, 62:5

**V**

**valid** [1] - 21:8
**validation** [9] - 14:7, 14:16, 14:19, 15:13, 15:19, 15:23, 42:22, 42:25
**value** [1] - 53:22
**vehicle** [1] - 19:2
**verbally** [1] - 41:18
**verbiage** [1] - 33:25
**verdict** [15] - 34:8, 40:14, 41:3, 41:6, 41:9, 45:7, 45:16, 46:13, 47:5, 47:6, 47:10, 48:1, 49:13, 54:9, 62:13
**versus** [13] - 6:9, 17:8, 19:20, 45:14, 45:24, 46:2, 46:10, 47:10, 47:15, 49:11, 60:23, 63:25, 68:4
**VERSUS** [1] - 1:5
**Vice** [4] - 29:6, 32:8, 35:4, 53:8
**view** [3] - 15:17, 27:10, 58:25
**viewed** [2] - 55:22, 55:25
**viewing** [1] - 45:18
**VII** [6] - 4:1, 6:3, 6:25, 10:21, 11:7, 41:4
**violate** [6] - 4:14, 5:4, 6:18, 10:11, 38:9, 43:10
**violated** [1] - 48:16
**violating** [1] - 31:15
**VOLUME** [1] - 1:12
**VP** [2] - 26:3

**W**

**wait** [2] - 31:14, 38:7
**walk** [1] - 25:2
**walked** [1] - 9:19
**walking** [1] - 61:22
**wants** [1] - 75:4
**Ward** [1] - 6:9
**water** [1] - 6:22
**weapon** [1] - 73:19
**weeds** [1] - 67:6
**weigh** [3] - 46:20, 47:14, 53:18
**weighed** [1] - 52:10
**weighing** [1] - 46:4
**weight** [5] - 47:6, 48:2, 59:8, 66:22, 66:23
**Western** [1] - 59:25
**whatsoever** [7] - 22:1, 22:14, 23:4, 26:22, 30:14, 31:20, 33:11
**Wheatley** [1] - 46:10
**WHITSETT** [1] - 1:15
**whoa** [1] - 31:14
**whole** [5] - 27:25, 32:3, 34:10, 44:3, 54:21
**Wicomico** [1] - 46:11
**willful** [1] - 50:20
**willing** [1] - 71:3
**Wilson** [4] - 60:23, 61:13, 63:25, 68:4
**win** [1] - 20:9
**witnesses** [5] - 24:8, 27:21, 46:6, 46:21, 47:15
**woods** [1] - 61:6
**word** [3] - 40:4, 57:7, 74:9
**words** [2] - 33:23, 43:21
**workplace** [1] - 50:11
**worries** [1] - 3:4
**wrapped** [1] - 61:12
**writes** [1] - 68:10
**writing** [1] - 60:1
**writings** [2] - 17:10, 17:15
**written** [2] - 17:1, 17:3
**wrote** [1] - 25:7

**Y**

**y'all** [1] - 75:17
**year** [2] - 13:14, 74:14
**years** [4] - 4:18, 13:15, 13:22, 26:19

**Z**

**Zienni** [2] - 52:3, 52:6
**Zone** [1] - 6:9
**Zoners** [1] - 6:9