No. 26-1793

---

# In the United States Court of Appeals for the Fourth Circuit

---

KELLY DAWSEY,

*Plaintiff-Appellee*,

v.

BMW MANUFACTURING CO., LLC,

*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the District of South Carolina

---

**JOINT APPENDIX**
**VOLUME II OF VI**

Charles E. Johnson
Brendan P. Biffany
Aryana Ainolhayat
ROBINSON, BRADSHAW & HINSON, P.A.
600 South Tryon Street
Suite 2300
Charlotte, North Carolina 28202
704.377.2536

*Counsel for Defendant-Appellant BMW Manufacturing Co., LLC*

Brian P. Murphy
STEPHENSON AND MURPHY, LLC
207 Whitsett Street
Greenville, South Carolina 29601
864.370.9400

*Counsel for Plaintiff-Appellee Kelly Dawsey*

# TABLE OF CONTENTS

**Page**


**Volume I**

Judgment (DE 217) ........ JA1

Amended Judgment (DE 236) ........ JA2

Order Awarding Backpay (DE 238) ........ JA3

Second Amended Judgment (DE 239) ........ JA22

May 13, 2026 Post-Trial Motion Hearing Transcript (DE 272) ........ JA23

**Volume II**

District Court Docket Sheet ........ JA112

Plaintiff's Amended Complaint (DE 20) ........ JA142

BMW MC's Answer to Amended Complaint (DE 40) ........ JA158

BMW AG's Answer to Amended Complaint (DE 96) ........ JA171

Report of Magistrate Judge (DE 113) ........ JA182

Order (DE 119) ........ JA200

February 12, 2026 Strikes for Cause Transcript (DE 246) ........ JA219

February 17, 2026 Trial Transcript, Volume I (DE 247) ........ JA247

Opening Statement by Counsel for Plaintiff ........ JA316

Opening Statement by Counsel for Defendant BMW MC ........ JA319

Opening Statement by Counsel for Defendant BMW AG ........ JA315

Kelly Dawsey, Direct Examination ........ JA334

February 18, 2026 Trial Transcript, Volume II (DE 248) ........ JA452

Kelly Dawsey, Direct Examination (cont'd) ........ JA457

Kelly Dawsey, Cross Examination
by Counsel for Defendant BMW MC ....................................JA562

**Volume III**

February 19, 2026 Trial Transcript, Volume III (DE 249).............JA684

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC (cont'd) ..........................................................JA688

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW AG.......................................................................JA754

Robert Englehorn, Direct Examination by Counsel for Defendant BMW MC ......................................................JA797

Robert Englehorn, Cross Examination by Counsel for Defendant BMW AG .......................................................JA851

Robert Englehorn, Cross Examination by Counsel for Plaintiff.........................................................................JA859

Robert Englehorn, Redirect Examination by Counsel for Defendant BMW MC......................................................JA906

Robert Englehorn, Recross Examination by Counsel for Plaintiff.........................................................................JA910

February 20, 2026 Trial Transcript, Volume IV (DE 250).............JA942

Christine Petrasch, Direct Examination by Counsel for Defendant BMW MC ......................................................JA946

Christine Petrasch, Cross Examination by Counsel for Defendant BMW AG .....................................................JA1032

Christine Petrasch, Cross Examination by Counsel for Plaintiff.......................................................................JA1056

Christine Petrasch, Redirect Examination by Counsel for Defendant BMW MC....................................................JA1133

Christine Petrasch, Recross Examination by Counsel for Defendant BMW AG ............................................................JA1138

**Volume IV**

February 23, 2026 Trial Transcript, Volume V (DE 251) .............JA1164

Corey Epps, Direct Examination by Counsel for Defendant BMW MC .....................................................................................JA1169

Corey Epps, Cross Examination by Counsel for Defendant BMW AG.....................................................................................JA1194

Corey Epps, Cross Examination by Counsel for Plaintiff ....JA1198

Corey Epps, Redirect Examination by Counsel for Defendant BMW MC .....................................................................................JA1210

Corey Epps, Recross Examination by Counsel for Defendant BMW AG .....................................................................................JA1211

Sherill Miller, Direct Examination by Counsel for Defendant BMW MC .....................................................................................JA1276

Sherill Miller, Cross Examination by Counsel for Plaintiff.........................................................................................JA1297

Sherry McCraw, Direct Examination by Counsel for Defendant BMW MC...........................................................JA1304

Sherry McCraw, Cross Examination by Counsel for Defendant BMW AG ..........................................................JA1383

Sherry McCraw, Cross Examination by Counsel for Plaintiff ........................................................................................JA1384

Sherry McCraw, Redirect Examination by Counsel for Defendant BMW MC ..........................................................JA1419

February 24, 2026 Trial Transcript, Volume VI (DE 252) ............JA1460

Clarence Edward Bailey, II, Examination by Deposition Testimony ..........JA1465

Neal Gilmore, Examination by Deposition Testimony.........JA1478

Eva Burgmeier, Examination by Deposition Testimony......JA1484

Charge Conference ..........JA1622

**Volume V**

February 25, 2026 Trial Transcript, Volume VII (DE 253) ..........JA1666

Charge Conference (cont'd) ..........JA1669

Closing Argument by Counsel for Plaintiff ..........JA1678

Closing Argument by Counsel for Defendant BMW MC......JA1723

Closing Argument by Counsel for Defendant BMW AG ......JA1766

Rebuttal Closing Argument by Counsel for Plaintiff ..........JA1788

Jury Charge..........JA1794

Verdict ..........JA1830

Jury Polled..........JA1832

Verdict Form (DE 216) ..........JA1862

March 13, 2026 Post-Trial Damages Hearing Transcript (DE 254)..........JA1868

Kelly Dawsey, Direct Examination ..........JA1874

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC ..........JA1855

Kelly Dawsey, Redirect Examination..........JA1904

John E. Gibson, Jr., Direct Examination by Counsel for

Plaintiff....JA1909

John E. Gibson, Jr., Cross Examination by Counsel for Defendant BMW MC....JA1926

John E. Gibson, Jr., Redirect Examination by Counsel for Plaintiff....JA1983

Closing Statement by Counsel for Defendant BMW MC....JA1989

Closing Statement by Counsel for Plaintiff....JA2003

Consent Motion to Amend/Correct Judgment (DE 231)....JA2031

Order Granting Consent Motion to Amend/Correct Judgment (DE 235)....JA2034

Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial (DE 237)....JA2036

Joint Proposed Jury Charges (DE 240-1)....JA2059

Notice of Appeal (DE 265)....JA2062

Amended Notice of Appeal (DE 275)....JA2064

**Vol VI**

Trial Exhibits

Plaintiff's Exhibit 1 (Plaintiff's Resume, Dec. 2021)....JA2066

Plaintiff's Exhibit 2 (Plant Spartanburg Organization Chart)....JA2069

Plaintiff's Exhibit 3 (Petrasch Jan. 10, 2022 email to HR network)....JA2070

Plaintiff's Exhibit 4 (Petrasch Dec. 3, 2021 email)....JA2074

Plaintiff's Exhibit 5 (TX-6 Organization Structure Development Step 2 – for April 2021)....JA2077

Plaintiff's Exhibit 6 (TX-6 and TX-60 Info-Share Documentation, Sept. 29, 2021) .......................................... JA2078

Plaintiff's Exhibit 7 (T-Vorhalt Request) ............................ JA2080

Plaintiff's Exhibit 8 (TX-60 Job Function Data Sheet, Rev. April 1, 2019) ......................................................... JA2081

Plaintiff's Exhibit 9 (TX-61 Job Function Data Sheet, Rev. March 1, 2020) ...................................................... JA2085

Plaintiff's Exhibit 10 (Exempt Organizational Structure, Aug. 2021) .......................................................... JA2088

Plaintiff's Exhibit 12 (Exempt Organizational Structure, Sept. 2021) .......................................................... JA2100

Plaintiff's Exhibit 14 (Plaintiff's Portfolio 2020) ................. JA2112

Plaintiff's Exhibit 15 (Plaintiff's Portfolio 2019) ................. JA2117

Plaintiff's Exhibit 16 (Plaintiff's Portfolio 2018) ................. JA2122

Plaintiff's Exhibit 17 (Expat Guidelines for Plant Spartanburg, Jan. 8, 2016) ............................................ JA2126

Plaintiff's Exhibit 18 (TX-6 Organizational Overview) ........ JA2141

Plaintiff's Exhibit 19 (Plaintiff's Compensation Change Statement, March 20, 2021) ............................................ JA2142

Plaintiff's Exhibit 20 (Overview on Reference Partner input during the promotion procedure, Oct. 2010) ....................... JA2143

Plaintiff's Exhibit 21 (Petrasch Text to Plaintiff, Oct. 1, 2021) ................................................................... JA2144

Plaintiff's Exhibit 22 (International Grading FLIV Approval Committee TS Spartanburg) ........................................... JA2145

Plaintiff's Exhibit 24 (June 3, 2021 email from Plaintiff to Epps, Suber and Sanders attaching Project Misaligned PG Overview PowerPoint)........JA2146

Plaintiff's Exhibit 25 (Jan. 1, 2021 email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian re: "as discussed" topics)........JA2152

Plaintiff's Exhibit 26 (March 19, 2021 email from Petrasch to Belinski attaching 2021 Review TX-60 Org)........JA2154

Plaintiff's Exhibit 27 (April 8, 2021 email from Petrasch to Plaintiff re: draft job descriptions for VP HR and Manager of Recruiting)........JA2161

Plaintiff's Exhibit 28 (Email from Petrasch to Plaintiff re: HR Compact submittals)........JA2163

Plaintiff's Exhibit 29 (TX-61 Job Function Data Sheet, rev. date Oct. 24, 2021)........JA2166

Plaintiff's Exhibit 31 (March 3, 2021 email from Petrasch to Plaintiff re: P&S TX-6)........JA2169

Plaintiff's Exhibit 37 (Sept. 23, 2021 email from Petrasch to Koepnick and Burgmeier re: PE-TAG PE-Kreis)........JA2170

Plaintiff's Exhibit 39 (Jan. 4, 2022 email from Petrasch to Hacker)........JA2173

Plaintiff's Exhibit 41 (Jan. 5, 2022 email from Petrasch to Burghardt re: Plaintiff's resignation)........JA2174

Plaintiff's Exhibit 46 (TX-60 Job Function Data Sheet, Feb. 1, 2022)........JA2175

Plaintiff's Exhibit 47 (HRIS Screenshots re Epps Employment)........JA2179

Plaintiff's Exhibit 48 (Personnel Development Succession Planning, June 19, 2020)........JA2183

Plaintiff's Exhibit 49 (BMW Group Plant Spartanburg, Memo to Eddie Bailey re: Compensation Statement, April 19, 2023) ........JA2185

Plaintiff's Exhibit 50 (BMW Group Plant Spartanburg, Memo to Neal Gilmore Compensation Statement, April 19, 2023) ........JA2186

Plaintiff's Exhibit 52 (Portfolio 2022 – Eddie Bailey, March 2023)........JA2187

Plaintiff's Exhibit 63 (April 21, 2021 Burgmeier email re: P-Circle) ........JA2191

Defendant's Exhibit 1 (BMW MC Job Offer Letter, April 25, 1995) ........JA2192

Defendant's Exhibit 2 (Morse & Savage copy of Plaintiff's Resume) ........JA2194

Defendant's Exhibit 3 (BMW MC Implementation of Exempt Grading, Salary, Bonus and Benefits Structure Effective Aug. 2001)........JA2197

Defendant's Exhibit 4 (Personnel Development/Succession Planning PowerPoint, June 2021) ........JA2209

Defendant's Exhibit 5 (TX-6 Organizational Overview PowerPoint, Jan. 2022) ........JA2221

Defendant's Exhibit 6 (Documents related to promotions, salary increases, and bonuses (2014-2021)) ........JA2226

Defendant's Exhibit 7 (HR Records re: Plaintiff's Position/Pay History) ........JA2236

Defendant's Exhibit 9 (HR Records on Scott Medley Position/Pay History, 2007 – 2025)........JA2240

Defendant's Exhibit 10 (July 19, 2021 Email from Petrasch to Koepnick re: Succession)........JA2242

Defendant's Exhibit 11 (TX-60 Job Function Data Sheet, Feb. 1, 2022) ........................................................................JA2244

Defendant's Exhibit 12 (TX-61 Job Function Data Sheet, Oct. 24, 2021 ..............................................................................JA2252

Defendant's Exhibit 13 (TX-64 Job Function Data Sheet, May 1, 2019) ........................................................................JA2261

Defendant's Exhibit 14 (June 3, 2021 Email from Plaintiff to Epps re: "Project Misaligned" PowerPoint) ..........................JA2265

Defendant's Exhibit 15 (Jan. 21, 2021 Email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian with Topics for Network to HR Team)...................................................JA2271

Defendant's Exhibit 16 (Substructure HR Plant Spartanburg, TX-6, Nov. 2019)............................................JA2273

Defendant's Exhibit 17 (Sherry McCraw BMW MC Position History)...............................................................................JA2277

Defendant's Exhibit 18 (Sept 23, 2021 Email from Petrasch to Englehorn attaching PowerPoint for PE Tax TX-6 Presentation) ..............................................................................JA2278

Defendant's Exhibit 19 (TX-6 and TX-60 Info-Share Documents for Plaintiff and Petrasch with Handwritten Notes, Sept. 29, 2021)........................................................JA2280

Defendant's Exhibit 20 (Oct. 1, 2021 Email from Petrasch to Koepnick with Org. Chart).................................................JA2284

Defendant's Exhibit 21 (Sept. 23, 2021 Email from Petrasch to Sanders re: Epps' Promotion) .........................................JA2288

Defendant's Exhibit 22 (Oct. 1, 2021 Email from Petrasch to McCraw re: Upgrading Epps to G11) .................................JA2290

Defendant's Exhibit 23 (TX-6 - HR Workshop VI / Management Workshop Agenda, Nov. 11, 2021) ................JA2291

Defendant's Exhibit 24 (TX-6 Reorganization PowerPoint, Aug. 2019)....JA2293

Defendant's Exhibit 25 (Dec. 10, 2021 Email from Petrasch to HR Team re: Meeting on TX-6 Organization)....JA2308

Defendant's Exhibit 26 (Dec. 13, 2021 Email from Petrasch to Plaintiff and Medley attaching TX-6 PowerPoint)....JA2309

Defendant's Exhibit 27 (Documents Produced by Miller in response to Subpoena issued to Morse & Savage)....JA2323

Defendant's Exhibit 28 (Morse & Savage Consultant Agreement signed by Plaintiff, Sept. 2021)....JA2354

Defendant's Exhibit 29 (Plaintiff's Check to Morse & Savage, Sept. 16, 2021)....JA2355

Defendant's Exhibit 30 (Madewell Concrete Offer Letter to Plaintiff, Dec. 10, 2021)....JA2356

Defendant's Exhibit 31 (Dec. 9, 2021 Email from Petrasch to all HR Team re: TX-6 Circle)....JA2370

Defendant's Exhibit 32 (Plaintiff's Notes, Sept. 27, 2021)....JA2371

Defendant's Exhibit 33 (Jan. 3, 2022 Email from Petrasch to McCraw attaching Plaintiff's Resignation Notice)....JA2372

Defendant's Exhibit 34 (Plaintiff's Resignation letter, Jan. 3, 2022)....JA2374

Defendant's Exhibit 36 (GSP International Airport Offer of Employment, July 1, 2022)....JA2375

Economic Damages Hearing Exhibits

Plaintiff's Exhibit 53 (BMW Salary History)....JA2377

Plaintiff's Exhibit 54 (BMW RSA Statement)....JA2379

Plaintiff's Exhibit 55 (Summary Page Regarding Retirement Contributions....JA2380

Plaintiff's Exhibit 56 (Madewell 2022 W-2)....JA2381

Plaintiff's Exhibit 57 (GSP Annual Compensation Statements) ....JA2382

Plaintiff's Exhibit 58 (2022 GSP W-2) ....JA2390

Plaintiff's Exhibit 59 (2023 GSP W-2) ....JA2391

Plaintiff's Exhibit 60 (2024 GSP W-2) ....JA2392

Plaintiff's Exhibit 61 (2025 GSP W-2) ....JA2393

Plaintiff's Exhibit 62 (Dec. 22, 2025 Expert Report of John E. Gibson)....JA2398

Defendant's Exhibit 38 (Jan. 18, 2023 Expert Report of John E. Gibson) ....JA2413

Defendant's Exhibit 39 (Oct. 31, 2025 Expert Report of John E. Gibson) ....JA2427

Defendant's Exhibit 40 (Dec. 1, 2025 Expert Report of John E. Gibson) ....JA2441

Defendant's Exhibit 41 (Dec. 22, 2025 Expert Report of John E. Gibson) ....JA2456

Defendant's Exhibit 42 (Nov. 20, 2025 Expert Rebuttal Report of Nicholas R. Harris)....JA2471

Defendant's Exhibit 55 (Plaintiff BMW MC Earning Statement 2019-2022) ....JA2501

20142541

Query Reports Utilities Help Log Out

APPEAL,CLOSED,JURY,LC 2

# U.S. District Court
# District of South Carolina (Spartanburg)
# CIVIL DOCKET FOR CASE #: 7:22-cv-03738-TMC

Dawsey v. Bayerische Motoren Werke Aktiengesellschaft et al
Assigned to: Chief Judge Timothy M Cain
Case in other court: 4CCA, 26-01793
Cause: 42:2000 Job Discrimination (Race)

Date Filed: 10/28/2022
Date Terminated: 02/25/2026
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Kelly Dawsey** represented by **Brian P Murphy**
Stephenson and Murphy
207 Whitsett Street
Greenville, SC 29601
864-370-9400
Fax: 864-240-9292
Email: brian@stephensonmurphy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bayerische Motoren Werke Aktiengesellschaft**
*collectively d/b/a BMW Group*
*doing business as*
BMW Group

represented by **Kurt Matthew Rozelsky**
Spencer Fane LLP
PO Box 294
27 Cleveland Street
Greenville, SC 29602-0294
864-695-5202
Email: krozelsky@spencerfane.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel S Savrin**
Morgan Lewis and Bockius LLP (Boston)
One Federal Street
Boston, MA 02110-1726
617-951-8674
Fax: 617-341-7701
Email: daniel.savrin@morganlewis.com
*TERMINATED: 02/09/2026*
*PRO HAC VICE*

**Duke K McCall , III**
Morgan Lewis and Bockius LLP (DC)
1111 Pennsylvania Avenue NW

Washington, DC 20004
202-373-6607
Fax: 202-739-3001
Email: duke.mccall@morganlewis.com
*TERMINATED: 02/09/2026*

**Nathaniel P Bruhn**
Morgan Lewis and Bockius LLP (Boston)
One Federal Street
Boston, MA 02110-1726
617-951-8651
Fax: 617-341-7701
Email: nathaniel.bruhn@morganlewis.com
*TERMINATED: 02/09/2026*
*PRO HAC VICE*

**Defendant**

**BMW Manufacturing Co LLC**
*collectively d/b/a BMW Group*
*doing business as*
BMW Group

represented by

**Donald Randle Moody , II**
Jackson Lewis (GRE)
15 South Main Street
Suite 700
Greenville, SC 29601
864-232-7000
Fax: 864-235-1381
Email: Randy.moody@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ellison Ford McCoy**
Jackson Lewis (GRE)
15 South Main Street
Suite 700
Greenville, SC 29601
864-232-7000
Fax: 864-235-1381
Email: ellison.mccoy@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mallory Hart Gantt**
Jackson Lewis (GRE)
15 South Main Street
Suite 700
Greenville, SC 29601
864-672-8087
Fax: 864-235-1381
Email: mallory.gantt@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 10/28/2022 | 1 | COMPLAINT against BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft ( Filing fee $ 402 receipt number ASCDC-10772648.), filed by Kelly Dawsey. Service due by 1/26/2023.(arut) (Entered: 10/28/2022) |
| 10/28/2022 | 3 | Local Rule 26.01 Answers to Interrogatories by Kelly Dawsey.(arut) (Entered: 10/28/2022) |
| 10/28/2022 | 4 | Summons Issued as to BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. (Attachments: # 1 BMW Mfg summons)(kric, ) (Entered: 10/28/2022) |
| 12/19/2022 | 7 | SUMMONS Returned Executed by Kelly Dawsey. BMW Manufacturing Co LLC served on 12/15/2022, answer due 1/5/2023. (Attachments: # 1 Supporting Documents PS Form 3811 - BMW Manufacturing Co., LLC)(Murphy, Brian) (Entered: 12/19/2022) |
| 12/27/2022 | 8 | Consent MOTION for Extension of Time to File Answer re 1 Complaint *Consent Motion for Extension of Time to Respond to the Complaint* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 1/10/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(McCall, Duke) (Entered: 12/27/2022) |
| 12/28/2022 | 9 | **TEXT ORDER granting 8 defendant Bayerische Motoren Werke Aktiengesellschaft's consent motion for extension until January 30, 2023, to respond to the plaintiff's complaint. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 12/28/22.(rweb, )** (Entered: 12/28/2022) |
| 01/05/2023 | 10 | ANSWER to 1 Complaint by BMW Manufacturing Co LLC.(McCoy, Ellison) (Entered: 01/05/2023) |
| 01/09/2023 | 12 | **SCHEDULING ORDER Rule 26(f) Conference Deadline 1/30/2023, 26(a) Initial Disclosures due by 2/13/2023, Rule 26 Report due by 2/13/2023, Motions to Amend Pleadings due by 3/27/2023, Plaintiffs ID of Expert Witness due by 4/26/2023, Defendants ID of Expert Witnesses Due by 5/26/2023, Records Custodian Affidavit due by 5/26/2023, Discovery due by 6/26/2023, Motions due by 7/10/2023, Jury Selection Deadline 9/8/2023 or sixty (60 days after dispositive motions have been resolved. Signed by Magistrate Judge Kevin McDonald on 1/9/2023. (kric, )** (Entered: 01/09/2023) |
| 01/09/2023 | 13 | **MEDIATION ORDER Mediation Due by 7/3/2023, Signed by Magistrate Judge Kevin McDonald on 1/9/2023. (kric, )** Modified on 1/10/2023 to edit text (kric, ). (Entered: 01/09/2023) |
| 01/30/2023 | 14 | MOTION to Dismiss *for Lack of Personal Jurisdiction* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 2/13/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit Declaration of Claudia Koepnick, # 3 Exhibit Declaration of Sherry C. McCraw)No proposed order.Motions referred to Kevin McDonald.(McCall, Duke) (Entered: 01/30/2023) |
| 01/31/2023 | 15 | MOTION to Appear Pro Hac Vice by Nathaniel P. Bruhn ( Filing fee $ 350 receipt number ASCDC-10918939) by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 2/14/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Proposed Order)No proposed order.Motions referred to Kevin McDonald.(McCall, Duke) (Entered: 01/31/2023) |
| 01/31/2023 | 16 | MOTION to Appear Pro Hac Vice by Daniel S. Savrin ( Filing fee $ 350 receipt number ASCDC-10918963) by Bayerische Motoren Werke Aktiengesellschaft. Response to |

| | | |
|---|---|---|
| | | Motion due by 2/14/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Proposed Order)No proposed order.Motions referred to Kevin McDonald.(McCall, Duke) (Entered: 01/31/2023) |
| 01/31/2023 | 17 | **TEXT ORDER granting 16 the consent motion to admit Daniel S. Savrin pro hac vice as counsel for defendant Bayerische Motoren Werke Aktiengesellschaft. IT IS SO ORDERED. Entered at the direction of Magistrate Judge Kevin McDonald on 1/31/23.(arut)** (Entered: 01/31/2023) |
| 01/31/2023 | 18 | **TEXT ORDER granting 15 the consent motion to admit Nathaniel P. Bruhn pro hac vice as counsel for defendant Bayerische Motoren Werke Aktiengesellschaft. IT IS SO ORDERED. Entered at the direction of Magistrate Judge Kevin McDonald on 1/31/23.(arut)** (Entered: 01/31/2023) |
| 02/02/2023 | 19 | MOTION to Stay *Discovery* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 3/24/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Plaintiff's First Discovery to Bayerische Motoren Werke Aktiengesellschaft, # 2 Exhibit B - Plaintiffs First Discovery to BMW Manufacturing Co., LLC)No proposed order.Motions referred to Kevin McDonald.(McCall, Duke) Modified on 3/8/2023: to reset response deadline to 3/24/23 per 25 Order. (kmca). (Entered: 02/02/2023) |
| 02/09/2023 | 20 | AMENDED COMPLAINT against All Defendants, filed by Kelly Dawsey. Service due by 5/11/2023 (Murphy, Brian) (Entered: 02/09/2023) |
| 02/09/2023 | 21 | Joint MOTION for Confidentiality Order by BMW Manufacturing Co LLC, Kelly Dawsey. Response to Motion due by 2/23/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Motions referred to Kevin McDonald.(McCoy, Ellison) Modified on 2/9/2023: to add additional filer as listed (kmca). (Entered: 02/09/2023) |
| 02/10/2023 | 22 | **TEXT ORDER granting 21 Motion for Confidentiality Order. Signed by Magistrate Judge Kevin McDonald on 2/10/23.(rweb, )** (Entered: 02/10/2023) |
| 02/10/2023 | 23 | **CONFIDENTIALITY ORDER FILED Signed by Magistrate Judge Kevin McDonald on 2/10/23. (rweb, )** (Entered: 02/10/2023) |
| 02/10/2023 | 24 | MOTION to Stay re 19 MOTION to Stay *Discovery and Motion to Dismiss 14 Request for Rule 16 Conference* by Kelly Dawsey. Response to Motion due by 2/24/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(Murphy, Brian) (Entered: 02/10/2023) |
| 02/10/2023 | 25 | **TEXT ORDER granting 24 the plaintiff's request for a stay of deadlines for filing her responses to the motions to dismiss for lack of personal jurisdiction 14 and to stay discovery 19 of defendant Bayerische Motoren Werke Aktiengesellschaft. The stay is granted until March 24, 2023. Specifically, defendant BMW Manufacturing Co., LLC, must fully respond to the plaintiff's discovery requests by March 10, 2023; the parties must then consult and attempt to resolve any issues; and the plaintiff must then file responses to the motions to dismiss and to stay discovery on or before March 24, 2023. The plaintiff's request for a Rule 16 status conference is denied at this time. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 2/10/23.(rweb, )** (Entered: 02/10/2023) |
| 02/15/2023 | 28 | Joint Rule 26(f) Report by BMW Manufacturing Co LLC., Kelly Dawsey (Attachments: # 1 Proposed Order)(McCoy, Ellison) Modified on 2/17/2023 to edit filers and text (kric, |

| | | |
|---|---|---|
| | | ). (Entered: 02/15/2023) |
| 02/15/2023 | 29 | Local Rule 26.03 Answers to Interrogatories by BMW Manufacturing Co LLC.(McCoy, Ellison) (Entered: 02/15/2023) |
| 02/15/2023 | 30 | ADR STATEMENT/CERTIFICATION by BMW Manufacturing Co LLC(McCoy, Ellison) (Entered: 02/15/2023) |
| 02/16/2023 | 31 | **TEXT ORDER: As defendant Bayerische Motoren Werke Aktiengesellschaft did not participate in the Rule 26(f) conference and Rule 26(f) report (doc. 28) submitted jointly by the plaintiff and defendant BMW Manufacturing Co., LLC, the deadline for a Rule 26(f) conference of all parties and submission of an amended Rule 26(f) report is extended until Wednesday, February 22, 2023. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 2/16/2023. (kric, )** (Entered: 02/16/2023) |
| 02/17/2023 | 32 | NOTICE of Appearance by Kurt Matthew Rozelsky on behalf of Bayerische Motoren Werke Aktiengesellschaft (Rozelsky, Kurt) (Entered: 02/17/2023) |
| 02/17/2023 | 33 | Consent MOTION for Extension of Time *to Reply to Amended Complaint* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 3/3/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(Rozelsky, Kurt) (Entered: 02/17/2023) |
| 02/17/2023 | 34 | **TEXT ORDER granting defendant Bayerische Motoren Werke Aktiengesellschaft's (AG) consent motion for extension of time 33 to answer or otherwise respond to the plaintiff's amended complaint 20 by March 6, 2023. Moreover, the plaintiff's original complaint 1 is superseded and AG's motion to dismiss 14 is moot based on the plaintiff subsequently filing her amended complaint 20 . *Additionally, plaintiff's response to AG's to be filed Motion to Dismiss remains 3/24/23. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 2/17/2023.(kric, )** Modified on 3/8/2023: to add text (additionally...) per chambers (kmca). (Entered: 02/17/2023) |
| 02/22/2023 | 36 | AMENDED Joint Rule 26(f) Report by BMW Manufacturing Co LLC., Kelly Dawsey, Bayerische Motoren Werke Aktiengesellschaft (Attachments: # 1 Proposed Order) (McCoy, Ellison) Modified on 2/23/2023 to edit filers and text (kric, ). (Entered: 02/22/2023) |
| 02/22/2023 | 37 | Local Rule 26.03 Answers to Interrogatories by Bayerische Motoren Werke Aktiengesellschaft.(Rozelsky, Kurt) (Entered: 02/22/2023) |
| 02/22/2023 | 38 | Local Rule 26.03 Answers to Interrogatories by Kelly Dawsey.(Murphy, Brian) (Entered: 02/22/2023) |
| 02/23/2023 | 39 | **CONSENT AMENDED SCHEDULING ORDER Motions to Amend Pleadings due by 6/26/2023, Plaintiffs ID of Expert Witness due by 7/25/2023, Defendants ID of Expert Witnesses Due by 8/24/2023, Records Custodian Affidavit due by 9/11/2023, Discovery due by 9/25/2023, Motions due by 10/9/2023, Jury Selection Deadline 12/7/2023, Mediation Due by 10/4/2023, Signed by Magistrate Judge Kevin McDonald on 2/23/2023. (kric, )** (Entered: 02/23/2023) |
| 02/23/2023 | 40 | ANSWER to 20 Amended Complaint by BMW Manufacturing Co LLC.(McCoy, Ellison) (Entered: 02/23/2023) |
| 03/06/2023 | 42 | MOTION to Dismiss *the 20 Amended Complaint for Lack of Personal Jurisdiction* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 3/24/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. |

| | | |
|---|---|---|
| | | P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memorandum in Support of its Motion to Dismiss the Amended Complaint for Lack of Personal Jurisdiction, # 2 Declaration of Sherry C. McCraw, # 3 Declaration of Claudia Kopnick)No proposed order.Motions referred to Kevin McDonald.(Rozelsky, Kurt) Modified on 3/8/2023: to add link ( 20 ); to reset Response deadline per 25 Order to 3/24/23. (kmca). Modified on 5/31/2023 to add linkage see reply 61 (kric, ). (Entered: 03/06/2023) |
| 03/17/2023 | 43 | MOTION to Seal *(Unopposed)* by Kelly Dawsey. Response to Motion due by 3/31/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald. (Murphy, Brian) (Entered: 03/17/2023) |
| 03/17/2023 | 44 | **TEXT ORDER granting 43 the plaintiff's unopposed motion to file under seal certain documents that the plaintiff anticipates filing with her response in opposition to the motion to dismiss of defendant Bayerische Motoren Werke Aktiengesellschaft (BMW AG) (doc. 43). Specifically, as set out in the plaintiff's motion, the documents are identified as exhibits E, F, and H to the plaintiff's declaration, and BMW 231-47 and BMW 426 (id. at 2). The plaintiff notes that some of the documents are documents that she possesses and others were produced in discovery and designated confidential by defendant BMW Manufacturing Co., LLC (BMW Manufacturing). As for the documents the plaintiff possesses, the plaintiff's counsel has shared the proposed exhibits with counsel for BMW Manufacturing, who has requested that the documents be treated as confidential under the confidentiality order. The undersigned hereby finds that the plaintiff has fully complied with the procedure required by Local Civil Rule 5.03 (D.S.C.), and the factors set forth in *Ashcroft v. Conoco*, Inc., 218 F.3d 288, 302 (4th Cir. 2000), and *In re Knight Publishing Co.*, 743 F.2d 231, 235 (4th Cir. 1984), favor sealing. BMW Manufacturing consents to the motion to seal. Accordingly, the 43 motion to file under seal is granted. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 3/17/2023.(kric, )** Modified on 3/20/2023 to edit text (kric, ). (Entered: 03/17/2023) |
| 03/20/2023 | 45 | RESPONSE in Opposition re 42 MOTION to Dismiss *the Amended Complaint for Lack of Personal Jurisdiction* Response filed by Kelly Dawsey.Reply to Response to Motion due by 3/27/2023 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 1 - Dawsey Declaration, # 2 Exhibit 2 - BMW MC's Interrog. Resp, # 3 Exhibit 3 - filed under seal, # 4 Exhibit 4 - filed under seal, # 5 Exhibit 5 - BMW 520, # 6 Exhibit 6 - BMW 387-89, # 7 Exhibit 7 - Burghardt LinkedIn, # 8 Exhibit 8 - BMW 448, # 9 Exhibit 9 - BMW 571-73, # 10 Exhibit 10 - BMW 466, # 11 Exhibit 11 - EEOC Charge) See supplement 59 (Murphy, Brian) Modified on 5/23/2023 to add linkage (kric, ). (Entered: 03/20/2023) |
| 03/20/2023 | 46 | Sealed Document in re document 45 . (Attachments: # 1 Exhibit 4 - BMW 426, # 2 Pl Decl Exh E- Info Share, # 3 Pl Decl Exh F - T Vorhalt Request, # 4 Pl Decl Exh H - Draft Input Target Proposal)(Murphy, Brian) (Entered: 03/20/2023) |
| 03/21/2023 | 47 | Consent MOTION for Extension of Time to File Response/Reply as to 45 Response in Opposition to Motion,, by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 4/4/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(Rozelsky, Kurt) (Entered: 03/21/2023) |
| 03/21/2023 | 48 | **TEXT ORDER granting the 47 consent motion for extension of time until March 31, 2023, to file a reply in support of its 42 motion to dismiss of defendant Bayerische Motoren Werke Aktiengesellschaft. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 3/21/2023.(kric, )** (Entered: 03/21/2023) |

| | | |
|---|---|---|
| 03/21/2023 | 49 | RESPONSE in Opposition re 19 MOTION to Stay *Discovery* Response filed by Kelly Dawsey.Reply to Response to Motion due by 3/28/2023 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Murphy, Brian) (Main Document 49 replaced on 3/22/2023: to replace with corrected document (typo) as requested by and provided by filing user) (kmca). (Entered: 03/21/2023) |
| 03/28/2023 | 51 | REPLY to Response to Motion re 19 MOTION to Stay *Discovery* Response filed by Bayerische Motoren Werke Aktiengesellschaft. (Rozelsky, Kurt) (Entered: 03/28/2023) |
| 03/31/2023 | 52 | REPLY to Response to Motion re 42 MOTION to Dismiss *the Amended Complaint for Lack of Personal Jurisdiction* Response filed by Bayerische Motoren Werke Aktiengesellschaft. (Attachments: # 1 Affidavit of Dr. Robert Engelhorn)(Rozelsky, Kurt) (Entered: 03/31/2023) |
| 04/27/2023 | 54 | **ORDER denying BMW AG's 19 Motion to Stay Signed by Magistrate Judge Kevin McDonald on 4/27/2023.(kric, )** (Entered: 04/27/2023) |
| 05/08/2023 | 55 | MOTION for Leave to File *(Unopposed)* by Kelly Dawsey. Response to Motion due by 5/22/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(Murphy, Brian) (Entered: 05/08/2023) |
| 05/09/2023 | 56 | **TEXT ORDER granting 55 the plaintiff's unopposed motion for leave to file a supplement in opposition to AG's motion to dismiss based on newly acquired evidence. As set forth in the motion, the plaintiff may file a supplement within seven days of her receipt of Mr. Engelhorn's deposition transcript, and AG may file a responsive supplement within seven days of the filing of the plaintiffs supplement. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 5/9/2023.(kric, )** (Entered: 05/09/2023) |
| 05/16/2023 | 57 | MOTION to Compel *Against BMW AG* by Kelly Dawsey. Response to Motion due by 5/30/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - BMW AG letter, # 2 Exhibit B - Emails)No proposed order.Motions referred to Kevin McDonald.(Murphy, Brian) (Entered: 05/16/2023) |
| 05/19/2023 | 58 | PLAINTIFF'S ID OF EXPERT WITNESSES by Kelly Dawsey.(Murphy, Brian) (Entered: 05/19/2023) |
| 05/22/2023 | 59 | SUPPLEMENT by Kelly Dawsey to 45 Response in Opposition to Motion, . (Attachments: # 1 Exhibit Engelhorn deposition excerpts) See reply 61 (Murphy, Brian) (Entered: 05/22/2023) |
| 05/30/2023 | 60 | RESPONSE in Opposition re 57 MOTION to Compel *Against BMW AG* Response filed by Bayerische Motoren Werke Aktiengesellschaft.Reply to Response to Motion due by 6/6/2023 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Plaintiff's Second Discovery to Bayerische Motoren Werke Aktiengesellschaft)(Rozelsky, Kurt) (Entered: 05/30/2023) |
| 05/30/2023 | 61 | REPLY by Bayerische Motoren Werke Aktiengesellschaft to 59 Supplement *to Motion to Dismiss Briefing*. (Attachments: # 1 Exhibit A - Deposition of Robert Engelhorn) (Rozelsky, Kurt) (Entered: 05/30/2023) |
| 05/31/2023 | 62 | REPLY to Response to Motion re 57 MOTION to Compel *Against BMW AG* Response filed by Kelly Dawsey. (Murphy, Brian) (Entered: 05/31/2023) |
| 06/21/2023 | 65 | **REPORT AND RECOMMENDATION recommending that BMW AG's motion to dismiss 42 be denied. Objections to R&R due by 7/5/2023 Add an additional 3 days** |

| | | |
|---|---|---|
| | | **only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Magistrate Judge Kevin McDonald on 6/21/2023. (kric, )** (Entered: 06/21/2023) |
| 06/26/2023 | 66 | **TEXT ORDER. The undersigned directs counsel for the plaintiff and BMW AG to confer in good faith in an effort to resolve the issues set forth in the plaintiff's motion to compel 57 in light of the undersigned's report and recommendation 65 recommending that BMW AG's motion to dismiss 42 be denied. Counsel shall file a joint status report by July 12, 2023. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 6/26/23. (rweb, )** (Entered: 06/26/2023) |
| 07/05/2023 | 68 | OBJECTION to 65 Report and Recommendation *of the Magistrate Judge* by Bayerische Motoren Werke Aktiengesellschaft. Reply to Objections due by 7/19/2023 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Rozelsky, Kurt) (Entered: 07/05/2023) |
| 07/10/2023 | 69 | REPLY by Kelly Dawsey to 68 Objection to Report and Recommendation, . (Murphy, Brian) (Entered: 07/10/2023) |
| 07/12/2023 | 70 | STATUS REPORT *on Plaintiff's Motion to Compel Against Bayerische Motoren Werke Aktiengesellschaft* by Bayerische Motoren Werke Aktiengesellschaft. (Rozelsky, Kurt) (Entered: 07/12/2023) |
| 07/12/2023 | 71 | Withdrawal of Motions: 57 MOTION to Compel *Against BMW AG* filed by Kelly Dawsey based on the plaintiff's statement within the 70 Status Report. (kric, ) Modified on 7/12/2023 to edit text (kric, ). (Entered: 07/12/2023) |
| 08/02/2023 | 73 | MOTION to Compel *and Strike Objections* by Kelly Dawsey. Response to Motion due by 8/16/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit First Discovery, # 2 Exhibit Second Discovery, # 3 Exhibit BMW AG Responses)No proposed order.Motions referred to Kevin McDonald.(Murphy, Brian) (Entered: 08/02/2023) |
| 08/11/2023 | 75 | RESPONSE in Support re 73 MOTION to Compel *and Strike Objections* Response filed by Bayerische Motoren Werke Aktiengesellschaft. (Attachments: # 1 Exhibit A - May 9, 2023 Rozelsky to Murphy, # 2 Exhibit B - May 16, 2023 Rozelsky to Murphy email with letter)(Rozelsky, Kurt) (Entered: 08/11/2023) |
| 08/14/2023 | 76 | REPLY to Response to Motion re 73 MOTION to Compel *and Strike Objections* Response filed by Kelly Dawsey. (Attachments: # 1 Exhibit EU Regulation)(Murphy, Brian) (Entered: 08/14/2023) |
| 08/15/2023 | 78 | **ORDER granting in part and denying in part the plaintiff's motion to compel responses and strike objections 73 . Signed by Magistrate Judge Kevin McDonald on 8/15/23.(pbri, )** (Entered: 08/15/2023) |
| 08/24/2023 | 79 | *Supplemental Responses to* Local Rule 26.03 Answers to Interrogatories by BMW Manufacturing Co LLC.(McCoy, Ellison) (Entered: 08/24/2023) |
| 08/24/2023 | 80 | DEFENDANT'S ID OF EXPERT WITNESSES by BMW Manufacturing Co LLC. (McCoy, Ellison) Modified on 11/21/2025: See 143 Supplemental Disclosure of Expert Witness (kmca). (Entered: 08/24/2023) |
| 08/25/2023 | 81 | MOTION for Protective Order *With* MOTION/Request to Expedite by Kelly Dawsey. Response to Motion due by 9/8/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Petrasch dep. excerpts, # 2 Exhibit Example of journal page designation)No proposed order.Motions referred to Kevin McDonald.(Murphy, Brian). Added MOTION to Expedite on 8/25/2023: to add additional relief listed (kmca). (Main Document 81 |

| | | |
|---|---|---|
| | | replaced on 8/25/2023: to replace with corrected document (LR 7.02) as provided by filing user) (kmca). (Entered: 08/25/2023) |
| 08/25/2023 | 82 | **ORDER denying the plaintiff's motion for protective order with motion/request to expedite 81 . Signed by Magistrate Judge Kevin McDonald on 8/25/23.(pbri, )** (Entered: 08/25/2023) |
| 09/21/2023 | 83 | Joint MOTION to Amend/Correct 39 Scheduling Order, by BMW Manufacturing Co LLC. Response to Motion due by 10/5/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Motions referred to Kevin McDonald.(McCoy, Ellison) (Entered: 09/21/2023) |
| 09/22/2023 | 84 | **TEXT ORDER granting 83 Consent Motion to Amend/Correct Scheduling Order. Signed by Magistrate Judge Kevin McDonald on 9/22/23.(pbri, )** (Entered: 09/22/2023) |
| 09/22/2023 | 85 | **CONSENT SECOND AMENDED SCHEDULING ORDER:Records Custodian Affidavit due by 1/9/2024, Discovery due by 1/23/2024, Mediation Due by 2/2/2024, Motions due by 2/16/2024, Jury Selection Deadline 4/5/2024. Signed by Magistrate Judge Kevin McDonald on 9/22/23. (pbri, )** (Entered: 09/22/2023) |
| 01/24/2024 | 87 | MOTION for Extension of Time *for AG to File a Motion for Summary Judgment* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 2/7/2024. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(Rozelsky, Kurt) (Entered: 01/24/2024) |
| 01/24/2024 | 88 | RESPONSE in Opposition re 87 MOTION for Extension of Time *for AG to File a Motion for Summary Judgment* Response filed by Kelly Dawsey.Reply to Response to Motion due by 1/31/2024 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Murphy, Brian) (Entered: 01/24/2024) |
| 01/25/2024 | 89 | **TEXT ORDER. Considering BMW AG's motion for extension of time and the plaintiff's response 87 88 , the undersigned grants 87 BMW AG's motion for extension to file its motion for summary judgment until 30 days after the district court rules on its pending motion to dismiss 42 . IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 1/25/24.(pbri, )** (Entered: 01/25/2024) |
| 02/07/2024 | 90 | **ORDER adopting 65 Report and Recommendation and denying 42 Motion to Dismiss without prejudice. Signed by Honorable Timothy M Cain on 02/07/2024. (jens)** (Entered: 02/07/2024) |
| 02/16/2024 | 92 | MOTION for Summary Judgment by BMW Manufacturing Co LLC. Response to Motion due by 3/1/2024. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit A - Deposition Excerpts of Plaintiff, # 3 Exhibit B - Deposition Excerpts of Robert Engelhorn, # 4 Exhibit C - Deposition Excerpts of Christine Petrasch, # 5 Exhibit D - Deposition Excerpts of Scott Medley, # 6 Exhibit E - Deposition Excerpts of Eva Burgmeier, # 7 Exhibit F - Deposition Excerpts of Sherry McCraw, # 8 Exhibit G - Deposition Excerpts of Sherrill Miller, # 9 Exhibit H - Deposition Excerpts of Kathryn Keiser, # 10 Exhibit I - Deposition Excerpts of Corey Epps)No proposed order.Motions referred to Kevin McDonald.(McCoy, Ellison) (Attachment 2 replaced on 2/27/2024 to redact provided by filing user) (pbri, ). (Entered: 02/16/2024) |
| 02/21/2024 | 96 | ANSWER to 20 Amended Complaint by Bayerische Motoren Werke Aktiengesellschaft. (Rozelsky, Kurt) (Entered: 02/21/2024) |

| | | |
|---|---|---|
| 02/29/2024 | 97 | RESPONSE in Opposition re 92 MOTION for Summary Judgment Response filed by Kelly Dawsey.Reply to Response to Motion due by 3/7/2024 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 01 - Dawsey 2nd Declaration, # 2 Exhibit 02 - Bailey dep excerpts, # 3 Exhibit 03 - Burgmeier dep excerpts, # 4 Exhibit 04 - Dawsey dep excerpts, # 5 Exhibit 05 - Engelhorn dep excerpts, # 6 Exhibit 06 - Epps dep excerpts, # 7 Exhibit 07 - Gilmore dep excerpts, # 8 Exhibit 08 - Keiser dep excerpts, # 9 Exhibit 09 - McCraw dep excerpts, # 10 Exhibit 10 - Medley dep excerpts, # 11 Exhibit 11 - Petrasch dep excerpts, # 12 Exhibit 12 - TX-60 JFDS 2019, # 13 Exhibit 13 - TX-60 JFDS 2022, # 14 Exhibit 14 - TX-61 JFDS 2019, # 15 Exhibit 15 - TX-61 JFDS 2021, # 16 Exhibit 16 - TX-61 JFDS 2022, # 17 Exhibit 17 - Exempt Org Structure 2018, # 18 Exhibit 18 - Exempt Org Structure 2021, # 19 Exhibit 19 - Exempt Org Structure 2023, # 20 Exhibit 20 - Dawsey Portfolio 2020, # 21 Exhibit 21 - Dawsey Portfolio 2021, # 22 Exhibit 22 - Dawsey Portfolio 2022, # 23 Exhibit 23 - Expat Guidelines excerpt, # 24 Exhibit 24 - Petrasch Dep. Exh. 8, # 25 Exhibit 25 - Petrasch Dep. Exh. 16, # 26 Exhibit 26 - Petrasch Dep. Exh. 5, # 27 Exhibit 27 - Org Chart, # 28 Exhibit 28 - Bailey pay, # 29 Exhibit 29 - Gilmore pay, # 30 Exhibit 30 - Dawsey pay, # 31 Exhibit 31 - Petrasch Dep. Exh. 18, # 32 Exhibit 32 - Dawsey Dep. Exh. 28, # 33 Exhibit 33 - Petrasch Dep. Exh. 3, # 34 Exhibit 34 - BMW MC Resp. to RTA, # 35 Exhibit 35 - Muldrow article, # 36 Exhibit 36 - Promotion procedure overview, # 37 Exhibit 37 - Petrasch text, # 38 Exhibit 38 - International Grading Committee, # 39 Exhibit 39 - Transition Memo)(Murphy, Brian) Modified on 4/17/2024 see also 107 (rweb, ). (Entered: 02/29/2024) |
| 02/29/2024 | 98 | Sealed Document in re document 97 . (Attachments: # 1 Exhibit 29 - Sealed Gilmore Compensation)(Murphy, Brian) (Entered: 02/29/2024) |
| 03/07/2024 | 100 | REPLY to Response to Motion re 92 MOTION for Summary Judgment Response filed by BMW Manufacturing Co LLC. (Attachments: # 1 Exhibit A - Plaintiff's Deposition Excerpts, # 2 Exhibit B - Petrasch Deposition Excerpts)(McCoy, Ellison) (Entered: 03/07/2024) |
| 03/08/2024 | 102 | MOTION for Summary Judgment by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 3/22/2024. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Motions referred to Kevin McDonald.(Rozelsky, Kurt) (Entered: 03/08/2024) |
| 03/08/2024 | 103 | Additional Attachments to Main Document 102 MOTION for Summary Judgment . First attachment description: Bayerische Motoren Werke Aktiengesellschaft's Memorandum in Support of Its Motion for Summary Judgment . (Attachments: # 1 Exhibit A - Plaintiff depo excerpts, # 2 Exhibit B - Engelhorn depo excerpts, # 3 Exhibit C - Petrasch depo excerpts, # 4 Exhibit D - Burgmeier depo excerpts, # 5 Exhibit E - McCraw depo excerpts)(Rozelsky, Kurt) (Entered: 03/08/2024) |
| 03/22/2024 | 104 | RESPONSE in Opposition re 102 MOTION for Summary Judgment Response filed by Kelly Dawsey.Reply to Response to Motion due by 3/29/2024 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 1 - Bailey dep excerpts, # 2 Exhibit 2 - Burgmeier dep excerpts, # 3 Exhibit 3 - Dawsey dep excerpts, # 4 Exhibit 4 - Engelhorn dep excerpts, # 5 Exhibit 5 - Epps dep excerpts, # 6 Exhibit 6 - Gilmore dep excerpts, # 7 Exhibit 7 - McCraw dep excerpts, # 8 Exhibit 8 - Petrasch dep excerpts, # 9 Exhibit 9 - Dawsey Third Declaration, # 10 Exhibit 10 - BMW Group Report, # 11 Exhibit 11 - Petrasch Dep Ex 7, # 12 Exhibit 12 - Dawsey Dep Ex 30, # 13 Exhibit 13 - Petrasch Dep Ex 14, # 14 Exhibit 14 - Petrasch Dep Ex 12, # 15 Exhibit 15 - Petrasch Dep Ex 9, # 16 Exhibit 16 - Petrasch Dep Ex 19, # 17 Exhibit 17 - Petrasch Dep Ex 6, # 18 Exhibit 18 - Petrasch Dep Ex 4, # 19 Exhibit 19 - Petrasch Dep Ex 13, # 20 Exhibit 20 - Petrasch Dep Ex 1, # 21 Exhibit 21 - Dawsey Portfolio |

| | | |
|---|---|---|
| | | 2021, # 22 Exhibit 22 - Germany - US FCN Treaty, # 23 Exhibit 23 - BMW US Holding SOS filing)(Murphy, Brian) (Entered: 03/22/2024) |
| 03/29/2024 | 106 | REPLY to Response to Motion re 102 MOTION for Summary Judgment Response filed by Bayerische Motoren Werke Aktiengesellschaft. (Rozelsky, Kurt) (Entered: 03/29/2024) |
| 04/17/2024 | 107 | SUPPLEMENT by Kelly Dawsey to 97 Response in Opposition to Motion,,,,,,, . (Attachments: # 1 Exhibit Muldrow decision (April 17, 2024))(Murphy, Brian) (Entered: 04/17/2024) |
| 04/24/2024 | 108 | **TEXT ORDER. In light of the opinion issued by the Supreme Court of the United States in *Muldrow v. City of St. Louis, Missouri, et al.*, C/A No. 22-193, 2024 WL 1642826 (2024) on April 17, 2024, the undersigned hereby provides the plaintiff and the defendants an opportunity to submit a supplemental brief regarding the impact of the *Muldrow* decision on the defendants' motions for summary judgment 92 102 . Any such supplemental brief shall be filed by May 8, 2024, and shall be limited to five pages. IT IS SO ORDERED. Signed by Magistrate Judge Kevin McDonald on 4/24/24. (pbri, )** Modified on 4/24/2024 to modify text (pbri, ). (Entered: 04/24/2024) |
| 05/07/2024 | 110 | RESPONSE in Opposition re 92 MOTION for Summary Judgment *(Supplemental per Order DE 108)* Response filed by Kelly Dawsey.Reply to Response to Motion due by 5/14/2024 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Jackson Lewis article, # 2 Exhibit Morgan Lewis article)(Murphy, Brian) (Entered: 05/07/2024) |
| 05/08/2024 | 111 | RESPONSE in Support re 92 MOTION for Summary Judgment *(Supplement per Order #108)* Response filed by BMW Manufacturing Co LLC. (McCoy, Ellison) (Entered: 05/08/2024) |
| 05/08/2024 | 112 | SUPPLEMENT by Bayerische Motoren Werke Aktiengesellschaft to 108 Order,, *Supplemental Brief in Support of Defendants' Motions for Summary Judgment*. (Rozelsky, Kurt) (Entered: 05/08/2024) |
| 06/21/2024 | 113 | **REPORT AND RECOMMENDATION recommending that the defendants' motions for summary judgment 92 ; 102 be granted. Objections to R&R due by 7/8/2024. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Magistrate Judge Kevin McDonald on 6/21/24. (pbri, )** Modified on 6/21/2024 to correct linkage (pbri, ). (Entered: 06/21/2024) |
| 06/21/2024 | 114 | ***CASE MANAGEMENT TRANSFERRED to civil case manager for Judge Timothy M Cain. New case number is **7:22cv03738-TMC**. Please make a note of this for all future filings as well as Judge's preferences. Any future filings must be sent to the Clerk's Office at the following address: Carroll Campbell Jr. U.S. Courthouse, 250 East North Street, Greenville, SC 29601. (pbri, ) (Entered: 06/21/2024) |
| 07/07/2024 | 115 | OBJECTION to 113 Report and Recommendation by Kelly Dawsey. Reply to Objections due by 7/22/2024 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Murphy, Brian) (Entered: 07/07/2024) |
| 07/19/2024 | 116 | REPLY by BMW Manufacturing Co LLC to 115 Objection to Report and Recommendation . (McCoy, Ellison) (Entered: 07/19/2024) |
| 07/19/2024 | 117 | REPLY by Bayerische Motoren Werke Aktiengesellschaft to 115 Objection to Report and Recommendation . (Rozelsky, Kurt) (Entered: 07/19/2024) |
| 09/26/2024 | 119 | **ORDER RULING ON REPORT AND RECOMMENDATION. The court declines to adopt the Report (ECF No. 113 ) and rejects BMW AG's additional summary judgment arguments not addressed by the Report. Accordingly, the Court DENIES** |

| | | |
|---|---|---|
| | | **both BMW MC's Motion for Summary Judgment (ECF No. 92 ) and BMW AG's Motion for Summary Judgment. (ECF No. 102 ). Signed by Chief Judge Timothy M Cain on 9/26/24. (kmca)** (Entered: 09/26/2024) |
| 12/04/2024 | 120 | NOTICE of Hearing: Telephone Status Conference set for Wednesday, 4/9/2025, 11:00 AM in G Ross Anderson Jr Court House, 315 S McDuffie St, Anderson before Chief Judge Timothy M Cain.<br><br>NOTE: parties need to be prepared to discuss status of the case, mediation and settlement efforts, and readiness for trial.<br><br>Please see attached for call-in information.(kmca) (Entered: 12/04/2024) |
| 04/04/2025 | 122 | Consent MOTION to Continue *Status Conference Date* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 4/18/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Rozelsky, Kurt) (Entered: 04/04/2025) |
| 04/07/2025 | 123 | **TEXT ORDER granting 122 Consent Motion to Continue *Status Conference Date*. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 4/7/25. (kmca)** (Entered: 04/07/2025) |
| 04/07/2025 | 124 | NOTICE of Cancellation of Hearing: Telephone Status Conference set for Wednesday, 4/9/2025, 11:00 AM. **The hearing will be re-scheduled at a later date convenient to the court. (kmca) (Entered: 04/07/2025) |
| 04/10/2025 | 125 | **TEXT ORDER. An in-person status conference in this matter is hereby scheduled for May 6, 2025 at 2:30 p.m. at the G. Ross Anderson, Jr. Federal Building and United States Courthouse, 315 S. McDuffie Street, Anderson, S.C. before Chief U.S. Judge Timothy M. Cain.**<br><br>**At least seven days prior to the pretrial conference, each party shall provide the court with a status conference memorandum not exceeding ten pages, double spaced, with a brief summary of the factual background and legal basis for all causes of action/defenses asserted by such party, to include the following:**<br><br>**(1) Plaintiffs shall set forth a brief statement of the case and contentions as to all claims set forth in the pleadings.**<br><br>**(2) Each defendant shall set forth a brief statement of the case and contentions as to all defenses set forth in the pleadings.**<br><br>**(3) Similar statements shall be included as to any counterclaim, crossclaim or third-party claim.**<br><br>**(4) The details of the damages claimed.**<br><br>**(5) Any outstanding discovery issues.**<br><br>**(6) Any outstanding or anticipated motions, including dispositive motions.**<br><br>**(7) Any anticipated unusual questions of law or evidentiary issues that have been identified that may arise at trial.**<br><br>**(8) Each party shall provide a brief summary as to the efforts made to settle the case and identify the significant impediments to resolution.** |

| | | |
|---|---|---|
| | | **The status conference shall be attended by at least one attorney of record for each party who will actually try the case. Prior to the pretrial conference, counsel for the parties shall confer to determine the estimated time required for trial. Counsel should have their schedules/calendars available.**<br><br>**Failure of counsel to appear at the pretrial conference without just cause may result in the imposition of sanctions.**<br><br>**DO NOT FILE THE MEMORANDUM. It should be emailed to the judge's ECF in-box at cain_ecf@scd.uscourts.gov. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 4/10/25. (kmca)** (Entered: 04/10/2025) |
| 04/10/2025 | 126 | NOTICE of Hearing: Informal, In-Person, Pretrial Conference set for Tuesday, 5/6/2025, 02:30 PM in G Ross Anderson Jr Court House, 315 S McDuffie St, Anderson before Chief Judge Timothy M Cain.<br><br>Please see Order, entry 125 for requirements. (kmca) (Entered: 04/10/2025) |
| 05/06/2025 | 128 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Informal status conference held on 5/6/2025. All parties represented. Attorneys to submit trial protection requests for the months of December 2025 and January March 2026. (arut, )** (Entered: 05/06/2025) |
| 05/15/2025 | 130 | NOTICE of Request for Protection from Court Appearance by Brian P Murphy for March 23 - 31, 2026 (Murphy, Brian) (Entered: 05/15/2025) |
| 06/26/2025 | 132 | NOTICE of Request for Protection from Court Appearance by Kurt Matthew Rozelsky for Feb 5-9, 2026 and March 12-22, 2026 (Rozelsky, Kurt) (Main Document 132 replaced on 6/27/2025: to replace with corrected document (case number) as provided by filing user) (kmca). (Entered: 06/26/2025) |
| 06/26/2025 | 133 | NOTICE of Request for Protection from Court Appearance by Ellison Ford McCoy for December 11, 2025-January 9, 2026, and February 16-20, 2026 *as listed* (McCoy, Ellison) (Main Document 133 replaced on 6/26/2025: to replace with corrected document (case number) as provided by filing user) (kmca). (Entered: 06/26/2025) |
| 08/04/2025 | 135 | NOTICE of Hearing: Jury Selection set for Tuesday, 2/17/2026, 09:00 AM in Greenville #6100, Carroll A Campbell Jr Courthouse, 250 East North St, Greenville before Chief Judge Timothy M Cain.<br><br>Jury Trial to begin after jury selection through Friday, 2/27/2026, in Greenville #6100, Carroll A Campbell Jr Courthouse, 250 East North St, Greenville before Chief Judge Timothy M Cain.<br><br>Please see attached for important deadlines, instructions and forms.(kmca) Modified on 1/29/2026: See 187 Order for updated deadlines re juror questionnaires available 2/6/26 and joint strikes for cause due 2/9/26 by 5:00 pm (kmca). (Entered: 08/04/2025) |
| 08/04/2025 | 136 | NOTICE of Hearing: Informal Telephone Status Conference set for Friday, 8/8/2025, 02:30 PM before Chief Judge Timothy M Cain.<br><br>Please see attached for call-in information.(kmca) (Entered: 08/04/2025) |
| 08/08/2025 | 138 | **Minute Entry. Informal telephone status conference held before Honorable Timothy M. Cain on 8/8/25. All Parties represented. Mediation to be held before Magistrate Judge William S. Brown. (kmca)** (Entered: 08/08/2025) |

| | | |
|---|---|---|
| 08/08/2025 | 139 | **TEXT ORDER. A status conference was held on August 8, 2025, to address the parties' readiness for trial and the parties' interest in mediating this action with a United States Magistrate Judge. (ECF No. 136 ). In light of the time, inconvenience, and expense to the parties, the court and the potential jurors if a trial is held, the court concludes justice is best served to require the parties to mediate this matter before a United States Magistrate Judge to attempt in good faith to resolve the case. Accordingly, the court appoints United States Magistrate Judge William S. Brown to conduct and preside at a mediation in this action. The parties are instructed to contact Judge Brown's chambers (brown_ecf@scd.uscourts.gov) the week of August 11, 2025, to schedule such mediation and then to appear at the time and place determined by Judge Brown. The parties shall participate in mediation in good faith and subject to the provisions of Local Rule 16:08, D.S.C. The parties are further advised that the trial of this case, should it fail to settle, will proceed on February 17, 2026. No continuances will be granted in the absence of extraordinary and compelling circumstances outside of the control of the parties and lawyers. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 8/8/25. (kmca)** (Entered: 08/08/2025) |
| 08/13/2025 | 140 | NOTICE of Hearing: Mediation Hearing set for 9/8/2025 at 01:00 PM in Greenville #3200, Carroll A Campbell Jr Courthouse, 250 East North St, Greenville before Magistrate Judge William S. Brown. (rweb, ) (Entered: 08/13/2025) |
| 11/20/2025 | 143 | DEFENDANT'S ID OF EXPERT WITNESSES *(Supplemental)* by BMW Manufacturing Co LLC.(McCoy, Ellison) (Main Document 143 replaced on 11/21/2025: to replace with correct case number (Judge's initials) as provided by filing user) (kmca). (Entered: 11/20/2025) |
| 11/24/2025 | 144 | MOTION in Limine *re BMW MC's Expert Report* by Kelly Dawsey. Response to Motion due by 12/8/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit 1 - BMW MC Report, # 2 Exhibit 2 - Litigation Servs Handbook excerpts, # 3 Exhibit 3 - AICPA Practice Aid excerpts)No proposed order.(Murphy, Brian) (Entered: 11/24/2025) |
| 12/15/2025 | 145 | RESPONSE in Opposition re 144 MOTION in Limine *re BMW MC's Expert Report* Response filed by BMW Manufacturing Co LLC.Reply to Response to Motion due by 12/22/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - 01-18-23 Expert Report of John E. Gibson Jr., # 2 Exhibit B - 10-31-25 Expert Report of John E. Gibson Jr., # 3 Exhibit C - 12-01-25 - Expert Report of John E. Gibson Jr., # 4 Exhibit D - Deposition Excerpts of John E. Gibson, Jr.)(McCoy, Ellison) (Entered: 12/15/2025) |
| 12/16/2025 | 146 | REPLY to Response to Motion re 144 MOTION in Limine *re BMW MC's Expert Report* Response filed by Kelly Dawsey. (Murphy, Brian) (Entered: 12/16/2025) |
| 12/22/2025 | 149 | RULE 26(a)(3)PRETRIAL DISCLOSURES by BMW Manufacturing Co LLC. Objections to PreTrial Disclosures due by 1/5/2026. (Attachments: # 1 Exhibit A - Proposed Exhibit List)(McCoy, Ellison) Modified on 1/13/2026: See 172 Amended Pretrial Disclosures (kmca). (Entered: 12/22/2025) |
| 12/22/2025 | 150 | RULE 26(a)(3)PRETRIAL DISCLOSURES by Bayerische Motoren Werke Aktiengesellschaft. Objections to PreTrial Disclosures due by 1/5/2026. (Attachments: # 1 Exhibit A - Proposed Exhibit List)(Rozelsky, Kurt) (Main Document 150 and Attachment 1 replaced on 12/23/2025: to replace with corrected documents (title) as provided by filing user) (kmca). Modified on 1/13/2026: See 174 Amended Pretrial Disclosures (kmca). (Entered: 12/22/2025) |

| | | |
|---|---|---|
| 12/22/2025 | 151 | RULE 26(a)(3)PRETRIAL DISCLOSURES by Kelly Dawsey. Objections to PreTrial Disclosures due by 1/5/2026.(Murphy, Brian) Modified on 1/13/2026: See 171 Amended Pretrial Disclosures (kmca). (Entered: 12/22/2025) |
| 12/29/2025 | 152 | MOTION in Limine by Kelly Dawsey. Response to Motion due by 1/12/2026. (Attachments: # 1 Exhibit 01 - Medley deposition excerpts, # 2 Exhibit 02 - Burgmeier deposition excerpts) No proposed order. (Murphy, Brian) (Main Document 152 replaced on 12/30/2025 with the corrected case header) (alma, ). (Entered: 12/29/2025) |
| 12/29/2025 | 153 | Joint MOTION in Limine *to Exclude Evidence of Damages and to Bifurcate* by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 1/12/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Plaintiff's Deposition Excerpts, # 2 Exhibit B - Kathryn Kaiser Deposition Excerpts)No proposed order.(McCoy, Ellison) (Entered: 12/29/2025) |
| 12/29/2025 | 154 | Joint MOTION in Limine by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 1/12/2026. (Attachments: # 1 Exhibit A - Plaintiff's Deposition Excerpts, # 2 Exhibit B - Petrasch Deposition Excerpts)No proposed order.(McCoy, Ellison) (Attachment 2 replaced on 12/31/2025 with the corrected document) (alma, ). (Entered: 12/29/2025) |
| 12/29/2025 | 155 | Joint MOTION in Limine by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 1/12/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Plaintiff's Deposition Exhibits)No proposed order.(McCoy, Ellison) (Entered: 12/29/2025) |
| 12/29/2025 | 156 | Joint MOTION in Limine *to Exclude Testimony of Expert Witness* by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 1/12/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - John E. Gibson Deposition Excerpts, # 2 Exhibit B - Plaintiff's Deposition Exhibits)No proposed order.(McCoy, Ellison) (Entered: 12/29/2025) |
| 12/29/2025 | 157 | MOTION in Limine by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 1/12/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Rozelsky, Kurt) (Entered: 12/29/2025) |
| 01/05/2026 | 158 | RESPONSE in Opposition re 152 MOTION in Limine. Response filed by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. Reply to Response to Motion due by 1/7/2026. (Attachments: # 1 Exhibit A - Sherry McCraw Deposition Excerpts)(McCoy, Ellison) Modified on 1/6/2026: to correct Reply date per 135 trial notice (kmca). (Entered: 01/05/2026) |
| 01/05/2026 | 159 | RESPONSE in Opposition re 153 Joint MOTION in Limine *to Exclude Evidence of Damages and to Bifurcate*. Response filed by Kelly Dawsey. Reply to Response to Motion due by 1/7/2026. (Murphy, Brian) Modified on 1/6/2026: to correct Reply date per 135 trial notice (kmca). (Entered: 01/05/2026) |
| 01/05/2026 | 160 | RESPONSE in Opposition re 154 Joint MOTION in Limine. Response filed by Kelly Dawsey. Reply to Response to Motion due by 1/7/2026. (Murphy, Brian) Modified on 1/6/2026: to correct Reply date per 135 trial notice (kmca). (Entered: 01/05/2026) |

| | | |
|---|---|---|
| 01/05/2026 | 161 | RESPONSE in Opposition re 155 Joint MOTION in Limine. Response filed by Kelly Dawsey. Reply to Response to Motion due by 1/7/2026. (Murphy, Brian) Modified on 1/6/2026: to correct Reply date per 135 trial notice (kmca). (Entered: 01/05/2026) |
| 01/05/2026 | 162 | RESPONSE in Opposition re 156 Joint MOTION in Limine *to Exclude Testimony of Expert Witness* and Request for scheduling guidance. Response filed by Kelly Dawsey. Reply to Response to Motion due by 1/7/2026. (Attachments: # 1 Exhibit 01 - Gibson deposition excerpts)(Murphy, Brian) Modified on 1/6/2026: to correct Reply date per 135 trial notice (kmca). Modified on 1/6/2026: to add text (scheduling guidance) (kmca). (Entered: 01/05/2026) |
| 01/05/2026 | 163 | RESPONSE in Opposition re 157 MOTION in Limine. Response filed by Kelly Dawsey. Reply to Response to Motion due by 1/7/2026. (Attachments: # 1 Exhibit 01 - Petrasch deposition excerpts, # 2 Exhibit 02 - Dawsey deposition excerpts, # 3 Exhibit 03 - Rozelsky email)(Murphy, Brian) Modified on 1/6/2026: to correct Reply date per 135 trial notice (kmca). (Entered: 01/05/2026) |
| 01/07/2026 | 165 | REPLY to Response to Motion re 152 MOTION in Limine Response filed by Kelly Dawsey. (Murphy, Brian) (Entered: 01/07/2026) |
| 01/07/2026 | 166 | REPLY to Response to Motion re 157 MOTION in Limine Response filed by Bayerische Motoren Werke Aktiengesellschaft. (Rozelsky, Kurt) (Entered: 01/07/2026) |
| 01/07/2026 | 167 | REPLY to Response to Motion re 156 Joint MOTION in Limine *to Exclude Testimony of Expert Witness* Response filed by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. (Attachments: # 1 Exhibit A - John Gibson Deposition Excerpts)(McCoy, Ellison) (Entered: 01/07/2026) |
| 01/07/2026 | 168 | REPLY to Response to Motion re 154 Joint MOTION in Limine Response filed by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. (Attachments: # 1 Exhibit A - Petrasch Deposition Excerpts, # 2 Exhibit B - Engelhorn Deposition Excerpts, # 3 Exhibit C - McCraw Deposition Excerpts)(McCoy, Ellison) (Entered: 01/07/2026) |
| 01/07/2026 | 169 | REPLY to Response to Motion re 155 Joint MOTION in Limine Response filed by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. (McCoy, Ellison) (Entered: 01/07/2026) |
| 01/07/2026 | 170 | REPLY to Response to Motion re 153 Joint MOTION in Limine *to Exclude Evidence of Damages and to Bifurcate* Response filed by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft. (Attachments: # 1 Exhibit A - Dawsey Deposition Excerpts)(McCoy, Ellison) (Entered: 01/07/2026) |
| 01/12/2026 | 171 | AMENDED RULE 26(a)(3)PRETRIAL DISCLOSURES by Kelly Dawsey. Objections to PreTrial Disclosures due by 1/26/2026.(Murphy, Brian) Modified on 1/12/2026: to add text (amended) (kmca). (Entered: 01/12/2026) |
| 01/12/2026 | 172 | *Amended* RULE 26(a)(3)PRETRIAL DISCLOSURES by BMW Manufacturing Co LLC. Objections to PreTrial Disclosures due by 1/26/2026. (Attachments: # 1 Exhibit A - Exhibit List)(McCoy, Ellison) (Entered: 01/12/2026) |
| 01/12/2026 | 173 | OBJECTIONS by Kelly Dawsey to 172 Pretrial Disclosures. (Murphy, Brian) (Main Document 173 replaced on 1/13/2026: to replace with corrected document as requested by and provided by filing user) (kmca). (Entered: 01/12/2026) |
| 01/12/2026 | 174 | *Amended* RULE 26(a)(3)PRETRIAL DISCLOSURES by Bayerische Motoren Werke Aktiengesellschaft. Objections to PreTrial Disclosures due by 1/26/2026. (Attachments: # 1 Exhibit A - Exhibit List)(Rozelsky, Kurt) (Entered: 01/12/2026) |

| | | |
|---|---|---|
| 01/12/2026 | 175 | OBJECTIONS by Kelly Dawsey to 174 Pretrial Disclosures. (Murphy, Brian) (Entered: 01/12/2026) |
| 01/12/2026 | 176 | OBJECTIONS by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft to 171 Pretrial Disclosures. (kmca) Re-filed by clerk to correct event and add link ( 171 ) (kmca) (Entered: 01/13/2026) |
| 01/14/2026 | 177 | **TEXT ORDER. The trial notice (ECF No. 135 ) in this case imposes a January 19, 2026 deadline for submission of the parties' requests to charge and requests for voir dire. In light of the fact that Monday January 19, 2026, is a federal holiday, the January 19 deadline for the forgoing submissions is hereby changed to TUESDAY JANUARY 20, 2026. All other deadlines remain the same. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/14/26. (kmca)** (Entered: 01/14/2026) |
| 01/15/2026 | 178 | NOTICE of Hearing: Informal Telephone Conference set for Thursday, 1/22/2026, 11:00 AM before Chief Judge Timothy M Cain.<br><br>The parties should be prepared to discuss potential presentation of expert testimony on economic damages and/or bifurcation.<br><br>Please see attached for call-in information.(kmca) (Entered: 01/15/2026) |
| 01/16/2026 | 179 | **TEXT ORDER: Before the court is Plaintiff's "motion in limine regarding irrelevant efforts to disparage plaintiff's character." (ECF No. 152 ). Specifically, Plaintiff seeks to exclude any testimony from potential trial witness Scott Medley to the extent he would testify that (1) he disagreed with various business decisions made by Plaintiff and came to the conclusion after Plaintiff resigned that she was not being honest in those decisions or (2) that Plaintiff's failure to disclose her plans to resign before doing so was not honest. Plaintiff also seeks to exclude testimony from potential trial witness Eva Burgmeier to the extent she would testify that she discovered after the fact that Plaintiff did a poor job of documenting her decisions and processes, making it more difficult for Burgmeier when she took over the TX-60 position from Plaintiff. Plaintiff specifies three bases for her motion. First, Plaintiff contends that such testimony is irrelevant since no decision-maker for Defendant BMW relied on these conclusions by Medley and Burgmeier. Second, Plaintiff argues this testimony would be unduly prejudicial. And third, Plaintiff argues this testimony constitutes inadmissible character evidence under Fed. R. Evid. 404(b). Defendants submitted a joint response in opposition to the motion (ECF No. 158 ) and Plaintiff filed a reply (ECF No. 165 ).**<br><br>**"The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the [fact-finder] will consider."** ***Moke Am. LLC v. Am. Custom Golf Cars, Inc.*****, 2023 WL 3686963, at *1 (E.D. Va. Jan. 11, 2023). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial."** ***Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*****, 652 F. Supp. 1400, 1401 (D. Md. 1987). Because questions of trial management are quintessentially the province of the district courts, the district court has "broad discretion" to grant or deny motions in limine.** ***Kauffman v. Park Place Hosp.*****, 468 F. App'x 220, 222 (4th Cir. 2012). Rulings in limine are preliminary and may be subject to change as the trial unfolds.** ***Luce v. United States*****, 469 U.S. 38, 41-42 (1984).**<br><br>**The court has carefully considered all of the parties' submissions on the issue raised in Plaintiff's motion in limine. The court agrees with Defendants that the purported** |

| | | |
|---|---|---|
| | | **testimony in question does not constitute improper character evidence that would be inadmissible under Federal Rule of Evidence 404(b). Furthermore, the court declines, at this time, to conclude this testimony is necessarily irrelevant. Should Plaintiff offer evidence at trial to establish that her performance of her duties for Defendants was excellent, such testimony may be relevant in rebuttal. And, finally, the court declines, at this juncture, to conclude that the probative value of this testimony would be substantially outweighed by the danger of unfair prejudice. Plaintiff effectively highlighted in her motion a number of reasons for a jury to discount the conclusions of these witnesses, including, for example, Medley's inability to identify a single example or a specific fact to support his testimony. Accordingly, the court DENIES Plaintiff's motion in limine at ECF No. 152. The court notes, however, rulings in limine are preliminary, *see Luce*, 469 U.S. at 41, and the court may reconsider this issue should events at trial require it as the evidence unfolds. This ruling is made based on the grounds set forth in the motion and arguments raised in the response. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/16/26.(kmca)** (Entered: 01/16/2026) |
| 01/16/2026 | 180 | **TEXT ORDER: Before the court is Defendant BMW AG's motion in limine to exclude Plaintiff's expected testimony that Christine Petrasch told her the only way to have an American Level II VP of human resources was to have a German national in the Level III TX-60 position that was held by Plaintiff and implied this policy was determined by BMW AG executives. (ECF No. 157 ). BMW AG contends this testimony should be excluded because (1) it contains inadmissible hearsay; (2) it lacks a proper foundation as Plaintiff has failed to establish Petrasch has personal knowledge of the matter in question and also is based on improper lay opinion testimony; and (3) its probative value is outweighed by the risk of unfair prejudice and jury confusion. Plaintiff submitted a response in opposition to the motion (ECF No. 163 ) and BMW AG filed a reply (ECF No. 166 ).**<br><br>**"The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the [factfinder] will consider." *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3686963, at *1 (E.D. Va. Jan. 11, 2023). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987). Because questions of trial management are quintessentially the province of the district courts, the district court has "broad discretion" to grant or deny motions in limine. *Kauffman v. Park Place Hosp.*, 468 F. App'x 220, 222 (4th Cir. 2012). Rulings in limine are preliminary and may be subject to change as the trial unfolds. *Luce v. United States*, 469 U.S. 38, 41-42 (1984).**<br><br>**The court has carefully considered the arguments offered by the parties in support of and in opposition to BMW AG's motion in limine. The court declines at this time to exclude such testimony based on lack of personal knowledge under Federal Rule of Evidence 602; Plaintiff, as the witness, will have an opportunity to establish sufficient personal knowledge at trial and Defendants will have an opportunity to examine her. The court likewise concludes the purported testimony is factual in nature, not based on opinion. With regard to BMW AG's hearsay argument, Plaintiff has presented evidence suggesting German nationals such a Petrasch are still employees of BMW AG even when assigned to BMW MC. This statement by Petrasch, therefore, would not constitute hearsay under Federal Rule of Evidence 801(d)(2); however, BMW AG may be entitled to an appropriate limiting instruction as to this testimony. Finally, the court notes that the testimony BMW AG seeks to exclude is based on Plaintiff's notes regarding her conversation with Petrasch. As** |

| | | |
|---|---|---|
| | | **pointed out by Plaintiff, Defendants, in their Federal Rule of Civil Procedure 26(a)(3) disclosures, designate Plaintiff's deposition transcript - including her notes on Petrasch's comments - as trial exhibits. Both Defendants also designate Plaintiff's amended complaint, which recounts these same statements by Petrasch, as a trial exhibit. Under the circumstances, the court is not convinced the admission of Petrash's comments would be unfairly prejudicial. Accordingly, the court DENIES BMW AG's motion in limine at ECF No. 157 . The court notes, however, rulings in limine are preliminary, see Luce, 469 U.S. at 41, and the court may reconsider this issue should events at trial require it as the evidence unfolds. This ruling is made based on the grounds set forth in the motion and arguments raised in the response. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/16/25. (kmca)** (Entered: 01/16/2026) |
| 01/22/2026 | 181 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: InformalTelephone Conference held on 1/22/2026. All parties represented. (kmca)** (Entered: 01/23/2026) |
| 01/23/2026 | 182 | **TEXT ORDER. The court conducted a telephone status conference in this action on January 22, 2026. Brian Murphy appeared on behalf of Plaintiff; Randy Moody, Ellison McCoy, and Mallory Gantt appeared on behalf of BMW MC; and Kurt Rozelsky appeared on behalf of BMW AG. The parties confirmed their agreement that the issue of front pay/back pay (economic damages) should be decided by the court. The parties further agreed that Plaintiff's motion in limine at ECF No. 144 ; Defendants' motion in limine at ECF No. 156 ; and Defendants' motion in limine at ECF No. 155 are moot. The parties shall confer regarding the most efficient and time saving means for Plaintiff to present testimony reflected by the deposition excerpts set forth in her amended pretrial disclosures and report any proposals to the court by Friday, January 30, 2026. Finally, in light of the winter storm forecast for upstate South Carolina over the next several days, the court extends the January 26, 2026, deadlines set forth in the Trial Notice (ECF No. 135 ) to January 27, 2026. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/23/26. (kmca)** (Entered: 01/23/2026) |
| 01/26/2026 | 184 | **Text Order Denying in part and Granting in part Defendants' motion in limine at ECF No. 153 .**<br><br>**Before the court is Defendants' "motion in limine to exclude evidence of damages and to bifurcate the trial into phases." (ECF No. 153 ). "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the [factfinder] will consider." *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3686963, at *1 (E.D. Va. Jan. 11, 2023). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987). Because questions of trial management are quintessentially the province of the district courts, the district court has "broad discretion" to grant or deny motions in limine. *Kauffman v. Park Place Hosp.*, 468 F. App'x 220, 222 (4th Cir. 2012). Rulings in limine are preliminary and may be subject to change as the trial unfolds. *Luce v. United States*, 469 U.S. 38, 41-42 (1984).**<br><br>**First, Defendants contend Plaintiff's claims for back pay and front pay seek equitable remedies that should be determined by the court, not a jury. *Id.* at 3. Thus, Defendants ask the court to exclude from jury consideration any evidence relating to front pay or back pay. In response, Plaintiff indicates she has no objection to the court ruling on economic damages, *i.e.*, front pay and back pay. (ECF No. 159 at 1).** |

**And, during a January 22, 2026, status conference, the parties confirmed their agreement to and support of this approach. Accordingly, with Plaintiff's consent, the court grants this portion of Defendants' motion and excludes all evidence relating to front pay or back pay from jury consideration; if the jury returns a verdict in favor of Plaintiff as to liability, evidence of front pay and back pay will be presented to the bench separately at a time set by the court.**

**Next, Defendants argue that Plaintiff will be unable to produce evidence supporting an award of compensatory or punitive damages and, therefore, should not be allowed even to seek such damages at trial. (ECF No. 153 at 48). For example, Defendants emphasize that in response to an interrogatory requesting Plaintiff identify every healthcare provider, minister or counselor who provided treatment or services for any alleged compensatory damages, "Plaintiff identified nobody."** ***Id.*** **at 5. Defendants further point out that during her deposition, Plaintiff "stated that she would rely on her counsel to determine any amount that she was seeking in this case."** ***Id.*** **at 6. To the extent Defendants are suggesting that these answers effectively operate as a waiver of Plaintiffs ability to pursue compensatory damages at trial, the court disagrees. Plaintiff never indicated she did not experience emotional distress related to Defendants' alleged actions, and "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress" in an employment discrimination case.** ***Bryant v. Aiken Reg'l Med. Centers Inc.*****, 333 F.3d 536, 546 (4th Cir. 2003). Defendants have not pointed to surprise damages evidence Plaintiff failed to disclose during discovery but now seeks to introduce at trial. Plaintiff may testify as to how Defendants' alleged action affected her, and Defendants may vigorously cross-examine her testimony. If, at the close of Plaintiff's case, Defendants genuinely believe Plaintiff failed to introduce any evidence that would support compensatory or punitive damages, they may move for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Similarly, Defendants may contend after Plaintiff has presented her case that there is no evidence to support an instruction on punitive damages; but Plaintiff will be permitted to present in her case in chief evidence she believes supports a claim of punitive damages.**

**Finally, Defendants contend the trial of this action should be bifurcated pursuant to Rule 42(b) of the Federal Rules of Civil Procedure which permits the court to "order a separate trial of one or more separate issues" "[f]or convenience, to avoid prejudice, or to expedite and economize." Defendants suggest separating the trial into (a) a first stage addressing Defendant's liability on Plaintiff's statutory claims, and (b) a second phase on the amount of non-economic damages, if any. (ECF No. 153 at 8). According to Defendants, this approach promotes judicial economy and avoids unnecessary expenditure of time and resources because if the jury determines Defendants are not liable, there would be no need for a second phase; is convenient for the witnesses; and eliminates the risk of unfair prejudice to Defendants because "introducing evidence of Plaintiff's alleged emotional state could confuse the jury and improperly influence its deliberations through sympathy or bias."** ***Id.*** **at 9.**

**The court concludes bifurcation is neither required nor appropriate in this case and that trying liability and non-economic damages issues together is more efficient. Plaintiff's evidence supporting her request for compensatory and punitive damages consists of the same evidence Plaintiff will introduce to establish the underlying discrimination. Splitting the presentation of this evidence into phases would likely result in Plaintiff giving repetitive testimony. With respect to punitive damages, Plaintiff does not intend to submit financial information about Defendants or any such potentially inflammatory evidence that would justify bifurcation of punitive**

| | | |
|---|---|---|
| | | **damages. Accordingly, the court concludes Defendants have not shown that bifurcation will promote efficiency or convenience of the witnesses; rather, it appears that the evidence for liability and damages may overlap in this case and that bifurcation could result in the unnecessary duplication of witness testimony. Additionally, the court finds that Defendants are not exposed to any undue prejudice if the trial is not bifurcated.**<br><br>**This motion (ECF No. 153 ) is GRANTED IN PART and DENIED IN PART. It is GRANTED to the extent Defendants seek to exclude evidence relating to front pay or back pay; if the jury returns a verdict in favor of Plaintiff as to liability, the issue of front pay and back pay will be tried to the bench separately at a time set by the court. It is DENIED to the extent that Defendants seek to bar Plaintiff from pursuing compensatory or punitive damages at trial. It is further DENIED to the extent Defendants seek bifurcation of liability and non-economic damages. The court notes rulings in limine are preliminary, *see Luce*, 469 U.S. at 41, and the court may reconsider this issue should events at trial require it as the evidence unfolds. This ruling is made based on the grounds set forth in the motion and arguments raised in the response. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/26/26.(kmca)** (Entered: 01/26/2026) |
| 01/26/2026 | 185 | **Text Order Denying Defendants' motion in limine at ECF No. 154**<br><br>**Before the court is Defendants' "motion in limine to exclude evidence regarding Expat Guidelines for Plant Spartanburg prepared by Plaintiff." (ECF No. 154 ). Plaintiff submitted a response in opposition to the motion, (ECF No. 160 ), and Defendants filed a reply, (ECF No. 168 ).**<br><br>**"The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the [factfinder] will consider." *Moke Am. LLC v. Am. Custom Golf Cars, Inc.*, 2023 WL 3686963, at *1 (E.D. Va. Jan. 11, 2023). These motions help to streamline a case by allowing a court to avoid "lengthy argument at, or interruption of, the trial." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987). Because questions of trial management are quintessentially the province of the district courts, the district court has "broad discretion" to grant or deny motions in limine. *Kauffman v. Park Place Hosp.*, 468 F. App'x 220, 222 (4th Cir. 2012). Rulings in limine are preliminary and may be subject to change as the trial unfolds. *Luce v. United States*, 469 U.S. 38, 41-42 (1984).**<br><br>**Defendants seek to exclude any testimony or evidence regarding the so-called "Expat Guidelines" as irrelevant because there is no evidence Defendants actually followed them in replacing Plaintiff with a German national. Plaintiff, as she notes in her opposition to this motion, points to evidence that supports a contrary interpretation that Defendants have followed these guidelines consistently including when they filled the TX-60 position with a German national. It is the function of the jury, not the court, to assess the credibility of the witnesses and weigh the evidence as to this issue. Whether Defendants followed these Guidelines is relevant to Plaintiffs claim that Defendants discriminated on the basis of national origin. The court does not find the significant probative value of this evidence is substantially outweighed by the risk of unfair prejudice or jury confusion. Defendants are free to argue that the jury should discount this evidence; however, Defendants' argument goes to the weight of the evidence, not its admissibility. Accordingly, the court DENIES Defendants' motion in limine at ECF No. 154 . The court notes, however, rulings in limine are preliminary, *see Luce*, 469 U.S. at 41, and the court may** |

| | | |
|---|---|---|
| | | **reconsider this issue should events at trial require it as the evidence unfolds. This ruling is made based on the grounds set forth in the motion and arguments raised in the response. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/26/26.(kmca)** (Entered: 01/26/2026) |
| 01/26/2026 | 186 | **TEXT ORDER. The court, in a prior order, granted Defendants' request, which Plaintiff did not oppose, to exclude all evidence relating to front pay or back pay from jury consideration and try the issue of front and back pay to the bench if the jury finds Defendants liable on Plaintiff's claims. (ECF No. 184 ).**<br><br>**Accordingly, the court DENIES as MOOT the following Motions in Limine: Plaintiff's Motion in Limine regarding Defendant BMW MC's Economic Expert Report (ECF No. 144 ); Defendants' Motion in Limine to Exclude the Testimony and Reports of Plaintiff's Accounting Expert Witness, John E. Gibson, Jr. (ECF No. 156 ); and Defendants' Motion in Limine to exclude evidence that Plaintiff was forced or compelled to resign from BMW MC (ECF No. 155 ). Each of these motions seek to exclude evidence relating to the issue of economic damages (front pay and back pay) which will be tried to the bench rather than a jury. The parties agree that the forgoing motions (ECF Nos. 144 , 155 , and 156 ) are moot. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/26/26. (kmca)** (Entered: 01/26/2026) |
| 01/29/2026 | 187 | **TEXT ORDER: In light of the busy court docket in February, the court deems it prudent to make the responses to the juror questionnaires available to counsel of record beginning on Friday, February 6, 2026. All strikes for cause must now be submitted jointly as set forth in the Trial Notice (ECF No. 135 ) no later than 5:00 pm on Monday, February 9, 2026. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 1/29/26. (kmca)** (Entered: 01/29/2026) |
| 01/29/2026 | 188 | Counsel for Kelly Dawsey hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm, US Attorney or Federal Defender organization without written consent of the United States District Court. This information shall be used solely for evaluation of potential jurors for service in this case and shall not use juror information for any other purpose. Further, counsel certifies that immediately after trial, he or she will destroy all copies, whether paper or electronic, of completed juror questionnaires, juror lists, and any other documents containing information obtained from the completed forms. Failure to adhere to the above requirements would be in violation of 28 U.S.C. 1867(f) and the District of South Carolina's Amended Jury Selection Plan Order.. (Murphy, Brian) (Entered: 01/29/2026) |
| 01/29/2026 | 189 | Counsel for BMW Manufacturing Co LLC hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm, US Attorney or Federal Defender organization without written consent of the United States District Court. This information shall be used solely for evaluation of potential jurors for service in this case and shall not use juror information for any other purpose. Further, counsel certifies that immediately after trial, he or she will destroy all copies, whether paper or electronic, of completed juror questionnaires, juror lists, and any other documents containing information obtained from the completed forms. Failure to adhere to the above requirements would be in violation of 28 U.S.C. 1867(f) and the District of South Carolina's Amended Jury Selection Plan Order.. (McCoy, Ellison) (Entered: 01/29/2026) |

| | | |
|---|---|---|
| 01/30/2026 | 190 | Counsel for Bayerische Motoren Werke Aktiengesellschaft hereby certifies that the juror information forms and the information obtained therefrom are privileged and shall be kept confidential and not shared with anyone other than his or her client or other members of his or her law firm, US Attorney or Federal Defender organization without written consent of the United States District Court. This information shall be used solely for evaluation of potential jurors for service in this case and shall not use juror information for any other purpose. Further, counsel certifies that immediately after trial, he or she will destroy all copies, whether paper or electronic, of completed juror questionnaires, juror lists, and any other documents containing information obtained from the completed forms. Failure to adhere to the above requirements would be in violation of 28 U.S.C. 1867(f) and the District of South Carolina's Amended Jury Selection Plan Order.. (Rozelsky, Kurt) (Entered: 01/30/2026) |
| 02/06/2026 | 192 | INITIAL NOTIFICATION OF ELECTRONIC AVAILABILITY OF JUROR QUESTIONNAIRES. In order to obtain access to the attached juror questionnaires, you must docket CERTIFICATION FOR JUROR QUESTIONNAIRES. ***NOTE: **FOR CERTIFICATIONS FOR JUROR QUESTIONNAIRES FILED AFTER 4:30 PM, ACCESS WILL BE GRANTED AFTER 8:30 AM THE FOLLOWING BUSINESS DAY*****. (kcar, ) (Entered: 02/06/2026) |
| 02/06/2026 | 193 | Consent MOTION to Withdraw *Counsel* by Bayerische Motoren Werke Aktiengesellschaft. Response to Motion due by 2/20/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Rozelsky, Kurt) (Entered: 02/06/2026) |
| 02/09/2026 | 194 | **TEXT ORDER granting 193 Consent MOTION to Withdraw *Counsel*. Attorneys Daniel S Savrin, Nathaniel P Bruhn, and Duke K McCall, III are withdrawn from Defendant Bayerische Motoren Worke Aktiengesellschaft. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 2/9/26.(kmca)** (Entered: 02/09/2026) |
| 02/10/2026 | 196 | NOTICE of Hearing: Telephone Conference set for Thursday, 2/12/2026, 01:30 PM before Chief Judge Timothy M Cain. Will discuss Strikes for Cause, Voir Dire and other trial issues.<br><br>Please see attached for call-in information.(kmca) (Entered: 02/10/2026) |
| 02/12/2026 | 197 | **Minute Entry. Telephone Conference held before Chief Judge Timothy M Cain on 2/12/2026. All parties represented. Strikes for cause and voir dire discussed. (kmca)** (Entered: 02/13/2026) |
| 02/17/2026 | 198 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Selection held on 2/17/2026. Trial to begin immediately proceeding jury selection. Court Reporter Debra Bull. (arut)** (Entered: 02/17/2026) |
| 02/17/2026 | 199 | Panel Strike List. (arut) (Entered: 02/17/2026) |
| 02/17/2026 | 200 | Jury List. (arut) (Main Document 200 replaced with corrected document on 2/18/2026) (arut). (Entered: 02/17/2026) |
| 02/17/2026 | 201 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial began on 2/17/2026. ORAL MOTION for witness sequestration made by plaintiff. ORAL ORDER granting witness sequestration. Jurors to report at 9:00 a.m. on 2/18/26. Court Reporter Debra Bull. (arut)** (Entered: 02/17/2026) |

| | | |
|---|---|---|
| 02/17/2026 | 202 | MOTION in Limine, MOTION for Curative Instruction, by Kelly Dawsey. (Response to Motion due by 3/3/2026.) No proposed order.(Murphy, Brian) Modified on 2/18/2026: to add text (for) (kmca). (Entered: 02/17/2026) |
| 02/18/2026 | 203 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial continued on 2/18/2026. Jurors to report at 9:00 a.m. on 2/19/26. Court Reporter Debra Bull. (arut)** Modified on 2/19/2026 to edit text (arut). (Entered: 02/18/2026) |
| 02/19/2026 | 204 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial held on 2/19/2026. ORAL ORDER granting in part and denying in part 202 Motion in Limine and Motion for Curative Instruction for the reasons set forth on the record. Jurors to report at 9:30 a.m. on 2/20/26. Court Reporter Debra Bull. (arut)** (Entered: 02/19/2026) |
| 02/20/2026 | 205 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial continued on 2/20/2026. Jurors to report at 9:30 a.m. on 2/23/26. Court Reporter Debra Bull. (arut)** (Entered: 02/20/2026) |
| 02/23/2026 | 206 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial continued on 2/23/2026. ORAL MOTION for directed verdict on issue of personal jurisdiction and integrated employer made by BMW AG; ORAL MOTION for directed verdict on issue of sex and race discrimination made by BMW Manufacturing. ORAL ORDER denying motions for directed verdict as set forth on the record. Issue of directed verdict relating to treaty taken under advisement. Jurors to report at 9:15 a.m. on 2/24/26. Court Reporter Debra Bull. (arut)** (Entered: 02/23/2026) |
| 02/23/2026 | 219 | COURT EXHIBIT 1. (arut) (Entered: 02/26/2026) |
| 02/24/2026 | 207 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial continued on 2/24/2026. ORAL MOTION for judgment as matter of law made by plaintiff; RENEWED ORAL MOTION for judgment as matter of law made by BMW Manufacturing and BMW AG. ORAL ORDER denying motions for judgment as matter of law for reasons set forth on the record. Jurors to report at 9:00 a.m. on 2/25/26. Court Reporter Debra Bull. (arut)** (Entered: 02/24/2026) |
| 02/25/2026 | 209 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Jury Trial completed on 2/25/2026. Court Reporter Debra Bull. (arut)** (Entered: 02/25/2026) |
| 02/25/2026 | 210 | Jury Note #1. (arut) (Entered: 02/25/2026) |
| 02/25/2026 | 211 | Jury Note #2. (Attachments: # 1 Response by Judge)(arut) (Entered: 02/25/2026) |
| 02/25/2026 | 212 | Plaintiff's Exhibit List. (arut) (Entered: 02/25/2026) |
| 02/25/2026 | 213 | Defendant's Exhibit List. (arut) (Entered: 02/25/2026) |
| 02/25/2026 | 214 | **ORDER RETURNING EXHIBITS Signed by Chief Judge Timothy M Cain on 2/25/26. (arut)** (Entered: 02/25/2026) |
| 02/25/2026 | 216 | JURY VERDICT. (arut) (Entered: 02/25/2026) |
| 02/25/2026 | 217 | JUDGMENT in favor of Kelly Dawsey against BMW Manufacturing Co LLC. (arut) (Entered: 02/25/2026) |
| 02/27/2026 | 221 | NOTICE of Hearing: Hearing on Economic Damages set for Friday, 3/13/2026, 09:30 AM in Greenville #6100, Carroll A Campbell Jr Courthouse, 250 East North St, Greenville before Chief Judge Timothy M Cain. (kmca) (Entered: 02/27/2026) |

| | | |
|---|---|---|
| 03/06/2026 | 224 | NOTICE of Hearing: Informal Judicial Settlement Conference set for Monday, 3/9/2026, 01:30 PM in Greenville #6100, Carroll A Campbell Jr Courthouse, 250 East North St, Greenville before Chief Judge Timothy M Cain. (kmca) (Entered: 03/06/2026) |
| 03/10/2026 | 225 | MOTION for Attorney Fees *and Expenses*, MOTION to Amend the Judgment, by Kelly Dawsey. Response to Motion due by 3/24/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Murphy Declaration, # 2 Exhibit Time Entries, # 3 Exhibit Expenses, # 4 Exhibit Arnold Declaration, # 5 Exhibit Dunlaevy Declaration, # 6 Exhibit Thompson Declaration, # 7 Exhibit BMW MC Resp. to Int. 21, # 8 Exhibit BMW AG Resp. to Int. 9)No proposed order.(Murphy, Brian). Added MOTION to Amend the Judgment on 3/12/2026: to add additional relief requested. (kmca). Modified on 4/8/2026: See 241 Supplement (kmca). Modified on 4/15/2026: See 244 Second Supplement (kmca). Modified on 5/1/2026: See 260 Supplement (awil, ). (Entered: 03/10/2026) |
| 03/13/2026 | 226 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Economic Damages hearing held on 3/13/2026. Defense renewed motion in limine to exclude testimony of expert witness John Gibson, Jr. ORAL ORDER denying motion in limine. Matter taken under advisement. Parties to submit proposed findings of fact and conclusions of law by noon on March 23, 2026. Court Reporter Debra Bull. (arut)** (Entered: 03/13/2026) |
| 03/13/2026 | 227 | Plaintiff's Exhibit List. (arut) (Entered: 03/13/2026) |
| 03/13/2026 | 228 | Defendant's Exhibit List. (arut) (Entered: 03/13/2026) |
| 03/13/2026 | 229 | **ORDER RETURNING EXHIBITS Signed by Chief Judge Timothy M Cain on 3/13/26. (arut)** (Entered: 03/13/2026) |
| 03/18/2026 | 230 | Joint MOTION for Extension of Time to File Response/Reply as to 225 MOTION for Attorney Fees *and Expenses*, by BMW Manufacturing Co LLC, Kelly Dawsey. Response to Motion due by 4/1/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(McCoy, Ellison) Modified on 3/18/2026: to add joint filer as listed; to remove relief filed as separate entry 231 (MOTION to Amend the Judgment) (kmca). (Entered: 03/18/2026) |
| 03/18/2026 | 231 | Consent MOTION to Amend/Correct 217 Judgment by BMW Manufacturing Co LLC. Response to Motion due by 4/1/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order. (McCoy, Ellison) (Entered: 03/18/2026) |
| 03/18/2026 | 232 | **TEXT ORDER granting 230 Joint Motion for Extension of Time to File Response/Reply as to 225 MOTION for Attorney Fees and Expenses. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 3/18/26.(kmca)** (Entered: 03/18/2026) |
| 03/25/2026 | 235 | **ORDER granting 231 Consent Motion to Amend/Correct 217 Judgment. Signed by Chief Judge Timothy M Cain on 3/25/26.(kmca)** (Entered: 03/25/2026) |
| 03/25/2026 | 236 | AMENDED JUDGMENT in favor of Kelly Dawsey against BMW Manufacturing Co LLC. (kmca) (Entered: 03/25/2026) |
| 03/25/2026 | 237 | MOTION for Judgment as a Matter of Law *or in the alternative* MOTION for a New Trial, by BMW Manufacturing Co LLC. Response to Motion due by 4/8/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support)No proposed order.(McCoy, Ellison). Added MOTION for New Trial on 3/27/2026: to add additional relief requested. (kmca). (Entered: 03/25/2026) |

| | | |
|---|---|---|
| 04/06/2026 | 238 | **ORDER the court AWARDS Plaintiff $389,907 in BACK PAY and ORDERS that the Amended Judgment (ECF No. 236 ) be further AMENDED to reflect this amount as set out. Signed by Chief Judge Timothy M Cain on 4/6/2026. (alma, )** (Entered: 04/06/2026) |
| 04/06/2026 | 239 | SECOND AMENDED JUDGMENT entered. (alma, ) (Entered: 04/06/2026) |
| 04/07/2026 | 240 | RESPONSE in Opposition re 237 MOTION for Judgment as a Matter of Law MOTION for New Trial Response filed by Kelly Dawsey.Reply to Response to Motion due by 4/14/2026 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Excerpt of joint charge submission)(Murphy, Brian) (Entered: 04/07/2026) |
| 04/08/2026 | 241 | SUPPLEMENT by Kelly Dawsey to 225 MOTION for Attorney Fees *and Expenses*, MOTION to Amend the Judgment . (Attachments: # 1 Exhibit BPM Supplemental Declaration, # 2 Exhibit Time entries March 11 - April 8)(Murphy, Brian) Modified on 4/15/2026: See 244 Second Supplement (kmca). (Entered: 04/08/2026) |
| 04/14/2026 | 243 | REPLY to Response to Motion re 237 MOTION for Judgment as a Matter of Law MOTION for New Trial Response filed by BMW Manufacturing Co LLC. (McCoy, Ellison) (Entered: 04/14/2026) |
| 04/14/2026 | 244 | SECOND SUPPLEMENT by Kelly Dawsey to 225 MOTION for Attorney Fees *and Expenses*, MOTION to Amend the Judgment. (Attachments: # 1 Exhibit BPM Declaration, # 2 Exhibit Time entries)(Murphy, Brian) Modified on 4/15/2026: to add text (second) (kmca). (Entered: 04/14/2026) |
| 04/21/2026 | 246 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Strikes for Cause held on February 12, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 247 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume I held on February 17, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 248 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume II held on February 18, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |

| | | |
|---|---|---|
| 04/21/2026 | 249 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume III held on February 19, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 250 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume IV held on February 20, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 251 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume V held on February 23, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 252 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume VI held on February 24, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 253 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Jury Trial, Volume VII held on February 25, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/21/2026 | 254 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Bench Trial/Damages Hearing held on March 13, 2026, before Judge Timothy M. Cain, Chief Judge,. Court Reporter/Transcriber dbull, Telephone number/E-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 |

| | | |
|---|---|---|
| | | calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 5/12/2026. Redacted Transcript Deadline set for 5/22/2026. Release of Transcript Restriction set for 7/20/2026. (Bull, Debra) (Entered: 04/21/2026) |
| 04/22/2026 | 255 | RESPONSE in Opposition re 225 MOTION for Attorney Fees *and Expenses*MOTION to Amend the Judgment Response filed by BMW Manufacturing Co LLC.Reply to Response to Motion due by 4/29/2026 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Mullaney Declaration, # 2 Exhibit B - Ehman Declaration, # 3 Exhibit C - Davis Declaration, # 4 Exhibit D - Falls Declaration, # 5 Exhibit E - Ricksecker Declaration, # 6 Exhibit F - Spence Declaration, # 7 Exhibit G - Examples of Time Spent on Research, Drafting, and Other Non-Partner Level Work, # 8 Exhibit H - Sturup Declaration, # 9 Exhibit I - Quisenberry Declaration, # 10 Exhibit J - Examples of Time Spent on Litigation Against BMW AG, # 11 Exhibit K - Lindemann Declaration, # 12 Exhibit L - Examples of Block Billed Entries, # 13 Exhibit M - Examples of Vague Entries)(McCoy, Ellison) (Attachments 1, 2, 3, 4, 5, 6, 8, 9, 11 replaced on 4/23/2026: to replace with legible documents (double headers, 11=sideways) as provided by filing user) (kmca). (Entered: 04/22/2026) |
| 04/23/2026 | 256 | MOTION for Production of Invoices of Defense Counsel re 225 MOTION for Attorney Fees *and Expenses*, MOTION to Amend the Judgment by Kelly Dawsey. Response to Motion due by 5/7/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Murphy, Brian) Modified on 4/24/2026: to add text (for) (kmca). (Entered: 04/23/2026) |
| 04/27/2026 | 257 | **TEXT ORDER: Now before the court is Plaintiff's Motion for Production of Invoices of Defense Counsel. (ECF 256 ). In it, Plaintiff requests "an order to have BMW MC provide copies of all invoices submitted either by BMW MC attorneys and by BMW AG's counsel to the extent BMW MC paid for those attorneys or was charged for their fees and expense." The court finds it necessary and appropriate to shorten the response times. Any response in opposition to the aforementioned motion for production of invoices is due not later than 5:00 pm, Friday, May 1, 2026. Any reply to such response in opposition is due not later than 5:00 pm, Thursday, May 7, 2026. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 4/27/26. (kmca)** Modified on 4/27/2026: to edit text (5/7/26 = Thursday not Friday) (kmca). (Entered: 04/27/2026) |
| 04/28/2026 | 259 | REPLY to Response to Motion re 225 MOTION for Attorney Fees *and Expenses*MOTION to Amend the Judgment Response filed by Kelly Dawsey. (Attachments: # 1 Exhibit Murphy Supplemental Declaration, # 2 Exhibit Time entries, # 3 Exhibit Jackson Lewis 2026 report, # 4 Exhibit Jackson Lewis 2025 report, # 5 Exhibit Thomson Reuters study, # 6 Exhibit Lindemann email)(Murphy, Brian) (Entered: 04/28/2026) |
| 04/28/2026 | 260 | SUPPLEMENT by Kelly Dawsey to 225 MOTION for Attorney Fees *and Expenses*MOTION to Amend the Judgment . (Murphy, Brian) (Entered: 04/28/2026) |
| 04/30/2026 | 262 | NOTICE of Hearing on Motions: 237 MOTION for Judgment as a Matter of Law, MOTION for New Trial and 256 MOTION for Production of Invoices of Defense Counsel re 225 MOTION for Attorney Fees *and Expenses*, MOTION to Amend the Judgment. Motion Hearing set for Wednesday, 5/13/2026, 10:30 AM in Greenville #6100, Carroll A Campbell Jr Courthouse, 250 East North St, Greenville before Chief Judge Timothy M Cain. (kmca) (Entered: 04/30/2026) |
| 05/01/2026 | 264 | RESPONSE in Opposition re 256 MOTION for Production of Invoices of Defense Counsel re 225 MOTION for Attorney Fees *and Expenses*MOTION to Amend the |

| | | |
|---|---|---|
| | | Judgment Response filed by BMW Manufacturing Co LLC, Bayerische Motoren Werke Aktiengesellschaft.Reply to Response to Motion due by 5/8/2026 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (McCoy, Ellison) (Entered: 05/01/2026) |
| 05/04/2026 | 265 | NOTICE OF APPEAL as to 239 Judgment by BMW Manufacturing Co LLC. - Filing fee $ 605, receipt number ASCDC-13150106. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (McCoy, Ellison) (Entered: 05/04/2026) |
| 05/05/2026 | 266 | Transmittal Sheet for Notice of Appeal to USCA re 265 Notice of Appeal. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (kmca) (Entered: 05/05/2026) |
| 05/06/2026 | 267 | 4CCA Appeal Remark re 265 Notice of Appeal: A notice of appeal filed after entry of judgment but before disposition of a post-judgment motion becomes effective upon entry of an order disposing of the last such motion...Please notify this court upon entry of an order disposing of the motion. (kmca) (Entered: 05/06/2026) |
| 05/06/2026 | 268 | REPLY to Response to Motion re 256 MOTION for Production of Invoices of Defense Counsel re 225 MOTION for Attorney Fees *and Expenses*MOTION to Amend the Judgment Response filed by Kelly Dawsey. (Murphy, Brian) (Entered: 05/06/2026) |
| 05/13/2026 | 270 | **Minute Entry. Proceedings held before Chief Judge Timothy M Cain: Motion Hearing held on 5/13/2026 re 256 MOTION for Production of Invoices of Defense Counsel and 237 MOTION for Judgment as a Matter of Law MOTION for New Trial filed by BMW Manufacturing Co LLC. Court Reporter Debra Bull. (arut)** (Entered: 05/14/2026) |
| 05/14/2026 | 271 | **TEXT ORDER. For the reasons stated during the March 13, 2026, hearing, the Court DENIES BMW MC's motion for Judgment as a Matter of Law or, in the alternative, for a New Trial, (ECF No. 237 ). Furthermore, as stated during the hearing, the Court takes Plaintiff's motion for Production of Invoices of Defense Counsel (ECF No. 256 ) under advisement. IT IS SO ORDERED. Entered at the direction of the Honorable Chief Judge Timothy M Cain on 5/14/26.(kmca)** (Entered: 05/14/2026) |
| 05/29/2026 | 272 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Post-trial motions for dates of May 13, 2026, before Judge Timothy M. Cain, Chief Judge,, re 265 Notice of Appeal, Court Reporter/Transcriber dbull, Telephone number/e-mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 6/22/2026. Redacted Transcript Deadline set for 6/29/2026. Release of Transcript Restriction set for 8/27/2026. (Bull, Debra) (Entered: 05/29/2026) |
| 06/08/2026 | 273 | Appeal Remark from 4CCA re 265 Notice of Appeal: "By letter dated May 6, 2026, notice was sent to your court indicating that an appeal had been received by this office but would not be docketed until action by the district court.Please continue to update this court as to the status of this case, as necessary." (kmca) (Entered: 06/08/2026) |
| 06/11/2026 | 275 | AMENDED NOTICE OF APPEAL as to 271 Order on Motion for Judgment as a Matter of Law, or, in the alternative, Order on Motion for New Trial, by BMW Manufacturing Co LLC. - Filing fee $ 605, receipt number ASCDC-13217380. The Docketing Statement |

| | | |
|---|---|---|
| | | form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (McCoy, Ellison) Modified on 6/12/2026: to add text (Amended) (kmca). (Entered: 06/11/2026) |
| 06/12/2026 | 276 | Transmittal Sheet for Amended Notice of Appeal to USCA re 275 AMENDED Notice of Appeal. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (kmca) (Entered: 06/12/2026) |
| 06/15/2026 | 277 | Consent MOTION to Stay by BMW Manufacturing Co LLC. Response to Motion due by 6/29/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Supersedeas Bond for Stay of Judgment Pending Appeal)No proposed order.(McCoy, Ellison) (Entered: 06/15/2026) |
| 06/16/2026 | 279 | **ORDER STAYING EXECUTION OF JUDGMENT AND APPROVING DEFENDANT'S SUPERSEDEAS BOND. Signed by Chief Judge Timothy M Cain on 6/16/26.(arut)** (Entered: 06/16/2026) |
| 06/24/2026 | 283 | Surety BOND from Federal Insurance Company in the amount of $ $862,383.75 for Stay of Judgment, posted by BMW Manufacturing Co LLC. Bond approved by the Clerk of Court. (kmca) (Entered: 06/24/2026) |



| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/25/2026 16:57:33 | | | |
| **PACER Login:** | elisedeal3 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:22-cv-03738-TMC |
| **Billable Pages:** | 27 | **Cost:** | 2.70 |

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| **Kelly Dawsey,** | **7:22-03738-TMC-KFM** |
| **Plaintiff,** | |
| **v.** | **AMENDED COMPLAINT** |
| **Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC collectively d/b/a "BMW Group",** | **(Jury Trial Demanded)** |
| **Defendants.** | |

Plaintiff, through her attorney, now amends as a matter of right under Rule 15(a)(1)(B) and would respectfully show as follows:

**Parties**

1. Plaintiff is a resident of Greenville County, South Carolina and, at all relevant times, was employed by Defendants in Spartanburg County, South Carolina.

2. Plaintiff is a white, English speaking United States citizen, was born in and is a lifelong resident of the United States.

3. Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") is a foreign corporation with a principal place of business in Munich, Bavaria, Germany.

4. Defendant BMW Manufacturing Co., LLC ("BMW Manufacturing") is a Delaware limited liability company with a principal place of business in Spartanburg County, South Carolina.

**Integrated Nature of BMW Group**

5. Defendants represent themselves as "BMW Group" -- an integrated enterprise for human resource ("HR") and marketing purposes, and they maintain a common website: https://www.bmwgroup.com

6. BMW AG, directly or indirectly, wholly owns and operates BMW Manufacturing and operates it, along with other affiliates, through a common "Board of Management" and "Supervisory Board," both of which are in Germany.

7. The German Board of Management comprises executives from various disciplines (HR, production, customer/brands/sales, finance, purchasing, and development), who exercise common control over the various affiliates.

8. BMW Group touts its integrated nature on its website, which refers collectively to Defendants as a single enterprise. For example:

> As a global company, the BMW Group operates 31 production and assembly facilities in 15 countries and has a global sales network in more than 140 countries. As of December 2019, the BMW Group had a workforce of 126[,]016 employees[1]

9. BMW advertises for career ladders ("Careers Worldwide") under which applicants are told that they can transfer to sites such as the one in Spartanburg.[2]

10. Since the opening of the Spartanburg Plant, BMW Manufacturing management has included German nationals from BMW AG and other affiliates, who are transferred to the Spartanburg Plant by BMW AG. At the Spartanburg plant, these

1 https://www.bmwgroup.com/en/company/locations.html.

2 https://www.bmwgroup.com/en/careers.html

individuals are referred to as "Internationals" or "ex-pats," while United States citizens are referred to commonly in Spartanburg as "domestic."

11. BMW AG has placed a dominant number of German nationals at the top positions at BMW Manufacturing. In early 2021, for example, eight of the top eleven positions (Levels I and II) were filled by German nationals.

12. Except for the first president appointed to open the plant thirty-one years ago, the last seven presidents of BMW Manufacturing have been ex-pats employed by BMW AG before and/or after their assignment to BMW Manufacturing.

13. Various managers at the Spartanburg Plant report directly to managers at BMW AG and other BMW Group affiliates.

14. BMW Group institutes common manufacturing, analytics, logistics, automation, and engineering methods throughout its affiliates.[3]

15. BMW Group issues "integrated reports" on such issues as environmental compliance based on the common board of management policies, which it attributes to "integrated management of the company."[4]

**BMW AG directly manages through system of management "circles" in Germany**

16. The various disciplines of management within BMW Group are managed directly from Germany by groups designated as the "circle" for that discipline. For example,

3 https://www.bmwgroup.com/en/innovation/company/industry-4-0.html#Smart_Logistics

4 https://www.press.bmwgroup.com/global/article/detail/T0327384EN/bmw-group-becomes-first-premium-manufacturer-to-publish-integrated-group-report?language=en

a. manufacturing/production was overseen and directed by the "T circle."

b. Human resources or personnel is overseen and directed by the "P circle."

The head of each circle is a director and member of the Board of Management of BMW AG.

17. At all relevant times, the P-circle consisted solely of German management located at BMW AG.

**BMW AG is directly involved in personnel decisions for BMW Manufacturing**

18. BMW AG directs day-to-day activities in Greer, including the promotion and placement of managers at BMW Manufacturing.

19. BMW AG controls and is directly involved in succession planning at BMW Manufacturing. For example, Eva Burgemeir, while employed at BMW AG, sent a memo to Plaintiff and others, telling them to update their information because "[t]he P-circle will discuss succession planning next Monday . . . ." Plaintiff was not included in these discussions, even as to BMW Manufacturing, which apparently occurred solely among members of the "P circle" in Munich.

20. BMW Group maintained a policy and procedure document entitled "Overview on Reference Partner Input" ("Input Policy") that was in place from 2010 through the cessation of Plaintiff's employment. This document was created by BMW Group in Germany. The Input Policy requires approval (called "verification") of the corporate office in Germany for any promotion of a BMW Manufacturing employee to a

Level III or Level II position. In later years, BMW corporate in Germany also required this for certain Level IV positions (starting at grade level 8).

21. BMW AG's practice of determining who will fill management positions at BMW Manufacturing is long-standing. By way of example, Knudt Flor has publicly commented about his prior tenure as a manager at BMW Manufacturing. Flor noted that he told BMW that he did not want to return to BMW AG after working as a manager in Greer, but the reality of working at BMW is that the parent company tells you where you will be working.[5]

22. Plaintiff regularly worked directly with BMW AG regularly, and she communicated directly with BMW AG on an approximate weekly basis. Plaintiff needed to communicate with BMW in Munich to get approval of BMW Manufacturing matters.

23. For example, if Plaintiff wanted to make any changes in benefits, salary, structure, or bonuses, she had to obtain approval from BMW AG.

24. BMW AG makes staffing and headcount decisions for BMW Manufacturing. For example, BMW AG mandated a headcount reduction in Plaintiff's department.

25. As another example, during the planning phase for the new press shop in Greer, BMW AG dictated the headcount issues and from where employees could be hired (e.g., internal vs. external). This included even floor-level hourly positions.

26. BMW AG also determined the management structure at BMW Manufacturing. BMW AG required Plaintiff and others to submit leadership positions, and BMW AG would direct as to where positions could remain or be eliminated.

5 https://www.youtube.com/watch?v=nnpVFvcZTu0&t=544s beginning at 8:15

27. Even Englehorn and Petrasch complained that BMW AG was dictating who would be considered for positions at BMW Manufacturing. Specifically, both complained to Plaintiff that BMW AG was putting a German CFO candidate on Englehorn's calendar, whom Englehorn said he did not want to interview.

28. BMW Manufacturing could not even create its own organization charts. Instead, only BMW AG would create and issue such documents.

**BMW AG dictates many other day-to-day issues at BMW Manufacturing**

29. BMW Manufacturing also could not customize the SAP system to meet the unique needs of an operation in the United States. Instead, BMW AG mandated that BMW Manufacturing use SAP in the precise manner that BMW AG uses it for purposes of uniformity.

30. BMW AG also determined the priorities for BMW Manufacturing, and it determined the systems BMW Manufacturing would use. It emailed these priorities to Petrasch, who would then forward BMW AG's email to local management.

**Defendants' use of nationality to filling positions**

31. Defendants have maintained a practice in human resources of ensuring that a German national is either the head (Level II) or in a secondary role (Level III) at the Spartanburg Plant. There have been, for example, six vice presidents of human resources at the Spartanburg Plant. Except for the tenure of the first two VPs, Defendants have maintained the practice of having a German national in one of the two positions.

32. Plaintiff first learned of this initiative during the tenure of the fourth vice president at the plant, a German national named Johannes Trauth. The practice was documented at that time.

33. Trauth's successor was another German National, Christine Petrasch. As an example of both the integrated nature of Defendants and the centralized HR function, Defendants announced: "BMW Manufacturing announced today that Christine Petrasch has been named the new Vice President of Human Resources. Petrasch succeeds Johannes Trauth, who has returned to Germany as the Head of HR Services."[6]

**Structure of management and job levels in human resources**

34. BMW Group maintains a level system of classifying jobs based primarily on points or scores derived from the Mercer system.

35. At BMW Manufacturing, there is one Level I position, which is occupied by the president of BMW Manufacturing. That position is currently held by ex-pat Robert Englehorn (German). BMW Group's common board of management announced Englehorn's transfer from the Munich plant in 2021.

36. Level II is a vice president level. The vice president ("VP") of HR at BMW Manufacturing is the only Level II executive in HR.

37. Individuals in Level I and Level II positions with personal grades of 13 or above are known at BMW as holding "OFK" positions, an acronym for obere Führungskräfte, which means senior executive. At BMW Group, OFK employees are

---

6 https://www.bmwgroup-werke.com/spartanburg/en/news/2018/bmw-manufacturing-announces-management-change-petrasch.html

moved around to various affiliates and plants within the BMW Group at the direction of the board of management of BMW AG.

38. Level III is the next highest position. In Spartanburg in 2021 there were two level III designated managers in human resources: (1) Plaintiff; and (2) a male. The male actually occupied a Level IV position, but BMW designated his position "Level III" during the time he occupied it only because he had previously occupied another position that was designated Level III.

**Plaintiff's job history and duties**

39. Plaintiff joined BMW in June 1995 as a staff recruiter. Plaintiff moved into associate relations. BMW then promoted her to coordinator in associate relations. She then gained additional human resource experience in compensation. BMW then promoted Plaintiff to manager in compensation and organization. To broaden Plaintiff's experience further, she was moved to HR services in a section manager role. In or around 2014, BMW again promoted Plaintiff to department manager for HR planning, which included compensation, benefits, HR planning, organization, and the family medical center.

40. At all times relevant to the claims raised herein, Plaintiff's position was TX-60, which was responsible for strategic matters such as planning. Plaintiff also was responsible for benefits and employee compensation, and she handled significant projects, such as policies and practices regarding COVID testing and vaccination and the scheduled ramp down and ramp up of personnel during the pandemic-related shutdown, which required significant understanding of various U.S. laws and practices.

41. Plaintiff performed her duties and was employed solely within the United States but at the direction many times of individuals in Munich Germany.

**Defendants removed Plaintiff from her job based on nationality**

42. On or about September 15, 2021, Petrasch told Plaintiff that she had met with Englehorn. Petrasch told Plaintiff that BMW Group in Germany had determined that Sherry McCraw, who is a White American, would be the next VP of HR in Spartanburg. Petrasch reiterated that BMW Group has a rule that if there is a domestic VP, there must be one German national next in line, which would be a Level III position. Petrasch further explained that it would not make sense to bring a German in to a Level IV position. Plaintiff immediately explained that it is obvious that she is the person who will be displaced based on the position she held, and Petrasch did not argue the point.

43. In a subsequent meeting on or about September 29, Petrasch again told Plaintiff that the only way BMW Group could get a local into the VP of HR position was to have a German in Plaintiff's position (TX-60) to serve as a "bridge to Germany."

44. Petrasch reiterated that the decision was made by two executives/directors of BMW AG and Englehorn (a German national assigned to BMW Manufacturing). Petrasch specifically cited "T" and "P." "T" is a reference to Milan Nedelijkovic, the head of manufacturing and a BMW AG board member (Germany). "P" is Ilka Horstmeier, the head of personnel and a board member of BMW AG.

45. Petrash left no doubt that BMW Group in Germany was making the decision. In fact, Petrasch complained that the executives from Germany had called her on a Sunday about the decision.

46. Petrasch explained that the decision to move McCraw to human resources was part of an agreement to have a German national fill Spartanburg's assembly manufacturing vice president position (TX-4) that had been occupied by McCraw.

47. All of these moves are consistent with the documented instances in which BMW AG used the “circles” in Germany to make appointments at BMW Manufacturing and at other affiliates. *See,e.g., supra* ¶ 20.

48. Plaintiff asked Petrasch if BMW Group gave any consideration to the content of the job in deciding to move a German national into her position. Petrasch confirmed that job duties were not a factor.

49. Petrasch told Plaintiff that Petrasch had been given two tasks: (1) to implement the decision to bring in the German national; and (2) to communicate with McCraw.

50. On November 11 2021, Englehorn, Petrasch, and McCraw met with the HR management in Spartanburg to announce the changes. During the meeting, Petrasch again reiterated that Plaintiff was being removed from TX-60 because a German national needed to be put in that position since the VP of HR was now a domestic and the position considered the next in line is the planning function of the department. Englehorn also told the HR management group during the meeting that they need an ex-pat on the team to have a connection with Munich (BMW AG) since BMW AG controls the finances.

51. The German national chosen by BMW Group to replace Plaintiff is Burgmeier, who, as discussed above, worked on staffing decisions for BMW Manufacturing while employed at BMW AG. *See supra* ¶ 20.

52. Burgmeier apparently spent her entire career in Germany and has no apparent prior experience in ERISA, with American laws, or with U.S. compensation practices and systems.

53. Burgmeier's inexperience is demonstrated by the fact that, after Plaintiff left the company, Defendants transferred another HR manager back to compensation and benefits to compensate for Burgmeier's unfamiliarity with the areas of responsibility into which she has been placed.

54. The decision to move Burgemeir to BMW Manufacturing was made by BMW AG.

55. The decision to move Burgmeier to BMW Manufacturing was announced by BMW AG.

**Plaintiff told her best-case scenario might be a demotion to Level IV**

56. In late 2021, Petrasch began to encourage Plaintiff to look for jobs outside of HR. When Plaintiff inquired as to why, Petrasch repeatedly told Plaintiff that they were considering moving her to different positions, but that the positions would be designated as Level IV. Petrasch also announced that the other Level III in the department (who was in a Level IV position) would be moved out to a project. Petrasch even produced a Powerpoint presentation showing a possible reorganization with Plaintiff being demoted to a Level IV position.

57. After discussing a possible Level IV position, which Defendants never offered, Petrasch began to encourage Plaintiff to look for positions outside of human resources.

58. Petrasch, through her assistant, arranged for Plaintiff to interview for other positions in other departments, none of which involved HR or for which Plaintiff was likely the best candidate.

59. Defendants never offered Plaintiff a position and never promised her one.

**Plaintiff told that a nonwhite employee would be receiving preferential treatment**

60. Defendants also employed a black male, Corey Epps, a Level IV employee. Defendants told Plaintiff that, while they might move Plaintiff to a level IV position (which they never did), they were going to promote Epps from level IV position to level III.

**Plaintiff resigns to accept the best available employment opportunity**

61. Plaintiff began looking for positions outside of BMW as she had no offers at BMW, and she wished to continue her career in human resources. Plaintiff accepted an HR position at another company and resigned from BMW. Petrasch told her that she could "100,000% understand" Plaintiff's decision under the circumstances.

62. Defendants put Plaintiff in the unbearable position of being removed from her position but not offering her any employment, which jeopardized her livelihood and ability to support herself.

63. To ensure continued employment, including employment in her field, Plaintiff had no reasonable alternative but to resign, which any reasonable person would have done.

64. Defendants' actions were intentional, willful, and in reckless disregard for the rights of Plaintiff.

65. Before commencing this action, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, which issued a Notice of Right to Sue. Plaintiff commences this action within ninety days of her receipt thereof.

**Count I**
**For a First Cause of Action**
**National Origin Discrimination**
**Title VII**

66. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

67. Defendants maintain one or more policies and or practices that "discriminate against . . . individual[s] with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin" in violation of Section 703(a)(1) of Title VII. 42 U.S.C. § 2000e-2(a)(1).

68. Defendants maintain one or more policies and or practices that "limit, segregate, or classify" employees "with respect to . . . compensation, terms, conditions, or privileges of employment, because of . . . national origin" in violation of Section 703(a)(2) of Title VII. *Id.* § 2000e-2(a)(2).

69. Defendants removed Plaintiff from her job based on her national origin.

70. Defendants informed Plaintiff of a possible demotion to another job, which never materialized.

71. Defendants never offered Plaintiff employment to remain at BMW.

72. Plaintiff acted as a reasonable person would by finding alternative employment in her field.

WHEREFORE, Plaintiff respectfully requests a trial by jury on her claims of national origin discrimination in violation of Title VII and that she be granted all available relief including, but not limited to, a declaratory judgment that the acts and practices of Defendant complained of herein are in violation of the laws of the United States, injunctive and other relief, including but not limited to actual/make whole relief such as

reinstatement to her former position and level, compensatory and punitive damages, attorney fees, expenses, costs, and pre- and post-judgment interest, and all other and further relief as to this Court appears necessary and proper.

**Count II**
**For a Second Cause of Action**
**Race Discrimination**
**Title VII**

73. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

74. Defendants maintain one or more policies and or practices that "discriminate against . . . individual[s] with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . race" in violation of Section 703(a)(1) of Title VII. 42 U.S.C. § 2000e-2(a)(1).

75. Defendants discriminated against Plaintiff regarding compensation and classification on the basis of her race.

76. By way of example, Defendants informed Plaintiff of a possible demotion to a Level IV position while providing preferential treatment to a black employee, whom Defendants promoted to Level III.

WHEREFORE, Plaintiff respectfully requests a trial by jury on her claims of race discrimination in violation of Title VII and that she be granted all available relief including, but not limited to, a declaratory judgment that the acts and practices of Defendant complained of herein are in violation of the laws of the United States, injunctive and other relief, including but not limited to actual/make whole relief such as reinstatement to her former position and level, compensatory and punitive damages, attorney fees, expenses,

costs, and pre- and post-judgment interest, and all other and further relief as to this Court appears necessary and proper.

**Count III**
**For a Third Cause of Action**
**Race Discrimination**
**Section 1981**

77. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

78. Defendants discriminated against Plaintiff regarding compensation and classification on the basis of her race.

WHEREFORE, Plaintiff respectfully requests a trial by jury on her claims of race discrimination in violation of Section 1981 and that she be granted all available relief including, but not limited to, a declaratory judgment that the acts and practices of Defendant complained of herein are in violation of the laws of the United States, injunctive and other relief, including but not limited to actual/make whole relief such as reinstatement to her former position and level, compensatory and punitive damages, attorney fees, expenses, costs, and pre- and post-judgment interest, and all other and further relief as to this Court appears necessary and proper.

**Count IV**
**For a Fourth Cause of Action**
**Sex Discrimination**
**Title VII**

79. Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

80. Petrasch told Plaintiff that human resources could have only two level III managers.

81. Petrasch discussed the possibility of moving Plaintiff to TX-64, which had been occupied by a male. Petrasch told Plaintiff that, if Plaintiff was put in that position, she would be downgraded to a Level IV because that was the level for the position. When Defendants filled that position with a male, however, they kept him at a level III because he had previously filled a Level III position. In short, while Defendants "red circled" a male to keep him at Level III, they told Plaintiff that they would not retain her at a level III if she was put in the very same position.

82. Keeping Plaintiff in TX-64 at a level III would have left BMW with two level III managers. Defendants, however, told Plaintiff that they were going to promote Epps (male) to level III at the same time they told Plaintiff that she would be demoted if retained.

WHEREFORE, Plaintiff respectfully requests a trial by jury on her claims of sex discrimination in violation of Title VII and that she be granted all available relief including, but not limited to, a declaratory judgment that the acts and practices of Defendant complained of herein are in violation of the laws of the United States, injunctive and other relief, including but not limited to actual/make whole relief such as reinstatement to her former position and level, compensatory and punitive damages, attorney fees, expenses, costs, and pre- and post-judgment interest, and all other and further relief as to this Court appears necessary and proper.

Respectfully submitted this 9th day of February, 2023

s/ Brian P. Murphy
Brian P. Murphy, Fed. I.D. No. 6405
Attorney for Plaintiff

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WORKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP",<br><br>Defendants. | ) | C.A. No. 7:22-cv-03738-TMC-KFM |

**ANSWER OF DEFENDANT BMW MANUFACTURING CO., LLC
TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant BMW Manufacturing Co., LLC ("BMW MC"), by and through its undersigned counsel, responds to Plaintiff's Amended Complaint as follows:

**FOR A FIRST DEFENSE**

In response to the specific numbered allegations in Plaintiff's Amended Complaint, Defendant BMW MC responds as follows:

1. Upon information and belief, BMW MC admits the allegations in Paragraph 1 of the Amended Complaint to the extent they allege that Plaintiff is a resident of Greenville County, South Carolina. BMW MC admits the allegations in Paragraph 1 of the Amended Complaint to the extent they allege that Plaintiff was employed by BMW MC in Spartanburg County, South Carolina. BMW MC denies the remaining allegations in Paragraph 1 of the Amended Complaint.

2. Upon information and belief, BMW MC admits the allegations in Paragraph 2 of the Amended Complaint.

3. The allegations in Paragraph 3 of the Amended Complaint are directed at Defendant Bayerische Motoren Worke Aktiengesellschaft ("BMW AG") and, therefore, a response is not required by BMW MC.

4. BMW MC admits the allegations in Paragraph 4 of the Amended Complaint. BMW MC denies any allegations contained in the heading that immediately follows Paragraph 4 of the Amended Complaint.

5. BMW MC admits the allegations in Paragraph 5 of the Amended Complaint only to the extent they allege that the term "BMW Group" is used to refer to BMW AG and companies directly and indirectly owned by or affiliated with BMW AG and that information regarding BMW MC and BMW AG can be found on the website https://www.bmwgroup.com. BMW MC denies the remaining allegations in Paragraph 5 of the Amended Complaint.

6. BMW MC admits the allegations in Paragraph 6 of the Amended Complaint only to the extent they allege that BMW AG indirectly owns BMW MC. BMW MC denies the remaining allegations in Paragraph 6 of the Amended Complaint.

7. BMW MC denies the allegations in Paragraph 7 of the Amended Complaint.

8. BMW MC states that the contents of the referenced website speak for themselves. BMW MC otherwise denies the allegations in Paragraph 8 of the Amended Complaint.

9. BMW MC denies the allegations in Paragraph 9 of the Amended Complaint.

10. BMW MC admits the allegations in Paragraph 10 of the Amended Complaint to the extent they allege that, from time to time, BMW MC management has included German citizens who previously were employed at BMW AG or other affiliates. BMW MC further

admits the allegations in Paragraph 10 of the Amended Complaint to the extent they allege that managers from countries other than the United States are commonly referred to as "Internationals" or "ex-pats." BMW MC denies the remaining allegations in Paragraph 10 of the Amended Complaint.

11. BMW MC denies the allegations in Paragraph 11 of the Amended Complaint.

12. BMW MC admits the allegations in Paragraph 12 of the Amended Complaint.

13. BMW MC denies the allegations in Paragraph 13 of the Amended Complaint.

14. BMW MC denies the allegations in Paragraph 14 of the Amended Complaint.

15. BMW MC states that the contents of the referenced website speak for themselves. BMW MC otherwise denies the allegations in Paragraph 15 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 15 of the Amended Complaint.

16. BMW MC denies the allegations in Paragraph 16 of the Amended Complaint.

17. BMW MC admits the allegations in Paragraph 17 of the Amended Complaint. BMW MC denies any allegations contained in the heading that immediately follows Paragraph 17 of the Amended Complaint.

18. BMW MC denies the allegations in Paragraph 18 of the Amended Complaint.

19. BMW MC admits the allegations in Paragraph 19 of the Amended Complaint to the extent they allege that while employed by BMW AG, Eva Burgmeier sent a memo to Plaintiff and other employees. BMW MC denies the remaining allegations in Paragraph 19 of the Amended Complaint.

20. BMW MC is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 of the Amended Complaint and thus denies those allegations.

21. In response to the allegations in Paragraph 21 of the Amended Complaint, BMW MC states that the referenced video of Knudt Flor speaks for itself. BMW MC denies the remaining allegations in Paragraph 21 of the Amended Complaint.

22. BMW MC denies the allegations in Paragraph 22 of the Amended Complaint.

23. BMW MC denies the allegations in Paragraph 23 of the Amended Complaint.

24. BMW MC denies the allegations in Paragraph 24 of the Amended Complaint.

25. BMW MC denies the allegations in Paragraph 25 of the Amended Complaint.

26. BMW MC denies the allegations in Paragraph 26 of the Amended Complaint.

27. BMW MC denies the allegations in Paragraph 27 of the Amended Complaint.

28. BMW MC denies the allegations in Paragraph 28 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 28 of the Amended Complaint.

29. BMW MC denies the allegations in Paragraph 29 of the Amended Complaint.

30. BMW MC denies the allegations in Paragraph 30 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 30 of the Amended Complaint.

31. BMW MC admits the allegations in Paragraph 31 of the Amended Complaint only to the extent they allege that there have been six vice presidents of human resources at BMW MC and that during the tenure of the four most recent vice presidents of human resources, there has been a German citizen in a Level II or Level III position in human resources at

BMW MC. BMW MC denies the remaining allegations in Paragraph 31 of the Amended Complaint.

32. BMW MC admits the allegations in Paragraph 32 of the Amended Complaint to the extent they allege that Johannes Trauth, a German citizen, was the fourth vice president of human resources at BMW MC. BMW MC denies the remaining allegations in Paragraph 32 of the Amended Complaint.

33. BMW MC states that the contents of the website referenced in Paragraph 33 of the Amended Complaint speak for themselves. BMW MC admits the allegations in Paragraph 33 of the Amended Complaint only to the extent they allege that Trauth's successor as Vice President of Human Resources at BMW MC was Christine Petrasch, a German citizen, and that Trauth transferred from BMW MC to BMW AG and became a Head of Human Resources Services at BMW AG. BMW MC denies the remaining allegations in Paragraph 33 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 33 of the Amended Complaint.

34. BMW MC denies the allegations in Paragraph 34 of the Amended Complaint.

35. BMW MC admits the allegations in Paragraph 35 of the Amended Complaint only to the extent they allege that there is one Level 1 position at BMW MC and that such position is currently held by Robert Englehorn, who is a German citizen. BMW MC denies the remaining allegations in Paragraph 35 of the Amended Complaint.

36. BMW MC admits the allegations in Paragraph 36 of the Amended Complaint.

37. BMW MC denies the allegations in Paragraph 37 of the Amended Complaint.

38. BMW MC admits the allegations in Paragraph 38 of the Amended Complaint only to the extent they allege that Level III is the next highest position at BMW MC to Level I

and Level II positions and that there are multiple associates at Level III in Human Resources at BMW MC. BMW MC denies the remaining allegations in Paragraph 38 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 38 of the Amended Complaint.

39. BMW MC admits the allegations in Paragraph 39 of the Amended Complaint only to the extent they allege that Plaintiff held such positions at BMW MC. BMW MC denies the remaining allegations in Paragraph 39 of the Amended Complaint.

40. BMW MC admits the allegations in Paragraph 40 of the Amended Complaint only to the extent they allege that Plaintiff previously held the TX-60 position at BMW MC, in which she was responsible for human resources planning and for benefits and employee compensation. BMW MC denies the remaining allegations in Paragraph 40 of the Amended Complaint.

41. BMW MC admits the allegations in Paragraph 41 of the Amended Complaint only to the extent that they allege that Plaintiff performed her duties and was employed by BMW MC solely within the United States. BMW MC denies the remaining allegations contained in Paragraph 41 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 41 of the Amended Complaint.

42. BMW MC denies the allegations in Paragraph 42 of the Amended Complaint.

43. BMW MC denies the allegations in Paragraph 43 of the Amended Complaint.

44. BMW MC denies the allegations in Paragraph 44 of the Amended Complaint.

45. BMW MC denies the allegations in Paragraph 45 of the Amended Complaint.

46. BMW MC denies the allegations in Paragraph 46 of the Amended Complaint.

47. BMW MC denies the allegations in Paragraph 47 of the Amended Complaint.

48. BMW MC denies the allegations in Paragraph 48 of the Amended Complaint.

49. BMW MC denies the allegations in Paragraph 49 of the Amended Complaint.

50. BMW MC admits the allegations in Paragraph 50 of the Amended Complaint only to the extent they allege that Englehorn, Petrasch, and Sherry McCraw met with the HR management team at BMW MC on November 11, 2021. BMW MC denies the remaining allegations in Paragraph 50 of the Amended Complaint.

51. BMW MC admits the allegations in Paragraph 51 of the Amended Complaint only to the extent they allege that Eva Burgmeier currently holds the TX-60 position at BMW MC. BMW MC denies the remaining allegations in Paragraph 51 of the Amended Complaint.

52. BMW MC denies the allegations in Paragraph 52 of the Amended Complaint.

53. BMW MC denies the allegations in Paragraph 53 of the Amended Complaint.

54. BMW MC denies the allegations in Paragraph 54 of the Amended Complaint.

55. BMW MC admits the allegations in Paragraph 55 of the Amended Complaint only to the extent they allege that BMW AG made an announcement that Eva Burgmeier was transferring to BMW MC. BMW MC denies the remaining allegations in Paragraph 55 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 55 of the Amended Complaint.

56. BMW MC denies the allegations in Paragraph 56 of the Amended Complaint.

57. BMW MC denies the allegations in Paragraph 57 of the Amended Complaint.

58. BMW MC denies the allegations in Paragraph 58 of the Amended Complaint.

59. BMW MC denies the allegations in Paragraph 59 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 59 of the Amended Complaint.

60. BMW MC admits the allegations in Paragraph 60 of the Amended Complaint only to the extent they allege that Corey Epps, an African American BMW MC associate, was promoted to a Level III position in Human Resources at BMW MC. BMW MC denies the remaining allegations in Paragraph 60 of the Amended Complaint. BMW MC further denies any allegations contained in the heading that immediately follows Paragraph 60 of the Amended Complaint.

61. BMW MC admits the allegations in Paragraph 61 of the Amended Complaint only to the extent they allege that Plaintiff voluntarily resigned from employment at BMW MC to take a human resources position at another company. BMW MC denies the remaining allegations in Paragraph 61 of the Amended Complaint.

62. BMW MC denies the allegations in Paragraph 62 of the Amended Complaint.

63. BMW MC denies the allegations in Paragraph 63 of the Amended Complaint.

64. BMW MC denies the allegations in Paragraph 64 of the Amended Complaint.

65. BMW MC admits the allegations in Paragraph 65 of the Amended Complaint only to the extent they allege that prior to commencing this action, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), that the EEOC issued a Notice of Right to Sue to Plaintiff with regard to the Charge of Discrimination against BMW MC, and that Plaintiff filed this action against BMW MC within 90 days of the issuance of such Notice by the EEOC. BMW MC denies the remaining allegations in Paragraph 65 of the Amended Complaint.

66. BMW MC repeats and realleges its responses to Paragraphs 1 through 65 of the Amended Complaint as if fully set forth in response to Paragraph 66 of the Amended Complaint.

67. BMW MC denies the allegations in Paragraph 67 of the Amended Complaint.

68. BMW MC denies the allegations in Paragraph 68 of the Amended Complaint.

69. BMW MC denies the allegations in Paragraph 69 of the Amended Complaint.

70. BMW MC denies the allegations in Paragraph 70 of the Amended Complaint.

71. BMW MC denies the allegations in Paragraph 71 of the Amended Complaint.

72. BMW MC denies the allegations in Paragraph 72 of the Amended Complaint. BMW MC further denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following Paragraph 72 of the Amended Complaint.

73. BMW MC repeats and realleges its responses to Paragraphs 1 through 72 of the Amended Complaint as if fully set forth in response to Paragraph 73 of the Amended Complaint.

74. BMW MC denies the allegations in Paragraph 74 of the Amended Complaint.

75. BMW MC denies the allegations in Paragraph 75 of the Amended Complaint.

76. BMW MC denies the allegations in Paragraph 76 of the Amended Complaint. BMW MC further denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following Paragraph 76 in the Amended Complaint.

77. BMW MC repeats and realleges its responses to Paragraphs 1 through 76 of the Amended Complaint as if fully set forth in response to Paragraph 77 of the Amended Complaint.

78. BMW MC denies the allegations in Paragraph 78 of the Amended Complaint. BMW MC further denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following Paragraph 78 in the Amended Complaint.

79. BMW MC repeats and realleges its responses to Paragraphs 1 through 78 of the Amended Complaint as if fully set forth in response to Paragraph 79 of the Amended Complaint.

80. BMW MC denies the allegations in Paragraph 80 of the Amended Complaint.

81. BMW MC admits the allegations in Paragraph 81 of the Amended Complaint only to the extent they allege that Petrasch told Plaintiff BMW MC planned to move Plaintiff to the TX-64 position, which was previously occupied by a male associate. BMW MC denies the remaining allegations in Paragraph 81 of the Amended Complaint.

82. BMW MC denies the allegations in Paragraph 82 of the Amended Complaint. BMW MC further denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following Paragraph 82 in the Amended Complaint.

83. BMW MC denies any allegations in the Amended Complaint which have not been expressly admitted, denied, or referred to on information and belief.

**FOR A SECOND DEFENSE**

Plaintiff's Amended Complaint should be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.

**FOR A THIRD DEFENSE**

Some or all of the relief sought by Plaintiff is barred to the extent that Plaintiff has failed to mitigate her damages.

**FOR A FOURTH DEFENSE**

Some or all of the relief sought by Plaintiff may be barred by the doctrines of waiver, unclean hands, laches, and/or estoppel.

**FOR A FIFTH DEFENSE**

Some or all of the claims and/or relief sought by Plaintiff in the Amended Complaint are barred to the extent that Plaintiff failed to exhaust administrative remedies and procedural prerequisites for bringing a private action under Title VII of the Civil Rights Act of 1964 ("Title VII").

**FOR A SIXTH DEFENSE**

Plaintiff's claims are barred on the basis that all actions taken by BMW MC were based on legitimate, non-discriminatory business reasons.

**FOR A SEVENTH DEFENSE**

Notwithstanding the general denials and previous defenses set forth herein, to the extent that Plaintiff establishes that any prohibited criteria was a motivating factor for any action taken by BMW MC, BMW MC would have taken the same action in the absence of such an impermissible motivating factor.

**FOR AN EIGHTH DEFENSE**

Any award of damages to Plaintiff should be limited or precluded pursuant to the after-acquired evidence doctrine, as may be applicable.

**FOR A NINTH DEFENSE**

BMW MC has not engaged in any act constituting willful misconduct, demonstrating wantonness, oppression, want of care or any other conduct of any type whatsoever which could support an award of punitive damages under applicable law.

**FOR A TENTH DEFENSE**

Any award or damages should be barred or limited to the extent that the relief demanded by Plaintiff is improper, inappropriate, exceeds the scope of permissible damages and remedies,

and/or otherwise is not available under the laws upon which his claims rest. Alternatively, in the event that the Plaintiff is granted relief under his claims, such relief should be limited by the applicable provisions of Title VII and/or any other state or federal law.

**FOR AN ELEVENTH DEFENSE**

BMW MC has made good-faith efforts to prevent discrimination in the workplace and to comply with Title VII, Section 1981, and all other applicable employment laws. In the event that BMW MC is determined to have violated such laws, which BMW MC denies, such violation was in good faith, and BMW MC had reasonable grounds for believing that its actions did not violate Title VII, Section 1981, or any other applicable employment law.

**FOR A TWELFTH DEFENSE**

Plaintiff's claim for punitive damages is barred because any award of punitive damages would violate the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States.

**FOR A THIRTEENTH DEFENSE**

Plaintiff's claim for damages should be limited by the applicable provisions of South Carolina statutory and common law, specifically including, but not limited to, S.C. Code Ann. § 15-32-530.

**FOR A FOURTEENTH DEFENSE**

BMW MC reserves the right to amend its Answer or add further defenses that may become known after the filing of this pleading.

**WHEREFORE,** having fully answered Plaintiff's Amended Complaint**,** BMW MC prays that:

A. The Court enter judgment in BMW MC's favor;

B. Plaintiff's Amended Complaint be dismissed with prejudice as to BMW MC;

C. The Court award BMW MC all costs, expenses, fees, and damages that may arise with the defense of Plaintiff's Amended Complaint; and

D. The Court award BMW MC such further relief as it deems just and proper.

Respectfully submitted this the 23rd day of February, 2023.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br>v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC,<br><br>Defendants. | ) | **CA 7:22-cv-3738-TMC-KFM**<br><br>**(Jury Trial Demanded)** |

**BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT'S**
**<u>ANSWER AND SPECIFIC DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT</u>**

Defendant Bayerische Motoren Werke Aktiengesellschaft ("AG") files this Answer and Specific Defenses to Plaintiff's Amended Complaint (ECF No. 20). To the extent any allegations in the Amended Complaint are not expressly admitted, they are denied. Any averment by AG that it lacks knowledge or information sufficient to form a belief about the truth of an allegation shall have the effect of a denial.[1]

1. Upon information and belief, AG admits the allegations in paragraph 1 to the extent they allege that Plaintiff is a resident of Greenville County, South Carolina. AG admits the allegations in paragraph 1 to the extent they allege that Plaintiff was employed by Defendant BMW Manufacturing Co., LLC ("BMW MC") in Spartanburg County, South Carolina. AG denies the remaining allegations in paragraph 1.

2. Upon information and belief, AG admits the allegations in paragraph 2.

---

[1] The Complaint contains various headings that purport to characterize the allegations in the Amended Complaint that AG will not repeat here. To the extent that any response is required, AG denies the allegations in the headings.

3. AG admits that it is a corporation organized and existing under the laws of Federal Republic of Germany, and that its principal place of business and corporate headquarters is in Munich, Germany.

4. AG admits the allegations in paragraph 4.

5. AG states that the referenced website speaks for itself, and AG denies any allegations in paragraph 5 to the extent they do not fully and accurately characterize the content of that website. AG denies the remaining allegations in paragraph 5.

6. AG admits that it indirectly owns Defendant BMW Manufacturing Co., LLC ("BMW MC"), and denies the remaining allegations in paragraph 6.

7. AG denies the allegations in paragraph 7.

8. AG states that the referenced website speaks for itself, and AG denies any allegations in paragraph 8 to the extent they do not fully and accurately characterize the content of that website. AG denies the remaining allegations in paragraph 8.

9. AG states that the referenced website speaks for itself, and AG denies any allegations in paragraph 9 to the extent they do not fully and accurately characterize the content of that website.

10. AG admits that, from time to time, AG personnel transfer to work for BMW MC. AG lacks sufficient knowledge or information to admit or deny the remaining allegations in paragraph 10; therefore, to the extent a response is required, AG denies the remaining allegations in paragraph 10.

11. AG denies the allegations in paragraph 11.

12. AG denies the allegations in paragraph 12.

13. AG denies the allegations in paragraph 13.

14. AG denies the allegations in paragraph 14.

15. AG states that the referenced website speaks for itself, and AG denies any allegations in paragraph 15 to the extent they do not fully and accurately characterize the content of that website. AG denies the remaining allegations in paragraph 15.

16. AG denies the allegations in paragraph 16.

17. AG admits the allegations in paragraph 17.

18. AG denies the allegations in paragraph 18.

19. AG states that the referenced document speaks for itself, and AG denies any allegations in paragraph 19 to the extent they do not fully and accurately characterize the content of that document. AG denies the remaining allegations in paragraph 19.

20. AG states that the referenced document speaks for itself, and AG denies any allegations in paragraph 20 to the extent they do not fully and accurately characterize the content of that document. AG denies the remaining allegations in paragraph 20.

21. AG states that the referenced video speaks for itself, and AG denies any allegations in paragraph 21 to the extent they do not fully and accurately characterize the content of that video. AG denies the remaining allegations in paragraph 21.

22. AG denies the allegations in paragraph 22.

23. AG denies the allegations in paragraph 23.

24. AG denies the allegations in paragraph 24.

25. AG denies the allegations in paragraph 25.

26. AG denies the allegations in paragraph 26.

27. AG denies the allegations in paragraph 27.

28. AG denies the allegations in paragraph 28.

29. AG denies the allegations in paragraph 29.

30. AG denies the allegations in paragraph 30.

31. AG admits the allegations of paragraph 31 to the extent they allege that there have been six vice presidents of human resources at BMW MC, and that during the tenure of the four most recent vice presidents of human resources, there has been a German citizen in a Level II or Level III position in human resources at BMW MC. AG denies the remaining allegations in paragraph 31.

32. AG lacks sufficient knowledge or information to admit or deny the allegations in the first sentence of paragraph 32; therefore, to the extent a response is required, AG denies the allegations in the first sentence of paragraph 32. AG denies the second sentence of paragraph 32.

33. AG states that the reference document speaks for itself, and AG denies any allegations in paragraph 33 to the extent they do not fully and accurately characterize the content of that document. AG denies the remaining allegations in paragraph 33.

34. AG denies the allegations in paragraph 34.

35. AG admits that there is one Level I position at BMW MC and that position is currently held by Robert Engelhorn. AG denies the remaining allegations in paragraph 35.

36. AG admits the allegations in paragraph 36.

37. AG denies the allegations in paragraph 37.

38. AG lacks sufficient knowledge or information to admit or deny the allegations in paragraph 38; therefore, to the extent a response is required, AG denies the allegations in paragraph 38.

39. AG denies the allegations in paragraph 39 to the extent they allege that Plaintiff was employed by AG. AG lacks sufficient knowledge or information to admit or deny the

remaining allegations in paragraph 39; therefore, to the extent a response is required, AG denies the remaining allegations in paragraph 39.

40. AG lacks sufficient knowledge or information to admit or deny the allegations in paragraph 40; therefore, to the extent a response is required, AG denies the allegations in paragraph 40.

41. AG admits the allegations of paragraph 41 only to the extent that they allege Plaintiff performed her duties and was employed by BMW MC solely within the United States. AG denies the remaining allegations in paragraph 41.

42. AG denies the allegations in paragraph 42.

43. AG denies the allegations in paragraph 43.

44. AG denies the allegations in paragraph 44.

45. AG denies the allegations in paragraph 45.

46. AG denies the allegations in paragraph 46.

47. AG denies the allegations in paragraph 47.

48. AG denies the allegations in paragraph 48.

49. AG denies the allegations in paragraph 49.

50. Upon information and belief, AG admits the allegations in paragraph 50 only to the extent they allege that Robert Engelhorn, Christine Petrasch, and Sherry McCraw met with the HR management team at BMW MC on November 11, 2021. AG denies the remaining allegations in paragraph 50.

51. AG admits that Eva Burgmeier currently holds the position of TX-60 at BMW MC. AG denies the remaining allegations in paragraph 51.

52. AG denies the allegations in paragraph 52.

53. AG denies the allegations in paragraph 53.

54. AG denies the allegations in paragraph 54.

55. AG admits the allegations in paragraph 55 only to the extent they allege that AG made an announcement that Eva Burgmeier was transferring to BMW MC. AG denies the remaining allegations in paragraph 55.

56. AG denies the allegations in paragraph 56.

57. AG denies the allegations in paragraph 57.

58. AG denies the allegations in paragraph 58.

59. AG denies the allegations in paragraph 59.

60. AG denies the allegations in paragraph 60 to the extent they allege that Corey Epps was employed by AG. AG lacks sufficient knowledge or information to admit or deny the remaining allegations in paragraph 60; therefore, to the extent a response is required, AG denies the remaining allegations in paragraph 60.

61. AG lacks sufficient knowledge or information to admit or deny the allegations in paragraph 61; therefore, to the extent a response is required, AG denies the allegations in paragraph 61.

62. AG denies the allegations in paragraph 62.

63. AG denies the allegations in paragraph 63.

64. AG denies the allegations in paragraph 64.

65. Upon information and belief, AG admits the allegations in paragraph 65 only to the extent they allege that prior to commencing this action, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), that the EEOC issued a Notice of Right to Sue to Plaintiff with regard to the Charge of Discrimination against BMW MC, and

that Plaintiff filed this action within 90 days of the issuance of such Notice with respect to BMW MC by the EEOC. AG denies that any Charge of Discrimination or Notice of Right to Sue was ever served on AG, and denies the remaining allegations in Paragraph 65.

**Count I**

66. AG repeats and realleges its responses to paragraph 1 to 65 of the Amended Complaint.

67. AG denies the allegations in paragraph 67.

68. AG denies the allegations in paragraph 68.

69. AG denies the allegations in paragraph 69.

70. AG denies the allegations in paragraph 70.

71. AG denies the allegations in paragraph 71.

72. AG denies the allegations in paragraph 72. AG denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following paragraph 72.

**Count II**

73. AG repeats and realleges its responses to paragraph 1 to 72 of the Amended Complaint.

74. AG denies the allegations in paragraph 74.

75. AG denies the allegations in paragraph 75.

76. AG denies the allegations in paragraph 76. AG denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following paragraph 76.

**Count III**

77. AG repeats and realleges its responses to paragraph 1 to 76 of the Amended Complaint.

78. AG denies the allegations in paragraph 78. AG denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following paragraph 78.

**Count IV**

79. AG repeats and realleges its responses to paragraph 1 to 78 of the Amended Complaint.

80. AG denies the allegations in paragraph 80.

81. Upon information and belief, AG admits the allegations in paragraph 81 only to the extent they allege that Christine Petrasch told Plaintiff BMW MC planned to move Plaintiff to the TX-64 position. AG denies the remaining allegations in paragraph 81.

82. AG denies the allegations in paragraph 82. AG denies that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" paragraph immediately following paragraph 82.

**SPECIFIC DEFENSES**

1. Plaintiff's claims against AG cannot be maintained because the Court lacks personal jurisdiction over AG.

2. Plaintiff's Amended Complaint fails to state a claim upon which relief may be granted.

3. Plaintiff's claims must be denied to the extent Plaintiff's alleged damages are the result of Plaintiff's own conduct, or another party's actions, omissions, and/or course of conduct.

4. Plaintiff's claims are barred, in whole or in part, because of Plaintiff's failure to mitigate her alleged damages, if any.

5. Some or all of the relief sought by Plaintiff may be barred by the doctrines of waiver, unclean hands, and/or estoppel.

6. Some or all of the claims and/or relief sought by Plaintiff in the Amended Complaint are barred to the extent that Plaintiff failed to exhaust administrative remedies and procedural prerequisites for bringing a private action under Title VII of the Civil Rights Act of 1964.

7. Plaintiff's claims are barred on the basis that all actions taken by AG were based on legitimate, non-discriminatory business reasons.

8. Notwithstanding the general denials and previous defenses set forth herein, to the extent that Plaintiff establishes that any prohibited criteria was a motivating factor for any action taken by AG, AG would have taken the same action in the absence of such an impermissible motivating factor.

9. Any award of damages to Plaintiff should be limited or precluded pursuant to the after-acquired evidence doctrine, as may be applicable.

10. Any award or damages should be barred or limited to the extent that the relief demanded by Plaintiff is improper, inappropriate, exceeds the scope of permissible damages and remedies, and/or otherwise is not available under the laws upon which his claims rest. Alternatively, in the event that the Plaintiff is granted relief under his claims, such relief should be limited by the applicable provisions of Title VII and/or any other state or federal law.

11. In the event that a violation of Title VII, Section 1981, or any other applicable employment laws is found, such violation was in good faith, and based on the reasonable belief that any actions did not violate Title VII, Section 1981, or any other applicable employment law.

12. Plaintiff's claim for punitive damages is barred because any award of punitive damages would violate the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States.

13. Plaintiff's claim for damages should be limited by the applicable provisions of South Carolina statutory and common law, specifically including, but not limited to, S.C. Code Ann. § 15-32-530.

14. As alleged, Plaintiff's claims are barred, in whole or in part, by treaty, international law, and principles of comity.

15. AG reserves the right to amend its Answer or add further defenses that may become known after the filing of this pleading.

WHEREFORE, AG prays that the Court enter judgment in AG's favor; Plaintiff's Amended Complaint be dismissed with prejudice, and that AG be awarded its costs, attorney's fees, and such relief as the Court deems just and proper.

Dated: February 21, 2024

Respectfully submitted,

*/s/ Kurt M. Rozelsky*
Kurt M. Rozelsky, Bar No. 6299
SPENCER FANE LLP
27 Cleveland St., Suite 201
P.O. Box 294 (29602-0294)
Greenville, SC 29601
Phone: 864. .695.5202
Fax: 864.695.5201
Email: krozelsky@spencerfane.com

Daniel S. Savrin (admitted *pro hac vice*)
Nathaniel P. Bruhn (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
Phone: 1.617.951.8674
1.617.951.8651
Fax: 1.617.428.6310
Email: daniel.savrin@morganlewis.com
nathaniel.bruhn@morganlewis.com

*Counsel for Defendant*
*Bayerische Motoren Werke Aktiengesellschaft*

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

Kelly Dawsey,

Plaintiff,

vs.

Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC,

Defendants.

Civil Action No. 7:22-3738-TMC-KFM

**REPORT OF MAGISTRATE JUDGE**

This matter is before the court on defendant BMW Manufacing Co., LLC's ("BMW MC") motion for summary judgment (doc. 92) and Bayerische Motoren Werke Aktiengesellschaft's ("BMW AG") motion for summary judgment (doc. 102). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

## I. BACKGROUND AND FACTUAL ALLEGATIONS

BMW MC operates an automotive manufacturing plant in Spartanburg County, South Carolina and assembles certain models of BMW brand vehicles (doc. 42-2, McCraw decl. ¶ 5). BMW MC is an indirect subsidiary of BMW AG, a German corporation (*id.* ¶ 6). BMW MC's production facility is part of BMW AG's global vehicle production network, and all production plants in this network are designated with a "T" code (doc. 92-1 at 3). BMW MC is designated as "TX" (*id.*). Accordingly, positions at BMW MC all have a TX code assigned to them, which varies depending on the department in which they are located (*id.*; doc. 92-2, Dawsey dep. ex. 7). Relevant here, the human resources ("HR") department is known as TX-6, and all positions within the HR department have a code that begins with

TX-6 (doc. 92-2, Dawsey dep. ex. 7). The vice president of HR is TX-6, and positions directly reporting to the vice president, which include department managers and section managers, have a single number following TX-6 (*i.e.*, TX-60, TX-61, TX-62, TX-64, and TX-65) (docs. 45-1, Dawsey decl. ex. G; 97-1, Dawsey 2nd decl. ¶ 6). Additionally, employees that report to the department managers have two numbers following TX-6 (*i.e.*, TX-600 reports to TX-60) (doc. 97-1, Dawsey 2nd decl. ¶ 6).

The plaintiff, a white American, began her employment with BMW MC in 1995 working in staff associate relations (docs. 20 ¶ 2; 97-4, Dawsey dep. 36:15-37:7; 97-1, Dawsey 2nd decl. ¶ 2). After a series of promotions, the plaintiff was ultimately promoted to TX-60, which is the department manager for HR planning, in February 2015 (docs. 97-4, Dawsey dep. 45:16-50:9, 55:1-19, 64:21-25; 92-2, Dawsey dep. ex. 3). TX-60 is responsible for HR planning and steering, compensation and organization, benefits, associate family health center, associate well-being, and compliance (docs. 97-4, Dawsey dep. 59:10-12; 92-2, Dawsey dep. ex. 8).

On September 1, 2021, Robert Engelhorn ("Dr. Engelhorn"), a German who was formerly working for BMW AG, became the president of BMW MC (docs. 92-4, Petrasch dep. 126:4-6; 92-6, Burgmeier dep. 46:24-47:1). At that time, Christina Petrasch, a German, served as TX-6 and was therefore the person to whom the plaintiff directly reported (docs. 97-1, Dawsey 2nd decl. ¶ 4; 97-11, Petrasch dep. 8:20-24). The record reflects that Ms. Petrasch gave the plaintiff high performance ratings (docs. 94-11, Petrasch dep. 124:3-5; 97-20; 97-21; 97-22). At one point, BMW MC considered the plaintiff to be a possible nominee for TX-6 (doc. 97-1, Dawsey 2nd decl. ¶ 31).

Ms. Petrasch's international assignment to BMW MC was scheduled to end at the end of 2021, and she was returning to Germany at that time (doc. 92-4, Petrasch dep. 126:4-11). Accordingly, BMW MC needed to fill the TX-6 role (*see id.*). Also, during the first half of 2021, BMW MC created an HR special project to focus on issues relating

to hiring and retention of employees (docs. 92-2, Dawsey dep. ex. 36; 92-3, Engelhorn dep. 43:16-44:1). This special project was scheduled to begin in early 2022 (doc. 92-2, Dawsey dep. ex. 36). Ms. Petrasch selected Scott Medley ("Mr. Medley"), who was employed at TX-64, to lead this special project (doc. 92-2, Dawsey dep. ex. 41). Accordingly, the TX-64 position also needed to be filled (*see id.*).

The plaintiff testified in her declaration that Ms. Petrasch told her that Dr. Engelhorn wanted a German in TX-4, the vice president of assembly (doc. 45-1, Dawsey decl. ¶ 10). At that time, Sherry McCraw ("Ms. McCraw"), an American, was TX-4 (*id.*). BMW MC then moved Philip Heinrichsdorff from Germany to TX-4 (*id.*). Additionally, in early September 2021, Dr. Engelhorn selected Ms. McCraw for TX-6 (docs. 97-5, Engelhorn dep. 59:5-9; 92-1 at 6). Dr. Engelhorn testified in his deposition that he wanted a local person in the TX-6 position (doc. 97-5, Engelhorn dep. 22:15-17). Because Ms. McCraw was unable to transition to TX-6 until April 2022, Ms. Petrasch agreed to remain as TX-6 until March 31, 2022 (docs. 92-4, Petrasch dep. 8:20-24; 92-1 at 6).

In July 2021, while Dr. Engelhorn was still working for BMW AG, he met Eva Burgmeier ("Ms. Burgmeier"), a German and department manager in the HR department at BMW AG (doc. 92-6, Burgmeier dep. 45:5-14). Although Dr. Engelhorn was still in Germany, he had been formally announced as the next president of BMW MC (*id*. at 45:5-47:1). During this meeting, Ms. Burgmeier expressed an interest in an international assignment (*id.*). Subsequently, on September 9, 2021, Dr. Engelhorn had a teleconference with Ms. Burgmeier (*id.* at 45:5-46:11). Dr. Engelhorn told Ms. Burgmeier that there would be a department manager opening at BMW MC in early 2022 and asked if she was interested in taking an international assignment to work for BMW MC (*id.*). Ms. Burgmeier testified in her deposition that Dr. Engelhorn did not indicate which position she would fill in the BMW MC HR department (*id.*).

The plaintiff testified in her deposition that on September 15, 2021, she received a telephone call from Ms. Petrasch and learned that Ms. McCraw would be the next TX-6 (doc. 92-2, Dawsey dep. 209:13-210:2). Ms. Petrasch also told the plaintiff that "there was a rule when TX-6 vice president of HR was a local, that there needed to be a German in the next line" (*id.* at 210:3-5). The plaintiff testified that during this telephone call, Ms. Petrasch did not "indicate . . . what role the German was coming to" (*id.* at 211:22-25). However, the plaintiff also testified at a different time in her deposition that Ms. Petrasch told her on September 15th that Ms. Burgmeier was filling the TX-60 role that the plaintiff occupied (doc. 97-4, Dawsey dep. 106:9-18). Moreover, the plaintiff testified in her deposition that in October, Ms. Petrasch told her to look for jobs outside of HR (doc. 97-4, Dawsey dep. 230:18-234:8-13).

The plaintiff testified that she was aware of the rule that there had to be a German "next in line" if an American was in TX-6 (doc. 92-2, Dawsey dep. 210:7-13, 212:5-13). The plaintiff produced a document from "BMW Group," which is dated January 6, 2016, and entitled "Expat Guidelines for Plant Spartanburg" ("Expat Guidelines") (doc. 97-23). Relevant to these Expat Guidelines, the terms "domestic" and "local" refer to United States citizens and the terms "expat" and "international" refer to German nationals sent by BMW AG to work in Spartanburg (docs. 97-5, Engelhorn dep. 19:23-20:5; 45-1, Dawsey decl. ¶ 20; 97-1, Dawsey 2nd decl. ¶ 8). "Global" refers to a candidate from any other county in the BMW Group network (doc. 45-1, Dawsey decl. ¶ 20). Additionally, "inbound" means an expat/international or global employee transferred from another country (doc. 97-1, Dawsey 2nd decl. ¶ 8).

Under a heading entitled "Topics Taken Into Consideration for Inbound Assignments," the Expat Guidelines state, among other topics, that "[i]n general there is an alternating reporting structure of international and domestic below the Senior Management level" (doc. 97-23 at 4). The Expat Guidelines then describe options for how this alternating

reporting structure would look for TX-60[1] (*id.* at 6). The positions are color-coded based on nationality (*id.*). The Expat Guidelines state that the "T[X]-60 department has a need for an international inbound (Planner or Dept Mgr ideally from AG - tie to network) and should follow the status of T[X]-6" (*id.*). The plaintiff testified in her declaration that the practice of alternating the nationality of TX-6 and TX-60 is longstanding (doc. 97-1, Dawsey 2nd decl. ¶ 12). The plaintiff explained as follows:

> Before I became TX-60, Moritz Kippenberger (German) held TX-60 when Ann Marie Higgins (American) was TX-6. I became TX-60 when Johannes Trauth (German) was TX-6. I remained TX-60 when Christina Petrasch (German) was TX-6. When Sherry McCraw (American) was announced as TX-6, BMW replaced me with Eva Burgmeier (German).

(*Id.*).

On September 23rd, Ms. Petrasch prepared a draft document outlining a proposed reorganization the HR department (doc. 92-4, Petrasch dep. ex. 1). According to that document, Ms. Burgmeier would assume the TX-60 role, the plaintiff would move to TX-61, Corey Epps ("Mr. Epps"), a black male, would move to TX-64, and Mr. Medley would move to the special project (*id.*). Sometime in late September, Ms. Petrasch met with Dr. Engelhorn and Ms. McCraw to discuss her proposed reorganization (docs. 92-3, Engelhorn dep. 23:20-24:33; 92-7, McCraw dep. 15:24-16:13). During that meeting, Ms. McCraw expressed concerns with the proposal to move the plaintiff to TX-61 (92-7, McCraw dep. 16:10-18:20). Ms. McCraw testified in her deposition that Mr. Epps was doing a good job in TX-61 and had been in that position for less than two years (*id.* at 18:12-18). Ms. McCraw also testified that based on her experience working with the plaintiff, the TX-64 position was a better fit for her (*id.* at 16:14-17:1). Therefore, Ms. McCraw recommended that Mr. Epps remain in the TX-61 position and that the plaintiff be moved to TX-64 (*id.* at 16:2-18:18). Dr. Engelhorn agreed with Ms. McCraw's recommendation (doc. 92-3,

---

[1] The Expat Guidelines refer to this position as "TS-60" (doc. 97-23 at 6). BWM MC's codes were "TS" before they were changed to "TX" (doc. 97-10, Medley dep. 12:1-9).

Engelhorn dep. 23:13-22, 66:15-67:18). On October 1st, Ms. Petrasch prepared an updated chart reflecting that Ms. Burgmeier would assume the TX-60 position, the plaintiff would move to TX-64, and Mr. Medley would move to the special project (doc. 92-4, Petrasch dep. ex. 2).

On November 11th, Dr. Engelhorn, Ms. Petrasch, and Ms. McCraw met with HR management to announce the changes (doc. 92-2, Dawsey dep. 244:9-245:8). During that meeting, Ms. Petrasch used a presentation that showed the new structure of the HR department, including the plaintiff's move to TX-64 (*id.* at 250:19-251:6). The plaintiff testified in her declaration that in addressing the plaintiff's position, Ms. Petrasch reiterated that an expat needs to be in TX-60 when a domestic is in TX-6 (doc. 97-1, Dawsey decl. ¶ 11). The plaintiff also testified that Dr. Engelhorn told HR management that they needed an expat in the Spartanburg HR function so that they had a "connection with Munich" (*id.*).

When asked about the restructuring of HR, Mr. Epps testified in his deposition:

> Q. Did Ms. Petrasch tell you why she was proposing that Kelly be moved?
>
> A. So the person that was coming was a domestic, so it was - - this was Sherry. Sherry was a domestic. And a normal practice and considered somewhat of a best practice, but not the law, rule, or regulation, but a normal practice is that when you have a domestic, you try to put an international so you can keep your tie-in to Germany on the international side, and you can keep your tie-in to the American side. . . .

(Doc. 97-6, Epps dep. 38:14-25). Further, when discussing why Ms. Burgmeier was selected for TX-60, Dr. Engelhorn testified in his deposition that, among other reasons, Ms. Burgmeier had "a clear link to the international network" (doc 97-5, Engelhorn dep. 54:3-5). Dr. Engelhorn testified that it is vital to have this close link and that "BMW setup is a global setup" (*id.* at 54:8-55:2). Ms. Petrasch also testified in her deposition that Dr. Engelhorn brought up Ms. Burgmeier for TX-60 so that she could "act like a bridge to Germany" (doc. 97-77, Petrasch dep. 126:3-18). On December 2nd, an employee at BMW AG sent an

email announcing Ms. Burgmeier's international assignment (doc. 45-1, Dawsey decl. ¶ 4 & ex. D).

The plaintiff contends that a transfer from TX-60 to TX-64 would be a demotion (doc. 97-1, Dawsey 2nd decl. ¶ 9). TX-64 does not require HR experience and has different job responsibilities from TX-60 (docs. 97-9, McCraw dep. 58:24-59:2; 92-2, Dawsey dep. ex. 10; 92-5, Medley dep. 26:7-12; 97-27). In addition, the plaintiff asserts that this transfer would result in a decrease in her job's function level ("FL") (doc. 97-1, Dawsey 2nd decl. ¶ 9). Non-production jobs at BMW MC are graded and assigned an FL, which is designated by a roman numeral (doc. 92-2, Dawsey dep. ex. 4). FLs are determined by a variety of factors, including the amount of responsibility that the position involves (*id.*). There are seven FLs, with FL I representing the highest, executive level responsibility for the plant (*i.e.*, the president) and FL VII representing employees who perform work of a standardized nature under direct supervision (*id.*). Relevant here, FL II represents vice presidents/general managers, FL III represents department managers, and FL IV represents section managers (*id.*). FL III involves "[m]anagement level responsibility for multiple functional areas and/or leads a single functional area with full operational responsibility" and "[t]ypically manages multiple direct reports who have managerial responsibility" (*id.*). In contrast, FL IV "manages one or several functional areas and works highly independently on very specialized tasks" (*id.*). TX-60 is classified as FL III (doc. 97-1, Dawsey 2nd decl. ¶ 9). The parties dispute whether, during the relevant period, TX-64 was classified as FL III or FL IV (*id.*; 92-2, Dawsey dep. 262:24-263:3 & ex. 26; 97-11, Petrasch dep. 31:1-25; 97-26).

Moreover, employees are given personal grades ("PG") based on their performance (doc. 92-2, Dawsey dep. ex. 4). PGs are identified by a number – two through fifteen, and they determine salary, bonuses, and benefits (including personal time off, vehicle, etc.) (*id.*; doc. 97-18). Although PGs determine compensation and benefits, each FL has a salary range, and BMW limits which PGs can serve at various FLs (docs. 92-2, Dawsey dep. ex. 4; 97-18 at 5; 97-3, Burgmeier dep. 71:23-72:4; 92-1, Dawsey 2nd decl. ¶¶

16, 18). For example, FL III is limited to PGs 10, 11, and 12, and FL IV is limited to PGs 8, 9, and 10 (docs. 92-2, Dawsey dep. ex. 4; 97-18 at 5; 97-3, Burgmeier dep. 71:23-72:4; 92-1, Dawsey 2nd decl. ¶¶ 16, 18). The plaintiff testified in her deposition that this system essentially creates a band of compensation (doc. 97-4, Dawsey dep. 258:16-20). While there is some overlap in the permissible salaries for employees at FL III and FL IV, the overall salary range for FL III is higher than the salary range for FL IV (doc. 97-1, Dawsey 2nd decl. ¶ 27).

The plaintiff testified that FLs also impact an employee's ability to advance (doc. 97-1, Dawsey 2nd decl. ¶ 31). FL II executives are eligible for Obere Fuehrungskraefte ("OFK") designation, which is a designation that represents BMW's top leaders (docs. 97 at 13; 97-11, Petrasch dep. 49:3-15). As a FL III department manager, the plaintiff was eligible to be a candidate for FL II and OFK status (docs. 97 at 13; 97-11, Petrasch dep. 49:3-15; 97-1, Dawsey 2nd decl. ¶ 31). Further, the plaintiff had expressed an interest in such a promotion, and, as set out above, she was previously considered for TX-6 on one occasion (doc. 97-1, Dawsey 2nd decl. ¶ 31). However, the plaintiff testified in her deposition that FL IV employees are not promoted directly into FL II positions, so a downgrade from FL III to FL IV affected her ability for a promotion (*id.*). The plaintiff also testified that since she began working for BMW MC in 1995, she never saw someone who was demoted from FL III to FL IV rise back up to FL II (*id.*).

Also during this time frame, the plaintiff was looking for other employment. Specifically, on September 8, 2021, the plaintiff's husband reached out to a job recruiter, Sherrill Miller ("Ms. Miller"), on the plaintiff's behalf to assist her in finding another job (doc. 92-2, Dawsey dep. 269:2-17). The plaintiff explained that they contacted a recruiter because "communications were chaotic" at BMW MC, so she "started really praying hard about what my positions should be, what I should do, and very ironically, my husband met Sherrill Miller at a job because she was the neighbor of an elderly woman that he was working on her house" (*id.* at 269:20-270:2). The plaintiff had an initial meeting with Ms.

Miller on September 10th (*id.* at 270:10-17). Ms. Miller testified in her deposition that during this meeting, the plaintiff told her that "the only reason she was considering looking was to kind of slow down from all the responsibilities that had been assigned over the last couple of years . . . to her, and she wanted to do something different, so to speak" (doc. 92-8, Miller dep. 38:25-39:8). Ms. Miller recalled the plaintiff telling her that she wanted "less responsibility" and "didn't really want to do what she had done so deeply in the past. She really was looking for new avenues to be created for all of her experience and knowledge" (*id.* at 88:13-89:13). The plaintiff, however, testified in her declaration:

> My point to Sherrill Miller was not that I wanted a lesser job or less responsibility. My point to her was that I was not interested in working 12-15 hour days. As my job search indicates, I was looking to see if there were top HR positions available so that I could continue my HR career, which I have done. I did not say that I wanted to "slow down."

(Doc. 97-1, Dawsey 2nd decl. ¶ 41).

On September 13th, the plaintiff sent an email to Ms. Miller regarding some job postings in which she was interested (doc. 92-2, Dawsey dep. 271:7-14). On the evening of September 15th, Ms. Miller sent a services contract to the plaintiff, which the plaintiff signed (*id.* at 274:14-276:5). The plaintiff engaged in a job search, and on November 30th, she had an initial interview for the position of director of HR with Madewell Concrete (*id.* at 285:12-287:4). The plaintiff had another interview with Madewell Concrete on December 3rd, and on December 6th, Madewell Concrete offered the plaintiff a job (*id.* at 285:16-12, 287:11-288:8). The plaintiff accepted Madewell Concrete's offer on December 10th (*id.*).

The plaintiff did not immediately tell anyone at BMW MC about her acceptance of another job offer (doc. 92-2, Dawsey dep. 289:3-10). On December 13th, the plaintiff met with members of her team and informed them of the upcoming organizational changes in the HR department, including that she was moving to TX-64 (*id.*

at 252:12-254:13, 288:1-289:10). Following that meeting, the plaintiff participated in a meeting with the entire HR department, during which Ms. Petrasch informed the HR department of the reorganization plan (*id.*).

On January 3, 2022, the plaintiff called Ms. Petrasch and resigned from employment (doc. 92-2, Dawsey dep. 300:11-25). The plaintiff followed up with a written resignation letter, in which she stated that her last day of work at BMW MC would be January 14th (*id.* at 300:11-304:3). When the plaintiff notified Mr. Medley and Kathy Keizer, her co-workers, of her resignation, she told them that an opportunity was presented that she could not pass up and that she believed it was a sign from God (*id.* at 305:25-305:5; docs. 92-5, Medley dep. 84:1-15; 92-9, Keiser dep. 69:1-5). The plaintiff testified in her declaration that BMW MC makes offers of employment in writing and, at the time she resigned, she had not received an offer of employment regarding any role (doc. 97-1, Dawsey 2nd decl. ¶ 37). At the time that the plaintiff left BMW MC on January 14th, she was still in the TX-60 position (doc. 92-2, Dawsey dep. 313:16-20).

The plaintiff filed an amended complaint in this court on February 9, 2023, alleging claims against the defendants for national origin discrimination in violation of Section 703(a)(1) and Section 703(a)(2)[2] of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), race discrimination in violation of Title VII, race discrimination in violation of 42 U.S.C. 1981 ("Section 1981"), and sex discrimination in violation of Title VII (doc. 20). On February 16, 2024, BMW MC filed a motion for summary judgment (doc. 92). The plaintiff filed a response on February 29, 2024 (doc. 97), and BMW MC filed a reply on March 7, 2024 (doc. 100). Additionally, BMW AG filed a motion for summary judgment on

---

[2] BMW MC argues that the plaintiff only brought one national origin discrimination claim under Section703(a)(1) of Title VII and did not bring a claim under Section 703(a)(2) (doc. 100 at 10). However, the plaintiff cited to both Section 703(a)(1) and Section 703(a)(2) in her national origin discrimination claim in her amended complaint (doc. 20 ¶¶ 67-68), so the undersigned has considered her claim under both Sections herein.

March 8, 2024 (doc. 102), to which the plaintiff filed a response on March 22, 2024 (doc. 104). BMW AG filed a reply on March 29, 2024 (doc. 106). In light of the opinion issued by the Supreme Court of the United States in *Muldrow v. City of St. Louis, Missouri, et al.*, 144 S.Ct. 967 (2024) on April 17, 2024, the undersigned issued a text order on April 24, 2024, providing the plaintiff and the defendants an opportunity to submit supplemental briefing by May 8, 2024, regarding the impact of the *Muldrow* decision on the defendants' motions for summary judgment (doc. 108). The plaintiff filed a supplemental brief on May 7, 2024 (doc. 110), and BMW MC filed a supplemental brief on May 8, 2024 (doc. 111). BMW AG filed a supplemental brief on May 8, 2024, adopting BMW MC's supplemental brief (doc. 112). Accordingly, these matters are now ripe for review.

## II. APPLICABLE LAW AND ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold

demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

**B. Adverse Employment Action**

BMW MC argues that it is entitled to summary judgment on all of the plaintiff's claims because she cannot show that she suffered an adverse employment action (doc. 92 at 14-30). BMW AG has adopted this argument in its motion for summary judgment (doc. 102 at 1-2).

Regarding the plaintiff's claims for national origin discrimination in violation of Section 703(a)(1) of Title VII, race discrimination in violation of Title VII and Section 1981, and sex discrimination in violation of Title VII, the undersigned agrees with the defendants. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (noting, in the Title VII context, that "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's *adverse employment decision*. . . . Alternatively, a plaintiff may proceed under [the *McDonnell Douglas* ] pretext framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an *adverse employment action* is actually a pretext for discrimination.") (emphasis added) (internal citations and quotation marks omitted); *Thomas v. Am. Sec. Ins. Co.*, C/A

No. 4:21-2301-JD-KDW, 2022 WL 19402466, at *17 (D.S.C. Dec. 19, 2022) ("Importantly, under either [the mixed-motive/direct evidence or the *McDonnell Douglas*] framework, Plaintiff must show some adverse employment action to prevail on his discrimination claim.") (citations omitted), *R&R adopted by* 2023 WL 2674397 (D.S.C. Mar. 29, 2023); *see also Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 703 (4th Cir. 2023) (adverse employment action required for prima facie Section 1981 discrimination claim); *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015) (noting that plaintiffs bringing Section 1981 claims must proceed under either the same mixed motive or *McDonnell Douglas* framework as with Title VII claims).

For these claims, "[a]n adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citation and internal quotation marks omitted). The Supreme Court of the United States has recently held that a plaintiff does not have to show that the harm incurred was significant. *Muldrow*, 144 S.Ct. at 974-76. She must simply show "some harm respecting an identifiable term or condition of employment." *Id.*

The defendants argue that the plaintiff voluntarily resigned from employment, so she was therefore not subject to an adverse employment action (docs. 92; 100). While the law is clear that a voluntary resignation from employment is not an adverse employment action, *see Benjamin v. Sparks*, 986 F.3d 332, 352 (4th Cir. 2021), the plaintiff does not contend that this event is the basis of her claim. Rather, the plaintiff argues that she experienced adverse employment actions when (1) BMW decided to remove her from TX-60 and (2) BMW decided to transfer her to TX-64 (doc. 97 at 21). The plaintiff contends that these actions easily meet the standard for "some harm" to the terms and conditions of her employment (*id.* at 21-24; doc. 110 at 4-5). The defendants, however, argue that these decisions are not adverse employment actions because, at the time the plaintiff resigned,

she had neither been removed from TX-60 nor transferred to TX-64 (docs. 100 at 5-10; 111 at 2-4).

The undersigned agrees with the defendants. The plaintiff is essentially alleging that being notified of a planned, future reorganization is an adverse employment action. However, she has failed to point to any case law in support of this proposition. The cases that the plaintiff does rely on in support of her argument do not having any bearing on the issue here, as all of those cases deal with when the statute of limitations accrues and not what constitutes an adverse employment action (*see* doc. 97 at 19-20) (citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981); *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256-58 (1980); *Smith v. Univ. of Md. Baltimore*, 770 F. App'x 50, 50 (4th Cir. 2019); *Hospodor v. Burlington Indus., Inc.*, C/A No. No. 99-2017, 2000 WL 203933, at *1 (4th Cir. Feb. 23, 2000); *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982)).

A district court addressed a similar issue in *Ratcliff v. Spencer*, C/A No. 1:18-cv-757, 2019 WL 2375131 (E.D. Va. June 4, 2019). In that case, the plaintiff worked as a chief human capital officer ("CHCO") in Naval Intelligence. *Id.* at *1. The plaintiff applied for and received a joint duty assignment ("JDA"), whereby she was detailed to a position in another Intelligence Community element for the purpose of gaining a wider understanding of the missions and functions of the various components of the Intelligence Community. *Id.* at *1-2 A JDA is required before being considered for promotion to the senior intelligence executive corps. *Id.* at *1. The plaintiff learned that, upon the expiration of her JDA, she would not be permitted to return to her CHCO position. *Id.* at *2-3. A cyber workforce position was proposed for her. *Id*. Before her JDA expired, the plaintiff resigned from Naval Intelligence. *Id.* at *3. The plaintiff sued, alleging various discrimination claims. *Id.* at *1. The district court found that the plaintiff could not show that an adverse employment action had occurred because she resigned "before any action was taken." *Id.* at 4. Specifically, the district court stated that the plaintiff "speculates on the impact of

reassignment if she had not resigned, but she cannot cobble together an adverse employment action based on what might have been." *Id.*; *see also James*, 368 F.3d at 377 (although using the "significant detriment" test for an adverse employment action, which was subsequently overturned by *Muldrow*, the court noted that "[s]peculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute" and that it was "left to guesswork and conjecture").

Here, the plaintiff resigned before she was ever removed from TX-60 or transferred to TX-64, so the undersigned is similarly left to speculation about future potential harms. Moreover, the plaintiff resigned before Ms. McCraw was scheduled to be transferred from TX-4 to TX-6. The HR reorganization plan changed throughout the course of the latter part of 2021, and it may have changed again. While the Supreme Court lowered the standard for showing an adverse employment action in *Muldrow*, the plaintiff still is required to show "some harm." 144 S.Ct. at 974-76. At the time that the plaintiff resigned, she simply had yet to experience any harm to the terms and conditions of her employment (*see* doc. 110 at 4) ("Here, the announced transfer *would have* reduced [the plaintiff's] rank from FL III to FL IV. [The plaintiff] *would have* gone from a high-level strategy position to a non-departmental manager position that does not require any experience in HR") (emphasis added) (internal citations and quotation marks omitted). Based on the foregoing, the undersigned recommends that the district court grant the defendants' motions for summary judgment on these claims.[3]

[3] The plaintiff also makes clear that she is not bringing a claim for constructive discharge (doc. 97 at 24, 33) ("that is not the theory"). However, even if she had brought such claim, the undersigned would recommend that it be dismissed as well because no reasonable jury could find that her working conditions were sufficiently intolerable based on a future job transfer. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019) ("A claim for constructive discharge has two elements. First, a plaintiff must show that his working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign. Second, a plaintiff must actually resign because of those conditions.") (internal citations and quotation marks omitted).

Regarding the plaintiff's national origin discrimination claim in violation of Section 703(a)(2) of Title VII, the plaintiff argues that her claim should survive summary judgment because BMW MC only addresses her Section 703(a)(1) claim in its motion (doc. 97 at 17-18; *see also* doc. 20 ¶¶ 67-68). However, BMW MC moves for summary judgment on all of the plaintiff's claims and addresses her Section 703(a)(2) claim in its reply (docs. 92 at 1; 100 at 10-11), so the undersigned has considered BMW MC's arguments on the plaintiff's Section 703(a)(2) claim herein.

Section 703(a)(2) provides that it is unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court of Appeals for the Fourth Circuit has made clear that claims under both Section 703(a)(1) and Section 703(a)(2) require the existence of an adverse employment action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (noting, in the context of Title VII Section 703(a)(1) claims and Section 703(a)(2) claims, that "[r]egardless of the route a plaintiff follows in proving a Title VII action, . . . the existence of some adverse employment action is required"), *abrogated on other grounds by Muldrow v. City of St. Louis, Mo.*, 144 S.Ct. 967 (2024). Moreover, as discussed above, the plaintiff resigned before she was removed from TX-60 or transferred to TX-64. Accordingly, because the plaintiff's status as an employee had not yet been affected and she had not yet been denied any employment opportunities, the undersigned further recommends that the district court grant summary judgment on the plaintiff's Section 703(a)(2) claim. *Compare Conn. v. Teal*, 457 U.S. 440, 448 (1982) (finding that black employees presented a cognizable claim under Section 703(a)(2) when they failed their employer's examination, passage of the examination was required to attain permanent status as a supervisor, and the examination had not been

shown to be job related); *Nashville Gas Co. v. Satty*, 434 U.S. 136, 141 (1977) (finding that an employer's policy, which resulted in the plaintiff losing all of her seniority because she went on maternity leave, deprived the plaintiff of employment opportunities and adversely affected her status as an employee); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 444 (4th Cir. 1981) ("Armstrong demonstrated that she was a member of a protected class, that she was employed in a job expressly limited to the protected class[,] and that she was excluded from a higher paid classification whose duties she satisfactorily performed. The [defendant's] segregation of jobs by sex adversely affected her status as an employee and deprived her of the opportunity to reach the maximum salary payable to salesmen.").

## III. CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the district court grant the defendants' motions for summary judgment (docs. 92; 102).

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

June 21, 2024
Greenville, South Carolina

**The attention of the parties is directed to the important notice on the next page.**

***Notice of Right to File Objections to Report and Recommendation***

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
250 East North Street, Suite 2300
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Kelly Dawsey,<br><br>Plaintiff,<br><br>v.<br><br>Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC,<br><br>Defendants. | ) | Civil Action No. 7:22-cv-3738-TMC<br><br>**ORDER** |

Plaintiff Kelly Dawsey brought this action against Defendants Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), a German corporation headquartered in Munich, and BMW Manufacturing Co. LLC ("BMW MC"), a Delaware limited liability company which has a principal place of business in Greer, South Carolina. Plaintiff alleges Defendants unlawfully discriminated against her on the basis of national origin, race and sex in violation of Title VII, and race discrimination in violation of 42 U.S.C. § 1981. (ECF No. 20). In accordance with 28 U.S.C. § 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), this matter was referred automatically to a United States Magistrate Judge for all pretrial proceedings. On February 7, 2024, the Court adopted the recommendation of the magistrate judge (ECF No. 65) and denied BMW AG's Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 90). Shortly thereafter, BMW MC filed a Motion for Summary Judgment (ECF No. 92), and then BMW AG followed suit with a Motion for Summary Judgment of its own (ECF No. 102). These summary judgment motions remained with the magistrate judge for issuance of a Report and

Recommendation ("Report") to the Court. After these motions were fully briefed,[1] the magistrate judge afforded the parties an opportunity to address the effect, if any, of the Supreme Court's decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which was issued shortly after briefing on the instant motions closed. (ECF No. 108). Each of the parties submitted a brief addressing *Muldrow*. (ECF Nos. 110 (Plaintiff); 111 (BMW MC); and 112 (BMW AG)).

Now before the Court is the magistrate judge's Report recommending that the Court grant both motions for summary judgment. (ECF No. 113 at 17). Plaintiff submitted objections to the Report (ECF No. 115), to which both BMW MC (ECF No. 116) and BMW AG (ECF No. 117) replied. In light of the thorough briefing submitted by the parties, as well as the voluminous materials presented to the Court, the Court has determined that the issues before it have been adequately covered by the parties and, as a result, a hearing is unnecessary for the Court to render a decision on the Defendants' summary judgment motions.

**I. Background[2]**

BMW MC operates a vehicle assembly plant in Greer, South Carolina, where it produces a number of different BMW brand models. (ECF No. 42-2 at 2). BMW MC is part of the "BMW Group" – BMW AG's global vehicle production network. Defendants describe BMW AG as an "indirect" parent of BMW MC, (ECF Nos. 42-2 at 2; 103 at 3), with no direct control or

[1] *See* ECF Nos. 97 (Plaintiff's Response in Opposition to ECF No. 92); 100 (BMW MC's Reply to ECF No. 97); 104 (Plaintiff's Response in Opposition to ECF No. 102); and 106 (BMW AG's Reply to ECF No. 104).

[2] The magistrate judge thoroughly recounted the facts and evidence supporting them in the Report. (ECF No. 113 at 1–10). None of the parties objected to the magistrate judge's general recitation of the facts. Thus, the Court need not rehash the facts and evidence in detail here and merely provides a brief overview. To the extent that Plaintiff objects to the magistrate judge's handling of the facts in connection with a specific conclusion, the Court will address the objection, if necessary, when discussing that conclusion.

involvement in BMW MC's personnel decisions. This is a point of significant dispute, however, and Plaintiff has presented evidence she believes reflects direct involvement, including deposition testimony from BMW MC President Robert Engelhorn suggesting he reports directly to BMW AG. (ECF No. 104 at 2).

The BMW Group management hierarchy uses code designations to signify an employee's location and position. All production plants are designed with a "T" and BMW MC's Greer, South Carolina production plant is specifically designated with a "TX" code. Positions within the Human Resources ("HR") Department for BMW MC, in turn, are designated with a "TX-6" prefix. (ECF No. 92-2). The Vice President for HR who heads the department is designated simply as TX-6; reporting to the Vice President for HR are Department managers and Section Managers designated as TX-60, TX-61, TX-62, TX-64 and TX-65. (ECF No. 45-1).

Plaintiff, an American citizen, began working for BMW MC in 1995. By February 2015, Plaintiff had been promoted to the position of Department Manager in HR planning—a position designated as "TX-60." (ECF No. 20 at 8). In 2018, Plaintiff began reporting to Vice President Christina Petrasch ("Petrasch"), a German national who held the TX-6 position at BMW MC until March 2022. (ECF Nos. 97-1; 97-11 at 3). Plaintiff received excellent performance ratings from Petrasch and garnered consideration as a potential TX-6 HR Vice President.

On September 1, 2021, Robert Engelhorn ("Englehorn"), a German citizen, came from a position with BMW AG in Germany to become President of BMW MC. (ECF No. 92-4 at 8). Because Petrasch's employment contract was set to expire at the end of 2021, Englehorn wished to clarify who would fill the TX-6 position upon Petrasch's departure. *Id*. Engelhorn wanted a local rather than international employee to fill the TX-6 position (ECF No. 97-5) and selected Sherry McCraw ("McCraw"), an American engineer who had been serving as the Vice President

of Assembly at BMW MC (designated as "TX-4") at the time. (ECF No. 45-1). On September 15, 2021, Plaintiff received a telephone call from Petrasch who informed her that McCraw would be taking the TX-6 position and, significantly, that "there was a rule when TX-6 vice president of HR was a local, . . . there needed to be a German [next in] line." (ECF No. 92-2 at 21). That is, if McCraw, an American, was placed in the TX-6 position, such a rule would require a German to have the next position in the department hierarchy, potentially affecting Plaintiff's employment as the current TX-60. And, in fact, Plaintiff offered Defendants' "Expat Guidelines for Plant Spartanburg" ("Expat Guidelines") which reduced to writing their preference for "an alternating reporting structure of international and domestic below the Senior Management level." (ECF No. 97-23 at 4). The Expat Guidelines also contains an organizational chart, color-coded by domestic or international status, explaining that the "T[X]-60 department has a need for an international inbound (Planner or Dept Mgr ideally from [BMW AG] - tie to network) and should follow the status of T[X]-6" and specifically stating that if TS-6 is filled by an international employee, the TS-60 will be filled by a domestic employee, and vice-versa. *Id*. at 6.

On November 11, 2021, Englehorn, Petrasch and McCraw met with Plaintiff and other HR management personnel to announce the coming changes in the HR Department. (ECF No. 92-2 at 28). These changes followed the alternating reporting structure with McCraw taking over as T-6, and Eva Burgmeier ("Burgmeier"), a German HR Department manager for BMW AG with whom Englehorn was familiar, sliding into the TX-60 position that Plaintiff held. Plaintiff was further informed that as part of the restructuring she would be moved to the TX-64 position. *Id*. at 31. The evidence, construed in a light most favorable to Plaintiff as the non-moving party, reflected that a transfer from TX-60 to TX-64 qualified as a demotion. (ECF No. 97-1 at 2). According to Plaintiff, the TX-64 slot was classified as a Function Level (FL) IV position while the TX-60

position was an FL III job. *Id*.; (ECF No. 92-2 at 36). The salary range for FL III jobs at BMW MC is generally higher than for FL IV jobs, and bonuses and benefits are better. (ECF Nos. 97-1 at 6; 97-18). Additionally, Plaintiff testified that being demoted to an FL IV position would have ended her ability to advance to the TX-6 Department Manager job, an FL II position for which she once was a candidate; in nearly three decades at BMW MC, Plaintiff has never seen an employee receive a demotion from FL III to FL IV and then subsequently rise back to the FL II level.

As noted, HR managers were notified on November 11, 2021 of the intended hierarchical changes, and Plaintiff testified she was actually informed earlier by Petrasch on September 15, 2021, that McCraw was replacing Petrasch in the TX-6 position and Burgmeier would be taking Plaintiff's TX-60 Department Manager role. (ECF No. 97-4 at 35). Even before Plaintiff learned about the coming changes in the HR Department at BMW MC, however, she apparently began considering other employment. On September 10, 2021, Plaintiff had an initial virtual meeting with Sherrill Miller, an employment recruiter, and then retained Ms. Miller and executed a recruiting services contract on September 16, 2021, (ECF No. 92-2 at 42–43), the day after her conversation with Petrasch. Over the next three months, Miller reached out to numerous companies regarding HR positions. *Id*. at 43–54. On December 10, 2021, Plaintiff accepted a job offer from Madewell Concrete to become their Director of HR. *Id*. at 54.

On December 13, 2021, Plaintiff met with her HR team at BMW MC and explained she would be getting replaced by a German national at TX-60 and would be moved to the TX-64 position. *Id*. at 33–34. Plaintiff then participated in a meeting held by Petrasch for the entire BMW MC HR Department in which the managerial changes were announced. *Id*. at 32–33, 54–55. At that time, Plaintiff did not inform her team or her superiors that she had accepted another HR job with Madewell Concrete. *Id*. at 32–33, 54–55. Rather, on January 3, 2022, Plaintiff called

Petrasch and told her that she was resigning from BMW MC, *id*. at 57, and then provided written notification that her final day of employment at BMW MC would be January 14, 2022, *id*. at 129.

Plaintiff brought this action against Defendants on October 28, 2022. (ECF No. 1). In the amended complaint, Plaintiff asserts claims for national origin discrimination in violation of Section 703(a)(1) and Section 703(a)(2) of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), race discrimination in violation of Title VII, race discrimination in violation of 42 U.S.C. 1981 ("Section 1981"), and sex discrimination in violation of Title VII. (ECF No. 20). After the Court denied BMW AG's motion to dismiss, (ECF No. 90), both BMW MC and BMW AG filed motions for summary judgment. (ECF Nos. 92, 102). As noted previously, these motions have been fully briefed, including supplemental briefs from the parties on the effect, if any, of *Muldrow* on this case.

**II. Report**

Both BMW MC (ECF No. 92 at 14–30) and BMW AG (ECF No. 102 at 1–2) argue that summary judgment is required on all of Plaintiff's claims because she is unable to show that she suffered an adverse employment action. In addressing this argument, the magistrate judge explained, in pertinent part, as follows:

> . . . "[An] adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Wash. Homes, Inc*., 487 F.3d 208, 219 (4th Cir. 2007) (citation and internal quotation marks omitted). The Supreme Court of the United States has recently held that a plaintiff does not have to show that the harm incurred was significant. *Muldrow*, 144 S. Ct. at 974-76. She must simply show "some harm respecting an identifiable term or condition of employment." *Id*.
>
> The defendants argue that the plaintiff voluntarily resigned from employment, so she was therefore not subject to an adverse employment action (docs. 92; 100). While the law is clear that a voluntary resignation from employment is not an adverse employment action, *see Benjamin v. Sparks*, 986 F.3d 332, 352 (4th Cir. 2021), the plaintiff does not contend that this event is the basis of her claim. Rather, the plaintiff argues that she experienced adverse employment actions when (1) BMW decided to remove her from TX- 60 and (2) BMW decided

> to transfer her to TX-64 (doc. 97 at 21). The plaintiff contends that these actions easily meet the standard for "some harm" to the terms and conditions of her employment (*id.* at 21-24; doc. 110 at 4-5). The defendants, however, argue that these decisions are not adverse employment actions because, at the time the plaintiff resigned, she had neither been removed from TX-60 nor transferred to TX-64 (docs. 100 at 5-10; 111 at 2-4).
>
> The undersigned agrees with the defendants. The plaintiff is essentially alleging that being notified of a planned, future reorganization is an adverse employment action. However, she has failed to point to any case law in support of this proposition. The cases that the plaintiff does rely on in support of her argument do not hav[e] any bearing on the issue here, as all of those cases deal with when the statute of limitations accrues and not what constitutes an adverse employment action [citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981); *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256-58 (1980) as cases relied upon by Plaintiff].
>
> . . .
>
> Here, the plaintiff resigned before she was ever removed from TX-60 or transferred to TX-64, so the undersigned is similarly left to speculat[e] about future potential harms. Moreover, the plaintiff resigned before Ms. McCraw was scheduled to be transferred from TX-4 to TX-6. The HR reorganization plan changed throughout the course of the latter part of 2021, and it may have changed again. While the Supreme Court lowered the standard for showing an adverse employment action in *Muldrow*, the plaintiff still is required to show "some harm." 144 S. Ct. at 974-76. At the time that the plaintiff resigned, she simply had yet to experience any harm to the terms and conditions of her employment (see doc. 110 at 4) ("Here, the announced transfer would have reduced [the plaintiff's] rank from FL III to FL IV. [The plaintiff] would have gone from a high-level strategy position to a non-departmental manager position that does not require any experience in HR") (emphasis added) (internal citations and quotation marks omitted). Based on the foregoing, the undersigned recommends that the district court grant the defendants' motions for summary judgment on these claims.

(ECF No. 113 at 13–15).

Additionally, the magistrate judge rejected Plaintiff's argument that BMW MC's summary judgment motion only addressed her national origin discrimination claim under Section 703(a)(1) of Title VII and did not cover her claim under Section 703(a)(2) claim. *Id*. at 16. With respect to this claim, the magistrate judge explained as follows:

> Section 703(a)(2) provides that it is unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's

> race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court of Appeals for the Fourth Circuit has made clear that claims under both Section 703(a)(1) and Section 703(a)(2) require the existence of an adverse employment action. *See James v. Booz-Allen & Hamilton, Inc*., 368 F.3d 371, 375 (4th Cir. 2004) (noting, in the context of Title VII Section 703(a)(1) claims and Section 703(a)(2) claims, that "[r]egardless of the route a plaintiff follows in proving a Title VII action, . . . the existence of some adverse employment action is required"), *abrogated on other grounds by Muldrow v. City of St. Louis, Mo*., 144 S. Ct. 967 (2024). Moreover, as discussed above, the plaintiff resigned before she was removed from TX-60 or transferred to TX-64. Accordingly, because the plaintiff's status as an employee had not yet been affected and she had not yet been denied any employment opportunities, the undersigned further recommends that the district court grant summary judgment on the plaintiff's Section 703(a)(2) claim.

(ECF No. 113 at 16).

The magistrate judge, therefore, recommended that the Court grant Defendants' motion for summary judgment as to all of Plaintiff's claims. *Id*. at 17.

## III. Standard of Review

### Report of the Magistrate Judge

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). Thus, "[t]o trigger de novo review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah*, 66 F.4th at 460 (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F.

Supp. 3d 654, 662 (D.S.C. 2017); *see also Elijah*, 66 F.4th at 460 (noting that "[i]f a litigant objects only generally, the district court reviews the magistrate's recommendation for clear error only"). Furthermore, "'the court is not obligated to consider new arguments raised by a party for the first time in objections to the magistrate's Report.'" *Floyd v. City of Spartanburg S.C.*, Civ. A. No. 7:20-cv-1305-TMC, 2022 WL 796819, at *9 (D.S.C. Mar. 16, 2022) (quoting *Elliott v. Oldcastle Lawn & Garden, Inc.*, No. 2:16-cv-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar. 31, 2017); *see also Elijah*, 66 F.4th at 460 n. 3 (noting "district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation").

BMW MC suggests the Court apply a clear error standard of review to Plaintiff's objections to the Report in this case, arguing that the objections, in large part, are mere "recitations of the same arguments she made in opposition to BMW MC's Motion for Summary Judgment" and that, "to the extent that Plaintiff's Objections are simply a repackaged version of the same arguments" already considered by the magistrate judge, "she is not entitled to a de novo review of such objections." (ECF No. 116 at 3–4). Put in such absolute terms, this is incorrect. *Elijah* recently made clear that a district court cannot eschew de novo review *solely* because the objecting party has "repeated his previous arguments" and the magistrate judge has already addressed these arguments. *Elijah*, 66 F.4th at 460–63 (explaining that "objections need not be novel to be sufficiently specific" and remanding for de novo review where "[t]he district court concluded that because Elijah repeated his previous arguments, he did not object with sufficient specificity to warrant de novo review"). Plaintiff in this case has clearly objected to the conclusions set forth in the Report with sufficient specificity to warrant de novo review, which the Court is now obliged to apply.

**Rule 56**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Phillips v. Nlyte Software Am. Ltd.*, 615 Fed. App'x 151, 152 (4th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"'In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party.'" *Sellers v. Keller Unlimited LLC*, 388 F. Supp. 3d 646, 649 (D.S.C. 2019) (quoting *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996)). However, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *McKinney v. G4S Gov't Sols., Inc.*, 711 Fed. App'x 130, 134 (4th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of proving that summary judgment is appropriate. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Lane & Roderick, Inc.*, 736 Fed. App'x 400, 400 (4th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322–23). Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth

specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc*., 790 F.3d 532, 540 (4th Cir. 2015).

## IV. Discussion

Adverse Employment Action

Plaintiff objects on several grounds to the magistrate judge's conclusion that she cannot establish an adverse employment action because she resigned before the reorganization was implemented by BMW MC. Plaintiff contends (ECF No. 115 at 3) that the magistrate judge's analysis went awry as an initial matter based on the conclusion that *Ricks*, 449 U.S. 250, and *Chardon*, 454 U.S. 6, do not apply because *Ricks* and *Chardon* "deal with when the statute of limitations accrues and not what constitutes an adverse employment action." (ECF No. 113 at 14). Plaintiff, however, points out that the Report did not question whether removal from one's job or a demotion meets the "some harm" standard for establishing an adverse action under *Muldrow* but instead focused on *when* the proposed demotion occurred. Indeed, the magistrate judge agreed with Defendants that there was no adverse employment action because "*at the time the plaintiff resigned*, she had neither been removed from TX-60 nor transferred to TX-64." (ECF No. 113 at 13–14 (emphasis added)). Therefore, Plaintiff argues, cases addressing when a claim accrues are generally relevant here. The Court agrees.

Citing to *Ricks*, Plaintiff contends that "(1) an adverse action happens when a claim accrues; (2) a claim accrues and the statute of limitation commences at the same time; and (3) both happen when the employer announces the decision." (ECF No. 115 at 3–4). *See Ricks*, 449 U.S. at 258 (concluding that discrimination claim under Title VII and § 1981 arose for purposes of the limitations period when decision to deny tenure was communicated to plaintiff professor); *Chardon*, 454 U.S. at 8 ("In *Ricks*, we held that the proper focus is on the time of the discriminatory

act, not the point at which the consequences of the act become painful."). Thus, notification of the discriminatory action is key—"the mere notice of termination is a cognizable adverse employment action *regardless of whether the employer follows through*." *Singletary v. Howard Univ*., 939 F.3d 287, 300 (D.C. Cir. 2019) (emphasis added) (discussing *Ricks* in the FCA context). Under *Ricks* and *Chardon*, "a discrimination claim accrues upon notice of termination, rather than upon the implementation of that decision, necessarily imply[ing] that the notification of termination qualifies as an adverse employment action." *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 305 (2d Cir. 2017) (explaining that a Title VII claim "is actionable on the date 'when the employer notifies the employee he is fired, not on the last day of his employment'" (quoting *Green v. Brennan*, 578 U.S. 547, 564(2016)). *See also Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011) ("As applied to the employment discrimination context, . . . a claim accrues when the disputed employment practice—the demotion, transfer, firing, refusal to hire, or the like—is first announced to the plaintiff.").

A few months ago, the Court of Appeals for the District of Columbia Circuit addressed adverse employment action issue in similar circumstances in *Van Horn v. Del Toro*, No. 23-5169, 2024 U.S. App. LEXIS 15154, at *1 (D.C. Cir. June 21, 2024). Because *Van Horn* was issued the same day that the magistrate judge issued the Report in this case, the magistrate judge was unable to consider it; however, the Court finds *Van Horn* instructive. In considering an employment discrimination claim by a Plaintiff who retired rather than accept an unwanted transfer required by her employer, the court explained as follows:

> *[It does not] matter to the adverse-action analysis that the [unwanted] transfers were never effectuated*. As *Singletary v. Howard University*, 939 F.3d 287, 300 (D.C. Cir. 2019), recognized, an adverse employment action becomes cognizable *when the employer provides notice of the action to the employee*, "regardless of whether the employer follows through." *See also Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) ("The proper focus is upon the time of the

> discriminatory acts, not upon the time at which the consequences of the acts became most painful." (cleaned up)); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011) (Gorsuch, J.) ("[A] claim accrues when the disputed employment practice—the demotion, transfer, firing, refusal to hire, or the like—is first announced to the plaintiff."). Accordingly, *the [unwanted] Naples and Great Lakes transfers were adverse employment actions on announcement, no matter that Plaintiff] never went to Naples and retired rather than relocate to Great Lakes.*

*Id*. at *3. Similarly, in this case, the fact Plaintiff resigned before her transfer to a less desirable position with a lower salary range and less prospects for advancement took effect does not mean that Plaintiff cannot show an adverse employment action because the transfer was announced *before* she left Defendants' employment. The Court agrees with Plaintiff that limiting *Ricks* and its progeny to the statute of limitations context (ECF No. 113 at 14) would be problematic as the limitations period would begin to run upon announcement, but Plaintiff would not be able to bring a claim until the employer followed through on the adverse action, effectively shortening the time for bringing an action. Accordingly, the Court agrees that Plaintiff has offered sufficient evidence to permit a finder of fact to conclude that the adverse employment action occurred when BMW MC announced Plaintiff would be demoted.

Plaintiff also objects to the magistrate judge's conclusion that Plaintiff's evidence of an adverse employment action was speculative because the "HR reorganization plan changed throughout the course of the latter part of 2021, and it may have changed again." (ECF No. 113 at 15). Plaintiff contends that "[e]ven if BMW had some evidence that things were up in the air, the Magistrate Judge erred by construing facts in the light most favorable to BMW." (ECF No. 115 at 9). In suggesting that a dispute of material facts exists, Plaintiff noted that,

> [b]y the fall of 2021, the reorganization plan was not preliminary or speculative. Burgmeier was coming from Germany. Nobody claimed otherwise. Once BMW decided that, Dawsey had to leave TX-60. BMW's policy left no other choice. Burgmeier had to go into TX-60 because the policy required that a German be in that position since an American would be in TX-6. [ECF 97 at 3-5]. Because Burgmeier was the only German at that level in HR, Dawsey could not have remained in TX-60. [*Id*.]

*Id*. The Court is constrained to agree that, viewed in a light most favorable to Plaintiff, there was nothing speculative above the fact that Plaintiff would be removed from her TX-60 position and demoted. The evidence presented here is unlike the speculative evidence presented in *Ratcliff v. Spencer*, No. 1:18-cv-757, 2019 WL 2375131 (E.D. Va. June 4, 2019), a constructive discharge case relied upon by Defendants and cited in the Report. In *Ratcliff*, the district court granted summary judgment against a plaintiff who resigned rather than accept an assignment to a position that had not yet been created but which plaintiff insisted would not be equivalent as required by a memorandum of understanding. In particular, the district court noted the plaintiff "speculates on the impact of reassignment if she had not resigned, but she cannot cobble together an adverse employment action based on what might have been." *Id*. at *4. But, as Plaintiff points out, the position in *Ratcliff* "was merely a concept" and the plaintiff in that case resigned before the parameters of the position had been fully fleshed out—therefore, the district court was unable to determine without speculating whether an adverse action had occurred. By contrast, there is sufficient evidence to show that the TX-64 was an established position with an assigned FL and compensation range. No speculation is required to determine that a transfer from TX-60 to TX-64 would be a demotion.

The Court respectfully declines to adopt the Report and, therefore, **DENIES** BMW MC's Motion for Summary Judgment (ECF No. 92). The Court likewise **DENIES** BMW AG's Motion for Summary Judgment (ECF No. 102) to the extent it is based on Plaintiff's failure to establish an adverse employment action; however, BMW AG pursues summary judgment on three additional grounds not addressed by the Report. *See* (ECF No. 117 at 2). The Court now addresses these arguments.

<u>BMW AG's Additional Grounds</u>

1. *FCN Treaty.* BMW AG argues it is shielded from liability by the Treaty of Friendship, Commerce and Navigation between the United States and the Federal Republic of Germany ("FCN Treaty"), 7 U.S.T. 1839 (1956). (ECF No. 103 at 26–27). The FCN Treaty between the United States and Germany was one of approximately two dozen similar post-World War Two treaties intended "to encourage and facilitate private international investment." Silver, Gerald D., *Friendship, Commerce and Navigation Treaties and United States Discrimination Law: The Right of Branches of Foreign Companies to Hire Executives "Of Their Choice*," 57 Fordham L. Rev. 765, 784 (1989). These FCN treaties generally include a provision specially allowing companies of signatory countries to hire executive personnel "of their choice." Article VIII of the FCN Treaty provides, in pertinent part, as follows:

> Nationals and *companies of either Party shall be permitted to engage*, within the territories of the other Party, accountants and other *technical experts, executive personnel, attorneys, agents and other specialists of their choice*. Moreover, such nationals and companies shall be permitted to engage accountants and other technical experts regardless of the extent to which they may have qualified for the practice of these professions within the territories of such other Party, for the particular purpose of making for internal purposes examinations, audits and technical investigations for, and rendering reports to, such nationals and companies in connection with the planning and operation of their enterprises, and enterprises in which they have a financial interest, within such territories.

*Id*. (emphasis added). BMW AG contends that even if it is found to have direct control over personnel decisions at the BMW plant in Spartanburg, it is nonetheless immune from liability for national origin discrimination claims pursuant to the foregoing provision. (ECF No. 103 at 26–27). The plain language of Article VIII "entitles companies of either nation to hire *executive personnel* of their choice in the other nation, which at the very least entitles them to discriminate in favor of their own citizens even if the other nation prohibits such discrimination." *Wallace v. SMC Pneumatics, Inc*., 103 F.3d 1394, 1401 (7th Cir. 1997) (emphasis added). However, the FCN Treaty employer choice provision does not give companies formed under the laws of a signatory

country the right to favor their own citizens for *non-executive* positions. *See* Hamabe, Yoichiro, *The JFCN Treaty Preemption of U.S. Anti-Discrimination Laws in Executive Positions: Analysis in International Contexts*, 27 Law & Pol'y Int'l Bus. 67, 80 (1995); Silver, 57 Fordham L. Rev. at 766 n.2.

The Court agrees with Plaintiff that the TX-60 position in this case is not an executive-level position. Viewed in a light most favorable to Plaintiff, the evidence reflects that the executive level positions at BMW MC include the President and the Vice President level positions such as TX-6 (Vice President of Human Resources). Accordingly, Article VIII of the FCN Treaty does not permit Defendants to favor employees of German national origin for the TX-60 position.

2. *Personal Jurisdiction.* BMW AG also renews its argument that it is not subject to personal jurisdiction in this Court. On February 6, 2024, the Court denied BMW AG's Motion to Dismiss pursuant to Rule 12(b)(2), noting that BMW AG could "re-assert its challenge to personal jurisdiction at the summary judgment stage should discovery establish as a matter of law that the Court does not enjoy personal jurisdiction." (ECF No. 90 at 13). On March 8, 2024, BMW AG re-asserted this argument as a basis for summary judgment. (ECF Nos. 102, 103).

The evidence, viewed in a light most favorable to Plaintiff, fails to establish as a matter of law that the Court cannot exercise personal jurisdiction. The Court has carefully considered all of the evidence submitted by the parties and concludes that a substantial question of fact exists as to whether BMW AG was directly involved, participated in or controlled the decision to remove Plaintiff from her TX-60 position and place her in the TX-64 position—a move that can be viewed as a demotion. Plaintiff, who was employed in the HR Department from 2015 until she departed BMW in mid-January 2022, indicated that German nationals from BMW AG on assignment to BMW MC – like Petrasch – were "still BMW AG employees under contract with BMW AG to

work at BMW MC for a specific term" and "continue[d] to receive partial compensation from BMW AG." (ECF No. 104-9 at 1). Petrasch indicated that BMW MC could not create a new position without BMW AG's approval. *Id*. at 3. And, as noted previously, Petrasch explained to Plaintiff that McCraw would be taking the TX-6 position and that "there was a rule when TX-6 vice president of HR was a local, . . . there needed to be a German [next in] line." (ECF No. 92-2 at 21). Petrasch also testified that "BMW AG collected candidates for this [TX-60] position." (ECF Nos. 97-11 at 23; 104-8 at 54–55). "Expat Guidelines" likewise made clear that the BMW Group used "an alternating reporting structure of international and domestic below the Senior Management level" and even noted that "an international inbound (Planner or *Dept. Mgr ideally from AG* . . . should follow the status of [TX-6]." (ECF No. 97-23 at 4, 6 (emphasis added)). Based on the evidence in the record, including but not limited to that summarized above, the Court rejects BMW AG's personal jurisdiction argument on the same basis that it previously denied BMW AG's motion to dismiss in its order at ECF No. 90.

3. *Integrated Employer*. Finally, BMW AG contends it was never Plaintiff's employer and that it is not subject to liability in this case under the "integrated employer" test. (ECF No. 103 at 23–26). *See Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 664 (D.S.C. 2017) (noting in a section 1981 action that "there are a variety of tests by which a defendant who does not directly employ the plaintiff may still be the plaintiff's 'employer'" including the "integrated employer test"); *Bruce v. Ladies Choice Fitness Ctr. Columbia, Inc.*, No. 3:12-cv-2678-JFA, 2013 WL 3320785, at *4 (D.S.C. July 1, 2013) (applying integrated employer test in Title VII context). The "integrated employer" test requires consideration of four factors: "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442

(4th Cir. 1999), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006); *see Bittle-Lindsey v. Seegars Fence Co., Inc.*, No. 21-1044, 2022 WL 1566770, at *3 (4th Cir. May 18, 2022) (continuing to apply the *Hukill* factors). "[W]hether or not separate entities can be considered a single integrated employer is a question of fact." *Carter v. Ascend Performance Material Holdings, Inc.*, No. 8:20-cv-4379-TMC, 2022 WL 4463021, at *1 (D.S.C. Sept. 26, 2022).

There is sufficient record evidence to create a genuine issue regarding BMW AG's involvement in factual matters material to the case, including evidence suggesting: (1) Expat BMW executives and managers work at BMW MC but remain employed and compensated at least in part by BMW AG; (2) BMW AG must approve the creation of new HR positions; (3) BMW AG gathered candidates for the TX-60 position at the Spartanburg plant; (4) the alternating reporting structure is dictated by BMW AG; and (5) funding for any position at BMW MC requires approval or consultation with BMW AG. The Court concludes there is enough evidence to permit Plaintiff to clear the summary judgment hurdle on this issue as well.

**V. Conclusion**

Having carefully considered the thorough Report of the magistrate judge in light of the record and the submissions of the parties, the court, for the reasons stated herein, respectfully declines to adopt the Report (ECF No. 113) and rejects BMW AG's additional summary judgment arguments not addressed by the Report. Accordingly, the Court **DENIES** both BMW MC's Motion for Summary Judgment (ECF No. 92) and BMW AG's Motion for Summary Judgment. (ECF No. 102).

**IT IS SO ORDERED**.

s/Timothy M. Cain
Chief United States District Judge

September 26, 2024
Anderson, South Carolina

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KELLY DAWSEY, PLAINTIFF, | ) | CA. NO. 7:22-CV-3738 |
| | ) | GREENVILLE, SC |
| VERSUS | ) | FEBRUARY 12, 2026 |
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP, | ) | |
| BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP | ) | |
| DEFENDANTS. | ) | |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
MOTION HEARING
TELEPHONIC HEARING

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT: KURT ROZELSKY, ESQ.
SPENCER FANE LLP
P O BOX 294
GREENVILLE, SC 29602

APPEARANCES CONTINUED

BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

(Whereupon, the hearing commenced at 1:36 p.m.)

THE COURT: All right. Let's go on the record. This is the matter of Dawsey v BMW collectively, the BMW Group, case 7:22-3738. This is an on-the-record hearing being held telephonically to address some pretrial matters. This matter is scheduled to commence or trial is scheduled to commence Tuesday of next week. This is Tim Cain, the trial Judge, and Ms. Bull is our court reporter, Ms. McAllister is our deputy clerk.

I want to begin by thanking you all for being available to participate today. I felt if we could handle some of these matters today, it would put us in a better position to proceed more efficiently on jury selection day when the trial is also scheduled to commence. So, if we could just get all of the attorneys, if you would just state your name one at a time for the record beginning with Plaintiff's counsel, Mr. Murphy, and tell me who you represent.

MR. MURPHY: Brian Murphy for the Plaintiff.

MR. ROZELSKY: Kurt Rozelsky for BMW AG.

MR. MOODY: Randy Moody for BMC MC.

MR.MCCOY: Ellis McCoy for BMW.

MR. GANTT: Mallory Gantt for BMW.

THE COURT: Repeat that, I talked over you by mistake.

MR. GANTT: No problem, Your Honor, Mallory Gantt.

THE COURT: I wanted to talk about voir dire and address your joint request for voir dire as well as the request to strike. And I wanted to do that on the record and then I would like to go off the record and talk about some logistical matters, but I felt this way you would be protected in the record in terms of my rulings on your voir dire questions and strikes. If you speak, as Ms. McAllister indicated, this can be somewhat cumbersome and it can be a challenge for the court reporter, so we will just ask if we allow a little bit of time between speakers to make sure the one who is speaking is finished. And cumbersome as it is, if you could just identify yourself for the record when you are speaking so that it is clear for the court reporter.

So, you submitted revised joint request for voir dire and I will ask all of those questions during the process.

Item two listed a number of potential witnesses. Some of these witnesses may not be testifying during the jury portion, but might testify during the bench trial, but I just decided to leave all of those in, all the names in 2-A through M, but if anyone has a strong opinion about that, I am happy to take that up. So,

all of those will be included in the questions for the potential jurors.

The Plaintiff has requested a supplemental question, have you or anyone in your immediate family ever worked for management at BMW? We will curve that, I will ask if any of the potential jurors or members of their immediate family have ever worked for BMW in a managerial capacity or had some type of connection with BMW, just as I will ask them, or any connection with Ms. Dawsey.

The Defendant also provided some supplemental voir dire requests and I will go through those now: So, question one was, do you have any negative feelings towards Germans? So what I will do is include a question to the effect that, do you have any negative feelings towards Germans or German companies operating in the United States?

Question two was, do you feel that you cannot be fair to a foreign company that establishes operation in the United States? I think that will be covered, but it is also covered in question number 37 of the juror questionnaire. And I will be asking the jurors, probably in redundant fashion, if they can be fair and if they know of any reason why they can't be fair. So, I think that will be covered.

Number three is the question, do you know anybody who worked or who previously worked at BMW Manufacturing. And I have decided not to ask that question because -- at least that way, because we are asking potential jurors if they or any immediate family member has worked for or has any type of relationship with BMW. And we are also asking in the questionnaires, and I will ask again redundantly whether or not they can be fair. But I think this is just too broad to ask if they know somebody who now works or previously worked at BMW. But, again, the focus of these questionnaires and the questions I will be asking of these jurors is, can you be fair to both sides?

Number four, the question was, have you or do you know anyone who has ever had any dispute or difficulty or any kind with BMW or with their employees? So, again, I feel this is too broad. Again, I feel that we are asking about fairness in the questionnaires and I will be asking the jurors about if they know of any reason why they can't be fair to either side. So, it is not a products liability case, it is an employment case, I just felt that was too broad.

Number five, have you or any of your relatives or friends been subjected to what you or they believe unfair action on the part of an employer? I feel this

is too broad. Again, the questionnaires and the Court's questions will ask the potential jurors about their ability to be fair, impartial, and give both sides auto fair trial. I just feel that is way too broad. When I think about some of the jobs I have had in my past and some of the tasks that I have been asked to perform in those jobs, I didn't always think it was fair, didn't always want to do those jobs, but it wouldn't have affected my ability to give somebody a fair shake.

Number six, the question is this case involves allegations based on national origin, race, and sex. Do any of those topics raise strong feelings for you that might affect your judgment? Again, this is going to be covered when I conduct the examination of the potential jurors. I will ask them detailed questions about their ability to be fair to both sides, it is also covered in the questionnaire. So, I would not be inclined to ask that question.

Question number 7, have you or any member of your family ever made a complaint about discrimination by an employer? If so, please describe the situation. I will ask that question. It will be included in questions asked.

Number 8 is, have you or any member of your

family sued an employer over a job related situation? I think that is a fair question to ask. And I think it is the same question that was included as question number five of the revised joint request for voir dire. So we will cover that.

Question nine was. Would you distrust the testimony of a company employee regarding the facts of this case merely because that employee is employed with the company? I am not going to ask that question because I think it could be somewhat confusing. I think it is covered in the Court's questionnaire. I think it will be covered sufficiently during the voir dire process. And, you know, an employee status might be a factor that a juror would want to consider when assessing the credibility of that employee's testimony, I just think that has potential for causing some confusion. And I think the ability to be fair will be sufficiently covered.

Number ten, the question is. If you found no discrimination occurred, would you be comfortable returning a verdict for the employer even if you sympathize with the employee? And I believe this will be sufficiently covered when I ask the jurors if they can be fair. The questionnaires also ask if the jurors can put aside any personal feelings and follow the law.

I will also be asking them if they can do that, so I believe it will be sufficiently covered.

Number 11, the question is, would anyone have difficulty judging the credibility of witnesses who are supervisors, managers, or HR professionals? So again, I think this will be covered by the questions asked during the process. I think it is covered in the questionnaires, as well. And I would not be inclined to ask number 11.

Number 12 and 13, 12 is, can everyone agree that your verdict must be based solely on the evidence and not personal experiences, social movements, or news stories? And 13 is whether you will be able to follow the Judge's instructions on the law, even if you personally disagree with them. And those will be covered as a part of the voir dire questions I will be asking.

So, I appreciate your submitting these questions, there were some good questions in there and those are my inclinations as it goes to the questions you submitted. S are.

MR. ROZELSKY: This is Kurt Rozelsky. I have a question about number five that you said you were not going to do, it was too broad, it would be otherwise covered on fairness. Is your concern that we have any

of your relatives or friends or is the concern about the unfair action part of the employer? Because we could limit it to say any unfair action on part of the employer that impacts your ability to be fair.

THE COURT: Well, I think it is too broad and I think it could just lead us down a path where we could still be doing jury selection when we should be on our second witness.

MR. ROZELSKY: Understood.

THE COURT: I think the ability of the jurors to be fair regardless of any experience they have had with a different employer during the course of their working life or an experience of a friend or relative, I think we will cover that. Okay?

MR. ROZELSKY: Thank you. Yes, sir.

THE COURT: Thank you. Any other questions or comments?

THE COURT: Let's move on to the strikes. And just as an initial matter, Plaintiff -- my intent at this point is to have ten jurors, we will be going straight into trial, having ten instead of 12, will give those folks a little more room back in the jury area. I hope we don't lose any jurors, but we could lose up to four. So, this has worked well in the past and hopefully it will for this trial. The Plaintiff

will get three strikes and the Defendants collectively will get three strikes pursuant to 28 USC 1870. And I would just ask that y'all decide who will be the spokesman or spokeswoman for the defense.

On the strikes for cause, you submitted joint strikes for cause and I am fine with striking those jurors that you have agreed on.

The Defendants also had some additional strikes for cause and I will go through those now and, again, we are doing this to hopefully expedite things on Tuesday and also at the same time protect you on the record.

So, juror number 19, the basis is that the juror states he cannot set aside personal feelings and apply the law as stated by the Judge. The Plaintiff objects saying this is grounds to inquire into the context of this case, but not grounds for disqualification. Let me just pull that questionnaire: Question number 45 on the questionnaire, regardless of any opinion you may have concerning a particular law, would you be able to set aside your feelings and follow the law as stated by the Judge? And the juror answered, no.

And so in my view, that question and answer goes to the core of what we want a juror to do. Given the

fact that we have many jurors who have answered yes to that question, I would be inclined to strike this juror based on that answer.

Next is juror number 42, the Defendant's move to strike because the juror states that it would be difficult for him to serve because of his job requirements. And the Plaintiff states this may be grounds for excusal if the juror identifies being unable to serve, but it is not grounds to disqualify. So, turning to that questionnaire, number 47, the question is, is there any additional information about you that the Court should know? And the answer was, I am the only person on my post of my job, which runs daily, making it difficult for me to miss time. This juror works for Michelin. I will not strike the juror at this time, but if he is in the pool of jurors selected to appear for jury selection, he can speak up and we can address his concern at that time and make a decision. We will leave him in at the time being.

Juror number 48 answered to question 26, question 26 states: Have you or anyone in your family ever been involved in a lawsuit, including a suit involving a worker's compensation claim? The answer was yes. The potential juror indicated that she was the plaintiff in the case and asked what type of case it

was, the answer was employment.

And so Plaintiff did not want to strike that juror, I think that juror needs to be stricken given the fact that this case is an employment case and she is currently a plaintiff in an employment case, so we would not include juror number 48 in the pool. I just would not want to run the risk that that juror would have strong feelings about this case and we would not want any of that to seep into the jury process.

Juror number 49, the defense says juror states that he cannot be fair and impartial in judging the believability of government witnesses. Plaintiff says Government is not involved in this case and does not want the juror to be stricken. So, for the record, question 44 states: Jurors are often required to decide which witnesses to believe and which not to believe. In deciding believability, jurors may consider how the witnesses presented themselves, certain factors, and the witness's background, and many other factors. However, you may not judge believability of a witness simply based on that person's occupation or position in life. Understanding these rules, would you be able to judge the believability of law enforcement officers and other government witnesses by the same standard as any other witnesses, and the juror answered no. So, I recognize

that the question addresses the ability to judge the testimony of law enforcement officers and government witnesses by the same standard as any other witness. That question also talks about that jurors are required to figure out which witnesses are credible and who are not. And I just think that question and the answer gives me pause about asking this juror to serve. The juror also indicated in several other questions that in certain situations the juror could not be fair, and so I might be able to get the juror in and ask some questions to try to, so to speak, rehabilitate to make sure you had a fair juror, but given the fact that we have a lot of jurors saying they can be fair, I am going to strike that juror. Again, that is juror 49.

So, juror number 77 in answer to question one or subpart of question one, how would you describe the condition of your health? If you have any physical or medical problems that would make jury duty difficult that require accommodations, please explain them. The juror said back pain and sciatica. Can't sit for very long at all without being in unbearable pain. And so the Plaintiff notes that this may be grounds for excusal, but is not grounds to disqualify. The juror described the situation that he would be in unbearable pain. And I think being in unbearable pain would

certainly affect a person's ability to concentrate and follow the testimony and evidence, and I don't know if the juror takes any pain medication. If I was in unbearable pain, I probably would want to do that and that might be a concern, as well. So, I am going to strike the juror. I could make this juror come in and stand up and tell me he is in unbearable pain and I will be hard-pressed not to excuse him. So, I am going to -- I am not going to require him to come.

That takes us to juror 102. Juror 102 indicated that she does not drive in the Greenville area and will need to make accommodations for travel. And that is in response to a subpart of question one again, do you have any issue that would make it difficult for you to serve? Plaintiff asserts this may be grounds for excusal if juror identifies as being unable to serve, it is not grounds to disqualify. We will be trying this case in Greenville, and getting here and getting parked and getting in the courthouse is a challenge on a good day and I recognize that. But given this juror's answer and the fact that she indicates she is 70 years of age, if she shows up, make her show up, pay somebody to drive her over here and says I am 70 years old, I don't want to serve, I am going to excuse her. I am not going to require her to come over here, so 102

will be struck.

163, the juror indicated that she was mugged while stationed in Germany and this is in response to question 30. Have you or any close friends or relatives been the victim of a crime? The answer was yes. If yes, please provide details including who the victim was and the type of crime. And she said that she was the victim and that she was mugged while stationed in Germany in 2012 or 2013. Plaintiff says this is not grounds to qualify, Defendant's witnesses are not muggers.

I am going to let this juror remain in the pool and certainly if she is selected to appear as a potential juror I will ask a lot of questions in several different ways as to whether the jurors can be fair and impartial and give both sides a fair trial, but she will stay in for the time being.

And finally, juror number 209, that last juror by the way was 163, if I didn't say that.

Juror -- potential juror 209, defense says she states that she cannot set aside personal feelings and apply the law as stated by the judge and plaintiff says, this is grounds to inquire into the context of this case, but not grounds for disqualification. So, this juror, in answer to question 45, regardless of any

opinion you may have concerning a particular law, would you be able to set aside your feelings and follow the law as stated by the judge? The answer was no. She went on to explain in question 47 to the question, is there any additional information about you that the Court should know? She said she cannot handle sexual assault cases or crimes dealing with mistreatment or abuse of children, I will not be fair in those cases. So, I understand the Plaintiff's point here, she indicates that she could not give a fair verdict based on the law in certain types of cases. It concerns me that one of the claims in this case is a sex discrimination case. We have several jurors who say they can be fair in all circumstances, and while I am certainly not in any way minimizing this juror's feelings, I don't want to run the risk that personal feelings might impair a juror's ability to be fair in other types of cases. So, I am going to strike juror number 209.

So, I believe that is all of those. Anybody want to make a comment? I am happy for you to.

MR. MURPHY: This is Murphy. And I would like to be heard on 48, please, Your Honor.

THE COURT: Go ahead.

MR. MURPHY: Your Honor, a couple of concerns

about striking 48 based on the answer to 26. First of all, she doesn't say she is currently in a lawsuit. She doesn't say that it is a lawsuit. The question asked, have you or anyone in your family been involved in a lawsuit including a suit involving worker's compensation claim. And I tell you people use the word lawsuit to refer to EEOC charges, worker's comp administrative claims. I looked, I could not find any lawsuit that involved this woman. So, and I am very concerned about the notion that if you assert rights as a plaintiff in an employment case you are disqualified from being on a jury.

Now, certainly, they could use their peremptory strike for that, but we get lots of jurors and we may have some self identify on Tuesday as being involved in employment litigation for the defendants and we have never struck them for cause. And I have always been told, well, that is maybe a reason you don't like them, but that doesn't disqualify them from service. So, I am really concerned about the notion that, first of all, we don't know what this is. We know she said an employment matter and Spielberger Law Group, I am not that familiar with them, I do see on their website they do say they handle some employment cases. You may be more familiar with them than I am, but I think

certainly this juror could be questioned. But just the mere fact of participating in employment litigation that that is disqualifying. Then we have a lot of people to disqualify because that comes up fairly frequently with business owners. And it comes up with HR people. And it comes up with line management people who say, yes, we got sued one time and I was a witness in the case. Your Honor, I don't think that that has ever been grounds for strike -- being stricken for cause. So, I would respectfully request that you revisit that, allow the witness (sic) to come in, and you can question her, what did you mean by this? Are you currently in a case? What are the issues involved in that case? Knowing that do you believe you can be fair and impartial in serving? And if we get more information and that warrants a strike for cause, I understand, but we don't have that information at this point, Your Honor. I don't think there was a lawsuit. It doesn't even ask if there is a lawsuit, she just says employment. That could be anything from an EEOC charge, worker's comp administration claim, an unemployment claim. I have heard people refer to unemployment claims as lawsuits. You got a lawsuit against the company, t urns out the person has an unemployment claim.

So, this person may have hired somebody ten,

fifteen years ago to help them get unemployment benefits and so we are striking them for cause. So, I would respectfully request that you revisit that. By all means voir dire the witness. And I request the opportunity to make a record on that.

MR. ROZELSKY: Your Honor, may I respond?

THE COURT: Yes. Is this Mr. Rozelsky?

MR. ROZELSKY: Kurt Rozelsky on behalf of BMW AG. Your Honor, with all due respect to Mr. Murphy's argument, this is the only juror of all of the folks in this venire that checked the box saying they were involved in an employment case. It says, were you involved in a lawsuit including a suit involving worker's compensation, she says yes. In this case she says she is the plaintiff, but in Mr. Murphy's hypothetical of all of these 150 defense witnesses (sic), they could have just as easily answered question number 26, said I was involved, I was a witness. It was an employment or whatever and they didn't do that.

So, I understand Mr. Murphy's concern and out of the duty of candor, Your Honor, I am not sure how we came up with the fact that she was currently in an employment lawsuit. I know that we were looking at that as well, and I can't tell you this is the case number and it is currently pending.

But regardless, that question, as I understand it, is looking for some sort of generalized bias. Something that will -- you will bring into this courtroom that says, I may not be able to be fair because I have personal bias based on the fact that I was a plaintiff in an employment lawsuit brought by a law firm that does -- routinely deals with employment litigation.

And I think there is a risk if this person comes in and is asked in open court questions about this of us potentially tainting others in the jury pool.

MR. MURPHY: If I may be heard, this is Murphy. I wouldn't suggest we question them in front of the jury pool, we tend to pull them up to the front with the microphone where only counsel and the court reporter can hear.

And finally it doesn't really say -- we don't know that it was a lawsuit. If it is a lawsuit we would have been able to find it. Like I said, this could be a 20-year -old compensation claim and then nothing, but by all means I think it is worth inquiring into but. Just being involved in some kind of employment thing as being disqualifying for cause I think goes too far.

THE COURT: All right. Anything else on this?

MR. MURPHY: Not from the Plaintiff, Your Honor,

thank you.

MR. ROZELSKY: Your Honor, the only thing I would add is I think your comment when we were talking about number -- number 48 was that you were concerned and did not want to risk prior strong feelings about the case. She doesn't say I was plaintiff or claimant in worker compensation, I was a plaintiff in employment, the risk is significant she will bring strong feelings about this particular case.

THE COURT: Thank you. The question is or she responds to the question saying she was the plaintiff in an employment case and indicates she was represented by this law group. So, I think Mr. Murphy makes some valid arguments. I just feel like, and is of the opinion, this is an employment case, she was a plaintiff in an employment case, and I would just be concerned about her bringing her own experiences into the process and potentially even sharing her own experiences with other potential jurors. I will stick with my initial ruling, but, Mr. Murphy, I think you are protected on the record.

MR. MURPHY: Than, you, Your Honor.

THE COURT: Thank you. All right. Let me just confer with my notes and my staff and see if at this point we could go off the record. Is there anything

you want to take up on the record before we do that? And the court reporter has graciously agreed to stay in case we need to go back on the record. Let me see if I need to ask anything on the record before we talk about some logistical matters.

All right. We will go off the record and talk about some logistical things, but if anybody wants to put something on the record before we do that. Thank you.

(Whereupon, a conference was held off the record.)

(Whereupon, the hearing concluded at 2:21 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR          April 20, 2026
                                   Date

**1**

**102** [3] - 15:10, 15:25
**11** [2] - 9:3, 9:9
**12** [4] - 1:4, 9:10, 10:21
**13** [2] - 9:10, 9:13
**15** [1] - 2:4
**150** [1] - 20:16
**163** [2] - 16:2, 16:19
**1870** [1] - 11:2
**19** [1] - 11:13
**1:36** [1] - 3:1

**2**

**2-A** [1] - 4:24
**20** [1] - 23:22
**20-year** [1] - 21:20
**2012** [1] - 16:9
**2013** [1] - 16:9
**2026** [2] - 1:4, 23:22
**207** [1] - 1:17
**209** [3] - 16:18, 16:20, 17:19
**26** [4] - 12:20, 12:21, 18:1, 20:18
**28** [1] - 11:2
**294** [1] - 1:21
**29601** [2] - 1:18, 2:5
**29602** [1] - 1:22
**29624** [1] - 2:7
**2:21** [1] - 23:11

**3**

**30** [1] - 16:4
**315** [1] - 2:7
**37** [1] - 5:21

**4**

**42** [1] - 12:4
**44** [1] - 13:15
**45** [2] - 11:19, 16:25
**47** [2] - 12:10, 17:4
**48** [5] - 12:20, 13:6, 17:23, 18:1, 22:4
**49** [2] - 13:10, 14:14

**7**

**7** [1] - 7:20
**70** [2] - 15:21, 15:23
**700** [1] - 2:4
**77** [1] - 14:15
**7:22-3738** [1] - 3:4
**7:22-CV-3738** [1] - 1:3

**8**

**8** [1] - 7:25

**A**

**ability** [9] - 7:3, 7:9, 7:17, 8:17, 10:4, 10:10, 14:1, 15:1, 17:17
**able** [7] - 9:13, 11:21, 13:22, 14:10, 17:2, 21:4, 21:19
**above-entitled** [1] - 23:17
**abuse** [1] - 17:8
**accommodations** [2] - 14:19, 15:12
**action** [3] - 6:25, 10:2, 10:3
**add** [1] - 22:3
**additional** [3] - 11:8, 12:11, 17:5
**address** [3] - 3:5, 4:4, 12:18
**addresses** [1] - 14:1
**administration** [1] - 19:21
**administrative** [1] - 18:8
**affect** [2] - 7:14, 15:1
**affected** [1] - 7:9
**AG** [2] - 3:20, 20:8
**age** [1] - 15:22
**ago** [1] - 20:1
**agree** [1] - 9:10
**agreed** [2] - 11:7, 23:2
**ahead** [1] - 17:24
**AIDED** [1] - 2:9
**AKTIENGESELLSCHAFT** [2] - 1:7, 1:20
**allegations** [1] - 7:12
**allow** [2] - 4:12, 19:10
**AND** [1] - 1:17
**ANDERSON** [1] - 2:7
**answer** [12] - 11:24, 12:3, 12:12, 12:23, 13:1, 14:6, 14:15, 15:21, 16:5, 16:25, 17:3, 18:1
**answered** [5] - 11:22, 12:1, 12:20, 13:25, 20:17
**appear** [2] - 12:17, 16:13
**APPEARANCES** [2] - 1:15, 2:1
**apply** [2] - 11:15, 16:22
**appreciate** [1] - 9:18
**April** [1] - 23:22
**area** [2] - 10:23, 15:11
**argument** [1] - 20:10
**arguments** [1] - 22:14
**AS** [2] - 1:8, 1:10
**aside** [5] - 8:25, 11:14, 11:21, 16:21, 17:2
**assault** [1] - 17:7
**assert** [1] - 18:10
**asserts** [1] - 15:15
**assessing** [1] - 8:15
**attorneys** [1] - 3:16
**auto** [1] - 7:4
**available** [1] - 3:11

**B**

**background** [1] - 13:19
**based** [7] - 7:12, 9:11, 12:3, 13:21, 17:10, 18:1, 21:5
**basis** [1] - 11:13
**BAYERISCHE** [2] - 1:6, 1:19
**BEFORE** [1] - 1:13
**begin** [1] - 3:10
**beginning** [1] - 3:17
**behalf** [1] - 20:8
**believability** [4] - 13:12, 13:17, 13:20, 13:23
**bench** [1] - 4:22
**benefits** [1] - 20:1
**better** [1] - 3:13
**between** [1] - 4:13
**bias** [2] - 21:2, 21:5
**bit** [1] - 4:13
**BMC** [1] - 3:21
**BMW** [19] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:2, 3:3, 3:4, 3:20, 3:22, 3:23, 5:5, 5:7, 5:9, 6:2, 6:7, 6:11, 6:16, 20:8
**BOX** [1] - 1:21
**box** [1] - 20:11
**BRIAN** [1] - 1:16
**Brian** [1] - 3:19
**bring** [2] - 21:3, 22:8
**bringing** [1] - 22:17
**broad** [7] - 6:10, 6:17, 6:22, 7:1, 7:5, 9:24, 10:5
**brought** [1] - 21:6
**BULL** [1] - 2:6
**bull** [2] - 3:8, 23:22
**business** [1] - 19:5
**BUSINESS** [2] - 1:8, 1:10

**C**

**CA** [1] - 1:3
**Cain** [1] - 3:8
**CAIN** [1] - 1:13
**candor** [1] - 20:21
**cannot** [5] - 5:18, 11:14, 13:11, 16:21, 17:6
**capacity** [1] - 5:8
**CAROLINA** [1] - 1:1
**case** [30] - 3:4, 6:21, 6:22, 7:11, 8:8, 11:17, 12:25, 13:4, 13:5, 13:8, 13:13, 15:18, 16:24, 17:12, 17:13, 18:11, 19:7, 19:12, 19:13, 20:12, 20:14, 20:24, 22:6, 22:9, 22:12, 22:15, 22:16, 23:3
**cases** [5] - 17:7, 17:8, 17:11, 17:18, 18:24
**causing** [1] - 8:16
**certain** [3] - 13:18, 14:9, 17:11
**certainly** [5] - 15:1, 16:13, 17:15, 18:13, 19:1
**CERTIFICATE** [1] - 23:14
**certify** [1] - 23:15
**challenge** [2] - 4:11, 15:19
**charge** [1] - 19:20
**charges** [1] - 18:7
**checked** [1] - 20:11
**CHIEF** [1] - 1:14
**children** [1] - 17:8
**circumstances** [1] - 17:14
**claim** [6] - 12:23, 18:6, 19:21, 19:24, 21:20
**claimant** [1] - 22:6
**claims** [3] - 17:12, 18:8, 19:22
**clear** [1] - 4:16
**clerk** [1] - 3:9
**close** [1] - 16:4
**CO** [2] - 1:9, 2:2
**collectively** [2] - 3:3, 11:1
**COLLECTIVELY** [2] - 1:7, 1:10
**comfortable** [1] - 8:20
**commence** [3] - 3:6, 3:7, 3:15
**commenced** [1] - 3:1
**comment** [2] - 17:21, 22:3
**comments** [1] - 10:17
**comp** [2] - 18:7, 19:20
**companies** [1] - 5:16
**company** [4] - 5:19, 8:7, 8:9, 19:23
**compensation** [5] - 12:23, 18:6, 20:14, 21:20, 22:7
**complaint** [1] - 7:21
**concentrate** [1] - 15:1
**concern** [5] - 9:25, 10:1, 12:18, 15:5, 20:20
**concerned** [4] - 18:10, 18:20, 22:4, 22:17
**concerning** [2] - 11:20, 17:1
**concerns** [2] - 17:11, 17:25
**concluded** [1] - 23:11
**condition** [1] - 14:17
**conduct** [1] - 7:15
**confer** [1] - 22:24
**conference** [1] - 23:10
**confusing** [1] - 8:10
**confusion** [1] - 8:17
**connection** [2] - 5:8, 5:9
**consider** [2] - 8:14, 13:17
**context** [2] - 11:17, 16:23
**CONTINUED** [1] - 2:1
**core** [1] - 11:25
**correct** [1] - 23:15
**counsel** [2] - 3:17, 21:15
**couple** [1] - 17:25
**course** [1] - 10:12
**COURT** [16] - 1:1, 1:14, 2:6, 2:6, 3:2, 3:24, 4:3, 10:5, 10:10, 10:16, 10:18, 17:24, 20:7, 21:24, 22:10,

22:23
**Court** [2] - 12:12, 17:6
**court** [6] - 3:9, 4:12, 4:16, 21:10, 21:15, 23:2
**Court's** [2] - 7:2, 8:11
**courthouse** [1] - 15:19
**courtroom** [1] - 21:4
**cover** [2] - 8:5, 10:14
**covered** [14] - 5:20, 5:21, 5:25, 7:15, 7:18, 8:11, 8:12, 8:18, 8:23, 9:2, 9:6, 9:7, 9:16, 9:25
**credibility** [2] - 8:15, 9:4
**credible** [1] - 14:5
**crime** [2] - 16:5, 16:7
**crimes** [1] - 17:7
**CRR** [2] - 2:6, 23:22
**cumbersome** [2] - 4:11, 4:14
**curve** [1] - 5:5

D

**D/B/A** [2] - 1:7, 1:10
**daily** [1] - 12:13
**date** [1] - 23:22
**Dawsey** [2] - 3:3, 5:10
**DAWSEY** [1] - 1:3
**dealing** [1] - 17:7
**deals** [1] - 21:7
**DEBRA** [1] - 2:6
**decide** [2] - 11:3, 13:15
**decided** [2] - 4:23, 6:3
**deciding** [1] - 13:17
**decision** [1] - 12:18
**DEFENDANT** [1] - 1:19
**Defendant** [1] - 5:11
**Defendant's** [2] - 12:4, 16:10
**defendants** [1] - 18:16
**Defendants** [2] - 11:1, 11:8
**DEFENDANTS** [1] - 1:12
**defense** [4] - 11:4, 13:10, 16:20, 20:16
**deputy** [1] - 3:9
**describe** [2] - 7:22, 14:16
**described** [1] - 14:24
**detailed** [1] - 7:16
**details** [1] - 16:6
**different** [2] - 10:12, 16:15
**difficult** [4] - 12:6, 12:14, 14:18, 15:14
**difficulty** [2] - 6:16, 9:4
**dire** [9] - 4:3, 4:4, 4:9, 4:18, 5:12, 8:4, 8:13, 9:16, 20:4
**disagree** [1] - 9:15
**discrimination** [3] - 7:21, 8:20, 17:13
**dispute** [1] - 6:15
**disqualification** [2] - 11:18, 16:24
**disqualified** [1] - 18:11
**disqualify** [5] - 12:9, 14:23, 15:17, 18:19, 19:4
**disqualifying** [2] - 19:3, 21:23
**DISTRICT** [3] - 1:1, 1:1, 1:14
**distrust** [1] - 8:6
**DIVISION** [1] - 1:2
**DOING** [2] - 1:8, 1:10
**DONALD** [1] - 2:2
**down** [1] - 10:6
**drive** [2] - 15:11, 15:23
**due** [1] - 20:9
**during** [6] - 4:18, 4:21, 4:22, 8:12, 9:7, 10:12
**duty** [2] - 14:18, 20:21

E

**easily** [1] - 20:17
**EEOC** [2] - 18:7, 19:20
**effect** [1] - 5:15
**efficiently** [1] - 3:13
**either** [1] - 6:20
**Ellis** [1] - 3:22
**ELLISON** [1] - 2:3
**employed** [1] - 8:8
**employee** [4] - 8:7, 8:8, 8:13, 8:22
**employee's** [1] - 8:15
**employees** [1] - 6:16
**employer** [7] - 6:25, 7:22, 8:1, 8:21, 10:2, 10:4, 10:12
**employment** [20] - 6:21, 13:1, 13:4, 13:5, 18:11, 18:16, 18:22, 18:24, 19:2, 19:19, 20:12, 20:19, 20:23, 21:6, 21:7, 21:22, 22:7, 22:12, 22:15, 22:16
**END** [1] - 23:12
**enforcement** [2] - 13:23, 14:2
**entitled** [1] - 23:17
**ESQ** [4] - 1:16, 1:20, 2:2, 2:3
**establishes** [1] - 5:19
**evidence** [2] - 9:11, 15:2
**examination** [1] - 7:15
**excusal** [3] - 12:8, 14:23, 15:16
**excuse** [2] - 15:8, 15:24
**expedite** [1] - 11:10
**experience** [2] - 10:11, 10:13
**experiences** [3] - 9:12, 22:17, 22:19
**explain** [2] - 14:19, 17:4

F

**fact** [7] - 12:1, 13:4, 14:12, 15:21, 19:2, 20:22, 21:5
**factor** [1] - 8:14
**factors** [2] - 13:18, 13:19
**facts** [1] - 8:7
**fair** [28] - 5:19, 5:23, 5:24, 6:9, 6:13, 6:20, 7:3, 7:4, 7:8, 7:10, 7:17, 8:2, 8:17, 8:24, 10:4, 10:11, 13:11, 14:9, 14:12, 14:13, 16:15, 16:16, 17:8, 17:10, 17:14, 17:17, 19:14, 21:4
**fairly** [1] - 19:4
**fairness** [2] - 6:18, 9:25
**familiar** [2] - 18:23, 18:25
**family** [7] - 5:4, 5:7, 6:5, 7:21, 8:1, 12:21, 18:4
**FANE** [1] - 1:21
**far** [1] - 21:23
**fashion** [1] - 5:23
**FEBRUARY** [1] - 1:4
**feelings** [13] - 5:13, 5:16, 7:13, 8:25, 11:14, 11:21, 13:8, 16:21, 17:2, 17:16, 17:17, 22:5, 22:8
**felt** [3] - 3:11, 4:7, 6:22
**fifteen** [1] - 20:1
**figure** [1] - 14:5
**finally** [2] - 16:18, 21:17
**fine** [1] - 11:6
**finished** [1] - 4:14
**firm** [1] - 21:7
**first** [2] - 18:1, 18:20
**five** [3] - 6:23, 8:4, 9:23
**focus** [1] - 6:11
**folks** [2] - 10:22, 20:10
**follow** [5] - 8:25, 9:13, 11:21, 15:2, 17:2
**FOR** [3] - 1:1, 1:16, 1:19
**foregoing** [1] - 23:15
**foreign** [1] - 5:19
**four** [2] - 6:14, 10:24
**frequently** [1] - 19:4
**friend** [1] - 10:13
**friends** [3] - 6:24, 10:1, 16:4
**front** [2] - 21:13, 21:14

G

**GANTT** [2] - 3:23, 4:1
**Gantt** [2] - 3:23, 4:2
**generalized** [1] - 21:2
**German** [1] - 5:16
**Germans** [2] - 5:14, 5:16
**Germany** [2] - 16:3, 16:9
**given** [4] - 11:25, 13:3, 14:12, 15:20
**government** [3] - 13:12, 13:24, 14:2
**Government** [1] - 13:13
**graciously** [1] - 23:2
**Greenville** [2] - 15:11, 15:18
**GREENVILLE** [4] - 1:3, 1:18, 1:22, 2:5
**grounds** [12] - 11:16, 11:17, 12:8, 12:9, 14:22, 14:23, 15:15, 15:17, 16:10, 16:23, 16:24, 19:9
**Group** [2] - 3:4, 18:22
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**group** [1] - 22:13

H

**handle** [3] - 3:12, 17:6, 18:24
**happy** [2] - 4:25, 17:21
**hard** [1] - 15:8
**hard-pressed** [1] - 15:8
**health** [1] - 14:17
**hear** [1] - 21:16
**heard** [3] - 17:23, 19:22, 21:12
**hearing** [3] - 3:1, 3:5, 23:11
**HEARING** [2] - 1:14, 1:15
**held** [2] - 3:5, 23:10
**help** [1] - 20:1
**hired** [1] - 19:25
**Honor** [11] - 4:1, 17:23, 17:25, 19:8, 19:17, 20:6, 20:9, 20:21, 21:25, 22:2, 22:22
**HONORABLE** [1] - 1:13
**hope** [1] - 10:23
**hopefully** [2] - 10:25, 11:10
**HR** [2] - 9:5, 19:5
**hypothetical** [1] - 20:16

I

**identifies** [2] - 12:8, 15:16
**identify** [2] - 4:15, 18:15
**II** [1] - 2:2
**immediate** [3] - 5:4, 5:7, 6:5
**impacts** [1] - 10:4
**impair** [1] - 17:17
**impartial** [4] - 7:3, 13:11, 16:16, 19:14
**IN** [1] - 1:1
**inclinations** [1] - 9:20

**inclined** [3] - 7:19, 9:8, 12:2
**include** [2] - 5:14, 13:6
**included** [3] - 5:1, 7:23, 8:3
**including** [4] - 12:22, 16:6, 18:5, 20:13
**indicated** [5] - 4:10, 12:24, 14:8, 15:11, 16:2
**indicates** [3] - 15:21, 17:10, 22:12
**information** [4] - 12:11, 17:5, 19:15, 19:17
**initial** [2] - 10:19, 22:20
**inquire** [2] - 11:16, 16:23
**inquiring** [1] - 21:21
**instead** [1] - 10:21
**instructions** [1] - 9:14
**intent** [1] - 10:19
**involved** [10] - 12:22, 13:13, 18:4, 18:9, 18:15, 19:13, 20:12, 20:13, 20:18, 21:22
**involves** [1] - 7:11
**involving** [3] - 12:23, 18:5, 20:13
**issue** [1] - 15:14
**issues** [1] - 19:13
**item** [1] - 4:20

**J**

**JACKSON** [1] - 2:3
**job** [3] - 8:1, 12:6, 12:13
**jobs** [3] - 7:5, 7:7, 7:8
**joint** [4] - 4:4, 4:17, 8:4, 11:5
**JUDGE** [1] - 1:14
**judge** [5] - 13:20, 13:22, 14:1, 16:22, 17:3
**Judge** [3] - 3:8, 11:15, 11:22
**Judge's** [1] - 9:14
**judging** [2] - 9:4, 13:11
**judgment** [1] - 7:14
**juror** [49] - 5:21, 8:14, 11:13, 11:14, 11:22, 11:25, 12:2, 12:4, 12:5, 12:8, 12:14, 12:15, 12:20, 12:24, 13:3, 13:6, 13:7, 13:10, 13:14, 13:25, 14:7, 14:8, 14:9, 14:10, 14:12, 14:14, 14:15, 14:20, 14:23, 15:3, 15:6, 15:10, 15:16, 16:2, 16:12, 16:14, 16:18, 16:20, 16:25, 17:18, 19:1, 20:10
**juror's** [3] - 15:20, 17:15, 17:17
**jurors** [24] - 5:2, 5:6, 5:22, 6:5, 6:13, 6:19, 7:2, 7:16, 8:23, 8:24, 10:10, 10:20, 10:23, 11:7, 12:1, 12:16, 13:15, 13:17, 14:4, 14:13, 16:15, 17:13, 18:14, 22:19
**jury** [10] - 3:13, 4:22, 10:7, 10:22, 12:17, 13:9, 14:18, 18:12, 21:11, 21:13

**K**

**KELLY** [1] - 1:3
**kind** [2] - 6:16, 21:22
**knowing** [1] - 19:13
**Kurt** [3] - 3:20, 9:22, 20:8
**KURT** [1] - 1:20

**L**

**last** [1] - 16:18
**law** [13] - 8:25, 9:14, 11:15, 11:20, 11:22, 13:23, 14:2, 16:22, 17:1, 17:3, 17:11, 21:7, 22:13
**Law** [1] - 18:22
**lawsuit** [14] - 12:22, 18:2, 18:3, 18:5, 18:7, 18:9, 19:18, 19:19, 19:23, 20:13, 20:23, 21:6, 21:18
**lawsuits** [1] - 19:22
**lead** [1] - 10:6
**least** [1] - 6:4
**leave** [2] - 4:23, 12:19
**LEWIS** [1] - 2:3
**liability** [1] - 6:21
**life** [2] - 10:13, 13:21
**limit** [1] - 10:3
**line** [1] - 19:6
**listed** [1] - 4:20
**litigation** [3] - 18:16, 19:2, 21:8
**LLC** [2] - 1:9, 2:2
**LLP** [1] - 1:21
**logistical** [3] - 4:7, 23:5, 23:7
**looked** [1] - 18:8
**looking** [2] - 20:23, 21:2
**lose** [2] - 10:23, 10:24

**M**

**MAIN** [1] - 2:4
**Mallory** [2] - 3:23, 4:1
**management** [2] - 5:5, 19:6
**managerial** [1] - 5:8
**managers** [1] - 9:5
**Manufacturing** [1] - 6:3
**MANUFACTURING** [2] - 1:9, 2:2
**matter** [5] - 3:3, 3:6, 10:19, 18:22, 23:17
**matters** [4] - 3:6, 3:12, 4:7, 23:5
**MC** [1] - 3:21
**McAllister** [2] - 3:9, 4:10
**McCoy** [1] - 3:22
**MCCOY** [1] - 2:3
**MCDUFFIE** [1] - 2:7
**mean** [1] - 19:12
**means** [2] - 20:4, 21:21
**medical** [1] - 14:18
**medication** [1] - 15:3
**member** [3] - 6:6, 7:20, 7:25
**members** [1] - 5:6
**mere** [1] - 19:2
**merely** [1] - 8:8
**Michelin** [1] - 12:15
**microphone** [1] - 21:15
**might** [6] - 4:22, 7:14, 8:14, 14:10, 15:5, 17:17
**minimizing** [1] - 17:15
**miss** [1] - 12:14
**mistake** [1] - 3:25
**mistreatment** [1] - 17:7
**MOODY** [2] - 2:2, 3:21
**Moody** [1] - 3:21
**MOTION** [1] - 1:14
**MOTOREN** [2] - 1:6, 1:19
**move** [2] - 10:18, 12:4
**movements** [1] - 9:12
**MR** [16] - 3:19, 3:20, 3:21, 3:23, 4:1, 9:22, 10:9, 10:15, 17:22, 17:25, 20:6, 20:8, 21:12, 21:25, 22:2, 22:22
**MR.MCCOY** [1] - 3:22
**mugged** [2] - 16:2, 16:8
**muggers** [1] - 16:11
**MURPHY** [8] - 1:16, 1:17, 3:19, 17:22, 17:25, 21:12, 21:25, 22:22
**Murphy** [6] - 3:18, 3:19, 17:22, 21:12, 22:13, 22:20
**Murphy's** [3] - 20:9, 20:15, 20:20
**must** [1] - 9:11

**N**

**name** [1] - 3:16
**names** [1] - 4:24
**national** [1] - 7:12
**need** [3] - 15:12, 23:3, 23:4
**needs** [1] - 13:3
**negative** [2] - 5:13, 5:15
**never** [1] - 18:17
**news** [1] - 9:12
**next** [2] - 3:7, 12:4
**nine** [1] - 8:6
**NO** [1] - 1:3
**notes** [3] - 14:22, 22:24, 23:16
**nothing** [1] - 21:20
**notion** [2] - 18:10, 18:20
**number** [28] - 4:20, 5:21, 6:1, 6:14, 6:23, 7:11, 7:20, 7:25, 8:3, 8:19, 9:3, 9:9, 9:10, 9:23, 11:13, 11:19, 12:4, 12:10, 12:20, 13:6, 13:10, 14:15, 16:18, 17:19, 20:18, 20:24, 22:4

**O**

**objects** [1] - 11:16
**occupation** [1] - 13:21
**occurred** [1] - 8:20
**OF** [3] - 1:1, 23:12, 23:14
**officers** [2] - 13:23, 14:2
**often** [1] - 13:15
**old** [2] - 15:24, 21:20
**on-the-record** [1] - 3:4
**one** [8] - 3:16, 4:13, 5:13, 14:15, 14:16, 15:13, 17:12, 19:7
**open** [1] - 21:10
**operating** [1] - 5:16
**operation** [1] - 5:19
**opinion** [4] - 4:25, 11:20, 17:1, 22:15
**opportunity** [1] - 20:5
**origin** [1] - 7:12
**otherwise** [1] - 9:24
**own** [2] - 22:17, 22:18
**owners** [1] - 19:5

**P**

**p.m** [2] - 3:1, 23:11
**pain** [7] - 14:20, 14:21, 14:25, 15:3, 15:4, 15:7
**parked** [1] - 15:18
**part** [4] - 6:25, 9:16, 10:2, 10:3
**participate** [1] - 3:11
**participating** [1] - 19:2
**particular** [3] - 11:20, 17:1, 22:9
**past** [2] - 7:6, 10:24
**path** [1] - 10:6
**pause** [1] - 14:7
**pay** [1] - 15:22
**pending** [1] - 20:25
**people** [5] - 18:6, 19:3, 19:5, 19:6, 19:22
**peremptory** [1] - 18:13
**perform** [1] - 7:7
**person** [4] - 12:13, 19:24, 19:25, 21:9
**person's** [2] - 13:21, 15:1
**personal** [6] - 8:25, 9:12, 11:14, 16:21, 17:16, 21:5
**personally** [1] - 9:15
**physical** [1] - 14:17

**plaintiff** [12] - 12:25, 13:5, 15:15, 16:9, 16:22, 18:11, 20:15, 21:6, 22:6, 22:7, 22:11, 22:16
**PLAINTIFF** [2] - 1:4, 1:16
**Plaintiff** [10] - 3:19, 5:3, 10:19, 10:25, 11:15, 12:7, 13:2, 13:12, 14:22, 21:25
**Plaintiff's** [2] - 3:17, 17:9
**point** [4] - 10:20, 17:9, 19:17, 22:25
**pool** [5] - 12:16, 13:6, 16:12, 21:11, 21:14
**portion** [1] - 4:22
**position** [2] - 3:13, 13:21
**post** [1] - 12:13
**potential** [11] - 4:20, 5:2, 5:6, 6:5, 7:2, 7:16, 8:16, 12:24, 16:14, 16:20, 22:19
**potentially** [2] - 21:11, 22:18
**presented** [1] - 13:18
**pressed** [1] - 15:8
**pretrial** [1] - 3:6
**previously** [2] - 6:2, 6:11
**problem** [1] - 4:1
**problems** [1] - 14:18
**proceed** [1] - 3:13
**process** [5] - 4:19, 8:13, 9:7, 13:9, 22:18
**products** [1] - 6:21
**professionals** [1] - 9:5
**protect** [1] - 11:11
**protected** [2] - 4:8, 22:21
**provide** [1] - 16:6
**provided** [1] - 5:11
**pull** [2] - 11:18, 21:14
**pursuant** [1] - 11:2
**put** [3] - 3:12, 8:25, 23:8

**Q**

**qualify** [1] - 16:10
**questioned** [1] - 19:1
**questionnaire** [6] - 5:22, 7:18, 8:11, 11:18, 11:19, 12:10
**questionnaires** [6] - 6:8, 6:12, 6:18, 7:1, 8:24, 9:8
**questions** [17] - 4:9, 4:18, 5:1, 6:12, 7:2, 7:16, 7:24, 9:6, 9:16, 9:19, 9:20, 10:16, 14:8, 14:10, 16:14, 21:10

**R**

**race** [1] - 7:12
**raise** [1] - 7:13
**RANDLE** [1] - 2:2
**Randy** [1] - 3:21
**really** [2] - 18:20, 21:17
**reason** [3] - 5:24, 6:20, 18:18
**recognize** [2] - 13:25, 15:20
**record** [18] - 3:2, 3:4, 3:17, 4:6, 4:8, 4:15, 11:12, 13:14, 20:5, 22:21, 22:25, 23:1, 23:3, 23:4, 23:6, 23:8, 23:10
**redundant** [1] - 5:23
**redundantly** [1] - 6:8
**refer** [2] - 18:7, 19:22
**regarding** [1] - 8:7
**regardless** [4] - 10:11, 11:19, 16:25, 21:1
**rehabilitate** [1] - 14:11
**related** [1] - 8:1
**relationship** [1] - 6:6
**relative** [1] - 10:13
**relatives** [3] - 6:23, 10:1, 16:5
**remain** [1] - 16:12
**repeat** [1] - 3:24
**REPORTER** [3] - 2:6, 2:6, 23:14
**reporter** [5] - 3:9, 4:12, 4:16, 21:15, 23:2
**represent** [1] - 3:18
**represented** [1] - 22:12
**request** [7] - 4:4, 4:5, 4:17, 8:4, 19:10, 20:3, 20:4
**REQUESTED** [1] - 23:12
**requested** [1] - 5:3
**requests** [1] - 5:12
**require** [3] - 14:19, 15:9, 15:25
**required** [2] - 13:15, 14:4
**requirements** [1] - 12:7
**respect** [1] - 20:9
**respectfully** [2] - 19:10, 20:3
**respond** [1] - 20:6
**responds** [1] - 22:11
**response** [2] - 15:13, 16:3
**returning** [1] - 8:21
**revised** [2] - 4:17, 8:4
**revisit** [2] - 19:10, 20:3
**rights** [1] - 18:10
**risk** [5] - 13:7, 17:16, 21:9, 22:5, 22:8
**room** [1] - 10:22
**routinely** [1] - 21:7
**Rozelsky** [4] - 3:20, 9:22, 20:7, 20:8
**ROZELSKY** [8] - 1:20, 3:20, 9:22, 10:9, 10:15, 20:6, 20:8, 22:2
**RPR** [2] - 2:6, 23:22
**rules** [1] - 13:22
**ruling** [1] - 22:20
**rulings** [1] - 4:9
**run** [2] - 13:7, 17:16
**runs** [1] - 12:13

**S**

**s/Debra** [1] - 23:22
**SC** [5] - 1:3, 1:18, 1:22, 2:5, 2:7
**scheduled** [3] - 3:6, 3:7, 3:14
**sciatica** [1] - 14:20
**second** [1] - 10:8
**see** [3] - 18:23, 22:24, 23:3
**seep** [1] - 13:9
**selected** [2] - 12:16, 16:13
**selection** [3] - 3:14, 10:7, 12:17
**self** [1] - 18:15
**serve** [6] - 12:6, 12:9, 14:7, 15:15, 15:16, 15:24
**service** [1] - 18:19
**serving** [1] - 19:14
**set** [4] - 11:14, 11:21, 16:21, 17:2
**several** [3] - 14:8, 16:14, 17:13
**sex** [2] - 7:12, 17:12
**sexual** [1] - 17:6
**shake** [1] - 7:10
**sharing** [1] - 22:18
**show** [1] - 15:22
**shows** [1] - 15:22
**sic** [2] - 19:11, 20:17
**side** [1] - 6:20
**sides** [4] - 6:13, 7:4, 7:17, 16:16
**significant** [1] - 22:8
**simply** [1] - 13:20
**sit** [1] - 14:20
**situation** [3] - 7:22, 8:1, 14:24
**situations** [1] - 14:9
**six** [1] - 7:11
**social** [1] - 9:12
**solely** [1] - 9:11
**somewhat** [2] - 4:11, 8:10
**sort** [1] - 21:2
**SOUTH** [3] - 1:1, 2:4, 2:7
**SPARTANBURG** [1] - 1:2
**speakers** [1] - 4:13
**speaking** [2] - 4:14, 4:16
**SPENCER** [1] - 1:21
**Spielberger** [1] - 18:22
**spokesman** [1] - 11:4
**spokeswoman** [1] - 11:4
**staff** [1] - 22:24
**stand** [1] - 15:7
**standard** [2] - 13:24, 14:3
**state** [1] - 3:16
**states** [7] - 11:14, 12:5, 12:7, 12:21, 13:10, 13:15, 16:21
**States** [2] - 5:17, 5:20
**STATES** [3] - 1:1, 1:14, 2:6
**stationed** [2] - 16:3, 16:9
**status** [1] - 8:13
**stay** [2] - 16:17, 23:2
**stenographic** [1] - 23:16
**STENOTYPE/ COMPUTER** [1] - 2:9
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:9
**STEPHENSON** [1] - 1:17
**stick** [1] - 22:19
**still** [1] - 10:7
**stories** [1] - 9:13
**straight** [1] - 10:21
**STREET** [3] - 1:17, 2:4, 2:7
**stricken** [3] - 13:3, 13:14, 19:9
**strike** [11] - 4:5, 12:2, 12:5, 12:15, 13:2, 14:13, 15:6, 17:18, 18:14, 19:9, 19:16
**strikes** [7] - 4:9, 10:18, 11:1, 11:2, 11:5, 11:6, 11:8
**striking** [3] - 11:6, 18:1, 20:2
**strong** [5] - 4:24, 7:13, 13:8, 22:5, 22:8
**struck** [2] - 16:1, 18:17
**subjected** [1] - 6:24
**submitted** [3] - 4:17, 9:21, 11:5
**submitting** [1] - 9:18
**subpart** [2] - 14:16, 15:13
**sued** [2] - 8:1, 19:7
**sufficiently** [4] - 8:12, 8:18, 8:23, 9:2
**suggest** [1] - 21:13
**suit** [3] - 12:22, 18:5, 20:13
**SUITE** [1] - 2:4
**supervisors** [1] - 9:5
**supplemental** [2] - 5:3, 5:11
**sympathize** [1] - 8:22

**T**

**tainting** [1] - 21:11
**talks** [1] - 14:4
**tasks** [1] - 7:6
**TELEPHONIC** [1] - 1:15
**telephonically** [1] - 3:5
**ten** [4] - 8:19, 10:20, 10:21, 19:25
**tend** [1] - 21:14
**terms** [1] - 4:8
**testify** [1] - 4:22
**testifying** [1] - 4:21
**testimony** [4] - 8:7, 8:16, 14:2, 15:2
**thanking** [1] - 3:10

**THE** [17] - 1:1, 1:1, 1:13, 1:16, 1:19, 3:2, 3:24, 4:3, 10:5, 10:10, 10:16, 10:18, 17:24, 20:7, 21:24, 22:10, 22:23
**themselves** [1] - 13:18
**three** [3] - 6:1, 11:1, 11:2
**Tim** [1] - 3:8
**TIMOTHY** [1] - 1:13
**today** [2] - 3:11, 3:12
**topics** [1] - 7:13
**towards** [2] - 5:14, 5:16
**TRANSCRIPT** [1] - 23:12
**transcript** [1] - 23:16
**TRANSCRIPTION** [1] - 2:9
**travel** [1] - 15:12
**trial** [8] - 3:7, 3:8, 3:14, 4:22, 7:4, 10:21, 10:25, 16:16
**try** [1] - 14:11
**trying** [1] - 15:17
**Tuesday** [3] - 3:7, 11:11, 18:15
**turning** [1] - 12:10
**two** [2] - 4:20, 5:18
**type** [4] - 5:8, 6:6, 12:25, 16:7
**types** [2] - 17:11, 17:18

**U**

**unable** [2] - 12:8, 15:16
**unbearable** [5] - 14:21, 14:24, 14:25, 15:4, 15:7
**understood** [1] - 10:9
**unemployment** [4] - 19:21, 19:22, 19:24, 20:1
**unfair** [3] - 6:25, 10:2, 10:3
**United** [2] - 5:17, 5:20
**UNITED** [3] - 1:1, 1:14, 2:6
**up** [12] - 4:25, 10:24, 12:17, 15:7, 15:22, 19:4, 19:5, 19:6, 20:22, 21:14, 23:1
**urns** [1] - 19:23
**USC** [1] - 11:2

**V**

**valid** [1] - 22:14
**venire** [1] - 20:11
**verdict** [3] - 8:21, 9:11, 17:10
**VERSUS** [1] - 1:5
**victim** [3] - 16:5, 16:7, 16:8
**view** [1] - 11:24
**voir** [9] - 4:3, 4:4, 4:9, 4:17, 5:12, 8:4, 8:12, 9:16, 20:4

**W**

**wants** [1] - 23:7
**warrants** [1] - 19:15
**ways** [1] - 16:15
**website** [1] - 18:23
**week** [1] - 3:7
**WERKE** [2] - 1:6, 1:20
**WHITSETT** [1] - 1:17
**witness** [7] - 10:8, 13:20, 14:3, 19:7, 19:11, 20:4, 20:18
**witness's** [1] - 13:19
**witnesses** [12] - 4:20, 4:21, 9:4, 13:12, 13:16, 13:18, 13:24, 13:25, 14:3, 14:5, 16:10, 20:16
**woman** [1] - 18:9
**word** [1] - 18:6
**worker** [1] - 22:7
**worker's** [5] - 12:23, 18:5, 18:7, 19:20, 20:14
**works** [2] - 6:10, 12:15
**worth** [1] - 21:21

**Y**

**y'all** [1] - 11:3
**years** [3] - 15:21, 15:23, 20:1
**yourself** [1] - 4:15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KELLY DAWSEY, PLAINTIFF, | ) | CA. NO. 7:22-CV-3738 GREENVILLE, SC FEBRUARY 17, 2026 |
| VERSUS | ) | |
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP, | ) | |
| BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP | ) | |
| DEFENDANTS. | ) | |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
JURY TRIAL
VOLUME I

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT: KURT ROZELSKY, ESQ.
SPENCER FANE LLP
P O BOX 294
GREENVILLE, SC 29602

APPEARANCES CONTINUED

BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

INDEX


Opening statement by Mr. Murphy 70

Opening statement by Mr. McCoy 73

Opening statement by Mr. Rozelsky 88

KELLY DAWSEY

Direct exam by Mr. Murphy 91


EXHIBITS

PLAINTIFFS


1 Dawsey December 2021 resume 95

2 Plant Spartanburg Organization chart 107

3 1-10-22 Petrasch email re New Years Email to HR network 136

5 TX-6 organization structure development step 2 For April 2021 112

7 T-Vorhalt request 146

8 TX-60 JFDS Rev 4/1/2019 104

10 Exempt Organizational structure BMW MC August 2001 153

12 Exempt organization structure BMW MC September 2021 110

14 Portfolio 2020 - Dawsey 166

15 Portfolio 2019 Dawsey 165

16 Portfolio 2018 Dawsey 162

18 TX-6 Organizational overview - new Structure since 12/2019 113

INDEX CONTINUED

PLAINTIFF'S EXHIBITS

19 3/20/2021 compensation change statement Dawsey 173
22 International grading FLIV approval Committee TS Spartanburg 154
25 1/21/2021 Petrasch email topics she shared with P 141
27 4/8/2021 Petrasch email to Dawsey re Draft job descriptions 148
28 10/07/2023 Petrasch email to Dawsey HR Compact 135
63 Burgmeier 4/21/2021 email re P circle 157

DEFENSE EXHIBITS

5 TX-6 organizational overview - new structure Since 12/2019 PowerPoint 133

(Whereupon, the hearing commenced at 9:46 a.m.)

THE COURT: Thank you, please be seated. Good morning. Hello, ladies.

Good morning, and welcome to the United States District Court for the District of South Carolina. My name is Tim Cain and I am one of the trial judges here in the District Court. We will now begin the process of selecting a jury for a civil case to be tried here in this courtroom beginning immediately following jury selection today.

The first thing I would like to do is recognize Ms. Amy Rutgers, our Deputy Clerk of Court, who will administer the juror's oath to you at this time. Please stand and raise your right hand.

(Whereupon, the petit jury was sworn.)

THE COURT: Thank you, you may be seated.

You folks have been randomly selected as potential jurors for a civil trial commencing today, Tuesday, February 17th, 2026, in which we hope and believe will conclude by Wednesday, February 25th, 2026. The lawyers tell me that we should finish on or before that day and I am hopeful that we will finish well before next Wednesday.

The Court recognizes that serving as a jury for a trial of this length can be a significant imposition

on your lives. And I will do my best to make sure that the lawyers present their cases as efficiently as possible; however, jury service is one of the most important responsibilities you have as a citizen of this country. We all recognize that your presence here today, and if you are chosen for trial, your presence at the trial is a burden and a hardship for many of you. You have had to set-aside whatever you were doing, leave your jobs and families, and sacrifice your time to come sit here with a room full of strangers. I am sure there are many things that you would rather be doing than sitting here in this courthouse.

I also recognize that travel to downtown Greenville and securing a parking space can be challenging. Your presence here today, however, is what makes our system of justice one of the fairest in the entire world. The right to a trial by jury is one of the most important and sacred rights guaranteed by our Constitution.

Let me now explain the jury selection process. As I mentioned earlier, all of you are here today because you were randomly selected from voter registration lists as potential jurors. We will soon began the process of deciding which of you will be selected to actually serve on the trial jury.

Your service here today is important because having a panel of fair-minded, qualified citizens from which to select a jury is itself part of the fair trial process. In just a few moments you will be asked to answer some questions about the case to be tried. Today we are selecting a jury panel for a civil trial. I will first give you some information describing the case and then I will ask you a series of questions designed to determine if you can be fair and impartial in the case. Remember that you will be under oath when you give your answers. Our overriding goal in every case is to select a jury that is completely fair and open-minded and that can give all parties a fair trial. The answers that you give to the questions during this selection process will help us achieve that result.

At this point I should mention the questionnaires that we asked you to complete and send back several weeks ago. The questionnaires contained many questions that we would normally have asked you orally here in the courtroom, but we have learned from experience that it saves time for everyone to have that information on paper before jury selection begins. We appreciate your cooperation in completing and returning those questionnaires. It saves time for everyone here on jury selection day.

You may wonder about some of the questions you saw in the questionnaire or that you were asked here in the courtroom today. They may seem personal, but the parties have a right to know some things about the people who will decide their case.

Some of the questions you are asked today may be follow-up questions based on your written responses; other questions may be specific to the issues in the case for which you are being considered. The lawyers and the Court will listen carefully to the answers that you give. A juror's answers to questions may reveal that the juror has personally been involved in a dispute that is very similar to the dispute being tried. In such a case, it,may be best to excuse that juror from the jury panel for cause to guard against the possibility that the juror will be influenced by his or her prior experiences. Merely having heard or read something about the case will not automatically disqualify you from serving, nor your past experiences. What must be determined is whether you have made up your mind about the case or can decide it impartially.

Questions will be asked to the entire panel during the jury selection process. You should listen very carefully to the question. If you decide that you need to respond, you should stand, and when I recognize

you, first state your juror number, and then speak clearly and distinctly in giving your response. I know from experience that jurors need to make a conscious effort to speak loudly. The court reporter, who is taking down the proceedings, needs to hear what you say, so do the Judge, the attorneys, and the parties. We have a microphone to assist you in giving your answer, but please still be sure to speak clearly and loudly enough to be heard in the front of the courtroom.

If at any time you feel that your response to any of these questions is private, simply let me know and we will ask you to come up to the bench so that we can discuss the matter out of the hearing of the other potential jurors; however, the lawyers and the court reporter must be present when you speak with me.

After the questioning is complete, the lawyers will be given an opportunity to look over their notes and decide how to use their allotted peremptory challenges. The jurors remaining after the challenges will be the trial jury for the case. Those of you not selected on this case as jurors or alternate jurors will be free to leave after the selection process is complete and you will not be required to return during this term of court. You will not be required to serve again for two years for this court. You might, however, be

called to serve in a state court proceeding.

It is critically important that you not discuss the case for which you are being considered or have been selected with anyone, not even your fellow jurors, and you also must not do any investigation or reading about the case on your own. Your only exposure to a case that you are to decide should occur inside the four walls of this courtroom. If you are selected for the jury, everything you need to know you will see or hear in this courtroom. All you will need to bring to the courtroom are your common sense and an open mind. Your everyday common sense combined with what you learn in the courtroom will help you reach an impartial decision based on the evidence and the law, that is what a juror's job is all about.

As you know, when the Clerk called the roll earlier this morning, you were given a label with your juror number on it. Please keep this label on throughout the selection process because we are going to refer to you by your juror number from this point forward. You may remove it when you leave the courthouse. For obvious reasons, we do not want any confusion as to who is responding to questions during the selection process, so it is critically important that you maintain possession of your juror number.

You may have other questions such as how to verify for your employer that you have been serving as a juror, or where to park, or get lunch. The Clerk's office personnel assigned to work with you will be happy to assist you with these matters.

In the United States of America, the very foundation of our democratic society is a guarantee of the right to a fair trial by an impartial jury of our peers. Each day across this country thousands of individuals participate in preserving that fundamental right; today, it is your turn.

In just a moment we will begin discussing the case on which you might serve. First, however, I need to find out if any of you have personal hardships that would prevent you from effectively serving as a juror. The clerk has already asked you about conflicts with the dates of the trial, now I want to ask you additional questions to determine if there are any persons on the panel who are disqualified by law from jury service. Some persons are exempt from jury service based on certain criteria. If these factors apply to you and you wish to be excused, you will be allowed to leave; however, even if you are exempt, you may choose to stay and participate, if you wish.

Please listen carefully to determine if any of

the following questions apply to you. If one of the following questions applies to you, please stand and wait for the Court to address you. When it is your turn, a Court Security Officer will bring you a microphone, give us your juror number, and speak loudly and clearly and answer any questions. And, again, if for any reason you feel you need to address the Court privately instead of answering the question out loud, please let Court Security Officer know when he or she gets to you and you can come up to the bench; the attorneys for the parties will be present during any such conversation.

I have four questions at this point, if any apply to you, please stand after all of the questions have been read.

First, is there any member of the jury panel who is not a United States citizen? Who is not at least 18 years of age? Or who has not resided in the State of South Carolina Fore the entire past year?

Second, is there any member of the jury panel who is unable to read, write, speak, and understand the English language?

Third, is there any member of the jury panel who is incapable by reason of mental or physical infirmity or disability of rendering satisfactory jury

service?

And fourth, is there any member of the jury panel who has a charge pending against him or her for the commission of a crime in a state or federal court, or who has been convicted of a state or federal crime punishable by imprisonment of more than one year whose Civil Rights have not been restored by pardon or amnesty?

If any of these questions apply to you, please stand.

The record will reflect no response.

The following criteria apply to persons who may have personal hardships which would prevent them from rendering effective jury service. The following persons may be excused from jury service due to undue hardship or extreme inconvenience. If any of these apply to you, please stand, if you are able; if you are not able to stand, raise your hand:

Persons over 70 years of age; persons who have served as a federal grand juror or federal petit or trial juror within the past two years; persons having the active care and custody of a child or children under ten years of age whose health and/or safety would be jeopardized by their absence for jury service; or persons who are essential to the care of aged or

infirmed persons. Persons whose services are so essential to the operation of a business, commercial or agricultural enterprise, that it must close or cease to function if they were required to perform jury duty. Volunteer safety personnel who serve without compensation, such as firefighters or members of a rescue squad or ambulance crew for a public agency. If any of these situations apply to you and you wish to be excused from jury service, please stand.

Yes, sir, what is your juror number?

THE JUROR: Your Honor, it is number five.

THE COURT: Okay.

THE JUROR: I have a nine-year-old son, I am currently going through a divorce, and I am his only care for this week. And he also has two therapy sessions due to the divorce that I would have to miss. I was hoping that I would be able to do that for him. And he -- I don't have any other care this week and he would need to be picked up also from school and today is the only day I was able to get coverage.

THE COURT: Thank you. If you will have a seat we will be back with you.

Yes, ma'am, what is your number?

THE JUROR: Juror number 54.

THE COURT: Yes, ma'am.

THE JUROR: I am a single mother of an autistic six year old who has significant melt downs. He is currently with his grandmother and she struggles to care for him.

THE COURT: Your child is six years old?

THE JUROR: Yes, sir.

THE COURT: All right. Thank you, ma'am, we will be back with you momentarily.

The following questions are for persons who are exempted from jury service by reason of their employment. Please listen carefully to see if any of these questions apply to you mand if any do, please stand or raise your hand.

Is any member of the jury panel in active service in the armed forces of the United States as defined in 10, United States Code, Section 101(a)(4) as including only the Army, Navy, Air Force, Marine Corps, Space Force, and Coast Guard?

Is any member of the jury panel a full-time member of a fire or police department of any state, district, territory, or possession of the United States?

Is any member of the jury panel a public officer in the executive, legislative, or judicial branch of the Government of the United States or of a state or

local government actively engaged in the performance of official duties? This means any person so employed who is either elected to public office or who is directly appointed by a person elected to public office?

If any of these questions apply to you, please stand or raise your hand.

The record will reflect no response.

Finally, as I mentioned earlier, each of you completed the questionnaires mailed to you by our Clerk of Court. Because the answers to the questionnaires are all extremely important, I need to afford each of you an opportunity to supplement your responses here in court today. If any of you have remembered additional information that should have been included in your responses or if your situation or circumstances have changed since you completed and sent in the questionnaire, please stand or raise your hand.

And the record will reflect no response.

Could I see the lawyers up here just briefly?

(Whereupon, a bench conference was held off the record.)

THE COURT: After fifteen years I have learned government equipment works about half the time. Having said that, the judiciary functions using about one percent of the total federal budget, so I think we do a

fairly good job with what we are allotted by Congress. By consent, and let me just confirm this on the record, by consent, jurors 5 and 54 will be excused.

MR. MURPHY: Yes, sir.

MR. ROZELSKY: Yes.

MR. MCCOY: Yes, Your Honor.

THE COURT: Jurors 5 and 54 are free to leave at this time.

All right. Before we generate a random computer list of jurors to be submitted to the attorneys, I will give you some information about the case. Specifically, I will give you a brief outline of what the case is about. I will have you introduced to the attorneys, the parties, and the witnesses who might be called, and I may ask some special questions that touch on your ability to be fair and impartial in this specific case. Please remember that you are under oath as we go through these proceedings and be mindful that the Court's overriding goal is to select an open-minded, fair, and impartial jury.

I am going to apologize to the parties and everyone concerned in advance because I will probably mispronounce some of these names. During this term of court, we are trying a civil case captioned Kelly Dawsey, Plaintiff, versus Bayerische Motoren Werke

Atkiengesellschaft or BMW AG, it may also be referred to as BMW Germany during the trial and BMW Manufacturing Company LLC or BMW MC collectively, doing business as BMW Group, Defendants. This is case number 7:22-CV-3738. In this case, the Plaintiff, Ms. Dawsey, claims that BMW, her former employer, discriminated against her on the basis of national origin, race, and sex in violation of federal law. The BMW Defendants, each of them, deny the Plaintiff's allegations.

Has any member of the jury panel heard, read, or seen anything about this case? Does any member of the jury panel have any independent knowledge or information concerning the allegations involved in this case? If so, please stand.

The record will reflect no response.

Mr. Rozelsky, do you want to pronounce the name of your client so at least once during the trial it is done right?

MR. ROZELSKY: Bayerische Motoren Werke Atkiengesellschaft or BMW AG.

THE COURT: No response to that question.

I will ask you all a few more questions. Immediate family is intended to include your parents, grandparents, siblings, children, stepchildren,

grandchildren, spouses, or domestic partners, step-parents, mother-in-law, father-in-law, sisters-in-law and brothers-in-law.

Ladies and gentlemen, I want to ask you, do you know Plaintiff's counsel, Brian Murphy, or his law firm, Stephenson and Murphy? Let me do this. Let me get the lawyers to introduce themselves. If they want to introduce any of their clients or client representatives, we will do that.

MR. MURPHY: Thank you, Your Honor. Good morning, ladies and gentlemen. I am Brian Murphy, I represent Kelly, Kelly Dawsey, the Plaintiff in this case.

THE COURT: Thank you.

MR. MCCOY: Good morning. I am Ellison McCoy, attorney with Jackson Lewis here in Greenville. Assisted by my colleague Randy Moody and our client representative is Sherry McCraw, who is vice president of Human Resources of BMW Manufacturing.

MR. ROZELSKY: I am Kurt Rozelsky with the Spencer Fane law firm, I represent BMW AG.

THE COURT: Thank you.

Do any of you know Plaintiff's counsel, Brian Murphy, or his law firm, Stephenson and Murphy? Do any of you know counsel for BMW Manufacturing, Ellison McCoy, Randy Moody, also Mallory Gantt or their law

firm Jackson Lewis PC? Do any of you know BMW AG's counsel, Kurt Rozelsky or his law firm Spencer Fane, LLP?

Again, if any of these questions apply, please stand or raise your hand. Yes, sir. Let's get the microphone to this gentleman.

THE JUROR: Mr. Rozelsky is a former neighbor of mine.

THE COURT: What is your juror number?

THE JUROR: 107.

THE COURT: All right. And how long did you live near Mr. Rozelsky?

THE JUROR: Five or six years. He moved away in 2017, something like that.

THE COURT: When you say y'all were neighbors, did you socialize other than just speaking as you saw each other around the neighborhood? Did y'all have any other contact or association?

THE JUROR: It was mostly just talking across the fence and neighborhood functions. I don't remember us doing anything socially together, just us or with spouses.

THE COURT: Okay. Would that in any way keep you from giving all of the parties a fair trial in this case?

THE JUROR: No, Your Honor, it would not.

THE COURT: Thank you. If you will just bear with us. All right.

No other response.

Here is another question. Have you or any member of your immediate family ever had any type of association with these attorneys or their law firms? By that I mean have you or any member of your family ever been represented by them in a legal matter, been sued by them, or been adverse to them in a legal matter, been employed by them, or had any business, or social, or similar connection or relationship with them? Do any of you know or are you related by blood or marriage to Plaintiff Kelly Dawsey who now works for the Greenville Spartanburg Airport?

Have you or any member of your immediate family had any type of relationship, business dealings affiliation, or connection with the Plaintiff Kelly Dawsey? Have you or any member of your immediate family ever worked for BMW in management or in any other capacity or had any type of employment, or business relationship affiliation, or connection with BMW? If any of these apply to you, please stand or raise your hand.

Yes, ma'am, what is your juror number?

THE JUROR: 154.
THE COURT: Okay.
THE JUROR: My husband briefly worked at BMW before we met about when he was about 18 for about a year.
THE COURT: Approximately what year would that have been?
THE JUROR: 2014 or 15.
THE COURT: And he worked at BMW in the plant here in South Carolina?
THE JUROR: Yes.
THE COURT: For about a year?
THE JUROR: Yes.
THE COURT: He was 18 years old at the time?
THE JUROR: Yes.
THE COURT: Do you know what job he had?
THE JUROR: I am not quite sure.
THE COURT: Was he in management?
THE JUROR: No.
THE COURT: Would that fact that he worked for BMW for that period of time in any way affect your ability to give both sides a fair trial?
THE JUROR: No, Your Honor.
THE COURT: Thank you. I appreciate your response.

We have another juror who is standing. What is your juror number?

THE JUROR: Number 146.

THE COURT: Okay.

THE JUROR: My mother and myself have both worked for BMW's plant here in Greenville. She worked early nineties and then I worked in 2020 to 2022 before I was released.

THE COURT: 2020 to 2022?

THE JUROR: Yes, Your Honor.

THE COURT: Would that information affect your ability to give both sides a fair trial?

THE JUROR: No, Your Honor.

THE COURT: Were you in management or was your mother in management?

THE JUROR: I am not sure about my mother, but I was not, I was just a regular line associate.

THE COURT: So you said you were released in 2022?

THE JUROR: Yes, sir.

THE COURT: Thank you. Just have a seat, we will be back with you.

THE JUROR: Juror 186. My son worked through a temp service for several years at BMW. He no longer works there.

THE COURT: What time period approximately did he work?
THE JUROR: Approximately 2013 to 2022.
THE COURT: Do you know the name of the temp service he worked through?
THE JUROR: It was an engineering company, I don't know. I think the last couple of years he did get hired on for BMW.
THE COURT: I don't mean to pry, but did he leave to go to another job or was there some other reason.
THE JUROR: He left to go to another job closer to home.
THE COURT: Would any of that information prevent you, or keep you, or affect your ability to give all parties a fair trial?
THE JUROR: No, sir.
THE COURT: Thank you.
THE JUROR: I am juror 203. I don't know if this exactly applies, I work for a company that works with BMW, we provide equipment in some of their labs.
THE COURT: What is the name of your employer?
THE JUROR: Martin Microscope Company.
THE COURT: So your company makes some product that is used by BMW as part of its manufacturing

process?

THE JUROR: Mostly in their quality labs.

THE COURT: Okay. How long have you been with your employer?

THE JUROR: Since 2010.

THE COURT: Are you in management?

THE JUROR: I am.

THE COURT: Do you frequently have contact with management at BMW?

THE JUROR: Only in those labs. I don't know whether they would be, you know, called management or not, but the manager of those labs.

THE COURT: Are you in the BMW facility at times?

THE JUROR: We are.

THE COURT: How often?

THE JUROR: Probably two to three times a year.

THE COURT: Would you be able to give all of the parties a fair trial in this case?

THE JUROR: Yes, sir.

THE COURT: All right. Thank you.

Yes, ma'am, what is your number?

THE JUROR: Juror 51. My brother worked at BMW through the temp service.

THE COURT: Your brother?

THE JUROR: Yes, sir. I am not sure, it may be

five years ago. I don't know the temp service name.

THE COURT: Your brother works for a temp service?

THE JUROR: He worked temp service at BMW, it was about five years ago.

THE COURT: Do you know the name?

THE JUROR: No, sir.

THE COURT: He hasn't worked there in the last five years?

THE JUROR: No, sir.

THE COURT: Do you know what he did? What he did in his job?

THE JUROR: He worked on the line, I am not quite sure.

THE COURT: Would that in any way affect your ability to give all parties a fair trial in this case?

THE JUROR: No, sir.

THE COURT: Thank you.

Yes, ma'am.

THE JUROR: Juror 220. I have a son that works for Lear Corporation, they make car seats for BMW. I didn't know if I needed to mention that.

THE COURT: Lear?

THE JUROR: Lear, L-e-a-r.

THE COURT: Do you know if his company makes

seats for just BMW or other vehicle manufacturers?

THE JUROR: I am not sure.

THE COURT: How long has he worked there?

THE JUROR: Probably ten years, something like that.

THE COURT: Is he in management?

THE JUROR: No.

THE COURT: Do you know if he goes to the BMW plant on a regular basis?

THE JUROR: I do not.

MR. ROZELSKY: Your Honor, I am sorry, what is the juror number again?

THE COURT: 220.

Would that information in any way affect your ability to give all parties a fair trial in this case?

THE JUROR: Not at all.

THE COURT: Thank you.

We have another one?

THE JUROR: Mine is more of -- juror number 8.

THE COURT: Eight?

THE JUROR: Yes. May we approach?

THE COURT: Yes, sir.

(Whereupon, a bench conference was held on the record in the presence of the petit jury, but outside the hearing of the petit jury.)

THE JUROR: I wanted --

THE COURT: All right. I am sorry, sir. Talk into this.

THE JUROR: Okay. That is fine. I need to tell everyone that it is not really my stepson, he was involved in a similar case like this recently -- last year. It was settled, okay.

THE COURT: Do you know, not your son, but the other party, the name of the company or whatever?

THE JUROR: It was in Greenwood called CPW.

THE COURT: CPW in Greenwood.

THE COURT: I have been involved with her and the family, we have been together, but not together maybe or anything.

THE COURT: But it is your partner's son? And he sued the company in Greenwood on a case like this?

THE JUROR: Yes. Similar.

THE COURT: Similar to this. Okay. And how long ago was that?

THE JUROR: I think they settled about a year or two years ago. I am guessing.

THE COURT: Did you go for any of the trial or any of the proceedings?

THE JUROR: I did not. But I helped with getting facts together, stuff to help his story

collaborate.

THE COURT: Were you going to be a witness?

THE JUROR: I was not called. It didn't get that far. They settled in deliberation.

THE COURT: Did they start the trial?

THE JUROR: Yeah. Did the trial, I guess.

THE COURT: EEOC?

THE JUROR: Yes. Gave the information gathering, we obtained a lawyer, well they were doing it.

THE COURT: Would any of that make you uncomfortable about sitting as a juror in this case or keep you from giving all of the parties a fair trial having gone through that experience with your stepson?

THE JUROR: I believe I could. You know.

THE COURT: You seem hesitant?

THE JUROR: Because I didn't know that that fellow he got a fair shake.

THE COURT: You don't think he got a fair shake?

THE JUROR: Not fair. Okay.

THE COURT: Do you want to ask any other questions?

MR. ROZELSKY: No.

MR. MOODY: What were the allegations? Was it a discrimination case?

THE JUROR: No, it ended up being kind of a

harassment, they even tried on the sexual harassment. I don't know.

MR. MOODY: Yes, sir. Thank you for that.

MR. MURPHY: You don't know if there was an actual lawsuit, you think it is an EEOC charge?

THE JUROR: There was an EEOC charge, they had a meeting, and they settled when they were deliberating.

MR. MURPHY: Mediation?

THE JUROR: I believe that is right. The lawyers met with him and we had -- they discussed that and decided on a settlement.

MR. MURPHY: Were you at the mediation?

THE JUROR: I was not.

THE COURT: Okay. I appreciate your coming up and sharing that with us. You did the right thing. You can go back and have a seat.

MR. MURPHY: May we discuss it afterwards?

THE COURT: We may be about through.

(Whereupon, the following was heard in open court.)

THE COURT: Okay. Anyone else need to respond to those last few questions, if so, please stand or raise your hand.

No further response is noted.

I will now read a list of potential witnesses in this case. Again, these are potential witnesses:

Kelly Dawsey; John E. J. Gibson; Robert Engelhorn, who worked for BMW Manufacturing; Sherry McCraw, who works for BMW manufacturing; Christine Petrasch, who works for BMW AG; Corey Epps, who works for Scout Motors; Sherrill Miller, who works for Morris and Savage; Nicholas Harris, who works for Greer Walker; Kathy Keiser, K-e-i-s-e-r, who works for BMW Manufacturing; Scott Medley, who works for BMW Manufacturing; Neal Gilmore, who works for BMW Manufacturing; Eva Burgmeier, who works for BMW AG; Eddy Bailey, who works for Toyota. And I will just spell Christine Petrasch, P-e-t-r-a-s-c-h, and Eva Burgmeier is spelled B-u-r-g-m-e-i-e-r.

So, let me ask you all, do any of you know any of the prospective witnesses whose names I have just read?

Have any of you or any member of your immediate family had any business dealings with any of the potential witnesses whose names have just been read or any other business or social relationship with them?

Have you or any member of your family been accused of discriminating against an employee in either an EEOC charge of discrimination or a discrimination lawsuit?

Have you ever made a managerial decision that

resulted in an employee suing either you or your company?

Have you or any member of your family sued an employer over a job-related situation?

Do you have any negative feelings towards Germans or German companies operating in the United States?

Have you or any member of your family ever made a complaint about discrimination by an employer?

If you are selected to sit on this case, then you must be able to render a verdict solely on the evidence presented at the trial and in the context of the law as I explain it to you in my instructions disregarding any ideas or beliefs that you may have previously had about the law. If any of you feel that you cannot do this, please stand or raise your hand.

Having heard the questions put to you by the Court, is there any reason that you could not sit on this jury and render a fair verdict based on the evidence presented and in the context of the Court's instructions to you on the law?

Is there any reason that would prevent you from being fair and unbiased to either Plaintiff Dawsey or the BMW Defendants if you are selected to serve as a juror in this case?

Finally, if you are selected to serve as a juror in this case, you cannot discuss the case with your fellow jurors before you are permitted to do so at the conclusion of the trial or with anyone else, including your family or the members of your household until after a decision has been reached by the jury; therefore, you cannot talk about the case or otherwise have any communications about the case with anyone, including your fellow jurors, until I tell you that such discussions may take place. Thus, in addition to not having face-to-face discussions with your fellow jurors or anyone else, you cannot communicate with anyone about the case in any way, whether in writing or through email, text messaging, blogs, or posts, or comments on social media platforms and apps like X, Facebook, Instagram, Tik Tok, LinkedIn, Youtube, WhatsApp. Is there anyone who will not be able to comply with this restriction?

You also cannot conduct any type of independent or personal research or investigation regarding any matters related to this case; therefore, you cannot use your cellphones, Ipads, computers, or any other device to do any research or investigation regarding this case, the matters in the case, the legal issues in the case, or the individuals or other entities

involved in the case. And you must ignore any information about the case you might see, even accidentally while browsing the internet or on your social media feeds. This is because you must base the decisions you will have to make in this case solely on what you hear and see in the courtroom. Is there anyone who will not be able to comply with this restriction?

So, if any of the questions I have put to you apply, please stand or raise your hand at this time.

THE COURT: Yes, ma'am.

THE JUROR: Juror number 1. I have been in human resources my entire career, so I have been deposed by --

THE COURT: Slow down a little bit. I heard you have been in human resources.

THE JUROR: Correct.

THE COURT: Go ahead.

THE JUROR: So, I have been deposed and a witness on both sides of EEOC claims, as well as a couple of lawsuits.

THE COURT: I know this was on your questionnaire, I don't have that in front of me, where do you work?

THE JUROR: I currently work for ChartSpan Medical

Technologies.

THE COURT: I heard Medical Technologies.

THE JUROR: ChartSpan Medical Technologies.

THE COURT: Can you spell that?

THE JUROR: C-h-a-r-t-S-p-a-n.

THE COURT: ChartSpan Medical technologies. How long have you been there?

THE JUROR: Been there almost two years.

THE COURT: How long have you been in the HR field?

THE JUROR: Almost 30 years.

THE COURT: You say you have been on both sides of these cases?

THE JUROR: Correct. I have been called as a witness for the companies that I worked for and also called afterwards as a witness for the things the employees told me.

THE COURT: Okay. You had specialized training as a part of your career in applicable law and regulations as it applies to the human resource field?

THE JUROR: I do. I have a bachelor's and a masters and also have a SCHR certification and CHRCPA certification.

THE COURT: Do you go for regular training in this field, seminars, meetings?

THE JUROR: I do.

THE COURT: All right. Would you be able to give both sides a fair trial?

THE JUROR: Yes, sir, I would.

THE COURT: Okay. Thank you. Anyone else?

Let me ask the attorneys if they want me to ask any additional questions or if you want to have a conversation about it?

MR. MURPHY: No further questions, but a conversation.

MR. MCCOY: I think if we could address --

THE COURT: Okay -- wait one second. Let's make sure.

(Whereupon, a bench conference was held on the record in the presence of the petit jury, but outside the hearing of the petit jury.)

MR. MCCOY: Ellison McCoy for BMW Manufacturing. Judge, I just wanted to ask 164 said she had been released, we might want to follow up on what she meant by that, was she terminated by BMW? Or did she leave for another job? What was the reason she left BMW.

MR. MURPHY: I don't have any problem inquiring, I think probably call her up to do that in case it is embarrassing. I don't have an objection to asking.

THE COURT: Okay.

MR. ROZELSKY: Your Honor, also, are we asking about people who should be struck for cause at this point? Number 8 came up here, the gentleman from Greenwood, I think given his hesitation on his ability to be fair would be an appropriate one to strike for cause. I think number one, who just spoke, the HR manager, I think she said at the end she thought she could be fair, but I think, as Your Honor would recognize, and asked several questions, the fact that she has this HR background and it sort of puts her in the, I know the legal sides of it, in my opinion, cause a reason for her to be stricken.

THE COURT: So, one and eight.

MR. ROZELSKY: One and eight Judge.

I would say 164, but they want to ask questions.

THE COURT: Any others you want to strike for cause?

MR. MURPHY: Your Honor, Brian Murphy for the Plaintiff. I would move to strike number 203 based on the answer he has given and his answers to questions six and seven of the questionnaire. He has identified himself as a manager for a supplier, deals directly with their management. And in response to question number seven, he confirms that includes sales. So he -- his livelihood is directly connected to this Defendant and

for that reason we move to strike him for cause.

MR. ROZELSKY: Your Honor, just for the record, you asked about additional questions, the Defendants would renew their request for questions four, five and six from Defendant's supplemental voir dire request. You ruled on these last week during our call. But I just want to put on the record that we renew those requests, that is -- you want the questions? Do you want me to tell you what they are again?

THE COURT: That's fine.

MR. ROZELSKY: Number 4, have you or do you know anyone who has ever been -- who has ever had any dispute or difficulty of any kind with BMW or with any of their employees? You indicated that that was too broad at the time.

Number five, have you or any of your relatives or friends been subjected to what you or they believed to be unfair action on the part of an employer? If so, explain.

Number six, this case involves allegations based on national origin, race, and sex. Do any of these topics raise strong feelings for you that might affect your judgment? We would just renew the request for those three.

THE COURT: Anything else in terms of folks you

want stricken?

MR. MURPHY: May I be heard on one?

THE COURT: That is fine.

MR. MURPHY: Your Honor, number one, the fact she has experience in the field is not disqualifying, it can be in their discretion something to use a peremptory strike on. She answered the questions both in the questionnaire and here today she could be fair. I would note, while my client is in the HR profession, so are many are their witnesses. So, I don't see. And she has always been on, what I can tell, in management, so I don't think there is cause to strike her.

On number 8, the gentleman answered all of the questions fairly and I think the fact that he had some relationship, and I didn't follow exactly what the relationship was, but somebody who apparently filed an EEOC charge is not the cause for striking someone. Again, it could be a reason for them to use a peremptory strike, but the gentleman has repeatedly answered in questionnaires and here in court today that with everything disclosed he can be a fair and partial juror.

MR. ROZELSKY: That is not what he said. What he said was, I am not sure. I could try, but I am not sure. It was his life partner's son. He said he was

involved in gathering evidence and developing the case. I think that is a reason for a strike for cause.

THE COURT: Okay. So that I am clear, BMW wants to strike one and eight; plaintiff wants to strike 203. Okay. And we are going to bring -- juror number 164.

(Whereupon, the bench conference concluded.)

THE COURT: Juror 164, would you please come forward?

(Whereupon, a bench conference was held on the record in the presence of the petit jury, but outside the hearing of the petit jury.)

THE COURT: Thank you, ma'am. Ma'am, you indicated at one point in time you worked for BMW and you were released, so could you explain what was the reason that you left?

THE JUROR: So I ended up having carpal tunnel in both of my wrists and had to be put out on worker's compensation. During the time of my worker's compensation, I was injured in a car accident that caused further issues with my lower back and things. Ended up having to go for some serious rehabilitation through that. When I was returning from rehabilitation, after I had already made BMW aware, the line manager for my specific line told me that two days prior he went ahead and terminated me from that position and that I

was no longer allowed at BMW and I would have to reapply without giving me any notice. So, I was no longer made aware of having a job there.

THE COURT: Would all of that impact your ability to be fair?

THE JUROR: Not exactly. It is not the same sort of a situation and I really wouldn't see it that way. My circumstances are totally different, so, no, I would not.

THE COURT: Okay. Any other questions for this young lady? Thank you. You may return to your seat.

Anybody want to be heard on 154 -- 164?

MR. ROZELSKY: Yes, Your Honor, this is Kurt Rozelsky, BMW AG. We believe given that she was terminated, given the tone of her voice when she was describing the situation, the suggestion that it was unfairly terminated, that that is exactly the kind of person that should be struck for cause on a case involving a BMW employment decision.

MR. MURPHY: She said it is a very different circumstance. She was terminated as a result of an injury, but she said she can be fair and this is about strikes for cause, this is not about whether I think the person leans one way or leans the other way. She answers the question, she answered them forthright, and

said she can be fair, then there is no cause to strike her.

MR. MCCOY: I would agree with what Mr. Rozelsky said on behalf of BMW MC, which is that she was terminated by our client. She admits she tried to come back to work and was terminated. I think that does give grounds to strike.

MR. MOODY: She got fired by a party, Judge.

THE COURT: Thank you.

Let's talk about these, we go through it. Let's back it up and talk about some of these other folks. 107 lived near Mr. Rozelsky, was a neighbor of Mr. Rozelsky, said they didn't have any social affiliations other than just speaking to each other across the fence. So what is everybody's position on 107? If there is --

MR. MURPHY: Not on the record.

THE COURT: If there is no one else we need to talk about, I won't go through these, but I am hearing no objection to 107.

Number 154, husband worked at BMW for a year when he was 18 years of age, I am hearing no objection to him.

Number 164, she and her mother worked at BMW for a period of time. She is the lady that just came up.

Number 186 had a son who worked for a temp

service for BMW for a period of time, left that job for another job, she said she can be fair.

MR. ROZELSKY: No objection.

THE COURT: I am hearing no objection to that juror. Juror 203 works for a supplier for the lab at BMW, he is in the plant two or three times a year, says he can be fair. I am hearing no objection.

MR. MURPHY: I did.

THE COURT: Number 203 you did move?

MR. ROZELSKY: This is Kurt Rozelsky. On 203, BMW AG, he says I work with folks in the lab. He is not dealing with people in HR. On occasion he is helping quality control. I don't think, and as Mr. Murphy has pointed out, he says if he is able to be fair.

THE COURT: Okay.

MR. MURPHY: He indicates he is in sales. He is a manager in sales. So, that is his livelihood.

THE COURT: I am hearing no objection to 51, 220.

MR. ROZELSKY: No objection.

MR. MURPHY: No objection.

THE COURT: Have I covered everyone? So the jurors in dispute are 1, 8, and 203, and 164. Juror 1 says she has worked in HR for 30 years, been on both sides of EEOC claims. She has a lot of training,

experience, and education in human resources. She goes to regular seminars to keep current on the law and regulations and she says she can be fair, but I am concerned that during deliberations her specialized knowledge in this matter could bleed into the jury process and so in order to make sure that the jurors base their ruling, base their decision solely on what is in the four walls of the courtroom, I am going to excuse her.

Juror number 8, that was the domestic partner's son was involved in a claim, but it went before the EEOC. When I asked him if he could be fair, and this is the kind of thing that is not picked up on a transcript or a cold record, but he seemed to hesitate. His hesitation, his body language, his demeanor gives me concern about his ability to be fair. I don't think he would -- I think he would give it a shot, but he seemed to be very involved in that claims process and felt that his stepson did not really receive a fair result, so I am going to excuse juror number 8. So, eight and one I will excuse.

Number 203, I think he is in and out of the plant a lot. He has frequent contacts with management with the lab at BMW so I am going to excuse that juror.

And then 164 is the lady that came up very

forthright and honest, but again this is something that can't be picked up on a cold record or transcript, but she -- there was some hesitation or a little bit of equivocation when I asked if he she could be fair to every party in the case so I will release her.

So, one, eight, 203, and 164 will be released. As to your questions for the voir dire, I think, again, for the same reasons that I gave you at the on-the-record telephone conference, I will stick with my previous ruling. I think we have covered everything.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: All right. We are back on the full record. I want to thank those of you who responded to my questions. I appreciate the fact that you provided us with additional information. Based on my conversations with the attorneys, the following jurors will be excused and allowed to leave: Juror number one, juror number eight, juror number 203, and juror number 164 would be allowed to leave. One, eight, 203, and 164.

And so as you can tell, we put a lot of effort both before you get here and after you get here to make sure that we are putting the people in that jury box who

can give both sides, all sides, all parties a fair trial.

So I will do a final catchall, is there any reason that anyone knows that they might not be able to give all of the parties in this case a fair trial? If so, please raise your right hand or stand. All right, ma'am. Stand up and give me your juror number.

THE JUROR: Juror 54.

THE COURT: Yes, ma'am. Your husband worked at BMW for about a year when he was 18?

THE JUROR: Yes, sir.

THE COURT: Okay.

THE JUROR: And I also experienced workplace harassment and discrimination at a previous job. I don't know if that would matter.

THE COURT: Can you tell me approximately when that occurred?

THE JUROR: The year 2020 to 2021.

THE COURT: I hate to ask you to do this, but can you come up here?

(Whereupon a bench conference was held on the record in the presence of the petit jury, but outside the hearing of the petit jury.)

THE COURT: Okay. When did you say this took place?

THE JUROR: In 2020 and 2021.
THE COURT; where were you working?
THE JUROR: Keller Williams.
THE COURT: Keller Williams?
THE JUROR: Yes.
THE COURT: Is that a real estate firm?
THE JUROR: Yes.
THE COURT: And you were the victim of some type of harassment?
THE JUROR: Yes, workplace harassment.
THE COURT: Okay. I am not trying to embarrass you, but can you describe the nature of it? Was it sexual harassment or hostile?
THE JUROR: It was a hostile work environment and I was also told that I wouldn't -- she wouldn't have hired me if she had known my brother's sexual orientation.
THE COURT: All right. Did you file any type of claim?
THE JUROR: No, I wasn't allowed to. They don't have an HR department.
THE COURT: So, did you leave voluntarily?
THE JUROR: I did.
THE COURT: You have heard what this case is about.

THE JUROR: Uh-huh (affirmative response).

THE COURT: And just let me ask you, could you be fair if you sat as a juror in this case?

THE JUROR: Probably not.

THE COURT: All right. I appreciate your honesty. Thank you. You can have a seat.

THE COURT: All right. Any objection to this juror being allowed to leave?

MR. MURPHY: Leave? I don't.

THE COURT: We will excuse 154.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Anyone else have any concern about their ability to be fair? If so, raise your hand and please stand.

No response provided.

Juror number 154, you will be excused, you may leave.

Let me ask the lawyers, is there anything else before we ask the Clerk to generate a list of potential jurors?

MR. MURPHY: Nothing from the Plaintiff, Your Honor.

MR. MCCOY: Nothing from Defendant BMW MC.

MR. ROZELSKY: Nothing from BMW AG, Your Honor.

THE COURT: All right. Madame Clerk, will you please give me a jury?

All right. I try most of my cases in Anderson, but I tried the first case in this, the first jury trial, and there are some quirks so the clerk is going to generate a list of names that the lawyers will use to pick the jurors.

Now, in Anderson we do that while we are altogether, but can't do it here. They have to go back down to the jury assembly room and get on a computer to generate that list of names so that is going to take a few minutes. And some people may want to stretch their legs or use the restroom or get a drink of water. So, how long do you think that will take, Ms. McAlister?

THE CLERK: Ten minutes.

THE COURT: So, let's take about a fifteen-minute break or so while that process is completed. And, I mean, the lawyers will need some time to look it over, so it could probably be 20 minutes. Keep in mind you can go outside if you want to, but if you come back in, you will have to go through that machine down there, the metal detector, I hate it but it is just the world we live in.

So now I am going to hush and the Clerk's office is going to go downstairs and generate that list and

come back and then the lawyers are going to look at the list and then we are going to go from there, but we are going to get ten of y'all to serve on this jury.

Now, here is the other thing. Sometimes that computer doesn't work. If it doesn't, we are going to put everyone's number in a jar and shake it up and somebody is going to have to pick those names out. They probably say I have jinxed it. In Anderson we got this thing with a roller on it for such emergencies, but we are going to hope that that computer works and we are going to hope that we can get these microphones to work, but whether we do or whether we don't, we are going to have this trial. So with that, y'all can take a break. I would ask that you be back in about 20 minutes. They haven't provided a clock for this room, but my watch says 11:08, so take about twenty minutes, come back in. They may be in the process of looking at their list when that happens, but that is okay.

Don't talk to each other about this case or anybody else about the case. And here is another thing, if you see some of these lawyers, they may want to take a break, too. If you see some of them out in the hall or lobby and they don't speak to you, don't be offended, they have been taught not to talk to potential jurors. Don't do any research about the case, talk to

anybody about the case. You haven't even heard anything about the case yet, you haven't heard any testimony yet. So, with that we will be in recess for 20 minutes. Thank you.

(Whereupon, a short recess was held.)

THE COURT: Thank you, please be seated. All right. I have been told the computer in fact did malfunction, but with our crack team, the folks with the Clerk's office, they were able to make it work, so we now have a list of names generated by the computer and let me just ask the Plaintiff, is the Plaintiff ready to proceed?

MR. MURPHY: Yes, sir.

THE COURT: Are the Defendants ready to proceed?

MR. MOODY: Defendants are ready to proceed, Your Honor.

MR. ROZELSKY: Yes, sir.

THE COURT: Madame Clerk, three and three.

THE CLERK: Ladies and gentlemen we will now strike the panel. The Plaintiff and the Defendant will each have three strikes. Counsel is reminded to strike using the random number on the far left side. The Plaintiff will strike first immediately followed by the Defendant. We will proceed in that order until all strikes are completed.

What says the Plaintiff for her first strike?

MR. MURPHY: Number six.

THE CLERK: What says the Defendant for its first strike?

MR. MOODY: Please excuse number 2.

THE CLERK: What says the Plaintiff for her second strike?

MR. MURPHY: Number one.

THE CLERK: What says the Defendant for its second strike?

MR. MOODY: Please excuse number 4.

THE CLERK: What says the Plaintiff for her third strike?

MR. MURPHY: Number five.

THE CLERK: What says the Defendant for its final strike?

MR. MOODY: Please excuse number 15.

THE CLERK: For the record, Plaintiff has struck numbers one, five and six; Defendant has struck numbers two, four, and fifteen; is this correct?

MR. MOODY: That's correct.

MR. MURPHY: Yes.

THE CLERK: Thank you.

Ladies and gentlemen, when I call your number, please stand and come sit in the jury box to my left:

117, 173, 190, 17, 35, 51, 7, 138, 140, 153.

THE COURT: All right. Thank you, Madame Clerk. Just to make sure there is no confusion, you folks who have been selected, if you will just raise your hand when I call your juror number: Juror number 117, 173, 190, 17, 35, 51, 7, 138, 140, 153. If I didn't call your number, raise your hand. Thank you.

All right is there anything from the parties before I release the remaining members of the panel?

MR. MURPHY: Nothing from the Plaintiff, Your Honor.

MR. MOODY: Nothing from Defendant BMW MC, Judge.

MR. ROZELSKY: Nothing from Defendant BMW AG.

THE COURT: All right. Those of you who were not selected, I want to take this opportunity to again thank you for coming and for your willingness to serve. You are free to leave at this time. And let me ask the Clerk -- do you want them -- they can just throwaway those juror numbers? You can discard the juror numbers or you can keep them as a souvenir. If you need some help with an excuse for work or some verification that you have been here, the folks in the Clerk's office will be glad to help you with that. So, with that, thank you, and we may catch you next time. Let me speak with

the lawyers just briefly. This doesn't need to be on the record.

(Whereupon, a bench conference was held off the record in the presence of the trial jury.)

THE COURT: All right. Madame Clerk, will you administer the oath to our jurors who have been selected to serve?

THE CLERK: Ladies and gentlemen, please stand and raise your right hand to be sworn.

(Whereupon, the trial jury was sworn.)

THE COURT: Thank you.

Members of the jury, I want to again thank you for your willingness to serve as jurors in this case. Let me make a couple of comments and then we will break for lunch and ask that you come back and we will get into the case.

In terms of the schedule, we will try to start at nine o'clock, if possible, or shortly after nine o'clock in the morning and I will do my best to get us finished by five. Now, I am mindful that some of you have a ways to drive and I want to be sensitive to that and sensitive to your needs.

A trial is not a play so we don't have this script that we go by, it is a fluid proceeding. So some days we may finish before five. And when we can, I

would like to do that to give you a jump on the traffic, but there may be some days we need to go past five if we have a witness who is testifying and it is five o'clock and we can finish that witness's testimony with another 20 minutes or so, we might want to go ahead and do that so that will put us in a better position in terms of finishing up sooner than what we have asked you to be prepared for.

So, you have been sworn and we are going to break for lunch and I will ask that you try to be back here in the jury room by one p.m. Let me just reiterate the instructions I have previously given, do not discuss the case with each other or anyone else. Do not do any independent research about the case, keeping in mind that you have to base your ultimate decision on what you hear and see in this courtroom. So, with that, we will break for lunch and when we come back I will give you some preliminary opening instructions and the lawyers will make their opening statements and then we will begin the testimony.

Now, if at any point in time during the trial you need a break, just raise your hand and get my attention. I may not see it, but somebody will and they will make sure that I see it. So with that, anything else before we take our break?

MR. MURPHY: Not from the Plaintiff, Your Honor.

MR. MCCOY: Not from the Defendant.

MR. ROZELSKY: Nothing, Your Honor.

THE COURT: At this time, we, you will be excused for lunch. Everyone remain seated while the jury is excused. If you will follow the Court Security Officer to my left.

THE COURT: All right. We will be in recess until 1:00 o'clock.

(Whereupon, a lunch recess was held.)

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: All right. We are on the record. Mr. Murphy, I believe you wanted to talk about sequestration.

MR. MURPHY: Yes, Your Honor, thank you. Your Honor, Plaintiff moves that the witnesses in this matter be sequestered to include instructions that those in the courtroom be instructed not to discuss with any witness coming up what is said in the courtroom during this trial. And on my side I, of course, just have the one live witness for this portion and I am not sure I introduced you, Your Honor, but the gentleman who is with us is Mr. Dawsey, Greg Dawsey, her husband.

THE COURT: Thank you.

MR. MURPHY: We would probably appreciate we have a clear understanding we break at the end of the day that also what they can and can't talk about tonight if she is not wrapped up.

THE COURT: Okay. I will be glad to hear from the Defendants.

MR. MCCOY: Your Honor, Sherry McCraw on behalf of BMW MC, we certainly have no issue of sequestration of witnesses. In fact, the only witness of ours that is present in the courtroom is Ms. McCraw, who is our corporate representative. We have instructed her on sequestration, she understands. The other witnesses who will appear we will coordinate so that they do not come in the courtroom during the trial, but we understand the communication. But, you know, at the same time, I mean, we certainly have the right to meet with our witnesses and prepare them for trial. I understand we can't tell them what the testimony is in court.

THE COURT: Mr. Rozelsky.

MR. ROZELSKY: I just join in BMW MC on that point.

THE COURT: All right. Does that satisfy you, Mr. Murphy?

MR. MURPHY: Yes, sir, thank you.

THE COURT: I will grant that motion and request -- and I appreciate counsel's cooperation in that regard. Is there anything else before we bring in the jury and I give them some preliminary instructions and then you can do your opening and we are good to go?

MR. MURPHY: Nothing from the Plaintiff, Your Honor.

MR. MCCOY: Nothing further, Your Honor.

MR. ROZELSKY: Nothing further.

THE COURT: All right. Let's bring in the jury, please.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Welcome back, members of the jury. Now that you have been sworn, I want to give you some preliminary instructions to guide you in your participation in the trial. At the end of the trial, I will give you more detailed guidance on how you are to go about reaching your decision.

Madame Clerk, did we get note pads for everybody?

THE CLERK: Yes, sir.

THE COURT: Okay. Thank you.

It will be your duty to find from the evidence what the facts are. You and you alone are the judges

of the facts. You will then have to apply those facts to the law as I give it to you. You must follow that law whether you agree with it or not. Nothing I may say or do during the course of this trial is intended to indicate or should be taken by you as indicating what your verdict should be.

I want to talk about evidence. The evidence from which you will find the facts will consist of the testimony of witnesses and the documents or other things received into the record as exhibits. Additionally, the lawyers may agree or stipulate to facts which are not in dispute, and when they do so, you may accept the facts as stipulated. I may also tell you that I am taking judicial notice of certain facts, which you must accept as conclusive. It is always up to you, however, to decide what facts are established by the evidence and what inferences are to be drawn from the evidence. Certain things are not evidence and must not be treated as evidence by you. I will list them for you now.

Statements, arguments, and questions by the lawyers are not evidence. Objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe evidence being offered or a line of questioning is improper under

the Rules of Evidence. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered. Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

Now, as to what does constitute evidence that you may consider in reaching your decision, there are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact such as testimony of an eye witness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore

evidence; that means that when you are deciding the case, you must not consider the evidence I told you to disregard. It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I will give you some guidelines for determining the credibility or believability of witnesses at the end of the case.

Now, I want to talk about what the case is about. Plaintiff Kelly Dawsey, formerly employed as a Department Manager in Human Resources at the BMW plant in Spartanburg alleges that the BMW Defendants discriminated against her on the basis of her national origin, sex, and/or race. Plaintiff has brought discrimination claims under two different laws. The first law is Title Seven of the Civil Rights Act of 1964 as amended, often called Title VII, which prohibits discrimination based on national origin, race, or sex. The second law is 42, United States Code, Section 1981 or Section 1981, which also prohibits discrimination based on race. Each Defendant denies that it engaged in unlawful discrimination or that it is liable to the Plaintiff in any way. I will give you detailed instructions on the law at the end of the case and those instructions will control your deliberations and your

decision.

Now, I want to talk to you about the burden of proof. This is a civil case. Each party who asserts a claim in a civil case has the burden of proving its claim by what is known as a preponderance of the evidence. That means the party asserting the claim must produce evidence, which considered in light of all of the facts, leads you to believe that what that party claims is more likely true than not. To put it differently, if you were to put the evidence produced by both parties on opposite sides of the scales, the party asserting the claim would have to make the scales tip slightly on that side. If the claimant fails to meet this burden, the verdict must be for the other party.

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt. This is a stricter standard. It requires more proof than a preponderance of the evidence. The reasonable doubt standard does not apply to a civil case and you should, therefore, put it out of your mind.

Now, a few words about your conduct as jurors. First, I instruct you that you are not to discuss the case or anything about it with each other or anyone else, including your families, friends, and the other

jurors. Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about the case. Do not read any news accounts about this case in any newspaper or watch any such news accounts on television or listen to any such news accounts on the radio or from any other source. You must not consider anything you have read or heard about the case outside the courtroom, whether before or during the trial or during your deliberations.

Please do not try to find out information about this case from any source outside the confines of the courtroom. You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom. This means that during the trial, you must not conduct any independent research or investigation about the case, the matters in the case, or the individuals or parties involved in the case by any means, including, but not limited to, consulting dictionaries or reference materials, searching the internet, websites, or blogs, or using any other electronic tools to obtain information about this case or help you decide the case. I know that many of you use cellphones, laptops, the internet, and other tools of technology. While the trial is ongoing, you must not use these tools to communicate electronically with

anyone about the case or to conduct research into the case. You may not communicate with anyone, including your family and friends, about the case on your cellphone through email, IPhone, Android, text messaging, or through any blog, website, internet chat room, or any social networking website, including Facebook, SnapChat, Instagram, X, formerly known as Twitter, Tik Tok, LinkedIn, or Youtube. You may not use any similar technology or social media even if I have not specifically mentioned it here.

After you retire to deliberate only then may you begin discussing the case with your fellow jurors. You may not discuss the case with anyone else until you have returned a verdict and the case is at an end. I expect you will inform me if you become aware of another juror's violation of these instructions.

Now, obviously, your family members will know that you are serving on a jury, otherwise, it might be hard to explain what you are doing all week and certainly you can tell them that you are serving on a jury, but you cannot discuss the case with them or anyone else. A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result, which would require the whole trial process to start over.

A question sometimes arises as to whether individual members of the jury will be permitted to take notes during the trial. If you want to take notes during the course of the trial, you may do so. On the other hand, of course, you are not required to take notes if you do not want to, that will be left up to you individually. However, it is difficult to take detailed notes and pay attention to what the witnesses are saying at the same time. If you do take notes, be sure that your note taking does not interfere with your listening to and considering all of the evidence. Also, if you do take notes, do not discuss them with anyone before you begin your deliberations. If you choose not to take notes, remember that it is your own individual responsibility to listen carefully to the evidence. You cannot give this responsibility to someone who is taking notes. And if you take notes, remember they are for your own personal use, they are not to be given to or read by anyone else. We depend on the judgment of all members of the jury, each of you must remember the evidence the case.

If you do take notes, I ask that you put your names on the top page of your note pads and begin your notes on a subsequent page, this will protect the privacy of your notes when they are in your seats or in

the jury room and you are not present. Do not take your notes with you at the end of the day, be sure to leave them in the jury room during lunch and bathroom breaks. Please turn your notes face down in your chair so they may not be read by anyone passing by. Court Security Officers will ensure that the notes are safe and secure during recesses and when you leave the courthouse each afternoon.

No statement, ruling, remark or comments that I may make during the course of the trial is intended to indicate my opinion as to how you should decide the case. Nor is it intended to influence you in any way in your determination of the facts. At times, I may ask questions of witnesses. If I do, it is for the sole purpose of bringing out matters that I feel should be brought out and not in any way to indicate my opinion about the facts or indicate the weight I feel you should give to the testimony of the witness.

If I find it necessary to admonish a lawyer, you should not show prejudice toward the lawyer or the client of that lawyer because I have admonished him or her.

Before each recess I will not repeat the entire admonition I have just given you, probably I will refer to it by saying please remember the admonition or

something like that or do not discuss the case or do any independent research about the case; however, even if I forget to make reference to it, remember that the admonition still applies at all times during the trial.

When outside the courtroom, if you should see any of the attorneys or parties and they do not greet you, do not be offended or think they are being rude, they are not permitted to talk to you. If anybody approaches you and tries to talk about the case, report that to me or Court staff immediately without discussing it with your fellow jurors.

Finally, do not form any opinion until all of the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

Let me say a quick word about proceedings that take place here in the courtroom when you are not present. Occasionally in trials it becomes necessary for me to ask the jury to step outside the courtroom while I take up a matter with the lawyers out of the jury's presence. The purpose of these proceedings is not to hide anything from you but to ensure that the trial is conducted fairly. Often times during these conferences we are discussing whether certain evidence should be presented to the jury or not. Obviously, you should not overhear discussions about possible

evidence as I may later determine that it should not be presented to the jury. If any of you have friends or relatives who will be attending the trial with you, they are certainly free to sit in designated areas and view the proceedings. I would ask, however, that any time the jury is excused from the courtroom for these private discussions with the lawyers that your friend or relative step out into the hallway and remain away from the courtroom until the discussions have concluded. The reason for this precaution is, I am sure you will understand, is to be absolutely certain that you are not exposed to anything that you should not see or hear about the case.

The trial will now begin. First, each side may make an opening statement. An opening statement is neither evidence or argument, it is an outline of what that party intends to prove offered to help you follow the evidence.

Next, Plaintiff will present any witnesses she may have and the Defendants may cross-examine such witnesses. The Defendants may also present witnesses who Plaintiff may then cross-examine. After all of the evidence is in, the attorneys will make their closing arguments to summarize and interpret the evidence for you and the Court will give you instructions on the law.

You will then retire to deliberate on your verdict; however, you must first wait until I instruct you that deliberations may begin before you start discussing the case with your fellow jurors, and at no time may you discuss this case with anyone else.

Your verdict must be unanimous. Your deliberations will be secret, you will never have to explain your verdict to anyone.

As I say -- as I said earlier, this trial is scheduled to go through Wednesday of next week, but that may not be necessary. We have talked a little bit about the daily schedule, I recognize that some of you are having to drive a ways to get here so I want to be mindful of that. Service on a jury is hard work, but it also is a rare privilege. By the oath that you have taken, you will become active participants in the public administration of justice and have become judges of the facts in this particular case. I want to impress upon you that your role in this case is just as important as mine in the operation of this trial. I am confident that you will pay close attention to the evidence and give both parties a fair trial in this case.

And now with these preliminary instructions in mind, please listen carefully to the opening

statements. We will begin with the attorney for the Plaintiff and then hear from the attorneys for the Defendants. Remember, while the lawyers' statements may be helpful, they are not evidence.

Thank you.

Mr. Murphy.

MR. MURPHY: Thank you, Your Honor. Good afternoon now again. We met earlier. I am Brian Murphy. I have the honor of representing Kelly Dawsey. I will try to keep this brief because you will hear from Kelly as soon as these openings have concluded.

Kelly graduated from Clemson in about 1990 and then she started her Human Resource or HR career at Westinghouse Savannah River Site. After about five years of gaining experience in HR with Savannah River Site, she got a position at BMW and that would have been about 1995, a little over 30 years ago.

For about 20 years, Kelly moved around into different positions, and different jobs, and received promotions until 19 -- excuse me -- 2015 she was promoted to a position you will hear called TX-60. TX-60 is the Department Manager position for Compensation at BMW reporting to the Vice President of Human Resources. Kelly was in that position for about seven years.

In 2021, the Vice President of HR at BMW tells Kelly that she needs to leave her position and then tells her in a subsequent conversation that she is going to be demoted to another position. Now, it wasn't because of Kelly's work, that was excellent, and you will see Kelly's reviews from BMW itself about the quality and excellence of her work. Kelly didn't have to leave her job because of her performance, she was given one reason why she had to leave that job, she is an American. BMW has a rule that when one person, say the vice president of HR is of one nationality, then the person in her position has to be a different nationality. They have a German vice president, then an American can serve in the role. But when BMW decided to bring an American, Sherry McCraw, into the vice president, they told Kelly she had to leave her job because she is an American. And as the Judge has alluded to, we are also pursuing other theories of discrimination, you will hear about that, also.

Now, I am going to be very brief to give you just that much of what I call the 30,000 foot view of this case because, and I will apologize in advance for this, the detail and the evidence in this case is going to be very complex at times and we are going to get into a lot of matters where you are going to hear about

functions, function levels, personal grades, a lot of HR corporate-type detail stuff that I will freely understand is dry and boring. The reason we are going into it, though, I am going to ask you to please, as difficult as it is, pay attention to it because once we put all of that together, you will understand how Kelly was treated differently on the basis of the claims that we have brought.

So, it doesn't sound like that story I told you should take very long to present evidence on, but there are two reasons we have to do that: First, is, as I explained, the detailed matters in this case in terms of understanding the discrimination. You are also going to hear a lot of evidence, which you may not understand at first why I keep talking about Germany and Germans being involved in the decision-making. There will be a lot of evidence on that. I will tell you right now, the reason I am going into that is because BMW AG contends it is not a proper party to this lawsuit and it shouldn't be sued. And they are going to have their story, you are going to hear a lot of evidence about that. So, that is why we are going into the extensive detail. And Kelly's examination will be long, okay, but here is the good news, if everything goes according to plan, Kelly is the only live witness we

will need to call in our case.

So, once we are done with her, the defense will put up its witnesses, we may have something in reply, we don't know yet. After the Judge makes some decisions, we will make that decision, but that is how we are going to present it. So, that is a very, very truncated nutshell version of what is going to happen in this case because Kelly is going to get up as soon as these closings (sic) are done, Kelly will get up and give you all the detail and the story from her own mouth. So, I thank you in advance for your attention and your patience and we will try to get through this as quickly as we can.

Thank you.

MR. MCCOY: Good afternoon, ladies and gentlemen. May it please the Court. Ladies and gentlemen, this case, let me tell you what it is not about. This case is not about somebody being fired, it is not about a pay cut, it is not about a demotion, it is not about somebody being pushed out of a job. None of those things happened in this case. You will hear that evidence right here in front of you. Instead, this is a case where the Plaintiff, Ms. Kelly Dawsey, actively engaged in a search to find a job outside of BMW Manufacturing and decided to voluntarily leave her

position with BMW because she disagreed with decisions that were being made by management at the company. Now, my client doesn't dispute that Ms. Dawsey had the right to seek another job. Of course, that is her right, and, frankly, you will hear she has done very well for herself, she is now the Vice President of Human Resources at GSP Airport. But deciding to leave your job does not give you a valid legal claim against BMW Manufacturing.

Now, it is my honor and privilege to serve as counsel for BMW Manufacturing in this case. Let me introduce you to my colleague, Randy Moody, will be working with me. Next to Randy is seated Sherry McCraw, you will hear from Ms. McCraw later. Ms. McCraw is currently the Vice President of Human Resources at BMW Manufacturing. Also joined by Mallory Gantt in the back and Jodi Fowler, who is our paralegal who will be assisting us with all of the electronics and help you see the exhibits.

Now, you are saying, what does BMW manufacture? BMW Manufacturing is the plant that sits right out on Interstate-85. At this point in time everybody knows what BMW Manufacturing is, but that is the legal name for it, as we have heard in the courtroom today, we will refer to it as BMW MC. BMW Manufacturing is an

American company. It was established in 1992 right here in the Upstate of South Carolina. BMW Manufacturing has a German parent. Shocking. BMW is a German company. We are not going to hide from that. And with us you will hear from Kurt Rozelsky, who represents BMW AG in just a few minutes, but BMW AG is the parent company to BMW Manufacturing.

You will hear testimony from our witnesses about how BMW Manufacturing is part of BMW AG's global production network, which consists of 30 plants around the world. But guess what? BMW Manufacturing is the most productive plant of all of the BMW plants. BMW Manufacturing produces more vehicles out of this plant in South Carolina than anywhere else in the world.

Now, back in 1992, some of you are like me, old enough to remember that, back in 1992, there was no BMW manufacturing, there were some peach orchards up near -- well, a much smaller GSP Airport then. And you may recall, those of you who were around or heard the story, our Governor at the time, Carroll Campbell, was instrumental in working with BMW AG and convinced them to come to South Carolina to build a plant here. That plant -- one of the biggest concerns for the Germans when they decided to build a plant in South Carolina was, wow, we find enough labor? We need 2,000 people

to build vehicles in South Carolina, can we find enough people? Governor Carroll Campbell convinced them that they could. I don't know if you noticed when you walked in the door of this courthouse today whose name is on the building, Carroll Campbell. The reason his name is on this very building is because of his legacy, certainly as Governor of our state, but also because of his instrumental role in bringing BMW to the United States and to the Upstate of South Carolina.

MR. MURPHY: Excuse me, Your Honor, can we approach?

THE COURT: Yes.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

THE COURT: Okay.

MR. MURPHY: Your Honor, there is not a single witness that is going to testify to any of this. And tying the name of this courthouse to BMW in that way is just a very transparent attempt to improperly influence this jury. There is no witness talking about Carroll Campbell. There is no witness who was here in 1992. And now to say that this man -- this courthouse is named for Carroll Campbell because of what he did with BMW is, one, completely misleading, has nothing to do with the

issues in this case, and it is just a really improper attempt to influence this jury.

He can talk about what the evidence is going to show regarding these discrimination claims that are in this case, but to go back and say that -- and tie this courthouse to the name of Carroll Campbell and BMW and say this courthouse is named for Carroll Campbell for what he did in bringing BMW here is completely inappropriate.

MR. MCCOY: I don't believe I said that. I was just giving background on Carroll Campbell. Carroll Campbell played a role in the plant. We do have a witness who will testify to that, who was one of the first employees in the plant will testify about being there when Carroll Campbell was on-site when the ground is open.

MR. MURPHY: He is tying this courthouse and this court to BMW and Carroll Campbell through those, that is completely inappropriate.

MR. MCCOY: All I said was he was instrumental in bringing BMW here. He was also the Governor.

MR. MURPHY: What about the courthouse?

MR. MCCOY: I am moving on.

THE COURT: Okay. Well, I understand there is going to be some testimony that is proffered about the

history of the company and how it got here, but he tells me he is moving on, so what are you asking me?

MR. MURPHY: Can the jury be told to disregard the statements about the courthouse and Carroll Campbell's name being on the courthouse and it is because he brought BMW to South Carolina.

MR. MCCOY: I didn't say because he brought.

THE COURT: To the extent you are objecting and asking me to do that, I am not going to do that. He says he is moving on, and people walk in, they se the name, different people have different views about politicians, and I think if he is moving on it will be better off to leave it there.

MR. MOODY: Your Honor, just for the record, one of the things of our defense is the struggles to continue to have a confident and qualified work force. There is going to be lots of testimony related to that.

MR. MURPHY: There has been no witness that has been identified for any of this. This is about why they did what they did. My understanding is we are talking about things that don't have anything to do with this case. The struggle to keep competent, what does that have to do with --

THE COURT: I don't know, but I am sure we are going to hear about it as we move forward.

MR. MOODY: Yes, sir.

THE COURT: All right. Thank you.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Proceed.

MR. MCCOY: Thank you, Your Honor.

Now, during this trial, you are going to hear from several witnesses at BMW Manufacturing, who will tell you about the impact that this company has had on the Upstate of South Carolina. The plant originally was supposed to have 2,000 employees, now has over 10,000 employees. Since September of 1994, when the first vehicle was built at BMW Manufacturing, my client has now produced more than 7 million vehicles. Many of those vehicles are exported through the Port of Charleston creating more jobs throughout the state.

So, I give you that background to talk about, you know, Ms. Dawsey and Ms. Dawsey's role with my client. Like I said at the beginning, it is important to recognize this is not a case where my client was looking to get rid of Ms. Dawsey. As Mr. Murphy explained to you, Ms. Dawsey worked at BMW Manufacturing for more than 26 years; all of in it the HR Department. She rose through the ranks. Started as an entry-level employee in 1995, became a Section Manager in 2000;

2011 she was promoted to a Section Manager in Human Resources Operations; and then in 2015 was promoted to a Department Manager role in Human Resources.

You heard Mr. Murphy mention the TX-60 role that she was in. In that role she was responsible for what was known as Human Resources planning, compensation, and benefits.

From 2015 when she was promoted to that position through the time that she resigned in January of 2022, Ms. Dawsey remained in the TX-60 role and was one of the top managers in the Human Resources Department at BMW Manufacturing. So, the question is, why did Ms. Dawsey leave BMW Manufacturing in 2022? Ultimately that is the question you are going to have to decide at the end of this trial.

Now, the evidence will show you several things and it is really important that you pay attention throughout the trial, as the Judge said, as to the evidence that comes in the courtroom, but pay attention to the timing that happens here.

There are several important things that occur in 2021 that are, from my perspective, important to this case. First of all, in the spring of 2021, Christine Petrasch, you will hear from, at that time Ms. Petrasch was the Vice President of Human Resources at BMW

Manufacturing. She decided to create a special Human Resources project to talk about work force development. And she selected one of the Department Managers in Human Resources, an individual by the name of Scott Medley, to lead that project. The plan was that project would start in early 2022. The result of her creating that project is suddenly there was a vacancy in the Department Manager level at BMW Manufacturing. The TX-60 full position was -- Medley was vacating it to go to the project.

Second, in June of 2021, BMW Manufacturing did its annual, what they call, succession platform. You will hear more detail about that from several of our witnesses, but what happens in that process is the company at the management level decides, hey, let's look ahead, how do we fill positions as they come open? In terms of movement of people, training of people, what is the effective way for us to get the best people in the right jobs?

Ms. Dawsey, at that time, had already been in the TX-60 role for six years. As part of the June 2021 succession planning, you will see and hear that there was talk about her moving outside of the Human Resources department to get additional experience and additional skills.

On September 1st of 2021, Dr. Robert Englehorn became the CEO of BMW Manufacturing. Mr. Englehorn will be here, you will hear from him. Dr. Englehorn, when he started in September of 2021, one of the first responsibilities he had was to find a new Vice President of Human Resources. Ms. Petrasch, who I just mentioned, her time in the United States was ending, she was planning to go back to a role at BMW AG at the end of 2021. So, when Dr. Englehorn comes on board he decides, look I have got to get a new VP of HR. Dr. Englehorn made the decision to promote Ms. Sherry McCraw, an American, to the -- what is known as the TX-6 position. TX-6 is the Vice President of Human Resources. So, we will talk in code some throughout this trial, will try to help you understand. TX-6, vice president of Human Resources. Ms. McCraw filled that role or Dr. Englehorn selected Ms. McCraw to fill that role.

You will hear a lot more about Ms. McCraw during the trial, you will hear from her, but Ms. McCraw had a wide variety of experience at BMW, including she was the Chief Financial Officer at BMW Manufacturing, she was also the Vice President of Assembly, was responsible for the largest department of the plant that builds cars, and she also had done a stint in Germany.

As part of that process, Dr. Englehorn convinced Ms. Petrasch to stay on beyond the end of the year, so into the end of March of 2022 in order to allow the transition for Ms. McCraw to move from Assembly into HR.

Now, you will also hear that prior to starting work at BMW Manufacturing, Dr. Englehorn met an individual by the name of Eva Burgmeier. Ms. Burgmeier was a Human Resources Professional at BMW AG in Germany. Ms. Burgmeier, the testimony will show, Ms. Burgmeier was interested in an international assignment. Dr. Englehorn notified Ms. Petrasch that Eva was interested in a job and the decision was made by Ms. Petrasch to bring Eva Burgmeier to BMW Manufacturing to work in the Human Resources department.

In late September of 2021, Ms. Petrasch made a proposal to Dr. Englehorn and also to Ms. McCraw, who was going to be filling the Vice President of Human Resource's role to make changes to the structure abroad. Again, Mr. Medley was going out early in 2022, and the decision was made by Ms. Petrasch along with -- she received feedback from Ms. McCraw and Dr. Englehorn to place Ms. Burgmeier in the TX-60 role, the role that Ms. Dawsey held at the time. So, the plan was Ms. Burgmeier is coming to the United States, she was going to take TX-60, Ms. Dawsey is going to move to the

TX-64 position, which is the position being vacated by Mr. Medley. Both of those roles, Department Manager roles, reporting to Vice President of Human Resources.

Now, Ms. Dawsey will tell you that there was chaotic communication in early September. And what she will -- what you will ten is that in early September of 2021, Ms. Dawsey engages a recruiter to help her find a new job outside of BMW Manufacturing. So, she starts a search for a new job. And the record will reflect that on September 10th of 2021, she is actively engaged in a search for a new job. The evidence will show you that job search started before Ms. Dawsey knew that Ms. Burgmeier was coming to BMW Manufacturing or that she was going to be moved out of the TX-60 position.

Now, you will hear from us through the end of the year, from September to December, BMW Manufacturing was making plans with this restructure for the department, with Ms. Burgmeier going to come in early '22, Mr. Medley going to the project, Ms. Dawsey moving over to TX-64. That plan included meetings with the, first of all, the Department Managers that were under, at that time, Ms. Petrasch -- or reporting directly to Ms. Petrasch in the TX-6 Department, the Human Resources Department. Those employees were reporting directly to Eva. In that meeting, they were showed a

PowerPoint, you will see it here. That PowerPoint showed Ms. Dawsey moving to the TX-64 role.

You will also learn that in December of 2021, Ms. Dawsey held a meeting with her team, in which she told them, I am going to be moving to the TX-64 role. However, the evidence will show that three days before she held that meeting with her team, Ms. Dawsey had actually accepted another job and was leaving BMW Manufacturing.

After obtaining that job, and that job was with a company called Madewell concrete, we will learn more about that. The job she obtained with Madewell Concrete made her the top Human Resources person at that company. After she accepted that job in early December, she waited three weeks to tell BMW she was leaving. And then when she did tell BMW, she called Ms. Petrasch, who happened to be on holiday over the Christmas holiday was back in Germany, which, of course, setoff a kind of mad dash to try to figure out what they were going to do with our restructured Human Resources Department, you will hear all of that from Ms. Petrasch.

You will hear Ms. Petrasch was disappointed that Ms. Dawsey was leaving the company because she planned on her being an integral role in the new restructured HR Department. You will hear that Dr. Englehorn asked to

meet with Ms. Dawsey before she resigned. And when Ms. Dawsey met with Dr. Englehorn, one of the things she told him was she was upset that she had not been considered for the Vice President of Human Resources job.

Ladies and gentlemen, I tell you, there is one critical fact you must pay attention to in this case. And that is that on January 14th of 2022, when Ms. Dawsey walked out the door at BMW Manufacturing for the very last time, she was still in the TX-60 position, the position that she held for the past seven years, she was still in the same job. The organizational changes that she had talked about that, you know, are the heart of the issue in this case, they never occurred. They had not occurred at the time she left the company.

At the time she left the company on January 14th of 2022, none of the terms, conditions, or privileges of employment that Ms. Dawsey had at BMW Manufacturing had changed in any way. This case is all about speculation, what might have happened to Ms. Dawsey had she stayed around, but the evidence is going to show you she didn't, she left. She decided to take another job. I get it. That is not a problem, people move. To her credit, she sought out another job where she could be

the top Human Resources professional at a company, but that does not create a legal claim against my client.

Now, in this case, Ms. Dawsey alleges that BMW Manufacturing has discriminated against her based upon her national origin, her race, and her sex. These are serious claims, serious allegations, and you must treat them as so because at the end of the day, you have to weigh the evidence and render a verdict as to whether my client discriminated against Ms. Dawsey in any way.

I am going to ask for two favors from you: First of all, please be patient. As Judge Cain has already explained to you, Ms. Dawsey gets to go first so she gets to tell her story, but as we all know, there are two sides to every story, so we ask you to be patient, don't make up your mind, listen to all of the evidence before you render any or make up your mind or render any decision.

Second, as Judge Cain has instructed you, it is important for you to pay attention to the evidence in the courtroom, not things you hear outside. Block out the outside noise, focus on what you hear in here in terms of making your decision. If you do, we believe the evidence will reveal that BMW Manufacturing did not take any action against Ms. Dawsey based upon her national origin, her race, or her sex. Instead, the

evidence will show you, she left BMW on her own accord, her own decision to seek out what she viewed as greener pastures.

Thank you very much for your service. Once you have heard all of the evidence, we are confident you will return a verdict for our client, BMW Manufacturing.

Thank you.

MR. ROZELSKY: May it please the Court. Good afternoon. I am the last one to get to talk to you, hopefully I will be the shortest of those for your sake and mine.

My name is Kurt Rozelsky. I represent BMW AG, you heard me say it before, I am probably not going to butcher it again, but it is the BMW parent company; we will call it BMW AG. It is important that you listen to all of the evidence. This is like putting together a puzzle, okay. If you have ever put together a puzzle, if you do it like I do, you set the box there, you are looking at the picture the whole time. Unfortunately, you don't get the box, so you have got to figure out how these pieces come together. So, what do you do to do that? Well, you look at perspective as you sit and listen to a witness, figure out, you know, what is their position? What are they saying? Why are they saying it? What is the timing of it? Do they have

an incentive to say something that is different that might help them? Or are they independent? At the end of the day, you get to determine how that puzzle fits together.

Now, Mr. Murphy said in his opening that he is not sure -- he said BMW AG is here because they contend they are not a proper party. He didn't say BMW AG is here because they did something, he said because they contend they are not a proper party. When you listen to Ms. Dawsey testify, what you are going to hear is that for nearly 27 years, she worked for BMW Manufacturing Company, BMW MC. She never worked for BMW AG. She never applied to work for BMW AG. She never was paid anything by BMW AG. She had some calls with BMW AG's HR group because they are responsible for plants around the world, but she didn't work for BMW AG.

Now, they say that doesn't matter because BMW AG helped make decisions. You are going to hear from a number of BMW MC employees and I want you to listen very closely when they talk about who and why they made certain decisions about Ms. Dawsey.

Now, no one is going to say Ms. Dawsey was a bad employee. In fact, she had great reviews, you are going to hear about that. But when you listen to these, I want you to hear what BMW MC is saying and I

want you to hear, were they taking direction from Germany or were they making decisions and telling Germany what they were doing? Ms. Dawsey would have you believe that the folks in Germany, who were looking at worldwide production for BMW, are concerned about the TX-60 Department, that is simply not going to be evidence that you hear.

So, I won't go through the details about Ms. Dawsey's journey at BMW, you heard that from Mr. McCoy. I ask that you listen very closely to a couple of things. The dates are important here, as Mr. McCoy said, but also I want you to listen to the testimony about the decision to restructure the department, about the decision to move Ms. Dawsey after seven years in her role, about the decision to place an international candidate in TX-60, and most importantly, about Ms. Dawsey's decision to resign to become the Director of HR at another company even before she moved positions.

Now, Winston Churchill said, "In peacetime, there is no greater service you can do for your country than jury duty." And I appreciate your time and I appreciate your service. It is incredibly important to Ms. Dawsey, to BMW MC, and to BMW AG that you pay attention and that you continue this commitment. The

Judge said earlier when he was asking you questions, he asked each of you, can you be fair and open minded? Fair and open minded. He said, use your common sense. That is all I ask of you, that is all BMW AG asks of you, that is all any of us asks of you. At the end, I want to thank you for your commitment to seeing justice is done. Thank you.

THE COURT: Mr. Murphy.

MR. MURPHY: The plaintiff calls Kelly Dawsey.

THE COURT: Ms. Dawsey, please come forward to be sworn.

KELLY DAWSEY, having been first duly sworn, testified as follows:

DIRECT EXAM

BY MR. MURPHY:

Q. We all know this by now, just so the record is clear, will you give the jury your name, please?

A. Kelly Dawsey.

Q. Kelly, where are you from?

A. I live in Simpsonville.

Q. Are you originally from Simpsonville?

A. I am originally from Orangeburg, South Carolina.

Q. Is that where you attended schools?

A. High school, yes.

Q. And where did you go after high school?

A. I went to Clemson University.
Q. And did you graduate from Clemson?
A. I did.
Q. With what kind of degree?
A. I have a business management BS degree.
Q. Is -- that is a four-year degree?
A. Correct.
Q. After you graduated from Clemson, did you find work?
A. I did.
Q. Tell the jury about your first job.
A. So, my first job was a recruiter at Westinghouse Savannah River Site in Aiken, South Carolina.
Q. And how long were you with Westinghouse?
A. I was there five years.
Q. In the same role?
A. No. I moved around there, as well.
Q. And now you live in the Upstate, correct?
A. I do.
Q. What brought you to the Upstate?
A. In 1995 I came to the Upstate for a job at BMW Manufacturing.
Q. And have you lived in the Upstate since you joined BMW in 1995?
A. I have.

Q. Who do you live here with?
A. I live here with my husband and our youngest daughter.
Q. And this is your husband, who has been with us today?
A. Correct, yes.
Q. And who else?
A. Our youngest daughter lives with us as well.
Q. You say "youngest daughter," do you have other children?
A. I do.
Q. What other children do you have?
A. I have an older daughter that lives in Raleigh, North Carolina; and I have a son that lives here in Greenville.
Q. And what do your children do?
A. Our oldest daughter is a bilingual speech pathologist, she works with children with special needs; our son is s construction project manager here in Greenville; and our youngest daughter is currently in nursing school.
Q. Okay. And what is -- your husband's name is what?
A. Greg.
Q. Greg. I knew it. What does Greg do?

A. Greg has a construction restoration company.
Q. You said before you live in Simpsonville, what community or what part of Simpsonville are you in?
A. We live in the Five Forks area.
Q. And are you part of any community groups or do you attend church there?
A. We do. We are a long-time member of Brookwood Community Church.
Q. What about professional groups or professional organizations, are you a member of any of those?
A. Some active with One Spartanburg, which is the Greenville Chamber, organization in Spartanburg; and I am active with the Greenville SCHRM, which is the Society for Human Resource Management.
Q. What year did you graduate, just to be clear?
A. From Clemson?
Q. Yes.
A. In 1990.
Q. Then you were at Westinghouse until 1995, and that is when you came to the Upstate?
A. That's right.
Q. I am going to show you our first exhibit, can you tell the jury what this document is?
A. This is my resume.
MR. MURPHY: Your Honor, this was offered without

objection before.

MR. MOODY: That's correct.

THE COURT: It is admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. If I page through your resume on here, this shows your employment at the Savannah River Site here?

A. That's correct.

Q. Okay. Now, let's go to the first job then that you have listed within BMW, tell the jury what that job was.

A. So, in June of 1995, I started as an Employee Relations Representative.

Q. Let me just ask, throughout your whole career, since you graduated from Clemson, have you worked in any other field other than Human Resources?

A. I have not.

Q. What drew you to HR?

A. I think it is the combination of people, I have a service heart, as well as I enjoy process compliance orientation.

Q. So, tell us about the first job here at BMW, June 1995 to August 1998, Employee Relations Representative for 700 employees. Tell the jury about that, what you did, and what kind of experience that was?

A. So, in this role it served as an associate advocate answering questions for employees, answering questions for leaders. This was also early in the development of the plant and so we were developing policies. And I also served on the start-up team for, ultimately, the night shift.
Q. Okay. And, again, you were in that position until when?
A. August 1998.
Q. And what level position was that in HR at the time?
A. This was an entry-level position.
Q. Even though you had five years of HR experience at Westinghouse?
A. Correct.
Q. Let's go to the next position I see on here. I see Coordinator for Human Resources, are those dates correct, you were in that position from September '98 until September 2000?
A. Correct.
Q. What department is that at BMW?
A. This today is TX-61.
Q. So, was that a different department than the one you originally joined?
A. No, it is the same department.

Q. Tell the jury what you did as a Coordinator for Human Resources -- - was that a promotion from the entry-level job?
A. It was.
Q. So, you got a promotion in 1998. Tell the jury what this job entailed and how it was maybe different than your first job.
A. So, this role was my first leadership role. You see that I supervised two employee relations representatives, so this role consulted more with leadership. And I supervised the two employee relations representatives who were the advocates for the employees.
Q. All right. The next position I see on here, the next position I see on here is Section Manager of Compensation and Organization; is that correct?
A. Correct.
Q. Is that in the same department as your first two jobs?
A. It is not. This is in a different department.
Q. What department is this in?
A. This is in TX-60.
Q. Okay. What is TX-60?
A. TX-60 is HR Planning and Steering, Compensation and Benefits.

Q. Okay. And so was this a lateral move, promotion, downgrade from your prior job?
A. It was a promotion.
Q. Why was it a promotion?
A. Because it was to a Section Manager role.
Q. Okay. From a Coordinator role?
A. Correct.
Q. And what does Section Manager mean? What did it mean at that time?
A. Section Manager is, I would say, the first level of leadership. You -- we will talk about function level four, Section Manager.
Q. All right. And tell the jury what you did as a Section Manager of Compensation and Organization for, it looks like, eleven-and-a-half years?
A. So, this role is responsible for all compensation programs, so that is base pay, those are bonus programs. Those are administration of those annually, as well as developing philosophies around attraction, retention of employees. So, benefit development, what type benefits do we need to have to ensure that we are attracting the right employees, and, of course, paying them competitively and retaining.
Q. Okay. I think that section went onto the next page, what are these final bullet points?

A. So, this is HR Data Integrity, this role was also responsible for personnel data in Human Resources information system, which was SAP at the time.
Q. Run that back a little bit. HRIS or HR Information System, what does that mean in plain terms?
A. It is a computer system that holds personnel data.
Q. And what is SAP?
A. SAP is a name of a software that was used for HR personnel data.
Q. Now, let's talk a little bit about in 2011 you moved to a different position, correct?
A. Correct.
Q. And what is that position?
A. In is Section Manager Human Resource Operations.
Q. Okay. Now the last job you had was also called Section Manager, right?
A. Correct.
Q. Is this in the same department or a different department?
A. It is a different department.
Q. So, why would you move from Section Manager from one department to Section Manager in another department?
A. One to broaden my experience; and, secondly, I had been told that I was in consideration for next level vice president and that I should move to Human Resources

operations to gain experience in that area.
Q. Okay. And is that what this department is, HR Operations?
A. Yes, it is.
Q. Okay. Did it involve a change in reporting structure for you?
A. It did. This job reported to the Vice President of Human Resources.
Q. Okay. What did your previous job report to?
A. Reported to a Department Manager.
Q. I will ask you about the final bullet that was on that position, it states:

"Managed the cross functional BMW U.S. entity project in coordination with the parent company in Germany to implement standard HR processes and standard SAP HRIS functionality across the U. S."

Did I read that correctly?
A. Correct.
Q. Would you tell the jury what that means and what that was about?
A. So, Germany was forcing the plant and the other locations here in America to join their SAP system. We ran an independent SAP system. And this project HRI,

I lead for the North America locations of BMW attempting to coordinate standardized processes that ultimately would then fit into the German SAP system.

Q. Okay. When you say the BMW organization and companies in North America, are there others other than MC out here in Spartanburg?

A. Spartanburg is the only manufacturing plant, there is a location in Woodcliff Lake, New Jersey, that is the sales and marketing. And there is a location in Ohio, which is financial services.

Q. So, they are outside of MC, but still part of BMW?

A. They are part of BMW Group.

Q. But you were leading that project for these other entities, as well?

A. Correct.

Q. And then the last job I see on here is Manager of HR Planning Compensation and Benefits Organization and Associate Well-Being Medical Facilities Management; is that correct?

A. Correct.

Q. What is that job known as?

A. This is the Department Manager, TX-60.

Q. That is another move from another department?

A. Correct.

Q. And for how long did you hold this position?
A. I was in this position approximately seven years, since 2015.
Q. So, is this the last position you held at BMW?
A. Yes, it was.
Q. Was this move to Manager of HR planning or TX-60, was that a lateral or a promotion or a downgrade from your Section Manager?
A. This was a promotion; function level four to function level three.
Q. We will talk more about function levels in a bit. Tell the jury, you have got a summary on here where you say, "Six functional areas and 15 employees," that is what you managed?
A. Correct.
Q. Let's go -- a summary of these types of areas: "Compensation" relates to what?
A. "Compensation" or wage structure, salary structures and bonus. So, cash compensation paid to employees.
Q. Okay. And what is "Benefits"?
A. Benefits would be the health and well-being benefits, so health benefits, vision benefits, dental benefits.
Q. Were there other benefits or are there other

benefits at BMW?
A. There are, what we consider, voluntary benefits, an EAP program, additional health insurance if the employees want to purchase up. So, voluntary and what is company offered.
Q. Okay. The next area is "Organization," what is organization?
A. Organization is around the organizational structure of the plant. So, what are the department names, how is the plant structured.
Q. Okay. What is "HR Planning"?
A. HR planning looked to the future, so what is coming in the future, and what are those topics, and what would be the impact to Human Resources for those topics.
Q. It says "Associate Family Health Center, what is the "Associate Family Health Center"?
A. So, the AFHC, for short, is an on-site health clinic that is open to the employees and their dependent family members.
Q. What happened in there?
A. There are physicians, there is physical therapy, there is a pharmacy so the employees and their dependents have the capability to use the facility.
Q. Okay. And the last functional area on here is

"Well-being Programs," what are "Well-being Programs"?
A. So, well-being programs were organized around several topics, so one being physical health, what kind of programs could we do to ensure that there is promotion of physical health, emotional health as well. Career, where did employees want to go and how could we further help to develop those. So, those over arching topics that helped individuals be better individuals and better employees ultimately.
MR. MURPHY: I will go ahead and introduce this concept and we will come back to it several times. I will show you what has been marked as Plaintiff's exhibit 8. This is offered without objection, I believe.
THE COURT: Plaintiff's 8 is admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. What is the title of this document, Kelly? Wait, you can't see it.
A. "Job Function Data Sheet."
Q. So, what is a "Job Function Data Sheet"?
A. It is a job description.
Q. Okay. And this is the job description for what?
A. Department Manager, TX-60.

Q. So this would have been the last job you held at BMW?
A. Correct.
Q. We will come back to that.
Now, in addition to jobs you hold, do you have any certifications in HR?
A. I do.
Q. And tell the jury about that and what those involve.
A. So, the Society for Human Resources Management, which is a national and a global organization for Human Resources professionals offers certifications, there are different levels. I hold the Senior Professional Certification, which is the top level with regards to there is some strategic elements in the certification, as well as other basic Human Resources compliance, leadership topics.
Q. So, is any certification higher than the one you have obtained?
A. Not for HR generalist, no.
Q. Let's talk about the term we heard before, BMW Group, and let's talk about the organization of BMW for a little bit.
Where is -- the company we referred to BMW AG that Mr. Rozelsky represents, where is that

headquartered and located?
A. It is headquartered in Munich, Germany.
Q. And the plant that is located here in Spartanburg what does that -- what name does it go by?
A. It goes by Plant Spartanburg or TX.
Q. Do you know the name of the entity over in Spartanburg?
A. BMW MC.
Q. And we talked about there are other BMW companies in the states as well, correct?
A. Correct.
Q. What are some of those that you may know?
A. So sales and marketing in New Jersey and financial services in Ohio.
Q. Was there a term that was used -- do you know all of the BMW entities and company names throughout the globe?
A. Not off the top of my head, no.
Q. Was there a term that BMW used to refer to them collectively?
A. All of the locations, BMW Group.
Q. I want to talk about next a concept called circles. Within BMW are you familiar with the term "circling"?
A. Yes.

Q. Tell the jury, what is a circle at BMW?
A. So, a circle would be a group of those individuals that lead common functions and so they are called a circle and they lead those functional areas. For instance, there was a P circle for personnel that led Human Resources topics.
Q. Was there a circle for manufacturing?
A. Yes.
Q. What is that called?
A. The T circle.
Q. What about finance, is there a circle for finance?
A. Yes.
Q. What is it called?
A. F circle.
Q. Okay. And where are these circles located?
A. Those circles are led out of Germany.
Q. Let's talk about now the organization in Spartanburg or what we call NC. I am going to show you a document we have marked as plaintiff's exhibit 2 and can you tell the jury what this is?
THE COURT: This is admitted without objection.
MR. MOODY: That's correct, Your Honor.
THE COURT: It is admitted.
MR. MURPHY: I will do that at the beginning, I was going to ID it first.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Can you tell the jury what this document is?

A. This is the Plant Spartanburg leadership structure organization chart.

Q. And does -- I don't know the nomenclature of BMW, does Spartanburg has its own name other than Spartanburg?

A. TX.

Q. And at certain times did it have -- did it use a different initial or initials?

A. Yes, it was formally TS; S stood for Spartanburg.

Q. So TS and TX are the same?

A. Correct. It was changed over the years to reflect the production of the X models so, TX.

Q. So, where on this chart then is Human Resources?

A. Human Resources has the six code, so you will see it in TX-6 column.

Q. And let's go through that. This is some of the detail. When I see a function called TX-6 then I know two things about it from those letters and that number, right?

A. Correct.

Q. What do I know? Anywhere in the company I see TX-6 I know what?

A. TX will tell you it is a manufacturing facility; X tells you it is Spartanburg because of the X models; and the six would tell you it is Human Resources.
Q. And then under the TX-6 I see there are various jobs, for example, do you see your department on this chart?
A. I do.
Q. Where is it?
A. It is the first box under TX-6, which is TX-60.
Q. And what are the other boxes under TX-6?
A. Those are other functional areas, departments within Human Resources.
Q. Okay. What does it tell me when I see two digits after the TX?
A. So, two digits tells you the function within Human Resources that that department is.
Q. Okay. Each management level position under -- let's go through this, TX-6 is what position?
A. TX-6 is Vice President Human Resources.
Q. And at the time of this chart being made, it was who?
A. Christine Petrasch.
Q. And so do these people underneath here all report directly to Ms. Petrasch or did they at the time of this chart?

A. That's correct.

Q. Let's talk a little bit about the structure of management jobs throughout the BMW group. I am going to show you a document that has been marked as Plaintiff's exhibit number 12, can you tell the jury just what this document is?

A. This is the exempt organization structure brochure. It gives an overview of the personnel organizational structure.

Q. Okay.

MR. MURPHY: Your Honor, this was again offered without objection.

THE COURT: Admitted without objection, Plaintiff's 12.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Take you to the last page of this and does the date of this document appear on there?

A. It does.

Q. So what version of this exempt structure are we looking at first?

A. September 2021.

Q. Okay. Now, I am going to take you to page four and that is when we get into some of the fun stuff here. Tell the jury what page four of the exempt structure is

telling us.
A. So, this defines the organizational reporting levels, the function levels, which are equivalent to the value of the job; and personal grades, which were assigned to each employee.
Q. So, we are going to be talking about these this afternoon. Under function level, how many function levels existed as of the time of this publication?
A. In management there were four function levels represented by Roman numerals one, two, three, and four.
Q. Let's start with the function level concept, we will talk about personal grades in a little bit. In Spartanburg during your employment at BMW, how many function level one positions were there?
A. One.
Q. And who was that?
A. That is the President and CEO.
Q. Who occupies the function level two positions?
A. Those would be the vice presidents.
Q. Of course. So, if we go back to our main org chart, this top box would be the function level one position?
A. Correct.
Q. And function level two is what?

A. Function level two would be that first row where you would see a TX-1, TX-2, TX-3 and so forth, those are the vice president functions.
Q. So these positions here, this level?
A. Are you pointing --
Q. I was trying to?
A. Correct.
Q. So under that level in looking at TX-6 that we looked at before, your level, the human resource, Ms. Petrasch would have been a function level what?
A. Two.
Q. These positions reporting to her then would be what function levels?
A. So, those are either function level three or function level four.
Q. Now, below these levels are there more people reporting to say yourself and Mr. Epps, Ms. Keith, Mr. Medley and Mr. Sinanian?
A. Yes.
MR. MURPHY: Let me show you exhibit 5. This is Plaintiff's exhibit 5 offered without objection.
MR. MOODY: No objection.
THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. We have the TX-6, which we discussed, and the other 61, 62, 64, 65, these positions underneath are what?

A. These are what we refer to as three digit or sub-functional areas within those two digits, for instance, 600 and 601.

Q. So if I see somebody with a three digit I know they report to a two digit?

A. Correct.

Q. I know two digit reports to a one digit?

A. Correct.

MR. MURPHY: Let's go ahead and introduce some of these management people because we are hearing these names throughout the trial. I will show you what has been marked and offered without objection that is Plaintiff's exhibit 18.

MR. MOODY: No objection.

THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. We have at the top the one digit, that is a function level two, right?

A. Right.

Q. Ms. Petrasch?
A. Right.
Q. Are these the people who reported to her in 2020?
A. Yes.
Q. So tell the jury who was in the positions that reported directly to Ms. Petrasch, the Vice President?
A. So, I was in TX-60, HR Planning and Steering; Corey Epps in TX-61, HR Managing and Employee Relations; Michelle Keith in TX-62, HR Services; TX-64 was Scott Medley, Recruiting, Health Management, Occupation, Safety and Food service; TX-65, Talent Programs and Training was Paul Sinanian.
Q. When we talk about this level two, the Vice President, was there another term used at BMW to refer to that level of management?
A. This level are the senior management or OFK level.
Q. Okay. The term OFK, tell the jury your understanding of what OFK means.
A. OFK was a senior executive designation that you had to go through a validation process to be granted or awarded. So, it was a senior executive designation.
Q. Go back to the departmental chart on Plaintiff's exhibit 18, these folks we just talked about, yourself, Mr. Epps, Ms. Keith, Mr. Medley, and Paul Sinanian, are any of those positions referred to as senior management

at BMW?
A. They are not.
Q. Have any of those folks ever been OFK designated?
A. Not to my knowledge.
Q. In the opening I heard Mr. McCoy talk about the creation of jobs here that BMW has done, but has BMW staffed the management at this plant with just Americans?
A. No.
Q. Okay. Where else did BMW primarily get managers for the Spartanburg plant?
A. Primarily from Germany.
Q. And when we say Germany, we are referring to AG?
A. BMW AG, correct.
Q. And how often did BMW send managers or executives from AG to the Spartanburg plant?
A. Quite often.
Q. And at what levels?
MR. ROZELSKY: Objection, Your Honor, calls for speculation.
MR. MURPHY: What levels the Germans served in.
MR. ROZELSKY: Repeat your question.
MR. MURPHY: I asked her.
MR. ROZELSKY: First you asked her was staffed primarily by AG. You are now asking her what levels, I

think it is speculation.

THE COURT: I think you need to lay some foundation.

MR. MURPHY: When I say "level," I mean function levels.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. The function levels at Spartanburg, at what function levels were Germans sent to work at Spartanburg?

THE COURT: Wait a second.

MR. ROZELSKY: Your Honor, may we approach?

THE COURT: Yes.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

MR. ROZELSKY: This is getting into the issue of the treaty. They have absolute right to put people in these function level one and function level two under the treaty and a suggestion that somehow it is improper and she has knowledge of all of these levels is exactly why the treaty is in place. They are allowed to do that. They are a general company and are allowed to put it in their American subsidiary at these executive levels. SO, the suggestion that somehow this is

untowards, the jury will hear they put all of these Germans in, it is just inappropriate. And it is irrelevant to her claims.

MR. MURPHY: It is certainly not irrelevant to her claims because, especially when it says the treaty is at issue, then evidence related to whether the treaty applies has to be an issue at the case. So, I mean, he has shot himself in the foot there. If he wants to raise the affirmative defense, I get to put in evidence of that. Because these un-senior management level positions that we are talking about, she needs to answer the question. Her level, three and four, are not senior management level positions, she just testified to that. Now she will testify that the Germans came in at level 3 and 4 positions, too. He doesn't get to raise an affirmative defense and then say that bars evidence.

MR. ROZELSKY: He didn't limit it to say how many people come in at threes and fours; he said, how many Germans were being brought over and at what levels, okay.

MR. MURPHY: Let's say bring Germans in for a function level one, that is relevant to your claim of defense.

MR. ROZELSKY: Absolutely.

THE COURT: Repeat the question.

MR. MURPHY: At what function levels did the Germans come over.

MR. ROZELSKY: My first objection was it was speculation, how would she know, there are thousands of people that come in and out of that plant, does she know everyone that comes in at every level? Or does she knows some that she wants to testify to. A, that is speculation. I think that implicates the treaty again because the suggestion is that somehow bringing Germans here, regardless of what level, is untoward. If you were to say, did they only -- at levels three and four did they bring in Germans, that is different.

MR. MURPHY: That doesn't bar me from saying levels one and two. If you are saying the treaty is at issue, then the evidence related to what the positions these people filled is at issue. It is not like you get to raise an affirmative defense and then bars evidence.

MR. ROZELSKY: Your position is that it is okay to bring people in at 1 and 2 because of the treaty, but it is not okay at 3 and 4.

MR. MURPHY: I never said that.

MR. ROZELSKY: Okay.

MR. MURPHY: You are saying part of that, I am not saying that.

THE COURT: I think you need to lay some foundation for how she knows, she was in charge of Human Resources, so I think you need to.

MR. MURPHY: I can lay that easily.

THE COURT: I think you need to develop how she knows who came in and at what levels they came in.

MR. MURPHY: Again, we can do that, it is just part of the job. I can lay more foundation.

MR. ROZELSKY: That is not what you asked. That is why I want to be more clear.

THE COURT: I guess he is going to ask are they coming in at all of these levels. Some folks that come over from Germany and staff a lot of these positions. So why can't he ask about that?

MR. ROZELSKY: I think, Your Honor, if the suggestion is that they never let Germans over here without it violating some kind of national origin discrimination, which is clearly the breadth of the question. The treaty says, at executive levels, technical levels, accountants, legals they are allowed to bring in. So when he suggests, well, they bring Germans in all the time, the suggestion to the jury is that is somehow bad, they are not allowed to do that under the treaty.

MR. MURPHY: I am allowed to suggest bad things,

it is a trial.

MR. MOODY: One of the issues that we have is that she cannot speak for AG, she can speak to her own involvement in things, but this inference that she is speaking on behalf of AG. We have been very lenient and allowed Mr. Murphy to develop things with leading questions, but we are really getting into some tight spots. I want to echo what Mr. Rozelsky is saying on behalf of MC for them to imply and she testified that AG was primarily Germans. There is a little bit of national origin reverse discrimination.

THE COURT: Maybe we need to send the jury out and you proffer the testimony.

MR. MURPHY: I didn't raise the objection, but basically his objection is, I am putting evidence of discrimination in.

MR. ROZELSKY: Yeah.

MR. MURPHY: I fully intend to do that.

MR. ROZELSKY: I don't think that is my objection.

THE COURT: I mean there is another question, some people came over from Germany to fill various positions in the plant. The question is whether or not this was done to discriminate against her.

MR. MURPHY: No, no. That is also what we term the integrated employer and their direct involvement.

The evidence goes to those issues, too.

MR. ROZELSKY: She can't say why AG sent somebody there, she doesn't work for AG.

MR. MURPHY: I didn't ask her why.

MR. ROZELSKY I understand. She is saying the integrated employer, there may be a decision to send people over. She is testifying she doesn't know who made that decision.

MR. MURPHY: She does know.

MR. ROZELSKY: How?

MR. MURPHY: She will testify to that. She will testify people from Germany made that decision. She talked to people in Germany daily. Christine Petrasch was telling here what was going on. Unless it goes to the control, it goes to integrated employer, we are going to have a lot of testimony.

THE COURT: Let's do this. Let's let the jury go back and have a break, we will take a break, we have been going at it for a bit, and then we will come back and you proffer your testimony and you make your objections, and I will make a ruling on it.

MR. ROZELSKY: Okay.

MR. MURPHY: Okay.

(Whereupon, the bench conference concluded and the following was heard in the presence of the trial jury.)

THE COURT: Ladies and gentlemen, we are going to take what I hope is a short break while I take up some legal issues with the attorneys. At this time you may retire to the jury room. Remember, don't come to any final decisions about the case, don't discuss the case, don't communicate the matters involved in the case. All right. Thank you.

(Whereupon, the following was heard outside the presence of the trial jury.)

MR. ROZELSKY: Your Honor, can I ask one quick question? Some courts want us to sit while the jurors are coming in and out, others want us to stand, do you have a preference? I want to make sure we are all consistent.

THE COURT: I typically have folks remain seated while the jurors go in and out, that is partly because for 15 years I have been trying cases in Anderson and everybody goes out the same door so I don't know that it is as much an issue here, but let's just remain seated. If I need to I can say everyone remain seated and that way it doesn't look like anyone is being disrespectful.

Okay. Mr. Murphy.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Kelly, we are going to lay a little bit of

foundation to try to back up here and introduce some of these concepts. I apologize, I may have moved too fast through some of this. At BMW, was there a term used to refer to AG employees who came to work at the Spartanburg plant?
A. International employees.
Q. Okay. And in your roles at BMW, were you familiar with the movement of international employees into Spartanburg?
A. Yes.
Q. Okay. And, in fact, were you involved in the development of a document that is referred to that we have marked -- well, it was ruled on in I think ECF -- I remember it 54 or something like that, Your Honor, these are the expat guidelines. Were you involved in the development of Plaintiff's exhibit 17?
A. Can I see it?
Q. Oh, I'm sorry.
A. Yes, I was.
Q. And the first word of this document is what?
A. "Expat."
Q. What is expat in BMW terms?
A. Expat is also another term for international employee.
Q. And in your role at BMW, if I take you to page six

of that exhibit, were you involved -- and we will go through this testimony in-depth more later -- were you involved in the discussion that is on page six of exhibit 17?
A. Yes.
Q. And what exactly is that discussion about?
A. This is a discussion about which functions in T, at this time S 60, would need to be international or domestic.
Q. And TX-60, at this time, was your department, correct?
A. Correct.
Q. And were expats or internationals brought into other departments, as well?
A. Yes.
Q. In fact, were they brought into -- is there any department that you know of that expats were not brought into? If I go back to Plaintiff's exhibit number 2, we have a bunch of departments listed here. During the course of your employment was expats brought into TX-1?
A. Yes.
Q. Two?
A. Yes.
Q. Three?
A. Yes.

Q. Four?
A. Yes.
Q. Five?
A. Yes.
Q. Six?
A. Yes.
Q. Seven?
A. Yes.
Q. And R, whatever R is, TX-R, do you know?
A. It is Plant Rosalyn and I can't speak to TX-R.
Q. Okay. Now, we discussed function levels earlier. At what function levels did expats come to Spartanburg from BMW AG?
A. Function level one, two, three, four.
Q. Okay.

MR. MURPHY: In terms of the question to which there was an objection, that is the foundation and the proffer.

MR. ROZELSKY: Your Honor, I -- obviously he jumped eight or ten questions ahead and that is why I objected to speculation. I withdraw that objection.

MR. MOODY: Your Honor, the issue on all of this becomes, what is the relevance to her situation so that is where we are headed there. And without the context of the treaty, that was our concern about the bias that

this line of questioning establishes. And we would, of course, reassert our objections and motion in limine, et cetera, for this Plaintiff's exhibit 17. I know you ruled against us, but we will need to preserve that.

THE COURT: Okay.

Do you want to say anything else about that?

MR. MURPHY: It sounded like the objection is withdrawn.

MR. MOODY: I said relevance to her, Your Honor.

MR. MURPHY: The relevance to her, Your Honor, again, I can't put all of the case in as a foundation, but she is replaced by a function level three expat, which is the basis of this case. And we will go into the story about how it happened and how it happens normally at BMW. And it doesn't -- you know, for the party who stood up here and talked a about Carroll Campbell and the name on the courthouse talk about, this case is limited to one little issue, it is not.

THE COURT: Well, here was my ruling at ECF 185 on that motion:

"Defendant seeks to exclude any testimony or evidence regarding the so-called expat guidelines as irrelevant because there is no

evidence Defendants actually followed them in replacing Plaintiff with a German national. Plaintiff, as she notes in her opposition, points to evidence that supports contrarian interpretation and that the Defendants have followed the guidelines consistently and they filled TX-60 position with a German national. It is the function of the jury, not the Court, to assess the credibility of the witness and weigh the evidence as to this issue. Whether the Defendants followed the guidelines is relevant to Plaintiff's claim that Defendants discriminated on the basis of national origin."

I made a finding that:

"The significant probative value of the evidence -- or that I could not find that the significant probative value of the evidence is substantially outweighed by the risk of unfair prejudice or jury

confusion. Defendants are free to argue that the jury should discount this evidence. The argument goes more to the weight than admissibility."

So, I denied the motion at ECF 154. Of course, noting that rulings on motions in limine are preliminary and may be considered as the evidence unfolds. So, i think you are protected.

MR. MOODY: May I mention one point? It just occurred to me, I apologize, Judge, I like to stand out of respect, I hope that is okay.

THE COURT: I think that is the way we are supposed to do it.

MR. MOODY: You talked about sitting down, Randy was at war with himself.

But anyway, when he was proffering, he talked about all of these different areas, departments, and segments of the company. The issue, as we briefed on these expat guidelines, is it only applies to TX-6, it wasn't applying to the rest of the plant. She is the author of this document, which we briefed all of those issues as well, it is self-serving, it is not a policy, it is a conversation and it is a workshop. And it is one of these many documents that she took with her

to help build this case.

So, when they talk about all of the other sections and then try to bootstrap it back to expat guidelines that were merely a conversation in the HR department, that would be our objection to this proffer.

THE COURT: All right.

MR. ROZELSKY: AG joins in that objection.

THE COURT: You will have the opportunity to cross-examine her on that and to put up whatever testimony you have about it.

MR. MOODY: Thank you, Judge. Appreciate the opportunity to be heard.

THE COURT: Thank you. All right.

MR. MURPHY: Your Honor, I just want to say one thing, I would like us to be a little careful when we make accusations against each other as parties. I don't believe there is any evidence she took this document with her, you produced this document. We did not produce this document.

THE COURT: Well, is there anything else on this?

MR. MURPHY: No, sir.

THE COURT: Okay. Let's take a short break and, ma'am, don't discuss your testimony with anybody during

the break. We will come back and get started again. Thank you.

(Whereupon, a short recess was held.)

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: All right. Mr. Murphy.

MR. MURPHY: Thank you, Your Honor.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Kelly, before the break we were talking about the AG people coming to work in Spartanburg and let me back up because I did probably get a little ahead of myself there.

Was there a term at BMW to refer to the AG employees who transferred to Spartanburg?

A. International.

Q. And any other terms used to refer to them?

A. Expats; inpats were foreign nationals.

Q. In your roles at BMW, were you familiar with the transfer of expats or internationals to the Spartanburg facility?

A. Yes, I was.

Q. We talked a little while ago about the different function levels, you said in management there are four function levels. Into what function levels did these

expats transfer into at Spartanburg?
A. Function level four, three, two and one.
Q. And returning to this concept of OFK, that is what function level again?
A. Function levels two and one.
Q. Okay. And there are -- were there people in Spartanburg who were designated OFK?
A. Yes.
Q. And who decides whether an employee, including the employees in Spartanburg, are designated OFK?
A. There is a validation circle that you go through, a process, and that validation circle is in Munich, Germany.
Q. Even for the positions here in Spartanburg Germany?
A. In OFK positions in Spartanburg, yes.
Q. And is there validation for other function levels, as well?
A. Yes.
Q. So, again, in plain terms, what does it mean if I am being validated or they are validating somebody, what does that mean?
A. It is an interview. It is a look over your background, your experience, and it is, I would say, a confirmation or an acceptance into that level, that next

level.
Q. What levels are people validated for? Is it just the OFKs we talked about?
A. So, validation occurs for the leadership levels, function levels four, three, two, and one.
Q. And does -- do folks at BMW AG lead the validation for even levels 3 and 4?
MR. ROZELSKY: Objection, calls for speculation.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Do you know? Are you aware of the validation process?
A. Yes.
THE COURT: I will overrule the objection, she may answer if she knows.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. If you know, who leads the validation process for functions levels one through four?
A. So, the one and two are led out of Germany; and for function level three and for four, they are cross functional with some American input as well, but those are also mainly led out of Germany.
Q. When these expats come from AG to MC in Spartanburg, do they sever their ties, employment ties

with AG?
A. No.
Q. Do they give up their German benefits?
A. No.
Q. Now, we talked a little bit about folks from AG being involved in Spartanburg or MC affairs, were there people who were employed in Spartanburg who did work for other BMW group companies?
A. Yes.
Q. I want to show you Defendant's exhibit 5.
MR. MURPHY: Your Honor, there has been no objection to this exhibit. May I put it up?
THE COURT: Admitted without objection Defendant's number 5.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. I will take you to the last page of exhibit number 5. Are you familiar with that document?
A. Yes, I am.
Q. What is that document?
A. So, Germany was forcing a head count reduction. If you see in the bottom left corner it is "The journey to minus 25 CPU," which is cost per unit.
Q. Is that --
A. Correct.

Q. -- this?

A. Yes.

Q. What does negative 25 CPU mean?

A. It is a reduction of the cost per unit by 25.

Q. Twenty-five what?

A. Twenty-five percent.

Q. And a unit is what?

A. Unit is an automobile.

Q. Go ahead with your story.

A. And Germany had given Spartanburg a head count reduction target and it included positions that sat at the plant, but were not directly doing work for just the plant. And so this document was an argument to say the head count reduction should be based on the TX positions, not including the non TX because these functions were not directly, singularly focused on the plant.

Q. And so where are the non TX positions that you referred to, are they on this page?

A. They are. They are in the box in the top right, non TX departments.

Q. Okay. So, again, these are people at Spartanburg, but doing work for the other companies?

A. For some of these are worldwide. So, for instance, MN is a procurement function that does

procurement function for the plant, but also for other locations.

Q. And what are some of the other positions?

A. So for instance P, so if you see PZ, or as we referred to it as Pzet, this is a North American hub, HR department, that was centralized in New Jersey, but it had employees who actually sat at the plant, Spartanburg Plant.

MR. MURPHY: All right. Let me show you another document now, this is Plaintiff's exhibit 28. Again, Your Honor, this was offered without objection.

THE COURT: You said Defendant's 28?

MR. MURPHY: It is Plaintiff's.

THE COURT: Let me catch up with you. Plaintiff's 28 is admitted without objection.

MR. MURPHY: Okay.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Kelly, do you recognize this email exchange?

A. I do.

Q. Okay. Tell the jury in kind of plain language, what is this about?

A. So, it is about HR Compact, which is a project where Germany was asking us to submit the Plant Spartanburg head count relevant to processes in a

template that they had developed. And we had functions at Plant Spartanburg that did not fit in their template; for instance, benefits. The benefits are totally different in a European company versus an American company. For instance, the Associate Family Health Center. These were topics that did not fit in their template and I was informing our Vice President that even though I had tried to explain that we had functions in Spartanburg that didn't fit the template that I was being instructed that I could not include them and I just had to report in the categories where the template indicated. And I wanted to make her aware.

Q. When you say you were being told, who is giving you this directive?

A. So the HR Compact project leader.

Q. And where was the HR Compact project leader located?

A. In Germany.

MR. MURPHY: I want to go back to this concept that was introduced awhile back on circles, like to next go to Plaintiff's exhibit number 3 which, Your Honor, I believe is offered without objection?

THE COURT: Plaintiff's 3. Admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Kelly, what are we looking at here?

A. So, this is an email from Christine Petrasch, who is the Vice President of Human Resources at the time, January 2022, and she is sending to all of the HR Managers an email from the P circle giving us the priorities for the upcoming year.

Q. Is this the email she is forwarding to you?

A. Yes, it is.

Q. And you mentioned P circle before, what is P circle?

A. P circle is the group in Germany that leads the personnel area of BMW group.

Q. Are you familiar with what language this email from the P circle is in?

A. Yes.

Q. What is that?

A. German.

Q. Let me go to the third page down. Let me ask you these signatures on the email that we just looked at, are you familiar with those names?

A. Yes, I am.

Q. Okay. I am going to say a name and then number, that is the benefit for our court reporter, she has a

key here, these are very hard to hear or spell. The first one in that top left corner Ilka Horstmeier. It is 16, ma'am.
A. Correct.
Q. Okay. And who was or is Ms. Horstmeier?
A. She is the Human Resources or Personnel Board Member for BMW group.
Q. And do -- are people at BMW referred to by these letters or codes?
A. Yes, they are.
Q. So, the next person over to the right of that, and tell me if I am saying this wrong, is Andreas Batz, and that is number two, madame court reporter. Who is Andreas Batz and what does that designation next to his name mean?
A. So, he is PZ, and PZ managed the hub Human Resources areas across the BMW group.
Q. Okay. And the second line there we have PM, Barbara Burghardt, that is number five, madame court reporter, who is that?
A. PM managed the personnel topics across the BMW group. So, that "M" stands for management, personnel management.
Q. Okay. The name to her right is number 12, madame court reporter, and I will try, as Nicole Haft-Zboril,

PI, can you do better than me on that pronunciation?
A. I cannot.
Q. Do you know what position that person held?
A. PI is international personnel. So they are responsible for the international terms and conditions as employees transfer across different countries.
Q. And so does that include expats?
A. Correct.
Q. On the last line there we have a -- I will spell it, madame court reporter, this one didn't make the list Nicole Kurek, K-u-r-e-k, did I get that right?
A. Correct.
Q. And it is designated PT, do you know what that person does?
A. Yes, PT is talent management. So, they are responsible for talent management-type programs: Attraction, retention, talent development, succession planning.
Q. For what scope?
A. This is global. This is P circle, worldwide.
Q. The last name is number 30, madame court reporter, Rudy Riechenauer, Rudolph Riechenauer, PA, did I say that right?
A. Yes, you did.
Q. Are you familiar with that person and what his job

was?
A. So, PA is facility management and real estate-type acquisitions, and purchases, and land development.
Q. And so collectively these people are referred to as what?
A. The P circle.
Q. Are any of these people -- do any of these people work in the United States?
A. No, they do not.
Q. Now, I want to, if things aren't confusing enough, I want to talk about another circle. Are you familiar with the term called the F circle?
A. I am.
Q. Okay. What is F circle?
A. The F is the finance division of BMW and the F circle mirrors the P circle, but for the finance functions.
Q. So, are there any members of the F circle whom you are aware located in the United States?
A. No.
Q. Are you familiar with the position called FO?
A. I am.
Q. What is FO?
A. So, FO is responsible for the organizational

structures across the locations, across the world for BMW. So, I coordinated with FO on structure topics for Plant Spartanburg.

Q. At the time you left BMW, who was in the position known as FO?

A. Johannes Trauth.

Q. Number 39, madame court reporter.

And when Mr. Trauth was serving as FO, where was he located?

A. In Germany.

MR. MURPHY: I will next show you a document we have marked as Plaintiff's exhibit number 25, I believe it was offered without objection?

THE COURT: Hearing no objection, Plaintiff's 25 is admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Ms. Dawsey, are you familiar with this document?

A. Yes.

Q. What is this?

A. This is an email from Christine Petrasch, who was the Vice President of Human Resources, to the first line leadership in Human Resources sharing the -- that she had shared with P top three plant topics and also other topics that we were to work on to contribute with the

network.
Q. Again, who is P?
A. P is the personnel or Human Resources board member in Germany.
Q. Who was it at that time?
A. Ilka Horstmeier.
Q. Again, 16 madame reporter.
So, on this email list of topics, what are the topics that are not highlighted?
A. So, these look like topics that were specific to Plant Spartanburg.
Q. Let's talk about the first area then, "Strategic Work Force Development." Are you familiar with the first non-highlighted term starts with initial "CWF" or the abbreviation "CWF," are you familiar with what that stands for?
A. Yes, I am.
Q. What does that stand for?
A. Contract work force.
Q. What does that mean in BMW terms?
A. Those are employees of a contract staffing company that are not directly employed with the plant.
Q. Okay. And the phrase "recruiting," what does recruiting mean?
A. Recruiting means attracting new hires, new

candidates, new employees.

Q. Okay. The next one is: "Two Focus Topics, Press Shop Joining/Control Area and also Launch, E/E (slashing, blitz)," do you know what that is about?

A. So, I was working on and there were plans to, at this time, build a new press shop or build a press shop at Plant Spartanburg, there was not a press shop on the site. So, this was talking about the planning for that press shop would be a focus topic and the launch of E/E, that is electrical engineering.

Q. Okay. At BMW, what is a press shop?

A. A press shop, and I am not a technical person, but a press shop presses the materials, the metal materials, needed to start the build of a vehicle. So, let's say the floor pan, for instance, would have a certain shape, and it would be molded, if you will, and that would be a material then used in the construction of or the build of the automobile. So, the press shop would be to make those molds on-site at the plant.

Q. Then the next bullet is: "Hire ten people management positions," do you know what is that is about?

A. That is referencing hiring ten people into leadership positions.

Q. Where?

A. At Plant Spartanburg.
Q. "Hire ten more PACE for focus topics," what does that mean.
A. So, pace, P-A-C-E, is a development program where individuals early in their career come in, they do an eight month rotation times three in different areas, so they would do eight most in engineering, eight months potentially in a technology, and potentially another eight months in an operational/administrative area, and then they would be placed in a position.
Q. And where do these positions exist, just so we are clear?
A. At Plant Spartanburg.
Q. Let me just touch on it, I am not going to go through all of these. Let me touch on the next major area here, Leadership. What are the first three bullet points on there that aren't highlighted? "Finish I-lead" and the next two?
A. I-lead is a leadership development program. It is several months, you go to a course, you do some outside of the course work, it is for leadership development. So interpreting it now, I would say it means to put the remaining leaders that had not been through the development course through it. That is what I would interpret "finish I-lead" means.

"Finish AC for SL," is finish assessment center for section leader. Section leader is the first line supervisor and assessment center was being developed to assess those to enter into that role.

"Define I-lead 2.0," is what is that next iteration of I-lead, the next leadership development program that needed to be developed.

Q. And, again, what was the scope of these initiatives, was it Spartanburg? Worldwide? What is it about?

A. It is Spartanburg specific.

Q. Within the BMW Group, who ultimately determined the duties of each position for jobs in Spartanburg?

A. So for leadership, that was done through FO.

Q. Just so we hear a lot of terms and a lot of letters, I will stop and refresh, FO was who at the time you left?

A. Johannes Trauth.

Q. Where was he?

A. In Germany.

Q. Did BMW and Germany play a role in how many positions you could have in Spartanburg?

A. Yes.

MR. MURPHY: I am going to show you another document, Plaintiff's exhibit number 7. Again, Your

Honor, was offered without objection.

THE COURT: Hearing no objections, admitted.

MR. MURPHY: Okay.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Do you recognize this document?

A. I do.

Q. What is the title up there in the top left?

A. "T-Vorhalt request."

Q. Do you know what language Vorhalt is?

A. It is German.

Q. And who put in the text in this form T-Vorhalt.

A. So, TX-60 would have entered the text in the template.

Q. And that was who?

A. Myself, along with the planner, who was Stephan Dombrowski at the time.

Q. So, what does T-Vorhalt mean, as you understand it, or used it and understood it at BMW?

A. As I understood it, it was -- we had to make a request to the T circle for, in this case, this was an additional demand for resources for head count for the new press shop that was going to come online.

Q. Is that the press shop you were talking about earlier?

A. Correct.
Q. That is a press shop located where?
A. Plant Spartanburg.
Q. And what level employees -- so, what are you doing with this T-Vorhalt? What, essentially, are you doing with it? What is the purpose of it?
A. We are requesting approval.
Q. From whom?
A. From the T circle.
Q. Located where?
A. In Germany.
Q. And what level of employees are you talking about? Are you talking about function level one and function level two?
A. No, these were, you see on the bottom, 68 indirect head count target, so these were production positions to support the press shop.
Q. So, these aren't even leadership level positions; is that correct?
A. Some of them could have been, but the majority are not.
Q. So could you get positions approved for hourly people in an operation here in South Carolina without approval from these circles in Germany?
A. I could not.

Q. Did BMW AG play a role in how many positions could be at each function level?
A. Yes.
Q. In your position as TX-60, were you involved in the creation of new positions within HR?
A. Yes.
MR. MURPHY: I want to show you a document that we have marked as Plaintiff's exhibit 27, Your Honor, offered without objection, I believe.
THE COURT: Plaintiff's 27 admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Okay. Kelly, can you tell the jury what this is about?
A. This is an email to me from Vice President Human Resources Christine Petrasch, April 8th of 2021. And she is indicating that she is going to have a discussion with Germany and she needs me to draft two job descriptions: One would be head of Recruiting and the other one would be head of HR.
Q. I see a reference down in here to a position referred to as TX-66; is that right?
A. Correct.
Q. What is TX-66?

A. Christine was requesting a new position and new organizational code to be added to the HR structure and she was calling it TX-66?
Q. Okay. And with whom was she having those discussions?
A. PM, PZ.
Q. And, again, are those the positions you referred to earlier --
A. In the P circle.
Q. -- in the P circle?
A. Correct.
Q. We talked about function levels and the different ones that were in that book that we looked at. Who ultimately controlled how the jobs were graded in terms of function level one, two, three, or four?
A. So, there was a grading circle in Germany. We would prepare the submittal and we would submit to the grading circle and they would deliver back to us the function level.
Q. Okay. I am going to make everybody really happy here by making this a little bit more confusing I am going to show you Plaintiff's exhibit number 12, which we may have already --
THE COURT: It is in evidence.
MR. MURPHY: I thought we had already looked at

this one.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Did that function level system change at any point in time during your employment?

A. Yes.

Q. Okay. And what happened?

A. So --

THE COURT: You want 12 up on the screen?

MR. MURPHY: I will. Thank you.

I didn't want to show the page to suggest an answer.

THE COURT: I am not saying you have to put it up. I wanted to know if this equipment was working.

THE WITNESS: So, when we initially rolled out function levels and personal grades, which was the structure from Germany at the Plant, we added four personal grades allotted to each fixed level. And Germany came back and said you cannot have four, you can only have three. And so they had us to remove what I used to call the upper, upper personal grade showing that an employee could not grow to that level without moving function level.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Okay. We will get to that. What I wanted to talk about was, did the term "functioning level" become something different at some point in time?

A. It did. It was broken into expert and leadership. So, EL and LL.

Q. Okay. So, I will go to page five of that exhibit number 12. Can you just explain to the jury what is being shown on this page and what this is about?

A. So, this just simply breaks the structure into two career ladders. The left hand is leadership level ladder meaning these positions supervise other positions and the right side is expert level meaning these are individual contributor functions.

Q. Okay. So, if a job was a function level three prior to this change, is it still known as a level three?

A. Yes.

Q. And is a four still a four?

A. Yes.

Q. And you talked about how personal grades fit into function levels, what does that show both with respect to expert level or leadership level in terms of, for example, what fits into a level three?

A. So, looking at leadership level three, which is the left-hand side chart, it shows that personal grade ten, 11 and 12 are aligned with leadership level three and also expert level three.
Q. So, the same personal grade fit in the same levels?
A. Correct.
Q. So, we go to the prior page on that, is this -- what does this page explain to us?
A. So, it is explaining the components of the organizational structure at Plant Spartanburg.
Q. Okay. So, in a nutshell then we have got all of these concepts floating around. What is the difference between function level and personal grade in the simplest terms?
A. So, function level was assigned to the job via the value of the job and personal grade is assigned to the employee.
Q. And I want to highlight the paragraph on function levels and what document does this policy say shows the function level of the job?
A. The job function data sheet.
Q. Which is also what you referred to as what?
A. Job description.
Q. We saw an example of that earlier, right?

A. Correct.

MR. MURPHY: Now, we are going to do just a little bit of the history of development. I believe you touched on this a little built earlier, but I want to show you another document and this is Plaintiff's exhibit 10, Your Honor, offered without objection.

THE COURT: Plaintiff's 10 admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. If we go to the last page of this document, what is the date of it?

A. August 2001.

Q. So, what is this exhibit?

A. This is the first organizational brochure that was published when function levels and personal grades were implemented as the structure at Plant Spartanburg.

Q. Okay. Now, let's look at page, it is bates stamp Dawsey 297, I believe it is page five of that document, what is this showing us?

A. So, it is showing us the job titles, the function levels, and the corresponding personal grades with the function levels.

Q. Okay. And in 2001, how many personal grades were at each level?

A. Four.
Q. And did that continue -- did it stay four personal grades per function level throughout your employment?
A. It did not.
Q. For example, if we go back to our Plaintiff's exhibit number 12, how many personal grades fit into each level?
A. For function level four and three and two, three.
Q. So, is that a decrease or increase?
A. That is a decrease.
Q. What caused that decrease?
A. Sir, I think I mentioned that earlier. Germany came back and said we could not have four personal grades per function level, that we could only have three.

MR. MURPHY: Let me take you then to Plaintiff's exhibit 22 which again, Your Honor, was offered without objection?

THE COURT: Twenty-two is admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Kelly, can you identify this document?
A. Yes. So, this is the output from the grading circle in Germany. So, when you submit for grading,

this is what will come back. And so this one is the function level four approval committee and it shows by function what the levels are in Spartanburg HR.
Q. And at this point in time, what did Germany say were the function level three positions?
A. TS 60 and TS 61.
Q. Okay. And what were the function level four positions at that time?
A. TS 62 and TS 65.
Q. Did you or anybody from Spartanburg, to the best of your knowledge, ever sit on this international grading function level four approval committee?
A. None that I am aware of.
Q. And we saw some organizational charts earlier, did BMW in Spartanburg have organizational charts?
A. Yes.
Q. While you were in TS 60, were you involved in creating organizational charts?
A. Yes, TS 60 produced the organizational charts.
Q. Did that change at some point in time?
A. Yes, it did.
Q. Let me go back to Plaintiff's exhibit 2, which has already been admitted, Your Honor. Do you recall -- this is the org chart we looked at earlier.
A. Yes.

Q. I will draw your attention to the blurb at the bottom here, can you read that?
A.
"Local Plant Spartanburg org chart publications will be discontinued after March 2021. The BMW group contacts org charts will be utilized as of April 1, 2021."
Q. So, what happened here?
A. So, Germany said that we could no longer --
MR. ROZELSKY: Objection, Your Honor, hearsay.
MR. MOODY: Objection.
MR. ROZELSKY: I am not sure all of who is Germany is speaking, it is hearsay.
MR. MURPHY: I can ask her to clarify.
THE COURT: Will you withdraw the question and rephrase it?
MR. MURPHY: I will withdraw it and rephrase it.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Who is BMW Group Contacts Org?
A. This is an Org Context from Central -- Central BMW.
Q. What does Central BMW mean?
A. Out of their human resources information system

from Germany.
Q. So, who took over creating the org charts at this point in time?
A. A department in Germany.
Q. We heard Mr. McCoy use a term in opening called succession planning, what is succession planning?
A. Succession planning is planning for backfill of resources as they turnover.
Q. Backfill of resources meaning what?
A. Of employee, backfill of an employee.
Q. What does backfill mean?
A. To fill the role. To recruit for a role.
Q. And is that an important HR function?
A. Yes.
MR. MURPHY: Let me show you a document. Your Honor, this is Plaintiff's exhibit 63 offered without objection.
THE COURT: Sixty-three admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. I will show you this email, I know it is not the best printout, are you familiar with this email?
A. Yes, I am.
Q. And who is it from?

A. Eva Burgmeier.
Q. What is her position at the time?
A. PM 62.
Q. Where is that?
A. In Germany.
Q. And go ahead and read to the jury, I will blow it up a little bit, maybe it will help a little bit. Read to the jury what she wrote:
A.
"Dear all: The P circle will discuss succession planning next Monday based on My TMS. Your My TMS people profile will be an important information for the discussions, especially in the overviews, the employees pictures are shown. Please make sure your My TMS people profile contains all relevant information and you have a picture uploaded. Thank you."
Q. What is My TMS people profile?
A. That is central talent management system from Germany.
Q. Let me blow it up for you. What is the -- can you see the date on there?

A. I cannot.
Q. Okay.
Q. Does it help if I do it a little lower resolution?
A. Yeah, Wednesday April 21, 2021.
Q. So that is while you were still in TX-60?
A. Correct.
Q. Were you included in these succession planning P circle meetings?
A. I was not.
Q. Was anybody from Spartanburg that you are aware of?
A. Not that I am aware of.
Q. All right. Now we are going to talk about your last position, specifically TX-60. We talked about the six general areas before that are covered by your position, correct?
A. Correct.
Q. What is OFCCP if you know?
A. Office of Federal Contract Compliance.
Q. And did -- as TX-60, did you have any responsibilities with respect to OFCCP?
A. I did.
Q. Okay. Just tell the jury what that is about and what you -- first of all, is that a Government agency?
A. It is.

Q. Do you know what government?

A. United States Federal Government.

Q. So, tell the jury what your role was with respect to OFCCP compliance.

A. Plant Spartanburg had contracts with the Government to sell X5s, and because we were a government contractor, we had to comply with OFCCP guidelines, mainly reporting guidelines, and so it was a compliance topic.

Q. Okay. Guidelines about what?

A. Hiring, diversity, mainly, mainly those topics, how many people we hired, how many people were in the pool.

Q. All right. Is this something that you also had training on through your certifications?

A. Not with SHRM, but I had OFCC training.

Q. What is ERISA?

A. ERISA is the governing law for health benefits in America.

Q. And TX-60, did you have responsibilities with respect to ERISA?

A. I did.

Q. And what were your responsibilities as TX-60 in terms of ERISA?

A. I had to ensure that the health benefits we

offered were in compliance with ERISA.
Q. And what kind of health benefits are those, are those through the Government? Are they private? What are they?
A. They are private offered through BMW Manufacturing.
Q. As TX-60, how often did you interact with your counterparts in Germany?
A. I would say weekly.
Q. And with whom would you interact?
A. So, it would depend on the topic. Grading circle with FO if we were asking for a box, a new functional code; special project you saw earlier, HR Compact type special project. And also on the SAP centralization, the HRIS centralization.
Q. Why were you interacting with them with such frequency?
A. Because I had to submit a number of things to them for their approval or they were driving a project seeking information for -- from Plant Spartanburg and I was the contact.
Q. As TX-60, were you able to implement new policies by yourself?
A. Some policies, yes. If, I would say, very local to Spartanburg, but mostly in my area I had to get

approval.
Q. Okay. Approval from whom?
A. From the contacts in Germany, depending on the topic.
Q. Did you like the TX-60 position?
A. I did.
Q. Why?
A. Because it brought the technical aspects of HR for me, so I enjoyed the compensation aspect, the planning, the steering, as well as still interacting with the people. So, I enjoyed that combination of HR technical and taking care of the employees.
Q. And over the years, did you receive feedback from the various Vice Presidents to whom you reported?
A. I did.
Q. And how was feedback documented at BMW?
A. There is an annual performance review and it is called portfolio.
Q. Okay. I am going to just do a couple years, say a few years, let's look at three years of them. I am going to ask you to first look at Plaintiff's exhibit 16.
MR. MURPHY: Again, Your Honor, offered without objection.
THE COURT: Sixteen is admitted without

objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. I am showing you Plaintiff's exhibit 16, what is that?

A. This is my portfolio from 2018.

Q. I want to point out a couple of things up in the information section. Is the function level for, I guess it was called TS at that time 60, is that indicated on your portfolio?

A. It is.

Q. And what function level?

A. Three.

Q. And who ultimately rated you or gave you the final rating on this portfolio?

A. My manager, Christine Petrasch.

Q. It says on the document, but what year is this?

A. 2018.

Q. When are portfolios shared with the employee? Is that at the end of the year, beginning of the next year, whenever they get to it, how does that work?

A. Yeah, at the end of the year.

Q. So under "Overall appraisal," what grades did Ms. Petrasch give you?

A. It says:

"Targeted achievements and performance results is three. Fully meets requirements and leadership behavior was four. Exceeds requirements."

Q. Take you to the second page in terms of leading business and transformation, what grade did you receive?

A. "Four, exceeds requirements."

Q. And at the bottom of that page starts the top called "Leader People and Collaboration," do you see that?

A. I do.

Q. What was your overall grade in that section?

A. "Four, exceeds requirements."

Q. At the bottom of page three is a section called "Change of job," do you see that?

A. I do.

Q. It goes to the next page, what is this section for?

A. When employees are going to move positions in the next 12 months, it will be indicated in that section.

Q. Was anything indicated to you in terms of changing jobs?

A. Can you flip to page four? No.

Q. I just want to call out one thing since people

might notice it, this is not signed, what does this document say about signatures?

A.

"This document was issued
electronically and is therefore
valid without signature. A
signature is optional. It will be
stored by HR in the personnel file.
Additional copies are not allowed."

Q. All right. So that is 2018. Let's go to the next year, 2019.

MR. MURPHY: Again, this is Plaintiff's exhibit 15, Your Honor, offered without objection.

THE COURT: Admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. What is this, Kelly?

A. This is my portfolio 2019.

Q. What was your overall appraisals then in that year?

A. "Target achievement performance results, four, exceeds requirements. Leadership behavior, three, fully meets requirements."

Q. And again if I go to the section on change of job, does it indicate you will be changing jobs or should

change jobs?
A. It did not.
MR. MURPHY: Let's look at Plaintiff's exhibit 14. Again, Your Honor, this was admitted -- offered without objection.
THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Was this the last full year you were at BMW?
A. No, 2021.
Q. Is it the last portfolio you ever received from BMW?
A. Yes, it is.
Q. So, in the last year you received a portfolio from BMW, what were your overall appraisals?
A. "Target achievement and performance results, four, exceeds requirements. Leadership behavior, four, exceeds requirements."
Q. So in the BMW system, can you do better than "exceed requirements"?
A. There is a score of 55 exceeds requirements, but exceeds requirements are the highest words.
Q. Now, let's talk about 2020. I think everybody knows the answer to this, was 2020 a typical year?
A. No, it was not.

Q. What issues did you face in 2020 that you did not face in your prior many years with BMW?
A. COVID.
Q. Okay. During COVID, did the plant stay open?
A. The plant closed for a bit.
Q. Okay. In your 2020 review on the second page, are there comments about your handling of the COVID crisis?
A. Yes, there are.
Q. And who put those comments on there?
A. Christine Petrasch.
Q. She was, at that time, what?
A. Vice President Human Resource.
Q. What did she say about your COVID crisis management?
A.
"Kelly showed personal responsibility accountability for business results in steering the successful work force ramp-down/ ramp-up cross functionally. All technologies and MAU within Plant Spartanburg. Kelly was truly the leader for that."
Q. Okay. What is ramp-down/ramp-up?

A. Ramp-down means decrease in employee number and ramp-up means increase in employee number.
Q. Okay. Let me ask you about the final entry there under paragraph that says: "Kelly is the TX-6-DM forum, do you see that paragraph?
A. I do.
Q. Let me ask you about the final sentence. Can you read that to the jury:
A.
"She is very inspiring. The person to go to and excellent sparring partner for her peers and colleagues."
Q. Did Ms. Petrasch explain to you what she meant by "sparring partner"?
A. Yes, she did.
Q. Okay. What in -- and what explanation did she give you?
MR. ROZELSKY: Objection, hearsay.
THE COURT: Overruled.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Go ahead.
A. So I would challenge her. I would ask her questions, I would ask her why, and we had -- we had a

relationship where we could explain things to each other and that is what she called "sparring."

Q. Let me ask you with respect to the COVID handling of it, was everybody happy with the decisions that were made on the ramp-up and ramp-down of COVID?

A. No.

Q. Was there some debate within management?

A. Yes.

Q. About that -- tell the jury about that.

A. So, there were a lot of unknowns and whether production would get to run, whether production would not get to run. We were considering the safety of the associates, of course. We didn't know if COVID was going to go away tomorrow or in a week or ever and so we were having to make leadership decisions on, will we have parts? Can we bring employees into a factory knowing that COVID was going on? So, there was a daily leadership meeting to determine what was going to happen, how were we going to respond with the information that we received everyday from reports on COVID.

Q. And so what were you trying to accomplish in HR with the ramp-up and ramp-down?

A. This topic was about if we did not run and if it were a long period, then how do we manage the employees?

We had a contract base employee and we also had the BMW Spartanburg employees that we had to also consider, so we ultimately ended up releasing the contract work force and we did a furlough with the BMW Manufacturing employees.

Q. Let me, and again, was that popular with everybody at BMW?

A. No, it was not.

Q. Let me take you to the fourth page of that document under comments again, whose comments are these?

A. Christine Petrasch.

Q. Go ahead and read the first one, please.

A.

"Kelly knows her HR business very well. She is the key player within HR for strategy, development of new concepts, and HR steering."

Q. Let's go to the next to last one, "Kelly is well," go ahead and read that.

A.

"Kelly is well respected within the team, peers, management, and also local and central colleagues.

Q. And the last entry for that section.

A.
"Kelly is my role model for U.S. leadership. Excellent communication and information sharing. No surprises. Her goal, as a leader, is to lead by example and ensure focus on business, associate, and personal development. And I and all process partners I interviewed only can confirm that day by day."
Q. Okay. I will get back to this "partners concept" here in a little bit. But I want to go to this section we have talked again before, as of the last portfolio provided to you, was there anything indicated for you about changing jobs?
A. No, there was not.
Q. In the entire time you worked at BMW since 1995, did you ever receive a bad review?
A. I did not.
Q. And prior to the 2021 events that we will discuss in a minute, had Ms. Petrasch ever told you that BMW ever wanted you in any position other than TX-60?
A. She had not.
Q. And were you happy in TX-60?

A. I was.
Q. Now, in these portfolios that we have talked about or performance evaluations, do they represent only the view of your boss?
A. No.
Q. Who else is involved?
A. So, how the process works is there are process partners that you have worked with closely throughout the year that provide feedback, and then that feedback is taken to the senior leadership, that first line you saw on the work chart earlier, and they discuss every manager in the portfolio round each year.
Q. Who all discusses that?
A. The senior management team.
Q. Oak. And, again, what group do we include in the senior management team?
A. Function level two and function level one.
Q. And you know an individual named Sherry McCraw, correct?
A. I do.
Q. Is she in the courtroom?
A. Yes, she is.
Q. And she is sitting over there with her counsel?
A. Correct.
Q. Okay. And during these years that we just

reviewed, 2018, 2019, 2020, was Ms. McCraw in the group that reviewed your portfolio before it was provided to you?

A. She was in the senior management team, yes.

MR. MURPHY: Let me also show you a document we have marked and offered without objection, Your Honor, as Plaintiff's exhibit 19.

THE COURT: Admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. What is this document?

A. This is from March 20, 2021. It is my compensation change statement showing base salary change and bonus.

Q. And what kind of bonuses did you receive here?

A. I received a plant bonus, and individual bonus, and a high performer bonus.

Q. And what is a high performer bonus?

A. It is money that is granted over and above the approved individual and plant bonus for high performing employees.

Q. Does everybody receive a high performance bonus?

A. They do not.

Q. In addition to the COVID issues we discussed, were you given any other special assignments to handle

at BMW?
A. I was.
Q. Can you give the jury an example of one?
A. So, we were required to do a project where we put a freeze on the defined benefit pension.
Q. Let me just stop you. What is a defined benefit pension?
A. It is a retirement program, retirement benefit, defined benefit.
Q. What does defined benefit mean?
A. Defined benefit means there is a certain percentage that the employee earns with each year of tenure that is a contribution into their retirement cannot.
Q. So, what is the outcome of a defined benefit pension? What is it?
A. It is a retirement benefit for employees.
Q. Okay. And what was the change that was happening?
A. So, we were required to close or freeze the defined benefit and transfer it into what is called a defined contribution.
Q. What is the difference between defined benefit and defined contribution?
A. So, one, the defined contribution is a percentage

contribution annually and a defined benefit continues to grow year over year with an accumulating factor.
Q. You say this is something you led or worked on?
A. Yes, I was the project leader.
Q. Who was requiring you to change from defined benefit to defined contribution?
A. The P circle.
Q. Is that something you wanted to do?
A. I did not.
Q. And did that change present challenges in Spartanburg?
A. Yes, it did.
Q. What were the challenges?
A. So, we were hitting our 25th anniversary and we had to communicate during that year that we were freezing a retirement benefit that was, one, an attraction and a retention tool for the employees.
Q. How did you deal with that?
A. It was a challenge, but we did the best that we could. We, with Christine's help, we were able to push back and actually get an additional contribution for the first year in that transitional period to try to help with the communication, the acceptance from employees.
Q. You were able to get that from who?
A. Approved from Germany.

Q. When we say "Christine," you are referring to Ms. Petrasch?
A. Yes.
Q. Were you ever told you were under consideration for Vice President of HR or TX-6?
A. I was.
Q. And when did that occur?
A. The first time was in 2019.
Q. And who discussed that with you?
A. Knudt Flor.
Q. Anyone else?
A. Johannes Trauth.
Q. And who is -- that is number 8 and number 39 madame court reporter?
Q. Who is Knudt Flor?
A. He was the President and CEO at Plant Spartanburg at that time.
Q. And do you know where he is from?
A. He is from Germany.
Q. And Mr. Trauth?
A. He is from Germany.
Q. What did they tell you in terms of your candidacy to become a candidate or possibility to becoming a candidate for TX-6?
A. Knudt told me I needed to take on more visible

project so that I could be visible to Germany and the project needed to be of large scope and have an impact at the plant.

Q. And what did Mr. Trauth tell you?

A. He told me that there was some interest in having a local or a domestic TX-6 and that I was being considered and reviewed for that position.

Q. And is "local" and "domestic" terms that are used in BMW at BMW?

A. They are.

Q. What did they mean?

A. They mean American employee at Plant Spartanburg.

Q. When you were first hired into HR, I think we said it was 1995, who was the Vice President?

A. Kathleen Wall.

Q. Is she who hired you?

A. No, I stand corrected, my apologies. Susan Crocker.

Q. How did you get along with Susan Crocker?

A. Good.

Q. Who was next?

A. Kathleen Wall.

Q. Okay. And how did you get along with her?

A. Good.

Q. Who was after Kathleen Wall?

A. Annmarie Higgins.
Q. And how did you get along with her?
A. Good.
Q. Who was after Ms. Higgins?
A. Johannes Trauth.
Q. Again, ma'am, it is number 39.
And we talked about him a little bit and will talk about him a little bit more. How did you get along with Johannes?
A. Good.
Q. Who was after Johannes?
A. Christine Petrasch.
Q. How did you get along with her while she was there?
A. We were good.
Q. She was the one who did the reviews we just went over?
A. She is.
Q. Now, in 2021, did things start to change in the Spartanburg HR department?
A. They did.
THE COURT: Let me interrupt you just a minute and see the attorneys up here briefly.
(Whereupon, a bench conference was held off the record in the presence of the trial jury.)

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Members of the jury, inasmuch as we will not complete this witness's testimony today, I have consulted with the attorneys and we are going to break for the day to give you a little bit of a head start on the traffic. So, we need to take care of some housekeeping things after you leave, but let me just ask, is nine o'clock in the morning, is that doable or is it going to present any hardships? If it is going to present a hardship, I am happy to have that conversation. Let's try for nine a.m. tomorrow.

Do not discuss the case, do not do any independent research about the case. Remember my previous admonition. And so with that I hope you have safe travels home and a pleasant evening and we will see you back here in the morning at nine a.m.

All right. Thank you. Everyone may remain seated while the jurors are excused.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: Ms. Dawsey, of course you are in the middle of your testimony -- well, I don't know if you have made it to the middle or past the middle, but anyway, you are in your testimony, so don't discuss your

testimony with anyone during the break. Obviously you will talk to Mr. Murphy, say good morning, good evening. He is an officer of the Court. You may step down. If there is nothing else on the record, I would like to go off the record and go over these exhibits, okay.

(Whereupon, the hearing concluded at 4:31 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR　　　　April 12, 2026
Date

**'**

**'22** [1] - 84:19
**'98** [1] - 96:18

**1**

**1** [6] - 3:9, 34:12, 43:23, 118:20, 156:8
**1-10-22** [1] - 3:11
**1/21/2021** [1] - 4:7
**10** [4] - 3:17, 15:16, 153:6, 153:7
**10,000** [1] - 79:12
**10/07/2023** [1] - 4:10
**101(a)(4** [1] - 15:16
**104** [1] - 3:16
**107** [5] - 3:10, 20:10, 42:12, 42:15, 42:19
**10th** [1] - 84:10
**11** [1] - 152:3
**110** [1] - 3:20
**112** [1] - 3:14
**113** [1] - 3:25
**117** [2] - 53:1, 53:6
**11:08** [1] - 50:16
**12** [11] - 3:19, 110:5, 110:14, 138:24, 149:22, 150:9, 151:9, 152:3, 154:6, 164:21, 180:17
**12/2019** [2] - 3:25, 4:14
**133** [1] - 4:14
**135** [1] - 4:10
**136** [1] - 3:12
**138** [2] - 53:1, 53:6
**14** [2] - 3:21, 166:3
**140** [2] - 53:1, 53:6
**141** [1] - 4:7
**146** [2] - 3:15, 23:3
**148** [1] - 4:9
**14th** [2] - 86:8, 86:17
**15** [7] - 2:4, 3:22, 22:8, 52:17, 102:13, 122:17, 165:13
**153** [3] - 3:18, 53:1, 53:6
**154** [7] - 4:6, 22:1, 41:12, 42:20, 48:10, 48:17, 128:6
**157** [1] - 4:11
**16** [5] - 3:23, 138:3, 142:7, 162:22, 163:4
**162** [1] - 3:23
**164** [11] - 36:18, 37:15, 40:5, 40:7, 41:12, 42:23, 43:23, 44:25, 45:6, 45:21, 45:22
**165** [1] - 3:22
**166** [1] - 3:21
**17** [6] - 1:4, 53:1, 53:6, 123:16, 124:4, 126:3
**173** [3] - 4:4, 53:1, 53:6
**17th** [1] - 5:19
**18** [8] - 3:24, 12:18, 22:4, 22:14, 42:21, 46:10, 113:18, 114:23
**185** [1] - 126:20
**186** [2] - 23:23, 42:25
**19** [3] - 4:3, 70:20, 173:7
**190** [2] - 53:1, 53:6
**1964** [1] - 61:16
**1981** [2] - 61:19, 61:20
**1990** [2] - 70:12, 94:18
**1992** [4] - 75:1, 75:15, 75:16, 76:22
**1994** [1] - 79:12
**1995** [9] - 70:17, 79:25, 92:21, 92:24, 94:19, 95:12, 95:23, 171:18, 177:14
**1998** [3] - 95:23, 96:9, 97:5
**1:00** [1] - 56:9
**1st** [1] - 82:1

**2**

**2** [7] - 3:10, 3:13, 52:5, 107:19, 118:20, 124:18, 155:22
**2,000** [2] - 75:25, 79:11
**2.0** [1] - 145:5
**20** [6] - 49:19, 50:14, 51:3, 55:5, 70:18, 173:12
**2000** [2] - 79:25, 96:19
**2001** [3] - 3:18, 153:13, 153:24
**2010** [1] - 25:5
**2011** [2] - 80:1, 99:10
**2013** [1] - 24:3
**2014** [1] - 22:8
**2015** [4] - 70:20, 80:2, 80:8, 102:3
**2017** [1] - 20:14
**2018** [5] - 3:23, 163:6, 163:18, 165:10, 173:1
**2019** [5] - 3:22, 165:11, 165:18, 173:1, 176:8
**2020** [11] - 3:21, 23:7, 23:9, 46:18, 47:1, 114:3, 166:23, 166:24, 167:1, 167:6, 173:1
**2021** [26] - 3:9, 3:14, 3:20, 46:18, 47:1, 71:1, 80:22, 80:23, 81:11, 81:21, 82:1, 82:4, 82:9, 83:15, 84:7, 84:10, 85:3, 110:22, 148:17, 156:6, 156:8, 159:4, 166:10, 171:21, 173:12, 178:19
**2022** [12] - 23:7, 23:9, 23:19, 24:3, 80:9, 80:13, 81:6, 83:3, 83:19, 86:8, 86:18, 137:6
**2026** [4] - 1:4, 5:19, 5:21, 180:17
**203** [11] - 24:19, 37:19, 40:4, 43:5, 43:9, 43:10, 43:23, 44:22, 45:6, 45:20, 45:22
**207** [1] - 1:18
**21** [1] - 159:4
**22** [2] - 4:5, 154:17
**220** [3] - 26:20, 27:13, 43:19
**25** [6] - 4:7, 133:23, 134:3, 134:4, 141:12, 141:14
**25th** [2] - 5:20, 175:14
**26** [1] - 79:23
**27** [4] - 4:8, 89:11, 148:8, 148:10
**28** [4] - 4:10, 135:10, 135:12, 135:15
**294** [1] - 1:22
**29601** [2] - 1:18, 2:5
**29602** [1] - 1:22
**29624** [1] - 2:7
**297** [1] - 153:19

**3**

**3** [6] - 3:11, 117:15, 118:21, 132:7, 136:21, 136:23
**3/20/2021** [1] - 4:3
**30** [5] - 35:11, 43:24, 70:17, 75:10, 139:21
**30,000** [1] - 71:21
**315** [1] - 2:7
**35** [2] - 53:1, 53:6
**39** [3] - 141:7, 176:13, 178:6

**4**

**4** [5] - 38:11, 52:11, 117:15, 118:21, 132:7
**4/1/2019** [1] - 3:16
**4/21/2021** [1] - 4:11
**4/8/2021** [1] - 4:8
**42** [1] - 61:19
**4:31** [1] - 180:6

**5**

**5** [9] - 3:13, 4:13, 17:3, 17:7, 112:20, 112:21, 133:10, 133:14, 133:18
**51** [4] - 25:22, 43:18, 53:1, 53:6
**54** [5] - 14:24, 17:3, 17:7, 46:8, 123:14
**55** [1] - 166:21

**6**

**60** [5] - 124:8, 155:6, 155:17, 155:19, 163:9
**600** [1] - 113:8
**601** [1] - 113:8
**61** [2] - 113:4, 155:6
**62** [3] - 113:4, 155:9, 158:3
**63** [2] - 4:11, 157:16
**64** [1] - 113:4
**65** [2] - 113:4, 155:9
**68** [1] - 147:15

**7**

**7** [5] - 3:15, 53:1, 53:6, 79:14, 145:25
**70** [2] - 3:2, 13:19
**700** [2] - 2:4, 95:24
**73** [1] - 3:3
**7:22-CV-3738** [2] - 1:3, 18:5

**8**

**8** [10] - 3:16, 27:19, 37:3, 39:13, 43:23, 44:10, 44:20, 104:13, 104:15, 176:13
**88** [1] - 3:4
**8th** [1] - 148:17

**9**

**91** [1] - 3:6
**95** [1] - 3:9
**9:46** [1] - 5:1

**A**

**a.m** [3] - 5:1, 179:12, 179:17
**abbreviation** [1] - 142:15
**ability** [10] - 17:16, 22:22, 23:12, 24:15, 26:16, 27:15, 37:4, 41:4, 44:16, 48:14
**able** [15] - 13:17, 13:18, 14:17, 14:20, 25:17, 32:11, 33:17, 34:7, 36:2, 43:14, 46:4, 51:9, 161:22, 175:20, 175:24
**above-entitled** [1] - 180:12
**abroad** [1] - 83:18
**absence** [1] - 13:24
**absolute** [1] - 116:18
**absolutely** [2] - 68:11, 117:24
**AC** [1] - 145:1
**accept** [3] - 59:12, 59:15, 61:5
**acceptance** [2] - 131:25, 175:23
**accepted** [2] - 85:8, 85:14
**accident** [1] - 40:19
**accidentally** [1] - 34:3
**accomplish** [1] - 169:22
**accord** [1] - 88:1
**according** [1] - 72:25
**accountability** [1] - 167:18
**accountants** [1] - 119:20
**accounts** [3] - 63:4, 63:5, 63:6
**accumulating** [1] - 175:2
**accusations** [1] - 129:17
**accused** [1] - 31:22
**achieve** [1] - 7:15
**achievement** [2] - 165:21, 166:16
**achievements** [1] - 164:1
**acquisitions** [1] - 140:3
**Act** [1] - 61:16
**action** [2] - 38:18, 87:24

**active** [5] - 13:22, 15:14, 69:16, 94:11, 94:13
**actively** [3] - 16:1, 73:23, 84:10
**actual** [1] - 30:4
**added** [2] - 149:2, 150:17
**addition** [3] - 33:10, 105:5, 173:24
**additional** [11] - 11:18, 16:13, 36:7, 38:3, 45:17, 81:24, 103:3, 146:22, 165:9, 175:21
**additionally** [1] - 59:10
**address** [3] - 12:3, 12:7, 36:11
**administer** [2] - 5:13, 54:6
**administration** [2] - 69:17, 98:18
**admissibility** [1] - 128:5
**admits** [1] - 42:5
**admitted** [22] - 95:3, 104:15, 107:21, 107:23, 110:13, 112:23, 113:20, 133:13, 135:15, 136:23, 141:15, 146:2, 148:10, 153:7, 154:19, 155:23, 157:18, 162:25, 165:14, 166:4, 166:6, 173:8
**admonish** [1] - 66:19
**admonished** [1] - 66:21
**admonition** [4] - 66:24, 66:25, 67:4, 179:15
**advance** [3] - 17:22, 71:22, 73:11
**adverse** [1] - 21:10
**advocate** [1] - 96:2
**advocates** [1] - 97:12
**affairs** [1] - 133:6
**affect** [6] - 22:21, 23:11, 24:15, 26:15, 27:14, 38:23
**affiliation** [2] - 21:18, 21:22
**affiliations** [1] - 42:13
**afford** [1] - 16:11
**AFHC** [1] - 103:18
**afternoon** [5] - 66:8, 70:8, 73:15, 88:9, 111:7
**afterwards** [2] - 30:17, 35:16
**AG** [46] - 18:1, 18:21, 19:20, 31:4, 31:10, 41:14, 43:11, 48:25, 53:14, 72:19, 75:6, 75:21, 82:8, 83:8, 88:12, 88:15, 89:6, 89:7, 89:12, 89:13, 89:14, 89:16, 89:18, 90:24, 91:4, 105:24, 115:13, 115:14, 115:16, 115:25, 120:3, 120:5, 120:9, 121:2, 121:3, 123:4, 125:13, 129:8, 130:11, 130:14, 132:6, 132:24, 133:1, 133:5, 148:1
**AG's** [3] - 20:1, 75:9, 89:14
**age** [4] - 12:18, 13:19, 13:23, 42:21
**aged** [1] - 13:25
**agency** [2] - 14:7, 159:24
**ago** [7] - 7:18, 26:1, 26:5, 28:19, 28:21, 70:17, 130:23
**agree** [3] - 42:3, 59:3, 59:11
**agricultural** [1] - 14:3
**ahead** [13] - 34:18, 40:25, 55:5, 81:16, 104:10, 113:14, 125:20, 130:12, 134:9, 158:6, 168:23, 170:12, 170:19
**AIDED** [1] - 2:9
**Aiken** [1] - 92:13
**Air** [1] - 15:17
**Airport** [3] - 21:15, 74:7, 75:18
**AKTIENGESELLSCHAFT** [2] - 1:7, 1:21
**aligned** [1] - 152:3
**allegations** [5] - 18:10, 18:14, 29:23, 38:20, 87:6
**alleges** [2] - 61:12, 87:3
**allotted** [3] - 9:18, 17:1, 150:18
**allow** [1] - 83:3
**allowed** [13] - 11:23, 41:1, 45:19, 45:21, 47:20, 48:8, 116:22, 116:23, 119:20, 119:23, 119:25, 120:6, 165:9
**alluded** [1] - 71:18
**almost** [2] - 35:8, 35:11
**alone** [1] - 58:25
**alternate** [1] - 9:21
**altogether** [1] - 49:9
**ambulance** [1] - 14:7
**amended** [1] - 61:17
**America** [5] - 11:6, 100:24, 101:1, 101:5, 160:19
**American** [11] - 71:10, 71:14, 71:15, 71:17, 75:1, 82:12, 116:24, 132:22, 135:5, 136:4, 177:12
**Americans** [1] - 115:8
**amnesty** [1] - 13:8
**Amy** [1] - 5:12
**AND** [1] - 1:17
**Anderson** [4] - 49:3, 49:8, 50:8, 122:17
**ANDERSON** [1] - 2:7
**Andreas** [2] - 138:12, 138:14
**Android** [1] - 64:4
**anniversary** [1] - 175:14
**annmarie** [1] - 178:1
**annual** [2] - 81:12, 162:17
**annually** [2] - 98:18, 175:1
**answer** [9] - 7:5, 9:7, 12:6, 37:20, 60:4, 117:11, 132:15, 150:12, 166:24
**answered** [4] - 39:7, 39:13, 39:20, 41:25
**answering** [3] - 12:8, 96:2
**answers** [7] - 7:11, 7:14, 8:10, 8:11, 16:10, 37:20, 41:25
**anyway** [2] - 128:17, 179:25
**apologies** [1] - 177:17
**apologize** [4] - 17:21, 71:22, 123:2, 128:11
**appear** [2] - 57:13, 110:18
**APPEARANCES** [2] - 1:16, 2:1
**applicable** [1] - 35:19
**applied** [1] - 89:13
**applies** [6] - 12:2, 24:20, 35:20, 67:4, 117:7, 128:20
**apply** [14] - 11:22, 12:1, 12:14, 13:9, 13:12, 13:17, 14:8, 15:12, 16:5, 20:4, 21:23, 34:10, 59:1, 62:20
**applying** [1] - 128:21
**appointed** [1] - 16:4
**appraisal** [1] - 163:23
**appraisals** [2] - 165:19, 166:15
**appreciate** [10] - 7:23, 22:24, 30:14, 45:16, 48:5, 57:1, 58:2, 90:22, 90:23, 129:12
**approach** [3] - 27:21, 76:11, 116:12
**approaches** [1] - 67:9
**appropriate** [1] - 37:5
**approval** [8] - 4:5, 147:7, 147:24, 155:2, 155:12, 161:19, 162:1, 162:2
**approved** [3] - 147:22, 173:20, 175:25
**apps** [1] - 33:15
**April** [5] - 3:14, 148:17, 156:8, 159:4, 180:17
**arching** [1] - 104:7
**area** [9] - 94:4, 100:1, 103:6, 103:25, 137:14, 142:12, 144:9, 144:16, 161:25
**Area** [1] - 143:3
**areas** [10] - 68:4, 102:13, 102:16, 107:4, 109:11, 113:7, 128:18, 138:17, 144:6, 159:15
**argue** [1] - 128:2
**argument** [3] - 68:16, 128:3, 134:13
**arguments** [2] - 59:21, 68:24
**arises** [1] - 65:1
**armed** [1] - 15:15
**Army** [1] - 15:17
**AS** [2] - 1:8, 1:10
**aside** [1] - 6:8
**aspect** [1] - 162:9
**aspects** [1] - 162:8
**Assembly** [2] - 82:23, 83:4
**assembly** [1] - 49:10
**asserting** [2] - 62:6, 62:12
**asserts** [1] - 62:3
**assess** [2] - 127:11, 145:4
**assessment** [2] - 145:1, 145:3
**assigned** [4] - 11:4, 111:5, 152:16, 152:17
**assignment** [1] - 83:10
**assignments** [1] - 173:25
**assist** [2] - 9:7, 11:5
**assisted** [1] - 19:16
**assisting** [1] - 74:18
**Associate** [4] - 101:19, 103:16, 103:17, 136:5
**associate** [3] - 23:17, 96:1, 171:8
**associates** [1] - 169:13
**association** [2] - 20:18, 21:7
**Atkiengesellschaft** [2] - 18:1, 18:21
**attempt** [2] - 76:20, 77:2
**attempting** [1] - 101:1
**attend** [1] - 94:6
**attended** [1] - 91:23
**attending** [1] - 68:3
**attention** [11] - 55:23, 65:8, 69:21, 72:5, 73:11, 80:17, 80:19, 86:7, 87:19, 90:25, 156:1
**attorney** [2] - 19:15, 70:1
**attorneys** [13] - 9:6, 12:11, 17:10, 17:13, 21:7, 36:6, 45:18, 67:6, 68:23, 70:2, 122:3, 178:23, 179:5
**attracting** [2] - 98:22, 142:25
**attraction** [3] - 98:19, 139:17, 175:17
**August** [4] - 3:18, 95:23, 96:9, 153:13
**author** [1] - 128:22
**autistic** [1] - 15:1
**automatically** [1] -

8:18
**automobile** [2] - 134:8, 143:18
**awarded** [1] - 114:21
**aware** [9] - 40:23, 41:3, 64:15, 132:11, 136:12, 140:20, 155:13, 159:10, 159:12
**awhile** [1] - 136:20

**B**

**B-u-r-g-m-e-i-e-r** [1] - 31:13
**bachelor's** [1] - 35:21
**backfill** [4] - 157:7, 157:9, 157:10, 157:11
**background** [4] - 37:10, 77:11, 79:17, 131:24
**bad** [4] - 89:23, 119:23, 119:25, 171:19
**Bailey** [1] - 31:10
**bar** [1] - 118:13
**Barbara** [1] - 138:19
**bars** [2] - 117:16, 118:17
**base** [7] - 34:4, 44:7, 55:15, 98:17, 170:1, 173:13
**based** [14] - 8:7, 10:14, 11:21, 32:19, 37:19, 38:21, 45:17, 61:18, 61:21, 63:12, 87:4, 87:24, 134:14, 158:12
**basic** [1] - 105:16
**basis** [6] - 18:7, 27:9, 61:13, 72:7, 126:14, 127:17
**bates** [1] - 153:18
**bathroom** [1] - 66:3
**Batz** [2] - 138:12, 138:14
**BAYERISCHE** [2] - 1:6, 1:20
**Bayerische** [2] - 17:25, 18:20
**bear** [1] - 21:2
**became** [2] - 79:25, 82:2
**become** [6] - 64:15, 69:16, 69:17, 90:17, 151:4, 176:23
**becomes** [2] - 67:17, 125:23
**becoming** [1] - 176:23
**BEFORE** [1] - 1:13
**began** [1] - 6:24
**begin** [9] - 5:7, 11:12, 55:20, 64:12, 65:13, 65:23, 68:14, 69:3, 70:1
**beginning** [4] - 5:9, 79:19, 107:24, 163:20
**begins** [1] - 7:22
**behalf** [4] - 42:4, 57:7, 120:5, 120:9
**behavior** [3] - 164:4, 165:22, 166:17
**beliefs** [1] - 32:14
**believability** [1] - 61:7
**below** [1] - 112:16
**bench** [17] - 9:12, 12:10, 16:20, 27:23, 36:14, 40:6, 40:9, 45:12, 46:21, 48:11, 54:3, 76:13, 79:3, 116:14, 121:24, 178:24, 179:1
**benefit** [15] - 98:20, 137:25, 174:5, 174:6, 174:8, 174:9, 174:10, 174:11, 174:15, 174:17, 174:21, 174:23, 175:1, 175:6, 175:16
**benefits** [16] - 80:7, 98:21, 102:22, 102:23, 102:24, 102:25, 103:1, 103:2, 133:3, 136:3, 160:18, 160:25, 161:2
**Benefits** [3] - 97:25, 101:18, 102:21
**best** [7] - 6:1, 8:14, 54:19, 81:18, 155:10, 157:23, 175:19
**better** [6] - 55:6, 78:13, 104:8, 104:9, 139:1, 166:19
**between** [2] - 152:14, 174:23
**beyond** [2] - 62:17, 83:2
**bias** [1] - 125:25
**biggest** [1] - 75:23
**bilingual** [1] - 93:17
**bit** [22] - 34:15, 45:3, 69:11, 99:4, 99:10, 102:11, 105:23, 110:2, 111:13, 120:10, 121:19, 122:25, 133:5, 149:21, 153:3, 158:7, 167:5, 171:13, 178:7, 178:8, 179:6
**bleed** [1] - 44:5
**blitz** [1] - 143:4
**block** [1] - 87:20
**blog** [1] - 64:5
**blogs** [2] - 33:14, 63:20
**blood** [1] - 21:13
**blow** [2] - 158:6, 158:24
**blurb** [1] - 156:1
**bMW** [1] - 3:18
**BMW** [230] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:2, 3:20, 18:1, 18:2, 18:3, 18:4, 18:6, 18:9, 18:21, 19:18, 19:20, 19:24, 20:1, 21:20, 21:22, 22:3, 22:9, 22:21, 23:24, 24:8, 24:21, 24:25, 25:9, 25:13, 25:22, 26:4, 26:21, 27:1, 27:8, 31:2, 31:3, 31:4, 31:7, 31:8, 31:9, 31:10, 32:24, 36:17, 36:20, 36:21, 38:13, 40:3, 40:13, 40:23, 41:1, 41:14, 41:19, 42:4, 42:20, 42:23, 43:1, 43:6, 43:10, 44:24, 46:10, 48:24, 48:25, 53:13, 53:14, 57:8, 57:21, 61:11, 61:12, 70:16, 70:23, 71:1, 71:6, 71:10, 71:14, 72:19, 73:24, 74:1, 74:9, 74:11, 74:15, 74:20, 74:21, 74:23, 74:25, 75:2, 75:3, 75:6, 75:7, 75:9, 75:11, 75:12, 75:17, 75:21, 76:8, 76:19, 76:24, 77:6, 77:8, 77:18, 77:21, 78:6, 79:8, 79:13, 79:22, 80:11, 80:13, 80:25, 81:8, 81:11, 82:2, 82:8, 82:21, 82:22, 83:6, 83:8, 83:13, 84:8, 84:13, 84:16, 85:8, 85:15, 85:16, 86:9, 86:19, 87:3, 87:23, 88:1, 88:6, 88:12, 88:14, 88:15, 89:6, 89:7, 89:11, 89:12, 89:13, 89:14, 89:16, 89:17, 89:19, 89:25, 90:5, 90:9, 90:24, 91:4, 92:21, 92:24, 95:10, 95:22, 96:21, 100:13, 101:1, 101:4, 101:12, 101:13, 102:4, 103:1, 105:2, 105:21, 105:22, 105:24, 106:8, 106:9, 106:16, 106:19, 106:21, 106:23, 107:1, 108:6, 110:3, 111:14, 114:14, 115:1, 115:6, 115:10, 115:14, 115:15, 123:3, 123:7, 123:22, 123:25, 125:13, 126:16, 130:14, 130:19, 132:6, 133:8, 137:14, 138:7, 138:8, 138:17, 138:21, 140:16, 141:2, 141:4, 142:20, 143:11, 145:12, 145:21, 146:19, 148:1, 155:15, 156:6, 156:21, 156:23, 156:24, 161:5, 162:16, 166:9, 166:12, 166:15, 166:19, 167:2, 170:1, 170:4, 170:7, 171:18, 171:22, 174:1, 177:9
**BMW's** [1] - 23:6
**Board** [1] - 138:6
**board** [2] - 82:9, 142:3
**body** [1] - 44:15
**bonus** [9] - 98:17, 102:19, 173:14, 173:16, 173:17, 173:18, 173:20, 173:22
**bonuses** [1] - 173:15
**book** [1] - 149:13
**bootstrap** [1] - 129:3
**boring** [1] - 72:3
**boss** [1] - 172:4
**bottom** [5] - 133:22, 147:15, 156:2, 164:9, 164:15
**BOX** [1] - 1:22
**box** [8] - 45:25, 52:25, 88:18, 88:20, 109:9, 111:22, 134:20, 161:12
**boxes** [1] - 109:10
**branch** [1] - 15:24
**breadth** [1] - 119:18
**break** [17] - 49:17, 50:14, 50:22, 54:14, 55:10, 55:17, 55:22, 55:25, 57:2, 121:18, 122:2, 129:24, 130:1, 130:10, 179:6, 180:1
**breaks** [2] - 66:4, 151:11
**BRIAN** [1] - 1:17
**Brian** [5] - 19:5, 19:11, 19:22, 37:18, 70:8
**brief** [3] - 17:12, 70:10, 71:20
**briefed** [2] - 128:19, 128:22
**briefly** [4] - 16:19, 22:3, 54:1, 178:23
**bring** [13] - 10:10, 12:4, 40:5, 58:3, 58:10, 71:15, 83:13, 117:21, 118:12, 118:20, 119:21, 169:16
**bringing** [5] - 66:15, 76:8, 77:8, 77:21, 118:9
**broad** [1] - 38:15
**broaden** [1] - 99:23
**brochure** [2] - 110:8, 153:15
**broken** [1] - 151:6
**Brookwood** [1] - 94:7
**brother** [3] - 25:22, 25:24, 26:2
**brother's** [1] - 47:16
**brothers** [1] - 19:3
**brothers-in-law** [1] - 19:3
**brought** [12] - 61:14, 66:16, 72:8, 78:6, 78:7, 92:20, 117:19, 124:13, 124:16, 124:17, 124:20, 162:8
**browsing** [1] - 34:3
**BS** [1] - 92:5
**budget** [1] - 16:25
**build** [8] - 75:22, 75:24, 76:1, 129:1, 143:6, 143:14, 143:18
**building** [2] - 76:5, 76:6
**builds** [1] - 82:24
**built** [2] - 79:13, 153:4
**BULL** [1] - 2:6
**bull** [1] - 180:17
**bullet** [4] - 98:25, 100:11, 143:20, 144:16
**bunch** [1] - 124:19
**burden** [4] - 6:7,

62:2, 62:4, 62:14
**Burghardt** [1] - 138:19
**Burgmeier** [13] - 4:11, 31:9, 31:12, 83:7, 83:9, 83:13, 83:22, 83:24, 84:13, 84:18, 158:1
**business** [12] - 14:2, 18:3, 21:11, 21:17, 21:21, 31:18, 31:20, 92:5, 164:7, 167:19, 170:14, 171:7
**BUSINESS** [2] - 1:8, 1:10
**butcher** [1] - 88:14
**BY** [29] - 91:15, 95:5, 104:18, 108:2, 110:16, 113:2, 113:22, 116:7, 122:24, 130:9, 132:10, 132:17, 133:16, 135:18, 137:2, 141:17, 146:5, 148:13, 150:3, 151:2, 153:10, 154:22, 156:20, 157:21, 163:3, 165:16, 166:8, 168:22, 173:10

## C

**c-h-a-r-t-S-p-a-n** [1] - 35:5
**CA** [1] - 1:3
**Cain** [3] - 5:6, 87:11, 87:18
**CAIN** [1] - 1:13
**Campbell** [12] - 75:20, 76:2, 76:5, 76:22, 76:24, 77:6, 77:7, 77:11, 77:12, 77:15, 77:18, 126:18
**Campbell's** [1] - 78:4
**candidacy** [1] - 176:22
**candidate** [3] - 90:16, 176:23, 176:24
**candidates** [1] - 143:1
**cannot** [13] - 32:16, 33:2, 33:7, 33:12, 33:19, 33:21, 64:21, 65:16, 120:3, 139:2, 150:19, 159:1, 174:14
**capability** [1] - 103:24
**capacity** [1] - 21:21
**captioned** [1] - 17:24
**car** [2] - 26:21, 40:19
**care** [7] - 13:22, 13:25, 14:15, 14:18, 15:3, 162:12, 179:7
**career** [7] - 34:13, 35:19, 70:13, 95:14, 104:6, 144:5, 151:12
**careful** [1] - 129:16
**carefully** [6] - 8:10, 8:24, 11:25, 15:11, 65:15, 69:25
**CAROLINA** [1] - 1:1
**Carolina** [15] - 5:5, 12:19, 22:10, 75:2, 75:14, 75:22, 75:24, 76:1, 76:9, 78:6, 79:10, 91:22, 92:13, 93:14, 147:23
**carpal** [1] - 40:16
**Carroll** [13] - 75:20, 76:2, 76:5, 76:21, 76:24, 77:6, 77:7, 77:11, 77:15, 77:18, 78:4, 126:17
**cars** [1] - 82:24
**case** [136] - 5:8, 7:5, 7:8, 7:10, 7:12, 8:5, 8:9, 8:14, 8:18, 8:21, 9:20, 9:21, 10:3, 10:6, 11:13, 17:11, 17:12, 17:16, 17:24, 18:4, 18:5, 18:12, 18:15, 19:12, 20:25, 25:18, 26:16, 27:15, 28:6, 28:16, 29:11, 29:24, 30:25, 32:10, 32:25, 33:2, 33:7, 33:8, 33:13, 33:21, 33:24, 33:25, 34:1, 34:2, 34:5, 36:23, 38:20, 40:1, 41:18, 45:5, 46:5, 47:24, 48:3, 49:4, 50:19, 50:20, 50:25, 51:1, 51:2, 54:13, 54:16, 55:13, 55:14, 60:12, 60:22, 61:2, 61:8, 61:9, 61:24, 62:3, 62:4, 62:20, 62:24, 63:2, 63:3, 63:4, 63:8, 63:11, 63:12, 63:16, 63:17, 63:21, 63:22, 64:1, 64:2, 64:3, 64:12, 64:13, 64:14, 64:21, 65:21, 66:12, 67:1, 67:2, 67:9, 67:14, 68:13, 69:4, 69:5, 69:18, 69:19, 69:23, 71:22, 71:23, 72:12, 73:1, 73:8, 73:17, 73:21, 73:23, 74:11, 77:1, 77:5, 78:22, 79:20, 80:23, 86:7, 86:14, 86:20, 87:3, 117:7, 122:5, 122:6, 122:7, 126:12, 126:14, 126:19, 129:1, 146:21, 179:13, 179:14
**cases** [5] - 6:2, 35:13, 49:3, 62:16, 122:17
**cash** [1] - 102:19
**catch** [2] - 53:25, 135:14
**catchall** [1] - 46:3
**categories** [1] - 136:11
**caused** [2] - 40:20, 154:11
**cease** [1] - 14:3
**cellphone** [1] - 64:4
**cellphones** [2] - 33:22, 63:23
**Center** [3] - 103:16, 103:17, 136:6
**center** [2] - 145:1, 145:3
**Central** [3] - 156:22, 156:24
**central** [2] - 158:22, 170:23
**centralization** [2] - 161:14, 161:15
**centralized** [1] - 135:6
**CEO** [3] - 82:2, 111:18, 176:16
**certain** [9] - 11:21, 59:14, 59:18, 67:23, 68:11, 89:21, 108:10, 143:16, 174:11
**certainly** [6] - 57:8, 57:16, 64:20, 68:4, 76:7, 117:4
**CERTIFICATE** [1] - 180:9
**certification** [4] - 35:22, 35:23, 105:15, 105:18
**Certification** [1] - 105:14
**certifications** [3] - 105:6, 105:12, 160:15
**certify** [1] - 180:10
**cetera** [1] - 126:3
**chair** [1] - 66:4
**challenge** [2] - 168:24, 175:19
**challenges** [4] - 9:19, 175:10, 175:13
**challenging** [1] - 6:15
**Chamber** [1] - 94:12
**Change** [1] - 164:16
**change** [13] - 4:3, 100:5, 150:4, 151:17, 155:20, 165:24, 166:1, 173:13, 174:18, 175:5, 175:10, 178:19
**changed** [3] - 16:16, 86:20, 108:14
**changes** [2] - 83:18, 86:13
**changing** [3] - 164:22, 165:25, 171:16
**chaotic** [1] - 84:5
**charge** [6] - 13:3, 30:5, 30:6, 31:23, 39:17, 119:2
**Charleston** [1] - 79:16
**chart** [12] - 3:10, 108:5, 108:16, 109:6, 109:20, 109:25, 111:22, 114:22, 152:2, 155:24, 156:4, 172:11
**charts** [6] - 155:14, 155:15, 155:18, 155:19, 156:7, 157:2
**ChartSpan** [1] - 34:25
**chartSpan** [2] - 35:3, 35:6
**chat** [1] - 64:5
**CHIEF** [1] - 1:14
**Chief** [1] - 82:22
**child** [2] - 13:22, 15:5
**children** [6] - 13:22, 18:25, 93:10, 93:12, 93:16, 93:18
**choose** [2] - 11:24, 65:14
**chosen** [1] - 6:6
**CHRCPA** [1] - 35:22
**Christine** [14] - 31:3, 31:11, 80:23, 109:22, 121:13, 137:4, 141:21, 148:17, 149:1, 163:16, 167:11, 170:11, 176:1, 178:12
**Christine's** [1] - 175:20
**Christmas** [1] - 85:17
**church** [1] - 94:6
**Church** [1] - 94:8
**Churchill** [1] - 90:20
**circle** [35] - 4:11, 107:1, 107:2, 107:4, 107:5, 107:7, 107:10, 107:11, 107:14, 131:11, 131:12, 137:7, 137:11, 137:12, 137:13, 137:16, 139:20, 140:7, 140:12, 140:13, 140:15, 140:17, 140:19, 146:21, 147:9, 149:9, 149:10, 149:16, 149:18, 154:25, 158:10, 159:8, 161:11, 175:7
**circles** [5] - 106:23, 107:15, 107:16, 136:20, 147:24
**circling** [1] - 106:24
**circumstance** [1] - 41:21
**circumstances** [2] - 16:15, 41:8
**circumstantial** [2] - 60:16, 60:18
**citizen** [2] - 6:4, 12:17
**citizens** [1] - 7:2
**Civil** [2] - 13:7, 61:16
**civil** [7] - 5:8, 5:18, 7:6, 17:24, 62:3, 62:4, 62:20
**claim** [10] - 44:11, 47:19, 62:4, 62:5, 62:6, 62:12, 74:8, 87:2, 117:22, 127:16
**claimant** [1] - 62:13
**claims** [11] - 18:6, 34:20, 43:25, 44:18, 61:15, 62:9, 72:7, 77:4, 87:6, 117:3, 117:5
**clarify** [1] - 156:15
**clear** [6] - 40:3, 57:2, 91:17, 94:15, 119:10, 144:12
**clearly** [4] - 9:2, 9:8, 12:6, 119:18
**Clemson** [6] - 70:12, 92:1, 92:2, 92:8, 94:16, 95:15
**Clerk** [10] - 5:12, 10:16, 16:9, 48:20, 49:1, 51:18, 53:3, 53:19, 54:5, 58:20
**CLERK** [11] - 49:15, 51:19, 52:3, 52:6,

52:9, 52:12, 52:15, 52:18, 52:23, 54:8, 58:22
**clerk** [2] - 11:16, 49:5
**Clerk's** [4] - 11:3, 49:24, 51:9, 53:23
**client** [13] - 18:18, 19:8, 19:16, 39:9, 42:5, 66:21, 74:3, 79:13, 79:19, 79:20, 87:2, 87:9, 88:6
**clients** [2] - 19:8, 59:24
**clinic** [1] - 103:19
**clock** [1] - 50:15
**close** [3] - 14:3, 69:21, 174:20
**closed** [1] - 167:5
**closely** [3] - 89:20, 90:10, 172:8
**closer** [1] - 24:12
**closing** [1] - 68:23
**closings** [1] - 73:9
**CO** [2] - 1:9, 2:2
**Coast** [1] - 15:18
**code** [4] - 82:14, 108:17, 149:2, 161:13
**Code** [2] - 15:16, 61:19
**codes** [1] - 138:9
**cold** [2] - 44:14, 45:2
**collaborate** [1] - 29:1
**Collaboration** [1] - 164:10
**colleague** [2] - 19:16, 74:12
**colleagues** [2] - 168:13, 170:23
**COLLECTIVELY** [2] - 1:7, 1:10
**collectively** [3] - 18:3, 106:20, 140:5
**column** [1] - 108:18
**combination** [2] - 95:19, 162:11
**combined** [1] - 10:12
**coming** [9] - 30:14, 53:17, 56:20, 83:24, 84:13, 103:13, 119:12, 122:12, 130:11
**commenced** [1] - 5:1
**commencing** [1] - 5:18
**comments** [7] - 33:14, 54:14, 66:9, 167:7, 167:10, 170:10
**commercial** [1] - 14:2
**commission** [1] - 13:4
**commitment** [2] - 90:25, 91:6
**committee** [3] - 4:6, 155:2, 155:12
**common** [4] - 10:11, 10:12, 91:3, 107:3
**communicate** [5] - 33:12, 63:25, 64:2, 122:6, 175:15
**communication** [4] - 57:15, 84:5, 171:4, 175:23
**communications** [1] - 33:8
**community** [2] - 94:3, 94:5
**Community** [1] - 94:8
**Compact** [5] - 4:10, 135:23, 136:15, 136:16, 161:13
**companies** [6] - 32:6, 35:15, 101:5, 106:9, 133:8, 134:23
**Company** [3] - 18:3, 24:23, 89:12
**company** [33] - 24:6, 24:20, 24:24, 26:25, 28:9, 28:16, 32:2, 74:2, 75:1, 75:4, 75:7, 78:1, 79:9, 81:15, 85:11, 85:13, 85:23, 86:16, 86:17, 87:1, 88:14, 90:18, 94:1, 100:15, 103:5, 105:24, 106:16, 108:24, 116:23, 128:19, 136:4, 136:5, 142:21
**Compensation** [5] - 70:23, 97:16, 97:24, 98:14, 101:18
**compensation** [11] - 4:3, 14:6, 40:18, 40:19, 80:6, 98:16, 102:17, 102:18, 102:19, 162:9, 173:13
**competent** [1] - 78:22
**competitively** [1] - 98:23
**complaint** [1] - 32:9
**complete** [4] - 7:17, 9:16, 9:22, 179:4
**completed** [4] - 16:9, 16:16, 49:18, 51:25
**completely** [4] - 7:12, 76:25, 77:8, 77:19
**completing** [1] - 7:23
**complex** [1] - 71:24
**Compliance** [1] - 159:19
**compliance** [5] - 95:20, 105:16, 160:4, 160:8, 161:1
**comply** [3] - 33:17, 34:7, 160:7
**components** [1] - 152:10
**computer** [7] - 17:9, 49:10, 50:5, 50:10, 51:7, 51:10, 99:6
**computers** [1] - 33:22
**concept** [6] - 104:11, 106:22, 111:12, 131:3, 136:19, 171:12
**concepts** [3] - 123:2, 152:13, 170:17
**concern** [3] - 44:16, 48:13, 125:25
**concerned** [3] - 17:22, 44:4, 90:5
**concerning** [1] - 18:14
**concerns** [1] - 75:23
**conclude** [2] - 5:20, 60:19
**concluded** [9] - 40:6, 45:12, 48:11, 68:9, 70:11, 79:3, 121:24, 179:1, 180:6
**conclusion** [1] - 33:4
**conclusive** [1] - 59:15
**concrete** [1] - 85:11
**Concrete** [1] - 85:12
**conditions** [2] - 86:18, 139:5
**conduct** [4] - 33:19, 62:22, 63:15, 64:1
**conducted** [1] - 67:22
**conference** [16] - 16:20, 27:23, 36:14, 40:6, 40:9, 45:9, 45:12, 46:21, 48:11, 54:3, 76:13, 79:3, 116:14, 121:24, 178:24, 179:1
**conferences** [1] - 67:23
**confident** [3] - 69:21, 78:16, 88:5
**confines** [1] - 63:11
**confirm** [2] - 17:2, 171:11
**confirmation** [1] - 131:25
**confirms** [1] - 37:24
**conflicts** [1] - 11:16
**confusing** [2] - 140:11, 149:21
**confusion** [3] - 10:23, 53:3, 128:1
**Congress** [1] - 17:1
**connected** [1] - 37:25
**connection** [3] - 21:12, 21:18, 21:22
**conscious** [1] - 9:3
**consent** [2] - 17:2, 17:3
**consider** [6] - 60:15, 60:22, 61:2, 63:7, 103:2, 170:2
**consideration** [2] - 99:24, 176:4
**considered** [7] - 8:9, 10:3, 60:10, 62:7, 86:4, 128:8, 177:7
**considering** [2] - 65:11, 169:12
**consist** [1] - 59:8
**consistent** [1] - 122:14
**consistently** [1] - 127:8
**consists** [1] - 75:10
**constitute** [1] - 60:14
**Constitution** [1] - 6:19
**construction** [3] - 93:19, 94:1, 143:17
**consulted** [2] - 97:10, 179:5
**consulting** [1] - 63:18
**contact** [3] - 20:18, 25:8, 161:21
**contacts** [3] - 44:23, 156:7, 162:3
**Contacts** [1] - 156:21
**contained** [1] - 7:18
**contains** [1] - 158:18
**contend** [2] - 89:6, 89:9
**contends** [1] - 72:19
**Context** [1] - 156:22
**context** [3] - 32:12, 32:20, 125:24
**continue** [3] - 78:16, 90:25, 154:2
**CONTINUED** [30] - 2:1, 4:1, 95:4, 104:17, 108:1, 110:15, 113:1, 113:21, 116:6, 122:23, 130:8, 132:9, 132:16, 133:15, 135:17, 137:1, 141:16, 146:4, 148:12, 150:2, 151:1, 153:9, 154:21, 156:19, 157:20, 163:2, 165:15, 166:7, 168:21, 173:9
**continues** [1] - 175:1
**Contract** [1] - 159:19
**contract** [4] - 142:19, 142:21, 170:1, 170:3
**contractor** [1] - 160:7
**contracts** [1] - 160:5
**contrarian** [1] - 127:6
**contribute** [1] - 141:25
**contribution** [7] - 174:13, 174:22, 174:24, 174:25, 175:1, 175:6, 175:21
**contributor** [1] - 151:15
**control** [3] - 43:13, 61:25, 121:15
**controlled** [1] - 149:14
**conversation** [7] - 12:12, 36:8, 36:10, 71:3, 128:24, 129:4, 179:12
**conversations** [1] - 45:18
**convicted** [1] - 13:5
**convinced** [3] - 75:21, 76:2, 83:1
**cooperation** [2] - 7:23, 58:2
**coordinate** [2] - 57:13, 101:2
**coordinated** [1] - 141:2
**coordination** [1] - 100:14
**Coordinator** [3] - 96:17, 97:1, 98:6
**copies** [1] - 165:9
**Corey** [2] - 31:4, 114:8
**corner** [2] - 133:22, 138:2
**corporate** [2] - 57:11, 72:2
**corporate-type** [1] - 72:2
**Corporation** [1] -

26:21
**Corps** [1] - 15:18
**correct** [54] - 34:17, 35:14, 52:20, 52:21, 92:7, 92:18, 93:6, 95:2, 95:8, 96:15, 96:18, 96:20, 97:16, 97:17, 98:7, 99:11, 99:12, 99:17, 100:20, 101:16, 101:20, 101:21, 101:25, 102:15, 105:3, 106:10, 106:11, 107:22, 108:14, 108:23, 110:1, 111:24, 112:7, 113:11, 113:13, 115:14, 124:11, 124:12, 133:25, 138:4, 139:8, 139:12, 147:1, 147:19, 148:24, 149:11, 152:7, 153:1, 159:6, 159:16, 159:17, 172:19, 172:24, 180:10
**corrected** [1] - 177:17
**correctly** [1] - 100:19
**corresponding** [1] - 153:22
**cost** [2] - 133:23, 134:4
**counsel** [7] - 19:5, 19:22, 19:24, 20:2, 51:21, 74:11, 172:23
**counsel's** [1] - 58:2
**count** [6] - 133:21, 134:10, 134:14, 135:25, 146:22, 147:16
**counterparts** [1] - 161:8
**countries** [1] - 139:6
**country** [3] - 6:5, 11:9, 90:21
**couple** [6] - 24:7, 34:20, 54:14, 90:11, 162:19, 163:7
**course** [17] - 56:21, 59:4, 65:4, 65:5, 66:10, 74:4, 85:18, 98:22, 111:21, 124:20, 126:2, 128:6, 144:20, 144:21, 144:24, 169:13, 179:22
**Court** [20] - 5:5, 5:7, 5:12, 5:24, 8:10, 12:3, 12:4, 12:7, 12:9, 16:10, 32:18, 56:6, 60:8, 66:5, 67:10, 68:25, 73:16, 88:8, 127:11, 180:3
**court** [24] - 9:4, 9:14, 9:24, 9:25, 10:1, 13:4, 16:13, 17:24, 30:19, 39:20, 45:13, 48:12, 57:19, 77:18, 79:4, 137:25, 138:13, 138:19, 138:25, 139:10, 139:21, 141:7, 176:14, 179:2
**COURT** [214] - 1:1, 1:14, 2:6, 2:6, 5:2, 5:16, 14:12, 14:21, 14:25, 15:5, 15:7, 16:22, 17:7, 18:22, 19:13, 19:21, 20:9, 20:11, 20:15, 20:23, 21:2, 22:2, 22:6, 22:9, 22:12, 22:14, 22:16, 22:18, 22:20, 22:24, 23:4, 23:9, 23:11, 23:14, 23:18, 23:21, 24:1, 24:4, 24:9, 24:14, 24:18, 24:22, 24:24, 25:3, 25:6, 25:8, 25:13, 25:15, 25:17, 25:20, 25:24, 26:2, 26:6, 26:8, 26:11, 26:15, 26:18, 26:23, 26:25, 27:3, 27:6, 27:8, 27:13, 27:17, 27:20, 27:22, 28:2, 28:8, 28:11, 28:12, 28:15, 28:18, 28:22, 29:2, 29:5, 29:7, 29:10, 29:15, 29:18, 29:20, 30:14, 30:18, 30:20, 34:11, 34:15, 34:18, 34:22, 35:2, 35:4, 35:6, 35:9, 35:12, 35:18, 35:24, 36:2, 36:5, 36:12, 36:25, 37:13, 37:16, 38:10, 38:25, 39:3, 40:3, 40:7, 40:12, 41:4, 41:10, 42:9, 42:17, 43:4, 43:9, 43:15, 43:18, 43:22, 45:14, 46:9, 46:12, 46:16, 46:19, 46:24, 47:2, 47:4, 47:6, 47:8, 47:11, 47:18, 47:22, 47:24, 48:2, 48:5, 48:7, 48:10, 48:13, 49:1, 49:16, 51:6, 51:14, 51:18, 53:2, 53:15, 54:5, 54:11, 56:4, 56:8, 56:13, 56:25, 57:5, 57:20, 57:23, 58:1, 58:10, 58:14, 58:23, 76:12, 76:16, 77:24, 78:8, 78:24, 79:2, 79:5, 91:8, 91:10, 95:3, 104:15, 107:21, 107:23, 110:13, 112:23, 113:20, 116:2, 116:11, 116:13, 117:25, 119:1, 119:5, 119:11, 120:12, 120:20, 121:17, 122:1, 122:15, 126:6, 126:20, 128:13, 129:7, 129:9, 129:14, 129:21, 129:24, 130:6, 132:14, 133:13, 135:12, 135:14, 136:23, 141:14, 146:2, 148:10, 149:24, 150:9, 150:13, 153:7, 154:19, 156:16, 157:18, 162:25, 165:14, 166:6, 168:20, 173:8, 178:22, 179:3, 179:22
**Court's** [3] - 17:18, 32:20, 60:2
**courthouse** [13] - 6:12, 10:22, 66:8, 76:4, 76:19, 76:23, 77:6, 77:7, 77:17, 77:22, 78:4, 78:5, 126:18
**courtroom** [29] - 5:9, 7:20, 8:3, 9:9, 10:8, 10:10, 10:11, 10:13, 34:6, 44:8, 55:16, 56:19, 56:20, 57:10, 57:14, 60:11, 60:13, 63:8, 63:12, 63:14, 67:5, 67:16, 67:18, 68:6, 68:9, 74:24, 80:19, 87:20, 172:21
**courts** [1] - 122:11
**coverage** [1] - 14:20
**covered** [3] - 43:22, 45:10, 159:15
**COVID** [10] - 167:3, 167:4, 167:7, 167:14, 169:3, 169:5, 169:13, 169:17, 169:21, 173:24
**CPU** [2] - 133:23, 134:3
**CPW** [2] - 28:10, 28:11
**crack** [1] - 51:8
**create** [2] - 81:1, 87:2
**creating** [4] - 79:16, 81:6, 155:18, 157:2
**creation** [2] - 115:6, 148:5
**credibility** [2] - 61:7, 127:12
**credit** [1] - 86:25
**crew** [1] - 14:7
**crime** [2] - 13:4, 13:5
**criminal** [1] - 62:16
**crisis** [2] - 167:8, 167:14
**criteria** [2] - 11:21, 13:12
**critical** [1] - 86:7
**critically** [2] - 10:2, 10:24
**Crocker** [2] - 177:18, 177:19
**cross** [6] - 68:20, 68:22, 100:13, 129:10, 132:21, 167:21
**cross-examine** [3] - 68:20, 68:22, 129:10
**CRR** [2] - 2:6, 180:17
**current** [1] - 44:2
**custody** [1] - 13:22
**cut** [1] - 73:19
**CWF** [2] - 142:14, 142:15

**D**

**D/B/A** [2] - 1:7, 1:10
**daily** [3] - 69:12, 121:13, 169:17
**dash** [1] - 85:19
**Data** [3] - 99:1, 104:21, 104:22
**data** [4] - 99:2, 99:6, 99:9, 152:22
**date** [4] - 110:18, 153:12, 158:25, 180:17
**dates** [3] - 11:17, 90:11, 96:17
**daughter** [6] - 93:3, 93:8, 93:9, 93:13, 93:17, 93:20
**Dawsey** [57] - 3:9, 3:21, 3:22, 3:23, 4:4, 4:8, 4:10, 17:25, 18:6, 19:12, 21:14, 21:19, 31:1, 32:23, 56:24, 61:10, 70:9, 73:23, 74:3, 79:18, 79:21, 79:22, 80:10, 80:13, 81:20, 83:23, 83:25, 84:4, 84:7, 84:12, 84:19, 85:2, 85:4, 85:7, 85:23, 86:1, 86:2, 86:9, 86:19, 86:21, 87:3, 87:9, 87:12, 87:24, 89:10, 89:21, 89:22, 90:3, 90:14, 90:24, 91:9, 91:10, 91:18, 141:18, 153:19, 179:22
**DAWSEY** [3] - 1:3, 3:5, 91:12
**Dawsey's** [3] - 79:18, 90:9, 90:17
**days** [4] - 40:24, 54:25, 55:2, 85:6
**deal** [1] - 175:18
**dealing** [1] - 43:12
**dealings** [2] - 21:17, 31:18
**deals** [1] - 37:22
**Dear** [1] - 158:10
**debate** [1] - 169:7
**DEBRA** [1] - 2:6
**December** [4] - 3:9, 84:16, 85:3, 85:14
**decide** [12] - 8:5, 8:21, 8:24, 9:18, 10:7, 59:16, 60:12, 61:3, 63:12, 63:22, 66:11, 80:14
**decided** [6] - 30:11, 71:14, 73:25, 75:24, 81:1, 86:23
**decides** [3] - 81:15, 82:10, 131:9
**deciding** [3] - 6:24, 61:1, 74:7
**decision** [24] - 10:13, 31:25, 33:6, 41:19, 44:7, 55:16, 58:19, 60:15, 62:1, 72:16, 73:5, 82:11, 83:12, 83:20, 87:17, 87:22, 88:2, 90:13, 90:14, 90:15, 90:17, 121:6, 121:8, 121:12
**decision-making** [1] - 72:16
**decisions** [9] - 34:5, 73:5, 74:1, 89:18, 89:21, 90:2, 122:5, 169:4, 169:15
**decrease** [4] - 154:9, 154:10, 154:11, 168:1
**Defendant** [13] - 37:25, 48:24, 51:20, 51:24, 52:3, 52:9,

52:15, 52:19, 53:13, 53:14, 56:2, 61:21, 126:22
**DEFENDANT** [1] - 1:19
**Defendant's** [4] - 38:5, 133:10, 133:14, 135:12
**Defendants** [14] - 18:4, 18:9, 32:24, 38:3, 51:14, 57:6, 61:12, 68:20, 68:21, 70:3, 127:1, 127:7, 127:14, 127:16
**defendants** [2] - 51:15, 128:1
**DEFENDANTS** [1] - 1:12
**DEFENSE** [1] - 4:12
**defense** [6] - 73:2, 78:15, 117:9, 117:16, 117:23, 118:17
**define** [1] - 145:5
**defined** [15] - 15:16, 174:5, 174:6, 174:9, 174:10, 174:11, 174:15, 174:21, 174:22, 174:23, 174:24, 174:25, 175:1, 175:5, 175:6
**defines** [1] - 111:2
**degree** [3] - 92:4, 92:5, 92:6
**deliberate** [3] - 63:2, 64:11, 69:1
**deliberating** [1] - 30:7
**deliberation** [1] - 29:4
**deliberations** [7] - 44:4, 61:25, 63:9, 65:13, 67:14, 69:3, 69:7
**deliver** [1] - 149:18
**demand** [1] - 146:22
**demeanor** [1] - 44:15
**democratic** [1] - 11:7
**demoted** [1] - 71:4
**demotion** [1] - 73:19
**denied** [1] - 128:6
**denies** [1] - 61:21
**dental** [1] - 102:23
**deny** [1] - 18:9
**department** [30] - 15:20, 47:21, 81:24, 82:24, 83:14, 84:18, 90:14, 96:21, 96:23, 96:25, 97:18, 97:20, 97:21, 99:18, 99:19, 99:20, 99:22, 100:2, 101:24, 103:9, 104:25, 109:5, 109:16, 124:10, 124:17, 129:5, 135:6, 157:4, 178:20
**Department** [16] - 61:11, 70:22, 79:23, 80:3, 80:11, 81:3, 81:8, 84:2, 84:21, 84:23, 84:24, 85:20, 85:25, 90:6, 100:10, 101:23
**departmental** [1] - 114:22
**departments** [5] - 109:11, 124:14, 124:19, 128:18, 134:21
**dependent** [1] - 103:19
**dependents** [1] - 103:24
**deposed** [2] - 34:13, 34:19
**depth** [1] - 124:2
**Deputy** [1] - 5:12
**describe** [1] - 47:12
**describing** [2] - 7:7, 41:16
**description** [3] - 104:23, 104:24, 152:24
**descriptions** [2] - 4:9, 148:20
**designated** [5] - 68:4, 115:3, 131:7, 131:10, 139:13
**designation** [3] - 114:19, 114:21, 138:14
**designed** [1] - 7:9
**detail** [6] - 71:23, 72:2, 72:23, 73:10, 81:13, 108:20
**detailed** [4] - 58:18, 61:23, 65:8, 72:12
**details** [1] - 90:8
**detector** [1] - 49:22
**determination** [1] - 66:13
**determine** [6] - 7:9, 11:18, 11:25, 68:1, 89:3, 169:18
**determined** [2] - 8:20, 145:12
**determining** [1] - 61:7
**develop** [3] - 104:7, 119:5, 120:6
**developed** [3] - 136:1, 145:3, 145:7
**developing** [3] - 40:1, 96:4, 98:19
**Development** [1] - 142:13
**development** [16] - 3:13, 81:2, 96:4, 98:20, 123:12, 123:16, 139:17, 140:4, 144:4, 144:19, 144:22, 144:24, 145:6, 153:3, 170:16, 171:9
**device** [1] - 33:23
**dictionaries** [1] - 63:19
**difference** [2] - 152:13, 174:23
**different** [25] - 41:8, 41:20, 61:15, 70:19, 71:12, 78:11, 89:1, 96:23, 97:6, 97:20, 99:11, 99:18, 99:20, 105:13, 108:11, 118:12, 128:18, 130:23, 136:4, 139:6, 144:6, 149:12, 151:5
**differently** [2] - 62:10, 72:7
**difficult** [2] - 65:7, 72:5
**difficulty** [1] - 38:13
**digit** [6] - 113:6, 113:9, 113:10, 113:12, 113:23
**digits** [3] - 109:13, 109:15, 113:7
**dire** [2] - 38:5, 45:7
**DIRECT** [29] - 91:14, 95:4, 104:17, 108:1, 110:15, 113:1, 113:21, 116:6, 122:23, 130:8, 132:9, 132:16, 133:15, 135:17, 137:1, 141:16, 146:4, 148:12, 150:2, 151:1, 153:9, 154:21, 156:19, 157:20, 163:2, 165:15, 166:7, 168:21, 173:9
**direct** [4] - 60:16, 60:17, 120:25
**Direct** [1] - 3:6
**direction** [1] - 90:1
**directive** [1] - 136:14
**directly** [10] - 16:3, 37:22, 37:25, 84:22, 84:25, 109:24, 114:6, 134:12, 134:16, 142:22
**Director** [1] - 90:18
**disability** [1] - 12:25
**disagreed** [1] - 74:1
**disappointed** [1] - 85:22
**discard** [1] - 53:20
**disclosed** [1] - 39:21
**discontinued** [1] - 156:5
**discount** [1] - 128:2
**discretion** [1] - 39:6
**discriminate** [1] - 120:23
**discriminated** [5] - 18:7, 61:13, 87:4, 87:9, 127:17
**discriminating** [1] - 31:22
**discrimination** [15] - 29:24, 31:23, 32:9, 46:14, 61:15, 61:18, 61:20, 61:22, 71:19, 72:13, 77:4, 119:18, 120:11, 120:16
**discuss** [19] - 9:13, 10:2, 30:17, 33:2, 55:13, 56:19, 62:23, 64:13, 64:21, 65:12, 67:1, 69:5, 122:5, 129:25, 158:11, 171:21, 172:11, 179:13, 179:25
**discussed** [5] - 30:10, 113:3, 125:11, 173:24, 176:9
**discusses** [1] - 172:13
**discussing** [5] - 11:12, 64:12, 67:10, 67:23, 69:3
**discussion** [4] - 124:3, 124:6, 124:7, 148:18
**discussions** [7] - 33:10, 33:11, 67:25, 68:7, 68:9, 149:5, 158:15
**dispute** [6] - 8:12, 8:13, 38:13, 43:23, 59:12, 74:3
**disqualified** [1] - 11:19
**disqualify** [1] - 8:19
**disqualifying** [1] - 39:5
**disregard** [4] - 60:9, 60:25, 61:3, 78:3
**disregarded** [1] - 60:12
**disregarding** [1] - 32:14
**disrespectful** [1] - 122:21
**distinctly** [1] - 9:2
**District** [3] - 5:5, 5:7
**DISTRICT** [3] - 1:1, 1:1, 1:14
**district** [1] - 15:21
**diversity** [1] - 160:11
**division** [1] - 140:16
**DIVISION** [1] - 1:2
**divorce** [2] - 14:14, 14:16
**doable** [1] - 179:9
**document** [34] - 94:23, 104:19, 107:19, 108:3, 110:4, 110:6, 110:18, 123:12, 123:20, 128:22, 129:18, 129:19, 129:20, 133:18, 133:20, 134:13, 135:10, 141:11, 141:18, 145:25, 146:6, 148:7, 152:20, 153:5, 153:11, 153:20, 154:23, 157:15, 163:17, 165:2, 165:4, 170:10, 173:5, 173:11
**documented** [1] - 162:16
**documents** [2] - 59:9, 128:25
**DOING** [2] - 1:8, 1:10
**Dombrowski** [1] - 146:17
**domestic** [5] - 19:1, 44:10, 124:9, 177:6, 177:8
**DONALD** [1] - 2:2
**done** [9] - 18:19, 73:2, 73:9, 74:5, 82:25, 91:7, 115:6, 120:23, 145:14
**door** [3] - 76:4, 86:9, 122:18
**doubt** [2] - 62:17, 62:19
**down** [13] - 9:5, 34:15, 49:10, 49:22, 66:4, 128:15, 137:20, 148:22, 167:20, 168:1, 169:5, 169:23, 180:3
**down/ramp** [1] - 167:25
**downgrade** [2] - 98:2, 102:7

**downs** [1] - 15:2
**downstairs** [1] - 49:25
**downtown** [1] - 6:13
**Dr** [12] - 82:1, 82:3, 82:9, 82:11, 82:17, 83:1, 83:6, 83:11, 83:16, 83:21, 85:25, 86:2
**draft** [2] - 4:9, 148:19
**draw** [1] - 156:1
**drawn** [1] - 59:17
**drew** [1] - 95:18
**drink** [1] - 49:13
**drive** [2] - 54:21, 69:13
**driving** [1] - 161:19
**dry** [1] - 72:3
**due** [2] - 13:15, 14:16
**duly** [1] - 91:12
**during** [35] - 7:14, 8:23, 9:23, 10:23, 12:11, 17:23, 18:2, 18:18, 38:6, 40:18, 44:4, 55:21, 56:20, 57:14, 59:4, 63:9, 63:14, 65:3, 65:4, 66:3, 66:7, 66:10, 67:4, 67:22, 79:7, 82:19, 111:14, 124:19, 129:25, 150:5, 167:4, 172:25, 175:15, 180:1
**duties** [2] - 16:2, 145:13
**duty** [3] - 14:4, 58:24, 90:22

**E**

**E/E** [2] - 143:3, 143:10
**EAP** [1] - 103:3
**early** [9] - 23:6, 81:6, 83:19, 84:5, 84:6, 84:18, 85:14, 96:3, 144:5
**earns** [1] - 174:12
**easily** [1] - 119:4
**ECF** [3] - 123:13, 126:20, 128:6
**echo** [1] - 120:8
**Eddy** [1] - 31:10
**education** [1] - 44:1
**EEOC** [8] - 29:7, 30:5, 30:6, 31:23, 34:20, 39:17, 43:25, 44:12
**effective** [2] - 13:14, 81:18
**effectively** [1] - 11:15
**efficiently** [1] - 6:2
**effort** [2] - 9:4, 45:23
**eight** [13] - 27:20, 37:13, 37:14, 40:4, 44:21, 45:6, 45:20, 45:21, 125:20, 144:6, 144:7, 144:9
**either** [5] - 16:3, 31:22, 32:1, 32:23, 112:14
**EL** [1] - 151:7
**elected** [2] - 16:3, 16:4
**electrical** [1] - 143:10
**electronic** [1] - 63:21
**electronically** [2] - 63:25, 165:5
**electronics** [1] - 74:18
**elements** [1] - 105:15
**eleven** [1] - 98:15
**eleven-and-a-half** [1] - 98:15
**ELLISON** [1] - 2:3
**Ellison** [3] - 19:14, 19:24, 36:17
**email** [19] - 3:11, 3:12, 4:7, 4:8, 4:10, 4:11, 33:14, 64:4, 135:19, 137:4, 137:7, 137:9, 137:15, 137:21, 141:21, 142:8, 148:16, 157:22, 157:23
**embarrass** [1] - 47:11
**embarrassing** [1] - 36:24
**emergencies** [1] - 50:9
**emotional** [1] - 104:5
**employed** [5] - 16:2, 21:11, 61:10, 133:7, 142:22
**employee** [19] - 31:22, 32:1, 79:25, 89:23, 97:9, 97:11, 111:5, 123:24, 131:9, 150:22, 152:18, 157:10, 163:19, 168:1, 168:2, 170:1, 174:12, 177:12
**Employee** [3] - 95:12, 95:23, 114:8
**employees** [41] - 35:17, 38:14, 77:14, 79:11, 79:12, 84:24, 89:19, 95:24, 96:2, 97:13, 98:20, 98:22, 102:13, 102:20, 103:4, 103:19, 103:23, 104:6, 104:9, 123:4, 123:6, 123:8, 130:15, 131:10, 135:7, 139:6, 142:21, 143:1, 147:4, 147:12, 158:16, 162:12, 164:20, 169:16, 169:25, 170:2, 170:5, 173:21, 174:17, 175:17, 175:23
**employer** [10] - 11:2, 18:6, 24:22, 25:4, 32:4, 32:9, 38:18, 120:25, 121:6, 121:15
**employment** [10] - 15:11, 21:21, 41:19, 86:19, 95:7, 111:14, 124:20, 132:25, 150:5, 154:3
**end** [20] - 37:7, 57:2, 58:17, 60:22, 61:8, 61:24, 63:1, 64:14, 66:2, 67:14, 80:15, 82:8, 83:2, 83:3, 84:15, 87:7, 89:2, 91:5, 163:20, 163:22
**END** [1] - 180:7
**Ended** [1] - 40:21
**ended** [3] - 29:25, 40:16, 170:3
**ending** [1] - 82:7
**engaged** [4] - 16:1, 61:21, 73:24, 84:10
**engages** [1] - 84:7
**Engelhorn** [1] - 31:1
**engineering** [3] - 24:6, 143:10, 144:7
**Englehorn** [13] - 82:1, 82:2, 82:3, 82:9, 82:11, 82:17, 83:1, 83:6, 83:11, 83:16, 83:21, 85:25, 86:2
**English** [1] - 12:22
**enjoy** [1] - 95:20
**enjoyed** [2] - 162:9, 162:11
**ensure** [6] - 66:6, 67:21, 98:21, 104:4, 160:25, 171:7
**entailed** [1] - 97:6
**enter** [1] - 145:4
**entered** [1] - 146:13
**enterprise** [1] - 14:3
**entire** [6] - 6:17, 8:22, 12:19, 34:13, 66:23, 171:18
**entities** [3] - 33:25, 101:15, 106:16
**entitled** [1] - 180:12
**entity** [2] - 100:14, 106:6
**entry** [5] - 79:24, 96:12, 97:3, 168:3, 170:24
**entry-level** [3] - 79:24, 96:12, 97:3
**environment** [1] - 47:14
**Epps** [4] - 31:4, 112:17, 114:8, 114:24
**equipment** [3] - 16:23, 24:21, 150:14
**equivalent** [1] - 111:3
**equivocation** [1] - 45:4
**ERISA** [5] - 160:17, 160:18, 160:21, 160:24, 161:1
**especially** [2] - 117:5, 158:15
**ESQ** [4] - 1:17, 1:21, 2:2, 2:3
**essential** [2] - 13:25, 14:2
**essentially** [1] - 147:5
**established** [2] - 59:16, 75:1
**establishes** [1] - 126:1
**estate** [2] - 47:6, 140:3
**estate-type** [1] - 140:3
**et** [1] - 126:3
**European** [1] - 136:4
**Eva** [7] - 31:9, 31:12, 83:7, 83:11, 83:13, 84:25, 158:1
**evaluations** [1] - 172:3
**evening** [2] - 179:16, 180:2
**events** [1] - 171:21
**everyday** [2] - 10:12, 169:20
**Evidence** [1] - 60:1
**evidence** [80] - 10:14, 32:12, 32:20, 40:1, 58:24, 59:7, 59:17, 59:18, 59:19, 59:22, 59:23, 59:24, 60:5, 60:9, 60:11, 60:13, 60:14, 60:16, 60:17, 60:18, 60:23, 60:24, 61:1, 61:2, 62:6, 62:7, 62:10, 62:19, 63:13, 65:11, 65:16, 65:21, 67:13, 67:23, 68:1, 68:16, 68:18, 68:23, 68:24, 69:22, 70:4, 71:23, 72:10, 72:14, 72:17, 72:21, 73:22, 77:3, 80:16, 80:19, 84:11, 85:6, 86:22, 87:8, 87:16, 87:19, 87:23, 88:1, 88:5, 88:16, 90:7, 117:6, 117:9, 117:16, 118:15, 118:18, 120:15, 121:1, 126:23, 127:1, 127:5, 127:13, 127:21, 127:23, 128:3, 128:8, 129:18, 149:24
**exactly** [6] - 24:20, 39:15, 41:6, 41:17, 116:21, 124:6
**exam** [1] - 3:6
**EXAM** [29] - 91:14, 95:4, 104:17, 108:1, 110:15, 113:1, 113:21, 116:6, 122:23, 130:8, 132:9, 132:16, 133:15, 135:17, 137:1, 141:16, 146:4, 148:12, 150:2, 151:1, 153:9, 154:21, 156:19, 157:20, 163:2, 165:15, 166:7, 168:21, 173:9
**examination** [1] - 72:23
**examine** [3] - 68:20, 68:22, 129:10
**example** [6] - 109:5, 151:25, 152:25, 154:5, 171:6, 174:3
**exceed** [1] - 166:20
**exceeds** [8] - 164:4, 164:8, 164:14, 165:22, 166:17, 166:18, 166:21, 166:22
**excellence** [1] - 71:7
**excellent** [3] - 71:5, 168:11, 171:3
**exchange** [1] - 135:19
**exclude** [1] - 126:22
**excluded** [1] - 60:8

**excuse** [12] - 8:14, 44:9, 44:20, 44:21, 44:24, 48:10, 52:5, 52:11, 52:17, 53:22, 70:20, 76:10
**excused** [10] - 11:22, 13:15, 14:9, 17:3, 45:19, 48:17, 56:5, 56:6, 68:6, 179:19
**executive** [5] - 15:24, 114:19, 114:21, 116:24, 119:19
**executives** [1] - 115:15
**Exempt** [2] - 3:17, 3:19
**exempt** [5] - 11:20, 11:23, 110:7, 110:20, 110:25
**exempted** [1] - 15:10
**exhibit** [34] - 94:22, 104:13, 107:19, 110:5, 112:20, 112:21, 113:18, 114:23, 123:16, 124:1, 124:4, 124:18, 126:3, 133:10, 133:12, 133:17, 135:10, 136:21, 141:12, 145:25, 148:8, 149:22, 151:8, 153:6, 153:14, 154:6, 154:17, 155:22, 157:16, 162:21, 163:4, 165:12, 166:3, 173:7
**EXHIBITS** [3] - 3:7, 4:2, 4:12
**exhibits** [3] - 59:10, 74:19, 180:5
**exist** [2] - 60:20, 144:11
**existed** [1] - 111:8
**expat** [8] - 123:15, 123:21, 123:22, 123:23, 126:13, 126:24, 128:20, 129:3
**expats** [9] - 124:13, 124:17, 124:20, 125:12, 130:18, 130:20, 131:1, 132:24, 139:7
**expect** [1] - 64:14
**experience** [13] - 7:21, 9:3, 29:13, 39:5, 44:1, 70:15, 81:24, 82:21, 95:25, 96:13, 99:23, 100:1, 131:24
**experienced** [1] - 46:13
**experiences** [2] - 8:17, 8:19
**expert** [4] - 151:6, 151:14, 151:24, 152:4
**explain** [11] - 6:20, 32:13, 38:19, 40:14, 64:19, 69:8, 136:8, 151:9, 152:9, 168:14, 169:1
**explained** [3] - 72:12, 79:22, 87:12
**explaining** [1] - 152:10
**explanation** [1] - 168:17
**exported** [1] - 79:15
**exposed** [1] - 68:12
**exposure** [1] - 10:6
**extensive** [1] - 72:23
**extent** [1] - 78:8
**extreme** [1] - 13:16
**extremely** [1] - 16:11
**eye** [1] - 60:18

**F**

**face** [5] - 33:11, 66:4, 167:1, 167:2
**face-to-face** [1] - 33:11
**Facebook** [2] - 33:15, 64:7
**Facilities** [1] - 101:19
**facility** [5] - 25:13, 103:24, 109:1, 130:21, 140:2
**fact** [12] - 22:20, 37:9, 39:4, 39:14, 45:16, 51:7, 57:9, 60:17, 86:7, 89:23, 123:11, 124:16
**factor** [1] - 175:2
**factors** [1] - 11:21
**factory** [1] - 169:16
**facts** [15] - 28:25, 58:25, 59:1, 59:8, 59:11, 59:13, 59:14, 59:16, 60:19, 60:20, 62:8, 66:13, 66:17, 69:18
**fails** [1] - 62:13
**fair** [44] - 7:2, 7:3, 7:9, 7:12, 7:13, 11:8, 17:16, 17:19, 20:24, 22:22, 23:12, 24:16, 25:18, 26:16, 27:15, 29:12, 29:17, 29:18, 29:19, 32:19, 32:23, 36:3, 37:5, 37:8, 39:8, 39:21, 41:5, 41:22, 42:1, 43:2, 43:7, 43:14, 44:3, 44:12, 44:16, 44:19, 45:4, 46:1, 46:5, 48:3, 48:14, 69:22, 91:2, 91:3
**fair-minded** [1] - 7:2
**fairest** [1] - 6:16
**fairly** [3] - 17:1, 39:14, 67:22
**fairness** [1] - 64:23
**familiar** [13] - 106:23, 123:8, 130:19, 133:18, 137:15, 137:22, 139:25, 140:13, 140:22, 141:18, 142:13, 142:15, 157:23
**families** [2] - 6:9, 62:25
**family** [14] - 18:24, 21:6, 21:8, 21:16, 21:19, 28:13, 31:18, 31:21, 32:3, 32:8, 33:5, 64:3, 64:17, 103:20
**Family** [3] - 103:16, 103:17, 136:5
**Fane** [2] - 19:20, 20:2
**FANE** [1] - 1:21
**far** [2] - 29:4, 51:22
**fast** [1] - 123:2
**father** [1] - 19:2
**father-in-law** [1] - 19:2
**favors** [1] - 87:10
**FEBRUARY** [1] - 1:4
**February** [2] - 5:19, 5:20
**Federal** [2] - 159:19, 160:2
**federal** [6] - 13:4, 13:5, 13:20, 16:25, 18:8
**feedback** [5] - 83:21, 162:13, 162:16, 172:9
**feeds** [1] - 34:4
**feelings** [2] - 32:5, 38:22
**fellow** [8] - 10:4, 29:17, 33:3, 33:9, 33:11, 64:12, 67:11, 69:4
**felt** [1] - 44:19
**fence** [2] - 20:20, 42:14
**few** [7] - 7:4, 18:23, 30:21, 49:12, 62:22, 75:6, 162:20
**field** [5] - 35:10, 35:20, 35:25, 39:5, 95:16
**fifteen** [3] - 16:22, 49:17, 52:20
**fifteen-minute** [1] - 49:17
**figure** [3] - 85:19, 88:21, 88:23
**file** [2] - 47:18, 165:8
**filed** [1] - 39:16
**fill** [4] - 81:16, 82:17, 120:21, 157:12
**filled** [3] - 82:16, 118:16, 127:9
**filling** [1] - 83:17
**final** [8] - 46:3, 52:15, 98:25, 100:11, 122:5, 163:14, 168:3, 168:7
**finally** [3] - 16:8, 33:1, 67:12
**finance** [4] - 107:11, 140:16, 140:17
**financial** [2] - 101:10, 106:13
**Financial** [1] - 82:22
**fine** [3] - 28:4, 38:10, 39:3
**finish** [8] - 5:21, 5:22, 54:25, 55:4, 144:17, 144:25, 145:1
**finished** [1] - 54:20
**finishing** [1] - 55:7
**fire** [1] - 15:20
**fired** [2] - 42:8, 73:18
**firefighters** [1] - 14:6
**firm** [6] - 19:6, 19:20, 19:23, 20:1, 20:2, 47:6
**firms** [1] - 21:7
**first** [54] - 5:11, 7:7, 9:1, 11:13, 12:16, 49:4, 51:23, 52:1, 52:3, 61:16, 62:23, 68:14, 69:2, 72:11, 72:15, 77:14, 79:13, 80:23, 82:4, 84:21, 87:11, 87:12, 91:12, 92:11, 92:12, 94:22, 95:9, 95:22, 97:7, 97:8, 97:18, 98:10, 107:25, 109:9, 110:21, 112:1, 115:24, 118:3, 123:20, 138:2, 141:22, 142:12, 142:14, 144:16, 145:2, 153:15, 159:24, 162:21, 170:12, 172:10, 175:22, 176:8, 177:13
**fit** [7] - 101:3, 136:2, 136:6, 136:9, 151:22, 152:5, 154:6
**fits** [2] - 89:3, 151:25
**five** [22] - 14:11, 20:13, 26:1, 26:5, 26:9, 38:4, 38:16, 52:14, 52:19, 54:20, 54:25, 55:2, 55:3, 70:14, 92:15, 96:13, 125:3, 134:5, 134:6, 138:19, 151:8, 153:19
**Five** [1] - 94:4
**fixed** [1] - 150:18
**flip** [1] - 164:24
**FLIV** [1] - 4:5
**floating** [1] - 152:13
**floor** [1] - 143:15
**Flor** [2] - 176:10, 176:15
**fluid** [1] - 54:24
**FO** [9] - 140:22, 140:24, 140:25, 141:2, 141:5, 141:8, 145:14, 145:16, 161:12
**focus** [4] - 87:21, 143:9, 144:2, 171:7
**Focus** [1] - 143:2
**focused** [1] - 134:16
**folks** [14] - 5:17, 38:25, 42:11, 43:11, 51:8, 53:4, 53:23, 90:4, 114:23, 115:3, 119:12, 122:15, 132:6, 133:5
**follow** [7] - 8:7, 36:19, 39:15, 56:6, 59:2, 60:6, 68:17
**follow-up** [1] - 8:7
**followed** [4] - 51:23, 127:2, 127:7, 127:14
**following** [18] - 5:9, 12:1, 12:2, 13:12, 13:14, 15:9, 30:19, 45:13, 45:18, 48:12, 56:11, 58:12, 79:4, 121:25, 122:8, 130:4, 179:2, 179:20
**follows** [1] - 91:13
**Food** [1] - 114:11
**foot** [2] - 71:21, 117:8
**FOR** [3] - 1:1, 1:17, 1:19
**force** [5] - 78:16,

81:2, 142:19, 167:20, 170:3
**Force** [3] - 15:17, 15:18, 142:13
**forces** [1] - 15:15
**forcing** [2] - 100:23, 133:21
**Fore** [1] - 12:19
**foregoing** [1] - 180:10
**foreign** [1] - 130:18
**forget** [1] - 67:3
**Forks** [1] - 94:4
**form** [2] - 67:12, 146:12
**formally** [1] - 108:12
**former** [2] - 18:6, 20:7
**formerly** [2] - 61:10, 64:7
**forth** [1] - 112:2
**forthright** [2] - 41:25, 45:1
**forum** [1] - 168:5
**forward** [4] - 10:21, 40:8, 78:25, 91:10
**forwarding** [1] - 137:9
**foundation** [7] - 11:7, 116:3, 119:2, 119:8, 123:1, 125:17, 126:12
**four** [42] - 10:7, 12:13, 38:4, 44:8, 52:20, 63:13, 92:6, 98:12, 102:9, 110:23, 110:25, 111:9, 111:11, 112:15, 117:12, 118:11, 125:1, 125:14, 130:24, 131:2, 132:5, 132:19, 132:21, 149:15, 150:17, 150:19, 151:20, 154:1, 154:2, 154:8, 154:13, 155:2, 155:7, 155:12, 164:4, 164:8, 164:14, 164:24, 165:21, 166:16, 166:17
**four-year** [1] - 92:6
**fours** [1] - 117:18
**fourth** [2] - 13:2, 170:9
**Fowler** [1] - 74:17
**frankly** [1] - 74:5
**free** [5] - 9:22, 17:7, 53:18, 68:4, 128:1
**freely** [1] - 72:2
**freeze** [2] - 174:5, 174:20
**freezing** [1] - 175:16
**frequency** [1] - 161:17
**frequent** [1] - 44:23
**frequently** [1] - 25:8
**friend** [1] - 68:7
**friends** [4] - 38:17, 62:25, 64:3, 68:2
**front** [3] - 9:9, 34:23, 73:22
**full** [5] - 6:10, 15:19, 45:14, 81:9, 166:9
**full-time** [1] - 15:19
**fully** [3] - 120:18, 164:2, 165:23
**fun** [1] - 110:24
**Function** [2] - 104:21, 104:22
**function** [78] - 14:4, 72:1, 98:11, 102:9, 102:10, 102:11, 108:20, 109:15, 111:3, 111:7, 111:9, 111:12, 111:15, 111:19, 111:22, 111:25, 112:1, 112:10, 112:13, 112:14, 112:15, 113:24, 116:4, 116:8, 116:9, 116:19, 117:22, 118:1, 125:11, 125:12, 125:14, 126:13, 127:10, 130:24, 130:25, 131:2, 131:4, 131:5, 131:17, 132:5, 132:21, 134:25, 135:1, 147:13, 148:2, 149:12, 149:15, 149:19, 150:4, 150:16, 150:23, 151:16, 151:23, 152:14, 152:16, 152:19, 152:21, 152:22, 153:16, 153:21, 153:23, 154:3, 154:8, 154:14, 155:2, 155:3, 155:5, 155:7, 155:12, 157:13, 163:8, 163:12, 172:17
**functional** [8] - 100:13, 102:13, 103:25, 107:4, 109:11, 113:7, 132:22, 161:12
**functionality** [1] - 100:17
**functionally** [1] - 167:21
**functioning** [1] - 151:4
**functions** [12] - 16:24, 20:20, 72:1, 107:3, 112:3, 124:7, 132:19, 134:16, 136:1, 136:8, 140:18, 151:15
**fundamental** [1] - 11:10
**furlough** [1] - 170:4
**future** [2] - 103:12, 103:13

**G**

**gain** [1] - 100:1
**gaining** [1] - 70:15
**Gantt** [2] - 19:25, 74:16
**gathering** [2] - 29:8, 40:1
**general** [2] - 116:23, 159:15
**generalist** [1] - 105:20
**generate** [5] - 17:9, 48:20, 49:6, 49:11, 49:25
**generated** [1] - 51:10
**gentleman** [5] - 20:6, 37:3, 39:13, 39:19, 56:23
**gentlemen** [9] - 19:4, 19:11, 51:19, 52:24, 54:8, 73:15, 73:16, 86:6, 122:1
**German** [10] - 32:6, 71:13, 75:3, 75:4, 101:3, 127:3, 127:9, 133:3, 137:19, 146:11
**Germans** [15] - 32:6, 72:16, 75:23, 115:21, 116:9, 117:2, 117:14, 117:19, 117:21, 118:2, 118:9, 118:12, 119:16, 119:22, 120:10
**Germany** [52] - 18:2, 72:15, 82:25, 83:8, 85:18, 90:2, 90:3, 90:4, 100:15, 100:23, 106:2, 107:16, 115:12, 115:13, 119:13, 120:21, 121:12, 121:13, 131:13, 131:15, 132:20, 132:23, 133:21, 134:10, 135:24, 136:18, 137:13, 141:10, 142:4, 145:20, 145:21, 147:11, 147:24, 148:19, 149:16, 150:17, 150:19, 154:12, 154:25, 155:4, 156:10, 156:13, 157:1, 157:4, 158:5, 158:23, 161:8, 162:3, 175:25, 176:19, 176:21, 177:1
**Gibson** [1] - 31:1
**Gilmore** [1] - 31:8
**given** [12] - 9:17, 10:17, 37:4, 37:20, 41:14, 41:15, 55:12, 65:19, 66:24, 71:9, 134:10, 173:25
**glad** [2] - 53:24, 57:5
**global** [3] - 75:9, 105:11, 139:20
**globe** [1] - 106:17
**goal** [3] - 7:11, 17:19, 171:5
**governing** [1] - 160:18
**Government** [5] - 15:25, 159:24, 160:2, 160:6, 161:3
**government** [4] - 16:1, 16:23, 160:1, 160:6
**Governor** [4] - 75:20, 76:2, 76:7, 77:21
**grade** [7] - 150:21, 152:2, 152:5, 152:14, 152:17, 164:7, 164:13
**graded** [1] - 149:14
**grades** [13] - 72:1, 111:4, 111:13, 150:16, 150:18, 151:22, 153:16, 153:22, 153:24, 154:3, 154:6, 154:14, 163:23
**grading** [7] - 4:5, 149:16, 149:18, 154:24, 154:25, 155:12, 161:11
**graduate** [2] - 92:2, 94:15
**graduated** [3] - 70:12, 92:8, 95:15
**grand** [1] - 13:20
**grandchildren** [1] - 19:1
**grandmother** [1] - 15:3
**grandparents** [1] - 18:25
**grant** [1] - 58:1
**granted** [2] - 114:20, 173:19
**great** [1] - 89:23
**greater** [1] - 90:21
**greener** [1] - 88:2
**Greenville** [8] - 6:14, 19:15, 21:14, 23:6, 93:15, 93:20, 94:12, 94:13
**GREENVILLE** [4] - 1:3, 1:18, 1:22, 2:5
**Greenwood** [4] - 28:10, 28:11, 28:16, 37:4
**Greer** [1] - 31:6
**greet** [1] - 67:6
**Greg** [5] - 56:24, 93:24, 93:25, 94:1
**ground** [1] - 77:15
**grounds** [1] - 42:7
**Group** [6] - 18:4, 101:13, 105:22, 106:21, 145:12, 156:21
**group** [12] - 89:15, 107:2, 110:3, 133:8, 137:13, 137:14, 138:7, 138:17, 138:22, 156:6, 172:15, 173:2
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**groups** [2] - 94:5, 94:9
**grow** [2] - 150:22, 175:2
**GSP** [2] - 74:7, 75:18
**guarantee** [1] - 11:7
**guaranteed** [1] - 6:18
**Guard** [1] - 15:18
**guard** [1] - 8:15
**guess** [4] - 29:6, 75:11, 119:11, 163:9
**guessing** [1] - 28:21
**guidance** [1] - 58:18
**guide** [1] - 58:16
**guidelines** [10] - 61:6, 123:15, 126:24, 127:8, 127:15, 128:20, 129:4, 160:7, 160:8, 160:10

**H**

**Haft** [1] - 138:25
**Haft-Zboril** [1] -

138:25
**half** [2] - 16:23, 98:15
**hall** [1] - 50:23
**hallway** [1] - 68:8
**hand** [19] - 5:14, 13:18, 15:13, 16:6, 16:17, 20:5, 21:24, 30:22, 32:16, 34:10, 46:6, 48:14, 53:5, 53:7, 54:9, 55:22, 65:5, 151:12, 152:2
**handle** [1] - 173:25
**handling** [2] - 167:7, 169:3
**happy** [5] - 11:4, 149:20, 169:4, 171:25, 179:11
**harassment** [6] - 30:1, 46:14, 47:9, 47:10, 47:13
**hard** [3] - 64:19, 69:14, 138:1
**hardship** [3] - 6:7, 13:16, 179:11
**hardships** [3] - 11:14, 13:13, 179:10
**Harris** [1] - 31:6
**hate** [2] - 46:19, 49:22
**head** [10] - 106:18, 133:21, 134:10, 134:14, 135:25, 146:22, 147:16, 148:20, 148:21, 179:6
**headed** [1] - 125:24
**headquartered** [2] - 106:1, 106:2
**health** [11] - 13:23, 102:22, 102:23, 103:3, 103:18, 104:3, 104:5, 160:18, 160:25, 161:2
**Health** [4] - 103:16, 103:17, 114:10, 136:5
**hear** [42] - 9:5, 10:9, 34:6, 55:16, 57:5, 68:12, 70:2, 70:10, 70:21, 71:19, 71:25, 72:14, 72:21, 73:21, 74:5, 74:14, 75:5, 75:8, 78:25, 79:7, 80:24, 81:13, 81:22, 82:3, 82:19, 82:20, 83:5, 84:15, 85:21, 85:22, 85:25, 87:20, 87:21, 89:10, 89:18, 89:24, 89:25, 90:1, 90:7, 117:1, 138:1, 145:15
**heard** [35] - 8:17, 9:9, 18:11, 30:19, 32:17, 34:15, 35:2, 39:2, 41:12, 45:13, 47:24, 48:12, 51:1, 51:2, 56:11, 58:12, 60:10, 62:17, 63:7, 74:24, 75:19, 79:4, 80:4, 88:5, 88:13, 90:9, 105:21, 115:5, 121:25, 122:8, 129:13, 130:4, 157:5, 179:2, 179:20
**hearing** [17] - 5:1, 9:13, 27:24, 36:15, 40:10, 42:18, 42:21, 43:4, 43:7, 43:18, 46:22, 76:14, 113:15, 116:15, 141:14, 146:2, 180:6
**hearsay** [3] - 156:11, 156:14, 168:19
**heart** [2] - 86:14, 95:20
**held** [19] - 16:20, 27:23, 36:14, 40:9, 46:21, 51:5, 54:3, 56:10, 76:13, 83:23, 85:4, 85:7, 86:11, 102:4, 105:1, 116:14, 130:3, 139:3, 178:24
**hello** [1] - 5:3
**help** [17] - 7:15, 10:13, 28:25, 53:22, 53:24, 63:22, 68:17, 74:18, 82:15, 84:7, 89:2, 104:7, 129:1, 158:7, 159:3, 175:20, 175:22
**helped** [3] - 28:24, 89:18, 104:8
**helpful** [1] - 70:4
**helping** [1] - 43:12
**herself** [1] - 74:6
**hesitant** [1] - 29:15
**hesitate** [1] - 44:14
**hesitation** [3] - 37:4, 44:15, 45:3
**hide** [2] - 67:21, 75:4
**Higgins** [2] - 178:1, 178:4
**high** [6] - 91:24, 91:25, 173:17, 173:18, 173:20, 173:22
**higher** [1] - 105:18
**highest** [1] - 166:22
**highlight** [1] - 152:19
**highlighted** [3] - 142:9, 142:14, 144:17
**himself** [3] - 37:22, 117:8, 128:16
**hire** [2] - 143:20, 144:2
**hired** [5] - 24:8, 47:16, 160:12, 177:13, 177:16
**hires** [1] - 142:25
**hiring** [2] - 143:23, 160:11
**history** [2] - 78:1, 153:3
**hitting** [1] - 175:14
**hold** [3] - 102:1, 105:5, 105:13
**holds** [1] - 99:6
**holiday** [2] - 85:17
**home** [2] - 24:13, 179:16
**honest** [1] - 45:1
**honesty** [1] - 48:6
**honor** [2] - 70:9, 74:10
**Honor** [59] - 14:11, 17:6, 19:10, 21:1, 22:23, 23:10, 23:13, 27:11, 37:1, 37:8, 37:18, 38:2, 39:4, 41:13, 48:23, 48:25, 51:16, 53:12, 56:1, 56:3, 56:16, 56:17, 56:23, 57:7, 58:7, 58:8, 70:7, 76:10, 76:17, 78:14, 79:6, 94:25, 107:22, 110:11, 115:19, 116:12, 119:15, 122:10, 123:14, 125:19, 125:22, 126:10, 126:11, 129:15, 130:7, 133:11, 135:11, 136:22, 146:1, 148:8, 153:6, 154:17, 155:23, 156:11, 157:16, 162:23, 165:13, 166:4, 173:6
**HONORABLE** [1] - 1:13
**hope** [6] - 5:19, 50:10, 50:11, 122:2, 128:12, 179:15
**hopeful** [1] - 5:22
**hopefully** [1] - 88:10
**hoping** [1] - 14:17
**Horstmeier** [3] - 138:2, 138:5, 142:6
**hostile** [2] - 47:13, 47:14
**hourly** [1] - 147:22
**household** [1] - 33:5
**housekeeping** [1] - 179:8
**HR** [60] - 3:12, 4:10, 35:9, 37:6, 37:10, 39:9, 43:12, 43:24, 47:21, 70:13, 70:15, 71:1, 71:11, 72:2, 79:23, 82:10, 83:4, 85:24, 89:14, 90:18, 95:18, 96:10, 96:13, 97:24, 99:1, 99:4, 99:8, 100:2, 100:16, 101:18, 102:6, 103:11, 103:12, 105:6, 105:20, 114:7, 114:8, 114:9, 129:4, 135:6, 135:23, 136:15, 136:16, 137:6, 148:5, 148:21, 149:2, 155:3, 157:13, 161:13, 162:8, 162:11, 165:8, 169:22, 170:14, 170:16, 170:17, 176:5, 177:13, 178:20
**HRI** [1] - 100:25
**HRIS** [3] - 99:4, 100:17, 161:15
**hub** [2] - 135:5, 138:16
**Human** [54] - 19:18, 61:11, 70:13, 70:24, 74:7, 74:15, 80:1, 80:3, 80:6, 80:11, 80:25, 81:1, 81:3, 81:23, 82:6, 82:13, 82:16, 83:8, 83:14, 83:17, 84:3, 84:23, 85:13, 85:20, 86:4, 87:1, 94:14, 95:16, 96:17, 97:2, 99:2, 99:14, 99:25, 100:8, 103:14, 105:10, 105:11, 105:16, 107:6, 108:16, 108:17, 109:3, 109:12, 109:16, 109:19, 119:2, 137:5, 138:6, 138:16, 141:22, 141:23, 142:3, 148:16, 167:13
**human** [6] - 34:13, 34:16, 35:20, 44:1, 112:9, 156:25
**husband** [6] - 22:3, 42:20, 46:9, 56:24, 93:2, 93:4
**husband's** [1] - 93:22
**hush** [1] - 49:24

**I**

**I-lead** [5] - 144:18, 144:19, 144:25, 145:5, 145:6
**ID** [1] - 107:25
**ideas** [1] - 32:14
**identified** [2] - 37:21, 78:19
**identify** [1] - 154:23
**ignore** [3] - 34:1, 60:3, 60:25
**II** [1] - 2:2
**Ilka** [2] - 138:2, 142:6
**immediate** [5] - 18:24, 21:6, 21:16, 21:19, 31:17
**immediately** [3] - 5:9, 51:23, 67:10
**impact** [4] - 41:4, 79:9, 103:14, 177:2
**impartial** [5] - 7:9, 10:13, 11:8, 17:16, 17:20
**impartially** [1] - 8:21
**implement** [2] - 100:16, 161:22
**implemented** [1] - 153:17
**implicates** [1] - 118:8
**imply** [1] - 120:9
**important** [17] - 6:4, 6:18, 7:1, 10:2, 10:24, 16:11, 69:20, 79:19, 80:17, 80:21, 80:22, 87:19, 88:15, 90:11, 90:23, 157:13, 158:14
**importantly** [1] - 90:16
**imposition** [1] - 5:25
**impress** [1] - 69:19
**imprisonment** [1] - 13:6
**improper** [3] - 59:25, 77:1, 116:20
**improperly** [1] - 76:20
**IN** [1] - 1:1
**in-depth** [1] - 124:2
**inappropriate** [3] - 77:9, 77:19, 117:2
**inasmuch** [1] - 179:3
**incapable** [1] - 12:24
**incentive** [1] - 89:1
**include** [5] - 18:24, 56:18, 136:10, 139:7, 172:15

**included** [4] - 16:14, 84:20, 134:11, 159:7
**includes** [1] - 37:24
**including** [10] - 15:17, 33:5, 33:9, 62:25, 63:18, 64:2, 64:6, 82:21, 131:9, 134:15
**inconvenience** [1] - 13:16
**increase** [2] - 154:9, 168:2
**incredibly** [1] - 90:23
**independent** [8] - 18:13, 33:19, 55:14, 63:15, 67:2, 89:2, 100:25, 179:14
**INDEX** [2] - 3:1, 4:1
**indicate** [5] - 59:5, 66:11, 66:16, 66:17, 165:25
**indicated** [7] - 38:14, 40:13, 136:12, 163:10, 164:21, 164:22, 171:15
**indicates** [1] - 43:16
**indicating** [2] - 59:5, 148:18
**indirect** [1] - 147:16
**individual** [8] - 65:2, 65:15, 81:4, 83:7, 151:15, 172:18, 173:16, 173:20
**individually** [1] - 65:7
**individuals** [7] - 11:10, 33:25, 63:17, 104:8, 107:3, 144:5
**infer** [1] - 60:19
**inference** [1] - 120:4
**inferences** [1] - 59:17
**infirmed** [1] - 14:1
**infirmity** [1] - 12:25
**influence** [3] - 66:12, 76:20, 77:2
**influenced** [2] - 8:16, 60:1
**inform** [1] - 64:15
**information** [21] - 7:7, 7:22, 16:14, 17:11, 18:14, 23:11, 24:14, 27:14, 29:8, 34:2, 45:17, 63:10, 63:21, 99:3, 156:25, 158:14, 158:19, 161:20, 163:8, 169:20, 171:4
**Information** [1] - 99:5
**informing** [1] - 136:7
**initial** [2] - 108:11, 142:14
**initials** [1] - 108:11
**initiatives** [1] - 145:9
**injured** [1] - 40:19
**injury** [1] - 41:22
**inpats** [1] - 130:18
**input** [1] - 132:22
**inquiring** [1] - 36:22
**inside** [1] - 10:7
**inspiring** [1] - 168:10
**Instagram** [2] - 33:16, 64:7
**instance** [7] - 107:5, 113:8, 134:25, 135:4, 136:3, 136:5, 143:15
**instead** [3] - 12:8, 73:22, 87:25
**instruct** [2] - 62:23, 69:2
**instructed** [5] - 56:19, 57:11, 60:5, 87:18, 136:10
**instruction** [1] - 60:7
**instructions** [13] - 32:13, 32:21, 55:12, 55:19, 56:18, 58:4, 58:16, 60:21, 61:24, 61:25, 64:16, 68:25, 69:24
**instrumental** [3] - 75:21, 76:8, 77:20
**insurance** [1] - 103:3
**integral** [1] - 85:24
**integrated** [3] - 120:25, 121:6, 121:15
**Integrity** [1] - 99:1
**intend** [1] - 120:18
**intended** [4] - 18:24, 59:4, 66:10, 66:12
**intends** [1] - 68:17
**interact** [2] - 161:7, 161:10
**interacting** [2] - 161:16, 162:10
**interest** [1] - 177:5
**interested** [2] - 83:10, 83:12
**interfere** [1] - 65:10
**international** [10] - 83:10, 90:16, 123:6, 123:8, 123:23, 124:8, 130:16, 139:4, 139:5, 155:11
**International** [1] - 4:5
**internationals** [2] - 124:13, 130:20
**internet** [4] - 34:3, 63:20, 63:23, 64:5
**interpret** [2] - 68:24, 144:25
**interpretation** [1] - 127:6
**interpreting** [1] - 144:22
**interrupt** [1] - 178:22
**Interstate-85** [1] - 74:22
**interview** [1] - 131:23
**interviewed** [1] - 171:10
**introduce** [6] - 19:7, 19:8, 74:12, 104:10, 113:14, 123:1
**introduced** [3] - 17:13, 56:23, 136:20
**investigation** [4] - 10:5, 33:20, 33:23, 63:16
**involve** [2] - 100:5, 105:9
**involved** [19] - 8:12, 18:14, 28:6, 28:12, 34:1, 40:1, 44:11, 44:18, 63:17, 72:16, 122:6, 123:11, 123:15, 124:1, 124:3, 133:6, 148:4, 155:17, 172:6
**involvement** [2] - 120:4, 120:25
**involves** [1] - 38:20
**involving** [1] - 41:19
**Ipads** [1] - 33:22
**IPhone** [1] - 64:4
**irrelevant** [3] - 117:3, 117:4, 126:25
**issue** [12] - 57:8, 86:14, 116:17, 117:6, 117:7, 118:15, 118:16, 122:19, 125:22, 126:19, 127:13, 128:19
**issued** [1] - 165:4
**issues** [10] - 8:8, 33:24, 40:20, 77:1, 120:2, 121:1, 122:3, 128:23, 167:1, 173:24
**it,may** [1] - 8:14
**item** [1] - 60:5
**iteration** [1] - 145:6
**itself** [2] - 7:3, 71:6

**J**

**JACKSON** [1] - 2:3
**Jackson** [2] - 19:15, 20:1
**January** [4] - 80:9, 86:8, 86:17, 137:6
**jar** [1] - 50:6
**jeopardized** [1] - 13:24
**jeopardizes** [1] - 64:23
**Jersey** [3] - 101:8, 106:13, 135:6
**JFDS** [1] - 3:16
**jinxed** [1] - 50:8
**Job** [1] - 104:22
**job** [66] - 4:9, 10:15, 17:1, 22:16, 24:10, 24:12, 26:12, 32:4, 36:21, 41:3, 43:1, 43:2, 46:14, 71:8, 71:9, 71:16, 73:20, 73:24, 74:4, 74:8, 83:12, 84:8, 84:9, 84:11, 84:12, 85:8, 85:10, 85:12, 85:14, 86:5, 86:12, 86:23, 86:25, 92:11, 92:12, 92:21, 95:9, 95:10, 95:22, 97:3, 97:6, 97:7, 98:2, 99:15, 100:7, 100:9, 101:17, 101:22, 104:21, 104:23, 104:24, 105:1, 111:4, 119:8, 139:25, 148:19, 151:16, 152:16, 152:17, 152:21, 152:22, 152:24, 153:21, 164:16, 165:24
**job-related** [1] - 32:4
**jobs** [15] - 6:9, 70:19, 79:16, 81:19, 97:19, 105:5, 109:5, 110:3, 115:6, 145:13, 149:14, 164:23, 165:25, 166:1, 171:16
**Jodi** [1] - 74:17
**Johannes** [6] - 141:6, 145:18, 176:12, 178:5, 178:9, 178:11
**John** [1] - 31:1
**join** [2] - 57:21, 100:24
**joined** [3] - 74:16, 92:23, 96:24
**Joining/Control** [1] - 143:3
**joins** [1] - 129:8
**journey** [2] - 90:9, 133:22
**JUDGE** [1] - 1:14
**Judge** [13] - 9:6, 36:18, 37:14, 42:8, 53:13, 71:17, 73:4, 80:18, 87:11, 87:18, 91:1, 128:11, 129:12
**judges** [3] - 5:6, 58:25, 69:17
**judgment** [2] - 38:23, 65:20
**judicial** [2] - 15:24, 59:14
**judiciary** [1] - 16:24
**jump** [1] - 55:1
**jumped** [1] - 125:20
**June** [4] - 81:11, 81:21, 95:12, 95:22
**juror** [50] - 8:12, 8:14, 8:16, 9:1, 10:18, 10:20, 10:25, 11:3, 11:16, 12:5, 13:20, 13:21, 14:10, 14:24, 20:9, 21:25, 23:1, 23:2, 23:23, 24:19, 25:22, 26:20, 27:12, 27:19, 29:11, 32:25, 33:2, 34:12, 39:22, 40:5, 43:5, 43:23, 44:10, 44:20, 44:24, 45:19, 45:20, 46:7, 46:8, 48:3, 48:8, 48:17, 53:5, 53:20, 64:22
**Juror** [1] - 40:7
**JUROR** [99] - 14:11, 14:13, 14:24, 15:1, 15:6, 20:7, 20:10, 20:13, 20:19, 21:1, 22:1, 22:3, 22:8, 22:11, 22:13, 22:15, 22:17, 22:19, 22:23, 23:3, 23:5, 23:10, 23:13, 23:16, 23:20, 23:23, 24:3, 24:6, 24:12, 24:17, 24:19, 24:23, 25:2, 25:5, 25:7, 25:10, 25:14, 25:16, 25:19, 25:22, 25:25, 26:4, 26:7, 26:10, 26:13, 26:17, 26:20, 26:24, 27:2, 27:4, 27:7, 27:10, 27:16, 27:19, 27:21, 28:1, 28:4, 28:10, 28:17, 28:20, 28:24, 29:3, 29:6, 29:8, 29:14, 29:16, 29:19, 29:25, 30:6, 30:9, 30:13, 34:12, 34:17, 34:19, 34:25, 35:3,

35:5, 35:8, 35:11, 35:14, 35:21, 36:1, 36:4, 40:16, 41:6, 46:8, 46:11, 46:13, 46:18, 47:1, 47:3, 47:5, 47:7, 47:10, 47:14, 47:20, 47:23, 48:1, 48:4
**juror's** [4] - 5:13, 8:11, 10:15, 64:16
**jurors** [31] - 5:18, 6:23, 9:3, 9:14, 9:19, 9:21, 10:4, 17:3, 17:7, 17:10, 33:3, 33:9, 33:11, 43:23, 44:6, 45:18, 48:21, 49:7, 50:25, 54:6, 54:13, 62:22, 63:1, 63:12, 64:12, 67:11, 69:4, 122:11, 122:16, 179:19
**jury** [126] - 5:8, 5:9, 5:15, 5:24, 6:3, 6:17, 6:20, 6:25, 7:3, 7:6, 7:12, 7:22, 7:25, 8:15, 8:23, 9:20, 10:9, 11:8, 11:20, 12:16, 12:20, 12:23, 12:25, 13:2, 13:14, 13:15, 13:24, 14:4, 14:9, 15:10, 15:14, 15:19, 15:23, 17:20, 18:11, 18:13, 27:24, 27:25, 32:19, 33:6, 36:15, 36:16, 40:10, 40:11, 44:5, 45:25, 46:22, 46:23, 49:2, 49:4, 49:10, 50:3, 52:25, 54:4, 54:10, 54:12, 55:11, 56:6, 56:12, 58:4, 58:10, 58:13, 58:14, 63:1, 64:18, 64:21, 65:2, 65:20, 66:1, 66:3, 67:18, 67:24, 68:2, 68:6, 69:14, 76:14, 76:15, 76:21, 77:2, 78:3, 90:22, 91:17, 92:11, 94:23, 95:10, 95:24, 97:1, 97:5, 98:13, 100:21, 102:12, 105:8, 107:1, 107:20, 108:3, 110:5, 110:25, 114:5, 114:17, 116:15, 116:16, 117:1, 119:22, 120:12, 121:17, 121:25, 122:4, 122:9, 127:11, 127:25, 128:2, 130:5, 135:21, 148:14, 151:9, 158:6, 158:8, 159:23, 160:3, 168:8, 169:9, 174:3, 178:25, 179:3, 179:21
**JURY** [1] - 1:14
**jury's** [1] - 67:20
**justice** [3] - 6:16, 69:17, 91:6

**K**

**Kathleen** [3] - 177:15, 177:22, 177:25
**Kathy** [1] - 31:6
**keep** [12] - 10:18, 20:23, 24:15, 29:12, 44:2, 49:20, 53:21, 60:22, 67:13, 70:10, 72:15, 78:22
**keeping** [1] - 55:15
**Keiser** [1] - 31:6
**KEISER** [1] - 31:7
**Keith** [3] - 112:17, 114:9, 114:24
**Keller** [1] - 47:3
**keller** [1] - 47:4
**KELLY** [3] - 1:3, 3:5, 91:12
**kelly** [1] - 170:21
**Kelly** [37] - 17:24, 19:12, 21:14, 21:18, 31:1, 61:10, 70:9, 70:11, 70:12, 70:18, 70:24, 71:2, 71:7, 71:16, 72:6, 72:25, 73:8, 73:9, 73:23, 91:9, 91:18, 91:19, 104:19, 122:25, 130:10, 135:19, 137:3, 148:14, 154:23, 165:17, 167:17, 167:23, 168:4, 170:14, 170:18, 171:2
**Kelly's** [3] - 71:5, 71:6, 72:23
**key** [2] - 138:1, 170:15
**kind** [12] - 29:25, 38:13, 41:17, 44:13, 85:18, 92:4, 95:25, 104:3, 119:17, 135:21, 161:2, 173:15
**kinds** [2] - 60:16, 60:23
**knowing** [1] - 169:17
**knowledge** [5] - 18:13, 44:5, 115:4, 116:21, 155:11
**known** [8] - 47:16, 62:5, 64:7, 80:6, 82:12, 101:22, 141:5, 151:17
**knows** [8] - 46:4, 74:22, 118:7, 119:2, 119:6, 132:15, 166:24, 170:14
**Knudt** [3] - 176:10, 176:15, 176:25
**Kurek** [1] - 139:11
**KUREK** [1] - 139:11
**Kurt** [6] - 19:19, 20:2, 41:13, 43:10, 75:5, 88:12
**KURT** [1] - 1:21

**L**

**L-e-a-r** [1] - 26:24
**lab** [3] - 43:5, 43:11, 44:24
**label** [2] - 10:17, 10:18
**labor** [1] - 75:25
**labs** [4] - 24:21, 25:2, 25:10, 25:12
**ladder** [1] - 151:13
**ladders** [1] - 151:12
**ladies** [9] - 5:3, 19:4, 19:11, 51:19, 52:24, 54:8, 73:15, 86:6, 122:1
**Ladies** [1] - 73:16
**lady** [3] - 41:11, 42:24, 44:25
**Lake** [1] - 101:8
**land** [1] - 140:3
**language** [5] - 12:22, 44:15, 135:21, 137:15, 146:10
**laptops** [1] - 63:23
**large** [1] - 177:2
**largest** [1] - 82:24
**last** [24] - 24:7, 26:8, 28:6, 30:21, 38:6, 86:10, 88:9, 99:15, 101:17, 102:4, 103:25, 105:1, 110:17, 133:17, 139:9, 139:21, 153:11, 159:14, 166:9, 166:11, 166:14, 170:18, 170:24, 171:14
**late** [1] - 83:15
**lateral** [2] - 98:1, 102:7
**Launch** [1] - 143:3
**launch** [1] - 143:9
**law** [25] - 10:14, 11:19, 18:8, 19:2, 19:3, 19:5, 19:20, 19:23, 19:25, 20:2, 21:7, 32:13, 32:15, 32:21, 35:19, 44:2, 59:2, 59:3, 61:16, 61:19, 61:24, 68:25, 160:18
**laws** [1] - 61:15
**lawsuit** [3] - 30:5, 31:24, 72:19
**lawsuits** [1] - 34:21
**lawyer** [4] - 29:9, 66:19, 66:20, 66:21
**lawyers** [20] - 5:21, 6:2, 8:9, 9:14, 9:16, 16:19, 19:7, 30:10, 48:19, 49:6, 49:18, 50:1, 50:21, 54:1, 55:19, 59:11, 59:22, 59:23, 67:19, 68:7
**lawyers'** [1] - 70:3
**lay** [5] - 116:2, 119:1, 119:4, 119:8, 122:25
**lead** [11] - 81:5, 101:1, 107:3, 107:4, 132:6, 144:18, 144:19, 144:25, 145:5, 145:6, 171:6
**Leader** [1] - 164:10
**leader** [7] - 136:15, 136:16, 145:2, 167:24, 171:6, 175:4
**leaders** [2] - 96:3, 144:23
**leadership** [26] - 97:8, 97:11, 98:11, 105:17, 108:4, 132:4, 141:23, 143:24, 144:16, 144:19, 144:21, 145:6, 145:14, 147:18, 151:6, 151:12, 151:24, 152:1, 152:3, 164:3, 165:22, 166:17, 169:15, 169:18, 171:3, 172:10
**leading** [3] - 101:14, 120:6, 164:6
**leads** [3] - 62:8, 132:18, 137:13
**leans** [2] - 41:24
**Lear** [3] - 26:21, 26:23, 26:24
**learn** [3] - 10:12, 85:3, 85:11
**learned** [2] - 7:20, 16:22
**least** [2] - 12:17, 18:18
**leave** [25] - 6:9, 9:22, 10:21, 11:23, 17:7, 24:10, 36:20, 45:19, 45:21, 47:22, 48:8, 48:9, 48:18, 53:18, 66:3, 66:7, 71:2, 71:8, 71:9, 71:16, 73:25, 74:7, 78:13, 80:13, 179:8
**leaving** [3] - 85:8, 85:15, 85:23
**led** [5] - 107:6, 107:16, 132:20, 132:23, 175:3
**left** [19] - 24:12, 36:21, 40:15, 43:1, 51:22, 52:25, 56:7, 65:6, 86:16, 86:17, 86:23, 88:1, 133:22, 138:2, 141:4, 145:17, 146:8, 151:12, 152:2
**left-hand** [1] - 152:2
**legacy** [1] - 76:6
**legal** [8] - 21:9, 21:10, 33:24, 37:11, 74:8, 74:23, 87:2, 122:3
**legals** [1] - 119:20
**legislative** [1] - 15:24
**legs** [1] - 49:13
**length** [1] - 5:25
**lenient** [1] - 120:5
**letters** [3] - 108:21, 138:9, 145:16
**level** [87] - 79:24, 81:8, 81:15, 96:10, 96:12, 97:3, 98:10, 98:12, 99:24, 102:9, 102:10, 105:14, 109:17, 111:7, 111:12, 111:15, 111:19, 111:22, 111:25, 112:1, 112:4, 112:8, 112:9, 112:10, 112:14, 112:15, 113:24, 114:13, 114:15, 114:16, 116:4, 116:19, 117:10, 117:12, 117:13, 117:15, 117:22, 118:6, 118:10, 125:14, 126:13, 131:2, 131:4, 131:25, 132:1, 132:21, 147:4, 147:12, 147:13, 147:14, 147:18, 148:2, 149:15, 149:19, 150:4,

150:18, 150:22, 150:23, 151:4, 151:12, 151:14, 151:16, 151:17, 151:24, 151:25, 152:1, 152:3, 152:4, 152:14, 152:16, 152:21, 153:25, 154:3, 154:7, 154:8, 154:14, 155:2, 155:5, 155:7, 155:12, 163:8, 163:12, 172:17
**levels** [46] - 72:1, 102:11, 105:13, 111:3, 111:8, 111:9, 112:13, 112:16, 115:18, 115:21, 115:25, 116:5, 116:8, 116:9, 116:21, 116:25, 117:19, 118:1, 118:11, 118:14, 119:6, 119:12, 119:19, 119:20, 125:11, 125:12, 130:24, 130:25, 131:5, 131:17, 132:2, 132:4, 132:5, 132:7, 132:19, 149:12, 150:16, 151:23, 152:6, 152:20, 153:16, 153:22, 153:23, 155:3
**Lewis** [2] - 19:15, 20:1
**LEWIS** [1] - 2:3
**liable** [1] - 61:22
**life** [1] - 39:25
**light** [1] - 62:7
**likely** [1] - 62:9
**limine** [2] - 126:3, 128:7
**limit** [1] - 117:17
**limited** [3] - 60:6, 63:18, 126:19
**line** [11] - 23:17, 26:13, 40:23, 40:24, 59:25, 126:1, 138:18, 139:9, 141:22, 145:2, 172:10
**LinkedIn** [2] - 33:16, 64:8
**list** [12] - 17:10, 30:24, 48:20, 49:6, 49:11, 49:25, 50:2, 50:18, 51:10, 59:19, 139:10, 142:8
**listed** [2] - 95:10, 124:19
**listen** [15] - 8:10, 8:23, 11:25, 15:11, 63:5, 65:15, 69:25, 87:15, 88:15, 88:23, 89:9, 89:19, 89:24, 90:10, 90:12
**listening** [1] - 65:11
**lists** [1] - 6:23
**live** [10] - 20:12, 49:23, 56:22, 72:25, 91:20, 92:18, 93:1, 93:2, 94:2, 94:4
**lived** [2] - 42:12, 92:23
**livelihood** [2] - 37:25, 43:17
**lives** [4] - 6:1, 93:8, 93:13, 93:14
**LL** [1] - 151:7
**LLC** [3] - 1:9, 2:2, 18:3
**LLP** [2] - 1:21, 20:3
**lobby** [1] - 50:23
**local** [6] - 16:1, 156:4, 161:24, 170:23, 177:6, 177:8
**located** [8] - 106:1, 106:3, 107:15, 136:17, 140:20, 141:9, 147:2, 147:10
**location** [2] - 101:8, 101:9
**locations** [5] - 100:24, 101:1, 106:21, 135:2, 141:1
**long-time** [1] - 94:7
**look** [13] - 9:17, 49:19, 50:1, 81:15, 82:10, 88:22, 122:21, 131:23, 142:10, 153:18, 162:20, 162:21, 166:3
**looked** [6] - 103:12, 112:9, 137:21, 149:13, 149:25, 155:24
**looking** [8] - 50:17, 79:21, 88:19, 90:4, 110:21, 112:8, 137:3, 152:1
**looks** [1] - 98:15
**loud** [1] - 12:8
**loudly** [3] - 9:4, 9:8, 12:5
**lower** [2] - 40:20, 159:3
**lunch** [7] - 11:3, 54:15, 55:10, 55:17, 56:5, 56:10, 66:3


**M**


**ma'am** [14] - 14:23, 14:25, 15:7, 21:25, 25:21, 26:19, 34:11, 40:12, 46:7, 46:9, 129:25, 138:3, 178:6
**machine** [1] - 49:22
**mad** [1] - 85:18
**madame** [8] - 138:13, 138:19, 138:24, 139:10, 139:21, 141:7, 142:7, 176:14
**Madame** [5] - 49:1, 51:18, 53:2, 54:5, 58:20
**Madewell** [2] - 85:11, 85:12
**mailed** [1] - 16:9
**main** [1] - 111:21
**MAIN** [1] - 2:4
**maintain** [1] - 10:25
**major** [1] - 144:15
**majority** [1] - 147:20
**malfunction** [1] - 51:8
**Mallory** [2] - 19:25, 74:16
**man** [1] - 76:23
**manage** [1] - 169:25
**managed** [4] - 100:13, 102:14, 138:16, 138:21
**Management** [4] - 94:14, 101:19, 105:10, 114:10
**management** [38] - 21:20, 22:18, 23:14, 23:15, 25:6, 25:9, 25:11, 27:6, 37:23, 39:11, 44:23, 74:2, 81:15, 92:5, 109:17, 110:3, 111:9, 113:15, 114:15, 114:16, 114:25, 115:7, 117:10, 117:13, 130:24, 138:22, 138:23, 139:15, 139:16, 140:2, 143:21, 158:22, 167:15, 169:7, 170:22, 172:14, 172:16, 173:4
**management-type** [1] - 139:16
**manager** [8] - 25:12, 37:7, 37:22, 40:23, 43:17, 93:19, 163:16, 172:12
**Manager** [23] - 61:11, 70:22, 79:25, 80:1, 80:3, 81:8, 84:2, 97:15, 98:5, 98:8, 98:10, 98:12, 98:14, 99:14, 99:16, 99:21, 99:22, 100:10, 101:17, 101:23, 102:6, 102:8, 104:25
**managerial** [1] - 31:25
**managers** [3] - 80:11, 115:10, 115:15
**Managers** [3] - 81:3, 84:21, 137:7
**Managing** [1] - 114:8
**mand** [1] - 15:12
**manufacture** [1] - 74:20
**manufacturers** [1] - 27:1
**MANUFACTURING** [2] - 1:9, 2:2
**Manufacturing** [45] - 18:2, 19:18, 19:24, 31:2, 31:7, 31:8, 31:9, 36:17, 73:25, 74:9, 74:11, 74:16, 74:21, 74:23, 74:25, 75:3, 75:7, 75:9, 75:11, 75:13, 79:8, 79:13, 79:22, 80:12, 80:13, 81:1, 81:8, 81:11, 82:2, 82:22, 83:6, 83:13, 84:8, 84:13, 84:16, 85:9, 86:9, 86:19, 87:4, 87:23, 88:6, 89:11, 92:22, 161:6, 170:4
**manufacturing** [6] - 24:25, 31:3, 75:17, 101:7, 107:7, 109:1
**March** [3] - 83:3, 156:6, 173:12
**Marine** [1] - 15:17
**marked** [8] - 104:12, 107:19, 110:4, 113:17, 123:13, 141:12, 148:8, 173:6
**marketing** [2] - 101:9, 106:13
**marriage** [1] - 21:13
**Martin** [1] - 24:23
**masters** [1] - 35:22
**material** [1] - 143:17
**materials** [3] - 63:19, 143:13, 143:14
**matter** [9] - 9:13, 21:9, 21:10, 44:5, 46:15, 56:18, 67:19, 89:17, 180:12
**matters** [9] - 11:5, 33:21, 33:24, 60:21, 63:16, 66:15, 71:25, 72:12, 122:6
**MAU** [1] - 167:22
**MC** [19] - 3:18, 3:20, 18:3, 42:4, 48:24, 53:13, 57:8, 57:21, 74:25, 89:12, 89:19, 89:25, 90:24, 101:6, 101:11, 106:8, 120:9, 132:24, 133:6
**McAlister** [1] - 49:14
**MCCOY** [16] - 2:3, 17:6, 19:14, 36:11, 36:17, 42:3, 48:24, 56:2, 57:7, 58:8, 73:15, 77:10, 77:20, 77:23, 78:7, 79:6
**McCoy** [8] - 3:3, 19:14, 19:25, 36:17, 90:10, 90:12, 115:5, 157:5
**McCraw** [18] - 19:17, 31:2, 57:7, 57:10, 71:15, 74:13, 74:14, 82:12, 82:16, 82:17, 82:19, 82:20, 83:4, 83:16, 83:21, 172:18, 173:1
**MCDUFFIE** [1] - 2:7
**mean** [23] - 21:8, 24:9, 49:18, 57:16, 98:8, 98:9, 99:5, 116:4, 117:7, 120:20, 131:20, 131:22, 134:3, 138:15, 142:20, 142:24, 144:3, 146:18, 156:24, 157:11, 174:10, 177:11, 177:12
**meaning** [3] - 151:13, 151:14, 157:9
**means** [13] - 16:2, 61:1, 62:6, 63:14, 63:18, 100:21, 114:18, 142:25, 144:23, 144:25, 168:1, 168:2, 174:11
**meant** [2] - 36:19, 168:14
**media** [3] - 33:15, 34:4, 64:9
**mediation** [2] - 30:8, 30:12
**Medical** [5] - 34:25, 35:2, 35:3, 35:6, 101:19

**Medley** [9] - 31:8, 81:4, 81:9, 83:19, 84:2, 84:19, 112:18, 114:10, 114:24
**meet** [3] - 57:16, 62:14, 86:1
**meeting** [5] - 30:7, 84:25, 85:4, 85:7, 169:18
**meetings** [3] - 35:25, 84:20, 159:8
**meets** [2] - 164:3, 165:23
**melt** [1] - 15:2
**member** [21] - 12:16, 12:20, 12:23, 13:2, 15:14, 15:19, 15:20, 15:23, 18:11, 18:12, 21:6, 21:8, 21:16, 21:19, 31:17, 31:21, 32:3, 32:8, 94:7, 94:10, 142:3
**Member** [1] - 138:7
**members** [11] - 14:6, 33:5, 53:10, 54:12, 58:14, 64:17, 65:2, 65:20, 103:20, 140:19, 179:3
**mental** [1] - 12:24
**mention** [4] - 7:16, 26:22, 80:4, 128:10
**mentioned** [6] - 6:21, 16:8, 64:10, 82:7, 137:11, 154:12
**merely** [2] - 8:17, 129:4
**messaging** [2] - 33:14, 64:5
**met** [5] - 22:4, 30:10, 70:8, 83:6, 86:2
**metal** [2] - 49:22, 143:13
**Michelle** [1] - 114:9
**microphone** [3] - 9:7, 12:5, 20:6
**microphones** [1] - 50:11
**Microscope** [1] - 24:23
**middle** [3] - 179:23, 179:24
**might** [12] - 9:25, 11:13, 17:14, 34:2, 36:19, 38:22, 46:4, 55:5, 64:18, 86:21, 89:2, 165:1
**Miller** [1] - 31:5
**million** [1] - 79:14
**mind** [10] - 8:21, 10:11, 49:20, 55:15, 60:22, 62:21, 67:13, 69:25, 87:15, 87:16
**minded** [5] - 7:2, 7:13, 17:19, 91:2, 91:3
**mindful** [3] - 17:18, 54:20, 69:14
**mine** [4] - 20:8, 27:19, 69:20, 88:11
**minus** [1] - 133:23
**minute** [3] - 49:17, 171:22, 178:22
**minutes** [8] - 49:12, 49:15, 49:19, 50:15, 50:16, 51:3, 55:5, 75:6
**mirrors** [1] - 140:17
**misleading** [1] - 76:25
**mispronounce** [1] - 17:23
**miss** [1] - 14:16
**mistrial** [1] - 64:24
**MN** [1] - 134:25
**model** [1] - 171:2
**models** [2] - 108:15, 109:2
**molded** [1] - 143:16
**molds** [1] - 143:19
**moment** [1] - 11:12
**momentarily** [1] - 15:8
**moments** [1] - 7:4
**Monday** [1] - 158:12
**money** [1] - 173:19
**month** [1] - 144:6
**months** [4] - 144:7, 144:9, 144:20, 164:21
**Moody** [3] - 19:16, 19:25, 74:12
**MOODY** [23] - 2:2, 29:23, 30:3, 42:8, 51:15, 52:5, 52:11, 52:17, 52:21, 53:13, 78:14, 79:1, 95:2, 107:22, 112:22, 113:19, 120:2, 125:22, 126:10, 128:10, 128:15, 129:12, 156:12
**morning** [9] - 5:3, 5:4, 10:17, 19:10, 19:14, 54:19, 179:9, 179:17, 180:2
**Morris** [1] - 31:5
**most** [6] - 6:3, 6:18, 49:3, 75:12, 90:16, 144:7
**mostly** [3] - 20:19, 25:2, 161:25
**mother** [6] - 15:1, 19:2, 23:5, 23:15, 23:16, 42:23
**mother-in-law** [1] - 19:2
**motion** [4] - 58:1, 126:2, 126:21, 128:6
**motions** [1] - 128:7
**Motoren** [2] - 17:25, 18:20
**MOTOREN** [2] - 1:6, 1:20
**Motors** [1] - 31:4
**mouth** [1] - 73:11
**move** [14] - 37:19, 38:1, 43:9, 78:25, 83:4, 83:25, 86:24, 90:14, 98:1, 99:21, 99:25, 101:24, 102:6, 164:20
**moved** [7] - 20:13, 70:18, 84:14, 90:18, 92:17, 99:11, 123:2
**movement** [2] - 81:17, 123:8
**moves** [1] - 56:17
**moving** [9] - 77:23, 78:2, 78:10, 78:12, 81:23, 84:19, 85:2, 85:5, 150:23
**MR** [199] - 17:4, 17:5, 17:6, 18:20, 19:10, 19:14, 19:19, 27:11, 29:22, 29:23, 30:3, 30:4, 30:8, 30:12, 30:17, 36:9, 36:11, 36:17, 36:22, 37:1, 37:14, 37:18, 38:2, 38:11, 39:2, 39:4, 39:23, 41:13, 41:20, 42:3, 42:8, 42:16, 43:3, 43:8, 43:10, 43:16, 43:20, 43:21, 48:9, 48:22, 48:24, 48:25, 51:13, 51:15, 51:17, 52:2, 52:5, 52:8, 52:11, 52:14, 52:17, 52:21, 52:22, 53:11, 53:13, 53:14, 56:1, 56:2, 56:3, 56:16, 57:1, 57:7, 57:21, 57:25, 58:6, 58:8, 58:9, 70:7, 73:15, 76:10, 76:17, 77:10, 77:17, 77:20, 77:22, 77:23, 78:3, 78:7, 78:14, 78:18, 79:1, 79:6, 88:8, 91:9, 91:15, 94:25, 95:2, 95:5, 104:10, 104:18, 107:22, 107:24, 108:2, 110:11, 110:16, 112:20, 112:22, 113:2, 113:14, 113:19, 113:22, 115:19, 115:21, 115:22, 115:23, 115:24, 116:4, 116:7, 116:12, 116:17, 117:4, 117:17, 117:21, 117:24, 118:1, 118:3, 118:13, 118:19, 118:22, 118:23, 118:24, 119:4, 119:7, 119:9, 119:15, 119:25, 120:2, 120:14, 120:17, 120:18, 120:19, 120:24, 121:2, 121:4, 121:5, 121:9, 121:10, 121:11, 121:22, 121:23, 122:10, 122:24, 125:16, 125:19, 125:22, 126:8, 126:10, 126:11, 128:10, 128:15, 129:8, 129:12, 129:15, 129:23, 130:7, 130:9, 132:8, 132:10, 132:17, 133:11, 133:16, 135:9, 135:13, 135:16, 135:18, 136:19, 137:2, 141:11, 141:17, 145:24, 146:3, 146:5, 148:7, 148:13, 149:25, 150:3, 150:10, 151:2, 153:2, 153:10, 154:16, 154:22, 156:11, 156:12, 156:13, 156:15, 156:18, 156:20, 157:15, 157:21, 162:23, 163:3, 165:12, 165:16, 166:8, 168:19, 168:22, 173:5, 173:10
**Munich** [2] - 106:2, 131:12
**Murphy** [21] - 3:2, 3:6, 19:5, 19:6, 19:11, 19:23, 37:18, 43:13, 56:14, 57:24, 70:6, 70:9, 79:21, 80:4, 89:5, 91:8, 120:6, 122:22, 130:6, 180:2
**MURPHY** [119] - 1:17, 1:17, 17:4, 19:10, 30:4, 30:8, 30:12, 30:17, 36:9, 36:22, 37:18, 39:2, 39:4, 41:20, 42:16, 43:8, 43:16, 43:21, 48:9, 48:22, 51:13, 52:2, 52:8, 52:14, 52:22, 53:11, 56:1, 56:16, 57:1, 57:25, 58:6, 70:7, 76:10, 76:17, 77:17, 77:22, 78:3, 78:18, 91:9, 91:15, 94:25, 95:5, 104:10, 104:18, 107:24, 108:2, 110:11, 110:16, 112:20, 113:2, 113:14, 113:22, 115:21, 115:23, 116:4, 116:7, 117:4, 117:21, 118:1, 118:13, 118:22, 118:24, 119:4, 119:7, 119:25, 120:14, 120:18, 120:24, 121:4, 121:9, 121:11, 121:23, 122:24, 125:16, 126:8, 126:11, 129:15, 129:23, 130:7, 130:9, 132:10, 132:17, 133:11, 133:16, 135:9, 135:13, 135:16, 135:18, 136:19, 137:2, 141:11, 141:17, 145:24, 146:3, 146:5, 148:7, 148:13, 149:25, 150:3, 150:10, 151:2, 153:2, 153:10, 154:16, 154:22, 156:15, 156:18, 156:20, 157:15, 157:21, 162:23, 163:3, 165:12, 165:16, 166:3, 166:8, 168:22, 173:5, 173:10
**must** [25] - 8:20, 9:15, 10:5, 14:3, 32:11, 34:1, 34:4, 59:2, 59:14, 59:18, 60:6, 60:9, 60:11, 61:2, 62:7, 62:14, 63:7, 63:12, 63:15, 63:24, 65:21, 69:2, 69:6, 86:7, 87:6

**N**

**name** [28] - 5:6,

18:17, 24:4, 24:22, 26:1, 26:6, 28:9, 74:23, 76:4, 76:6, 76:19, 77:6, 78:5, 78:11, 81:4, 83:7, 88:12, 91:17, 93:22, 99:8, 106:4, 106:6, 108:7, 126:18, 137:24, 138:15, 138:24, 139:21
**named** [3] - 76:23, 77:7, 172:18
**names** [12] - 17:23, 31:15, 31:19, 49:6, 49:11, 50:7, 51:10, 65:23, 103:10, 106:16, 113:16, 137:22
**national** [12] - 18:7, 38:21, 61:13, 61:18, 87:5, 87:25, 105:11, 119:17, 120:11, 127:3, 127:10, 127:18
**nationality** [2] - 71:11, 71:13
**nationals** [1] - 130:18
**nature** [1] - 47:12
**Navy** [1] - 15:17
**NC** [1] - 107:18
**Neal** [1] - 31:8
**near** [3] - 20:12, 42:12, 75:18
**nearly** [1] - 89:11
**necessary** [3] - 66:19, 67:17, 69:11
**need** [28] - 8:25, 9:3, 10:9, 10:10, 11:14, 12:7, 14:19, 16:11, 28:4, 30:20, 42:17, 49:18, 53:21, 54:1, 55:2, 55:22, 73:1, 75:25, 98:21, 116:2, 119:1, 119:3, 119:5, 120:12, 122:20, 124:8, 126:4, 179:7
**needed** [5] - 26:22, 143:14, 145:7, 176:25, 177:2
**needs** [6] - 9:5, 54:22, 71:2, 93:18, 117:11, 148:19
**negative** [2] - 32:5, 134:3
**neighbor** [2] - 20:7, 42:12
**neighborhood** [2] - 20:17, 20:20
**neighbors** [1] - 20:15
**network** [3] - 3:12, 75:10, 142:1
**networking** [1] - 64:6
**never** [7] - 69:7, 86:15, 89:12, 89:13, 118:22, 119:16
**New** [4] - 3:11, 101:8, 106:13, 135:6
**new** [19] - 3:24, 4:13, 82:5, 82:10, 84:8, 84:9, 84:11, 85:24, 142:25, 143:1, 143:6, 146:23, 148:5, 149:1, 161:12, 161:22, 170:16
**news** [4] - 63:3, 63:5, 63:6, 72:24
**newspaper** [1] - 63:4
**next** [30] - 5:23, 53:25, 68:19, 69:10, 74:13, 96:16, 97:14, 97:15, 98:24, 99:24, 103:6, 106:22, 131:25, 136:21, 138:11, 138:14, 141:11, 143:2, 143:20, 144:15, 144:18, 145:5, 145:6, 158:11, 163:20, 164:18, 164:21, 165:11, 170:18, 177:21
**Nicholas** [1] - 31:5
**Nicole** [2] - 138:25, 139:11
**night** [1] - 96:6
**nine** [6] - 14:13, 54:18, 179:9, 179:12, 179:17
**nine-year-old** [1] - 14:13
**nineties** [1] - 23:7
**NO** [1] - 1:3
**noise** [1] - 87:21
**nomenclature** [1] - 108:6
**non** [4] - 134:15, 134:18, 134:21, 142:14
**non-highlighted** [1] - 142:14
**none** [3] - 73:20, 86:18, 155:13
**normally** [2] - 7:19, 126:16
**North** [4] - 93:14, 101:1, 101:5, 135:5
**note** [4] - 39:9, 58:20, 65:10, 65:23
**noted** [1] - 30:23
**notes** [18] - 9:17, 65:3, 65:6, 65:8, 65:9, 65:12, 65:14, 65:17, 65:22, 65:24, 65:25, 66:2, 66:4, 66:6, 127:4, 180:11
**nothing** [13] - 48:22, 48:24, 48:25, 53:11, 53:13, 53:14, 56:3, 58:6, 58:8, 58:9, 59:3, 76:25, 180:4
**notice** [3] - 41:2, 59:14, 165:1
**noticed** [1] - 76:3
**notified** [1] - 83:11
**noting** [1] - 128:7
**number** [72] - 9:1, 10:18, 10:20, 10:25, 12:5, 14:10, 14:11, 14:23, 14:24, 18:4, 20:9, 21:25, 23:2, 23:3, 25:21, 27:12, 27:19, 34:12, 37:3, 37:6, 37:19, 37:23, 38:11, 38:16, 38:20, 39:4, 39:13, 40:5, 42:23, 44:10, 44:20, 45:19, 45:20, 45:21, 46:7, 48:17, 50:6, 51:22, 52:5, 52:8, 52:11, 52:14, 52:17, 52:24, 53:5, 53:7, 89:19, 108:21, 110:5, 124:18, 133:14, 133:17, 136:21, 137:24, 138:13, 138:19, 138:24, 139:21, 141:7, 141:12, 145:25, 149:22, 151:9, 154:6, 161:18, 168:1, 168:2, 176:13, 178:6
**Number** [5] - 42:20, 42:25, 43:9, 44:22, 52:2
**numbers** [4] - 52:19, 52:20, 53:20
**numerals** [1] - 111:10
**nursing** [1] - 93:21
**nutshell** [2] - 73:7, 152:12

**O**

**o'clock** [5] - 54:18, 54:19, 55:3, 56:9, 179:9
**oak** [1] - 172:15
**oath** [5] - 5:13, 7:10, 17:17, 54:6, 69:15
**objected** [1] - 125:21
**objecting** [1] - 78:8
**objection** [62] - 36:24, 42:19, 42:21, 43:3, 43:4, 43:7, 43:18, 43:20, 43:21, 48:7, 59:24, 60:2, 60:3, 95:1, 104:13, 104:16, 107:21, 110:12, 110:13, 112:21, 112:22, 113:17, 113:19, 115:19, 118:3, 120:14, 120:15, 120:19, 125:17, 125:21, 126:8, 129:5, 129:8, 132:8, 132:14, 133:12, 133:13, 135:11, 135:15, 136:22, 136:24, 141:13, 141:14, 146:1, 148:9, 148:11, 153:6, 153:8, 154:18, 154:20, 156:11, 156:12, 157:17, 157:19, 162:24, 163:1, 165:13, 165:14, 166:5, 168:19, 173:6, 173:8
**objections** [4] - 59:22, 121:21, 126:2, 146:2
**obligation** [1] - 59:23
**obtain** [1] - 63:21
**obtained** [3] - 29:9, 85:12, 105:19
**obtaining** [1] - 85:10
**obvious** [1] - 10:22
**obviously** [4] - 64:17, 67:24, 125:19, 180:1
**occasion** [1] - 43:12
**occasionally** [1] - 67:17
**Occupation** [1] - 114:10
**occupies** [1] - 111:19
**occur** [3] - 10:7, 80:21, 176:7
**occurred** [4] - 46:17, 86:15, 128:11
**occurs** [1] - 132:4
**OF** [3] - 1:1, 180:7, 180:9
**OFCC** [1] - 160:16
**OFCCP** [4] - 159:18, 159:21, 160:4, 160:7
**offended** [2] - 50:24, 67:7
**offered** [22] - 59:25, 68:17, 94:25, 103:5, 104:13, 110:11, 112:21, 113:17, 135:11, 136:22, 141:13, 146:1, 148:9, 153:6, 154:17, 157:16, 161:1, 161:5, 162:23, 165:13, 166:4, 173:6
**offers** [1] - 105:12
**office** [7] - 11:4, 16:3, 16:4, 49:24, 51:9, 53:23, 159:19
**officer** [2] - 15:23, 180:3
**Officer** [4] - 12:4, 12:9, 56:7, 82:22
**Officers** [1] - 66:6
**official** [1] - 16:2
**OFK** [9] - 114:16, 114:17, 114:18, 114:19, 115:3, 131:3, 131:7, 131:10, 131:16
**OFKs** [1] - 132:3
**often** [6] - 25:15, 61:17, 67:22, 115:15, 115:17, 161:7
**Ohio** [2] - 101:10, 106:14
**old** [5] - 14:13, 15:2, 15:5, 22:14, 75:16
**older** [1] - 93:13
**oldest** [1] - 93:17
**on-site** [3] - 77:15, 103:18, 143:19
**on-the-record** [1] - 45:9
**once** [4] - 18:18, 72:5, 73:2, 88:4
**One** [1] - 94:11
**one** [84] - 5:6, 6:3, 6:16, 6:17, 12:1, 13:6, 16:24, 27:18, 36:12, 37:5, 37:6, 37:13, 37:14, 39:2, 39:4, 40:4, 40:13, 41:24, 42:17, 44:21, 45:6, 45:20, 45:21, 52:8, 52:19, 55:11, 56:22, 71:9, 71:10, 71:11, 75:23, 76:25, 77:13, 78:14, 80:10, 81:3, 82:4, 86:2, 86:6, 88:9, 89:22, 96:23, 99:22, 99:23, 104:3, 105:18, 111:10, 111:15, 111:16, 111:22, 113:12, 113:23, 116:19, 117:22,

118:14, 120:2, 122:10, 125:14, 126:19, 128:10, 128:25, 129:15, 131:2, 131:5, 132:5, 132:19, 132:20, 138:2, 139:10, 143:2, 147:13, 148:20, 148:21, 149:15, 150:1, 155:1, 164:25, 170:12, 170:18, 172:17, 174:3, 174:25, 175:16, 178:16
**ones** [1] - 149:13
**ongoing** [1] - 63:24
**online** [1] - 146:23
**open** [15] - 7:13, 10:11, 17:19, 30:19, 45:13, 48:12, 67:13, 77:16, 79:4, 81:16, 91:2, 91:3, 103:19, 167:4, 179:2
**open-minded** [2] - 7:13, 17:19
**opening** [9] - 55:18, 55:19, 58:5, 68:15, 69:25, 89:5, 115:5, 157:5
**Opening** [3] - 3:2, 3:3, 3:4
**openings** [1] - 70:11
**operating** [1] - 32:6
**operation** [3] - 14:2, 69:20, 147:23
**operational/ administrative** [1] - 144:9
**Operations** [3] - 80:2, 99:14, 100:3
**operations** [1] - 100:1
**opinion** [4] - 37:11, 66:11, 66:16, 67:12
**opportunity** [5] - 9:17, 16:12, 53:16, 129:9, 129:13
**opposite** [1] - 62:11
**opposition** [1] - 127:4
**optional** [1] - 165:7
**orally** [1] - 7:20
**Orangeburg** [1] - 91:22
**orchards** [1] - 75:17
**order** [4] - 44:6, 51:24, 60:24, 83:3
**org** [5] - 111:21, 155:24, 156:4, 156:7, 157:2
**Org** [2] - 156:21, 156:22
**Organization** [5] - 3:10, 97:16, 98:14, 101:18, 103:6
**organization** [11] - 3:13, 3:19, 94:12, 101:4, 103:7, 103:8, 105:11, 105:22, 107:17, 108:5, 110:7
**organizational** [13] - 4:13, 86:13, 103:8, 110:9, 111:2, 140:25, 149:2, 152:11, 153:15, 155:14, 155:15, 155:18, 155:19
**Organizational** [2] - 3:17, 3:24
**organizations** [1] - 94:10
**organized** [1] - 104:2
**orientation** [2] - 47:17, 95:21
**origin** [9] - 18:8, 38:21, 61:14, 61:18, 87:5, 87:25, 119:17, 120:11, 127:18
**originally** [4] - 79:10, 91:21, 91:22, 96:24
**otherwise** [2] - 33:7, 64:18
**outcome** [1] - 174:15
**outline** [2] - 17:12, 68:16
**output** [1] - 154:24
**outside** [22] - 27:24, 36:15, 40:10, 46:22, 49:20, 56:11, 60:11, 63:8, 63:11, 67:5, 67:18, 73:24, 76:14, 81:23, 84:8, 87:20, 87:21, 101:11, 116:15, 122:8, 144:21, 179:20
**outweighed** [1] - 127:24
**Overall** [1] - 163:23
**overall** [3] - 164:13, 165:19, 166:15
**overhear** [1] - 67:25
**overriding** [2] - 7:11, 17:19
**overrule** [1] - 132:14
**overruled** [2] - 60:4, 168:20
**overview** [3] - 3:24, 4:13, 110:8
**overviews** [1] - 158:16
**own** [8] - 10:6, 65:14, 65:18, 73:10, 88:1, 88:2, 108:7, 120:3

**P**

**p.m** [2] - 55:11, 180:6
**PA** [2] - 139:22, 140:2
**PACE** [2] - 144:2, 144:4
**pace** [1] - 144:4
**pads** [2] - 58:20, 65:23
**page** [27] - 65:23, 65:24, 95:6, 98:25, 110:17, 110:23, 110:25, 123:25, 124:3, 133:17, 134:19, 137:20, 150:11, 151:8, 151:10, 152:8, 152:9, 153:11, 153:18, 153:19, 164:6, 164:9, 164:15, 164:18, 164:24, 167:6, 170:9
**paid** [2] - 89:13, 102:19
**pan** [1] - 143:15
**panel** [16] - 7:2, 7:6, 8:15, 8:22, 11:19, 12:16, 12:20, 12:23, 13:3, 15:14, 15:19, 15:23, 18:11, 18:13, 51:20, 53:10
**paper** [1] - 7:22
**paragraph** [3] - 152:19, 168:4, 168:5
**paralegal** [1] - 74:17
**pardon** [1] - 13:7
**parent** [4] - 75:3, 75:7, 88:14, 100:15
**parents** [2] - 18:24, 19:2
**park** [1] - 11:3
**parking** [1] - 6:14
**part** [13] - 7:3, 24:25, 35:19, 38:18, 75:9, 81:21, 83:1, 94:3, 94:5, 101:11, 101:13, 118:24, 119:8
**partial** [1] - 39:21
**participants** [1] - 69:16
**participate** [2] - 11:10, 11:24
**participation** [1] - 58:17
**particular** [1] - 69:18
**parties** [20] - 7:13, 8:4, 9:6, 12:11, 17:14, 17:21, 20:24, 24:16, 25:18, 26:16, 27:15, 29:12, 46:1, 46:5, 53:9, 62:11, 63:17, 67:6, 69:22, 129:17
**partly** [1] - 122:16
**partner** [2] - 168:12, 168:15
**partner's** [3] - 28:15, 39:25, 44:10
**partners** [4] - 19:1, 171:10, 171:12, 172:8
**parts** [1] - 169:16
**party** [13] - 28:9, 42:8, 45:5, 62:3, 62:6, 62:8, 62:12, 62:15, 68:17, 72:19, 89:7, 89:9, 126:17
**passing** [1] - 66:5
**past** [6] - 8:19, 12:19, 13:21, 55:2, 86:11, 179:24
**pastures** [1] - 88:3
**pathologist** [1] - 93:18
**patience** [1] - 73:12
**patient** [2] - 87:11, 87:15
**Paul** [2] - 114:12, 114:24
**pay** [10] - 65:8, 69:21, 72:5, 73:19, 80:17, 80:19, 86:7, 87:19, 90:24, 98:17
**paying** [1] - 98:23
**PC** [1] - 20:1
**peacetime** [1] - 90:20
**peach** [1] - 75:17
**peers** [3] - 11:9, 168:12, 170:22
**pending** [1] - 13:3
**pension** [3] - 174:5, 174:7, 174:16
**People** [1] - 164:10
**people** [46] - 8:5, 37:2, 43:12, 45:25, 49:12, 75:25, 76:2, 78:10, 78:11, 81:17, 81:18, 86:24, 95:19, 109:23, 112:16, 113:15, 114:3, 116:18, 117:18, 118:5, 118:16, 118:20, 120:21, 121:7, 121:12, 121:13, 130:11, 131:6, 132:2, 133:7, 134:22, 138:8, 140:5, 140:8, 143:20, 143:23, 147:23, 158:13, 158:18, 158:21, 160:12, 162:11, 164:25
**per** [4] - 133:23, 134:4, 154:3, 154:14
**percent** [2] - 16:25, 134:6
**percentage** [2] - 174:12, 174:25
**peremptory** [3] - 9:18, 39:6, 39:19
**perform** [1] - 14:4
**performance** [8] - 16:1, 71:8, 162:17, 164:2, 165:21, 166:16, 172:3, 173:22
**performer** [2] - 173:17, 173:18
**performing** [1] - 173:20
**period** [6] - 22:21, 24:1, 42:24, 43:1, 169:25, 175:22
**permitted** [3] - 33:3, 65:2, 67:8
**person** [13] - 16:2, 16:4, 41:18, 41:24, 71:10, 71:12, 85:13, 138:11, 139:3, 139:14, 139:25, 143:12, 168:10
**personal** [24] - 8:3, 11:14, 13:13, 33:20, 65:18, 72:1, 111:4, 111:13, 150:16, 150:18, 150:21, 151:22, 152:2, 152:5, 152:14, 152:17, 153:16, 153:22, 153:24, 154:2, 154:6, 154:13, 167:17, 171:8
**personally** [1] - 8:12
**Personnel** [1] - 138:6
**personnel** [13] - 11:4, 14:5, 99:2, 99:6, 99:9, 107:5, 110:8, 137:14, 138:21, 138:22, 139:4, 142:3, 165:8
**persons** [11] - 11:19, 11:20, 13:12, 13:15, 13:19, 13:21, 13:25, 14:1, 15:9
**perspective** [2] - 80:22, 88:22
**petit** [10] - 5:15,

13:20, 27:24, 27:25, 36:15, 36:16, 40:10, 40:11, 46:22, 46:23
**Petrasch** [36] - 3:11, 4:7, 4:8, 4:10, 31:3, 31:11, 80:24, 82:6, 83:2, 83:11, 83:13, 83:15, 83:20, 84:22, 84:23, 85:16, 85:21, 85:22, 109:22, 109:24, 112:10, 114:1, 114:6, 121:13, 137:4, 141:21, 148:17, 163:16, 163:24, 167:11, 168:14, 170:11, 171:22, 176:2, 178:12
**PETRASCH** [1] - 31:12
**pharmacy** [1] - 103:23
**philosophies** [1] - 98:19
**phrase** [1] - 142:23
**physical** [4] - 12:24, 103:22, 104:3, 104:5
**physicians** [1] - 103:22
**PI** [2] - 139:1, 139:4
**pick** [2] - 49:7, 50:7
**picked** [3] - 14:19, 44:13, 45:2
**picture** [2] - 88:19, 158:20
**pictures** [1] - 158:16
**pieces** [1] - 88:21
**place** [6] - 33:10, 46:25, 67:16, 83:22, 90:15, 116:22
**placed** [1] - 144:10
**plain** [3] - 99:5, 131:20, 135:21
**Plaintiff** [26] - 17:25, 18:5, 19:12, 21:14, 21:18, 32:23, 37:19, 48:22, 51:11, 51:20, 51:23, 52:1, 52:6, 52:12, 52:18, 53:11, 56:1, 56:17, 58:6, 61:23, 68:19, 68:22, 70:2, 73:23, 127:2
**plaintiff** [5] - 40:4, 61:10, 61:14, 91:9, 127:3
**PLAINTIFF** [2] - 1:4, 1:17
**PLAINTIFF'S** [1] - 4:2
**Plaintiff's** [35] - 18:9, 19:5, 19:22, 104:12, 110:5, 110:14, 112:21, 113:18, 114:22, 123:16, 124:18, 126:3, 127:16, 135:10, 135:13, 135:15, 136:21, 136:23, 141:12, 141:14, 145:25, 148:8, 148:10, 149:22, 153:5, 153:7, 154:5, 154:16, 155:22, 157:16, 162:21, 163:4, 165:12, 166:3, 173:7
**plaintiff's** [2] - 104:15, 107:19
**PLAINTIFFS** [1] - 3:8
**plan** [4] - 72:25, 81:5, 83:23, 84:20
**planned** [1] - 85:23
**planner** [1] - 146:16
**Planning** [4] - 97:24, 101:18, 103:11, 114:7
**planning** [14] - 80:6, 81:22, 82:8, 102:6, 103:12, 139:18, 143:8, 157:6, 157:7, 158:11, 159:7, 162:9
**plans** [2] - 84:17, 143:5
**plant** [42] - 22:9, 23:6, 27:9, 43:6, 44:23, 61:11, 74:21, 75:12, 75:13, 75:22, 75:23, 75:24, 77:12, 77:14, 79:10, 82:24, 96:4, 100:23, 101:7, 103:9, 103:10, 106:3, 115:7, 115:11, 115:16, 118:5, 120:22, 123:5, 128:21, 134:12, 134:13, 134:17, 135:1, 135:7, 141:24, 142:22, 143:19, 167:4, 167:5, 173:16, 173:20, 177:3
**Plant** [22] - 3:10, 106:5, 108:4, 125:10, 135:8, 135:24, 136:2, 141:3, 142:11, 143:7, 144:1, 144:13, 147:3, 150:17, 152:11, 153:17, 156:4, 160:5, 161:20, 167:22, 176:16, 177:12
**plants** [3] - 75:10, 75:12, 89:15
**platform** [1] - 81:12
**platforms** [1] - 33:15
**play** [3] - 54:23, 145:21, 148:1
**played** [1] - 77:12
**player** [1] - 170:15
**pleasant** [1] - 179:16
**PM** [2] - 138:18, 149:6
**pM** [2] - 138:21, 158:3
**point** [15] - 7:16, 10:20, 12:13, 37:3, 40:13, 55:21, 57:22, 74:22, 128:10, 150:4, 151:5, 155:4, 155:20, 157:3, 163:7
**pointed** [1] - 43:14
**pointing** [1] - 112:5
**points** [3] - 98:25, 127:5, 144:17
**police** [1] - 15:20
**policies** [3] - 96:5, 161:22, 161:24
**policy** [2] - 128:24, 152:20
**politicians** [1] - 78:12
**pool** [1] - 160:13
**popular** [1] - 170:6
**Port** [1] - 79:15
**Portfolio** [3] - 3:21, 3:22, 3:23
**portfolio** [10] - 162:18, 163:6, 163:10, 163:15, 165:18, 166:11, 166:14, 171:14, 172:12, 173:2
**portfolios** [2] - 163:19, 172:2
**portion** [1] - 56:22
**position** [52] - 40:25, 42:15, 55:6, 70:16, 70:21, 70:22, 70:24, 71:2, 71:4, 71:12, 74:1, 80:8, 81:9, 82:13, 84:1, 84:14, 86:11, 88:24, 96:7, 96:10, 96:12, 96:16, 96:18, 97:14, 97:15, 99:11, 99:13, 100:12, 102:1, 102:2, 102:4, 109:17, 109:18, 111:23, 118:19, 127:9, 139:3, 140:22, 141:4, 144:10, 145:13, 148:4, 148:22, 149:1, 158:2, 159:14, 159:16, 162:5, 171:23, 177:7
**positions** [37] - 70:19, 81:16, 90:19, 111:15, 111:19, 112:4, 112:12, 113:4, 114:5, 114:25, 117:11, 117:13, 117:15, 118:15, 119:13, 120:22, 131:14, 131:16, 134:11, 134:15, 134:18, 135:3, 143:21, 143:24, 144:11, 145:22, 147:17, 147:18, 147:22, 148:1, 148:5, 149:7, 151:13, 155:5, 155:8, 164:20
**possession** [2] - 10:25, 15:21
**possibility** [2] - 8:16, 176:23
**possible** [3] - 6:3, 54:18, 67:25
**posts** [1] - 33:14
**potential** [8] - 5:18, 6:23, 9:14, 30:24, 30:25, 31:19, 48:20, 50:24
**potentially** [2] - 144:8
**PowerPoint** [3] - 4:14, 85:1
**precaution** [1] - 68:10
**preference** [1] - 122:13
**prejudice** [2] - 66:20, 127:25
**preliminary** [5] - 55:18, 58:4, 58:16, 69:24, 128:7
**prepare** [2] - 57:17, 149:17
**prepared** [1] - 55:8
**preponderance** [2] - 62:5, 62:19
**presence** [18] - 6:5, 6:6, 6:15, 27:24, 36:15, 40:10, 46:22, 54:4, 56:12, 58:12, 67:20, 76:14, 116:15, 121:25, 122:9, 130:4, 178:25, 179:21
**present** [13] - 6:2, 9:15, 12:11, 57:10, 66:1, 67:17, 68:19, 68:21, 72:10, 73:6, 175:10, 179:10, 179:11
**presented** [6] - 32:12, 32:20, 60:13, 63:13, 67:24, 68:2
**preserve** [1] - 126:4
**preserving** [1] - 11:10
**president** [7] - 19:17, 71:11, 71:13, 71:16, 82:16, 99:25, 112:3
**President** [24] - 70:23, 71:1, 74:6, 74:15, 80:25, 82:5, 82:13, 82:23, 83:17, 84:3, 86:4, 100:7, 109:19, 111:18, 114:6, 114:14, 136:7, 137:5, 141:22, 148:16, 167:13, 176:5, 176:16, 177:14
**presidents** [1] - 111:20
**Presidents** [1] - 162:14
**Press** [1] - 143:2
**press** [12] - 143:6, 143:7, 143:9, 143:11, 143:12, 143:13, 143:18, 146:23, 146:24, 147:2, 147:17
**presses** [1] - 143:13
**prevent** [4] - 11:15, 13:13, 24:14, 32:22
**previous** [4] - 45:10, 46:14, 100:9, 179:15
**previously** [2] - 32:15, 55:12
**primarily** [4] - 115:10, 115:12, 115:25, 120:10
**printout** [1] - 157:23
**priorities** [1] - 137:8
**privacy** [1] - 65:25
**private** [4] - 9:11, 68:7, 161:3, 161:5
**privately** [1] - 12:8
**privilege** [2] - 69:15, 74:10
**privileges** [1] - 86:18
**probative** [2] - 127:20, 127:22
**problem** [2] - 36:22, 86:24
**proceed** [5] - 51:12, 51:14, 51:15, 51:24, 79:5
**proceeding** [2] - 10:1, 54:24
**proceedings** [7] - 9:5, 17:18, 28:23, 64:23, 67:15, 67:20, 68:5

**process** [25] - 5:7, 6:20, 6:24, 7:4, 7:15, 8:23, 9:22, 10:19, 10:24, 25:1, 44:6, 44:18, 49:17, 50:17, 64:25, 81:14, 83:1, 95:20, 114:20, 131:12, 132:12, 132:18, 171:9, 172:7
**processes** [3] - 100:16, 101:2, 135:25
**procurement** [2] - 134:25, 135:1
**produce** [2] - 62:7, 129:20
**produced** [4] - 62:10, 79:14, 129:19, 155:19
**produces** [1] - 75:13
**product** [1] - 24:24
**production** [6] - 75:10, 90:5, 108:15, 147:16, 169:11
**productive** [1] - 75:12
**profession** [1] - 39:9
**Professional** [2] - 83:8, 105:13
**professional** [3] - 87:1, 94:9
**professionals** [1] - 105:12
**proffer** [4] - 120:13, 121:20, 125:18, 129:6
**proffered** [1] - 77:25
**proffering** [1] - 128:17
**profile** [3] - 158:13, 158:18, 158:21
**program** [5] - 103:3, 144:4, 144:19, 145:7, 174:8
**programs** [5] - 98:17, 98:18, 104:2, 104:4, 139:16
**Programs** [3] - 104:1, 114:11
**prohibits** [2] - 61:17, 61:20
**project** [20] - 81:2, 81:5, 81:7, 81:10, 84:19, 93:19, 100:14, 100:25, 101:14, 135:23, 136:15, 136:16, 161:13, 161:14, 161:19, 174:4, 175:4, 177:1, 177:2
**promote** [1] - 82:11
**promoted** [4] - 70:21, 80:1, 80:2, 80:8
**promotion** [8] - 97:2, 97:5, 98:2, 98:3, 98:4, 102:7, 102:9, 104:5
**promotions** [1] - 70:20
**pronounce** [1] - 18:17
**pronunciation** [1] - 139:1
**proof** [5] - 60:17, 60:19, 62:3, 62:17, 62:18
**proper** [3] - 72:19, 89:7, 89:9
**proposal** [1] - 83:16
**prospective** [1] - 31:15
**protect** [1] - 65:24
**protected** [1] - 128:9
**prove** [1] - 68:17
**provide** [2] - 24:21, 172:9
**provided** [5] - 45:16, 48:16, 50:15, 171:15, 173:3
**proving** [1] - 62:4
**pry** [1] - 24:9
**PT** [2] - 139:13, 139:15
**public** [5] - 14:7, 15:23, 16:3, 16:4, 69:17
**publication** [1] - 111:8
**publications** [1] - 156:5
**published** [1] - 153:16
**punishable** [1] - 13:6
**purchase** [1] - 103:4
**purchases** [1] - 140:3
**purpose** [4] - 60:6, 66:15, 67:20, 147:6
**pursuing** [1] - 71:18
**push** [1] - 175:20
**pushed** [1] - 73:20
**put** [26] - 32:17, 34:9, 38:7, 40:17, 45:23, 50:6, 55:6, 62:9, 62:10, 62:21, 65:22, 72:6, 73:3, 88:17, 116:18, 116:24, 117:1, 117:9, 126:12, 129:10, 133:12, 144:23, 146:12, 150:13, 167:10, 174:4
**puts** [1] - 37:10
**putting** [3] - 45:25, 88:16, 120:15
**puzzle** [3] - 88:17, 88:18, 89:3
**PZ** [4] - 135:4, 138:16, 149:6
**Pzet** [1] - 135:5

## Q

**qualified** [2] - 7:2, 78:16
**quality** [3] - 25:2, 43:13, 71:7
**questioning** [3] - 9:16, 59:25, 126:1
**questionnaire** [5] - 8:2, 16:17, 34:23, 37:21, 39:8
**questionnaires** [6] - 7:17, 7:18, 7:24, 16:9, 16:10, 39:20
**questions** [52] - 7:5, 7:8, 7:14, 7:19, 8:1, 8:6, 8:7, 8:8, 8:11, 8:22, 9:11, 10:23, 11:1, 11:18, 12:1, 12:2, 12:6, 12:13, 12:14, 13:9, 15:9, 15:12, 16:5, 17:15, 18:23, 20:4, 29:21, 30:21, 32:17, 34:9, 36:7, 36:9, 37:9, 37:15, 37:20, 38:3, 38:4, 38:8, 39:7, 39:14, 41:10, 45:7, 45:16, 59:21, 59:22, 66:14, 91:1, 96:2, 96:3, 120:7, 125:20, 168:25
**quick** [2] - 67:15, 122:10
**quickly** [1] - 73:13
**quirks** [1] - 49:5
**quite** [3] - 22:17, 26:14, 115:17

## R

**race** [7] - 18:8, 38:21, 61:14, 61:18, 61:21, 87:5, 87:25
**radio** [1] - 63:6
**raise** [21] - 5:14, 13:18, 15:13, 16:6, 16:17, 20:5, 21:23, 30:22, 32:16, 34:10, 38:22, 46:6, 48:14, 53:4, 53:7, 54:9, 55:22, 117:9, 117:15, 118:17, 120:14
**Raleigh** [1] - 93:13
**ramp** [9] - 167:20, 167:21, 167:25, 168:1, 168:2, 169:5, 169:23
**ramp-down** [4] - 167:20, 168:1, 169:5, 169:23
**ramp-down/ramp-up** [1] - 167:25
**ramp-up** [4] - 167:21, 168:2, 169:5, 169:23
**ran** [1] - 100:25
**RANDLE** [1] - 2:2
**random** [2] - 17:9, 51:22
**randomly** [2] - 5:17, 6:22
**Randy** [5] - 19:16, 19:25, 74:12, 74:13, 128:15
**ranks** [1] - 79:24
**rare** [1] - 69:15
**rated** [1] - 163:14
**rather** [1] - 6:11
**rating** [1] - 163:15
**re** [3] - 3:11, 4:8, 4:11
**reach** [1] - 10:13
**reached** [1] - 33:6
**reaching** [2] - 58:19, 60:15
**read** [18] - 8:17, 12:15, 12:21, 18:11, 30:24, 31:16, 31:19, 63:3, 63:7, 65:19, 66:5, 100:19, 156:2, 158:6, 158:7, 168:8, 170:12, 170:19
**reading** [1] - 10:5
**ready** [3] - 51:12, 51:14, 51:15
**real** [2] - 47:6, 140:2
**really** [7] - 28:5, 41:7, 44:19, 77:1, 80:17, 120:7, 149:20
**reapply** [1] - 41:1
**reason** [18] - 12:7, 12:24, 15:10, 24:11, 32:18, 32:22, 36:21, 37:12, 38:1, 39:18, 40:2, 40:15, 46:4, 68:10, 71:9, 72:3, 72:18, 76:5
**reasonable** [2] - 62:17, 62:19
**reasons** [3] - 10:22, 45:8, 72:11
**reassert** [1] - 126:2
**receive** [6] - 44:19, 162:13, 164:7, 171:19, 173:15, 173:22
**received** [8] - 59:10, 60:5, 70:19, 83:21, 166:11, 166:14, 169:20, 173:16
**recently** [1] - 28:6
**recess** [6] - 51:3, 51:5, 56:8, 56:10, 66:23, 130:3
**recesses** [1] - 66:7
**recognize** [9] - 5:11, 6:5, 6:13, 8:25, 37:9, 69:12, 79:20, 135:19, 146:6
**recognizes** [1] - 5:24
**record** [31] - 13:11, 16:7, 16:18, 16:21, 17:2, 18:16, 27:23, 36:14, 38:2, 38:7, 40:9, 42:16, 44:14, 45:2, 45:9, 45:15, 46:21, 52:18, 54:2, 54:4, 56:13, 59:10, 60:25, 76:13, 78:14, 84:9, 91:16, 116:14, 178:25, 180:4, 180:5
**recruit** [1] - 157:12
**recruiter** [2] - 84:7, 92:12
**Recruiting** [2] - 114:10, 148:20
**recruiting** [3] - 142:23, 142:24, 142:25
**reduction** [4] - 133:21, 134:4, 134:11, 134:14
**refer** [9] - 10:20, 66:24, 74:25, 106:19, 113:6, 114:14, 123:4, 130:14, 130:17
**reference** [3] - 63:19, 67:3, 148:22
**referencing** [1] - 143:23
**referred** [11] - 18:1, 105:24, 114:25, 123:12, 134:19, 135:5, 138:8, 140:5, 148:23, 149:7, 152:23
**referring** [2] - 115:13, 176:1
**reflect** [6] - 13:11, 16:7, 16:18, 18:16, 84:9, 108:15
**refresh** [1] - 145:16
**regard** [1] - 58:3

**regarding** [4] - 33:20, 33:23, 77:4, 126:23
**regardless** [1] - 118:10
**regards** [1] - 105:14
**registration** [1] - 6:23
**regular** [4] - 23:17, 27:9, 35:24, 44:2
**regulations** [2] - 35:20, 44:3
**rehabilitation** [2] - 40:21, 40:22
**reiterate** [1] - 55:12
**reject** [1] - 61:6
**related** [6] - 21:13, 32:4, 33:21, 78:17, 117:6, 118:15
**relates** [1] - 102:17
**Relations** [3] - 95:13, 95:23, 114:8
**relations** [2] - 97:9, 97:11
**relationship** [7] - 21:12, 21:17, 21:22, 31:20, 39:15, 39:16, 169:1
**relative** [1] - 68:8
**relatives** [2] - 38:16, 68:3
**release** [2] - 45:5, 53:10
**released** [5] - 23:8, 23:18, 36:19, 40:14, 45:7
**releasing** [1] - 170:3
**relevance** [3] - 125:23, 126:10, 126:11
**relevant** [4] - 117:22, 127:15, 135:25, 158:19
**remain** [6] - 56:5, 68:8, 122:15, 122:19, 122:20, 179:18
**remained** [1] - 80:10
**remaining** [3] - 9:19, 53:10, 144:23
**remark** [1] - 66:9
**remember** [13] - 7:10, 17:17, 20:20, 65:14, 65:18, 65:21, 66:25, 67:3, 70:3, 75:16, 122:4, 123:14, 179:14
**remembered** [1] - 16:13
**reminded** [1] - 51:21
**remove** [2] - 10:21, 150:20
**render** [5] - 32:11, 32:19, 87:8, 87:16, 87:17
**rendering** [2] - 12:25, 13:14
**renew** [3] - 38:4, 38:7, 38:23
**repeat** [3] - 66:23, 115:22, 117:25
**repeatedly** [1] - 39:19
**rephrase** [2] - 156:17, 156:18
**replaced** [1] - 126:13
**replacing** [1] - 127:2
**reply** [1] - 73:4
**report** [5] - 67:9, 100:9, 109:23, 113:10, 136:11
**reported** [5] - 100:7, 100:10, 114:3, 114:6, 162:14
**reporter** [11] - 9:4, 9:15, 137:25, 138:13, 138:20, 138:25, 139:10, 139:22, 141:7, 142:7, 176:14
**REPORTER** [3] - 2:6, 2:6, 180:9
**reporting** [9] - 70:23, 84:3, 84:22, 84:24, 100:5, 111:2, 112:12, 112:17, 160:8
**reports** [2] - 113:12, 169:20
**represent** [4] - 19:11, 19:20, 88:12, 172:3
**representative** [2] - 19:17, 57:11
**Representative** [2] - 95:13, 95:23
**representatives** [3] - 19:9, 97:10, 97:12
**represented** [2] - 21:9, 111:10
**representing** [1] - 70:9
**represents** [2] - 75:6, 105:25
**request** [7] - 3:15, 38:4, 38:5, 38:23, 58:1, 146:9, 146:21
**REQUESTED** [1] - 180:7
**requesting** [2] - 147:7, 149:1
**requests** [1] - 38:8
**require** [1] - 64:24
**required** [6] - 9:23, 9:24, 14:4, 65:5, 174:4, 174:20
**requirements** [11] - 164:3, 164:5, 164:8, 164:14, 165:22, 165:23, 166:17, 166:18, 166:20, 166:21, 166:22
**requires** [1] - 62:18
**requiring** [1] - 175:5
**rescue** [1] - 14:7
**research** [8] - 33:20, 33:23, 50:25, 55:14, 63:15, 64:1, 67:2, 179:14
**resided** [1] - 12:18
**resign** [1] - 90:17
**resigned** [2] - 80:9, 86:1
**resolution** [1] - 159:3
**Resource** [4] - 70:13, 94:14, 99:14, 167:13
**resource** [2] - 35:20, 112:9
**Resource's** [1] - 83:18
**Resources** [49] - 19:18, 61:11, 70:24, 74:7, 74:15, 80:2, 80:3, 80:6, 80:11, 80:25, 81:2, 81:4, 81:23, 82:6, 82:14, 82:16, 83:8, 83:14, 84:3, 84:24, 85:13, 85:20, 86:4, 87:1, 95:16, 96:17, 97:2, 99:2, 99:25, 100:8, 103:14, 105:10, 105:12, 105:16, 107:6, 108:16, 108:17, 109:3, 109:12, 109:16, 109:19, 119:3, 137:5, 138:6, 138:17, 141:22, 141:23, 142:3, 148:17
**resources** [7] - 34:13, 34:16, 44:1, 146:22, 156:25, 157:8, 157:9
**respect** [6] - 128:12, 151:23, 159:21, 160:3, 160:21, 169:3
**respected** [1] - 170:21
**respond** [3] - 8:25, 30:20, 169:19
**responded** [1] - 45:15
**responding** [1] - 10:23
**response** [12] - 9:2, 9:10, 13:11, 16:7, 16:18, 18:16, 18:22, 21:4, 22:25, 30:23, 37:23, 48:16
**response)** [1] - 48:1
**responses** [3] - 8:7, 16:12, 16:15
**responsibilities** [5] - 6:4, 82:5, 159:21, 160:20, 160:23
**responsibility** [3] - 65:15, 65:16, 167:18
**responsible** [8] - 80:5, 82:23, 89:15, 98:16, 99:2, 139:5, 139:16, 140:25
**rest** [1] - 128:21
**restoration** [1] - 94:1
**restored** [1] - 13:7
**restriction** [2] - 33:18, 34:8
**restrictions** [1] - 64:22
**restroom** [1] - 49:13
**restructure** [2] - 84:17, 90:13
**restructured** [2] - 85:20, 85:24
**result** [5] - 7:15, 41:21, 44:20, 64:24, 81:6
**resulted** [1] - 32:1
**results** [4] - 164:2, 165:21, 166:16, 167:19
**resume** [3] - 3:9, 94:24, 95:6
**retaining** [1] - 98:23
**retention** [3] - 98:20, 139:17, 175:17
**retire** [4] - 63:1, 64:11, 69:1, 122:4
**retirement** [5] - 174:8, 174:13, 174:17, 175:16
**return** [3] - 9:23, 41:11, 88:6
**returned** [1] - 64:14
**returning** [3] - 7:23, 40:22, 131:3
**Rev** [1] - 3:16
**reveal** [2] - 8:11, 87:23
**reverse** [1] - 120:11
**review** [3] - 162:17, 167:6, 171:19
**reviewed** [3] - 173:1, 173:2, 177:7
**reviews** [3] - 71:6, 89:23, 178:16
**rid** [1] - 79:21
**Riechenauer** [2] - 139:22
**rights** [1] - 6:18
**Rights** [2] - 13:7, 61:16
**risk** [1] - 127:24
**River** [4] - 70:14, 70:15, 92:13, 95:7
**Robert** [2] - 31:1, 82:1
**role** [37] - 69:19, 71:14, 76:8, 77:12, 79:18, 80:3, 80:4, 80:5, 80:10, 81:21, 82:8, 82:17, 82:18, 83:18, 83:22, 85:2, 85:5, 85:24, 90:15, 92:16, 96:1, 97:8, 97:10, 98:5, 98:6, 98:16, 99:1, 123:25, 145:4, 145:21, 148:1, 157:12, 160:3, 171:2
**roles** [4] - 84:2, 84:3, 123:7, 130:19
**roll** [1] - 10:16
**rolled** [1] - 150:15
**roller** [1] - 50:9
**Roman** [1] - 111:10
**room** [9] - 6:10, 49:10, 50:15, 55:11, 63:1, 64:6, 66:1, 66:3, 122:4
**Rosalyn** [1] - 125:10
**rose** [1] - 79:24
**rotation** [1] - 144:6
**round** [1] - 172:12
**row** [1] - 112:1
**Rozelsky** [16] - 3:4, 18:17, 19:19, 20:2, 20:7, 20:12, 41:14, 42:3, 42:12, 42:13, 43:10, 57:20, 75:5, 88:12, 105:25, 120:8
**ROZELSKY** [47] - 1:21, 17:5, 18:20, 19:19, 27:11, 29:22, 37:1, 37:14, 38:2, 38:11, 39:23, 41:13, 43:3, 43:10, 43:20, 48:25, 51:17, 53:14, 56:3, 57:21, 58:9, 88:8, 115:19, 115:22, 115:24, 116:12, 116:17, 117:17,

117:24, 118:3, 118:19, 118:23, 119:9, 119:15, 120:17, 120:19, 121:2, 121:5, 121:10, 121:22, 122:10, 125:19, 129:8, 132:8, 156:11, 156:13, 168:19
**RPR** [2] - 2:6, 180:17
**rude** [1] - 67:7
**Rudolph** [1] - 139:22
**Rudy** [1] - 139:22
**rule** [1] - 71:10
**ruled** [3] - 38:6, 123:13, 126:4
**Rules** [1] - 60:1
**ruling** [6] - 44:7, 45:10, 60:2, 66:9, 121:21, 126:20
**rulings** [1] - 128:7
**run** [4] - 99:4, 169:11, 169:12, 169:24
**Rutgers** [1] - 5:12

**S**

**s/Debra** [1] - 180:17
**sacred** [1] - 6:18
**sacrifice** [1] - 6:9
**safe** [2] - 66:6, 179:16
**Safety** [1] - 114:11
**safety** [3] - 13:23, 14:5, 169:12
**sake** [1] - 88:10
**salary** [2] - 102:18, 173:13
**sales** [5] - 37:24, 43:16, 43:17, 101:9, 106:13
**SAP** [8] - 99:3, 99:7, 99:8, 100:17, 100:24, 100:25, 101:3, 161:14
**sat** [4] - 48:3, 62:16, 134:11, 135:7
**satisfactory** [1] - 12:25
**satisfy** [1] - 57:23
**Savage** [1] - 31:5
**Savannah** [4] - 70:14, 70:15, 92:13, 95:7
**saves** [2] - 7:21, 7:24
**saw** [6] - 8:2, 20:16, 152:25, 155:14, 161:13, 172:11
**SC** [5] - 1:3, 1:18, 1:22, 2:5, 2:7
**scales** [2] - 62:11, 62:12
**schedule** [2] - 54:17, 69:12
**scheduled** [1] - 69:10
**school** [4] - 14:19, 91:24, 91:25, 93:21
**schools** [1] - 91:23
**SCHR** [1] - 35:22
**SCHRM** [1] - 94:13
**scope** [3] - 139:19, 145:8, 177:2
**score** [1] - 166:21
**Scott** [3] - 31:7, 81:4, 114:9
**Scout** [1] - 31:4
**screen** [1] - 150:9
**script** [1] - 54:24
**se** [1] - 78:10
**search** [4] - 73:24, 84:9, 84:11, 84:12
**searching** [1] - 63:19
**seat** [5] - 14:21, 23:21, 30:16, 41:11, 48:6
**seated** [9] - 5:2, 5:16, 51:6, 56:5, 74:13, 122:15, 122:19, 122:20, 179:19
**seats** [3] - 26:21, 27:1, 65:25
**second** [11] - 12:20, 36:12, 52:6, 52:9, 61:19, 81:11, 87:18, 116:11, 138:18, 164:6, 167:6
**secondly** [1] - 99:23
**secret** [1] - 69:7
**Section** [16] - 15:16, 61:19, 61:20, 79:25, 80:1, 97:15, 98:5, 98:8, 98:10, 98:12, 98:14, 99:14, 99:16, 99:21, 99:22, 102:8
**section** [11] - 98:24, 145:2, 163:8, 164:13, 164:15, 164:18, 164:21, 165:24, 170:24, 171:13
**sections** [1] - 129:3
**secure** [1] - 66:7
**securing** [1] - 6:14
**Security** [4] - 12:4, 12:9, 56:6, 66:6
**see** [44] - 10:9, 15:11, 16:19, 34:2, 34:6, 39:10, 41:7, 50:21, 50:22, 55:16, 55:23, 55:24, 67:5, 68:12, 71:6, 74:19, 81:22, 85:1, 96:16, 96:17, 97:9, 97:14, 97:15, 101:17, 104:20, 108:17, 108:20, 108:24, 109:4, 109:5, 109:13, 112:2, 113:9, 123:17, 133:22, 135:4, 147:15, 148:22, 158:25, 164:10, 164:16, 168:5, 178:23, 179:16
**seeing** [1] - 91:6
**seek** [2] - 74:4, 88:2
**seeking** [1] - 161:20
**seeks** [1] - 126:22
**seem** [2] - 8:3, 29:15
**segments** [1] - 128:19
**select** [3] - 7:3, 7:12, 17:19
**selected** [14] - 5:17, 6:22, 6:25, 9:21, 10:4, 10:8, 32:10, 32:24, 33:1, 53:4, 53:16, 54:6, 81:3, 82:17
**selecting** [2] - 5:8, 7:6
**selection** [9] - 5:10, 6:20, 7:15, 7:22, 7:25, 8:23, 9:22, 10:19, 10:24
**self** [1] - 128:23
**self-serving** [1] - 128:23
**sell** [1] - 160:6
**seminars** [2] - 35:25, 44:2
**send** [4] - 7:17, 115:15, 120:12, 121:6
**sending** [1] - 137:6
**Senior** [1] - 105:13
**senior** [10] - 114:16, 114:19, 114:21, 114:25, 117:10, 117:13, 172:10, 172:14, 172:16, 173:4
**sense** [3] - 10:11, 10:12, 91:3
**sensitive** [2] - 54:21, 54:22
**sent** [3] - 16:16, 116:9, 121:2
**sentence** [1] - 168:7
**September** [12] - 3:20, 79:12, 82:1, 82:4, 83:15, 84:5, 84:6, 84:10, 84:16, 96:18, 96:19, 110:22
**sequestered** [1] - 56:18
**sequestration** [3] - 56:15, 57:8, 57:12
**series** [1] - 7:8
**serious** [3] - 40:21, 87:6
**serve** [13] - 6:25, 9:24, 10:1, 11:13, 14:5, 32:24, 33:1, 50:3, 53:17, 54:7, 54:13, 71:14, 74:10
**served** [4] - 13:20, 96:1, 96:5, 115:21
**service** [24] - 6:3, 7:1, 11:20, 11:21, 13:1, 13:14, 13:15, 13:24, 14:9, 15:10, 15:15, 23:24, 24:5, 25:23, 26:1, 26:3, 26:4, 43:1, 69:14, 88:4, 90:21, 90:23, 95:20, 114:11
**Services** [1] - 114:9
**services** [3] - 14:1, 101:10, 106:14
**serving** [8] - 5:24, 8:19, 11:2, 11:15, 64:18, 64:20, 128:23, 141:8
**sessions** [1] - 14:16
**set** [2] - 6:8, 88:18
**set-aside** [1] - 6:8
**setoff** [1] - 85:18
**settled** [4] - 28:7, 28:20, 29:4, 30:7
**settlement** [1] - 30:11
**seven** [7] - 37:21, 37:24, 70:25, 86:11, 90:15, 102:2, 125:7
**Seven** [1] - 61:16
**sever** [1] - 132:25
**several** [10] - 7:18, 23:24, 37:9, 79:8, 80:16, 80:21, 81:13, 104:3, 104:11, 144:20
**sex** [6] - 18:8, 38:21, 61:14, 61:18, 87:5, 87:25
**sexual** [3] - 30:1, 47:13, 47:16
**shake** [3] - 29:17, 29:18, 50:6
**shape** [1] - 143:16
**shared** [3] - 4:7, 141:24, 163:19
**sharing** [3] - 30:15, 141:23, 171:5
**Sheet** [2] - 104:21, 104:22
**sheet** [1] - 152:22
**Sherrill** [1] - 31:4
**Sherry** [7] - 19:17, 31:2, 57:7, 71:15, 74:13, 82:11, 172:18
**shift** [1] - 96:6
**shocking** [1] - 75:3
**Shop** [1] - 143:3
**shop** [12] - 143:6, 143:7, 143:9, 143:11, 143:12, 143:13, 143:18, 146:23, 146:24, 147:2, 147:17
**short** [5] - 51:5, 103:18, 122:2, 129:24, 130:3
**shortest** [1] - 88:10
**shortly** [1] - 54:18
**shot** [2] - 44:17, 117:8
**show** [26] - 66:20, 77:4, 80:16, 83:9, 84:11, 85:6, 86:22, 88:1, 94:22, 104:12, 107:18, 110:4, 112:20, 113:16, 133:10, 135:9, 141:11, 145:24, 148:7, 149:22, 150:11, 151:23, 153:5, 157:15, 157:22, 173:5
**showed** [3] - 84:25, 85:2, 167:17
**showing** [5] - 150:21, 153:20, 153:21, 163:4, 173:13
**shown** [2] - 151:10, 158:17
**shows** [4] - 95:6, 152:2, 152:20, 155:2
**SHRM** [1] - 160:16
**siblings** [1] - 18:25
**sic** [1] - 73:9
**side** [6] - 51:22, 56:21, 62:13, 68:14, 151:14, 152:2
**sides** [11] - 22:22, 23:12, 34:20, 35:12, 36:3, 37:11, 43:25, 46:1, 62:11, 87:14
**signature** [2] - 165:6, 165:7
**signatures** [2] - 137:21, 165:2
**signed** [1] - 165:1
**significant** [4] - 5:25, 15:2, 127:20, 127:22

**similar** [6] - 8:13, 21:12, 28:6, 28:17, 28:18, 64:9
**simplest** [1] - 152:15
**simply** [4] - 9:11, 63:2, 90:6, 151:11
**Simpsonville** [4] - 91:20, 91:21, 94:2, 94:3
**Sinanian** [3] - 112:18, 114:12, 114:24
**single** [2] - 15:1, 76:17
**singularly** [1] - 134:16
**sisters** [1] - 19:3
**sisters-in-law** [1] - 19:3
**sit** [8] - 6:10, 32:10, 32:18, 52:25, 68:4, 88:23, 122:11, 155:11
**Site** [4] - 70:14, 70:16, 92:13, 95:7
**site** [4] - 77:15, 103:18, 143:8, 143:19
**sits** [1] - 74:21
**sitting** [4] - 6:12, 29:11, 128:15, 172:23
**situation** [5] - 16:15, 32:4, 41:7, 41:16, 125:23
**situations** [1] - 14:8
**Six** [1] - 102:13
**six** [15] - 15:2, 15:5, 20:13, 37:20, 38:5, 38:20, 52:2, 52:19, 81:21, 108:17, 109:3, 123:25, 124:3, 125:5, 159:15
**sixteen** [1] - 162:25
**sixty** [1] - 157:18
**sixty-three** [1] - 157:18
**skills** [1] - 81:25
**SL** [1] - 145:1
**slashing** [1] - 143:4
**slightly** [1] - 62:13
**slow** [1] - 34:15
**smaller** [1] - 75:18
**SnapChat** [1] - 64:7
**SO** [1] - 116:25
**so-called** [1] - 126:24
**social** [7] - 21:11, 31:20, 33:15, 34:4, 42:13, 64:6, 64:9
**socialize** [1] - 20:16
**socially** [1] - 20:21
**society** [1] - 11:7
**Society** [2] - 94:14, 105:10
**software** [1] - 99:8
**sole** [1] - 66:15
**solely** [5] - 32:11, 34:5, 44:7, 60:12, 63:13
**someone** [2] - 39:17, 65:17
**sometimes** [3] - 50:4, 60:24, 65:1
**son** [10] - 14:13, 23:23, 26:20, 28:8, 28:15, 39:25, 42:25, 44:11, 93:14, 93:19
**soon** [3] - 6:23, 70:11, 73:8
**sooner** [1] - 55:7
**sorry** [3] - 27:11, 28:2, 123:18
**sort** [2] - 37:10, 41:6
**sought** [1] - 86:25
**sound** [1] - 72:9
**sounded** [1] - 126:8
**source** [2] - 63:6, 63:11
**SOUTH** [3] - 1:1, 2:4, 2:7
**South** [14] - 5:5, 12:19, 22:10, 75:2, 75:14, 75:22, 75:24, 76:1, 76:9, 78:6, 79:10, 91:22, 92:13, 147:23
**souvenir** [1] - 53:21
**Space** [1] - 15:18
**space** [1] - 6:14
**sparring** [3] - 168:11, 168:15, 169:2
**Spartanburg** [68] - 3:10, 4:6, 21:15, 61:12, 94:11, 94:12, 101:6, 101:7, 106:3, 106:5, 106:7, 107:18, 108:4, 108:7, 108:8, 108:12, 109:2, 111:14, 115:11, 115:16, 116:8, 116:10, 123:5, 123:9, 125:13, 130:11, 130:15, 130:20, 131:1, 131:7, 131:10, 131:14, 131:16, 132:25, 133:6, 133:7, 134:10, 134:23, 135:8, 135:25, 136:2, 136:9, 141:3, 142:11, 143:7, 144:1, 144:13, 145:9, 145:11, 145:13, 145:22, 147:3, 152:11, 153:17, 155:3, 155:10, 155:15, 156:4, 159:10, 160:5, 161:20, 161:25, 167:23, 170:2, 175:11, 176:16, 177:12, 178:20
**SPARTANBURG** [1] - 1:2
**speaking** [4] - 20:16, 42:14, 120:5, 156:14
**special** [6] - 17:15, 81:1, 93:18, 161:13, 161:14, 173:25
**specialized** [2] - 35:18, 44:4
**specific** [5] - 8:8, 17:16, 40:24, 142:10, 145:11
**specifically** [3] - 17:11, 64:10, 159:14
**speculation** [7] - 86:21, 115:20, 116:1, 118:4, 118:8, 125:21, 132:8
**speech** [1] - 93:17
**spell** [4] - 31:11, 35:4, 138:1, 139:9
**spelled** [1] - 31:12
**Spencer** [2] - 19:19, 20:2
**SPENCER** [1] - 1:21
**spots** [1] - 120:8
**spouses** [2] - 19:1, 20:22
**spring** [1] - 80:23
**squad** [1] - 14:7
**staff** [2] - 67:10, 119:13
**staffed** [2] - 115:7, 115:24
**staffing** [1] - 142:21
**stamp** [1] - 153:19
**stand** [26] - 5:14, 8:25, 12:2, 12:14, 13:10, 13:17, 13:18, 14:9, 15:13, 16:6, 16:17, 18:15, 20:5, 21:23, 30:21, 32:16, 34:10, 46:6, 46:7, 48:15, 52:25, 54:8, 122:12, 128:11, 142:18, 177:17
**standard** [4] - 62:18, 62:20, 100:16, 100:17
**standardized** [1] - 101:2
**standing** [1] - 23:1
**stands** [2] - 138:22, 142:16
**start** [11] - 29:5, 54:17, 64:25, 67:13, 69:3, 81:6, 96:5, 111:12, 143:14, 178:19, 179:7
**start-up** [1] - 96:5
**started** [6] - 70:13, 79:24, 82:4, 84:12, 95:12, 130:1
**starting** [1] - 83:5
**starts** [3] - 84:8, 142:14, 164:9
**State** [1] - 12:18
**state** [8] - 9:1, 10:1, 13:4, 13:5, 15:20, 15:25, 76:7, 79:16
**statement** [8] - 3:2, 3:3, 3:4, 4:3, 66:9, 68:15, 173:13
**statements** [5] - 55:20, 59:21, 70:1, 70:3, 78:4
**STATES** [3] - 1:1, 1:14, 2:6
**states** [2] - 100:12, 106:10
**States** [15] - 5:4, 11:6, 12:17, 15:15, 15:16, 15:22, 15:25, 32:7, 61:19, 76:9, 82:7, 83:24, 140:9, 140:20, 160:2
**stay** [4] - 11:24, 83:2, 154:2, 167:4
**stayed** [1] - 86:22
**steering** [3] - 162:10, 167:19, 170:17
**Steering** [2] - 97:24, 114:7
**stenographic** [1] - 180:11
**STENOTYPE/ COMPUTER** [1] - 2:9
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:9
**step** [5] - 3:13, 19:2, 67:18, 68:8, 180:3
**step-parents** [1] - 19:2
**stepchildren** [1] - 18:25
**Stephan** [1] - 146:16
**STEPHENSON** [1] - 1:17
**Stephenson** [2] - 19:6, 19:23
**stepson** [3] - 28:5, 29:13, 44:19
**stick** [1] - 45:9
**still** [9] - 9:8, 67:4, 86:10, 86:12, 101:11, 151:17, 151:20, 159:5, 162:10
**stint** [1] - 82:25
**stipulate** [1] - 59:11
**stipulated** [1] - 59:13
**stood** [2] - 108:12, 126:17
**stop** [2] - 145:16, 174:6
**stored** [1] - 165:8
**story** [9] - 28:25, 72:9, 72:21, 73:10, 75:20, 87:13, 87:14, 126:15, 134:9
**strangers** [1] - 6:10
**Strategic** [1] - 142:12
**strategic** [1] - 105:15
**strategy** [1] - 170:16
**STREET** [3] - 1:18, 2:4, 2:7
**stretch** [1] - 49:12
**stricken** [3] - 37:12, 39:1, 60:24
**stricter** [1] - 62:18
**strike** [21] - 37:5, 37:16, 37:19, 38:1, 39:7, 39:12, 39:19, 40:2, 40:4, 42:1, 42:7, 51:20, 51:21, 51:23, 52:1, 52:4, 52:7, 52:10, 52:13, 52:16
**strikes** [3] - 41:23, 51:21, 51:25
**striking** [1] - 39:17
**strong** [1] - 38:22
**struck** [4] - 37:2, 41:18, 52:18, 52:19
**structure** [21] - 3:13, 3:17, 3:19, 3:25, 4:13, 83:18, 100:6, 102:18, 103:9, 108:4, 110:2, 110:7, 110:9, 110:20, 110:25, 141:2, 149:2, 150:17, 151:11, 152:11, 153:17
**structured** [1] - 103:10
**structures** [2] - 102:19, 141:1
**struggle** [1] - 78:22
**struggles** [2] - 15:3, 78:15
**stuff** [3] - 28:25, 72:2, 110:24
**sub** [1] - 113:7
**sub-functional** [1] -

113:7
**subjected** [1] - 38:17
**submit** [4] - 135:24, 149:17, 154:25, 161:18
**submittal** [1] - 149:17
**submitted** [1] - 17:10
**subsequent** [2] - 65:24, 71:3
**subsidiary** [1] - 116:24
**substantially** [1] - 127:24
**successful** [1] - 167:20
**succession** [8] - 81:12, 81:22, 139:17, 157:6, 157:7, 158:11, 159:7
**suddenly** [1] - 81:7
**sued** [4] - 21:9, 28:16, 32:3, 72:20
**suggest** [2] - 119:25, 150:11
**suggestion** [6] - 41:16, 116:20, 116:25, 118:9, 119:16, 119:22
**suggests** [1] - 119:21
**suing** [1] - 32:1
**SUITE** [1] - 2:4
**summarize** [1] - 68:24
**summary** [2] - 102:12, 102:16
**supervise** [1] - 151:13
**supervised** [2] - 97:9, 97:11
**supervisor** [1] - 145:3
**supplement** [1] - 16:12
**supplemental** [1] - 38:5
**supplier** [2] - 37:22, 43:5
**support** [1] - 147:17
**supports** [1] - 127:5
**supposed** [2] - 79:11, 128:14
**surprises** [1] - 171:5
**Susan** [2] - 177:17, 177:19
**sustained** [1] - 60:3
**sworn** [7] - 5:15, 54:9, 54:10, 55:9, 58:15, 91:11, 91:12
**System** [1] - 99:5
**system** [10] - 6:16, 99:3, 99:6, 100:24, 100:25, 101:3, 150:4, 156:25, 158:22, 166:19

**T**

**T-Vorhalt** [5] - 3:15, 146:9, 146:12, 146:18, 147:5
**talent** [4] - 139:15, 139:16, 139:17, 158:22
**Talent** [1] - 114:11
**target** [4] - 134:11, 147:16, 165:21, 166:16
**targeted** [1] - 164:1
**taught** [1] - 50:24
**team** [8] - 51:8, 85:4, 85:7, 96:5, 170:22, 172:14, 172:16, 173:4
**technical** [4] - 119:20, 143:12, 162:8, 162:12
**Technologies** [3] - 35:1, 35:2, 35:3
**technologies** [2] - 35:6, 167:22
**technology** [3] - 63:24, 64:9, 144:8
**telephone** [1] - 45:9
**television** [1] - 63:5
**temp** [7] - 23:24, 24:4, 25:23, 26:1, 26:2, 26:4, 42:25
**template** [6] - 136:1, 136:2, 136:7, 136:9, 136:11, 146:14
**ten** [10] - 13:23, 27:4, 49:15, 50:3, 84:6, 125:20, 143:20, 143:23, 144:2, 152:3
**tenure** [1] - 174:13
**term** [16] - 9:23, 17:23, 105:21, 106:15, 106:19, 106:23, 114:14, 114:17, 120:24, 123:3, 123:23, 130:14, 140:13, 142:14, 151:4, 157:5
**terminated** [7] - 36:20, 40:25, 41:15, 41:17, 41:21, 42:5, 42:6
**terms** [23] - 38:25, 54:17, 55:6, 72:12, 81:17, 86:18, 87:22, 99:5, 123:22, 125:16, 130:17, 131:20, 139:5, 142:20, 145:15, 149:14, 151:24, 152:15, 160:24, 164:6, 164:22, 176:22, 177:8
**territory** [1] - 15:21
**testified** [3] - 91:13, 117:13, 120:9
**testify** [8] - 76:18, 77:13, 77:14, 89:10, 117:14, 118:7, 121:11, 121:12
**testifying** [2] - 55:3, 121:7
**testimony** [25] - 51:2, 55:4, 55:20, 57:18, 59:9, 60:8, 60:18, 61:5, 66:18, 75:8, 77:25, 78:17, 83:9, 90:13, 120:13, 121:16, 121:20, 124:2, 126:23, 129:11, 129:25, 179:4, 179:23, 179:25, 180:1
**text** [4] - 33:14, 64:4, 146:12, 146:13
**THE** [326] - 1:1, 1:1, 1:13, 1:17, 1:19, 5:2, 5:16, 14:11, 14:12, 14:13, 14:21, 14:24, 14:25, 15:1, 15:5, 15:6, 15:7, 16:22, 17:7, 18:22, 19:13, 19:21, 20:7, 20:9, 20:10, 20:11, 20:13, 20:15, 20:19, 20:23, 21:1, 21:2, 22:1, 22:2, 22:3, 22:6, 22:8, 22:9, 22:11, 22:12, 22:13, 22:14, 22:15, 22:16, 22:17, 22:18, 22:19, 22:20, 22:23, 22:24, 23:3, 23:4, 23:5, 23:9, 23:10, 23:11, 23:13, 23:14, 23:16, 23:18, 23:20, 23:21, 23:23, 24:1, 24:3, 24:4, 24:6, 24:9, 24:12, 24:14, 24:17, 24:18, 24:19, 24:22, 24:23, 24:24, 25:2, 25:3, 25:5, 25:6, 25:7, 25:8, 25:10, 25:13, 25:14, 25:15, 25:16, 25:17, 25:19, 25:20, 25:22, 25:24, 25:25, 26:2, 26:4, 26:6, 26:7, 26:8, 26:10, 26:11, 26:13, 26:15, 26:17, 26:18, 26:20, 26:23, 26:24, 26:25, 27:2, 27:3, 27:4, 27:6, 27:7, 27:8, 27:10, 27:13, 27:16, 27:17, 27:19, 27:20, 27:21, 27:22, 28:1, 28:2, 28:4, 28:8, 28:10, 28:11, 28:12, 28:15, 28:17, 28:18, 28:20, 28:22, 28:24, 29:2, 29:3, 29:5, 29:6, 29:7, 29:8, 29:10, 29:14, 29:15, 29:16, 29:18, 29:19, 29:20, 29:25, 30:6, 30:9, 30:13, 30:14, 30:18, 30:20, 34:11, 34:12, 34:15, 34:17, 34:18, 34:19, 34:22, 34:25, 35:2, 35:3, 35:4, 35:5, 35:6, 35:8, 35:9, 35:11, 35:12, 35:14, 35:18, 35:21, 35:24, 36:1, 36:2, 36:4, 36:5, 36:12, 36:25, 37:13, 37:16, 38:10, 38:25, 39:3, 40:3, 40:7, 40:12, 40:16, 41:4, 41:6, 41:10, 42:9, 42:17, 43:4, 43:9, 43:15, 43:18, 43:22, 45:14, 46:8, 46:9, 46:11, 46:12, 46:13, 46:16, 46:18, 46:19, 46:24, 47:1, 47:2, 47:3, 47:4, 47:5, 47:6, 47:7, 47:8, 47:10, 47:11, 47:14, 47:18, 47:20, 47:22, 47:23, 47:24, 48:1, 48:2, 48:4, 48:5, 48:7, 48:10, 48:13, 49:1, 49:15, 49:16, 51:6, 51:14, 51:18, 51:19, 52:3, 52:6, 52:9, 52:12, 52:15, 52:18, 52:23, 53:2, 53:15, 54:5, 54:8, 54:11, 56:4, 56:8, 56:13, 56:25, 57:5, 57:20, 57:23, 58:1, 58:10, 58:14, 58:22, 58:23, 76:12, 76:16, 77:24, 78:8, 78:24, 79:2, 79:5, 91:8, 91:10, 95:3, 104:15, 107:21, 107:23, 110:13, 112:23, 113:20, 116:2, 116:11, 116:13, 117:25, 119:1, 119:5, 119:11, 120:12, 120:20, 121:17, 122:1, 122:15, 126:6, 126:20, 128:13, 129:7, 129:9, 129:14, 129:21, 129:24, 130:6, 132:14, 133:13, 135:12, 135:14, 136:23, 141:14, 146:2, 148:10, 149:24, 150:9, 150:13, 150:15, 153:7, 154:19, 156:16, 157:18, 162:25, 165:14, 166:6, 168:20, 173:8, 178:22, 179:3, 179:22
**themselves** [1] - 19:7
**theories** [1] - 71:18
**therapy** [2] - 14:15, 103:22
**therefore** [4] - 33:7, 33:21, 62:21, 165:5
**third** [3] - 12:23, 52:12, 137:20
**thousands** [2] - 11:9, 118:4
**three** [42] - 25:16, 38:24, 43:6, 51:18, 51:21, 85:6, 85:15, 102:10, 111:10, 112:14, 113:6, 113:9, 117:12, 118:11, 124:24, 125:14, 126:13, 131:2, 132:5, 132:21, 141:24, 144:6, 144:16, 149:15, 150:20, 151:16, 151:18, 151:25, 152:1, 152:3, 152:4, 154:8, 154:15, 155:5, 157:18, 162:20, 163:13, 164:2, 164:15, 165:22
**threes** [1] - 117:18
**throughout** [10] - 10:19, 79:16, 80:18, 82:14, 95:14, 106:16, 110:3, 113:16, 154:3, 172:8
**throwaway** [1] - 53:19
**tie** [1] - 77:5
**ties** [2] - 132:25
**tight** [1] - 120:7

**Tik** [2] - 33:16, 64:8
**Tim** [1] - 5:6
**timing** [2] - 80:20, 88:25
**TIMOTHY** [1] - 1:13
**tip** [1] - 62:13
**title** [2] - 104:19, 146:8
**Title** [2] - 61:16, 61:17
**titles** [1] - 153:21
**TMS** [4] - 158:12, 158:13, 158:18, 158:21
**today** [19] - 5:10, 5:18, 6:6, 6:15, 6:21, 7:1, 7:6, 8:3, 8:6, 11:11, 14:19, 16:13, 39:8, 39:20, 74:24, 76:4, 93:5, 96:22, 179:4
**together** [9] - 20:21, 28:13, 28:25, 72:6, 88:16, 88:17, 88:21, 89:4
**Tok** [2] - 33:16, 64:8
**tomorrow** [2] - 169:14, 179:12
**tone** [1] - 41:15
**tonight** [1] - 57:3
**took** [4] - 46:24, 128:25, 129:18, 157:2
**tool** [1] - 175:17
**tools** [3] - 63:21, 63:23, 63:25
**top** [13] - 65:23, 80:11, 85:13, 87:1, 105:14, 106:18, 111:22, 113:23, 134:20, 138:2, 141:24, 146:8, 164:9
**topic** [5] - 143:9, 160:9, 161:11, 162:4, 169:24
**topics** [18] - 4:7, 38:22, 103:13, 103:15, 104:3, 104:8, 105:17, 107:6, 136:6, 138:21, 141:2, 141:24, 141:25, 142:8, 142:9, 142:10, 144:2, 160:11
**Topics** [1] - 143:2
**total** [1] - 16:25
**totally** [2] - 41:8, 136:3
**touch** [3] - 17:15, 144:14, 144:15
**touched** [1] - 153:4
**toward** [1] - 66:20
**towards** [1] - 32:5
**Toyota** [1] - 31:10
**traffic** [2] - 55:1, 179:7
**training** [6] - 35:18, 35:24, 43:25, 81:17, 160:15, 160:16
**Training** [1] - 114:12
**transcript** [3] - 44:13, 45:2, 180:11
**TRANSCRIPT** [1] - 180:7
**TRANSCRIPTION** [1] - 2:9
**transfer** [4] - 130:20, 131:1, 139:6, 174:21
**transferred** [1] - 130:15
**transformation** [1] - 164:7
**transition** [1] - 83:4
**transitional** [1] - 175:22
**transparent** [1] - 76:20
**Trauth** [7] - 141:6, 141:8, 145:18, 176:12, 176:20, 177:4, 178:5
**travel** [1] - 6:13
**travels** [1] - 179:16
**treat** [2] - 60:4, 87:6
**treated** [2] - 59:19, 72:7
**treaty** [11] - 116:18, 116:20, 116:22, 117:5, 117:6, 118:8, 118:14, 118:20, 119:19, 119:24, 125:25
**trial** [76] - 5:6, 5:18, 5:25, 6:6, 6:7, 6:17, 6:25, 7:3, 7:6, 7:13, 9:20, 11:8, 11:17, 13:21, 18:2, 18:18, 20:24, 22:22, 23:12, 24:16, 25:18, 26:16, 27:15, 28:22, 29:5, 29:6, 29:12, 32:12, 33:4, 36:3, 46:2, 46:5, 49:5, 50:13, 54:4, 54:10, 54:23, 55:21, 56:12, 56:21, 57:14, 57:17, 58:13, 58:17, 59:4, 63:9, 63:15, 63:24, 64:25, 65:3, 65:4, 66:10, 67:4, 67:22, 68:3, 68:14, 69:9, 69:20, 69:22, 76:14, 76:15, 79:7, 80:15, 80:18, 82:15, 82:20, 113:16, 116:15, 116:16, 120:1, 121:25, 122:9, 130:5, 178:25, 179:21
**TRIAL** [1] - 1:14
**trials** [1] - 67:17
**tried** [7] - 5:8, 7:5, 8:13, 30:1, 42:5, 49:4, 136:8
**tries** [1] - 67:9
**true** [1] - 62:9
**truly** [1] - 167:23
**truncated** [1] - 73:7
**try** [14] - 39:24, 49:3, 54:17, 55:10, 63:10, 70:10, 73:12, 82:15, 85:19, 123:1, 129:3, 138:25, 175:22, 179:12
**trying** [5] - 17:24, 47:11, 112:6, 122:17, 169:22
**TS** [10] - 4:6, 108:12, 108:13, 155:6, 155:9, 155:17, 155:19, 163:9
**Tuesday** [1] - 5:19
**tunnel** [1] - 40:16
**turn** [3] - 11:11, 12:4, 66:4
**turnover** [1] - 157:8
**twenty** [4] - 50:16, 134:5, 134:6, 154:19
**twenty-five** [2] - 134:5, 134:6
**twenty-two** [1] - 154:19
**Twitter** [1] - 64:8
**two** [48] - 9:25, 13:21, 14:15, 25:16, 28:21, 35:8, 40:24, 43:6, 52:20, 60:16, 61:15, 72:11, 87:10, 87:14, 97:9, 97:11, 97:18, 108:21, 109:13, 109:15, 111:10, 111:19, 111:25, 112:1, 112:11, 113:7, 113:10, 113:12, 113:24, 114:13, 116:19, 118:14, 124:22, 125:14, 131:2, 131:5, 132:5, 132:20, 138:13, 143:2, 144:18, 147:14, 148:19, 149:15, 151:12, 154:8, 154:19, 172:17
**TX** [12] - 106:5, 108:9, 108:13, 108:15, 109:1, 109:14, 125:9, 125:10, 134:14, 134:15, 134:18, 134:21
**TX-1** [2] - 112:2, 124:20
**TX-2** [1] - 112:2
**TX-3** [1] - 112:2
**TX-6** [21] - 3:13, 3:24, 4:13, 82:12, 82:13, 82:15, 84:23, 108:18, 108:20, 108:25, 109:4, 109:9, 109:10, 109:18, 109:19, 112:8, 113:3, 128:20, 176:5, 176:24, 177:6
**TX-6-DM** [1] - 168:4
**TX-60** [35] - 3:16, 70:21, 70:22, 80:4, 80:10, 81:9, 81:21, 83:22, 83:25, 84:14, 86:10, 90:6, 90:16, 97:22, 97:23, 97:24, 101:23, 102:6, 104:25, 109:9, 114:7, 124:10, 127:9, 146:13, 148:4, 159:5, 159:14, 159:20, 160:20, 160:23, 161:7, 161:22, 162:5, 171:23, 171:25
**TX-61** [2] - 96:22, 114:8
**TX-62** [1] - 114:9
**TX-64** [5] - 84:1, 84:20, 85:2, 85:5, 114:9
**TX-65** [1] - 114:11
**TX-66** [3] - 148:23, 148:25, 149:3
**TX-R** [2] - 125:9, 125:10
**tying** [2] - 76:19, 77:17
**type** [11] - 21:6, 21:17, 21:21, 33:19, 47:8, 47:18, 72:2, 98:21, 139:16, 140:3, 161:13
**types** [1] - 102:16
**typical** [1] - 166:24
**typically** [1] - 122:15

**U**

**U.S** [2] - 100:14, 171:2
**ultimate** [1] - 55:15
**ultimately** [8] - 80:13, 96:6, 101:2, 104:9, 145:12, 149:14, 163:14, 170:3
**un-senior** [1] - 117:10
**unable** [1] - 12:21
**unanimous** [1] - 69:6
**unbiased** [1] - 32:23
**uncomfortable** [1] - 29:11
**under** [18] - 7:10, 13:22, 17:17, 59:25, 61:15, 84:21, 109:4, 109:9, 109:10, 109:17, 111:7, 112:8, 116:19, 119:24, 163:23, 168:4, 170:10, 176:4
**underneath** [2] - 109:23, 113:4
**understood** [2] - 146:19, 146:20
**undue** [1] - 13:15
**unfair** [2] - 38:18, 127:25
**unfairly** [1] - 41:17
**unfolds** [1] - 128:8
**unfortunately** [1] - 88:20
**unit** [4] - 133:23, 134:4, 134:7, 134:8
**UNITED** [3] - 1:1, 1:14, 2:6
**United** [15] - 5:4, 11:6, 12:17, 15:15, 15:16, 15:21, 15:25, 32:6, 61:19, 76:8, 82:7, 83:24, 140:9, 140:20, 160:2
**University** [1] - 92:1
**unknowns** [1] - 169:10
**unlawful** [1] - 61:22
**unless** [1] - 121:14
**untoward** [1] - 118:10
**untowards** [1] - 117:1
**up** [57] - 8:7, 8:20, 9:12, 12:10, 14:19, 16:19, 29:25, 30:14, 36:19, 36:23, 37:3, 40:16, 40:21, 42:11, 42:24, 44:13, 44:25, 45:2, 46:7, 46:20, 50:6, 55:7, 56:20, 57:4, 59:15, 61:3, 65:6, 67:19, 73:3, 73:8, 73:9, 75:17,

87:15, 87:16, 96:5, 103:4, 122:2, 123:1, 126:17, 129:10, 130:12, 133:3, 133:12, 135:14, 146:8, 150:9, 150:14, 158:7, 158:24, 163:7, 167:21, 167:25, 168:2, 169:5, 169:23, 170:3, 178:23
**upcoming** [1] - 137:8
**uploaded** [1] - 158:20
**upper** [2] - 150:21
**upset** [1] - 86:3
**Upstate** [8] - 75:2, 76:9, 79:10, 92:18, 92:20, 92:21, 92:23, 94:20
**utilized** [1] - 156:7

V

**vacancy** [1] - 81:7
**vacated** [1] - 84:1
**vacating** [1] - 81:9
**valid** [2] - 74:8, 165:6
**validated** [2] - 131:21, 132:2
**validating** [1] - 131:21
**validation** [8] - 114:20, 131:11, 131:12, 131:17, 132:4, 132:6, 132:11, 132:18
**value** [4] - 111:4, 127:20, 127:23, 152:17
**variety** [1] - 82:21
**various** [3] - 109:4, 120:21, 162:14
**vehicle** [3] - 27:1, 79:13, 143:14
**vehicles** [4] - 75:13, 76:1, 79:14, 79:15
**verdict** [11] - 32:11, 32:19, 59:6, 62:14, 63:2, 64:14, 69:1, 69:6, 69:8, 87:8, 88:6
**verification** [1] - 53:22
**verify** [1] - 11:2
**version** [2] - 73:7, 110:20
**VERSUS** [1] - 1:5
**versus** [2] - 17:25, 136:4
**via** [1] - 152:16
**Vice** [23] - 70:23, 71:1, 74:6, 74:15, 80:25, 82:5, 82:13, 82:23, 83:17, 84:3, 86:4, 100:7, 109:19, 114:6, 114:13, 136:7, 137:5, 141:22, 148:16, 162:14, 167:13, 176:5, 177:14
**vice** [8] - 19:17, 71:11, 71:13, 71:15, 82:16, 99:25, 111:20, 112:3
**victim** [1] - 47:8
**view** [3] - 68:5, 71:21, 172:4
**viewed** [1] - 88:2
**views** [1] - 78:11
**VII** [1] - 61:17
**violates** [1] - 64:22
**violating** [1] - 119:17
**violation** [2] - 18:8, 64:16
**visible** [2] - 176:25, 177:1
**vision** [1] - 102:23
**voice** [1] - 41:15
**voir** [2] - 38:5, 45:7
**VOLUME** [1] - 1:15
**voluntarily** [2] - 47:22, 73:25
**voluntary** [2] - 103:2, 103:4
**volunteer** [1] - 14:5
**Vorhalt** [6] - 3:15, 146:9, 146:10, 146:12, 146:18, 147:5
**voter** [1] - 6:22
**VP** [1] - 82:10

W

**wage** [1] - 102:18
**wait** [5] - 12:3, 36:12, 69:2, 104:19, 116:11
**waited** [1] - 85:15
**walk** [1] - 78:10
**walked** [2] - 76:4, 86:9
**Walker** [1] - 31:6
**Wall** [3] - 177:15, 177:22, 177:25
**walls** [3] - 10:8, 44:8, 63:14
**wants** [4] - 40:3, 40:4, 117:8, 118:7
**war** [1] - 128:16
**watch** [2] - 50:16, 63:4
**water** [1] - 49:13
**ways** [2] - 54:21, 69:13
**website** [2] - 64:5, 64:6
**websites** [1] - 63:20
**Wednesday** [4] - 5:20, 5:23, 69:10, 159:4
**week** [6] - 14:15, 14:18, 38:6, 64:19, 69:10, 169:14
**weekly** [1] - 161:9
**weeks** [2] - 7:18, 85:15
**weigh** [2] - 87:8, 127:13
**weight** [2] - 66:17, 128:4
**welcome** [2] - 5:4, 58:14
**Well-being** [3] - 101:19, 104:1
**well-being** [2] - 102:22, 104:2
**Werke** [2] - 17:25, 18:20
**WERKE** [2] - 1:6, 1:20
**Westinghouse** [5] - 70:14, 92:12, 92:14, 94:19, 96:14
**WhatsApp** [1] - 33:16
**WHITSETT** [1] - 1:18
**whole** [3] - 64:24, 88:19, 95:14
**wide** [1] - 82:21
**Williams** [2] - 47:3, 47:4
**willingness** [2] - 53:17, 54:13
**Winston** [1] - 90:20
**wish** [3] - 11:22, 11:24, 14:8
**withdraw** [3] - 125:21, 156:16, 156:18
**withdrawn** [1] - 126:9
**witness** [18] - 29:2, 34:19, 35:15, 35:16, 55:3, 56:20, 56:22, 57:9, 60:18, 66:18, 72:25, 76:18, 76:21, 76:22, 77:13, 78:18, 88:23, 127:12
**WITNESS** [1] - 150:15
**witness's** [3] - 55:4, 61:5, 179:4
**witnesses** [23] - 17:14, 30:24, 30:25, 31:15, 31:19, 39:10, 56:17, 57:9, 57:12, 57:17, 59:9, 61:4, 61:8, 65:8, 66:14, 68:19, 68:21, 73:3, 75:8, 79:8, 81:14
**wonder** [1] - 8:1
**Woodcliff** [1] - 101:8
**word** [2] - 67:15, 123:20
**words** [2] - 62:22, 166:22
**worker's** [2] - 40:17, 40:18
**workplace** [2] - 46:13, 47:10
**works** [20] - 16:23, 21:14, 23:25, 24:20, 26:2, 26:20, 31:2, 31:3, 31:4, 31:5, 31:6, 31:7, 31:8, 31:9, 31:10, 43:5, 50:10, 93:18, 172:7
**workshop** [1] - 128:24
**world** [6] - 6:17, 49:23, 75:11, 75:14, 89:16, 141:1
**worldwide** [4] - 90:5, 134:24, 139:20, 145:9
**wow** [1] - 75:25
**wrapped** [1] - 57:4
**wrists** [1] - 40:17
**write** [1] - 12:21
**writing** [1] - 33:13
**written** [1] - 8:7
**wrote** [1] - 158:8

X

**X5s** [1] - 160:6

Y

**y'all** [4] - 20:15, 20:17, 50:3, 50:13
**year** [35] - 12:19, 13:6, 14:13, 15:2, 22:5, 22:6, 22:12, 25:16, 28:7, 28:20, 42:20, 43:6, 46:10, 46:18, 83:2, 84:16, 92:6, 94:15, 137:8, 163:17, 163:20, 163:21, 163:22, 165:11, 165:20, 166:9, 166:14, 166:24, 172:9, 172:12, 174:12, 175:2, 175:15, 175:22
**years** [41] - 9:25, 12:18, 13:19, 13:21, 13:23, 15:5, 16:22, 20:13, 22:14, 23:24, 24:7, 26:1, 26:5, 26:9, 27:4, 28:21, 35:8, 35:11, 42:21, 43:24, 70:15, 70:17, 70:18, 70:25, 79:23, 81:21, 86:12, 89:11, 90:15, 92:15, 96:13, 98:15, 102:2, 108:14, 122:17, 162:13, 162:19, 162:20, 167:2, 172:25
**Years** [1] - 3:11
**young** [1] - 41:11
**youngest** [4] - 93:2, 93:8, 93:9, 93:20
**yourself** [3] - 112:17, 114:23, 161:23
**Youtube** [2] - 33:16, 64:8

Z

**Zboril** [1] - 138:25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KELLY DAWSEY, PLAINTIFF, | ) | CA. NO. 7:22-CV-3738 GREENVILLE, SC FEBRUARY 18, 2026 |
| VERSUS | ) | |
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP, | ) | |
| BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP DEFENDANTS. | ) | |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
JURY TRIAL
VOLUME II

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT: KURT ROZELSKY, ESQ.
SPENCER FANE LLP
P O BOX 294
GREENVILLE, SC 29602

APPEARANCES CONTINUED

BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

INDEX

KELLY DAWSON

Direct exam continued by Mr. Murphy 6

Cross exam by Mr. Moody 111

EXHIBITS

PLAINTIFF'S

4 12/3/2021 Petrasch email personnel changes in P network 91

6 TX-6 and TX-60 info-share documentation Wednesday 9/29/2021 with handwritten notes 24

17 Expat guidelines for Plant Spartanburg 33

20 Overview on reference partner input During the promotion procedure 73

21 Text Petrasch to Dawsey 10/1/2021 77

24 Epps email 6/3/2021 50

31 Petrasch email to Dawsey 3/3/2021 79

DEFENSE EXHIBITS

1 4/25/95 job offer 117

2 Kelly Dawsey resume 118

3 BMW MC Implementation of exempt grading, salary, Bonus and benefit structure 116

4 Personnel development/Succession planning PowerPoint dated June 2021 90

6 Documents related to promotions, salary Increases and bonuses 2014-2021 90

INDEX CONTINUED

DEFENSE EXHIBITS


| | | |
|---|---|---|
| 7 | Kelly Dawsey BMW MC Position/Pay history | 128 |
| 11 | Job function data sheets for TX-60 position | 136 |
| 12 | Job function data sheets for TX-61 position | 65 |
| 13 | Job function data sheet for TX-64 position TX-64 job requirements | 48 |
| 15 | Email from Petrasch with topics for network Sent to HR team dated 1/19/2021 | 172 |
| 16 | Substructure HR Plant Spartanburg TX-6 PowerPoint | 190 |
| 19 | TX-6 and TX-60 info-share documents for Dawsey And Petrasch with handwritten notes | 41 |
| 20 | Email from Petrasch to Koepnick with org Chart dated 10/1/2021 | 73 |
| 21 | Email from Petrasch to Dawsey regarding Corey Epps promotion dated 9/13/2021 | 144 |
| 22 | Email from Petrasch to Dawsey asking to upgrade Corey Epps to GAA dated 10/1/2021 | 147 |
| 33 | Email from Petrasch to McCraw with Kelly Dawsey Resignation notice dated 1/3/2022 | 198 |
| 34 | Kelly Dawsey resignation letter | 197 |

(Whereupon, the hearing commenced at 9:10 a.m. )

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: Please be seated. All right. Are we ready to proceed?

MR. MURPHY: Yes, sir.

MR. MCCOY: We are, Your Honor.

THE COURT: Okay. Ms. Dawsey, will you please come back up and have a seat in the witness box?

THE COURT: Ms. Dawsey you were sworn yesterday so you are still under oath; do you understand?

THE WITNESS: Yes, sir.

THE COURT: All right. Let's bring in the jury, please.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Good morning, members of the jury, I hope you had a good evening and uneventful trip back into Greenville. I grew up in a little farm in Oakway, South Carolina, and for a while I drove a school bus. I got up at five o'clock and I was complaining about it. At five a.m., the day is half over by then. But I know you had to get up early, been having to get up early to come up here and we all appreciate it.

I also appreciate the careful attention you have

been giving to the testimony and we will get started. Mr. Murphy.

MR. MURPHY: Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Good morning, Kelly.

A. Good morning.

Q. Yesterday we talked a lot about the structure and the details of function levels and personal grades I want to switch now to kind of the guts of the case and the facts of this case. We talked about the HR department and its organizations. In 2021, did things start to change in Spartanburg HR department?

A. They did.

Q. When did you first hear that there were changes underfoot?

A. I would say early 2021.

Q. Okay. And what were you first hearing in early 2021?

A. So, we knew that the Vice President of Human Resources, her contract was ending, she would be returning to Germany. In early 2021 she was making the request to create a project, I think we saw that yesterday, and she had asked me to assist in developing some of the materials for that.

Q. And what position are you referring to in terms of what we talked about yesterday in terms of the new position?
A. TX-66.
Q. Okay. Did anyone tell you in early 2021 that the challenges would affect you personally?
A. They did not.
Q. Now, let's go throughout the summer, were there discussions throughout the summer about changes that could be made?
A. There was continued discussions about the project, what the content of the project would be, and I think probably the next milestone would have been August.
Q. Okay. And how would you characterize those discussions that happened throughout the summer?
A. So, it was very chaotic. I would get called to Christine's office and I had a discussion with Germany and there was discussion about having a domestic in the VP of HR. There is discussion about another international, just a lot of information going back and forth, no decisions, but she was having multiple discussions about the future after she left.
Q. You said I had a conversation with Germany, are you referring to you or --
A. No, she would tell me that she had had

discussions with Germany, "she" being Christine.
Q. Okay. And how often was she having you in her office and talking about these discussions with Germany and different changes?
A. So --
MR. MOODY: Objection to form, Judge. Leading.
THE COURT: Don't lead the witness.
MR. MURPHY: I think the question was how often.
MR. MOODY: Judge, again, it is hearsay upon hearsay. It is based on alleged -- Ms. Petrasch had a conversation with an unknown person in Germany, that is the basis of our conversation.
MR. MURPHY: I wasn't asking about that conversation. I was asking how often her conversations with Ms. Petrasch occurred.
THE COURT: I will allow that question.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. How often were those conversations with Ms. Petrasch?
A. Throughout the summer, about -- every third day in my info-shares, which were once per week.
THE COURT: Info what?
THE WITNESS: Info-share. One-to-one meeting with her.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Lets be clear about that because these terms, you have lived them, a lot of people have lived them, but some of us don't understand, what is an info-share?

A. It is a one-to-one meeting to share information.

Q. Okay. In the summer were you told you would be directly affected by whatever happens in HR?

A. I was not.

Q. Going into the late summer early fall time period, did these discussions continue?

A. It did.

Q. What was the first discussion you can recall where you were informed by BMW that there was a possibility you would be affected?

A. I would say that I would be affected directly was late September 2021.

Q. You mentioned Ms. Petrasch going back to Germany, were you informed at some point in time who would be replacing Ms. Petrasch as Vice President of HR?

A. I was.

Q. Do you recall about when that was?

A. That was a little bit earlier in September, so I knew that prior to knowing that I would be affected.

Q. And what were you told about that?

MR.ROZELSKY: Objection, calls for hearsay.

MR. MURPHY: It is Ms. Petrasch, 801(d)(2)(D), Your Honor.

MR.ROZELSKY: I understand, but I think he is asking for her to testify about what she learned from Germany, she is not an agent of BMW AG, and therefore, it is hearsay about whether if it is coming from Germany.

MR. MURPHY: Well, the exception applies in either instance, Your Honor, Your Honor. Plus, I didn't ask anything about conversations with Germany.

THE COURT: I think she can talk about what Ms. Petrasch told her.

MR.ROZELSKY: To the extent it is MC. I mean, Ms. Petrasch, she is an agent of BMW MC, she doesn't get to testify that says, I also am an agent of AG and I get to talk about AG. She can testify about her knowledge as an MC employee, she is not an AG employee. There is no exception that applies.

MR. MURPHY: Your Honor, there is no Rule of Evidence that says if the agent of the employer makes a statement that becomes inadmissible for the reasons he stated. And even if there was a double hearsay issue, they are both party opponents, there is no hearsay. It is definitionally not hearsay under Rule 801, which

excludes things from the definition of hearsay.

MR.ROZELSKY: Your Honor,we argued this in the motion in limine, I want to make sure it is clear on the record, she, to the extent she is testifying --

THE COURT: Members of the jury, I am going to ask that you step back to the jury room while I take up a legal matter. Remember my previous admonition, don't talk about the case or make any final decisions about the case.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: What is your question, Mr. Murphy?

MR. MURPHY: The pending question was just what Ms. Petrasch told her.

THE COURT: Your objection is that Ms. Petrasch can't talk about what someone with BMW AG allegedly said or told her?

MR.ROZELSKY: Exactly. It is the question, but the anticipated answer, which is going to be about AG, and it is not just about AG. What you heard Ms. Dawsey say for the last three hours is Germany, Germany, Germany. Not specific person in Germany so that we can test whether or not that person is actually a Rule 801(d) exception. It is just Germany. She talked to Germany.

MR. MURPHY: That is not the testimony at play here and I can identify the specific people at BMW AG through this line of testimony, but it is definitionally not hearsay. These are party opponents, and one party opponent saying what another party opponent saying is not hearsay upon hearsay. It is not double hearsay, it is double not hearsay under the rules. We briefed this and you already ruled on this.

THE COURT: So, is there any objection to the witness testifying that Ms. Petrasch went to Germany for meetings, she came back, and what she told her about what was going to happen at BMW MC moving forward without referencing specific conversations with AG?

MR.ROZELSKY: No, Your Honor.

MR. MURPHY: Your Honor, I have to prove both under direct involvement test and the integrated employer test BMW AG's involvement. Now, the argument that they have not identified somebody didn't have the opportunity, that is just not true, and I don't want to say what that evidence is while the witness is on the stand, but they know who the people are. They have been identified. And Ms. Petrasch will also testify who they are. They have known this for years, but it wouldn't matter. If Ms. Petrasch says, I talked to somebody in Germany and they said, that is relevant to

this transaction, it is definitionally not hearsay, it is excluded from the definition of hearsay, and it wouldn't matter who the other person is. But we can identify the other people. They have known these other people for years, they have never identified them as experts -- I'm sorry -- as witnesses, and they never stood forward to contradict. So, they have had the documentation -- I am trying not to say too much, should we excuse the witness?

THE COURT: Well, she is a party. She is your client .

MR. MURPHY: I want to say something, but I don't want to.

THE COURT: You don't want to taint?

MR. MURPHY: Yes.

THE COURT: I dealt with this when I -- AG motion in limine at ECF 157 and let me just refer to that: You all made very good and thorough arguments with respect to that motion.

"The Court has carefully considered
the arguments offered by the parties
in support of and in opposition to
BMW AG's motion in limine. The
Court declines at this time to
exclude such testimony based on lack

of personal knowledge under Federal Rules of Evidence 602. Plaintiff, as the witness, will have the opportunity to establish sufficient personal knowledge at trial and Defendants will have an opportunity to examine her. The Court likewise concludes the purported testimony is factual in nature, not based on opinion with regard to BMW AG's hearsay argument. Plaintiff has presented evidence suggesting German nationals, such as Petrasch, are still employees of BMW AG even when assigned to BMW MC. This statement by Petrasch, therefore, would not constitute hearsay under Rule 801(d)(2); however, BMW AG may be entitled to an appropriate limiting instruction as to this testimony. Finally, the Court notes that the testimony of BMW AG seeks to exclude is based on Plaintiff's notes regarding her conversation with Petrasch. As pointed out by

Plaintiff, Defendants in their Rule 26(a)(3) disclosures, designate Plaintiff's deposition transcript, including her notes on Petrasch's comments, as trial exhibits. Both Defendants also designate Plaintiff's amended complaint, which recounts the same statements by Petrasch as a trial exhibit."

I am not convinced that the statements -- I said:

"Under the circumstances, the Court is not convinced the admission of Petrasch's comments will be unfairly prejudicial."

So I denied the motion in limine at ECF 157. This is from my Order at ECF 180.

MR.ROZELSKY: Your Honor, may I briefly respond. There has been no testimony from the stand that an AG employee still being employees of AG while at MC. Been no testimony about that. You are reading from what was up to that point the testimony, it was inaccurate. Ms. Petrasch testified at her deposition that she did not receive any remuneration in any way from AG. Eva Burgmeier testified about it, so that is why we didn't

raise that issue. But there has been no testimony from the stand from Ms. Dawsey that anyone who was employed at MC, specifically Ms. Petrasch, was still being paid or employed in any way by AG.

But also to this point that it is not double hearsay. Under Mr. Murphy's reading of it, you can have a line worker, line worker, a production worker who says, well, I am also still getting some pay from AG, so I can bind AG to anything I say, that simply cannot be the case. It can't be that if you are getting some money from somebody, and it will come out later more about that issue, but if you are getting some money, that doesn't mean you get to bind anybody. They are not an employee of AG. So she doesn't get to just say, well somebody at AG, even if it is a named person, okay, they don't, as an MC employee, they can bind MC all day long, but they couldn't bind AG. And this question and the subsequent questions that I believe are coming are going to continue to build on this double hearsay issue.

MR. MURPHY: Your Honor, I have three responses. First of all, to the statement that there is nothing in testimony so far that BMW AG employees stopped being BMW AG employees, there was yesterday, we talked about that. They don't sever their ties, they still get their

benefits. It is the same evidence -- some of the same evidence we relied on.

Second, the very testimony I am talking about is documented in exhibits that are not in dispute and I am going to have her testify about those. And there is no objection to those exhibits, in fact they marked some of the same documents themselves, as you noted in your ruling. So, this stuff is in evidence without objection. I am just getting her into the topic, that is all.

Third, we are not talking about people working on the line, Rule 801(d)(2)(D) covers a party's agent or employee on a matter within the scope of that relationship while it existed. That is all we have to show. We don't have to show that the company authorized her to say or anything, it is Ms. Petrasch speaking as the Vice President of Human Resources. When she does that, it is within 801(d)(2)(D), quite clearly. We are not talking about people on the floor.

THE COURT: All right. Anything else on this?

MR. MOODY: Your Honor, MC would like to join with AG's objection.

THE COURT: I am going to overrule your objection, but, Mr. Murphy, I think you need to be careful about being too general, and, of course, you

can't be speculative about who said what.

MR. MURPHY: Well, Ms. Petrasch saying it is not speculative, correct? If Ms. Petrasch said something, even if it is false, it comes in under 801(d)(2)(D), I don't have to prove the truth of what she is saying to get the statement admitted.

THE COURT: I don't know that the witness can testify that Ms. Petrasch came back and said I heard some people talking at the water cooler, I don't know who they were, but this is what I heard.

MR. MURPHY: Agreed. Well, I don't have any testimony like that. It is Ms. Petrasch talking about her discussions with the other BMW Group executives about the decisions being made in this case. They have got the exhibits, we produced them at the very beginning of this case, almost four years ago, they have the info-shares that aren't in dispute, it is the same thing we are talking about right now.

THE COURT: I have ruled in your favor. If you want to keep going, I am happy to hear from you.

MR. MURPHY: Right. Okay.

MR. MOODY: Your Honor, may I footnote something real quick?

THE COURT: Yes.

MR. MOODY: Can we have an agreement that she not

refer to "Germany" generically? I think that would help us all because this generic reference to Germany puts us in a spot every time she does that.

MR. MURPHY: Your Honor, we don't tell witnesses what words to use. If that is the word that was used, that is the word that was used. And if they don't like the word "Germany," they shouldn't have used the word "Germany." But that is the evidence. We get to say what people say, we get to say what words were used at the time. We don't have to sanitize it just for the benefit of BMW just because now they don't like the import of their words.

MR.ROZELSKY: Your Honor, my response to that was I was going to suggest the same thing. If she wants to say BMW AG, but in essence what she is saying is every human in Germany because she is saying she talked to Germany. She is not saying she talked to people at AG or at BMW Group or anything like, that she keeps using the word Germany. I understand that Mr. Murphy thinks that is wonderful to say, oh, they are the Germans and mad about the courthouse, the problem is she needs to be more specific or it really is a hearsay issue because we have no idea, no way to disprove who in Germany said it.

MR. MURPHY: Ms. Petrasch said I spoke to Germany,

that is a truthful statement. And I have never been in this situation where a witness has been told to change a truthful statement to an untruthful statement so it feels better for the other side. If Ms. Petrasch used those words, then those are the words.

THE COURT: Well, I think, first of all, Germany is a country, okay. And the parties to this case are BMW MC and BMW AG. So, I would ask moving forward that if your client repeats what Ms. Petrasch said and what she said was Germany says this, I would ask that you follow up and just clarify who did she mean. In your mind, who did she mean? She can say AG and I think that is a fair way to handle that. It needs to be clear on the record, needs to be clarified so she is not talking about a community, country, or group of people, but she is talking about BMW AG.

MR. MURPHY: I will be happy to ask her that clarification, but I think they will stand up and object ever single time. If we can have a standing ruling on that we can move this on. I am getting to the who specifically are we referring to, I don't want to say it to you right now because if I were on the other side I would be a little upset if I said that with the witness on the stand.

THE COURT: Just make sure that the witness is

clear about what we are talking about.

MR. MURPHY: I think I can do that on this line, Your Honor. That is in the documents, too.

THE COURT: Okay. Well, let's bring the jury in, see if we can get moving forward with this case.

(Whereupon, the following was heard in the presence of the trial jury. )

THE COURT: All right. Jury is back. One second. All right. Jury is back. Mr. Murphy, you may proceed.

DIRECT EXAM CONTINUED

MR. MURPHY:

Q. Ms. Dawsey, when Ms. Petrasch was talking to you during the course of this summer and early fall period, did she tell you with whom she had been speaking about the reorganization?

A. She did.

Q. Who did she tell you she had been speaking with?

A. Specifically, she told me she had talked to T and P.

Q. Okay.

A. And Andy Batz.

Q. Is that Mr. Batz, B-a-t-z?

A. Correct.

Q. Do you know if he goes by another name as well?

A. Andreas.
Q. It is number two, madame court reporter.
We will come back to that in just a little bit, but I was asking you before the break about changes with the Vice President level position and what did Ms. Petrasch tell you about the changes that were happening at that level, at the Vice President level?
A. So, in August, around August, we also knew that we were getting a new President and CEO, our President and CEO was retiring. So, she told me that the incoming President and CEO, who is now Dr. Englehorn, wanted to have a German in the Assembly Vice President position.
Q. And how does that affect -- did she explain whether that had any effect on your department and how?
A. At this point it was still generic, but the next part of that discussion is Sherry McCraw was in Assembly as the Vice President and, therefore, if our new President brought another individual to be the Vice President of Assembly, then at that point Sherry would need to move to another position.
Q. And did Dr. Englehorn bring a German in to head up Assembly?
A. My understanding is he did.
Q. And who is that person?

A. Philip Heinrichsdorff.
Q. Number 13, madame court reporter.
So, let's go to the first discussion that you had where you were told directly that you could be affected. Who did you have that discussion with?
A. Christine Petrasch.
Q. And what did Ms. Petrasch tell you in the first conversation, as best you can recall?
A. So, at that point I was told that the decision had been made that Sherry McCraw would move from Assembly Vice President to Vice President Human Resources. I was also told that there was a rule that if the Vice President of Human Resources was a domestic or a local that the next line of leadership in Human Resources would have to have a German. And she indicated at that point that the German would either come to the role that I was in, TX-60, the role that Corey Epps was in, TX-61, or the role that Scott Medley was in, TX-64.
Q. Okay. I don't remember if we went over these terms, you used two terms domestic and local, I know we talked about expats and inpats, what were the terms domestic or local used at BMW to refer to?
A. Those were the americans who were employees of Plant Spartanburg.

Q. And during your time at BMW, was the term international ever used to refer to an American?
A. Not that I am aware of.
Q. And in this conversation where Ms. Petrasch is telling you about the possible moves for the new person coming from Germany into the department, did she confirm with you whether she had spoken to anybody at AG, BMW AG about that?
A. She told me that she had talked to Dr. Englehorn.
Q. Okay. I am going to show you Plaintiff's exhibit number 6.
MR. MURPHY: Your Honor, this was offered without objection.
THE COURT: Plaintiff's 6 is admitted into evidence.
MR. MURPHY: May I proceed Your Honor?
THE COURT: Yes.
MR. MURPHY: Can we publish?

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Take you to the second page of this. Ms. Dawsey, can you identify the document that we have marked and entered as Plaintiff's exhibit number 6?
A. I can. These are my handwritten notes from my meeting with Christine Petrasch on 9-30-2021.

Q. Is that the date up in the upper right-hand corner?
A. Correct.
Q. Is this all in your handwriting?
A. Yes, it is.
Q. And let me go to what you documented then and I am going to go to the highlighted language and can you read to the jury what you wrote at that time?
A. So, Christine told me in this info-share that the only way to get a local in TX-60 is to have an international in TX-60 to be a bridge to Germany. And that it was already discussed with T and P and that its done.
Q. Now, we have heard those terms before, T and P, can you remind the jury from yesterday what/who T is?
A. T is the Board member for manufacturing.
Q. And P?
A. P is the Board member for HR or personnel.
Q. And when you say "board," what board are you referring to?
A. The BMW Board of Management.
Q. And where is that located again?
A. In Munich, Germany.
Q. Now, in the margin of this document I see you -- well, what did you write?

A. I wrote Eva Burgmeier.
Q. And who is that?
A. I asked her in this conversation if the international had been named and she told me, yes, and that it was Eva Burgmeier.
Q. The international for what?
A. That would be coming to the role that I was in, TX-60.
Q. Did you know who Ms. Burgmeier was?
A. I had only heard her name, I had not worked with her.
Q. Do you know where she worked?
A. She worked in Munich, Germany. I think her code was PM 6, beyond that I don't remember.
Q. At this point in time when you created this set of notes from 9-30, was there discussion between yourself and Ms. Petrasch about what your next position might be?
A. Yes. She also told me in this discussion that she wanted to maintain my function level three and that she wanted to get me moved to TX-61, the position that Corey Epps was in.
Q. Okay. So, to be clear then, TX-61 is at what function level?
A. TX-61 function level 3.
Q. And TX-60 was?

A. Function level 3.
Q. Read for the jury the language I just called out on this exhibit.
A. She also told me that the only way to help and fix and stabilize is that I take over TX-61 because Sherry will take the associate position and you can help balance and influence TX-60.
Q. Did she explain what she meant by Sherry will take the associate position?
A. She didn't elaborate too much, but her indication was that the business balance between associate and business needed some attention.
Q. And there is another entry, let me do a better job there, that is below the highlighted language, can you read that to the jury? Do you see it?
A. I can.
Q. Tell the jury what you wrote.
A. I asked her if there was any consideration to the people in the functions. And she told me no, that they didn't care.
Q. At the top we will be talking about this a little bit. What is the entry I just highlighted there, can you read that to the jury and tell them what it is about?
A. She told me that Scott, who is Scott Medley,

would be going to the project that she had been working to develop for two years.

Q. And we touched on this, I know we saw a screen on it yesterday, but just to refresh the jury's recollection, what position was Mr. Medley in?

A. He was in TX-64.

Q. And what function level is TX-64?

A. TX-64 at the time was a function level three as when Scott moved into it. Christine said she wanted Scott to maintain a three; however, it would be a function level four after this reorganization.

Q. The next entry on that document, please read to the jury what you wrote and explain it.

A. I wrote Corey to TX-64. So, she shared an order for me to go to 61 to maintain the function level three, that Corey Epps would move to TX-64, which would be the vacancy created when Scott Medley moved to the project.

Q. Let me ask you about the last entry, what did you write?

A. Doesn't know if Sherry knows about this.

Q. What conversation did you have with Ms. Petrasch about that or what did she say about that?

A. That was in regards to the note just above where I said recruiting was going toTX-6065 and Christine was indicating she did not know if Sherry was aware of that

change.
Q. So, at this point in time when you created these notes on 9-30, did you know something was happening to your job?
A. I knew at this time that the international was coming and I knew that they would go to TX-60, which is the role that I was in, and I knew that she was trying to maintain my function level three and wanted me to go toTX-61.
Q. Now back to this highlighted language. You testified a few moments ago that Ms. Petrasch said there is a rule, did I hear that right?
A. That is what she told me.
Q. And were you aware of that rule?
A. I was aware of discussions around that rule, yes.
MR. MURPHY: Your Honor, I want to go next to Plaintiff's exhibit 17, which was the subject of earlier discussions. Ms. Rutgers, do not publish this to the jury. Can I send it to you?
MR. MOODY: Your Honor, MC continues to object about this exhibit for reasons that we previously advised the Court. We just want to note that for the record, Your Honor.
MR.ROZELSKY: BMW AG joins in that objection.
THE COURT: Overruled.

MR. MURPHY: Thank you.
May it be published?
THE COURT: Well, I think you need to lay a foundation for it.
MR. MURPHY: Okay. I can do that.
THE COURT: I will revisit my ruling if a proper foundation has not been laid.
MR. MOODY: Thank you, Your Honor.
MR. MURPHY: Thank you, Your Honor.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Ms. Dawsey, are you familiar with a document that has been marked Plaintiff's exhibit 17?
A. I am.
Q. And what is Plaintiff's exhibit 17?
A. This is a document that establishes how expats would be used in what areas, in what means at Plant Spartanburg. In addition, it is an example of using those guidelines and how it would affect TS 6 at the time.
Q. Were you personally involved in the development of those guidelines?
A. I was.
Q. Who created the rule that reflected these guidelines?

A. This was a directive by Johannes Trauth.

Q. What position was Mr. Trauth?

A. He was Vice President of Human Resources.

Q. Where?

A. At Plant Spartanburg.

Q. And does this document reflect the rule about which we have been speaking in terms of filling positions with domestics or expats?

A. Yes, it does.

MR. MURPHY: May I proceed, Your Honor.

MR. MOODY: I don't think I heard a time for foundation purposes, maybe as far as timing.

THE COURT: Can you ask her about the time when this document was developed?

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Do you recall about when this was developed?

A. So, there is a date on it, January 8th, 2016, which would have been the presentation date that it was made to our senior management team.

Q. And let me ask this also, you say it was presented to the senior management team, when documents are presented to the senior management team, what happens to those documents?

A. They are recorded in formal meeting minutes.

Q. And who maintains those formal meeting minutes?
A. The executive assistant to the President and CEO.
Q. Did the President and CEO or the Vice President of BMW MC ever revoke those guidelines?
A. Not that I am aware of.
MR. MOODY: Objection, Your Honor, how does she know that?
MR. MURPHY: Did anybody ever inform you --
THE COURT: Let me rule on it. I will sustain the objection, but go ahead with your next question.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Did Mr. Trauth ever inform you that these guidelines had been revoked?
A. No.
Q. Did Ms. Petrasch ever tell you these guidelines had been revoked?
A. No.
Q. Did Knudt Flor ever tell you these guidelines had been revoked?
A. No.
Q. Did Dr. Englehorn ever tell you that these guidelines had been revoked?
A. He did not.
THE COURT: Permission to publish.

THE COURT: Same objections?

MR. MOODY: Same objection.

MR.ROZELSKY: Yes, Your Honor.

THE COURT: Thank you. Overruled. I will admit the exhibit number 17. Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Let's walk through this document a little bit, Ms. Dawsey, and I want to first point out the title is called what again?

A. "Expat guidelines for Plant Spartanburg."

Q. What does the next line say?

A. Outcome of TS Gesprach October 2015.

Q. Okay. What does that mean?

A. That means that the senior leadership team, TS, had a workshop on October 2015 and this is documenting the outcome of that.

Q. So, again, the senior leadership is having this discussion is what level at BMW?

A. Function level two and function level one.

Q. Okay. Let me take to you the fourth page of this and explain to the jury what they are looking at on this fourth page.

A. So, these, as the top indicates, were topics taken into consideration for when an inbound or an

international was coming in to Plant Spartanburg.
Q. Okay. For example, under, for discussion in TS 6 workshop, what does it say in that first box?
A. Review overall HR organize chart, identify functions that always need to be an international position, could be international, and will not be international.
Q. Okay. During your 25 years in HR or 26 years at BMW, was there ever an international employee in HR in Spartanburg from any country other than Germany?
A. No.
Q. Let me take to you the sixth page of this document. Can you tell the jury what they are looking at?
A. So, this is the organization chart, at this time it would have been TS but now TX-60, the department that I was managing. And it is indicating different options for when an international or a domestic would be appropriate and what scenario.
Q. If we start with the right column here, I see there is some color coding, what is that?
A. So, a green box around the chart would indicate international or domestic could fill the position; a red box would indicate a domestic, meaning a local American; and a yellow box in global indicating an international,

not only from Germany, but others. We had facilities in South Africa, for instance, and a global resource could fill that role.

Q. Were there any positions identified on this chart that could be filled by anyone other than a domestic or a candidate from Germany?

A. Can you repeat that question, please?

Q. Well, you said global could be somebody from across the world other than from I guess AG in Germany; is that correct?

A. Correct.

Q. Are there any global positions on here?

A. No.

Q. Okay. You talked about the two, the options, what are the two options listed here?

A. So, option one, when the Vice President of Human Resources is an international, then the TS 60 manager could be domestic. The planner would be international, the compensation analyst international possible. The benefits role was not recommended for international due to the U.S. ERISA and ACA regulatory environment.

Q. Okay. Now, TS 60 again was your position?

A. Correct.

Q. Let me ask you to read the statement in the top right to the jury.

A.
"TS 60 department has a need for an international in-bound planner or Department Manager ideally from AG tie to network and should follow the status of TS 6."
Q. And, again, AG is a reference to who?
A. BMW AG in Munich, Germany.
Q. So, who made the decision that TS 60 has a need for an international inbound planner, Department Manager ideally from AG?
A. Johannes Trauth.
Q. And I know we talked about he has had a couple of different positions within BMW Group, but at the time this was created, what was his position?
A. Vice President Human Resources at Plant Spartanburg.
Q. Were you involved in the guidelines, expat guidelines?
A. I was.
Q. Explain what your involvement was.
A. So Johannes wanted this documented so that the plant transfer of international that there was some organization to it. And as we got into the discussion, he indicated, as you saw in the boxes, that he wanted to

highlight the positions where Americans could fill them, where other nationalities could fill them, and at that point I started to explain to him that in the United States that there are protected classes and that we cannot slot positions based on national origin.

Q. After you explained that to Mr. Trauth you can't slot positions based on national origin, did he revoke the policy or say, well, then we are not doing this?

A. He did not.

Q. And this Gesprach senior management meeting you were referring to, that was the level ones and twos?

MR. MOODY: Objection, Your Honor. It doesn't say senior management anywhere on the document.

MR. MURPHY: She testified, Your Honor, that the outcome of TS Gesprach October 2015 was a senior management meeting.

THE COURT: Well, the question was leading, so I will sustain that objection, but you can follow up and lay appropriate foundation for her testimony.

MR. MURPHY: I appreciate it, Your Honor, make sure I got it right.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Again, what is TS Gesprach?

A. TS is the senior management team function level

two and function level one, and Gesprach is German and it means workshop. So they had a workshop talking about expats and then we were given the task of how do we develop them, what are they. And at that point TS 6 was then used as the example of how these guidelines would be applied.

Q. Okay. And in 2015, was Ms. McCraw on the senior management group?

A. Yes.

Q. Now, let's talk about the rule and the reality over time. Let me start with some of these past Vice Presidents. The Vice President before Mr. Trauth was who?

A. Let me go back, Brian, I was thinking 2025 when you asked the former question, I would have to look back at Sherry's history to see if she was on the TS team in 2015.

Q. Okay.

A. I want to correct that.

Q. Thank you. If we need to correct something let's get it corrected.

A. Okay.

Q. I appreciate that. I will move on back to where I was going before.

The Vice President before Mr. Trauth was who?

A. Annmarie Higgins.
Q. And when Annmarie Higgins was in TS 6, who was in TS 60?
A. Moritz Kippenberger.
Q. I apologize, we may have missed that one on this sheet. The spelling I have down, unless there is an objection, M-o-r-i-t-z; last name, K-i-p-p-e-n-b-e-r-g-e-r.
So, does the combination of Annmarie Higgins and Moritz Kippenberger follow this pattern that is reflected on page six of Plaintiff's exhibit 6?
A. Yes, it does. It follows option two, Annmarie was domestic, American, Vice President Human Resources and Moritz Kippenberger was German from Munich, Germany.
Q. Now let's go back to when these guidelines were created, again the Vice President was who?
A. Johannes Trauth.
Q. Were you TX-60?
A. Right.
Q. Does this guideline follow that guideline as well?
A. Yes.
Q. After Mr. Trauth, who became the Vice President?
A. Christine Petrasch.
Q. And you were still TX-60?
A. Correct.

Q. So, does that combination, is that combination consistent with the chart on page 6 of paragraph's exhibit 6?
A. Yes. That follows option one, Vice President Human Resources international, TS 60 domestic.
Q. If I could correct the record, I have referred twice to Plaintiff's exhibit 6, I am referring to Plaintiff's exhibit 17.
Let's talk about Ms. Burgmeier, the individual you identified in your notes a while ago. Do you know her work background?
A. I didn't.
Q. Okay. Had she ever worked for BMW in the United States before?
A. Not that I am aware of.
Q. Had you ever seen her before?
A. I had not ever seen her before.
Q. While you were in TX-60, was Ms. Burgmeier ever involved in health benefit issues for the Spartanburg plant?
A. Not to my knowledge.
Q. You talked yesterday about OFCCP, the federal government agency, was she ever involved with dealing with OFCCP while you were in TX-60?
A. Not to my knowledge.

Q. How about ERISA matters?
A. Not to my knowledge.
Q. Okay. I want to now move to October, did you have discussions with Ms. Petrasch in October of 2021?
A. I did.
Q. Did you document those conversations?
A. I did.
MR. MURPHY: Okay. I would like to show you Defendant's exhibit 19, Your Honor, which is offered without objection.
THE COURT: Defendant's 19?
MR. MOODY: That's correct, Your Honor, no objection.
THE COURT: All right. It is admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Take you to the third page of Defendant's exhibit 19 and can you tell the jury what this is?
A. Sir, I developed this sheet to help me just stay organized when I had my one-to-one or my info-share with Christine, so it was my notes document, if you will, that I would take each time.
Q. And what is the date of these notes?
A. Monday, October 4, 2021.
Q. Did you have a discussion with Ms. Petrasch on

October 4th?
A. I did.
Q. And let me ask, if we go to page -- the last page of Defendant's exhibit 19, what are we looking at?
A. These are my handwritten notes of what she shared with me during this meeting.
Q. And what did Ms. Petrasch tell you in this meeting?
A. Would it be okay if I read it?
Q. I don't want you to have to read the whole thing to the jury out loud, but if you would like to review it before you answer, that is fine.
Q. So, she told me there had been another meeting with Sherry and that Sherry was saying that she did not want the older, experienced talent in Human Resources when she takes over.
Q. In this meeting October 4th, were you told what was going to happen to you?
A. I was.
Q. What were you told was going to happen to you?
A. So, I was told that Sherry also did not agree to move me to TX-61 and that I would be moving to TX-64.
Q. Let me ask you about a statement. Do you see where it begins, "I said quote"?
A. I do.

Q. Tell the jury what you wrote and what that was about?
A. So, in this discussion, she also shared with me that Sherry said that it was a shame that I had not moved out of HR and gotten additional life experience in other technologies. And I told her that I had been instructed to move over to HR services and that I did that, that I had moved around into multiple HR areas. And so I basically told her at that point that I felt like the rules were being made up at the time to fit the situation.
Q. And what did Ms. Petrasch say in response to that?
A. She looked to me and she said, yes. And then she said, because of this, you need to take this very seriously. You need to look around, even external to HR and you need to find another job. She asked me to let her know what I wanted her to do to help me. She told me not to show any fear and she said they honestly do not deserve you.
Q. Okay. Let me go through a couple of that, are you okay?
A. Yeah. Thank you.
Q. You used the word "technologies." How is that word used at BMW? What does that refer to?
A. So, technologies are referred to, I would say,

the different functional areas mainly, assembly, paint, body, those production areas.
Q. So, let me ask you a couple of questions about this: At any point in time that you served in Human Resources at BMW, did any of your bosses ever suggest to you that you should move out of HR?
A. They did not.
Q. And we went through your portfolios yesterday, do you remember those boxes talking about moves or what was it called, do you recall?
A. Change in position.
Q. Change of position. Was there any indication on any of your annual portfolios that you needed to move to one of these other areas?
A. There was not.
Q. In your experience at BMW, can you recall any manager within HR moving to another area of the plant in Spartanburg?
A. Not out of HR, no.
Q. After the section you just read, there is another entry on there, can you read that to the jury and tell them what that is about?
A. Yeah, she told me to look at MN 7, which is a purchasing organization; TX-7, which is a finance organization; and PI.

Q. What is PI?
A. PI is an international, they manage the international terms and conditions for BMW.
Q. Terms and conditions of what?
A. International assignments.
Q. Are any of these positions within TX-6 or Human Resources?
A. They are not.
Q. We will come back to that topic in a little bit, but I want to talk about TX-64. So, Ms. Petrasch told you October 4th, that the decision was made to move you to TX-64; is that correct?
A. Correct.
Q. I don't want to go through all of these charts and everything that we went through yesterday, I am going to pull a couple up, but let's talk about the differences between function level three and function level four. I will put back up -- this has already been admitted, Your Honor.
THE COURT: Which exhibit is this?
MR. MURPHY: Plaintiff's 12, Your Honor.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Now, did the different function levels have names that went with them within the HR function?

A. They were titles.
Q. And so what was the title for somebody called function level three?
A. Department Manager.
Q. What was the title for somebody at a level four position?
A. Manager.
Q. Let's focus on what the policy says about level three and level four. How does the policy describe a level three individual?
A. Management level responsibility for multiple functional areas and/or leads a single functional area with full operational control. Typically manages multiple managerial direct reports.
Q. Okay. And by comparison, what does the policy say about level four?
A. Manages one or several functional areas or works highly independently on specialized tasks.
Q. So, what is practically the distinction between function level three, Department Manager, and a level four manager?
A. So, a Department Manager typically managed other managers who had functional responsibility for other areas, let's say. And a function level -- and tended to be more strategic in scope, had a broader scope. A

function level four had more of an operational type scope and usually a less broad scope.
Q. Were function level fours referred to as department managers?
A. They were referred to as managers of departments, but not Department Manager by title.
Q. Let's talk about the experience requirements for your position TX-60 and the TX-64. First, I want to go to Plaintiff's exhibit number 8, this has already been admitted yesterday, Your Honor. Just so we are clear on Plaintiff's exhibit number 8, Ms. Dawsey, what is this document?
A. This is the job description for TX-60 Department Manager HR Planning.
Q. That is your job, right?
A. Correct.
Q. Does the job you hold require prior management experience in Human Resources?
A. It requires ten plus years of progressive leadership experience in Human Resources.
MR. MURPHY: Let's look at then Defendant's exhibit -- just a moment, Your Honor. Defendant's exhibit 13, and, Your Honor, we are offering this without objection.
THE COURT: Defendant's 13.

MR. MURPHY: Yes, sir.
THE COURT: Admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Ms. Dawsey, can you identify for the jury the document we have marked as -- well, they marked as Defendant's exhibit 13?
A. This is the job description for TX-64.
Q. That is the job you were told you were going to, right?
A. Correct.
Q. Now, does TX-64 require any prior HR management experience or progressive HR management experience as a result of TX-60?
A. Reading this it does not.
Q. Now, I want to turn back to the concept we talked about yesterday called personal grades and we saw those charts about personal grades and leadership level or function level, what was your personal grade?
A. At what time.
Q. 2021?
A. Personal grade 11.
Q. Okay. And what kinds of things does a personal grade affect in terms of compensation or benefits?
A. So, a personal grade is an indication of

placement in the compensation band for the function level. And there are also benefits like bonus, there is a bonus percentage based on personal grade annually, you saw that chart yesterday, it is calculated from a personal grade percentage. Vehicle eligibility is based off of personal grade. And I would have to see the chart to know the other specifics, but there are benefits based on personal grade.

Q. Okay. And let's go back to our Plaintiff's exhibit number 12, which is already in evidence, we will go back to that chart we looked at yesterday. So you were a personal grade 11, correct?

A. Correct.

Q. And this is the chart we talked about there used to be four personal grades?

MR.ROZELSKY: What exhibit is that?

MR. MURPHY: Plaintiff's 12. It is on the fifth page.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. So, you are personal grade 11, correct?

A. Correct.

Q. And where does personal grade 11 fit with these functional levels?

A. So, it is what we would call the middle personal

grade on leadership level 3.
Q. So, does a personal grade 11 fit with a functional level four job?
A. It does not.
Q. During your time as TX-60, were there other occurrences where somebody was put in a function level that was lower than indicated on this chart? In other words, their personal grade was higher than the function personal levels for that?
A. Yes.
Q. Was there policy that addressed what would happen in that situation?
A. There was a policy that was established in the middle of 2021 at the direction of PM and PZ.
Q. Okay. Again, who is PM?
A. PM is Barbara Burghardt.
Q. Number five, madame court reporter.
And PZ?
A. Is Andy Batz.
Q. Number two, madame court reporter.
Take to you Plaintiff's exhibit 24, which was offered without objection.
THE COURT: Plaintiff's 24 admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. I will take you to the third page of that exhibit, are you familiar with this document?

A. I am.

Q. Okay. And when was it created?

A. Quarter 2, 2021.

Q. That is during these discussions about reorganization?

A. Yes.

Q. Were you personally involved in creation of this policy?

A. I was.

Q. What was your involvement?

A. We had been given direction that the plant could only have a certain number of function level three and function level four positions and that we needed to bring the plant in line with those targets. And we also needed to bring the employees who were out of line in their current level in their personal grade and who also were in projects needed to be placed in the structure according to these goals.

Q. Again, who was giving you this direction?

A. The direction was coming from the central group.

Q. Central group being?

A. So, our direction mainly came from the PM Group and then PZ through the U.S. hub, the HR hub.

Q. So, going to page three, what is this document showing us?

A. So, this is an overview of the number of employees that would be affected once we applied these guidelines.

A. And.

Q. And what did the guidelines, in a nutshell, do if I am in a higher rated job than that chart rated, talked about you personal grade 11 did not fit in function level four, what do these guidelines do in that situation?

A. So, these guidelines were to bring the individuals that were out of guidelines back into the structural guidelines and the management capacity targets.

Q. Okay. And when we say "bring them to guidelines," to the employee, to the individual, what does that eventually mean?

A. It means a change.

Q. A change how?

A. Depending on their status or if they were a project, they would go into a classification, either a function level or professional band. If they were above the range of the personal grade for the function

level they were in, their personal grade would be decreased.

Q. And was that a popular policy?

A. No, it was not.

Q. Who in particular was upset about that policy?

A. So, Human Resources for one, and I would say majority of the leadership was, as well.

Q. Leadership where?

A. In the plant.

Q. And, with the majority of leadership in the plant being upset, was there anything you could do about that as a TX-60?

A. There was not.

Q. So, under this policy, what does it provide for, for example, if a personal grade 11 is in a functional four position?

A. So, there were several conditions that we had to ask ourselves, this chart is intending to -- picture it as a flow chart. And if there were documented performance concerns or not, and you then would apply the what was called retention period. So, if an employee had a documented performance concern, you are going to follow that first row. If there was no documented performance concern, then row two and row three applied. And the middle was indicating how long

the employee would retain their current level before a decrease would be applied. And the far right of the chart was the impact to their benefits and the time period.

Q. Okay. What kind of benefits are impacted by adjusting somebody's personal grade down to comply with the policy?

A. So, bonus, vehicle, and anything else that was based off of personal grade would be impacted.

Q. Okay. And the last column says PTO impacts, what does PTO stand for?

A. It stands for paid time off.

Q. So, was someone's paid time off affected by what personal grade they were in?

A. Yes.

Q. So, under this policy that was implemented in 2021, when would your salary start being cut or affected by a move to TX-64?

MR. MOODY: Objection, speculation.

MR. MURPHY: Talking about the operation of the policy.

THE COURT: You are asking her how it would affect her?

MR. MURPHY: Yes.

MR. MOODY: Your Honor, I apologize, there has

been no testimony from her about the function level of 64 at the time period that we are talking about.

MR. MURPHY: Your Honor, we said --

MR. MOODY: I mean he can show the exhibit that shows the function level on it and all he is doing is speculating right now.

MR. MURPHY: I can clarify, I thought we had testified about it.

THE COURT: I will sustain the objection, you can lay a foundation.

MR. MOODY: Thank you, Your Honor.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. In your October discussion with Ms. Petrasch, did she tell you what function level TX-64 was going to be?

A. She told me the plan was to move recruiting out of TX-64 and the function level would be a function level four.

Q. So, under this policy --

MR. MOODY: Same objection, Judge.

MR. MURPHY: Same objection to what?

MR. MOODY: It is speculation, it didn't happen.

MR. MURPHY: She is saying what Ms. Petrasch told her, that is not speculation.

THE COURT: I overrule the objection. You can

certainly cross-examine her on that, talk about whether or not something happened or didn't happen.

MR. MOODY: Thank you, Judge.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Given the information Ms. Petrasch gave you in October, given this policy that was implemented in 2021, would your pay have been eventually affected as a result of moving to a function level four position?

A. Yes.

MR. MOODY: Same objection.

THE COURT: I think that was leading. I think you should have asked what affect would it have had on your position.

MR. MURPHY: I just asked would it be affected, didn't I? I can ask what would the effect be?

THE COURT: You asked would your pay have been eventually affected as a result of moving to a function level four, and I think on direct it might have been better to ask what would the effect have been.

MR. MURPHY: Let me rephrase with that question if I could then Your Honor.

THE COURT: I am not trying to tell you what to ask.

MR. MURPHY: It is sometimes I got something in my

mind, I am not hearing it.

THE COURT: We are on direct.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. What effect would this policy have on your compensation benefits?

MR.ROZELSKY: Objection, calls for speculation.

THE COURT: Overruled. She can testify if she knows of her understanding of the policy as related to her by Ms. Petrasch.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. The facts relayed by Ms. Petrasch and your involvement in the development of it?

A. Correct.

Q. What effect would this policy have on your compensation at BMW?

A. So, I would have been either applied to row two or row three. I would go to the salary impact column where there would have been no change during the retention period. Retention period would have either been one year or three years, and it depends on where my salary was in the range as to what the impact was. And that I cannot answer.

Q. Okay. Under this policy, if you are in a

position -- a personal grade higher than the function level even during that retention period, do you get raises?
A. No.
Q. And did you receive raises every year at BMW?
A. I did.
Q. Now, let's talk about the reality, was this policy used to affect compensation of people at BMW?
A. It was communicated --
MR. ROZELSKY: Judge, I am not sure what time period he is talking about, is he talking about when she was there or after she was there?
THE COURT: I will sustain. You need to narrow the time down.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. The policy went into effect in 2021, correct, Ms. Dawsey?
A. July 1, 2021.
Q. Once that policy went into effect, did it affect employees at BMW?
A. So Corey Epps and I sat down and met with the impacted employees. Because of the retention periods, the changes would not have occurred while I was there, but the letters distributing to employees that those

meetings had occurred that this is what would happen.

Q. So, this policy we are referring to, was it implemented at BMW?

A. Yes, it was.

Q. Now, you were at a function level three going to a function level four, does that affect one's ability to advance in the organization?

MR. MOODY: Objection to her going to a function level four.

MR. MURPHY: Ms. Petrasch told her she was going to a function level four.

THE COURT: Well, she can -- I sustain the objection, she can say what Ms. Petrasch told her.

MR. MURPHY: Okay.

THE COURT: And whether or not she -- what function she was at when she left the company.

MR. MURPHY: Those are --

THE COURT: She can testify as to what function level she was in while she was employed at BMW and what Ms. Petrasch told her was going to happen before she left.

MR. MURPHY: Okay.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Be clear, Ms. Dawsey.

THE COURT: Do you want to say something, Mr. Moody.

MR. MOODY: Your Honor, just continue to maintain that this is all speculation guesswork, all of those things. So just want to continue that objection because it didn't happen.

MR.ROZELSKY: I join in the objection.

THE COURT: You can cross her about that.

MR. MOODY: Thank you, Judge.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Yesterday we talked about OFK and your efforts to be promoted into that, was that something you still aspired to in 2021 to move up?

A. It was.

Q. And again what function levels are the OFKs at BMW?

A. Function level two and function level one.

Q. Can function level threes be promoted to OFK?

A. Into a function level two, yes.

Q. Was any function level four individual ever promoted to function level two during your employment?

A. Not that I am aware of.

Q. Did anyone at BMW ever go from function level four to OFK status?

A. Not that I am aware of.
Q. Are you aware of anybody who moved from function level three to function level four ever promoted back?
A. As I sit here I can't think of any that were promoted back up.
MR. MURPHY: Your Honor, I am about to start another section.
THE COURT: Well, this may be a good time for a break. We will take a short break, long enough for the folks to use the rest room if you need to.
Members of the jury, during the break, don't discuss the case or make up your mind about the case. I don't think you can do any research, you can't bring your phones in, but don't do it even if you somehow were to find a way to do it, don't do it. But everyone remain seated while the jurors are excused.
(Whereupon, a short recess was held.)
THE COURT: Bring in the jury, please.
(Whereupon, the following was heard in the presence of the trial jury.)
THE COURT: All right, Mr. Murphy.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Kelly, I want to move to a section now about how some of your colleagues have been treated. We talked

about a gentleman named Scott Medley. And at the time of this re-organization, what position did Mr. Medley hold?
A. TX-64.
Q. And just so we are clear, what sex is Mr. Medley?
A. Male.
Q. Now, do you recall when TX-64 was created?
A. About.
Q. Okay. At the time TX-64 was created, how was it treated from a function level standpoint?
A. So, when 64 was created, Scott Medley was in TX-61 as a function level three, and 64 was created for Scott to move over to 64. And Christine said I want to keep his function level as a three, so 64 will be designated function level three.
Q. We talked about this yesterday, but ow many function level three was BMW HR in Spartanburg allowed to have?
A. Two.
Q. So, your position was a function level three, right, 60?
A. Correct.
Q. And what was the function level three that was assigned to 61 then?
A. Correct.

Q. What was it, I am sorry?
A. Function level three was TX-60 and 61.
Q. So, did creating TX-64 create three function level threes when you were only allowed to have two?
MR. MOODY: Leading.
THE COURT: Sustained.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Did the creation of levels -- positionTX-6064 create three function level three positions?
A. It did not.
Q. How did it not create three function level three positions if 60 and 61 are function level threes and Ms. Petrasch said to treat 64 as a function level three?
A. Because she also said to downgrade TX-61 to function level four.
Q. Did she give any reason for making TX-64 a function level three other than the fact that Mr. Medley was going to be in it?
A. She did not.
Q. And you were involved in, at the plant level, of providing information for grading the positions that were then sent to the grading circle we talked about yesterday?
MR. MOODY: Objection, leading.

MR.ROZELSKY: Leading.
THE COURT: Sustained.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. You testified yesterday about the grading circle, correct?
A. Correct.
Q. And, again, what is the grading circle?
A. So, we would gather information on jobs and submit to the grading circle for their final grading of that job, grading meaning the level, the designation of the level.
Q. And what was your personal involvement then in gathering the information and providing the information to the grading circle?
A. So, I would work with a leader or on my team would work with a leader and gather what other responsibilities, what is the required education level, required experience level for the jobs. We would draft the job function data sheet, and there was a template, as well, that the grading circle required. We would complete that and submit to the grading circle.
Q. So, in creating and providing information on function levels, was who is in the position a factor in determining what the function level for a job was?

A. Should not have been. The level follows the job.
Q. Okay. And what follows the person, as we said yesterday?
A. The personal grade.
Q. I want to show you Defendant's exhibit 12 then. Your Honor, it has been admitted without objection.
THE COURT: Defendant's 12?
MR. MURPHY: Defendant's 12, yes.
THE COURT: It is admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. What are we looking at in Defendant's exhibit number 12?
A. This is the job description for TX-61 as of October 24th, 2021.
Q. Okay. And TX-61 is one of the positions that was formerly graded as a what?
A. Function level three.
Q. What does it reflect here in late 2021?
A. Function level four.
Q. Was the position ever formally regraded by the grading circle down to a level four?
A. It was not to my knowledge.
MR. MURPHY: Let's go to the next exhibit from that time period. Your Honor, this is Defendant's

exhibit 13 offered without objection?

THE COURT: Defendant's 13 admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. And what are we looking at here?

A. This is the job description for TX-64 as of May 1st, 2019.

Q. Who was in that position as of May 1st, 2019?

A. Scott Medley.

Q. What function level is it provided?

A. Function level three.

Q. Did TX-64 ever grade at a function level three?

A. TX-64 was never formally graded.

Q. So, were you ever provided any reason to why it shows up as a function level three other than the reasons Ms. Petrasch gave you about which you just spoke?

A. I was not.

Q. So, Mr. Medley had been in TX-61, which again, was what function level?

A. Function level three.

Q. Okay. So, when he went from a function level three position into TX-64, was the -- did he go from a function level three to a function level four?

A. He did not.

Q. When Ms. Petrasch told you that you were going from a function level three to function level four, did BMW ever change it in the system to keep TX-64 a function level three for you?

A. I was not.

MR. MOODY: Judge, speculation again. Judge, it didn't happen.

MR. MURPHY: That is the point.

THE COURT: She can testify as to what happened while she was there.

MR. MURPHY: Right.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. After you were informed --

THE COURT: Overrule the objection to that extent. She can talk about what happened while she was there.

MR. MURPHY: Yes, sir.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. After you were informed that you were going to TX-64 and then function level four, during the rest of your employment, did anyone ever tell you they would change it to a function level three like we did for

Scott Medley?

A. They did not.

MR. MOODY: Objection, it was always function level three. I don't understand his question. It is prospective.

THE COURT: Overruled.

MR. MURPHY: Your Honor, can we approach a second?

THE COURT: Yes.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

MR. MURPHY: I don't want to create a dust up in front of the jury, but Mr. Moody keeps making factual statements that are incorrect. He just stood up and told the jury that TX-64 was always a function level four; he knows that is not true. I can -- you already have the evidence that it has been treated throughout as a function level four except for the time that Mr. Medley was in it as part of the basis for our sex claim.

MR. MOODY: That is not true.

THE COURT: Three of you are talking at once. One at a time.

MR. MOODY: What he said is not true. Sixty-four

was created, Scott Medley filled it, and the only job description that we have while she was there is that it is indicated as a function level three.

MR. MURPHY: He didn't say while she was there. He said it was always treated as function level three, that is factually incorrect. I can show you line and verse and show you job description it is a four.

THE COURT: Your point is that you feel the basis for the objection is going too far to turn it into a speaking objection so to speak?

MR. MURPHY: Yes, sir. He is not objecting on the grounds of an objection if he wants to, but he just made a factual statement to the jury that is incorrect. He has told them something that I can't go in and correct with her, but we have got sworn testimony that is included in fact in the materials for the readings that you have. But if he wants to make an objection he can make an objection the way we do objections. That was a speaking objection and it is factually incorrect. He didn't say while she was there it was a three, he said it has always been a three, a function level three. And the evidence will come out during this trial it is absolutely not true. Only when Mr. Medley was in the position was it treated as function level three for the reason Ms. Petrasch gave. Everyone else who has

been in that position, it is a function level four, and the job description during those times all show function level four. So, my concern is I just didn't want this to spill out so the jury makes it sound like we are calling each other liars up here, we are not doing that. They may not understand that my problem is standing up in the guise of making an objection they are making factual statements.

MR. MOODY: Your Honor, you advised us and the witness that she could testify about when she was there and the function level when she was there so that was the basis of my objection. What he is doing is going prospective. The evidence will show and has shown that 64 is ungraded and, therefore, it has not been graded to this day. But the exhibit he has shows that it was function level three, so that was the basis of my objection. Trying to comply with Your Honor keeping us in that lane about when she was there.

MR.ROZELSKY: I have nothing to add, I join in theirs.

THE COURT: Well, you don't have a problem with the testimony being limited to what happened while she was --

MR. MURPHY: She has no intention of testifying about what happened after she left.

THE COURT: I think it is fine to make the objection and state -- you need to state the basis so if it is leading, if it calls for speculation, if it is not relevant, but if you feel you need to expound on the objection then we can come up here and do this, but I know what you are talking about, but you make sure that you are protected on the record, and if you need to do that you can come back up here and do this.

MR. MOODY: We have been trying to be lenient so we can move through this trial.

THE COURT: And I appreciate that. I mean, I recognize that there have been some objections that could have been made that weren't and it has helped us move along, I am sure that will be reciprocated.

MR. MURPHY: I don't know.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: All right.

MR. MURPHY: May I proceed, Your Honor?

THE COURT: Yes, sir.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Let me talk about the flip side of that 61, 64 Medley and Epps transition. Again, when Mr. Medley was in TX-61, what was it graded?

A. Function level three.
Q. And I will call your attention to again Defendant's exhibit 12, Your Honor, this is already in, I believe, it is offered without objection.
THE COURT: Twelve is in.
MR.ROZELSKY: It is.
THE COURT: Defendant's 12 is in.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. So, going back to Defendant's exhibit number 12, who was in TX-61 position at this time?
A. Corey Epps.
Q. And again just so we have the record complete, Mr. Epps's sex is what?
A. Male.
Q. And his race?
A. Black.
Q. And do you recall Mr. Epps's personal grade at the time?
A. Personal grade ten.
Q. Okay. So, he was a personal grade ten in a function level four position according to this document?
A. Correct.
Q. Did anything happen with respect to Mr. Epps's personal grade in 2021?

A. Yes.
Q. What happened?
A. He was promoted to personal grade 11.
Q. And who promoted him to personal grade 11?
A. Christine Petrasch.
Q. So, at that point in time, he was a personal grade 11 at what function level?
A. Function level four.
Q. And if we go back to Plaintiff's 12, our chart here on page five, does a personal grade 11 fit in a function level four?
A. It does not.
MR. MURPHY: Let me take you to another document, this is Plaintiff's exhibit 20, Your Honor, which has not been admitted yet, but offered without objection.
THE COURT: Plaintiff's 20?
MR. MURPHY: Yes, sir.
THE COURT: It is admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Ms. Dawsey, will you tell the jury what -- I don't believe it has been published yet, ma'am. Can you tell the jury what this document is, Plaintiff's exhibit 20?
A. This document is informing how reference partner

input would fit into the promotion process.
Q. And what does that mean?
A. That means based on if you look at left side promotion, there are different situations that you could promote an individual. And then on the top right are the personal grades and this would tell you again similar as before like a flow chart when certain scenarios were acceptable and when certain scenarios were not.
Q. Okay. And was this a policy that was applied to Spartanburg?
A. This is a BMW Group policy.
Q. But my question was, was it applied to Spartanburg?
A. Yes.
Q. Okay. And who created this policy?
A. So, if I look at top left would be PZ dash 30.
Q. And what is PZ-30?
A. That is an HR function in Munich, Germany.
Q. I don't want to -- I want to point out footnote 2, it says what?
A. Subject to the verification of the department circle.
Q. Where is the department circle?
A. So depending on the scenario, the department

circle would either be in Germany or in Spartanburg.
Q. Okay. Now, we talked about Mr. Epps being promoted from personal grade 10 to 11 while he is in a job that says function level four, what does this chart say about that?
A. So, I would apply the middle row, which is due to potential, which means there was not an identified role that had been offered in the next 12 months. And if you look at G 10 to G 11, which would be this promotion, it indicates not possible.
Q. This scenario fits in that box right there?
A. Correct.
Q. When that happened in 2021, did you, as TX-60, say anything about that?
A. I did.
Q. To whom?
A. To associate relations, who was the area who carried out promotions coming out of the portfolio round.
Q. And was it explained to you why they were treating Mr. Medley in this function?
A. They indicated that Christine had given them some information that she wanted the promotion to proceed.
MR. MURPHY: Let me show you a document that is marked as Plaintiff's exhibit 5 and Your Honor there is

no objection which I am aware to this one.
THE COURT: Plaintiff's 5?
MR. MURPHY: It is already in, isn't it?
THE COURT: Yes.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. So, we discussed this document yesterday, correct?
A. Correct.
Q. Okay. Let me highlight what it says about Mr. Epps. It talks there about personal grade 11, plan for October '21, do you see that?
A. I do.
Q. What does it say under number one for Mr. Epps?
A.
Corey Epps, first and only minority
candidate within HR first line.
Good market value, more offers on
function level three. Very
important to keep him in that HR
position to send a signal."
MR. MOODY: Your Honor, I object. She added a word or two.
THE COURT: I sustain that objection. She can tell us what the document says, although it speaks for

itself.

MR. MURPHY: I will move on.

THE COURT: Well, just a minute before you move on.

Members of the jury, in response to the previous question about what does it say under number one for Mr. Epps, the witness read from the document that was on the screen before you, which has the words, "very important to keep him in that HR position forward slash signal." That is what the document says. The witness said that was to send a signal. And so you will disregard that portion of her answer. The document speaks for itself in the absence of some additional testimony or evidence about it. Thank you.

MR. MURPHY: Thank you, Your Honor.

Next go to Plaintiff's 21, which, again, Your Honor is offered without objection.

THE COURT: Plaintiff's 21?

MR. MURPHY: Yes, sir.

THE COURT: It is admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Ms. Dawsey, what is Plaintiff's exhibit 21?

A. This is a text message that I received from Christine.

Q. Okay. And what does it relate to?
A. It relates to the promotion of Corey Epps.
Q. And what did Ms. Petrasch write? And just use the words that are on the page.
A.
"Kelly wrote that Corey email for
you to be safe in audits.)
Q. What is an audit?
A. So, HR is responsible for maintaining the guidelines that you just saw. And periodically an auditor would come in, they would check the books, they would check that compensation was according to the guidelines, promotions according to the guidelines. And she sent me an email indicating approval of that promotion and then sent me this text so that I knew that she wanted to protect us if we were ever audited.
Q. And who does these audits?
A. There is an internal compliance area at the plant, as well as a central compliance area and it just depends. Sometimes there are scheduled audits, sometimes they just appear and they are auditing.
Q. And where do the central auditors come from?
A. Germany; Munich, Germany.
Q. Within your own department, are you aware of other examples where BMW used national origin to fill a

position?
A. Yes.
Q. What position is that?
MR. MOODY: Objection, Your Honor. He used the term "national origin."
MR. MURPHY: I don't understand the objection.
THE COURT: I think his objection is that the better term would be international or someone from BMW AG, the jury will have to decide whether or not this was based on national origin. So, in the absence of any other testimony about that, I sustain the objection.
MR. MURPHY: Okay. Let me get to where we are going on it, I think it will clarify it, Your Honor. Let me go to Plaintiff's exhibit 31, which has been offered without objection.
THE COURT: Plaintiff's 31 admitted without objection.
MR. MURPHY: Okay.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Kelly, are you familiar with the e-mails we marked as Plaintiff's exhibit 31?
A. I am.
Q. And let me ask you, this is -- top of this is an email from Ms. Petrasch; is that correct?

A. Yes.
Q. What is the date of it?
A. March 3rd, 2021.
Q. Read us the first line, please.
A.
"Kelly, Germany is planning to
replace Stephan with an expat."
Q. What is she forwarding to you?
A. She has forwarded an email from Daniela Pekar PM 62.
Q. And do you know where Ms. Pekar worked?
A. Munich, Germany.
Q. I'm sorry, madame court reporter, that is number 29.
Okay and read the exact words Ms. Petrasch used in March of 2021.
A.
"Kelly, Germany is planning to
replace Stephan with an expat."
Q. And who is Stephan?
A. Stephan Dombrowski was the planner on the TX-60 team at the time.
Q. Did he report to you?
A. He did.
Q. Where did he come from?

A. He came from Germany.
Q. Did you select Mr. Dombrowski?
A. I did.
Q. What pool of candidates did you use to select Mr. Dombrowski?
A. So PM sent a list of international candidates and I interviewed from that list and selected Stephan.
Q. And when we say "international," again, what are we referring to?
A. They were nationality German.
Q. Were there any Americans on the list that the PM person sent you?
A. No.
Q. And do you recall this email and this discussion surrounding the email?
A. I do.
Q. And again the word expat was used to refer to what?
A. An incoming international, in this case an incoming German.
Q. When the expats from BMW and Germany are assigned to work in Spartanburg, do they have the same perks as the Americans?
A. No.
Q. Can you give examples of how?

MR.ROZELSKY: Objection, Your Honor, this calls for speculation. It is outside the scope of her duties.

THE COURT: Well, lay a foundation. You are talking about her time and employment with BMW MC?

MR. MURPHY: In HR.

MR.ROZELSKY: Can we approach, Your Honor?

THE COURT: Yes.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

MR.ROZELSKY: Two things: One, I don't think it is relevant. The charts that Mr. Murphy has shown show all of the job duties, showsTX-6062 being responsible for expat compensation. Nothing shows she is responsible for expat compensation or benefits. So, if he is going to lay a different foundation, say she dealt with that and it was outside the scope of her work right now, all he has put into evidence is a organization chart that says this is in a different department, so it is all speculation from her.

MR. MURPHY: She can testify she knows.

THE COURT: I think you need to lay a foundation how she knows. So, I sustain your objection up to this point, but if you lay a proper foundation it comes in, her knowledge.

MR. MURPHY: Yeah. That is fine.
THE COURT: Thank you.
(Whereupon, the bench conference concluded and the following was heard in open court.)

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Ms. Dawsey, from the positions you held within BMW HR, are you familiar with how the perks differed between German employees sent to Spartanburg and the Americans who were hired to work here?
A. I am.
Q. Can you give us examples or explain to the jury how they differ?
A. So, as an incoming international, in this case German, there are guaranteed cost increases, base compensation for international assignments, there is relocation assistance, there is schooling provided for children at Christ Church.
Q. What about time off? Does time off vary from where you are from?
A. Yes.
Q. How so?
A. So, the German employees get additional vacation time in their allotment while at AG and that time comes over as well and they are eligible to use that time.

Q. And is that additional time off based on something or related to anything?
A. A lot of them used it during August because August in Europe they are shut down and it is considered vacation or holiday time.
Q. And did any of the Americans hired to work at the plant get these extra time off or other perks you talked about?
A. They do not.
Q. I want to move now into the discussions about your change or what you were told your change would be with Ms. Petrasch as to what was told to the employees. Was there a discussion within the HR department in which anticipated changes were discussed with others?
A. Can you ask the question again?
Q. Sure. Nobody likes my questions this morning. The changes you discussed through the reorganization that were conveyed to you by Ms. Petrasch, was that presented the HR group?
A. Yes, it was.
Q. When was that?
A. Presented to the HR managers was November 11th, 2021.
Q. And it was later than or some other time presented to more people?

A. In early December it was presented to the whole HR department.
Q. And in the November meeting, what was said about where you were going, if anything?
A. There was a presentation and my name was on TX-64.
Q. In the session or the meeting, tell me whatever it was with the entire department, when did that occur again?
A. That would have been early December.
Q. Was the same information conveyed to the rest of the department?
A. Yes.
Q. You were present during these meetings?
A. Correct.
THE COURT: This is December 2021?
THE WITNESS: Yes, sir.
THE COURT: Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Now, when Ms. Petrasch began talking to you about we went to those notes where Eva's name was in the margin when she was talking to you about Ms. Burgmeier coming in, did you have any concerns with Ms. Petrasch about BMW Group bringing in a German to the HR leadership?

A. I did.
Q. Tell the jury about that.
A. So, I expressed to her that I felt that TX-60 was a critical role, that there were a number of U.S. related topics including benefits, including the Associate Family Health Center, and that I did not think that a German could move us ahead in that role.
Q. And did you discuss your concerns about that with anyone else in the leadership of BMW?
A. I did.
Q. With whom?
A. The President and CEO.
Q. Again, that is who?
A. Dr. Englehorn.
Q. Okay. And what did you say to Dr. Englehorn?
A. Dr. Englehorn invited me to a meeting to his office after he was informed that I had rendered my resignation and he wanted to know why. And I shared with him that I thought it was wrong that I was being displaced out of my job and being replaced with a German and that as an American I thought that was wrong. I also asked him if he was aware that there were discussions that I had been discussed forTX-606, and he told me that he was not aware of that.
Q. Were your concerns based on only what had happened

to you?
A. They were broader for Human Resources in general.
Q. What do you mean by that?
A. But for me, as well.
Q. What do you mean broader?
A. So, we had worked on a lot of major projects, we had moved a lot of topics forward, and I felt like bringing a German would move us backwards.
Q. In your role at HR, have you dealt with the concerns of similar things happening to other Americans here when they were replaced by the Germans?
MR. MOODY: Judge, objection.
MR.ROZELSKY: Objection.
THE COURT: Basis.
MR.ROZELSKY: I said leading, I'm sorry.
THE COURT: Sustained.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. In your role at HR, did you deal with the same type of situation involving others?
A. I did.
Q. Tell the jury about that.
A. So, I had a couple employees who this same thing happened to and they saw me as a confidant and they approached me and expressed concern as well when they

were informed that they would be moved out of their roles.

Q. Okay.

MR. MOODY: Objection. Hearsay.

THE COURT: Sustained.

MR. MURPHY: Your Honor, it goes to her state of mind, why she was concerned.

THE COURT: Thank you. Objection is sustained.

MR. MOODY: Your Honor, may we move to strike her answer?

THE COURT: The jury will disregard the last answer.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Let me move on to another topic, Ms. Dawsey. Does BMW, during the time you were there, does it have policies against discrimination?

A. Yes.

Q. And where are those policies?

A. In the Associate handbook.

Q. Okay. Anywhere else that you are aware of?

A. Not that I am aware of.

Q. Okay. And what basis of discrimination are covered in the policy?

A. So, the protected classes under the law, race,

gender, national origin, all of those that are named in the law.
Q. In addition to these policies, does the HR Department conduct training on discrimination?
A. The training that I am aware of was conducted by the Legal Department.
Q. Okay. And who attends those trainings?
A. So, all of leadership.
Q. And who in HR in Spartanburg was ultimately responsible for administering those policies?
A. So, Christine Petrasch ultimately.
Q. Was she involved in discrimination matters other than just applying the policy?
A. So, if there were charges or discrimination matters, they would go to Christine.
Q. We talked a while back about what Ms. Petrasch had told you that was summarized in your what is -- this is Defendant's exhibit 19, Your Honor, it is already in. Do you recall us talking about these notes?
A. I do.
Q. I want to talk to you again about this section. You testified earlier about these other positions outside of HR, do you recall that?
A. I do.
Q. Were you ever offered any of those jobs?

A. I was not.
Q. In terms of the TX-64 position, were you ever actually offered that position?
A. I was not.
Q. Is there a procedure for making offers at BMW?
A. Yes, there is.
Q. Okay. And how does that work?
A. There is an offer letter request form and the leader of the position fills the form out, submits it to TX-60, and TX-60 generates the offer letter. The offer letter then goes back to the leader and the leader makes the job offer.
Q. So, with respect to what was presented to the department you would be going to from 60 to 64, who was the leader?
A. Christine Petrasch.
Q. And who within TX-60 would work on such a letter?
A. That would be the Section Manager Compensation and Benefits.
Q. Is that somebody who worked for you?
A. Yes.
MR. MURPHY: And let's take a look at Defendant's exhibit 6 for a minute. Your Honor, I think it is offered without objection if it is not already in.
THE COURT: Defendant's 6 admitted without

objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Okay. What is this, Kelly?

A. This is a letter indicating a promotion that I received December 17th, 2014.

Q. Okay. So what would this otherwise be known as?

A. This is the offer communication letter.

Q. Did you ever receive a document like Defendant's exhibit 6 putting you into TX-64?

A. I did not.

Q. Is that because you chose not to issue one?

A. It is not.

MR. MURPHY: Let me take you to Plaintiff's exhibit 4. Your Honor, this is offered without objection.

THE COURT: Admitted without objection Plaintiff's 4.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Do you recall this email?

A. I do.

Q. And calling your attention to the "Dear Colleagues" email, who is number 27, madame court reporter, Franka Niessner?

A. I think it is Niessner. She is a colleague in PM 30.
Q. Okay. Where was she located?
A. In Munich.
Q. Okay. And what is going on with this email?
A. So, they are announcing personnel changes in the network.
Q. Okay. What is the date of that email?
A. December 3rd, 2021.
Q. Let me go to the second page where it begins in English. Will you explain to the jury why it shows German and then English? Just explain that to them.
A. Because the parent company of BMW is in Munich, Germany, and the native language is German.
Q. Do the emails come to you translated like this?
A. When I first started, no, but as the years went by, there was either a translation tool that we could use or you would see it in German and English.
Q. Okay. So, at the beginning of this then, do you see where it says:
"Dear P Circle, please be informed about the personnel changes within the P network."
A. I do.
Q. Does your name appear anywhere in that list?

A. It does not.
Q. On the second page of the exhibit. Let's go to the third page of the exhibit, and who is the first name that appears?
A. "Eva Burgmeier."
Q. And does your name or any mention of you moving to TX-64 appear in this document?
A. It does not.
Q. And who is number 22, Claudia Kopnick?
A. Kopnick, she is responsible for PM 6.
MR. MURPHY: Okay. If I can just have a second, Your Honor, I think I am moving, clear some stuff off.
THE COURT: Yes.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Kelly, from the time you graduated Clemson, it was 1990, was it?
A. Yes.
Q. To today, have you worked in any field or profession other than Human Resources?
A. I have not.
Q. Now, I want to back up to this summer time frame and early fall time frame, do you recall your testimony about the discussions with Ms. Petrasch.
A. I do.

Q. Okay. After those started, did you do anything to look at jobs outside of BMW?
A. I did.
Q. Okay. What did you do?
A. So, ironically, one evening my husband came home and he had been at an elderly lady's home doing some construction work and her neighbor came over and she said if you need any help with communication, I can help that.
Q. Let's not focus too much on what other people were saying, I just want to know what you did.
A. So, I engaged with a recruiter.
Q. Okay. We heard Mr. McCoy talk a lot about this in the opening statement, let's be very clear, when did you engage a recruiter?
A. So, middle -- I would say early to middle September.
Q. Throughout your entire career at BMW, had you ever engaged a recruiter before?
A. I had not.
Q. Why did you decide in early September to engage a recruiter?
A. She crossed our path through the interaction I was explaining earlier and I felt really uncomfortable with the communications, they were getting more chaotic by

the day, and I determined that I needed to see if there were other options in the market.
Q. And who was the recruiter?
A. Sherrill Miller.
Q. When you contacted Sherrill Miller, did you tell her about all of these chaotic communications and concerns you had at BMW?
A. I did not.
Q. And to be clear, at the time you contacted Ms. Miller, had you yet been told that you definitely were moving out of TX-60?
A. I had not.
Q. To be clear, at the time you initially contacted Ms. Miller, had you been formally told you were going to go to TX-64?
A. I had not.
Q. When you contacted Ms. Miller, had you made a decision about your future with BMW?
A. I had not.
Q. Then why were you contacting a recruiter when you had not made a decision about your future with BMW?
MR. MOODY: Leading.
MR. MURPHY: It I don't suggest an answer, Your Honor.
THE COURT: I overrule the objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Why, if you hadn't decided about your future with BMW, were you talking to a recruiter in early September 2021?

A. For my protection. I felt like I needed to explore my options.

Q. And when you say for your protection, what were you concerned about?

A. I really did not know where the discussions would end, so I was taking things into what I could into my own hands.

Q. Did you have particular concerns about your future at that time?

A. Not to the extent that ultimately came up.

Q. Okay. Now over the course of your career, had you ever talked to anybody about what else might be out there or talked to other people about jobs?

A. Yes.

Q. Okay. Had you been approached by other companies?

A. Yes.

Q. And did you talk to them when you were approached?

A. Not in every case, but in some I did.

Q. Did you ever accept employment with any other

employer while you were with BMW?
A. I did not.
Q. Prior to this time?
A. I did not.
Q. So, before these communications from Ms. Petrasch, what were your plans with respect to your career at BMW?
A. I planned to stay at BMW until I retired.
Q. When you spoke to Ms. Miller, did you give her any particular instructions about what you were looking for or what you wanted?
A. I did.
Q. What did you tell her?
A. I told her that I was working extremely long hours, some days 12, 15 hours a day and that I wanted a better work-life balance so I needed a job that did not require 15 hour days.

I also told her that I was looking for a culture that I could set myself in and ultimately stay and have that be the company that I retired from.
Q. Did you eventually find a position outside of BMW?
A. I did.
Q. With whom?
A. Madewell Concrete.
Q. What is Madewell Concrete?

A. They are a concrete pouring company mainly focused on driveway concrete projects.
Q. And what position did you accept with Madewell?
A. Human Resources Manager.
Q. And what level of your organization of HR is that at Madewell?
A. It was the top level position in Human Resources.
Q. Was it a pay bump for you?
MR. MOODY: Objection, Your Honor.
THE COURT: Sustained, that was leading.
MR. MOODY: May we approach?
(Whereupon, a bench conference was held in the presence of the trial on the record, but outside the hearing of the trial jury.)
MR. MOODY: Your Honor has bifurcated these proceedings, so to the extent they are going into damage information, I don't think that is proper for the jury because that is a determination for this Court.
MR. MURPHY: I thought Mr. McCoy mentioned at opening she accepted a job at lower pay. He does not want to mention pay for these positions at all.
MR. MOODY: We are looking at exhibits, we redacted comp and benefits.
MR. MURPHY: Okay. So, you are not intending to raise the issue she left for a lower paying job?

MR. MOODY: Not in front of the jury based on the Court's order.

MR. MURPHY: Okay. She didn't answer the question, did she?

MR. MOODY: No.

MR. MURPHY: If we are not going to -- no one is going to point out she accepted for a lower paying job, I will withdraw the question.

MR. MOODY: Could you just explain plain that to the jury? This is a perfect time.

THE COURT: There was no answer.

MR. MOODY: His question is out there and it is pregnant.

MR. MURPHY: That is just beer.

THE COURT: What do you suggest I say?

MR. MOODY: Just disregard that question. Withdraw the question maybe.

THE COURT: He says he will withdraw it.

MR. MOODY: As long as it is clear on the record, I just want to protect myself, Judge. Thank you.

THE COURT: Okay.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Mr. Murphy.

MR. MURPHY: Question withdrawn, Your Honor.

THE COURT: Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. At the time you accepted the Madewell offer and put a time line, do you recall when that was?

A. Early December or mid December, I would have to see the documentation.

Q. So, when did you make the actual decision you would end your career at BMW?

A. I think it was mid December.

Q. And at the time you accepted the job with Madewell, had you been offered any position formally at BMW?

A. I had not.

Q. And how did you resign?

A. I called Christine, my boss, she was in Germany, still on holiday in January, and I called her and told her that -- I apologized for doing it over the phone, but at that point I informed her that I was resigning my position and informed her I would follow with a written resignation.

Q. When you told Ms. Petrasch you were resigning, did she try to get you to stay?

A. She did not.

Q. And the incoming Vice President of HR was who?

A. Sherry McCraw.
Q. The lady sitting over there?
A. Correct.
Q. Did Ms. McCraw call you after you informed BMW you were leaving to urge you to stay?
A. She did not.
Q. From the time that you were told that Ms. McCraw was coming in as Vice President, did she ever reach out to you to talk to you about your future or wanting to work with you?
A. She did not.
Q. Now, you have been through reorganizations before at BMW, correct?
A. Correct.
Q. Did BMW routinely fire their managers during these reorganizations?
A. They did not.
Q. Was this a normal situation?
A. I did not consider this normal.
Q. Why not?
A. Because I had a PowerPoint with my name on it, I had no formal offer, and I had the Vice President of Human Resources telling me to look for another job, to show no fear. And telling me that the incoming Vice President of HR was not interested in the more tenured

employees when she took over. So, I considered this a very unique and I will say scary situation.

Q. Did anyone from BMW, any of the senior management leadership pick up the phone or something say, hey, Kelly, I would really like you to come over to my department and stay with the company?

A. They did not.

Q. And did anyone tell you that you would get the same treatment that Mr. Medley got when he changed positions?

A. They did not.

Q. Did anybody ever tell you you are going to get the same treatment that Mr. Epps got?

A. They did not.

Q. We saw that policy a while back about the adjustments when a personal grade is outside of a function level, do you recall that?

A. I do.

Q. Did anybody ever call you and say, you know what, Kelly? We are not going to apply that to you?

A. They did not.

Q. Did anybody ever tell you that that policy was going to be revoked?

A. They did not.

Q. Did Ms. McCraw have any communication with you

about the department or working on a transition?
A. She did not.
Q. Were you aware that there were any discussions at the senior management level about whether or not you and Ms. McCraw could work together?
A. I was not.
Q. Did you ever tell Ms. Petrasch that you could not work with Ms. McCraw?
A. I did not.
Q. Did you ever tell anyone that?
A. I did not.
Q. I want to clarify one thing because of something that was said yesterday, when did you start legal proceedings against BMW?
A. In February 2022.
Q. And have you been pursuing this case throughout these past four years?
A. Yes, I have.
Q. How long were you at Madewell?
A. Approximately six months.
Q. And why did you leave Madewell?
A. So, the economy had -- gas praises had started to go up, they were impacting the cost of running the business, and there was an instance where I was informed not to pay for payroll funding and this was the first

time this had ever really happened in my career. And at that point I was very concerned with the stability of the company and I decided I needed to look for a more stable company.

Q. Okay. And I think Mr. McCoy mentioned it, but where did you end up at?

A. I am currently at the Greenville Spartanburg International Airport.

Q. In what role?

A. I am the Vice President of Human Resources.

Q. And in terms of Human Resources, is there anybody above you in the chain?

A. There is not.

Q. So, how would you compare, say, the scope of your responsibility in the Madewell and Greenville Airport jobs compared to what you had at TX-60?

A. So, from a scope standpoint, I would say I have a broader scope currently; from a personnel standpoint, there were, of course, more people at BMW Manufacturing. So, similar but different from numbers of people and so forth. But the job I am in now is very broad and responsible for all aspects of HR.

Q. All right. Kelly, we want to wrap this up now. You spent a lot of time yesterday and you spent time today describing what happened to you and what you were

told going through this situation. With respect to the decision that was conveyed to you to take you out of your job, TX-60, and then communication to you that you were going to go to function level four TX-64, what effects did that have on you?

MR. MOODY: Objection, Your Honor, about the inclusion of a function level in that question.

MR. MURPHY: That is what Ms. Petrasch told her, Your Honor.

THE COURT: Can you rephrase the question?

MR. MURPHY: Let me back up.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. When you were told you were going to TX-64, did Ms. Petrasch tell you what function level you would be going to?

A. She did.

MR. MOODY: Leading.

MR. MURPHY: What function level?

THE COURT: Just ask her what she told her about her function level.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. What did she tell you about your function level?

A. She told me it would be a function level four.

Q. So those issues, the discussion about Eva coming into your job and then the subsequent discussion which you were informed that you were going to TX-64 as you just said, explain to the jury what all of those discussions and those moves, what effects did that have on you?

THE COURT: Let's have a chat for just a minute.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

THE COURT: I'm a little worried. I don't think this would be intentional, I am a little worried what she is asked what effect this had, she will get into reduction of income or get into numbers.

MR. MURPHY: Oh, okay.

MR. MOODY: Thank you for that.

MR. MURPHY: I can clarify that.

THE COURT: I hate to do it, I wonder if we ought to let the jury go out and just instruct her not to get into any kind of loss income or benefits and then bring them back in?

Do you want to pull her to the side and tell her that.

MR. MURPHY: I am like my last two.

MR.ROZELSKY: Could he just say without regard to

any income?

MR. MURPHY: That will suggest.

THE COURT: I don't mind asking her to step over if that is okay with y'all.

MR. MOODY: Thank you for that, Judge.

THE COURT: Ms. Dawsey, would you come over just a minute, please? Mr. Murphy is asking you about the effect all this had on you and I just want to make sure that you don't get into any testimony about reduction of income or reduction of benefits or any type of monetary or economic damages, and the reason for that is that if the jury finds in your favor, I will have to decide those issues.

THE WITNESS: Okay.

THE COURT: So, don't talk about reduction in income, benefits, any kind of financial stuff, okay.

THE WITNESS: Yes, sir.

THE COURT: Is that good enough for y'all?

MR. MURPHY: Yes, sir.

MR. MOODY: Thank you.

MR.ROZELSKY: Yes, sir.

THE COURT: Thank you, ma'am.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Thank you. I apologize for that

interruption.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Ms. Dawsey, with respect to those decisions we have just been discussing here, can you tell the jury what effect BMW's decisions had on you?

A. So, at first it was, I would say, a shock, you give 26-and-a-half years -- I am sorry. You give 26-and-a-half years to a company and in one decision you feel like you are undermined. I felt betrayed and at that point the trust was broken for me. I wanted to retire there. I never thought in my early fifties I would be looking for another job after 26 years. We had three kids in college that we wanted to ensure that we were able to get them through and set them up. I was exhausted from a year of chaos and change and I was in disbelief that I would be displaced for a German, so that took an emotional toll and it also took an emotional toll.

When I would eat I would throw up or I would have to run to the restroom. I was still trying to be professional and maintain the work that I was responsible for, the team that I was responsible for while still trying to balance the personal. I would lay down to sleep and I would be exhausted and need to

rest, but I couldn't because all of this was running around in my head. So, it just compounded. And fortunately we were in December and the plant closes for several weeks in December for maintenance and I was just trying to get to that opportunity so that I could rest and clear my mind and really digest what had just happened.

It took me about a year to physically get myself back -- sorry -- and I didn't know that all of this was still inside until now.

Q. Take your time.

A. I will just leave it as I felt very betrayed.

Q. Okay. Did this lead to any outburst at work or problems with your coworkers?

A. Not that I am aware of.

Q. Did you, for example, did you, when these changed were announced, did you announce them to your group?

A. I did.

Q. Did you protest to your group and tell them the things you told the jury the last two days?

A. I did not protest. I communicated as I was asked to.

Q. How are you able to manage that being professional at work if you were so upset?

A. I just tried to put everything in compartments and I made a pact with myself when I got out of the car in the morning that all of the emotional had to go away and I was a leader and I had to lead my team and that is what I tried to do.

MR. MURPHY: I have no further questions at this time, Your Honor.

THE COURT: Thank you. Well, it is 12:30, I think it is probably a good time to break for lunch. I'm sure members of the Clerk's office told you members of the jury there are places down Main Street to eat and side streets, so I hope you are able to get some lunch, if you did not bring your lunch, sometimes people bring their lunch, take a walk. We will break for lunch at this time, it is 12:30, so let's try to get back by one-thirty, but if you find you can't get something to eat and get back here by one-thirty, just make it as close as possible. Sometimes these places get crowded and sometimes service is not what it used to be. So we will shoot for one-thirty and try to start back then. If you are five to ten minutes late, I don't want you to worry about it. Have a good lunch.

Don't talk about the case. Don't make up your mind. Don't watch any TV, I don't think this is going to be on TV, but don't do any research on your phones

or using any other device. Thank you. Everyone may remain seated while the jurors are excused for lunch.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: We will give the jurors a few minutes to filter out. And, ma'am, again, do not discuss your testimony during the break. Thank you. You may step down.

All right. Thank you.

(Whereupon, a lunch recess was held.)

THE COURT: Let's bring the jury in, please.

Welcome back, members of the jury. Mr. Murphy has completed his examination of the Plaintiff and now the attorneys for the Defendants have an opportunity to ask their questions.

Mr. Moody.

MR. MOODY: Thank you, Your Honor.

CROSS EXAM

BY MR. MOODY:

Q. Good afternoon, Ms. Dawsey. I want to start out by just establishing a few things. You admit that you were in TX-60 from February 2015 until you resigned in early January 2022, correct?

A. Correct.

Q. And the date of your resignation was January 3rd,

2022; right?
A. Correct.
Q. And that was done through a resignation notice on January 3rd that stated that your last day would be on January 14th, of 2022, right?
A. Correct.
Q. Ma'am, you never experienced a reduction in salary prior to your resignation, correct?
A. Correct.
Q. Thank you. And as of January 3rd, 2022, your salary was $202,450, right?
A. Correct.
Q. And, ma'am, you never -- well, let me strike that.
Your personal grade at the date you resigned was PG 11, right?
A. Correct.
Q. Prior to your resignation, had your personal grade ever gone down?
A. It had not.
Q. Thank you, ma'am.
And at the time that you resigned, PG 11 was the highest for a Department Manager at BMW MC, right?
A. Correct.
Q. Department Managers are a pretty high position

over at MC, isn't it?
A. It is a function level three.
Q. My question, ma'am, is it a pretty high position over at MC?
A. It is a third level of leadership, yes.
Q. And we know there is one level one over there at MC, right?
A. Correct.
Q. And the level twos, less than ten people?
A. Maybe a little more, but close to ten.
Q. All right. So, as far as Department Managers went from the compensation standpoint, were you in the top five?
A. For the plant?
Q. Yes, ma'am.
A. I don't think so. I would have to look at all of the salaries.
Q. All right, ma'am. You were over compensation and benefits, right?
A. I was.
Q. TX-60 and you don't know where you ranked as far as Department Managers and compensation?
A. I don't.
Q. Okay. How many Department Managers were there at MC?

A. Maybe 18, 20.
Q. All right. Ms. Fowler, can you give us Defendant's 13, please? Apologies, Ms. Dawsey, I need help.
All right. Ma'am, we have established that you resigned on January 3rd and you continued to work until January 14th at BMW MC, right?
A. Correct.
Q. We know, as of those dates, if you look at Defendant's exhibit 13, the function level for TX-64 was what?
A. Function level three.
Q. All right. And this is the only document we have that reflects the function level for 64, correct?
MR. MURPHY: Your Honor, I hate to do this, but this raises the issue we talked about before.
MR. MOODY: I will rephrase it, Judge, let me see if I can fix it.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. While you were employed at BMW MC, this is the only job description that was in effect for TX-64, right?
A. Correct.
Q. And that says that TX-64 is function level three,

right?

A. Correct.

Q. Thank you, ma'am.

Let's go a little historical, if we could. Work with me and we will move this as fast as we can, Ms. Dawsey. You were promoted to function level three in 2015, right?

A. Correct.

Q. In 2015 your salary increased, right?

A. I think so, I would have to see the letter.

Q. And your salary continued to increase every year after that, correct?

A. Correct.

Q. I think from your testimony and the document that Mr. Murphy showed at the close of yesterday that by July of 2021 you were earning 202,450 per year, right?

A. That sounds correct.

Q. Ma'am, you never received a letter lowering your personal grade, did you?

A. Can you repeat the question?

Q. You never received a letter lowering your personal grade at BMW MC?

A. I did not.

Q. You never received a letter lowering your function at BMW MC, did you?

A. I did not.

Q. As far as personal grade promotions, I know Mr. Murphy referenced Mr. Epps, we know from talking to you before that you received two personal grade promotions in about a year and a half in 2015, didn't you?

A. Correct.

Q. Thank you, ma'am.

Now, let's look, Ms. Fowler, if you would exhibit 3. Defense exhibit 3. Let's go over to page five, Ms. Fowler.

THE COURT: Defendant's exhibit 3?

MR. MOODY: Yes, Your Honor.

THE COURT: It is not in .

MR. MOODY: We offer this without objection.

THE COURT: Admitted without objection.

MR. MOODY: Thank you.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ms. Fowler, if you would go to page five of that, two more over. There we go. That second paragraph, Ms. Fowler, if you will highlight that for us.

Ma'am, I am going to read this, you tell me if I misread it:

"It is the personal grade that

determines salary, bonus, and
benefits; therefore, it is your
performance that determines your
reward."
All right. So, would you agree with me that your personal grade determines salary, bonus, and benefits?
A. Correct.
Q. Thank you, ma'am.
And your personal grade never decreased, right?
A. Correct.
Q. All right. Ms. Fowler, let's go to 1. This is Defendant's 1.
MR. MOODY: Defendant's exhibit 1.
THE COURT: You are offering that without objection?
MR. MOODY: Yes, Your Honor, thank you.
THE COURT: Admitted.
CROSS EXAM CONTINUED
BY MR. MOODY:
Q. All right. Ma'am, this has been identified as Defendant's exhibit 1. Does this reflect the job offer letter you received from BMW Manufacturing back in 1995?
A. It does.
Q. And I think you testified to the fact that you

were entry level at the time?
A. Correct.
Q. You had some experience at another employer for about five years after completing Clemson; right?
A. Correct.
Q. Let's go to Defendant's exhibit 2 real quick. And, Judge, I think it might be duplicative of another Plaintiff's exhibit, I don't have that number I apologize. Plaintiff's 1?
THE COURT: Are you wanting Defendant's 2 to go in?
MR. MOODY: Yes, Your Honor, all my references are to this one, I apologize.
THE COURT: It is admitted without objection.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Let's look at this resume. And, ma'am, this is part of your submission to the recruiter that you talked about before lunch, right?
A. Correct.
Q. Thank you, ma'am. Let's look at your employment history, Ms. Fowler, go to the third page. I think Mr. Murphy went over this yesterday. You had some testimony, I just want some clarification, you said Coordinator of Human Resources and then you said it

changed to Section Manager. Wasn't that just a change in name?
A. Can you go back to the page before?
Q. Yes, ma'am, we can. Coordinator and Section Manager are the same thing, aren't they?
A. The Coordinator title was replaced with the Section Manager when we implemented function levels and personal grades.
Q. So, to the extent you claim that was a promotion, that was really just a change in title?
A. This was a promotion, I moved to a different functional level and took on more responsibility.
Q. Okay. Well, what was formally known as Coordinator also became known as Section Manager, right?
A. Correct.
Q. Thank you, ma'am. We see you have this history that leads us up to January 2015 that you were still a Section Manager, remind me, was that TX-62?
A. Can we see it?
Q. I am just asking you, November 2011 to January 15, were you in TX-62?
MR. MURPHY: Your Honor, she has asked to see it, that is fair.
THE COURT: She can testify if she knows.

THE WITNESS: November 11 through January 2015TX-6062 Human Resources Operation, correct.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ma'am, when was your -- when was Johannes Trauth at BMW?

A. I don't know, I would have to see the SAP record.

Q. Did I misunderstand your record that Johannes Trauth told you you needed to go to different functional areas?

A. He did.

Q. Do you remember what year that was?

A. I don't. I think it was prior to him coming when he was in Germany we had a conversation, but I don't remember the exact years.

Q. Do you have any idea what year that was?

A. I don't.

Q. Thank you, ma'am. So, just to hit on this while we are here, if you look at your resume, Ms. Fowler, if you will drop up just a little bit to the top ma'am, these are bullets regarding your position at TX-60, I want to ask a couple of questions since we are here.

Do you see on the first bullet that you say that your job involves "dealing with compensation and benefit

with a plan that covers approx 22,000 covered lives"?
A. I do.
Q. And in organization you say "oversight and local organization with corporate guidelines to ensure accuracy of implementation." What corporate guidelines are you referring to there, ma'am?
A. So, these are the FO guidelines.
Q. So, would those guidelines be coming from BMW AG you are saying?
A. Correct.
Q. All right. And, ma'am, in HR planning, there is some bolded type things says "target development." What is target development?
A. Target development, what targets would we track or keep performance indicators in Human Resources.
Q. Let's go to the first page, Ms. Fowler.
If we look under your key strengths in that paragraph, ma'am, you claim "expertise and in all generalist HR areas, including recruitment," do you see that? It is the last line?
A. Yes, I see it.
Q. Ms. Fowler, I need to grab those couple more lines down there.
It also says "training and development," right?
A. Correct.

Q. "Training and development," the last one is "talent and development programs"?
A. Yes.
Q. So, did you do that in TX-60?
A. Correct.
Q. Thank you. Let's pull up exhibit 6, Defendant's exhibit 6. All right, ma'am. When you went to the Section Manager for Compensation and Organization, you were in that position as a PG 8, right?
A. Correct.
Q. All right. And when you went in 2004, you moved to PG 9, didn't you?
A. December 2014.
Q. That is when you became PG 9?
A. I'm sorry, this was no change. I would have to see the letter to know when I became PG 9.
Q. All right. So, let's just say you became PG 9 in 2004, I don't want to dig out the letter. You remain PG 9 until October 14th, 2015, right?
A. I would have to see -- I would have to see my SAP record to confirm dates.
Q. Is it fair to say you stayed in PG 9 for about ten years?
A. I would have to see my record.
Q. You don't know?

A. I don't.
Q. Thank you.
We know you were promoted to TX-60 Department Manager on February 1st of 2015, right?
A. Correct.
Q. All right. So, is this document we are looking at the document that reflects you receiving that?
A. Correct.
Q. All right. And in 2014 your salary was 141,225 dollars, right?
A. Correct.
Q. And as a result of becoming a Department Manager, you moved up to 148,300 dollars, right?
A. Correct.
Q. And that was a little more than ten years ago, agreed?
A. Yes.
Q. Thank you, ma'am.
Let's go to the next page.
This is the document, I think, that reflects your personal grade promotion to PG 10 as of October 4th, 2015?
A. Correct.
Q. Then you had additional salary bumps from personal grade nine from 153,490.50 to personal grade ten, your

annual salary went to 162,000, right?
A. Correct.
Q. Now, down at -- we have this box, and I think you testified about how personal grade impacts vehicles and other benefits, is this an accurate reflection of how personal grade lines up with benefits?
A. It is.
Q. So, ma'am, at personal grade ten, you participated in the vehicles, right?
A. Correct.
Q. Your life insurance stayed the same, right?
A. Correct.
Q. Your plant bonus was the same?
A. No. The plant bonus was based on the percentage, then it had incremental increase on the personal grade.
Q. Okay, ma'am. Well, the descriptive there doesn't -- just shows it remains at half at the non-exempt bonus percentage result?
A. My apologies, I stand correct. The plant bonus was one half of the non exempt bonus percentage.
Q. All right. Your individual bonus was based upon the individuals and the increase in personal grade, right?
A. Right. So, this is the one that has the incremental increase.

Q. Then your individual bonus multiplier varied based upon your personal grade?
A. That's correct.
Q. All right. And so we know that you never went down in personal grade, right?
A. Correct.
Q. And your salary never went down?
A. Correct.
Q. And your benefits never went down?
A. Correct.
Q. Let's go to the next page. Your Honor, I think six is admitted without objection and if I omitted that?
THE COURT: Defendants?
MR. MOODY: Yes.
THE COURT: Admitted.
MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. If we look at the next page that is marked 94, again, we see new increases in salary, correct?
A. Correct.
Q. And at this point you are responsible for compensation and benefits, right?
A. Can I see the date on the letter?
Q. It says March 20, 2016.

A. Okay. Yes, I was in TX-60.
Q. Thank you. Let's go to the next page.
Now, ma'am, you were receiving an additional, in addition to your annual salary, what I call significant bonuses. Do you consider $40,476.10, as reflected on this page as of 2016, to be a significant bonus?
A. Can you define "significant"?
Q. I get to ask the questions, ma'am. I asked you, do you define $40,000 to be significant?
A. That is a nice bonus, yes.
Q. Is it "significant"?
A. I don't define it "significant."
Q. Thank you, ma'am.
Let's go to the next page.
So, as of 2017, March 20, 2017, does this accurately reflect that your personal grade was increasing from 10 to 11?
A. Yes.
Q. As a result of the increase of personal grade, your annual salary went up by approximately $10,000, correct?
A. To 178, correct.
Q. And you also had benefit changes as a result of the increase in your personal grade, right?

A. Correct.
Q. And that increase would be the individual bonus multiplier, is that the one increase?
A. Yes.
Q. Thank you, ma'am.
Ms. Fowler, let's go to the next page.
In addition to that 178,000, you also received a bonus in June, June 2nd of 2017, in the amount of 41,632 dollars right?
A. Correct.
Q. So, as of 2017, between your salary and your bonus, you were making in excess of 200,000, right?
A. Correct.
Q. Thank you, ma'am.
Next page.
As of 2018, your base salary was up to 183,5, and your bonus was just a little short of 41,000, right, ma'am?
A. Correct.
Q. Next page is as of 2019, your salary was 189,831 dollars and your bonus was 39,300 dollars, right?
A. Correct.
Q. In 2020, your salary had increased to 196,500 dollars and your bonus was 39,975.87, right?
A. Correct.

Q. And every time they changed your compensation, they gave you a written notice, right?
A. Correct.
Q. In 2021, your annual salary, I think we talked about this, was 202,450 dollars, right? She will get it back in just a second.
A. Correct.
Q. Thank you, ma'am. And your bonus was 42,599.50 dollars, right?
A. Correct.
Q. So, between your salary and your bonus, you were approximately 245,000 a year?
A. Correct.
Q. Thank you for that, Ms. Dawsey.

MR. MOODY: Let's look at Defendant's exhibit 7. I don't think this one has been admitted, Judge. If it has, we apologize, but we offer it without objection?

THE COURT: Admitted.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ms. Dawsey, this is one of the summary SAP sheets, and the first sheet, does that accurately reflect your positions through 1995 through 2020?
A. Yes, it does.
Q. All right. Let's go to the next sheet -- next

page, rather. All right.
All right. Ms. Dawsey, this is, again, a summary sheet that captures some additional information regarding dates of employment, which also includes levels and compensation amounts, is this an SAP type document, ma'am?
A. Yes, it is.
Q. So does this document accurately reflect your compensation from an annual salary standpoint from 2009 all the way through the date of your resignation?
A. No.
Q. It does not?
A. It is through July 4th, 2021.
Q. All right. But you would agree with me that the date you walked out of BMW MC, your annual salary was 202,450, right?
A. Correct.
Q. Other than that end date being, you know, one is that not filled out, does this accurately reflect your compensation from the annual salary?
A. Yes, it does.
Q. Does it accurately reflect your personal grade where it says "LV?"
A. Yes, it does.
Q. And the "LV" column stands for personal grade,

right?
A. It does.
Q. Thank you, ma'am.
And as you testified earlier, every year your salary increased and then you went from personal grade nine to 11 in almost a year and a half, correct?
A. Correct.
Q. And that is when Johannes Trauth was the HR Director?
A. Correct.
Q. And I apologize, I said HR Director, I should say VP of HR.
A. Yes.
Q. So, when Johannes Trauth came on board, your personal grade increased two levels, from nine to eleven, in a little bit over a year and a half, correct?
A. Correct.
Q. Now, ma'am, as of July 4th, 2021, you and Scott Medley had identical salaries, didn't you?
A. I would have to see his record.
Q. When you testified at your deposition, you told me that you had identical salaries, has that changed?
A. It has just been years, so I would have to see his record.

Q. All right. So, what how about your deposition? If I showed you your deposition, would that help you remember?
A. If I confirmed it in my deposition, yes.
Q. Okay. All right.
MR. MOODY: Your Honor, can I publish her deposition?
THE COURT: Any objection? Are you talking about that portion of the deposition?
MR. MURPHY: I thought the purpose was to refresh her recollection, which would have him just show it to her, have her read it.
THE COURT: You can show it to her and ask her about it.
MR. MURPHY: What page?
MR. MOODY: One twenty-eight (128) and 129, I think. Your Honor, this is the original.
THE COURT: The record will reflect that Mr. Moody is opening the sealed original of the deposition.
MR. MOODY: Your Honor, may I approach?
THE COURT: Yes.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ms. Dawson, this is the original deposition

transcript, your deposition of August 30th of 2023, unsealed it from the court reporter, and I am told if we look at page 128 --

THE COURT: Let me say something about a deposition, not everybody is familiar with a deposition. When there is an action like this pending, the parties get to exchange information and they also get to ask questions of parties and witnesses under oath with a court reporter present. And the court reporter prepares a deposition, which is a written transcript, we call it a deposition, but the deposition -- as a result of the deposition, a written transcript of what was said is prepared. And so that is what Mr. Moody has handed Ms. Dawsey is the transcript from her deposition when the lawyers got to meet with her and ask her questions under oath.

Any exceptions to my remarks inartful as they were?

MR. MURPHY: Not from the Plaintiff.

MR.ROZELSKY: No, Your Honor.

THE COURT: All right. Thank you. Go ahead, Mr. Moody.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ms. Dawsey, I am going to direct your attention

and I am going to read the question and you can read the answer.

MR. MURPHY: Your Honor, he is not impeaching, I thought he was just refreshing her recollection.

THE COURT: I think that is what he is doing. Do you have an objection?

MR. MURPHY: I thought she was just -- I'm sorry, refreshing, she was going to look at it and then answer his question. I don't want there to be an implication she is changing her testimony, which is what that process is for.

MR. MOODY: I am not implying she is changing her testimony.

THE COURT: I think he can ask her, he says he is not making any implication, I will take him at his word. So, I think he will read the question and let her read the answer. It is typically he would have another copy back there.

MR. MOODY: I can put it on the ELMO for everybody, Judge.

THE COURT: Just go ahead.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ms. Dawsey, you remember on August 30th, 2023, at your lawyer's office where I took your deposition?

A. Yes, sir.
Q. I asked you questions, you gave me answers?
A. I did.
Q. Let's look at page 128, line eight, it says:
"All right. And we see that Mr. Medley has on an entry here an annual salary of 202,450 as of what dates?"
A.
"7-4-21."
Q. My question:
"So you had equalized with him as of that date, right?"
A.
"Our salaries were the same as of that date."
Q.
"All right. What about your function level or leadership level, what was your leadership level as of that date?"
A.
"Function level three."
Q. It actually says "three."
A. "Three."

Q. Thank you, ma'am.
Question: "What was Mr. Medley's leadership level as of that date?"
A.
"Three."
Q.
Question: What "was your personal grade as of July 4th, 2021?"
A.
"Eleven."
Q.
Question: "What was Mr. Medley's personal grade as of July 4th, 2021?"
I guess I need to turn the page.
A.
"Eleven."
Q.
Question: "So, from a personal grade, leadership level, and annual salary, you and Scott Medley were identical, correct?"
A.
"As of 7-4-2021."
Q. And I said, "thank you, ma'am," right?

A. Correct.

MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ma'am, as we have now looked at your deposition from that day, has that refreshed your recollection that you and Scott Medley were identical as of July 4, 2021?

A. Correct.

Q. Let's talk about TX-60. Ms. Fowler, would you go to the next exhibit and I think it is five pages in.

THE COURT: I'm sorry, which one is this?

MR. MOODY: It is -- Judge, you don't have to be sorry because I didn't say it, it is Defendant's exhibit I think 11.

THE COURT: Admitted without objection. Thank you.

MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. If we look at the fifth page, it is BMW MC 306, it is on the board. Mr. Murphy, I think, asked you some questions about this. As of April 1, 2019, the Department Manager for HR planning, which is the position you held, was what function level?

A. Function level three.
Q. All right. And who is responsible for these job descriptions?
A. TX-60.
Q. That would be your department, right?
A. Correct.
Q. You have personally written these job descriptions, haven't you?
A. We get input from the managers, then we fill out the form, the template.
Q. You have actually inputted data into these, haven't you?
A. I have.
Q. As the Department Manager?
A. Correct.
Q. All right. So, if we look over a couple of pages, go to the education section, Ms. Fowler, it is 308 at the bottom. Go back one. There we go.
You see at the top where it says "education"?
A. I do.
Q. Thank you, ma'am. You see where it says "Master's degree" preferred, right?
A. I do.
Q. You didn't have a Master's degree?
A. I do not.

Q. And yet you were allowed to perform that job?

A. Correct.

Q. Thank you, ma'am. And in "Experience," would you agree with me that there is an or that talks about the ten-plus years of progressive leadership experience in Human Resources position or related professional experience, including five-plus years of supervisory experience, right?

A. Correct.

Q. That is an or, that is not an exclusive thing that you had to have ten years of progressive leadership experience, would you agree with me about that?

A. Correct.

Q. Thank you, ma'am.

Let's go to number 12, Defendant's exhibit 12, Your Honor.

THE COURT: Twelve (12) is in.

MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Now, ma'am, this is the -- yeah. This is the job function data sheet as of October 24, 2021, right?

A. Correct.

Q. This is the period of time where you testified that you had already engaged a recruiter, right?

A. Correct.
Q. And this is a period of time where Corey Epps is in the TX-61 position, right?
A. Correct.
Q. And I think you testified that you attributed this statement to Ms. Petrasch that she had proposed moving you to TX-61 to protect the level three, is that what you testified to?
A. Correct.
Q. And so after that time period in early October when you learned that you would be going to 64, you changed the job description for 61, didn't you?
A. I don't know who updated the job description, but it was updated October 24, 2021.
Q. Well, somebody in your department updated it, didn't they?
A. Correct.
Q. So, is it your testimony you didn't update this job description for Corey Epps in TX-61?
A. I don't remember who -- somebody updated it, I don't remember who updated it. And I don't know what the change was.
Q. All right. But you do -- I mean, this is a BMW MC document that came from your department, right?
A. Correct.

Q. And you agree with me that as of October 24th of '21, that the function level of TX-61 had changed to four?
A. The function level changed to four when Corey -- when Corey took over the job.
Q. I had a real simple question. Would you agree with me that as of October 24th, 2021, the job description for TX-61 was changed to function level four?
A. The job description was changed. I can't tell you that that was the change.
Q. That was my question. Thank you, ma'am.
So, before October 24, 2021, it was what function level?
A. I would have to see the SAP printout for the job.
Q. All right. How about we do better. Ms. Fowler, let's go back to the first page. Let's go five pages to the right if I am turning a book. Go back two. That is my fault.
Let me ask it this way. Let's not worry about that. It is 316 at the bottom. There we go.
Before this change in October, the last job description was April 1st of 2019, do you see that?
A. I do.
Q. And do you also see that the function level was

reflected as three in that one?
A. I do.
Q. So, from April 2019 until October '21, the job description was for a function level three, right?
A. I would have to see the SAP record, the job description feeds from the SAP function.
Q. So, I am asking you about the job description. So the job description was function level three and in October it changed -- October of '21 it changed to four, right?
A. If there weren't any other iterations in between, correct.
Q. Are you aware of any other iterations in between?
A. I would have to look in SAP.
Q. Okay. Ma'am, I think we have already talked about 13. As of May 1, 2019, Defendant's exhibit 13, which is the job function data sheet for TX-64, we know that that is a level three, right?
A. Correct.
Q. So, as of the date you resigned from BMW MC, the job description for TX-60 reflected it was a function level three position, right?
A. Correct.
Q. And the job description for TX-64 reflected it was a level three position, correct?

A. Correct.
Q. And the job description for TX-61 indicated it was a function level four position, right?
A. Correct.
Q. So, from a job description standpoint, you had two level threes in theTX-606 Department for Department Managers, right?
A. Correct.
Q. All right. So, we know that you and Scott Medley were equalized. Do you have any idea, were you and Scott Medley ranked as Department Managers from a compensation standpoint?
A. I don't.
Q. And after seven years as the compensation benefits Department Manager, you don't know where you ranked in the organization from Department Managers?
A. I don't. I separated myself from the numbers.
Q. Let's talk about Corey Epps a little bit more. We just looked at the job description and how his position function level was changed on the job description in October 24th of '21, and you claim that Corey Epps is treated more favorably than you, right?
A. Corey Epps was treated differently than the guidelines.
Q. Okay. Do you claim in this lawsuit that Corey

Epps was treated more favorably than you?
A. Differently than the guidelines I was trying to uphold.
Q. You brought a claim for race discrimination in this case, right?
A. Correct.
Q. And you claim that you were discriminated against and that Corey Epps is the person you point to, right?
A. Correct.
Q. So, was Corey Epps treated more favorably than you?
A. Corey Epps was going up while I was going down.
Q. Was he treated more favorably than you?
A. Yes.
Q. He was at what personal grade during this time period of October 2021?
A. Personal grade being ten, promoted to 11.
Q. You were above him at personal grade 11, weren't you?
A. Correct.
Q. You were at a function level three job, right?
A. Correct.
Q. And we just looked at a document that showed that you or someone in your department changed Corey Epps's function level down to four in October of '21, right?

A. That is the date on the job description. The function level change happens in SAP, so we would have to look at the SAP record to see the date of the function level change for 61.
Q. Ma'am, I am asking you what the document reflects, and it reflects that somebody in your department changed it October 24th, 2021, right?
A. They changed the job description. There is something on the job description that changed October 24th, it is not necessarily the function level.
Q. Let's go to Defendant's 21, please.
THE COURT: Are you offering this?
MR. MOODY: Yes, I am offering it, thank you, Judge.
THE COURT: Admitted without objection.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ma'am, do you remember this email exchange from your deposition?
A. I do.
Q. All right. So, if we go one more page, Ms. Fowler.
We see in September 13th of 2021 that there is an email chain, you and I in your deposition we talked about this, you thought you had sent the email, it ends

up it was Monique Sanders, correct?
A. Correct.
Q. And you were working with Monique on this, right?
A. Yes, sir.
Q. So, on September 13th, this email chain starts, and the subject is:

"Monique, where are we with Corey's
promotion to PG -- it is G 11? I
will need to go to Germany and will
come back end of September,
Christine."

Do you see where Ms. Sanders reflects on September 13th that she is checking TX-60 on this and will follow up with you?
A. Correct.
Q. Did she check with you, ma'am?
A. She did.
Q. Go to the first page, Ms. Fowler. All right.
So we see that you are the "at" symbol there, I guess added to the chain, and do you recall receiving this email from Monique Sanders on September 13th, ma'am, in the middle?
A. I see the email on the screen, I don't recall it coming in, but, yes, I see it, it was to me or cc me.
Q. You see at the bottom it says "Kelly," that would

be you?
A. Yes.
Q.
"Please advise the next step if Christine wants to move forward."
Did you advise of next steps, ma'am?
A. I let Monique know, yes.
Q. And what were they?
A. That Corey could not be moved to a G 11 on a function level four because he did not have a secured position.
Q. All right, ma'am. And, you know, we have seen already in this case that there was a response by Ms. Petrasch saying that Corey had other technologies, meaning other areas of the plant that were desiring him, right?
A. Correct.
Q. And that other areas of the plant were trying to obtain his services as a level three, right?
A. Correct.
Q. And so do you see at the top where you are copied that Ms. Petrasch, who is your boss, right?
A. Correct.
Q. Says:
"We will talk about that tomorrow.

If there is -- there is a rule in
Germany, if there is a position
within next 12 month on Horizon it
is no problem. So all should be
good."
Right?
A. Correct.
Q. You did not implement that on September 13th, did you?
A. I did not.
Q. Let's go to Defendant's exhibit 22.
THE COURT: Defendant 22?
MR. MOODY: We would move for its admission without objection.
THE COURT: Admitted.
MR. MURPHY: Did you say 22?

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. You see at the bottom ma'am it is now October 1st and you are receiving an email from your boss, right?
A. Correct.
Q. And tell me if I am reading this wrong:
"Dear Kelly, Corey Epps's promotion,
G 10 to G 11, (October 2021), was
discussed and confirmed in SMM

portfolio around April 2021. Corey will takeover a FE 3 within the next 12 months? Therefore, please go ahead with his paperwork and realization. PM-6 is informed."

So, ma'am, does this basically say in his portfolio review in April it was indicated to him that his personal grade would increase to G 11 in October 2021?

A. No.

Q. That doesn't say that to you?

A. No.

Q. Did you move Corey Epps from G 10 to G 11?

A. Corey was promoted from G 10 to G 11.

Q. Did you implement the paperwork and realization as instructed by your boss?

A. It was implemented, yes.

Q. I asked if you did it?

A. It is not mine to do; there is a member of the staff that does that.

Q. All right. But it is your department, right?

A. Correct.

Q. Did you instruct someone in your department to do it?

A. Yes.

Q. Thank you.
Why did you wait from the 13th of September until you were told by your boss on October 1?
A. Because it still doesn't meet the guidelines.
Q. Even if your boss tells you to do it?
A. My job is to ensure the guidelines, so I had to make sure she understood that moving forward did not meet the guidelines. A position needed to be secured.
Q. Ma'am, is your race claim in this case based on either Corey Epps was promoted to PG 11 and you disagreed with it?
A. It is not.
Q. Once you promoted Corey Epps or your department moved him to PG 11, as your boss told you to, what personal grade were you?
A. PG 11.
Q. So, he was an equal personal grade?
A. Correct.
Q. What function level was he performing?
A. Function level four.
Q. Okay. So, you had a better function level than him, right?
A. I was in a function level three.
Q. All right. So, yes, right?
A. Yes.

Q. And we know from your deposition that Corey Epps was making 168,814.37 dollars, right?
A. Are you reading from the deposition?
Q. Ma'am, I get to ask the questions.
A. I'm sorry, I don't remember the number.
Q. Okay. Do you remember that you made over 30,000 dollars more than Corey Epps?
A. I remember I made more than Corey, I don't know the exact number.
MR. MOODY: Judge, may I refresh her recollection?
THE COURT: Yes.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ma'am, I am going back to the deposition. Ms. Bull will get me if I don't say some things to talk about what we are doing. I am opening the deposition and I am told we need to go to page 133. I am going to show you 133.
My question:
"Now, ma'am. You have made some allegations in this case regarding that there are people that are -- were favored because of their race. Is the person you are referring to

Corey Epps?"
What was your answer?
A.
"Yes."
Q. Question:
"All right. So as we look at this printout, BMW MC, Corey Epps made 168,814.37 dollars as his actual earnings in 2021. What was your salary in 2021, ma'am?"
Mr. Murphy had an objection, Your Honor.
And then she answered.
A.
"As of 7-4-2021, 202,450 reflective of function level three PG 11."
Q. Then my question:
"As of the date of the printout we are looking at, Mr. Epps is the same personal grade, but makes less than 170,000, whereas you are above 200,000, right?"
A.
"What is missing from this sheet is his function level, four."

Q. Okay. I think we can stop on refreshing that. So, after seeing your testimony from August of 2023, would you agree with me that you made more than 30,000 dollars than Corey Epps?

A. Correct.

Q. Thank you, ma'am. Would you also agree with me that you suffered no money loss as a result of Corey Epps being promoted to PG 11?

A. Correct.

Q. All right. Ma'am, let's talk about this validation stuff. Early on yesterday, talking about the validation process, and for folks in level three and four, that doesn't have to go to Europe, does it?

A. Function level threes, I think, are validated in Germany unless that has been changed. Fours are within their country.

Q. So, there is also people sitting in New Jersey that participate in that process, right?

A. Correct, for four and I think three, I am not sure.

Q. Thank you for that. So there are people in the United States that participate in the validation process, agreed?

A. For lower level function levels.

Q. Okay. And for function level two, that is a pretty elite number of people, would you agree with me?
A. It is a small number, I wouldn't know the number, but, yes.
Q. Very small number. When we say small number on an international basis in the BMW Group, that is a small number of people around the globe, agreed?
A. I don't know that number.
Q. Would you agree that it is a small number?
A. How would you define small? I don't know what the around the globe number is.
Q. All right, ma'am. I don't want to argue with you, I was just trying to get a baseline.
We know that at BMW MC it is a little above ten people that are in function level one and function level two, right?
A. Correct.
Q. And it is hard to get into that level at BMW, would you agree with that?
A. Correct.
Q. And would you agree with me that out of 11,000 people who work in Spartanburg that there are ten function level two leaders?
A. Approximately ten. I would have to see the chart to count them.

Q. You never went through validation for function level two, did you?
A. I did not.
Q. You never nominated yourself to be a function level two leader, did you?
A. It is not a self-nomination.
Q. So, is the answer to my question "no"?
A. There is not a self-nomination, so, no, I did not.
Q. Thank you, ma'am. And you said that you had expressed the interest of being a VP of HR, and correct me if I am wrong, your answer was Johannes Trauth, right?
A. Right.
Q. When did he leave? What year?
A. 2018, 19.
Q. And Knudt Flor?
A. Correct.
Q. When did he retire?
A. 2021.
Q. So, we have talked about your conversation with Knudt Flor, do you remember that from your deposition?
A. I do.
Q. And do you remember that Mr. Fluor told you that you needed to be very visible and that if you had any

questions that you could call him at any time, right?
A. Correct.
Q. And that his door was always open to you, right?
A. Correct.
Q. And you never called him about being a level two, did you?
A. I did not.
Q. And you never darkened his door to be a level two, did you?
A. I did not.
Q. And that was all the way from 2018 to 2021 when he left, right?
A. Correct.
Q. You are aware that during the portfolio planning that Ms. Petrasch went to bat for you with senior leadership so that you might be a candidate for validation, didn't she?
A. I am not aware of that.
Q. Okay. Are you aware that senior leadership did not see you as a function level two candidate?
A. I am not aware of that.
MR. MOODY: All right. Let's talk about succession plan in general.
Ms. Fowler, if you will pull up Defendant's exhibit 4. Judge, I think this is admitted without

objection if it hadn't already?

THE COURT: Admitted without objection, Defendant's 4.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. This document is titled "Personnel Development," right?

A. Yes.

Q. It says "Succession Planning," correct?

A. Correct.

Q. Ms. Fowler, if you will go to the next page.

Do you see this page, it says, "Personnel Development Potential Candidates Function Level Two," do you see that, ma'am?

A. I do.

Q. And you see that there is a validated candidate for function level two, and that is Mr. Chad Johnson, are you familiar with him?

A. Yes.

Q. He is a PG 11, isn't he?

A. Correct.

Q. You don't go above PG 11 unless you are validated to function level two, correct?

A. I don't remember that.

Q. Okay.

A. It sounds right, but I don't remember that.
Q. So, would you agree with me that PG 11 had kind of -- you had kind of hit the top as far as personal grades without being validated as to you?
A. Correct.
Q. We also see another gentleman on the watch list in TX-4 that would be somebody from assembly, right?
A. Correct.
Q. Ms. Fowler, let's go to the next page, please.
We see here candidates for function level three, do you see that, ma'am?
A. I do.
Q. In fact, one of the people on here happens to be a lady in the courtroom, she is from legal, right?
A. Correct.
Q. That is Ms. Sean Tzouvelekas, she was function level four and seeking validation up to function level three, right?
A. Correct.
Q. So, at a function level, you were -- you were at a function level higher than somebody in the legal department, would you agree with me?
A. Correct.
Q. Let's Go, Ms. Fowler, just a second, let's go two pages.

Ma'am, do you see in TX-2, do you see Mr. Chad Johnson there?
A. I do.
Q. Same man we saw on the validated candidate function level two, right?
A. Yes. Sorry, his picture is on two columns. I see him, yes.
Q. I am sorry, I don't understand. Is it displaying okay?
A. It is.
Q. All right. Ms. Fowler, let's go on over to TX-6, if you could.
Ma'am, if we look at the bottom of this it says:
"2021TX-60 Succession Planning Summary, June of 2021."
Right?
A. Correct.
Q. You can remove that, Ms. Fowler.
Now, we see this is you in June of 2021 and you are a PG 11 TX-60, and it is cutoff, but it says in position since, and we know that you were in that position since 2015; is that correct?
A. Correct.
Q. Now, at BMW MC, it is encouraged for people to

move positions, right?
A. Correct.
Q. And that is because the culture of BMW means if you are moving you are growing, would you agree with that?
A. You are developing, growing, yes.
Q. And being exposed to different positions in technology is viewed as a positive by BMW MC, right?
A. Correct.
Q. And, ma'am, we see your picture has a red box around it and your descriptor has a red box around it and that red box, if you look into the key to the right, shows that you have been in a position four to five years, right?
A. Correct.
Q. And in 2021 we know you had been in that position for six years, right?
A. Correct.
Q. All right. And you were listed as TX-60 PG 11, it is actually G 11, but can we agree that the G 11 stands for personal grade?
A. Yes, we can.
Q. And then FL 3 as you have testified, right?
A. Correct.
Q. Now, Right above your picture, it says:

"Potential for PZ or technical planning."

And is PZ in New Jersey?

A. PZ is in Germany.

Q. Is it also in New Jersey?

A. PZ AM is in New Jersey.

Q. You had had some discussions at some point about potentially going to Woodcliff, New Jersey, right?

A. I had discussions around HRI project and going to New Jersey, correct.

Q. And in technical planning. And is that the recognition, I think you testified yesterday, that you were really good at technical stuff and that is one of the reasons you liked TX-60, right?

A. Correct.

Q. So, is that a recognition of your strengths for technical jobs that you are being considered as a potential for PZ in technical planning?

MR. MURPHY: Excuse me, Your Honor. I have to object, that calls for speculation. He has not established she even knows about this document and now he is asking her to give reasons why somebody else put language on it.

THE COURT: Well, she had an important job in the Human Resources Department at the company for

several years and has talked about that she is familiar with the policies, including policies related to promotions, so she can answer even if she knows. So, I will overrule the objection; if she knows, she can answer. You might have to state the question again.

MR. MOODY: I will never get it right, Judge. I will do my best.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ma'am, you see on this document that you are indicated to have potential for "PZ comma technical planning." Let me ask you this question: Do those positions play to your strengths?

A. They do.

Q. Thank you. Ma'am, there is references to your position as TX-60 to be planning and steering. Now, steering is not applying to driving vehicles, right?

A. Correct.

Q. All right. So, when we are talking about steering, is that more of a European management type term?

A. I don't know. I define steering as a governance type responsibility.

Q. Okay. Governance. All right. So, in your entire time at BMW MC, you never worked in assembly,

right?
A. Correct.
Q. You didn't assemble any vehicles, right?
A. I did work on the line when I first started.
Q. Well, great. So, you know what it takes, right?
A. I do.
Q. And what did you do on the line?
A. I assembled vehicles for two weeks.
Q. Which kind?
A. Z3.
Q. Back in the early, early days?
A. Correct.
Q. So you know that the mission of this plant is to produce cars?
A. Correct.
Q. And everything that you do and everything that everybody else in management is doing is to meet that goal of producing cars, right?
A. Correct.
Q. Thank you.
When that exhibit talked about technical planning, that meant that you would be doing something outside of HR, right?
A. No -- from a function?

Q. Yes, ma'am.
A. Yes, yes, yes.
Q. You were -- you had a red box around you, said you had been in position for more than four or five years. It was suggested you go to PZ, were there any PZ positions at BMW MC?
A. PZ AM had positions at BMW.
Q. Okay. But that was outside of HR, right?
A. No, PZ is HR.
Q. Okay. Was it in theTX-606 Department?
A. It was not in theTX-606 Department.
Q. So, let me ask it another way. So, PZ would mean you would leave theTX-606 Department, right?
A. Correct.
Q. And technical planning, as indicated on, you know, potential for that, that would be you leaving HR as well, right?
A. I can't answer that. I did not write those and I don't know what the intention and there were several technical planning functions.
Q. Ms. Fowler, can you put that back up, that last one we saw?
Thank you for that. Ms. Dawson.
Let's look at the whole slide if we could. All right.

If we look over to the right, we see Scott Medley, do you see him over there in TX-64?
A. I do.
Q. That is G 11 function level three. Do you see at the top up there that there is a indication for him to be potentially go to logistics or PI -- is that an I?
A. That is I.
Q. Is that buildings and structures?
A. I think so.
Q. So, as of June 2021, from the succession planning standpoint, would you agree with me that someone in TX-61 had identified you and Scott Medley to be candidates to move out of your roles?
A. No.
Q. Okay. But we know that as of June 2021 that you were not being considered to be a validated candidate for function level two, right?
A. I didn't know that.
Q. According to this document we know that, right?
A. This is not my document. I don't know the intention of the document with that respect.
Q. All right. But on the first page we saw that Chad Johnson and Mr. Kavit Antani were the ones that were validated or on the watch list, right?
A. Correct.

Q. As you said you had not nominated yourself, right?
A. I didn't know it was a self-nomination.
Q. And you didn't ask anybody, did you?
A. I did not.
Q. And you didn't take the CEO, Knudt Flor, up on his offer that you could call him any time, right?
A. I did not.
Q. You didn't go to his office and talk to him about, I want to be your VP of HR in 2021, did you?
A. I did not.
Q. Thank you.
Ma'am, are you aware of any person to serve as VP of HR at BMW MC that was not validated for function level two?
A. I can't answer that. I don't know.
MR. MOODY: Thank you. Judge, may we approach?
THE COURT: Yes.
(Whereupon a bench conference was held off the record.)
(Whereupon, the bench conference concluded.)
THE COURT: All the lawyers agree that now would be a good time for a break. And when I can get lawyers to agree to something, I generally take them up on that. In fact, I concur. So, let's take a ten-,

fifteen-minute break and have time to go to the restroom, stretch your legs a little bit. And remember my previous admonition, don't talk about the case, make any final decisions about the case, or do any research about the case. Everyone may remain in place while the jurors are excused.

(Whereupon, a short recess was held)

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: I am going to put one thing on the record and then we will bring the jury in. I wanted to put this on the record just so the record is clear in the event this matter is reviewed by a higher court. The parties submitted their exhibit list and they agreed on most of their exhibits, they agreed they would be admitted. We had a pretrial conference, I mentioned that at a prior trial or two the parties came in at the beginning of the trial and just by agreement and consent had put all of the exhibits in en masse and that had become a problem during the course of the trial, which is a very fluid proceeding, they decided not to call some witnesses and so the exhibits that were going to come in via those witnesses would no longer be relevant; however, they were then in evidence. And so the process of taking those out of evidence was a little bit

cumbersome and problematic when you have a courtroom deputy clerk and a court reporter and a Judge just trying to make sure we have a clear record. So, it may appear interesting in the transcript the way these came in, but it is the way everybody agreed to do it to put the exhibits in formally at the time they were being offered through the witnesses and I commend the parties again for reaching an agreement on most of these exhibits.

So, with that, if there is nothing else, we will -- Mr. Murphy.

MR. MURPHY: It may be appropriate time to put on the record. I have been given a modified defense Defendant's exhibit 27, which are essentially emails between Sherrill Miller, that is the recruiter, and Ms. Dawsey. And with the amendment or the modifications, Plaintiff has no objection to Defendant's revised exhibit 27.

MR. MOODY: Your Honor, out of fairness to Mr. Murphy, there may be one, I didn't bring it, I promise I am trying not to. Stuff was falling off the wall back there, too, Judge, just to report. We might have a claim against the contractor.

THE COURT: There are some cracks in the walls behind me here, too.

MR. MOODY: There may be an email in there that we need to double-check before I publish that references the salary she is seeking, which was a step down, so I want to be incredibly careful about that and not to open a door or anything like that. So, I might need tonight to get that cleaned up before we put it up on the board.

THE COURT: Thank you.

MR. MOODY: And, Judge, I think in light of the day being Ash Wednesday, I am going to try to move around in my outline to get another hour in. I beg the Court's indulgence if I am looking for papers, I am kind of going with the flow to get out of here and let people get home.

THE COURT: We want everybody to have a full and complete opportunity to present their part of the case.

MR. MOODY: And the reason I say that, Judge, is if I have the evening, I think I can expedite what is remaining in that time. I just have to make sure I get what I need to. Thank you, Judge.

THE COURT: So, you think -- y'all think we can go to about -- it is 3:20 now, you think we can go about another hour you think?

MR. MOODY: Yes, sir. I think depending on our pace and if I don't look discombobulated too bad, I can

make that happen. And leave a couple of things for tomorrow morning.

THE COURT: Okay. Thank you.

MR.ROZELSKY: The more he covers, the less I will need to cover presumably for tomorrow.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: All right. The jury is back in the courtroom so we will proceed.

MR. MOODY: Thank you, Your Honor.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ms. Dawsey, I have been trying to move in segments and this may be jumping around a little bit in light of the lateness of the day, if you will bear with me I will try to move this as quickly as I can.

A. Absolutely.

Q. 2021 was full of change at BMW MC, I think you testified to that, right?

A. Yes.

Q. New President and CEO coming?

A. Correct.

Q. And that would be September that Dr. Englehorn took over?

A. August or September, yes.

Q. Thank you for that.
And we have looked at many slides about reorganization of the HR Department, that reorganization continued, right?
A. Correct.
Q. We had Scott Medley potentially moving out in that succession plan, we have discussed him moving to a project that you had worked with Ms. Petrasch about different job descriptions involving another position in the VP of HR, do you recall that?
A. Correct.
Q. Thank you, ma'am.
MR. MOODY:
Ms. Fowler, if you can put up five, Defendant's exhibit 5. Your Honor, my apologies. Go to page three -- actually four. Your Honor, this is Defendant's exhibit 5. If it has not yet been admitted it is admitted by agreement.
THE COURT: It is in.
MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ms. Dawsey, I don't know if this has been published yet, but as of December 2021, which is the -- in the bottom right, do you see that?

A. I do.
Q. I know it is small. Is this a reflection of the TX-60 Department?
A. Functionally, yes. I think some of the people had turned over.
Q. Okay. Which ones had turned over?
A. So, Taranda -- no, Taranda had not. I think it looks accurate, yes.
Q. But you were talking about Taranda Frost, your benefit -- one of your benefits planners?
A. Correct.
Q. And did she at some point in January of '22 leave BMW MC?
A. She did.
Q. And you had a lot of movement in your department in 2021, hadn't you?
A. There had been some, yes.
Q. Okay. And the some movement, that would include Stephan Dombrowski leaving, right?
A. Correct.
Q. That would also include Lateia Harris (phonetic), who was one of your benefits folks, right?
A. Correct.
Q. And we know that around the time that you leave Taranda Frost leaves as well, right?

A. Correct.

Q. Essentially from your benefits planner and the folks doing benefits, they had all left by the time you leave as well, right?

A. Correct.

Q. And so as far as TX-60 goes, the benefits employees had left by the time you leave, right?

A. Correct.

Q. Let's talk about how your department communicates with other plants. I know with Dombrowski -- you had talked with Dombrowski, it had Vorhalt on it?

A. Yes.

THE COURT: Had what?

MR. MOODY: Vorhalt. I can barely speak English, so speaking Dutch, German. I think it is Plaintiff's 7 is that document.

THE COURT: Thank you.

MR. MOODY: Ms. Fowler, can you get us to Defendant's exhibit 15?

Your Honor, this may have been admitted as a Plaintiff's exhibit, we move it as Defendant's exhibit 15, just me not fishing for it.

THE COURT: Thank you. Admitted.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Ms. Dawsey, we may have talked about this yesterday or today, my days are blending, do you remember talking about this email of January 21, 2021?

A. I do.

Q. I think Mr. Murphy asked you about a lot of the stuff that was not highlighted, but at BMW MC, would you agree with me that BMW MC is one of the top plants in the entire BMW production network worldwide?

A. "Top" with regards to what? How do you define "top"?

Q. Well, I don't know how you define it. Let's talk about it this way. Would you agree with me that the BMW MC plant is regarded as a very important plant in the BMW production network?

A. Yes.

Q. Thank you.

And you have not served as an employee at any other production plant for BMW, correct?

A. Correct.

Q. And you have not done an international assignment and served at any other administrative office for BMW other than Plant Spartanburg, correct?

A. Correct.

Q. And you would agree with me that doing an international assignment is important for leaders at BMW?
A. I think it is important for some functions, yes.
Q. And as you testified in your deposition that you agreed with me that if you go on an international assignment that that enhances your potential to become a function level two?
A. Correct.
Q. And there are, as you call them, Americans, that go on international assignments, aren't there?
A. Correct.
Q. And as BMW refers to them and Plant Spartanburg, that would be a domestic, that goes on international assignment, right?
A. Correct.
Q. And when Americans or domestics go on international assignment, as Mr. Murphy was referring to you about folks that come from AG, we don't punish people for leaving the states to go on assignment from a compensation, benefits, and time off standpoint either, do we?
A. Correct.
Q. So, it is a reciprocity thing that if you are a United States citizen and you go on international

assignment that they are going to make sure that you don't lose something by doing so, right?
A. Correct.
Q. Thank you.
As far as an important plant in the BMW international production network, would you agree with me that about two-thirds of the cars or vehicles that are made in Spartanburg are exported?
A. Correct.
Q. It is a big world out there from a production standpoint, would you agree?
A. Agree.
Q. Are you aware that BMW MC, we are in competition with other BMW plants as to which models we get to make here?
A. Yes.
Q. And would you agree with me that getting to make the X model is a status symbol from a production plant at BMW?
A. No.
Q. Okay. Now, because we have an international production network, we are not alone in the world, would you agree with that?
A. What do you mean "we are not alone"?
Q. At BMW MC, we are not on an island by ourselves in

the production network, are we?
A. No.
Q. So, part of being at BMW MC is the ability to leverage best practices from other plants, isn't it?
A. Correct.
Q. All right. So, as we look at 15, Defendant's exhibit 15, you see that highlighted item number one:

"Local talent development (expats
sign document for local candidate
development and trade with Germany
both ways)."

Is that referring to this reciprocal deal that if someone from the United States goes to an international assignment, say, in Munich, that, you know, the local talent gets developed as well as somebody coming here and exchanging skills and knowledge?
A. Yes.
Q. Would you agree that that is a best business practice to take people who are experts or have high skills in areas that a plant may not have and bring them in on an assignment?
A. In certain functions, yes.
Q. Okay. The second item is "Diversity and Inclusion." You have talked about the OFCCP, that is a government agency, right?

A. Correct.
Q. And when you are a government contractor, back in 2020 and 2021, you were required to report certain data about your diversity and inclusion, weren't you?
A. Correct.
Q. That would be kind of a uniquely American situation based on the dictates of the United States Government at that time, right?
A. Correct.
Q. We see in item three, I am going to ask for your help here, it says:

"Sell AC for SL as blueprint for SL validation (leadership excellence) to other plants."

And then there is a paren with those four indicators.

I am going to ask you ma'am, what does "sell AC" mean?
A. Sell assessment center.
Q. What does "SL" mean?
A. Section leader.
Q. And so that means sell assessment center for section leader as blueprint for section leader validation?
A. Correct.

Q. To other plants, and who are these other plants?
A. ZA is South Africa.
Q. Okay.
A. UK is UK; SLP, Mexico.
Q. Okay.
A. D-e-b -- Debrecen.
Q. Where is that?
A. I believe that is the new plant that was being established in Austria.
Q. When you say Austria, that is not the continent down there with koalas, we are talking about Austria in Europe?
A. Correct.
Q. Thank you. Why are you selling stuff to other plants according to this email?
A. So, per Christine, she wanted us to sell best practices, as you call them, to other locations.
Q. And did you consider this blueprint to be a best practice?
A. I was not involved in the assessment center, so I can't really speak to that.
Q. All right. Well, who was involved with the assessment center?
A. TX-65.
Q. Paul Sinanian?

A. Correct.
Q. And then the last one that is highlighted is number four, do you see that?
A. Yes.
Q.
"Make blueprint and sell it to other plants."
And I think you said that is South Africa, the U.K., which is maybe Brittain, maybe somewhere else in the United Kingdom?
A. Correct.
Q. Mexico and the new plant in Austria, right?
A. In Debrecen.
Q. Is there any particular reason that those are the four plants, to your knowledge, that Ms. Petrasch is focusing on?
A. I don't know.
Q. All right. Thank you.
Above that -- Ms. Fowler, you can take that down.
You see in January of '21 that one of the bullets is the "TX orga," and the first bullet under that is 64 function, do you know what that means, ma'am?
A. I can't speculate. I don't know for sure.

Q. Ms. Fowler, you can take that down.
One of the things that I omitted and did not reference and I apologize is the first bullet is "Strategic Workforce Development." Now, ma'am, you, as the TX-60, had been involved in strategic workforce development, hadn't you?
A. I had.
Q. As we look at that list -- you can take that down, Ms. Fowler. Thank you.
We have talked about the first bullet, we have talked about the one at number two, you listed recruiting as something you did in your resume, right?
A. Correct.
Q. "CWF Second Agency for Directs," what does that mean?
A. This is contract work force identifying a secondary agency to provide contractors to the Plant Spartanburg.
Q. And you have the two focus topics, press shop joining control area and also launch E/E/ and that is parened for flashing blitz. Does that pertain to Plaintiff's exhibit 7 in the Stephan Dombrowski exhibit that we looked at or is that something different?
A. I would have to see 7.
Q. I am just asking a generic question. Do you know

in January of '21 if the press shop was built?
A. It was not built.
Q. Okay. So, it was in the planning stage?
A. Correct.
Q. And you talking about is the E/E, was that electrical engineering?
A. Correct.
Q. Do you know if other plants in the network had press shops?
A. They did.
Q. And was BMW MC behind other plants in not having a press shop?
A. What do you mean by "behind"?
Q. Well, if other plants had press shops and we didn't have one, that would potentially put us at a disadvantage at Spartanburg, right?
A. So, we had a supplier who produced the press shop product, if you will.
Q. Yeah.
A. And it was decided to build one at Plant Spartanburg.
Q. And we had -- what is the supplier that comes to mind when you reference a supplier?
A. Magna.
Q. Yes, ma'am. Were there others?

A. Spartanburg Steel.
Q. Okay. And then as you testified, these -- a press shop makes the metal components that you put together to build the body, et cetera, of a car, right?
A. Correct.
Q. Pretty important to have a press shop, agreed?
A. Agreed.
Q. Thank you.
And part of the HR challenge in 2021 was getting human beings to build a press shop and eventually operate a press shop, right?
A. We were doing the planning for the numbers to get the approval to then ultimately do the recruiting, correct.
Q. All right. And the approval you were seeking would be from BMW AG?
A. Correct.
Q. Would you agree with me that BMW AG has expertise on press shops through the international production network of their plants?
A. I would agree.
Q. Thank you.
This hire ten people management positions and hire ten more pace focus topics, did that relate to any

particular area of the HR department that you managed?
A. No.
Q. Thank you.
Ma'am, that first item, "strategic work force development," you were on a strategic work force development team, weren't you?
A. I was.
Q. In early 2021, Sherry McCraw was on that team with you, wasn't she?
A. I don't recall Sherry on the, as we called it SWP, strategic work force planning.
Q. Do you recall asking Sherry's assistant to have a meeting in January 2021 because you referred to her as one of your mentors?
A. I don't recall, but it could have happened, yes.
Q. Do you recall meeting with Sherry McCraw and Oliver Zipse regarding strategic work force development in 2021?
A. I don't.
Q. What is strategic work force development, ma'am?
A. So, in the context you are asking about, we had a committee that had to review all personnel requests, new positions in-bounds, out-bounds to look at everything holistically, and that committee wasTX-606 andTX-607.

Q. All right. Would you agree that getting qualified people to build cars at the plant is always an issue?
A. I would say it is a challenge.
Q. Why is it a challenge?
A. Because you need right numbers at the right time, you need right skills at the right time.
Q. How do you get right skills at the right time?
A. That is recruiting's function.
Q. Did -- at BMW MC, did you partner with local and state organizations in order to get people trained to potentially work at BMW MC?
A. You would have to explain that further.
Q. I'm sorry, I am not allowed to. Let me ask you this. Are you aware of partnerships with governmental authorities in South Carolina that assist in job training for a qualified work force that can work at BMW MC?
A. I am not as I sit here.
Q. Ma'am, on your team at TX-60 up until July 2021, it was all domestic people with the exception of one, right?
A. Correct.
Q. And that one person was Stephan Dombrowski, right?
A. Correct.

Q. Would you agree with me that Stephan Dombrowski handled most of the communication with the production network for you?
A. I would not.
Q. Okay. Would you agree with me that Stephan Dombrowski handled most of the communication with central for you?
A. I would not.
Q. Would you agree with me that Stephan Dombrowski would travel to Germany to meet with production network folks instead of yourself?
A. I would not.
Q. Would you agree with me that after Stephan left you had no internationals on your TX-60 team?
A. Correct.
Q. Would you agree with me that in TX-60, with the exception of Christine Petrasch, who was the Vice President of HR, that the only -- excuse me -- that there were no other internationals as of July 2021?
A. I would have to see the personnel list. I think there were internationals in TX-64 international HR, but I would have to see the list, I just don't remember.
Q. You just don't know?
A. I don't. If there were --
Q. So, how many people are in TX-6, if you know?

A. Approximately 80, 80 to 90.
Q. So, as you sit here today, you don't know if there -- it might be some in another department, but we do know that, out of your 15, there were no internationals, right?
A. At what time?
Q. July 2021 when Stephan leaves.
A. Correct.
Q. Ma'am, you don't speak German or Dutch, do you?
A. I do not.
Q. And in your deposition you agreed with me that it is difficult to communicate with the production network if you don't know German, correct?
A. It used to be difficult; as technology progressed, it became easier.
Q. You had to rely on technology to communicate, right?
A. When documents were in German, correct.
Q. Would you agree with me that the technology sometimes fails in communications to reflect emotions and true intents by people when you translate in technology?
A. I would agree.
Q. It is kind of like getting a text from your child, you just don't know what is going on with the raw words,

right?
A. Correct.
MR. MOODY: Beg the Court's indulgence one moment. I need to connect something Judge, I apologize.
Your Honor, I think Plaintiff's exhibit 31 is already admitted.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ms. Dawsey, that is on the screen in front of you, do you see it?
A. I do.
Q. Have you had a chance to look at it yet?
A. I did.
Q. Sew, I think Mr. Murphy asked you about this, this is in March of 2021, right?
A. Correct.
Q. And we see at the top one that it is to you and Ms. Petrasch is sending you a message from her I-Phone, it says, "K -- Germany is planning to replace Stephan with an expat, multiple exclamation points," right?
A. Correct.
Q. So, you had hired Mr. Dombrowski, right?
A. At the start of his assignment, yes.
Q. Yes, ma'am. So, if Germany was planning to replace Stephan with an expat, who was that expat?

A. I didn't know.
Q. Did you replace Stephan with this person you didn't know?
A. I did not.
Q. So, who took Stephan Dombrowski's position?
A. Chris Lominac.
Q. And is Chris Lominac a domestic?
A. Yes, he is.
Q. So you replaced the one international associate you had on your team with a domestic individual, Chris Lominac, right?
A. Correct.
Q. If Germany was planning to replace Stephan with an expat, how did you get Chris Lominac the job?
A. Because I had already started recruiting and was -- I think the offer actually had been extended and then Christine sends this out of the blue and I told her that we were too far in recruiting and we were staying the course with the domestic.
Q. All right. So, you said we are going domestic?
A. Right.
Q. This is in March, right?
A. March 3rd, yes.
Q. Wasn't the successor you had to have Michael Davis?

A. I think he is on the list, yes.
Q. And so Michael Davis declined that job, didn't he?
A. I don't -- I remember us talking about that, I don't recall that he declined it. I think there was a topic with some family obligations and he didn't want -- he didn't want to move.
Q. He didn't want that job. And, in fact, you know Chris Lominac was a secondary candidate that you chose later, right?
A. Chris Lominac was selected through job posting.
Q. All right. Thank you.
I guess the point of exhibit 31 is an expat didn't replace Stephan Dombrowski, right?
A. Correct.
Q. And that left your department void of any international associates, correct?
A. Correct.
Q. Ma'am, I am asking you to take a look at exhibit 7. Give you an opportunity to take a quick look, let me know when you are ready.
A. I'm ready.
Q. This one has a date on there it says "July of 2021," right?
A. Yes.

Q. We know that Mr. Dombrowski left you that month, correct?
A. I believe so, yes.
Q. And this is a request, basically, talking about a target head count in 2022 for the press shop, right?
A. Correct.
Q. And this is the press shop we talked about that is really important for Spartanburg to have, right?
A. Correct.
Q. Thank you, ma'am.
MR. MOODY: I know we jumped forward to July a little bit, let's go to April of 2021 and let's look at Defendant's 16.
THE COURT: Defendant's 16?
MR. MOODY: Defendant's exhibit 16. If this has not been admitted --
THE COURT: It is admitted without objection.
MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ma'am, I am going to ask Ms. Fowler to go on over to the third page, Ms. Fowler. All right.
So we are in April of 2021 here, Ms. Dawsey, as you can see from that photo, do you see that, ma'am?
A. I do.

Q. So we knew that organizational structure in the January email was one of the things on the list that had the four highlights, do you remember that?
A. I do.
Q. All right. So, we are in April here and we see over there on the left that would be you, Kelly Dawsey, there, in the blue under TX-60?
A. Yes.
Q. And we have talked about Mrs. Harris, she ends up leaving; we talked about Stephan Dombrowski, he leaves as well, right?
A. Correct.
Q. And in the second column we have talked about Mr. Epps, and I think you referenced it earlier in your testimony, there is a parenthetical in red there says PG 11 planned for October 21, do you see that, ma'am?
A. I do.
Q. That would be consistent with your boss's emails to you saying in portfolio in April we talked about Mr. Epps becoming PG 11, right?
A. Correct.
Q. If we look to the fourth column, do you see that ma'am?
A. I do.
Q. Were you aware that Ms. Petrasch was considering

external candidates for TX-64?
A. I was aware of an external candidate that had had some conversation, but not directly, I was not involved.
Q. Do you know who the external candidate was?
A. Garth Warner.
Q. He was the gentleman that worked at Hubbell?
A. Correct.
Q. How did you become aware of Mr. Warner?
A. Kathy Keiser and Scott Medley told me that they were pursuing him as a watch candidate for Vice President of Human Resources.
Q. Okay. So, do you know what month they told you this?
A. I don't.
Q. Do you know what year they told you this?
A. I don't.
Q. Was it in 2021?
A. I don't remember.
Q. All right. So, if it wasn't in 2021, you knew either in 2021 or some time before that an external candidate was being pursued as a potential VP of HR, right?
A. Correct.
Q. That person worked at Hubbell Lighting?

A. Correct.
Q. Did you ever meet this person?
A. I did not.
Q. And as we look here it says, "external candidate PG 11." Is this where it looks like Ms. Petrasch has Garth Warner potentially coming to maybe move into the VP of HR?
A. I don't know. I don't know this document.
Q. So, there is this number one it says, "TX-64 is on board function for external candidate, (MFK)." Were you an MFK?
A. Yes.
Q. MFK stands for level three and four, right?
A. I think level three, I'm not sure if four was included.
Q. You don't know if four includes MFK?
A. I don't know. We didn't use MFK at the plant.
Q. Okay. So, ma'am, when you were at the plant, are you aware of any MFK being demoted out of MFK status?
A. You would have to define "MFK" for me.
Q. You were MFK. Are you aware of anyone else being demoted, any other MFKs?
A. I am aware of function level three moving to function level four.

Q. Who is that?
A. There were a number of them across the plant.
Q. Don't have names?
A. Randall Trigg is one that comes to mind. Hollis Butler. Chris Lee. That is it for those that I can think of.
Q. If we look atTX-6065, do you see that Paul Sinanian --
A. Yes.
Q. -- I think you referred to him before. Is he a domestic?
A. Yes, he is.
Q. And then in the far right we see that Scott Medley as to report -- direct report and project lead, project HR/legal/communication, and GAV.AFF, until 12.22. Do you know what that means, ma'am?
A. Which part?
Q. The whole part, do you know what that means?
A. Scott was going to a project until 12-22.
Q. Do you know what the lead project HR meant?
A. I don't.
Q. Do you know what GOV.AFF., do you know if that means government affairs?
A. I don't.
Q. At the top it is in red, it says "project

HR/legal/GOV.AFF until 12-22. Scott Medley as direct report and project lead." That looks like it is just reordered as to what we just looked at on the far right for Scott Medley, right?
A. Correct.
Q. We see that Scott Medley is kind of removed from the organizational structure on this slide in April of 2021, right?
A. He is on the far right, if that is what you mean.
Q. There are no lines or box to say where he is, though, right?
A. There are lines and boxes, he is on the far right.
Q. Okay. Well -- do you at the bottom below that red box it says that he might move to TV 54, do you see that, ma'am?
A. I do.
Q. After completion of the project, right?
A. Correct. The next two to three years.
Q. Thank you, ma'am.
And this is the man that you had equal compensation benefits with that we read from the deposition, right?
A. Correct.
Q. Thank you, let's go to the next page, Ms. Fowler.

When Mr. Murphy asked you if certain functions were important in HR, are there some functions in HR that are not important?
A. I think all HR functions are important.
Q. Thank you. We would agree.
If you look at this list from April of 2021, TX-64, does it say, "potential external candidate," from the previous page, "has eight numbered areas," would you call those functions?
A. I would say areas.
Q. Okay.
A. I don't know her intention.
Q. Okay. Well, there are eight of them there, so eight areas. So 64, if you look at the numbers of areas, would you agree with me -- you can take that down, Ms. Fowler.
That 64 has more areas than any other department in TX-6?
A. On this chart it appears that way, yes.
Q. Thank for that, ma'am. Beg the Court's indulgence. I am jumping around.
All right, ma'am. You testified that you called Ms. Petrasch on January 3rd, 2022 to resign, right?
A. Correct.
Q. And you followed up in writing with your

resignation letter, right?
A. Correct.
MR. MOODY: Ms. Fowler, can we get Defendant's exhibit 34?
Your Honor, this is Defendant's exhibit 34. I don't believe it has been admitted. We would move for its submission.
THE COURT: Admitted without objection.
MR. MOODY: Thank you.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Ms. Dawsey, is this the letter you sent on January 3rd, 2022?
A. Yes, it is.
Q. And you resigned from BMW Manufacturing Company, LLC, is that BMW MC?
A. Correct.
Q. And you said:
"As is customary and professional in the United States, I am providing a two-week notice prior to my resignation date."
Right?
A. Correct.
Q. You told them:

"Therefore, my last day of work with BMW MC will be Friday, January 14, 2022."
Right?
A. Correct.
Q. It was really an 11-day notice, right, ma'am?
A. I guess if you don't count the Monday.
Q. I am just counting the date, January 3rd to January 14th, right, 11 days?
A. Monday -- two weeks. Monday to Friday week.
Q. Are you talking about two business weeks?
A. Correct.
MR. MOODY: Okay. Let's go to, Ms. Fowler, Defendant's exhibit 33.
Ma'am, I am referring you to the bottom there and -- Judge, we would move for the admission of Defendant's exhibit 33.
THE COURT: It is admitted without objection.
MR. MOODY: Thank you.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. You see, ma'am, this is your email on January 3rd to Christine Petrasch, right?
A. Correct.
Q. You used company email to send it, right?

A. I did.
Q. And in the "from" line says "Dawsey Kelly," TX-60, right?
A. Correct.
Q. We are not sure what time you sent this because we talked about it in your deposition and you weren't sure, right?
A. Correct.
Q. The subject is -- did you type in this subject?
A. I did.
Q. And you say:
"As per our discussion earlier today. Thank you for your time while you are away. Kind regards, Kelly."
You knew that she was on holiday, right?
A. Correct.
Q. And the email signature down there, that is indicating you are still the Department Manager Planning, Steering, Compensation, Benefits, and Grading, right?
A. Correct.
Q. When does the plant start back up from the holiday?
A. Usually the first week in January.

Q. All right. So did you send the resignation email the first week of January when the plant was starting back up?
A. I did.
Q. You told your colleagues at BMW that you had an opportunity you could not pass up, didn't you?
A. I did.
Q. You told your colleagues at BMW that you wanted to go somewhere where you were valued at the new company, didn't you?
A. I told that to Christine.
Q. Okay. And you said in your testimony that, you know, that Ms. McCraw didn't come to you; Christine didn't ask you -- didn't come to you about your resignation after you submitted it. Ma'am, did you, before you submitted your resignation, go talk to Christine Petrasch about I got another job and I am not happy? Can you reconsider the reorganization?
A. I did not.
Q. Okay. Did you know that Sherry McCraw was the top leader for assembly, right?
A. Correct.
Q. She had, what, 6,000 associates that she was responsible for?
A. I don't know the exact number, but, yes.

Q. It is a lot, right?
A. It is a lot.
Q. From a standpoint of numbers, is it true that Ms. McCraw had more employees in her department than anybody else?
A. Yes.
Q. Okay. And we know that as of January 3rd, 2022, Ms. McCraw was running assembly, wasn't she?
A. Correct.
Q. And you knew, at the time, that Ms. McCraw was running assembly, wasn't she?
A. Correct.
Q. And the plant had been shut down for, what, a week or two?
A. I think two.
Q. And you resigned when production was starting back up, right?
A. I did.
Q. Would you agree with me that Ms. McCraw might have been pretty busy those days?
A. I would.
Q. All right. And you knew that Ms. McCraw was not taking over as VP of HR until April, right?
A. I knew in September for sure.
Q. That she was taking over in April?

A. Ask the question again.
Q. Thank you. I will do my best. You knew that Sherry McCraw was not going to become the VP of HR until April of '22, right?
A. I don't think we had been told an effective date.
Q. You knew Christine Petrasch didn't leave the VP of HR at the end of the year, right?
A. She had been extended, yes, until, I think, February.
Q. Okay. I will try to ask it in a non objectionable way. If she were extended through the end of March, would you disagree with that?
A. Disagree with what?
Q. That Ms. Petrasch was extended through the end of March?
A. Are you asking me if she was extended through March?
Q. I am asking you if you disagree with me that she was extended through the end of March?
A. I thought it was February, so I can't validate March.
Q. And we know you didn't go to Ms. Petrasch, you didn't go to McCraw after January 3rd. Did they throw a party for you?
A. My team did, yes.

Q. Dr. Englehorn requested a meeting with you, didn't he?

A. He did.

Q. And in your prior testimony you remember when we were talking about a note you had in your calendar from September 26 when Dr. Englehorn made a comment that you wrote down, do you remember that?

A. I don't.

Q. All right. Do you remember him talking about a boat?

A. I don't.

Q. Do you remember Dr. Englehorn saying that we are all in the same boat together, if you have a problem raise your hand?

A. Potentially, yes, I don't recall it.

MR. MOODY: Your Honor, may I refresh her from her deposition?

THE COURT: Yes.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. So, the record reflects, I have your original deposition from August 3rd of 2023, and I am going to turn to page 328. Now I hope I am on the right page. Actually I will start on 327. We are looking at one of your calendars, do you remember that?

A. I do.
Q. My question is:
"All right. Let's go to Sunday, September 26th, ma'am. Direct Managers Forum. You have a note that says,' TX message,' do you see? And that will be Dr. Englehorn, right?"
And your answer is?
A.
"Yes."
Q. My question is:
"Do you see your note says, 'if have a problem, please raise your hand, sitting in one boat together, ready for the extra mile.' Is that what Dr. Englehorn said?"
A.
"Yes."
Q. And I said question:
"All right. Did you take him up on that before you resigned?"
A.
"I did not."
Q. Okay. All right. Thank you, ma'am.
So the new President and CEO, in a meeting,

references everybody being in the same boat, and if you have a problem, raise your hand, and this is in September, and you didn't take him up on it, did you?
A. I did not.
Q. He came to you to discuss why you quit, didn't he?
A. He asked me for a meeting after my resignation, yes.
Q. And you told him that you chose to leave, didn't you?
A. I told him that I thought it was wrong that I was being displaced with a German and that I had chosen to leave.
Q. Yeah, and that you had, that was my question, you told him you had chose to leave?
A. Correct.
Q. Thank you. You asked him about the VP of HR, didn't you?
A. I did.
Q. And he had no knowledge of that, correct?
A. Correct.
Q. And you had asked him about the VP of HR knowing you had never been validated for level two, right?
A. Correct.
Q. This meeting with Dr. Englehorn was after you resigned, right?

A. Correct.
Q. And he took time out of restarting a plant to meet with you, didn't he?
A. He did.
Q. Ma'am, you accepted a job with Madewell Concrete officially on December 10th, didn't you?
A. Middle of December, I would have to see the documentation again. I'm sorry, the dates are leaving me but middle of December, yes.
Q. I can bring your deposition up again if I need to, but if the record says you did it on December 10th, would you disagree with me?
A. If it is on the record December 10th, I would not.
Q. And you accepted a job with another company on December 10th, and that was before you had your meetings with your team where you put up on the board the slide that said you would be in TX-64, right?
A. Correct.
Q. You told me in your deposition that the reason you didn't tell anybody at BMW that you had another job as of December 10th is because you said I didn't believe that they deserved to know, right?
A. I did not.
Q. You didn't believe that they deserved to know?
A. I did not say that.

Q. Oh, you didn't say that?

A. I said that I didn't believe it was any of their business.

Q. Oh, pardon me.

MR. MOODY: Your Honor, may we approach?

THE COURT: Yes, sir.

(Whereupon, a bench conference was held off the record

THE COURT: All right. Members of the jury, we have come to a stopping point for today so we are going to let you be free for the rest of the evening. So, I will ask that we try to start back up at nine o'clock in the morning. Hopefully this will give you a bit of a jump on the traffic, and I wish you safe travels back to your homes and hope you have a good evening.

Remember, don't talk about the case, form any opinions about the case, or do any research about the case. And with that, we will see you in the morning.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: Anything else before we recess? Hearing nothing, you are excused.

(Whereupon, the hearing concluded at 4:30 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR          April 13, 2026
Date

$

**$10,000** [1] - 126:21
**$202,450** [1] - 112:11
**$40,000** [1] - 126:10
**$40,476.10** [1] - 126:5

'

**'21** [8] - 76:12, 140:2, 141:3, 141:9, 142:21, 143:25, 179:21, 181:1
**'22** [2] - 171:12, 202:4
**'if** [1] - 204:12

1

**1** [10] - 3:18, 58:19, 117:12, 117:13, 117:14, 117:22, 118:9, 136:23, 141:16, 149:3
**1/19/2021** [1] - 4:9
**1/3/2022** [1] - 4:20
**10** [7] - 75:3, 75:9, 123:21, 126:18, 147:24, 148:13, 148:14
**10/1/2021** [3] - 3:14, 4:14, 4:18
**10th** [5] - 206:6, 206:11, 206:13, 206:15, 206:21
**11** [46] - 4:4, 48:22, 49:12, 49:21, 49:23, 50:2, 52:10, 53:15, 73:3, 73:4, 73:7, 73:10, 75:3, 75:9, 76:11, 112:16, 112:22, 120:1, 126:18, 130:6, 136:15, 143:17, 143:18, 145:8, 146:9, 147:24, 148:8, 148:13, 148:14, 149:10, 149:14, 149:16, 151:16, 152:9, 156:20, 156:22, 157:2, 158:21, 159:19, 159:20, 164:4, 191:16, 191:20, 193:5, 198:9
**11,000** [1] - 153:21
**11-day** [1] - 198:6
**111** [1] - 3:4
**116** [1] - 3:21
**117** [1] - 3:18
**118** [1] - 3:19
**11th** [1] - 84:22
**12** [19] - 4:5, 45:21, 49:10, 49:17, 65:5, 65:7, 65:8, 65:13, 72:3, 72:7, 72:10, 73:9, 75:8, 97:15, 138:15, 138:17, 147:3, 148:3
**12-22** [2] - 194:19, 195:1
**12.22** [1] - 194:15
**12/3/2021** [1] - 3:7
**128** [4] - 4:3, 131:16, 132:3, 134:4
**129** [1] - 131:16
**12:30** [2] - 110:8, 110:15
**13** [12] - 4:6, 23:2, 47:23, 47:25, 48:7, 66:1, 66:2, 114:3, 114:10, 141:16, 208:11
**133** [2] - 150:18, 150:19
**136** [1] - 4:4
**13th** [6] - 144:23, 145:5, 145:13, 145:21, 147:8, 149:2
**14** [1] - 198:2
**141,225** [1] - 123:9
**144** [1] - 4:16
**147** [1] - 4:18
**148,300** [1] - 123:13
**14th** [4] - 112:5, 114:7, 122:19, 198:9
**15** [10] - 2:4, 4:8, 97:15, 97:17, 119:22, 172:19, 172:22, 176:6, 176:7, 186:4
**153,490.50** [1] - 123:25
**157** [2] - 13:17, 15:16
**16** [4] - 4:10, 190:13, 190:14, 190:15
**162,000** [1] - 124:1
**168,814.37** [2] - 150:2, 151:8
**17** [6] - 3:11, 29:17, 30:13, 30:15, 33:5, 40:8
**170,000** [1] - 151:21
**172** [1] - 4:9
**178** [1] - 126:23
**178,000** [1] - 127:7
**17th** [1] - 91:6
**18** [2] - 1:4, 114:1
**180** [1] - 15:17
**183,5** [1] - 127:16
**189,831** [1] - 127:20
**19** [7] - 4:11, 41:9, 41:11, 41:18, 42:4, 89:18, 154:16
**190** [1] - 4:10
**196,500** [1] - 127:23
**197** [1] - 4:21
**198** [1] - 4:20
**1990** [1] - 93:17
**1995** [2] - 117:23, 128:23
**1st** [5] - 66:8, 66:9, 123:4, 140:23, 147:19

2

**2** [5] - 3:19, 51:7, 74:21, 118:6, 118:10
**20** [8] - 3:12, 4:13, 73:14, 73:16, 73:24, 114:1, 125:25, 126:16
**200,000** [2] - 127:12, 151:22
**2004** [2] - 122:11, 122:18
**2009** [1] - 129:9
**2011** [1] - 119:21
**2014** [3] - 91:6, 122:13, 123:9
**2014-2021** [1] - 3:25
**2015** [14] - 33:13, 33:16, 37:15, 38:7, 38:17, 111:22, 115:7, 115:9, 116:5, 119:18, 122:19, 123:4, 123:22, 158:23
**2015TX-6062** [1] - 120:2
**2016** [3] - 31:18, 125:25, 126:6
**2017** [4] - 126:16, 127:8, 127:11
**2018** [3] - 127:16, 154:16, 155:11
**2019** [7] - 66:8, 66:9, 127:20, 136:23, 140:23, 141:3, 141:16
**202,450** [5] - 115:16, 128:5, 129:16, 134:7, 151:15
**2020** [3] - 127:23, 128:23, 177:3
**2021** [75] - 3:23, 6:12, 6:17, 6:19, 6:22, 7:5, 9:17, 41:4, 41:24, 48:21, 50:14, 51:7, 54:17, 56:7, 58:17, 58:19, 60:14, 65:15, 65:19, 72:25, 75:13, 80:3, 80:16, 84:23, 85:15, 92:9, 96:5, 115:16, 128:4, 129:13, 130:19, 135:8, 135:14, 136:8, 138:22, 139:14, 140:7, 140:13, 143:16, 144:7, 144:23, 147:24, 148:1, 148:9, 151:9, 151:10, 154:20, 155:11, 158:16, 158:20, 159:16, 164:10, 164:15, 165:10, 169:18, 170:24, 171:16, 173:5, 177:3, 182:10, 183:8, 183:13, 183:18, 184:19, 185:19, 186:7, 187:15, 189:24, 190:12, 190:23, 192:18, 192:20, 192:21, 195:8, 196:6
**2021TX-60** [1] - 158:15
**2022** [10] - 103:15, 111:23, 112:1, 112:5, 112:10, 190:5, 196:23, 197:13, 198:3, 201:7
**2023** [4] - 132:1, 133:24, 152:3, 203:22
**2025** [1] - 38:14
**2026** [2] - 1:4, 208:11
**207** [1] - 1:18
**21** [8] - 3:14, 4:15, 77:16, 77:18, 77:23, 144:11, 173:5, 191:16
**22** [5] - 4:17, 93:9, 147:11, 147:12, 147:16
**22,000** [1] - 121:1
**24** [7] - 3:10, 3:15, 50:21, 50:23, 138:22, 139:14, 140:13
**245,000** [1] - 128:12
**24th** [6] - 65:15, 140:1, 140:7, 142:21, 144:7, 144:10
**25** [1] - 34:8
**26** [3] - 34:8, 108:13, 203:6
**26(a)(3** [1] - 15:2
**26-and-a-half** [2] - 108:8, 108:9
**26th** [1] - 204:4
**27** [3] - 91:24, 167:14, 167:18
**29** [1] - 80:14
**294** [1] - 1:22
**29601** [2] - 1:18, 2:5
**29602** [1] - 1:22
**29624** [1] - 2:7
**2nd** [1] - 127:8

3

**3** [9] - 3:20, 26:24, 27:1, 50:1, 116:10, 116:12, 148:2, 159:23
**3/3/2021** [1] - 3:16
**30** [2] - 74:17, 92:2
**30,000** [2] - 150:6, 152:4
**306** [1] - 136:21
**308** [1] - 137:18
**30th** [2] - 132:1, 133:24
**31** [6] - 3:16, 79:14, 79:16, 79:22, 187:5, 189:13
**315** [1] - 2:7
**316** [1] - 140:21
**327** [1] - 203:24
**328** [1] - 203:23
**33** [4] - 3:11, 4:19, 198:14, 198:17
**34** [3] - 4:21, 197:4, 197:5
**39,300** [1] - 127:21
**39,975.87** [1] - 127:24
**3:20** [1] - 168:22
**3rd** [14] - 80:3, 92:9, 111:25, 112:4, 112:10, 114:6, 188:23, 196:23, 197:13, 198:8, 198:22, 201:7, 202:23, 203:22

4

**4** [8] - 3:7, 3:22, 41:24, 91:15, 91:18, 136:7, 155:25, 156:3
**4/25/95** [1] - 3:18
**41** [1] - 4:12
**41,000** [1] - 127:17
**41,632** [1] - 127:9
**42,599.50** [1] - 128:8
**48** [1] - 4:7
**4:30** [1] - 207:22
**4th** [8] - 42:1, 42:17, 45:11, 123:22, 129:13, 130:19, 135:8, 135:13

5

**5** [4] - 75:25, 76:2, 170:15, 170:17
**50** [1] - 3:15

**54** [1] - 195:14

**6**

**6** [22] - 3:3, 3:9, 3:24, 24:11, 24:14, 24:23, 26:14, 30:19, 34:3, 36:6, 38:5, 39:2, 39:11, 40:2, 40:3, 40:7, 90:23, 90:25, 91:10, 93:10, 122:6, 122:7
**6,000** [1] - 200:23
**6/3/2021** [1] - 3:15
**60** [9] - 35:17, 35:22, 36:2, 36:9, 39:3, 40:5, 62:21, 63:13, 90:14
**602** [1] - 14:2
**61** [7] - 28:15, 62:24, 63:2, 63:13, 71:23, 139:12, 144:4
**62** [1] - 80:10
**64** [14] - 55:2, 62:11, 62:12, 62:13, 62:14, 63:14, 70:14, 71:23, 90:14, 114:14, 139:11, 179:23, 196:14, 196:17
**65** [1] - 4:5

**7**

**7** [7] - 4:3, 44:23, 128:15, 172:16, 180:22, 180:24, 189:20
**7-4-2021** [2] - 135:24, 151:15
**7-4-21** [1] - 134:10
**700** [1] - 2:4
**73** [2] - 3:13, 4:14
**77** [1] - 3:14
**79** [1] - 3:16
**7:22-CV-3738** [1] - 1:3

**8**

**8** [3] - 47:9, 47:11, 122:9
**80** [2] - 186:1
**801** [1] - 10:25
**801(d** [1] - 11:24
**801(d)(2** [1] - 14:18
**801(d)(2)(D** [4] - 10:2, 17:12, 17:18, 18:4
**8th** [1] - 31:18

**9**

**9** [6] - 122:12, 122:14, 122:16, 122:17, 122:19, 122:22
**9-30** [2] - 26:16, 29:3
**9-30-2021** [1] - 24:25
**9/13/2021** [1] - 4:16
**9/29/2021** [1] - 3:10
**90** [3] - 3:23, 3:25, 186:1
**91** [1] - 3:8
**94** [1] - 125:19
**9:10** [1] - 5:1

**A**

**a.m** [2] - 5:1, 5:22
**ability** [2] - 59:6, 176:3
**able** [3] - 108:15, 109:24, 110:12
**above-entitled** [1] - 208:6
**absence** [2] - 77:13, 79:10
**absolutely** [1] - 69:23
**Absolutely** [1] - 169:17
**AC** [2] - 177:12, 177:18
**ACA** [1] - 35:21
**accept** [2] - 96:25, 98:3
**acceptable** [1] - 74:8
**accepted** [6] - 98:20, 99:7, 100:4, 100:11, 206:5, 206:14
**according** [6] - 51:22, 72:22, 78:12, 78:13, 164:19, 178:15
**accuracy** [1] - 121:5
**accurate** [2] - 124:5, 171:8
**accurately** [5] - 126:17, 128:22, 129:8, 129:19, 129:22
**action** [1] - 132:6
**actual** [2] - 100:8, 151:8
**add** [1] - 70:19
**added** [2] - 76:22, 145:20
**addition** [4] - 30:18, 89:3, 126:4, 127:7
**additional** [7] - 43:5, 77:13, 83:23, 84:1, 123:24, 126:3, 129:3
**addressed** [1] - 50:11
**adjusting** [1] - 54:6
**adjustments** [1] - 102:16
**administering** [1] - 89:10
**administrative** [1] - 173:23
**admission** [3] - 15:13, 147:13, 198:16
**admit** [2] - 33:4, 111:21
**Admitted** [1] - 125:15
**admitted** [38] - 18:6, 24:14, 41:14, 45:19, 47:10, 48:2, 50:23, 65:6, 65:9, 66:2, 73:15, 73:18, 77:20, 79:16, 90:25, 91:17, 116:16, 117:18, 118:14, 125:12, 128:16, 128:18, 136:16, 144:15, 147:15, 155:25, 156:2, 166:16, 170:17, 170:18, 172:20, 172:23, 187:6, 190:16, 190:17, 197:6, 197:8, 198:18
**admonition** [2] - 11:7, 166:3
**advance** [1] - 59:7
**advise** [2] - 146:4, 146:6
**advised** [2] - 29:22, 70:9
**affairs** [1] - 194:23
**affect** [9] - 7:6, 22:14, 30:19, 48:24, 54:23, 56:13, 58:8, 58:20, 59:6
**affected** [11] - 9:8, 9:15, 9:16, 9:24, 23:5, 52:6, 54:13, 54:18, 56:8, 56:15, 56:18
**Africa** [3] - 35:2, 178:2, 179:8
**afternoon** [1] - 111:20
**AG** [43] - 10:6, 10:16, 10:17, 10:18, 11:16, 11:19, 11:20, 12:2, 12:13, 13:16, 14:14, 14:18, 14:22, 15:19, 15:20, 15:24, 16:4, 16:9, 16:14, 16:15, 16:17, 16:23, 16:24, 19:15, 19:17, 20:8, 20:12, 20:16, 24:8, 29:24, 35:9, 36:4, 36:7, 36:8, 36:11, 79:9, 83:24, 121:8, 174:19, 182:17, 182:19
**AG's** [4] - 12:17, 13:23, 14:10, 17:22
**agency** [3] - 40:23, 176:25, 180:17
**Agency** [1] - 180:14
**agent** [5] - 10:6, 10:15, 10:16, 10:21, 17:12
**ago** [4] - 18:16, 29:11, 40:10, 123:15
**agree** [42] - 42:21, 117:5, 129:14, 138:4, 138:12, 140:1, 140:6, 152:3, 152:7, 153:2, 153:9, 153:19, 153:21, 157:2, 157:22, 159:4, 159:20, 164:11, 165:22, 165:24, 173:9, 173:14, 174:1, 175:6, 175:11, 175:12, 175:17, 175:23, 176:18, 182:19, 182:22, 184:1, 185:1, 185:5, 185:9, 185:13, 185:16, 186:19, 186:23, 196:5, 196:15, 201:19
**agreed** [11] - 18:11, 123:16, 152:24, 153:7, 166:14, 166:15, 167:5, 174:6, 182:7, 182:8, 186:11
**agreement** [4] - 18:25, 166:18, 167:8, 170:18
**ahead** [5] - 32:10, 86:7, 132:21, 133:21, 148:4
**AIDED** [1] - 2:9
**Airport** [2] - 104:8, 104:15
**AKTIENGESELLSCHAFT** [2] - 1:7, 1:21
**allegations** [1] - 150:22
**alleged** [1] - 8:10
**allegedly** [1] - 11:16
**allotment** [1] - 83:24
**allow** [1] - 8:16
**allowed** [4] - 62:17, 63:4, 138:1, 184:13
**almost** [2] - 18:16, 130:6
**alone** [2] - 175:22, 175:24
**AM** [2] - 160:6, 163:7
**amended** [1] - 15:7
**amendment** [1] - 167:16
**American** [5] - 24:2, 34:24, 39:13, 86:21, 177:6
**Americans** [8] - 37:1, 81:11, 81:23, 83:10, 84:6, 87:10, 174:10, 174:17
**americans** [1] - 23:24
**amount** [1] - 127:8
**amounts** [1] - 129:5
**analyst** [1] - 35:19
**AND** [1] - 1:17
**ANDERSON** [1] - 2:7
**Andreas** [1] - 22:1
**andTX-607** [1] - 183:25
**Andy** [2] - 21:22, 50:19
**Annmarie** [3] - 39:2, 39:9, 39:12
**annmarie** [1] - 39:1
**announce** [1] - 109:17
**announced** [1] - 109:17
**announcing** [1] - 92:6
**annual** [10] - 44:13, 124:1, 126:4, 126:21, 128:4, 129:9, 129:15, 129:20, 134:7, 135:20
**annually** [1] - 49:3
**answer** [20] - 11:19, 42:12, 57:24, 77:12, 88:10, 88:12, 95:23, 99:3, 99:11, 133:2, 133:8, 133:17, 151:2, 154:7, 154:12, 161:3, 161:5, 163:18, 165:16, 204:8
**answered** [1] - 151:13
**answers** [1] - 134:2
**Antani** [1] - 164:23
**anticipated** [2] - 11:19, 84:14
**apologies** [3] - 114:3, 124:19, 170:15
**apologize** [9] - 39:5, 54:25, 107:25, 118:9, 118:13, 128:17,

130:11, 180:3, 187:4
**apologized** [1] - 100:18
**appear** [4] - 78:21, 92:25, 93:7, 167:4
**APPEARANCES** [2] - 1:16, 2:1
**applied** [7] - 38:6, 52:6, 53:25, 54:2, 57:18, 74:10, 74:13
**applies** [2] - 10:9, 10:19
**apply** [3] - 53:20, 75:6, 102:20
**applying** [2] - 89:13, 161:17
**appreciate** [5] - 5:24, 5:25, 37:20, 38:23, 71:11
**approach** [6] - 68:7, 82:6, 98:11, 131:21, 165:17, 207:5
**approached** [3] - 87:25, 96:20, 96:23
**appropriate** [4] - 14:19, 34:19, 37:19, 167:12
**approval** [3] - 78:14, 182:14, 182:16
**approx** [1] - 121:1
**April** [15] - 136:23, 140:23, 141:3, 148:1, 148:7, 190:12, 190:23, 191:5, 191:19, 195:7, 196:6, 201:23, 201:25, 202:4, 208:11
**area** [7] - 44:17, 46:12, 75:17, 78:18, 78:19, 180:20, 183:1
**areas** [18] - 30:17, 43:8, 44:1, 44:2, 44:14, 46:12, 46:17, 46:24, 120:10, 121:19, 146:15, 146:18, 176:20, 196:8, 196:10, 196:14, 196:15, 196:17
**argue** [1] - 153:12
**argued** [1] - 11:2
**argument** [2] - 12:17, 14:11
**arguments** [2] - 13:18, 13:21
**AS** [2] - 1:8, 1:10
**Ash** [1] - 168:10
**aspects** [1] - 104:22
**aspired** [1] - 60:14
**assemble** [1] - 162:3
**assembled** [1] - 162:9
**assembly** [6] - 44:1, 157:7, 161:25, 200:21, 201:8, 201:11
**Assembly** [5] - 22:12, 22:17, 22:20, 22:23, 23:11
**assessment** [4] - 177:19, 177:22, 178:20, 178:23
**assigned** [3] - 14:15, 62:24, 81:21
**assignment** [10] - 173:22, 174:2, 174:7, 174:15, 174:18, 174:20, 175:1, 176:14, 176:21, 187:23
**assignments** [3] - 45:5, 83:16, 174:11
**assist** [2] - 6:24, 184:15
**assistance** [1] - 83:17
**assistant** [2] - 32:2, 183:12
**Associate** [2] - 86:6, 88:20
**associate** [5] - 27:6, 27:9, 27:11, 75:17, 188:9
**associates** [2] - 189:17, 200:23
**attends** [1] - 89:7
**attention** [5] - 5:25, 27:12, 72:2, 91:23, 132:25
**attorneys** [1] - 111:14
**attributed** [1] - 139:5
**atTX-6065** [1] - 194:7
**audit** [1] - 78:8
**audited** [1] - 78:16
**auditing** [1] - 78:21
**auditor** [1] - 78:11
**auditors** [1] - 78:22
**audits** [3] - 78:7, 78:17, 78:20
**August** [10] - 7:13, 22:8, 84:3, 132:1, 133:24, 152:2, 169:25, 203:22
**Austria** [4] - 178:9, 178:10, 178:11, 179:12
**authorities** [1] - 184:15
**authorized** [1] - 17:16
**aware** [32] - 24:3, 28:25, 29:14, 29:15, 32:5, 40:15, 60:23, 61:1, 61:2, 76:1, 78:24, 86:22, 86:24, 88:21, 88:22, 89:5, 103:3, 109:15, 141:13, 155:14, 155:18, 155:19, 155:21, 165:13, 175:13, 184:14, 191:25, 192:2, 192:9, 193:19, 193:22, 193:24

**B**

**background** [1] - 40:11
**backwards** [1] - 87:8
**bad** [1] - 168:25
**balance** [4] - 27:7, 27:11, 97:16, 108:24
**band** [2] - 49:1, 52:24
**Barbara** [1] - 50:16
**barely** [1] - 172:14
**base** [2] - 83:15, 127:16
**based** [20] - 8:10, 13:25, 14:9, 14:23, 37:5, 37:7, 49:3, 49:6, 49:8, 54:9, 74:3, 79:10, 84:1, 86:25, 99:1, 124:14, 124:21, 125:1, 149:9, 177:7
**baseline** [1] - 153:13
**basis** [9] - 8:12, 68:20, 69:8, 70:12, 70:16, 71:2, 87:14, 88:23, 153:6
**bat** [1] - 155:15
**Batz** [2] - 21:22, 50:19
**batz** [1] - 21:23
**BATZ** [1] - 21:23
**BAYERISCHE** [2] - 1:6, 1:20
**bear** [1] - 169:15
**became** [6] - 39:22, 119:14, 122:14, 122:16, 122:17, 186:15
**become** [4] - 166:20, 174:7, 192:9, 202:3
**becomes** [1] - 10:22
**becoming** [2] - 123:12, 191:20
**beer** [1] - 99:14
**BEFORE** [1] - 1:13
**beg** [3] - 168:11, 187:3, 196:20
**began** [1] - 85:20
**beginning** [3] - 18:16, 92:19, 166:18
**begins** [2] - 42:24, 92:10
**behind** [3] - 167:25, 181:11, 181:13
**beings** [1] - 182:11
**below** [2] - 27:14, 195:13
**bench** [11] - 68:10, 71:16, 82:8, 83:3, 98:12, 99:22, 106:8, 107:23, 165:19, 165:21, 207:7
**benefit** [6] - 3:21, 19:11, 40:19, 120:25, 126:24, 171:10
**benefits** [29] - 17:1, 35:20, 48:24, 49:2, 49:8, 54:3, 54:5, 57:6, 82:15, 86:5, 98:23, 106:20, 107:10, 107:16, 113:19, 117:2, 117:7, 124:5, 124:6, 125:9, 125:23, 142:14, 171:10, 171:22, 172:2, 172:3, 172:6, 174:21, 195:21
**Benefits** [2] - 90:19, 199:20
**best** [7] - 23:8, 161:7, 176:4, 176:18, 178:16, 178:18, 202:2
**betrayed** [2] - 108:10, 109:12
**better** [7] - 20:4, 27:13, 56:20, 79:8, 97:16, 140:16, 149:21
**between** [10] - 26:16, 27:11, 45:17, 46:19, 83:9, 127:11, 128:11, 141:11, 141:13, 167:15
**beyond** [1] - 26:14
**bifurcated** [1] - 98:15
**big** [1] - 175:10
**bind** [4] - 16:9, 16:13, 16:17
**bit** [13] - 9:23, 22:3, 27:22, 33:8, 45:9, 120:20, 130:16, 142:18, 166:2, 166:25, 169:14, 190:12, 207:12
**black** [1] - 72:17
**blending** [1] - 173:4
**blitz** [1] - 180:21
**blue** [2] - 188:17, 191:7
**blueprint** [4] - 177:12, 177:23, 178:18, 179:6
**BMW** [136] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:2, 3:20, 4:3, 9:14, 10:6, 10:15, 11:16, 12:2, 12:12, 12:17, 13:23, 14:10, 14:14, 14:15, 14:18, 14:22, 16:23, 18:13, 19:11, 19:15, 19:18, 20:8, 20:16, 23:23, 24:1, 24:8, 25:21, 29:24, 32:4, 33:19, 34:9, 36:8, 36:14, 40:13, 43:24, 44:5, 44:16, 45:3, 57:17, 58:5, 58:8, 58:21, 59:3, 59:19, 60:17, 60:24, 62:17, 67:4, 74:12, 78:25, 79:8, 81:21, 82:4, 83:8, 85:24, 86:9, 88:16, 90:5, 92:13, 94:2, 94:18, 95:7, 95:18, 95:21, 96:4, 97:1, 97:7, 97:8, 97:21, 100:9, 100:13, 101:4, 101:13, 101:15, 102:3, 103:14, 104:19, 112:23, 114:7, 114:21, 115:22, 115:25, 117:23, 120:6, 121:8, 129:15, 136:21, 139:23, 141:20, 151:7, 153:6, 153:14, 153:18, 158:25, 159:3, 159:8, 161:25, 163:6, 163:7, 165:14, 169:18, 171:13, 173:8, 173:9, 173:10, 173:15, 173:16, 173:20, 173:23, 174:3, 174:13, 175:5, 175:13, 175:14, 175:19, 175:25, 176:3, 181:11, 182:17, 182:19, 184:9, 184:11, 184:16, 197:15, 197:16, 198:2, 200:5, 200:8, 206:20
**BMW's** [1] - 108:6
**Board** [3] - 25:16, 25:18, 25:21

**board** [7] - 25:19, 130:14, 136:22, 168:7, 193:10, 206:16
**boat** [4] - 203:10, 203:13, 204:14, 205:1
**body** [2] - 44:2, 182:4
**bolded** [1] - 121:12
**bonus** [23] - 3:21, 49:2, 49:3, 54:8, 117:1, 117:6, 124:13, 124:14, 124:18, 124:19, 124:20, 124:21, 125:1, 126:7, 126:11, 127:2, 127:8, 127:12, 127:17, 127:21, 127:24, 128:8, 128:11
**bonuses** [2] - 3:25, 126:5
**book** [1] - 140:18
**books** [1] - 78:11
**boss** [7] - 100:16, 146:22, 147:20, 148:16, 149:3, 149:5, 149:14
**boss's** [1] - 191:18
**bosses** [1] - 44:5
**bottom** [8] - 137:18, 140:21, 145:25, 147:19, 158:13, 170:25, 195:13, 198:15
**bound** [1] - 36:3
**bounds** [2] - 183:23
**BOX** [1] - 1:22
**box** [13] - 5:9, 34:3, 34:22, 34:24, 34:25, 75:11, 124:3, 159:10, 159:11, 159:12, 163:3, 195:10, 195:14
**boxes** [3] - 36:25, 44:9, 195:12
**break** [9] - 22:4, 61:9, 61:11, 110:9, 110:14, 111:7, 165:23, 166:1
**BRIAN** [1] - 1:17
**Brian** [1] - 38:14
**bridge** [1] - 25:11
**briefed** [1] - 12:7
**briefly** [1] - 15:18
**bring** [17] - 5:13, 21:4, 22:22, 51:18, 51:19, 52:13, 52:17, 61:13, 61:18, 106:20, 110:13, 111:11, 166:11, 167:20, 176:20, 206:10
**bringing** [2] - 85:24, 87:8
**Brittain** [1] - 179:9
**broad** [2] - 47:2, 104:21
**broader** [4] - 46:25, 87:2, 87:5, 104:18
**broken** [1] - 108:11
**brought** [2] - 22:19, 143:4
**build** [5] - 16:19, 181:20, 182:4, 182:11, 184:2
**buildings** [1] - 164:8
**built** [2] - 181:1, 181:2
**BULL** [1] - 2:6
**bull** [2] - 150:16, 208:11
**bullet** [4] - 120:24, 179:22, 180:3, 180:10
**bullets** [2] - 120:21, 179:22
**bump** [1] - 98:8
**bumps** [1] - 123:24
**Burghardt** [1] - 50:16
**Burgmeier** [8] - 15:25, 26:1, 26:5, 26:9, 40:9, 40:18, 85:22, 93:5
**bus** [1] - 5:20
**BUSINESS** [2] - 1:8, 1:10
**business** [6] - 27:11, 27:12, 103:24, 176:18, 198:11, 207:3
**busy** [1] - 201:20
**Butler** [1] - 194:5
**BY** [73] - 6:5, 8:18, 9:2, 24:20, 30:11, 31:16, 32:12, 33:7, 37:23, 41:16, 45:23, 48:4, 49:20, 51:2, 55:13, 56:5, 57:4, 57:12, 58:16, 59:24, 60:11, 61:23, 63:8, 64:4, 65:11, 66:5, 67:14, 67:21, 71:22, 72:9, 73:20, 76:6, 77:22, 79:20, 83:6, 85:19, 87:18, 88:14, 91:3, 91:20, 93:15, 96:2, 100:3, 105:13, 105:23, 108:3, 111:19, 114:20, 116:19, 117:20, 118:16, 120:4, 125:18, 128:20, 131:24, 132:24, 133:23, 136:4, 136:20, 138:20, 144:17, 147:18, 150:14, 156:5, 161:9, 169:12, 170:22, 173:2, 187:8, 190:20, 197:11, 198:21, 203:20

**C**

**CA** [1] - 1:3
**CAIN** [1] - 1:13
**calculated** [1] - 49:4
**calendar** [1] - 203:5
**calendars** [1] - 203:25
**candidate** [16] - 35:6, 76:17, 155:16, 155:20, 156:16, 158:4, 164:16, 176:9, 189:9, 192:2, 192:5, 192:11, 192:22, 193:4, 193:10, 196:7
**Candidates** [1] - 156:13
**candidates** [5] - 81:4, 81:6, 157:10, 164:13, 192:1
**cannot** [3] - 16:10, 37:5, 57:24
**capacity** [1] - 52:15
**captures** [1] - 129:3
**car** [2] - 110:2, 182:4
**care** [1] - 27:20
**career** [5] - 94:18, 96:16, 97:7, 100:9, 104:1
**careful** [3] - 5:25, 17:25, 168:4
**carefully** [1] - 13:20
**Carolina** [2] - 5:20, 184:15
**CAROLINA** [1] - 1:1
**carried** [1] - 75:18
**cars** [4] - 162:15, 162:19, 175:7, 184:2
**case** [27] - 6:10, 6:11, 11:8, 11:9, 16:10, 18:14, 18:16, 20:8, 21:5, 61:12, 81:19, 83:14, 96:24, 103:16, 110:23, 143:5, 146:13, 149:9, 150:22, 166:3, 166:4, 166:5, 168:16, 207:15, 207:16, 207:17
**cc** [1] - 145:24
**Center** [1] - 86:6
**center** [4] - 177:19, 177:22, 178:20, 178:23
**central** [5] - 51:24, 51:25, 78:19, 78:22, 185:7
**CEO** [9] - 22:9, 22:10, 22:11, 32:2, 32:3, 86:12, 165:6, 169:21, 204:25
**certain** [6] - 51:16, 74:7, 74:8, 176:22, 177:3, 196:1
**certainly** [1] - 56:1
**CERTIFICATE** [1] - 208:3
**certify** [1] - 208:4
**cetera** [1] - 182:4
**Chad** [3] - 156:17, 158:1, 164:23
**chain** [4] - 104:12, 144:24, 145:5, 145:20
**challenge** [3] - 182:10, 184:3, 184:4
**challenges** [1] - 7:6
**chance** [1] - 187:12
**change** [22] - 6:13, 20:2, 29:1, 44:11, 44:12, 52:20, 52:21, 57:20, 67:4, 67:25, 84:11, 108:16, 119:1, 119:10, 122:15, 139:22, 140:11, 140:22, 144:2, 144:4, 169:18
**changed** [18] - 102:9, 109:17, 119:1, 128:1, 130:23, 139:12, 140:2, 140:4, 140:8, 140:10, 141:9, 142:20, 143:24, 144:7, 144:8, 144:9, 152:16
**changes** [12] - 3:7, 6:15, 7:9, 8:4, 22:4, 22:6, 58:24, 84:14, 84:17, 92:6, 92:22, 126:24
**changing** [2] - 133:10, 133:12
**chaos** [1] - 108:16
**chaotic** [3] - 7:16, 94:25, 95:6
**characterize** [1] - 7:14
**charges** [1] - 89:14
**chart** [21] - 4:14, 34:4, 34:15, 34:22, 35:4, 40:2, 49:4, 49:7, 49:11, 49:14, 50:7, 52:9, 53:18, 53:19, 54:3, 73:9, 74:7, 75:4, 82:19, 153:24, 196:19
**charts** [3] - 45:14, 48:18, 82:12
**chat** [1] - 106:7
**check** [4] - 78:11, 78:12, 145:16, 168:2
**checking** [1] - 145:13
**CHIEF** [1] - 1:14
**child** [1] - 186:24
**children** [1] - 83:18
**chose** [4] - 91:12, 189:9, 205:8, 205:14
**chosen** [1] - 205:11
**Chris** [7] - 188:6, 188:7, 188:10, 188:14, 189:9, 189:11, 194:5
**Christ** [1] - 83:18
**Christine** [26] - 8:1, 23:6, 24:25, 25:9, 28:9, 28:24, 39:23, 41:21, 62:13, 73:5, 75:22, 77:25, 89:11, 89:15, 90:16, 100:16, 145:11, 146:5, 178:16, 185:17, 188:17, 198:23, 200:11, 200:13, 200:17, 202:6
**Christine's** [1] - 7:17
**Church** [1] - 83:18
**circle** [11] - 63:23, 64:5, 64:8, 64:10, 64:15, 64:21, 64:22, 65:22, 74:23, 74:24, 75:1
**Circle** [1] - 92:21
**circumstances** [1] - 15:12
**citizen** [1] - 174:25
**claim** [9] - 68:21, 119:9, 121:18, 142:21, 142:25, 143:4, 143:7, 149:9, 167:23
**clarification** [2] - 20:18, 118:24
**clarified** [1] - 20:14
**clarify** [5] - 20:11, 55:7, 79:13, 103:12, 106:17
**classes** [2] - 37:4, 88:25
**classification** [1] - 52:23
**Claudia** [1] - 93:9
**cleaned** [1] - 168:6
**clear** [16] - 9:3, 11:3,

20:14, 21:1, 26:22, 47:11, 59:25, 62:5, 93:12, 94:14, 95:9, 95:13, 99:19, 109:6, 166:12, 167:3
**clearly** [1] - 17:19
**Clemson** [2] - 93:16, 118:4
**clerk** [1] - 167:2
**Clerk's** [1] - 110:10
**client** [2] - 13:11, 20:9
**close** [3] - 110:18, 113:10, 115:15
**closes** [1] - 109:3
**CO** [2] - 1:9, 2:2
**code** [1] - 26:13
**coding** [1] - 34:21
**colleague** [1] - 92:1
**colleagues** [3] - 61:25, 200:5, 200:8
**Colleagues** [1] - 91:24
**COLLECTIVELY** [2] - 1:7, 1:10
**college** [1] - 108:14
**color** [1] - 34:21
**column** [6] - 34:20, 54:10, 57:19, 129:25, 191:13, 191:22
**columns** [1] - 158:6
**combination** [3] - 39:9, 40:1
**coming** [17] - 10:7, 16:19, 24:6, 26:7, 29:6, 34:1, 51:24, 75:18, 85:23, 101:8, 106:1, 120:13, 121:8, 145:24, 169:21, 176:15, 193:6
**comma** [1] - 161:11
**commenced** [1] - 5:1
**commend** [1] - 167:7
**comment** [1] - 203:6
**comments** [2] - 15:5, 15:14
**committee** [2] - 183:22, 183:24
**communicate** [2] - 186:12, 186:16
**communicated** [2] - 58:9, 109:22
**communicates** [1] - 172:9
**communication** [6] - 91:8, 94:8, 102:25, 105:3, 185:2, 185:6
**communications** [4] - 94:25, 95:6, 97:5, 186:20
**community** [1] - 20:15
**comp** [1] - 98:23
**companies** [1] - 96:21
**company** [13] - 17:15, 59:16, 92:13, 97:20, 98:1, 102:6, 104:3, 104:4, 108:9, 160:25, 198:25, 200:9, 206:14
**Company** [1] - 197:15
**compare** [1] - 104:14
**compared** [1] - 104:16
**comparison** [1] - 46:15
**compartments** [1] - 110:1
**compensation** [23] - 35:19, 48:24, 49:1, 57:6, 57:17, 58:8, 78:12, 82:14, 82:15, 83:16, 113:12, 113:18, 113:22, 120:25, 125:23, 128:1, 129:5, 129:9, 129:20, 142:12, 142:14, 174:21, 195:21
**Compensation** [3] - 90:18, 122:8, 199:20
**competition** [1] - 175:13
**complaining** [1] - 5:21
**complaint** [1] - 15:7
**complete** [3] - 64:22, 72:13, 168:16
**completed** [1] - 111:13
**completing** [1] - 118:4
**completion** [1] - 195:17
**compliance** [2] - 78:18, 78:19
**comply** [2] - 54:6, 70:17
**components** [1] - 182:3
**compounded** [1] - 109:2
**concept** [1] - 48:16
**concern** [4] - 53:22, 53:24, 70:3, 87:25
**concerned** [3] - 88:7, 96:9, 104:2
**concerns** [7] - 53:20, 85:23, 86:8, 86:25, 87:10, 95:7, 96:13
**concluded** [6] - 71:16, 83:3, 99:22, 107:23, 165:21, 207:22
**concludes** [1] - 14:8
**Concrete** [3] - 97:24, 97:25, 206:5
**concrete** [2] - 98:1, 98:2
**concur** [1] - 165:25
**conditions** [3] - 45:3, 45:4, 53:17
**conduct** [1] - 89:4
**conducted** [1] - 89:5
**conference** [12] - 68:10, 71:16, 82:8, 83:3, 98:12, 99:22, 106:8, 107:23, 165:19, 165:21, 166:16, 207:7
**confidant** [1] - 87:24
**confirm** [2] - 24:7, 122:21
**confirmed** [2] - 131:4, 147:25
**connect** [1] - 187:4
**consent** [1] - 166:18
**consider** [3] - 101:19, 126:5, 178:18
**consideration** [2] - 27:18, 33:25
**considered** [5] - 13:20, 84:4, 102:1, 160:17, 164:16
**considering** [1] - 191:25
**consistent** [2] - 40:2, 191:18
**constitute** [1] - 14:17
**construction** [1] - 94:7
**contacted** [4] - 95:5, 95:9, 95:13, 95:17
**contacting** [1] - 95:20
**content** [1] - 7:12
**context** [1] - 183:21
**continent** [1] - 178:10
**continue** [4] - 9:11, 16:19, 60:3, 60:5
**CONTINUED** [75] - 2:1, 4:1, 6:4, 8:17, 9:1, 21:11, 24:19, 30:10, 31:15, 32:11, 33:6, 37:22, 41:15, 45:22, 48:3, 49:19, 51:1, 55:12, 56:4, 57:3, 57:11, 58:15, 59:23, 60:10, 61:22, 63:7, 64:3, 65:10, 66:4, 67:13, 67:20, 71:21, 72:8, 73:19, 76:5, 77:21, 79:19, 83:5, 85:18, 87:17, 88:13, 91:2, 91:19, 93:14, 96:1, 100:2, 105:12, 105:22, 108:2, 114:19, 116:18, 117:19, 118:15, 120:3, 125:17, 128:19, 131:23, 132:23, 133:22, 136:3, 136:19, 138:19, 144:16, 147:17, 150:13, 156:4, 161:8, 169:11, 170:21, 173:1, 187:7, 190:19, 197:10, 198:20, 203:19
**continued** [5] - 3:3, 7:11, 114:6, 115:11, 170:4
**continues** [1] - 29:20
**contract** [2] - 6:21, 180:16
**contractor** [2] - 167:23, 177:2
**contractors** [1] - 180:17
**contradict** [1] - 13:7
**control** [2] - 46:13, 180:20
**conversation** [12] - 7:23, 8:11, 8:12, 8:14, 14:24, 23:8, 24:4, 26:3, 28:21, 120:14, 154:21, 192:3
**conversations** [5] - 8:14, 8:19, 10:11, 12:13, 41:6
**conveyed** [3] - 84:18, 85:10, 105:2
**convinced** [2] - 15:10, 15:13
**cooler** [1] - 18:9
**Coordinator** [3] - 118:25, 119:6, 119:14
**coordinator** [1] - 119:4
**copied** [1] - 146:21
**copy** [1] - 133:18
**Corey** [38] - 4:15, 4:18, 23:18, 26:21, 28:14, 28:16, 58:22, 72:12, 76:16, 78:2, 78:6, 139:2, 139:19, 140:4, 140:5, 142:18, 142:22, 142:23, 142:25, 143:8, 143:10, 143:12, 143:24, 146:9, 146:14, 147:23, 148:1, 148:13, 148:14, 149:10, 149:13, 150:1, 150:7, 150:8, 151:1, 151:7, 152:4, 152:8
**Corey's** [1] - 145:7
**corner** [1] - 25:2
**corporate** [2] - 121:4, 121:5
**Correct** [1] - 159:24
**correct** [246] - 18:3, 21:24, 25:3, 35:10, 35:11, 35:23, 38:19, 38:20, 39:25, 40:6, 41:12, 45:12, 45:13, 47:16, 48:11, 49:12, 49:13, 49:21, 49:22, 57:15, 58:17, 62:22, 62:25, 64:6, 64:7, 69:15, 72:23, 75:12, 76:8, 76:9, 79:25, 85:14, 101:3, 101:13, 101:14, 111:23, 111:24, 112:2, 112:6, 112:8, 112:9, 112:12, 112:17, 112:24, 113:8, 114:8, 114:14, 114:24, 115:2, 115:8, 115:12, 115:13, 115:17, 116:7, 117:8, 117:11, 118:2, 118:5, 118:20, 119:16, 120:2, 121:10, 121:25, 122:5, 122:10, 123:5, 123:8, 123:11, 123:14, 123:23, 124:2, 124:10, 124:12, 124:19, 125:3, 125:6, 125:8, 125:10, 125:20, 125:21, 126:22, 126:23, 127:1, 127:10, 127:13, 127:19, 127:22, 127:25, 128:3, 128:7, 128:10, 128:13, 129:17, 130:6, 130:7, 130:10, 130:17, 130:18, 135:22, 136:1, 136:9, 137:6, 137:15, 138:2, 138:9, 138:13, 138:23, 139:1, 139:4, 139:9, 139:17,

139:25, 141:12, 141:19, 141:23, 141:25, 142:1, 142:4, 142:8, 143:6, 143:9, 143:20, 143:22, 145:1, 145:2, 145:15, 146:17, 146:20, 146:23, 147:7, 147:21, 148:22, 149:18, 152:5, 152:10, 152:20, 153:17, 153:20, 154:11, 154:18, 155:2, 155:4, 155:13, 156:9, 156:10, 156:21, 156:23, 157:5, 157:8, 157:15, 157:19, 157:23, 158:18, 158:23, 158:24, 159:2, 159:9, 159:15, 159:18, 160:10, 160:15, 161:18, 162:2, 162:13, 162:16, 162:20, 163:14, 164:25, 169:22, 170:5, 170:11, 171:11, 171:20, 171:23, 172:1, 172:5, 172:8, 173:20, 173:21, 173:24, 173:25, 174:9, 174:12, 174:16, 174:23, 175:3, 175:9, 176:5, 177:1, 177:5, 177:9, 177:25, 178:13, 179:1, 179:11, 180:13, 181:4, 181:7, 182:6, 182:15, 182:18, 184:22, 184:25, 185:15, 186:8, 186:13, 186:18, 187:2, 187:16, 187:21, 188:12, 189:15, 189:17, 189:18, 190:2, 190:6, 190:9, 191:12, 191:21, 192:8, 192:24, 193:1, 195:5, 195:18, 195:23, 196:24, 197:2, 197:17, 197:24, 198:5, 198:12, 198:24, 199:4, 199:8, 199:17, 199:22, 200:22, 201:9, 201:12, 205:15, 205:19, 205:20, 205:23, 206:1, 206:18, 208:4

**corrected** [1] - 38:21
**cost** [2] - 83:15, 103:23
**count** [3] - 153:25, 190:5, 198:7
**counting** [1] - 198:8
**country** [4] - 20:7, 20:15, 34:10, 152:17
**couple** [9] - 36:13, 43:20, 44:3, 45:16, 87:23, 120:22, 121:22, 137:16, 169:1
**course** [6] - 17:25, 21:14, 96:16, 104:19, 166:20, 188:19
**COURT** [178] - 1:1, 1:14, 2:6, 2:6, 5:4, 5:8, 5:10, 5:13, 5:17, 8:7, 8:16, 8:23, 10:12, 11:5, 11:12, 11:15, 12:9, 13:10, 13:14, 13:16, 17:20, 17:23, 18:7, 18:19, 18:24, 20:6, 20:25, 21:4, 21:8, 24:14, 24:17, 29:25, 30:3, 30:6, 31:13, 32:9, 32:25, 33:1, 33:4, 37:17, 41:11, 41:14, 45:20, 47:25, 48:2, 50:23, 54:22, 55:9, 55:25, 56:12, 56:17, 56:23, 57:2, 57:8, 58:13, 59:12, 59:15, 59:18, 60:1, 60:8, 61:8, 61:18, 61:21, 63:6, 64:2, 65:7, 65:9, 66:2, 67:10, 67:16, 68:6, 68:9, 68:23, 69:8, 70:21, 71:1, 71:11, 71:18, 71:20, 72:5, 72:7, 73:16, 73:18, 76:2, 76:4, 76:24, 77:3, 77:18, 77:20, 79:7, 79:16, 82:3, 82:7, 82:22, 83:2, 85:15, 85:17, 87:14, 87:16, 88:5, 88:8, 88:11, 90:25, 91:17, 93:13, 95:25, 98:10, 99:11, 99:15, 99:18, 99:21, 99:24, 100:1, 105:10, 105:20, 106:7, 106:11, 106:18, 107:3, 107:6, 107:15, 107:18, 107:22, 107:25, 110:8, 111:5, 111:11, 116:12, 116:14, 116:16, 117:15, 117:18, 118:10, 118:14, 119:25, 125:13, 125:15, 128:18, 131:8, 131:13, 131:18, 131:22, 132:4, 132:21, 133:5, 133:14, 133:21, 136:12, 136:16, 138:17, 144:12, 144:15, 147:12, 147:15, 150:12, 156:2, 160:24, 165:18, 165:22, 166:10, 167:24, 168:8, 168:15, 168:21, 169:3, 169:8, 170:19, 172:13, 172:17, 172:23, 190:14, 190:17, 197:8, 198:18, 203:18, 207:6, 207:8, 207:20
**court** [15] - 22:2, 23:2, 50:17, 50:20, 71:17, 80:13, 83:4, 91:24, 99:23, 107:24, 132:2, 132:9, 166:13, 167:2
**Court** [7] - 13:20, 13:24, 14:7, 14:21, 15:12, 29:22, 98:18
**Court's** [4] - 99:2, 168:12, 187:3, 196:20
**courthouse** [1] - 19:21
**courtroom** [3] - 157:14, 167:1, 169:9
**cover** [1] - 169:5
**covered** [2] - 88:24, 121:1
**covers** [3] - 17:12, 121:1, 169:4
**coworkers** [1] - 109:14
**cracks** [1] - 167:24
**create** [5] - 6:23, 63:3, 63:10, 63:12, 68:13
**created** [13] - 26:15, 28:17, 29:2, 30:24, 36:15, 39:16, 51:6, 62:7, 62:9, 62:11, 62:12, 69:1, 74:16
**creating** [2] - 63:3, 64:23
**creation** [2] - 51:11, 63:9
**critical** [1] - 86:4
**CROSS** [27] - 111:18, 114:19, 116:18, 117:19, 118:15, 120:3, 125:17, 128:19, 131:23, 132:23, 133:22, 136:3, 136:19, 138:19, 144:16, 147:17, 150:13, 156:4, 161:8, 169:11, 170:21, 173:1, 187:7, 190:19, 197:10, 198:20, 203:19
**cross** [2] - 56:1, 60:8
**Cross** [1] - 3:4
**cross-examine** [1] - 56:1
**crossed** [1] - 94:23
**crowded** [1] - 110:18
**CRR** [2] - 2:6, 208:11
**culture** [2] - 97:18, 159:3
**cumbersome** [1] - 167:1
**current** [2] - 51:20, 54:1
**customary** [1] - 197:19
**cut** [1] - 54:17
**cutoff** [1] - 158:21
**CWF** [1] - 180:14

**D**

**D/B/A** [2] - 1:7, 1:10
**damage** [1] - 98:16
**damages** [1] - 107:11
**Daniela** [1] - 80:9
**darkened** [1] - 155:8
**dash** [1] - 74:17
**data** [8] - 4:4, 4:5, 4:6, 64:20, 137:11, 138:22, 141:17, 177:3
**date** [25] - 25:1, 31:18, 31:19, 41:23, 80:2, 92:8, 111:25, 112:15, 125:24, 129:10, 129:15, 129:18, 134:13, 134:16, 134:21, 135:3, 141:20, 144:1, 144:3, 151:18, 189:23, 197:22, 198:8, 202:5, 208:11
**dated** [6] - 3:23, 4:9, 4:14, 4:16, 4:18, 4:20
**dates** [5] - 114:9, 122:21, 129:4, 134:8, 206:8
**Davis** [2] - 188:25, 189:2
**DAWSEY** [1] - 1:3
**Dawsey** [45] - 3:14, 3:16, 3:19, 4:3, 4:11, 4:15, 4:17, 4:19, 4:21, 5:8, 5:10, 11:20, 16:2, 21:13, 24:21, 30:12, 33:9, 47:11, 48:5, 58:18, 59:25, 73:21, 77:23, 83:7, 88:15, 107:6, 108:4, 111:20, 114:3, 115:6, 128:14, 128:21, 129:2, 132:14, 132:25, 133:24, 167:16, 169:13, 170:23, 173:3, 187:9, 190:23, 191:6, 197:12, 199:2
**DAWSON** [1] - 3:2
**Dawson** [2] - 131:25, 163:23
**days** [7] - 97:15, 97:17, 109:21, 162:12, 173:4, 198:9, 201:20
**deal** [2] - 87:19, 176:12
**dealing** [2] - 40:23, 120:25
**dealt** [3] - 13:16, 82:17, 87:9
**Dear** [3] - 91:23, 92:21, 147:23
**DEB** [1] - 178:6
**DEBRA** [1] - 2:6
**Debrecen** [2] - 178:6, 179:13
**December** [19] - 85:1, 85:9, 85:15, 91:6, 92:9, 100:6, 100:10, 109:3, 109:4, 122:13, 170:24, 206:6, 206:7, 206:9, 206:11, 206:13, 206:15, 206:21
**decide** [3] - 79:9, 94:21, 107:12
**decided** [4] - 96:3, 104:3, 166:21, 181:20
**decision** [8] - 23:9, 36:9, 45:11, 95:18, 95:21, 100:8, 105:2, 108:9
**decisions** [6] - 7:21, 11:8, 18:14, 108:4, 108:6, 166:4
**declined** [2] - 189:2, 189:5
**declines** [1] - 13:24
**decrease** [1] - 54:2

**decreased** [2] - 53:2, 117:10
**DEFENDANT** [1] - 1:19
**defendant** [1] - 147:12
**Defendant's** [52] - 41:9, 41:11, 41:17, 42:4, 47:21, 47:22, 47:25, 48:7, 65:5, 65:7, 65:8, 65:12, 65:25, 66:2, 72:3, 72:7, 72:10, 89:18, 90:22, 90:25, 91:9, 114:3, 114:10, 116:12, 117:13, 117:14, 117:22, 118:6, 118:10, 122:6, 128:15, 136:14, 138:15, 141:16, 144:11, 147:11, 155:24, 156:3, 167:14, 167:17, 170:14, 170:17, 172:19, 172:21, 176:6, 190:13, 190:14, 190:15, 197:3, 197:5, 198:14, 198:17
**defendants** [1] - 125:13
**Defendants** [4] - 14:6, 15:1, 15:6, 111:14
**DEFENDANTS** [1] - 1:12
**DEFENSE** [2] - 3:17, 4:2
**defense** [2] - 116:10, 167:13
**define** [8] - 126:8, 126:10, 126:13, 153:10, 161:22, 173:11, 173:13, 193:21
**definitely** [1] - 95:10
**definition** [2] - 11:1, 13:2
**definitionally** [3] - 10:25, 12:3, 13:1
**degree** [2] - 137:22, 137:24
**demoted** [2] - 193:19, 193:23
**denied** [1] - 15:16
**Department** [29] - 36:4, 36:10, 46:4, 46:20, 46:22, 47:6, 47:13, 89:4, 89:6, 112:23, 113:11, 113:22, 113:24, 123:3, 123:12, 136:24, 137:14, 142:6, 142:11, 142:15, 142:16, 160:25, 163:10, 163:11, 163:13, 170:3, 171:3, 199:19
**department** [36] - 6:12, 6:13, 22:15, 24:6, 34:16, 36:2, 47:4, 74:22, 74:24, 74:25, 78:24, 82:20, 84:13, 85:2, 85:7, 85:11, 90:14, 102:6, 103:1, 112:25, 137:5, 139:15, 139:24, 143:24, 144:7, 148:21, 148:23, 149:13, 157:22, 171:15, 172:9, 183:1, 186:3, 189:16, 196:17, 201:4
**departments** [1] - 47:5
**deposition** [35] - 15:3, 15:23, 130:22, 131:1, 131:2, 131:4, 131:7, 131:9, 131:20, 131:25, 132:1, 132:5, 132:10, 132:11, 132:12, 132:14, 133:25, 136:5, 144:19, 144:24, 150:1, 150:3, 150:15, 150:17, 154:22, 174:5, 186:11, 195:22, 199:6, 203:17, 203:22, 206:10, 206:19
**deputy** [1] - 167:2
**describe** [1] - 46:9
**describing** [1] - 104:25
**description** [27] - 47:13, 48:8, 65:14, 66:7, 69:2, 69:7, 70:2, 114:22, 139:12, 139:13, 139:19, 140:8, 140:10, 140:23, 141:4, 141:6, 141:7, 141:8, 141:21, 141:24, 142:2, 142:5, 142:19, 142:21, 144:1, 144:8, 144:9
**descriptions** [3] - 137:3, 137:8, 170:9
**descriptive** [1] - 124:16
**descriptor** [1] - 159:11
**deserve** [1] - 43:19
**deserved** [2] - 206:22, 206:24
**designate** [2] - 15:2, 15:6
**designated** [1] - 62:15
**designation** [1] - 64:11
**desiring** [1] - 146:15
**details** [1] - 6:9
**determination** [1] - 98:18
**determined** [1] - 95:1
**determines** [3] - 117:1, 117:3, 117:6
**determining** [1] - 64:25
**develop** [2] - 28:2, 38:4
**developed** [4] - 31:14, 31:17, 41:19, 176:15
**developing** [2] - 6:24, 159:6
**Development** [3] - 156:6, 156:13, 180:4
**development** [15] - 30:21, 57:14, 121:12, 121:13, 121:14, 121:24, 122:1, 122:2, 176:8, 176:10, 180:6, 183:5, 183:6, 183:17, 183:20
**development/ Succession** [1] - 3:22
**device** [1] - 111:1
**dictates** [1] - 177:7
**differ** [1] - 83:13
**differed** [1] - 83:8
**differences** [1] - 45:17
**different** [14] - 8:4, 34:17, 36:14, 44:1, 45:24, 74:4, 82:16, 82:19, 104:20, 119:11, 120:9, 159:7, 170:9, 180:23
**differently** [2] - 142:23, 143:2
**difficult** [2] - 186:12, 186:14
**dig** [1] - 122:18
**digest** [1] - 109:6
**Direct** [1] - 3:3
**direct** [8] - 12:16, 46:14, 56:19, 57:2, 132:25, 194:14, 195:1, 204:4
**DIRECT** [47] - 6:4, 8:17, 9:1, 21:11, 24:19, 30:10, 31:15, 32:11, 33:6, 37:22, 41:15, 45:22, 48:3, 49:19, 51:1, 55:12, 56:4, 57:3, 57:11, 58:15, 59:23, 60:10, 61:22, 63:7, 64:3, 65:10, 66:4, 67:13, 67:20, 71:21, 72:8, 73:19, 76:5, 77:21, 79:19, 83:5, 85:18, 87:17, 88:13, 91:2, 91:19, 93:14, 96:1, 100:2, 105:12, 105:22, 108:2
**direction** [5] - 50:14, 51:15, 51:23, 51:24, 52:1
**directive** [1] - 31:1
**directly** [4] - 9:8, 9:16, 23:4, 192:3
**Director** [2] - 130:9, 130:11
**Directs** [1] - 180:14
**disadvantage** [1] - 181:16
**disagree** [4] - 202:12, 202:13, 202:18, 206:12
**disagreed** [1] - 149:11
**disbelief** [1] - 108:17
**disclosures** [1] - 15:2
**discombobulated** [1] - 168:25
**discriminated** [1] - 143:7
**discrimination** [6] - 88:17, 88:23, 89:4, 89:12, 89:14, 143:4
**discuss** [4] - 61:12, 86:8, 111:6, 205:5
**discussed** [7] - 25:12, 76:7, 84:14, 84:17, 86:23, 147:25, 170:7
**discussing** [1] - 108:5
**discussion** [20] - 7:17, 7:18, 7:19, 9:13, 22:17, 23:3, 23:5, 26:16, 26:18, 33:19, 34:2, 36:24, 41:25, 43:3, 55:14, 81:14, 84:13, 106:1, 106:2, 199:12
**discussions** [20] - 7:9, 7:11, 7:15, 7:22, 8:1, 8:3, 9:11, 18:13, 29:15, 29:18, 41:4, 51:8, 84:10, 86:23, 93:24, 96:10, 103:3, 106:5, 160:7, 160:9
**displaced** [3] - 86:20, 108:17, 205:11
**displaying** [1] - 158:8
**disprove** [1] - 19:23
**dispute** [2] - 17:4, 18:17
**disregard** [3] - 77:12, 88:11, 99:16
**distinction** [1] - 46:19
**distributing** [1] - 58:25
**DISTRICT** [3] - 1:1, 1:1, 1:14
**Diversity** [1] - 176:23
**diversity** [1] - 177:4
**DIVISION** [1] - 1:2
**document** [47] - 24:22, 25:24, 28:12, 30:12, 30:16, 31:6, 31:14, 33:8, 34:13, 37:13, 41:6, 41:21, 47:12, 48:6, 51:4, 52:3, 72:22, 73:13, 73:23, 73:25, 75:24, 76:7, 76:25, 77:7, 77:10, 77:12, 91:9, 93:7, 114:13, 115:14, 123:6, 123:7, 123:20, 129:6, 129:8, 139:24, 143:23, 144:5, 156:6, 160:21, 161:10, 164:19, 164:20, 164:21, 172:16, 176:9, 193:8
**documentation** [4] - 3:9, 13:8, 100:7, 206:8
**documented** [6] - 17:4, 25:6, 36:22, 53:19, 53:22, 53:24
**documenting** [1] - 33:16
**Documents** [1] - 3:24
**documents** [6] - 4:11, 17:7, 21:3, 31:22, 31:24, 186:18
**DOING** [2] - 1:8, 1:10
**dollars** [12] - 123:10, 123:13, 127:9, 127:21, 127:24,

128:5, 128:9, 150:2, 150:7, 151:8, 152:4
**Dombrowski** [15] - 80:21, 81:2, 81:5, 171:19, 172:10, 172:11, 180:22, 184:23, 185:1, 185:6, 185:9, 187:22, 189:14, 190:1, 191:10
**Dombrowski's** [1] - 188:5
**domestic** [18] - 7:18, 23:13, 23:21, 23:23, 34:18, 34:23, 34:24, 35:5, 35:18, 39:13, 40:5, 174:14, 184:20, 188:7, 188:10, 188:19, 188:20, 194:11
**domestics** [2] - 31:8, 174:17
**DONALD** [1] - 2:2
**done** [3] - 25:13, 112:3, 173:22
**door** [3] - 155:3, 155:8, 168:5
**double** [6] - 10:23, 12:6, 12:7, 16:5, 16:20, 168:2
**double-check** [1] - 168:2
**down** [26] - 39:6, 54:6, 58:14, 58:22, 65:22, 84:4, 108:25, 110:11, 111:8, 112:19, 121:23, 124:3, 125:5, 125:7, 125:9, 143:12, 143:25, 168:3, 178:11, 179:20, 180:1, 180:9, 196:16, 199:18, 201:13, 203:7
**downgrade** [1] - 63:15
**Dr** [13] - 22:11, 22:22, 24:9, 32:22, 86:14, 86:15, 86:16, 169:23, 203:6, 203:12, 204:7, 204:16, 205:24
**dr** [1] - 203:1
**draft** [1] - 64:19
**driveway** [1] - 98:2
**driving** [1] - 161:17
**drop** [1] - 120:20
**drove** [1] - 5:20
**due** [2] - 35:20, 75:6
**duplicative** [1] - 118:7
**during** [22] - 3:13, 21:14, 24:1, 34:8, 42:6, 50:5, 51:8, 57:20, 58:2, 60:22, 61:11, 67:23, 69:22, 70:2, 84:3, 85:13, 88:16, 101:15, 111:7, 143:15, 155:14, 166:20
**dust** [1] - 68:13
**Dutch** [2] - 172:15, 186:9
**duties** [2] - 82:2, 82:13

**E**

**e-mails** [1] - 79:21
**E/E** [2] - 180:20, 181:5
**early** [22] - 5:23, 6:17, 6:18, 6:22, 7:5, 9:10, 21:14, 85:1, 85:9, 93:23, 94:16, 94:21, 96:4, 100:6, 108:12, 111:23, 139:10, 152:12, 162:12, 183:8
**earning** [1] - 115:16
**earnings** [1] - 151:9
**easier** [1] - 186:15
**eat** [3] - 108:20, 110:11, 110:17
**ECF** [3] - 13:17, 15:16, 15:17
**economic** [1] - 107:11
**economy** [1] - 103:22
**education** [3] - 64:18, 137:17, 137:19
**effect** [11] - 22:15, 56:16, 56:20, 57:5, 57:16, 58:17, 58:20, 106:13, 107:8, 108:6, 114:22
**effective** [1] - 202:5
**effects** [2] - 105:5, 106:5
**efforts** [1] - 60:12
**eight** [5] - 131:16, 134:4, 196:8, 196:13, 196:14
**either** [10] - 10:9, 23:16, 52:23, 57:18, 57:21, 75:1, 92:17, 149:10, 174:21, 192:21
**elaborate** [1] - 27:10
**elderly** [1] - 94:6
**electrical** [1] - 181:6
**eleven** [3] - 130:16, 135:10, 135:17
**eligibility** [1] - 49:5
**eligible** [1] - 83:25
**elite** [1] - 153:2
**ELLISON** [1] - 2:3
**ELMO** [1] - 133:19
**Email** [5] - 4:8, 4:13, 4:15, 4:17, 4:19
**email** [28] - 3:7, 3:15, 3:16, 78:6, 78:14, 79:25, 80:9, 81:14, 81:15, 91:21, 91:24, 92:5, 92:8, 144:18, 144:24, 144:25, 145:5, 145:21, 145:23, 147:20, 168:1, 173:5, 178:15, 191:2, 198:22, 198:25, 199:18, 200:1
**emails** [3] - 92:15, 167:14, 191:18
**emotional** [3] - 108:18, 108:19, 110:3
**emotions** [1] - 186:20
**employed** [4] - 16:2, 16:4, 59:19, 114:21
**employee** [11] - 10:18, 15:20, 16:14, 16:16, 17:13, 34:9, 52:18, 53:22, 54:1, 173:19
**employees** [17] - 14:14, 15:20, 16:23, 16:24, 23:24, 51:19, 52:5, 58:21, 58:23, 58:25, 83:9, 83:23, 84:12, 87:23, 102:1, 172:7, 201:4
**employer** [4] - 10:21, 12:17, 97:1, 118:3
**employment** [6] - 60:22, 67:24, 82:4, 96:25, 118:21, 129:4
**en** [1] - 166:19
**encouraged** [1] - 158:25
**END** [1] - 208:1
**end** [9] - 96:11, 100:9, 104:6, 129:18, 145:10, 202:7, 202:12, 202:14, 202:19
**ending** [1] - 6:21
**ends** [2] - 144:25, 191:9
**engage** [2] - 94:15, 94:21
**engaged** [3] - 94:12, 94:19, 138:25
**engineering** [1] - 181:6
**Englehorn** [14] - 22:11, 22:22, 24:9, 32:22, 86:14, 86:15, 86:16, 169:23, 203:1, 203:6, 203:12, 204:7, 204:16, 205:24
**English** [4] - 92:11, 92:12, 92:18, 172:14
**enhances** [1] - 174:7
**ensure** [3] - 108:14, 121:4, 149:6
**entered** [1] - 24:23
**entire** [4] - 85:7, 94:18, 161:25, 173:10
**entitled** [2] - 14:19, 208:6
**entry** [7] - 27:13, 27:22, 28:12, 28:18, 44:21, 118:1, 134:6
**environment** [1] - 35:21
**Epps** [38] - 3:15, 4:16, 4:18, 23:18, 26:21, 28:16, 58:22, 71:24, 72:12, 75:2, 76:11, 76:14, 76:16, 77:7, 78:2, 102:13, 116:3, 139:2, 139:19, 142:18, 142:22, 142:23, 143:1, 143:8, 143:10, 143:12, 148:13, 149:10, 149:13, 150:1, 150:7, 151:1, 151:7, 151:19, 152:4, 152:8, 191:14, 191:20
**Epps's** [5] - 72:14, 72:18, 72:24, 143:24, 147:23
**equal** [2] - 149:17, 195:20
**equalized** [2] - 134:12, 142:10
**ERISA** [2] - 35:21, 41:1
**ESQ** [4] - 1:17, 1:21, 2:2, 2:3
**essence** [1] - 19:15
**essentially** [2] - 167:14, 172:2
**establish** [1] - 14:4
**established** [4] - 50:13, 114:5, 160:21, 178:9
**establishes** [1] - 30:16
**establishing** [1] - 111:21
**et** [1] - 182:4
**Europe** [3] - 84:4, 152:14, 178:12
**European** [1] - 161:20
**Eva** [5] - 15:24, 26:1, 26:5, 93:5, 106:1
**Eva's** [1] - 85:21
**evening** [5] - 5:18, 94:5, 168:18, 207:10, 207:14
**event** [1] - 166:13
**eventually** [5] - 52:19, 56:8, 56:18, 97:21, 182:11
**evidence** [15] - 12:20, 14:12, 17:1, 17:2, 17:8, 19:8, 24:15, 49:10, 68:18, 69:22, 70:13, 77:14, 82:18, 166:24, 166:25
**Evidence** [2] - 10:21, 14:2
**exact** [4] - 80:15, 120:15, 150:9, 200:25
**exactly** [1] - 11:18
**exam** [2] - 3:3, 3:4
**EXAM** [74] - 6:4, 8:17, 9:1, 21:11, 24:19, 30:10, 31:15, 32:11, 33:6, 37:22, 41:15, 45:22, 48:3, 49:19, 51:1, 55:12, 56:4, 57:3, 57:11, 58:15, 59:23, 60:10, 61:22, 63:7, 64:3, 65:10, 66:4, 67:13, 67:20, 71:21, 72:8, 73:19, 76:5, 77:21, 79:19, 83:5, 85:18, 87:17, 88:13, 91:2, 91:19, 93:14, 96:1, 100:2, 105:12, 105:22, 108:2, 111:18, 114:19, 116:18, 117:19, 118:15, 120:3, 125:17, 128:19, 131:23, 132:23, 133:22, 136:3, 136:19, 138:19, 144:16, 147:17, 150:13, 156:4, 161:8, 169:11, 170:21, 173:1, 187:7, 190:19, 197:10, 198:20, 203:19
**examination** [1] - 111:13

**examine** [2] - 14:7, 56:1
**example** [5] - 30:18, 34:2, 38:5, 53:15, 109:16
**examples** [3] - 78:25, 81:25, 83:12
**excellence** [1] - 177:13
**except** [1] - 68:19
**exception** [5] - 10:9, 10:19, 11:24, 184:20, 185:17
**exceptions** [1] - 132:17
**excess** [1] - 127:12
**exchange** [2] - 132:7, 144:18
**exchanging** [1] - 176:16
**exclamation** [1] - 187:20
**exclude** [2] - 13:25, 14:22
**excluded** [1] - 13:2
**excludes** [1] - 11:1
**exclusive** [1] - 138:10
**excuse** [3] - 13:9, 160:19, 185:18
**excused** [4] - 61:16, 111:2, 166:6, 207:21
**executive** [1] - 32:2
**executives** [1] - 18:13
**exempt** [3] - 3:20, 124:18, 124:20
**exhausted** [2] - 108:16, 108:25
**exhibit** [83] - 15:9, 24:10, 24:23, 27:3, 29:17, 29:21, 30:13, 30:15, 33:5, 39:11, 40:3, 40:7, 40:8, 41:9, 41:17, 42:4, 45:20, 47:9, 47:11, 47:22, 47:23, 48:7, 49:10, 49:16, 50:21, 51:3, 55:4, 65:5, 65:12, 65:24, 66:1, 70:15, 72:3, 72:10, 73:14, 73:23, 75:25, 77:23, 79:14, 79:22, 89:18, 90:23, 91:10, 91:15, 93:2, 93:3, 114:10, 116:10, 116:12, 117:14, 117:22, 118:6, 118:8, 122:6, 122:7, 128:15, 136:11, 136:15, 138:15, 141:16, 147:11, 155:25, 162:22, 166:14, 167:14, 167:18, 170:15, 170:17, 172:19, 172:21, 176:7, 180:22, 187:5, 189:13, 189:19, 190:15, 197:4, 197:5, 198:14, 198:17
**EXHIBITS** [3] - 3:5, 3:17, 4:2
**exhibits** [10] - 15:5, 17:4, 17:6, 18:15, 98:22, 166:15, 166:19, 166:22, 167:6, 167:9
**existed** [1] - 17:14
**expat** [12] - 33:11, 36:18, 80:7, 80:19, 81:17, 82:14, 82:15, 187:20, 187:25, 188:14, 189:13
**Expat** [1] - 3:11
**expats** [6] - 23:22, 30:16, 31:8, 38:3, 81:21, 176:8
**expedite** [1] - 168:18
**experience** [13] - 43:5, 44:16, 47:7, 47:18, 47:20, 48:13, 64:19, 118:3, 138:5, 138:7, 138:8, 138:12
**Experience** [1] - 138:3
**experienced** [2] - 42:15, 112:7
**expertise** [2] - 121:18, 182:19
**experts** [2] - 13:6, 176:19
**explain** [12] - 22:14, 27:8, 28:13, 33:22, 36:21, 37:3, 83:12, 92:11, 92:12, 99:9, 106:4, 184:12
**explained** [2] - 37:6, 75:20
**explaining** [1] - 94:24
**explore** [1] - 96:7
**exported** [1] - 175:8
**exposed** [1] - 159:7
**expound** [1] - 71:4
**expressed** [3] - 86:3, 87:25, 154:11
**extended** [6] - 188:16, 202:8, 202:11, 202:14, 202:16, 202:19
**extent** [6] - 10:14, 11:4, 67:17, 96:15, 98:16, 119:9
**external** [8] - 43:15, 192:1, 192:2, 192:5, 192:21, 193:4, 193:10, 196:7
**extra** [2] - 84:7, 204:15
**extremely** [1] - 97:14

## F

**facilities** [1] - 35:1
**fact** [7] - 17:6, 63:18, 69:16, 117:25, 157:13, 165:25, 189:8
**factor** [1] - 64:24
**facts** [2] - 6:11, 57:13
**factual** [4] - 14:9, 68:14, 69:13, 70:8
**factually** [2] - 69:6, 69:19
**fails** [1] - 186:20
**fair** [3] - 20:13, 119:24, 122:22
**fairness** [1] - 167:19
**fall** [3] - 9:10, 21:14, 93:23
**falling** [1] - 167:21
**false** [1] - 18:4
**familiar** [7] - 30:12, 51:4, 79:21, 83:8, 132:5, 156:18, 161:1
**Family** [1] - 86:6
**family** [1] - 189:6
**FANE** [1] - 1:21
**far** [15] - 16:23, 31:12, 54:2, 69:9, 113:11, 113:21, 116:2, 157:3, 172:6, 175:5, 188:18, 194:13, 195:3, 195:9, 195:12
**farm** [1] - 5:19
**fast** [1] - 115:5
**fault** [1] - 140:19
**favor** [2] - 18:19, 107:12
**favorably** [4] - 142:22, 143:1, 143:10, 143:13
**favored** [1] - 150:24
**FE** [1] - 148:2
**fear** [2] - 43:18, 101:24
**FEBRUARY** [1] - 1:4
**February** [5] - 103:15, 111:22, 123:4, 202:9, 202:20
**federal** [1] - 40:22
**Federal** [1] - 14:1
**feeds** [1] - 141:6
**felt** [7] - 43:9, 86:3, 87:7, 94:24, 96:6, 108:10, 109:12
**few** [3] - 29:11, 111:5, 111:21
**field** [1] - 93:19
**fifteen** [1] - 166:1
**fifteen-minute** [1] - 166:1
**fifth** [2] - 49:17, 136:21
**fifties** [1] - 108:12
**fill** [6] - 34:23, 35:3, 37:1, 37:2, 78:25, 137:9
**filled** [3] - 35:5, 69:1, 129:19
**filling** [1] - 31:7
**fills** [1] - 90:9
**filter** [1] - 111:6
**final** [3] - 11:8, 64:10, 166:4
**finally** [1] - 14:21
**finance** [1] - 44:24
**financial** [1] - 107:16
**fine** [3] - 42:12, 71:1, 83:1
**fire** [1] - 101:15
**first** [31] - 6:15, 6:18, 9:13, 16:22, 20:6, 23:3, 23:7, 33:9, 34:3, 47:8, 53:23, 76:16, 76:17, 80:4, 92:16, 93:3, 103:25, 108:7, 120:24, 121:16, 128:22, 140:17, 145:18, 162:4, 164:22, 179:22, 180:3, 180:10, 183:4, 199:25, 200:2
**fishing** [1] - 172:22
**fit** [6] - 43:10, 49:23, 50:2, 52:10, 73:10, 74:1
**fits** [1] - 75:11
**five** [15] - 5:21, 5:22, 50:17, 73:10, 110:21, 113:13, 116:11, 116:20, 118:4, 136:11, 138:7, 140:17, 159:13, 163:4, 170:14
**five-plus** [1] - 138:7
**fix** [2] - 27:4, 114:18
**FL** [1] - 159:23
**flashing** [1] - 180:21
**flip** [1] - 71:23
**floor** [1] - 17:19
**Flor** [4] - 32:19, 154:17, 154:22, 165:6
**flow** [3] - 53:19, 74:7, 168:13
**fluid** [1] - 166:21
**Fluor** [1] - 154:24
**FO** [1] - 121:7
**focus** [4] - 46:8, 94:10, 180:19, 182:25
**focused** [1] - 98:1
**focusing** [1] - 179:16
**folks** [6] - 61:10, 152:13, 171:22, 172:3, 174:19, 185:11
**follow** [8] - 20:11, 36:5, 37:18, 39:10, 39:20, 53:23, 100:20, 145:13
**followed** [1] - 196:25
**following** [13] - 5:2, 5:15, 11:10, 21:6, 61:19, 71:17, 83:4, 99:23, 107:24, 111:3, 166:8, 169:6, 207:18
**follows** [4] - 39:12, 40:4, 65:1, 65:2
**footnote** [2] - 18:22, 74:20
**FOR** [3] - 1:1, 1:17, 1:19
**force** [7] - 180:16, 183:4, 183:5, 183:11, 183:17, 183:20, 184:16
**foregoing** [1] - 208:4
**form** [5] - 8:6, 90:8, 90:9, 137:10, 207:15
**formal** [3] - 31:25, 32:1, 101:22
**formally** [6] - 65:21, 66:14, 95:14, 100:12, 119:13, 167:6
**former** [1] - 38:15
**formerly** [1] - 65:17
**forth** [2] - 7:21, 104:21
**fortunately** [1] - 109:3
**forTX-606** [1] - 86:23
**Forum** [1] - 204:5
**forward** [9] - 12:12, 13:7, 20:9, 21:5, 77:9, 87:7, 146:5, 149:7, 190:11
**forwarded** [1] - 80:9
**forwarding** [1] - 80:8
**foundation** [9] - 30:4, 30:7, 31:12,

37:19, 55:10, 82:3, 82:16, 82:22, 82:24
**four** [64] - 18:16, 28:11, 45:18, 46:5, 46:9, 46:16, 46:21, 47:1, 49:15, 50:3, 51:17, 52:11, 53:16, 55:18, 56:9, 56:19, 59:6, 59:9, 59:11, 60:21, 60:24, 61:3, 63:16, 65:20, 65:22, 66:25, 67:3, 67:23, 68:17, 68:19, 68:25, 69:7, 70:1, 70:3, 72:22, 73:8, 73:11, 75:4, 103:17, 105:4, 105:25, 140:3, 140:4, 140:9, 141:9, 142:3, 143:25, 146:10, 149:20, 151:25, 152:14, 152:20, 157:17, 159:13, 163:4, 170:16, 177:15, 179:3, 179:15, 191:3, 193:13, 193:14, 193:16, 193:25
**fours** [2] - 47:3, 152:16
**fourth** [3] - 33:21, 33:23, 191:22
**Fowler** [34] - 114:2, 116:9, 116:11, 116:20, 116:22, 117:12, 118:22, 120:20, 121:16, 121:22, 127:6, 136:10, 137:17, 140:16, 144:22, 145:18, 155:24, 156:11, 157:9, 157:24, 158:11, 158:19, 163:21, 170:14, 172:18, 179:19, 180:1, 180:9, 190:21, 190:22, 195:25, 196:16, 197:3, 198:13
**frame** [2] - 93:22, 93:23
**Franka** [1] - 91:25
**free** [1] - 207:10
**Friday** [2] - 198:2, 198:10
**front** [3] - 68:14, 99:1, 187:9
**Frost** [2] - 171:9, 171:25
**full** [3] - 46:13, 168:15, 169:18
**Function** [1] - 156:13
**function** [185] - 4:4, 4:5, 4:6, 6:9, 26:19, 26:23, 26:24, 27:1, 28:7, 28:8, 28:11, 28:15, 29:8, 33:20, 37:25, 38:1, 45:17, 45:24, 45:25, 46:3, 46:20, 46:24, 47:1, 47:3, 48:19, 49:1, 50:6, 50:9, 51:16, 51:17, 52:10, 52:24, 52:25, 55:1, 55:5, 55:15, 55:17, 56:9, 56:18, 58:1, 59:5, 59:6, 59:8, 59:11, 59:16, 59:18, 60:16, 60:18, 60:19, 60:20, 60:21, 60:22, 60:24, 61:2, 61:3, 62:10, 62:12, 62:14, 62:15, 62:17, 62:20, 62:23, 63:2, 63:3, 63:10, 63:12, 63:13, 63:14, 63:16, 63:18, 64:20, 64:24, 64:25, 65:18, 65:20, 66:11, 66:12, 66:13, 66:16, 66:21, 66:22, 66:23, 66:25, 67:3, 67:5, 67:23, 67:25, 68:3, 68:16, 68:19, 69:3, 69:5, 69:21, 69:24, 70:1, 70:2, 70:11, 70:16, 72:1, 72:22, 73:7, 73:8, 73:11, 74:19, 75:4, 75:21, 76:19, 102:17, 105:4, 105:7, 105:15, 105:19, 105:21, 105:24, 105:25, 113:2, 114:10, 114:12, 114:14, 114:25, 115:6, 115:24, 119:7, 134:19, 134:23, 136:25, 137:1, 138:22, 140:2, 140:4, 140:8, 140:14, 140:25, 141:4, 141:6, 141:8, 141:17, 141:21, 142:3, 142:20, 143:21, 143:25, 144:2, 144:4, 144:10, 146:10, 149:19, 149:20, 149:21, 149:23, 151:16, 151:25, 152:15, 152:25, 153:1, 153:15, 153:23, 154:1, 154:4, 155:20, 156:17, 156:23, 157:10, 157:16, 157:17, 157:20, 157:21, 158:5, 162:25, 164:4, 164:17, 165:14, 174:8, 179:23, 184:8, 193:10, 193:24, 193:25
**functional** [10] - 44:1, 46:12, 46:17, 46:23, 49:24, 50:3, 53:15, 119:12, 120:9
**functionally** [1] - 171:4
**functions** [9] - 27:19, 34:5, 163:20, 174:4, 176:22, 196:1, 196:2, 196:4, 196:9
**funding** [1] - 103:25
**future** [6] - 7:22, 95:18, 95:21, 96:3, 96:13, 101:9

**G**

**GAA** [1] - 4:18
**Garth** [2] - 192:6, 193:6
**gas** [1] - 103:22
**gather** [2] - 64:9, 64:17
**gathering** [1] - 64:14
**GAV.AFF** [1] - 194:15
**gender** [1] - 89:1
**general** [3] - 17:25, 87:2, 155:23
**generalist** [1] - 121:19
**generally** [1] - 165:24
**generates** [1] - 90:10
**generic** [3] - 19:2, 22:16, 180:25
**generically** [1] - 19:1
**gentleman** [3] - 62:1, 157:6, 192:7
**German** [25] - 14:12, 22:12, 22:22, 23:15, 23:16, 38:1, 39:14, 81:10, 81:20, 83:9, 83:15, 83:23, 85:24, 86:7, 86:20, 87:8, 92:12, 92:14, 92:18, 108:17, 172:15, 186:9, 186:13, 186:18, 205:11
**Germans** [2] - 19:20, 87:11
**Germany** [60] - 6:22, 7:17, 7:23, 8:1, 8:3, 8:11, 9:18, 10:6, 10:8, 10:11, 11:21, 11:22, 11:24, 11:25, 12:10, 12:25, 19:1, 19:2, 19:7, 19:8, 19:16, 19:17, 19:19, 19:23, 19:25, 20:7, 20:10, 24:6, 25:11, 25:23, 26:13, 34:10, 35:1, 35:6, 35:9, 36:8, 39:14, 74:19, 75:1, 78:23, 80:6, 80:12, 80:18, 81:1, 81:21, 92:14, 100:16, 120:14, 145:9, 147:2, 152:16, 160:4, 176:10, 185:10, 187:19, 187:24, 188:13
**Gesprach** [5] - 33:13, 37:10, 37:15, 37:24, 38:1
**given** [6] - 38:3, 51:15, 56:6, 56:7, 75:22, 167:13
**global** [4] - 34:25, 35:2, 35:8, 35:12
**globe** [2] - 153:7, 153:11
**goal** [1] - 162:19
**goals** [1] - 51:22
**GOV.AFF** [1] - 194:22
**governance** [2] - 161:22, 161:24
**government** [4] - 40:23, 176:25, 177:2, 194:23
**Government** [1] - 177:8
**governmental** [1] - 184:14
**grab** [1] - 121:22
**grade** [73] - 48:19, 48:22, 48:24, 48:25, 49:3, 49:5, 49:6, 49:8, 49:12, 49:21, 49:23, 50:1, 50:2, 50:8, 51:20, 52:10, 52:25, 53:1, 53:15, 54:6, 54:9, 54:14, 58:1, 65:4, 66:13, 72:18, 72:20, 72:21, 72:25, 73:3, 73:4, 73:7, 73:10, 75:3, 76:11, 102:16, 112:15, 112:19, 115:19, 115:22, 116:2, 116:4, 116:25, 117:6, 117:10, 123:21, 123:25, 124:4, 124:6, 124:8, 124:15, 124:22, 125:2, 125:5, 126:17, 126:20, 126:25, 129:22, 129:25, 130:5, 130:15, 135:8, 135:13, 135:20, 143:15, 143:17, 143:18, 148:8, 149:15, 149:17, 151:20, 159:21
**graded** [4] - 65:17, 66:14, 70:14, 71:25
**grades** [7] - 6:9, 48:17, 48:18, 49:15, 74:6, 119:8, 157:4
**Grading** [1] - 199:21
**grading** [12] - 3:20, 63:22, 63:23, 64:5, 64:8, 64:10, 64:11, 64:15, 64:21, 64:22, 65:22
**graduated** [1] - 93:16
**great** [1] - 162:5
**green** [1] - 34:22
**GREENVILLE** [4] - 1:3, 1:18, 1:22, 2:5
**Greenville** [3] - 5:19, 104:7, 104:15
**grew** [1] - 5:19
**grounds** [1] - 69:12
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**Group** [7] - 18:13, 19:18, 36:14, 52:1, 74:12, 85:24, 153:6
**group** [7] - 20:16, 38:8, 51:24, 51:25, 84:19, 109:18, 109:20
**growing** [2] - 159:4, 159:6
**guaranteed** [1] - 83:15
**guess** [5] - 35:9, 135:15, 145:20, 189:13, 198:7
**guesswork** [1] - 60:4
**guideline** [2] - 39:20
**guidelines** [33] - 3:11, 30:19, 30:22, 30:25, 32:4, 32:14, 32:16, 32:19, 32:23, 33:11, 36:18, 36:19, 38:6, 39:15, 52:6, 52:8, 52:11, 52:13, 52:14, 52:15, 52:18, 78:10, 78:13, 121:4,

121:5, 121:7, 121:8, 142:24, 143:2, 149:4, 149:6, 149:8
**guise** [1] - 70:7
**guts** [1] - 6:10

**H**

**half** [6] - 5:22, 116:5, 124:17, 124:20, 130:6, 130:16
**hand** [4] - 25:1, 203:14, 204:13, 205:2
**handbook** [1] - 88:20
**handed** [1] - 132:14
**handle** [1] - 20:13
**handled** [2] - 185:2, 185:6
**hands** [1] - 96:12
**handwriting** [1] - 25:4
**handwritten** [4] - 3:10, 4:12, 24:24, 42:5
**happy** [3] - 18:20, 20:17, 200:18
**hard** [1] - 153:18
**Harris** [2] - 171:21, 191:9
**hate** [2] - 106:18, 114:15
**head** [3] - 22:22, 109:2, 190:5
**health** [1] - 40:19
**Health** [1] - 86:6
**hear** [3] - 6:15, 18:20, 29:12
**heard** [20] - 5:2, 5:15, 11:10, 11:20, 18:8, 18:10, 21:6, 25:14, 26:10, 31:11, 61:19, 71:17, 83:4, 94:13, 99:23, 107:24, 111:3, 166:8, 169:6, 207:18
**hearing** [9] - 5:1, 6:18, 57:1, 68:11, 82:9, 98:14, 106:9, 207:21, 207:22
**hearsay** [21] - 8:9, 8:10, 10:1, 10:7, 10:23, 10:24, 10:25, 11:1, 12:4, 12:6, 12:7, 13:1, 13:2, 14:11, 14:17, 16:6, 16:20, 19:22, 88:4
**Heinrichsdorff** [1] - 23:1
**held** [11] - 61:17, 68:10, 82:8, 83:7, 98:12, 106:8, 111:10, 136:25, 165:19, 166:7, 207:7
**help** [10] - 19:1, 27:4, 27:6, 41:19, 43:17, 94:8, 94:9, 114:4, 131:2, 177:11
**helped** [1] - 71:13
**Higgins** [3] - 39:1, 39:2, 39:9
**high** [3] - 112:25, 113:3, 176:19
**higher** [5] - 50:8, 52:9, 58:1, 157:21, 166:13
**highest** [1] - 112:23
**highlight** [3] - 37:1, 76:10, 116:22
**highlighted** [7] - 25:7, 27:14, 27:22, 29:10, 173:8, 176:7, 179:2
**highlights** [1] - 191:3
**highly** [1] - 46:18
**hire** [2] - 182:24, 182:25
**hired** [3] - 83:10, 84:6, 187:22
**historical** [1] - 115:4
**history** [4] - 4:3, 38:16, 118:22, 119:17
**hit** [2] - 120:18, 157:3
**hold** [2] - 47:17, 62:3
**holiday** [4] - 84:5, 100:17, 199:16, 199:24
**holistically** [1] - 183:24
**Hollis** [1] - 194:4
**home** [3] - 94:5, 94:6, 168:14
**homes** [1] - 207:14
**honestly** [1] - 43:18
**Honor** [93] - 5:7, 10:3, 10:10, 10:20, 12:14, 12:15, 15:18, 16:21, 17:21, 18:22, 19:4, 19:13, 21:3, 24:12, 24:16, 29:16, 29:20, 29:23, 30:8, 30:9, 31:10, 32:6, 33:3, 37:12, 37:14, 37:20, 41:9, 41:12, 45:19, 45:21, 47:10, 47:22, 47:23, 54:25, 55:3, 55:11, 56:22, 60:3, 61:6, 65:6, 65:25, 68:7, 70:9, 70:17, 71:19, 72:3, 73:14, 75:25, 76:22, 77:15, 77:17, 79:4, 79:13, 82:1, 82:6, 88:6, 88:9, 89:18, 90:23, 91:15, 93:12, 95:24, 98:9, 98:15, 99:25, 105:6, 105:9, 110:7, 111:17, 114:15, 116:13, 117:17, 118:12, 119:23, 125:11, 131:6, 131:17, 131:21, 132:20, 133:3, 138:16, 151:12, 160:19, 167:19, 169:10, 170:15, 170:16, 172:20, 187:5, 197:5, 203:16, 207:5
**Honor,we** [1] - 11:2
**HONORABLE** [1] - 1:13
**hope** [4] - 5:18, 110:12, 203:23, 207:14
**hopefully** [1] - 207:12
**Horizon** [1] - 147:3
**hour** [3] - 97:17, 168:11, 168:23
**hours** [3] - 11:21, 97:15
**HR** [75] - 4:9, 4:10, 6:11, 6:13, 7:19, 9:8, 9:20, 25:18, 34:4, 34:8, 34:9, 43:5, 43:7, 43:8, 43:16, 44:6, 44:17, 44:19, 45:25, 47:14, 48:12, 48:13, 52:2, 62:17, 74:19, 76:17, 76:20, 77:9, 78:9, 82:5, 83:8, 84:13, 84:19, 84:22, 85:1, 85:24, 87:9, 87:19, 89:3, 89:9, 89:23, 98:5, 100:25, 101:25, 104:22, 121:11, 121:19, 130:8, 130:11, 130:12, 136:24, 154:11, 162:24, 163:8, 163:9, 163:16, 165:10, 165:14, 170:3, 170:10, 182:10, 183:1, 185:18, 185:21, 192:22, 193:7, 194:20, 196:2, 196:4, 201:23, 202:3, 202:7, 205:16, 205:21
**HR/legal/ communication** [1] - 194:15
**HR/legal/GOV.AFF** [1] - 195:1
**HRI** [1] - 160:9
**hub** [2] - 52:2
**Hubbell** [2] - 192:7, 192:25
**human** [2] - 19:16, 182:11
**Human** [29] - 6:20, 17:17, 23:11, 23:13, 23:14, 31:3, 35:16, 36:16, 39:13, 40:5, 42:15, 44:4, 45:6, 47:18, 47:20, 53:6, 87:2, 93:20, 98:4, 98:7, 101:23, 104:10, 104:11, 118:25, 120:2, 121:15, 138:6, 160:25, 192:12
**husband** [1] - 94:5

**I**

**I-Phone** [1] - 187:18
**idea** [3] - 19:23, 120:16, 142:10
**ideally** [2] - 36:4, 36:11
**identical** [4] - 130:20, 130:23, 135:22, 136:7
**identified** [8] - 12:18, 12:22, 13:5, 35:4, 40:10, 75:7, 117:21, 164:12
**identify** [5] - 12:2, 13:4, 24:22, 34:4, 48:5
**identifying** [1] - 180:16
**II** [2] - 1:15, 2:2
**impact** [3] - 54:3, 57:19, 57:23
**impacted** [3] - 54:5, 54:9, 58:23
**impacting** [1] - 103:23
**impacts** [2] - 54:10, 124:4
**impeaching** [1] - 133:3
**implement** [2] - 147:8, 148:15
**Implementation** [1] - 3:20
**implementation** [1] - 121:5
**implemented** [5] - 54:16, 56:7, 59:3, 119:7, 148:17
**implication** [2] - 133:9, 133:15
**implying** [1] - 133:12
**import** [1] - 19:12
**important** [12] - 76:20, 77:9, 160:24, 173:15, 174:2, 174:4, 175:5, 182:7, 190:8, 196:2, 196:3, 196:4
**IN** [1] - 1:1
**in-bound** [1] - 36:3
**in-bounds** [1] - 183:23
**inaccurate** [1] - 15:22
**inadmissible** [1] - 10:22
**inartful** [1] - 132:17
**inbound** [2] - 33:25, 36:10
**include** [2] - 171:18, 171:21
**included** [2] - 69:16, 193:15
**includes** [2] - 129:4, 193:16
**including** [6] - 15:4, 86:5, 121:19, 138:7, 161:2
**inclusion** [2] - 105:7, 177:4
**Inclusion** [1] - 176:24
**income** [5] - 106:14, 106:20, 107:1, 107:10, 107:16
**incoming** [6] - 22:11, 81:19, 81:20, 83:14, 100:25, 101:24
**incorrect** [4] - 68:15, 69:6, 69:13, 69:19
**increase** [9] - 115:11, 124:15, 124:22, 124:25, 126:20, 126:25, 127:2, 127:3, 148:8
**increased** [4] - 115:9, 127:23, 130:5, 130:15
**increases** [3] - 3:25, 83:15, 125:20
**increasing** [1] - 126:18
**incredibly** [1] - 168:4
**incremental** [2] - 124:15, 124:25
**independently** [1] -

46:18
**INDEX** [2] - 3:1, 4:1
**indicate** [2] - 34:22, 34:24
**indicated** [9] - 23:16, 36:25, 50:7, 69:3, 75:22, 142:2, 148:7, 161:11, 163:15
**indicates** [2] - 33:24, 75:10
**indicating** [7] - 28:25, 34:17, 34:25, 53:25, 78:14, 91:5, 199:19
**indication** [4] - 27:10, 44:12, 48:25, 164:5
**indicators** [2] - 121:15, 177:16
**individual** [10] - 22:19, 40:9, 46:10, 52:18, 60:21, 74:5, 124:21, 125:1, 127:2, 188:10
**individuals** [2] - 52:14, 124:22
**indulgence** [3] - 168:12, 187:3, 196:21
**influence** [1] - 27:7
**info** [9] - 3:9, 4:11, 8:22, 8:23, 8:24, 9:5, 18:17, 25:9, 41:20
**info-share** [6] - 3:9, 4:11, 8:24, 9:5, 25:9, 41:20
**info-shares** [2] - 8:22, 18:17
**inform** [2] - 32:8, 32:13
**information** [13] - 7:20, 9:6, 56:6, 63:22, 64:9, 64:14, 64:23, 75:23, 85:10, 98:17, 129:3, 132:7
**informed** [13] - 9:14, 9:19, 67:15, 67:22, 86:17, 88:1, 92:21, 100:19, 100:20, 101:4, 103:24, 106:3, 148:5
**informing** [1] - 73:25
**inpats** [1] - 23:22
**input** [3] - 3:12, 74:1, 137:9
**inputted** [1] - 137:11
**inside** [1] - 109:10
**instance** [3] - 10:10, 35:2, 103:24
**instead** [1] - 185:11
**instruct** [2] - 106:19, 148:23
**instructed** [2] - 43:7, 148:16
**instruction** [1] - 14:20
**instructions** [1] - 97:10
**insurance** [1] - 124:11
**integrated** [1] - 12:16
**intending** [2] - 53:18, 98:24
**intention** [4] - 70:24, 163:19, 164:21, 196:12
**intentional** [1] - 106:12
**intents** [1] - 186:21
**interaction** [1] - 94:23
**interest** [1] - 154:11
**interested** [1] - 101:25
**interesting** [1] - 167:4
**internal** [1] - 78:18
**International** [1] - 104:8
**international** [46] - 7:20, 24:2, 25:11, 26:4, 26:6, 29:5, 34:1, 34:5, 34:6, 34:7, 34:9, 34:18, 34:23, 34:25, 35:17, 35:18, 35:19, 35:20, 36:3, 36:10, 36:23, 40:5, 45:2, 45:3, 45:5, 79:8, 81:6, 81:8, 81:19, 83:14, 83:16, 153:6, 173:22, 174:2, 174:6, 174:11, 174:14, 174:18, 174:25, 175:6, 175:21, 176:13, 182:20, 185:21, 188:9, 189:17
**internationals** [4] - 185:14, 185:19, 185:21, 186:5
**interruption** [1] - 108:1
**interviewed** [1] - 81:7
**invited** [1] - 86:16
**involved** [11] - 30:21, 36:18, 40:19, 40:23, 51:11, 63:21, 89:12, 178:20, 178:22, 180:5, 192:4
**involvement** [6] - 12:16, 12:17, 36:21, 51:14, 57:14, 64:13
**involves** [1] - 120:25
**involving** [2] - 87:20, 170:9
**ironically** [1] - 94:5
**island** [1] - 175:25
**issue** [9] - 10:23, 16:1, 16:12, 16:20, 19:22, 91:12, 98:25, 114:16, 184:2
**issues** [3] - 40:19, 106:1, 107:13
**item** [4] - 176:7, 176:23, 177:10, 183:4
**iterations** [2] - 141:11, 141:13
**itself** [2] - 77:1, 77:13

**J**

**JACKSON** [1] - 2:3
**January** [28] - 31:18, 100:17, 111:23, 111:25, 112:4, 112:5, 112:10, 114:6, 114:7, 119:18, 119:21, 120:1, 171:12, 173:5, 179:21, 181:1, 183:13, 191:2, 196:23, 197:13, 198:2, 198:8, 198:9, 198:22, 199:25, 200:2, 201:7, 202:23
**Jersey** [6] - 152:18, 160:3, 160:5, 160:6, 160:8, 160:10
**job** [77] - 3:18, 4:7, 27:14, 29:4, 43:16, 47:13, 47:15, 47:17, 48:8, 48:9, 50:3, 52:9, 64:11, 64:20, 64:25, 65:1, 65:14, 66:7, 69:1, 69:7, 70:2, 75:4, 82:13, 86:20, 90:12, 97:16, 98:20, 98:25, 99:7, 100:11, 101:23, 104:21, 105:3, 106:2, 108:13, 114:22, 117:22, 120:25, 137:2, 137:7, 138:1, 138:22, 139:12, 139:13, 139:19, 140:5, 140:7, 140:10, 140:15, 140:22, 141:3, 141:5, 141:7, 141:8, 141:17, 141:21, 141:24, 142:2, 142:5, 142:19, 142:20, 143:21, 144:1, 144:8, 144:9, 149:6, 160:24, 170:9, 184:15, 188:14, 189:2, 189:8, 189:11, 200:17, 206:5, 206:14, 206:20
**Job** [3] - 4:4, 4:5, 4:6
**jobs** [7] - 64:9, 64:19, 89:25, 94:2, 96:18, 104:16, 160:17
**Johannes** [9] - 31:1, 36:12, 36:22, 39:17, 120:5, 120:8, 130:8, 130:14, 154:12
**Johnson** [3] - 156:17, 158:2, 164:23
**join** [3] - 17:21, 60:7, 70:19
**joining** [1] - 180:20
**joins** [1] - 29:24
**JUDGE** [1] - 1:14
**Judge** [34] - 8:6, 8:9, 55:20, 56:3, 58:10, 60:9, 67:7, 87:12, 99:20, 107:5, 114:17, 118:7, 125:16, 128:16, 133:20, 136:2, 136:13, 136:18, 138:18, 144:14, 150:10, 155:25, 161:6, 165:17, 167:2, 167:22, 168:9, 168:17, 168:20, 170:20, 187:4, 190:18, 198:16
**July** [12] - 58:19, 115:15, 129:13, 130:19, 135:8, 135:13, 136:7, 184:19, 185:19, 186:7, 189:23, 190:11
**jump** [1] - 207:13
**jumped** [1] - 190:11
**jumping** [2] - 169:14, 196:21
**June** [7] - 3:23, 127:8, 158:16, 158:20, 164:10, 164:15
**jurors** [4] - 61:16, 111:2, 111:5, 166:6
**JURY** [1] - 1:14
**jury** [68] - 5:3, 5:13, 5:16, 5:17, 11:5, 11:6, 11:11, 21:4, 21:7, 21:8, 21:9, 25:8, 25:15, 27:2, 27:15, 27:17, 27:23, 28:13, 29:19, 33:22, 34:13, 35:25, 41:18, 42:11, 43:1, 44:21, 48:5, 61:11, 61:18, 61:20, 68:11, 68:12, 68:14, 68:16, 69:13, 70:4, 73:21, 73:23, 77:5, 79:9, 82:9, 82:10, 83:12, 86:2, 87:22, 88:11, 92:11, 98:14, 98:17, 99:1, 99:10, 106:4, 106:9, 106:10, 106:19, 107:12, 108:5, 109:21, 110:11, 111:4, 111:11, 111:12, 166:9, 166:11, 169:7, 169:8, 207:8, 207:19
**jury's** [1] - 28:4

**K**

**K-i-p-p-e-n-b-e-r-g-e-r** [1] - 39:8
**Kathy** [1] - 192:10
**Kavit** [1] - 164:23
**keep** [6] - 18:20, 62:14, 67:4, 76:20, 77:9, 121:15
**keeping** [1] - 70:17
**keeps** [2] - 19:18, 68:14
**Keiser** [1] - 192:10
**Kelly** [20] - 3:19, 4:3, 4:19, 4:21, 6:6, 61:24, 78:6, 79:21, 80:6, 80:18, 91:4, 93:16, 102:5, 102:20, 104:23, 145:25, 147:23, 191:6, 199:2, 199:15
**KELLY** [2] - 1:3, 3:2
**key** [2] - 121:17, 159:12
**kids** [1] - 108:14
**kind** [12] - 6:10, 54:5, 106:20, 107:16, 157:2, 157:3, 162:10, 168:13, 177:6, 186:24, 195:6, 199:14
**kinds** [1] - 48:23
**Kingdom** [1] - 179:10
**Kippenberger** [3] - 39:4, 39:10, 39:14
**knowing** [2] - 9:24, 205:21
**knowledge** [11] - 10:18, 14:1, 14:5, 40:21, 40:25, 41:2, 65:23, 82:25, 176:16,

179:15, 205:19
**known** [5] - 12:23, 13:4, 91:7, 119:13, 119:14
**knows** [9] - 28:20, 57:9, 68:17, 82:21, 82:23, 119:25, 160:21, 161:3, 161:4
**Knudt** [4] - 32:19, 154:17, 154:22, 165:6
**koalas** [1] - 178:11
**Koepnick** [1] - 4:13
**Kopnick** [2] - 93:9, 93:10
**KURT** [1] - 1:21

**L**

**lack** [1] - 13:25
**lady** [2] - 101:2, 157:14
**lady's** [1] - 94:6
**laid** [1] - 30:7
**lane** [1] - 70:18
**language** [6] - 25:7, 27:2, 27:14, 29:10, 92:14, 160:23
**last** [15] - 11:21, 28:18, 39:7, 42:3, 54:10, 88:11, 106:24, 109:21, 112:4, 121:20, 122:1, 140:22, 163:21, 179:2, 198:1
**late** [4] - 9:10, 9:17, 65:19, 110:21
**Lateia** [1] - 171:21
**lateness** [1] - 169:15
**launch** [1] - 180:20
**law** [2] - 88:25, 89:2
**lawsuit** [1] - 142:25
**lawyer's** [1] - 133:25
**lawyers** [3] - 132:15, 165:22, 165:23
**lay** [8] - 30:3, 37:19, 55:10, 82:3, 82:16, 82:22, 82:24, 108:25
**lead** [6] - 8:7, 109:13, 110:4, 194:14, 194:20, 195:2
**leader** [12] - 64:16, 64:17, 90:9, 90:11, 90:15, 110:4, 154:5, 177:21, 177:23, 200:21
**leaders** [2] - 153:23, 174:2
**leadership** [23] - 23:14, 33:15, 33:18, 47:20, 48:18, 50:1, 53:7, 53:8, 53:10, 85:25, 86:9, 89:8, 102:4, 113:5, 134:19, 134:20, 135:3, 135:20, 138:5, 138:11, 155:16, 155:19, 177:13
**leading** [11] - 8:6, 37:17, 56:12, 63:5, 63:25, 64:1, 71:3, 87:15, 95:22, 98:10, 105:18
**leads** [2] - 46:12, 119:18
**learned** [2] - 10:5, 139:11
**leave** [13] - 103:21, 109:12, 154:15, 163:13, 169:1, 171:12, 171:24, 172:4, 172:7, 202:6, 205:8, 205:12, 205:14
**leaves** [3] - 171:25, 186:7, 191:10
**leaving** [6] - 101:5, 163:16, 171:19, 174:20, 191:10, 206:8
**Lee** [1] - 194:5
**left** [14] - 7:22, 59:16, 59:21, 70:25, 74:3, 74:17, 98:25, 155:12, 172:3, 172:7, 185:13, 189:16, 190:1, 191:6
**Legal** [1] - 89:6
**legal** [4] - 11:7, 103:13, 157:14, 157:21
**legs** [1] - 166:2
**lenient** [1] - 71:9
**less** [4] - 47:2, 113:9, 151:20, 169:4
**letter** [17] - 4:21, 90:8, 90:10, 90:11, 90:17, 91:5, 91:8, 115:10, 115:18, 115:21, 115:24, 117:23, 122:16, 122:18, 125:24, 197:1, 197:12
**letters** [1] - 58:25
**level** [211] - 22:5, 22:7, 26:19, 26:23, 26:24, 27:1, 28:7, 28:8, 28:11, 28:15, 29:8, 33:19, 33:20, 37:11, 37:25, 38:1, 45:17, 45:18, 46:3, 46:5, 46:8, 46:9, 46:10, 46:11, 46:16, 46:20, 46:24, 47:1, 47:3, 48:18, 48:19, 49:2, 50:1, 50:3, 50:6, 51:16, 51:17, 51:20, 52:11, 52:24, 53:1, 54:1, 55:1, 55:5, 55:15, 55:17, 56:9, 56:19, 58:2, 59:5, 59:6, 59:9, 59:11, 59:19, 60:18, 60:19, 60:20, 60:21, 60:22, 60:24, 61:3, 62:10, 62:12, 62:14, 62:15, 62:17, 62:20, 62:23, 63:2, 63:4, 63:10, 63:12, 63:13, 63:14, 63:16, 63:18, 63:21, 64:11, 64:12, 64:18, 64:19, 64:25, 65:1, 65:18, 65:20, 65:22, 66:11, 66:12, 66:13, 66:16, 66:21, 66:22, 66:23, 66:25, 67:3, 67:5, 67:23, 67:25, 68:4, 68:16, 68:19, 69:3, 69:5, 69:21, 69:24, 70:1, 70:3, 70:11, 70:16, 72:1, 72:22, 73:7, 73:8, 73:11, 75:4, 76:19, 98:5, 98:7, 102:17, 103:4, 105:4, 105:7, 105:15, 105:19, 105:21, 105:24, 105:25, 113:2, 113:5, 113:6, 113:9, 114:10, 114:12, 114:14, 114:25, 115:6, 118:1, 119:12, 134:19, 134:20, 134:23, 135:3, 135:20, 136:25, 137:1, 139:7, 140:2, 140:4, 140:8, 140:14, 140:25, 141:4, 141:8, 141:18, 141:22, 141:25, 142:3, 142:6, 142:20, 143:21, 143:25, 144:2, 144:4, 144:10, 146:10, 146:19, 149:19, 149:20, 149:21, 149:23, 151:16, 151:25, 152:13, 152:15, 152:25, 153:1, 153:15, 153:18, 153:23, 154:2, 154:5, 155:5, 155:8, 155:20, 156:17, 156:23, 157:10, 157:17, 157:20, 157:21, 158:5, 164:4, 164:17, 165:15, 174:8, 193:13, 193:14, 193:24, 193:25, 205:22
**Level** [1] - 156:13
**levels** [11] - 6:9, 45:24, 49:24, 50:9, 60:16, 63:9, 64:24, 119:7, 129:5, 130:15, 152:25
**leverage** [1] - 176:4
**LEWIS** [1] - 2:3
**liars** [1] - 70:5
**life** [3] - 43:5, 97:16, 124:11
**light** [2] - 168:9, 169:14
**Lighting** [1] - 192:25
**likewise** [1] - 14:7
**limine** [4] - 11:3, 13:17, 13:23, 15:16
**limited** [1] - 70:22
**limiting** [1] - 14:19
**line** [18] - 12:3, 16:7, 17:12, 21:2, 23:14, 33:12, 51:18, 51:19, 69:6, 76:17, 80:4, 100:5, 121:20, 134:4, 162:4, 162:8, 199:2
**lines** [4] - 121:22, 124:6, 195:10, 195:12
**list** [13] - 81:6, 81:7, 81:11, 92:25, 157:6, 164:24, 166:14, 180:8, 185:20, 185:22, 189:1, 191:2, 196:6
**listed** [3] - 35:15, 159:19, 180:11
**lived** [2] - 9:4
**lives** [1] - 121:1
**LLC** [3] - 1:9, 2:2, 197:16
**LLP** [1] - 1:21
**local** [10] - 23:14, 23:21, 23:23, 25:10, 34:24, 121:3, 176:8, 176:9, 176:14, 184:9
**located** [2] - 25:22, 92:3
**locations** [1] - 178:17
**logistics** [1] - 164:6
**Lominac** [6] - 188:6, 188:7, 188:11, 188:14, 189:9, 189:11
**look** [45] - 38:15, 43:15, 44:23, 47:21, 74:3, 74:17, 75:9, 90:22, 94:2, 101:23, 104:3, 113:16, 114:9, 116:9, 118:17, 118:21, 120:19, 121:17, 125:19, 128:15, 132:3, 133:8, 134:4, 136:21, 137:16, 141:14, 144:3, 151:6, 158:13, 159:12, 163:24, 164:1, 168:25, 176:6, 180:8, 183:23, 187:12, 189:19, 189:20, 190:12, 191:22, 193:4, 194:7, 196:6, 196:14
**looked** [8] - 43:13, 49:11, 136:5, 142:19, 143:23, 170:2, 180:23, 195:3
**looking** [13] - 33:22, 34:13, 42:4, 65:12, 66:6, 97:10, 97:18, 98:22, 108:13, 123:6, 151:19, 168:12, 203:24
**looks** [3] - 171:8, 193:5, 195:2
**lose** [1] - 175:2
**loss** [2] - 106:20, 152:8
**loud** [1] - 42:11
**lower** [5] - 50:7, 98:20, 98:25, 99:7, 152:25
**lowering** [3] - 115:18, 115:21, 115:24
**lunch** [9] - 110:9, 110:12, 110:13, 110:14, 110:22, 111:2, 111:10, 118:19
**LV** [2] - 129:23, 129:25

**M**

**Ma'am** [1] - 158:1
**ma'am** [103] - 73:22, 107:22, 111:6, 112:7, 112:13, 112:21, 113:3, 113:15, 113:18, 114:5, 115:3, 115:18, 116:8, 116:23, 117:9, 117:21, 118:17, 118:21, 119:4, 119:17, 120:5, 120:18, 120:21, 121:6, 121:11, 121:18, 122:7, 123:18, 124:8,

124:16, 126:3, 126:9, 126:14, 127:5, 127:14, 127:18, 128:8, 129:6, 130:3, 130:19, 135:1, 135:25, 136:5, 137:21, 138:3, 138:14, 138:21, 140:12, 141:15, 144:5, 144:18, 145:16, 145:22, 146:6, 146:12, 147:19, 148:6, 149:9, 150:4, 150:15, 150:21, 151:10, 152:6, 152:11, 153:12, 154:10, 156:14, 157:11, 158:13, 159:10, 161:10, 161:15, 163:1, 165:13, 170:12, 177:17, 179:24, 180:4, 181:25, 183:4, 183:20, 184:19, 186:9, 187:24, 189:19, 190:10, 190:21, 190:24, 191:16, 191:23, 193:18, 194:16, 195:15, 195:19, 196:20, 196:22, 198:6, 198:15, 198:22, 200:15, 204:4, 204:24, 206:5
**mad** [1] - 19:21
**madame** [6] - 22:2, 23:2, 50:17, 50:20, 80:13, 91:24
**Madewell** [10] - 97:24, 97:25, 98:3, 98:6, 100:4, 100:12, 103:19, 103:21, 104:15, 206:5
**Magna** [1] - 181:24
**mails** [1] - 79:21
**Main** [1] - 110:11
**MAIN** [1] - 2:4
**maintain** [6] - 26:19, 28:10, 28:15, 29:8, 60:3, 108:22
**maintaining** [1] - 78:9
**maintains** [1] - 32:1
**maintenance** [1] - 109:4
**major** [1] - 87:6
**majority** [2] - 53:7, 53:10
**male** [2] - 62:6, 72:15
**man** [2] - 158:4, 195:20
**manage** [2] - 45:2, 109:24
**managed** [2] - 46:22, 183:1
**management** [18] - 31:20, 31:22, 31:23, 37:10, 37:13, 37:16, 37:25, 38:8, 46:11, 47:17, 48:12, 48:13, 52:15, 102:3, 103:4, 161:20, 162:18, 182:24
**Management** [1] - 25:21
**manager** [4] - 35:17, 44:17, 46:7, 46:21
**Manager** [22] - 36:4, 36:11, 46:4, 46:20, 46:22, 47:6, 47:14, 90:18, 98:4, 112:23, 119:1, 119:5, 119:7, 119:14, 119:19, 122:8, 123:4, 123:12, 136:24, 137:14, 142:15, 199:19
**managerial** [1] - 46:14
**Managers** [8] - 112:25, 113:11, 113:22, 113:24, 142:7, 142:11, 142:16, 204:5
**managers** [6] - 46:23, 47:4, 47:5, 84:22, 101:15, 137:9
**manages** [2] - 46:13, 46:17
**managing** [1] - 34:17
**Manufacturing** [3] - 104:19, 117:23, 197:15
**MANUFACTURING** [2] - 1:9, 2:2
**manufacturing** [1] - 25:16
**March** [12] - 80:3, 80:16, 125:25, 126:16, 187:15, 188:22, 188:23, 202:12, 202:15, 202:17, 202:19, 202:21
**margin** [2] - 25:24, 85:22
**marked** [8] - 17:6, 24:22, 30:13, 48:6, 75:25, 79:21, 125:19
**market** [2] - 76:18, 95:2
**masse** [1] - 166:19
**Master's** [2] - 137:22, 137:24
**materials** [2] - 6:25, 69:16
**matter** [6] - 11:7, 12:24, 13:3, 17:13, 166:13, 208:6
**matters** [3] - 41:1, 89:12, 89:15
**MC** [50] - 3:20, 4:3, 10:14, 10:15, 10:18, 12:12, 14:15, 15:20, 16:3, 16:16, 16:17, 17:21, 20:8, 29:20, 32:4, 82:4, 112:23, 113:1, 113:4, 113:7, 113:25, 114:7, 114:21, 115:22, 115:25, 129:15, 136:21, 139:24, 141:20, 151:7, 153:14, 158:25, 159:8, 161:25, 163:6, 165:14, 169:18, 171:13, 173:8, 173:9, 173:15, 175:13, 175:25, 176:3, 181:11, 184:9, 184:11, 184:17, 197:16, 198:2
**McCoy** [3] - 94:13, 98:19, 104:5
**MCCOY** [2] - 2:3, 5:7
**McCraw** [21] - 4:19, 22:17, 23:10, 38:7, 101:1, 101:4, 101:7, 102:25, 103:5, 103:8, 183:8, 183:16, 200:13, 200:20, 201:4, 201:8, 201:10, 201:19, 201:22, 202:3, 202:23
**MCDUFFIE** [1] - 2:7
**mean** [19] - 10:14, 16:13, 20:12, 33:14, 52:19, 55:4, 71:11, 74:2, 87:3, 87:5, 139:23, 163:13, 175:24, 177:18, 177:20, 180:15, 181:13, 195:9
**meaning** [3] - 34:24, 64:11, 146:15
**means** [12] - 30:17, 33:15, 38:2, 52:20, 74:3, 75:7, 159:3, 177:22, 179:23, 194:16, 194:18, 194:23
**meant** [3] - 27:8, 162:23, 194:20
**Medley** [33] - 23:18, 27:25, 28:5, 28:17, 62:1, 62:2, 62:5, 62:11, 63:18, 66:10, 66:20, 68:1, 68:20, 69:1, 69:23, 71:24, 75:21, 102:9, 130:20, 134:6, 135:21, 136:7, 142:10, 142:11, 164:2, 164:12, 170:6, 192:10, 194:13, 195:1, 195:4, 195:6
**Medley's** [2] - 135:2, 135:12
**meet** [7] - 132:15, 149:4, 149:8, 162:18, 185:10, 193:2, 206:2
**meeting** [20] - 8:24, 9:6, 24:25, 31:25, 32:1, 37:10, 37:16, 42:6, 42:8, 42:13, 42:17, 85:3, 85:6, 86:16, 183:13, 183:16, 203:1, 204:25, 205:6, 205:24
**meetings** [4] - 12:11, 59:1, 85:13, 206:15
**member** [3] - 25:16, 25:18, 148:19
**members** [8] - 5:17, 11:5, 61:11, 77:5, 110:10, 111:12, 207:8
**mention** [2] - 93:6, 98:21
**mentioned** [4] - 9:18, 98:19, 104:5, 166:16
**mentors** [1] - 183:14
**message** [3] - 77:24, 187:18, 204:6
**met** [1] - 58:22
**metal** [1] - 182:3
**Mexico** [2] - 178:4, 179:12
**MFK** [8] - 193:11, 193:13, 193:16, 193:17, 193:19, 193:21, 193:22
**MFK)** [1] - 193:10
**MFKs** [1] - 193:23
**Michael** [2] - 188:24, 189:2
**mid** [2] - 100:6, 100:10
**middle** [9] - 49:25, 50:14, 53:25, 75:6, 94:16, 145:22, 206:7, 206:9
**might** [11] - 26:17, 56:19, 96:17, 118:7, 155:16, 161:5, 167:23, 168:5, 186:3, 195:14, 201:19
**mile** [1] - 204:15
**milestone** [1] - 7:13
**Miller** [7] - 95:4, 95:5, 95:10, 95:14, 95:17, 97:9, 167:15
**mind** [9] - 20:12, 57:1, 61:12, 88:7, 107:3, 109:6, 110:24, 181:23, 194:4
**mine** [1] - 148:19
**minority** [1] - 76:16
**minute** [5] - 77:3, 90:23, 106:7, 107:7, 166:1
**minutes** [4] - 31:25, 32:1, 110:21, 111:5
**misread** [1] - 116:24
**missed** [1] - 39:5
**missing** [1] - 151:24
**mission** [1] - 162:14
**misunderstand** [1] - 120:8
**MN** [1] - 44:23
**model** [1] - 175:18
**models** [1] - 175:14
**modifications** [1] - 167:17
**modified** [1] - 167:13
**moment** [2] - 47:22, 187:3
**moments** [1] - 29:11
**Monday** [4] - 41:24, 198:7, 198:10
**monetary** [1] - 107:10
**money** [3] - 16:11, 16:13, 152:8
**Monique** [5] - 145:1, 145:3, 145:7, 145:21, 146:7
**month** [3] - 147:3, 190:1, 192:13
**months** [3] - 75:8, 103:20, 148:3
**MOODY** [126] - 2:2, 8:6, 8:9, 17:21, 18:22, 18:25, 29:20, 30:8, 31:11, 32:6, 33:2, 37:12, 41:12, 54:19, 54:25, 55:4, 55:11, 55:20, 55:22, 56:3, 56:11, 59:8, 60:3, 60:9, 63:5, 63:25, 67:7, 68:3, 68:22, 68:25, 70:9, 71:9,

76:22, 79:4, 87:12, 88:4, 88:9, 95:22, 98:9, 98:11, 98:15, 98:22, 99:1, 99:5, 99:9, 99:12, 99:16, 99:19, 105:6, 105:18, 106:16, 107:5, 107:20, 111:17, 111:19, 114:17, 114:20, 116:13, 116:15, 116:17, 116:19, 117:14, 117:17, 117:20, 118:12, 118:16, 120:4, 125:14, 125:16, 125:18, 128:15, 128:20, 131:6, 131:16, 131:21, 131:24, 132:24, 133:12, 133:19, 133:23, 136:2, 136:4, 136:13, 136:18, 136:20, 138:18, 138:20, 144:13, 144:17, 147:13, 147:18, 150:10, 150:14, 155:22, 156:5, 161:6, 161:9, 165:17, 167:19, 168:1, 168:9, 168:17, 168:24, 169:10, 169:12, 170:13, 170:20, 170:22, 172:14, 172:18, 173:2, 187:3, 187:8, 190:11, 190:15, 190:18, 190:20, 197:3, 197:9, 197:11, 198:13, 198:19, 198:21, 203:16, 203:20, 207:5

**moody** [6] - 60:2, 68:14, 111:16, 131:19, 132:13, 132:22

**Moody** [1] - 3:4

**Moritz** [3] - 39:4, 39:10, 39:14

**MORITZ** [1] - 39:7

**morning** [8] - 5:17, 6:6, 6:7, 84:16, 110:3, 169:2, 207:12, 207:17

**most** [4] - 166:15, 167:8, 185:2, 185:6

**motion** [5] - 11:3, 13:16, 13:19, 13:23, 15:16

**MOTOREN** [2] - 1:6, 1:20

**move** [40] - 20:20, 22:21, 23:10, 28:16, 38:23, 41:3, 42:22, 43:7, 44:6, 44:13, 45:11, 54:18, 55:16, 60:14, 61:24, 62:13, 71:10, 71:14, 77:2, 77:3, 84:10, 86:7, 87:8, 88:9, 88:15, 115:5, 146:5, 147:13, 148:13, 159:1, 164:13, 168:10, 169:13, 169:16, 172:21, 189:7, 193:6, 195:14, 197:6, 198:16

**moved** [13] - 26:20, 28:9, 28:17, 43:5, 43:8, 61:2, 87:7, 88:1, 119:11, 122:11, 123:13, 146:9, 149:14

**movement** [2] - 171:15, 171:18

**moves** [3] - 24:5, 44:9, 106:5

**moving** [16] - 12:12, 20:8, 21:5, 42:22, 44:17, 56:9, 56:18, 93:6, 93:12, 95:11, 139:6, 149:7, 159:4, 170:6, 170:7, 193:24

**MR** [279] - 5:6, 5:7, 6:3, 6:5, 8:6, 8:8, 8:9, 8:13, 8:18, 9:2, 10:2, 10:9, 10:20, 11:13, 12:1, 12:15, 13:12, 13:15, 16:21, 17:21, 18:2, 18:11, 18:21, 18:22, 18:25, 19:4, 19:25, 20:17, 21:2, 21:12, 24:12, 24:16, 24:18, 24:20, 29:16, 29:20, 30:1, 30:5, 30:8, 30:9, 30:11, 31:10, 31:11, 31:16, 32:6, 32:8, 32:12, 33:2, 33:7, 37:12, 37:14, 37:20, 37:23, 41:8, 41:12, 41:16, 45:21, 45:23, 47:21, 48:1, 48:4, 49:17, 49:20, 51:2, 54:19, 54:20, 54:24, 54:25, 55:3, 55:4, 55:7, 55:11, 55:13, 55:20, 55:21, 55:22, 55:23, 56:3, 56:5, 56:11, 56:15, 56:21, 56:25, 57:4, 57:12, 58:10, 58:16, 59:8, 59:10, 59:14, 59:17, 59:22, 59:24, 60:3, 60:9, 60:11, 61:6, 61:23, 63:5, 63:8, 63:25, 64:4, 65:8, 65:11, 65:24, 66:5, 67:7, 67:9, 67:12, 67:14, 67:19, 67:21, 68:3, 68:7, 68:13, 68:22, 68:25, 69:4, 69:11, 70:9, 70:24, 71:9, 71:15, 71:19, 71:22, 72:9, 73:13, 73:17, 73:20, 75:24, 76:3, 76:6, 76:22, 77:2, 77:15, 77:19, 77:22, 79:4, 79:6, 79:12, 79:18, 79:20, 82:5, 82:21, 83:1, 83:6, 85:19, 87:12, 87:18, 88:4, 88:6, 88:9, 88:14, 90:22, 91:3, 91:14, 91:20, 93:11, 93:15, 95:22, 95:23, 96:2, 98:9, 98:11, 98:15, 98:19, 98:22, 98:24, 99:1, 99:3, 99:5, 99:6, 99:9, 99:12, 99:14, 99:16, 99:19, 99:25, 100:3, 105:6, 105:8, 105:11, 105:13, 105:18, 105:19, 105:23, 106:15, 106:16, 106:17, 106:24, 107:2, 107:5, 107:19, 107:20, 108:3, 110:6, 111:17, 111:19, 114:15, 114:17, 114:20, 116:13, 116:15, 116:17, 116:19, 117:14, 117:17, 117:20, 118:12, 118:16, 119:23, 120:4, 125:14, 125:16, 125:18, 128:15, 128:20, 131:6, 131:10, 131:15, 131:16, 131:21, 131:24, 132:19, 132:24, 133:3, 133:7, 133:12, 133:19, 133:23, 136:2, 136:4, 136:13, 136:18, 136:20, 138:18, 138:20, 144:13, 144:17, 147:13, 147:16, 147:18, 150:10, 150:14, 155:22, 156:5, 160:19, 161:6, 161:9, 165:17, 167:12, 167:19, 168:1, 168:9, 168:17, 168:24, 169:10, 169:12, 170:13, 170:20, 170:22, 172:14, 172:18, 173:2, 187:3, 187:8, 190:11, 190:15, 190:18, 190:20, 197:3, 197:9, 197:11, 198:13, 198:19, 198:21, 203:16, 203:20, 207:5

**MR.ROZELSKY** [25] - 10:1, 10:4, 10:14, 11:2, 11:18, 12:14, 15:18, 19:13, 29:24, 33:3, 49:16, 57:7, 60:7, 64:1, 70:19, 72:6, 82:1, 82:6, 82:11, 87:13, 87:15, 106:25, 107:21, 132:20, 169:4

**multiple** [5] - 7:21, 43:8, 46:11, 46:14, 187:20

**multiplier** [2] - 125:1, 127:3

**Munich** [10] - 25:23, 26:13, 36:8, 39:14, 74:19, 78:23, 80:12, 92:4, 92:13, 176:14

**MURPHY** [154] - 1:17, 1:17, 5:6, 6:3, 6:5, 8:8, 8:13, 8:18, 9:2, 10:2, 10:9, 10:20, 11:13, 12:1, 12:15, 13:12, 13:15, 16:21, 18:2, 18:11, 18:21, 19:4, 19:25, 20:17, 21:2, 21:12, 24:12, 24:16, 24:18, 24:20, 29:16, 30:1, 30:5, 30:9, 30:11, 31:10, 31:16, 32:8, 32:12, 33:7, 37:14, 37:20, 37:23, 41:8, 41:16, 45:21, 45:23, 47:21, 48:1, 48:4, 49:17, 49:20, 51:2, 54:20, 54:24, 55:3, 55:7, 55:13, 55:21, 55:23, 56:5, 56:15, 56:21, 56:25, 57:4, 57:12, 58:16, 59:10, 59:14, 59:17, 59:22, 59:24, 60:11, 61:6, 61:23, 63:8, 64:4, 65:8, 65:11, 65:24, 66:5, 67:9, 67:12, 67:14, 67:19, 67:21, 68:7, 68:13, 69:4, 69:11, 70:24, 71:15, 71:19, 71:22, 72:9, 73:13, 73:17, 73:20, 75:24, 76:3, 76:6, 77:2, 77:15, 77:19, 77:22, 79:6, 79:12, 79:18, 79:20, 82:5, 82:21, 83:1, 83:6, 85:19, 87:18, 88:6, 88:14, 90:22, 91:3, 91:14, 91:20, 93:11, 93:15, 95:23, 96:2, 98:19, 98:24, 99:3, 99:6, 99:14, 99:25, 100:3, 105:8, 105:11, 105:13, 105:19, 105:23, 106:15, 106:17, 106:24, 107:2, 107:19, 108:3, 110:6, 114:15, 119:23, 131:10, 131:15, 132:19, 133:3, 133:7, 147:16, 160:19, 167:12

**Murphy** [22] - 3:3, 6:2, 11:12, 17:24, 19:19, 21:9, 61:21, 82:12, 99:24, 107:7, 111:12, 115:15, 116:3, 118:23, 136:22, 151:11, 167:11, 167:20, 173:7, 174:18, 187:14, 196:1

**Murphy's** [1] - 16:6

## N

**name** [10] - 21:25, 26:10, 39:7, 85:5, 85:21, 92:25, 93:3, 93:6, 101:21, 119:2

**named** [4] - 16:15, 26:4, 62:1, 89:1

**names** [2] - 45:24, 194:3

**narrow** [1] - 58:13

**national** [6] - 37:5, 37:7, 78:25, 79:5, 79:10, 89:1

**nationalities** [1] - 37:2

**nationality** [1] - 81:10

**nationals** [1] - 14:13

**native** [1] - 92:14

**nature** [1] - 14:9

**necessarily** [1] - 144:10

**need** [31] - 17:24,

22:21, 30:3, 34:5, 36:2, 36:9, 38:20, 43:14, 43:15, 43:16, 58:13, 61:10, 71:2, 71:4, 71:7, 82:22, 94:8, 108:25, 114:4, 121:22, 135:15, 145:9, 150:18, 168:2, 168:5, 168:20, 169:5, 184:5, 184:6, 187:4, 206:10
**needed** [12] - 27:12, 44:13, 51:17, 51:19, 51:21, 95:1, 96:6, 97:16, 104:3, 120:9, 149:8, 154:25
**needs** [3] - 19:21, 20:14
**neighbor** [1] - 94:7
**network** [15] - 3:8, 4:8, 36:5, 92:7, 92:23, 173:10, 173:16, 175:6, 175:22, 176:1, 181:8, 182:21, 185:3, 185:10, 186:12
**never** [21] - 13:5, 13:6, 20:1, 66:14, 108:12, 112:7, 112:13, 115:18, 115:21, 115:24, 117:10, 125:4, 125:7, 125:9, 154:1, 154:4, 155:5, 155:8, 161:6, 161:25, 205:22
**New** [6] - 152:18, 160:3, 160:5, 160:6, 160:8, 160:10
**new** [11] - 7:2, 22:9, 22:18, 24:5, 125:20, 169:21, 178:8, 179:12, 183:23, 200:9, 204:25
**next** [30] - 7:13, 22:16, 23:14, 26:17, 28:12, 29:16, 32:10, 33:12, 65:24, 75:8, 77:16, 123:19, 125:11, 125:19, 126:2, 126:15, 127:6, 127:15, 127:20, 128:25, 136:11, 146:4, 146:6, 147:3, 148:2, 156:11, 157:9, 195:18, 195:24
**nice** [1] - 126:11
**Niessner** [2] - 91:25, 92:1
**nine** [4] - 123:25, 130:6, 130:15, 207:11
**NO** [1] - 1:3
**nobody** [1] - 84:16
**nominated** [2] - 154:4, 165:1
**nomination** [3] - 154:6, 154:8, 165:3
**non** [3] - 124:18, 124:20, 202:10
**non-exempt** [1] - 124:18
**normal** [2] - 101:18, 101:19
**note** [5] - 28:23, 29:22, 203:5, 204:5, 204:12
**noted** [1] - 17:7
**notes** [15] - 3:10, 4:12, 14:21, 14:23, 15:4, 24:24, 26:16, 29:3, 40:10, 41:21, 41:23, 42:5, 85:21, 89:19, 208:5
**nothing** [5] - 16:22, 70:19, 82:14, 167:10, 207:21
**notice** [5] - 4:20, 112:3, 128:2, 197:21, 198:6
**November** [4] - 84:22, 85:3, 119:21, 120:1
**number** [39] - 22:2, 23:2, 24:11, 24:23, 33:5, 47:9, 47:11, 49:10, 50:17, 50:20, 51:16, 52:5, 65:13, 72:10, 76:14, 77:6, 80:13, 86:4, 91:24, 93:9, 118:8, 138:15, 150:5, 150:9, 153:2, 153:3, 153:5, 153:7, 153:8, 153:9, 153:11, 176:7, 179:3, 180:11, 193:9, 194:2, 200:25
**numbered** [1] - 196:8
**numbers** [7] - 104:20, 106:14, 142:17, 182:13, 184:5, 196:14, 201:3
**nutshell** [1] - 52:8

**O**

**o'clock** [2] - 5:21, 207:11
**Oakway** [1] - 5:19
**oath** [3] - 5:11, 132:8, 132:16
**object** [4] - 20:18, 29:20, 76:22, 160:20
**objecting** [1] - 69:11
**objection** [96] - 8:6, 10:1, 11:15, 12:9, 17:6, 17:9, 17:22, 17:24, 24:13, 29:24, 32:6, 32:10, 33:2, 37:12, 37:18, 39:7, 41:10, 41:13, 47:24, 48:2, 50:22, 50:24, 54:19, 55:9, 55:20, 55:21, 55:25, 56:11, 57:7, 59:8, 59:13, 60:5, 60:7, 63:25, 65:6, 65:9, 66:1, 66:3, 67:16, 68:3, 69:9, 69:10, 69:12, 69:17, 69:18, 69:19, 70:7, 70:12, 70:17, 71:2, 71:5, 72:4, 73:15, 73:18, 76:1, 76:24, 77:17, 77:20, 79:4, 79:6, 79:7, 79:11, 79:15, 79:17, 82:1, 82:23, 87:12, 87:13, 88:4, 88:8, 90:24, 91:1, 91:16, 91:17, 95:25, 98:9, 105:6, 116:15, 116:16, 117:16, 118:14, 125:12, 128:17, 131:8, 133:6, 136:16, 144:15, 147:14, 151:11, 156:1, 156:2, 161:4, 167:17, 190:17, 197:8, 198:18
**objectionable** [1] - 202:11
**objections** [3] - 33:1, 69:18, 71:12
**obligations** [1] - 189:6
**obtain** [1] - 146:19
**occur** [1] - 85:7
**occurred** [3] - 8:15, 58:24, 59:1
**occurrences** [1] - 50:6
**October** [35] - 33:13, 33:16, 37:15, 41:3, 41:4, 41:24, 42:1, 42:17, 45:11, 55:14, 56:7, 65:15, 76:12, 122:19, 123:21, 138:22, 139:10, 139:14, 140:1, 140:7, 140:13, 140:22, 141:3, 141:9, 142:21, 143:16, 143:25, 144:7, 144:9, 147:19, 147:24, 148:8, 149:3, 191:16
**OF** [3] - 1:1, 208:1, 208:3
**OFCCP** [3] - 40:22, 40:24, 176:24
**offer** [13] - 3:18, 90:8, 90:10, 90:11, 90:12, 91:8, 100:4, 101:22, 116:15, 117:22, 128:17, 165:7, 188:16
**offered** [16] - 13:21, 24:12, 41:9, 50:22, 66:1, 72:4, 73:15, 75:8, 77:17, 79:15, 89:25, 90:3, 90:24, 91:15, 100:12, 167:7
**offering** [4] - 47:23, 117:15, 144:12, 144:13
**offers** [2] - 76:18, 90:5
**office** [7] - 7:17, 8:3, 86:17, 110:10, 133:25, 165:9, 173:23
**officially** [1] - 206:6
**OFK** [3] - 60:12, 60:19, 60:25
**OFKs** [1] - 60:16
**often** [4] - 8:2, 8:8, 8:14, 8:19
**older** [1] - 42:15
**Oliver** [1] - 183:17
**omitted** [2] - 125:12, 180:2
**once** [5] - 8:22, 52:6, 58:20, 68:23, 149:13
**one** [75] - 8:24, 9:6, 12:4, 21:8, 33:20, 35:16, 38:1, 39:5, 40:4, 41:20, 44:14, 46:17, 53:6, 57:22, 60:18, 65:16, 68:24, 76:1, 76:14, 77:6, 82:11, 91:12, 94:5, 99:6, 103:12, 108:9, 110:16, 110:17, 110:20, 113:6, 118:13, 122:1, 124:20, 124:24, 127:3, 128:16, 128:21, 129:18, 131:16, 136:12, 137:18, 141:1, 144:21, 153:15, 157:13, 160:13, 163:22, 166:10, 167:20, 171:10, 171:22, 173:9, 176:7, 179:2, 179:21, 180:2, 180:11, 181:15, 181:20, 183:14, 184:20, 184:23, 187:3, 187:17, 188:9, 189:23, 191:2, 193:9, 194:4, 203:24, 204:14
**one's** [1] - 59:6
**one-thirty** [3] - 110:16, 110:17, 110:20
**one-to-one** [3] - 8:24, 9:6, 41:20
**ones** [3] - 37:11, 164:23, 171:6
**open** [6] - 71:17, 83:4, 99:23, 107:24, 155:3, 168:4
**opening** [4] - 94:14, 98:20, 131:19, 150:17
**operate** [1] - 182:12
**Operation** [1] - 120:2
**operation** [1] - 54:20
**operational** [2] - 46:13, 47:1
**opinion** [1] - 14:10
**opinions** [1] - 207:16
**opponent** [2] - 12:5
**opponents** [2] - 10:24, 12:4
**opportunity** [8] - 12:19, 14:4, 14:6, 109:5, 111:14, 168:16, 189:20, 200:6
**opposition** [1] - 13:22
**option** [3] - 35:16, 39:12, 40:4
**options** [5] - 34:18, 35:14, 35:15, 95:2, 96:7
**order** [3] - 28:14, 99:2, 184:10
**Order** [1] - 15:17
**org** [1] - 4:13
**orga** [1] - 179:22
**Organization** [1] - 122:8
**organization** [11] - 34:15, 36:24, 44:24, 44:25, 59:7, 62:2, 82:19, 98:5, 121:3, 121:4, 142:16
**organizational** [2] - 191:1, 195:7
**organizations** [2] - 6:12, 184:10
**organize** [1] - 34:4
**organized** [1] - 41:20
**origin** [6] - 37:5, 37:7, 78:25, 79:5,

79:10, 89:1
**original** [4] - 131:17, 131:19, 131:25, 203:21
**otherwise** [1] - 91:7
**ought** [1] - 106:18
**ourselves** [2] - 53:18, 175:25
**out-bounds** [1] - 183:23
**outburst** [1] - 109:13
**outcome** [3] - 33:13, 33:17, 37:15
**outline** [1] - 168:11
**outside** [17] - 5:2, 11:10, 68:11, 82:2, 82:9, 82:17, 89:23, 94:2, 97:21, 98:13, 102:16, 106:9, 111:3, 162:24, 163:8, 166:8, 207:18
**overall** [1] - 34:4
**overrule** [5] - 17:23, 55:25, 67:16, 95:25, 161:4
**overruled** [4] - 29:25, 33:4, 57:8, 68:6
**oversight** [1] - 121:3
**Overview** [1] - 3:12
**overview** [1] - 52:5
**own** [2] - 78:24, 96:12

**P**

**p.m** [1] - 207:22
**pace** [2] - 168:25, 182:25
**pact** [1] - 110:2
**page** [51] - 24:21, 33:21, 33:23, 34:12, 39:11, 40:2, 41:17, 42:3, 49:18, 51:3, 52:3, 73:10, 78:4, 92:10, 93:2, 93:3, 116:10, 116:20, 118:22, 119:3, 121:16, 123:19, 125:11, 125:19, 126:2, 126:6, 126:15, 127:6, 127:15, 127:20, 129:1, 131:15, 132:3, 134:4, 135:15, 136:21, 140:17, 144:21, 145:18, 150:18, 156:11, 156:12, 157:9, 164:22, 170:15, 190:22, 195:24, 196:8, 203:23
**pages** [4] - 136:11, 137:17, 140:17, 157:25
**paid** [3] - 16:3, 54:12, 54:13
**paint** [1] - 44:2
**papers** [1] - 168:12
**paperwork** [2] - 148:4, 148:15
**paragraph** [2] - 116:21, 121:18
**paragraph's** [1] - 40:2
**pardon** [1] - 207:4
**paren** [1] - 177:15
**parened** [1] - 180:21
**parent** [1] - 92:13
**parenthetical** [1] - 191:15
**part** [8] - 22:17, 68:20, 118:18, 168:16, 176:3, 182:10, 194:17, 194:18
**participate** [2] - 152:19, 152:23
**participated** [1] - 124:9
**particular** [5] - 53:5, 96:13, 97:10, 179:14, 183:1
**parties** [7] - 13:21, 20:7, 132:6, 132:8, 166:14, 166:17, 167:7
**partner** [3] - 3:12, 73:25, 184:9
**partnerships** [1] - 184:14
**party** [6] - 10:24, 12:4, 12:5, 13:10, 202:24
**party's** [1] - 17:12
**pass** [1] - 200:6
**past** [2] - 38:11, 103:17
**path** [1] - 94:23
**pattern** [1] - 39:10
**Paul** [2] - 178:25, 194:7
**pay** [7] - 16:8, 56:8, 56:17, 98:8, 98:20, 98:21, 103:25
**paying** [2] - 98:25, 99:7
**payroll** [1] - 103:25
**Pekar** [2] - 80:9, 80:11
**pending** [2] - 11:13, 132:6
**people** [39] - 9:4, 12:2, 12:21, 13:4, 13:5, 17:11, 17:19, 18:9, 19:9, 19:17, 20:16, 27:19, 58:8, 84:25, 94:10, 96:18, 104:19, 104:20, 110:13, 113:9, 150:23, 152:18, 152:22, 153:2, 153:7, 153:15, 153:22, 157:13, 158:25, 168:14, 171:4, 174:20, 176:19, 182:24, 184:2, 184:10, 184:20, 185:25, 186:21
**per** [4] - 8:22, 115:16, 178:16, 199:12
**percentage** [5] - 49:3, 49:5, 124:14, 124:18, 124:20
**perfect** [1] - 99:10
**perform** [1] - 138:1
**performance** [5] - 53:20, 53:22, 53:24, 117:3, 121:15
**performing** [1] - 149:19
**period** [14] - 9:10, 21:14, 53:21, 54:4, 55:2, 57:21, 58:2, 58:11, 65:25, 138:24, 139:2, 139:10, 143:16
**periodically** [1] - 78:10
**periods** [1] - 58:23
**perks** [3] - 81:22, 83:8, 84:7
**permission** [1] - 32:25
**person** [16] - 8:11, 11:22, 11:23, 13:3, 16:16, 22:25, 24:5, 65:2, 81:12, 143:8, 150:25, 165:13, 184:23, 188:2, 192:25, 193:2
**personal** [84] - 6:9, 14:1, 14:5, 48:17, 48:18, 48:19, 48:22, 48:23, 48:25, 49:3, 49:5, 49:6, 49:8, 49:12, 49:15, 49:21, 49:23, 49:25, 50:2, 50:8, 50:9, 51:20, 52:10, 52:25, 53:1, 53:15, 54:6, 54:9, 54:14, 58:1, 64:13, 65:4, 72:18, 72:20, 72:21, 72:25, 73:3, 73:4, 73:6, 73:10, 74:6, 75:3, 76:11, 102:16, 108:24, 112:15, 112:18, 115:19, 115:21, 116:2, 116:4, 116:25, 117:6, 117:10, 119:8, 123:21, 123:24, 123:25, 124:4, 124:6, 124:8, 124:15, 124:22, 125:2, 125:5, 126:17, 126:20, 126:25, 129:22, 129:25, 130:5, 130:15, 135:7, 135:13, 135:19, 143:15, 143:17, 143:18, 148:8, 149:15, 149:17, 151:20, 157:3, 159:21
**personally** [4] - 7:6, 30:21, 51:11, 137:7
**personnel** [7] - 3:7, 25:18, 92:6, 92:22, 104:18, 183:22, 185:20
**Personnel** [3] - 3:22, 156:6, 156:12
**pertain** [1] - 180:21
**Petrasch** [97] - 3:7, 3:14, 3:16, 4:8, 4:12, 4:13, 4:15, 4:17, 4:19, 8:10, 8:15, 8:20, 9:18, 9:20, 10:2, 10:13, 10:15, 11:14, 11:15, 12:10, 12:22, 12:24, 14:13, 14:16, 14:25, 15:9, 15:23, 16:3, 17:16, 18:2, 18:3, 18:8, 18:12, 19:25, 20:4, 20:9, 21:13, 22:6, 23:6, 23:7, 24:4, 24:25, 26:17, 28:21, 29:11, 32:16, 39:23, 41:4, 41:25, 42:7, 43:12, 45:10, 55:14, 55:23, 56:6, 57:10, 57:13, 59:10, 59:13, 59:20, 63:14, 66:17, 67:2, 69:25, 73:5, 78:3, 79:25, 80:15, 84:12, 84:18, 85:20, 85:23, 89:11, 89:16, 90:16, 93:24, 97:6, 100:22, 103:7, 105:8, 105:15, 139:6, 146:14, 146:22, 155:15, 170:8, 179:15, 185:17, 187:18, 191:25, 193:5, 196:23, 198:23, 200:17, 202:6, 202:14, 202:22
**Petrasch's** [2] - 15:4, 15:14
**PG** [24] - 112:16, 112:22, 122:9, 122:12, 122:14, 122:16, 122:17, 122:19, 122:22, 123:21, 145:8, 149:10, 149:14, 149:16, 151:16, 152:9, 156:20, 156:22, 157:2, 158:21, 159:19, 191:15, 191:20, 193:5
**Philip** [1] - 23:1
**phone** [2] - 100:18, 102:4
**Phone** [1] - 187:18
**phones** [2] - 61:14, 110:25
**phonetic** [1] - 171:21
**photo** [1] - 190:24
**physically** [1] - 109:8
**PI** [4] - 44:25, 45:1, 45:2, 164:6
**pick** [1] - 102:4
**picture** [4] - 53:18, 158:6, 159:10, 159:25
**place** [1] - 166:5
**placed** [1] - 51:21
**placement** [1] - 49:1
**places** [2] - 110:11, 110:18
**plain** [1] - 99:9
**plaintiff** [2] - 14:2, 14:11
**Plaintiff** [4] - 15:1, 111:13, 132:19, 167:17
**PLAINTIFF** [2] - 1:4, 1:17
**PLAINTIFF'S** [1] - 3:6
**Plaintiff's** [39] - 14:23, 15:3, 15:7, 24:10, 24:14, 24:23, 29:17, 30:13, 30:15, 39:11, 40:7, 40:8, 45:21, 47:9, 47:11, 49:9, 49:17, 50:21, 50:23, 73:9, 73:14, 73:16, 73:23, 75:25, 76:2, 77:16, 77:18, 77:23, 79:14, 79:16, 79:22, 91:14, 91:18,

118:8, 118:9, 172:15, 172:21, 180:22, 187:5
**plan** [5] - 55:16, 76:11, 121:1, 155:23, 170:7
**planned** [2] - 97:8, 191:16
**planner** [5] - 35:18, 36:3, 36:10, 80:21, 172:2
**planners** [1] - 171:10
**planning** [21] - 3:22, 80:6, 80:18, 121:11, 136:24, 155:14, 160:2, 160:11, 160:18, 161:12, 161:16, 162:23, 163:15, 163:20, 164:10, 181:3, 182:13, 183:11, 187:19, 187:24, 188:13
**Planning** [4] - 47:14, 156:9, 158:15, 199:20
**plans** [1] - 97:6
**plant** [34] - 36:23, 40:20, 44:17, 51:15, 51:18, 53:9, 53:10, 63:21, 78:18, 84:7, 109:3, 113:14, 124:13, 124:14, 124:19, 146:15, 146:18, 162:14, 173:15, 173:20, 175:5, 175:18, 176:20, 178:8, 179:12, 184:2, 193:17, 193:18, 194:2, 199:23, 200:2, 201:13, 206:2
**Plant** [12] - 3:11, 4:10, 23:25, 30:17, 31:5, 33:11, 34:1, 36:16, 173:24, 174:13, 180:17, 181:20
**plants** [14] - 172:10, 173:9, 175:14, 176:4, 177:14, 178:1, 178:15, 179:7, 179:15, 181:8, 181:11, 181:14, 182:21
**play** [2] - 12:1, 161:13
**Plus** [1] - 10:10
**plus** [3] - 47:19, 138:5, 138:7
**PM** [10] - 26:14, 50:14, 50:15, 50:16, 52:1, 80:9, 81:6, 81:11, 92:1, 93:10
**PM-6** [1] - 148:5
**point** [29] - 9:19, 15:22, 16:5, 22:16, 22:20, 23:9, 23:16, 26:15, 29:2, 33:9, 37:3, 38:4, 43:9, 44:4, 67:9, 69:8, 73:6, 74:20, 82:24, 99:7, 100:19, 104:2, 108:11, 125:22, 143:8, 160:7, 171:12, 189:13, 207:9
**pointed** [1] - 14:25
**points** [1] - 187:20
**policies** [6] - 88:17, 88:19, 89:3, 89:10, 161:2
**policy** [30] - 37:8, 46:8, 46:9, 46:15, 50:11, 50:13, 51:12, 53:3, 53:5, 53:14, 54:7, 54:16, 54:21, 55:19, 56:7, 57:5, 57:9, 57:16, 57:25, 58:8, 58:17, 58:20, 59:2, 74:10, 74:12, 74:16, 88:24, 89:13, 102:15, 102:22
**pool** [1] - 81:4
**popular** [1] - 53:3
**portfolio** [5] - 75:18, 148:1, 148:7, 155:14, 191:19
**portfolios** [2] - 44:8, 44:13
**portion** [2] - 77:12, 131:9
**position** [70] - 4:4, 4:5, 4:6, 7:1, 7:3, 22:5, 22:13, 22:21, 26:17, 26:20, 27:6, 27:9, 28:5, 31:2, 34:6, 34:23, 35:22, 36:15, 44:11, 44:12, 46:6, 47:8, 53:16, 56:9, 56:14, 58:1, 62:2, 62:20, 64:24, 65:21, 66:9, 66:24, 69:24, 70:1, 72:11, 72:22, 76:21, 77:9, 79:1, 79:3, 90:2, 90:3, 90:9, 97:21, 98:3, 98:7, 100:12, 100:20, 112:25, 113:3, 120:22, 122:9, 136:25, 138:6, 139:3, 141:22, 141:25, 142:3, 142:20, 146:11, 147:2, 149:8, 158:22, 158:23, 159:13, 159:16, 161:16, 163:4, 170:9, 188:5
**Position/Pay** [1] - 4:3
**positions** [25] - 31:8, 35:4, 35:12, 36:14, 37:1, 37:5, 37:7, 45:6, 51:17, 63:10, 63:13, 63:22, 65:16, 83:7, 89:22, 98:21, 102:10, 128:23, 159:1, 159:7, 161:13, 163:6, 163:7, 182:24, 183:23
**positionTX-6064** [1] - 63:9
**positive** [1] - 159:8
**possibility** [1] - 9:14
**possible** [4] - 24:5, 35:19, 75:10, 110:18
**posting** [1] - 189:11
**potential** [8] - 75:7, 160:1, 160:18, 161:11, 163:16, 174:7, 192:22, 196:7
**Potential** [1] - 156:13
**potentially** [7] - 160:8, 164:6, 170:6, 181:15, 184:11, 193:6, 203:15
**pouring** [1] - 98:1
**PowerPoint** [3] - 3:23, 4:10, 101:21
**practically** [1] - 46:19
**practice** [2] - 176:19, 178:19
**practices** [2] - 176:4, 178:17
**praises** [1] - 103:22
**preferred** [1] - 137:22
**pregnant** [1] - 99:13
**prejudicial** [1] - 15:15
**prepared** [1] - 132:13
**prepares** [1] - 132:10
**presence** [13] - 5:3, 5:15, 11:11, 21:6, 61:19, 68:11, 82:9, 98:13, 106:9, 111:4, 166:9, 169:6, 207:19
**present** [3] - 85:13, 132:9, 168:16
**presentation** [2] - 31:19, 85:5
**presented** [8] - 14:12, 31:22, 31:23, 84:19, 84:22, 84:24, 85:1, 90:13
**President** [37] - 6:20, 9:20, 17:17, 22:5, 22:7, 22:9, 22:11, 22:12, 22:18, 22:19, 22:20, 23:11, 23:13, 31:3, 32:2, 32:3, 35:16, 36:16, 38:12, 38:25, 39:13, 39:16, 39:22, 40:4, 86:12, 100:25, 101:8, 101:22, 101:25, 104:10, 169:21, 185:18, 192:12, 204:25
**Presidents** [1] - 38:12
**press** [13] - 180:19, 181:1, 181:9, 181:12, 181:14, 181:17, 182:3, 182:7, 182:11, 182:12, 182:20, 190:5, 190:7
**presumably** [1] - 169:5
**pretrial** [1] - 166:16
**pretty** [5] - 112:25, 113:3, 153:2, 182:7, 201:20
**previous** [4] - 11:7, 77:5, 166:3, 196:8
**previously** [1] - 29:21
**printout** [3] - 140:15, 151:7, 151:18
**problem** [8] - 19:21, 70:6, 70:21, 147:4, 166:20, 203:13, 204:13, 205:2
**problematic** [1] - 167:1
**problems** [1] - 109:14
**procedure** [2] - 3:13, 90:5
**proceed** [7] - 5:5, 21:10, 24:16, 31:10, 71:19, 75:23, 169:9
**proceeding** [1] - 166:21
**proceedings** [2] - 98:16, 103:14
**process** [6] - 74:1, 133:11, 152:13, 152:19, 152:24, 166:25
**produce** [1] - 162:15
**produced** [2] - 18:15, 181:17
**producing** [1] - 162:19
**product** [1] - 181:18
**production** [15] - 16:7, 44:2, 173:10, 173:16, 173:20, 175:6, 175:10, 175:18, 175:22, 176:1, 182:20, 185:2, 185:10, 186:12, 201:16
**profession** [1] - 93:20
**professional** [5] - 52:24, 108:22, 109:24, 138:6, 197:19
**programs** [1] - 122:2
**progressed** [1] - 186:14
**progressive** [4] - 47:19, 48:13, 138:5, 138:11
**project** [15] - 6:23, 7:11, 7:12, 28:1, 28:17, 52:23, 160:9, 170:8, 194:14, 194:19, 194:20, 194:25, 195:2, 195:17
**projects** [3] - 51:21, 87:6, 98:2
**promise** [1] - 167:21
**promote** [1] - 74:5
**promoted** [15] - 60:13, 60:19, 60:22, 61:3, 61:5, 73:3, 73:4, 75:3, 115:6, 123:3, 143:17, 148:14, 149:10, 149:13, 152:8
**promotion** [14] - 3:13, 4:16, 74:1, 74:4, 75:10, 75:23, 78:2, 78:15, 91:5, 119:9, 119:11, 123:21, 145:8, 147:23
**promotions** [6] - 3:24, 75:18, 78:13, 116:2, 116:5, 161:3
**proper** [3] - 30:6, 82:24, 98:17
**proposed** [1] - 139:6
**prospective** [2] - 68:5, 70:13
**protect** [3] - 78:16, 99:20, 139:7
**protected** [3] - 37:4, 71:7, 88:25
**protection** [2] - 96:6, 96:8
**protest** [2] - 109:20,

109:22
**prove** [2] - 12:15, 18:5
**provide** [2] - 53:14, 180:17
**provided** [3] - 66:11, 66:15, 83:17
**providing** [4] - 63:22, 64:14, 64:23, 197:20
**PTO** [2] - 54:10, 54:11
**publish** [5] - 24:18, 29:18, 32:25, 131:6, 168:2
**published** [3] - 30:2, 73:22, 170:24
**pull** [4] - 45:16, 106:22, 122:6, 155:24
**punish** [1] - 174:19
**purchasing** [1] - 44:24
**purported** [1] - 14:8
**purpose** [1] - 131:10
**purposes** [1] - 31:12
**pursued** [1] - 192:22
**pursuing** [2] - 103:16, 192:11
**put** [18] - 45:18, 50:6, 82:18, 100:5, 110:1, 133:19, 160:22, 163:21, 166:10, 166:12, 166:19, 167:5, 167:12, 168:6, 170:14, 181:15, 182:3, 206:16
**puts** [1] - 19:2
**putting** [1] - 91:10
**PZ** [15] - 50:14, 50:18, 52:2, 74:17, 160:1, 160:3, 160:4, 160:6, 160:18, 161:11, 163:5, 163:7, 163:9, 163:12
**PZ-30** [1] - 74:18

**Q**

**qualified** [2] - 184:1, 184:16
**Quarter** [1] - 51:7
**questions** [13] - 16:18, 44:3, 84:16, 110:6, 111:15, 120:22, 126:9, 132:8, 132:16, 134:2, 136:23, 150:4, 155:1
**quick** [3] - 18:23, 118:6, 189:20
**quickly** [1] - 169:16
**quit** [1] - 205:5
**quite** [1] - 17:18
**quote** [1] - 42:24

**R**

**race** [5] - 72:16, 88:25, 143:4, 149:9, 150:24
**raise** [5] - 16:1, 98:25, 203:14, 204:13, 205:2
**raises** [3] - 58:3, 58:5, 114:16
**Randall** [1] - 194:4
**RANDLE** [1] - 2:2
**range** [2] - 52:25, 57:23
**ranked** [3] - 113:21, 142:11, 142:15
**rated** [2] - 52:9
**rather** [1] - 129:1
**raw** [1] - 186:25
**re** [1] - 62:2
**re-organization** [1] - 62:2
**reach** [1] - 101:8
**reaching** [1] - 167:8
**read** [20] - 25:7, 27:2, 27:15, 27:23, 28:12, 35:24, 42:9, 42:10, 44:20, 44:21, 77:7, 80:4, 80:15, 116:23, 131:12, 133:1, 133:16, 133:17, 195:21
**reading** [5] - 15:21, 16:6, 48:15, 147:22, 150:3
**readings** [1] - 69:16
**ready** [4] - 5:5, 189:21, 189:22, 204:14
**real** [3] - 18:23, 118:6, 140:6
**reality** [2] - 38:10, 58:7
**realization** [2] - 148:5, 148:15
**really** [11] - 19:22, 94:24, 96:10, 102:5, 104:1, 109:6, 119:10, 160:13, 178:21, 190:8, 198:6
**reason** [7] - 63:17, 66:15, 69:25, 107:11, 168:17, 179:14, 206:19
**reasons** [5] - 10:22, 29:21, 66:17, 160:14, 160:22
**receive** [3] - 15:24, 58:5, 91:9
**received** [8] - 77:24, 91:6, 115:18, 115:21, 115:24, 116:4, 117:23, 127:7
**receiving** [4] - 123:7, 126:3, 145:20, 147:20
**recess** [4] - 61:17, 111:10, 166:7, 207:20
**reciprocal** [1] - 176:12
**reciprocated** [1] - 71:14
**reciprocity** [1] - 174:24
**recognition** [2] - 160:12, 160:16
**recognize** [1] - 71:12
**recollection** [5] - 28:5, 131:11, 133:4, 136:6, 150:11
**recommended** [1] - 35:20
**reconsider** [1] - 200:18
**record** [30] - 11:4, 20:14, 29:23, 40:6, 68:10, 71:7, 72:13, 82:8, 98:13, 99:19, 106:8, 120:7, 120:8, 122:21, 122:24, 130:21, 130:25, 131:18, 141:5, 144:3, 165:20, 166:11, 166:12, 167:3, 167:13, 203:21, 206:11, 206:13, 207:7
**recorded** [1] - 31:25
**recounts** [1] - 15:8
**recruiter** [10] - 94:12, 94:15, 94:19, 94:22, 95:3, 95:20, 96:4, 118:18, 138:25, 167:15
**recruiting** [6] - 28:24, 55:16, 180:12, 182:14, 188:15, 188:18
**recruiting's** [1] - 184:8
**recruitment** [1] - 121:19
**red** [8] - 34:23, 159:10, 159:11, 159:12, 163:3, 191:15, 194:25, 195:14
**redacted** [1] - 98:23
**reduction** [5] - 106:14, 107:9, 107:10, 107:15, 112:7
**refer** [6] - 13:17, 19:1, 23:23, 24:2, 43:24, 81:17
**reference** [6] - 3:12, 19:2, 36:7, 73:25, 180:3, 181:23
**referenced** [2] - 116:3, 191:14
**references** [4] - 118:12, 161:15, 168:2, 205:1
**referencing** [1] - 12:13
**referred** [6] - 40:6, 43:25, 47:3, 47:5, 183:13, 194:10
**referring** [13] - 7:1, 7:24, 20:21, 25:20, 37:11, 40:7, 59:2, 81:9, 121:6, 150:25, 174:18, 176:12, 198:15
**refers** [1] - 174:13
**reflect** [10] - 31:6, 65:19, 117:22, 126:17, 128:22, 129:8, 129:19, 129:22, 131:18, 186:20
**reflected** [6] - 30:24, 39:11, 126:6, 141:1, 141:21, 141:24
**reflection** [2] - 124:5, 171:2
**reflective** [1] - 151:15
**reflects** [7] - 114:14, 123:7, 123:20, 144:6, 145:12, 203:21
**refresh** [4] - 28:4, 131:10, 150:10, 203:16
**refreshed** [1] - 136:6
**refreshing** [3] - 133:4, 133:8, 152:1
**regard** [2] - 14:10, 106:25
**regarded** [1] - 173:15
**regarding** [6] - 4:15, 14:24, 120:21, 129:4, 150:22, 183:17
**regards** [3] - 28:23, 173:11, 199:14
**regraded** [1] - 65:21
**regulatory** [1] - 35:21
**relate** [2] - 78:1, 182:25
**related** [6] - 3:24, 57:9, 84:2, 86:5, 138:6, 161:2
**relates** [1] - 78:2
**relations** [1] - 75:17
**relationship** [1] - 17:14
**relayed** [1] - 57:13
**relevant** [4] - 12:25, 71:4, 82:12, 166:23
**relied** [1] - 17:2
**relocation** [1] - 83:17
**rely** [1] - 186:16
**remain** [4] - 61:16, 111:2, 122:19, 166:5
**remaining** [1] - 168:19
**remains** [1] - 124:17
**remarks** [1] - 132:17
**remember** [30] - 11:7, 23:20, 26:14, 44:9, 120:12, 120:15, 131:3, 133:24, 139:20, 139:21, 144:18, 150:5, 150:6, 150:8, 154:22, 154:24, 156:24, 157:1, 166:2, 173:5, 185:22, 189:4, 191:3, 192:19, 203:4, 203:7, 203:9, 203:12, 203:25, 207:15
**remind** [2] - 25:15, 119:19
**remove** [1] - 158:19
**removed** [1] - 195:6
**remuneration** [1] - 15:24
**rendered** [1] - 86:17
**reordered** [1] - 195:3
**reorganization** [7] - 21:16, 28:11, 51:9, 84:17, 170:3, 200:18
**reorganizations** [2] - 101:12, 101:16
**repeat** [2] - 35:7, 115:20
**repeats** [1] - 20:9
**rephrase** [3] - 56:21, 105:10, 114:17
**replace** [7] - 80:7, 80:19, 187:19, 187:25, 188:2, 188:13, 189:14
**replaced** [4] - 86:20, 87:11, 119:6, 188:9
**replacing** [1] - 9:20
**report** [6] - 80:23,

167:22, 177:3, 194:14, 195:2
**REPORTER** [3] - 2:6, 2:6, 208:3
**reporter** [10] - 22:2, 23:2, 50:17, 50:20, 80:13, 91:25, 132:2, 132:9, 167:2
**reports** [1] - 46:14
**request** [3] - 6:23, 90:8, 190:4
**requested** [1] - 203:1
**REQUESTED** [1] - 208:1
**requests** [1] - 183:22
**require** [3] - 47:17, 48:12, 97:17
**required** [4] - 64:18, 64:19, 64:21, 177:3
**requirements** [2] - 4:7, 47:7
**requires** [1] - 47:19
**research** [4] - 61:13, 110:25, 166:4, 207:16
**resign** [2] - 100:15, 196:23
**resignation** [15] - 4:20, 4:21, 86:18, 100:21, 111:25, 112:3, 112:8, 112:18, 129:10, 197:1, 197:22, 200:1, 200:15, 200:16, 205:6
**resigned** [9] - 111:22, 112:15, 112:22, 114:6, 141:20, 197:15, 201:16, 204:21, 205:25
**resigning** [2] - 100:19, 100:22
**resource** [1] - 35:2
**Resources** [29] - 6:21, 17:17, 23:12, 23:13, 23:15, 31:3, 35:17, 36:16, 39:13, 40:5, 42:15, 44:5, 45:7, 47:18, 47:20, 53:6, 87:2, 93:20, 98:4, 98:7, 101:23, 104:10, 104:11, 118:25, 120:2, 121:15, 138:6, 160:25, 192:12
**respect** [7] - 13:19, 72:24, 90:13, 97:6, 105:1, 108:4, 164:21
**respond** [1] - 15:18
**response** [4] - 19:13, 43:12, 77:5, 146:13
**responses** [1] - 16:21
**responsibilities** [1] - 64:18
**responsibility** [5] - 46:11, 46:23, 104:15, 119:12, 161:23
**responsible** [11] - 78:9, 82:13, 82:15, 89:10, 93:10, 104:22, 108:23, 125:22, 137:2, 200:24
**rest** [6] - 61:10, 67:23, 85:10, 109:1, 109:5, 207:10
**restarting** [1] - 206:2
**restroom** [2] - 108:21, 166:2
**result** [9] - 48:14, 56:8, 56:18, 123:12, 124:18, 126:20, 126:24, 132:12, 152:8
**resume** [4] - 3:19, 118:17, 120:19, 180:12
**retain** [1] - 54:1
**retention** [5] - 53:21, 57:21, 58:2, 58:23
**retire** [2] - 108:12, 154:19
**retired** [2] - 97:8, 97:20
**retiring** [1] - 22:10
**returning** [1] - 6:22
**review** [4] - 34:4, 42:11, 148:7, 183:22
**reviewed** [1] - 166:13
**revised** [1] - 167:18
**revisit** [1] - 30:6
**revoke** [2] - 32:4, 37:7
**revoked** [5] - 32:14, 32:17, 32:20, 32:23, 102:23
**reward** [1] - 117:4
**right-hand** [1] - 25:1
**role** [13] - 23:17, 23:18, 26:7, 29:7, 35:3, 35:20, 75:7, 86:4, 86:7, 87:9, 87:19, 104:9
**roles** [2] - 88:2, 164:13
**room** [2] - 11:6, 61:10
**round** [1] - 75:19
**routinely** [1] - 101:15
**row** [6] - 53:23, 53:24, 57:18, 57:19, 75:6
**ROZELSKY** [2] - 1:21, 58:10
**RPR** [2] - 2:6, 208:11
**rule** [9] - 23:12, 29:12, 29:14, 29:15, 30:24, 31:6, 32:9, 38:10, 147:1
**Rule** [6] - 10:20, 10:25, 11:23, 14:17, 15:1, 17:12
**ruled** [2] - 12:8, 18:19
**rules** [2] - 12:7, 43:10
**Rules** [1] - 14:2
**ruling** [3] - 17:8, 20:19, 30:6
**run** [1] - 108:21
**running** [4] - 103:23, 109:1, 201:8, 201:11
**Rutgers** [1] - 29:18

## S

**s/Debra** [1] - 208:11
**safe** [2] - 78:7, 207:13
**salaries** [4] - 113:17, 130:20, 130:23, 134:15
**salary** [32] - 3:20, 3:24, 54:17, 57:19, 57:23, 112:8, 112:11, 115:9, 115:11, 117:1, 117:6, 123:9, 123:24, 124:1, 125:7, 125:20, 126:4, 126:21, 127:11, 127:16, 127:20, 127:23, 128:4, 128:11, 129:9, 129:15, 129:20, 130:5, 134:7, 135:21, 151:10, 168:3
**Sanders** [3] - 145:1, 145:12, 145:21
**sanitize** [1] - 19:10
**SAP** [10] - 120:7, 122:20, 128:21, 129:5, 140:15, 141:5, 141:6, 141:14, 144:2, 144:3
**sat** [1] - 58:22
**saw** [11] - 6:23, 28:3, 36:25, 48:17, 49:4, 78:10, 87:24, 102:15, 158:4, 163:22, 164:22
**SC** [5] - 1:3, 1:18, 1:22, 2:5, 2:7
**scary** [1] - 102:2
**scenario** [3] - 34:19, 74:25, 75:11
**scenarios** [2] - 74:8
**scheduled** [1] - 78:20
**school** [1] - 5:20
**schooling** [1] - 83:17
**scope** [10] - 17:13, 46:25, 47:2, 82:2, 82:17, 104:14, 104:17, 104:18
**Scott** [26] - 23:18, 27:25, 28:9, 28:10, 28:17, 62:1, 62:11, 62:13, 66:10, 68:1, 69:1, 130:19, 135:21, 136:7, 142:9, 142:11, 164:1, 164:12, 170:6, 192:10, 194:13, 194:19, 195:1, 195:4, 195:6
**screen** [4] - 28:3, 77:8, 145:23, 187:9
**sealed** [1] - 131:19
**Sean** [1] - 157:16
**seat** [1] - 5:9
**seated** [3] - 5:4, 61:16, 111:2
**Second** [1] - 180:14
**second** [12] - 17:3, 21:9, 24:21, 68:8, 92:10, 93:2, 93:11, 116:21, 128:6, 157:24, 176:23, 191:13
**secondary** [2] - 180:17, 189:9
**section** [8] - 44:20, 61:7, 61:24, 89:21, 137:17, 177:21, 177:23
**Section** [7] - 90:18, 119:1, 119:4, 119:7, 119:14, 119:19, 122:8
**secured** [2] - 146:10, 149:8
**see** [86] - 21:5, 25:24, 27:15, 34:20, 38:16, 42:23, 49:6, 76:12, 92:18, 92:20, 95:1, 100:7, 114:18, 115:10, 119:17, 119:20, 119:23, 120:7, 120:24, 121:20, 121:21, 122:16, 122:20, 122:24, 125:20, 125:24, 130:21, 130:24, 134:5, 137:19, 137:21, 140:15, 140:23, 140:25, 141:5, 144:3, 144:23, 145:12, 145:19, 145:23, 145:24, 145:25, 146:21, 147:19, 153:24, 155:20, 156:12, 156:14, 156:16, 157:6, 157:10, 157:11, 158:1, 158:7, 158:20, 159:10, 161:10, 164:1, 164:2, 164:4, 170:25, 176:7, 177:10, 179:3, 179:21, 180:24, 185:20, 185:22, 187:10, 187:17, 190:24, 191:5, 191:16, 191:22, 194:7, 194:13, 195:6, 195:14, 198:22, 204:6, 204:12, 206:7, 207:17
**seeing** [1] - 152:2
**seeking** [3] - 157:17, 168:3, 182:16
**seeks** [1] - 14:22
**segments** [1] - 169:13
**select** [2] - 81:2, 81:4
**selected** [2] - 81:7, 189:11
**self** [3] - 154:6, 154:8, 165:3
**self-nomination** [3] - 154:6, 154:8, 165:3
**sell** [6] - 177:12, 177:17, 177:19, 177:22, 178:16, 179:6
**selling** [1] - 178:14
**send** [5] - 29:19, 76:21, 77:11, 198:25, 200:1
**sending** [1] - 187:18
**sends** [1] - 188:17
**senior** [14] - 31:20, 31:22, 31:23, 33:15, 33:18, 37:10, 37:13, 37:15, 37:25, 38:7, 102:3, 103:4, 155:15, 155:19
**sent** [10] - 4:9, 63:23, 78:14, 78:15, 81:6, 81:12, 83:9, 144:25, 197:12, 199:5
**separated** [1] - 142:17
**September** [18] - 9:17, 9:23, 94:17,

94:21, 96:4, 144:23, 145:5, 145:10, 145:12, 145:21, 147:8, 149:2, 169:23, 169:25, 201:24, 203:6, 204:4, 205:3
**seriously** [1] - 43:15
**serve** [1] - 165:13
**served** [3] - 44:4, 173:19, 173:23
**service** [1] - 110:19
**services** [2] - 43:7, 146:19
**session** [1] - 85:6
**set** [3] - 26:15, 97:19, 108:15
**seven** [1] - 142:14
**sever** [1] - 16:25
**several** [5] - 46:17, 53:17, 109:4, 161:1, 163:19
**sew** [1] - 187:14
**sex** [3] - 62:5, 68:20, 72:14
**shame** [1] - 43:4
**share** [7] - 3:9, 4:11, 8:24, 9:5, 9:6, 25:9, 41:20
**shared** [4] - 28:14, 42:5, 43:3, 86:18
**shares** [2] - 8:22, 18:17
**sheet** [10] - 4:6, 39:6, 41:19, 64:20, 128:22, 128:25, 129:3, 138:22, 141:17, 151:24
**sheets** [3] - 4:4, 4:5, 128:21
**Sherrill** [3] - 95:4, 95:5, 167:15
**Sherry** [17] - 22:17, 22:20, 23:10, 27:5, 27:8, 28:20, 28:25, 42:14, 42:21, 43:4, 101:1, 183:8, 183:10, 183:16, 200:20, 202:3
**Sherry's** [2] - 38:16, 183:12
**shock** [1] - 108:7
**shoot** [1] - 110:20
**shop** [10] - 180:19, 181:1, 181:12, 181:17, 182:3, 182:7, 182:11, 182:12, 190:5, 190:7
**shops** [3] - 181:9, 181:14, 182:20
**short** [4] - 61:9, 61:17, 127:17, 166:7
**show** [17] - 17:15, 24:10, 41:8, 43:18, 55:4, 65:5, 69:6, 69:7, 70:2, 70:13, 75:24, 82:12, 101:24, 131:11, 131:13, 150:19
**showed** [3] - 115:15, 131:2, 143:23
**showing** [1] - 52:4
**shown** [2] - 70:13, 82:12
**shows** [7] - 55:5, 66:16, 70:15, 82:14, 92:11, 124:17, 159:13
**showsTX-6062** [1] - 82:13
**shut** [2] - 84:4, 201:13
**side** [6] - 20:4, 20:22, 71:23, 74:3, 106:22, 110:12
**sign** [1] - 176:9
**signal** [3] - 76:21, 77:10, 77:11
**signature** [1] - 199:18
**significant** [6] - 126:5, 126:6, 126:8, 126:10, 126:12, 126:13
**similar** [3] - 74:7, 87:10, 104:20
**simple** [1] - 140:6
**simply** [1] - 16:9
**Sinanian** [2] - 178:25, 194:8
**single** [2] - 20:19, 46:12
**sit** [3] - 61:4, 184:18, 186:2
**sitting** [3] - 101:2, 152:18, 204:14
**situation** [9] - 20:2, 43:11, 50:12, 52:12, 87:20, 101:18, 102:2, 105:1, 177:7
**situations** [1] - 74:4
**six** [4] - 39:11, 103:20, 125:12, 159:17
**sixth** [1] - 34:12
**sixty** [1] - 68:25
**sixty-four** [1] - 68:25
**skills** [4] - 176:16, 176:20, 184:6, 184:7
**SL** [3] - 177:12, 177:20
**slash** [1] - 77:9
**sleep** [1] - 108:25
**slide** [3] - 163:24, 195:7, 206:16
**slides** [1] - 170:2
**slot** [2] - 37:5, 37:7
**SLP** [1] - 178:4
**small** [7] - 153:3, 153:5, 153:6, 153:9, 153:10, 171:2
**SMM** [1] - 147:25
**someone** [6] - 11:16, 79:8, 143:24, 148:23, 164:11, 176:13
**sometimes** [7] - 56:25, 78:20, 78:21, 110:13, 110:18, 110:19, 186:20
**somewhere** [2] - 179:9, 200:9
**sorry** [15] - 13:6, 63:1, 80:13, 87:15, 108:8, 109:9, 122:15, 133:7, 136:12, 136:14, 150:5, 158:6, 158:8, 184:13, 206:8
**sound** [1] - 70:4
**sounds** [2] - 115:17, 157:1
**South** [5] - 5:20, 35:2, 178:2, 179:8, 184:15
**SOUTH** [3] - 1:1, 2:4, 2:7
**Spartanburg** [29] - 3:11, 4:10, 6:13, 23:25, 30:18, 31:5, 33:11, 34:1, 34:10, 36:17, 40:19, 44:18, 62:17, 74:11, 74:14, 75:1, 81:22, 83:9, 89:9, 104:7, 153:22, 173:24, 174:13, 175:8, 180:18, 181:16, 181:21, 182:1, 190:8
**SPARTANBURG** [1] - 1:2
**speaking** [7] - 17:17, 21:15, 21:18, 31:7, 69:10, 69:19, 172:15
**speaks** [2] - 76:25, 77:13
**specialized** [1] - 46:18
**specific** [4] - 11:22, 12:2, 12:13, 19:22
**specifically** [3] - 16:3, 20:21, 21:19
**specifics** [1] - 49:7
**speculate** [1] - 179:25
**speculating** [1] - 55:6
**speculation** [10] - 54:19, 55:22, 55:24, 57:7, 60:4, 67:7, 71:3, 82:2, 82:20, 160:20
**speculative** [2] - 18:1, 18:3
**spelling** [1] - 39:6
**SPENCER** [1] - 1:21
**spent** [2] - 104:24
**spill** [1] - 70:4
**spoken** [1] - 24:7
**spot** [1] - 19:3
**stability** [1] - 104:2
**stabilize** [1] - 27:5
**stable** [1] - 104:4
**staff** [1] - 148:20
**stage** [1] - 181:3
**stand** [7] - 12:21, 15:19, 16:2, 20:18, 20:24, 54:11, 124:19
**standing** [2] - 20:19, 70:6
**standpoint** [11] - 62:10, 104:17, 104:18, 113:12, 129:9, 142:5, 142:12, 164:11, 174:21, 175:11, 201:3
**stands** [4] - 54:12, 129:25, 159:21, 193:13
**start** [12] - 6:13, 34:20, 38:11, 54:17, 61:6, 103:13, 110:20, 111:20, 187:23, 199:23, 203:24, 207:11
**started** [7] - 6:1, 37:3, 92:16, 94:1, 103:22, 162:4, 188:15
**starting** [2] - 200:2, 201:16
**starts** [1] - 145:5
**state** [5] - 71:2, 88:6, 161:5, 184:10
**statement** [12] - 10:22, 14:15, 16:22, 18:6, 20:1, 20:3, 35:24, 42:23, 69:13, 94:14, 139:6
**statements** [4] - 15:8, 15:10, 68:15, 70:8
**States** [7] - 37:4, 40:14, 152:23, 174:25, 176:13, 177:7, 197:20
**states** [1] - 174:20
**STATES** [3] - 1:1, 1:14, 2:6
**status** [5] - 36:6, 52:22, 60:25, 175:18, 193:20
**stay** [6] - 41:19, 97:8, 97:19, 100:23, 101:5, 102:6
**stayed** [2] - 122:22, 124:11
**staying** [1] - 188:18
**Steel** [1] - 182:1
**steering** [4] - 161:16, 161:17, 161:20, 161:22
**Steering** [1] - 199:20
**stenographic** [1] - 208:5
**STENOTYPE/ COMPUTER** [1] - 2:9
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:9
**step** [5] - 11:6, 107:3, 111:8, 146:4, 168:3
**Stephan** [20] - 80:7, 80:19, 80:20, 80:21, 81:7, 171:19, 180:22, 184:23, 185:1, 185:5, 185:9, 185:13, 186:7, 187:19, 187:25, 188:2, 188:5, 188:13, 189:14, 191:10
**STEPHENSON** [1] - 1:17
**steps** [1] - 146:6
**still** [16] - 5:11, 14:14, 15:20, 16:3, 16:8, 16:25, 22:16, 39:24, 60:13, 100:17, 108:21, 108:24, 109:10, 119:18, 149:4, 199:19
**stood** [2] - 13:7, 68:15
**stop** [1] - 152:1
**stopped** [1] - 16:23
**stopping** [1] - 207:9
**Strategic** [1] - 180:4
**strategic** [7] - 46:25, 180:5, 183:4, 183:5, 183:11, 183:17, 183:20
**STREET** [3] - 1:18, 2:4, 2:7
**Street** [1] - 110:11
**streets** [1] - 110:12
**strengths** [3] - 121:17, 160:16,

161:13
**stretch** [1] - 166:2
**strike** [2] - 88:9, 112:13
**structural** [1] - 52:15
**structure** [5] - 3:21, 6:8, 51:21, 191:1, 195:7
**structures** [1] - 164:8
**stuff** [8] - 17:8, 93:12, 107:16, 152:12, 160:13, 167:21, 173:8, 178:14
**subject** [5] - 29:17, 74:22, 145:6, 199:9
**submission** [2] - 118:18, 197:7
**submit** [2] - 64:10, 64:22
**submits** [1] - 90:9
**submitted** [3] - 166:14, 200:15, 200:16
**subsequent** [2] - 16:18, 106:2
**Substructure** [1] - 4:10
**succession** [3] - 155:23, 164:10, 170:7
**Succession** [2] - 156:9, 158:15
**successor** [1] - 188:24
**suffered** [1] - 152:7
**sufficient** [1] - 14:4
**suggest** [5] - 19:14, 44:5, 95:23, 99:15, 107:2
**suggested** [1] - 163:5
**suggesting** [1] - 14:12
**SUITE** [1] - 2:4
**summarized** [1] - 89:17
**Summary** [1] - 158:16
**summary** [2] - 128:21, 129:3
**summer** [8] - 7:8, 7:9, 7:15, 8:21, 9:7, 9:10, 21:14, 93:22
**Sunday** [1] - 204:3
**supervisory** [1] - 138:7
**supplier** [3] - 181:17, 181:22, 181:23
**support** [1] - 13:22
**surrounding** [1] - 81:15
**sustain** [8] - 32:9, 37:18, 55:9, 58:13, 59:12, 76:24, 79:11, 82:23
**sustained** [6] - 63:6, 64:2, 87:16, 88:5, 88:8, 98:10
**switch** [1] - 6:10
**sworn** [2] - 5:10, 69:15
**SWP** [1] - 183:11
**symbol** [2] - 145:19, 175:18
**system** [1] - 67:4

**T**

**taint** [1] - 13:14
**takeover** [1] - 148:2
**talent** [4] - 42:15, 122:2, 176:8, 176:15
**talks** [2] - 76:11, 138:4
**Taranda** [4] - 171:7, 171:9, 171:25
**target** [4] - 121:12, 121:13, 121:14, 190:5
**targets** [3] - 51:18, 52:16, 121:14
**task** [1] - 38:3
**tasks** [1] - 46:18
**team** [18] - 4:9, 31:20, 31:22, 31:23, 33:15, 37:25, 38:17, 64:16, 80:22, 108:23, 110:4, 183:6, 183:8, 184:19, 185:14, 188:10, 202:25, 206:16
**technical** [9] - 160:1, 160:11, 160:13, 160:17, 160:18, 161:11, 162:22, 163:15, 163:20
**technologies** [4] - 43:6, 43:23, 43:25, 146:14
**technology** [5] - 159:8, 186:14, 186:16, 186:19, 186:22
**template** [2] - 64:20, 137:10
**ten** [19] - 47:19, 72:20, 72:21, 110:21, 113:9, 113:10, 122:22, 123:15, 123:25, 124:8, 138:5, 138:11, 143:17, 153:14, 153:22, 153:24, 165:25, 182:24, 182:25
**ten-plus** [1] - 138:5
**tended** [1] - 46:24
**tenured** [1] - 101:25
**term** [4] - 24:1, 79:5, 79:8, 161:21
**terms** [13] - 7:1, 7:2, 9:3, 23:21, 23:22, 25:14, 31:7, 45:3, 45:4, 48:24, 90:2, 104:11
**test** [3] - 11:23, 12:16, 12:17
**testified** [20] - 15:23, 15:25, 29:11, 37:14, 55:8, 64:5, 89:22, 117:25, 124:4, 130:4, 130:22, 138:24, 139:5, 139:8, 159:23, 160:12, 169:19, 174:5, 182:2, 196:22
**testify** [12] - 10:5, 10:16, 10:17, 12:22, 17:5, 18:8, 57:8, 59:18, 67:10, 70:10, 82:21, 119:25
**testifying** [3] - 11:4, 12:10, 70:24
**testimony** [32] - 6:1, 12:1, 12:3, 13:25, 14:8, 14:20, 14:22, 15:19, 15:21, 15:22, 16:1, 16:23, 17:3, 18:12, 37:19, 55:1, 69:15, 70:22, 77:14, 79:11, 93:23, 107:9, 111:7, 115:14, 118:24, 133:10, 133:13, 139:18, 152:2, 191:15, 200:12, 203:4
**Text** [1] - 3:14
**text** [3] - 77:24, 78:15, 186:24
**THE** [185] - 1:1, 1:1, 1:13, 1:17, 1:19, 5:4, 5:8, 5:10, 5:12, 5:13, 5:17, 8:7, 8:16, 8:23, 8:24, 10:12, 11:5, 11:12, 11:15, 12:9, 13:10, 13:14, 13:16, 17:20, 17:23, 18:7, 18:19, 18:24, 20:6, 20:25, 21:4, 21:8, 24:14, 24:17, 29:25, 30:3, 30:6, 31:13, 32:9, 32:25, 33:1, 33:4, 37:17, 41:11, 41:14, 45:20, 47:25, 48:2, 50:23, 54:22, 55:9, 55:25, 56:12, 56:17, 56:23, 57:2, 57:8, 58:13, 59:12, 59:15, 59:18, 60:1, 60:8, 61:8, 61:18, 61:21, 63:6, 64:2, 65:7, 65:9, 66:2, 67:10, 67:16, 68:6, 68:9, 68:23, 69:8, 70:21, 71:1, 71:11, 71:18, 71:20, 72:5, 72:7, 73:16, 73:18, 76:2, 76:4, 76:24, 77:3, 77:18, 77:20, 79:7, 79:16, 82:3, 82:7, 82:22, 83:2, 85:15, 85:16, 85:17, 87:14, 87:16, 88:5, 88:8, 88:11, 90:25, 91:17, 93:13, 95:25, 98:10, 99:11, 99:15, 99:18, 99:21, 99:24, 100:1, 105:10, 105:20, 106:7, 106:11, 106:18, 107:3, 107:6, 107:14, 107:15, 107:17, 107:18, 107:22, 107:25, 110:8, 111:5, 111:11, 116:12, 116:14, 116:16, 117:15, 117:18, 118:10, 118:14, 119:25, 120:1, 125:13, 125:15, 128:18, 131:8, 131:13, 131:18, 131:22, 132:4, 132:21, 133:5, 133:14, 133:21, 136:12, 136:16, 138:17, 144:12, 144:15, 147:12, 147:15, 150:12, 156:2, 160:24, 165:18, 165:22, 166:10, 167:24, 168:8, 168:15, 168:21, 169:3, 169:8, 170:19, 172:13, 172:17, 172:23, 190:14, 190:17, 197:8, 198:18, 203:18, 207:6, 207:8, 207:20
**theirs** [1] - 70:20
**themselves** [1] - 17:7
**therefore** [7] - 10:6, 14:16, 22:18, 70:14, 117:2, 148:3, 198:1
**theTX-606** [4] - 142:6, 163:10, 163:11, 163:13
**thinking** [1] - 38:14
**thinks** [1] - 19:19
**third** [8] - 8:21, 17:11, 41:17, 51:3, 93:3, 113:5, 118:22, 190:22
**thirds** [1] - 175:7
**thirty** [3] - 110:16, 110:17, 110:20
**thorough** [1] - 13:18
**three** [86] - 11:21, 16:21, 26:19, 28:8, 28:10, 28:15, 29:8, 45:17, 46:3, 46:9, 46:10, 46:20, 51:16, 52:3, 53:25, 57:19, 57:22, 59:5, 61:3, 62:12, 62:14, 62:15, 62:17, 62:20, 62:23, 63:2, 63:3, 63:10, 63:12, 63:14, 63:18, 65:18, 66:12, 66:13, 66:16, 66:22, 66:24, 66:25, 67:3, 67:5, 67:25, 68:4, 68:23, 69:3, 69:5, 69:20, 69:21, 69:22, 69:24, 70:16, 72:1, 76:19, 108:14, 113:2, 114:12, 114:25, 115:6, 134:23, 134:24, 134:25, 135:5, 137:1, 139:7, 141:1, 141:4, 141:8, 141:18, 141:22, 141:25, 143:21, 146:19, 149:23, 151:16, 152:13, 152:20, 157:10, 157:18, 164:4, 170:16, 177:10, 193:13, 193:14, 193:24, 195:18
**threes** [5] - 60:19, 63:4, 63:13, 142:6, 152:15
**throughout** [7] - 7:8, 7:9, 7:15, 8:21, 68:18, 94:18, 103:16
**throw** [2] - 108:20, 202:23
**tie** [1] - 36:5
**ties** [1] - 16:25
**timing** [1] - 31:12
**TIMOTHY** [1] - 1:13

**title** [6] - 33:9, 46:2, 46:5, 47:6, 119:6, 119:10
**titled** [1] - 156:6
**titles** [1] - 46:1
**today** [6] - 93:19, 104:25, 173:4, 186:2, 199:13, 207:9
**together** [4] - 103:5, 182:4, 203:13, 204:14
**toll** [2] - 108:18, 108:19
**tomorrow** [3] - 146:25, 169:2, 169:5
**tonight** [1] - 168:6
**took** [10] - 102:1, 108:18, 109:8, 119:12, 133:25, 140:5, 169:24, 188:5, 206:2
**tool** [1] - 92:17
**top** [19] - 27:21, 33:24, 35:24, 74:5, 74:17, 79:24, 98:7, 113:13, 120:21, 137:19, 146:21, 157:3, 164:5, 173:9, 173:11, 173:12, 187:17, 194:25, 200:21
**topic** [4] - 17:9, 45:9, 88:15, 189:6
**topics** [6] - 4:8, 33:24, 86:5, 87:7, 180:19, 182:25
**toTX-6065** [1] - 28:24
**toTX-61** [1] - 29:9
**touched** [1] - 28:3
**track** [1] - 121:14
**trade** [1] - 176:10
**traffic** [1] - 207:13
**trained** [1] - 184:10
**training** [5] - 89:4, 89:5, 121:24, 122:1, 184:16
**trainings** [1] - 89:7
**transaction** [1] - 13:1
**transcript** [7] - 15:3, 132:1, 132:10, 132:12, 132:14, 167:4, 208:5
**TRANSCRIPT** [1] - 208:1
**TRANSCRIPTION** [1] - 2:9
**transfer** [1] - 36:23
**transition** [2] - 71:24, 103:1
**translate** [1] - 186:21
**translated** [1] - 92:15
**translation** [1] - 92:17
**Trauth** [14] - 31:1, 31:2, 32:13, 36:12, 37:6, 38:12, 38:25, 39:17, 39:22, 120:5, 120:9, 130:8, 130:14, 154:12
**travel** [1] - 185:10
**travels** [1] - 207:13
**treat** [1] - 63:14
**treated** [10] - 61:25, 62:10, 68:18, 69:5, 69:24, 142:22, 142:23, 143:1, 143:10, 143:13
**treating** [1] - 75:20
**treatment** [2] - 102:9, 102:13
**TRIAL** [1] - 1:14
**trial** [25] - 5:3, 5:16, 11:11, 14:5, 15:5, 15:9, 21:7, 61:20, 68:11, 68:12, 69:22, 71:10, 82:9, 82:10, 98:13, 98:14, 106:9, 106:10, 111:4, 166:9, 166:17, 166:18, 166:20, 169:7, 207:19
**tried** [2] - 110:1, 110:5
**Trigg** [1] - 194:4
**trip** [1] - 5:18
**true** [7] - 12:19, 68:17, 68:22, 68:25, 69:23, 186:21, 201:3
**trust** [1] - 108:11
**truth** [1] - 18:5
**truthful** [2] - 20:1, 20:3
**try** [7] - 100:23, 110:15, 110:20, 168:10, 169:16, 202:10, 207:11
**trying** [14] - 13:8, 29:7, 56:23, 70:17, 71:9, 108:21, 108:24, 109:5, 143:2, 146:18, 153:13, 167:3, 167:21, 169:13
**TS** [18] - 30:19, 33:13, 33:15, 34:2, 34:16, 35:17, 35:22, 36:2, 36:6, 36:9, 37:15, 37:24, 37:25, 38:5, 38:16, 39:2, 39:3, 40:5
**turn** [4] - 48:16, 69:9, 135:15, 203:23
**turned** [2] - 171:5, 171:6
**turning** [1] - 140:18
**TV** [3] - 110:24, 110:25, 195:14
**twelve** [1] - 72:5
**Twelve** [1] - 138:17
**twenty** [1] - 131:16
**twenty-eight** [1] - 131:16
**twice** [1] - 40:7
**Two** [1] - 156:13
**two** [53] - 22:2, 23:21, 28:2, 33:20, 35:14, 35:15, 38:1, 39:12, 50:20, 53:24, 57:18, 60:18, 60:20, 60:22, 62:19, 63:4, 76:23, 82:11, 106:24, 109:21, 116:4, 116:21, 130:15, 140:18, 142:6, 153:1, 153:16, 153:23, 154:2, 154:5, 155:5, 155:8, 155:20, 156:17, 156:23, 157:24, 158:5, 158:6, 162:9, 164:17, 165:15, 166:17, 174:8, 175:7, 180:11, 180:19, 195:18, 197:21, 198:10, 198:11, 201:14, 201:15, 205:22
**two-thirds** [1] - 175:7
**two-week** [1] - 197:21
**twos** [2] - 37:11, 113:9
**TX** [2] - 179:22, 204:6
**TX-2** [1] - 158:1
**TX-4** [1] - 157:7
**TX-6** [7] - 3:9, 4:10, 4:11, 45:6, 158:11, 185:25, 196:18
**TX-60** [52] - 3:9, 4:4, 4:11, 23:17, 25:10, 25:11, 26:8, 26:25, 27:7, 29:6, 34:16, 39:18, 39:24, 40:18, 40:24, 47:8, 47:13, 48:14, 50:5, 53:12, 63:2, 75:13, 80:21, 86:3, 90:10, 90:17, 95:11, 104:16, 105:3, 111:22, 113:21, 120:22, 122:4, 123:3, 126:1, 136:10, 137:4, 141:21, 145:13, 158:21, 159:19, 160:14, 161:16, 171:3, 172:6, 180:5, 184:19, 185:14, 185:16, 191:7, 199:2
**TX-61** [21] - 4:5, 23:18, 26:20, 26:22, 26:24, 27:5, 42:22, 62:12, 63:15, 65:14, 65:16, 66:20, 71:25, 72:11, 139:3, 139:7, 139:19, 140:2, 140:8, 142:2, 164:12
**TX-62** [2] - 119:19, 119:22
**TX-64** [48] - 4:6, 4:7, 23:19, 28:6, 28:7, 28:8, 28:14, 28:16, 42:22, 45:10, 45:12, 47:8, 48:8, 48:12, 54:18, 55:15, 55:17, 62:4, 62:7, 62:9, 63:3, 63:17, 66:7, 66:13, 66:14, 66:24, 67:4, 67:23, 68:16, 85:5, 90:2, 91:10, 93:7, 95:15, 105:4, 105:14, 106:3, 114:10, 114:22, 114:25, 141:17, 141:24, 164:2, 185:21, 192:1, 193:9, 196:7, 206:17
**TX-65** [1] - 178:24
**TX-66** [1] - 7:4
**TX-7** [1] - 44:24
**type** [8] - 47:1, 87:20, 107:10, 121:12, 129:5, 161:20, 161:23, 199:9
**typically** [3] - 46:13, 46:22, 133:17
**Tzouvelekas** [1] - 157:16

## U

**U.K** [1] - 179:9
**U.S** [3] - 35:21, 52:2, 86:4
**UK** [2] - 178:4
**ultimately** [5] - 89:9, 89:11, 96:15, 97:19, 182:14
**uncomfortable** [1] - 94:24
**under** [22] - 5:11, 10:25, 12:7, 12:16, 14:1, 14:17, 15:12, 16:6, 18:4, 34:2, 53:14, 54:16, 55:19, 57:25, 76:14, 77:6, 88:25, 121:17, 132:8, 132:16, 179:22, 191:7
**underfoot** [1] - 6:16
**undermined** [1] - 108:10
**understood** [1] - 149:7
**uneventful** [1] - 5:18
**unfairly** [1] - 15:14
**ungraded** [1] - 70:14
**unique** [1] - 102:2
**uniquely** [1] - 177:6
**UNITED** [3] - 1:1, 1:14, 2:6
**United** [8] - 37:3, 40:13, 152:23, 174:25, 176:13, 177:7, 179:10, 197:20
**unknown** [1] - 8:11
**unless** [3] - 39:6, 152:16, 156:22
**unsealed** [1] - 132:2
**untruthful** [1] - 20:3
**up** [68] - 5:9, 5:19, 5:21, 5:23, 5:24, 11:6, 15:22, 20:11, 20:18, 22:22, 25:1, 37:18, 43:10, 45:16, 45:18, 60:14, 61:5, 61:12, 66:16, 68:13, 68:15, 70:5, 70:6, 71:5, 71:8, 82:23, 93:22, 96:15, 102:4, 103:23, 104:6, 104:23, 105:11, 108:15, 108:20, 110:23, 119:18, 120:20, 122:6, 123:13, 124:6, 126:21, 127:16, 143:12, 145:1, 145:14, 155:24, 157:17, 163:21, 164:5, 165:6, 165:24, 168:6, 170:14, 184:19, 191:9, 196:25, 199:23, 200:3, 200:6, 201:17, 204:20, 205:3, 206:10, 206:16, 207:11
**update** [1] - 139:18
**updated** [5] - 139:13, 139:14, 139:15, 139:20, 139:21
**upgrade** [1] - 4:17
**uphold** [1] - 143:3
**upper** [1] - 25:1
**upset** [4] - 20:23, 53:5, 53:11, 109:25

**urge** [1] - 101:5

V

**vacancy** [1] - 28:17
**vacation** [2] - 83:23, 84:5
**validate** [1] - 202:20
**validated** [9] - 152:15, 156:16, 156:22, 157:4, 158:4, 164:16, 164:24, 165:14, 205:22
**validation** [8] - 152:12, 152:13, 152:23, 154:1, 155:17, 157:17, 177:13, 177:24
**value** [1] - 76:18
**valued** [1] - 200:9
**varied** [1] - 125:1
**vary** [1] - 83:19
**vehicle** [2] - 49:5, 54:8
**vehicles** [6] - 124:4, 124:9, 161:17, 162:3, 162:9, 175:7
**verification** [1] - 74:22
**verse** [1] - 69:7
**VERSUS** [1] - 1:5
**via** [1] - 166:23
**Vice** [29] - 6:20, 9:20, 17:17, 22:5, 22:7, 22:12, 22:18, 22:19, 23:11, 23:13, 31:3, 32:3, 35:16, 36:16, 38:11, 38:12, 38:25, 39:13, 39:16, 39:22, 40:4, 100:25, 101:8, 101:22, 101:24, 104:10, 185:17, 192:11
**viewed** [1] - 159:8
**visible** [1] - 154:25
**void** [1] - 189:16
**VOLUME** [1] - 1:15
**Vorhalt** [2] - 172:11, 172:14
**VP** [13] - 7:19, 130:12, 154:11, 165:10, 165:14, 170:10, 192:22, 193:7, 201:23, 202:3, 202:6, 205:16, 205:21

W

**wait** [1] - 149:2
**walk** [2] - 33:8, 110:14
**walked** [1] - 129:15
**wall** [1] - 167:22
**walls** [1] - 167:24
**wants** [4] - 19:14, 69:12, 69:17, 146:5
**Warner** [3] - 192:6, 192:9, 193:6
**wasTX-606** [1] - 183:24
**watch** [4] - 110:24, 157:6, 164:24, 192:11
**water** [1] - 18:9
**ways)** [1] - 176:11
**Wednesday** [2] - 3:9, 168:10
**week** [6] - 8:22, 197:21, 198:10, 199:25, 200:2, 201:13
**weeks** [4] - 109:4, 162:9, 198:10, 198:11
**welcome** [1] - 111:12
**WERKE** [2] - 1:6, 1:20
**what/who** [1] - 25:15
**whereas** [1] - 151:21
**WHITSETT** [1] - 1:18
**whole** [4] - 42:10, 85:1, 163:24, 194:18
**wish** [1] - 207:13
**withdraw** [3] - 99:8, 99:17, 99:18
**withdrawn** [1] - 99:25
**witness** [13] - 5:9, 8:7, 12:10, 12:20, 13:9, 14:3, 18:7, 20:2, 20:23, 20:25, 70:10, 77:7, 77:10
**WITNESS** [6] - 5:12, 8:24, 85:16, 107:14, 107:17, 120:1
**witnesses** [6] - 13:6, 19:4, 132:8, 166:22, 166:23, 167:7
**wonder** [1] - 106:18
**wonderful** [1] - 19:20
**Woodcliff** [1] - 160:8
**word** [10] - 19:5, 19:6, 19:7, 19:19, 43:23, 43:24, 76:23, 81:17, 133:16
**words** [10] - 19:5, 19:9, 19:12, 20:5, 50:8, 77:8, 78:4, 80:15, 186:25
**work-life** [1] - 97:16
**worker** [3] - 16:7
**Workforce** [1] - 180:4
**workforce** [1] - 180:5
**works** [1] - 46:17
**workshop** [4] - 33:16, 34:3, 38:2
**world** [3] - 35:9, 175:10, 175:22
**worldwide** [1] - 173:10
**worried** [2] - 106:11, 106:12
**worry** [2] - 110:22, 140:20
**wrap** [1] - 104:23
**write** [4] - 25:25, 28:19, 78:3, 163:18
**writing** [1] - 196:25
**written** [5] - 100:20, 128:2, 132:10, 132:12, 137:7
**wrote** [8] - 25:8, 26:1, 27:17, 28:13, 28:14, 43:1, 78:6, 203:7

Y

**y'all** [3] - 107:4, 107:18, 168:21
**year** [16] - 57:22, 58:5, 108:16, 109:8, 115:11, 115:16, 116:5, 120:12, 120:16, 128:12, 130:4, 130:6, 130:16, 154:15, 192:16, 202:7
**years** [27] - 12:23, 13:5, 18:16, 28:2, 34:8, 47:19, 57:22, 92:16, 103:17, 108:8, 108:9, 108:13, 118:4, 120:15, 122:23, 123:15, 130:24, 138:5, 138:7, 138:11, 142:14, 159:14, 159:17, 161:1, 163:4, 195:18
**yellow** [1] - 34:25
**yesterday** [27] - 5:10, 6:8, 6:24, 7:2, 16:24, 25:15, 28:4, 40:22, 44:8, 45:15, 47:10, 48:17, 49:4, 49:11, 60:12, 62:16, 63:24, 64:5, 65:3, 76:7, 103:13, 104:24, 115:15, 118:23, 152:12, 160:12, 173:4
**yourself** [4] - 26:16, 154:4, 165:1, 185:11

Z

**z3** [1] - 162:11
**zA** [1] - 178:2
**Zipse** [1] - 183:17