No. 26-1793

# In the United States Court of Appeals for the Fourth Circuit

KELLY DAWSEY,

*Plaintiff-Appellee*,

v.

BMW MANUFACTURING CO., LLC,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of South Carolina

**JOINT APPENDIX**
**VOLUME IV OF VI**

Charles E. Johnson
Brendan P. Biffany
Aryana Ainolhayat
ROBINSON, BRADSHAW & HINSON, P.A.
600 South Tryon Street
Suite 2300
Charlotte, North Carolina 28202
704.377.2536

*Counsel for Defendant-Appellant BMW Manufacturing Co., LLC*

Brian P. Murphy
STEPHENSON AND MURPHY, LLC
207 Whitsett Street
Greenville, South Carolina 29601
864.370.9400

*Counsel for Plaintiff-Appellee Kelly Dawsey*

# TABLE OF CONTENTS

**Page**


**Volume I**

Judgment (DE 217) .......... JA1

Amended Judgment (DE 236) .......... JA2

Order Awarding Backpay (DE 238) .......... JA3

Second Amended Judgment (DE 239) .......... JA22

May 13, 2026 Post-Trial Motion Hearing Transcript (DE 272) .......... JA23

**Volume II**

District Court Docket Sheet .......... JA112

Plaintiff's Amended Complaint (DE 20) .......... JA142

BMW MC's Answer to Amended Complaint (DE 40) .......... JA158

BMW AG's Answer to Amended Complaint (DE 96) .......... JA171

Report of Magistrate Judge (DE 113) .......... JA182

Order (DE 119) .......... JA200

February 12, 2026 Strikes for Cause Transcript (DE 246) .......... JA219

February 17, 2026 Trial Transcript, Volume I (DE 247) .......... JA247

Opening Statement by Counsel for Plaintiff .......... JA316

Opening Statement by Counsel for Defendant BMW MC .......... JA319

Opening Statement by Counsel for Defendant BMW AG .......... JA315

Kelly Dawsey, Direct Examination .......... JA334

February 18, 2026 Trial Transcript, Volume II (DE 248) .......... JA452

Kelly Dawsey, Direct Examination (cont'd) .......... JA457

Kelly Dawsey, Cross Examination
by Counsel for Defendant BMW MC ....................................JA562

**Volume III**

February 19, 2026 Trial Transcript, Volume III (DE 249).............JA684

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC (cont'd) ..........................................................JA688

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW AG.................................................................JA754

Robert Englehorn, Direct Examination by Counsel for Defendant BMW MC ........................................................JA797

Robert Englehorn, Cross Examination by Counsel for Defendant BMW AG ........................................................JA851

Robert Englehorn, Cross Examination by Counsel for Plaintiff...................................................................JA859

Robert Englehorn, Redirect Examination by Counsel for Defendant BMW MC........................................................JA906

Robert Englehorn, Recross Examination by Counsel for Plaintiff...................................................................JA910

February 20, 2026 Trial Transcript, Volume IV (DE 250).............JA942

Christine Petrasch, Direct Examination by Counsel for Defendant BMW MC ......................................................JA946

Christine Petrasch, Cross Examination by Counsel for Defendant BMW AG .....................................................JA1032

Christine Petrasch, Cross Examination by Counsel for Plaintiff................................................................JA1056

Christine Petrasch, Redirect Examination by Counsel for Defendant BMW MC.....................................................JA1133

Christine Petrasch, Recross Examination by Counsel for Defendant BMW AG ....................JA1138

**Volume IV**

February 23, 2026 Trial Transcript, Volume V (DE 251) ............JA1164

Corey Epps, Direct Examination by Counsel for Defendant BMW MC ....................JA1169

Corey Epps, Cross Examination by Counsel for Defendant BMW AG....................JA1194

Corey Epps, Cross Examination by Counsel for Plaintiff ....JA1198

Corey Epps, Redirect Examination by Counsel for Defendant BMW MC ....................JA1210

Corey Epps, Recross Examination by Counsel for Defendant BMW AG ....................JA1211

Sherill Miller, Direct Examination by Counsel for Defendant BMW MC ....................JA1276

Sherill Miller, Cross Examination by Counsel for Plaintiff....................JA1297

Sherry McCraw, Direct Examination by Counsel for Defendant BMW MC....................JA1304

Sherry McCraw, Cross Examination by Counsel for Defendant BMW AG ....................JA1383

Sherry McCraw, Cross Examination by Counsel for Plaintiff ....................JA1384

Sherry McCraw, Redirect Examination by Counsel for Defendant BMW MC ....................JA1419

February 24, 2026 Trial Transcript, Volume VI (DE 252) ............JA1460

Clarence Edward Bailey, II, Examination by Deposition Testimony ..........................................................................JA1465

Neal Gilmore, Examination by Deposition Testimony.........JA1478

Eva Burgmeier, Examination by Deposition Testimony......JA1484

Charge Conference ..........................................................JA1622

**Volume V**

February 25, 2026 Trial Transcript, Volume VII (DE 253) ..........JA1666

Charge Conference (cont'd) ................................................JA1669

Closing Argument by Counsel for Plaintiff ..........................JA1678

Closing Argument by Counsel for Defendant BMW MC......JA1723

Closing Argument by Counsel for Defendant BMW AG ......JA1766

Rebuttal Closing Argument by Counsel for Plaintiff ...........JA1788

Jury Charge..........................................................................JA1794

Verdict ..................................................................................JA1830

Jury Polled...........................................................................JA1832

Verdict Form (DE 216) ...........................................................JA1862

March 13, 2026 Post-Trial Damages Hearing Transcript (DE 254).................................................................................JA1868

Kelly Dawsey, Direct Examination .....................................JA1874

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC ...........................................................JA1855

Kelly Dawsey, Redirect Examination..................................JA1904

John E. Gibson, Jr., Direct Examination by Counsel for

Plaintiff....JA1909

John E. Gibson, Jr., Cross Examination by Counsel for Defendant BMW MC....JA1926

John E. Gibson, Jr., Redirect Examination by Counsel for Plaintiff....JA1983

Closing Statement by Counsel for Defendant BMW MC....JA1989

Closing Statement by Counsel for Plaintiff....JA2003

Consent Motion to Amend/Correct Judgment (DE 231)....JA2031

Order Granting Consent Motion to Amend/Correct Judgment (DE 235)....JA2034

Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial (DE 237)....JA2036

Joint Proposed Jury Charges (DE 240-1)....JA2059

Notice of Appeal (DE 265)....JA2062

Amended Notice of Appeal (DE 275)....JA2064

**Vol VI**

Trial Exhibits

Plaintiff's Exhibit 1 (Plaintiff's Resume, Dec. 2021)....JA2066

Plaintiff's Exhibit 2 (Plant Spartanburg Organization Chart)....JA2069

Plaintiff's Exhibit 3 (Petrasch Jan. 10, 2022 email to HR network)....JA2070

Plaintiff's Exhibit 4 (Petrasch Dec. 3, 2021 email)....JA2074

Plaintiff's Exhibit 5 (TX-6 Organization Structure Development Step 2 – for April 2021)....JA2077

Plaintiff's Exhibit 6 (TX-6 and TX-60 Info-Share Documentation, Sept. 29, 2021) .......................................... JA2078

Plaintiff's Exhibit 7 (T-Vorhalt Request) ............................ JA2080

Plaintiff's Exhibit 8 (TX-60 Job Function Data Sheet, Rev. April 1, 2019) ........................................................ JA2081

Plaintiff's Exhibit 9 (TX-61 Job Function Data Sheet, Rev. March 1, 2020) ...................................................... JA2085

Plaintiff's Exhibit 10 (Exempt Organizational Structure, Aug. 2021) ............................................................ JA2088

Plaintiff's Exhibit 12 (Exempt Organizational Structure, Sept. 2021) ........................................................... JA2100

Plaintiff's Exhibit 14 (Plaintiff's Portfolio 2020) ................. JA2112

Plaintiff's Exhibit 15 (Plaintiff's Portfolio 2019) ................. JA2117

Plaintiff's Exhibit 16 (Plaintiff's Portfolio 2018) ................. JA2122

Plaintiff's Exhibit 17 (Expat Guidelines for Plant Spartanburg, Jan. 8, 2016) ............................................ JA2126

Plaintiff's Exhibit 18 (TX-6 Organizational Overview) ........ JA2141

Plaintiff's Exhibit 19 (Plaintiff's Compensation Change Statement, March 20, 2021) ............................................. JA2142

Plaintiff's Exhibit 20 (Overview on Reference Partner input during the promotion procedure, Oct. 2010) ....................... JA2143

Plaintiff's Exhibit 21 (Petrasch Text to Plaintiff, Oct. 1, 2021) ............................................................................ JA2144

Plaintiff's Exhibit 22 (International Grading FLIV Approval Committee TS Spartanburg) .......................................... JA2145

Plaintiff's Exhibit 24 (June 3, 2021 email from Plaintiff to Epps, Suber and Sanders attaching Project Misaligned PG Overview PowerPoint).......................................................JA2146

Plaintiff's Exhibit 25 (Jan. 1, 2021 email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian re: "as discussed" topics).............................................................JA2152

Plaintiff's Exhibit 26 (March 19, 2021 email from Petrasch to Belinski attaching 2021 Review TX-60 Org) ........................JA2154

Plaintiff's Exhibit 27 (April 8, 2021 email from Petrasch to Plaintiff re: draft job descriptions for VP HR and Manager of Recruiting)...............................................................JA2161

Plaintiff's Exhibit 28 (Email from Petrasch to Plaintiff re: HR Compact submittals)...................................................JA2163

Plaintiff's Exhibit 29 (TX-61 Job Function Data Sheet, rev. date Oct. 24, 2021)..........................................................JA2166

Plaintiff's Exhibit 31 (March 3, 2021 email from Petrasch to Plaintiff re: P&S TX-6).....................................................JA2169

Plaintiff's Exhibit 37 (Sept. 23, 2021 email from Petrasch to Koepnick and Burgmeier re: PE-TAG PE-Kreis) .................JA2170

Plaintiff's Exhibit 39 (Jan. 4, 2022 email from Petrasch to Hacker) ..................................................................JA2173

Plaintiff's Exhibit 41 (Jan. 5, 2022 email from Petrasch to Burghardt re: Plaintiff's resignation) ................................JA2174

Plaintiff's Exhibit 46 (TX-60 Job Function Data Sheet, Feb. 1, 2022) ..................................................................JA2175

Plaintiff's Exhibit 47 (HRIS Screenshots re Epps Employment) ...........................................................JA2179

Plaintiff's Exhibit 48 (Personnel Development Succession Planning, June 19, 2020) ..................................................JA2183

Plaintiff's Exhibit 49 (BMW Group Plant Spartanburg, Memo to Eddie Bailey re: Compensation Statement, April 19, 2023) ....................JA2185

Plaintiff's Exhibit 50 (BMW Group Plant Spartanburg, Memo to Neal Gilmore Compensation Statement, April 19, 2023) ....................JA2186

Plaintiff's Exhibit 52 (Portfolio 2022 – Eddie Bailey, March 2023)....................JA2187

Plaintiff's Exhibit 63 (April 21, 2021 Burgmeier email re: P-Circle) ....................JA2191

Defendant's Exhibit 1 (BMW MC Job Offer Letter, April 25, 1995) ....................JA2192

Defendant's Exhibit 2 (Morse & Savage copy of Plaintiff's Resume) ....................JA2194

Defendant's Exhibit 3 (BMW MC Implementation of Exempt Grading, Salary, Bonus and Benefits Structure Effective Aug. 2001)....................JA2197

Defendant's Exhibit 4 (Personnel Development/Succession Planning PowerPoint, June 2021) ....................JA2209

Defendant's Exhibit 5 (TX-6 Organizational Overview PowerPoint, Jan. 2022) ....................JA2221

Defendant's Exhibit 6 (Documents related to promotions, salary increases, and bonuses (2014-2021)) ....................JA2226

Defendant's Exhibit 7 (HR Records re: Plaintiff's Position/Pay History) ....................JA2236

Defendant's Exhibit 9 (HR Records on Scott Medley Position/Pay History, 2007 – 2025)....................JA2240

Defendant's Exhibit 10 (July 19, 2021 Email from Petrasch to Koepnick re: Succession)....................JA2242

Defendant's Exhibit 11 (TX-60 Job Function Data Sheet, Feb. 1, 2022) ........JA2244

Defendant's Exhibit 12 (TX-61 Job Function Data Sheet, Oct. 24, 2021 ........JA2252

Defendant's Exhibit 13 (TX-64 Job Function Data Sheet, May 1, 2019) ........JA2261

Defendant's Exhibit 14 (June 3, 2021 Email from Plaintiff to Epps re: "Project Misaligned" PowerPoint) ........JA2265

Defendant's Exhibit 15 (Jan. 21, 2021 Email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian with Topics for Network to HR Team)........JA2271

Defendant's Exhibit 16 (Substructure HR Plant Spartanburg, TX-6, Nov. 2019)........JA2273

Defendant's Exhibit 17 (Sherry McCraw BMW MC Position History)........JA2277

Defendant's Exhibit 18 (Sept 23, 2021 Email from Petrasch to Englehorn attaching PowerPoint for PE Tax TX-6 Presentation)........JA2278

Defendant's Exhibit 19 (TX-6 and TX-60 Info-Share Documents for Plaintiff and Petrasch with Handwritten Notes, Sept. 29, 2021)........JA2280

Defendant's Exhibit 20 (Oct. 1, 2021 Email from Petrasch to Koepnick with Org. Chart)........JA2284

Defendant's Exhibit 21 (Sept. 23, 2021 Email from Petrasch to Sanders re: Epps' Promotion) ........JA2288

Defendant's Exhibit 22 (Oct. 1, 2021 Email from Petrasch to McCraw re: Upgrading Epps to G11) ........JA2290

Defendant's Exhibit 23 (TX-6 - HR Workshop VI / Management Workshop Agenda, Nov. 11, 2021) ........JA2291

Defendant's Exhibit 24 (TX-6 Reorganization PowerPoint, Aug. 2019)....................JA2293

Defendant's Exhibit 25 (Dec. 10, 2021 Email from Petrasch to HR Team re: Meeting on TX-6 Organization)....................JA2308

Defendant's Exhibit 26 (Dec. 13, 2021 Email from Petrasch to Plaintiff and Medley attaching TX-6 PowerPoint)....................JA2309

Defendant's Exhibit 27 (Documents Produced by Miller in response to Subpoena issued to Morse & Savage)....................JA2323

Defendant's Exhibit 28 (Morse & Savage Consultant Agreement signed by Plaintiff, Sept. 2021)....................JA2354

Defendant's Exhibit 29 (Plaintiff's Check to Morse & Savage, Sept. 16, 2021)....................JA2355

Defendant's Exhibit 30 (Madewell Concrete Offer Letter to Plaintiff, Dec. 10, 2021)....................JA2356

Defendant's Exhibit 31 (Dec. 9, 2021 Email from Petrasch to all HR Team re: TX-6 Circle)....................JA2370

Defendant's Exhibit 32 (Plaintiff's Notes, Sept. 27, 2021)...JA2371

Defendant's Exhibit 33 (Jan. 3, 2022 Email from Petrasch to McCraw attaching Plaintiff's Resignation Notice)....................JA2372

Defendant's Exhibit 34 (Plaintiff's Resignation letter, Jan. 3, 2022)....................JA2374

Defendant's Exhibit 36 (GSP International Airport Offer of Employment, July 1, 2022)....................JA2375

Economic Damages Hearing Exhibits

Plaintiff's Exhibit 53 (BMW Salary History)....................JA2377

Plaintiff's Exhibit 54 (BMW RSA Statement)....................JA2379

Plaintiff's Exhibit 55 (Summary Page Regarding Retirement Contributions....................JA2380

Plaintiff's Exhibit 56 (Madewell 2022 W-2)....................JA2381

Plaintiff's Exhibit 57 (GSP Annual Compensation Statements) ....................JA2382

Plaintiff's Exhibit 58 (2022 GSP W-2) ....................JA2390

Plaintiff's Exhibit 59 (2023 GSP W-2) ....................JA2391

Plaintiff's Exhibit 60 (2024 GSP W-2) ....................JA2392

Plaintiff's Exhibit 61 (2025 GSP W-2) ....................JA2393

Plaintiff's Exhibit 62 (Dec. 22, 2025 Expert Report of John E. Gibson)....................JA2398

Defendant's Exhibit 38 (Jan. 18, 2023 Expert Report of John E. Gibson) ....................JA2413

Defendant's Exhibit 39 (Oct. 31, 2025 Expert Report of John E. Gibson) ....................JA2427

Defendant's Exhibit 40 (Dec. 1, 2025 Expert Report of John E. Gibson) ....................JA2441

Defendant's Exhibit 41 (Dec. 22, 2025 Expert Report of John E. Gibson) ....................JA2456

Defendant's Exhibit 42 (Nov. 20, 2025 Expert Rebuttal Report of Nicholas R. Harris)....................JA2471

Defendant's Exhibit 55 (Plaintiff BMW MC Earning Statement 2019-2022) ....................JA2501

20142541

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KELLY DAWSEY, PLAINTIFF, | ) | CA. NO. 7:22-CV-3738 GREENVILLE, SC FEBRUARY 23, 2026 |
| VERSUS | ) | |
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP, | ) | |
| BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP | ) | |
| DEFENDANTS. | ) | |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
JURY TRIAL
VOLUME V

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT: KURT ROZELSKY, ESQ.
SPENCER FANE LLP
P O BOX 294
GREENVILLE, SC 29602

APPEARANCES CONTINUED

BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

INDEX

COREY EPPS
Direct exam by Mr. McCoy 6
Cross exam by Mr. Rozelsky 31
Cross exam by Mr. Murphy 35
Redirect exam by Mr. McCoy 47
Recross exam by Mr. Rozelsky 48
SHERILL MILLER
Direct exam by Mr. McCoy 113
Cross exam by Mr. Murphy 134
SHERRY MCCRAW
Direct exam by Mr. Moody 141
Cross exam by Mr. Rozelsky 220
Cross exam by Mr. Murphy 221
Redirect exam by Mr. Moody 256

INDEX

EXHIBITS

PLAINTIFF

9 TX-61 JFDS Rev 4/1/2019 221
47 HRMIS screenshot re Epps employment 44

DEFENSE

9 Scott Medley BMW MC Position/Pay history 212
17 Sherry McCraw BMW MC Position History 149

INDEX CONTINUED

COURTS

EXHIBITS

1 Deposition excerpts for directed verdict
And exhibit cross reference 73

(Whereupon, the proceedings commenced at 9:30 a.m.)

THE COURT: Please bring in the jury.

(Whereupon, the following was heard in the presence of trial jury.)

THE COURT: Welcome back, members of the jury. I hope you had a good weekend and we are now ready to resume testimony. Before we do that, it may be necessary for us to work a little later on some of these days so that we can make sure that we finish by Wednesday. It is not that we are trying to rush anything, this is an important case to all parties, but we represented to you that we would finish on Wednesday, so the lawyers have been working together to streamline things, but I just wanted to give you some notice of that that we may work past five. I am reluctant to go too much later than that because I know some of you are travelling a good ways to get here, but if that is going to pose some hardship or inconvenience on anyone, you can let the Clerk know and she will let me know or we can have a conversation about it.

So, with that, I will be glad to hear from the defense.

MR. MCCOY: Thank you, Your Honor. The Defendant BMW MC calls Mr. Corey Epps to the stand.

THE COURT: Mr. Epps, come forward to the front

right here and be sworn.

THE CLERK: Please raise your right hand.

COREY EPPS, having been first duly sworn, testified as follows:

THE CLERK: If you will take a seat at the witness stand.

THE COURT: You can have a seat right up here in the witness box, sir.

DIRECT EXAM

By MR. MCCOY:

Q. Good morning.
A. Morning.
Q. Could you please state your name for the record?
A. Corey Lamar Epps.
Q. Do you mind if I call you Corey?
A. No, I don't.
Q. Corey, where are you currently employed?
A. Scout Motors, Columbia, South Carolina.
Q. What is your position at Scout Motors?
A. I am the HR Director Production.
Q. How long have you been with Scout Motors?
A. About two-and-a-half years, close to three years, almost.
Q. And prior to working at Scout, where were you employed?

A. BMW in Greer.
Q. When did you leave -- and that is BMW Manufacturing?
A. Manufacturing, yes, sir.
Q. When did you leave BMW Manufacturing?
A. 2023, June or July.
Q. And, Corey, can you please tell the jury why you decided to leave BMW Manufacturing in the summer of '23?
A. It was a lot of different things. The main thing was I live in Chapin, I drove from Chapin to BMW for 23 years, and, you know, it starts to affect a lot of things that you are doing, and it was just -- I felt like it was time for a change.
Q. Mr. Epps, can you please tell the jury about your educational background?
A. I went to the University of South Carolina, Darla Moore School of Business. My degree is in Management with HR Foundational as a second.
Q. HR -- you said HR Foundational as a second?
A. Well, HR, you have your main duty, your main degree, which is management, and then the secondary degree tagged on it automatically, in those times, that was a little while ago. So, it was just a little bit different, but it was the HR was my second -- well, my degree. So, it is HR Human Resources Leadership or

something like that, but it is HR.
Q. But you took classes in Human Resources?
A. Yeah, my last two years were all HR.
Q. Yeah. All right. Mr. Epps, when were you hired by BMW Manufacturing?
A. Two thousand (2000).
Q. When you were hired by BMW Manufacturing, what position were you hired into?
A. I was hired as a supervisor, they called it staff back then, but I was hired as a supervisor in production.
Q. Was that a supervisor in Human Resources?
A. No, it was in production. I started in production.
Q. Production meaning out on the production line?
A. Out on the production line. I was in the assembly area.
Q. How long did you remain a supervisor in the production area?
A. Eight years.
Q. Did you change jobs during that eight years?
A. Changed jobs inside of production?
Q. Yes.
A. No, I was a supervisor for those first eight years.

Q. So, after those eight years of production supervisor, where did you go next?
A. I went to HR. I went to HR Specialist, night shift. I was a supervisor on A shift, but I went to HR as a Specialist on night shift, B shift.
Q. Did you say A shift, just to make sure it is clear.
A. It was B shift.
Q. You were a supervisor on A shift?
A. I was a supervisor on A, I went to HR on night shift. B shift they call it at BMW.
Q. When you went to Human Resources in 2008 -- is that the right year?
A. 2008.
Q. Do you recall what your title was?
A. HR Specialist.
Q. And how long did you remain an HR Specialist?
A. I think three or four years.
Q. All right. After those three or four years, where did you go next?
A. I went back into production, back on night shift. So, I came up to first shift in HR, I was on first shift for about two years. I was on night shift for two years with HR, and then I went on day shift for two years in HR. And then I went to -- back to night shift

as a HR manager over Hall 52, ran all the operations on Hall 52 at night.
Q. Just to make sure we are clear, I think you said an HR manager when you went back to night shift, what position were you in?
A. No, I was a HR specialist, but when I went back to night shift, I was a production manager over night shift.
Q. And do you recall what your title was at that point in time?
A. Section Manager Hall 52, I think it was. I can't remember exactly the words.
Q. How long did you remain the Section Manager in Hall 52?
A. On night shift, I did it for two years, so 2014-ish, and then I went to Logistics Section Manager Hall 50, so I moved around a lot.
Q. So you moved into Logistics?
A. Yes, sir.
Q. You were a Section Manager in Logistics. How long did you stay in that role?
A. Two years.
Q. And after that, where did you go?
A. I went to HR -- back to HR as a Section Manager.
Q. And when you went back to HR as Section Manager,

what area were you in?
A. I was over the Associate Relations portion, it was the positive relations with the team members, policies, procedures, guidelines.
Q. And who are you reporting to when you went back to HR?
A. When I went back to HR, I was reporting to Scott Medley.
THE COURT: Who?
THE WITNESS: Scott Medley.
THE COURT: Scott Medley, okay.

DIRECT EXAM CONTINUED

BY MR. MCCOY:
Q. What was Mr. Medley's position at that time?
A. He was the Department Manager for HR Associate Relations.
Q. We have been talking about numbers, is that TX-61?
A. That is TX-61.
Q. And so you went back, as, you know, reporting to Mr. Medley. At some point in time did you change roles within the HR Department?
A. I did in 2019, 2019 I changed roles, there was a reorg. I was what BMW called validated candidate, I went into the role of Section Manager, direct report to the VP.

Q. And which position, if we talk about numbers, what was your position when you got promoted to a direct report?
A. TX-61.
Q. And so that was the position that Mr. Medley was in?
A. Yes, sir.
Q. Where did Mr. Medley go?
A. He went to TX-64.
Q. And, Mr. Epps, did you remain as TX-61 until you left BMW Manufacturing?
A. Yes, sir, I did.
Q. During your time at BMW Manufacturing working in the Human Resources Department, have you always worked in TX-61?
A. During my time -- say it again, I'm sorry.
Q. Yes, sir. During your time at BMW Manufacturing in the Human Resources Department, have you always been in the TX-61 Department?
A. Yes.
Q. Now, how many different positions have you held in the TX-61 Department?
A. Three total.
Q. Mr. Epps, when you moved into the TX-61 role, I believe you said that was 2019?

A. 2019.
Q. What was your personal grade?
A. Nine.
Q. And did you receive a promotion after that?
A. Not immediately. I received a promotion about a year later, September, October to a PG 10.
Q. September, October, do you remember what year that was?
A. 2020.
Q. And then did you receive another promotion after that?
A. Yeah, I got the PG 11 September, October '21.
Q. From your perspective, was there anything unusual about your increase in personal grade while you were in TX-61?
A. Not as a Department Manager there was nothing unusual to it.
Q. All right. Now, Corey, do you know the Plaintiff in this case, Kelly Dawsey?
A. Yes, sir.
Q. Did you ever have any issues with Ms. Dawsey?
A. We worked together.
Q. At any point in time during your -- when you were working as a Department Manager in TX-61 did Ms. Dawsey ever tell you that she was interested in being the TX-6,

the Vice President of Human Resources?
A. I don't remember those conversations.
Q. I want to talk specifically about the TX-61 position for just a moment. What were the areas of responsibility for TX-61 when you were in the Department Manager role?
A. So, when I was in the Department Manager role, we had changed it, it was still social relations, it was HR business partners, we were to be the strategic partners with business directly, my team was. We were responsible for policies, we were responsible for succession planning, responsible for discipline, hiring. It used to be in 61, it moved to 64 with Scott. So, basically, we did the back end of the process, we dealt with people everyday.
Q. Is that a job that required you to be out on the production floor?
A. Yes, sir, actually, it was.
Q. You mentioned succession planning and I know you haven't been in the courtroom, we have talked about that some here. Would you please explain to the jury the process of succession planning at BMW Manufacturing?
A. Yes. So, twice a year there is a review -- you have performance review, performance review leads into succession planning conversations twice a year. At the

early part of the year, some time around what you are feeling now, and then towards the middle part of the year. Succession planning was documentation, basically be short-term, mid term, and long-term of who could possibly replace managers. So, it was looked at from, you know, what was the business need, what was the company need, and what was good for the growth of the employee.
Q. And did you have -- did you do the succession planning all by yourself?
A. No, my team and I did it, we put it together, but the managers really laid their own foundation, we just organized it.
Q. So, did the managers provide --
A. They provide.
Q. -- the names?
A. Yeah. They provide the names, they provide information, we then put it together in an organized fashion to review it with our senior management.
Q. As TX-61, would you meet with employees to go through the succession plans?
A. No. It was never discussed from our side, we only -- we put it together, the dialogues that the manager had, if he chose -- he or she chose to have it. We didn't really encourage that conversation because the

section plan was so flexible, so movable, the business need could change, the employees need could change. The structure of how we are going to operate could change. So we had to be careful with telling somebody, this is where you are going to go, this is where you are going to move to. So we didn't encourage that kind of conversation, some managers did, but we didn't encourage it.

Q. Ms. Fowler, if you could pull up Plaintiff's exhibit 48, please, ma'am.

A. Wow, this is nice.

Q. Technology.

MR. MCCOY: Your Honor, we have pulled up Plaintiff's exhibit 48, I believe that has already been admitted.

THE COURT: Thank you.

MR. MCCOY: Maybe not.

THE COURT: It is.

DIRECT EXAM CONTINUED

BY MR. MCCOY:

Q. So, Corey, if you would look at the screen in front of you, there is a document there that we have marked as Plaintiff's exhibit 48, do you recognize that document?

A. Yeah, it is the form we would use to summarize

all of the data.
Q. Summarize the data for what?
A. For succession planning.
Q. And what is the date of this particular succession plan?
A. June 19th, 2020.
Q. Go to page two, please. Blow it up just a little bit maybe.
So, Corey, you were talking about the information that you put together, is this a succession plan you put together for the TX-6 Department in 2020?
A. Yes, sir.
Q. At that point in time, who were the successors for the TX-60 position?
A. TX-60 Kathy Keiser, Michelle Keith, and Courtney B.
Q. Auto do you know who Courtney B. is?
A. I don't remember. I think maybe a person in New Jersey, but I can't remember.
Q. When you say "New Jersey," what do you mean by that?
A. I'm sorry, BMW of New Jersey, North America. So, it was always the context, we weren't the only ones doing succession planning, everyone was. It was in the context of potentially Courtney had her growth path,

also.
Q. Now, there were not any international candidates listed at that time for TX-6, why?
A. No, no, sir.
Q. Why not?
A. SO, the manager or VP could pull whoever they wanted, there was no mention or need at that time for an international candidate.
Q. Does BMW AG do their own succession list?
A. Yeah, so, everybody, BMW AG, BMW North America, all of BMW does their own succession planning list.
Q. If we could go to Defendant's exhibit 4, please. This one has already been admitted.
Corey, in front of you now?
THE COURT: Which one is this?
MR. MCCOY: Defendant's 4.

DIRECT EXAM CONTINUED

BY MR. MCCOY:
Q. Corey, in front of you is a document that has been marked as Defendant's exhibit 4, do you recognize this document?
A. Yes, sir, succession planning again.
Q. What year is this from?
A. Twenty-one ('21).
Q. So, this is a year later than the one we just

looked at?
A. It is a year later.
Q. And so I am going to, you know, ask you, Ms. Fowler, if you would go to the TX-6 page, please. So, Corey, is this the 2021 version of the TX-60 succession plan?
A. Yes, sir.
Q. So, when we look at this, we see there are some different names on the list, why is that?
A. It is a fluid list, I mean, it could change depending on the business need, again individuals themselves could need a different path or need a different growth path. So, it was always fluid, it never stayed the same year to year, never exact.
Q. So, a couple of things that I see, first of all, there are a couple of employees, Ms. Dawsey and Michelle Keith, who are outlined in red, why is that?
A. They had been in their positions either right at or -- five years or right at five years.
Q. Okay. And then with regard to Scott Medley, he has got like pink square up above him, what does that mean?
A. Change candidate. So, if you square them in red -- so let's go back to Michelle and Kelly. If you square them in the red, that means they have been in

their position for a long period of time, is it time to change them or not becomes a bigger question. So, that is more of a, is it time for them to do something different, almost a push. For Scott, it was other people were not asking about him, so it is almost a pull so, he was a change candidate because other people were like, you know, should he do logistics? Can he do logistics? Can he come back. So that is more of a pull mechanism to it.

Q. Let's talk about Michelle Keith for just a minute. She is outlined in red because she has been in her position for four to five years. Was their discussion during the succession planning process in 2021 about moving Michelle Keith out of her role as TX-62?

A. So because of the red box, there was a discussion, but the discussion ended with, basically, we had a project coming up, it was an IT project, IT driven system, I think it was SAP changeover tying into the whole BMW system, and Michelle was subject matter expert, she would not be changed because the information was she would lead that project.

Q. At some point in time, after June of 2021, did she in fact leave to go lead that project?

A. She did. She left the position to go lead, I can't remember the name of the project, it was an SAP

update, basically.
Q. Ms. Dawsey is also highlighted in red. Do you recall in June of 2021 if there were any discussions about moving Ms. Dawsey out of the TX-60 position?
A. Yeah, the conversation was there, too, as you can see from the top. The note from PZ is an internal move, it is like a technical planning role, a planning role, still at the plant, but yeah, there was talk about moving her, also.
Q. And who would you have those discussions with?
A. So, at this level we would talk to the senior managers, but the first conversation is with -- in this situation, Christine Petrasch, the VP, and then we would go the senior management round. Senior management also had the option, this is where the pull comes in at, they say I will take them, or I will take them, or whatever.
Q. And in June of 2021, in that time frame, did you meet with Ms. Dawsey to talk about her, you know, succession planning?
A. No, I wouldn't have met with her, it would have been Christine, if anybody.
Q. You can take it down, Ms. Fowler.
Mr. Epps, in 2021, were there some changes that occurred in the Human Resources department at BMW

Manufacturing?
A. Yeah, we were then being -- so, the initial move -- so, when you make a first initial move, it is about a two year move. You get agreements to say, okay, for two years, let's see if this is the right structure. So, we were at the end of that two year period and we also had a project coming up. So, 64 was going to stay, but we needed to move Scott, the discussion was moving Scott to a project. It was a project around positive work force, how do you make the best positive work force for employees. So, it was going to be a secondary project. This was going to tie-in to North America, a little bit to Germany, but not much, but the environment that was going on. And then the rest of the structure was going to stay the same. So, there was discussions about how do you complete that structure with the move but allowing Scott to go to the project.
Q. So, Scott, at that point in time, was in TX-64?
A. He was a 64.
Q. And he was -- the plan was for him to leave to go to the project?
A. The plan was for him to leave and go to the project.
Q. Did you have any discussions at that time with

Christine Petrasch about who should fill the 64?
A. So, she talked to me about the 64 role, me personally. I had been in the role now about two years, I think it was. So, I had been in the role about two years, but she also liked the way that I was performing in the 61 role and what we were able to do with the team members, so we had conversation about that. The 64 was on my radar, 64 was on conversation for Kelly also, and within 6, those are the two I remember.
Q. Did Ms. Petrasch come to you and say, hey, Corey, you know, let's look at the succession plan, who needs to go to 64?
A. She didn't do that, no. She came to me talking to me more about her thoughts, but her thoughts around me.
Q. Corey, when did you learn that Sherry McCraw was going to become the new Vice President of Human Resources at BMW Manufacturing?
A. October or November of '21. We knew Christine was leaving, we didn't know who the replacement would be.
Q. Do you remember how you found out Ms. McCraw would become Vice President of Human Resources?
A. The official announcement was in November, we were in a team meeting, I think leadership meeting with us

and I think Christine, Sherry, and plant President was there, I can't remember -- Robert, I'm sorry.

Q. Prior to that, did you hear any rumors in the plant about who was going to be the VP of HR?

A. Oh, always, yes, sir. That is common to hear rumors, common to hear names, common to hear movement to the conversation.

Q. Did you have any discussions with Ms. Dawsey about any of those rumors?

A. At that point, Kelly and I weren't talking a whole lot.

Q. Now, when you found out that Ms. McCraw was going to be the Vice President of Human Resources, what was your reaction to that?

A. Well, I was happy. I worked with her and she was in a planning role before she built Hall 52, she built it during the work recession, had a lot of pressure on the plant and the company, and she helped us with it.

THE COURT: I'm sorry, did you say "work recession"?

THE WITNESS: It was the great recession.

THE COURT: Great recession.

THE WITNESS: 2008 and 2009 time periods, she built it, planned it, very structured. I worked with

her in assembly and in my earlier days --I was going to say younger -- but my earlier days, I worked with her. So, I knew she was a great worker, I knew she was a great leader, so I was happy.

DIRECT EXAM CONTINUED

BY MR. MCCOY:

Q. Did you have any discussions with the other Department Managers in TX-6 about Ms. McCraw when she was named successor?

A. Yes. We were asked, they knew I had worked with her. We would have a meeting, they would ask how was she --

MR. MURPHY: Your Honor, at this point I have to object on two grounds, one is hearsay and the second is relevance. I don't understand what this has to do with the decisions of Kelly Dawsey. He is testifying to what other BMW employees talked to him in meetings.

THE COURT: He said there were discussions, he has not gotten into what those discussions were, but I think that is a valid objection.

MR. MCCOY: Let me -- I will withdraw that question.

DIRECT EXAM CONTINUED

BY MR. MCCOY:

Q. Corey, at any point in time did Ms. Dawsey

express any concerns about Sherry McCraw being the new VP of HR?
A. Not to me. Kelly and I at that point weren't really talking.
Q. When did you first learn that Eva Burgmeier was going to take the TX-60 position?
A. We had a meeting, might have been the same meeting, had a team meeting, team discussion, and that was the first time we heard the name Eva Burgmeier.
Q. Did you know her at all before that?
A. No, I did not know Eva.
Q. Did you play any role in the decision to place Ms. Burgmeier in TX-60?
A. Did I?
Q. Yes, sir.
A. No. No, sir.
Q. Did you have any discussions with Ms. Petrasch regarding the plan reorganization of the TX-6 Department?
A. Yes, again, where my role would be, what she thought it should be, or what she thought Kelly should be. I think her initial thoughts were move to 64 and Kelly to 61, but she did say -- she did say that, you know, but I am leaving, so Sherry will have to make the final call.

Q. What was your reaction to you potentially moving to 64?
A. I liked 61, I like interaction with people, but I also said, hey, I will do whatever for the company. I had been -- you can see by my driving record up and down the road for 23 years, I was all in. So, I went to logistics, didn't know it. So, I told her, I said, you know, it don't have to be that hard, whatever is best for the company, that is what y'all feel, it won't hurt my career, then I will go for it.
Q. Pull up Defendant's 23, please.
Corey, were you -- you mentioned a meeting with Department Managers with Robert Engelhorn, with Christine Petrasch, and with Sherry McCraw.
If you go to page two for me.
Let me ask you, is this the meeting you were referring to?
A. Yes, sir.
Q. And if you look down at item 11 on the agenda, it appears TX and TX-4, who is that?
A. TX is Robert, at that time, and TX-4, at that time, was Sherry.
Q. Do you recall that they came into the meeting and talked about the reorganization plan?
A. Yes, sir.

Q. Is this the meeting you were referring to a little while ago?
A. Yes.
Q. When did the meeting take place?
A. November 2021.
Q. Now, who else besides you was present in that meeting?
A. So, it would be all of the direct reports, department managers, the TX-60, Kelly, TX-61, myself, TX-62, hard to remember all of these numbers, TX-62 was Michelle Keith, TX-64 and Scott Medley, TX-65 was Paul Sinanian.
Q. Do you recall how the organizational changes were presented to you in that meeting?
A. In presentation I think they went one by one by area, basically telling us what it was going to be. And I think that Sherry and Robert were there more as support. I think Christine led it, but I can't remember.
Q. If you will go to 24, please.
Corey, do you remember seeing this PowerPoint in that meeting? Let me ask you this. Ms. Fowler, if you would go to BMW MC 258, please.
A. Yes. This page.
Q. Is this the PowerPoint that you saw in that

meeting?
A. Yes, sir.
Q. If you would go to the next page, please, Ms. Fowler.
After being in this meeting and seeing this PowerPoint, Corey, was there any question in your mind what position Kelly Dawsey was going to be in?
A. No, the PowerPoint told us she would be in 64.
Q. During that meeting was there -- did Ms. Dawsey raise any concerns about the proposed changes to the organization?
A. Not in that meeting, no, sir.
Q. After that meeting, did you have any discussion with Ms. Dawsey where she raised any concern about going to TX-64?
A. No.
Q. Later in the year did you attend another meeting of the entire TX-6 Department where these changes were discussed?
A. Yes, sir. It would be our regular, probably year-end closeout meeting where you talk about the whole time and telling everybody what the change points will be for the next year, if any. And at that point we had some.
Q. Who led that meeting?

A. Christine Petrasch.
Q. During that meeting, did she share this same PowerPoint?
A. She did.
Q. After that meeting and during that PowerPoint, did she show that Ms. Dawsey was going to TX-64?
A. She did.
Q. Corey, how did you learn that Ms. Dawsey had decided to resign from BMW Manufacturing?
A. I was -- one, I want to think I was on vacation, I can't remember, but Michelle Keith called me and told me she was resigning.
Q. Did Ms. Dawsey ever call you to tell you she was resigning?
A. She did not.
Q. What was the impact of Ms. Dawsey's resignation on the TX-6 organization?
A. So move one, which was Scott Medley goes to project, you couldn't make move one because now you had to cover 64. Sixty-four (64) was operating and function, so it probably had to be delayed, the restructure had to be delayed. And you would now -- we had to all basically scramble to try to keep everything floating.
Q. During the time period after Ms. Dawsey had

resigned until she left BMW Manufacturing, did you have any discussions with her about her decision to retire (sic)?
A. No, I did not. We didn't -- we didn't talk a lot.
MR. MCCOY: I used the word "retire," she resigned from employment, that was my mistake.
Give me just a moment, if you will, Your Honor.
Corey, thank you for coming today. We appreciate your time. If you will answer any questions Mr. Rozelsky may have.
THE COURT: Yes, sir.
MR. ROZELSKY: May it please the Court.
THE COURT: Yes.

CROSS EXAM

BY MR. ROZELSKY:
Q. I am going to stand here at the podium, I printed out my notes to ask you questions and they are sitting on the printer, which is not in this room, so I have my laptop, so I apologize.
You talked a little bit a moment ago to Mr. McCoy about a term you used, you said that was a "pull," what does that mean? What is a pull?
A. So, you have a market, you have to think of it like job hunting, basically, inside the plant, but

somebody -- you have a market, you are flexible, you could do more things than one. So, the internal managers would "pull" you, for lack of a better word, or put you in say, yeah, he can do my job, yeah, I would like him. That is more of a pull side of the system.
Q. So, if somebody was in, say, logistics and they say, we have met that Corey guy, we think he does good work, we are going to put him on a succession plan in our department, is that the pull?
A. That is the pull.
Q. Is there a push?
A. So, when you are in the position over X amount of time, then your VP or your manager starts saying, okay, they need a change point. So that becomes the -- it is time to look. You can look within your department or look outside of your department.
Q. So, for example, if Ms. Keith was in a position where she had been in it four to five years, you might speak first with Christine Petrasch and say, is there another spot you want her in your division? Or you might go outside, you might go to TX2 or TX5 and say, do y'all have any roles that might suit and here are her skill sets?
A. Yeah, I wouldn't do it, Christine would do it. Christine would talk to her fellow managers and VPs to

see if somebody had market value, it sounds bad, but that is what it was.
Q. You are saying market value, you are taking a skill set and trying to market it to other departments to say, we have got a person who is a really great employee, been here 25 years, do you want this skill set?
A. Exactly.
Q. Now, you said you had been at BMW from 2000 to 2023; is that right?
A. That's right.
Q. And all or at least when you were in HR you were always in the TX-61 org chart, right?
A. Yes, sir.
Q. When we say "TX-61," is that both a position, the Department Manager, as well as all of the three digit people below that position?
A. Yes, it all flows together.
Q. As TX-61, were you familiar with the duties or the role of TX-60?
A. Familiar, yes.
Q. Not everyday, but --
A. Not every ay doing it, familiar.
Q. Was TX-60 a position that interfaced regularly with BMW AG and the Global Network?

A. It did. It was the liaison back on the account, liaison between us and the plant on structure, a lot of budgeting conversations was in the structure. It would be a very strategic position overall.
Q. You spoke with Mr. McCoy a little bit about succession planning. And I think you said that BMW MC would have succession planning, maybe BMW NA in New Jersey might have a succession plan, and maybe even BMW AG would have a succession plan; is that right?
A. That's correct.
Q. So, if BMW AG had candidates, international candidates that they wanted to place, they would be looking at where things might get placed?
A. So, what AG did is market them as an international candidate.
MR. MURPHY: Your Honor, I have to object, he can't speak for AG.
MR. ROZELSKY: I will withdraw. Move on.
BY MR. ROZELSKY:
Q. Did you have international candidates at MC that you had to discuss with AG?
A. Yeah. SO, what we did is, we would mark them as "I," which meant they were an international candidate, which means, number one, the person was open to it; and, number two, the management team was also open to it,

thought it would be a good marketing for the person to grow. That could be anywhere, that could be -- when you say international, it could be Mexico, it could be Thailand, it could be China. We have people going everywhere, not just Germany.

Q. To your knowledge, did BMW AG dictate any part of MC's hiring decisions?

A. No hiring decisions, no.

Q. To your knowledge, did BMW AG control BMW MC's employment practices and decisions?

A. No, sir.

Q. To your knowledge, did BMW AG dominate BMW MC's HR operations in any way whatsoever?

A. No, it was run by the plant.

Q. Did AG share resources and best practices with MC?

A. Yes.

Q. Did MC share resources and best practices with AG?

A. Yes.

MR. ROZELSKY: Thank you. I have no further questions.

THE COURT: Mr. Murphy.

MR. MURPHY: Thank you, Your Honor.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Mr. Epps, how are you today?

A. Good, Mr. Murphy.
Q. Mr. Epps, I want to start sort of where you started a little bit with this Plaintiff's exhibit 48 that you were shown. Do you recall testifying about this document?
A. Yes, sir.
THE COURT: Just a second. Is his mic working?

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. This is a document you and your staff created at TX-61, correct?
A. Correct.
Q. Okay. So when we see these designations in these boxes in the color coding, domestic, international, that is something you and your staff did, correct?
A. We made the color code, yes.
Q. And when you color coded this box in as expat, that is something you and your staff did?
A. Yes, sir.
Q. That is a box for an expat, right?
A. Yes, sir.
Q. Then I want to show you what was marked as Defendant's exhibit 4, unfortunately it malfunctioned on mine, could we show it through this? And this was the Defendant's 4 is the 2021 plan, correct?

A. Yes, sir.
Q. And, again, that color coding in those boxes designated for expats and domestics or something, you and your staff did, correct?
A. Created the color code, yes, sir.
Q. Now, your company's attorney asked you about the candidates for succession for TX-60 and he pointed out that all of the candidates to succeed Ms. Dawsey were American; do you recall that?
A. He pointed out, yes, sir.
Q. And you said there was no need for an international, do you recall saying that?
A. I did, yes, sir.
Q. And there was no need for an international because at that point TX-6 was headed by an expat or an international, correct?
A. No, that wasn't why I said that.
Q. Well, why would you not need an international candidate or why would you need an international candidate when there are, three what you determined to be, qualified Americans in line for the job?
A. Yeah, so, I don't, let me just clarify something. I don't determine that. I take the information in from the VP of the area, which was Christine Petrasch. We document the information as it

is given to us, so I don't make those determinations. Christine would have said that she didn't need an expat at that time.
Q. Okay. Who determined that there were three qualified Americans to succeed Ms. Dawsey?
A. Christine Petrasch.
Q. And I will return to your discussion with Ms. Petrasch in a minute, but you also talked about the rumors that were going on in the summer time of 2021; do you recall that?
A. Yes, sir.
Q. And while those rumors were going on, nobody ever came to you and told you you might need to be worried about your position or status at the company, did they?
A. With the company?
Q. Yes, sir.
A. You mean to me directly?
Q. Yes, sir.
A. No, sir.
Q. Now, let's move to your conversation with Ms. Petrasch that you testified about on direct. Ms. Petrasch told you that BMW was moving Ms. Dawsey, correct?
A. Ms. Petrasch, depend on which conversation we had, a conversation where she was going to move.

Q. Okay. And she told you why they were moving Ms. Dawsey?
A. Time and position, opportunity in that area.
Q. Well, what she told you was that because Ms. McCraw is a domestic, the best practice was to put an international in the planning role, that is what she told you, right?
A. She told me she was moving because time in position or whatever. She also said that 60, in her opinion, 60 and 6 should have the domestic/international combo, if possible.
Q. Six and 60 should have the domestic and international combo?
A. In her opinion.
Q. Okay. Meaning that if one is domestic, the other is to be international?
A. That is not what she said.
Q. I know it has been some time, sir, you know, you and I met in October of 2023?
A. Yes, sir. I will never forget that.
MR. MURPHY: Your Honor, I am handing the witness -- I'm sorry, I am doing it wrong. It is not your fault.
THE COURT: The record will reflect the witness has been provided his original deposition.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Mr. Epps, if you will turn to page 38, please. I am going to start reading on line 14. I will read my question and if you will read your answer, and while we are doing this, if you would read just what is on the printed page. If you have more you want to say or explain after we are done, I am sure the Judge will give you that opportunity, but right now we are just going to read verbatim words, okay.

"Question: Did Ms. Petrasch tell you why she was proposing that Kelly be moved?"

Please read your answer.

A.

"So, the person that was coming was a domestic, so it was -- it was Sherry. Sherry was a domestic. And normal practice is considered, sort of the best practice, not the long rule or regulation, but the normal practice that when you have a domestic you try to put an international, so you can keep your tie-ins to the market. You can

keep your tie-in on the German -- on the international side and keep your tie-in on the American side. So, certain roles are pegged" -- going to the next page -- "pegged to kind of mirror that way. It just depends on the department and what those roles are. Usually around planning, usually around structure, those type of roles."

Q. If you could go a little bit slower for the Court reporter. Go to line 9.

"And so Ms. McCraw is a domestic, correct?"

A.

"Sherry is a domestic."

Q. Okay.

"And TX-60 was the planning role?"

Your answer?

A.

"It is the planning, structure individual, yes, sir."

Q. And you are well familiar with that alternating rule, weren't you?

A. The alternating rule?

Q. Yes, sir.
A. We had -- you say I can answer now, right?
Q. Yes, sir.
A. We had people underneath Kelly that were international, we had people that were underneath -- we had people that was Kelly in the past that were international, so the role varied, just depended on what the need of the business was. But it wasn't an alternating role, it was just depended on what the need of the business was.
Q. You are referring now to the roles underneath Kelly?
A. I am referring to any role in 60.
Q. Within 60 you are saying?
A. Sixty (60) in general. We had people underneath Kelly that were international, and we had those in those roles before, they were in there when Kelly was in the role.
Q. You also talked about TX-64.
A. Uh-huh (affirmative response).
Q. That was a function level four position, correct?
A. Sixty-four (64) was -- I don't remember what it was graded, I think it was graded as a function level four.
THE COURT: Can I ask for a clarification? I

don't want to interrupt the role of your examination. You said TX-60, you said planning, structure, and what?

THE WITNESS: Strategic.

THE COURT: Okay. Thank you.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. And you knew the two individuals who were in that position after Mr. Medley went to the project was Mr. Bailey and Mr. Moore?

A. Yes.

Q. And they were both at function level four when they were in TX-64?

A. Correct.

Q. And your position, TX-61, was changed in 2022 to move it back to a function level three position after Mr. Medley went to the project; is that correct?

A. You got to explain that again.

Q. You were in TX-61 in 2021 and 2022; is that correct?

A. That's correct.

Q. In May of 2022, they changed that position back to a function level three after Mr. Medley went to the project?

A. Yeah. I don't know if Scott ever went to a project, but I will say that I stayed in the role, I was

a function level three.
Q. Okay. Well, it was a function level four at first, right?
A. The role --
Q. -- at 61?
A. It is two different things we are talking about. You and me did this before, we will do it again. TX-60 -- the role is graded and then -- so if I go into the role, the role is graded. TX-61 was a function level 3 graded role.
Q. I understand that and I agree with you on that, but when Mr. Medley moved from 61 to 64, he took that three with him. They designated your position four to keep the two function level three positions, right?
A. Yeah. But 61 was always a three. Me, I was a four, direct report.
MR. MURPHY: Your Honor, we are going to go now to Plaintiff's 47, which is offered without objection.
THE COURT: Plaintiff's 47 is admitted.

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. Mr. Epps, you know what SAP records are, don't you?
A. Yes.
Q. And this document shows a change made on

12-19-2019?
A. Yes, sir.
Q. At that time you are listed as TX-61, right?
A. Yes, sir.
Q. And it is listed as function level four, isn't it?
A. I am listed as function level four, yes, sir.
Q. And then it was changed in the year 2022 to function level three, right?
A. Now, we keep -- I was changed to function level three, exactly.
Q. And the other function level three position in HR throughout this time was TX-60?
A. TX-60 was the function level three level.
Q. And so am I correct when I added up your two stints, you had about nine years total in TX-61?
A. 2008, '12 -- four years. Before I left, ten years, nine or ten years.
Q. Nine or ten years, okay. And during your second stint in HR, you had two personal grade promotions, correct?
A. During my second stint?
Q. Yes, sir?
A. When I came in as a nine, I stayed a nine until I was promoted into the function level four direct report

position.
Q. That takes you to ten?
A. That is ten.
Q. Then late 2021, they promoted you again while you are in the same position to a personal grade nine?
A. Yeah. I don't know about that, but let me just say this, when somebody gets a promotion, they earn that promotion, they did the work to get that promotion. Nobody give me anything, so I will be clear on that. But, yes, I got promoted again.
Q. So, two personal grade promotions and your function level was raised from a four to a three?
A. I was a validated candidate so I could be a three, yes, sir.
Q. And so that I am clear, after Ms. Dawsey resigned, Mr. Medley stayed in TX-64 for a while, didn't he?
A. Yes, sir.
Q. And then he was replaced by Mr. Bailey, correct?
A. Yes, sir.
Q. And then Mr. Bailey was replaced by Mr. Gilmore?
A. That's correct.
MR. MURPHY: Can I have just a second, Your Honor?
THE COURT: Yes.
MR. MURPHY: Your Honor, I have nothing further

at this time.

Thank you, Mr. Epps. Good to see you again.

MR. MCCOY: Very briefly, Your Honor.

REDIRECT EXAM

BY MR. MCCOY:

Q. Corey, a couple of quick follow-ups. First of all, when you were increased to a personal grade of 11, I believe you told me earlier that was in 2021?

A. Twenty-one ('21), yes, sir.

Q. Do you know what Ms. Dawsey's personal grade was at that time?

A. I don't directly know if she was a function level three, with her time in the position she would be an 11.

Q. Do you know if you ever had a higher personal grade than Ms. Dawsey did?

A. No, I never had a higher grade, that wasn't going to happen.

Q. You testified earlier that you moved back from, I believe, Logistics into TX-61, correct me if I am wrong, I believe you said 2015?

A. 2015.

Q. Fifteen or fourteen?

MR. MURPHY: Your Honor, this goes beyond the scope.

THE COURT: Stay within the scope of cross.

MR. MCCOY: I am, I am just establishing the time.

REDIRECT EXAM CONTINUED

BY MR. MCCOY:

Q. Now, you talked a few minutes ago about the alternation, the international combo as you called it. Do you recall who was TX-6 when you moved back into the Department?

A. Robert (sic) Trauth.

Q. Johannes Trauth?

A. Johannes Trauth.

Q. Do you recall who was in the TX-60 position?

A. Moritz Kippenberger.

Q. Where was he from?

A. He was international, maybe from Germany.

Q. How about Trauth?

A. International.

Q. You had international TX-6 and international TX-60?

A. Yes, sir.

MR. MCCOY: That is all I have, Your Honor.

RECROSS EXAM

BY MR. ROZELSKY:

Q. Was this international combo that you discussed, was this a BMW MC sort of tradition and not a BMW AG

tradition?
A. Yeah. No, we did practices at BMW, it wasn't an AG conversation, it was -- these are things that you just saw through the years.

MR. ROZELSKY: Thank you. No further questions.

MR. MURPHY: Nothing further, Your Honor.

THE COURT: Thank you very much, sir. You may leave or stay.

THE COURT: Let me chat with the attorneys very briefly about logistics.

(Whereupon, a bench conference was held off the record.)

THE COURT: All right. Members of the jury, it is almost eleven a.m. I need to take up some legal issues with the attorneys and that is going to take some time, so you will have an extended lunch break today. So we will break at this time and I will ask that you be back in the jury room ready to go at one p.m.

Remember my previous admonition, particularly about doing research in the case, looking at any social media sites, blogs, news stories that might be out there about the case, the parties in the case, or anything associated with this case. Do not discuss the case amongst yourselves or with anyone else and keep an open mind because you haven't heard everything yet.

With that, it looks like the sun is shining, but it is still a little bit chilly, so if you go out, make sure you wear a coat and we will see you back at 1:00 o'clock. Thank you.

(Whereupon, the following was heard outside the presence of the trial jury.)

(Whereupon, a recess was held.)

THE COURT: I will be glad to hear from you.

MR. MCCOY: Thank you, Your Honor. May it please the Court. Your Honor, Defendant BMW Manufacturing moves for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. As I just remind the Court, this is our motion from the close of Plaintiff's case as we have discussed. I am going to hold argument on the national origin issue, and then I will discuss the race and sex claims at this point in time. We obviously will plan to revisit those issues at the close of all the evidence.

The legal standard for granting judgment as a matter of law is where there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue. Plaintiff asserts claims against BMW Manufacturing for race discrimination under Title VII and Section 1981 and sex discrimination under Title VII. Plaintiff bears the burden of proof as to each of

these causes of action. It is our position Plaintiff has failed to submit sufficient evidence to establish that BMW Manufacturing has discriminated against her on the basis of any protected characteristic. And, thus, no reasonable jury could possibly decide in the Plaintiff's favor based on the evidence presented.

Your Honor, to establish a valid claim for discrimination under Title VII or Section 1981, the Fourth Circuit has held that the Plaintiff must prove she suffered an adverse employment action. The cite for Title VII is *Boone versus Goldin*, 178 F3rd 253, that is a 1999 case. And Section 1981, *Honor versus Booz-Allen and Hamilton*, 383 F3rd 80, that is a 2004 case.

Now, as we all well know, in the middle of this case, the Supreme Court issued its decision in *Muldrow versus the City of St. Louis*, which is reported at 144 Supreme Court 967, that was a 2024 decision. In Muldrow, the Supreme Court held a plaintiff challenging an alleged discriminatory transfer must show, quote, some harm, end quote, respecting an identifiable term or condition of employment.

In Muldrow, the plaintiff, who was a police sergeant, alleged sex discrimination after she was transferred from a job in the -- in a special

intelligence division to a different role in the department and her intelligence position was taken by a male employee. The plaintiff's rank and pay remained the same after the transfer, but the Court found the plaintiff was able to show she suffered some harm because she no longer worked in the specialized intelligence department, and she lost certain job benefits when she was transferred, including a preferable schedule, and a vehicle she could drive home when off duty.

Under Muldrow, it is Plaintiff's burden to present evidence in this courtroom of at least some harm to the terms or conditions of employment as a result of BMW Manufacturing's decision to transfer her to the TX-64 position.

Now, Plaintiff's testimony about this potential harm is as follows: First of all, there is no dispute here, the Plaintiff was in the TX-60 role in the fall of 2021. Mr. Medley was moving out of the TX-64 position into a special project. Ms. Petrasch told Ms. McCraw in September -- I'm sorry -- Ms. Petrasch told Ms. Dawsey in September that Ms. McCraw would be the new TX-6 and that an international from BMW AG would be coming to the TX-6 Department. In late September, Ms. Dawsey was told about the reorganization and that

Ms. Petrasch initially planned to move Ms. Dawsey to TX-61 and move Mr. Epps to TX-64. In early October, Ms. Dawsey testified she had a conversation with Ms. Petrasch in which she learned that Sherry McCraw, the incoming VP of HR, wanted to keep Corey Epps in TX-61 and move Plaintiff to TX-64. Ms. Dawsey testified that Ms. Petrasch told her that at some unidentified time in the future, TX-64 would potentially be changed to a function level four position because recruiting would be moved to a different department. Plaintiff admitted on cross-examination that Ms. Petrasch never told her that she would be, quote, demoted.

There is absolutely no dispute in this case that at the time when this conversation took place in early October of 2021, TX-64 was listed as a function level three position on the job function data sheet, that is Defendant's exhibit number 13. Ms. Dawsey testified that her department TX-60 prepared the job descriptions and that this was the only job description that had ever been prepared for the TX-64 position while she was at BMW Manufacturing.

Ms. Dawsey testified that she was moved from TX-64 and if TX-64 was downgraded to a function level four position, that might have a negative impact on

her. However, when asked by her own attorney to identify how that change in function level would impact her from her financial standpoint, she said, quote, I cannot answer that. The fact that Plaintiff herself cannot identify the harm shows the speculative nature of the alleged harm that she suffered in this case.

It is also important to note the Plaintiff testified that she is unaware of any other BMW MC employee who had their pay downgraded or reduced as a result of a downgraded function level. She testified that in 2021 she issued letters to a handful of employees stating that they potentially would suffer a potential decrease of personal grade some time within the next two years, but that while she was employed, none of those employees ever suffered -- ever had their personal grade lowered.

Now, Ms. Dawsey also testified that moving to the TX-64 position would have negatively impacted her chances for promotion. Notably, Your Honor, this is one of the allegations that the Court relied on when it denied our summary judgment motion in finding that there was some harm.

Ms. Dawsey testified that she is not aware of any employee who has been promoted from a function level four position to a function level two position;

however, it is our position that this argument is a red herring, Your Honor. Plaintiff admitted on cross-examination that nobody at BMW manufacturing can be promoted into a function level two position unless they have been validated to hold a function level two position.

It is not in dispute in this case that Ms. Dawsey was never validated for a function level two position. So the insinuation that moving her to TX-64 would somehow prevent her from later becoming the Vice President of Human Resources is simply not accurate. Until Plaintiff was validated for a function level two position, she was never going to be a candidate for Vice President of Human Resources.

Now, Ms. Dawsey also testified that she had no position at BMW Manufacturing when she resigned because she never received an offer letter to move to the TX-64 position. Ms. Dawsey admitted that it was the responsibility of her Department, TX-60, to prepare those offer letters, and the record shows that no offer letters were prepared for any of the candidates prior to Ms. Dawsey's resignation from employment in January -- on January 14th of 2022.

As for Ms. Dawsey's position in the reorganized department, the evidence shows the following:

Ms. Dawsey testified that in early October, Ms. Petrasch told her she would be moving to TX-64 as part of the reorganization, which would take effect in February of 2022. On November 11th, there was a meeting of the Department Managers in TX-6, along with Ms. McCraw and Dr. Englehorn, in which Ms. Petrasch presented a PowerPoint to the leaders showing that Plaintiff would move to TX-64 in February 2022. On December 13th, a few days after she had already accepted another job, Ms. Dawsey met with her team in TX-60 and she herself showed her team the same PowerPoint which reflected she would be moving to TX-64 in February 2022. Later in that same day, there was a meeting of the entire TX-6 Department in which the same PowerPoint showing Ms. Dawsey again moving to TX-64 was shown to all members of the Department.

Ms. Dawsey resigned from employment on January 3rd, 2022, and her last day at BMW MC was January 14th, 2022. When she walked out the door on January 14th, she was still in the TX-60 position, there had been no change to any of the terms, conditions, or privileges of her employment.

The evidence establishes that Ms. Dawsey never suffered any harm in this case when she left BMW MC, she was still in the same position she had held, TX-60.

Instead, Your Honor, this case is based strictly upon speculation about what might have happened had she remained at BMW Manufacturing instead of resigning to take the job at Madewell Concrete.

When Your Honor ruled against BMW Manufacturing at the summary judgment stage, the Court relied on the opinion of the DC Circuit in the *Van Horn versus Del Toro* case, which is reported at 2024 U.S. App Lexis 15154, that is a June 2024 decision from the DC Circuit. In Van Horn, the plaintiff was told she was being transferred to positions that were located in other states, so there were several different transfers at issue here, but she was told she was being transferred into positions in other states and they were less desirable than the position she previously held. The D. C. Circuit held that even though the plaintiff never actually took the other assignments, the announcement of the transfer to those roles was an adverse employment action under the some harm standard announced in *Muldrow*.

But in *Van Horn*, there was no dispute that the plaintiff would have suffered some harm had she taken that transfer because she was going to have to move out of state to take those jobs. Actually one may have been moving out of the country, but certainly requiring her

to relocate.

Based on the *Van Horn* decision, the Court in denying our summary judgment motion, ruled that Ms. Dawsey could show an adverse employment action even though she left BMW Manufacturing before ever transferring to the TX-64 position because it was, and I quote, a less desirable position with a lower salary range and less prospects for advancement.

However, the actual testimony in this court shows that that is not accurate. In October 2021, when Plaintiff was told she would be moved to TX-64, Plaintiff admits, and again the documented evidence, Defendant's exhibit 13, shows that the position was a function level three position, it was not a less desirable position with a lower salary range and less prospect for advancement.

Plaintiff's entire case is built upon the alleged statement from Ms. Petrasch that TX-64 would potentially be downgraded to a function level four position at some unknown time in the future; this is completely speculative. In the *Van Horn* case there was no such speculation required, the roles to which the plaintiff was being transferred were already in existence and there was no doubt that the plaintiff would suffer some harm -- the plaintiff would suffer

some harm by being required to move to one of those new roles. That is not the case here.

For us to get to the same conclusion that the court reached in *Van Horn* is to speculate about what happened to the TX-64 role in the future; however, the Fourth Circuit has repeatedly cautioned us we cannot engage in such speculation to establish an adverse employment action.

Your Honor, I want to bring to your attention a recent decision from the Eleventh Circuit Court of Appeals, and I have got copies if I may hand them up. And, yes, Your Honor, I am handing you a Mercedes Benz case and a BMW case. So, the Eleventh Circuit recently decided or issued an opinion in which it upheld a summary judgment in a Title VII case where the plaintiffs allegation of harm was based upon speculation. I have handed you two -- I have handed you both the District Court opinion, as well as the Eleventh Circuit opinion, which I would note the Eleventh Circuit opinion is unpublished. So, the first case is the *Zienni versus Mercedes Benz International*, the Eleventh Circuit cases were reported at 2025 U. S. App. Lexis, 33457, that is a December 2025 opinion from the Eleventh Circuit; the District Court opinion from the Northern District of Alabama is at 2024

U.S. District Lexis 210034, that is a November 19th, 2024 decision.

Now, in this case, Mr. Zienni was a Muslim. The lawsuit centered around his need to take breaks throughout the day to pray. At times those breaks didn't coincide with the scheduled breaks where the line would be stopped. Mr. Zienni's supervisor caught him praying outside one of those scheduled breaks, and told him he was not allowed to take a prayer break while the line was running. Mr. Zienni alleges he was told by his supervisor that he would be reported to Human Resources if he was caught praying outside of breaks, and that Human Resource officials stated he would be subject to discipline, including potential termination, if he violated this direction from his supervisor; however, there is no evidence that Mr. Zienni was ever disciplined by Mercedes in any way.

During the two-week winter shutdown at the Mercedes plant, Mr. Zienni decided to resign and seek other employment. He then sued Mercedes alleging religious discrimination under Title VII, the District Court granted Mercedes' motion for summary judgment on the basis that Zienni could not establish an adverse employment action. In reaching that conclusion, District Judge Coogler held as follows, this is at star

18 in the opinion, quote:

However, these hypothetical actions did not occur and thus cause no actual harm to an identifiable term or condition of Zienni's employment. In reality, the only change to Zienni's employment occurred when he made the choice to resign from MB U.S.I., and look for work elsewhere, end quote.

In upholding the award of summary judgment to Mercedes, the Eleventh Circuit, presenting an unpublished opinion, said the following, and this is at star five in that opinion, I have highlighted it for Your Honor.

"Zienni argues he experienced harm because he was exposed to the risk of discipline for taking additional breaks, but MBUSI never disciplined or threatened to discipline Zienni. Zienni rested on a speculation about what would have happened if he was caught praying during unscheduled break. But adverse action cannot be speculative. The Supreme

Court's decision in *Muldrow* did not alter that requirement. Thus, any risk of discipline that Zienni experienced was too speculative to show a change in a term or condition of his employment."

We would argue that these rulings from the Northern District of Alabama Eleventh Circuit are instructive here since Ms. Dawsey's case is built entirely upon speculation. There is no doubt in this case that Ms. Dawsey was never moved out of the TX-60 position prior to her resignation from employment. Her entire case is based upon what might have happened had she not resigned and had she actually moved into the TX-64 position, something that never happened.

Plaintiff admitted during her testimony that the TX-64 position was listed on the job function data sheet as a function level three position in October 2021 when she was told she would move to that role; therefore, that transfer would not have resulted in any harm to her.

Since Plaintiff has failed to present evidence she suffered some harm as required under *Muldrow*, no reasonable jury could find that she has met her legal burden to prove she suffered an adverse employment

action. Accordingly, Defendant BMW MC is entitled to judgment as a matter of law under the Title VII and Section 1981 claims for race and sex.

Your Honor, may I have just a few more minutes, I would like to address, first of all, the race discrimination claim.

As I indicated, Ms. Dawsey asserts a claim under Title VII and Section 1981 alleging she was discriminated against based upon her race. So, even if the Court finds there was an adverse employment action taken against Ms. Dawsey, she still bears the burden of proving that adverse action was motivated by unlawful race discrimination. But Title VII and Section 1981 prohibit an employer from discriminating against an employer with respect to the compensation terms, conditions, or privileges of employment because of such employee's race. Ms. Dawsey bears the burden of proof that her race was a determinative factor in the adverse employment action taken by BMW Manufacturing.

Here, Ms. Dawsey's race discrimination claim is based upon the allegation that Corey Epps, an African American, was treated more favorably than her. Now, initially, during her deposition, Ms. Dawsey testified that the race discrimination claim was based upon the fact Mr. Epps was elevated to a personal grade of 11 in

the fall of 2021. She alleged this elevation was outside of BMW's guidelines because Mr. Epps was in a function level four position and no BMW MC employee sitting in a function level four position had ever been elevated to PG 11. Ultimately, Ms. Petrasch, Ms. Dawsey's boss, instructed her to elevate Mr. Epps to PG 11 because he would be in a function level three position within the next 12 months.

Ms. Dawsey alleged this was discriminatory because she was not allowed to do her job, which was to uphold company guidelines with regard to compensation.

Now, based on Ms. Dawsey's testimony on the stand, it sounds like this isn't exactly her claim anymore. You know, to the extent that it is, we have obviously got an adverse employment action, the fact that she was claiming I am not allowed to do my job, I mean, that certainly fails to meet the some harm standard. But it seems like, based upon her testimony, that the real issue here is what happened to Mr. Epps compared to her. The -- just -- I'm sorry, to wrap up, to the extent Ms. Dawsey is still claiming she was unable to do her job, there is no evidence that Mr. Epps was treated differently because of his race there. Keep in mind, Mr. Epps was simply being elevated to PG 11, a position that Ms. Dawsey had had for several

years at that point in time. He was not promoted above her, he was not exceeding her, he was the same level as her, so there is no discriminatory treatment. He is not being treated more favorably than her; therefore, that is not race discrimination within the meaning of Title VII and Section 1981.

Now, during her testimony, Ms. Dawsey said, and I believe this is accurate, that Corey was moving up while I was moving down. And, again, not to kind of plow the same ground that I just plowed a minute ago, but there is a question here as to the basis of this claim, it is, again, based upon speculation.

Now, in October of 2021, there is no doubt Ms. Dawsey was already a PG 11. Corey Epps was increased to a PG 11 in October of 2021. There is no testimony that Ms. Dawsey's personal grade ever went down, she was a PG 11 when she walked out the door on January 14th of 2022; therefore, Ms. Dawsey and Mr. Epps had the same personal grade, they are equals, that is not discrimination.

To the extent that Ms. Dawsey's claim is that her personal grade would have been downgraded at some point in the future had she taken the TX-64 position instead of resigning, again, that is speculative. There is no dispute in this case in the fall of 2021

both the TX-60 and TX-64 positions were listed as function level three positions on the job function data sheets, Defendant's exhibits 11 and 13. Based on this fact, the Plaintiff's move to TX-64 was strictly a lateral move and there was no basis for a downgrade of personal grade.

Plaintiff's testimony and the documents of record indicate that in early October she was told by Ms. Petrasch that she would be moved to TX-64, and the 64 position would potentially be a function level 4 position because recruiting would be moved out to TX-65. Had Plaintiff agreed to move to the TX-64 position, and had the TX-64 position been downgraded from a function level three to a function level four position, then Plaintiff testified that there was this policy that she had put in place, the misaligned personal grade policy, that took effect July 1st of 2021, and that potentially would have impacted her. Under that policy, employees sitting in a job that has a function level too low for their personal grade would be given notice that they need to find another position with a personal grade -- with a function level consistent with their personal grade within the next one to four years, or else their personal grade would be downgraded. Again, as I said earlier, when asked how that would impact her

financially, Ms. Dawsey said, I cannot answer that question.

Therefore, to establish a race discrimination claim based upon this possibility that Plaintiff will be downgraded requires multiple levels of speculation. First, that Plaintiff actually moved to TX-64. Second, that TX-64 was actually downgraded to function level four. Third, that the misaligned personal grade policy would have applied to her. And, fourth, that at some unknown time in the future her personal grade would have been downgraded. This is exactly the kind of speculation that is prohibited under the law.

Ms. Dawsey's burden is to show that race was a determinative factor in the adverse employment action taken against her by BMW Manufacturing.

We do not deny that Mr. Epps is a different race than her, but that alone is insufficient to state a race discrimination claim. Ms. Dawsey must prove that Mr. Epps was treated mother favorably than her under similar circumstances, and the record does not support such a claim; therefore, BMW Manufacturing is entitled to judgment as a matter of law on the race discrimination claims under Title VII and Section 1981.

Now, to quickly turn to sex discrimination, again, assuming the Court finds there was an adverse

employment action, Ms. Dawsey bears the burden of proving that that adverse employment action was motivated by unlawful sex discrimination. She cannot meet her burden in this case because she cannot establish a male employee was treated more favorably than her under similar circumstances.

In this case, it appears her sex discrimination claim is based upon her testimony that BMW Manufacturing moved around the function level three positions in the HR Department to protect Scott Medley's personal grade when he moved to TX-64 in 2019, but they were not going to do the same for her when she moved to TX-64.

As mentioned twice already, Your Honor, there is no dispute this in this case that in the SAP system, the TX-64 position was listed as a function level three position on the job function data sheet, that is Defendant's exhibit 13, and that was in October of 2021. Ms. Dawsey testified that in October she was told by Ms. Petrasch she would be moved to TX-64 and the 64 position would potentially be a function level four position at some point in the future because recruiting would move out to 65. Plaintiff's problem is, that never happened. Ms. Dawsey never moved to the 64 position. And the position remained a function level three position the entire time Ms. Dawsey was employed

at BMW Manufacturing.

Again, we are faced with a situation where Ms. Dawsey's claim of discrimination is based upon multiple levels of speculation.

Now, she must show that Mr. Medley was treated more favorably than her under similar circumstances. She testified that Mr. Medley agreed to move to the TX-64 role when it was created in 2019, but the function level -- and when that happened the function level three designation travelled with Mr. Medley to that new role. There is no dispute that Mr. Medley actually took the TX-64 role at that time. There is also no dispute that Ms. Dawsey never took the TX-64 role. Instead, she decided to resign and go to Madewell Concrete before the reorganization took place and she was never in the 64 position; therefore, she cannot show that Mr. Medley was treated more favorably than her under similar circumstances because those similar circumstances never existed. The Fourth Circuit law does not allow this Court to speculate about what would have happened to Plaintiff had she taken the TX-64 role, something I said never actually happened. Therefore, no reasonable jury could find that BMW Manufacturing discriminated against Ms. Dawsey based upon her sex. Accordingly, my client is entitled to judgment as matter of law as to

the Title 7 sex discrimination cause of action.

Your Honor, we will, obviously, reserve, you know, the additional claim of national origin discrimination. I want to reserve argument on that. At the close of evidence, we will also intend to make arguments with regard to compensatory and punitive damages at that time.

Thank you, Your Honor.

THE COURT: Thank you.

MR. ROZELSKY: Your Honor, BMW AG joins in the motions made by BMW MC and incorporates by reference those arguments that were made.

Thank you.

Your Honor, I do have other arguments with regard to AG, I am presuming you want Mr. Murphy respond to that first?

THE COURT: Mr. Murphy, do you want to go ahead?

MR. MURPHY: I am fine with going ahead as long as we are done on those issues.

MR. ROZELSKY: Yes, on those issues. I will make arguments with regard to personal jurisdiction and greater to the point of the treaty.

MR. MURPHY: At this point or at the close of the evidence?

MR. ROZELSKY: At this point once you are finished

responding to the race and sex.

THE COURT: It is however you want to do it, Mr. Murphy.

MR. MURPHY: I will respond to this motion since it is fresh in your head. I am starting to doubt I want a clock time frame now.

THE COURT: I never believed it.

MR. MURPHY: Your Honor, every one of those arguments fails with the argument that everything is speculative, nothing happened, nothing occurred. As the Court is well aware, there are several Supreme Court cases and cases following it that have shot that argument down. It is not speculation that they announced adverse actions. When and whether those actions would occur is not the operative fact; the operative fact is that they were announced, that is the *Ricks* case and the *Chardon* case, and that is why we reversed the Report and Recommendation on summary judgment. And nothing has happened to *Ricks*, nothing has happened to *Chardon* since you issued those rulings, and they eliminate any argument about what you look at, what is the operative fact, and whether it is speculation or not.

Nor can counsel get around the *Muldrow* decision. *Muldrow* established that you only have to show some

disadvantage. Now, what he doesn't mention is the case, that is *H-e-r-k-e-r-t*, versus *Bisignano, B-i-s-i-g-n-a-n-o*, that is, 151 F4th 157, that is a 2025 Fourth Circuit Case about transfers. And the Fourth Circuit said, referring to *Muldrow*:

"To some change standard may be satisfied in a transfer case even if there is no loss of pay grade, salary or benefits," that is a quote.

And the next sentence, and this is all on page 160, the next sentence reads:

"It is for the jury to assess the Plaintiff's allegation that in her case we assigned it to an un-supervisory role as an adverse or disadvantage change that left her worse off, even if not significantly so."

So, the Fourth Circuit is following *Muldrow* and it is saying that all of the things that Mr. McCoy is pointing out didn't happen here don't have to happen for there to be an adverse action.

Before I get into some of the facts on this, Your Honor, we did submit to the Court a packet of

deposition excerpts entitled deposition excerpts for directed verdict and exhibit cross reference, I move that be admitted as a Court exhibit at this time.

THE COURT: Any objection?

MR. MCCOY: No.

MR. ROZELSKY: No.

THE COURT: Admitted.

Go ahead. Thank you.

MR. MURPHY: I want to go back to where I was on summary judgment to clarify what the Defendant keeps collapsing. He keeps saying that there is one adverse -- alleged adverse action in this case, there are two, from two different conversations. The first is that Kelly is going to be removed from her job, that is adverse action number one. Second, is the demotion, you are going to go to TX-64. Now, there was nothing speculative about that. That is the October 4 conversation. In the late September conversation, Ms. Petrasch didn't know what was happening to Kelly and Ms. Petrasch was fighting to keep Kelly at function level three by putting her in TX-61. Ms. McCraw came in, decided no, they talked about it, and ultimately the decision was she was going to 64. On October 4th, Ms. Petrasch told Kelly Dawsey, you are going to TX-64, and it will be a function level four position.

Now, there is already ample evidence in the record and in Court exhibit -- the Court exhibit about that, but let's start talking about the difference between TX-64 and TX-60. TX-60 is the strategy position, it was one of two function level three positions in the Department. TX-64, as we saw, which is the job description is both Plaintiff's exhibit 8 and Defendant's exhibit 11, is a function level four position, it doesn't even require any Human Resource experience. And in the Court's exhibit you will see Mr. Gilmore agrees with that on pages 22 and 23 of his deposition.

Also in the Court exhibit is Ms. Petrasch's testimony on pages 30 and 31 in which I asked her about this document, which you may remember I had some conversation with Ms. Petrasch about it at trial, I won't talk about what happened at trial until the second -- the next motion, but at the trial we talked about this line in her email. And she agrees, Your Honor, in her deposition, page 30 line 25 to page 31 line 17, she confirmed that she gave Germany two options, and this is in early January, she gave two options for 64, and said, either way, this is certainly a function level four position. Mr. Bailey testified, in the Court exhibit, his deposition on pages 26 to 27, he

confirms, TX-64 is a function level four position. His successor, Mr. Gilmore, testified on pages eight and nine and ten of his deposition that TX-64 is a function level four position. You have both, we refer in their testimony both to those offer letters, I think they were in trial Plaintiff's 49 and 50, where they were given offer letters 0?

THE COURT: What was that exhibit you just had up?

MR. MURPHY: It is Petrasch exhibit 5, which is now Plaintiff's trial exhibit 41.

THE COURT: Thank you.

MR. MURPHY: Also in the reference are these offer letters that went out.

THE COURT: Now, which one is this? What exhibit is this?

MR. MURPHY: This is now Plaintiff's exhibit 49.

THE COURT: Thank you.

MR. MURPHY: It is the Bailey document showing that TX-64 is function level four, as Mr. Bailey said. And we talked to Mr. Gilmore about his offer letter and, once again, it is now Plaintiff's exhibit 50 shows that TX-64 is a function level four position.

There is ample testimony also, Your Honor, that function level affects pay and we spent a lot of

time with Kelly on that. We went back through those different policy documents, it affects pay, it affects your ability to advance -- now, understand, these are things I don't have to show under *Herkert*, but I can. And the opportunity to advance. She has testified, as Mr. McCoy pointed out, that you can't go from a function level four up the ladder to a function level two. Now, he now argues, well, she wasn't validated for a two, well, you aren't going to be validated for two when you are at function level four. For additional support, Your Honor, within the Court exhibit, is Ms. Burgmeier's testimony at page 72, she says exactly the same thing.

Now, the move required a reduction in her personal grade under that policy. I guess they want to argue about whether that ultimately took effect or was changed in 2022, but the testimony from Ms. Dawsey was very clear, they did start implementing that, they met with the people affected, and explained it to them. Now, we will hear the testimony from Ms. McCraw later, but that is the testimony in the record. And Ms. Dawsey also testified that nobody came to her and said, well, that is not going to be applied to you. Nobody ever told her these things would not happen to her.

Mr. McCoy also argued no adverse action happened because the offer letters did not go out and that that

was TX-60's responsibility. That was not the testify. Ms. Dawsey testified about the offer letter request form that the manager affecting the change fills out an offer letter request form, and then it went to somebody on her staff and they issued the letter, and that was never done in this case. So, it wasn't on Ms. Dawsey. The blame doesn't lay with her for an offer letter not going out, Ms. Petrasch never requested such a letter, or at least they haven't put in any record that she requested a letter.

Also in terms of whether it is all speculative or not, not that it matters, but BMW -- well, I will reserve that argument.

The second argument, Your Honor, on race, Mr. McCoy, both as to race and sex, frames it up wrong. He says I have to prove that she was removed and demoted because of her race, that is not what I have to prove. I don't have to prove that they said we don't want a white woman in that position. All I got to show for race discrimination is disparity in treatment. And that, in this case, jumps off the page.

Mr. McCoy said there is no evidence that Mr. Epps was treated as he was because of his race. Well, of course there is. I am referring to Plaintiff's exhibit number 5 at this point, which you

recall was this planning chart. Let me tell you exactly why Corey Epps is in TX-61 and that is the only reason they give for Corey being in TX-61. So, I asked Ms. Petrasch about that in her deposition and, this is in the Court exhibit, and I am reading from in her deposition page 64 beginning on line 23:

"Question: It says very important
to keep him in that position/signal,
what does that mean?"

Here is her answer beginning on page 65:

"This means we are very happy to
develop a minority candidate. Also
within HR this is the first time we
had a minority candidate on how to
say first line, HR first line.
That is why we said it is very
helpful for us to keep him to show
we also develop African-American
people."

That is what they were trying to show. That is why he gets two personal grade promotions within a year, and his job gets changed from s function level four to a function level three. You recall there was testimony that violates their rules. They are violating their own rules by doing that. And that is when Ms. Petrasch

wrote that email saying, it is okay, there is a rule in Germany. And then she sent the text message, not an email, the text message to Ms. Dawsey saying, I sent that to cover you in audits.

We know why Mr. Epps was getting the rock star treatment he was getting and that is all I have to show, plus she wasn't getting the same consideration. I thought it was interesting the way she said it, as they are pushing him up, they are pushing her down; that is disparate treatment. And there is no question it was done. Nothing in that box says, Corey Epps was just crushing it on the job it; no, it just says he is the first minority.

Mr. McCoy has weaved in an argument that I have been objecting to throughout -- oh, by the way, Your Honor, I am going to step out of sequence here for a minute, he referenced the *Van Horn* decision and I wanted to alert the Court just to the fact the *Van Horn* decision was amended, if that decision is important to you. You cited it in your decision. There was a paragraph of dicta in that decision, which my position is it doesn't affect the ruling, but it is a -- it is now reported at 2024 U.S. Appellate Lexis 25290, so they amended that decision. I am bringing it up in case you wanted to review that.

THE COURT: Thank you.

MR. MURPHY: Mr. McCoy is making the argument if we do something for Corey and we don't do it for her, it doesn't hurt her. If we give something to one group and we don't do it for another group, and you heard that in the questioning on national origin issues, as well with Ms. Dawsey on the stand, just because we do something for one group, if we don't hurt you, that is not discrimination, that is absolutely wrong. And the courts have said it is being subjected to different terms and conditions that constitutes discrimination, including United States Supreme Court in the *Newsport News Shipbuilding and Dry Dock Company versus EEOC*, 462 U.S. 669, a 1983 case.

If I brought a case in here where I said, okay, this is a company and it is giving bonuses to men but not to women, or it is giving some benefit to whites but not to blacks, would there ever be a defense under Title VII to say, well, we may have given them a bonus and didn't give it to you on the basis of the protected characteristic , but we didn't take any money away from you so it didn't hurt you? No. Again, he is framing it up all wrong. Disparate treatment is discrimination, that is all I have to prove.

There were other ways that Mr. Epps, of course,

was favorably treated, I have talked about the promoting him outside the guidelines, but you also notice the same rules didn't apply to him that are being now applied to Ms. Dawsey. Mr. Epps was in TX-61 and never left TX-61. He never had to go from TX-61 to someplace else. Yet, they defend their treatment of Kelly Dawsey by saying she didn't move enough, she had been in 60, 61, 62. She moved around more than anybody else on the record within HR. Mr. Epps didn't have to do any of that, he gets the promotions denied to her on the grounds she didn't move. So, clearly, there is disparate treatment and there is no question as to why they are treating Mr. Epps as they do.

Now, on the sex, again, I don't have to prove she was demoted because she is a woman, I just have to prove that the way she was treated was different than the way the men were treated.

Let's start with Mr. Medley. Mr. Medley used to be in TX-61, which was a function level three position. Everybody agrees that it is graded as a function level three position. Until Mr. Medley moved to TX-64 when they created it and Ms. Dawsey explained that Ms. Petrasch made the decision to take the function level three, which is not supposed to follow the person and move it to 64 so Scott wouldn't be harmed, which

is, under those policies we looked at, not what is supposed to happen. Personal grade follows the person, function levels for the job. But she did it for Mr. Medley. But she told Kelly Dawsey that she would move her, when the same thing happened to Kelly Dawsey, that she was moving from a function level three in a TX-64, this time she was specifically told, no, for you, you are going down to a function level four. That is disparate treatment.

Mr. Epps, for the reasons I discussed before, got far more preferential treatment than Ms. Dawsey and he, too, is a man. So, all I have to do to show sex discrimination, race discrimination is show this disparate treatment, and I think we have more than ample evidence on those.

If I can just have a moment.

THE COURT: Yes.

MR. MURPHY: Your Honor, I think that is all I have at this time.

MR. MCCOY: Your Honor, if I can just briefly respond to a couple of points.

Your Honor, Mr. Murphy sites to a couple of decisions, first of all to the *Ricks and Chardon* decisions that Your Honor included in the Summary Judgment Order. And I would just note for the record

that those cases, while I don't disagree with what Mr. Murphy says they stand for, but the facts are important. In both of those cases, they were talking about tenured professors who were given notice of future terminations. An absolute definitive, this is what is going to happen to you, you are going to be terminated, that is not the case here. The *Herkert* case he cites to, the Fourth Circuit Case, that was an actual transfer, the transfer actually occurred, it is not speculative. The focus -- and at one point in time I think, you know, Mr. Murphy said, it is not that it -- it is not that it matters that it is speculative, it does matter that it is speculative. None of this ever actually happened, Your Honor. It did not happen. And so to say, oh, this was going to happen, this potentially would happen, there are multiple levels of speculation here. It is not just -- in this case, Ms. Petrasch said, it is possible, not -- and Ms. Dawsey wrote it into her own notes in her first call with Mr. Murphy's firm where she said "potentially." It was not set in stone, there was no definitive, this position is going to be a function level four. The position was a function level three at that time, there was no decrease, any future action that occurred was speculative.

Now, Mr. Murphy talked about what happened at that job after Ms. Dawsey left, and the fact that there were people hired into that job and they were function level four, they were in a function level four role. That just emphasizes the speculation here because you got to look forward to what happened to people in the future to determine what is the -- you know, what might happen in the future.

Now, with regard to Mr. Epps, there is no dispute in this case whatsoever that Mr. Epps was, when he came to Human Resources, a PG nine. He was elevated to a PG ten after a year, then elevated to a PG eleven after another year. He was brought to the same level as Ms. Dawsey, not elevated above her, not treated more favorably than her, brought to the same level as her. In fact, Ms. Dawsey testified, I believe, and I might get the number wrong, that Mr. Epps was making 30 to $40,000 a year less than her, he wasn't brought to the same level, he wasn't exceeding her, he received no favorable treatment here. Mr. Murphy does have to show that there was favorable treatment to someone of a different race under similar circumstances, that didn't happen here. Mr. Epps was simply brought up to the same level where he was equivalent with Ms. Dawsey, that is not discrimination under Title VII or Section 1981.

Thank you, Your Honor.

MR. MURPHY: Your Honor, can I just make one point? He refers to the notes of when Ms. Dawsey called my office, she had written some notes down, and says potentially three to four, those notes were in September. As I said, at that point in time, the discussion was about Ms. Dawsey going to TX-61. The testimony where she was told by Ms. Petrasch she is going to 64 and it will be a move from three to four was in October after those notes.

THE COURT: Do you have anything else on this?

MR. ROZELSKY: Not on that issue, Your Honor.

THE COURT: Are you ready to argue your part?

MR. ROZELSKY: Yes, I will be brief, Your Honor. Your Honor I am not sure if you can see from there, but I am wearing my German pin.

Your Honor, I am moving for directed verdict on behalf of BMW AG for three very clear reasons. I will acknowledge that I have never three years into a case been still arguing about personal jurisdiction, yet here we are. And that is because when I went back and looked at Your Honor's order denying summary judgment on that issue, it was relying on a lot of things that Ms. -- that ultimately did not come to fruition in Ms. Dawsey's testimony. And I think most importantly,

Your Honor, for both of my arguments, Your Honor, for both the personal jurisdiction and the integrated employer arguments, I think it is very important to look at the evidence that Ms. Dawsey really put into the record about involvement in this specific transaction, that is telling her that she was not going to get TX-6 -- Ms. McCraw was going to get TX-6 and that she was going to be moved out of TX-60. And what she says in this little section that I have highlighted, only way to get local TX-6 is to have international TX-60 to be a bridge to Germany. Already discussed with T and P and it is done.

And the reason that is important, this is in Defendant's 19, I'm sorry, Your Honor, second page of Defendant's 19. The reason this is important is remember this is notes that Ms. Dawsey testified to about her conversation with Ms. Petrasch, a BMW MC employee acting on behalf of BMW MC.

And so when we are talking about personal jurisdiction, and in this instance Plaintiffs are relying on suit-related conduct, that is, specific personal jurisdiction over AG, not general subject or personal jurisdiction over AG. And so you have got to look at whether the Fourth Circuit in the *Duong* at *3 citing *Helicopteros* case from the U.S. Supreme Court,

they look and say, there is a three-part test evaluating whether to exercise personal jurisdiction over a foreign defendant. First, whether and to what extent the defendant purposefully availed itself of the privileges of conducting activities in this state and thus invoke the benefits and protections of its law; second, whether a plaintiff's claim arises out of those foreign-related activities; and, third, whether the exercise of jurisdiction is constitutionally reasonable.

And so the testimony that Plaintiff put up about the involvement of AG, and this, again, will go to my next argument as well on the integrated employer, were all things that she did, all the communications she had with Germany. Not -- with one exception, Your Honor, that is the happy New Year 2022 after she had resigned email that says, happy New Year from the P Circle, and we would like to focus on three things this year, you know, associate relations, moving forward, et cetera.

So, Your Honor, you know, according to Plaintiff, Ms. Petrasch told her about a rule regarding expats. And Ms. Dawsey, herself, was the one that created the document with the -- or at the instruction of a BMW MC employee. She testified that she had spoken with Dr. Englehorn about this issue, again, President of BMW MC. These are all decisions being

made by MC, this is not AG purposefully availing itself of the courts.

Now, I don't want to go too deep in that because I think the more important issue is that BMW AG was not and never has been Ms. Dawsey's employer. So, instead they have suggested that under other Fourth Circuit rules, particularly looking at *Johnson versus Flowers Industries*, there are other ways that they can get to this. And they say either BMW AG substantially controlled the employment practices and decisions of the subsidiary or so dominated the subsidiary's operations that the parent and the subsidiary are one entity and one employer.

Your Honor, in the *Johnson versus Flowers* case, the Fourth circuit has said, when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer. Here, Ms. Dawsey testified that the control exerted over here and exerted over her department by AG, were, at least in her -- in her cross exam we talked about forcing a head count reduction, which she acknowledged was something that they were told, this is -- AG says we want to look at head-count reduction, but then goes on and says, the HR Compact was essentially Ms. Dawsey putting into a template, something they required in

Germany. There was no testimony as to whether or not that was ever done or not.

The other evidence that she showed of BMW AG's control was actually a document that Ms. Petrasch created, you remember the one that has four highlights, it is Plaintiff's 25, where it says, these are the P topics for 2021, four of which were items that BMW HR -- BMW MC HR wanted to export to the global network and the others were local ideas. And that was evidence in their presentation of control by AG.

And lastly is the expat guidelines, of which there is no testimony that anyone at AG even knew that these things existed. So, to rely on and suggest that there is an integrated employer relationship when AG -- there is no testimony they are even aware of these guidelines, would be inappropriate.

Lastly, Your Honor, I want to talk about my favorite part of this case, that is the Friendship Treaty. And I think the Friendship Treaty is important because in Ms. Dawsey's -- in her direct testimony to her lawyer, she said one of the things she loved about TX-60 was that it was a technical position. And that it was technical, and she enjoyed the technical aspects of it, as well as the people aspects. But the technical aspects are important because Article Eight of the

Treaty between the United States and Germany says:

"Nationals and companies of either party shall be permitted to engage within the territories of the other party, accountants, and other technical experts."

Okay. Now, in the summary judgment stage, we were still arguing about whether or not they were executives, and you said it is very clear she is not a level one or level two, but the fact that she offered up the testimony that this was a technical position I think is very important. It is also important, Your Honor, to recognize that none of the cases dealing with the Friendship Treaty fit our scenario because those cases, including the *Sumitomo* case that went to the Supreme Court and the *Korean Airlines* cases, they all deal with a single plaintiff suing a U.S. company. They don't involve this claim of integrated employment and we are going to sue the foreign company and the U.S. company. Okay.

And that is important because when you look at the *Sumitomo* case, ultimately the Supreme Court said, well, if we read the treaty literally, we are looking at a U.S. subsidiary and that is not a company of the foreign territory. My client is a company of the

foreign territory. My client didn't make the decisions, unless you agree with Mr. Murphy that they are an integrated employer, but if they are an integrated employer, and a jury gets to determine whether or not they were involved in this decision, then they get the benefit of the Friendship Treaty. There is no way around that. We are a foreign employer hiring for purposes in the U.S., for us, a technical expert. And so we think we are entitled to a directed verdict on that point, as well.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Murphy.

MR. MURPHY: Thank you, your honor. First let me start with the framing of this whole personal jurisdiction issue. They want to make it an either/or situation, and as we briefed, and has been briefed many times, that is a false framing of the issue. All we need to show for personal jurisdiction is substantial collaboration, and that is the *Universal Leather* case, this has all been briefed before. We just need to show they were substantially collaborating with BMW MC and BMW AG, and every witness has testified to that. And I will go through some of that because I understand for this phase of directed verdict we are limited to what is

in the Court exhibit and what was in the Plaintiff's case.

The perhaps most interesting one piece of evidence that blows through Mr. Rozelsky's entire argument when he says, we are not involved, we are not involved. You saw this come up and it happened pretty quickly, Your Honor, if you remember, Plaintiff's exhibit 37, this was the document that was created by Claudia Koepnick BMW AG. If you remember it was pointed out the date of that document July 2021. That is when these decisions were made.

Ms. Petrasch, in the Court exhibit, also confirms that when working on these matters, she was constantly in contact with Claudia Koepnick, Barbara Burghardt, Andreas Batz about the reorganization. That is in her deposition in the Court exhibit at pages 51, 52, 53, 55, 72 to 79. And it includes some of these exhibits we have been talking about, which were now 42, 26 and 43 and 37, I believe.

Dr. Englehorn, while he was still BMW AG, and while he is still actually in Germany, discussed the filling of TX-60 with Ms. Horstmeier and Ms. Burghardt, and that is in his deposition in pages 51, 52 and 53. BMW AG was involved in filling the TX-6 position, that is at Dr. Englehorn's deposition at page 15. And in

the decision to return Petrasch to AG, that is in his deposition at page 8.

AG was also involved in the other filling of positions, including TX-64, that is at Dr. Englehorn's testimony at page 61.

And, again, I point out, as the Court did in denying summary judgment, that BMW AG people are still BMW AG people when they are here on assignment. They have tried to create the impression, and the jury will hear the readings on this later, they have tried to create the impression that somehow these people shed their AG skin, become BMW MC, and put that skin back on when they go back to Germany, and that is not the case. And Ms. Burgmeier confirms that on pages 50 to 51 of her deposition, and she is employed through contractor AG, even while she is still at MC.

In terms of substantial collaboration, Dr. Englehorn agrees he reports directly to BMW AG, and that is his deposition pages 71, 69 and 73. BMW MC has no supervisory board or board of directors. That is his deposition pages 70, 71. A lot of this has been briefed before, Your Honor. He testifies that they all act seamlessly as the BMW Group, that is at pages 75 of his deposition.

On the issue of central control of labor

relations, Ms. Petrasch has testified at page 19 of her deposition, and Dr. Englehorn at page 70, that this is all read by the P Circle, which is located exclusively in Germany. The P Circle does the real HR planning, that is Ms. Petrasch's deposition exhibit 18, which we have introduced as Plaintiff's exhibits 45. And again at Plaintiff's exhibit 37, which is the one I just read from, Ms. Petrasch discussed that and that was in her deposition at that point it was Petrasch exhibit 19. And Ms. Koepnick, as it shows on your screen, she is the one doing this. She is the one who actually set out the plan, which is the plan that took place. They can talk about TX-61, and they can talk about Corey Epps, and they can talk about all of the documents they created at MC, but at the end of the day, just like the unwritten rules of Germany trump the written rules at MC, Ms. Koepnick trumped Corey Epps, but they have no involvement in this case? Their own documents show they were involved in this case.

BMW AG validates the candidates who can serve on positions at MC. And, again, that is backed up, not only by Ms. Dawsey's testimony, but by Ms. Burgmeier in her deposition and the Court exhibit pages 34, 35. She is in constant communication with BMW AG. And Ms. Burgmeier characterized it as very frequently when

she was in the position.

Dr. Englehorn agreed about TX-60 being in constant communication with AG, and that is in his deposition pages 57 to 58. Also in the Court deposition is a discussion from Ms. Petrasch about BMW MC having to follow the master structure set by BMW AG. Again, substantial collaboration is not at issue. That is her deposition at pages 32 and 33. There was the HR Compact testimony that Kelly Dawsey testified to and that BMW was dictating how the positions must fit into SAP.

Kelly also testified about a lot of other areas. For example, the T-Vorhalt Request. Just to fill any position in any shop, she has to go to Germany and get permission and to get the funding.

Mr. Bailey, in the Court exhibit page 32, testified that, yes, the positions have to align with Germany. And that BMW wanted all plants aligned, that is at page 33 of his deposition.

Dr. Englehorn agreed that they consulted AG on all moves because the need for the organization to align with the international network, that is pages 59 to 61 of his deposition in the Court exhibit.

Again, the FO Circle, again, located exclusively in Munich, must approve every position, and

that is Ms. Petrasch at pages 43 through 44, and 44 through 46 of her deposition.

If you remember, this was discussed as well, but Plaintiff's exhibit 27, created a new position TX-66, what do they have to do? They have to go to Germany to get it all approved.

Grading of positions. You may remember Plaintiff's exhibit 22, which was also Petrasch exhibit 6, the international grading function level four approval committee, even for function level four positions, Germany decides. Ms. Petrasch talked about this committee, upon which nobody from BMW MC serves, as operating all over the world. And she also explains at page 35 of her deposition that Germany maintains the department to grade all positions at MC.

So, although a lot of talk about grading and when grading was done and grading wasn't done, that was all BMW MC -- I'm sorry -- BMW AG, which took more and more functions away from BMW MC. You may remember this discussion on Plaintiff's exhibit number 2, which is the old chart for TX-6 in Spartanburg. If you look at the footer, you may recall the testimony that BMW MC can't even create its own work charts anymore. That is all being done, as Ms. Dawsey testified, that was taken away, and that is all being done by Germany.

Succession planning is done by Germany. Dr. Englehorn said that at pages 13 to 15 of his deposition. And, again, we looked at this exhibit 37, which was -- the testimony was that was created by Claudia Koepnick in Germany, and that is what she said she wanted to have happen and that is what happened. To say BMW AG is not involved in this, it is very difficult to understand with that type of evidence.

I will go to the Treaty issue, Your Honor. First of all, what bothers me about the Treaty is that it flies in the face of everything that BMW AG has said in the last four years. The Treaty only allows a foreign corporation to move certain people here to their corporation. The Supreme Court was very clear, it doesn't apply to a position being moved to a subsidiary, and BMW MC is a Delaware LLC, with a principal place of business in Spartanburg. They admitted that in the pleadings.

And throughout this case, Mr. Rozelsky's position has been that BMW AG had no role in the decision to put Ms. Burgmeier here when we know that is not true. The discussions happened before Mr. Englehorn -- Dr. Englehorn -- excuse me -- ever came here, and it happened with people like Ms. Horstmeier and Ms. Burghardt. He has said there is no facts in

the record demonstrating AG's direct involvement in any of these decisions. And he said the premise that AG made personnel decisions has been proven to be factually incorrect. That kills any argument about the Treaty because for the Treaty to apply, they have to be the one making the decision. The Treaty doesn't cover the subsidiaries, American subsidiaries, so he can't have it both ways.

I also note this is an issue he bears the burden of proof on and he has no witnesses. So, what evidence is there in the record on which you can make factual findings that the Treaty applies? There is none. And the Supreme Court decision, we briefed this before, Your Honor, is the *Avagliano*, A-v-a-g-l-i-a-n-o, case, 457 U.S. 176. In *Avagliano*, Supreme Court held that a wholly-owned Japanese subsidiary that is incorporated in the United States, quote, is not a company in Japan under the Treaty, and, therefore is not covered by Article 8, which is that Treaty, and that is at page 183. So, this Treaty never applied because the position is at BMW MC.

It also doesn't apply because TX-60 is not an executive level position. And if you will remember Plaintiff's exhibit 12, Your Honor, at page 6 or BMW MC 1716, it looks like to me, BMW is very specific:

You see the President and the Vice President level positions are the ones designated executive level; level three, level four are management level. So, even within their own policies these are not executives, but you already made findings, Your Honor, that these are not executives. And we have also provided other support on that. None of these people at function level three or function level four are officers in any way of BMW MC. And this level we talked about level one, level two, the executives, that is what they refer to as the OFK and you have to be validated into that.

Technical expertise. Again, they reframe the issue and frame it up incorrectly. The issue isn't whether the position calls for technical expertise, it is whether the person has technical expertise. Ms. Burgmeier has no technical expertise for TX-60. She had never worked here before. She had no experience with things like OFCCP or with ERISA. She testified in the Court exhibit, page 48, she had only ever worked in Germany for BMW. While she has a German variation of a law degree, she agreed at pages 56 to 59 she had never had a course in United States law. Pages 63 to 65, she agreed she had no experience in U.S. regulations or South Carolina regulations; U.S. HR policies; prepping info requested for compliance with U.S. or South

Carolina laws; modifying or designing policies to comply with U.S. or South Carolina law; she had no experience in health benefits in the U.S.; she had no experience in reporting requirements including ERISA, contributing development of compensation strategies in the U. S. That is all from -- directly from the job description, she didn't have any of that. She has no SHRM certifications or other HR certifications, that is at page 65. Also at page 65, no ERISA experience. Page 66, no experience with HIPAA, and she didn't even know what it was. She testified at pages 66 to 68 that while she is brought in as a compensation manager, in Germany compensations are done all differently, it is done, and you heard similar testimony at trial, but she says in the Court record, that in Germany wages are determined with the union. She has never used the MRSA system, which is the point system, the system that ranks the jobs, she had never used that, that is at page 69 of her deposition. She has never prepared an OFCCP report, that is at page 69 of her deposition. Never prepared OFCCP reports. Mr. Trauth, who hired her, knew that, and she admits that on pages 128, 130, and 131 of her deposition.

But even if somehow they can get beyond all of that, the Treaty doesn't give them carte blanche to

engage in any type of discrimination they want because their whole theory is that Ms. Burgmeier coming in here was a separate issue from where the others would move. Well, if that is the case, then the Treaty doesn't apply anyway. There is nothing in the Treaty or any case law that would give anybody a defense to demotion or the favorable treatment shown to men or minorities. That is not what the Treaty is about. So even if somehow he could establish his affirmative defense, as a matter of law, it doesn't cover this type of discrimination.

If I could have just a moment, Your Honor.

THE COURT: Yes, sir.

MR. MURPHY: Your Honor, I believe that covers it.

THE COURT: Let me ask you this, Mr. Murphy, if the Court or the jury determines that BMW AG is not an integrated employer of BMW MC, is AG then out of the case?

MR. MURPHY: No, sir, because it could still be an employer and it could still be held liable for its direct involvement in the discrimination. Once the juror kind of focuses on jurisdiction, the *Hukill* factors and integrated employer is not about jurisdiction, it is about -- usually about two companies that there is no dispute about jurisdiction, it is about

whether they are operating, so it is two separate issues.

THE COURT: Well, let me ask you this, if the Court or the jury determines that BMW AG is not the employer of the Plaintiff, is AG out of the case? While you are thinking about it, I will ask Mr. Rozelsky the same question.

MR. ROZELSKY: I think unequivocally AG is out of the case. I also think, Your Honor, I think that what Mr. Murphy just said in argument was the issue is the movement within the TX-6 Department, and there are no allegations that AG was involved in the movement; the only allegation is that AG sent Eva Burgmeier over here. Maybe I misunderstood Mr. Murphy's statement. And, Your Honor, I think the statute defines employer, I mean, I am accused of wanting it both ways, but what I have heard is, BMW is an integrated employer, the only testimony from Ms. Dawsey was, I didn't work for AG, and they were never my employer.

So, the only way AG stays in is if Mr. Murphy can show that we were substantially controlling or we were an integrated employer. And my contention is, he can't show either of those. In fact, the exhibit that he still has on the screen is an email from Ms. Petrasch to Ms. Koepnick.

MR. MURPHY: No. There is very clear testimony about that chart being created by Ms. Koepnick, and I have others, and they admitted that in discovery because I specifically requested, that chart shows up in different exhibits. And it is an attachment to different things. And I asked specifically in discovery who offered that. MC said, we don't know who offered that document; Mr. Rozelsky responded that Ms. Koepnick created that document, so that is from your own discovery responses.

MR. ROZELSKY: In AG's discovery responses? Your Honor, if you look at the cover sheet of Plaintiff's 37, it is an email from Ms. Petrasch to Ms. Koepnick. Now, I don't read German, so I don't know what it is all saying underneath that, but what Mr. Murphy just showed you is the second page, and the second page is the page that has Ms. Burgmeier on it. But, Your Honor, I think the point is the Plaintiff can't say, their own employment, which is what she testified to. She has never applied, never received any money, never suggested she was an employer of AG. The only way that AG remains in this case is if Mr. Murphy can show that they are either substantially controlling the HR functions or that they are an integrated employer. Absent that, AG goes home.

THE COURT: So, let me go back to my question, if the Court or the jury determines that BMW AG is not the employer or was not the employer of your client, is AG out?

MR. MURPHY: Well, the reason I struggle with that is because the definition of "employer." First of all, under Section 1981, no, it doesn't matter whether you are an employer or not. Section 1981 doesn't -- goes way beyond employer status. Secondly, as to Title VII, the definition of employer starts getting into things like agent of employer and those acting on behalf of an employer. So, it is a little bit of a circular reasoning for me to answer the question because there are different ways to prove that they are an employer. But we are essentially saying they are directly involved in the discrimination, and we showed you Plaintiff's exhibit 37 right there. And that they are a -- they are liable is an integrated employer. So, there are many ways to be liable under these laws without being what people consider to be the employer, and that is why I struggled with your question somewhat.

THE COURT: So, if it is determined, let's say it is determined by the jury, that BMW AG and BMW MC are not integrated employers, you are saying the 1981 claim can survive that?

MR. MURPHY: Absolutely.

THE COURT: Based on what contract of employment?

MR. MURPHY: I don't have to prove a contract of employment, I have to prove a relationship because the Section 1981 cases are very clear, you can have a total off wheel situation that is covered by Section 1981, so I don't have to prove a contract in that regard. But I guess I am puzzled, I don't know what question the jury is answering or how the question is worded, and that is my hesitation is giving the answer when I don't know exactly what the question they are being asked is.

If the question is, do you find them to be an integrated employer and they check no, can they still be liable? Yes, because of their direct involvement, they can still be an employer. Integrated employer and employer status are two completely different concepts. The argument he has made under directed verdict is not about integrated employer. He is arguing personal jurisdiction, and so that is how we have kind of veered off into this integrated employer issue. But his whole argument was just that there is not personal jurisdiction.

MR. ROZELSKY: That is absolutely a hundred percent incorrect, Your Honor. I said, a lot of those arguments of control involve both the personal

jurisdiction and whether or not they are an employer, and I think the record is pretty clear that I was referring to both of those issues because Your Honor ruled on both of those issues at the summary judgment phase. And I still I am not sure I understood Mr. Murphy to suggest what the basis for personal jurisdiction was. He went into a long discussion about control, about other issues, about validation by AG, but that has nothing to do with case specific Ms. Dawsey. I still -- I am not sure -- maybe he blended them as well, but I didn't hear what he said was the basis for Ms. Dawsey's testimony as to how there is personal jurisdiction over BMW AG. I think they acknowledged at some point earlier on in pleadings that this was a specific jurisdiction, not a general, personal jurisdiction position they were taking.

THE COURT: So, if the jury is asked the question, do you find that BMW AG was an employer of the plaintiff and the answer is no, how does BMW AG stay in the case?

MR. MURPHY: Is the definition they are given of "employer" the full definition, talks about agent of employer, and so forth, before they are asked that question?

THE COURT: Well, assume that is the question

they get. You are saying that the term "employer" would need to be defined?

MR. MURPHY: Yes, sir, because both employer and integrated employer would need to be defined. I mean, ultimately, we take this to the end and you say, if you lose, did you lose, but it is how we get to that how we get to that. I am concerned about conceding an ultimate result --

THE COURT: I understand. I understand.

What is AG's position on that?

MR. ROZELSKY: About whether you should charge the jury on the definition?

THE COURT: Well, we will get into that, I am just asking if the question to the jury is, was -- or was BMW AG an employer of the Plaintiff? And the question -- and the answer is no?

MR. ROZELSKY: I think they stop answering questions as to BMW AG at that moment. The moment they check the box that says BMW AG is not an employer, they don't go on.

THE COURT: Okay. All right. Anything else on these motions?

MR. MURPHY: No.

MR. MCCOY: Not from MC, Your Honor.

MR. ROZELSKY: Nothing, Your Honor.

THE COURT: Anything else, Mr. Murphy?

MR. MURPHY: No. I appreciate the opportunity to be heard, Your Honor.

THE COURT: Yes, sir. Well, it is about five minutes till one, let me ask -- let's break until 1:30. Try to start back at 1:30. Then I will come back and give you my ruling.

(Whereupon, a lunch recess was held)

THE COURT: Please be seated. Let's go on the record. I have had an opportunity to carefully consider all of the information presented with respect to the motions of the Defendants, including your briefing previously submitted in conjunction with summary judgment motion, as well as arguments you have made today and the authority you have referenced, and so this will be my ruling on those motions.

Rule 50 of the Federal Rules of Civil Procedure provides, if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party and grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with

a favorable finding on that issue.

A motion for a directed verdict, now a judgment of a matter of law, how it is often referred to, it is often referred to as directed verdict, but such a motion under Rule 50 raises a question of law only where there is -- whether there is any evidence which, if believed, would authorize a verdict against the movant.

The trial judge in considering those motions does not exercise discretion, but makes a ruling of law as noted in *Marsh versus Illinois Central Railroad Company*, 175 F.2d 498, a Fifth Circuit 1949 case. Because of this, the power to grant such motions must nonetheless be exercised with great restraint in order to avoid the possibility that a party will be precluded from presenting facts, which make out a question for the jury. It is noted in *Buchanan versus City of San Antonio*, 85 F.3d 196, a Fifth Circuit 1996 case.

Judgment as a matter of law is appropriate only when the evidence can support only one reasonable conclusion as noted in *Chaudhry*, C-h-a-u-d-h-r-y, versus *Gallerizzo*, G-a-l-l-e-r-i-z-z-o, 174 F.3d 394, a Fourth Circuit 1999 case.

The evidence and all reasonable inferences from it are assigned -- are assessed in the light most favorable to the non-moving party and the credibility of

all evidence favoring the non-moving party as assumed, as noted in *Crinkley versus Holiday Inn's Inc.*, 844 F.2d 156, a Fourth Circuit 1988 case.

If there is any evidence on which a reasonable jury could return a verdict in favor of the non-moving party, judgment as a matter of law should not be granted. I reference the case of *Price versus City of Charlotte*, 93 F.3d 1241, a Fourth Circuit 1996 case.

However, a mere scintilla of evidence introduced by the party having the burden of proof is not enough to avoid entry of judgment as a matter of law as noted in the case of *Bongam*, B-o-n-g-a-m, *versus Action Toyota, Inc.*, 14 Federal Appendix 275, a Fourth Circuit 2001 case.

Instead, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which the jury could properly proceed to find a verdict for the party producing it upon whom the onus of proof is imposed. And that is noted in the *Bongam* case, which quoted *Anderson versus Liberty Lobby, Inc.*, a U. S. Supreme Court case from 1986 at 447 U.S. 242. Also note the case of *Mathis versus Terra Renewal Services, Inc.*, from 2023. And in considering this standard, as provided by the Rule and the authority

cited, I will first address the motion of BMW AG.

As to the motion of BMW AG, for judgment as a matter of law on the issues of personal jurisdiction and integrated employer, based on the testimony and evidence presented, viewing the same in the light most favorable to the Plaintiff as the non-moving party, pursuant to the standards cited, said motion should be in the same and is hereby denied as to both issues.

As to the motions of BMW MC and BMW AG for judgment as a matter of law on the claims of race and sex discrimination, I find, based on the testimony and evidence presented, viewing the same in the light most favorable to the Plaintiff as the non-moving party, pursuant to the standard cited, that said motion should be and the same is hereby denied as to both claims. Thank you.

MR. ROZELSKY: Your Honor.

THE COURT: What?

MR. ROZELSKY: Are you getting to the Treaty? Or are you withholding at this point?

THE COURT: I am taking that one under advisement.

MR. ROZELSKY: Thank you, Your Honor.

THE COURT: Okay. Are we ready to proceed with the testimony?

MR. MCCOY: Yes, Your Honor. Ms. Miller is here and we are ready to go.

THE COURT: I said "what," I should have said "sir."

MR. ROZELSKY: That is okay. I am the youngest of four boys, Judge, I answer to just about anything.

THE COURT: Bring in the jury, please.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Welcome back, members of the jury. Some of you may be thinking that one thing you have learned as a part of this process that judges can't tell time and there is some truth to that. I apologize for the delay. The matters we needed to take up and had to take up took longer than we expected and we took a very expedited lunch break, so we are ready to start back up with the testimony now and the defense may call its next witness.

MR. MCCOY: Thank you, Your Honor. Defendant MC calls Sherrill Miller to the stand.

THE COURT: Come up to be sworn.

THE CLERK: Raise your right hand.

SHERILL MILLER, having been first duly sworn, testified as follows:

THE COURT: Come around, have a seat in the

witness box.

DIRECT EXAM

BY MR. MCCOY:

Q. Good afternoon.

A. Good afternoon.

Q. Would you please state your full name for the record?

A. Middle as well?

Q. Yes, please.

A. Sherrill Yvonne Miller.

Q. Ms. Miller, what do you do for a living?

A. I am a national direct hire recruiter.

Q. And where do you currently work?

A. The Savage Group.

Q. Who owns The Savage Group?

A. I do.

Q. And prior to The Savage Group, did your business have another name?

A. It did. Prior, Pro Job Source; post divorce and before that for 20 years Career Source USA in Charlotte, North Carolina.

Q. Have you also operated under the name Morse and Savage?

A. Correct, here in Greenville, yes, sir.

Q. Ms. Merrill, have you ever done any recruiting

work for BMW Manufacturing Company?
A. Directly?
Q. Yes, ma'am.
A. No. But to their tier one and tier two suppliers, yes.
Q. Have you ever received any compensation from BMW Manufacturing for performing any recruiting services?
A. No.
Q. Do you know the Plaintiff in this case, Ms. Kelly Dawsey?
A. I do.
Q. And how do you know Ms. Dawsey?
A. Well, we met outside of work and I was representing a neighbor through her husband through Ms. Kelly -- Ms. Dawsey's husband. I became familiar with him helping an elderly neighbor with some stuff he was having done to his home after a tree fell on his home. And I was thereby introduced to Ms. Dawsey through her husband.
Q. Do you recall when you first met Ms. Dawsey's husband?
A. I know that it was in the later months of the same year I met Ms. Dawsey, it was in like October-ish.
Q. Let me see if I can look.
A. I apologize.

Q. I understand. It has been a few years.

MR. MCCOY: May I approach the witness? I will give her a paper copy of the exhibit number 27. We will use them electronically, I want her to have a complete copy.

MR. MCCOY: Has 27 been admitted? It has.

THE COURT: I am showing Defendant's 27 as in.

MR. MCCOY: Okay. Thank you.

DIRECT EXAM CONTINUED

BY MR. MCCOY:

Q. So, Ms. Miller, you have been handed a package of information, it has been marked as Defendant's exhibit 27. Just looking at the first page of this document, do you recognize this stack of documents?

A. I do, yes, sir.

Q. Can you tell me what these documents are?

A. These are some communication emails back and forth between myself and Mr. Greg Dawsey. There will be notes in here about some meetings and gathering of information between myself and Ms. Dawsey. And there will also be just a little bit of back and forth information. I never communicated with them together, but separately.

Q. Understood. But these are documents that were maintained by your recruiting company, Morse and Savage,

at the time?
A. Yes.
Q. All right. So, if I can ask you to just look at the first page of 27. You set -- you first met Ms. Dawsey's husband, Greg Dawsey, what was the date of that first email with Mr. Dawsey?
A. The first email is September 8, 2022.
Q. Does that refresh your recollection as to when you first encountered Mr. Dawsey?
A. Yes.
Q. It would have been some time prior to that date?
A. Yes.
Q. Do you recall how many days or weeks ahead of that before that date you met Mr. Dawsey?
A. Less than sixty days.
Q. You met Mr. Dawsey at a neighbor's house, if I understand correctly?
A. Yes, that's correct.
Q. On September 8, 2021 at 4:43 a.m. he sent you an email, what did he provide in that email?
A. I believe it would have been the resume for Ms. Dawsey.
Q. Ms. Fowler, flip over to pages three and four.
Is that the resume that you received attached to this email?

A. Yes, it is.
Q. Had you requested Mr. Dawsey provide a resume from his wife?
A. I did. I did request that.
Q. Did he provide any additional information to you at that time?
A. In reference to Ms. Dawsey?
Q. Correct.
A. No, sir, not really. The resume was an indication of information that I needed and I received it, and my next step would have been to reach out to her.
Q. So, why did you ask Mr. Dawsey to send his wife's resume to you?
A. Okay. The request was made specifically because in our conversations, my conversation with Mr. Dawsey, and I explained what I did for a living, he was familiar with the terminology, recruiting, et cetera, because she is in HR, so he was familiar and he said you might want to talk to my wife, and the conversation went from there. I wasn't sure what I was stepping into, but happy to help because I have helped several throughout the years I have done this. And I absolutely wanted to be in a situation to meet her specifically because BMW, we had that common as a

footing.
Q. Okay. So, prior to receiving this resume on September 8th, were you aware that she worked at BMW Manufacturing?
A. No, not by then.
Q. So, once you received the email from Mr. Dawsey on September 8th, what did you do with that information?
A. I would have reached out to Kelly -- may I call her Kelly?
Q. Certainly.
A. I would have reached out to Kelly to have a conversation, just hello, and try to find out where I could be of use and/or services. I did not know if it would become a BMW-direct relationship or if I was working with her on something possibly. It ended up that I would help her.
Q. Okay. And let's go, if you will, go to page five in this packet, and I will just reference the numbers down at the bottom, Ms. Miller.
A. Okey doke.
Q. If we look at the page that is marked Morse and Savage five, is this an email that you received from Ms. Dawsey on September 13th?
A. Yes, it is an email I got from her, yes.
Q. All right. Prior to receiving this email, did

you meet with Ms. Dawsey?
A. As per the email states, we did meet, I think it was -- I am pretty sure we might have met for breakfast or something such as -- maybe lunch.
Q. Well, let me ask you this, in the first line of that email it says, "it was a pleasure to meet you on Friday"?
A. Uh-huh (affirmative response).
Q. The email is dated "Monday, September 13th"?
A. Yes, sir.
Q. So, was your first meeting with Ms. Dawsey the prior Friday?
A. Yes.
Q. That would be September 10th?
A. Yes.
Q. Then it goes on to say, "although our meeting was virtual," does that refresh your memory as to how you met with her?
A. Yes, it was conversation and just discussion of what I might be able to assist her with.
Q. And what did she tell you that you could assist her with?
A. That she wanted to pursue something a little different from where she was currently and what she was doing currently in work and job, and would I be able to

assist her, and the answer was yes.
Q. Did she give you any explanation about what she -- what she was looking for?
A. Not at that time. I do recall the first conversation was short and specific to just, you know, could I help her, and we probably discussed a little bit about how that would work from both sides and how I might need to move forward and help her, and who, and what, or with who I would call or speak to.
Q. And during that initial conversation on September 10th, did you talk to Ms. Dawsey about her job duties at BMW?
A. I did. I was then aware, obviously, I had had the resume in front of me, so I was then aware of her position and what she was doing at that time.
Q. And during that initial conversation, did she tell you that she wanted to do something different in terms of the job she was doing?
A. She knew that if she was leaving BMW she would absolutely probably be doing something different, and based on our conversation, she wanted to stay in Human Resources, if possible, but she was open, as well, to other opportunity that might fit parts or pieces of her background and experience.
Q. Did she indicate to you there were certain job

duties she did not want to do any longer?
A. We did talk about some likes or dislikes or, you know, possibilities, or not the area I want to go into or anything such as that. But, ultimately, we were going to be looking at where she needed to be maybe outside of BMW or another opportunity that would be similar in title, but not BMW.
Q. Okay. Did she indicate she was looking for less responsibility?
A. Yes. However, when I phrase what I want to say, it wasn't that she was looking for -- I mean, she is like me, we are getting older and she was looking to maybe change her path a little bit, take a little step back from career and certainly the hours that she was having to put in in the job that she was currently in.
Q. So, following the meeting with Ms. Dawsey on September 10th, is this 13th email the next communication you had with her?
A. Yes.
Q. On September 13th, what did Ms. Dawsey send to you?
A. She sent me a list of reasons and/or companies that she might be interested in pursuing. She sent me a list that she was not necessarily interested in pursuing and a couple of names of individuals we did

have in common and maybe we didn't necessarily want to go in that direction or path for new opportunity. I did have to acknowledge for her and for part of the conversations I did have to acknowledge and dissect with her a comfortable salary range that would benefit her.

Q. So, Ms. Fowler, if you will go to page two of the email, please.

So this is Morse and Savage page 8. Is this a list of the companies that Ms. Dawsey provided to you that she was interested in and not interested in?

A. Yes, it is.

Q. You received that on September 13th?

A. Yes, sir.

Q. After your initial, I guess, virtual meeting with Ms. Dawsey followed by this email, what was your impression of her?

A. I was certainly impressed. I wanted the opportunity to represent such of her level. She was very professional and I enjoyed the conversation with her greatly. It was an ease of communication.

Q. Did you enter into an agreement to provide recruiting services to Ms. Dawsey?

A. Yes, I did.

MR. MCCOY: Ms. Fowler, pull up number 28 for me, please.

Your Honor, this is Defendant's 28. It has already been entered into the record.

THE COURT: Thank you.

DIRECT EXAM CONTINUED

BY MR. MCCOY:

Q. Look on the screen in front of you. Ms. Miller, is this the agreement that you provided to Ms. Dawsey?

A. Yes, it is.

Q. Did Ms. Dawsey returned this agreement to you signed?

A. Yes, sir, she did.

Q. And so what services were you going to provide to Ms. Dawsey under this agreement?

A. In the industry of recruiting, I can recruit forward the candidate to the employer that is seeking the level of experience, the right salary band, et cetera. This is called reverse recruiting, I don't have a job description from the client saying we are seeking a Ms. Kelly Dawsey. It is an absolute opposite. It is a marketing mad of a day to do the opposite of what we typically and how we typically get paid.

Q. So, this is not the typical arrangement you have?

A. This is not.

Q. And pursuant to this agreement, did Ms. Dawsey

pay you for your services?
A. She did.
Q. Pull up 29, please.
And, Ms. Miller, is this the check that you received from Kelly Dawsey of $1,500 for your services?
A. Yes, sir, it is.
Q. And that was -- that check is dated September 16th of 2021?
A. It is, yes, sir.
Q. Ms. Miller, in the fall of 2021, how often did you communicate with Ms. Dawsey?
A. Not as often as I would have wanted to or in a typical recruiting forward method because it was -- this was an extra step for us to take in the office to present her to companies throughout the Greenville or Upstate area because we did not have a job description specifically for her search. If I can, I called on companies blindly, hi, hey, I have a candidate, I have an HR candidate open, I would like to introduce this candidate for your review and consideration.
Q. Open up 27. I will go to Morse and Savage number 23.
This appears to be an email to you from Ms. Dawsey on September 22nd?
A. Yes, sir.

Q. Tell me what you were doing on that date on September 22nd.

A. Giving her an update listing companies I have reached out to or have not spoken to, kind of giving her information regarding clients that were interested, not interested, willing to review a resume blindly. In other words, they did not have a name, they didn't even have the name of the place where she was working.

Q. Okay. Understood. All right. Do you recall if you received a response from Ms. Dawsey to this email?

A. I am not -- I am sure she probably responded. There was not a time that I reached out to her that she did not respond. Some of the clients we probably spoke about more than once in this particular document. There is a client that is listed, Hubbell, and that is Hubbell Lighting. I had a good relationship with the HR director there and although Hubbell was on Kelly's list of do not, I had reached out to them not coordinating my notes correctly.

Q. All right. So let's go to page 25, this is exhibit 27 -- Defendant's 27.

So, if we look over, Ms. Miller, on the Morse and Savage page 25, the bottom of that email, did you receive an email from Ms. Dawsey on September 29th?

A. Yes, I did.

Q. Did she request that you have a weekly check-in?
A. Yes, she did because I had missed a couple of weeks here or there.
Q. And after receiving this email from her, did you schedule an in-person meeting with her?
A. I believe we did. I am looking at the dates, hold on. I am sorry. I don't have my calendar to refer to. Yes. I did try and I believe we met the next opportunity we had.
Q. Okay. Right above that email it looks like you said, "I am available next Wednesday or Thursday," do you recall you met with her on the following Wednesday or Thursday?
A. Yes.
Q. Where did you meet her?
A. I believe we met at a little restaurant down off Pelham Road. I cannot recall the name of the restaurant, but it was a lunch hour, that is all we both had.
Q. Do you recall what you discussed with Ms. Dawsey at that meeting?
A. I found Ms. Kelly Dawsey to be personable and professional. We had conversation as moms, as wives, as business associates, and certainly on this particular project.

Q. So, you considered yourself friendly with Ms. Dawsey?
A. I did.
Q. During that meeting, do you recall if Ms. Dawsey said anything about her job at BM W?
A. I don't recall anything specific other than she was trying to emphasize the pull back from the hours and the time that was being invested, she has daughters going into college and in college, and that is all I can really recall. She never spoke negatively about BMW in any capacity in any of our meetings.
Q. If we could go to page 28 of exhibit 27.
A. Yes, sir.
Q. It looks like an email you received from Ms. Dawsey on September 30th, do you recall seeing this email?
A. Yes.
Q. Can you tell me what was happening with this email?
A. This was probably, and I don't want to get the company wrong, but this is regarding an opportunity that I believe she -- let me look at this real quick, okay. I believe this was a company that maybe she had contacted or had a contact with or anything such as that, and she was just getting me on board to go ahead

and reach out on her behalf and do what we had been doing with some of the others on the list.

Q. Okay. So she found a -- she found an opportunity and reached out to you and said here is one I want you to followup on?

A. Yes.

Q. If we could go to page 52. If you will flip forward to Morse and Savage 52, please, ma'am. If you will go to the second page of that. Okay.

So, down at the bottom of what is marked as Morse and Savage page 53, there is an email that appears to be to you from Ms. Dawsey on November 9th?

A. Yes.

Q. So, do you recall what had been going on on November 9th?

A. I had been sick and not in the office, and it was during the time of like COVID-ish, and I had apparently gotten ill and was responding to her concern that I had not checked in with her in a couple of weeks and she was just checking back with me.

Q. Ms. Fowler, go back to the first page, please. All right.

So, it looks like you responded to her on November 10th, the following day?

A. Yes, sir.

Q. And at that point in time it looks -- it appears you provided her an update on all of the activities you were engaging in on her behalf?
A. Correct. A list of companies, et cetera, some interests, some not interests, some didn't go anywhere.
Q. The email that you received on November 9th, what was your reaction after you got that email from Ms. Dawson?
A. I was concerned because I had not -- again, I want to repeat that this particular type of recruiting is not typical. We don't have a job description and I am reaching out to companies that would benefit from having her sit within their four walls. So, she was looking and waiting for me to respond and I had been out sick and had not kept up with it as I should have.
Q. All right. So, if we could go to 56, please, page 56, Ms. Miller.
This is an email from you to Ms. Dawsey, it looks like Wednesday, November 17th. I will point out in the first line you say, "just wanted to send you a quick note to tell you again how much I enjoyed meeting you yesterday." Was that an in-person meeting?
A. It was.
Q. Do you remember where you met with her on November 16th?

A. I am not a hundred percent sure, it would have been another quick lunch meeting. Honestly, I am not a hundred percent sure.
Q. Okay. All right.
A. But in this one we did have her scheduled with a client.
Q. And then if we will go to page 61, please.
I will flip over Morse and Savage 61, this appears to be an email from you to Ms. Dawsey December 2nd of 2021?
A. Uh-huh (affirmative response).
Q. At that point in time, did you have some opportunities for her?
A. Yes, we did.
Q. And we see down at the bottom of page 61 a reference to Madewell concrete?
A. Yes, sir.
Q. How did you know Madewell Concrete?
A. At the time I did not. They had posted that they were looking for an HR individual at the time, didn't know what the level was or anything like that, but we did our due diligence, reached out, gathered the information, and seemed like a seamless rollover for Kelly to be interviewed.
Q. Okay. And was Ms. Dawsey interviewed by

Madewell?
A. She was, yes.
Q. Was she hired by Madewell?
A. She was, yes.
Q. Do you know what level of job in their HR department she was hired for?
A. She was actually hired to develop that HR arena from the bottom up. The young man who owned that company did not, in my opinion, have a clue how to run or manage human resources for the number of people that he had employed and it proved to be kind of a seamless move for her. She was able to take it from not a whole lot of HR assets to putting them where they needed to be in business for HR.
Q. Once Ms. Dawsey was offered the job at Madewell Concrete, did you have discussions with her about that job?
A. I did. I did not have any conversation -- I don't recall that we were even made aware of salary or anything like that, that was --
Q. Was Ms. Dawsey -- what was Ms. Dawsey's reaction to getting a job offer from Madewell?
A. She seemed genuinely excited to be able to make the change and felt like she would bring great value to that company.

Q. If we could go to 65, please. Flip over to Morse and Savage 65.
On January 10th, 2022, did you receive an email from Ms. Dawsey?
A. Yes.
Q. What did she tell you in that email?
A. In that one we were going to meet again, it would have been after the holidays, this was in January. I hadn't really spoken to her or talked to her very much because then again it was the holidays. She had -- was notifying me she had presented her resignation and that it was hard to do so, but she felt like she would concentrate on the new challenges to move forward for the year.
Q. If you look at your response to her, it appears the same day you talked about having lunch with her on January 26th?
A. Correct.
Q. Did you meet with her again?
A. I did.
Q. What did you talk about on January 26th?
A. In that time I recall we met at Strossner's since I have forgotten everything else. We were thankful and grateful in our conversation. Bringing her into my career set and where I had been thus far with salary

ranges and placing individuals, you know, we had placed a couple of people within the banks, like Bank of America or what used to be First Union. We had not had the success in a change of salary where this put us, reverse recruiting for an individual. In other words, if I need to define that.

Q. No.

So, in that meeting, did she have anything negative to say about BMW?

A. Kelly Dawsey never spoke negatively in any way, shape, or form regarding BMW. She never shared if there was a concern, but nothing on a real personal work situation was ever described to me in any negative way.

Q. Did she ever tell you that she felt that she was being discriminated against working at BMW?

A. No, sir, she did not.

Q. Did she ever tell you she was being demoted by BMW?

A. No, sir, she did not.

Q. Did she ever tell you she was being forced to change positions at BMW?

A. No, sir, she did not.

MR. MCCOY: Give me one second.

MR. MCCOY: That is all the questions I have,

Your Honor.

MR. ROZELSKY: No questions for this witness, Your Honor.

CROSS EXAM

BY MR. MURPHY:

Q. Good to see you again, Ms. Miller.

A. Thank you, sir. Good to see you.

Q. I want to start, I won't be long. I want to start with what Kelly initially -- first of all, so Kelly didn't seek you out, you happened to get her name because you were both -- you were at a house with her husband and happened to bump into him, that is how all this started?

A. Well, yeah, if we don't word it exactly that way.

Q. What?

A. If we don't word it that way. My mother lived next door to this elderly gentleman. He was the contractor who came in to help the man build his house back after the big tree fell on it.

Q. Okay.

A. And I only went to give my input because there were a couple of things that the elderly gentleman needed done and wanted done and I don't think he felt confident enough to speak to it, so I did.

Q. Okay. And when you started talking to Kelly

about her expectation, what she told you is that she no longer wanted to work 12 to 15 hours a day; is that right?
A. Correct.
Q. And, in fact, in her one email to you, we are on this Defendant's exhibit 27, she told you she was looking for a culture of fast pace change orientation and leadership, right?
A. Yes, sir. I don't know what page that is, but, yes, I do recall.
Q. It was on page 5. And she gave you a list of companies she was interested in, right?
A. She did, yes, sir.
Q. These are big companies, aren't they?
A. Yes, they are. Some of them I had -- some of them I had worked with before, some of them I had not, and I was up for the challenge.
Q. And you spoke about the Madewell job and what that entailed?
A. Correct.
Q. Was that an easy job to just slide into and coast?
A. For her or for me?
Q. For her?
A. Oh, no, she definitely had to have her wits about her and probably pull a plethora of experience from the

number of years she had in Human Resources because they were a blank slate with HR. By the time she stepped in, she had to start from zero to where she exited.
Q. And you understood that when Kelly was talking to you she already had a job at BMW, right?
A. I did, yes.
Q. And executives frequently in your world will look to see what is out there without committing to quitting, correct?
A. Correct.
Q. And Mr. McCoy asked you a lot of questions about she didn't discriminate, bad mouth BMW. Does a professional level candidate typically go into a recruiter or go to a new job and say, let me tell you about these guys I am working for now and how much I hate them?
A. A smart one won't do it.
Q. Is it the fact that Kelly wasn't bad mouthing BMW a sign to you she was professional or unprofessional?
A. Professional.
Q. What kind of candidate did she make?
A. An excellent candidate. Our biggest challenge was the variance of salary where she sat and I was given a range, I never asked for a specific --
MR. MCCOY: Your Honor, can we approach for just

a second? I apologize.

MR. MURPHY: Wait just a minute, Ms. Miller.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

MR. MCCOY: I was trying to be very careful not to elicit any testimony about salary ranges from her, so I want to be -- I don't know if we need to caution her we are not talking about that. I don't want us to get into that.

MR. MURPHY: Why is it inadmissible?

MR. MCCOY: Because it is a damages issue that is reserved for the --

MR. MURPHY: No, you are trying to -- I didn't mean to talk over you.

You are trying to create the impression that with that testimony that she was looking for a semi-retirement job and you eased down. I am trying to -- and you had her looking at these bigger jobs, you argue to the jury, look, she is now Vice President of the Airport, she never suffered a day or anything. Why should I not be able to point out that she accepted a lower-paying job to support how hard that was for her, and in her mind, the urgency of why she needed to quit?

MR. MCCOY: I think the issue here is that you are

not -- we haven't presented any information about salary at all, about anything. And now you are somehow going to jump in and talk about salary and we will have to undo the testimony we have already avoided with previous witnesses.

MR. MURPHY: You made the argument to the jury that she has not suffered at all, that she just wanted to become a Vice President somewhere, and she had already made a decision to leave, and she got this great job at Madewell, and then another great job, and so nothing to do with discrimination, has all to do with her bettering her career, and that is not factual.

MR. MCCOY: I never said that. I never said that she is furthering her career.

MR. ROZELSKY: I thought there was an agreement we weren't planning on bringing up salary, I apologize if there is not. Your Honor had decided we had bifurcated, you were going to hear all of the damages I understand, maybe incorrectly, but that damage testimony would not come in on salary issues.

MR. MURPHY: The other discussion is about this exhibit with the companies. And Mr. Moody had a question to Ms. Dawsey, I am just trying to establish a time line, that is what stopped that line of questioning. But, Your Honor, I am going to seriously,

if you permit them to get up, especially in closing, and argue to the jury she is better off, she went off and looked for and got a better job, and I am foreclosed from telling the truth about that.

THE COURT: I don't want any testimony about salary discrepancies or any discussion about that. Y'all agreed that economic damages would be for the Court.

My impression was that the direction that we are heading was showing that she wanted a job with less hours, and less stress, and less commitment, but I think we need to stay away from --

MR. MOODY: Your Honor, just for the record, on exhibit 27, we redacted all of the salary information, salary range she was seeking. I thought that was part of the objection. That is why we removed that. I wanted to make sure we removed that after we bifurcated the trial. We did it in day one or day two, we made those specific redactions. We removed the compensation, you may recall, on the offered letter from the airport, we removed all the benefit areas as well, big blank out, which we were preserving all of that for the record, as well.

MR. MCCOY: She sort of volunteered that.

MR. MURPHY: I didn't ask her.

MR. MCCOY: I thought she was going to go through it all.

MR. MURPHY: What I can do is try to give her another question.

THE COURT: I think if you just go to another question.

MR. MURPHY: I will think of one.

MR. MOODY: Might I suggest that she come over here and she get instructed not to talk about salary for the remainder of her testimony?

MR. ROZELSKY: No, I think Mr. Murphy is a capable attorney and he very well can steer her away, and if she starts going down there, he can stop her and move along.

I don't think it is necessary to bring her off the stand.

MR. MURPHY: I agree with that.

MR. ROZELSKY: The pressure is on him.

(Whereupon, the bench conference concluded and the following was heard in open court.)

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. So, were you proud to represent Ms. Dawsey?

A. I'm sorry?

Q. Were you proud to represent Ms. Dawsey?

A. Well, yes.
MR. MURPHY: Nothing further at this time, Your Honor. Thank you.
MR. MCCOY: Nothing further, Your Honor.
MR. ROZELSKY: Nothing from BMW AG, Your Honor.
THE COURT: Thank you, ma'am. You may step down and leave or stay. I will take that exhibit right there if you will hand it to me.
Mr. Moody.
MR. MOODY: Your Honor, BMW MC calls Ms. Sherry McCraw.
THE CLERK: Raise your right hand.
SHERRY MCCRAW, having been first duly sworn, testified as follows:
THE COURT: Please come forward.
Please come around and have a seat in the witness box.

DIRECT EXAM

BY MR. MOODY:
Q. Good afternoon, Ms. McCraw. You have been here five days for trial, heard your name mentioned several times, would you state your full name for the record?
A. It is Sherry Coonse McCraw.
Q. Where do you currently work?
A. I work at BMW Manufacturing.

Q. What is your current role at BMW Manufacturing?
A. Vice President of Human Resources.
Q. Ms. McCraw, how long have you been with BMW Manufacturing?
A. Thirty-three years.
Q. I want to talk briefly about your career path before becoming VP of Human Resources. When I say "briefly," I may be proven incorrect. Let's talk about when you started, what is your badge number?
A. Associate number 39.
Q. Does that mean you were the 39th person hired by BMW Manufacturing?
A. Yes, ma'am.
Q. What year was that, ma'am?
A. 1993.
Q. We know 1993 -- was that the year after BMW Plant Spartanburg was announced?
A. Yes, it was after the groundbreaking.
Q. So, is it safe to say, other than the groundbreaking, that you have watched the entire life trajectory of Plant Spartanburg?
A. Yes, it is.
Q. Were you there when the plant was opened?
A. Yes.
Q. Can you tell the jury briefly about the opening of

Plant Spartanburg? Did you have a celebration?

A. We did. We basically had built the plant, so I started as an engineer when I first came in. I was working in textiles. I worked in Greenwood, South Carolina for Sara Lee Knit Products, we had just built up a dye and finishing plant down there. I took a job at BMW, and the first thing that happened was they gave us a uniform, which I was not used to wearing, it was a pair of blue pants and a white lab coat, it was really, really hot. And we started building the plant.

My first area was in assembly. I was responsible for the finishing and testing area. And I did all of the lay out, I helped pick out the equipment for that area, I was working on the conveyor systems we were going to --

THE COURT: I hate to interrupt you, but could you slow down just a little bit?

THE WITNESS: Yes, sir.

THE COURT: I need her to come back tomorrow.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Let me see if I can ask you a question to slow us down just a little bit. So, when you first started working for BMW MC, did you have a physical place where you went to work?

A. I worked in downtown Spartanburg. We were in this building called the Montgomery Building. It was a building that was pretty dilapidated at the time and that is where we started with BMW.
Q. What were you doing in those first days?
A. We were doing conveyor layouts, designing equipment, determining what kind of processes we were going to have, and then deciding how many people we would need for the area that I was responsible for.
Q. All right. So, by education, you are an engineer?
A. I am. I am a textile engineer. I went to North Carolina State University.
Q. All right. So, how many years did you work for Sara Lee?
A. Three years.
Q. Three years. You come to BMW, they put you in a building up in Spartanburg because literally there was nothing there --
A. Not yet.
Q. -- at the plant site, right, correct?
A. Yes.
Q. You were doing conveyor layouts, different engineering stuff?
A. We were doing automatic storage and retrieval

systems, conveyor layouts, buying equipment that we would need to basically finish the cars, test the cars, bought car washes. There were all kinds of things we needed for the finishing of the cars.

Q. Were you participating in hiring people in those early days, Ms. McCraw?

A. I was. We received about probably 100,000 applications. We had a room that was so full of applications that it went from the floor to the ceiling throughout the whole room. And we would have to sort through those in the afternoons and just look to see if somebody had experience, if they worked in manufacturing, if they had assembly experience, if they had automotive experience, some people were good repair people from different dealerships, but, yeah, we would sort through those manually.

We didn't have computers, we weren't sitting around with a computer system that could scan all of the resumes, we had to do it ourselves.

Q. Were you involved in training of people?

A. Yes, yes. So, after we determined what our area looked like, we had to write all of the training plans, all of the process descriptions, and then we actually started choosing our teams.

Q. All right. So, you are physically located in

Spartanburg, South Carolina --
A. Yes.
Q. -- at this dilapidated building. Was there a time where you actually had a building site that you could report to?
A. I did. We moved from Spartanburg in about probably December we moved over to a building off of Brockman McClimon Road that is near the plant.
THE COURT: Where?
THE WITNESS: Brockman McClimon. It is behind the airport. We moved from that into that building and that is where our first associates started coming in. And then we set up areas inside that building that would then make our production area.

DIRECT EXAM CONTINUED

BY MR. MOODY:
Q. So, as you drive up 85 --
A. Yes.
Q. -- from here, 85 north, there is a Brockman McClimon exit, so the building was located in that vicinity?
A. It is, and you can see it from the highway.
Q. All right. Thank you for that.
Now, you mentioned a grand opening and having blue pants and stuff, when did that occur?

A. That was in November. So, we had the plant structure was starting to come together and making sure the equipment was in, and then we actually had the building. So we were still on Brockman McClimon Road, but the building was coming together. And when the building was ready, that is when we had our grand opening celebration.
Q. When you say "grand opening celebration," we are talking about fireworks?
A. Huge fireworks. It was a really cool celebration. We all dressed in our blue pants and our little jackets. We all lined up, it was after work, so it was probably about five o'clock in the afternoon. There was a huge stage set up right by the highway so you could see it from 85. The Governor was there, so I hate to mention his name, but Governor Campbell was there. He did his speech at that meeting or at that celebration and he looked at us and he told us in the smaller group --
MR. MURPHY: Your Honor, I am going to make my objection on hearsay as to what Governor Campbell is saying.
MR. MOODY: That is fine. I will move forward, Judge. I will take care of this.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. So, the Governor spoke, fireworks, big celebration.

Did you feel like you were part of a transformative team?

A. Yes. It was a special night. It was the beginning of something great is what I would say. You know, that was kind of like one of those things that you do in your life and you don't realize at the time, but then afterwards, you look back and you say, wow, that really was a big deal, you know, those first 200 people sitting there on that stage. Most of those people are still there, so it is really cool.

Q. So you were a part of the first 200, in fact number 39. In that -- what year was that 1990 --

A. 1994.

Q. 1994. What was the plan as far as how many employees would be at Plant Spartanburg in 1994?

A. We were thinking we would get to a thousand people. We were building, at that time, we were going to build a hundred cars a day, but we were going to go to a thousand people.

Q. Okay. Thank you.

MR. MOODY: Let's talk about the brief history of

the roles and I know, let's see if we can look at a document just as a summary, it is Defendant's exhibit 17, Your Honor.

THE COURT: Defendant's 17 is admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Ms. McCraw, this is a long list. We have had testimony about how people in BMW move, it is a culture to move. So, I don't want to short-shrift you in any of your roles and accomplishments, but I will try to move through this the best I can. So, it looks like when we are starting -- we are starting at the top and coming down, right?

A. Yes.

Q. As far as job history, it is not down to top. Manager of Assembly Planning, is that pretty much what you were describing a few moments ago when you were in the dilapidated building and then you kind of came over to the structure off of Brockman McClimon?

A. Yes. I started in the finish area, the finish is the last process, it is the testing and finishing area. Then within about a year and a half I moved over to the power train area, where we did control arms, differentials, and engine pre-build to get ready to

marry to the car. Then I moved from there into the trim area, which is all of the interior components, the seats, the carpets, all of the wiring harness, everything that makes the car kind of special and makes it feel like a car inside, I had that responsibility.

Then I was responsible for the X5, so we started a project team because we wanted to build the X5 and the X5 at that time was just kind of a consideration, it was not really an accepted project, but I went to Germany and I spent a lot of time in Germany working on that project. And I was in charge basically of the structural expansion to build the X5 inside the assembly that we had.

Q. Okay. Help me here, what year are we at?

A. That was about 2000 -- '99 I would say, '98, '99, 2000 we launched.

Q. So, the X5 is the '99?

A. Yes.

Q. All right. I apologize for interrupting, there is a lot there, but please continue. You said that the X5 getting ready to lunch?

A. So, we launched the X5. With all good structure projects, I really like structure projects, every time a structure project ends, and I ran production.

Q. So let me ask you this question for those of us

who don't engineer, what is a structure project?
A. The building, the conveyors, the change points to the building, trying to change out all of the IT systems, all of the equipment, moving all of the tools around, retraining all of the people, everything that comes with changing for model type.
Q. Thank you for that.
So, you really like structure projects?
A. Yes.
Q. And when those projects are over, you go back to assembly?
A. Yes.
Q. And that is producing cars --
A. Yes.
Q. -- correct? Sorry, I interrupted again.
A. So, for one year I was the Manager of Assembly, the Department Manager of the Assembly Planning, so we started this reorganization where I was going to takeover the lead of the assembly planning. And I decided I wanted to do an expat assignment in Germany, and I traded with a colleague in Germany, so we traded jobs. He came to my job, and I went to his job. We traded apartments, we traded washing machines, we traded everything. He came to my job, I went to his job, and that would be until we wanted to come back, he would go

back and then we would be able to go back to the same positions.
Q. So, how long did you spend on your expat or I think international, would it be fair to say international?
A. It was an international assignment. I was in Munich for three years. I started actually before I moved over there a hundred percent, I was travelling back and forth, and then my husband and I had gotten married in the meanwhile, we both moved over there and worked.
Q. Okay. Thank you for that.
So you were there for three years and what was -- we see that in your previous Manager of Assembly and Planning, you were in TX-4, which is assembly, right?
A. Yes.
Q. When it says "expatriate" it says you are international, what were you doing for three years?
A. I worked on the new X5. The new X5 that was going to replace the original X5 was the next car, so I was working on that car project.
Q. All right. So, anything else you need to add about that three years on the international assignment?
A. No, it was a really nice time.
Q. Okay. So you come back, you are the Department

Manager of Assembly Planning and this is 2004. Do you know what personal grade you are in 2004?
A. 2004 I was an 11.
Q. Okay. So tell the jury, if you could, what was Department Manager of Assembly Planning doing, Ms. McCraw?
A. We do all of the process descriptions, the tools, the fixtures, everything it takes to build the car we are responsible for that. All of the planning for the line, all of the time studies, everything that comes together to build the car.
Q. All right. We see that you then go to Department Manager of Engineering and Planning, what is that?
A. We changed from 44 -- TS-44 became TS-42, it was a similar job, it just picked up more responsibility, so it was basically the same.
Q. All right. At that time, what are we making at Plant Spartanburg?
A. We were building the Z4 and the X5 together.
Q. This Department Manager of Engineering and Planning, then we see that you have Assembly Logistics Structure Projects Manager, what does this mean? You go from a Department Manager to it looks like on the far right that you go to several projects, can you tell us about that, please?

A. It is all the same projects, but basically we were. Competing with the other plants to take on new products and we had a chance to compete for something and I really believed that if we had an X Plant, if we became the X Plant, that would be good for Spartanburg. So, we put together a proposal within our team and I wanted us to build the X3. So, I was working together with a team in Germany there doing planning and that is when I presented that project to Germany. We have a structural team that reviews what we are spending our money on, and I presented that, I think we should build another plant, not just integrate it into the old plant like we had integrated the other car, but actually build the plant, because now looking at the master plans -- I wanted to flip -- I wanted to basically flip the assembly to the north. So, we built the assembly north project and I became the project leader to build a new structure.

Q. Let me break that down and to see if I can grasp this. You had ideas about what should be made in Spartanburg?

A. Yes. We were building the Z4, the Z4 is a really pretty roadster, but it was not the best car to build because it was hard to build, it was a low volume car, and I wanted us to have more possibilities for jobs

and to be the X plant. The X plant was -- the X models were really growing in the United States and they were kind of growing around the world, so I thought it would be better for us if we had cars that were more consistent and we could build those instead of building the Z4.

Q. Ma'am, I don't know if anybody has talked about this yet, but you are very familiar with what we produce and what we manufacture, right?

A. Yes.

Q. Could you explain to the jury how BMW MC does not make a car until they have an order? Can you explain that real quick, as opposed to say another manufacturer that says, between two and five, we are going to make a green sedan, how does BMW Manufacturing work?

A. So, we take custom orders, but custom orders can come from dealerships, too, so dealers put in for what they would like for us to build. And they tell us what color, what interior, I don't want to say a million, but we have about a million different options when you are trying to choose a package of options. So, basically, we build to order in that direction.

So, we get an order in the system. When that order that comes in, then we put that on the assembly line, we have a lot of IT systems that tell the

associates what parts to choose, what options they are building. We don't build in batch, we don't build in big lots, we don't build to stick outside, we basically build custom order.
Q. We are building to an order?
A. Yes.
Q. So you can have different models, different colors, all of that happening on the production line at the same time?
A. Yes.
Q. All right. So, I just wanted to get that baseline.
So, Department Manager Engineering and Planning, and you said you went and made a presentation in Germany?
A. Yes.
Q. Why you?
A. I was the lead of the department and I really believed in it. I thought we would have a chance. My German counterpart said, do you really think we will be able to convince them that you should build another whole plant? I said, I am not really sure, but it is definitely worth the chance, because it would be a chance for the plant to really grow. And when I presented it, it worked.

Q. So, ma'am, you were the spokesperson for BMW MC Plant Spartanburg in making a pitch at headquarters to say, we want to make more product in Spartanburg?
A. Yes.
MR. MURPHY: Your Honor, he is just leading her.
MR. MOODY: I am sorry.
THE COURT: Don't lead the witness.
MR. MOODY: Thank you, Your Honor, I apologize.

DIRECT EXAM CONTINUED

Y MR. MOODY:
Q. Ma'am, what was your thought process in thinking that Plant Spartanburg could support a new plant?
A. The people were, you know, able to pick up pretty fast. We were building the Z4 and the X5, both pretty complicated cars, and we were able to do that, and I felt like, though, if we could have cars that were more similar, it would be even easier, and we could hire more people, and then train them to build more car models.
Q. How many people did we have at the plant during this time period?
A. We only built about 200,000 X5s and Z4s together, so this allowed us to double the capacity at the plant. We had about 5,000 people at the time.
Q. Was this something that helped the growth of plant Spartanburg?

A. It did.
Q. So, from your career, how would you describe this moment where you won the pitch to bring more products to Spartanburg?
A. I was pretty surprised and I was happy. I think looking back it was probably the best decision that we could have made. It was really good timing. It was 2008, 2009. Had a lot of other companies laying people off, and so it was a chance for us to pick up additional head count and really grow the plant.
Q. All right, ma'am. Anything else before we move to your next position on this chart?
A. No, but I have sat here all week listening to grading and that project had no grade, so just to be fair, it was not a graded project, it was just a project.
Q. So you had no grade on your project, but what was your personal grade?
A. PG 11.
Q. So, you kept your personal grade regardless of these assignments?
A. Yes.
Q. Did you suffer any loss in pay as a result of these projects?
A. Absolutely not.

Q. Ms. McCraw, the next position is what?
A. The TS-41 position. This became the Department Manager Production Steering, this is technology steering and maintenance. So maintenance of the equipment we had installed, I was responsible for the maintenance team.
Q. All right. Next position would be what?
A. So, I was only in that job about a year and I had a chance to go back to structure projects, and I really like structure projects, and I could be the plant expansion team lead for the entire plant, so I took that project.
Q. And so you are still a --
A. PG 11.
Q. PG 11 in another project?
A. Yes.
Q. We see you are moving around within the floor department?
A. Yes.
Q. So, tell me where we are.
A. I am at TS-8, so that was a direct report to the President of the company, but, again, it was PG 11 position. And I basically did that job about a year and a half, and I had a chance to go for validation. The finance job, the CFO position was opening up, and I was validated to go to the CFO role.

Q. All right. So the validation process we have heard a lot about, I don't want to wear you out by having you re-describe that, but you were at PG 11, and without being validated, was that the highest personal grade you could achieve?
A. Yes.
Q. So, the validation process, was that easy?
A. I would not call that easy, no. It took a couple of years.
Q. Is it rigorous?
A. It is rigorous and you have to know a lot of people. I had to list ten people that I knew who could support me or, you know, give feedback about me, and they had to be all the same level as Dr. Englehorn or higher.
Q. All right. So, you mentioned validation process took you several years, but you get through the validation process, which allows you to --
A. I also went through a leadership program. I went to China and I studied at Stanford in California, and I went to New York University in New York.
Q. Okay. Thank you. That allowed you the opportunity to go through the validation process?
A. Yes.
Q. And you ultimately became validated for a function

level two candidate?
A. I was validated, but I still had to interview for the CFO role.
Q. All right. And when we say "CFO, "it shows vice president right there on the far right, when you become validated, you finally have the opportunity to become a vice president?
A. Yes.
Q. All right. So, tell us briefly about that, I think you were mentioning CFO role, but it does say Vice President Targets Production and Finance, is that the same thing as --
A. It is. This TS-1 job had a lot of different things, it had the scheduling of cars on the assembly lines, as well as through the entire plant. It had all of the target steering for the plant, and then, of course, the budget and controlling. We also did all of the accounting for BMW North America and for the Americas region.
Q. Okay. Thank you. I know there is a lot here, but personal grade, when did you move from personal grade 11 on up?
A. I moved to a 12, so I was at the 12 for one year, and then I moved to the 13 the next year.
Q. So personal grade 13 as a function level two, Vice

President?
A. Yes, yes.
Q. Okay. There are, you know we have VP targets, VP finance, VP assembly, so have we talked about you being the CFO, is there anything else that you would like to add?
A. No, I really liked that job I. Was there four-and-a-half years and then I moved to Vice President of Assembly.
Q. Ma'am, you are not an accountant, you are an engineer?
A. That's right.
Q. So, how can you be a CFO for BMW MC?
A. I spent a lot of money earlier, so, I guess, you know, I was suited for that job. I really enjoyed that job. I had people underneath it -- me. I had CPA's working for me, we had a lot of support people who could answer the detailed questions, but that was a really good chance to learn and to grow.
Q. Now we know that -- we have heard that you became the Vice President of Assembly at some point, what year was that?
A. That was in 2017.
Q. All right. And how long did you serve as Vice President of Assembly?

A. Four-and-a-half years.
Q. Did you like being the Vice President of Assembly?
A. Yes, of course, I did.
Q. How many associates were you responsible for in Assembly?
A. Almost 6,000. That is the biggest department in the plant.
Q. Ms. McCraw, why did you move around so much in positions at BMW MC?
A. I was asked to. Basically, there were openings, we were growing really fast. We have been growing the entire time I have been there, so that is a good thing, but it also means that you need to be ready to change and to move.
Q. So, would you describe change as punishment at BMW MC?
A. No, I think it is a good thing.
Q. Do you think an international assignment is important?
A. I really liked it, but I also think it is important to understand the culture. The German culture is very different from ours and so it is good to understand why they do certain things, how the company is running in Germany. We are trying to compete for business. If you are trying to compete, you need to

understand your competition a little bit, and I think that was what I really picked up most over there.

Q. Are you proud of what you helped build?

A. I am.

Q. We see on the chart that, you know, you became TX-6, did you move want to move to Human Resources?

A. No.

Q. Why is that?

A. I think it is policies, and procedures, and rules, and punishments, and it is just something that is a little more transactional than the kind of work I like to do.

Q. What is the kind of work you like to do?

A. I like to build things. I like to see things be produced. I like to help to make sure that our products are good and being part of the main business.

Q. There has been testimony from Robert -- Dr. Englehorn, why he came to you, why did Robert come to you about Human Resources?

MR. MURPHY: Objection, Your Honor. She can't speculate as to why Dr. Englehorn did something.

MR. MOODY: I am asking for her impression, Your Honor, I am not asking about what Dr. Englehorn testified about.

THE COURT: She can testify as to her

understanding of the reason she was placed in Human Resources.

THE WITNESS: He wanted me to go to Human Resources. It was four-and-a-half years already in Assembly and it was, basically, I was moving somewhere, and he said he thought that that would be a good job fit.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Did the plant have struggles and concerns?

A. We were in the middle of COVID, so COVID was going, and we were still trying to recover from the people that had been let go during COVID. So, we were working to rehire the people, and then we also were getting ready to expand again, so we needed enough head count. And from assembly, I had been running two to three hundred people short on any given shift because the people were either sick or we didn't have enough head count.

Q. So, you had experienced some issues with people and having enough people when you were running assembly. Did you have any concerns about leaving assembly and going into HR due to people shortages?

A. I had concerns about going to HR just in general, but I wouldn't say because of that.

Q. Did you have any impression that your experience as head of assembly could assist to make better the people issues y'all were encountering?
A. I wanted HR to actually be a partner for the production areas to help support. I mean, the whole plant is run by people, so I wanted it to be more closely connected and do things that would help people to keep them focused. Because I think if someone is worried about their health insurance, if they are worried about their paycheck, they are not focused. So kind of keep the people happy and healthy and working alongside the rest of the team, I think that is an important part of HR.
Q. Thank you.
Ma'am, was the HR Vice President role forced on you?
A. No.
Q. Did you have an option to remain in your prior role?
A. I could have complained and said no I don't want to leave, but I never do that. I know that deep inside there is some reason why I am considered the best person for the job, and through my history, it always ended up better for me.
Q. All right, ma'am, thank you for that.

Let's talk about briefly your past working with and/or relationship with Kelly Dawsey. Before becoming TX-6, how often did you interact with Ms. Dawsey?
A. Rarely.
Q. Did you ever supervise her?
A. No.
Q. Did you have any tension with her?
A. We had some professional disagreements about how some of my associates were treated, but I wasn't, I wouldn't say they were serious problems, we just didn't agree on those topics.
Q. What do you mean by how some of your associates were treated?
A. During the beginning of COVID, we were trying to decide how the plant would run. There was a discussion about what would be the plan with the temporaries. We didn't really know what we were doing because we didn't know if we were going to start back up, or we didn't know when we were going to start, and there was this anxiety around, okay, when do we come back together? When can we work together again? So, I was much more -- I am a very conservative person in the sense that I wanted to make sure I knew when I would have my team together and that the team would be, since you are going home, when we come back together we could start back up.

But we put together a plan, and on the first day of COVID, the first group of the people on the contract work force were sent home. They were given letters that we were basically being let go the first day. I was not happy about that and I think Kelly knew that, that I wasn't happy about it. We were asked to put together a plan to say, okay, when will we release the other contract work force? And the team worked really hard to come up with milestones of when the people would be released, and the next week they were all let go. And so that was a big problem.

There were about 300 people that did not get let go because there was a mistake made on the spreadsheet. We had some discussions about Kelly thought I should let them go because it was costing the company money, but we were really only paying the insurance cost to keep those people employed, they were not getting hourly payments, they were temporary. So, we basically -- I didn't see a reason to let them go. Ultimately, the President at the time, Knudt Flor, said no, they can stay.

Q. Was it a professional tension?

A. I would say I was upset by it more so because the circumstance, but there was not any kind of -- I wasn't saying things personally to Kelly, no.

Q. Did you ever seek to remove Ms. Dawsey from BMW

MC?
A. No, absolutely not.
Q. Did you actually serve as that mentor to her in 2021 for the strategic work force development projects?
A. Yes, I was a mentor on the project.
Q. After you became TX-6 and I think that is in --
A. September was when I found out I did not become TX-6 until April of 2022.
Q. So, April of 2022, we know that Kelly Dawsey was gone by then, right?
A. Yes.
Q. Before you officially took over the TX-6 position, how often did you interact with Ms. Dawsey?
A. Maybe once a month.
Q. Okay.
A. Not often.
Q. You are in senior leadership as the Vice President of Assembly, right?
A. Yes.
Q. Would Kelly Dawsey sometimes come to senior leadership meetings?
A. She came. She came with presentations sometimes.
Q. Let's talk just generally about the reorganization and the big picture there. When you were identified as TX-6 in September 2021, what was happening at the

plant?
A. I am sorry, I didn't --
Q. That's okay. I can't lead you, but you remember Dr. Englehorn testified that he took over as the President, right?
A. Yes.
Q. So, we have a new President at BMW MC?
A. Had a new President, we were still expected to build cars, it was a big year for us. I think that is probably the biggest year we have had so far.
Q. Were you having issues as the Manager of Assembly at obtaining qualified workers?
A. We didn't have enough maintenance people. It was really hard to find maintenance people in general. We also didn't have enough associates, so we were losing a lot. I don't know if you remember after COVID, but we were losing associates to jobs at Amazon or Chick-Fil-A and other places because they were finding better jobs.
Q. When you say "finding better jobs," does that mean they were finding better pay?
A. They were finding higher pay than we were paying.
Q. Are you telling this jury that Chick-Fil-A was saying more than some of our associates were --
A. According to the billboard, they were paying higher than our associates.

Q. And Amazon, you were losing to Amazon?
A. Yes.
Q. And what was the issue with maintenance workers?
A. They were just able to find jobs making a lot more money.
Q. All right. Ms. McCraw, there is -- there has been testimony, you have seen it, you have heard it, the jury has heard it as well, about the TX-60 position and Ms. Dawsey had been in that position for seven years, approximately?
A. Yes.
Q. You have seen all of the exhibits that has her with the red box. Did you have any opinion about if you were making the decisions for your team, what your team would look like? Let me see if I can ask it a better way.
When you had said, yes, I will come to TX-6, what was your intention for Kelly Dawsey in the position at TX-60?
A. I didn't really -- I didn't find out that I was coming to the TX-6 a hundred percent until September, so I didn't really have the plans yet put together for who would move where, where people would go. But certainly there were some discussions about moving people around just to give them different experiences. I didn't

really think that people would want to stay in the same jobs for a long time because that is just not very normal for the company.
Q. All right. Ma'am, I am going to try to stay somewhat within a format, but there has been some things that have come up, so I will pop off my outline for just a minute.
There has been some testimony that Sherry will take the associate position, I think that was a comment made earlier in this trial. Do you have --
A. Kelly you said.
Q. Do you have any question about what the comment Sherry will take associate position means?
A. That statement was that I was associate friendly. I like the associates. I had hired a lot of the associates, I care about the associates. I want the line to run well and they are a big part of it. So, yeah, I would definitely take the associate position probably before I would take a HR position.
Q. All right. There was also a comment made that Sherry did not want older, experienced talent in HR, do you have a response to that?
A. Everybody was still on the chart, I don't know who I was kicking out. I didn't plan to move anybody out. There was no plan to move people out or to change

things. I usually, when I took over these other roles, I just like move the people around to get the best team together, but I wasn't really changing people. It has to be an opening to change people, so I wasn't really changing anyone.

Q. As of today, have you maintained pretty much the TX-6 Department Managers that were there?

A. I have, outside of Corey getting poached by Scout and a couple other minor changes, the team is still together.

Q. All right. Ms. Fowler, now is the time.

Just going to ask real quick, Ms. McCraw, do function levels matter to you as the Vice President of HR?

A. The function grades are -- grading is not so critical. There are jobs that are still ungraded today so we are seeing here now, I don't know, I guess 12 years after grading occurred, we have jobs that have been added that are still not graded. For me, it is about the personal grade, it is also about the department managers, they are all equal on my chart. They all come to all my meetings. I don't think one is more critical than the other on the HR side.

Q. Just for the record, we are looking at Defendant's exhibit 11, and this is the job function data sheet for

department TX-60, do you see this, ma'am?
A. Yes.
Q. Let's go on over, Ms. Fowler, several pages to BMW MC 306. There it is.
Now, this is the job function data sheet for TX-60 as it existed as of April 1st of 2019, right?
A. Yes.
Q. And we see that it is -- it shows it is a function level three. Are you aware of any grading that has occurred on TX-60 since you took over as the Vice President of Human Resources?
A. No, I am not.
Q. Okay. Is that position important to have someone who can communicate with the production network?
A. It is a technical position. That person has to understand head count, and pay raises, and competition. And they have to be able to compete with benchmarks. We have to look at who we place against the benchmark. Also responsible for the total compensation, which includes benefits, our health services area, so it is a pretty important position.
Q. All right. Let's talk about that department around the time that you had been announced to be the Vice President of Human Resources. You know that the TX-60 Department, as Ms. Dawsey testified, had lost the

benefits team, correct?
A. Yes, all of the people had left the team.
Q. So, there was a reboot happening there?
A. Yes.
Q. You were also aware that Stephan Dombrowski left in July of 2021?
A. Yes.
Q. Out of how many people were in the TX-6 Department?
A. In the TX-60, about a hundred.
Q. About a hundred. Other than Christine Petrasch, were there any international?
A. At that point, no; Stephan had gone home already.
Q. So zero. So change was already happening internally in that TX-60 Department, correct?
A. Yes.
Q. Let's look, Ms. Fowler, at defense exhibit 12.
Ms. McCraw, we see this as the job function data sheet for Defendant's 12 for TX-61; do you see that?
A. Yes.
Q. As of October 24th, 2021, what was the function level attributed to TX-61?
A. It shows function level four, but had always been shown as a three before.
Q. Do you know why it was changed in October 24th,

'21?

A. No.

MR. MURPHY: Your Honor, objection. Has not established it was changed.

THE WITNESS: Has revision date on it 10-24.

THE COURT: Let me finish with him, then you can start back.

Were you finished?

MR. MURPHY: Yes, sir. There is no testimony that that was the change made as of that date.

THE COURT: Okay. Mr. Moody, are you going --

MR. MOODY: Your Honor, I apologize.

THE COURT: Are you going to lay some foundation for her knowledge.

MR. MOODY: I think Ms. Dawsey testified about this, I will do my best to get some foundation out of Ms. McCraw.

THE COURT: He is going to lay a foundation he says, Mr. Murphy.

MR. MOODY: Would you go to 316?

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Ms. McCraw, I ask you to look at Defendant's exhibit 12, the date that has the -- excuse me -- the bate stamp for the record is BMW MC 316.

Ma'am, do you see the revision date up at the top?
A. Yes.
Q. What is the revision date?
A. April 1st, 2019.
Q. So, as of April 1st, 2019, TX-61 had what function level?
A. A function level three.
Q. All right, ma'am. Ms. Fowler can we go back to the previous one?
I think I was asking you questions about this page, which is BMW MC 310 on Defendant's exhibit 12. It is the first sheet. What is the revision date on this document?
A. 10-24-2021.
Q. This is a job function data sheet for TX-61?
A. It is. It is.
Q. It has apparently been revised since 2019?
A. Yes.
Q. What is the function level reflected on this document?
A. A four.
Q. Were you aware of why it was changed to four in October of 24th 2021?
MR. MURPHY: Objection, Your Honor, it doesn't

show the change was made in October, it just shows this report was printed in October 2021.

THE COURT: The document speaks for itself and the witness may testify and answer the question if she knows. I overrule it.

THE WITNESS: No, I don't know why the change was made in October 2021.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. So, you became the Vice President of Human Resources on what date?

A. April of 2022.

Q. So, Ms. Fowler can we go to 313? Thank you.

So Ms. Bull, we are BMW MC 313 on Defendant's exhibit 12.

Ma'am, this shows a revision date of, is that May 22nd, 2022?

A. Yes, it is.

Q. Is that, under your leadership, that this job description was revised?

A. Yes. Yes.

THE COURT: What exhibit is this?

MR. MOODY: Exhibit 12, Judge.

MR. MOODY: This being we are looking at paginated as 313. We jumped around a little bit. I miss paper,

too.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. So, this is revised under your leadership?

A. Yes.

Q. And it shows that the function level is three?

A. It was, yes.

Q. Do you know why it was revised in May of 2022?

A. It was a function level three, it had always been shown as a function level three.

Q. So, the supervisor named that, that is your name there?

A. Yes, it is.

Q. What department is responsible for the job descriptions, ma'am?

A. TX-60.

Q. That would be, back in October, that would be Ms. Dawsey?

A. Yes.

Q. We know in May of 2022 when you had it changed to function level three that Ms. Dawsey was no longer there, correct?

A. Yeah, she quit in January.

Q. Thank you.

We were talking about TX-61, so many letters,

so many numbers. This is Corey Epps?
A. Associate relations, it is on the floor, associate relations.
Q. Now, ma'am, there has been some testimony, and you saw it, there was a proposal for Kelly Dawsey to move into 61, did you agree with that proposal?
A. I did not.
Q. Why?
A. Because Corey had been in that job less than two years and he was doing a really good job, he was moving nicely in that job, the associates really liked him, he had a good rapport with the managers and VPs. I felt it was too early for him to move.
Q. Was Ms. Dawsey a good fit for 61?
A. I didn't think so. I felt like that she was more contract management, numbers, she liked steering and strategy more than just dealing with associates.
Q. Ma'am, is there any limit on amount of function level threes that can be in your department?
A. No.
Q. So, there has been discussion in this courtroom about some kind of -- there is just two function level threes in the TX-6 Department, why do you say that?
A. No. There is a target for how many positions get rated at certain levels, but the 64 was showing as a

three, the 61 was showing as a three, the 60 was showing as a three, and at some point Scott Medley was sitting out on a three, so we had a lot of --
Q. So, you say that there is a target, does the target have a consequence if you don't make the target?
A. I have about 40 targets and they don't always fit together so, no. I have to choose which targets; I prioritize which targets matter and which don't.
Q. So, as far as function level goes, are you today over target?
A. We are three function level threes over and about 24 function level fours over as an organization, as a target.
Q. As a Vice President, is there a consequence to you to being 23 over target?
A. No. I just have to answer who they are and what they are doing, but I don't have to do something else with it.
Q. All right. Thank you. Let's go to Plaintiff's 47, real quick.
And this is Plaintiff's exhibit 47, and I don't know if you can see that real well, Ms. McCraw, but this employee number, this is 81?
A. Yes.
Q. Position number. Can you explain to the jury, it

says, "organizational plan" on the right side, do you see this?
A. Yes.
Q. Where it says "enterprise structure, personnel structure, organizational plan," and then it has position and that number ending in 81. Can you explain to the jury the significance of the position number?
A. So, every person has a position number, and they are basically assigned to that number. The positions, if the person is leaving or changing then they -- that person moves to the next position number, and then this would be the open.
Q. All right. So, is it -- within SAP or the IT management is somehow the position number tied to that person and sometimes their personnel information can follow?
A. Yes.
Q. All right.
MR. MOODY: Your Honor, may I approach real quick?
THE COURT: Yes, sir.
(Whereupon, a bench conference was held on the record, in the presence of the trial jury, but outside the hearing of the trial jury.)
MR. MOODY: May we have a quick five minutes or

so? I will try to streamline the best I can. We have been going for a little bit.

THE COURT: Yes, sir.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Members of the jury, we are going to take a short break, shouldn't be too long, maybe about ten minutes or so. So, remember my previous admonition, don't talk about the case, do research about the case, don't form any final opinions about the case. At this time you may take a break.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: Ma'am, you may take a break also, but may not discuss your testimony during the recess.

THE COURT: We will be in recess.

(Whereupon, a short recess was held.)

THE COURT: All right. Let's bring the jury in.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: All right. Mr. Moody.

MR. MOODY: Thank you, Judge Cain.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Ms. McCraw, I think you said there was not a limit

on the number of function level threes you can have in your department?
A. That's correct.
Q. Any limit on personal grade 11 you can have in your department?
A. No, there is not.
Q. Would you agree with everything we have heard in here about personal grade determines your compensation?
A. It does.
Q. I want to do a few cleanup things on some items that have come up and then I want to go to 64 and then sort of push towards the end here. It is late, I don't want you to rush because it is important, but before we talk about TX-64 I want to bring back some documents that have been discussed.
So, let's go to Plaintiff's exhibit 2, Ms. Fowler.
Now, there has been some discussion about this document and there is a star down there that says "org charts" will be discontinued after March 2021. What is the significance of that footer showing that org charts will not be taken -- will not be published, so to speak, and that BMW Group contacts will be utilized as of April 2021, any significance?
A. We used to draw our own org points, draw them in

PowerPoint, put different levels on the chart. After this date, there was a system that would print it out, would only take the heads of the boxes, so the two digit boxes, those are the only ones that would show on the chart.

Q. So, did this change make it easier locally?

A. It did. It made it standardized. It was just a matter of whether I had to draw the chart or someone else gave me the chart.

Q. Let's go to Plaintiff's 12.

All right. Ma'am, I am showing you Plaintiff's 12, which is BMW MC 1711 through 1722. Now, when we look --

MR. MOODY: Your Honor may I approach?

THE COURT: Yes, sir.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. When we look at the entire exhibit, I mean, is this some kind of policy and procedure that you have to comply with as the VP of HR?

A. No, it is a brochure.

Q. Okay. What is the significance of it being a brochure?

A. So that we can tell people how they can move up in the organization, so a promotional structure.

Q. All right. So, if we look at, I think it is page 5 of that, Ms. Fowler, is that correct?
You remember when Mr. Murphy kind of looked at those and, you know, those categories of PG 11, et cetera, et cetera. Does this graphic serve as any impediment to Ms. Dawsey or any other person in PG 11 moving forward in the organization?
A. No. It just shows that you go progressively from the 11 to the 12, 12 to the 13, 13 to the 14.
Q. Ms. McCraw, have you ever demoted someone --
A. No.
Q. -- from function level?
A. No.
Q. Have you demoted them based on personal grade?
A. No.
Q. Ms. Fowler, let's look at Plaintiff's I think 26. Let's go to the third page of that, please. Going to the third page.
All right. Ma'am, this has been an exhibit that has been talked about with numerous witnesses. You see at the bottom, no increase in grading, no increase of management capacities. Review in Q1 2021 allocation of recruiting to TX-65, Talent Programs, Training --
THE COURT: Whoa, whoa.

MR. MOODY: Excuse me.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Review in Q1 2021 allocation of recruiting to TX-65 Talent Programs, Training, according to HR Master Plants. Now, there has been some discussion about somehow the office in Germany is dictating about the master plants. What does the FO Circle do for BMW MC Plant Spartanburg?

A. They keep track of deviation boxes, so if we have a change point to the master plan, they add boxes to that OFK structure just to keep it documented.

Q. Do we have more changes in the United States of America and Plant Spartanburg than other international plants.

A. No. Everyone has lots of changes, so they just keep track of the boxes. They make sure if there is some exception, it is documented per the plant.

Q. Let's go to the next page. Again there has been much discussion about this one. Does FO dictate where people go in TX-6?

A. No. They just draw boxes. They don't do grading, they don't do anything, they just draw boxes.

Q. So 64 -- is 64 a function that exists through all of the international plants?

A. No, it is not.
Q. Is it a Plant Spartanburg kind of specific type function?
A. It is. We took it over from the region from the overview, the safety piece we took that inside. We wanted to have control over our own health and safety, the cafeteria, we wanted to be able to manage that contract.
Q. So would this be a reflection of exceptions to the master plant?
A. Yes.
Q. Thank you, ma'am.
Let's go to Plaintiff's 17, Ms. Fowler.
Ma'am, this is another one that has been talked about a lot. In 2015, were you in senior leadership?
A. Yes, I was.
Q. Did you participate in senior leadership presentations?
A. Yes.
Q. All right. Do you recall testimony from Ms. Dawsey where she said this was presented to senior leadership; do you remember that?
A. Yes.
Q. Ma'am, have you ever seen these expat guidelines

for Plant Spartanburg?
A. No.
Q. Do you read and speak German?
A. I do.
Q. When it says outcome of TS Gesprach, however you say it, October 2015, what does that mean to you?
A. It was a discussion in the senior management to look at what we could do for expats.
Q. And that says TX-6 workshop. Do you recall ever seeing this document before?
A. No, I was not part of 6, I was not part of their workshop.
Q. So, that would -- when you read this, this is part of 6 getting together?
A. Yes. TX-6 decided, I guess, to create some kind of guideline for themselves.
Q. All right. But as we are sitting here today, this case is the first time you have seen these things?
A. Yes, it is.
Q. Thank you. Let's go to paragraph 24 -- excuse me Plaintiff's 24.

Ma'am, this is the misaligned personal grades. Let's go a couple of pages. There we go. And keep going, Ms. Fowler, give me a few more pages. All right.

So, Ms. McCraw, you have seen the discussion and testimony about these personal grade adjustments and I think Ms. Dawsey testified there was nothing she could do about it, right?
A. That is what she said, yes.
Q. And Plant leadership was upset. Would you be one of those people who was upset?
A. Yes.
Q. And I think there was an issue in purchasing. Now, when this came out, I think there is testimony that it was July of '21, right?
A. Yes.
Q. Ms. Dawsey said she sent some letters to some folks. When you took over Vice President of Human Resources in April of 2022, what happened to this guideline?
A. Basically sent letters back to the people that said they were not being downgraded. So, we canceled the guideline. It was not an official guideline, it was just an idea how to adjust the PGs.
Q. Why did you cancel the guidelines?
A. It was unfair.
Q. Why is it unfair?
A. It is based on the personal grade. The brochure we just looked at showed the function determines the

grade of the job. But the personal grade is based on your personal performance. What did that person do to change their performance between the job changing? They didn't do anything.

Q. All right. So, you viewed it as unfair because people hadn't done anything to get their personal grade changed?

MR. MURPHY: Your Honor, he is leading the witness. Objection.

THE COURT: Overruled. But don't lead the witness.

MR. MOODY: Thank you, Your Honor. My apologies.

THE COURT: You essentially would have said that. But go ahead.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. To your knowledge, Ms. McCraw, did anyone receive a reduction in their personal grade as a result of these guidelines?

A. No, they did not.

Q. Ms. Dawsey testified that plant leadership was upset about these guidelines, were associates also upset about these guidelines?

A. They were very upset. The people who received the letters, there were about eight, maybe nine people who

got the letters, they didn't understand what was going on.

THE COURT: How many people got letters?

THE WITNESS: About eight or nine.

THE COURT: Eight or nine?

THE WITNESS: Yes.

THE COURT: Okay. Thank you.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Did you have meetings with those eight or nine people?

A. They stopped me just because they wanted to complain that it was unfair. They couldn't believe that we had agreed to downgrade their personal grade based on their functions.

Q. All right. And you put a stop to the guidelines?

A. Yes, I did.

Q. All right. We saw a picture of a gentleman, his name was Kavit?

A. Kavit Antani.

Q. Was he one of your direct reports in assembly?

A. He was.

Q. Were you part of his validation process?

A. Yes, I nominated him for validation.

Q. Kavit is considered a domestic?

A. He is. He was born in India, but he is an American citizen.

Q. Was his nationality ever an issue as to whether you would push him for validation?

A. No.

Q. Let's look at Plaintiff's 31, and I promise we are getting to 64. Ma'am, I know you say you read and speak German. There has been some discussion about this, you know, email with Ms. Petrasch, and, you know, this note to Kelly, "Germany is planning to replace Stephan with an expat." Could you please summarize for the jury, if you could, what the email below says?

MR. MURPHY: Your Honor, can we approach?

THE COURT: Yes.

(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)

MR. MURPHY: Your Honor, I have to object. This witness is not a certified translator by the Court. I have no way of cross-examining whatever she says that says in German. She has not taken an oath as a translator, not certified as a translator, and this is grossly unfair. If they are now going to put up these German emails, what did this person say? What did this

person mean? They have to bring that person in to translate it or have a Court-appointed translator who has sworn to translate exactly as it is written. I have no way of cross-examining if they get up and say, you speak German, read this to the jury, tell them what it is really about. She was never identified as a witness who was going to translate or who was going to speak to German emails, and there are tons of German emails in these records.

MR. MOODY: Judge, I think this is the only one I am going to ask about and it is specifically to rebut what Mr. Murphy has brought up about what the substance of the email is about, about an expat is coming, that is not what the email says.

MR. MURPHY: She can't. That is not for her to say.

MR. ROZELSKY: Your Honor, you also recall that Mr. Murphy testified as to what he thought some German sentences said, I objected, and you allowed it go on. The question that Mr. Moody asked was not translate this, it was to read this and summarize.

THE COURT: Well, so my recollection is that Dr. Englehorn testified about some German documents and what was meant. And I believe Ms. Petrasch testified about documents that were in German and she translated

them into English. And if this witness says that she speaks German and that you may want to ask her a question or two about how she came to know German, but other witnesses have given similar testimony. And so she did take an oath to tell the truth, so if she summarizes the document incorrectly, it is later determined later on it is material, there would be repercussions.

MR. MURPHY: How can I cross-examine without knowing what she is saying? She could make up anything about that email.

THE COURT: Well, this case has been pending about four years, and anybody who wanted to get a translation of any document and have it put in writing has had plenty of time to do that.

In fact, I think this is your exhibit, isn't it? I have made my ruling.

THE COURT: Go ahead.

(Whereupon, the bench conference concluded and the following was heard in open court.)

MR. MOODY: Your Honor, just a little housekeeping. I am told that Plaintiff's 24 that we just looked at a moment ago is not admitted, it is the same as Defendant's 14 and was admitted, so we would, I guess, move to admit 24 without objection.

THE COURT: It is in.
MR. MOODY: I apologize. I am just following orders.

DIRECT EXAM CONTINUED

BY MR. MOODY:
Q. Ms. McCraw, do you read German?
A. Yes.
Q. Are you fluent in speaking German?
A. Not super fluent, but I can speak German, yes.
Q. How did you learn to read German?
A. I took classes at BMW.
Q. At MC?
A. At MC, yes.
Q. And how long ago was it that you learned to read German?
A. I started about probably 33 years ago and then I just got better at it over time.
Q. Okay. And do you occasionally use German as a language in your business?
A. Yes, yes.
Q. As we look at plaintiff's 31, dated March 3, 2021 from Daniela Pekar to Christine Petrasch, do you see that first line?
A. Yes.
Q. What does it say?

A. It is Daniela's email?
Q. I'm sorry?
A. The Hello, Christine, I hope you are doing well?
Q. Yes.
A. Okay.
Q. Okay. It is just kind of greetings?
A. Yes.
Q. What is the second paragraph where it says, "Martin Starringer"? What does that say?
A. It says basically he has asked about a position, if we are going to consider another expat.
Q. Okay.
Q. Is this basically saying an expat is coming to BMW MC?
A. No, it says that Anna Sponsel has an associate, who is potential candidate for level function four, she is coming off of her parents part time.
Q. So, anything else about that paragraph?
A. It says that she was in the training program with PM 31 and 30 and that she would be available full time in September.
Q. Is this Anna Sponsel on parental leave?
A. No, Anna Sponsel is the manager, but she is recommending Mirjam Seitz for this potential.
Q. All right. Mirjam Seitz. The last paragraph,

what does that tell us?
A. It basically gives Mirjam's background, it says that they would support her as a potential candidate, but the question is, does she have planning and steering experience.
Q. All right? Anything else?
A. It says, if that is required, then she may not be -- they trust, her but she doesn't have that experience.
Q. Okay. So, it doesn't say an expat is inbound to BMW MC, does it?
A. No.
Q. Thank you for that.
Let's go and talk about 64. Ms. Fowler, can you put up Defendant's 13?
MR. MURPHY: Thirteen (13)or 64?
MR. MOODY: I'm sorry?
MR. MURPHY: Thirteen (13) or 64?
MR. MOODY: Defendant's exhibit 13, we are talking about TX-64.

DIRECT EXAM CONTINUED

BY MR. MOODY:
Q. Ma'am, this is Defendant's exhibit 13, I will ask, you, revision date is what?
A. May 1st, 2019.
Q. Department code?

Q. TX-64?
Q. Function level?
A. Three.
Q. You have already testified you didn't have a limit on function level threes, right?
A. That's correct.
Q. There has been talk about grading and not graded, has 64 ever been graded?
A. No, it is still not graded.
Q. Why not?
A. We are working on a new SAP system again and we have to send in all of the details of the jobs, so we just haven't done it.
Q. Scott Medley, what personal grade?
A. Eleven (11).
Q. Same as Kelly Dawsey?
A. Yes.
Q. Why is 64 important to your organization, ma'am?
A. Sixty-four (64) has the food services, which it sounds simple, but we have five cafeterias and we have to make sure there is food available day and night. We have little marketplaces for people to get food so we have to make sure that they have healthy food to eat.
The occupational safety part is a strict Government regulation of OSHA requirements. We have

construction safety and regular safety inside that group, so they have to make sure that we are following all of the guidelines from the safety side.

We also have to report into what is now the Department of Public Health on anything that is going on inside the plant. We have health management, which was meant to be the associate family health center, the pharmacy management of that contract making sure we are offering the right things to the associates from our insurance side.

Q. Is the 64 position important or not important to the mission of the plant?

A. I find it probably the most important, especially now, but it is definitely an important role.

Q. Did you participate in the discussions about where Ms. Dawsey may fit in the organization following the reorganization?

A. I did.

Q. Who was involved in those discussions, Ms. McCraw?

A. Christine and Robert.

Q. What factors did you consider when you were looking at where Ms. Dawsey may fit into the organization?

A. Strategy. I felt she was really good at strategy. I felt she was really good at budgeting and following

guidelines, writing policies and procedures. This person has to meet with OSHA if they come into the plant, being able to find the documents. And she is very structured and well organized.
Q. There has been testimony about Scott Medley going to a project, did you view that as a great assignment for Scott Medley?
A. No. No. He didn't want to lose his team. I mean, he really didn't want the project. He was willing to go, but he didn't want to go.
Q. Who would inherit his team?
A. In my thought process, Kelly would have taken over Scott's team.
Q. Would Ms. Dawsey, going to 64 after seven years in 60, potentially enhance her opportunities to advance at BMW MC?
A. I think it is helpful to know the entire business, not only knowing one element of the business or being so focused on one element, you really lose a lot of time, so it is good to know the entire business to make better strategies and better business decisions.
Q. All right. So you had big issues to tackle, work-force issues, why was Ms. Dawsey your choice to go to 64?
A. She needed a change and I thought that was a good

position to give her a different view because, again, it had come to us as a separate area or separate area that is not in other HRs, so it would give her the complete HR perspective of everything that is going on.

Q. When you say she needed a change, were you looking to reboot the HR Department?

A. I wasn't looking to reboot, but can you leave people in jobs for 20 years? I feel guilty doing that. I believe people should move around. I mean, my movements have always been beneficial to me, so I felt like the other movements are good.

Q. If Ms. Dawsey claims that 64 did not have as much Prestige as 60, is that true?

A. I don't know what prestige comes with strategy planning and head count. I don't see 60 any more important than 64.

Q. If someone claims that 64 has less responsibility, is that true?

A. It had more people, so I think the responsibilities are probably even higher in that group of people because, again, you have a lot of different topics, and a lot of different legal entities that you are dealing with as far as government agencies and trying to report everything properly.

Q. All right. Ma'am, if their claim is that going

to 64 was a demotion, is that true?
A. No, it is not.
Q. Have you ever downgraded anyone?
A. I have not.
Q. Does HR downgrade people?
A. No, we do not.
Q. And is that why one of the reasons you did away with the guidelines?
A. Yes.
Q. Ma'am you, you were here when I asked Ms. Dawsey about her compensation.
A. Yes.
Q. I asked her if you are in the top five of the department managers, do you remember me asking her?
A. Yes.
Q. Do you have the authority and/or ability to see where compensation is?
A. Yes.
Q. All right. With Kelly Dawsey and Scott Medley being -- were they your highest compensated department managers in HR?
A. Yes.
Q. How did they rank compared to the rest of the plant in 2021?
A. They were number four and five.

Q. Number four and five. How many department managers do you have at BMW MC?
A. I would say 70, 75.
Q. So, you are telling this jury that out of 70 people, Kelly Dawsey and Scott Medley ranked four and five?
A. Yes.
Q. You were the Vice President of Assembly, did they rank higher than any Assembly Department Manager?
A. Yes.
Q. Ma'am, Ms. Dawsey claims or made claim that going to 64 may have lessened her chance for promotion; is that true?
A. Promotions are based on your PG, so I was promoted out of a project into my validation, so, it is your PG.
Q. So, as a personal grade 11, had she hit the top without being validated?
A. Yes.
Q. So, the only way she really could go up was get validated?
A. Yes.
Q. You sat here and you heard her testimony about the efforts she made to get validated, right?
Let me strike that.

Ma'am, did Kelly Dawsey ever come to you and say, I want your support in getting validated?
A. No.
Q. From 2015 until 2022?
A. No.
Q. Never came to you?
A. No.
Q. You were a mentor to her and strategic work force developer?
A. Yes.
Q. Did she ever ask you, hey, Sherry, you are my mentor and strategic work force development, can you help me get validated?
A. No, she did not.
Q. Would moving to 64 help her potentially in her validation process?
A. Give new content.
MR. MURPHY: It calls for speculation and he is leading, objection.
THE COURT: She can testify if she knows.

DIRECT EXAM CONTINUED

BY MR. MOODY:
Q. Would moving to 64 help her get to validation process?
A. Give her different perspectives possibly depending

on what projects were going on in the plant, yes.
Q. Ms. McCraw, is it hard to become a vice president at BMW MC?
A. Yes.
Q. Do most people who enter the process make it or not make it?
A. If they enter the process, most make it, not all, but most.
Q. Do you know how many vice presidents there are in the BMW Group?
A. Two hundred seventy (270) out of 150,000 people.
Q. How many?
A. Two hundred seventy (270) out of 150,000 people.
Q. So, 270 people are vice presidents in the entire BMW Group?
A. Yes.
Q. I am not -- I'm a lawyer, I am not best at math, but I took 300 and 150,000, that comes up to point zero zero two, or point two percent of all people make it to vice president, right?
A. Yes.
Q. Would you call that elite to make it to vice president?
A. It is very difficult, I will just say that. I won't say it is elite, it is difficult.

Q. All right, ma'am. Let's clear the air on Eva Burgmeier. Did you select Eva Burgmeier for TX-60?
A. No.
Q. Did you slot the TX-60 position for an international?
A. No.
Q. Did you slot the position for a German?
A. No.
Q. Did you interview her?
A. No.
Q. Did you advocate for her?
A. No.
Q. Did anyone explain to you why she was selected?
A. No.
Q. Was Eva at TX-60 a good decision for your organization?
A. It worked out for us, yes.
Q. Why?
A. She had good information from different projects that we could use to help. We were able to add a subsidy for the food in cafeteria so that the food was more affordable for the people working there. We were able to advocate for more -- a bigger budget. We took benchmark data differently and we did analysis of the benchmark data, and we were able to pay more. We were

able to pay our maintenance --

Q. Okay. Hold on. You raised wages?

A. Yes, we did.

Q. With Eva Burgmeier?

A. Yes.

Q. From Europe?

A. Yes.

Q. She helped raise wages for who?

A. For the associates in Spartanburg.

Q. Okay. How much?

A. Twenty-five percent as of today that we were able to go up, that is over four years.

Q. All right. So, 25 percent increase over four years?

A. Yes.

Q. What about the maintenance issue? I interrupted you, I apologize?

A. Maintenance is up about 36 percent over the original.

Q. Are you doing better at getting people now that wages have gone up?

A. Yes, we don't have a problem.

Q. Was Eva Burgmeier an important add to make those wages go up?

A. Yes, she was.

Q. The cafeteria subsidy, is that something other international plants were doing?
A. Yes.
Q. We weren't doing it here?
A. No.
Q. And because Eva came from Central, she knew that that was something that was there, right?
A. She helped support it.
Q. Did she help fight for Plant Spartanburg?
A. Yes, she did.
Q. Ma'am, you didn't personally meet with Ms. Dawsey about the reorg, did you?
A. No.
Q. Ms. Fowler, can you do Defendant's 23, please?
We have seen this, let's go to the second page. Just want to make sure it is covered. Under item 11, you are a TX-4, right?
A. Yes.
Q. So, you were there for the presentation about the new organization?
A. Yes.
Q. We are talking November, and it is almost half a year until you come in to be the Vice President of Human Resources, right?
A. Yes.

Q. Lots of pre-planning?
A. Uh-huh (affirmative response).
Q. Did you make any presentation that day?
A. No, I did not.
Q. Let's go to Defendant's 24, please. Were you -- and I am sorry, Jodi, let's go forward into the joint team graphic wrap, go to 258.
Were you present when this was boarded.
A. Yes.
Q. This shows Scott Medley going to the project.
A. Yes.
Q. Our next one. Next, Ms. Fowler.
This shows Ms. Dawsey going to 64?
A. Yes.
Q. Recruiting Associate Relations, Health Management, Safety Management, and Food Services, right?
A. Yes.
Q. Ms. Fowler, the next one.
Then it shows Eva Burgmeier coming to 60, right?
A. Yes.
Q. Did Kelly ever come to you to discuss her position in the reorganization?
A. No, she did not.

Q. In reorganizations, do you ever have people come to you?
A. Yes.
Q. Have you ever reversed things when people came to you?
A. I considered it, moved people to different positions, yes.
Q. Now, we know Ms. Dawsey resigned -- gave her resignation letter on January 3rd. That January 3rd resignation, how would you describe that timing of the resignation?
A. We were starting back the lines, so it was busy with production, making sure the equipment was running, and people were there and that we were able to start-up. So, I wasn't really in my HR role yet, so I was still running Assembly at that time.
Q. What did you think about her resignation?
A. I just --
MR. MURPHY: Objection, Your Honor. What is the relevance about her thinking about the resignation?
MR. MOODY: Your Honor, she is the upcoming leader for the reorganization.
THE COURT: I overrule the objection.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. What did you think about the resignation by Kelly Dawsey?

A. I just thought she had a better job, she was going to do something else.

Q. All right. Let's look at a few things real quick. I have hidden my folder from myself. We have talked about Scott Medley, what does Scott Medley do today at BMW MC?

A. He is TX-64.

Q. He is back?

A. Yes.

Q. What is his personal grade?

A. PG 11.

Q. Has he had a demotion?

A. No.

Q. Has his pay been impacted?

A. He keeps increasing every year.

MR. MOODY: Defendant's exhibit 9. Your Honor, this is offered without objection.

THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. Real quickly, Ms. McCraw, we look at Defendant's

exhibit 9. We see for 2021 you see that line three, three from the bottom?
A. Yes.
Q. Until March 26, 2022, it shows that his annual salary was 202,450?
A. Yes.
Q. That would be equivalent with Kelly Dawsey?
A. Yes.
Q. Everything after Kelly, if you go up, that would be after Kelly Dawsey left, right?
A. Yes, it is.
Q. And so you said that he continues to go up, so as of this exhibit, we show that Scott Medley is -- his annual salary has gone up to $230,038.14, right?
A. Yes, it is.
Q. He receives bonuses?
A. He does.
Q. The (inaudible) as we discussed, the car policy, all the other things that go with PG 11, correct?
A. Yes.
Q. So, basically, he has gone up a little bit short of 28,000 since that in annual salary?
A. Yes.
Q. And that increase ripples into his bonuses and all the other things, right? Is that because personal

grade determines compensation, benefits, et cetera?
A. Yes.
MR. MOODY: Your Honor, if I could have just one moment.
Thank you for that, Judge, I just saved us five minutes or more.

DIRECT EXAM CONTINUED

BY MR. MOODY:
Q. Ms. McCraw, Eddy Bailey.
A. Yes.
Q. There has been, you know, an exhibit about him and TX-64. What personal grade was Eddy Bailey when he worked for you?
A. Personal grade nine.
Q. Did the function level matter?
A. No. We had two choices, I could hire from the outside, the original plan from Christine was either hire someone from the outside, she had a candidate, Garth, that she wanted to hire, or I could promote someone internally. And I felt that the people internally wanted movement or needed the chance to move up so I selected Eddy.
Q. And he was PG 9?
A. Yes.
Q. And since he was PG 9, is that how he was paid?

A. Yes.
Q. Did 64 get graded?
A. No, it did not.
Q. Dr. Englehorn testified that everything was in a state of, you know, getting unscrewed for six to 12 months, right?
A. Yes.
Q. All right. So, was Eddy part of that process of trying?
A. He was.
Q. Was the whole organization in a state of flux?
A. Yes. We had several change points going, and the buildings were growing, and the jobs were growing, and we needed to focus on recruiting. And we were looking for creative solutions together for how could we hire people, how could we have job fairs? What could we do to offer more positions inside the plant? So, we started internal job fairs with the production people able to bring their resumes forth and say these are jobs we want and then get people on the right track. So, it was good to have a fresh person there to say, okay, there are other ways to get people into the jobs.
Q. Okay. So Eddy Bailey's personal grade nine got paid according to his personal grade?
A. Yes.

Q. Neal Gilmore's personal grade?
A. Eddy left to go to Toyota Manufacturing and Neal came in and he also was a PG 9?
Q. Is that how he was compensated?
A. Yes, it was.
Q. Was the position graded?
A. No, it was not.
Q. So, now we know that Scott Medley is back in TX-64, and what is his personal grade?
A. Eleven (11).
Q. And we have seen his compensation, everything goes up, right?
A. Yes.
Q. Has he been demoted by going back to 64?
A. No.
Q. Ms. McCraw, was it important for you to have a proper hand over from Ms. Petrasch to you?
A. It was.
Q. All right. And is that one of the reasons why there was a three month extension of Petrasch?
A. Yes, because I wasn't going to be able to take the job until April, so she stayed longer to be able to hand over.
Q. Okay. And the job, as done by Eva Burgmeier in TX-60, and you saw her do it, right?

A. Yes.
Q. Would you describe that as a strategic job?
A. Yes, a technical job, I would say, yeah.
Q. All right. Did it require knowledge of the global network and resources?
A. I think it is helpful to make a global network if that is where we are competing.
Q. Were the expectations of Eva the same as the expectations of Kelly?
A. Yes, for the most part I would say they had the same responsibilities.
Q. Did AG control you as the VP of HR in any meaningful way?
A. No.
Q. Did AG make final decisions regarding employment matters at BMW MC?
A. No, they did not.
Q. Does MC -- BMW MC, do you sit on a management board for AG?
A. No.
Q. Are you aware of anyone at BMW MC sitting on a management board for AG?
A. No.
Q. As a CFO, you knew where the money and the capitalization for BMW MC came from, didn't you?

A. They are on separate profit and loss statement, we are our own company.

THE COURT: Could you repeat that?

THE WITNESS: We have our own profit and loss statement. We have a separate company. Manufacturing company. Even from the sales company.

DIRECT EXAM CONTINUED

BY MR. MOODY:

Q. All right. Ma'am, you heard Robert Englehorn talking about the investment that was being done at this critical period of time for the plant, Woodruff, battery, all of those things, the amount of people that needed to be hired. Did you view that as a small responsibility or a great responsibility as a leader?

A. It was a big responsibility because it meant another growth step that we were going to have to hire more maintenance people. That investment led to the need for more maintenance people; control specialist, people who understand basically the status of the equipment that we were buying, and the battery operation is not really an easy thing to build up. So, we needed to build technical competence and technical expertise in an area that we really weren't sure about.

Q. So, you are an engineer by trade, you like building things, you like building plants, you like

building cars?
A. Yes.
Q. Has your four years as the VP at HR been able to help build BMW MC?
A. I think it has been -- it has been a good experience for me and I would say I have been helpful in trying to get the people in the right places, to get the right kinds of career paths for people, and just try to keep the team together. I think it has been -- it has been an insightful experience, I will say that.
Q. Do you view being associate friendly or employee friendly as a negative thing as Vice President of Human Resources?
A. No, I think that is the job of Human Resources, that is the human in me.
MR. MOODY: One moment, Your Honor.

DIRECT EXAM CONTINUED

BY MR. MOODY:
Q. Ms. McCraw, just a few final questions. Did you ever intend to demote Kelly Dawsey?
A. No, I did not.
Q. Did you ever intend to push her out of BMW MC?
A. No.
Q. Did you believe TX-64 was an important senior role?

A. Yes.

Q. Were your decisions on putting Kelly Dawsey in 64 in your reorganization based on business needs?

A. Yes.

MR. MOODY: No further questions.

CROSS EXAM

BY MR. ROZELSKY:

Q. Did Ms. Dawsey quit before giving you a chance as a leader of TX-6?

A. Yes, she quit over Christmas, basically, so we never actually had a conversation.

MR. ROZELSKY: No further questions.

MR. MURPHY: May we approach?

(Whereupon, a bench conference was held off the record in the presence of the trial jury.)

THE COURT: Members of the jury, I am inclined to keep going for a while, but I don't want to put anybody in a bad spot. I also want to finish this case by Wednesday. So, are y'all okay if we keep going for another hour or so? Does anybody need like a five-minute break before we do that? If you would like a break, just raise your hand. Okay. Well, let's keep going for a while, Mr. Murphy.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Ms. McCraw, I want to return to this timing issue on TX-61, and let's get this very clear here, I am going to show you what is already in as Defendant's exhibit 13, I talked about this a while back. This is the job function data sheet for TX-61 -- I'm sorry -- this is 64, isn't it? Okay. I believe I found it now. Let me show you Plaintiff's exhibit 9, that is the job function data sheet TX-61 from 2019?

A. Yes.

Q. And at that point in time --

THE COURT: In an abundance of caution, Plaintiff's 9 is admitted or readmitted without objection.

MR. MURPHY: Thank you.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. At this time, who is in TX-61 is?

A. In April, Scott Medley.

Q. So, Scott Medley was a function level three when he was in TX-61, right?

A. Yes.

Q. Then you were asked about Plaintiff's 29, and that is the TX-61 sheet as of this October 24, 2021, right?

A. Yes.
Q. And who was in the position at that time?
A. Corey Epps.
Q. Okay. And you testified that, and you remember I objected, and you kept testifying that October 24, 2021 was when the grading was changed for TX-61 from function level three that we just saw to function level four, correct?
A. It is a change, yes.
Q. And you repeatedly said that is when the change was made?
A. That is when the revision was made, yes.
Q. The revision to function level four?
A. Revision date was 10-24-21.
Q. Was that a revision to function level four?
A. That did change, yes.
Q. But it didn't change on October 24, 2021, did it?
A. I don't know when it changed; all of the documents prior showed it as a three.
Q. But you testified that it became a function level four on October 24, 2021?
A. I am reading the sheet that says revision date 10-24-2021. I was not responsible for TX-6 at the time. And the change looks, the function grade is different,

yes.
Q. But you do know that it was changed earlier, don't you?
A. I don't have any evidence of that, no.
Q. Well, the next exhibit you saw was these set of sheets, which are marked Plaintiff's exhibit 47, do you recall that?
A. Yes.
Q. That was the very next exhibit you looked at, wasn't it?
A. Yes.
Q. And these are SAP records, right?
A. Yes.
Q. And when a change is made, the change is made in SAP, correct?
A. Yes.
Q. And that change then feeds the job function data sheet, that is where the job function data sheet got that, from the SAP record?
A. I don't know that, no. I assume maybe, but I don't know.
Q. Let's go to the second page because your lawyer didn't show you this. You see that SAP entry?
A. Yes.
Q. And it is showing this is for Corey Epps, right?

A. Yes.
Q. And it is for Corey Epps in TX-61, right?
A. Yes.
Q. And it is showing that Corey Epps is a level four, isn't it?
A. That is what it shows, yes.
Q. And most importantly, it shows that change was made in December of 2020, right?
A. I can't tell if that is what it shows there.
Q. You can't read?
A. I can read the date, I can't read the first box.
Q. Read whatever you want.
A. Yes, it says 12-04-2020.
Q. That change was not made in October 21, 2021?
A. There was a change made on October 21, 2021.
Q. It wasn't function level?
A. That definitely changed in 2021.
Q. Ma'am, he is a function level four in December of 2020. So, what possible change could have happened if he is still a function level four in October 24, 2021, there was no change?
A. None of these were officially graded at those times because they created the 64 without grading, nothing got changed to a four. We were starting with threes on 60 and 61, that was added, we have seen that.

Q. This is your SAP, BMW SAP record, right?
A. It is an SAP record, yes.
Q. BMW is sitting here in front of this jury trying to insinuate that after Kelly Dawsey got upset about being transferred and demoted that she went and changed Corey Epps's function level from a three to a four in October, and that is not true, is it?
A. I don't know who changed it in October.
Q. Nobody changed it in October, it was changed in December of 2020, that is what the SAP records show; isn't it?
A. It shows that here, yes.
Q. So, the insinuation that Kelly faced, and you sat here and watched her face it, and the insinuation you made from that stand that she made a change to Corey Epps's taking him from a function level three to function level four after she got upset, that is a lie, isn't it?
MR. MOODY: Judge, argumentative.
THE COURT: Overruled.
THE WITNESS: I am not lying, no. I was not responsible for the department at the time. I don't know who changed it. No one said Kelly herself changed it. It said it happened in TX-60.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. You are responsible for what you say to this jury, aren't you?

A. Yes, I am.

Q. You had this record in your possession because it has been an exhibit throughout this case?

A. Maybe I had it, I don't know.

Q. You are the Vice President of Human Resources, aren't you?

A. I am the Vice President of Human Resources. I have a hundred people who work for me and know the details of all of the job descriptions and position numbers; I don't do that myself, no.

Q. Well, you have access to all of these SAP records, right?

A. I could look at them if I wanted to, I don't normally do that now.

Q. And before you came and took an oath in this court and insinuated to this jury that Kelly Dawsey made a change in October 24, 2021, did you even consult your SAP records to determine whether the statements you were about to give were truthful or not?

A. I personally did not insinuate that. I said it happened in October 24th, 2021. I did not insinuate

that Kelly made the change herself, no, I did not.
Q. But the statement it was made in October 24, 2021 is false, isn't it?
A. I don't know that. I don't have any records to show the job function data sheet prior to 2024.
Q. The job function data sheet is from SAP records. This SAP record is the function level for TX-61 was made in December of 2020?
A. The one thing I notice is his position number never changed, so it just was carrying his position as when he was a Section Manager 9 to was his position number, that is the four.
Q. Ma'am, we can do this all day long if we need to?
THE COURT: No, we can't. You have asked, she has answered, move on to another item.
MR. MURPHY: All right.

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. Now, you talked about not wanting to move to HR. You were not told you had the option of staying at TX4, did you? Were you?
A. I was not told that, no.
Q. And there were no other options discussed with you except going to TX-6, were there?
A. That was an option that I was given, yes.

Q. The only option you were given?
A. I can say no to anything. I am a free -- I am free to go where I need to go. I could always put in my name to go to an international assignment, too.
Q. But you knew they were bringing in Philip Heinrichsdorff, number 13?
A. No, Philip was not decided at that time.
Q. So, were you aware that Ms. Petrasch told Ms. Dawsey because Dr. Englehorn wanted a German in assembly they were moving you to TX-6?
A. I am not aware of that so, no.
Q. And you have testified on direct about these top positions and vice presidents and about how hard it is to get to be a vice president. You spent a lot of time on that, right?
A. Yes.
Q. Let's talk about these top positions then. Do you know who Al Kinzer is?
A. Yes, the first President.
Q. And Mr. Kinzer is American, right?
A. Yes, he is.
Q. He left in 1998?
A. Maybe. I don't remember when he left.
Q. Does that sound about right?
A. Possibly, sometimes in the nineties.

Q. There hasn't been an American President since?
A. No, there is not.
Q. Vice Presidents. You talked about how hard it is to be vice president, how hard it is to be vice president, it is harder for Americans?
A. No, I think it is equally hard for everyone in the world.
Q. Well, you would agree at the time Kelly Dawsey left you were the only domestic vice president, weren't you?
A. We were, at that time, there were earlier vice presidents who were at other places.
Q. All of these vice presidents in these different groups, I think we said there was ten total, there was only two Americans out of the whole group?
MR. ROZELSKY: May we approach?
(Whereupon, a bench conference was held on the record in the presence of the trial jury, but outside the hearing of the trial jury.)
MR. ROZELSKY: Your Honor, now we are going into some more of the executive positions. Mr. Murphy has explained all along, I think we are entitled to a curative instruction. It says that BMW can put whoever they want in those top positions, and I think it is unfair to allow him to continue on to suggest that it

can only have Germans in certain positions, but everybody else is fine. I think under the Treaty, we are entitled to a curative instruction.

MR. MURPHY: I don't understand it, Judge. I mean, first of all, if the Treaty is at issue, then the Treaty is at issue, and there is evidence on it. You can't make something relevant and say because it is relevant it is an evidentiary bar. There is no evidentiary bar in the Treaty. Mr. Moody wanted to talk about and have her talk about on direct how hard it is to become a vice president, how many vice presidents there were out of the -- did the math, said something like you know two something, you know, you know, I get to follow up on that. There is absolutely nothing about the Treaty that says -- first of all, the Treaty can't apply to MC, okay. You guys want to stand up there and tell the jury time and time again MC made all of its own decisions, AG had nothing to do with it. MC is a American company, which is completely separate. You didn't have a treaty issue, but if you did have a treaty issue, it is not an evidentiary barring. You are making the issue relevant, not barring it.

MR. ROZELSKY: I am not suggesting it is a bar, but I think I am entitled to a curative instruction. If she is going to testify that -- and your implication

is that AG is making these decisions, and that it is only hard for Americans to make it, then I think we are entitled to an instruction to the jury that says, but under the Treaty, the parent company is allowed to do exactly what it has done.

THE COURT: We have been talking about the same thing for the last five days. It is your witness, you got anything to add?

MR. MOODY: Your Honor, like he is trying to insinuate, I said all they have done is German, German, and American, they are just repeating that same mantra.

THE COURT: Well, I think if I start giving a curative instruction on that at that point, I am basically getting into jury charges. So, I will overrule the objection, but y'all can followup on that if you want to. Did you want to say something else?

MR. ROZELSKY: No Your Honor.

(Whereupon, the bench conference concluded and the following was heard in open court.)

THE COURT: Give me just a minute.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Let's talk about TX-64. You testified you think it is the most important position?

A. It is, yes.

Q. Can you explain how the most important position in HR does not require any prior HR experience?

A. It requires ten-plus years of business experience and we are working on big contracts, we are dealing with a lot of government agencies. And, again, it is not a traditional HR-type function, it is a special function.

Q. Can you explain to the jury how the most important HR position does not require any HR experience?

MR. MOODY: Asked and answered.

MR. MURPHY: She didn't answer as to HR experience.

THE COURT: Overruled.

THE WITNESS: I think HR experience is necessary, but contract management experience is necessary, too, and it says operational business management, ten-plus years of experience, plus leadership experience or equivalent.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Let me try it this way. TX-64 does not require any prior HR experience, does it?

A. It doesn't call that out on the job function data sheet, no.

Q. As it does with TX-60?

A. TX-60 says or preferred. It says, preferred or relevant experience, so it calls it out very specific to 60.
Q. TX-64, this most important position, doesn't require any prior recruiting experience, does it?
A. I think recruiting experience is something that is -- I don't know what that -- what is prior recruiting experience? Like a superior recruiter, we are trying to recruit workers for our new operations, so it requires someone with good business acumen, it does not require recruiting experience.
Q. All right. We heard Dr. Englehorn sit up here, and I don't know how many times, he talked about 1.7 billion dollar investment and they needed to recruit people, and that was the importance of TX-64, but TX-64 doesn't require any prior recruiting experience?
A. It requires good business ideas and we have had good business ideas coming from our team.
Q. So, to invest 1.7 billion dollars and the biggest issue is recruitment, you just need someone with some business experience?
A. I think it is helpful to have business experience so you know how people think, and you know what kinds of people you are targeting, and you could put together action plans and projections for how many people you

want to hire, do an analysis of the jobs.
Q. You don't think it is necessary for someone going into TX-64 when the company is investing 1.7 billion dollars starting a new operation, you don't think it is necessary for them to have prior recruiting experience?
A. Again, I don't know what kind of prior recruiting experience you would have for that type of job. Like Ms. Miller or someone like that, I don't know what -- they can find professionals, but we are kind of hire for production associates, and maintenance, and controls people.
Q. You recall I took your deposition January 2024, about two years ago, do you remember that?
A. Yes.
THE COURT: Record will reflect the witness has been provided with the original deposition.

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. And it didn't seem to be such a hard question for you to answer then, so I am going to take you to page 59.
MR. MOODY: Your Honor, I object to the sidebar remarks.
THE COURT: What is that?
MR. MOODY: I object to the sidebar remark about

the preparatory, it was easier for her to answer at that time.

THE COURT: Don't testify, Mr. Murphy.

MR. MURPHY: All right, Your Honor. I got it.

THE COURT: Or provide commentary, just ask questions.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Let's go to page 59. I will read my question beginning on line 22 and I will have you read just the words you said on page 60 on line 1. Reading from the transcript line 22:

"My question was, is recruiting
experience a requirement for TX-64?
Please read your answer, page 60, line 1.

A.

"It is helpful, yes, but it is not
necessary."

Q. And in fact, the first person you hired in that position with 1.7 billion dollars on the line and critical recruiting needs was a gentleman named Eddy Bailey, right?

A. Yes.

Q. If we look at Plaintiff's 49, which is already in, that is your offer letter to Mr. Bailey, isn't it?

A. I can't see anything.
Q. That is my fault, ma'am.
A. Yes, that is the offer letter.
Q. And the date of that offer is what?
A. May 6, 2022.
Q. What is the classification for that job?
A. Leadership level four.
Q. So, there is no question that the job was a function level four, is there?
A. The job is still not graded. Eddy was coming in as a four, so he rolled over with his position number as a four.
Q. You had no problem saying certain jobs were graded as they were on direct. Why is it every time I show a grade that doesn't -- isn't consistent with what you have been saying, you keep going back to the jobs weren't graded? There is a grade right on that document.
A. I think we have talked about this multiple times. The 64 has not been graded, it shows as a three, it shows as a four, it changes around, the title changes, what is inside, what is outside. We restructured, we had the choice of replacing the 64 with Garth as a function level three PG 11, it showed it on one of the charts we looked at, or we could take an up and coming

with good ideas, and Eddy Bailey was the selected candidate.
Q. He was a personal grade nine, right?
A. He was, yes.
Q. Put in the most important job in HR?
A. He had some really great ideas. He decided to recruit battery people from Tesla and we were able to hire quite a few people using that strategy.
Q. The next person you offered it to because he quit after awhile or left, right?
A. He was recruited by Toyota for their battery operation in Liberty, North Carolina, so he did get promoted, yes.
Q. So, he left and the next person was Neal Gilmore, right?
A. Yes.
Q. Okay. And Mr. Gilmore didn't have any prior HR experience, did he?
A. He did not. He had recruited people in his role in purchasing, but he was not an HR person, no.
Q. You are saying Mr. Gilmore had prior recruiting experience?
A. He had hired people, he had helped recruit people for purchasing, yes.
Q. Hiring people and recruiting people are two very

different functions as an HR Vice President you know that, right?
A. I use those somewhat interchangeably. If I did that incorrectly, I am sorry. No, I think hiring people means you have to find the right people.
Q. Let's go back to your deposition. Page 59. I am going to read from line 6 and you read the answer beginning line eight.
"Question: Prior to putting Neal Gilmore in TX-64, did he have any prior recruiting experience?"
What was your answer?
A.
"He had hired people in his job in purchasing. He had hired a lot of people in purchasing, but recruiting officially, no."
Q. And Plaintiff's 50 is your offer letter to Mr. Gilmore, right?
A. Yes.
Q. And that is from April 2023?
A. Yes.
Q. And this most important level is still four?
A. We were restructuring, we moved a lot of things out of that position, yes.

Q. Now, we heard a lot of testimony, and I am not sure if BMW is trying to blame Kelly Dawsey for resigning, you heard Dr. Englehorn testify that your department was in big, big trouble and was screwed up for a year, year and a half after Kelly resigned, do you recall that testimony?

MR. MOODY: Objection, Your Honor, his personal comments lead the question again.

THE COURT: Don't do that. Just ask questions. You said, I don't know if somebody is trying to show Ms. Dawsey did this or did that, don't do that. Just ask questions.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Let me ask a question. Is BMW trying to establish that Kelly Dawsey leaving BMW in some way that is relevant to this case?

A. Not for me it is not, no.

Q. Because right before Kelly Dawsey resigned, who was in TX-64?

A. Scott Medley.

Q. Right after Kelly Dawsey resigned, who was in TX-64?

A. Scott Medley.

Q. So, that didn't change, did it?

A. No, but we didn't have a person for the project that Scott was supposed to go to, so we had to restructure all of the people.
Q. You delayed his project for a bit, correct? The project?
A. Five months.
Q. Is that what put the department in big, big trouble and screwed it up so badly for a year, year and a half?
A. Kelly was a respected member of the HR team. She knew all the details, the function grades, position numbers, personal grades, that was her expertise. She was the only one left in that group, the entire group had basically quit before she left. So, I'm not saying it was her fault, she was welcome to leave. I am just saying that it was all peaked out in the group, there wasn't a lot of expertise left.
Q. It wasn't her fault because BMW make the decision to move her out of 60, right?
A. She was supposed to stay in the department and help with the hand over.
Q. And she is supposed to go into this TX-64, most important job in the department, that went to personal grade 9 people with no prior experience that was the --
MR. MOODY: Objection, personal comments again,

Judge.

THE COURT: Overruled on that one.

THE WITNESS: If she had gone into that role, that role was a bigger job. These people were coming in basically blind. I had the choice to replace with a person from the outside from Hubbell Lighting or to move the positions around, so I moved things out of the job, and gave to it people who were up and coming able to do the work.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. You made the choice to go ahead and let Mr. Medley go to that project, right?

A. I did in May once we had someone.

Q. That is what screwed things up and put the department in big, big trouble as Dr. Englehorn testified to.

A. I don't know what Dr. Englehorn meant by his screwed up, unscrewed comments, it was not helpful to have a gap in the department.

Q. Let's talk about this personal grade reduction policy implementation. You have testified that once you became Vice President of HR, you revoked that policy, right?

A. Yes.

Q. And you revoked it in June?
A. I revoked it in April. It took until June to get documented with the letters to send out from legal.
Q. And you were sending letters to people who had already received letters, right?
A. Yes.
Q. And they received letters informing them that their personal grades would be reduced in accordance with BMW policy?
A. Those were the original letters that went out.
Q. They did go out, right?
A. Those letters had gone out in July of 2021 from TX-60, yes.
Q. Right. So, when Ms. Petrasch testified that none of that happened, she was wrong, wasn't she?
A. I don't remember if she was commenting on the letters going out or she was commenting on the jobs getting downgraded, no one was downgraded. The letters said they had one to three years to find other positions depending on the reason for the downgrade.
Q. And that policy was revoked after Kelly Dawsey started legal proceedings?
A. I didn't know Kelly Dawsey had started legal proceedings, so, no, it was the day I took over as the TX-6.

Q. And she had already started legal proceedings, hadn't she? You knew that?
A. I did not know that, no.
Q. You never told Kelly Dawsey you were going to revoke it, did you?
A. I never spoke to Kelly Dawsey privately.
Q. Okay, so that is a yes, you never told her that?
A. I never told her that.
Q. You knew it was in effect, you saw it affect your people, but you never went to her and said, Kelly, don't worry, I am going to take care of that, that will never happen to you, you never did that?
A. I was so busy with Assembly, I was trying to hand over my Assembly. I was not into the middle of all of this HR policy procedure, what levels the jobs were, all of those things. Everything I saw showed all of those people was PG 11, so I never saw that. So, no, I didnt do that to her. I didn't know she was leaving. I didn't know that she was leaving. I didn't know she thought she was being downgraded, I didn't know those things.
Q. Was there any record of you objecting to that policy when it was presented to and approved by the senior management group?
A. Yes, I definitely spoke against it, as did others.

Q. Okay. And have we seen any records of you disagreeing with it presented here in this trial?
A. We didn't -- I didn't pull the senior management records to see that I complained about it, no.
Q. And you realize that Kelly was working with Germany on that policy?
A. That was a -- not a policy of Germany. She may have been working with Germany on the policy, but it is not a requirement in Germany to downgrade positions.
Q. Well, you don't know what AG told Kelly when she was working on it, do you?
A. I wasn't part of those discussions, no.
Q. But you know she was working with Germany and you know she developed that policy under the supervision of Ms. Petrasch?
A. That's correct, she did develop the policy.
Q. And Ms. Petrasch has to approve any policy even before it goes to your senior management team, doesn't it?
A. She normally would look at it, yes.
Q. Not only look at it, she has to approve it before it goes to senior management, doesn't she?
A. I guess she approved it, I don't know. I wasn't there.
Q. In fact, you complained to Ms. Petrasch about it,

right?
A. I complained to Ms. Petrasch that that was an unfair policy.
Q. And you claim that your complaints fell on deaf ears when it came to Ms. Petrasch?
A. Yes.
Q. So, your problem was not with Kelly Dawsey, it was with Ms. Petrasch?
A. I didn't like the policy. I didn't have a problem with Christine and I didn't have a problem with Kelly, I didn't like the policy. I thought it was unfair. Personal grade is supposed to be based on your personal performance, not your function, or your project, or whatever you are assigned.
Q. And Knudt Fluor knew about this policy and he never said they weren't going to implement it, did he?
A. I don't know.
MR. ROZELSKY: Objection, calls for speculation.
THE COURT: Sustained.

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. Knudt Flor never told you they weren't going to implement the policy, did he?
A. Knudt didn't discuss that policy directly with me, no. I was in Assembly.

Q. Let's talk about the wage issue for a moment. Okay Your Honor to keep going?

THE COURT: Yes, sir.

MR. MURPHY: Okay.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Now, when it comes to wage decisions, you know that the person in Kelly Dawsey's seat makes a recommendation only to senior management, right?

A. They make a presentation what is decided, not a recommendation.

Q. But it is senior management who decides what the wages are going to be?

A. It comes from 60. Sixty (60) decides what, based on benchmark data, based on information that they have for local jobs where you should place the wages. They submit it for budget to the TX-7 department.

Q. TX-60 just makes the proposal on behalf of TX-6, doesn't it?

A. Yes.

Q. TX-60 or Kelly Dawsey works with PZ in Germany on that issue?

A. They look at what we have put together to make sure that it matches with what their guidelines would show us.

Q. And TX-60 must submit all of this information for review with the Central functions in Munich?
A. They review it. I don't know if it -- it is reviewed, yes, they see it.
Q. And you don't know what PZ or Christine Petrasch was telling Kelly about BMW's wage objectives, say, in 2019, do you?
A. No, I don't.
Q. I am going to show you a portfolio entry, this is from -- Your Honor, this is from Plaintiff's 14, I am going to page two.
Do you see that entry says:
"Labor cost continue focus for business/associate balance results in 24 percent reduction in fringe since 2013 and direct labor costs for plant ten well below the German locations."
Do you see that?
MR. MOODY: Objection on foundation on this, Judge.
THE COURT: Are you asking for him to identify the nature of this document?
MR. MOODY: Yes, Your Honor. This is something about 2013 in here, I don't even know which document

this is frankly.

MR. MURPHY: I thought I said it, Plaintiff's 14, her 2019 job performance.

THE COURT: You said 14, but explain again what this document is.

MR. MURPHY: It is the portfolio, sir. The review, performance review.

THE COURT: For?

MR. MURPHY: Ms. Dawsey.

THE COURT: For what year?

MR. MURPHY: 2019.

THE COURT: Okay.

MR. MOODY: If it is 2019, this witness has nothing to do with this document.

THE COURT: If she doesn't know, she can say she doesn't know, so I will overrule the objection. If she knows, she can talk about it.

MR. MURPHY: Right.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. You testified you thought the wages were too low, right, that was one of your complaints?

A. I wasn't referring to 2019. I don't think we had a big problem in 2019, but in 2020 and 2021 after COVID is when we had the problem.

Q. Well, did you know that BMW had and PZ and the Germans had created an objective to get labor costs below the German locations?

MR. ROZELSKY: Objection, Your Honor. Again, he is now throwing the Germans under the bus with this same question.

MR. MOODY: And it was very compound, Judge.

THE COURT: Sustained. Just ask her if she knows what this is and what it says.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. Did you know about this objective?

A. I didn't know about the objective. This is a portfolio for what Kelly was responsible for, so it is her personal portfolio. So I would just assume from that which, but I would not know, that Kelly was working on a project to save money on costs, but I don't know that. I was not a process partner for that portfolio.

Q. So, you don't know what direction she was given from Ms. Petrasch and PZ or BMW AG about the wage rates, do you?

A. I don't, not in 2019, I know nothing about that.

Q. In order to get more wages, TX-60 has to essentially barter or negotiate with PZ, doesn't it?

A. We don't negotiate. We send it over out of the

proposal base, along with market data, and the market data proves it is the right amount. It is just for documentation.

Q. Go back to your deposition on page 87. Do you see there on the bottom of page 87 I am asking you about Ms. Burgmeier, again line 24, do you see that?

A. Yes.

Q. Okay. Then page 88, line two I ask you:

"Who did she negotiate with in Germany?"

And your answer was PZ, wasn't it?

A. It was PZ. And I said:

"They just have to confirm what we submit. They don't approve, they just confirm that it is validated>"

MR. MURPHY: If I may have a second, Your Honor, trying to move through, cross off some sections.

THE COURT: Yes.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. You testified about the November meeting, do you remember seeing that schedule up there about the November meeting?

A. Yes.

Q. And that was when the management in TX-6 was being

introduced to their new boss, which is you, right?
A. Yes.
Q. And you stayed in that meeting for all of five minutes; is that correct?
A. Yes.
Q. And after staying in that meeting all of five minutes until the end of Kelly Dawsey's career with BMW, you never reached out to her, did you?
A. I went back to Assembly to work in Assembly, I was not in HR yet, so no is the answer, no, I did not.
Q. Plaintiff's exhibit 31. This is that email and then you interpreted Ms. Pekar number 29, email below that, do you recall that?
A. Yes.
Q. Whatever Ms. Pekar was saying, that is what Christine Petrasch wrote, isn't it? Germany is planning to replace Stephan with an expat?
A. That is what it shows, yes.
Q. With four exclamation points, right?
A. Yes.
Q. Let me ask you, do you think you know German better than Christine Petrasch?
A. No, she knows German much better than me.
Q. You were asked about comments and what you thought of them, and one of them was that you always take the

associate's side, do you remember that?
A. That was written in Kelly's notes.
Q. Written in Kelly's notes. That was a statement attributed to Ms. Petrasch?
A. I guess, I am not sure who said it.
Q. The statement that you didn't want the more experienced employees in the department, that was a statement from Ms. Petrasch, wasn't it?
A. I assume, I don't know.
Q. You talked about the FO Department. And you sat here while Kelly went through the T-Vorhalt request and several emails about her interactions with FO, which was then Mr. Trauth's Department, do you recall all of that?
A. Yes.
Q. Is it still your testimony that FOs were always just to draw boxes?
A. They are basically document changes, they are already pre-discussed, everything is done, representation is done by the person who does the box drawing, but, yes, it is to show deviations from the standard organization.
Q. Mr. Trauth is an OFK, right?
A. He is, yes.
Q. Former Vice President here in Spartanburg?
A. He was a Vice President here, yes.

Q. He is up in headquarters in BMW in Munich, right?
A. Not any longer, no.
Q. He was at the time?
A. Yes.
Q. And you want the jury to believe that this high-ranking OFK, which you said was very, very hard to get into, his job was to draw boxes?
A. Their job is to maintain the organizational structure at each location, but, yes that is what the job is.
Q. Plaintiff's 17, your testimony surprised me a little bit.
MR. MOODY: Side comment, Judge.
THE COURT: Sustained.
MR. MURPHY: I understand, Your Honor, thank you.

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. You have seen this document before today, haven't you?
A. Only associated with this trial.
Q. In fact, you were the Vice President of HR when this document was produced during this case?
A. I saw it as n exhibit as this case started, yes.
Q. But the document was produced to us by BMW,

wasn't it?
A. It was in the file, yes.
Q. Okay. In the BMW file?
A. In the BMW file, the DIVA folder.
Q. So, it was there?
A. I assume that is where it came from.
Q. So, it is in your records?
A. It is in our database of guidelines, flow charts, policies, procedures.
Q. The testimony you gave about people moving around a lot, you are aware Ms. Dawsey has moved around?
A. She has.
Q. And there is no BMW guideline or document anywhere saying that people have to move every four years, is there?
A. No, not that -- well, maybe, I don't know. There are a lot of guidelines, and policies, and procedures and flow charts. That is -- there is probably someplace a document that shows that, yes.
Q. There is probably someplace a document shows that, but in the last four years you haven't been able to find it?
A. No, we wouldn't document that onto an official policy.
Q. In fact, Scott Gregory had been in his position

in the paint shop for 15 years as the last time we talked to you two years ago, right?
A. Yes.
Q. Mr. Tucker was in his job for a very, very long time, more than 15 years the last time I talked to you, right?
A. Yes. They were not trying to get promoted or move any other place, they basically were just staying in their place.
Q. During Kelly Dawsey's tenure in HR, no manager at HR ever moved from HR to another technology, did they?
A. Most had come from other places, so, no.
MR. MURPHY: Your Honor, if I have a minute, I might be done.
THE COURT: Yes.
MR. MURPHY: I have one small area, Your Honor, if I could.

CROSS EXAM CONTINUED

BY MR. MURPHY:
Q. Let's talk about the COVID ramp-down, ramp-up because I understand you didn't agree with that and that is fine. I want to ask you about who made the decision. Kelly Dawsey didn't make the decision on how to ramp-up or ramp-down the work force, did she?
A. She was the project leader.

Q. Did she make the decision?
A. I assume, she was the project leader, yes.
Q. You don't know who made the decision, do you?
A. I am not a hundred percent positive. She made the suggestion, that I am sure of.
Q. You weren't party to Kelly's discussions with BMW AG about the ramp-down and ramp-up of the COVID work force, were you?
A. No, I was not.
MR. MURPHY: Your Honor, at this time I don't have anything further.
THE COURT: Thank you.
MR. MOODY: Your Honor, I will be very brief. I recognize that, I thank everyone for their attention.

REDIRECT EXAM

BY MR. MOODY:
Q. Ms. McCraw, when Mr. Murphy -- can we take this down?
When Mr. Murphy asked you to read from your deposition, I think it was lines 6 through ten on page 59, I would like to give you the opportunity to finish that reading. I will do the question at line 6 and then I would like you to read the answers and finish at line 22 when we go. Okay?
"Okay. Prior to putting Neal

Gilmore in TX-64, did he have any prior recruiting experience?"
Your answer?

A.

"He had hired people in his job in purchasing. He had hired a lot of people in purchasing, but recruiting officially, no."

Q.

"Question: Is recruiting experience a requirement for the TX-64 position?"
Your answer?

A.

"It is helpful, but they have experts in the team who are the most knowledgeable about recruiting process. I want my leaders to be strategic and manage their teams properly and use our KPIs to drive their business to be improved. One of those KPIs is contract management. I think that is a big target for Neal because he had purchasing experience. His

contract management experience is very helpful in that job."

Q. All right. Ma'am, you testified previously that Scott Medley was losing his team to go to a project?

A. Yes.

Q. So, the folks that come into 64, come in with a ready-made team?

A. Yes.

Q. And recruiting was part of that team already, right?

A. Yes, it was.

Q. So, if you are TX-64, you are a leader, and you have many people that report to you to accomplish the missions of the plant, right?

A. That's correct.

Q. Okay, ma'am. I think Mr. Murphy asked you if you ever reached out to Ms. Dawsey, right?

A. Yes, he did ask me.

Q. Okay, ma'am. Where is your office?

A. It is --

Q. At the plant?

A. It is in the front of the office area closest to outside.

Q. How long have you had that same office?

A. Since 2012.

Q. Okay. So, you have been in an office since 2012 and everybody knows where your office is, right?
A. Yes.
Q. How close is your office to where Ms. Kelly Dawsey worked?
A. Maybe fifty yards.
Q. Fifty yards?
A. Yes.
Q. A big old plant over there and she is that close?
A. Yes.
Q. Was there any physical impediment from her walking to your office to talk to you?
A. No, there was not.
Q. Was there any other impediment for her to schedule time with you?
A. No.
Q. As far as the President and CEO, how close is the President and CEO, Robert's office, to you?
A. He is two down from me, so he is in the same area.
Q. So, you and the President and CEO are fifty yards or so away from where Kelly Dawsey is when she is at work?
A. Yes.
Q. You didn't go to her and she certainly didn't come to you, correct?

A. That's right.
Q. There was reference to this DIVA system. Are there all kinds of documents floating around on a DIVA system?
A. The system has been there for a really long time, so, yes.
Q. So, this expat guideline, you didn't even know what they were until this case, right?
A. I wouldn't know to look for them. I wouldn't know where to even find them.
Q. And you testified those are guidelines that look like came from a TS workshop from 2015 or '16, correct?
A. That is what I assume based on what it shows on the title page.
Q. Before this case, did you have any understandings about their being expat guidelines floating on the DIVA system?
A. No.
Q. Are you aware of those expat guidelines being approved in senior management?
A. No, I am not.
Q. You were senior management?
A. I am.
Q. Were you aware that legal approved any such expat guidelines?

A. No.

MR. MOODY: All my questions, Your Honor.

MR. ROZELSKY: Nothing.

THE COURT: Anything else for this witness?

MR. MURPHY: Nothing further.

THE COURT: Thank you, ma'am, you may step down.

THE COURT: Members of the jury, it is now 5:32 so we did a fairly good job hitting that target and I want to thank you for your patience and indulgence for being willing to complete the testimony of this witness. I think that will help us move the case along.

So, we will recess for the evening and I am going to ask that you try to be back by 9:15 in the morning if possible. I know traffic parking is a real challenge and for the record I had nothing to do with the placement of this building on this spot. This property was bought before I came on.

Remember my previous admonition. Do not talk about the case, do not look at anything on TV or the computer or any type of electronic device. Don't look at any blogs, websites, anything like that. Don't do any independent research about anything involved in this case or the parties in this case using any tool or mechanism whatsoever. Do not discuss the case with

anyone and, again, you haven't heard and seen everything so don't makeup your mind.

With that I hope have you a good evening and we will see you back in the morning. Thank you. Everyone remain seated while the jurors are excused.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: Anything else we need to take up on the record before we recess?

MR. MURPHY: What were you thinking for a start time? This doesn't have to be on the record as far as I am concerned.

THE COURT: Okay. We are off the record.

(Whereupon, the hearing concluded at 5:34 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR April 17, 2026
Date

**$**

**$1,500** [1] - 124:5
**$230,038.14** [1] - 213:14
**$40,000** [1] - 84:18

**'**

**'12** [1] - 45:17
**'16** [1] - 260:12
**'21** [5] - 13:12, 23:19, 47:9, 176:1, 190:11
**'21)** [1] - 18:24
**'23** [1] - 7:8
**'98** [1] - 150:15
**'99** [3] - 150:15, 150:16, 150:17

**0**

**0** [1] - 75:7

**1**

**1** [3] - 4:4, 235:11, 235:15
**1.7** [4] - 233:13, 233:19, 234:3, 235:20
**10** [1] - 13:6
**10-24** [1] - 176:5
**10-24-2021** [2] - 177:15, 222:24
**10-24-21** [1] - 222:14
**100,000** [1] - 145:7
**10th** [5] - 119:14, 120:11, 121:17, 128:24, 132:3
**11** [31] - 13:12, 27:19, 47:7, 47:13, 63:25, 64:5, 64:7, 64:25, 65:14, 65:15, 65:17, 66:3, 74:8, 153:3, 158:19, 159:13, 159:14, 159:21, 160:3, 161:22, 173:25, 184:4, 186:4, 186:6, 186:9, 204:17, 209:16, 212:15, 213:19, 236:24, 243:17
**11)** [2] - 199:15, 216:10
**113** [1] - 3:9
**11th** [1] - 56:4
**12** [17] - 64:8, 98:24, 135:2, 161:23, 173:17, 175:17, 175:19, 176:24, 177:12, 178:15, 178:23, 185:10, 185:12, 186:9, 215:5
**12-04-2020** [1] - 224:13
**12-19-2019** [1] - 45:1
**1241** [1] - 110:8
**128** [1] - 100:22
**13** [15] - 53:18, 58:13, 66:3, 68:17, 97:2, 161:24, 161:25, 186:9, 198:14, 198:17, 198:18, 198:22, 221:6, 228:6
**13)or** [1] - 198:15
**130** [1] - 100:22
**131** [1] - 100:23
**134** [1] - 3:10
**13th** [6] - 56:9, 118:23, 119:9, 121:17, 121:20, 122:12
**14** [7] - 40:4, 110:13, 186:9, 195:24, 247:10, 248:2, 248:4
**141** [1] - 3:12
**144** [1] - 51:17
**149** [1] - 3:23
**14th** [4] - 55:23, 56:18, 56:19, 65:18
**15** [6] - 2:4, 92:25, 97:2, 135:2, 255:1, 255:5
**150,000** [3] - 206:11, 206:13, 206:18
**151** [1] - 72:3
**15154** [1] - 57:9
**156** [1] - 110:3
**157** [1] - 72:3
**160** [1] - 72:12
**16th** [2] - 124:7, 129:25
**17** [7] - 3:23, 74:20, 149:3, 149:4, 188:13, 253:11, 262:25
**1711** [1] - 185:12
**1716** [1] - 98:25
**1722** [1] - 185:12
**174** [1] - 109:21
**175** [1] - 109:11
**176** [1] - 98:15
**178** [1] - 51:11
**17th** [1] - 129:19
**18** [2] - 61:1, 94:5
**183** [1] - 98:20
**19** [4] - 86:14, 86:15, 94:1, 94:9
**1949** [1] - 109:11
**196** [1] - 109:17
**1981** [14] - 50:24, 51:8, 51:12, 63:3, 63:8, 63:13, 65:6, 67:23, 84:25, 104:7, 104:8, 104:24, 105:5, 105:6
**1983** [1] - 80:14
**1986** [1] - 110:22
**1988** [1] - 110:3
**1990** [1] - 148:16
**1993** [2] - 142:15, 142:16
**1994** [3] - 148:17, 148:18, 148:19
**1996** [2] - 109:17, 110:8
**1998** [1] - 228:22
**1999** [2] - 51:12, 109:22
**19th** [2] - 17:6, 60:1
**1:00** [1] - 50:4
**1:30** [2] - 108:5, 108:6
**1st** [5] - 66:17, 174:6, 177:5, 177:6, 198:24

**2**

**2** [2] - 96:20, 184:16
**20** [2] - 113:20, 202:8
**200** [2] - 148:12, 148:15
**200,000** [1] - 157:21
**2000** [3] - 33:9, 150:15, 150:16
**2000)** [1] - 8:6
**2001** [1] - 110:14
**2004** [4] - 51:13, 153:1, 153:2, 153:3
**2008** [5] - 9:12, 9:14, 24:24, 45:17, 158:8
**2009** [2] - 24:24, 158:8
**2012** [2] - 258:25, 259:1
**2013** [2] - 247:16, 247:25
**2014-ish** [1] - 10:16
**2015** [6] - 47:20, 47:21, 188:15, 189:6, 205:4, 260:12
**2017** [1] - 162:23
**2019** [19] - 11:22, 12:25, 13:1, 68:11, 69:8, 174:6, 177:5, 177:6, 177:18, 198:24, 221:10, 247:7, 248:3, 248:11, 248:13, 248:23, 248:24, 249:22
**202,450** [1] - 213:5
**2020** [8] - 13:9, 17:6, 17:11, 224:8, 224:19, 225:10, 227:8, 248:24
**2021** [56] - 19:5, 20:13, 20:22, 21:3, 21:18, 21:24, 28:5, 36:25, 38:9, 43:18, 46:4, 47:8, 52:19, 53:16, 54:11, 58:10, 62:18, 64:1, 65:13, 65:15, 65:25, 66:17, 68:17, 89:7, 92:10, 116:19, 124:8, 124:10, 130:10, 169:4, 169:25, 175:6, 175:21, 177:24, 178:2, 178:7, 184:20, 184:24, 186:22, 187:4, 196:21, 203:24, 213:1, 221:25, 222:5, 222:17, 222:22, 224:14, 224:15, 224:17, 224:20, 226:21, 226:25, 227:2, 242:12, 248:24
**2022** [25] - 43:14, 43:18, 43:21, 45:8, 55:23, 56:4, 56:8, 56:13, 56:18, 56:19, 65:18, 76:16, 87:15, 116:7, 132:3, 169:8, 169:9, 178:12, 178:17, 179:8, 179:20, 190:15, 205:4, 213:4, 236:5
**2023** [5] - 7:6, 33:10, 39:19, 110:24, 238:21
**2024** [8] - 51:18, 57:8, 57:9, 59:25, 60:2, 79:23, 227:5, 234:12
**2025** [3] - 59:23, 72:4
**2026** [2] - 1:4, 262:25
**207** [1] - 1:18
**21** [2] - 224:14, 224:15
**210034** [1] - 60:1
**212** [1] - 3:22
**22** [5] - 74:11, 96:8, 235:10, 235:12, 256:24
**220** [1] - 3:13
**221** [2] - 3:14, 3:19
**22nd** [3] - 124:24, 125:2, 178:17
**23** [9] - 1:4, 7:10, 27:6, 27:11, 74:11, 78:6, 124:22, 181:15, 209:14
**24** [16] - 28:20, 181:12, 189:20, 189:21, 195:22, 195:25, 210:5, 221:25, 222:5, 222:17, 222:22, 224:20, 226:21, 227:2, 247:15, 250:6
**242** [1] - 110:23
**24th** [4] - 175:21, 175:25, 177:24, 226:25
**25** [6] - 33:6, 74:20, 89:6, 125:20, 125:23, 208:13
**25290** [1] - 79:23
**253** [1] - 51:11
**256** [1] - 3:15
**258** [2] - 28:23, 210:7
**26** [4] - 74:25, 92:19, 186:16, 213:4
**26th** [2] - 132:17, 132:21
**27** [13] - 74:25, 96:4, 115:3, 115:6, 115:7, 115:13, 116:4, 124:21, 125:21, 127:12, 135:6, 139:14
**270** [3] - 206:11, 206:13, 206:14
**275** [1] - 110:13
**28** [3] - 122:24, 123:1, 127:12
**28,000** [1] - 213:22
**29** [3] - 124:3, 221:24, 251:12
**294** [1] - 1:22
**29601** [2] - 1:18, 2:5
**29602** [1] - 1:22
**29624** [1] - 2:7
**29th** [1] - 125:24
**2nd** [1] - 130:10

**3**

**3** [3] - 44:9, 86:24, 196:21
**30** [4] - 74:14, 74:20, 84:17, 197:20
**300** [2] - 168:12, 206:18
**306** [1] - 174:4
**30th** [1] - 127:15
**31** [7] - 3:4, 74:14, 74:20, 193:6, 196:21, 197:20, 251:11
**310** [1] - 177:12
**313** [3] - 178:13, 178:14, 178:25
**315** [1] - 2:7
**316** [2] - 176:20,

176:25
**32** [2] - 95:8, 95:16
**33** [3] - 95:8, 95:19, 196:16
**33457** [1] - 59:23
**34** [1] - 94:23
**35** [3] - 3:5, 94:23, 96:14
**36** [1] - 208:18
**37** [6] - 92:8, 92:19, 94:7, 97:3, 103:12, 104:17
**38** [1] - 40:3
**383** [1] - 51:13
**39** [2] - 142:10, 148:16
**394** [1] - 109:21
**39th** [1] - 142:11
**3rd** [3] - 56:18, 211:9

**4**

**4** [7] - 18:12, 18:16, 18:20, 36:23, 36:25, 66:10, 73:17
**4/1/2019** [1] - 3:19
**40** [1] - 181:6
**41** [1] - 75:11
**42** [1] - 92:18
**43** [2] - 92:19, 96:1
**44** [4] - 3:20, 96:1, 153:14
**447** [1] - 110:22
**45** [1] - 94:6
**457** [1] - 98:15
**46** [1] - 96:2
**462** [1] - 80:13
**47** [7] - 3:6, 3:20, 44:18, 44:19, 181:20, 181:21, 223:6
**48** [6] - 3:7, 16:10, 16:14, 16:23, 36:3, 99:19
**49** [3] - 75:6, 75:17, 235:24
**498** [1] - 109:11
**4:43** [1] - 116:19
**4th** [1] - 73:23

**5**

**5** [4] - 75:10, 77:25, 135:11, 186:2
**5,000** [1] - 157:23
**50** [8] - 10:17, 50:12, 75:6, 75:22, 93:14, 108:17, 109:5, 238:18
**51** [3] - 92:16, 92:23, 93:14
**52** [9] - 10:1, 10:2, 10:11, 10:14, 24:16, 92:17, 92:23, 128:7, 128:8
**53** [3] - 92:17, 92:23, 128:11
**55** [1] - 92:17
**56** [3] - 99:21, 129:16, 129:17
**57** [1] - 95:4
**58** [1] - 95:4
**59** [6] - 95:22, 99:21, 234:21, 235:9, 238:6, 256:21
**5:32** [1] - 261:8
**5:34** [1] - 262:14

**6**

**6** [11] - 3:3, 23:9, 39:10, 96:9, 98:24, 189:11, 189:14, 236:5, 238:7, 256:20, 256:22
**6,000** [1] - 163:6
**60** [19] - 39:9, 39:10, 39:12, 42:13, 42:14, 42:15, 81:8, 181:1, 201:15, 202:13, 202:15, 210:20, 224:25, 233:3, 235:11, 235:15, 240:19, 246:14
**61** [17] - 14:13, 23:6, 26:23, 27:3, 44:5, 44:12, 44:15, 81:8, 93:5, 95:22, 130:7, 130:8, 130:15, 180:6, 180:14, 181:1, 224:25
**62** [1] - 81:8
**63** [1] - 99:22
**64** [54] - 14:13, 22:7, 22:20, 23:1, 23:2, 23:7, 23:8, 23:12, 26:22, 27:2, 29:8, 30:20, 42:22, 44:12, 66:10, 68:19, 68:23, 69:15, 73:23, 74:22, 78:6, 81:25, 85:9, 180:25, 184:11, 187:24, 193:7, 198:13, 198:15, 198:17, 199:8, 199:18, 199:19, 200:11, 201:14, 201:24, 202:12, 202:16, 202:17, 203:1, 204:12, 205:15, 205:23, 210:13, 215:2, 216:14, 220:2, 221:8, 224:23, 236:20, 236:23, 258:6
**65** [7] - 68:22, 78:10, 99:22, 100:9, 132:1, 132:2
**66** [2] - 100:10, 100:11
**669** [1] - 80:14
**68** [1] - 100:11
**69** [3] - 93:19, 100:19, 100:20

**7**

**7** [1] - 70:1
**70** [4] - 93:21, 94:2, 204:3, 204:4
**700** [1] - 2:4
**71** [2] - 93:19, 93:21
**72** [2] - 76:12, 92:17
**73** [2] - 4:5, 93:19
**75** [2] - 93:24, 204:3
**79** [1] - 92:17
**7:22-CV-3738** [1] - 1:3

**8**

**8** [6] - 74:7, 93:2, 98:19, 116:7, 116:19, 122:8
**80** [1] - 51:13
**81** [2] - 181:23, 182:6
**844** [1] - 110:2
**85** [4] - 109:17, 146:17, 146:19, 147:15
**87** [2] - 250:4, 250:5
**88** [1] - 250:8
**8th** [2] - 118:3, 118:7

**9**

**9** [12] - 3:19, 3:22, 41:12, 212:20, 213:1, 214:23, 214:25, 216:3, 221:9, 221:14, 227:11, 240:24
**93** [1] - 110:8
**967** [1] - 51:18
**9:15** [1] - 261:14
**9:30** [1] - 5:1
**9th** [3] - 128:12, 128:15, 129:6

**A**

**a.m** [3] - 5:1, 49:14, 116:19
**ability** [2] - 76:3, 203:16
**able** [28] - 23:6, 52:5, 119:20, 119:25, 131:12, 131:23, 137:22, 152:1, 156:21, 157:13, 157:15, 171:4, 174:17, 188:7, 201:3, 207:20, 207:23, 207:25, 208:1, 208:11, 211:14, 215:19, 216:21, 216:22, 219:3, 237:7, 241:8, 254:21
**above-entitled** [1] - 262:20
**absent** [1] - 103:25
**absolute** [2] - 83:5, 123:19
**absolutely** [9] - 53:14, 80:9, 105:1, 105:23, 117:24, 120:20, 158:25, 169:2, 230:14
**abundance** [1] - 221:13
**accepted** [3] - 56:10, 137:22, 150:9
**access** [1] - 226:15
**accomplish** [1] - 258:13
**accomplishments** [1] - 149:11
**accordance** [1] - 242:8
**according** [4] - 87:19, 170:24, 187:5, 215:24
**accordingly** [2] - 63:1, 69:24
**account** [1] - 34:1
**accountant** [1] - 162:10
**accountants** [1] - 90:5
**accounting** [1] - 161:18
**accurate** [3] - 55:11, 58:10, 65:8
**accused** [1] - 102:16
**achieve** [1] - 160:5
**acknowledge** [3] - 85:19, 122:3, 122:4
**acknowledged** [2] - 88:21, 106:14
**act** [1] - 93:23
**acting** [2] - 86:18, 104:11
**action** [22] - 51:1, 51:10, 57:19, 58:4, 59:8, 60:24, 61:24, 63:1, 63:10, 63:12, 63:19, 64:15, 67:14, 68:1, 68:2, 70:1, 72:23, 73:12, 73:15, 76:24, 83:24, 233:25
**Action** [1] - 110:13
**actions** [3] - 61:2, 71:14, 71:15
**activities** [3] - 87:5, 87:8, 129:2
**actual** [3] - 58:9, 61:4, 83:8
**acumen** [1] - 233:10
**add** [6] - 152:22, 162:6, 187:11, 207:20, 208:23, 231:8
**added** [3] - 45:15, 173:19, 224:25
**additional** [5] - 61:18, 70:3, 76:10, 117:5, 158:9
**address** [2] - 63:5, 111:1
**adjust** [1] - 190:20
**adjustments** [1] - 190:2
**admit** [1] - 195:25
**admits** [2] - 58:12, 100:22
**admitted** [17] - 16:15, 18:13, 44:19, 53:11, 55:2, 55:18, 62:16, 73:3, 73:7, 97:17, 103:3, 115:6, 149:4, 195:23, 195:24, 212:22, 221:14
**admonition** [3] - 49:19, 183:9, 261:19
**advance** [3] - 76:3, 76:5, 201:15
**advancement** [2] - 58:8, 58:16
**adverse** [21] - 51:10, 57:18, 58:4, 59:7, 60:23, 61:24, 62:25, 63:10, 63:12, 63:18, 64:15, 67:14, 67:25, 68:2, 71:14, 72:16, 72:23, 73:11, 73:12, 73:15, 76:24
**advisement** [1] - 111:22
**advocate** [2] - 207:11, 207:23
**affect** [3] - 7:11, 79:22, 243:9
**affected** [1] - 76:18
**affecting** [1] - 77:3
**affects** [3] - 75:25, 76:2

**affordable** [1] - 207:22
**African** [2] - 63:21, 78:18
**African-American** [1] - 78:18
**afternoon** [4] - 113:4, 113:5, 141:20, 147:13
**afternoons** [1] - 145:11
**afterwards** [1] - 148:11
**AG** [86] - 18:9, 18:10, 33:25, 34:9, 34:11, 34:14, 34:17, 34:21, 35:6, 35:9, 35:12, 35:15, 35:17, 48:25, 49:3, 52:23, 70:10, 70:15, 85:18, 86:22, 86:23, 87:11, 88:1, 88:4, 88:9, 88:19, 88:22, 89:10, 89:12, 89:14, 91:23, 92:9, 92:20, 92:24, 93:1, 93:3, 93:7, 93:8, 93:12, 93:15, 93:18, 94:20, 94:24, 95:3, 95:6, 95:20, 96:18, 97:7, 97:11, 97:20, 98:2, 101:16, 101:17, 102:4, 102:5, 102:8, 102:12, 102:13, 102:18, 102:20, 103:21, 103:22, 103:25, 104:2, 104:4, 104:23, 106:8, 106:13, 106:18, 106:19, 107:15, 107:18, 107:19, 111:1, 111:2, 111:9, 141:5, 217:12, 217:15, 217:19, 217:22, 230:18, 231:1, 244:10, 249:20, 256:7
**AG's** [4] - 89:3, 98:1, 103:11, 107:10
**agencies** [2] - 202:23, 232:5
**agenda** [1] - 27:19
**agent** [2] - 104:11, 106:22
**ago** [11] - 7:23, 28:2, 31:21, 48:5, 65:10, 149:18, 195:23, 196:14, 196:16, 234:13, 255:2
**agree** [8] - 44:11, 91:2, 140:17, 167:11, 180:6, 184:7, 229:8, 255:21
**agreed** [8] - 66:12, 69:7, 95:2, 95:20, 99:21, 99:23, 139:7, 192:14
**agreement** [6] - 122:21, 123:7, 123:9, 123:13, 123:25, 138:15
**agreements** [1] - 22:4
**agrees** [4] - 74:11, 74:19, 81:20, 93:18
**ahead** [8] - 70:17, 70:18, 73:8, 116:13, 127:25, 191:14, 195:18, 241:12
**AIDED** [1] - 2:9
**air** [1] - 207:1
**Airlines** [1] - 90:16
**Airport** [1] - 137:21
**airport** [2] - 139:20, 146:11
**AKTIENGESELLSCHAFT** [2] - 1:7, 1:21
**Al** [1] - 228:18
**Alabama** [2] - 59:25, 62:8
**alert** [1] - 79:18
**align** [2] - 95:17, 95:21
**aligned** [1] - 95:18
**allegation** [4] - 59:16, 63:21, 72:14, 102:13
**allegations** [2] - 54:20, 102:12
**alleged** [7] - 51:20, 51:24, 54:6, 58:18, 64:1, 64:9, 73:12
**alleges** [1] - 60:10
**alleging** [2] - 60:20, 63:8
**Allen** [1] - 51:13
**allocation** [2] - 186:23, 187:4
**allow** [2] - 69:19, 229:25
**allowed** [7] - 60:9, 64:10, 64:16, 157:22, 160:22, 194:19, 231:4
**allowing** [1] - 22:17
**allows** [2] - 97:12, 160:18
**almost** [6] - 6:23, 20:4, 20:5, 49:14, 163:6, 209:22
**alone** [1] - 67:17
**alongside** [1] - 166:12
**alter** [1] - 62:2
**alternating** [3] - 41:23, 41:25, 42:9
**alternation** [1] - 48:6
**Amazon** [3] - 170:17, 171:1
**amended** [2] - 79:19, 79:24
**America** [6] - 17:22, 18:10, 22:13, 133:3, 161:18, 187:14
**American** [10] - 37:9, 41:3, 63:22, 78:18, 98:7, 193:2, 228:20, 229:1, 230:19, 231:11
**Americans** [5] - 37:21, 38:5, 229:5, 229:15, 231:2
**Americas** [1] - 161:19
**amount** [4] - 32:12, 180:18, 218:12, 250:2
**ample** [3] - 74:1, 75:24, 82:14
**analysis** [2] - 207:24, 234:1
**AND** [1] - 1:17
**Anderson** [1] - 110:21
**ANDERSON** [1] - 2:7
**Andreas** [1] - 92:15
**Anna** [3] - 197:15, 197:22, 197:23
**announced** [5] - 57:19, 71:14, 71:16, 142:17, 174:23
**announcement** [2] - 23:24, 57:17
**annual** [3] - 213:4, 213:14, 213:22
**answer** [27] - 31:10, 40:5, 40:14, 41:19, 42:2, 54:4, 67:1, 78:10, 104:13, 105:10, 106:19, 107:16, 112:6, 120:1, 162:18, 178:4, 181:16, 232:11, 234:20, 235:1, 235:15, 238:7, 238:12, 250:11, 251:10, 257:3, 257:13
**answered** [2] - 227:15, 232:10
**answering** [2] - 105:9, 107:17
**answers** [1] - 256:23
**Antani** [1] - 192:20
**Antonio** [1] - 109:17
**anxiety** [1] - 167:20
**anyway** [1] - 101:5
**apartments** [1] - 151:23
**apologies** [1] - 191:12
**apologize** [10] - 31:20, 112:13, 114:25, 137:1, 138:16, 150:19, 157:8, 176:12, 196:2, 208:17
**App** [2] - 57:8, 59:23
**Appeals** [1] - 59:11
**APPEARANCES** [2] - 1:16, 2:1
**Appellate** [1] - 79:23
**Appendix** [1] - 110:13
**applications** [2] - 145:8, 145:9
**applied** [5] - 67:9, 76:22, 81:4, 98:21, 103:20
**applies** [1] - 98:12
**apply** [6] - 81:3, 97:15, 98:5, 98:22, 101:4, 230:16
**appointed** [1] - 194:2
**appreciate** [2] - 31:9, 108:2
**approach** [7] - 115:2, 136:25, 182:19, 185:14, 193:14, 220:13, 229:16
**appropriate** [1] - 109:18
**approval** [1] - 96:10
**approve** [4] - 95:25, 244:17, 244:21, 250:14
**approved** [5] - 96:6, 243:22, 244:23, 260:20, 260:24
**April** [13] - 169:8, 169:9, 174:6, 177:5, 177:6, 178:12, 184:23, 190:15, 216:22, 221:20, 238:21, 242:2, 262:25
**area** [25] - 8:17, 8:19, 11:1, 28:16, 37:24, 39:3, 121:3, 124:16, 143:11, 143:12, 143:14, 144:9, 145:22, 146:14, 149:21, 149:23, 149:24, 150:2, 174:20, 202:2, 218:23, 255:16, 258:22, 259:19
**areas** [5] - 14:4, 95:12, 139:21, 146:13, 166:5
**arena** [1] - 131:7
**argue** [5] - 62:7, 76:15, 85:13, 137:20, 139:2
**argued** [1] - 76:24
**argues** [2] - 61:16, 76:8
**arguing** [3] - 85:20, 90:8, 105:18
**argument** [17] - 50:15, 55:1, 70:4, 71:9, 71:13, 71:21, 77:13, 77:14, 79:14, 80:2, 87:12, 92:5, 98:4, 102:10, 105:17, 105:21, 138:6
**argumentative** [1] - 225:19
**arguments** [9] - 70:6, 70:12, 70:14, 70:21, 71:9, 86:1, 86:3, 105:25, 108:14
**arises** [1] - 87:7
**arms** [1] - 149:24
**arrangement** [1] - 123:23
**Article** [2] - 89:25, 98:19
**AS** [2] - 1:8, 1:10
**aspects** [3] - 89:23, 89:24, 89:25
**Assembly** [23] - 149:17, 151:16, 151:17, 152:14, 153:1, 153:5, 153:21, 162:9, 162:21, 162:25, 163:2, 163:5, 165:5, 169:18, 170:11, 204:8, 204:9, 211:16, 243:13, 243:14, 245:25, 251:9
**assembly** [19] - 8:16, 25:1, 143:11, 145:13, 150:13, 151:11, 151:19, 152:15, 154:16, 155:24, 161:14, 162:4, 165:16, 165:21, 165:22, 166:2, 192:21, 228:10
**asserts** [2] - 50:22, 63:7
**assess** [1] - 72:13
**assessed** [1] - 109:24
**assets** [1] - 131:13

**assigned** [4] - 72:15, 109:24, 182:9, 245:14
**assignment** [7] - 93:8, 151:20, 152:6, 152:23, 163:18, 201:6, 228:4
**assignments** [2] - 57:17, 158:21
**assist** [4] - 119:20, 119:21, 120:1, 166:2
**Associate** [3] - 11:2, 11:15, 210:15
**associate** [11] - 87:18, 142:10, 172:9, 172:13, 172:14, 172:18, 180:2, 180:3, 197:15, 200:7, 219:11
**associate's** [1] - 252:1
**associated** [2] - 49:23, 253:21
**associates** [19] - 126:24, 146:12, 156:1, 163:4, 167:9, 167:12, 170:15, 170:17, 170:23, 170:25, 172:15, 172:16, 180:11, 180:17, 191:22, 200:9, 208:9, 234:10
**assume** [7] - 106:25, 223:20, 249:15, 252:9, 254:6, 256:2, 260:13
**assumed** [1] - 110:1
**assuming** [1] - 67:25
**attached** [1] - 116:24
**attachment** [1] - 103:5
**attend** [1] - 29:17
**attention** [2] - 59:9, 256:14
**attorney** [3] - 37:6, 54:1, 140:12
**attorneys** [2] - 49:9, 49:15
**attributed** [2] - 175:22, 252:4
**audits** [1] - 79:4
**authority** [3] - 108:15, 110:25, 203:16
**authorize** [1] - 109:7
**auto** [1] - 17:17
**automatic** [1] - 144:25
**automatically** [1] - 7:22
**automotive** [1] - 145:14
**Avagliano** [2] - 98:14, 98:15
**AVAGLIANO** [1] - 98:15
**available** [3] - 126:11, 197:20, 199:21
**availed** [1] - 87:4
**availing** [1] - 88:1
**avoid** [2] - 109:14, 110:11
**avoided** [1] - 138:4
**award** [1] - 61:11
**aware** [16] - 54:23, 71:11, 89:15, 118:3, 120:13, 120:14, 131:19, 174:9, 175:5, 177:23, 217:21, 228:8, 228:11, 254:11, 260:19, 260:24
**awhile** [1] - 237:10
**ay** [1] - 33:23

**B**

**backed** [1] - 94:21
**background** [3] - 7:15, 120:24, 198:2
**bad** [4] - 33:1, 136:12, 136:18, 220:18
**badge** [1] - 142:9
**badly** [1] - 240:8
**Bailey** [12] - 43:9, 46:18, 46:20, 74:24, 75:19, 75:20, 95:16, 214:9, 214:12, 235:22, 235:25, 237:1
**Bailey's** [1] - 215:23
**balance** [1] - 247:14
**band** [1] - 123:16
**Bank** [1] - 133:2
**banks** [1] - 133:2
**bar** [3] - 230:8, 230:9, 230:23
**Barbara** [1] - 92:14
**barring** [2] - 230:21, 230:22
**barter** [1] - 249:24
**base** [1] - 250:1
**based** [30] - 51:6, 57:1, 58:2, 59:16, 62:13, 63:9, 63:21, 63:24, 64:12, 64:18, 65:12, 66:3, 67:4, 68:8, 69:3, 69:24, 105:2, 111:4, 111:11, 120:21, 186:14, 190:24, 191:1, 192:14, 204:14, 220:3, 245:12, 246:14, 246:15, 260:13
**baseline** [1] - 156:12
**basis** [9] - 50:21, 51:4, 60:23, 65:11, 66:5, 80:20, 106:6, 106:12, 108:21
**batch** [1] - 156:2
**bate** [1] - 176:25
**battery** [4] - 218:12, 218:20, 237:7, 237:11
**Batz** [1] - 92:15
**BAYERISCHE** [2] - 1:6, 1:20
**bears** [5] - 50:25, 63:11, 63:17, 68:1, 98:9
**became** [12] - 114:15, 153:14, 154:5, 154:17, 159:2, 160:25, 162:20, 164:5, 169:6, 178:10, 222:21, 241:23
**become** [10] - 23:17, 23:23, 93:12, 118:14, 138:8, 161:5, 161:6, 169:7, 206:2, 230:11
**becomes** [2] - 20:2, 32:14
**becoming** [3] - 55:10, 142:7, 167:2
**BEFORE** [1] - 1:13
**beginning** [6] - 78:6, 78:10, 148:8, 167:14, 235:10, 238:8
**behalf** [6] - 85:18, 86:18, 104:12, 128:1, 129:3, 246:18
**behind** [1] - 146:10
**below** [5] - 33:17, 193:13, 247:17, 249:3, 251:12
**bench** [10] - 49:11, 137:3, 140:19, 182:22, 183:4, 193:16, 195:19, 220:14, 229:17, 231:18
**benchmark** [4] - 174:18, 207:24, 207:25, 246:15
**benchmarks** [1] - 174:17
**beneficial** [1] - 202:10
**benefit** [5] - 80:17, 91:6, 122:5, 129:12, 139:21
**benefits** [7] - 52:8, 72:9, 87:6, 100:3, 174:20, 175:1, 214:1
**Benz** [2] - 59:12, 59:21
**best** [14] - 22:11, 27:8, 35:15, 35:17, 39:5, 40:20, 149:12, 154:23, 158:6, 166:22, 173:2, 176:16, 183:1, 206:17
**better** [17] - 32:3, 139:2, 139:3, 155:4, 166:2, 166:24, 170:18, 170:19, 170:20, 171:15, 196:17, 201:20, 201:21, 208:20, 212:5, 251:22, 251:23
**bettering** [1] - 138:12
**between** [7] - 34:2, 74:4, 90:1, 115:18, 115:20, 155:14, 191:3
**beyond** [3] - 47:23, 100:24, 104:9
**bifurcated** [2] - 138:18, 139:17
**big** [22] - 134:19, 135:14, 139:21, 148:3, 148:12, 156:3, 168:11, 169:24, 170:9, 172:17, 201:22, 218:15, 232:4, 239:4, 240:7, 241:16, 248:24, 257:23, 259:9
**bigger** [4] - 20:2, 137:19, 207:23, 241:4
**biggest** [4] - 136:22, 163:6, 170:10, 233:19
**billboard** [1] - 170:24
**billion** [4] - 233:14, 233:19, 234:3, 235:20
**Bisignano** [1] - 72:2
**BISIGNANO** [1] - 72:3
**bit** [20] - 7:23, 17:8, 22:13, 31:21, 34:5, 36:3, 41:11, 50:2, 104:12, 115:21, 120:6, 121:13, 143:17, 143:23, 164:1, 178:25, 183:2, 213:21, 240:4, 253:12
**blacks** [1] - 80:18
**blame** [2] - 77:7, 239:2
**blanche** [1] - 100:25
**blank** [2] - 136:2, 139:21
**blended** [1] - 106:11
**blind** [1] - 241:5
**blindly** [2] - 124:18, 125:6
**blogs** [2] - 49:21, 261:22
**blow** [1] - 17:7
**blows** [1] - 92:4
**blue** [3] - 143:9, 146:25, 147:11
**BM** [1] - 127:5
**BMW** [211] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:2, 3:22, 3:23, 5:24, 7:1, 7:2, 7:5, 7:8, 7:10, 8:5, 8:7, 9:11, 11:23, 12:11, 12:13, 12:17, 14:22, 17:22, 18:9, 18:10, 18:11, 20:19, 21:25, 23:18, 25:17, 28:23, 30:9, 31:1, 33:9, 33:25, 34:6, 34:7, 34:8, 34:11, 35:6, 35:9, 35:12, 38:22, 48:25, 49:2, 50:10, 50:23, 51:3, 52:14, 52:23, 53:22, 54:8, 55:3, 55:16, 56:18, 56:24, 57:3, 57:5, 58:5, 59:13, 63:1, 63:19, 64:3, 67:15, 67:21, 68:8, 69:1, 69:23, 70:10, 70:11, 77:12, 85:18, 86:17, 86:18, 87:23, 87:25, 88:4, 88:9, 89:3, 89:7, 89:8, 91:22, 91:23, 92:9, 92:20, 92:24, 93:7, 93:8, 93:12, 93:18, 93:19, 93:23, 94:20, 94:24, 95:5, 95:6, 95:10, 95:18, 96:12, 96:18, 96:19, 96:22, 97:7, 97:11, 97:16, 97:20, 98:21, 98:24, 98:25, 99:8, 99:20, 101:16, 101:17, 102:4, 102:17, 104:2, 104:23, 106:13, 106:18, 106:19, 107:15, 107:18, 107:19, 111:1, 111:2, 111:9, 114:1, 114:6, 117:25, 118:3, 118:14, 120:12, 120:19, 121:6, 121:7, 127:10, 133:9, 133:11, 133:16,

133:19, 133:22, 136:5, 136:12, 136:18, 141:5, 141:10, 141:25, 142:1, 142:3, 142:12, 142:16, 143:7, 143:24, 144:4, 144:17, 149:9, 155:11, 155:15, 157:1, 161:18, 162:13, 163:9, 163:16, 168:25, 170:7, 174:3, 176:25, 177:12, 178:14, 184:23, 185:12, 187:8, 196:11, 197:13, 198:10, 201:16, 204:2, 206:3, 206:10, 206:15, 212:10, 217:16, 217:18, 217:21, 217:25, 219:4, 219:22, 225:1, 225:3, 229:23, 239:2, 239:15, 239:16, 240:18, 242:9, 249:1, 249:20, 251:7, 253:1, 253:25, 254:3, 254:4, 254:13, 256:6
**BMW's** [2] - 64:2, 247:6
**BMW-direct** [1] - 118:14
**board** [5] - 93:20, 127:25, 217:19, 217:22
**boarded** [1] - 210:8
**Bongam** [2] - 110:12, 110:21
**BONGAM** [1] - 110:12
**bonus** [1] - 80:19
**bonuses** [3] - 80:16, 213:16, 213:24
**Boone** [1] - 51:11
**Booz** [1] - 51:13
**Booz-Allen** [1] - 51:13
**born** [1] - 193:1
**boss** [2] - 64:6, 251:1
**bothers** [1] - 97:10
**bottom** [8] - 118:19, 125:23, 128:10, 130:15, 131:8, 186:21, 213:2, 250:5
**bought** [2] - 145:3, 261:18
**BOX** [1] - 1:22
**box** [11] - 6:8, 20:15, 36:17, 36:20, 79:11, 107:19, 113:1, 141:17, 171:13, 224:11, 252:19
**boxes** [11] - 36:14, 37:2, 185:3, 185:4, 187:10, 187:11, 187:17, 187:22, 187:23, 252:16, 253:7
**boys** [1] - 112:6
**break** [12] - 49:16, 49:17, 60:9, 61:24, 108:5, 112:16, 154:19, 183:7, 183:11, 183:14, 220:21, 220:22
**breakfast** [1] - 119:3
**breaks** [6] - 60:4, 60:5, 60:6, 60:8, 60:12, 61:19
**BRIAN** [1] - 1:17
**bridge** [1] - 86:11
**brief** [3] - 85:14, 148:25, 256:13
**briefed** [5] - 91:17, 91:21, 93:22, 98:13
**briefing** [1] - 108:13
**briefly** [8] - 47:3, 49:10, 82:20, 142:6, 142:8, 142:25, 161:9, 167:1
**bring** [10] - 5:2, 59:9, 112:7, 131:24, 140:15, 158:3, 183:18, 184:14, 194:1, 215:19
**bringing** [4] - 79:24, 132:24, 138:16, 228:5
**brochure** [3] - 185:21, 185:23, 190:24
**Brockman** [5] - 146:8, 146:10, 146:19, 147:4, 149:20
**brought** [7] - 80:15, 84:13, 84:15, 84:18, 84:23, 100:12, 194:12
**Buchanan** [1] - 109:16
**budget** [3] - 161:17, 207:23, 246:17
**budgeting** [2] - 34:3, 200:25
**build** [28] - 134:18, 148:22, 149:25, 150:7, 150:12, 153:8, 153:11, 154:7, 154:11, 154:13, 154:17, 154:24, 155:5, 155:18, 155:22, 156:2, 156:3, 156:4, 156:21, 157:18, 164:3, 164:14, 170:9, 218:21, 218:22, 219:4
**building** [27] - 143:10, 144:2, 144:3, 144:18, 146:3, 146:4, 146:7, 146:11, 146:13, 146:20, 147:4, 147:5, 147:6, 148:21, 149:19, 151:2, 151:3, 153:19, 154:22, 155:5, 156:2, 156:5, 157:14, 218:25, 219:1, 261:17
**Building** [1] - 144:2
**buildings** [1] - 215:13
**built** [9] - 24:16, 24:17, 24:25, 58:17, 62:9, 143:2, 143:5, 154:16, 157:21
**bull** [2] - 178:14, 262:25
**BULL** [1] - 2:6
**bump** [1] - 134:12
**burden** [10] - 50:25, 52:11, 62:25, 63:11, 63:17, 67:13, 68:1, 68:4, 98:9, 110:10
**Burghardt** [3] - 92:15, 92:22, 97:25
**Burgmeier** [18] - 26:5, 26:9, 26:13, 93:14, 94:22, 94:25, 97:21, 99:16, 101:2, 102:13, 103:17, 207:2, 208:4, 208:23, 210:20, 216:24, 250:6
**Burgmeier's** [1] - 76:11
**bus** [1] - 249:5
**Business** [1] - 7:17
**BUSINESS** [2] - 1:8, 1:10
**business** [27] - 14:9, 14:10, 15:6, 16:1, 19:11, 42:8, 42:10, 97:17, 113:17, 126:24, 131:14, 163:25, 164:16, 196:19, 201:17, 201:18, 201:20, 201:21, 220:3, 232:3, 232:16, 233:10, 233:17, 233:18, 233:21, 233:22, 257:21
**business/associate** [1] - 247:14
**busy** [2] - 211:12, 243:13
**buying** [2] - 145:1, 218:20
**BY** [61] - 11:13, 16:20, 18:18, 25:6, 25:24, 31:16, 34:19, 35:24, 36:9, 40:2, 43:6, 44:21, 47:5, 48:4, 48:23, 113:3, 115:10, 123:5, 134:5, 140:22, 141:19, 143:21, 146:16, 148:2, 149:7, 165:9, 176:22, 178:9, 179:3, 183:24, 185:17, 187:3, 191:16, 192:9, 196:5, 198:21, 205:22, 212:2, 212:24, 214:8, 218:8, 219:18, 220:7, 221:2, 221:18, 226:2, 227:18, 231:22, 232:20, 234:18, 235:8, 239:14, 241:11, 245:21, 246:6, 248:20, 249:11, 250:20, 253:18, 255:19, 256:16

## C

**CA** [1] - 1:3
**cafeteria** [3] - 188:7, 207:21, 209:1
**cafeterias** [1] - 199:20
**CAIN** [1] - 1:13
**Cain** [1] - 183:22
**calendar** [1] - 126:7
**California** [1] - 160:20
**Campbell** [2] - 147:16, 147:20
**cancel** [1] - 190:21
**canceled** [1] - 190:18
**candidate** [24] - 11:23, 18:8, 19:23, 20:6, 34:15, 34:23, 37:19, 37:20, 46:13, 55:13, 78:12, 78:14, 123:15, 124:18, 124:19, 124:20, 136:13, 136:21, 136:22, 161:1, 197:16, 198:3, 214:18, 237:2
**candidates** [8] - 18:2, 34:11, 34:12, 34:20, 37:7, 37:8, 55:21, 94:20
**cannot** [9] - 54:4, 54:5, 59:6, 61:24, 67:1, 68:3, 68:4, 69:16, 126:17
**capable** [1] - 140:12
**capacities** [1] - 186:22
**capacity** [2] - 127:11, 157:22
**capitalization** [1] - 217:25
**car** [14] - 145:3, 150:1, 150:4, 150:5, 152:20, 152:21, 153:8, 153:11, 154:13, 154:23, 154:25, 155:12, 157:18, 213:18
**care** [3] - 147:23, 172:16, 243:11
**career** [9] - 27:10, 121:14, 132:25, 138:12, 138:14, 142:6, 158:2, 219:8, 251:7
**Career** [1] - 113:20
**careful** [2] - 16:4, 137:6
**carefully** [1] - 108:10
**Carolina** [10] - 6:18, 7:16, 99:24, 100:1, 100:2, 113:21, 143:5, 144:13, 146:1, 237:12
**CAROLINA** [1] - 1:1
**carpets** [1] - 150:3
**carrying** [1] - 227:10
**cars** [11] - 145:2, 145:4, 148:22, 151:13, 155:4, 157:15, 157:16, 161:14, 170:9, 219:1
**carte** [1] - 100:25
**Case** [2] - 72:4, 83:8
**case** [97] - 5:11, 13:19, 49:20, 49:22, 49:23, 49:24, 50:14, 51:12, 51:14, 51:16, 53:14, 54:6, 55:7, 56:24, 57:1, 57:8, 58:17, 58:21, 59:2, 59:13, 59:15, 59:21, 60:3, 62:9, 62:11, 62:13, 65:25, 68:4, 68:7, 68:14, 71:17, 72:2, 72:7, 72:15, 73:12, 77:6, 77:21, 79:24, 80:14, 80:15,

83:7, 83:17, 84:10, 85:19, 86:25, 88:14, 89:18, 90:15, 90:22, 91:20, 92:2, 93:13, 94:18, 94:19, 97:19, 98:15, 101:4, 101:5, 101:18, 102:5, 102:9, 103:22, 106:9, 106:20, 109:11, 109:17, 109:22, 110:3, 110:7, 110:8, 110:12, 110:14, 110:21, 110:22, 110:23, 114:9, 183:9, 183:10, 189:18, 195:12, 220:18, 226:7, 239:17, 253:23, 253:24, 260:8, 260:15, 261:12, 261:20, 261:24, 261:25
**cases** [9] - 59:22, 71:12, 83:1, 83:3, 90:13, 90:14, 90:16, 105:5
**categories** [1] - 186:4
**caught** [3] - 60:7, 60:12, 61:23
**causes** [1] - 51:1
**caution** [2] - 137:8, 221:13
**cautioned** [1] - 59:6
**ceiling** [1] - 145:9
**celebration** [6] - 143:1, 147:7, 147:8, 147:10, 147:17, 148:4
**center** [1] - 200:7
**centered** [1] - 60:4
**Central** [3] - 109:10, 209:6, 247:2
**central** [1] - 93:25
**CEO** [3] - 259:17, 259:18, 259:20
**certain** [8] - 41:4, 52:7, 97:13, 120:25, 163:23, 180:25, 230:1, 236:13
**certainly** [9] - 57:25, 64:17, 74:23, 118:10, 121:14, 122:17, 126:24, 171:23, 259:24
**CERTIFICATE** [1] - 262:17
**certifications** [2] - 100:8
**certified** [2] - 193:20, 193:23
**certify** [1] - 262:18
**cetera** [7] - 87:18, 117:18, 123:17, 129:4, 186:5, 214:1
**CFO** [8] - 159:24, 159:25, 161:3, 161:4, 161:10, 162:5, 162:13, 217:24
**challenge** [3] - 135:17, 136:22, 261:16
**challenges** [1] - 132:13
**challenging** [1] - 51:19
**chance** [11] - 154:3, 156:19, 156:23, 156:24, 158:9, 159:8, 159:23, 162:19, 204:12, 214:21, 220:8
**chances** [1] - 54:19
**change** [58] - 7:13, 8:21, 11:20, 16:2, 16:4, 19:10, 19:23, 20:2, 20:6, 29:22, 32:14, 44:25, 54:2, 56:21, 61:6, 62:5, 72:6, 72:17, 77:3, 121:13, 131:24, 133:4, 133:22, 135:7, 151:2, 151:3, 163:13, 163:15, 172:25, 173:4, 175:14, 176:10, 178:1, 178:6, 185:6, 187:11, 191:3, 201:25, 202:5, 215:12, 222:9, 222:10, 222:16, 222:17, 222:25, 223:14, 223:17, 224:7, 224:14, 224:15, 224:19, 224:21, 225:15, 226:21, 227:1, 239:25
**changed** [29] - 8:22, 11:22, 14:8, 20:20, 43:14, 43:21, 45:8, 45:10, 53:9, 76:16, 78:22, 153:14, 175:25, 176:4, 177:23, 179:20, 191:7, 222:6, 222:19, 223:2, 224:17, 224:24, 225:5, 225:8, 225:9, 225:23, 227:10
**changeover** [1] - 20:18
**changes** [10] - 21:24, 28:13, 29:10, 29:18, 173:9, 187:13, 187:16, 236:21, 252:17
**changing** [5] - 151:6, 173:3, 173:5, 182:10, 191:3
**Chapin** [2] - 7:10
**characteristic** [2] - 51:4, 80:21
**characterized** [1] - 94:25
**charge** [2] - 107:11, 150:11
**charges** [1] - 231:14
**Charlotte** [2] - 110:8, 113:20
**chart** [13] - 33:13, 78:1, 96:21, 103:2, 103:4, 158:12, 164:5, 172:23, 173:21, 185:1, 185:5, 185:8, 185:9
**charts** [6] - 96:23, 184:20, 184:21, 236:25, 254:8, 254:18
**chat** [1] - 49:9
**Chaudhry** [1] - 109:20
**CHAUDHRY** [1] - 109:20
**check** [5] - 105:13, 107:19, 124:4, 124:7, 126:1
**check-in** [1] - 126:1
**checked** [1] - 128:19
**checking** [1] - 128:20
**Chick** [2] - 170:17, 170:22
**Chick-Fil-A** [2] - 170:17, 170:22
**CHIEF** [1] - 1:14
**chilly** [1] - 50:2
**China** [2] - 35:4, 160:20
**choice** [5] - 61:8, 201:23, 236:23, 241:5, 241:12
**choices** [1] - 214:16
**choose** [3] - 155:21, 156:1, 181:7
**choosing** [1] - 145:24
**chose** [2] - 15:24
**Christine** [23] - 21:13, 21:22, 23:1, 23:19, 24:1, 27:14, 28:18, 30:1, 32:19, 32:24, 32:25, 37:25, 38:2, 38:6, 175:11, 196:22, 197:3, 200:20, 214:17, 245:10, 247:5, 251:16, 251:22
**Christmas** [1] - 220:10
**Circle** [5] - 87:16, 94:3, 94:4, 95:24, 187:8
**Circuit** [26] - 51:9, 57:7, 57:9, 57:16, 59:6, 59:10, 59:13, 59:19, 59:20, 59:22, 59:24, 61:12, 62:8, 69:19, 72:4, 72:5, 72:20, 83:8, 86:24, 88:7, 109:11, 109:17, 109:22, 110:3, 110:8, 110:14
**circuit** [1] - 88:15
**circular** [1] - 104:13
**circumstance** [1] - 168:23
**circumstances** [6] - 67:20, 68:6, 69:6, 69:18, 84:22
**cite** [1] - 51:10
**cited** [4] - 79:20, 111:1, 111:7, 111:14
**cites** [1] - 83:7
**citing** [1] - 86:25
**citizen** [1] - 193:2
**City** [3] - 51:17, 109:16, 110:7
**Civil** [2] - 50:12, 108:17
**claim** [21] - 51:7, 63:6, 63:7, 63:20, 63:24, 64:13, 65:12, 65:21, 67:4, 67:18, 67:21, 68:8, 69:3, 70:3, 87:7, 90:18, 104:24, 108:24, 202:25, 204:11, 245:4
**claiming** [2] - 64:16, 64:21
**claims** [9] - 50:17, 50:22, 63:3, 67:23, 111:10, 111:15, 202:12, 202:17, 204:11
**clarification** [1] - 42:25
**clarify** [2] - 37:22, 73:10
**classes** [2] - 8:2, 196:11
**classification** [1] - 236:6
**Claudia** [3] - 92:9, 92:14, 97:5
**cleanup** [1] - 184:10
**clear** [13] - 9:7, 10:3, 46:9, 46:15, 76:17, 85:18, 90:9, 97:14, 103:1, 105:5, 106:2, 207:1, 221:4
**clearly** [1] - 81:11
**Clerk** [1] - 5:19
**CLERK** [4] - 6:2, 6:5, 112:22, 141:12
**client** [7] - 69:25, 90:25, 91:1, 104:3, 123:18, 125:15, 130:6
**clients** [2] - 125:5, 125:13
**clock** [1] - 71:6
**close** [8] - 6:22, 50:14, 50:18, 70:5, 70:23, 259:4, 259:9, 259:17
**closely** [1] - 166:7
**closeout** [1] - 29:21
**closest** [1] - 258:22
**closing** [1] - 139:1
**clue** [1] - 131:9
**CO** [2] - 1:9, 2:2
**coast** [1] - 135:21
**coat** [2] - 50:3, 143:9
**code** [3] - 36:16, 37:5, 198:25
**coded** [1] - 36:17
**coding** [2] - 36:14, 37:2
**coincide** [1] - 60:6
**collaborating** [1] - 91:22
**collaboration** [3] - 91:20, 93:17, 95:7
**collapsing** [1] - 73:11
**colleague** [1] - 151:21
**COLLECTIVELY** [2] - 1:7, 1:10
**college** [2] - 127:9
**color** [6] - 36:14, 36:16, 36:17, 37:2, 37:5, 155:19
**colors** [1] - 156:8
**Columbia** [1] - 6:18
**combo** [4] - 39:11, 39:13, 48:6, 48:24
**comfortable** [1] - 122:5
**coming** [19] - 20:17, 22:7, 31:9, 40:16, 52:24, 101:2, 146:12, 147:5, 149:14, 171:21, 194:13, 197:13, 197:17, 210:20, 233:18,

236:10, 236:25, 241:4, 241:8
**commenced** [1] - 5:1
**comment** [4] - 172:9, 172:12, 172:20, 253:13
**commentary** [1] - 235:5
**commenting** [2] - 242:16, 242:17
**comments** [4] - 239:8, 240:25, 241:19, 251:24
**commitment** [1] - 139:11
**committee** [2] - 96:10, 96:12
**committing** [1] - 136:8
**common** [5] - 24:5, 24:6, 117:25, 122:1
**communicate** [2] - 124:11, 174:14
**communicated** [1] - 115:22
**communication** [5] - 94:24, 95:3, 115:17, 121:18, 122:20
**communications** [1] - 87:13
**Compact** [2] - 88:24, 95:9
**companies** [13] - 90:2, 101:24, 121:22, 122:9, 124:15, 124:18, 125:3, 129:4, 129:12, 135:12, 135:14, 138:22, 158:8
**company** [31] - 15:7, 24:18, 27:4, 27:9, 38:14, 38:15, 64:11, 80:16, 88:17, 90:17, 90:19, 90:24, 90:25, 98:18, 115:25, 127:21, 127:23, 131:9, 131:25, 159:21, 163:23, 168:15, 172:3, 218:2, 218:5, 218:6, 230:19, 231:4, 234:3
**Company** [3] - 80:13, 109:11, 114:1
**company's** [1] - 37:6
**compared** [2] - 64:20, 203:23
**compensated** [2] - 203:20, 216:4
**compensation** [12] - 63:15, 64:11, 100:5, 100:12, 114:6, 139:19, 174:19, 184:8, 203:11, 203:17, 214:1, 216:11
**compensations** [1] - 100:13
**compensatory** [1] - 70:6
**compete** [4] - 154:3, 163:24, 163:25, 174:17
**competence** [1] - 218:22
**competing** [2] - 154:2, 217:7
**competition** [2] - 164:1, 174:16
**complain** [1] - 192:13
**complained** [4] - 166:20, 244:4, 244:25, 245:2
**complaints** [2] - 245:4, 248:22
**complete** [4] - 22:17, 115:4, 202:3, 261:11
**completely** [3] - 58:21, 105:16, 230:19
**compliance** [1] - 99:25
**complicated** [1] - 157:15
**comply** [2] - 100:1, 185:20
**components** [1] - 150:2
**compound** [1] - 249:7
**computer** [2] - 145:18, 261:21
**computers** [1] - 145:17
**conceding** [1] - 107:7
**concentrate** [1] - 132:13
**concepts** [1] - 105:16
**concern** [3] - 29:14, 128:18, 133:12
**concerned** [3] - 107:7, 129:9, 262:12
**concerns** [5] - 26:1, 29:10, 165:10, 165:22, 165:24
**concluded** [5] - 140:19, 183:4, 195:19, 231:18, 262:14
**conclusion** [3] - 59:3, 60:24, 109:20
**Concrete** [4] - 57:4, 69:14, 130:18, 131:16
**concrete** [1] - 130:16
**condition** [3] - 51:22, 61:5, 62:5
**conditions** [4] - 52:13, 56:21, 63:16, 80:11
**conduct** [1] - 86:21
**conducting** [1] - 87:5
**conference** [10] - 49:11, 137:3, 140:19, 182:22, 183:4, 193:16, 195:19, 220:14, 229:17, 231:18
**confident** [1] - 134:24
**confirm** [2] - 250:13, 250:15
**confirmed** [1] - 74:21
**confirms** [3] - 75:1, 92:13, 93:14
**conjunction** [1] - 108:13
**connected** [1] - 166:7
**consequence** [2] - 181:5, 181:14
**conservative** [1] - 167:22
**consider** [4] - 104:20, 108:11, 197:11, 200:21
**consideration** [3] - 79:7, 124:20, 150:9
**considered** [5] - 40:19, 127:1, 166:22, 192:25, 211:6
**considering** [2] - 109:8, 110:24
**consistent** [3] - 66:22, 155:5, 236:15
**constant** [2] - 94:24, 95:3
**constantly** [1] - 92:14
**constitutes** [1] - 80:11
**constitutionally** [1] - 87:9
**construction** [1] - 200:1
**consult** [1] - 226:21
**consulted** [1] - 95:20
**contact** [2] - 92:14, 127:24
**contacted** [1] - 127:24
**contacts** [1] - 184:23
**content** [1] - 205:17
**contention** [1] - 102:22
**context** [2] - 17:23, 17:25
**continue** [3] - 150:20, 229:25, 247:13
**CONTINUED** [55] - 2:1, 4:1, 11:12, 16:19, 18:17, 25:5, 25:23, 35:23, 36:8, 40:1, 43:5, 44:20, 48:3, 115:9, 123:4, 140:21, 143:20, 146:15, 148:1, 149:6, 157:9, 165:8, 176:21, 178:8, 179:2, 183:23, 185:16, 187:2, 191:15, 192:8, 196:4, 198:20, 205:21, 212:1, 212:23, 214:7, 218:7, 219:17, 221:1, 221:17, 226:1, 227:17, 231:21, 232:19, 234:17, 235:7, 239:13, 241:10, 245:20, 246:5, 248:19, 249:10, 250:19, 253:17, 255:18
**continues** [1] - 213:12
**contract** [11] - 105:2, 105:3, 105:7, 168:3, 168:8, 180:16, 188:8, 200:8, 232:15, 257:22, 258:1
**contractor** [2] - 93:15, 134:18
**contracts** [1] - 232:4
**contributing** [1] - 100:4
**control** [11] - 35:9, 88:18, 89:4, 89:10, 93:25, 105:25, 106:8, 149:24, 188:6, 217:12, 218:18
**controlled** [1] - 88:10
**controlling** [4] - 102:21, 103:23, 108:25, 161:17
**controls** [1] - 234:10
**conversation** [31] - 5:20, 15:25, 16:7, 21:5, 21:12, 23:7, 23:8, 24:7, 38:20, 38:24, 38:25, 49:3, 53:3, 53:15, 73:18, 74:16, 86:17, 117:16, 117:20, 118:12, 119:19, 120:5, 120:10, 120:16, 120:21, 122:19, 126:23, 131:18, 132:24, 220:11
**conversations** [6] - 14:2, 14:25, 34:3, 73:13, 117:16, 122:4
**conveyor** [4] - 143:14, 144:6, 144:23, 145:1
**conveyors** [1] - 151:2
**convince** [1] - 156:21
**Coogler** [1] - 60:25
**cool** [2] - 147:10, 148:14
**Coonse** [1] - 141:23
**coordinating** [1] - 125:19
**copies** [1] - 59:11
**copy** [2] - 115:3, 115:5
**COREY** [2] - 3:2, 6:3
**Corey** [40] - 5:24, 6:14, 6:15, 6:17, 7:7, 13:18, 16:21, 17:9, 18:14, 18:19, 19:5, 23:11, 23:16, 25:25, 27:12, 28:21, 29:6, 30:8, 31:9, 32:7, 47:6, 53:5, 63:21, 65:8, 65:14, 78:2, 78:3, 79:11, 80:3, 94:13, 94:17, 173:8, 180:1, 180:9, 222:3, 223:25, 224:2, 224:4, 225:6, 225:15
**corporation** [2] - 97:13, 97:14
**correct** [46] - 34:10, 36:11, 36:12, 36:15, 36:25, 37:4, 37:16, 38:23, 41:14, 42:21, 43:13, 43:16, 43:19, 43:20, 45:15, 45:21, 46:18, 46:21, 47:19, 113:24, 116:18, 117:8, 129:4, 132:18, 135:4, 135:20, 136:9, 136:10, 144:21, 151:15, 175:1, 175:15, 179:22, 184:3, 186:2, 199:6, 213:19, 222:8,

223:15, 240:4, 244:16, 251:4, 258:15, 259:25, 260:12, 262:18
**correctly** [2] - 116:17, 125:19
**cost** [2] - 168:16, 247:13
**costing** [1] - 168:15
**costs** [3] - 247:16, 249:2, 249:17
**counsel** [1] - 71:24
**count** [7] - 88:21, 88:23, 158:10, 165:16, 165:19, 174:16, 202:15
**counterpart** [1] - 156:20
**country** [1] - 57:25
**couple** [13] - 19:15, 19:16, 47:6, 82:21, 82:22, 121:25, 126:2, 128:19, 133:2, 134:22, 160:9, 173:9, 189:23
**course** [5] - 77:24, 80:25, 99:22, 161:17, 163:3
**court** [9] - 58:9, 59:4, 108:19, 108:22, 140:20, 183:5, 195:20, 226:19, 231:19
**Court** [53] - 31:13, 41:11, 50:10, 50:13, 51:16, 51:18, 51:19, 52:4, 54:20, 57:6, 58:2, 59:10, 59:18, 59:24, 60:22, 63:10, 67:25, 69:20, 71:11, 71:12, 72:25, 73:3, 74:2, 74:13, 74:25, 76:11, 78:5, 79:18, 80:12, 86:25, 90:16, 90:22, 92:1, 92:12, 92:16, 93:6, 94:23, 95:4, 95:16, 95:23, 97:14, 98:13, 98:16, 99:19, 100:15, 101:16, 102:4, 104:2, 110:22, 139:8, 193:20, 194:2
**COURT** [140] - 1:1, 1:14, 2:6, 2:6, 5:2, 5:5, 5:25, 6:7, 11:9, 11:11, 16:16, 16:18, 18:15, 24:20, 24:23, 25:18, 31:12, 31:14, 35:21, 36:7, 39:24, 42:25, 43:4, 44:19, 46:24, 47:25, 49:7, 49:9, 49:13, 50:8, 70:9, 70:17, 71:2, 71:7, 73:4, 73:7, 75:8, 75:12, 75:15, 75:18, 80:1, 82:17, 85:11, 85:13, 91:12, 101:12, 101:15, 102:3, 104:1, 104:22, 105:2, 106:17, 106:25, 107:9, 107:13, 107:21, 108:1, 108:4, 108:9, 111:18, 111:21, 111:24, 112:3, 112:7, 112:10, 112:21, 112:25, 115:7, 123:3, 139:5, 140:5, 141:6, 141:15, 143:16, 143:19, 146:9, 149:4, 157:7, 164:25, 176:6, 176:11, 176:13, 176:18, 178:3, 178:22, 182:21, 183:3, 183:6, 183:14, 183:16, 183:18, 183:21, 185:15, 186:25, 191:10, 191:13, 192:3, 192:5, 192:7, 193:15, 194:22, 195:12, 195:18, 196:1, 205:20, 211:23, 212:22, 218:3, 220:16, 221:13, 225:20, 227:14, 231:6, 231:12, 231:20, 232:13, 234:15, 234:24, 235:3, 235:5, 239:9, 241:2, 245:19, 246:3, 247:22, 248:4, 248:8, 248:10, 248:12, 248:15, 249:8, 250:18, 253:14, 255:15, 256:12, 261:4, 261:6, 261:8, 262:8, 262:13
**Court's** [2] - 62:1, 74:10
**Court-appointed** [1] - 194:2
**Courtney** [3] - 17:15, 17:17, 17:25
**courtroom** [3] - 14:20, 52:12, 180:21
**courts** [2] - 80:10, 88:2
**COURTS** [1] - 4:2
**cover** [5] - 30:20, 79:4, 98:6, 101:10, 103:12
**covered** [3] - 98:19, 105:6, 209:16
**covers** [1] - 101:13
**COVID** [10] - 128:17, 165:11, 165:13, 167:14, 168:2, 170:16, 248:24, 255:20, 256:7
**COVID-ish** [1] - 128:17
**CPA's** [1] - 162:16
**create** [5] - 93:9, 93:11, 96:23, 137:16, 189:15
**created** [14] - 36:10, 37:5, 69:8, 81:22, 87:22, 89:5, 92:8, 94:15, 96:4, 97:4, 103:2, 103:9, 224:23, 249:2
**creative** [1] - 215:15
**credibility** [1] - 109:25
**Crinkley** [1] - 110:2
**critical** [4] - 173:16, 173:23, 218:11, 235:21
**Cross** [5] - 3:4, 3:5, 3:10, 3:13, 3:14
**cross** [10] - 4:5, 47:25, 53:11, 55:3, 73:2, 88:20, 193:21, 194:4, 195:9, 250:17
**CROSS** [26] - 31:15, 35:23, 36:8, 40:1, 43:5, 44:20, 134:4, 140:21, 220:6, 221:1, 221:17, 226:1, 227:17, 231:21, 232:19, 234:17, 235:7, 239:13, 241:10, 245:20, 246:5, 248:19, 249:10, 250:19, 253:17, 255:18
**cross-examination** [2] - 53:11, 55:3
**cross-examine** [1] - 195:9
**cross-examining** [2] - 193:21, 194:4
**CRR** [2] - 2:6, 262:25
**crushing** [1] - 79:12
**culture** [4] - 135:7, 149:9, 163:21
**curative** [4] - 229:23, 230:3, 230:24, 231:13
**current** [1] - 142:1
**custom** [3] - 155:16, 156:4

**D**

**D/B/A** [2] - 1:7, 1:10
**damage** [1] - 138:19
**damages** [4] - 70:7, 137:12, 138:18, 139:7
**Daniela** [1] - 196:22
**Daniela's** [1] - 197:1
**Darla** [1] - 7:16
**data** [22] - 17:1, 17:2, 53:17, 62:17, 66:2, 68:16, 173:25, 174:5, 175:18, 177:16, 207:24, 207:25, 221:7, 221:10, 223:17, 223:18, 227:5, 227:6, 232:23, 246:15, 250:1, 250:2
**database** [1] - 254:8
**date** [21] - 17:4, 92:10, 116:5, 116:11, 116:14, 125:1, 176:5, 176:10, 176:24, 177:1, 177:4, 177:13, 178:11, 178:16, 185:2, 198:23, 222:14, 222:23, 224:11, 236:4, 262:25
**dated** [3] - 119:9, 124:7, 196:21
**dates** [1] - 126:6
**daughters** [1] - 127:8
**dawsey** [1] - 52:25
**DAWSEY** [1] - 1:3
**Dawsey** [200] - 13:19, 13:21, 13:24, 19:16, 21:2, 21:4, 21:19, 24:8, 25:16, 25:25, 29:7, 29:9, 29:14, 30:6, 30:8, 30:13, 30:25, 37:8, 38:5, 38:22, 39:2, 46:15, 47:15, 52:22, 53:1, 53:3, 53:6, 53:18, 53:23, 54:17, 54:23, 55:8, 55:15, 55:18, 56:1, 56:10, 56:15, 56:17, 56:23, 58:4, 62:11, 63:7, 63:11, 63:17, 63:23, 64:9, 64:21, 64:25, 65:7, 65:14, 65:18, 67:1, 67:18, 68:1, 68:18, 68:23, 68:25, 69:13, 69:24, 73:24, 76:16, 76:20, 77:2, 77:6, 79:3, 80:7, 81:4, 81:7, 81:22, 82:4, 82:5, 82:11, 83:18, 84:2, 84:14, 84:16, 84:24, 85:3, 85:7, 86:4, 86:16, 87:21, 88:18, 88:24, 95:9, 96:24, 102:18, 106:10, 114:10, 114:12, 114:18, 114:23, 115:18, 115:20, 116:5, 116:6, 116:9, 116:14, 116:16, 116:22, 117:2, 117:7, 117:13, 117:16, 118:6, 118:23, 119:1, 119:11, 120:11, 121:16, 121:20, 122:9, 122:15, 122:22, 123:7, 123:9, 123:13, 123:19, 123:25, 124:5, 124:11, 124:24, 125:10, 125:24, 126:20, 126:22, 127:2, 127:4, 127:15, 128:12, 129:18, 130:9, 130:25, 131:15, 131:21, 132:4, 133:10, 138:23, 140:23, 140:25, 167:2, 167:3, 168:25, 169:9, 169:13, 169:20, 171:9, 171:18, 174:25, 176:15, 179:18, 179:21, 180:5, 180:14, 186:6, 188:22, 190:3, 190:13, 191:21, 199:16, 200:16, 200:22, 201:14, 201:23, 202:12, 203:10, 203:19, 204:5, 204:11, 205:1, 209:11, 210:13, 211:8, 212:4, 213:7, 213:10, 219:20, 220:2, 220:8, 225:4, 226:20, 228:9, 229:8, 239:2, 239:11, 239:16, 239:19, 239:22, 242:21, 242:23, 243:4, 243:6, 245:7, 246:21, 248:9, 254:11, 255:23, 258:17, 259:4, 259:21
**Dawsey's** [24] - 30:16, 47:10, 55:22, 55:24, 62:9, 63:20, 64:6, 64:12, 65:16,

65:21, 67:13, 69:3, 85:25, 88:5, 89:20, 94:22, 106:12, 114:15, 114:20, 116:5, 131:21, 246:8, 251:7, 255:10
**Dawson** [1] - 129:8
**days** [10] - 5:9, 25:1, 25:2, 56:9, 116:13, 116:15, 141:21, 144:5, 145:6, 231:7
**DC** [2] - 57:7, 57:9
**deaf** [1] - 245:4
**deal** [2] - 90:16, 148:12
**dealers** [1] - 155:17
**dealerships** [2] - 145:15, 155:17
**dealing** [4] - 90:13, 180:17, 202:23, 232:4
**dealt** [1] - 14:15
**DEBRA** [1] - 2:6
**December** [8] - 56:9, 59:23, 130:9, 146:7, 224:8, 224:18, 225:10, 227:8
**decide** [2] - 51:5, 167:15
**decided** [12] - 7:8, 30:9, 59:14, 60:19, 69:14, 73:22, 138:17, 151:20, 189:15, 228:7, 237:6, 246:10
**decides** [3] - 96:11, 246:12, 246:14
**deciding** [1] - 144:8
**decision** [32] - 26:12, 31:2, 51:16, 51:18, 52:14, 57:9, 58:2, 59:10, 60:2, 62:1, 71:24, 73:23, 79:17, 79:19, 79:20, 79:21, 79:24, 81:23, 91:5, 93:1, 97:21, 98:6, 98:13, 138:9, 158:6, 207:15, 240:18, 255:22, 255:23, 256:1, 256:3
**decisions** [19] - 25:16, 35:7, 35:8, 35:10, 82:23, 82:24, 87:25, 88:10, 91:2, 92:11, 98:2, 98:3, 171:14, 201:21, 217:15, 220:2, 230:18, 231:1, 246:7
**decrease** [2] - 54:13, 83:24
**deep** [2] - 88:3, 166:21
**defeated** [1] - 108:25
**defend** [1] - 81:6
**defendant** [3] - 87:3, 87:4, 112:19
**DEFENDANT** [1] - 1:19
**Defendant** [4] - 5:23, 50:10, 63:1, 73:10
**defendant's** [1] - 66:3
**Defendant's** [33] - 18:12, 18:16, 18:20, 27:11, 36:23, 36:25, 53:18, 58:13, 68:17, 74:8, 86:14, 86:15, 115:7, 115:12, 123:1, 125:21, 135:6, 149:2, 149:4, 173:24, 175:19, 176:23, 177:12, 178:14, 195:24, 198:14, 198:18, 198:22, 209:14, 210:5, 212:20, 212:25, 221:5
**Defendants** [1] - 108:12
**DEFENDANTS** [1] - 1:12
**defense** [7] - 5:22, 80:18, 101:6, 101:9, 108:24, 112:17, 175:17
**DEFENSE** [1] - 3:21
**define** [1] - 133:6
**defined** [2] - 107:2, 107:4
**defines** [1] - 102:15
**definitely** [6] - 135:24, 156:23, 172:18, 200:14, 224:17, 243:24
**definition** [5] - 104:6, 104:10, 106:21, 106:22, 107:12
**definitive** [2] - 83:5, 83:21
**degree** [5] - 7:17, 7:21, 7:22, 7:25, 99:21
**Del** [1] - 57:7
**Delaware** [1] - 97:16
**delay** [1] - 112:14
**delayed** [3] - 30:21, 30:22, 240:4
**demonstrating** [1] - 98:1
**demote** [1] - 219:20
**demoted** [8] - 53:13, 77:16, 81:15, 133:18, 186:10, 186:14, 216:14, 225:5
**demotion** [4] - 73:15, 101:6, 203:1, 212:16
**denied** [4] - 54:21, 81:10, 111:8, 111:15
**deny** [1] - 67:16
**denying** [3] - 58:3, 85:22, 93:7
**department** [37] - 21:25, 28:9, 32:9, 32:15, 32:16, 41:7, 52:2, 52:7, 53:11, 53:19, 55:25, 88:19, 96:15, 131:6, 156:18, 159:17, 163:6, 173:21, 174:1, 174:22, 179:14, 180:19, 184:2, 184:5, 198:25, 203:14, 203:20, 204:1, 225:22, 239:4, 240:7, 240:20, 240:23, 241:16, 241:20, 246:17, 252:7
**Department** [43] - 11:15, 11:21, 12:14, 12:18, 12:19, 12:22, 13:16, 13:24, 14:5, 14:7, 17:11, 25:8, 26:19, 27:13, 29:18, 33:16, 48:8, 52:24, 55:19, 56:5, 56:14, 56:16, 68:10, 74:6, 102:11, 151:17, 152:25, 153:5, 153:12, 153:20, 153:23, 156:13, 159:2, 173:7, 174:25, 175:9, 175:15, 180:23, 200:5, 202:6, 204:9, 252:10, 252:13
**departments** [1] - 33:4
**depended** [2] - 42:7, 42:9
**Deposition** [1] - 4:4
**deposition** [38] - 39:25, 63:23, 73:1, 74:12, 74:20, 74:25, 75:3, 78:4, 78:6, 92:16, 92:23, 92:25, 93:2, 93:15, 93:19, 93:21, 93:24, 94:2, 94:5, 94:9, 94:23, 95:4, 95:5, 95:8, 95:19, 95:23, 96:2, 96:14, 97:3, 100:19, 100:20, 100:23, 234:12, 234:16, 238:6, 250:4, 256:20
**describe** [5] - 158:2, 160:3, 163:15, 211:10, 217:2
**described** [1] - 133:13
**describing** [1] - 149:18
**description** [7] - 53:20, 74:7, 100:6, 123:18, 124:16, 129:11, 178:20
**descriptions** [5] - 53:19, 145:23, 153:7, 179:15, 226:13
**designated** [3] - 37:3, 44:13, 99:2
**designation** [1] - 69:10
**designations** [1] - 36:13
**designing** [2] - 100:1, 144:6
**desirable** [3] - 57:15, 58:7, 58:15
**detailed** [1] - 162:18
**details** [3] - 199:12, 226:13, 240:11
**determinations** [1] - 38:1
**determinative** [2] - 63:18, 67:14
**determine** [4] - 37:23, 84:7, 91:4, 226:22
**determined** [7] - 37:20, 38:4, 100:16, 104:22, 104:23, 145:21, 195:7
**determines** [6] - 101:16, 102:4, 104:2, 184:8, 190:25, 214:1
**determining** [1] - 144:7
**develop** [4] - 78:12, 78:18, 131:7, 244:16
**developed** [1] - 244:14
**developer** [1] - 205:9
**development** [3] - 100:5, 169:4, 205:12
**deviation** [1] - 187:10
**deviations** [1] - 252:20
**device** [1] - 261:21
**dialogues** [1] - 15:23
**dicta** [1] - 79:21
**dictate** [2] - 35:6, 187:20
**dictating** [2] - 95:10, 187:7
**didnt** [1] - 243:17
**difference** [1] - 74:3
**different** [42] - 7:9, 7:24, 12:21, 19:9, 19:12, 19:13, 20:4, 44:6, 52:1, 53:10, 57:12, 67:16, 73:13, 76:2, 80:10, 81:16, 84:22, 103:5, 103:6, 104:14, 105:16, 119:24, 120:17, 120:20, 144:23, 145:15, 155:20, 156:7, 161:13, 163:22, 171:25, 185:1, 202:1, 202:21, 202:22, 205:25, 207:19, 211:6, 222:25, 229:13, 238:1
**differentials** [1] - 149:25
**differently** [3] - 64:23, 100:13, 207:24
**difficult** [3] - 97:8, 206:24, 206:25
**digit** [2] - 33:16, 185:3
**dilapidated** [3] - 144:3, 146:3, 149:19
**diligence** [1] - 130:22
**DIRECT** [32] - 6:9, 11:12, 16:19, 18:17, 25:5, 25:23, 113:2, 115:9, 123:4, 141:18, 143:20, 146:15, 148:1, 149:6, 157:9, 165:8, 176:21, 178:8, 179:2, 183:23, 185:16, 187:2, 191:15, 192:8, 196:4, 198:20, 205:21, 212:1, 212:23, 214:7, 218:7, 219:17
**Direct** [3] - 3:3, 3:9, 3:12
**direct** [18] - 11:24, 12:2, 28:8, 38:21, 44:16, 45:25, 89:20, 98:1, 101:21, 105:14, 113:12, 118:14, 159:20, 192:21, 228:12, 230:10, 236:14, 247:16
**directed** [8] - 4:4, 73:2, 85:17, 91:9, 91:25, 105:17, 109:2, 109:4
**direction** [5] - 60:15,

122:2, 139:9, 155:22, 249:19
**directly** [8] - 14:10, 38:17, 47:12, 93:18, 100:6, 104:16, 114:2, 245:24
**director** [1] - 125:17
**Director** [1] - 6:20
**directors** [1] - 93:20
**disadvantage** [2] - 72:1, 72:17
**disagree** [1] - 83:1
**disagreeing** [1] - 244:2
**disagreements** [1] - 167:8
**discipline** [5] - 14:12, 60:14, 61:18, 61:20, 62:3
**disciplined** [2] - 60:17, 61:19
**discontinued** [1] - 184:20
**discovery** [4] - 103:3, 103:6, 103:10, 103:11
**discrepancies** [1] - 139:6
**discretion** [1] - 109:9
**discriminate** [1] - 136:12
**discriminated** [4] - 51:3, 63:9, 69:23, 133:16
**discriminating** [1] - 63:14
**discrimination** [33] - 50:23, 50:24, 51:8, 51:24, 60:21, 63:6, 63:13, 63:20, 63:24, 65:5, 65:20, 67:3, 67:18, 67:23, 67:24, 68:3, 68:7, 69:3, 70:1, 70:4, 77:20, 80:9, 80:11, 80:24, 82:13, 84:25, 101:1, 101:10, 101:21, 104:16, 111:11, 138:11
**discriminatory** [3] - 51:20, 64:9, 65:3
**discuss** [7] - 34:21, 49:23, 50:16, 183:15, 210:23, 245:24, 261:25
**discussed** [15] - 15:22, 29:19, 48:24, 50:15, 82:10, 86:11, 92:21, 94:8, 96:3, 120:6, 126:20, 184:15, 213:18, 227:23, 252:18
**discussion** [22] - 20:12, 20:16, 22:9, 26:8, 29:13, 38:7, 85:7, 95:5, 96:20, 106:7, 119:19, 138:21, 139:6, 167:15, 180:21, 184:18, 187:6, 187:20, 189:7, 190:1, 193:8
**discussions** [18] - 21:3, 21:10, 22:16, 22:25, 24:8, 25:7, 25:18, 25:19, 26:17, 31:2, 97:22, 131:16, 168:14, 171:24, 200:15, 200:19, 244:12, 256:6
**dislikes** [1] - 121:2
**disparate** [5] - 79:10, 80:23, 81:12, 82:9, 82:14
**disparity** [1] - 77:20
**dispute** [10] - 52:17, 53:14, 55:7, 57:21, 65:25, 68:14, 69:11, 69:12, 84:10, 101:25
**dissect** [1] - 122:4
**DISTRICT** [3] - 1:1, 1:1, 1:14
**District** [7] - 59:18, 59:24, 59:25, 60:1, 60:21, 60:25, 62:8
**DIVA** [4] - 254:4, 260:2, 260:3, 260:16
**division** [2] - 32:20, 52:1
**DIVISION** [1] - 1:2
**divorce** [1] - 113:19
**Dock** [1] - 80:13
**document** [39] - 16:22, 16:24, 18:19, 18:21, 36:5, 36:10, 37:25, 44:25, 74:15, 75:19, 87:22, 89:4, 92:8, 92:10, 103:8, 103:9, 115:14, 125:14, 149:2, 177:14, 177:21, 178:3, 184:19, 189:10, 195:6, 195:14, 236:18, 247:23, 247:25, 248:5, 248:14, 252:17, 253:19, 253:23, 253:25, 254:13, 254:19, 254:20, 254:23
**documentation** [2] - 15:3, 250:3
**documented** [4] - 58:12, 187:12, 187:18, 242:3
**documents** [13] - 66:7, 76:2, 94:14, 94:18, 115:14, 115:16, 115:24, 184:14, 194:23, 194:25, 201:3, 222:19, 260:3
**DOING** [2] - 1:8, 1:10
**doke** [1] - 118:20
**dollar** [1] - 233:14
**dollars** [3] - 233:19, 234:4, 235:20
**Dombrowski** [1] - 175:5
**domestic** [11] - 36:14, 39:5, 39:12, 39:15, 40:17, 40:18, 40:23, 41:13, 41:16, 192:25, 229:9
**domestic/ international** [1] - 39:11
**domestics** [1] - 37:3
**dominate** [1] - 35:12
**dominated** [1] - 88:11
**DONALD** [1] - 2:2
**done** [27] - 40:8, 70:19, 77:6, 79:11, 86:12, 89:2, 96:17, 96:24, 96:25, 97:1, 100:13, 100:14, 113:25, 114:17, 117:23, 134:23, 191:6, 199:13, 216:24, 218:10, 231:5, 231:10, 252:18, 252:19, 255:14
**door** [3] - 56:19, 65:17, 134:17
**double** [1] - 157:22
**doubt** [4] - 58:24, 62:10, 65:13, 71:5
**down** [29] - 21:23, 27:6, 27:19, 65:9, 65:17, 71:13, 79:9, 82:8, 85:4, 118:19, 126:16, 128:10, 130:15, 137:18, 140:13, 141:6, 143:6, 143:17, 143:23, 149:14, 149:16, 154:19, 184:19, 255:20, 255:24, 256:7, 256:18, 259:19, 261:7
**downgrade** [5] - 66:5, 192:14, 203:5, 242:20, 244:9
**downgraded** [15] - 53:24, 54:9, 54:10, 58:19, 65:22, 66:13, 66:24, 67:5, 67:7, 67:11, 190:18, 203:3, 242:18, 243:20
**downtown** [1] - 144:1
**Dr** [23] - 56:6, 87:24, 92:20, 92:25, 93:4, 93:18, 94:2, 95:2, 95:20, 97:2, 97:23, 160:14, 164:18, 164:21, 164:23, 170:4, 194:23, 215:4, 228:9, 233:12, 239:3, 241:16, 241:18
**draw** [7] - 184:25, 185:8, 187:22, 187:23, 252:16, 253:7
**drawing** [1] - 252:20
**dressed** [1] - 147:11
**drive** [3] - 52:9, 146:17, 257:20
**driven** [1] - 20:18
**driving** [1] - 27:5
**drove** [1] - 7:10
**Dry** [1] - 80:13
**due** [2] - 130:22, 165:23
**duly** [3] - 6:3, 112:23, 141:13
**Duong** [1] - 86:24
**during** [29] - 8:21, 12:13, 12:16, 12:17, 13:23, 20:13, 24:17, 29:9, 30:2, 30:5, 30:25, 45:19, 45:22, 60:18, 61:23, 62:16, 63:23, 65:7, 108:19, 120:10, 120:16, 127:4, 128:17, 157:19, 165:13, 167:14, 183:15, 253:23, 255:10
**duties** [3] - 33:19, 120:11, 121:1
**duty** [2] - 7:20, 52:10
**dye** [1] - 143:6

### E

**early** [8] - 15:1, 53:2, 53:15, 56:1, 66:8, 74:22, 145:6, 180:13
**earn** [1] - 46:7
**ears** [1] - 245:5
**ease** [1] - 122:20
**eased** [1] - 137:18
**easier** [3] - 157:17, 185:6, 235:1
**easy** [4] - 135:21, 160:7, 160:8, 218:21
**eat** [1] - 199:23
**economic** [1] - 139:7
**Eddy** [9] - 214:9, 214:12, 214:22, 215:8, 215:23, 216:2, 235:21, 236:10, 237:1
**education** [1] - 144:10
**educational** [1] - 7:15
**EEOC** [1] - 80:13
**effect** [4] - 56:3, 66:17, 76:15, 243:9
**efforts** [1] - 204:24
**eight** [10] - 8:20, 8:21, 8:24, 9:1, 75:2, 191:25, 192:4, 192:5, 192:10, 238:8
**Eight** [1] - 89:25
**either** [8] - 19:18, 74:23, 88:9, 90:2, 102:23, 103:23, 165:18, 214:17
**either/or** [1] - 91:16
**elderly** [3] - 114:16, 134:17, 134:22
**electronic** [1] - 261:21
**electronically** [1] - 115:4
**element** [2] - 201:18, 201:19
**elevate** [1] - 64:6
**elevated** [6] - 63:25, 64:5, 64:24, 84:11, 84:12, 84:14
**elevation** [1] - 64:1
**eleven** [4] - 49:14, 84:12, 199:15, 216:10
**Eleventh** [8] - 59:10, 59:13, 59:19, 59:20, 59:22, 59:24, 61:12, 62:8
**elicit** [1] - 137:7
**eliminate** [1] - 71:21
**elite** [2] - 206:22, 206:25
**ELLISON** [1] - 2:3
**elsewhere** [1] - 61:9
**email** [46] - 74:19, 79:1, 79:3, 87:16, 102:24, 103:13, 116:6, 116:7, 116:20,

116:25, 118:6, 118:22, 118:24, 118:25, 119:2, 119:6, 119:9, 121:17, 122:7, 122:15, 124:23, 125:10, 125:23, 125:24, 126:4, 126:10, 127:14, 127:16, 127:19, 128:11, 129:6, 129:7, 129:18, 130:9, 132:3, 132:6, 135:5, 193:9, 193:12, 194:13, 194:14, 195:11, 197:1, 251:11, 251:12
**emails** [5] - 115:17, 193:25, 194:8, 252:12
**emphasize** [1] - 127:7
**emphasizes** [1] - 84:5
**employed** [7] - 6:17, 6:25, 54:14, 68:25, 93:15, 131:11, 168:17
**employee** [11] - 15:8, 33:6, 52:3, 54:9, 54:24, 64:3, 68:5, 86:18, 87:23, 181:23, 219:11
**employee's** [1] - 63:17
**employees** [11] - 15:20, 16:2, 19:16, 22:11, 25:17, 54:12, 54:15, 66:18, 88:16, 148:19, 252:7
**employer** [49] - 63:14, 63:15, 86:3, 87:12, 88:5, 88:13, 88:17, 89:14, 91:3, 91:4, 91:7, 101:17, 101:20, 101:23, 102:5, 102:15, 102:17, 102:19, 102:22, 103:21, 103:24, 104:3, 104:6, 104:8, 104:9, 104:10, 104:11, 104:12, 104:15, 104:18, 104:20, 105:13, 105:15, 105:16, 105:18, 105:20, 106:1, 106:18, 106:22, 106:23, 107:1, 107:3, 107:4, 107:15, 107:19, 111:4, 123:15
**employers** [1] - 104:24
**employment** [32] - 3:20, 31:7, 35:10, 51:10, 51:22, 52:13, 55:22, 56:17, 56:22, 57:18, 58:4, 59:8, 60:20, 60:24, 61:5, 61:7, 62:6, 62:12, 62:25, 63:10, 63:16, 63:19, 64:15, 67:14, 68:1, 68:2, 88:10, 90:18, 103:19, 105:2, 105:4, 217:15
**encountered** [1] - 116:9
**encountering** [1] - 166:3
**encourage** [3] - 15:25, 16:6, 16:7
**END** [1] - 262:15
**end** [9] - 14:14, 22:6, 29:21, 51:21, 61:10, 94:15, 107:5, 184:12, 251:7
**ended** [3] - 20:16, 118:15, 166:23
**ending** [1] - 182:6
**ends** [1] - 150:24
**engage** [3] - 59:7, 90:3, 101:1
**engaging** [1] - 129:3
**Engelhorn** [1] - 27:13
**engine** [1] - 149:25
**engineer** [6] - 143:3, 144:11, 144:12, 151:1, 162:11, 218:24
**Engineering** [3] - 153:13, 153:20, 156:13
**engineering** [1] - 144:24
**Englehorn** [23] - 56:6, 87:24, 92:20, 93:18, 94:2, 95:2, 95:20, 97:2, 97:23, 160:14, 164:18, 164:21, 164:23, 170:4, 194:23, 215:4, 218:9, 228:9, 233:12, 239:3, 241:16, 241:18
**Englehorn's** [2] - 92:25, 93:4
**English** [1] - 195:1
**enhance** [1] - 201:15
**enjoyed** [4] - 89:23, 122:19, 129:21, 162:15
**entailed** [1] - 135:19
**enter** [3] - 122:21, 206:5, 206:7
**entered** [1] - 123:2
**enterprise** [1] - 182:4
**entire** [15] - 29:18, 56:14, 58:17, 62:13, 68:25, 92:4, 142:20, 159:10, 161:15, 163:12, 185:18, 201:17, 201:20, 206:14, 240:13
**entirely** [1] - 62:10
**entities** [1] - 202:22
**entitled** [10] - 63:1, 67:21, 69:25, 73:1, 91:9, 229:22, 230:3, 230:24, 231:3, 262:20
**entity** [1] - 88:12
**entry** [4] - 110:11, 223:23, 247:9, 247:12
**environment** [1] - 22:14
**EPPS** [2] - 3:2, 6:3
**Epps** [47] - 3:20, 5:24, 5:25, 6:14, 7:14, 8:4, 12:10, 12:24, 21:24, 35:25, 36:2, 40:3, 44:22, 47:2, 53:2, 53:5, 63:21, 63:25, 64:2, 64:6, 64:19, 64:22, 64:24, 65:14, 65:19, 67:16, 67:19, 77:23, 78:2, 79:5, 79:11, 80:25, 81:4, 81:9, 81:13, 82:10, 84:9, 84:10, 84:17, 84:23, 94:13, 94:17, 180:1, 222:3, 223:25, 224:2, 224:4
**Epps's** [2] - 225:6, 225:16
**equal** [1] - 173:21
**equally** [1] - 229:6
**equals** [1] - 65:19
**equipment** [8] - 143:13, 144:7, 145:1, 147:3, 151:4, 159:4, 211:13, 218:20
**equivalent** [3] - 84:24, 213:7, 232:18
**ERISA** [3] - 99:18, 100:4, 100:9
**especially** [2] - 139:1, 200:13
**ESQ** [4] - 1:17, 1:21, 2:2, 2:3
**essentially** [4] - 88:24, 104:15, 191:13, 249:24
**establish** [9] - 51:2, 51:7, 59:7, 60:23, 67:3, 68:5, 101:9, 138:23, 239:16
**established** [2] - 71:25, 176:4
**establishes** [1] - 56:23
**establishing** [1] - 48:1
**et** [7] - 87:18, 117:18, 123:16, 129:4, 186:4, 186:5, 214:1
**Europe** [1] - 208:6
**Eva** [13] - 26:5, 26:9, 26:11, 102:13, 207:1, 207:2, 207:15, 208:4, 208:23, 209:6, 210:20, 216:24, 217:8
**evaluating** [1] - 87:1
**evening** [2] - 261:13, 262:3
**everyday** [2] - 14:15, 33:22
**everywhere** [1] - 35:5
**evidence** [33] - 50:18, 51:2, 51:6, 52:12, 55:25, 56:23, 58:12, 60:16, 62:22, 64:22, 70:5, 70:24, 74:1, 77:22, 82:15, 86:4, 89:3, 89:9, 92:4, 97:8, 98:11, 109:6, 109:19, 109:23, 110:1, 110:4, 110:9, 110:15, 110:17, 111:5, 111:12, 223:4, 230:6
**evidentiary** [5] - 50:21, 108:21, 230:8, 230:9, 230:21
**exact** [1] - 19:14
**exactly** [11] - 10:12, 33:8, 45:11, 64:13, 67:11, 76:12, 78:2, 105:11, 134:14, 194:3, 231:5
**EXAM** [62] - 6:9, 11:12, 16:19, 18:17, 25:5, 25:23, 31:15, 35:23, 36:8, 40:1, 43:5, 44:20, 47:4, 48:3, 48:22, 113:2, 115:9, 123:4, 134:4, 140:21, 141:18, 143:20, 146:15, 148:1, 149:6, 157:9, 165:8, 176:21, 178:8, 179:2, 183:23, 185:16, 187:2, 191:15, 192:8, 196:4, 198:20, 205:21, 212:1, 212:23, 214:7, 218:7, 219:17, 220:6, 221:1, 221:17, 226:1, 227:17, 231:21, 232:19, 234:17, 235:7, 239:13, 241:10, 245:20, 246:5, 248:19, 249:10, 250:19, 253:17, 255:18, 256:15
**exam** [12] - 3:3, 3:4, 3:5, 3:6, 3:7, 3:9, 3:10, 3:12, 3:13, 3:14, 3:15, 88:20
**examination** [3] - 43:1, 53:11, 55:3
**examine** [1] - 195:9
**examining** [2] - 193:21, 194:4
**example** [2] - 32:17, 95:13
**exceeding** [2] - 65:2, 84:19
**excellent** [1] - 136:22
**except** [1] - 227:24
**exception** [2] - 87:14, 187:18
**exceptions** [1] - 188:9
**excerpts** [3] - 4:4, 73:1
**excited** [1] - 131:23
**exclamation** [1] - 251:19
**exclusively** [2] - 94:3, 95:25
**excuse** [4] - 97:23, 176:24, 187:1, 189:20
**excused** [1] - 262:5
**executive** [3] - 98:23, 99:2, 229:21
**executives** [5] - 90:9, 99:4, 99:6, 99:10, 136:7
**exercise** [3] - 87:2, 87:8, 109:9
**exercised** [1] - 109:13
**exerted** [2] - 88:18, 88:19
**exhibit** [83] - 4:5, 16:10, 16:14, 16:23, 18:12, 18:20, 36:3, 36:23, 53:18, 58:13, 68:17, 73:2, 73:3, 74:2, 74:7, 74:8, 74:10, 74:13, 74:25, 75:8, 75:10, 75:11,

75:15, 75:17, 75:22, 76:11, 77:25, 78:5, 92:1, 92:8, 92:12, 92:16, 94:5, 94:7, 94:9, 94:23, 95:16, 95:23, 96:4, 96:8, 96:20, 97:3, 98:24, 99:19, 102:23, 104:17, 115:3, 115:13, 125:21, 127:12, 135:6, 138:22, 139:14, 141:7, 149:2, 173:25, 175:17, 176:24, 177:12, 178:15, 178:22, 178:23, 181:21, 184:16, 185:18, 186:19, 195:16, 198:18, 198:22, 212:20, 213:1, 213:13, 214:11, 221:5, 221:9, 223:5, 223:6, 223:9, 226:7, 251:11, 253:24

**exhibits** [5] - 66:3, 92:18, 94:6, 103:5, 171:12

**EXHIBITS** [2] - 3:17, 4:3

**existed** [3] - 69:19, 89:13, 174:6

**existence** [1] - 58:24

**exists** [1] - 187:24

**exit** [1] - 146:20

**exited** [1] - 136:3

**expand** [1] - 165:15

**expansion** [2] - 150:12, 159:10

**expat** [18] - 36:17, 36:20, 37:15, 38:2, 89:11, 151:20, 152:3, 188:25, 193:11, 194:13, 197:11, 197:13, 198:9, 251:17, 260:7, 260:16, 260:19, 260:24

**expatriate** [1] - 152:17

**expats** [3] - 37:3, 87:21, 189:8

**expectation** [1] - 135:1

**expectations** [2] - 217:8, 217:9

**expected** [2] - 112:15, 170:8

**expedited** [1] - 112:16

**experience** [46] - 74:10, 99:17, 99:23, 100:2, 100:3, 100:9, 100:10, 120:24, 123:16, 135:25, 145:12, 145:13, 145:14, 166:1, 198:5, 198:8, 219:6, 219:10, 232:2, 232:3, 232:9, 232:12, 232:14, 232:15, 232:17, 232:22, 233:2, 233:5, 233:6, 233:8, 233:11, 233:16, 233:21, 233:22, 234:5, 234:7, 235:14, 237:18, 237:22, 238:11, 240:24, 257:2, 257:10, 257:25, 258:1

**experienced** [5] - 61:16, 62:4, 165:20, 172:21, 252:7

**experiences** [1] - 171:25

**expert** [2] - 20:20, 91:9

**expertise** [7] - 99:12, 99:14, 99:15, 99:16, 218:22, 240:12, 240:17

**experts** [2] - 90:6, 257:16

**explain** [11] - 14:21, 40:8, 43:17, 155:11, 155:12, 181:25, 182:6, 207:13, 232:1, 232:8, 248:4

**explained** [4] - 76:18, 81:22, 117:17, 229:22

**explains** [1] - 96:13

**explanation** [1] - 120:2

**export** [1] - 89:8

**exposed** [1] - 61:17

**express** [1] - 26:1

**extended** [1] - 49:16

**extension** [1] - 216:20

**extent** [4] - 64:14, 64:21, 65:21, 87:3

**extra** [1] - 124:14

**F**

**F.2d** [2] - 109:11, 110:2

**F.3d** [3] - 109:17, 109:21, 110:8

**F3rd** [2] - 51:11, 51:13

**F4th** [1] - 72:3

**face** [2] - 97:11, 225:14

**faced** [2] - 69:2, 225:13

**fact** [21] - 20:23, 54:4, 63:25, 64:15, 66:4, 71:15, 71:16, 71:22, 79:18, 84:2, 84:16, 90:10, 102:23, 135:5, 136:18, 148:15, 195:16, 235:19, 244:25, 253:22, 254:25

**factor** [2] - 63:18, 67:14

**factors** [2] - 101:23, 200:21

**facts** [4] - 72:24, 83:2, 97:25, 109:15

**factual** [2] - 98:12, 138:12

**factually** [1] - 98:3

**failed** [2] - 51:2, 62:22

**fails** [2] - 64:17, 71:9

**fair** [2] - 152:4, 158:15

**fairly** [1] - 261:9

**fairs** [2] - 215:16, 215:18

**fall** [4] - 52:18, 64:1, 65:25, 124:10

**false** [2] - 91:18, 227:3

**familiar** [8] - 33:19, 33:21, 33:23, 41:23, 114:15, 117:18, 117:19, 155:8

**family** [1] - 200:7

**FANE** [1] - 1:21

**far** [11] - 82:11, 132:25, 148:18, 149:16, 153:23, 161:5, 170:10, 181:9, 202:23, 259:17, 262:11

**fashion** [1] - 15:19

**fast** [3] - 135:7, 157:14, 163:11

**fault** [4] - 39:23, 236:2, 240:15, 240:18

**favor** [2] - 51:6, 110:5

**favorable** [7] - 84:20, 84:21, 101:7, 109:1, 109:25, 111:6, 111:13

**favorably** [8] - 63:22, 65:4, 67:19, 68:5, 69:6, 69:17, 81:1, 84:15

**favoring** [1] - 110:1

**favorite** [1] - 89:18

**February** [3] - 56:4, 56:8, 56:13

**FEBRUARY** [1] - 1:4

**Federal** [3] - 50:12, 108:17, 110:13

**feedback** [1] - 160:13

**feeds** [1] - 223:17

**fell** [3] - 114:17, 134:19, 245:4

**fellow** [1] - 32:25

**felt** [12] - 7:12, 131:24, 132:12, 133:15, 134:23, 157:16, 180:12, 180:15, 200:24, 200:25, 202:10, 214:20

**few** [10] - 48:5, 56:9, 63:4, 115:1, 149:18, 184:10, 189:24, 212:7, 219:19, 237:8

**fifteen** [1] - 47:22

**Fifth** [2] - 109:11, 109:17

**fifty** [3] - 259:6, 259:7, 259:20

**fight** [1] - 209:9

**fighting** [1] - 73:20

**Fil** [2] - 170:17, 170:22

**file** [3] - 254:2, 254:3, 254:4

**fill** [2] - 23:1, 95:13

**filling** [3] - 92:22, 92:24, 93:3

**fills** [1] - 77:3

**final** [4] - 26:25, 183:10, 217:15, 219:19

**finally** [1] - 161:6

**finance** [2] - 159:24, 162:4

**Finance** [1] - 161:11

**financial** [1] - 54:3

**financially** [1] - 67:1

**findings** [2] - 98:12, 99:5

**fine** [4] - 70:18, 147:22, 230:2, 255:22

**finish** [9] - 5:9, 5:12, 145:2, 149:21, 176:6, 220:18, 256:21, 256:23

**finished** [2] - 70:25, 176:8

**finishing** [4] - 143:6, 143:12, 145:4, 149:22

**fireworks** [3] - 147:9, 147:10, 148:3

**firm** [1] - 83:20

**First** [1] - 133:3

**first** [63] - 6:3, 8:24, 9:22, 19:15, 21:12, 22:3, 26:5, 26:9, 32:19, 44:3, 47:6, 52:17, 59:21, 63:5, 67:6, 70:16, 73:13, 78:13, 78:15, 79:13, 82:23, 83:19, 87:3, 91:14, 97:10, 104:6, 111:1, 112:23, 114:20, 115:13, 116:4, 116:6, 116:7, 116:9, 119:5, 119:11, 120:4, 128:21, 129:20, 134:9, 141:13, 143:3, 143:7, 143:11, 143:23, 144:5, 146:12, 148:12, 148:15, 168:1, 168:2, 168:4, 177:13, 189:18, 196:23, 224:11, 228:19, 230:5, 230:15, 235:19

**fit** [8] - 90:14, 95:10, 120:23, 165:7, 180:14, 181:6, 200:16, 200:22

**five** [25] - 5:15, 19:19, 20:12, 32:18, 61:14, 108:4, 118:18, 118:22, 141:21, 147:13, 155:14, 182:25, 199:20, 203:13, 203:25, 204:1, 204:6, 208:11, 214:5, 220:21, 231:7, 240:6, 251:3, 251:6

**five-minute** [1] - 220:21

**fixtures** [1] - 153:8

**flexible** [2] - 16:1, 32:1

**flies** [1] - 97:11

**flip** [6] - 116:23, 128:7, 130:8, 132:1, 154:15

**floating** [3] - 30:24, 260:3, 260:16

**floor** [4] - 14:17, 145:9, 159:16, 180:2

**Flor** [2] - 168:20, 245:22

**flow** [2] - 254:8, 254:18

**Flowers** [2] - 88:8, 88:14
**flows** [1] - 33:18
**fluent** [2] - 196:8, 196:9
**fluid** [2] - 19:10, 19:13
**Fluor** [1] - 245:15
**flux** [1] - 215:11
**FO** [5] - 95:24, 187:8, 187:20, 252:10, 252:12
**focus** [4] - 83:10, 87:17, 215:14, 247:13
**focused** [3] - 166:8, 166:10, 201:19
**focuses** [1] - 101:22
**folder** [2] - 212:8, 254:4
**folks** [2] - 190:14, 258:6
**follow** [5] - 47:6, 81:24, 95:6, 182:16, 230:14
**follow-ups** [1] - 47:6
**followed** [1] - 122:15
**following** [21] - 5:3, 50:5, 55:25, 61:13, 71:12, 72:20, 112:8, 121:16, 126:12, 128:24, 140:20, 183:5, 183:12, 183:19, 195:20, 196:2, 200:2, 200:16, 200:25, 231:19, 262:6
**follows** [6] - 6:4, 52:17, 60:25, 82:2, 112:24, 141:14
**followup** [2] - 128:5, 231:15
**food** [6] - 199:19, 199:21, 199:22, 199:23, 207:21
**Food** [1] - 210:16
**footer** [2] - 96:22, 184:21
**footing** [1] - 118:1
**FOR** [3] - 1:1, 1:17, 1:19
**force** [10] - 22:10, 22:11, 168:3, 168:8, 169:4, 201:23, 205:8, 205:12, 255:24, 256:8
**forced** [2] - 133:21, 166:15
**forcing** [1] - 88:21
**foreclosed** [1] - 139:3
**foregoing** [1] - 262:18
**foreign** [7] - 87:2, 87:7, 90:19, 90:25, 91:1, 91:7, 97:13
**foreign-related** [1] - 87:7
**forget** [1] - 39:20
**forgotten** [1] - 132:23
**form** [5] - 16:25, 77:2, 77:4, 133:11, 183:10
**format** [1] - 172:5
**former** [1] - 252:24
**forth** [5] - 106:23, 115:17, 115:21, 152:9, 215:19
**forward** [12] - 5:25, 84:6, 87:18, 120:8, 123:15, 124:13, 128:8, 132:13, 141:15, 147:22, 186:7, 210:6
**FOs** [1] - 252:15
**foundation** [5] - 15:12, 176:13, 176:16, 176:18, 247:20
**Foundational** [2] - 7:18, 7:19
**four** [88] - 9:18, 9:19, 20:12, 30:20, 32:18, 42:21, 42:22, 42:24, 43:11, 44:2, 44:13, 44:16, 45:5, 45:7, 45:17, 45:25, 46:12, 53:9, 53:25, 54:25, 58:19, 64:3, 64:4, 66:14, 66:23, 67:8, 68:20, 73:25, 74:8, 74:24, 75:1, 75:4, 75:20, 75:23, 76:7, 76:10, 78:22, 82:8, 83:22, 84:4, 85:5, 85:9, 89:5, 89:7, 96:9, 96:10, 97:12, 99:3, 99:8, 112:6, 116:23, 129:13, 162:8, 163:1, 165:4, 175:23, 177:22, 177:23, 195:13, 197:16, 199:19, 203:25, 204:1, 204:5, 208:12, 208:13, 219:3, 222:7, 222:13, 222:15, 222:22, 224:4, 224:18, 224:20, 224:24, 225:6, 225:17, 227:12, 236:7, 236:9, 236:11, 236:12, 236:21, 238:23, 251:19, 254:14, 254:21
**four-and-a-half** [3] - 162:8, 163:1, 165:4
**fours** [1] - 181:12
**fourteen** [1] - 47:22
**Fourth** [14] - 51:9, 59:6, 69:19, 72:4, 72:5, 72:20, 83:8, 86:24, 88:6, 88:15, 109:22, 110:3, 110:8, 110:13
**fourth** [1] - 67:9
**Fowler** [23] - 16:9, 19:4, 21:23, 28:22, 29:4, 116:23, 122:6, 122:24, 128:21, 173:11, 174:3, 175:17, 177:9, 178:13, 184:17, 186:2, 186:16, 188:13, 189:24, 198:13, 209:14, 210:12, 210:19
**frame** [3] - 21:18, 71:6, 99:13
**frames** [1] - 77:15
**framing** [3] - 80:22, 91:15, 91:18
**frankly** [1] - 248:1
**free** [2] - 228:2, 228:3
**frequently** [2] - 94:25, 136:7
**fresh** [2] - 71:5, 215:21
**Friday** [2] - 119:7, 119:12
**friendly** [4] - 127:1, 172:14, 219:11, 219:12
**Friendship** [4] - 89:18, 89:19, 90:14, 91:6
**fringe** [1] - 247:15
**front** [8] - 5:25, 16:22, 18:14, 18:19, 120:14, 123:6, 225:3, 258:22
**fruition** [1] - 85:24
**full** [5] - 106:22, 113:6, 141:22, 145:8, 197:20
**fully** [1] - 108:18
**function** [141] - 30:21, 42:21, 42:23, 43:11, 43:15, 43:22, 44:1, 44:2, 44:9, 44:14, 45:5, 45:7, 45:9, 45:10, 45:12, 45:14, 45:25, 46:12, 47:12, 53:9, 53:16, 53:17, 53:24, 54:2, 54:10, 54:24, 54:25, 55:4, 55:5, 55:8, 55:12, 58:14, 58:19, 62:17, 62:18, 64:3, 64:4, 64:7, 66:2, 66:10, 66:13, 66:14, 66:19, 66:22, 67:7, 68:9, 68:15, 68:16, 68:20, 68:24, 69:8, 69:9, 73:20, 73:25, 74:5, 74:8, 74:23, 75:1, 75:3, 75:20, 75:23, 75:25, 76:6, 76:7, 76:10, 78:22, 78:23, 81:19, 81:21, 81:23, 82:3, 82:6, 82:8, 83:22, 83:23, 84:3, 84:4, 96:9, 96:10, 99:7, 99:8, 160:25, 161:25, 173:13, 173:15, 173:25, 174:5, 174:9, 175:18, 175:21, 175:23, 177:7, 177:8, 177:16, 177:20, 179:6, 179:9, 179:10, 179:21, 180:18, 180:22, 181:9, 181:11, 181:12, 184:1, 186:12, 187:24, 188:3, 190:25, 197:16, 199:2, 199:5, 214:15, 221:7, 221:10, 221:21, 222:6, 222:7, 222:13, 222:15, 222:21, 222:25, 223:17, 223:18, 224:16, 224:18, 224:20, 225:6, 225:16, 225:17, 227:5, 227:6, 227:7, 232:6, 232:7, 232:23, 236:9, 236:24, 240:11, 245:13
**functions** [5] - 96:19, 103:24, 192:15, 238:1, 247:2
**funding** [1] - 95:15
**furthering** [1] - 138:14
**future** [10] - 53:8, 58:20, 59:5, 65:23, 67:10, 68:21, 83:4, 83:24, 84:7, 84:8

**G**

**Gallerizzo** [1] - 109:21
**GALLERIZZO** [1] - 109:21
**gap** [1] - 241:20
**Garth** [2] - 214:19, 236:23
**gathered** [1] - 130:22
**gathering** [1] - 115:19
**general** [5] - 42:15, 86:22, 106:15, 165:24, 170:14
**generally** [1] - 169:23
**gentleman** [4] - 134:17, 134:22, 192:18, 235:21
**genuinely** [1] - 131:23
**German** [32] - 41:1, 85:16, 99:20, 103:14, 156:20, 163:21, 189:3, 193:8, 193:22, 193:25, 194:5, 194:8, 194:18, 194:23, 194:25, 195:2, 195:3, 196:6, 196:8, 196:9, 196:10, 196:15, 196:18, 207:7, 228:9, 231:10, 247:17, 249:3, 251:21, 251:23
**Germans** [3] - 230:1, 249:2, 249:5
**Germany** [42] - 22:13, 35:5, 48:15, 74:21, 79:2, 86:11, 87:14, 89:1, 90:1, 92:21, 93:13, 94:4, 94:16, 95:14, 95:18, 96:5, 96:11, 96:14, 96:25, 97:1, 97:5, 99:20, 100:13, 100:15, 150:10, 150:11, 151:20, 151:21, 154:8, 154:9, 156:15, 163:24, 187:7, 193:10, 244:6, 244:7, 244:8, 244:9, 244:13, 246:21, 250:10, 251:16
**Gesprach** [1] - 189:5
**Gilmore** [10] - 46:20, 74:11, 75:2, 75:21, 237:14, 237:17, 237:21, 238:10, 238:19, 257:1
**Gilmore's** [1] - 216:1

**given** [13] - 38:1, 66:20, 75:6, 80:19, 83:4, 106:21, 136:23, 165:17, 168:3, 195:4, 227:25, 228:1, 249:19
**glad** [2] - 5:21, 50:8
**global** [3] - 89:8, 217:5, 217:6
**Global** [1] - 33:25
**Goldin** [1] - 51:11
**Government** [1] - 199:25
**government** [2] - 202:23, 232:5
**Governor** [4] - 147:15, 147:16, 147:20, 148:3
**grade** [66] - 13:2, 13:14, 45:20, 46:5, 46:11, 47:7, 47:10, 47:15, 47:16, 54:13, 54:16, 63:25, 65:16, 65:19, 65:22, 66:6, 66:16, 66:20, 66:21, 66:23, 66:24, 67:8, 67:10, 68:10, 72:8, 76:14, 78:21, 82:2, 96:15, 153:2, 158:14, 158:17, 158:18, 158:20, 160:5, 161:21, 161:22, 161:25, 173:20, 184:4, 184:8, 186:14, 190:2, 190:24, 191:1, 191:6, 191:18, 192:14, 199:14, 204:17, 212:14, 214:1, 214:12, 214:14, 215:23, 215:24, 216:1, 216:9, 222:25, 236:15, 236:17, 237:3, 240:24, 241:21, 245:12
**graded** [18] - 42:23, 44:8, 44:9, 44:10, 81:20, 158:15, 173:19, 199:7, 199:8, 199:9, 215:2, 216:6, 224:22, 236:10, 236:13, 236:17, 236:20
**grades** [5] - 173:15, 189:22, 240:11, 240:12, 242:8
**grading** [14] - 96:7, 96:9, 96:16, 96:17, 158:14, 173:15, 173:18, 174:9, 186:21, 187:23, 199:7, 222:6, 224:23
**grand** [3] - 146:24, 147:6, 147:8
**grant** [2] - 108:23, 109:12
**granted** [2] - 60:22, 110:7
**granting** [1] - 50:19
**graphic** [2] - 186:5, 210:7
**grasp** [1] - 154:19
**grateful** [1] - 132:24
**great** [12] - 24:22, 25:3, 25:4, 33:5, 109:13, 131:24, 138:9, 138:10, 148:8, 201:6, 218:14, 237:6
**Great** [1] - 24:23
**greater** [1] - 70:22
**greatly** [1] - 122:20
**green** [1] - 155:15
**Greenville** [2] - 113:24, 124:15
**GREENVILLE** [4] - 1:3, 1:18, 1:22, 2:5
**Greenwood** [1] - 143:4
**Greer** [1] - 7:1
**greetings** [1] - 197:6
**Greg** [2] - 115:18, 116:5
**Gregory** [1] - 254:25
**grossly** [1] - 193:24
**ground** [1] - 65:10
**groundbreaking** [2] - 142:18, 142:20
**grounds** [2] - 25:14, 81:11
**group** [12] - 80:4, 80:5, 80:8, 147:18, 168:2, 200:2, 202:20, 229:15, 240:13, 240:16, 243:23
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**Group** [7] - 93:23, 113:14, 113:15, 113:17, 184:23, 206:10, 206:15
**groups** [1] - 229:14
**grow** [4] - 35:2, 156:24, 158:10, 162:19
**growing** [6] - 155:2, 155:3, 163:11, 215:13
**growth** [5] - 15:7, 17:25, 19:13, 157:24, 218:16
**guess** [9] - 76:14, 105:8, 122:14, 162:14, 173:17, 189:15, 195:25, 244:23, 252:5
**guideline** [6] - 189:16, 190:16, 190:19, 254:13, 260:7
**guidelines** [22] - 11:4, 64:2, 64:11, 81:2, 89:11, 89:16, 188:25, 190:21, 191:19, 191:22, 191:23, 192:16, 200:3, 201:1, 203:8, 246:24, 254:8, 254:17, 260:11, 260:16, 260:19, 260:25
**guilty** [1] - 202:8
**guy** [1] - 32:7
**guys** [2] - 136:15, 230:16

### H

**half** [9] - 6:22, 149:23, 159:23, 162:8, 163:1, 165:4, 209:22, 239:5, 240:9
**Hall** [6] - 10:1, 10:2, 10:11, 10:14, 10:17, 24:16
**Hamilton** [1] - 51:13
**hand** [10] - 6:2, 59:11, 112:22, 141:8, 141:12, 216:17, 216:23, 220:22, 240:21, 243:13
**handed** [3] - 59:17, 115:11
**handful** [1] - 54:11
**handing** [2] - 39:21, 59:12
**happy** [10] - 24:15, 25:4, 78:11, 87:15, 87:16, 117:22, 158:5, 166:11, 168:5, 168:6
**hard** [16] - 27:8, 28:10, 132:12, 137:23, 154:24, 168:9, 170:14, 206:2, 228:13, 229:3, 229:4, 229:6, 230:10, 231:2, 234:19, 253:6
**harder** [1] - 229:5
**hardship** [1] - 5:18
**harm** [18] - 51:21, 52:5, 52:12, 52:17, 54:5, 54:6, 54:22, 56:24, 57:19, 57:22, 58:25, 59:1, 59:16, 61:4, 61:16, 62:20, 62:23, 64:17
**harmed** [1] - 81:25
**harness** [1] - 150:3
**hate** [3] - 136:16, 143:16, 147:15
**head** [9] - 71:5, 88:21, 88:23, 158:10, 165:15, 165:19, 166:2, 174:16, 202:15
**head-count** [1] - 88:23
**headed** [1] - 37:15
**heading** [1] - 139:10
**headquarters** [2] - 157:2, 253:1
**heads** [1] - 185:3
**Health** [2] - 200:5, 210:15
**health** [6] - 100:3, 166:9, 174:20, 188:6, 200:6, 200:7
**healthy** [2] - 166:11, 199:23
**hear** [10] - 5:21, 24:3, 24:5, 24:6, 50:8, 76:19, 93:10, 106:11, 138:18
**heard** [29] - 5:3, 26:9, 49:25, 50:5, 80:5, 100:14, 102:17, 108:3, 108:18, 112:8, 140:20, 141:21, 160:2, 162:20, 171:7, 171:8, 183:5, 183:12, 183:19, 184:7, 195:20, 204:23, 218:9, 231:19, 233:12, 239:1, 239:3, 262:1, 262:6
**hearing** [5] - 137:4, 182:23, 193:17, 229:18, 262:14
**hearsay** [2] - 25:14, 147:20
**Heinrichsdorff** [1] - 228:6
**held** [18] - 12:21, 49:11, 50:7, 51:9, 51:19, 56:25, 57:15, 57:16, 60:25, 98:16, 101:20, 108:8, 137:3, 182:22, 183:17, 193:16, 220:14, 229:17
**Helicopteros** [1] - 86:25
**Hello** [1] - 197:3
**hello** [1] - 118:12
**help** [17] - 117:22, 118:16, 120:6, 120:8, 134:18, 150:14, 164:15, 166:5, 166:7, 205:13, 205:15, 205:23, 207:20, 209:9, 219:4, 240:21, 261:12
**helped** [8] - 24:18, 117:22, 143:13, 157:24, 164:3, 208:8, 209:8, 237:23
**helpful** [9] - 78:17, 201:17, 217:6, 219:6, 233:22, 235:17, 241:19, 257:15, 258:2
**helping** [1] - 114:16
**hereby** [2] - 111:8, 111:15
**HERKERT** [1] - 72:2
**Herkert** [2] - 76:4, 83:7
**herring** [1] - 55:2
**herself** [5] - 54:4, 56:11, 87:21, 225:23, 227:1
**hesitation** [1] - 105:10
**hi** [1] - 124:18
**hidden** [1] - 212:8
**high** [1] - 253:6
**high-ranking** [1] - 253:6
**higher** [7] - 47:14, 47:16, 160:15, 170:21, 170:25, 202:20, 204:9
**highest** [2] - 160:4, 203:20
**highlighted** [3] - 21:2, 61:14, 86:9
**highlights** [1] - 89:5
**highway** [2] - 146:22, 147:14
**HIPAA** [1] - 100:10
**hire** [10] - 113:12, 157:17, 214:16, 214:18, 214:19, 215:15, 218:16, 234:1, 234:9, 237:8
**hired** [19] - 8:4, 8:7, 8:8, 8:9, 8:10, 84:3, 100:21, 131:3, 131:6, 131:7, 142:11, 172:15, 218:13, 235:19, 237:23, 238:14, 238:15, 257:5, 257:6
**hires** [1] - 88:15
**hiring** [7] - 14:13, 35:7, 35:8, 91:8,

145:5, 237:25, 238:4
**history** [4] - 3:22, 148:25, 149:16, 166:23
**History** [1] - 3:23
**hit** [1] - 204:17
**hitting** [1] - 261:9
**hold** [4] - 50:15, 55:5, 126:7, 208:2
**Holiday** [1] - 110:2
**holidays** [2] - 132:8, 132:10
**home** [7] - 52:9, 103:25, 114:17, 114:18, 167:25, 168:3, 175:13
**honestly** [1] - 130:2
**Honor** [129] - 5:23, 16:13, 25:13, 31:8, 34:16, 35:22, 39:21, 44:17, 46:23, 46:25, 47:3, 47:23, 48:21, 49:6, 50:9, 50:10, 51:7, 51:12, 54:19, 55:2, 57:1, 57:5, 59:9, 59:12, 61:15, 63:4, 68:13, 70:2, 70:8, 70:10, 70:14, 71:8, 72:25, 74:19, 75:24, 76:11, 77:14, 79:16, 82:18, 82:20, 82:22, 82:24, 83:14, 85:1, 85:2, 85:12, 85:14, 85:15, 85:17, 86:1, 86:14, 87:14, 87:19, 88:14, 89:17, 90:12, 91:11, 92:7, 93:22, 97:9, 98:14, 98:24, 99:5, 101:11, 101:13, 102:9, 102:15, 103:12, 103:17, 105:24, 106:3, 107:24, 107:25, 108:3, 111:17, 111:23, 112:1, 112:19, 123:1, 134:1, 134:3, 136:25, 138:17, 138:25, 139:13, 141:3, 141:4, 141:5, 141:10, 147:19, 149:3, 157:5, 157:8, 164:20, 164:23, 176:3, 176:12, 177:25, 182:19, 185:14, 191:8, 191:12, 193:14, 193:19, 194:17, 195:21, 211:19, 211:21, 212:20, 214:3, 219:16, 229:20, 231:9, 231:17, 234:22, 235:4, 239:7, 246:2, 247:10, 247:24, 249:4, 250:16, 253:15, 255:13, 255:16, 256:10, 256:13, 261:2
**honor** [1] - 91:14
**Honor's** [1] - 85:22
**HONORABLE** [1] - 1:13
**hope** [3] - 5:6, 197:3, 262:3
**Horn** [8] - 57:7, 57:10, 57:21, 58:2, 58:21, 59:4, 79:17, 79:18
**Horstmeier** [2] - 92:22, 97:24
**hot** [1] - 143:10
**hour** [2] - 126:18, 220:20
**hourly** [1] - 168:17
**hours** [4] - 121:14, 127:7, 135:2, 139:11
**house** [3] - 116:16, 134:11, 134:18
**housekeeping** [1] - 195:22
**HR** [96] - 6:20, 7:18, 7:19, 7:20, 7:24, 7:25, 8:1, 8:3, 9:3, 9:4, 9:10, 9:16, 9:17, 9:22, 9:24, 9:25, 10:1, 10:4, 10:6, 10:24, 10:25, 11:6, 11:7, 11:15, 11:21, 14:8, 24:4, 26:2, 33:12, 35:13, 45:12, 45:20, 53:5, 68:10, 78:13, 78:15, 81:9, 88:24, 89:7, 89:8, 94:4, 95:9, 99:24, 100:8, 103:23, 117:19, 124:19, 125:17, 130:20, 131:5, 131:7, 131:13, 131:14, 136:2, 165:23, 165:24, 166:4, 166:13, 166:15, 172:19, 172:21, 173:14, 173:23, 185:20, 187:5, 202:4, 202:6, 203:5, 203:21, 211:15, 217:12, 219:3, 227:19, 232:2, 232:6, 232:9, 232:11, 232:14, 232:22, 237:5, 237:17, 237:20, 238:1, 240:10, 241:23, 243:15, 251:10, 253:22, 255:10, 255:11
**HR-type** [1] - 232:6
**HRMIS** [1] - 3:20
**HRs** [1] - 202:3
**Hubbell** [4] - 125:15, 125:16, 125:17, 241:6
**huge** [2] - 147:10, 147:13
**Hukill** [1] - 101:22
**human** [2] - 131:10, 219:15
**Human** [34] - 7:25, 8:2, 8:12, 9:12, 12:14, 12:18, 14:1, 21:25, 23:17, 23:23, 24:13, 55:11, 55:14, 60:11, 60:13, 74:9, 84:11, 120:21, 136:1, 142:2, 142:7, 164:6, 164:19, 165:1, 165:3, 174:11, 174:24, 178:10, 190:14, 209:23, 219:12, 219:14, 226:9, 226:11
**hundred** [13] - 105:23, 130:1, 130:3, 148:22, 152:8, 165:17, 171:21, 175:10, 175:11, 206:11, 206:13, 226:12, 256:4
**hunting** [1] - 31:25
**hurt** [4] - 27:9, 80:4, 80:8, 80:22
**husband** [7] - 114:14, 114:15, 114:19, 114:21, 116:5, 134:12, 152:9
**hypothetical** [1] - 61:2

**I**

**idea** [1] - 190:20
**ideas** [6] - 89:9, 154:20, 233:17, 233:18, 237:1, 237:6
**identifiable** [2] - 51:21, 61:4
**identified** [2] - 169:24, 194:6
**identify** [3] - 54:2, 54:5, 247:22
**II** [1] - 2:2
**ill** [1] - 128:18
**Illinois** [1] - 109:10
**immediately** [1] - 13:5
**impact** [4] - 30:16, 53:25, 54:2, 66:25
**impacted** [3] - 54:18, 66:18, 212:18
**impediment** [3] - 186:6, 259:11, 259:14
**implement** [2] - 245:16, 245:23
**implementation** [1] - 241:22
**implementing** [1] - 76:17
**implication** [1] - 230:25
**importance** [1] - 233:15
**important** [36] - 5:11, 54:7, 78:7, 79:19, 83:3, 86:3, 86:13, 86:15, 88:4, 89:19, 89:25, 90:12, 90:21, 163:19, 163:21, 166:13, 174:13, 174:21, 184:13, 199:18, 200:11, 200:13, 200:14, 202:16, 208:23, 216:16, 219:24, 231:24, 232:1, 232:8, 233:4, 237:5, 238:23, 240:23
**importantly** [2] - 85:25, 224:7
**imposed** [1] - 110:20
**impressed** [1] - 122:17
**impression** [7] - 93:9, 93:11, 122:16, 137:16, 139:9, 164:22, 166:1
**improved** [1] - 257:21
**IN** [1] - 1:1
**in-person** [2] - 126:5, 129:22
**inadmissible** [1] - 137:11
**inappropriate** [1] - 89:16
**inaudible** [1] - 213:18
**inbound** [1] - 198:9
**Inc** [4] - 110:2, 110:13, 110:22, 110:24
**inclined** [1] - 220:16
**included** [1] - 82:24
**includes** [2] - 92:17, 174:20
**including** [7] - 52:8, 60:14, 80:12, 90:15, 93:4, 100:4, 108:12
**incoming** [1] - 53:5
**inconvenience** [1] - 5:18
**incorporated** [1] - 98:17
**incorporates** [1] - 70:11
**incorrect** [3] - 98:4, 105:24, 142:8
**incorrectly** [4] - 99:13, 138:19, 195:6, 238:4
**increase** [5] - 13:14, 186:21, 186:22, 208:13, 213:24
**increased** [2] - 47:7, 65:15
**increasing** [1] - 212:19
**independent** [1] - 261:23
**INDEX** [3] - 3:1, 3:16, 4:1
**India** [1] - 193:1
**indicate** [3] - 66:8, 120:25, 121:8
**indicated** [1] - 63:7
**indication** [1] - 117:10
**individual** [3] - 41:22, 130:20, 133:5
**individuals** [4] - 19:11, 43:7, 121:25, 133:1
**indulgence** [1] - 261:10
**Industries** [1] - 88:8
**industry** [1] - 123:14
**inferences** [1] - 109:23
**info** [1] - 99:25
**information** [20] - 15:18, 17:10, 20:20, 37:24, 37:25, 108:11, 115:12, 115:20, 115:22, 117:5, 117:10, 118:7, 125:5, 130:23, 138:1, 139:14, 182:15, 207:19, 246:15, 247:1
**informing** [1] - 242:7
**inherit** [1] - 201:11
**initial** [6] - 22:2, 22:3, 26:22, 120:10, 120:16, 122:14
**Inn's** [1] - 110:2

**input** [1] - 134:21
**inside** [11] - 8:22, 31:25, 146:13, 150:5, 150:13, 166:21, 188:5, 200:1, 200:6, 215:17, 236:22
**insightful** [1] - 219:10
**insinuate** [4] - 225:4, 226:24, 226:25, 231:10
**insinuated** [1] - 226:20
**insinuation** [3] - 55:9, 225:13, 225:14
**installed** [1] - 159:5
**instance** [1] - 86:20
**instead** [7] - 57:1, 57:3, 65:24, 69:13, 88:6, 110:15, 155:5
**instructed** [2] - 64:6, 140:9
**instruction** [6] - 87:22, 229:23, 230:3, 230:24, 231:3, 231:13
**instructive** [1] - 62:9
**insufficient** [1] - 67:17
**insurance** [3] - 166:9, 168:16, 200:10
**integrate** [1] - 154:12
**integrated** [20] - 86:2, 87:12, 89:14, 90:18, 91:3, 91:4, 101:17, 101:23, 102:17, 102:22, 103:24, 104:18, 104:24, 105:13, 105:15, 105:18, 105:20, 107:4, 111:4, 154:13
**intelligence** [3] - 52:1, 52:2, 52:7
**intend** [3] - 70:5, 219:20, 219:22
**intention** [1] - 171:18
**interact** [2] - 167:3, 169:13
**interaction** [1] - 27:3
**interactions** [1] - 252:12
**interchangeably** [1] - 238:3
**interested** [8] - 13:25, 121:23, 121:24, 122:10, 125:5, 125:6, 135:12
**interesting** [2] - 79:8, 92:3
**interests** [2] - 129:5
**interfaced** [1] - 33:24
**interior** [2] - 150:2, 155:19
**internal** [3] - 21:6, 32:2, 215:18
**internally** [3] - 175:15, 214:20, 214:21
**international** [43] - 18:2, 18:8, 34:11, 34:15, 34:20, 34:23, 35:3, 36:14, 37:12, 37:14, 37:16, 37:18, 37:19, 39:6, 39:13, 39:16, 40:24, 41:2, 42:5, 42:7, 42:16, 48:6, 48:15, 48:17, 48:18, 48:24, 52:23, 86:10, 95:22, 96:9, 152:4, 152:5, 152:6, 152:18, 152:23, 163:18, 175:12, 187:14, 187:25, 207:5, 209:2, 228:4
**International** [1] - 59:22
**interpreted** [1] - 251:12
**interrupt** [2] - 43:1, 143:16
**interrupted** [2] - 151:15, 208:16
**interrupting** [1] - 150:19
**interview** [2] - 161:2, 207:9
**interviewed** [2] - 130:24, 130:25
**introduce** [1] - 124:19
**introduced** [4] - 94:6, 110:10, 114:18, 251:1
**invest** [1] - 233:19
**invested** [1] - 127:8
**investing** [1] - 234:3
**investment** [3] - 218:10, 218:17, 233:14
**invoke** [1] - 87:5
**involve** [2] - 90:18, 105:25
**involved** [12] - 91:5, 92:5, 92:6, 92:24, 93:3, 94:19, 97:7, 102:12, 104:16, 145:20, 200:19, 261:23
**involvement** [6] - 86:5, 87:11, 94:18, 98:1, 101:21, 105:14
**ish** [2] - 114:23, 128:17
**issue** [38] - 50:16, 50:22, 57:13, 64:19, 85:12, 85:23, 87:24, 88:4, 91:16, 91:18, 93:25, 95:7, 97:9, 98:9, 99:13, 101:3, 102:10, 105:20, 108:18, 108:21, 108:22, 109:1, 137:12, 137:25, 171:3, 190:9, 193:3, 208:16, 221:3, 230:5, 230:6, 230:20, 230:21, 230:22, 233:20, 246:1, 246:22
**issued** [5] - 51:16, 54:11, 59:14, 71:20, 77:5
**issues** [18] - 13:21, 49:15, 50:18, 70:19, 70:20, 80:6, 102:2, 106:3, 106:4, 106:8, 111:3, 111:8, 138:20, 165:20, 166:3, 170:11, 201:22, 201:23
**IT** [5] - 20:17, 151:3, 155:25, 182:13
**item** [3] - 27:19, 209:16, 227:15
**items** [2] - 89:7, 184:10
**itself** [3] - 87:4, 88:1, 178:3

**J**

**jackets** [1] - 147:11
**JACKSON** [1] - 2:3
**January** [15] - 55:22, 55:23, 56:17, 56:18, 56:19, 65:18, 74:22, 132:3, 132:8, 132:17, 132:21, 179:23, 211:9, 234:12
**Japan** [1] - 98:18
**Japanese** [1] - 98:16
**Jersey** [4] - 17:19, 17:20, 17:22, 34:8
**JFDS** [1] - 3:19
**Job** [1] - 113:19
**job** [109] - 14:16, 31:25, 32:4, 37:21, 51:25, 52:7, 53:17, 53:19, 53:20, 56:10, 57:4, 62:17, 64:10, 64:16, 64:22, 66:2, 66:19, 68:16, 73:14, 74:7, 78:22, 79:12, 82:3, 84:2, 84:3, 100:6, 119:25, 120:11, 120:18, 120:25, 121:15, 123:18, 124:16, 127:5, 129:11, 131:5, 131:15, 131:17, 131:22, 135:18, 135:21, 136:5, 136:14, 137:18, 137:23, 138:10, 139:3, 139:10, 143:6, 149:16, 151:22, 151:24, 153:15, 159:7, 159:22, 159:24, 161:13, 162:7, 162:15, 162:16, 165:6, 166:23, 173:25, 174:5, 175:18, 177:16, 178:19, 179:14, 180:9, 180:10, 180:11, 191:1, 191:3, 212:5, 215:16, 215:18, 216:22, 216:24, 217:2, 217:3, 219:14, 221:6, 221:9, 223:17, 223:18, 226:13, 227:5, 227:6, 232:23, 234:7, 236:6, 236:8, 236:10, 237:5, 238:14, 240:23, 241:4, 241:7, 248:3, 253:7, 253:8, 253:10, 255:4, 257:5, 258:2, 261:9
**jobs** [25] - 8:21, 8:22, 57:24, 100:18, 137:19, 151:22, 154:25, 170:17, 170:18, 170:19, 171:4, 172:2, 173:16, 173:18, 199:12, 202:8, 215:13, 215:19, 215:22, 234:1, 236:13, 236:16, 242:17, 243:15, 246:16
**Jodi** [1] - 210:6
**Johannes** [2] - 48:10, 48:11
**Johnson** [2] - 88:7, 88:14
**joins** [1] - 70:10
**joint** [1] - 210:6
**Judge** [14] - 40:8, 60:25, 112:6, 147:23, 178:23, 183:22, 194:10, 214:5, 225:19, 230:4, 241:1, 247:21, 249:7, 253:13
**judge** [2] - 109:8, 110:16
**JUDGE** [1] - 1:14
**judges** [1] - 112:12
**judgment** [25] - 50:11, 50:19, 54:21, 57:6, 58:3, 59:15, 60:22, 61:11, 63:2, 67:22, 69:25, 71:19, 73:10, 85:22, 90:7, 93:7, 106:4, 108:14, 108:23, 109:2, 109:18, 110:6, 110:11, 111:2, 111:10
**Judgment** [1] - 82:25
**July** [6] - 7:6, 66:17, 92:10, 175:6, 190:11, 242:12
**jump** [1] - 138:3
**jumped** [1] - 178:25
**jumps** [1] - 77:21
**June** [8] - 7:6, 17:6, 20:22, 21:3, 21:18, 57:9, 242:1, 242:2
**jurisdiction** [21] - 70:21, 85:20, 86:2, 86:20, 86:22, 86:23, 87:2, 87:9, 91:16, 91:19, 101:22, 101:24, 101:25, 105:19, 105:22, 106:1, 106:7, 106:13, 106:15, 106:16, 111:3
**juror** [1] - 101:22
**jurors** [1] - 262:5
**jury** [70] - 5:2, 5:4, 5:5, 7:7, 7:14, 14:21, 49:13, 49:18, 50:6, 50:21, 51:5, 62:24, 69:23, 72:13, 91:4, 93:9, 101:16, 102:4, 104:2, 104:23, 105:8, 106:17, 107:12, 107:14, 108:19, 108:20, 109:16, 110:5, 110:16, 110:18, 112:7, 112:9, 112:10, 137:4, 137:5, 137:20, 138:6, 139:2, 142:25, 153:4, 155:11, 170:22, 171:8, 181:25, 182:7, 182:23, 182:24, 183:6, 183:13, 183:18, 183:20, 193:12, 193:17,

193:18, 194:5, 204:4, 220:15, 220:16, 225:3, 226:3, 226:20, 229:18, 229:19, 230:17, 231:3, 231:14, 232:8, 253:5, 261:8, 262:7
**JURY** [1] - 1:14

### K

**Kathy** [1] - 17:15
**Kavit** [3] - 192:19, 192:20, 192:25
**keep** [25] - 30:23, 40:24, 41:1, 41:2, 44:14, 45:10, 49:24, 53:5, 64:24, 73:20, 78:8, 78:17, 166:8, 166:11, 168:16, 187:10, 187:12, 187:17, 189:23, 219:9, 220:17, 220:19, 220:23, 236:16, 246:2
**keeps** [3] - 73:10, 73:11, 212:19
**Keiser** [1] - 17:15
**Keith** [7] - 17:15, 19:17, 20:10, 20:14, 28:11, 30:11, 32:17
**KELLY** [1] - 1:3
**Kelly** [96] - 13:19, 19:24, 23:8, 24:10, 25:16, 26:3, 26:21, 26:23, 28:9, 29:7, 40:12, 42:4, 42:6, 42:12, 42:16, 42:17, 73:14, 73:19, 73:20, 73:24, 76:1, 81:7, 82:4, 82:5, 95:9, 95:12, 114:9, 114:15, 118:8, 118:9, 118:11, 123:19, 124:5, 126:22, 130:24, 133:10, 134:9, 134:10, 134:25, 136:4, 136:18, 167:2, 168:5, 168:14, 168:24, 169:9, 169:20, 171:18, 172:11, 180:5, 193:10, 199:16, 201:12, 203:19, 204:5, 205:1, 210:23, 212:3, 213:7, 213:9, 213:10, 217:9, 219:20, 220:2, 225:4, 225:13, 225:23, 226:20, 227:1, 229:8, 239:2, 239:5, 239:16, 239:19, 239:22, 240:10, 242:21, 242:23, 243:4, 243:6, 243:10, 244:5, 244:10, 245:7, 245:11, 246:8, 246:21, 247:6, 249:14, 249:16, 251:7, 252:11, 255:10, 255:23, 259:4, 259:21
**Kelly's** [4] - 125:17, 252:2, 252:3, 256:6
**kept** [3] - 129:15, 158:20, 222:5
**kicking** [1] - 172:24
**kills** [1] - 98:4
**kind** [27] - 16:6, 41:5, 65:9, 67:11, 101:22, 105:19, 125:4, 131:11, 136:21, 144:7, 148:9, 149:19, 150:4, 150:8, 155:3, 164:11, 164:13, 166:11, 168:23, 180:22, 185:19, 186:3, 188:2, 189:15, 197:6, 234:6, 234:9
**kinds** [4] - 145:3, 219:8, 233:23, 260:3
**Kinzer** [2] - 228:18, 228:20
**Kippenberger** [1] - 48:13
**Knit** [1] - 143:5
**knowing** [2] - 195:10, 201:18
**knowledge** [6] - 35:6, 35:9, 35:12, 176:14, 191:17, 217:4
**knowledgeable** [1] - 257:17
**knows** [6] - 178:5, 205:20, 248:17, 249:9, 251:23, 259:2
**Knudt** [4] - 168:20, 245:15, 245:22, 245:24
**Koepnick** [9] - 92:9, 92:14, 94:10, 94:17, 97:5, 102:25, 103:2, 103:8, 103:13
**Korean** [1] - 90:16
**KPIs** [2] - 257:20, 257:22
**KURT** [1] - 1:21

### L

**lab** [1] - 143:9
**labor** [4] - 93:25, 247:13, 247:16, 249:2
**lack** [1] - 32:3
**ladder** [1] - 76:7
**laid** [1] - 15:12
**Lamar** [1] - 6:14
**language** [1] - 196:19
**laptop** [1] - 31:20
**last** [9] - 8:3, 56:18, 97:12, 149:22, 197:25, 231:7, 254:21, 255:1, 255:5
**lastly** [2] - 89:11, 89:17
**late** [4] - 46:4, 52:24, 73:18, 184:12
**lateral** [1] - 66:5
**launched** [2] - 150:16, 150:22
**law** [23] - 50:11, 50:20, 63:2, 67:12, 67:22, 69:19, 69:25, 87:6, 99:21, 99:22, 100:2, 101:5, 101:10, 108:23, 108:25, 109:3, 109:5, 109:9, 109:18, 110:6, 110:11, 111:3, 111:10
**laws** [2] - 100:1, 104:19
**lawsuit** [1] - 60:4
**lawyer** [3] - 89:21, 206:17, 223:22
**lawyers** [1] - 5:13
**lay** [4] - 77:7, 143:13, 176:13, 176:18
**laying** [1] - 158:8
**layouts** [3] - 144:6, 144:23, 145:1
**lead** [10] - 20:21, 20:23, 20:24, 151:19, 156:18, 157:7, 159:10, 170:3, 191:10, 239:8
**leader** [8] - 25:4, 154:17, 211:21, 218:14, 220:9, 255:25, 256:2, 258:12
**leaders** [2] - 56:7, 257:18
**Leadership** [1] - 7:25
**leadership** [14] - 23:25, 135:8, 160:19, 169:17, 169:21, 178:19, 179:4, 188:16, 188:18, 188:23, 190:6, 191:21, 232:17, 236:7
**leading** [3] - 157:5, 191:8, 205:19
**leads** [1] - 14:24
**learn** [5] - 23:16, 26:5, 30:8, 162:19, 196:10
**learned** [3] - 53:4, 112:12, 196:14
**least** [4] - 33:12, 52:12, 77:9, 88:20
**Leather** [1] - 91:20
**leave** [13] - 7:2, 7:5, 7:8, 20:23, 22:21, 22:23, 49:8, 138:9, 141:7, 166:21, 197:22, 202:7, 240:15
**leaving** [8] - 23:20, 26:24, 120:19, 165:22, 182:10, 239:16, 243:18, 243:19
**led** [3] - 28:18, 29:25, 218:17
**Lee** [2] - 143:5, 144:15
**left** [22] - 12:11, 20:24, 31:1, 45:17, 56:24, 58:5, 72:17, 81:5, 84:2, 110:15, 175:2, 175:5, 213:10, 216:2, 228:22, 228:23, 229:9, 237:10, 237:14, 240:13, 240:14, 240:17
**legal** [9] - 49:14, 50:19, 62:24, 202:22, 242:3, 242:22, 242:23, 243:1, 260:24
**legally** [2] - 50:20, 108:20
**less** [13] - 57:14, 58:7, 58:8, 58:14, 58:15, 84:18, 116:15, 121:8, 139:10, 139:11, 180:9, 202:17
**lessened** [1] - 204:12
**letter** [13] - 55:17, 75:21, 77:2, 77:4, 77:5, 77:7, 77:8, 77:10, 139:20, 211:9, 235:25, 236:3, 238:18
**letters** [22] - 54:11, 55:20, 55:21, 75:5, 75:7, 75:14, 76:25, 168:4, 179:25, 190:13, 190:17, 191:25, 192:1, 192:3, 242:3, 242:4, 242:5, 242:7, 242:10, 242:12, 242:17, 242:19
**level** [141] - 21:11, 42:21, 42:23, 43:11, 43:15, 43:22, 44:1, 44:2, 44:9, 44:14, 45:5, 45:7, 45:9, 45:10, 45:12, 45:14, 45:25, 46:12, 47:12, 53:9, 53:16, 53:24, 54:2, 54:10, 54:24, 54:25, 55:4, 55:5, 55:8, 55:12, 58:14, 58:19, 62:18, 64:3, 64:4, 64:7, 65:2, 66:2, 66:10, 66:14, 66:19, 66:22, 67:8, 68:9, 68:15, 68:20, 68:24, 69:9, 73:21, 73:25, 74:5, 74:8, 74:24, 75:1, 75:4, 75:20, 75:23, 75:25, 76:7, 76:10, 78:22, 78:23, 81:19, 81:21, 81:24, 82:6, 82:8, 83:22, 83:23, 84:4, 84:13, 84:15, 84:19, 84:24, 90:10, 96:9, 96:10, 98:23, 99:1, 99:2, 99:3, 99:7, 99:8, 99:9, 122:18, 123:16, 130:21, 131:5, 136:13, 160:14, 161:1, 161:25, 174:9, 175:22, 175:23, 177:7, 177:8, 177:20, 179:6, 179:9, 179:10, 179:21, 180:19, 180:22, 181:9, 181:11, 181:12, 184:1, 186:12, 197:16, 199:2, 199:5, 214:15, 221:21, 222:7, 222:13, 222:15, 222:21, 224:4, 224:16, 224:18, 224:20, 225:6, 225:16, 225:17, 227:7, 236:7, 236:9, 236:24, 238:23
**levels** [8] - 67:5, 69:4, 82:3, 83:16, 173:13, 180:25, 185:1, 243:15
**LEWIS** [1] - 2:3
**Lexis** [4] - 57:8, 59:23, 60:1, 79:23
**liable** [4] - 101:20, 104:18, 104:19, 105:14

**liaison** [2] - 34:1, 34:2
**Liberty** [2] - 110:21, 237:12
**lie** [1] - 225:17
**life** [2] - 142:20, 148:10
**light** [3] - 109:24, 111:5, 111:12
**Lighting** [2] - 125:16, 241:6
**limit** [4] - 180:18, 183:25, 184:4, 199:4
**limited** [1] - 91:25
**line** [34] - 8:15, 8:16, 37:21, 40:4, 41:12, 60:6, 60:10, 74:19, 74:20, 78:6, 78:15, 119:5, 129:20, 138:24, 153:10, 155:25, 156:8, 172:17, 196:23, 213:1, 235:10, 235:11, 235:12, 235:15, 235:20, 238:7, 238:8, 250:6, 250:8, 256:22, 256:24
**lined** [1] - 147:12
**lines** [3] - 161:15, 211:12, 256:20
**list** [13] - 18:9, 18:11, 19:9, 19:10, 121:22, 121:24, 122:9, 125:18, 128:2, 129:4, 135:11, 149:8, 160:12
**listed** [9] - 18:3, 45:3, 45:5, 45:7, 53:16, 62:17, 66:1, 68:15, 125:15
**listening** [1] - 158:13
**listing** [1] - 125:3
**literally** [3] - 90:23, 110:17, 144:18
**live** [1] - 7:10
**lived** [1] - 134:16
**living** [2] - 113:11, 117:17
**LLC** [3] - 1:9, 2:2, 97:16
**LLP** [1] - 1:21
**Lobby** [1] - 110:21
**local** [3] - 86:10, 89:9, 246:16
**locally** [1] - 185:6
**located** [5] - 57:11, 94:3, 95:24, 145:25, 146:20
**location** [1] - 253:9
**locations** [2] - 247:18, 249:3
**logistics** [5] - 20:7, 20:8, 27:7, 32:6, 49:10
**Logistics** [5] - 10:16, 10:18, 10:20, 47:19, 153:21
**long-term** [1] - 15:4
**look** [51] - 16:21, 19:8, 23:11, 27:19, 32:15, 32:16, 61:9, 71:21, 84:6, 86:3, 86:24, 87:1, 88:23, 90:21, 96:21, 103:12, 114:24, 116:3, 118:21, 123:6, 125:22, 127:22, 132:15, 136:7, 137:20, 145:11, 148:11, 149:1, 171:15, 174:18, 175:17, 176:23, 185:13, 185:18, 186:1, 186:16, 189:8, 193:6, 196:21, 212:7, 212:25, 226:17, 235:24, 244:20, 244:21, 246:23, 260:9, 260:11, 261:20, 261:21
**looked** [13] - 15:5, 19:1, 82:1, 85:22, 97:3, 139:3, 145:22, 147:18, 186:3, 190:25, 195:23, 223:9, 236:25
**looking** [24] - 34:13, 49:20, 88:7, 90:23, 115:13, 120:3, 121:5, 121:8, 121:11, 121:12, 126:6, 129:14, 130:20, 135:7, 137:17, 137:19, 154:14, 158:6, 173:24, 178:24, 200:22, 202:6, 202:7, 215:14
**looks** [10] - 50:1, 98:25, 126:10, 127:14, 128:23, 129:1, 129:19, 149:12, 153:23, 222:25
**lose** [4] - 107:6, 201:8, 201:19
**losing** [4] - 170:15, 170:17, 171:1, 258:4
**loss** [4] - 72:8, 158:23, 218:1, 218:4
**lost** [2] - 52:7, 174:25
**Louis** [1] - 51:17
**loved** [1] - 89:21
**low** [3] - 66:19, 154:24, 248:21
**lower** [3] - 58:7, 58:15, 137:23
**lower-paying** [1] - 137:23
**lowered** [1] - 54:16
**lunch** [8] - 49:16, 108:8, 112:16, 119:4, 126:18, 130:2, 132:16, 150:21
**lying** [1] - 225:21

### M

**ma'am** [45] - 16:10, 114:3, 128:8, 141:6, 142:13, 142:14, 155:7, 157:1, 157:11, 158:11, 162:10, 166:15, 166:25, 172:4, 174:1, 177:1, 177:9, 178:16, 179:15, 180:4, 180:18, 183:14, 185:11, 186:19, 188:12, 188:14, 188:25, 189:22, 193:7, 198:22, 199:18, 202:25, 203:10, 204:11, 205:1, 207:1, 209:11, 218:9, 224:18, 227:13, 236:2, 258:3, 258:16, 258:19, 261:6
**machines** [1] - 151:23
**mad** [1] - 123:20
**Madewell** [10] - 57:4, 69:14, 130:16, 130:18, 131:1, 131:3, 131:15, 131:22, 135:18, 138:10
**MAIN** [1] - 2:4
**main** [4] - 7:9, 7:20, 164:16
**maintain** [1] - 253:8
**maintained** [3] - 108:25, 115:25, 173:6
**maintains** [1] - 96:14
**maintenance** [12] - 159:4, 159:5, 170:13, 170:14, 171:3, 208:1, 208:16, 208:18, 218:17, 218:18, 234:10
**makeup** [1] - 262:2
**male** [2] - 52:3, 68:5
**malfunctioned** [1] - 36:23
**man** [3] - 82:12, 131:8, 134:18
**manage** [3] - 131:10, 188:7, 257:19
**Management** [3] - 7:17, 210:16
**management** [27] - 7:21, 15:19, 21:14, 21:15, 34:25, 99:3, 180:16, 182:14, 186:22, 189:7, 200:6, 200:8, 217:18, 217:22, 232:15, 232:16, 243:23, 244:3, 244:18, 244:22, 246:9, 246:12, 250:25, 257:23, 258:1, 260:20, 260:22
**Manager** [27] - 10:11, 10:13, 10:16, 10:20, 10:24, 10:25, 11:15, 11:24, 13:16, 13:24, 14:6, 14:7, 33:16, 151:16, 151:17, 152:14, 153:1, 153:5, 153:13, 153:20, 153:22, 153:23, 156:13, 159:3, 170:11, 204:9, 227:11
**manager** [11] - 10:1, 10:4, 10:7, 15:24, 18:6, 32:13, 77:3, 100:12, 149:17, 197:23, 255:10
**Managers** [4] - 25:8, 27:13, 56:5, 173:7
**managers** [13] - 15:5, 15:12, 15:14, 16:7, 21:12, 28:9, 32:3, 32:25, 173:21, 180:12, 203:14, 203:21, 204:2
**mantra** [1] - 231:11
**manually** [1] - 145:16
**manufacture** [1] - 155:9
**manufacturer** [1] - 155:13
**Manufacturing** [36] - 7:3, 7:5, 7:8, 8:5, 8:7, 12:11, 12:13, 12:17, 14:22, 22:1, 23:18, 30:9, 31:1, 50:11, 50:23, 51:3, 53:22, 55:16, 57:3, 57:5, 58:5, 63:19, 67:15, 67:21, 68:8, 69:1, 69:23, 114:1, 114:7, 118:4, 141:25, 142:1, 142:4, 142:12, 155:15, 216:2
**MANUFACTURING** [2] - 1:9, 2:2
**manufacturing** [4] - 7:4, 55:3, 145:13, 218:5
**Manufacturing's** [1] - 52:14
**March** [3] - 184:20, 196:21, 213:4
**mark** [1] - 34:22
**marked** [7] - 16:23, 18:20, 36:22, 115:12, 118:21, 128:10, 223:6
**market** [9] - 31:24, 32:1, 33:1, 33:3, 33:4, 34:14, 40:25, 250:1
**marketing** [2] - 35:1, 123:20
**marketplaces** [1] - 199:22
**married** [1] - 152:10
**marry** [1] - 150:1
**Marsh** [1] - 109:10
**Martin** [1] - 197:9
**Master** [1] - 187:5
**master** [5] - 95:6, 154:14, 187:8, 187:11, 188:10
**matches** [1] - 246:24
**material** [1] - 195:7
**math** [2] - 206:17, 230:12
**Mathis** [1] - 110:23
**matter** [21] - 20:19, 50:11, 50:20, 63:2, 67:22, 69:25, 83:13, 101:9, 104:7, 108:23, 109:3, 109:18, 110:6, 110:11, 111:3, 111:10, 173:13, 181:8, 185:8, 214:15, 262:20
**matters** [5] - 77:12, 83:12, 92:13, 112:14, 217:16
**MB** [1] - 61:8
**MBUSI** [1] - 61:19
**MC** [77] - 3:22, 3:23, 5:24, 28:23, 34:6, 34:20, 35:15, 35:17, 48:25, 54:8, 56:18, 56:24, 63:1, 64:3, 70:11, 86:17, 86:18, 87:23, 87:25, 88:1, 89:8, 91:22, 93:12,

93:16, 93:19, 94:15, 94:17, 94:21, 95:6, 96:12, 96:15, 96:18, 96:19, 96:22, 97:16, 98:21, 98:25, 99:9, 101:17, 103:7, 104:23, 107:24, 111:9, 112:19, 141:10, 143:24, 155:11, 157:1, 162:13, 163:9, 163:16, 169:1, 170:7, 174:4, 176:25, 177:12, 178:14, 185:12, 187:8, 196:12, 196:13, 197:14, 198:10, 201:16, 204:2, 206:3, 212:10, 217:16, 217:18, 217:21, 217:25, 219:4, 219:22, 230:16, 230:17, 230:18
**MC's** [3] - 35:7, 35:9, 35:12
**McClimon** [5] - 146:8, 146:10, 146:20, 147:4, 149:20
**MCCOY** [41] - 2:3, 5:23, 6:10, 11:13, 16:13, 16:17, 16:20, 18:16, 18:18, 25:6, 25:21, 25:24, 31:6, 47:3, 47:5, 48:1, 48:4, 48:21, 50:9, 73:5, 82:20, 107:24, 112:1, 112:19, 113:3, 115:2, 115:6, 115:8, 115:10, 122:24, 123:5, 133:24, 133:25, 136:25, 137:6, 137:12, 137:25, 138:13, 139:24, 140:1, 141:4
**McCoy** [13] - 3:3, 3:6, 3:9, 31:22, 34:5, 72:21, 76:6, 76:24, 77:15, 77:22, 79:14, 80:2, 136:11
**McCraw** [44] - 3:23, 23:16, 23:22, 24:12, 25:8, 26:1, 27:14, 39:5, 41:13, 52:20, 52:22, 53:4, 56:6, 73:21, 76:19, 86:7, 141:11, 141:20, 141:23, 142:3, 145:6, 149:8, 153:6, 159:1, 163:8, 171:6, 173:12, 175:18, 176:17, 176:23, 181:22, 183:25, 186:10, 190:1, 191:17, 196:6, 200:19, 206:2, 212:25, 214:9, 216:16, 219:19, 221:3, 256:17
**MCCRAW** [2] - 3:11, 141:13
**MCDUFFIE** [1] - 2:7
**mean** [22] - 17:20, 19:10, 19:22, 31:23, 38:17, 64:17, 78:9, 102:16, 107:4, 121:11, 137:15, 142:11, 153:22, 166:5, 167:12, 170:19, 185:18, 189:6, 194:1, 201:9, 202:9, 230:5
**meaning** [3] - 8:15, 39:15, 65:5
**meaningful** [1] - 217:13
**means** [6] - 19:25, 34:24, 78:11, 163:13, 172:13, 238:5
**meant** [5] - 34:23, 194:24, 200:7, 218:15, 241:18
**meanwhile** [1] - 152:10
**mechanism** [2] - 20:9, 261:25
**media** [1] - 49:21
**Medley** [42] - 3:22, 11:8, 11:10, 11:11, 11:20, 12:5, 12:8, 19:20, 28:11, 30:18, 43:8, 43:16, 43:22, 44:12, 46:16, 52:19, 69:5, 69:7, 69:10, 69:11, 69:16, 81:18, 81:21, 82:4, 181:2, 199:14, 201:5, 201:7, 203:19, 204:5, 210:10, 212:9, 213:13, 216:8, 221:20, 221:21, 239:21, 239:24, 241:12, 258:4
**Medley's** [2] - 11:14, 68:10
**meet** [13] - 15:20, 21:19, 64:17, 68:4, 117:24, 119:1, 119:2, 119:6, 126:15, 132:7, 132:19, 201:2, 209:11
**meeting** [42] - 23:25, 25:11, 26:7, 26:8, 27:12, 27:16, 27:23, 28:1, 28:4, 28:7, 28:14, 28:22, 29:1, 29:5, 29:9, 29:12, 29:13, 29:17, 29:21, 29:25, 30:2, 30:5, 56:5, 56:14, 119:11, 119:16, 121:16, 122:14, 126:5, 126:21, 127:4, 129:21, 129:22, 130:2, 133:8, 147:17, 250:21, 250:23, 251:3, 251:6
**meetings** [6] - 25:17, 115:19, 127:11, 169:21, 173:22, 192:10
**member** [1] - 240:10
**members** [9] - 5:5, 11:3, 23:7, 49:13, 56:16, 112:10, 183:6, 220:16, 261:8
**memory** [1] - 119:17
**men** [3] - 80:16, 81:17, 101:7
**mention** [3] - 18:7, 72:1, 147:15
**mentioned** [6] - 14:19, 27:12, 68:13, 141:21, 146:24, 160:16
**mentioning** [1] - 161:10
**mentor** [4] - 169:3, 169:5, 205:8, 205:12
**Mercedes** [6] - 59:12, 59:21, 60:17, 60:19, 60:20, 61:12
**Mercedes'** [1] - 60:22
**mere** [1] - 110:9
**merrill** [1] - 113:25
**message** [2] - 79:2, 79:3
**met** [19] - 21:21, 32:7, 39:19, 56:10, 62:24, 76:17, 114:13, 114:20, 114:23, 116:4, 116:14, 116:16, 119:3, 119:18, 126:8, 126:12, 126:16, 129:24, 132:22
**method** [1] - 124:13
**Mexico** [1] - 35:3
**mic** [1] - 36:7
**Michelle** [8] - 17:15, 19:17, 19:24, 20:10, 20:14, 20:19, 28:11, 30:11
**mid** [1] - 15:4
**middle** [5] - 15:2, 51:15, 113:8, 165:11, 243:14
**might** [22] - 26:7, 32:18, 32:21, 32:22, 34:8, 34:13, 38:13, 49:21, 53:25, 57:2, 62:13, 84:7, 84:16, 117:20, 119:3, 119:20, 120:8, 120:23, 121:23, 140:8, 255:14
**milestones** [1] - 168:9
**MILLER** [2] - 3:8, 112:23
**miller** [1] - 124:10
**Miller** [13] - 112:1, 112:20, 113:10, 113:11, 115:11, 118:19, 123:6, 124:4, 125:22, 129:17, 134:6, 137:2, 234:8
**million** [2] - 155:19, 155:20
**mind** [6] - 6:15, 29:6, 49:25, 64:24, 137:24, 262:2
**mine** [1] - 36:24
**minor** [1] - 173:9
**minorities** [1] - 101:7
**minority** [3] - 78:12, 78:14, 79:13
**minute** [9] - 20:10, 38:8, 65:10, 79:17, 137:2, 172:7, 220:21, 231:20, 255:13
**minutes** [8] - 48:5, 63:4, 108:5, 182:25, 183:8, 214:6, 251:4, 251:7
**Mirjam** [2] - 197:24, 197:25
**Mirjam's** [1] - 198:2
**mirror** [1] - 41:6
**misaligned** [3] - 66:16, 67:8, 189:22
**miss** [1] - 178:25
**missed** [1] - 126:2
**mission** [1] - 200:12
**missions** [1] - 258:14
**mistake** [2] - 31:7, 168:13
**misunderstood** [1] - 102:14
**model** [1] - 151:6
**models** [3] - 155:1, 156:7, 157:18
**modifying** [1] - 100:1
**moment** [12] - 14:4, 31:8, 31:21, 82:16, 101:11, 107:18, 158:3, 195:23, 214:4, 219:16, 246:1
**moments** [1] - 149:18
**moms** [1] - 126:23
**Monday** [1] - 119:9
**money** [8] - 80:21, 103:20, 154:11, 162:14, 168:15, 171:5, 217:24, 249:17
**Montgomery** [1] - 144:2
**month** [2] - 169:14, 216:20
**months** [4] - 64:8, 114:22, 215:6, 240:6
**MOODY** [68] - 2:2, 139:13, 140:8, 141:10, 141:19, 143:21, 146:16, 147:22, 148:2, 148:25, 149:7, 157:6, 157:8, 157:10, 164:22, 165:9, 176:12, 176:15, 176:20, 176:22, 178:9, 178:23, 178:24, 179:3, 182:19, 182:25, 183:22, 183:24, 185:14, 185:17, 187:1, 187:3, 191:12, 191:16, 192:9, 194:10, 195:21, 196:2, 196:5, 198:16, 198:18, 198:21, 205:22, 211:21, 212:2, 212:20, 212:24, 214:3, 214:8, 218:8, 219:16, 219:18, 220:5, 225:19, 231:9, 232:10, 234:22, 234:25, 239:7, 240:25, 247:20, 247:24, 248:13, 249:7, 253:13, 256:13, 256:16, 261:2
**moody** [6] - 138:22, 141:9, 176:11, 183:21, 194:20, 230:9
**Moody** [2] - 3:12, 3:15
**Moore** [2] - 7:17, 43:9

**Moritz** [1] - 48:13
**morning** [4] - 6:11, 6:12, 261:15, 262:4
**Morse** [10] - 113:22, 115:25, 118:21, 122:8, 124:21, 125:22, 128:8, 128:11, 130:8, 132:2
**most** [22] - 85:25, 92:3, 109:24, 111:5, 111:12, 148:13, 164:2, 200:13, 206:5, 206:7, 206:8, 217:10, 224:7, 231:24, 232:1, 232:8, 233:4, 237:5, 238:23, 240:22, 255:12, 257:16
**mother** [2] - 67:19, 134:16
**motion** [14] - 50:14, 54:21, 58:3, 60:22, 71:4, 74:18, 108:14, 108:23, 109:2, 109:4, 111:1, 111:2, 111:7, 111:14
**motions** [7] - 70:11, 107:22, 108:12, 108:16, 109:8, 109:12, 111:9
**motivated** [2] - 63:12, 68:3
**MOTOREN** [2] - 1:6, 1:20
**Motors** [3] - 6:18, 6:19, 6:21
**mouth** [1] - 136:12
**mouthing** [1] - 136:18
**movable** [1] - 16:1
**movant** [1] - 109:7
**move** [68] - 16:6, 21:7, 22:3, 22:4, 22:8, 22:17, 26:22, 30:18, 30:19, 34:18, 38:20, 38:25, 43:15, 53:1, 53:2, 53:6, 55:17, 56:8, 57:23, 59:1, 62:19, 66:4, 66:5, 66:12, 68:22, 69:7, 73:2, 76:13, 81:7, 81:11, 81:25, 82:5, 85:9, 97:13, 101:3, 120:8, 131:12, 132:13, 140:14, 147:22, 149:9, 149:10, 149:12, 158:11, 161:21, 163:8, 163:14, 164:6, 171:23, 172:24, 172:25, 173:2, 180:5, 180:13, 185:24, 195:25, 202:9, 214:21, 227:15, 227:19, 240:19, 241:6, 250:17, 254:14, 255:7, 261:12
**moved** [40] - 10:17, 10:18, 12:24, 14:13, 40:13, 44:12, 47:18, 48:7, 53:10, 53:23, 58:11, 62:11, 62:14, 66:9, 66:11, 67:6, 68:9, 68:11, 68:12, 68:19, 68:23, 81:8, 81:21, 86:8, 97:15, 146:6, 146:7, 146:11, 149:23, 150:1, 152:8, 152:10, 161:23, 161:24, 162:8, 211:6, 238:24, 241:7, 254:11, 255:11
**movement** [4] - 24:6, 102:11, 102:12, 214:21
**movements** [2] - 202:10, 202:11
**moves** [3] - 50:11, 95:21, 182:11
**moving** [35] - 20:14, 21:4, 21:9, 22:9, 27:1, 38:22, 39:1, 39:8, 52:19, 54:17, 55:9, 56:2, 56:12, 56:15, 57:25, 65:8, 65:9, 82:6, 85:17, 87:18, 109:25, 110:1, 110:5, 111:6, 111:13, 151:4, 159:16, 165:5, 171:24, 180:10, 186:7, 205:15, 205:23, 228:10, 254:10
**MR** [245] - 5:23, 6:10, 11:13, 16:13, 16:17, 16:20, 18:16, 18:18, 25:6, 25:13, 25:21, 25:24, 31:6, 31:13, 31:16, 34:16, 34:18, 34:19, 35:19, 35:22, 35:24, 36:9, 39:21, 40:2, 43:6, 44:17, 44:21, 46:22, 46:25, 47:3, 47:5, 47:23, 48:1, 48:4, 48:21, 48:23, 49:5, 49:6, 50:9, 70:10, 70:18, 70:20, 70:23, 70:25, 71:4, 71:8, 73:5, 73:6, 73:9, 75:10, 75:13, 75:17, 75:19, 80:2, 82:18, 82:20, 85:2, 85:12, 85:14, 91:14, 101:13, 101:19, 102:8, 103:1, 103:11, 104:5, 105:1, 105:3, 105:23, 106:21, 107:3, 107:11, 107:17, 107:23, 107:24, 107:25, 108:2, 111:17, 111:19, 111:23, 112:1, 112:5, 112:19, 113:3, 115:2, 115:6, 115:8, 115:10, 122:24, 123:5, 133:24, 133:25, 134:2, 134:5, 136:25, 137:2, 137:6, 137:11, 137:12, 137:14, 137:25, 138:6, 138:13, 138:15, 138:21, 139:13, 139:24, 139:25, 140:1, 140:3, 140:7, 140:8, 140:11, 140:17, 140:18, 140:22, 141:2, 141:4, 141:5, 141:10, 141:19, 143:21, 146:16, 147:19, 147:22, 148:2, 148:25, 149:7, 157:5, 157:6, 157:8, 157:10, 164:20, 164:22, 165:9, 176:3, 176:9, 176:12, 176:15, 176:20, 176:22, 177:25, 178:9, 178:23, 178:24, 179:3, 182:19, 182:25, 183:22, 183:24, 185:14, 185:17, 187:1, 187:3, 191:8, 191:12, 191:16, 192:9, 193:14, 193:19, 194:10, 194:15, 194:17, 195:9, 195:21, 196:2, 196:5, 198:15, 198:16, 198:17, 198:18, 198:21, 205:18, 205:22, 211:19, 211:21, 212:2, 212:20, 212:24, 214:3, 214:8, 218:8, 219:16, 219:18, 220:5, 220:7, 220:12, 220:13, 221:2, 221:16, 221:18, 225:19, 226:2, 227:16, 227:18, 229:16, 229:20, 230:4, 230:23, 231:9, 231:17, 231:22, 232:10, 232:11, 232:20, 234:18, 234:22, 234:25, 235:4, 235:8, 239:7, 239:14, 240:25, 241:11, 245:18, 245:21, 246:4, 246:6, 247:20, 247:24, 248:2, 248:6, 248:9, 248:11, 248:13, 248:18, 248:20, 249:4, 249:7, 249:11, 250:16, 250:20, 253:13, 253:15, 253:18, 255:13, 255:16, 255:19, 256:10, 256:13, 256:16, 261:2, 261:3, 261:5, 262:10
**MRSA** [1] - 100:16
**Muldrow** [11] - 51:16, 51:19, 51:23, 52:11, 57:20, 62:1, 62:23, 71:24, 71:25, 72:5, 72:20
**multiple** [4] - 67:5, 69:4, 83:16, 236:19
**Munich** [4] - 95:25, 152:7, 247:2, 253:1
**MURPHY** [102] - 1:17, 1:17, 25:13, 34:16, 35:22, 35:24, 36:9, 39:21, 40:2, 43:6, 44:17, 44:21, 46:22, 46:25, 47:23, 49:6, 70:18, 70:23, 71:4, 71:8, 73:9, 75:10, 75:13, 75:17, 75:19, 80:2, 82:18, 85:2, 91:14, 101:13, 101:19, 103:1, 104:5, 105:1, 105:3, 106:21, 107:3, 107:23, 108:2, 134:5, 137:2, 137:11, 137:14, 138:6, 138:21, 139:25, 140:3, 140:7, 140:17, 140:22, 141:2, 147:19, 157:5, 164:20, 176:3, 176:9, 177:25, 191:8, 193:14, 193:19, 194:15, 195:9, 198:15, 198:17, 205:18, 211:19, 220:13, 221:2, 221:16, 221:18, 226:2, 227:16, 227:18, 230:4, 231:22, 232:11, 232:20, 234:18, 235:4, 235:8, 239:14, 241:11, 245:21, 246:4, 246:6, 248:2, 248:6, 248:9, 248:11, 248:18, 248:20, 249:11, 250:16, 250:20, 253:15, 253:18, 255:13, 255:16, 255:19, 256:10, 261:5, 262:10
**Murphy** [33] - 3:5, 3:10, 3:14, 35:21, 36:1, 70:15, 70:17, 71:3, 82:22, 83:2, 83:11, 84:1, 84:20, 91:2, 91:13, 101:15, 102:10, 102:20, 103:15, 103:22, 106:6, 108:1, 140:11, 176:19, 186:3, 194:12, 194:18, 220:23, 229:21, 235:3, 256:17, 256:19, 258:16
**Murphy's** [2] - 83:20, 102:14
**Muslim** [1] - 60:3
**must** [8] - 51:9, 51:20, 67:18, 69:5, 95:10, 95:25, 109:12, 247:1

**N**

**NA** [1] - 34:7
**name** [16] - 6:13, 20:25, 26:9, 113:6, 113:18, 113:22, 125:7, 125:8, 126:17, 134:10, 141:21, 141:22, 147:16, 179:11, 192:19, 228:4
**named** [3] - 25:9, 179:11, 235:21
**names** [5] - 15:16, 15:17, 19:9, 24:6, 121:25
**national** [4] - 50:15, 70:3, 80:6, 113:12
**nationality** [1] - 193:3
**nationals** [1] - 90:2
**nature** [2] - 54:5, 247:23
**Neal** [6] - 216:1, 216:2, 237:14, 238:9,

256:25, 257:24
**near** [1] - 146:8
**necessarily** [2] - 121:24, 122:1
**necessary** [7] - 5:8, 140:15, 232:14, 232:15, 234:2, 234:5, 235:18
**need** [41] - 15:6, 15:7, 16:2, 18:7, 19:11, 19:12, 32:14, 37:11, 37:14, 37:18, 37:19, 38:2, 38:13, 42:8, 42:9, 49:14, 60:4, 66:21, 91:19, 91:21, 95:21, 107:2, 107:4, 120:8, 133:6, 137:8, 139:12, 143:19, 144:9, 145:2, 152:22, 163:13, 163:25, 218:18, 220:20, 227:13, 228:3, 233:20, 262:8
**needed** [16] - 22:8, 112:14, 117:10, 121:5, 131:13, 134:23, 137:24, 145:4, 165:15, 201:25, 202:5, 214:21, 215:14, 218:13, 218:21, 233:14
**needs** [3] - 23:12, 220:3, 235:21
**negative** [4] - 53:25, 133:9, 133:13, 219:12
**negatively** [3] - 54:18, 127:10, 133:10
**negotiate** [3] - 249:24, 249:25, 250:9
**neighbor** [2] - 114:14, 114:16
**neighbor's** [1] - 116:16
**network** [5] - 89:8, 95:22, 174:14, 217:5, 217:6
**Network** [1] - 33:25
**never** [62] - 15:22, 19:14, 39:20, 47:16, 53:12, 55:8, 55:13, 55:17, 56:23, 57:16, 61:19, 62:11, 62:15, 68:23, 69:13, 69:15, 69:18, 69:22, 71:7, 77:5, 77:8, 81:5, 85:19, 88:5, 98:21, 99:17, 99:21, 100:16, 100:18, 100:19, 100:21, 102:19, 103:20, 115:22, 127:10, 133:10, 133:11, 136:24, 137:21, 138:13, 166:21, 194:6, 205:6, 220:11, 227:10, 243:4, 243:6, 243:7, 243:8, 243:10, 243:11, 243:12, 243:17, 245:16, 245:22, 251:8
**new** [22] - 23:17, 26:1, 52:22, 59:1, 69:10, 96:4, 122:2, 132:13, 136:14, 152:19, 154:2, 154:17, 157:12, 170:7, 170:8, 199:11, 205:17, 209:20, 233:9, 234:4, 251:1
**New** [8] - 17:18, 17:20, 17:22, 34:7, 87:15, 87:16, 160:21
**News** [1] - 80:13
**news** [1] - 49:21
**Newsport** [1] - 80:12
**next** [33] - 9:2, 9:20, 29:3, 29:23, 41:5, 54:14, 64:8, 66:23, 72:11, 72:12, 74:18, 87:12, 112:17, 117:11, 121:17, 126:9, 126:11, 134:17, 152:20, 158:12, 159:1, 159:6, 161:24, 168:10, 182:11, 187:19, 210:12, 210:19, 223:5, 223:9, 237:9, 237:14
**nice** [2] - 16:11, 152:24
**nicely** [1] - 180:11
**night** [13] - 9:3, 9:5, 9:10, 9:21, 9:23, 9:25, 10:2, 10:4, 10:7, 10:15, 148:7, 199:21
**nine** [16] - 13:3, 45:16, 45:18, 45:19, 45:24, 46:5, 75:3, 84:11, 191:25, 192:4, 192:5, 192:10, 214:14, 215:23, 237:3
**nineties** [1] - 228:25
**NO** [1] - 1:3
**nobody** [7] - 38:12, 46:9, 55:3, 76:21, 76:22, 96:12, 225:9
**nominated** [1] - 192:24
**non** [5] - 109:25, 110:1, 110:5, 111:6, 111:13
**non-moving** [5] - 109:25, 110:1, 110:5, 111:6, 111:13
**none** [7] - 54:15, 83:13, 90:13, 98:13, 99:7, 224:22, 242:15
**nonetheless** [1] - 109:13
**normal** [3] - 40:19, 40:22, 172:3
**normally** [2] - 226:18, 244:20
**north** [3] - 146:19, 154:16
**North** [7] - 17:22, 18:10, 22:13, 113:21, 144:12, 161:18, 237:12
**Northern** [2] - 59:25, 62:8
**notably** [1] - 54:19
**note** [8] - 21:6, 54:7, 59:19, 82:25, 98:9, 110:23, 129:21, 193:10
**noted** [6] - 109:10, 109:16, 109:20, 110:2, 110:12, 110:20
**notes** [12] - 31:18, 83:19, 85:3, 85:4, 85:5, 85:10, 86:16, 115:19, 125:19, 252:2, 252:3, 262:19
**Nothing** [1] - 79:11
**nothing** [26] - 13:16, 46:25, 49:6, 71:10, 71:19, 73:16, 101:5, 106:9, 107:25, 133:12, 138:11, 141:2, 141:4, 141:5, 144:19, 190:3, 224:24, 230:14, 230:18, 248:14, 249:22, 261:3, 261:5, 261:16
**notice** [5] - 5:15, 66:20, 81:3, 83:4, 227:9
**notifying** [1] - 132:11
**November** [15] - 23:19, 23:24, 28:5, 56:4, 60:1, 128:12, 128:15, 128:24, 129:6, 129:19, 129:24, 147:1, 209:22, 250:21, 250:23
**number** [31] - 34:24, 34:25, 53:18, 73:15, 77:25, 84:17, 96:20, 115:3, 122:24, 124:21, 131:10, 136:1, 142:9, 142:10, 148:16, 181:23, 181:25, 182:6, 182:7, 182:8, 182:9, 182:11, 182:14, 184:1, 203:25, 204:1, 227:9, 227:12, 228:6, 236:11, 251:12
**numbers** [8] - 11:17, 12:1, 28:10, 118:19, 180:1, 180:16, 226:14, 240:12
**numerous** [1] - 186:20

**O**

**o'clock** [2] - 50:4, 147:13
**oath** [3] - 193:22, 195:5, 226:19
**object** [5] - 25:14, 34:16, 193:19, 234:22, 234:25
**objected** [2] - 194:19, 222:5
**objecting** [2] - 79:15, 243:21
**Objection** [1] - 164:20
**objection** [22] - 25:20, 44:18, 73:4, 139:16, 147:20, 149:5, 176:3, 177:25, 191:9, 195:25, 205:19, 211:19, 211:23, 212:21, 221:15, 231:15, 239:7, 240:25, 245:18, 247:20, 248:16, 249:4
**objective** [3] - 249:2, 249:12, 249:13
**objectives** [1] - 247:6
**obtaining** [1] - 170:12
**obviously** [4] - 50:17, 64:15, 70:2, 120:13
**occasionally** [1] - 196:18
**occupational** [1] - 199:24
**occur** [3] - 61:3, 71:15, 146:25
**occurred** [7] - 21:25, 61:7, 71:10, 83:9, 83:24, 173:18, 174:10
**October** [40] - 13:6, 13:7, 13:12, 23:19, 39:19, 53:2, 53:16, 56:1, 58:10, 62:18, 65:13, 65:15, 66:8, 68:17, 68:18, 73:17, 73:23, 85:10, 114:23, 175:21, 175:25, 177:24, 178:1, 178:2, 178:7, 179:17, 189:6, 221:25, 222:5, 222:17, 222:22, 224:14, 224:15, 224:20, 225:7, 225:8, 225:9, 226:21, 226:25, 227:2
**October-ish** [1] - 114:23
**OF** [3] - 1:1, 262:15, 262:17
**OFCCP** [3] - 99:18, 100:20, 100:21
**offer** [17] - 55:17, 55:20, 75:5, 75:7, 75:13, 75:21, 76:25, 77:2, 77:3, 77:7, 131:22, 215:17, 235:25, 236:3, 236:4, 238:18
**offered** [8] - 44:18, 90:10, 103:7, 131:15, 139:20, 212:21, 237:9
**offering** [1] - 200:9
**office** [12] - 85:4, 124:14, 128:16, 187:7, 258:19, 258:22, 258:24, 259:1, 259:2, 259:4, 259:12, 259:18
**officers** [1] - 99:8
**official** [3] - 23:24, 190:19, 254:23
**officially** [4] - 169:12, 224:22, 238:17, 257:8
**officials** [1] - 60:13
**OFK** [4] - 99:11, 187:12, 252:22, 253:6
**often** [7] - 109:3, 109:4, 124:10, 124:12, 167:3, 169:13, 169:16
**okey** [1] - 118:20
**old** [3] - 96:21, 154:12, 259:9
**older** [2] - 121:12,

172:21
**once** [9] - 70:25, 75:22, 101:21, 118:6, 125:14, 131:15, 169:14, 241:14, 241:22
**one** [84] - 18:13, 18:15, 18:24, 18:25, 25:14, 28:15, 30:10, 30:18, 30:19, 32:2, 34:24, 39:15, 47:9, 49:18, 54:20, 57:24, 59:1, 60:8, 66:23, 71:8, 73:11, 73:15, 74:5, 75:15, 80:4, 80:8, 83:10, 85:2, 87:14, 87:21, 88:12, 88:13, 89:5, 89:21, 90:10, 92:3, 94:7, 94:11, 98:5, 99:9, 108:5, 109:19, 111:21, 112:11, 114:4, 128:4, 130:5, 132:7, 133:24, 135:5, 136:17, 139:18, 140:7, 148:9, 151:16, 161:23, 173:22, 177:10, 187:20, 188:14, 190:6, 192:21, 194:10, 201:18, 201:19, 203:7, 210:12, 210:19, 214:3, 216:19, 219:16, 225:23, 227:9, 236:24, 240:13, 241:2, 242:18, 242:19, 248:22, 251:25, 255:16, 257:21
**ones** [3] - 17:23, 99:2, 185:4
**onus** [1] - 110:20
**open** [11] - 34:24, 34:25, 49:25, 120:22, 124:19, 124:21, 140:20, 182:12, 183:5, 195:20, 231:19
**opened** [1] - 142:23
**opening** [6] - 142:25, 146:24, 147:7, 147:8, 159:24, 173:4
**openings** [1] - 163:10
**operate** [1] - 16:3
**operated** [1] - 113:22
**operating** [3] - 30:20, 96:13, 102:1
**operation** [3] - 218:20, 234:4, 237:12
**operational** [1] - 232:16
**operations** [4] - 10:1, 35:13, 88:11, 233:9
**operative** [3] - 71:15, 71:16, 71:22
**opinion** [14] - 39:10, 39:14, 57:7, 59:14, 59:18, 59:19, 59:20, 59:24, 59:25, 61:1, 61:13, 61:14, 131:9, 171:13
**opinions** [1] - 183:10
**opportunities** [2] - 130:13, 201:15
**opportunity** [15] - 39:3, 40:9, 76:5, 108:2, 108:10, 120:23, 121:6, 122:2, 122:18, 126:9, 127:21, 128:3, 160:23, 161:6, 256:21
**opposed** [1] - 155:13
**opposite** [2] - 123:20, 123:21
**option** [5] - 21:15, 166:18, 227:20, 227:25, 228:1
**options** [6] - 74:21, 74:22, 155:20, 155:21, 156:1, 227:23
**Order** [1] - 82:25
**order** [9] - 85:22, 109:13, 155:12, 155:22, 155:23, 155:24, 156:4, 156:5, 249:23
**orders** [3] - 155:16, 196:3
**org** [4] - 33:13, 184:19, 184:21, 184:25
**organization** [13] - 29:11, 30:17, 95:21, 181:12, 185:25, 186:7, 199:18, 200:16, 200:23, 207:16, 209:20, 215:11, 252:21
**organizational** [4] - 28:13, 182:1, 182:5, 253:8
**organized** [3] - 15:13, 15:18, 201:4
**orientation** [1] - 135:7
**origin** [3] - 50:16, 70:3, 80:6
**original** [6] - 39:25, 152:20, 208:19, 214:17, 234:16, 242:10
**OSHA** [2] - 199:25, 201:2
**ourselves** [1] - 145:19
**outcome** [1] - 189:5
**outline** [1] - 172:6
**outlined** [2] - 19:17, 20:11
**outside** [22] - 32:16, 32:21, 50:5, 60:8, 60:12, 64:2, 81:2, 114:13, 121:6, 137:4, 156:3, 173:8, 182:23, 183:12, 193:17, 214:17, 214:18, 229:18, 236:22, 241:6, 258:23, 262:6
**overall** [1] - 34:4
**overrule** [4] - 178:5, 211:23, 231:15, 248:16
**overruled** [4] - 191:10, 225:20, 232:13, 241:2
**overview** [1] - 188:5
**own** [16] - 15:12, 18:9, 18:11, 54:1, 78:25, 83:19, 94:18, 96:23, 99:4, 103:9, 103:18, 184:25, 188:6, 218:2, 218:4, 230:18
**owned** [2] - 98:16, 131:8
**owns** [1] - 113:15

**P**

**p.m** [2] - 49:18, 262:14
**pace** [1] - 135:7
**package** [2] - 115:11, 155:21
**packet** [2] - 72:25, 118:18
**page** [71] - 17:7, 19:4, 27:15, 28:24, 29:3, 40:3, 40:7, 41:5, 72:11, 74:20, 76:12, 77:21, 78:6, 78:10, 86:14, 92:25, 93:2, 93:5, 94:1, 94:2, 95:16, 95:19, 96:14, 98:20, 98:24, 99:19, 100:9, 100:19, 100:20, 103:16, 115:13, 116:4, 118:17, 118:21, 122:6, 122:8, 125:20, 125:23, 127:12, 128:7, 128:9, 128:11, 128:21, 129:17, 130:7, 130:15, 135:9, 135:11, 177:12, 186:2, 186:17, 186:18, 187:19, 209:15, 223:22, 234:20, 235:9, 235:11, 235:15, 238:6, 247:11, 250:4, 250:5, 250:8, 256:20, 260:14
**pages** [24] - 74:11, 74:14, 74:25, 75:2, 92:16, 92:23, 93:14, 93:19, 93:21, 93:24, 94:23, 95:4, 95:8, 95:22, 96:1, 97:2, 99:21, 99:22, 100:11, 100:22, 116:23, 174:3, 189:23, 189:24
**paginated** [1] - 178:24
**paid** [3] - 123:22, 214:25, 215:24
**paint** [1] - 255:1
**pair** [1] - 143:9
**pants** [3] - 143:9, 146:25, 147:11
**paper** [2] - 115:3, 178:25
**paragraph** [5] - 79:21, 189:20, 197:8, 197:18, 197:25
**parent** [3] - 88:12, 88:17, 231:4
**parental** [1] - 197:22
**parents** [1] - 197:17
**parking** [1] - 261:15
**part** [25] - 15:1, 15:2, 35:6, 56:3, 85:13, 87:1, 89:18, 112:12, 122:3, 139:15, 148:5, 148:15, 164:16, 166:13, 172:17, 189:11, 189:14, 192:23, 197:17, 199:24, 215:8, 217:10, 244:12, 258:9
**participate** [2] - 188:18, 200:15
**participating** [1] - 145:5
**particular** [4] - 17:4, 125:14, 126:24, 129:10
**particularly** [2] - 49:19, 88:7
**parties** [3] - 5:11, 49:22, 261:24
**partner** [2] - 166:4, 249:18
**partners** [2] - 14:9
**parts** [2] - 120:23, 156:1
**party** [16] - 50:22, 90:3, 90:5, 108:18, 108:21, 108:22, 108:24, 109:14, 109:25, 110:1, 110:6, 110:10, 110:19, 111:6, 111:13, 256:6
**past** [3] - 5:15, 42:6, 167:1
**path** [6] - 17:25, 19:12, 19:13, 121:13, 122:2, 142:6
**paths** [1] - 219:8
**patience** [1] - 261:10
**Paul** [1] - 28:12
**pay** [13] - 52:3, 54:9, 72:8, 75:25, 76:2, 124:1, 158:23, 170:20, 170:21, 174:16, 207:25, 208:1, 212:18
**paycheck** [1] - 166:10
**paying** [4] - 137:23, 168:16, 170:21, 170:24
**payments** [1] - 168:17
**peaked** [1] - 240:16
**pegged** [2] - 41:4, 41:5
**Pekar** [3] - 196:22, 251:12, 251:15
**Pelham** [1] - 126:17
**pending** [1] - 195:12
**people** [137] - 14:15, 20:5, 20:6, 27:3, 33:17, 35:4, 42:4, 42:5, 42:6, 42:15, 76:18, 78:19, 84:3, 84:6, 89:24, 93:7, 93:8, 93:11, 97:13, 97:24, 99:7, 104:20, 131:10, 133:2, 144:8, 145:5, 145:14, 145:15, 145:20, 148:12, 148:13, 148:21, 148:23, 149:9, 151:5, 157:13, 157:18, 157:19, 157:23, 158:8, 160:12, 162:16,

162:17, 165:13, 165:14, 165:17, 165:18, 165:20, 165:21, 165:23, 166:3, 166:6, 166:7, 166:11, 168:2, 168:10, 168:12, 168:17, 170:13, 170:14, 171:23, 171:24, 172:1, 172:25, 173:2, 173:3, 173:4, 175:2, 175:8, 185:24, 187:21, 190:7, 190:17, 191:6, 191:24, 191:25, 192:3, 192:11, 199:22, 202:8, 202:9, 202:19, 202:21, 203:5, 204:5, 206:5, 206:11, 206:13, 206:14, 206:19, 207:22, 208:20, 211:1, 211:4, 211:6, 211:14, 214:20, 215:16, 215:18, 215:20, 215:22, 218:12, 218:17, 218:18, 218:19, 219:7, 219:8, 226:12, 233:15, 233:23, 233:24, 233:25, 234:11, 237:7, 237:8, 237:19, 237:23, 237:25, 238:5, 238:14, 238:16, 240:3, 240:24, 241:4, 241:8, 242:4, 243:10, 243:17, 254:10, 254:14, 257:5, 257:7, 258:13

**per** [2] - 119:2, 187:18

**percent** [11] - 105:24, 130:1, 130:3, 152:8, 171:21, 206:19, 208:11, 208:13, 208:18, 247:15, 256:4

**performance** [7] - 14:24, 191:2, 191:3, 245:13, 248:3, 248:7

**performing** [2] - 23:5, 114:7

**perhaps** [1] - 92:3

**period** [5] - 20:1, 22:7, 30:25, 157:20, 218:11

**periods** [1] - 24:24

**permission** [1] - 95:15

**permit** [1] - 139:1

**permitted** [1] - 90:3

**person** [33] - 17:18, 33:5, 34:24, 35:1, 40:16, 81:24, 82:2, 99:15, 126:5, 129:22, 142:11, 166:22, 167:22, 174:15, 182:8, 182:10, 182:11, 182:15, 186:6, 191:2, 193:25, 194:1, 201:2, 215:21, 235:19, 237:9, 237:14, 237:20, 240:1, 241:6, 246:8, 252:19

**personable** [1] - 126:22

**personal** [82] - 13:2, 13:14, 45:20, 46:5, 46:11, 47:7, 47:10, 47:14, 54:13, 54:16, 63:25, 65:16, 65:19, 65:22, 66:6, 66:16, 66:20, 66:21, 66:22, 66:24, 67:8, 67:10, 68:10, 70:21, 76:14, 78:21, 82:2, 85:20, 86:2, 86:19, 86:22, 86:23, 87:2, 91:15, 91:19, 105:18, 105:21, 105:25, 106:6, 106:13, 106:16, 111:3, 133:12, 153:2, 158:18, 158:20, 160:4, 161:21, 161:25, 173:20, 184:4, 184:8, 186:14, 189:22, 190:2, 190:24, 191:1, 191:2, 191:6, 191:18, 192:14, 199:14, 204:17, 212:14, 213:25, 214:12, 214:14, 215:23, 215:24, 216:1, 216:9, 237:3, 239:7, 240:12, 240:23, 240:25, 241:21, 242:8, 245:12, 245:13, 249:15

**personally** [4] - 23:3, 168:24, 209:11, 226:24

**personnel** [3] - 98:3, 182:4, 182:15

**perspective** [2] - 13:13, 202:4

**perspectives** [1] - 205:25

**Petrasch** [71] - 21:13, 23:1, 23:10, 26:17, 27:14, 30:1, 32:19, 37:25, 38:6, 38:8, 38:21, 38:22, 38:24, 40:11, 52:20, 52:21, 53:1, 53:4, 53:7, 53:12, 56:2, 56:6, 58:18, 64:5, 66:9, 68:19, 73:19, 73:20, 73:24, 74:16, 75:10, 77:8, 78:4, 78:25, 81:23, 83:18, 85:8, 86:17, 87:20, 89:4, 92:12, 93:1, 94:1, 94:8, 94:9, 95:5, 96:1, 96:8, 96:11, 102:24, 103:13, 175:11, 193:9, 194:24, 196:22, 216:17, 216:20, 228:8, 242:14, 244:15, 244:17, 244:25, 245:2, 245:5, 245:8, 247:5, 249:20, 251:16, 251:22, 252:4, 252:8

**Petrasch's** [2] - 74:13, 94:5

**PG** [27] - 13:6, 13:12, 64:5, 64:7, 64:25, 65:14, 65:15, 65:17, 84:11, 84:12, 158:19, 159:13, 159:14, 159:21, 160:3, 186:4, 186:6, 204:14, 204:16, 212:15, 213:19, 214:23, 214:25, 216:3, 236:24, 243:17

**PGs** [1] - 190:20

**pharmacy** [1] - 200:8

**phase** [2] - 91:25, 106:5

**Philip** [2] - 228:5, 228:7

**phrase** [1] - 121:10

**physical** [2] - 143:24, 259:11

**physically** [1] - 145:25

**pick** [3] - 143:13, 157:13, 158:9

**picked** [2] - 153:15, 164:2

**picture** [2] - 169:24, 192:18

**piece** [2] - 92:3, 188:5

**pieces** [1] - 120:23

**pin** [1] - 85:16

**pink** [1] - 19:21

**pitch** [2] - 157:2, 158:3

**place** [14] - 26:12, 28:4, 34:12, 53:15, 66:16, 69:15, 94:12, 97:16, 125:8, 143:24, 174:18, 246:16, 255:8, 255:9

**placed** [3] - 34:13, 133:2, 165:1

**placement** [1] - 261:17

**places** [4] - 170:18, 219:7, 229:12, 255:12

**placing** [1] - 133:1

**Plaintiff** [25] - 13:19, 51:1, 51:9, 52:18, 53:6, 54:4, 54:7, 55:12, 56:8, 58:11, 58:12, 62:22, 66:12, 66:15, 67:4, 67:6, 69:21, 87:10, 87:20, 102:5, 103:18, 107:15, 111:6, 111:13, 114:9

**plaintiff** [16] - 50:22, 50:25, 51:19, 51:23, 52:5, 53:11, 55:2, 57:10, 57:16, 57:22, 58:23, 58:24, 58:25, 62:16, 90:17, 106:19

**PLAINTIFF** [3] - 1:4, 1:17, 3:18

**plaintiff's** [3] - 52:3, 87:7, 196:21

**Plaintiff's** [52] - 16:9, 16:14, 16:23, 36:3, 44:18, 44:19, 50:14, 51:6, 52:11, 52:16, 58:17, 66:4, 66:7, 68:22, 72:14, 74:7, 75:6, 75:11, 75:17, 75:22, 77:25, 89:6, 92:1, 92:7, 94:6, 94:7, 96:4, 96:8, 96:20, 98:24, 103:12, 104:17, 181:19, 181:21, 184:16, 185:10, 185:11, 186:16, 188:13, 189:21, 193:6, 195:22, 221:9, 221:14, 221:24, 223:6, 235:24, 238:18, 247:10, 248:2, 251:11, 253:11

**plaintiffs** [1] - 59:16

**Plaintiffs** [1] - 86:20

**plan** [26] - 16:1, 17:5, 17:11, 19:6, 22:21, 22:23, 23:11, 26:18, 27:24, 32:8, 34:8, 34:9, 36:25, 50:17, 94:12, 148:18, 167:16, 168:1, 168:7, 172:24, 172:25, 182:1, 182:5, 187:11, 214:17

**planned** [2] - 24:25, 53:1

**planning** [34] - 14:12, 14:19, 14:22, 14:25, 15:3, 15:10, 17:3, 17:24, 18:11, 18:22, 20:13, 21:7, 21:20, 24:16, 34:6, 34:7, 39:6, 41:9, 41:18, 41:21, 43:2, 78:1, 94:4, 97:1, 138:16, 151:19, 153:9, 154:8, 193:10, 198:4, 202:15, 210:1, 251:17

**Planning** [8] - 149:17, 151:17, 152:15, 153:1, 153:5, 153:13, 153:21, 156:14

**plans** [5] - 15:21, 145:23, 154:14, 171:22, 233:25

**plant** [50] - 21:8, 24:1, 24:4, 24:18, 31:25, 34:2, 35:14, 60:19, 142:23, 143:2, 143:6, 143:10, 144:21, 146:8, 147:1, 154:12, 154:14, 155:1, 156:22, 156:24, 157:12, 157:19, 157:22, 157:24, 158:10, 159:9, 159:10, 161:15, 161:16, 163:7, 165:10, 166:6, 167:15, 170:1, 187:18, 188:10, 191:21, 200:6, 200:12, 201:3, 203:24, 206:1, 215:17, 218:11, 247:17, 258:14, 258:21, 259:9

**Plant** [15] - 142:16, 142:21, 143:1, 148:19, 153:18, 154:4, 154:5, 157:2,

157:12, 187:9, 187:14, 188:2, 189:1, 190:6, 209:9
**plants** [7] - 95:18, 154:2, 187:8, 187:15, 187:25, 209:2, 218:25
**Plants** [1] - 187:6
**play** [1] - 26:12
**pleadings** [2] - 97:18, 106:14
**pleasure** [1] - 119:6
**plenty** [1] - 195:15
**plethora** [1] - 135:25
**plow** [1] - 65:10
**plowed** [1] - 65:10
**plus** [4] - 79:7, 232:3, 232:16, 232:17
**PM** [1] - 197:20
**poached** [1] - 173:8
**podium** [1] - 31:17
**point** [43] - 10:10, 11:20, 13:23, 17:13, 20:22, 22:19, 24:10, 25:13, 25:25, 26:3, 29:23, 32:14, 37:15, 50:17, 65:1, 65:23, 68:21, 70:22, 70:23, 70:25, 77:25, 83:10, 85:3, 85:6, 91:10, 93:6, 94:9, 100:17, 103:18, 106:14, 111:20, 129:1, 129:19, 130:12, 137:22, 162:21, 175:13, 181:2, 187:11, 206:18, 206:19, 221:12, 231:13
**pointed** [4] - 37:7, 37:10, 76:6, 92:10
**pointing** [1] - 72:22
**points** [6] - 29:22, 82:21, 151:2, 184:25, 215:12, 251:19
**police** [1] - 51:23
**policies** [10] - 11:4, 14:11, 82:1, 99:4, 99:24, 100:1, 164:9, 201:1, 254:9, 254:17
**policy** [27] - 66:15, 66:16, 66:18, 67:9, 76:2, 76:14, 185:19, 213:18, 241:22, 241:24, 242:9, 242:21, 243:15, 243:22, 244:6, 244:7, 244:8, 244:14, 244:16, 244:17, 245:3, 245:9, 245:11, 245:15, 245:23, 245:24, 254:24
**pop** [1] - 172:6
**portfolio** [5] - 247:9, 248:6, 249:14, 249:15, 249:18
**portion** [1] - 11:2
**pose** [1] - 5:18
**position** [159] - 6:19, 8:8, 10:5, 11:14, 12:1, 12:2, 12:5, 14:4, 17:14, 20:1, 20:12, 20:24, 21:4, 26:6, 29:7, 32:12, 32:17, 33:15, 33:17, 33:24, 34:4, 38:14, 39:3, 39:9, 42:21, 43:8, 43:14, 43:15, 43:21, 44:13, 45:12, 46:1, 46:5, 47:13, 48:12, 51:1, 52:2, 52:15, 52:19, 53:9, 53:17, 53:21, 53:25, 54:18, 54:25, 55:1, 55:4, 55:6, 55:9, 55:13, 55:16, 55:18, 55:24, 56:20, 56:25, 57:15, 58:6, 58:7, 58:13, 58:14, 58:15, 58:20, 62:12, 62:15, 62:17, 62:18, 64:3, 64:4, 64:8, 64:25, 65:23, 66:10, 66:11, 66:12, 66:13, 66:14, 66:21, 68:15, 68:16, 68:20, 68:21, 68:24, 68:25, 69:16, 73:25, 74:5, 74:9, 74:24, 75:1, 75:4, 75:23, 77:19, 79:21, 81:20, 81:21, 83:22, 83:23, 89:22, 90:11, 92:24, 95:1, 95:14, 95:25, 96:4, 97:15, 97:20, 98:21, 98:23, 99:14, 106:16, 107:10, 120:15, 158:12, 159:1, 159:2, 159:6, 159:22, 159:24, 169:12, 171:8, 171:9, 171:18, 172:9, 172:13, 172:18, 172:19, 174:13, 174:15, 174:21, 181:25, 182:6, 182:7, 182:8, 182:11, 182:14, 197:10, 200:11, 202:1, 207:4, 207:7, 210:23, 216:6, 222:2, 226:13, 227:9, 227:10, 227:11, 231:24, 232:1, 232:9, 233:4, 235:20, 236:11, 238:25, 240:11, 254:25, 257:12
**Position** [1] - 3:23
**Position/Pay** [1] - 3:22
**position/signal** [1] - 78:8
**positions** [32] - 12:21, 19:18, 44:14, 57:11, 57:14, 66:1, 66:2, 68:9, 74:6, 93:4, 94:21, 95:10, 95:17, 96:7, 96:11, 96:15, 99:2, 133:22, 152:2, 163:9, 180:24, 182:9, 211:7, 215:17, 228:13, 228:17, 229:21, 229:24, 230:1, 241:7, 242:20, 244:9
**positive** [4] - 11:3, 22:10, 22:11, 256:4
**possession** [1] - 226:6
**possibilities** [2] - 121:3, 154:25
**possibility** [2] - 67:4, 109:14
**possible** [5] - 39:11, 83:18, 120:22, 224:19, 261:15
**possibly** [5] - 15:5, 51:5, 118:15, 205:25, 228:25
**post** [1] - 113:19
**posted** [1] - 130:19
**potential** [6] - 52:16, 54:13, 60:14, 197:16, 197:24, 198:3
**potentially** [13] - 17:25, 27:1, 53:9, 54:12, 58:19, 66:10, 66:17, 68:20, 83:16, 83:20, 85:5, 201:15, 205:15
**power** [2] - 109:12, 149:24
**PowerPoint** [10] - 28:21, 28:25, 29:6, 29:8, 30:3, 30:5, 56:7, 56:12, 56:15, 185:1
**practice** [4] - 39:5, 40:19, 40:20, 40:22
**practices** [5] - 35:10, 35:15, 35:17, 49:2, 88:10
**pray** [1] - 60:5
**prayer** [1] - 60:9
**praying** [3] - 60:8, 60:12, 61:23
**pre** [3] - 149:25, 210:1, 252:18
**pre-build** [1] - 149:25
**pre-discussed** [1] - 252:18
**pre-planning** [1] - 210:1
**precluded** [1] - 109:14
**preferable** [1] - 52:9
**preferential** [1] - 82:11
**preferred** [2] - 233:1
**preliminary** [1] - 110:16
**premise** [1] - 98:2
**preparatory** [1] - 235:1
**prepare** [1] - 55:19
**prepared** [5] - 53:19, 53:21, 55:21, 100:19, 100:21
**prepping** [1] - 99:24
**presence** [11] - 5:3, 50:6, 112:8, 137:4, 182:23, 183:13, 183:19, 193:17, 220:15, 229:18, 262:7
**present** [5] - 28:6, 52:12, 62:22, 124:15, 210:8
**presentation** [6] - 28:15, 89:10, 156:14, 209:19, 210:3, 246:10
**presentations** [2] - 169:22, 188:19
**presented** [14] - 28:14, 51:6, 56:7, 108:11, 111:5, 111:12, 132:11, 138:1, 154:9, 154:11, 156:25, 188:22, 243:22, 244:2
**presenting** [2] - 61:12, 109:15
**preserving** [1] - 139:22
**President** [47] - 14:1, 23:17, 23:23, 24:1, 24:13, 55:11, 55:14, 87:25, 99:1, 137:20, 138:8, 142:2, 159:21, 161:11, 162:1, 162:8, 162:21, 162:25, 163:2, 166:15, 168:19, 169:17, 170:5, 170:7, 170:8, 173:13, 174:11, 174:24, 178:10, 181:14, 190:14, 204:8, 209:23, 219:12, 226:9, 226:11, 228:19, 229:1, 238:1, 241:23, 252:24, 252:25, 253:22, 259:17, 259:18, 259:20
**president** [10] - 161:5, 161:7, 206:2, 206:20, 206:23, 228:14, 229:4, 229:5, 229:9, 230:11
**presidents** [6] - 206:9, 206:14, 228:13, 229:12, 229:13, 230:11
**Presidents** [1] - 229:3
**pressure** [2] - 24:18, 140:18
**Prestige** [1] - 202:13
**prestige** [1] - 202:14
**presuming** [1] - 70:15
**presumption** [1] - 88:16
**pretty** [11] - 92:6, 106:2, 119:3, 144:3, 149:17, 154:23, 157:13, 157:14, 158:5, 173:6, 174:21
**prevent** [1] - 55:10
**previous** [6] - 49:19, 138:4, 152:14, 177:10, 183:8, 261:19
**previously** [3] - 57:15, 108:13, 258:3
**Price** [1] - 110:7
**principal** [1] - 97:16
**print** [1] - 185:2
**printed** [3] - 31:17, 40:7, 178:2
**printer** [1] - 31:19
**prioritize** [1] - 181:8
**privately** [1] - 243:6
**privileges** [3] - 56:21, 63:16, 87:4
**Pro** [1] - 113:19
**problem** [9] - 68:22, 168:11, 208:22, 236:13, 245:7, 245:10, 248:24, 248:25
**problems** [1] - 167:10
**Procedure** [2] -

50:13, 108:17
**procedure** [2] - 185:19, 243:15
**procedures** [5] - 11:4, 164:9, 201:1, 254:9, 254:18
**proceed** [2] - 110:18, 111:24
**proceedings** [4] - 5:1, 242:22, 242:24, 243:1
**process** [22] - 14:14, 14:22, 20:13, 112:12, 145:23, 149:22, 153:7, 157:11, 160:1, 160:7, 160:16, 160:18, 160:23, 192:23, 201:12, 205:16, 205:24, 206:5, 206:7, 215:8, 249:18, 257:18
**processes** [1] - 144:7
**produce** [1] - 155:8
**produced** [3] - 164:15, 253:23, 253:25
**producing** [2] - 110:19, 151:13
**product** [1] - 157:3
**production** [20] - 8:11, 8:13, 8:14, 8:15, 8:16, 8:19, 8:22, 9:1, 9:21, 10:7, 14:17, 146:14, 150:24, 156:8, 166:5, 174:14, 211:13, 215:18, 234:10
**Production** [3] - 6:20, 159:3, 161:11
**Products** [1] - 143:5
**products** [3] - 154:3, 158:4, 164:15
**professional** [7] - 122:19, 126:23, 136:13, 136:19, 136:20, 167:8, 168:21
**professionals** [1] - 234:9
**professors** [1] - 83:4
**profit** [2] - 218:1, 218:4
**program** [2] - 160:19, 197:19
**Programs** [2] - 186:23, 187:5
**progressively** [1] - 186:8
**prohibit** [1] - 63:14
**prohibited** [1] - 67:12
**project** [48] - 20:17, 20:21, 20:23, 20:25, 22:7, 22:9, 22:10, 22:12, 22:18, 22:22, 22:24, 30:19, 43:8, 43:16, 43:23, 43:25, 52:20, 126:25, 150:7, 150:9, 150:11, 150:24, 151:1, 152:21, 154:9, 154:17, 158:14, 158:15, 158:16, 158:17, 159:11, 159:14, 169:5, 201:6, 201:9, 204:15, 210:10, 240:1, 240:4, 240:5, 241:13, 245:14, 249:17, 255:25, 256:2, 258:4
**projections** [1] - 233:25
**projects** [12] - 150:23, 151:8, 151:10, 153:24, 154:1, 158:24, 159:8, 159:9, 169:4, 206:1, 207:19
**Projects** [1] - 153:22
**promise** [1] - 193:6
**promote** [1] - 214:19
**promoted** [10] - 12:2, 45:25, 46:4, 46:10, 54:24, 55:4, 65:1, 204:15, 237:13, 255:7
**promoting** [1] - 81:2
**promotion** [8] - 13:4, 13:5, 13:10, 46:7, 46:8, 54:19, 204:12
**promotional** [1] - 185:25
**promotions** [5] - 45:20, 46:11, 78:21, 81:10, 204:14
**proof** [5] - 50:25, 63:17, 98:10, 110:10, 110:20
**proper** [1] - 216:17
**properly** [3] - 110:18, 202:24, 257:20
**property** [1] - 261:18
**proposal** [5] - 154:6, 180:5, 180:6, 246:18, 250:1
**proposed** [1] - 29:10
**proposing** [1] - 40:12
**prospect** [1] - 58:16
**prospects** [1] - 58:8
**protect** [1] - 68:10
**protected** [2] - 51:4, 80:20
**protections** [1] - 87:6
**proud** [3] - 140:23, 140:25, 164:3
**prove** [13] - 51:9, 62:25, 67:18, 77:16, 77:17, 77:18, 80:24, 81:14, 81:16, 104:14, 105:3, 105:4, 105:7
**proved** [1] - 131:11
**proven** [2] - 98:3, 142:8
**proves** [1] - 250:2
**provide** [10] - 15:14, 15:15, 15:17, 116:20, 117:2, 117:5, 122:21, 123:12, 235:5
**provided** [7] - 39:25, 99:6, 110:25, 122:9, 123:7, 129:2, 234:16
**provides** [1] - 108:18
**proving** [2] - 63:12, 68:2
**Public** [1] - 200:5
**published** [1] - 184:22
**pull** [17] - 16:9, 18:6, 20:5, 20:8, 21:15, 27:11, 31:23, 32:3, 32:5, 32:9, 32:10, 122:24, 124:3, 127:7, 135:25, 244:3
**pulled** [1] - 16:13
**punishment** [1] - 163:15
**punishments** [1] - 164:10
**punitive** [1] - 70:6
**purchasing** [8] - 190:9, 237:20, 237:24, 238:15, 238:16, 257:6, 257:7, 257:25
**purposefully** [2] - 87:4, 88:1
**purposes** [1] - 91:8
**pursuant** [4] - 50:12, 111:7, 111:14, 123:25
**pursue** [1] - 119:23
**pursuing** [2] - 121:23, 121:25
**push** [5] - 20:4, 32:11, 184:12, 193:4, 219:22
**pushing** [2] - 79:9
**put** [37] - 15:11, 15:18, 15:23, 17:10, 17:11, 32:4, 32:8, 39:5, 40:23, 66:16, 77:9, 86:4, 87:10, 93:12, 97:21, 121:15, 133:4, 144:17, 154:6, 155:17, 155:24, 168:1, 168:7, 171:22, 185:1, 192:16, 193:24, 195:14, 198:14, 220:17, 228:3, 229:23, 233:24, 237:5, 240:7, 241:15, 246:23
**putting** [6] - 73:21, 88:25, 131:13, 220:2, 238:9, 256:25
**puzzled** [1] - 105:8
**PZ** [8] - 21:6, 246:21, 247:5, 249:1, 249:20, 249:24, 250:11, 250:12

**Q**

**Q1** [2] - 186:22, 187:4
**qualified** [3] - 37:21, 38:5, 170:12
**questioning** [2] - 80:6, 138:25
**questions** [17] - 31:10, 31:18, 35:20, 49:5, 107:18, 133:25, 134:2, 136:11, 162:18, 177:11, 219:19, 220:5, 220:12, 235:6, 239:9, 239:12, 261:2
**quick** [10] - 47:6, 127:22, 129:21, 130:2, 155:13, 173:12, 181:20, 182:20, 182:25, 212:8
**quickly** [3] - 67:24, 92:7, 212:25
**quit** [6] - 137:24, 179:23, 220:8, 220:10, 237:9, 240:14
**quite** [1] - 237:8
**quitting** [1] - 136:8
**quote** [9] - 51:20, 51:21, 53:13, 54:3, 58:7, 61:1, 61:10, 72:10, 98:18
**quoted** [1] - 110:21

**R**

**race** [26] - 50:16, 50:23, 63:3, 63:5, 63:9, 63:13, 63:17, 63:18, 63:20, 63:24, 64:23, 65:5, 67:3, 67:13, 67:16, 67:17, 67:22, 71:1, 77:14, 77:15, 77:17, 77:20, 77:23, 82:13, 84:22, 111:10
**radar** [1] - 23:8
**Railroad** [1] - 109:10
**raise** [6] - 6:2, 29:10, 112:22, 141:12, 208:8, 220:22
**raised** [3] - 29:14, 46:12, 208:2
**raises** [2] - 109:5, 174:16
**ramp** [6] - 255:20, 255:23, 255:24, 256:7
**ramp-down** [3] - 255:20, 255:24, 256:7
**ramp-up** [3] - 255:20, 255:23, 256:7
**ran** [2] - 10:1, 150:24
**RANDLE** [1] - 2:2
**range** [5] - 58:8, 58:15, 122:5, 136:24, 139:15
**ranges** [2] - 133:1, 137:7
**rank** [3] - 52:3, 203:23, 204:9
**ranked** [1] - 204:5
**ranking** [1] - 253:6
**ranks** [1] - 100:18
**rapport** [1] - 180:12
**rarely** [1] - 167:4
**rated** [1] - 180:25
**rates** [1] - 249:20
**re** [2] - 3:20, 160:3
**re-describe** [1] - 160:3
**reach** [2] - 117:11, 128:1
**reached** [10] - 59:4, 118:8, 118:11, 125:4, 125:12, 125:18, 128:4, 130:22, 251:8, 258:17
**reaching** [2] - 60:24, 129:12
**reaction** [4] - 24:14, 27:1, 129:7, 131:21
**read** [28] - 40:4, 40:5, 40:6, 40:10, 40:14, 90:23, 94:3, 94:7, 103:14, 189:3, 189:13, 193:7, 194:5, 194:21, 196:6, 196:10, 196:14, 224:10, 224:11,

224:12, 235:9, 235:10, 235:15, 238:7, 256:19, 256:23
**reading** [5] - 40:4, 78:5, 222:23, 235:11, 256:22
**readings** [1] - 93:10
**readmitted** [1] - 221:14
**reads** [1] - 72:12
**ready** [12] - 5:6, 49:18, 85:13, 111:24, 112:2, 112:16, 147:6, 149:25, 150:21, 163:13, 165:15, 258:7
**ready-made** [1] - 258:7
**real** [12] - 64:19, 94:4, 127:22, 133:12, 155:13, 173:12, 181:20, 181:22, 182:19, 212:7, 212:25, 261:15
**reality** [1] - 61:6
**realize** [2] - 148:10, 244:5
**really** [55] - 15:12, 15:25, 26:4, 33:5, 86:4, 117:9, 127:10, 132:9, 143:10, 147:10, 148:12, 148:14, 150:9, 150:23, 151:8, 152:24, 154:4, 154:23, 155:2, 156:18, 156:20, 156:22, 156:24, 158:7, 158:10, 159:8, 162:7, 162:15, 162:18, 163:11, 163:20, 164:2, 167:17, 168:9, 168:16, 170:14, 171:20, 171:22, 172:1, 173:3, 173:4, 180:10, 180:11, 194:6, 200:24, 200:25, 201:9, 201:19, 204:20, 211:15, 218:21, 218:23, 237:6, 260:5
**reason** [8] - 78:3, 86:13, 86:15, 104:5, 165:1, 166:22, 168:19, 242:20
**reasonable** [9] - 50:21, 51:5, 62:24, 69:22, 87:9, 108:20, 109:19, 109:23, 110:4
**reasoning** [1] - 104:13
**reasons** [5] - 82:10, 85:18, 121:22, 203:7, 216:19
**reboot** [3] - 175:3, 202:6, 202:7
**rebut** [1] - 194:11
**receive** [5] - 13:4, 13:10, 125:24, 132:3, 191:18
**received** [18] - 13:5, 55:17, 84:19, 103:20, 114:6, 116:24, 117:10, 118:6, 118:22, 122:12, 124:5, 125:10, 127:14, 129:6, 145:7, 191:24, 242:5, 242:7
**receives** [1] - 213:16
**receiving** [3] - 118:2, 118:25, 126:4
**recent** [1] - 59:10
**recently** [1] - 59:14
**recess** [7] - 50:7, 108:8, 183:15, 183:16, 183:17, 261:13, 262:9
**recession** [4] - 24:17, 24:21, 24:22, 24:23
**recognize** [5] - 16:23, 18:20, 90:13, 115:14, 256:14
**recollection** [2] - 116:8, 194:22
**recommendation** [3] - 71:18, 246:9, 246:11
**recommending** [1] - 197:24
**record** [41] - 6:13, 27:5, 39:24, 49:12, 55:20, 66:8, 67:20, 74:2, 76:20, 77:9, 81:9, 82:25, 86:5, 98:1, 98:11, 100:15, 106:2, 108:10, 113:7, 123:2, 137:3, 139:13, 139:22, 141:22, 173:24, 176:25, 182:22, 193:16, 220:14, 223:19, 225:1, 225:2, 226:6, 227:7, 229:17, 234:15, 243:21, 261:16, 262:9, 262:11, 262:13
**records** [11] - 44:22, 194:9, 223:12, 225:10, 226:16, 226:22, 227:4, 227:6, 244:1, 244:4, 254:7
**recover** [1] - 165:12
**Recross** [1] - 3:7
**RECROSS** [1] - 48:22
**recruit** [5] - 123:14, 233:9, 233:14, 237:7, 237:23
**recruited** [2] - 237:11, 237:19
**recruiter** [3] - 113:12, 136:14, 233:8
**recruiting** [35] - 53:10, 66:11, 68:21, 113:25, 114:7, 115:25, 117:18, 122:22, 123:14, 123:17, 124:13, 129:10, 133:5, 186:23, 187:4, 210:15, 215:14, 233:5, 233:6, 233:7, 233:11, 233:16, 234:5, 234:6, 235:13, 235:21, 237:21, 237:25, 238:11, 238:16, 257:2, 257:7, 257:10, 257:17, 258:9
**recruitment** [1] - 233:20
**red** [8] - 19:17, 19:23, 19:25, 20:11, 20:15, 21:2, 55:1, 171:13
**redacted** [1] - 139:14
**redactions** [1] - 139:19
**REDIRECT** [3] - 47:4, 48:3, 256:15
**Redirect** [2] - 3:6, 3:15
**reduced** [2] - 54:9, 242:8
**reduction** [6] - 76:13, 88:21, 88:23, 191:18, 241:21, 247:15
**refer** [3] - 75:4, 99:10, 126:8
**reference** [9] - 4:5, 70:11, 73:2, 75:13, 110:7, 117:7, 118:18, 130:16, 260:2
**referenced** [2] - 79:17, 108:15
**referred** [2] - 109:3, 109:4
**referring** [8] - 27:17, 28:1, 42:11, 42:13, 72:5, 77:24, 106:3, 248:23
**refers** [1] - 85:3
**reflect** [2] - 39:24, 234:15
**reflected** [2] - 56:12, 177:20
**reflection** [1] - 188:9
**reframe** [1] - 99:12
**refresh** [2] - 116:8, 119:17
**regard** [7] - 19:20, 64:11, 70:6, 70:14, 70:21, 84:9, 105:7
**regarding** [6] - 26:18, 87:20, 125:5, 127:21, 133:11, 217:15
**regardless** [1] - 158:20
**region** [2] - 161:19, 188:4
**regular** [2] - 29:20, 200:1
**regularly** [1] - 33:24
**regulation** [2] - 40:21, 199:25
**regulations** [2] - 99:23, 99:24
**rehire** [1] - 165:14
**related** [2] - 86:21, 87:7
**Relations** [3] - 11:2, 11:16, 210:15
**relations** [6] - 11:3, 14:8, 87:18, 94:1, 180:2, 180:3
**relationship** [5] - 89:14, 105:4, 118:14, 125:16, 167:2
**release** [1] - 168:7
**released** [1] - 168:10
**relevance** [2] - 25:15, 211:20
**relevant** [5] - 230:7, 230:8, 230:22, 233:2, 239:17
**relied** [2] - 54:20, 57:6
**religious** [1] - 60:21
**relocate** [1] - 58:1
**reluctant** [1] - 5:16
**rely** [1] - 89:13
**relying** [2] - 85:23, 86:21
**remain** [6] - 8:18, 9:17, 10:13, 12:10, 166:18, 262:5
**remainder** [1] - 140:10
**remained** [3] - 52:3, 57:3, 68:24
**remains** [1] - 103:22
**remark** [1] - 234:25
**remarks** [1] - 234:23
**remember** [37] - 10:12, 13:7, 14:2, 17:18, 17:19, 20:25, 23:9, 23:22, 24:2, 28:10, 28:19, 28:21, 30:11, 42:22, 74:15, 86:16, 89:5, 92:7, 92:9, 96:3, 96:7, 96:19, 98:23, 129:24, 170:3, 170:16, 183:8, 186:3, 188:23, 203:14, 222:4, 228:23, 234:13, 242:16, 250:22, 252:1, 261:19
**Remember** [1] - 49:19
**remind** [1] - 50:13
**remove** [1] - 168:25
**removed** [6] - 73:14, 77:16, 139:16, 139:17, 139:19, 139:21
**Renewal** [1] - 110:23
**reorg** [2] - 11:23, 209:12
**reorganization** [12] - 26:18, 27:24, 52:25, 56:3, 69:15, 92:15, 151:18, 169:23, 200:17, 210:24, 211:22, 220:3
**reorganizations** [1] - 211:1
**reorganized** [1] - 55:24
**repair** [1] - 145:15
**repeat** [2] - 129:10, 218:3
**repeatedly** [2] - 59:6, 222:10
**repeating** [1] - 231:11
**repercussions** [1] - 195:8
**replace** [5] - 15:5, 152:20, 193:11, 241:5, 251:17
**replaced** [2] - 46:18, 46:20
**replacement** [1] - 23:20
**replacing** [1] - 236:23
**report** [12] - 11:24, 12:3, 44:16, 45:25,

71:18, 100:20, 146:5, 159:20, 178:2, 200:4, 202:24, 258:13
**reported** [5] - 51:17, 57:8, 59:22, 60:11, 79:23
**REPORTER** [3] - 2:6, 2:6, 262:17
**reporter** [1] - 41:12
**reporting** [4] - 11:5, 11:7, 11:19, 100:4
**reports** [4] - 28:8, 93:18, 100:21, 192:21
**represent** [3] - 122:18, 140:23, 140:25
**representation** [1] - 252:19
**represented** [1] - 5:12
**representing** [1] - 114:14
**Request** [1] - 95:13
**request** [6] - 77:2, 77:4, 117:4, 117:15, 126:1, 252:11
**REQUESTED** [1] - 262:15
**requested** [5] - 77:8, 77:9, 99:25, 103:4, 117:2
**require** [8] - 74:9, 217:4, 232:2, 232:9, 232:21, 233:5, 233:10, 233:16
**required** [7] - 14:16, 58:22, 59:1, 62:23, 76:13, 88:25, 198:7
**requirement** [4] - 62:2, 235:14, 244:9, 257:11
**requirements** [2] - 100:4, 199:25
**requires** [4] - 67:5, 232:3, 233:9, 233:17
**requiring** [1] - 57:25
**research** [3] - 49:20, 183:9, 261:23
**reserve** [3] - 70:2, 70:4, 77:13
**reserved** [1] - 137:13
**resign** [4] - 30:9, 60:19, 61:8, 69:14
**resignation** [10] - 30:16, 55:22, 62:12, 132:11, 211:9, 211:10, 211:11, 211:17, 211:20, 212:3
**resigned** [11] - 31:1, 31:6, 46:15, 55:16, 56:17, 62:14, 87:15, 211:8, 239:5, 239:19, 239:22
**resigning** [5] - 30:12, 30:14, 57:3, 65:24, 239:3
**resolve** [1] - 108:22
**Resource** [2] - 60:13, 74:9
**Resources** [32] - 7:25, 8:2, 8:12, 9:12, 12:14, 12:18, 14:1, 21:25, 23:18, 23:23, 24:13, 55:11, 55:14, 60:12, 84:11, 120:22, 136:1, 142:2, 142:7, 164:6, 164:19, 165:2, 165:4, 174:11, 174:24, 178:11, 190:15, 209:24, 219:13, 219:14, 226:9, 226:11
**resources** [4] - 35:15, 35:17, 131:10, 217:5
**respect** [2] - 63:15, 108:11
**respected** [1] - 240:10
**respecting** [1] - 51:21
**respond** [5] - 70:15, 71:4, 82:21, 125:13, 129:14
**responded** [3] - 103:8, 125:11, 128:23
**responding** [2] - 71:1, 128:18
**response** [3] - 125:10, 132:15, 172:22
**response)** [4] - 42:20, 119:8, 130:11, 210:2
**responses** [2] - 103:10, 103:11
**responsibilities** [2] - 202:20, 217:11
**responsibility** [10] - 14:5, 55:19, 77:1, 121:9, 150:5, 153:15, 202:17, 218:14, 218:15
**responsible** [15] - 14:11, 14:12, 143:12, 144:9, 150:6, 153:9, 159:5, 163:4, 174:19, 179:14, 222:24, 225:22, 226:3, 249:14
**rest** [3] - 22:15, 166:12, 203:23
**restaurant** [2] - 126:16, 126:18
**rested** [1] - 61:21
**restraint** [1] - 109:13
**restructure** [2] - 30:22, 240:3
**restructured** [1] - 236:22
**restructuring** [1] - 238:24
**result** [5] - 52:13, 54:10, 107:8, 158:23, 191:18
**resulted** [1] - 62:20
**results** [1] - 247:14
**resume** [9] - 5:7, 116:21, 116:24, 117:2, 117:9, 117:14, 118:2, 120:14, 125:6
**resumes** [2] - 145:19, 215:19
**retire** [2] - 31:2, 31:6
**retirement** [1] - 137:18
**retraining** [1] - 151:5
**retrieval** [1] - 144:25
**return** [4] - 38:7, 93:1, 110:5, 221:3
**returned** [1] - 123:9
**Rev** [1] - 3:19
**reverse** [2] - 123:17, 133:5
**reversed** [2] - 71:18, 211:4
**review** [13] - 14:23, 14:24, 15:19, 79:25, 124:20, 125:6, 186:22, 187:4, 247:2, 247:3, 248:7
**reviewed** [1] - 247:4
**reviews** [1] - 154:10
**revised** [4] - 177:18, 178:20, 179:4, 179:8
**revision** [11] - 176:5, 177:1, 177:4, 177:13, 178:16, 198:23, 222:12, 222:13, 222:14, 222:15, 222:23
**revisit** [1] - 50:18
**revoke** [1] - 243:5
**revoked** [4] - 241:23, 242:1, 242:2, 242:21
**Riggs** [3] - 71:17, 71:19, 82:23
**rigorous** [2] - 160:10, 160:11
**ripples** [1] - 213:24
**risk** [2] - 61:17, 62:3
**Road** [3] - 126:17, 146:8, 147:4
**road** [1] - 27:6
**roadster** [1] - 154:23
**Robert** [9] - 24:2, 27:13, 27:21, 28:17, 48:9, 164:17, 164:18, 200:20, 218:9
**Robert's** [1] - 259:18
**rock** [1] - 79:5
**role** [53] - 10:21, 11:24, 12:24, 14:6, 14:7, 20:14, 21:7, 21:8, 23:2, 23:3, 23:4, 23:6, 24:16, 26:12, 26:20, 33:20, 39:6, 41:18, 42:7, 42:9, 42:13, 42:18, 43:1, 43:25, 44:4, 44:8, 44:9, 44:10, 52:1, 52:18, 59:5, 62:19, 69:8, 69:10, 69:12, 69:13, 69:21, 72:16, 84:4, 97:20, 142:1, 159:25, 161:3, 161:10, 166:15, 166:19, 200:14, 211:15, 219:25, 237:19, 241:3, 241:4
**roles** [14] - 11:20, 11:22, 32:22, 41:4, 41:8, 41:10, 42:11, 42:17, 57:18, 58:22, 59:2, 149:1, 149:11, 173:1
**rolled** [1] - 236:11
**rollover** [1] - 130:23
**room** [4] - 31:19, 49:18, 145:8, 145:10
**round** [1] - 21:14
**Rozelsky** [6] - 3:4, 3:7, 3:13, 31:11, 102:6, 103:8
**ROZELSKY** [39] - 1:21, 31:13, 31:16, 34:18, 34:19, 35:19, 48:23, 49:5, 70:10, 70:20, 70:25, 73:6, 85:12, 85:14, 102:8, 103:11, 105:23, 107:11, 107:17, 107:25, 111:17, 111:19, 111:23, 112:5, 134:2, 138:15, 140:11, 140:18, 141:5, 194:17, 220:7, 220:12, 229:16, 229:20, 230:23, 231:17, 245:18, 249:4, 261:3
**Rozelsky's** [2] - 92:4, 97:19
**RPR** [2] - 2:6, 262:25
**Rule** [3] - 50:12, 109:5, 110:25
**rule** [6] - 40:21, 41:24, 41:25, 79:1, 87:20, 108:17
**ruled** [3] - 57:5, 58:3, 106:4
**rules** [7] - 78:24, 78:25, 81:3, 88:7, 94:16, 164:9
**Rules** [2] - 50:12, 108:17
**ruling** [5] - 79:22, 108:7, 108:16, 109:9, 195:17
**rulings** [2] - 62:7, 71:20
**rumors** [5] - 24:3, 24:6, 24:9, 38:9, 38:12
**run** [5] - 35:14, 131:9, 166:6, 167:15, 172:17
**running** [6] - 60:10, 163:24, 165:16, 165:21, 211:13, 211:16
**rush** [2] - 5:10, 184:13

**S**

**s/Debra** [1] - 262:25
**safe** [1] - 142:19
**safety** [6] - 188:5, 188:6, 199:24, 200:1, 200:3
**Safety** [1] - 210:16
**salary** [21] - 58:7, 58:15, 72:9, 122:5, 123:16, 131:19, 132:25, 133:4, 136:23, 137:7, 138:1, 138:3, 138:16, 138:20, 139:6, 139:14, 139:15, 140:9, 213:5, 213:14, 213:22
**sales** [1] - 218:6
**San** [1] - 109:16
**SAP** [19] - 20:18, 20:25, 44:22, 68:14, 95:11, 182:13, 199:11, 223:12, 223:15, 223:19, 223:23, 225:1, 225:2, 225:10, 226:15,

226:22, 227:6, 227:7
**Sara** [2] - 143:5, 144:15
**sat** [5] - 136:23, 158:13, 204:23, 225:13, 252:10
**satisfied** [1] - 72:7
**Savage** [13] - 113:14, 113:15, 113:17, 113:23, 115:25, 118:22, 122:8, 124:21, 125:23, 128:8, 128:11, 130:8, 132:2
**save** [1] - 249:17
**saved** [1] - 214:5
**saw** [13] - 28:25, 49:4, 74:6, 92:6, 180:5, 192:18, 216:25, 222:7, 223:5, 243:9, 243:16, 243:17, 253:24
**SC** [5] - 1:3, 1:18, 1:22, 2:5, 2:7
**scan** [1] - 145:18
**scenario** [1] - 90:14
**schedule** [4] - 52:9, 126:5, 250:22, 259:14
**scheduled** [3] - 60:6, 60:8, 130:5
**scheduling** [1] - 161:14
**School** [1] - 7:17
**scintilla** [1] - 110:9
**scope** [2] - 47:24, 47:25
**Scott** [33] - 3:22, 11:7, 11:10, 14:13, 19:20, 20:4, 22:8, 22:9, 22:17, 22:19, 28:11, 30:18, 43:24, 68:10, 81:25, 181:2, 199:14, 201:5, 201:7, 203:19, 204:5, 210:10, 212:9, 213:13, 216:8, 221:20, 221:21, 239:21, 239:24, 240:2, 254:25, 258:4
**scott** [1] - 11:11
**Scott's** [1] - 201:13
**scout** [1] - 6:18
**Scout** [4] - 6:19, 6:21, 6:24, 173:8
**scramble** [1] - 30:23
**screen** [4] - 16:21, 94:10, 102:24, 123:6
**screenshot** [1] - 3:20
**screwed** [4] - 239:4, 240:8, 241:15, 241:19
**seamless** [2] - 130:23, 131:11
**seamlessly** [1] - 93:23
**search** [1] - 124:17
**seat** [5] - 6:5, 6:7, 112:25, 141:16, 246:8
**seated** [2] - 108:9, 262:5
**seats** [1] - 150:3
**second** [23] - 7:18, 7:19, 7:24, 25:14, 36:7, 45:19, 45:22, 46:22, 67:7, 73:15, 74:17, 77:14, 86:14, 87:6, 103:16, 128:9, 133:24, 137:1, 197:8, 209:15, 223:22, 250:16
**secondary** [2] - 7:21, 22:12
**secondly** [1] - 104:9
**Section** [20] - 10:11, 10:13, 10:16, 10:20, 10:24, 10:25, 11:24, 50:24, 51:8, 51:12, 63:3, 63:8, 63:13, 65:6, 67:23, 84:25, 104:7, 105:5, 105:6, 227:11
**section** [3] - 16:1, 86:9, 104:8
**sections** [1] - 250:17
**sedan** [1] - 155:15
**see** [53] - 19:8, 19:15, 21:6, 22:5, 27:5, 33:1, 36:13, 47:2, 50:3, 74:10, 85:15, 99:1, 114:24, 130:15, 134:6, 134:7, 136:8, 143:22, 145:11, 146:22, 147:14, 149:1, 152:14, 153:12, 153:21, 154:19, 159:16, 164:5, 164:14, 168:18, 171:15, 174:1, 174:8, 175:18, 175:19, 177:1, 181:22, 182:2, 186:21, 196:22, 202:15, 203:16, 213:1, 223:23, 236:1, 244:4, 247:4, 247:12, 247:19, 250:4, 250:6, 262:4
**seeing** [6] - 28:21, 29:5, 127:15, 173:17, 189:10, 250:22
**seek** [3] - 60:19, 134:10, 168:25
**seeking** [3] - 123:15, 123:19, 139:15
**seem** [1] - 234:19
**Seitz** [2] - 197:24, 197:25
**select** [1] - 207:2
**selected** [3] - 207:13, 214:22, 237:1
**semi** [1] - 137:18
**semi-retirement** [1] - 137:18
**send** [6] - 117:13, 121:20, 129:20, 199:12, 242:3, 249:25
**sending** [1] - 242:4
**senior** [19] - 15:19, 21:11, 21:14, 169:17, 169:20, 188:15, 188:18, 188:22, 189:7, 219:24, 243:23, 244:3, 244:18, 244:22, 246:9, 246:12, 260:20, 260:22
**sense** [1] - 167:22
**sent** [9] - 79:2, 79:3, 102:13, 116:19, 121:22, 121:23, 168:3, 190:13, 190:17
**sentence** [2] - 72:11, 72:12
**sentences** [1] - 194:19
**separate** [7] - 101:3, 102:1, 202:2, 218:1, 218:5, 230:19
**separately** [1] - 115:23
**September** [28] - 13:6, 13:7, 13:12, 52:21, 52:22, 52:24, 73:18, 85:6, 116:7, 116:19, 118:3, 118:7, 118:23, 119:9, 119:14, 120:10, 121:17, 121:20, 122:12, 124:7, 124:24, 125:2, 125:24, 127:15, 169:7, 169:25, 171:21, 197:21
**sequence** [1] - 79:16
**sergeant** [1] - 51:24
**serious** [1] - 167:10
**seriously** [1] - 138:25
**serve** [4] - 94:20, 162:24, 169:3, 186:5
**serves** [1] - 96:12
**services** [8] - 114:7, 118:13, 122:22, 123:12, 124:1, 124:5, 174:20, 199:19
**Services** [2] - 110:24, 210:16
**set** [10] - 33:4, 33:7, 83:21, 94:11, 95:6, 116:4, 132:25, 146:13, 147:14, 223:5
**sets** [1] - 32:23
**seven** [2] - 171:9, 201:14
**seventy** [2] - 206:11, 206:13
**several** [10] - 57:12, 64:25, 71:11, 117:22, 141:21, 153:24, 160:17, 174:3, 215:12, 252:12
**sex** [14] - 50:16, 50:24, 51:24, 63:3, 67:24, 68:3, 68:7, 69:24, 70:1, 71:1, 77:15, 81:14, 82:12, 111:11
**shall** [1] - 90:3
**shape** [1] - 133:11
**Shardin** [3] - 71:17, 71:20, 82:23
**share** [3] - 30:2, 35:15, 35:17
**shared** [1] - 133:11
**shed** [1] - 93:11
**sheet** [18] - 53:17, 62:17, 68:16, 103:12, 173:25, 174:5, 175:19, 177:13, 177:16, 221:7, 221:10, 221:25, 222:23, 223:18, 227:5, 227:6, 232:24
**sheets** [2] - 66:3, 223:6
**SHERILL** [2] - 3:8, 112:23
**Sherrill** [2] - 112:20, 113:10
**SHERRY** [2] - 3:11, 141:13
**Sherry** [18] - 3:23, 23:16, 24:1, 26:1, 26:24, 27:14, 27:22, 28:17, 40:18, 41:16, 53:4, 141:10, 141:23, 172:8, 172:13, 172:21, 205:11
**shift** [20] - 9:4, 9:5, 9:6, 9:8, 9:9, 9:11, 9:21, 9:22, 9:23, 9:24, 9:25, 10:4, 10:7, 10:8, 10:15, 165:17
**shining** [1] - 50:1
**Shipbuilding** [1] - 80:13
**shop** [2] - 95:14, 255:1
**short** [7] - 15:4, 120:5, 149:10, 165:17, 183:7, 183:17, 213:21
**short-shrift** [1] - 149:10
**short-term** [1] - 15:4
**shortages** [1] - 165:23
**shot** [1] - 71:12
**show** [38] - 30:6, 36:22, 36:24, 51:20, 52:5, 58:4, 62:5, 67:13, 69:5, 69:16, 71:25, 76:4, 77:19, 78:17, 78:20, 79:6, 82:12, 82:13, 84:20, 91:19, 91:21, 94:18, 102:21, 102:23, 103:22, 178:1, 185:4, 213:13, 221:5, 221:9, 223:23, 225:10, 227:5, 236:14, 239:10, 246:25, 247:9, 252:20
**showed** [8] - 56:11, 89:3, 103:15, 104:16, 190:25, 222:20, 236:24, 243:16
**showing** [12] - 56:7, 56:15, 75:19, 115:7, 139:10, 180:25, 181:1, 181:2, 184:21, 185:11, 223:25, 224:4
**shown** [5] - 36:4, 56:16, 101:7, 175:24, 179:10
**shows** [30] - 44:25, 54:5, 55:20, 55:25, 58:10, 58:13, 75:22, 94:10, 103:4, 161:4, 174:8, 175:23, 178:1, 178:16, 179:6, 186:8, 210:10, 210:13, 210:20, 213:4, 224:6, 224:7, 224:9, 225:12, 236:20, 236:21, 251:18, 254:19, 254:20, 260:13
**shrift** [1] - 149:10
**SHRM** [1] - 100:7
**shutdown** [1] - 60:18
**sic** [2] - 31:3, 48:9

**sick** [3] - 128:16, 129:15, 165:18
**side** [10] - 15:22, 32:5, 41:2, 41:3, 173:23, 182:1, 200:3, 200:10, 252:1, 253:13
**sidebar** [2] - 234:22, 234:25
**sides** [1] - 120:7
**sign** [1] - 136:19
**signed** [1] - 123:10
**significance** [4] - 182:7, 184:21, 184:24, 185:22
**significantly** [1] - 72:18
**similar** [11] - 67:20, 68:6, 69:6, 69:17, 69:18, 84:22, 100:14, 121:7, 153:15, 157:17, 195:4
**simple** [1] - 199:20
**simply** [3] - 55:11, 64:24, 84:23
**Sinanian** [1] - 28:12
**single** [1] - 90:17
**sit** [3] - 129:13, 217:18, 233:12
**site** [2] - 144:21, 146:4
**sites** [2] - 49:21, 82:22
**sitting** [9] - 31:18, 64:4, 66:19, 145:17, 148:13, 181:3, 189:17, 217:21, 225:3
**situation** [6] - 21:13, 69:2, 91:17, 105:6, 117:24, 133:13
**six** [2] - 39:12, 215:5
**Sixty** [2] - 30:20, 246:14
**sixty** [4] - 42:15, 42:22, 116:15, 199:19
**Sixty-four** [1] - 30:20
**sixty-four** [2] - 42:22, 199:19
**skill** [3] - 32:23, 33:4, 33:6
**skin** [2] - 93:12
**slate** [1] - 136:2
**slide** [1] - 135:21
**slot** [2] - 207:4, 207:7
**slow** [2] - 143:17, 143:22
**slower** [1] - 41:11
**small** [2] - 218:13, 255:16
**smaller** [1] - 147:18
**smart** [1] - 136:17
**SO** [2] - 18:6, 34:22
**social** [2] - 14:8, 49:20
**solutions** [1] - 215:15
**someone** [13] - 84:21, 166:8, 174:13, 185:8, 186:10, 202:17, 214:18, 214:20, 233:10, 233:20, 234:2, 234:8, 241:14
**someplace** [3] - 81:6, 254:19, 254:20
**sometimes** [4] - 169:20, 169:22, 182:15, 228:25
**somewhat** [3] - 104:21, 172:5, 238:3
**somewhere** [2] - 138:8, 165:5
**sorry** [19] - 12:16, 17:22, 24:2, 24:20, 39:22, 52:21, 64:20, 86:14, 96:18, 126:7, 140:24, 151:15, 157:6, 170:2, 197:2, 198:16, 210:6, 221:7, 238:4
**sort** [7] - 36:2, 40:20, 48:25, 139:24, 145:10, 145:16, 184:12
**sound** [1] - 228:24
**sounds** [3] - 33:1, 64:13, 199:20
**Source** [2] - 113:19, 113:20
**SOUTH** [3] - 1:1, 2:4, 2:7
**South** [7] - 6:18, 7:16, 99:24, 99:25, 100:2, 143:4, 146:1
**Spartanburg** [25] - 96:21, 97:17, 142:17, 142:21, 143:1, 144:1, 144:18, 146:1, 146:6, 148:19, 153:18, 154:5, 154:21, 157:2, 157:3, 157:12, 157:25, 158:4, 187:9, 187:14, 188:2, 189:1, 208:9, 209:9, 252:24
**SPARTANBURG** [1] - 1:2
**speaking** [1] - 196:8
**speaks** [2] - 178:3, 195:2
**special** [5] - 51:25, 52:20, 148:7, 150:4, 232:6
**Specialist** [4] - 9:3, 9:5, 9:16, 9:17
**specialist** [2] - 10:6, 218:18
**specialized** [1] - 52:6
**specific** [11] - 86:5, 86:21, 98:25, 106:9, 106:15, 120:5, 127:6, 136:24, 139:19, 188:2, 233:2
**specifically** [8] - 14:3, 82:7, 103:4, 103:6, 117:15, 117:25, 124:17, 194:11
**speculate** [3] - 59:4, 69:20, 164:21
**speculation** [16] - 57:2, 58:22, 59:7, 59:17, 61:21, 62:10, 65:12, 67:5, 67:12, 69:4, 71:13, 71:23, 83:17, 84:5, 205:18, 245:18
**speculative** [12] - 54:5, 58:21, 61:25, 62:4, 65:24, 71:10, 73:17, 77:11, 83:10, 83:12, 83:13, 83:25
**speech** [1] - 147:17
**SPENCER** [1] - 1:21
**spend** [1] - 152:3
**spending** [1] - 154:10
**spent** [4] - 75:25, 150:10, 162:14, 228:14
**spoken** [3] - 87:24, 125:4, 132:9
**spokesperson** [1] - 157:1
**Sponsel** [3] - 197:15, 197:22, 197:23
**spot** [3] - 32:20, 220:18, 261:17
**spreadsheet** [1] - 168:13
**square** [3] - 19:21, 19:23, 19:25
**St** [1] - 51:17
**stack** [1] - 115:14
**staff** [6] - 8:9, 36:10, 36:15, 36:18, 37:4, 77:5
**stage** [4] - 57:6, 90:7, 147:14, 148:13
**stamp** [1] - 176:25
**stand** [10] - 5:24, 6:6, 31:17, 64:13, 80:7, 83:2, 112:20, 140:16, 225:15, 230:16
**standard** [7] - 50:19, 57:19, 64:18, 72:6, 110:25, 111:14, 252:21
**standardized** [1] - 185:7
**standards** [1] - 111:7
**standpoint** [1] - 54:3
**Stanford** [1] - 160:20
**star** [4] - 60:25, 61:14, 79:5, 184:19
**Starringer** [1] - 197:9
**start** [18] - 36:2, 40:4, 74:3, 76:17, 81:18, 91:15, 108:6, 112:16, 134:8, 134:9, 136:3, 167:18, 167:19, 167:25, 176:7, 211:14, 231:12, 262:10
**start-up** [1] - 211:14
**started** [21] - 8:13, 36:3, 134:13, 134:25, 142:9, 143:3, 143:10, 143:23, 144:4, 145:24, 146:12, 149:21, 150:7, 151:18, 152:7, 196:16, 215:18, 242:22, 242:23, 243:1, 253:24
**starting** [7] - 71:5, 147:2, 149:13, 211:12, 224:24, 234:4
**starts** [4] - 7:11, 32:13, 104:10, 140:13
**State** [1] - 144:13
**state** [8] - 6:13, 57:24, 67:17, 87:5, 113:6, 141:22, 215:5, 215:11
**statement** [9] - 58:18, 102:14, 172:14, 218:1, 218:5, 227:2, 252:3, 252:6, 252:8
**statements** [1] - 226:22
**States** [6] - 80:12, 90:1, 98:17, 99:22, 155:2, 187:13
**STATES** [3] - 1:1, 1:14, 2:6
**states** [3] - 57:12, 57:14, 119:2
**stating** [1] - 54:12
**status** [4] - 38:14, 104:9, 105:16, 218:19
**statute** [1] - 102:15
**stay** [13] - 10:21, 22:8, 22:15, 47:25, 49:8, 106:19, 120:21, 139:12, 141:7, 168:20, 172:1, 172:4, 240:20
**stayed** [6] - 19:14, 43:25, 45:24, 46:16, 216:22, 251:3
**staying** [3] - 227:20, 251:6, 255:8
**stays** [1] - 102:20
**steer** [1] - 140:12
**Steering** [1] - 159:3
**steering** [4] - 159:3, 161:16, 180:16, 198:4
**stenographic** [1] - 262:19
**STENOTYPE/ COMPUTER** [1] - 2:9
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:9
**step** [7] - 79:16, 117:11, 121:13, 124:14, 141:6, 218:16, 261:6
**Stephan** [4] - 175:5, 175:13, 193:11, 251:17
**STEPHENSON** [1] - 1:17
**stepped** [1] - 136:2
**stepping** [1] - 117:21
**stick** [1] - 156:3
**still** [36] - 14:8, 21:8, 50:2, 56:20, 56:25, 63:11, 64:21, 85:20, 90:8, 92:20, 92:21, 93:7, 93:16, 101:19, 101:20, 102:24, 105:13, 105:15, 106:5, 106:10, 147:4, 148:14, 159:12, 161:2, 165:12, 170:8, 172:23, 173:9, 173:16, 173:19, 199:9, 211:15, 224:20, 236:10, 238:23, 252:15
**stint** [2] - 45:20, 45:22
**stints** [1] - 45:16
**stone** [1] - 83:21
**stop** [3] - 107:17, 140:13, 192:16
**stopped** [3] - 60:7, 138:24, 192:12

**storage** [1] - 144:25
**stories** [1] - 49:21
**strategic** [8] - 14:9, 34:4, 43:3, 169:4, 205:8, 205:12, 217:2, 257:19
**strategies** [2] - 100:5, 201:21
**strategy** [6] - 74:4, 180:17, 200:24, 202:14, 237:8
**streamline** [2] - 5:14, 183:1
**STREET** [3] - 1:18, 2:4, 2:7
**stress** [1] - 139:11
**strict** [1] - 199:24
**strictly** [2] - 57:1, 66:4
**strike** [1] - 204:25
**strong** [1] - 88:16
**Strossner's** [1] - 132:22
**structural** [2] - 150:12, 154:10
**structure** [25] - 16:3, 22:6, 22:15, 22:17, 34:2, 34:3, 41:9, 41:21, 43:2, 95:6, 147:2, 149:20, 150:22, 150:23, 150:24, 151:1, 151:8, 154:18, 159:8, 159:9, 182:4, 182:5, 185:25, 187:12, 253:9
**Structure** [1] - 153:22
**structured** [2] - 24:25, 201:4
**struggle** [1] - 104:5
**struggled** [1] - 104:21
**struggles** [1] - 165:10
**studied** [1] - 160:20
**studies** [1] - 153:10
**stuff** [3] - 114:16, 144:24, 146:25
**subject** [3] - 20:19, 60:14, 86:22
**subjected** [1] - 80:10
**submit** [5] - 51:2, 72:25, 246:17, 247:1, 250:14
**submitted** [1] - 108:13
**subsidiaries** [2] - 98:7
**subsidiary** [7] - 88:11, 88:12, 88:15, 88:17, 90:24, 97:15, 98:17
**subsidiary's** [1] - 88:11
**subsidy** [2] - 207:21, 209:1
**substance** [1] - 194:12
**substantial** [3] - 91:19, 93:17, 95:7
**substantially** [4] - 88:9, 91:22, 102:21, 103:23
**succeed** [2] - 37:8, 38:5
**success** [1] - 133:4
**succession** [25] - 14:12, 14:19, 14:22, 14:25, 15:3, 15:9, 15:21, 17:3, 17:4, 17:10, 17:24, 18:9, 18:11, 18:22, 19:6, 20:13, 21:20, 23:11, 32:8, 34:6, 34:7, 34:8, 34:9, 37:7, 97:1
**successor** [2] - 25:9, 75:2
**successors** [1] - 17:13
**sue** [1] - 90:19
**sued** [1] - 60:20
**suffer** [4] - 54:12, 58:25, 158:23
**suffered** [10] - 51:10, 52:5, 54:6, 54:15, 56:24, 57:22, 62:23, 62:25, 137:21, 138:7
**sufficient** [3] - 50:20, 51:2, 108:20
**suggest** [4] - 89:13, 106:6, 140:8, 229:25
**suggested** [2] - 88:6, 103:21
**suggesting** [1] - 230:23
**suggestion** [1] - 256:5
**suing** [1] - 90:17
**suit** [2] - 32:22, 86:21
**suit-related** [1] - 86:21
**SUITE** [1] - 2:4
**suited** [1] - 162:15
**Sumitomo** [2] - 90:15, 90:22
**summarize** [4] - 16:25, 17:2, 193:12, 194:21
**summarizes** [1] - 195:6
**summary** [14] - 54:21, 57:6, 58:3, 59:15, 60:22, 61:11, 71:18, 73:10, 85:22, 90:7, 93:7, 106:4, 108:14, 149:2
**Summary** [1] - 82:24
**summer** [2] - 7:8, 38:9
**sun** [1] - 50:1
**super** [1] - 196:9
**superior** [1] - 233:8
**supervise** [1] - 167:5
**supervision** [1] - 244:14
**supervisor** [13] - 8:9, 8:10, 8:12, 8:18, 8:24, 9:2, 9:4, 9:9, 9:10, 60:7, 60:11, 60:15, 179:11
**supervisory** [2] - 72:16, 93:20
**suppliers** [1] - 114:5
**support** [13] - 28:18, 67:20, 76:10, 99:6, 109:19, 137:23, 157:12, 160:13, 162:17, 166:5, 198:3, 205:2, 209:8
**supposed** [6] - 81:24, 82:2, 240:2, 240:20, 240:22, 245:12
**Supreme** [13] - 51:16, 51:18, 51:19, 61:25, 71:11, 80:12, 86:25, 90:15, 90:22, 97:14, 98:13, 98:16, 110:22
**surprised** [2] - 158:5, 253:11
**survive** [1] - 104:25
**Sustained** [1] - 245:19
**sustained** [2] - 249:8, 253:14
**sworn** [6] - 6:1, 6:3, 112:21, 112:23, 141:13, 194:3
**system** [15] - 20:18, 20:19, 32:5, 68:14, 100:17, 145:18, 155:23, 185:2, 199:11, 260:2, 260:4, 260:5, 260:17
**systems** [4] - 143:14, 145:1, 151:4, 155:25

### T

**T-Vorhalt** [2] - 95:13, 252:11
**tackle** [1] - 201:22
**tagged** [1] - 7:22
**takeover** [1] - 151:19
**talent** [1] - 172:21
**Talent** [2] - 186:23, 187:5
**talks** [1] - 106:22
**target** [10] - 161:16, 180:24, 181:4, 181:5, 181:10, 181:13, 181:15, 257:24, 261:9
**targeting** [1] - 233:24
**Targets** [1] - 161:11
**targets** [4] - 162:3, 181:6, 181:7, 181:8
**team** [39] - 11:3, 14:10, 15:11, 23:6, 23:25, 26:8, 34:25, 56:10, 56:11, 148:6, 150:7, 154:6, 154:8, 154:10, 159:5, 159:10, 166:12, 167:23, 167:24, 168:8, 171:14, 173:2, 173:9, 175:1, 175:2, 201:8, 201:11, 201:13, 210:7, 219:9, 233:18, 240:10, 244:18, 257:16, 258:4, 258:7, 258:9
**teams** [2] - 145:24, 257:19
**technical** [16] - 21:7, 89:22, 89:23, 89:24, 90:6, 90:11, 91:8, 99:12, 99:14, 99:15, 99:16, 174:15, 217:3, 218:22
**technology** [3] - 16:12, 159:3, 255:11
**template** [1] - 88:25
**temporaries** [1] - 167:16
**temporary** [1] - 168:18
**ten** [14] - 45:17, 45:18, 45:19, 46:2, 46:3, 75:3, 84:12, 160:12, 183:8, 229:14, 232:3, 232:16, 247:17, 256:20
**ten-plus** [2] - 232:3, 232:16
**tension** [2] - 167:7, 168:21
**tenure** [1] - 255:10
**tenured** [1] - 83:4
**term** [8] - 15:4, 31:22, 51:21, 61:4, 62:5, 107:1
**terminated** [1] - 83:6
**termination** [1] - 60:14
**terminations** [1] - 83:5
**terminology** [1] - 117:18
**terms** [7] - 52:13, 56:21, 63:15, 77:11, 80:11, 93:17, 120:18
**Terra** [1] - 110:23
**territories** [1] - 90:4
**territory** [2] - 90:25, 91:1
**Tesla** [1] - 237:7
**test** [2] - 87:1, 145:2
**testified** [59] - 6:4, 38:21, 47:18, 53:3, 53:7, 53:18, 53:23, 54:8, 54:10, 54:17, 54:23, 55:15, 56:1, 63:23, 66:15, 68:18, 69:7, 74:24, 75:2, 76:5, 76:21, 77:2, 84:16, 86:16, 87:23, 88:18, 91:23, 94:1, 95:9, 95:12, 95:17, 96:24, 99:18, 100:11, 103:19, 112:24, 141:13, 164:24, 170:4, 174:25, 176:15, 190:3, 191:21, 194:18, 194:23, 194:24, 199:4, 215:4, 222:4, 222:21, 228:12, 231:23, 241:17, 241:22, 242:14, 248:21, 250:21, 258:3, 260:11
**testifies** [1] - 93:22
**testify** [7] - 77:1, 164:25, 178:4, 205:20, 230:25, 235:3, 239:3
**testifying** [3] - 25:16, 36:4, 222:5
**testimony** [64] - 5:7, 52:16, 58:9, 62:16, 64:12, 64:18, 65:7, 65:16, 66:7, 68:8, 74:14, 75:5, 75:24, 76:12, 76:16, 76:19, 76:20, 78:23, 85:8,

85:25, 87:10, 89:1, 89:12, 89:15, 89:20, 90:11, 93:5, 94:22, 95:9, 96:22, 97:4, 100:14, 102:18, 103:1, 106:12, 111:4, 111:11, 111:25, 112:17, 137:7, 137:17, 138:4, 138:20, 139:5, 140:10, 149:9, 164:17, 171:7, 172:8, 176:9, 180:4, 183:15, 188:21, 190:2, 190:10, 195:4, 201:5, 204:23, 239:1, 239:6, 252:15, 253:11, 254:10, 261:11
**testing** [2] - 143:12, 149:22
**text** [2] - 79:2, 79:3
**textile** [1] - 144:12
**textiles** [1] - 143:4
**Thailand** [1] - 35:4
**thankful** [1] - 132:23
**THE** [160] - 1:1, 1:1, 1:13, 1:17, 1:19, 5:2, 5:5, 5:25, 6:2, 6:5, 6:7, 11:9, 11:10, 11:11, 16:16, 16:18, 18:15, 24:20, 24:22, 24:23, 24:24, 25:18, 31:12, 31:14, 35:21, 36:7, 39:24, 42:25, 43:3, 43:4, 44:19, 46:24, 47:25, 49:7, 49:9, 49:13, 50:8, 70:9, 70:17, 71:2, 71:7, 73:4, 73:7, 75:8, 75:12, 75:15, 75:18, 80:1, 82:17, 85:11, 85:13, 91:12, 101:12, 101:15, 102:3, 104:1, 104:22, 105:2, 106:17, 106:25, 107:9, 107:13, 107:21, 108:1, 108:4, 108:9, 111:18, 111:21, 111:24, 112:3, 112:7, 112:10, 112:21, 112:22, 112:25, 115:7, 123:3, 139:5, 140:5, 141:6, 141:12, 141:15, 143:16, 143:18, 143:19, 146:9, 146:10, 149:4, 157:7, 164:25, 165:3, 176:5, 176:6, 176:11, 176:13, 176:18, 178:3, 178:6, 178:22, 182:21, 183:3, 183:6, 183:14, 183:16, 183:18, 183:21, 185:15, 186:25, 191:10, 191:13, 192:3, 192:4, 192:5, 192:6, 192:7, 193:15, 194:22, 195:12, 195:18, 196:1, 205:20, 211:23, 212:22, 218:3, 218:4, 220:16, 221:13, 225:20, 225:21, 227:14, 231:6, 231:12, 231:20, 232:13, 232:14, 234:15, 234:24, 235:3, 235:5, 239:9, 241:2, 241:3, 245:19, 246:3, 247:22, 248:4, 248:8, 248:10, 248:12, 248:15, 249:8, 250:18, 253:14, 255:15, 256:12, 261:4, 261:6, 261:8, 262:8, 262:13
**themselves** [2] - 19:12, 189:16
**theory** [1] - 101:2
**thereby** [1] - 114:18
**Therefore** [1] - 69:22
**therefore** [7] - 62:19, 65:4, 65:18, 67:3, 67:21, 69:16, 98:19
**thinking** [6] - 102:6, 112:11, 148:20, 157:11, 211:20, 262:10
**third** [4] - 67:8, 87:8, 186:17, 186:18
**Thirteen** [2] - 198:15, 198:17
**thirty** [1] - 142:5
**thirty-three** [1] - 142:5
**thoughts** [3] - 23:14, 26:22
**thousand** [3] - 8:6, 148:20, 148:23
**threatened** [1] - 61:20
**three** [79] - 6:22, 9:18, 9:19, 12:23, 33:16, 37:20, 38:4, 43:15, 43:22, 44:1, 44:13, 44:14, 44:15, 45:9, 45:11, 45:12, 45:14, 46:12, 46:13, 47:13, 53:17, 58:14, 62:18, 64:7, 66:2, 66:14, 68:9, 68:15, 68:25, 69:9, 73:21, 74:5, 78:23, 81:19, 81:21, 81:24, 82:6, 83:23, 85:5, 85:9, 85:18, 85:19, 87:1, 87:17, 99:3, 99:7, 116:23, 142:5, 144:16, 144:17, 152:7, 152:13, 152:18, 152:23, 165:17, 174:9, 175:24, 177:8, 179:6, 179:9, 179:10, 179:21, 181:1, 181:2, 181:3, 181:11, 199:3, 213:1, 213:2, 216:20, 221:21, 222:7, 222:20, 225:6, 225:16, 236:20, 236:24, 242:19
**three-part** [1] - 87:1
**threes** [6] - 180:19, 180:23, 181:11, 184:1, 199:5, 224:25
**throughout** [8] - 45:13, 60:5, 79:15, 97:19, 117:23, 124:15, 145:10, 226:7
**throwing** [1] - 249:5
**Thursday** [2] - 126:11, 126:13
**tie** [4] - 22:13, 40:25, 41:1, 41:3
**tie-in** [3] - 22:13, 41:1, 41:3
**tie-ins** [1] - 40:25
**tied** [1] - 182:14
**tier** [2] - 114:4
**timing** [3] - 158:7, 211:10, 221:3
**TIMOTHY** [1] - 1:13
**Title** [15] - 50:23, 50:24, 51:8, 51:11, 59:15, 60:21, 63:2, 63:8, 63:13, 65:6, 67:23, 70:1, 80:19, 84:25, 104:10
**title** [5] - 9:15, 10:9, 121:7, 236:21, 260:14
**today** [11] - 31:9, 35:25, 49:16, 108:15, 173:6, 173:16, 181:9, 189:17, 208:11, 212:10, 253:19
**together** [31] - 5:13, 13:22, 15:11, 15:18, 15:23, 17:10, 17:11, 33:18, 115:22, 147:2, 147:5, 153:11, 153:19, 154:6, 154:7, 157:21, 167:20, 167:21, 167:24, 167:25, 168:1, 168:7, 171:22, 173:3, 173:10, 181:7, 189:14, 215:15, 219:9, 233:24, 246:23
**tomorrow** [1] - 143:19
**tons** [1] - 194:8
**took** [31] - 8:2, 44:12, 53:15, 57:17, 66:17, 69:11, 69:13, 69:15, 76:15, 94:12, 96:18, 112:15, 143:6, 159:10, 160:8, 160:17, 169:12, 170:4, 173:1, 174:10, 188:4, 188:5, 190:14, 196:11, 206:18, 207:23, 226:19, 234:12, 242:2, 242:24
**tool** [1] - 261:24
**tools** [2] - 151:4, 153:7
**top** [9] - 21:6, 149:13, 149:16, 177:2, 203:13, 204:17, 228:12, 228:17, 229:24
**topics** [3] - 89:7, 167:11, 202:22
**Toro** [1] - 57:8
**total** [5] - 12:23, 45:16, 105:5, 174:19, 229:14
**towards** [2] - 15:2, 184:12
**Toyota** [3] - 110:13, 216:2, 237:11
**track** [3] - 187:10, 187:17, 215:20
**trade** [1] - 218:24
**traded** [5] - 151:21, 151:23
**tradition** [2] - 48:25, 49:1
**traditional** [1] - 232:6
**traffic** [1] - 261:15
**train** [2] - 149:24, 157:18
**Training** [2] - 186:24, 187:5
**training** [3] - 145:20, 145:22, 197:19
**trajectory** [1] - 142:21
**transaction** [1] - 86:5
**transactional** [1] - 164:11
**TRANSCRIPT** [1] - 262:15
**transcript** [2] - 235:12, 262:19
**TRANSCRIPTION** [1] - 2:9
**transfer** [9] - 51:20, 52:4, 52:14, 57:18, 57:23, 62:20, 72:7, 83:9
**transferred** [6] - 51:25, 52:8, 57:11, 57:13, 58:23, 225:5
**transferring** [1] - 58:6
**transfers** [2] - 57:12, 72:4
**transformative** [1] - 148:6
**translate** [4] - 194:2, 194:3, 194:7, 194:20
**translated** [1] - 194:25
**translation** [1] - 195:14
**translator** [4] - 193:20, 193:23, 194:2
**Trauth** [6] - 48:9, 48:10, 48:11, 48:16, 100:21, 252:22
**Trauth's** [1] - 252:13
**travelled** [1] - 69:10
**travelling** [2] - 5:17, 152:8
**treated** [14] - 63:22, 64:23, 65:4, 67:19, 68:5, 69:5, 69:17, 77:23, 81:1, 81:16, 81:17, 84:14, 167:9, 167:13
**treating** [1] - 81:13
**treatment** [13] - 65:3, 77:20, 79:6, 79:10, 80:23, 81:6, 81:12, 82:9, 82:11, 82:14, 84:20, 84:21, 101:7
**Treaty** [27] - 89:19, 90:1, 90:14, 91:6, 97:9, 97:10, 97:12, 98:4, 98:5, 98:6, 98:12, 98:18, 98:20, 100:25, 101:4, 101:5, 101:8, 111:19, 230:2, 230:5, 230:6, 230:9, 230:15, 231:4
**treaty** [4] - 70:22,

90:23, 230:20, 230:21
**tree** [2] - 114:17, 134:19
**trial** [28] - 5:4, 50:6, 74:16, 74:17, 74:18, 75:6, 75:11, 100:14, 108:19, 109:8, 112:9, 137:4, 137:5, 139:18, 141:21, 172:10, 182:23, 182:24, 183:13, 183:20, 193:17, 193:18, 220:15, 229:18, 229:19, 244:2, 253:21, 262:7
**TRIAL** [1] - 1:14
**tried** [2] - 93:9, 93:10
**trim** [1] - 150:2
**trouble** [3] - 239:4, 240:8, 241:16
**true** [6] - 97:22, 202:13, 202:18, 203:1, 204:13, 225:7
**trump** [1] - 94:16
**trumped** [1] - 94:17
**trust** [1] - 198:8
**truth** [3] - 112:13, 139:4, 195:5
**truthful** [1] - 226:23
**try** [12] - 30:23, 40:23, 108:6, 118:12, 126:8, 140:3, 149:11, 172:4, 183:1, 219:8, 232:21, 261:14
**trying** [27] - 5:10, 33:4, 78:20, 127:7, 137:6, 137:14, 137:16, 137:18, 138:23, 151:3, 155:21, 163:24, 163:25, 165:12, 167:14, 202:24, 215:9, 219:7, 225:3, 231:9, 233:8, 239:2, 239:10, 239:15, 243:13, 250:17, 255:7
**TS** [2] - 189:5, 260:12
**TS-1** [1] - 161:13
**TS-41** [1] - 159:2
**TS-42** [1] - 153:14
**TS-44** [1] - 153:14
**TS-8** [1] - 159:20
**tucker** [1] - 255:4
**turn** [2] - 40:3, 67:24
**TV** [1] - 261:20
**twenty** [3] - 18:24, 47:9, 208:11
**twenty-five** [1] - 208:11
**twenty-one** [2] - 18:24, 47:9
**twice** [3] - 14:23, 14:25, 68:13
**Two** [1] - 8:6
**two** [69] - 6:22, 8:3, 9:23, 9:24, 10:15, 10:22, 17:7, 22:4, 22:5, 22:6, 23:3, 23:4, 23:9, 25:14, 27:15, 34:25, 43:7, 44:6, 44:14, 45:15, 45:20, 46:11, 54:14, 54:25, 55:4, 55:5, 55:8, 55:12, 59:17, 60:18, 73:12, 73:13, 74:5, 74:21, 74:22, 76:7, 76:8, 76:9, 78:21, 90:10, 99:10, 101:24, 102:1, 105:16, 114:4, 122:6, 139:18, 155:14, 161:1, 161:25, 165:16, 180:9, 180:22, 185:3, 195:3, 206:11, 206:13, 206:19, 214:16, 229:15, 230:13, 234:13, 237:25, 247:11, 250:8, 255:2, 259:19
**two-and-a-half** [1] - 6:22
**two-week** [1] - 60:18
**TX** [2] - 27:20, 27:21
**TX-4** [4] - 27:20, 27:21, 152:15, 209:17
**TX-6** [42] - 13:25, 17:11, 18:3, 19:4, 25:8, 26:18, 29:18, 30:17, 37:15, 48:7, 48:18, 52:23, 52:24, 56:5, 56:14, 86:6, 86:7, 86:10, 92:24, 96:21, 102:11, 164:6, 167:3, 169:6, 169:8, 169:12, 169:25, 171:17, 171:21, 173:7, 175:8, 180:23, 187:21, 189:9, 189:15, 220:9, 222:24, 227:24, 228:10, 242:25, 246:18, 250:25
**TX-60** [55] - 17:14, 17:15, 19:5, 21:4, 26:6, 26:13, 28:9, 33:20, 33:24, 37:7, 41:18, 43:2, 44:7, 45:13, 45:14, 48:12, 48:19, 52:18, 53:19, 55:19, 56:11, 56:20, 56:25, 62:11, 66:1, 74:4, 86:8, 86:10, 89:22, 92:22, 95:2, 98:22, 99:16, 171:8, 171:19, 174:1, 174:6, 174:10, 174:25, 175:10, 175:15, 179:16, 207:2, 207:4, 207:15, 216:25, 225:24, 232:25, 233:1, 242:13, 246:18, 246:21, 247:1, 249:23
**TX-60's** [1] - 77:1
**TX-61** [50] - 3:19, 11:17, 11:18, 12:4, 12:10, 12:15, 12:19, 12:22, 12:24, 13:15, 13:24, 14:3, 14:5, 15:20, 28:9, 33:13, 33:15, 33:19, 36:11, 43:14, 43:18, 44:9, 45:3, 45:16, 47:19, 53:2, 53:6, 73:21, 78:2, 78:3, 81:4, 81:5, 81:19, 85:7, 94:13, 175:19, 175:22, 177:6, 177:16, 179:25, 221:4, 221:7, 221:10, 221:19, 221:22, 221:25, 222:6, 224:2, 227:7
**TX-62** [3] - 20:14, 28:10, 28:11
**TX-64** [78] - 12:9, 22:19, 28:11, 29:15, 30:6, 42:19, 43:12, 46:16, 52:15, 52:19, 53:2, 53:6, 53:8, 53:16, 53:21, 53:24, 54:18, 55:9, 55:17, 56:2, 56:8, 56:12, 56:15, 58:6, 58:11, 58:18, 59:5, 62:15, 62:17, 65:23, 66:1, 66:4, 66:9, 66:12, 66:13, 67:6, 67:7, 68:11, 68:12, 68:15, 68:19, 69:8, 69:12, 69:13, 69:21, 73:16, 73:24, 74:4, 74:6, 75:1, 75:3, 75:20, 75:23, 81:22, 82:7, 93:4, 184:14, 198:19, 199:1, 212:11, 214:12, 216:9, 219:24, 231:23, 232:21, 233:4, 233:15, 234:3, 235:14, 238:10, 239:20, 239:23, 240:22, 257:1, 257:11, 258:12
**TX-65** [4] - 28:11, 66:11, 186:23, 187:5
**TX-66** [1] - 96:4
**TX-7** [1] - 246:17
**TX2** [1] - 32:21
**TX4** [1] - 227:20
**TX5** [1] - 32:21
**tying** [1] - 20:18
**type** [10] - 41:10, 97:8, 101:1, 101:10, 129:10, 151:6, 188:2, 232:6, 234:7, 261:21
**typical** [3] - 123:23, 124:13, 129:11
**typically** [3] - 123:21, 136:13

**U**

**U.S** [16] - 57:8, 60:1, 79:23, 80:14, 86:25, 90:17, 90:19, 90:24, 91:8, 98:15, 99:23, 99:24, 99:25, 100:2, 100:3, 110:22
**U.S.I** [1] - 61:9
**ultimate** [1] - 107:7
**ultimately** [9] - 64:5, 73:22, 76:15, 85:24, 90:22, 107:5, 121:4, 160:25, 168:19
**un-supervisory** [1] - 72:16
**unable** [1] - 64:22
**unaware** [1] - 54:8
**under** [39] - 50:23, 50:24, 51:8, 52:11, 57:19, 60:21, 62:23, 63:2, 63:7, 66:18, 67:12, 67:19, 67:23, 68:6, 69:6, 69:17, 76:4, 76:14, 80:18, 82:1, 84:22, 84:25, 88:6, 98:18, 104:7, 104:19, 105:17, 108:24, 109:5, 111:21, 113:22, 123:13, 178:19, 179:4, 209:16, 230:2, 231:4, 244:14, 249:5
**underneath** [6] - 42:4, 42:5, 42:11, 42:15, 103:15, 162:16
**understandings** [1] - 260:15
**understood** [3] - 106:5, 125:9, 136:4
**Understood** [1] - 115:24
**undo** [1] - 138:4
**unequivocally** [1] - 102:8
**unfair** [8] - 190:22, 190:23, 191:5, 192:13, 193:24, 229:25, 245:3, 245:12
**unfortunately** [1] - 36:23
**ungraded** [1] - 173:16
**unidentified** [1] - 53:8
**uniform** [1] - 143:8
**union** [1] - 100:16
**Union** [1] - 133:3
**UNITED** [3] - 1:1, 1:14, 2:6
**United** [6] - 80:12, 90:1, 98:17, 99:22, 155:2, 187:13
**Universal** [1] - 91:20
**University** [3] - 7:16, 144:13, 160:21
**unknown** [2] - 58:20, 67:10
**unlawful** [2] - 63:12, 68:3
**unless** [2] - 55:4, 91:2
**unprofessional** [1] - 136:19
**unpublished** [2] - 59:20, 61:13
**unscheduled** [1] - 61:23
**unscrewed** [2] - 215:5, 241:19
**unusual** [2] - 13:13, 13:17
**unwritten** [1] - 94:16
**up** [95] - 6:7, 9:22, 16:9, 16:13, 17:7, 19:21, 20:17, 22:7, 27:5, 27:11, 45:15, 49:14, 59:11, 64:21, 65:8, 75:9, 76:7, 77:15, 79:9, 79:24, 80:23, 84:23, 87:10, 90:10, 92:6, 94:21, 99:13, 103:4, 112:14, 112:15, 112:16, 112:21, 118:15, 122:24, 124:3, 124:21, 129:15, 131:8, 135:17, 138:16, 139:1, 143:6, 144:18, 146:13,

146:17, 147:12, 147:14, 153:15, 157:13, 158:9, 159:24, 161:22, 164:2, 166:23, 167:18, 167:25, 168:9, 172:6, 177:1, 184:11, 185:24, 193:24, 194:4, 194:12, 195:10, 198:14, 204:20, 206:18, 208:12, 208:18, 208:21, 208:24, 211:14, 213:9, 213:12, 213:14, 213:21, 214:22, 216:12, 218:21, 230:14, 230:16, 233:12, 236:25, 239:4, 240:8, 241:8, 241:15, 241:19, 250:22, 253:1, 255:20, 255:23, 256:7, 262:8
**upcoming** [1] - 211:21
**update** [3] - 21:1, 125:3, 129:2
**upheld** [1] - 59:14
**uphold** [1] - 64:11
**upholding** [1] - 61:11
**ups** [1] - 47:6
**upset** [8] - 168:22, 190:6, 190:7, 191:22, 191:24, 225:4, 225:17
**Upstate** [1] - 124:16
**urgency** [1] - 137:24
**USA** [1] - 113:20
**utilized** [1] - 184:23

**V**

**vacation** [1] - 30:10
**valid** [2] - 25:20, 51:7
**validated** [19] - 11:23, 46:13, 55:5, 55:8, 55:12, 76:8, 76:9, 99:11, 159:25, 160:4, 160:25, 161:2, 161:6, 204:18, 204:21, 204:24, 205:2, 205:13, 250:15
**validates** [1] - 94:20
**validation** [13] - 106:8, 159:23, 160:1, 160:7, 160:16, 160:18, 160:23, 192:23, 192:24, 193:4, 204:15, 205:16, 205:23
**value** [3] - 33:1, 33:3, 131:24
**Van** [8] - 57:7, 57:10, 57:21, 58:2, 58:21, 59:4, 79:17, 79:18
**variance** [1] - 136:23
**variation** [1] - 99:20
**varied** [1] - 42:7
**veered** [1] - 105:19
**vehicle** [1] - 52:9
**verbatim** [1] - 40:10
**verdict** [11] - 4:4, 73:2, 85:17, 91:10, 91:25, 105:17, 109:2, 109:4, 109:7, 110:5, 110:19
**version** [1] - 19:5
**versus** [17] - 51:11, 51:12, 51:17, 57:7, 59:21, 72:2, 80:13, 88:7, 88:14, 109:10, 109:16, 109:21, 110:2, 110:7, 110:12, 110:21, 110:23
**VERSUS** [1] - 1:5
**Vice** [35] - 14:1, 23:17, 23:23, 24:13, 55:10, 55:14, 99:1, 137:20, 138:8, 142:2, 161:11, 161:25, 162:8, 162:21, 162:24, 163:2, 166:15, 169:17, 173:13, 174:11, 174:24, 178:10, 181:14, 190:14, 204:8, 209:23, 219:12, 226:9, 226:11, 229:3, 238:1, 241:23, 252:24, 252:25, 253:22
**vice** [16] - 161:4, 161:7, 206:2, 206:9, 206:14, 206:20, 206:22, 228:13, 228:14, 229:4, 229:9, 229:11, 229:13, 230:11
**vicinity** [1] - 146:21
**view** [4] - 201:6, 202:1, 218:13, 219:11
**viewed** [1] - 191:5
**viewing** [2] - 111:5, 111:12
**VII** [14] - 50:24, 50:25, 51:8, 51:11, 59:15, 60:21, 63:2, 63:8, 63:13, 65:6, 67:23, 80:19, 84:25, 104:10
**violated** [1] - 60:15
**violates** [1] - 78:24
**violating** [1] - 78:24
**virtual** [2] - 119:17, 122:14
**VOLUME** [1] - 1:15
**volume** [1] - 154:24
**volunteered** [1] - 139:24
**Vorhalt** [2] - 95:13, 252:11
**VP** [15] - 11:25, 18:6, 21:13, 24:4, 26:2, 32:13, 37:24, 53:5, 142:7, 162:3, 162:4, 185:20, 217:12, 219:3
**VPs** [2] - 32:25, 180:12

**W**

**wage** [4] - 246:1, 246:7, 247:6, 249:20
**wages** [9] - 100:15, 208:2, 208:8, 208:21, 208:24, 246:13, 246:16, 248:21, 249:23
**wait** [1] - 137:2
**waiting** [1] - 129:14
**walked** [2] - 56:19, 65:17
**walking** [1] - 259:11
**walls** [1] - 129:13
**washes** [1] - 145:3
**washing** [1] - 151:23
**watched** [2] - 142:20, 225:14
**ways** [8] - 5:17, 80:25, 88:8, 98:8, 102:16, 104:14, 104:19, 215:22
**wear** [2] - 50:3, 160:2
**wearing** [2] - 85:16, 143:8
**weaved** [1] - 79:14
**websites** [1] - 261:22
**Wednesday** [6] - 5:10, 5:13, 126:11, 126:12, 129:19, 220:19
**week** [3] - 60:18, 158:13, 168:10
**weekend** [1] - 5:6
**weekly** [1] - 126:1
**weeks** [3] - 116:13, 126:3, 128:19
**welcome** [3] - 5:5, 112:10, 240:15
**WERKE** [2] - 1:6, 1:20
**whatsoever** [3] - 35:13, 84:10, 261:25
**wheel** [1] - 105:6
**white** [2] - 77:19, 143:9
**whites** [1] - 80:17
**WHITSETT** [1] - 1:18
**whoa** [2] - 186:25
**whole** [12] - 20:19, 24:10, 29:21, 91:15, 101:2, 105:20, 131:12, 145:10, 156:22, 166:5, 215:11, 229:15
**wholly** [1] - 98:16
**wholly-owned** [1] - 98:16
**wife** [2] - 117:3, 117:20
**wife's** [1] - 117:13
**willing** [3] - 125:6, 201:10, 261:11
**winter** [1] - 60:18
**wiring** [1] - 150:3
**withdraw** [2] - 25:21, 34:18
**withholding** [1] - 111:20
**witness** [22] - 6:5, 6:8, 39:21, 39:24, 91:23, 112:18, 113:1, 115:2, 134:2, 141:16, 157:7, 178:4, 191:9, 191:11, 193:20, 194:6, 195:1, 231:7, 234:15, 248:13, 261:4, 261:11
**WITNESS** [15] - 11:10, 24:22, 24:24, 43:3, 143:18, 146:10, 165:3, 176:5, 178:6, 192:4, 192:6, 218:4, 225:21, 232:14, 241:3
**witnesses** [4] - 98:10, 138:5, 186:20, 195:4
**wits** [1] - 135:24
**wives** [1] - 126:23
**woman** [2] - 77:19, 81:15
**women** [1] - 80:17
**won** [1] - 158:3
**Woodruff** [1] - 218:11
**word** [4] - 31:6, 32:3, 134:14, 134:16
**worded** [1] - 105:9
**words** [5] - 10:12, 40:10, 125:7, 133:5, 235:11
**work-force** [1] - 201:23
**worker** [1] - 25:3
**workers** [3] - 170:12, 171:3, 233:9
**works** [1] - 246:21
**workshop** [3] - 189:9, 189:12, 260:12
**world** [4] - 96:13, 136:7, 155:3, 229:7
**worried** [3] - 38:13, 166:9, 166:10
**worry** [1] - 243:11
**worse** [1] - 72:18
**worth** [1] - 156:23
**wow** [2] - 16:11, 148:11
**wrap** [2] - 64:20, 210:7
**write** [1] - 145:22
**writing** [2] - 195:14, 201:1
**written** [5] - 85:4, 94:16, 194:3, 252:2, 252:3
**wrote** [3] - 79:1, 83:19, 251:16

**X**

**X3** [1] - 154:7
**X5** [12] - 150:6, 150:7, 150:8, 150:12, 150:17, 150:21, 150:22, 152:19, 152:20, 153:19, 157:14
**X5s** [1] - 157:21

**Y**

**y'all** [6] - 27:9, 32:22, 139:7, 166:3, 220:19, 231:15
**yards** [3] - 259:6, 259:7, 259:20
**Year** [2] - 87:15, 87:16
**year** [45] - 9:13, 13:6, 13:7, 14:23, 14:25, 15:1, 15:3, 18:23, 18:25, 19:2, 19:14, 22:4, 22:6, 29:17, 29:21, 29:23, 45:8, 78:21, 84:12, 84:13, 84:18, 87:17, 114:23, 132:14, 142:14, 142:16, 148:16, 149:23, 150:14, 151:16, 159:7,

159:22, 161:23, 161:24, 162:21, 170:9, 170:10, 209:23, 212:19, 239:5, 240:8, 248:10
**year-end** [1] - 29:21
**years** [71] - 6:22, 7:11, 8:3, 8:20, 8:21, 8:25, 9:1, 9:18, 9:19, 9:23, 9:24, 9:25, 10:15, 10:22, 19:19, 20:12, 22:5, 23:3, 23:5, 27:6, 32:18, 33:6, 45:16, 45:17, 45:18, 45:19, 49:4, 54:14, 65:1, 66:23, 85:19, 97:12, 113:20, 115:1, 117:23, 136:1, 142:5, 144:14, 144:16, 144:17, 152:7, 152:13, 152:18, 152:23, 160:9, 160:17, 162:8, 163:1, 165:4, 171:9, 173:18, 180:10, 195:13, 196:16, 201:14, 202:8, 208:12, 208:14, 219:3, 232:3, 232:17, 234:13, 242:19, 254:14, 254:21, 255:1, 255:2, 255:5
**yesterday** [1] - 129:22
**York** [2] - 160:21
**young** [1] - 131:8
**younger** [1] - 25:2
**youngest** [1] - 112:5
**yourself** [2] - 15:10, 127:1
**yourselves** [1] - 49:24
**Yvonne** [1] - 113:10

**Z**

**Z4** [5] - 153:19, 154:22, 155:6, 157:14
**Z4s** [1] - 157:21
**zero** [4] - 136:3, 175:14, 206:18, 206:19
**Zienni** [10] - 59:21, 60:3, 60:10, 60:16, 60:19, 60:23, 61:16, 61:20, 61:21, 62:3
**Zienni's** [3] - 60:7, 61:5, 61:7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| KELLY DAWSEY, PLAINTIFF, VERSUS BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP, BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP DEFENDANTS. | ) | CA. NO. 7:22-CV-3738<br>GREENVILLE, SC<br>FEBRUARY 24, 2026 |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
JURY TRIAL
VOLUME VI

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT: KURT ROZELSKY, ESQ.
SPENCER FANE LLP
P O BOX 294
GREENVILLE, SC 29602

APPEARANCES CONTINUED

BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

*** *** *** *** ***

INDEX

PORTIONS OF DEPOSITIONS READ INTO THE RECORD ON REPLY

CLARENCE EDWARD BAILEY, II
By Mr. Murphy 6
NEAL GILMORE
Exam by Mr. Murphy 19
EVA BURGMEIER
Exam by Mr. Murphy 25

EXHIBITS

PLAINTIFF'S

46 JFDS TX-60 2-1-2022 53
52 Portfolio 2022 Bailey 17

(Whereupon, the hearing commenced at 9:30 a.m.)

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: Let's go on the record. Had a conference prior to beginning Court and I understand the parties have resolved all of the issues with respect to the depositions, and by agreement, Mr. Murphy will read all of the questions to the witness who will be providing the answers; is that right?

MR. MURPHY: Yes, sir.

MR. MCCOY: That's correct.

MR. ROZELSKY: Yes, Your Honor.

THE COURT: I am told the jurors are here, so is there anything else before we bring in the jury?

MR. MURPHY: I just need my microphone.

THE COURT: Okay.

THE COURT: Bring in the jury, please.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Welcome back, members of the jury. I hope you had a good evening and we are glad to have you back and we are now ready to proceed.

Mr. Murphy.

THE COURT: I'm sorry. Mr. Moody.

MR. MOODY: Thank you, Judge Cain. Your Honor,

the Defendant, BMW MC, rests its case.

THE COURT: Thank you.

MR. ROZELSKY: Your Honor, BMW AG is not calling any witnesses.

THE COURT: Thank you.

All right. Mr. Murphy.

MR. MURPHY: Thank you, Your Honor. In reply, Your Honor, we have three readings, and my assistant, Ms. Thweatt is here to assist the Court.

THE COURT: Ma'am, would you please come forward up here to the clerk and be sworn?

LISA THWEATT, having been first duly sworn, testified as follows:

THE COURT: Ma'am, if you will have a seat up here in the witness box.

Members of the jury, testimony is now going to be presented to you by way of deposition. A deposition is a document containing sworn testimony given by a witness outside of court in the presence of lawyers for each party who may ask questions of the witness. If any objections were made at the deposition, I will rule on them when the deposition is read.

This testimony is entitled to the same consideration, and is to be judged as to the same credibility -- as to credibility, and to be weighed by

you as if the witness were present and gave the testimony about to be read to you from the witness stand. It is then for you, the jury, to determine the effect, value, weight, and truth of the testimony given in the deposition.

Thank you.

Mr. Murphy.

MR. MURPHY: First like to present the testimony of Clarence Edward Bailey, II.

THE COURT: Thank you.

EXAM

BY MR. MURPHY:

Q. We will begin at page five, line 14.

A. Okay.

Q. Mr. Bailey, I am Brian Murphy. We have never met and I represent a lady flamed Kelly Dawsey. I don't know if you know Kelly?

A. Uh-huh (affirmative response).

Q. Page 16, line 3.

Let's start with that then. When did you join BMW?

A. August 20, 2000.

Q. And when you joined Human Resources in May of -- I'm sorry -- strike that. Okay.

And you joined Human Resources in May of 2022;

is that correct?
A. Yes, the second time.
Q. All right. When was the first time you were in HR?
A. I don't know the exact dates, but it was -- I want to say it was around 2014 or '13, between 2013 to 2015, I believe.
Q. Okay.
A. I don't know the exact dates.
Q. And what positions were you in HR in 2013 and 2015?
A. I was the operational lead over student programs.
Q. What is student programs?
A. Where I recruited -- sorry. I was operational lead over student programs and slash engineering operations management, EOMDP, development program, EOMDP program is what we call it.
Q. Engineering?
A. Engineering, operations, management, development program.
Q. Okay. And who did you report to?
A. Ryan Childers.
Q. What was Ryan Childers' position?
A. He was the manager over student programs and other training.

Q. Line 22.
During that time you were in HR, what function level were you?
A. Function level I want to say V.
MR. MURPHY: Your Honor, can I state for the record that should be a roman numeral five?
THE COURT: Yes.
MR. ROZELSKY: Number five.

EXAM CONTINUED

BY MR. MURPHY:
Q. Did you receive any performance evaluation --- I'm sorry. Go to page 22, line 12.
Okay. Did you work in Human Resources in 2013?
A. Yes, towards the end of 2013 I did.
Q. Where did you work in 2014?
A. So, it was still in HR.
Q. In 2015, you still worked in HR?
A. Yes, sir.
Q. And 2016 you still worked in HR?
A. Yes, sir.
Q. And 2017 you still worked in HR?
A. Yes.
Q. Until January of 2018 when you moved back to Assembly?
A. Yes.

Q. Okay. So you really worked there part or most of three, four years?
A. Four years, yeah.
Q. Down to line 15.
Is exhibit 2 a correct copy of the offer letter you received for TX-64?
A. Yes.
MR. MURPHY: Your Honor, for the record, that is now trial exhibit 49.
THE COURT: Thank you.
Plaintiff?
MR. MURPHY: Plaintiff's 49. Let's go to line 25.

EXAM CONTINUED

BY MR. MURPHY:
Q. How did you learn about the TX-4 job?
A. Ms. Sherry McCraw had offered me the position of Chief Diversity Officer for TX-64. And probably, maybe, after the job was offered to me in April, maybe a week or two after that, she then talked to me about the TX-64 role because we were just establishing the Chief Diversity Officer role, and because of my HR background, that is when she talked to me about the role.
Q. Go to page 25, please, we will begin on line 8.

And when did she contact you about Chief Diversity Officer for Spartanburg?
A. After she got the position in TX-6.
Q. Can you give me any -- I know you can't give me probably a specific date, but approximation or month?
A. April.
Q. Of 2022?
A. Yes, sir.
Q. And when did she talk to you about the TX-64 position?
A. Around the same time, maybe the end of April.
Q. Did you and Ms. McCraw or anybody else have a discussion about what level the Chief Diversity Officer would be?
A. Yes. It was going to be a lateral move for me with a potential of growing.
Q. Lateral means what?
A. I was a function level four, PG 9, when I came into TX-6. I was the same function in PG level in TX-4.
Q. TX-64?
A. No, in TX-4, where I came from, Assembly, I'm sorry. So TX-4 is Assembly.
Q. I got it.
Line 6.

A. Right. So, it was a lateral move from TX-4 to TX-6.

Q. When you were manager of Assembly you were a function level four, personal grade 9?

A. Yes, sir.

Q. And that is what you were offered to be the Chief Diversity Officer or that is what they discussed with you?

A. Yes.

Q. And when you became TX-64, were you a function level four, personal grade 9?

A. Yes.

Q. When you left BMW, were you still a function level four, personal grade nine?

A. Yes.

Q. At the time you left BMW, were you in TX-64?

A. Yes.

Q. And when did you leave BMW?

A. I left in -- it just happened, so I am trying to think. I turned in my resignation in April.

Q. Of 2023?

A. Yes.

Q. So, you were in the position about a little over ten months?

A. A little over ten months, yeah. It was -- yeah,

it was closer to 12 or 11, yeah.
Q. Line ten.
Okay. Did the duties of TX-64 or the areas of responsibility for TX-64 change during the time that you were in that position?
A. As far as I know, no.
Q. And you had food service when you were in TX-64?
A. Food service, yes.
Q. So, that was in TX-64 when you started?
A. Yes, sir.
Q. When you were in TX-64, what were your responsibilities for the contingent work force?
A. Contingent work force, just so I am clear, contingent work force, we are talking about the contract work force?
Q. I'm sorry, thank you. That is a good example, yes, contract work force.
A. So, I oversaw the collaboration of the contract work force and how they enabled us head count throughout the plant.
Q. And how do you do that?
A. So, we had meetings to establish a baseline of what each department needed, that is a body shop, paint shop, logistics, and assembly. And from then on that is how we disbursed the need of head count from the CWF

work force that we needed.
Q. What else did you do in terms of the contract work force?
A. Improved it. It was drastically bad when I came in.
Q. Tell me about that.
A. We were a negative 321 to the red, meaning that we were minus 321. And it was like that for maybe a year or so before I had got there and we had a slow recovery from COVID. So, I was able to use some of my problem-solving skills that I had used in Assembly to take it from 321 in June to December. I want to say we were around a positive 12 or positive 15 going into 2023.
Q. And when you say negative 321 and positive 12 or 15, what do you mean by that?
A. It means that we were -- we had open positions that we had to fill in those production departments logistics, body shop, assembly, and paint. We are not sometimes able to run at full staff or sometimes even run at all because they didn't have enough head count.
Q. When you say negative 321, there were 321 positions that you needed to fill that the contract work force providers were not --

A. Yes.
Q. -- filling?
A. Yes.
Q. Such as MAU?
A. Absolutely.
Q. And what responsibilities did you have in terms of making changes to the pay that the contract work force providers paid the employees?
A. That was not in my scope, that was more on the compensation --
Q. What do --
A. -- department.
Q. -- you mean?
A. So that was with the Vice President, which was Sherry McCraw and Eva Burgmeier. They were responsible for the salary for the contract work force and the permanent work force, as well.
MR. MURPHY: Just a second, Your Honor.
THE COURT: Yes, sir.
EXAM CONTINUED
BY MR. MURPHY:
Q. For this next question, read just the first two words of the answer?
A. Okay.
Q. The what work force?

A. The permanent.
Q. Go to page 31, line 16.
During the time you were at TX-64, was there any non-exempt recruiting that was done through your department?
A. Any non-exempt recruiting that was done through my department? No.
Q. And so the job fairs that -- my mic isn't working.
MR. MURPHY: Begin again at line 21, Your Honor.
THE COURT: Yes, sir.

EXAM CONTINUED

BY MR. MURPHY:
Q. So the job fairs that you went to at NCA&T and NC state was for recruiting candidates for exempt positions?
A. Some were exempt, most were for HR and co-ops,and our engineering management training program. For all of our positions, we refer them to our website in positions that were open on the website, and all of that good stuff. So, we were just facilitating a way for them to get in.
Q. Do you know who the TX-64 was before you got the job?
A. Scott Medley.
Q. Line ten.

During the time that you were TX-64, was there any discussion about splitting up your department or splitting up the responsibilities?
A. Yes.
Q. Tell me about those.
A. I didn't get the full understanding because it was more of a process that was coming from Germany. We were trying to align with what the German plants were doing, as well, and, but, like I said, I didn't stay there long enough to even -- I wasn't in 64 long enough to see how, it was just more of a conversation.
Q. And who was having this conversation?
A. Ms. Burgmeier and Ms. McCraw.
Q. Page 33, line 13.
And what had Ms. Burgmeier or Ms. McCraw tell you about the efforts to align Spartanburg structure with the Germany structure?
A. They didn't just tell me, they told our whole department that Central in Germany, they were looking at aligning the HR department different, but they wanted all of the plants Mexico, Germany, Spartanburg, all of us to be on the same accord. And the only thing that I heard that may be affected by department was that recruiting might go to a different department within TX-6, but it was just conversation.

Q. Page 49, line 17.
During the time you were employed at BMW, did you have any discussions with Ms. McCraw about being designated level three?
A. No.
Q. Line 22.
From the time you -- excuse me -- from the time that you rejoined the department in May of 2022, was there any discussion with you about the possibility of a promotion?
A. In the sense of growth, yes, but I didn't know what that meant.
Q. Down to line 23.
Mr. Bailey, do you recognize the document we have marked as exhibit 3?
A. Yes.
MR. MURPHY: Your Honor, for the record, that is already in as Plaintiff's exhibit -- I don't know if it is in, Plaintiff's exhibit 52 is offered without objection.
THE COURT: Fifty-two (52) is offered without objection.

EXAM CONTINUED

BY MR. MURPHY:
Q. On to page 51 at line 1.

Okay. And did you have a feedback dialogue with Ms. McCraw on March 29?

A. Yes.

MR. MURPHY: Just a moment to confer, Your Honor.

THE COURT: Yes.

MR. MURPHY: Your Honor, that concludes the reading of Mr. Bailey.

THE COURT: Thank you.

MR. MOODY: Your Honor, just for the record, I would like to preserve the fact that some words were added on just a few lines. I don't know that they are material, I just want to preserve it for the record. On 22, line 17 and 22, 19 he added the word "still." And then on page 29, line 5, he added -- he changed some of the syntax and added the word "to."

THE COURT: So you say you want to preserve that, are you making an objection, or do you want it to be republished.

MR. MOODY: I don't think it needs to be republished, Judge, I just want to make sure that it appeared differently than the written transcript.

THE COURT: There is no objection.

MR. MURPHY: Okay. The next deposition we wish to present is that of Neal Gilmore.

THE COURT: All right.

EXAM

BY MR. MURPHY:

Q. Let's begin at page 5, I will start at line 17.
Let me start by getting your current position, Mr. Gilmore.

A. I am manager of HR Marketing and Recruiting.

Q. Okay.

MR. MCCOY: Your Honor, Brian, do you mind taking down the exhibit from the last?

MR. MURPHY: Oh, yeah.

EXAM CONTINUED

BY MR. MURPHY:

Q. What position designation?

A. What do you mean by that?

Q. Is it TX-64?

A. TX-66.

Q. TX-66 okay. Have you been in TX-64?

A. I have.

Q. During what time were you in TX-64?

A. From May 15th until October 31st.

Q. Page 8, line 20.
And during the time that you were in TX-64, what function level were you?

A. Function level four.

Q. Go to page nine please, line 11.

Does TX-64 have any recruiting function at this time?
A. No.
Q. What is TX-64? What does it have now as of November 1?
A. TX-64 is, and I may not get all of the names exactly right, but it is food service, it is health and safety, and there is an occupational side of it.
Q. Okay.
A. I believe that is pretty close to the department name.
Q. And do you know what function level TX-64 is as of today?
A. I believe it to be a four.
Q. Are TX-60 and TX-61 the level three positions in the department?
A. As far as I know.
Q. Go to page 12, line 10, please.
Just in the easiest way for you, if you would, walk me through your BMW experience --
A. Okay.
Q. -- prior to joining the HR department in May.
A. Yep. I started in '93 and I came in at -- I was a -- an entry-level position, staff position in the purchasing area. And within purchasing, the

purchasing department, I was a buyer for a number of years. I was -- I think I moved to supplier development function, I think that was in '96 or so, yep. And then from there I -- excuse me -- and then from there was -- I would call -- I would have said that, yep.

In 2001 I was function level four in the purposing and supplier development area. And I did a number of jobs within the purchasing division, everything from supplier development to cost management to all kinds of various roles in that section, manager within purchasing.

In 2011 or so, '11, '12 I was moved to a function level three position, industrialization and projects. So, I was managing a larger group in that -- I was in that position for a couple of years, looks like two years or so. And then so after being in the purchasing role for roughly 20 years, I had an opportunity to move to the finance department in the project function. In that project role, I did all kinds of projects from a financial point of view. Many of the projects were related to supplier-related financial projects, given my purchasing and supplier experience.

In 2018, there was a compliance aspect added to

the -- roughly 2018, I would say. There was a compliance aspect added to the finance department. So, my project role continued, but also involved compliance-related projects. And then that -- I was in this project role within the finance department for roughly ten years or so.

And opportunity presented itself again to change after a long period of time and that is where the TX-64 role was presented to me, function level 4 there. And that was roughly May, middle of May when I moved into that TX-64 health management, occupational safety, food service, and recruiting role.

Q. And when we say "May," we are talking May of 2023?
A. May of this year, correct.
Q. Okay. And how did you learn of the TX-64 position?
A. The Vice President of HR phoned me and let me know there was an opportunity and she presented me with the opportunity to change.
Q. And had you worked with her before -- strike that.

And you had worked with her before in purchasing, correct?
A. I worked with -- no.
Q. Go ahead.

A. I worked with her when she was in the finance CFO role.
Q. In finance when you were doing projects?
A. Correct.
Q. Okay. And that is Sherry McCraw, just so we are clear?
A. Correct.
Q. All right. And you succeeded Mr. Bailey?
A. I did.
Q. Go to page 16, line 7.
Did Mr. Bailey provide you any training on your duties for TX-64?
A. I would say no.
Q. Okay. What were the duties of TX-64 at the time you entered the department in May of 2023?
A. It was managing the food service business, which was managing the service provider who delivers food service to the plant. It was managing health and safety, which involves steering in the plant safety functions and dealing with all kinds of safety initiatives and dealing with problems that come from a safety side and making sure we had corrective actions where problems were seen. Also managing how they worked with the technology departments, the central functions work with the technology departments. Working

together on the occupational health with all of that, that involves with people coming and going off of all kinds of disability and dealing with the administration of that, as well as some significant contracts with all kinds of different providers in the occupational health area. And then also there was -- you are talking about before November 1st, right?

Q. Now, we are going to read the question on line 9 and I am going to ask you to read the answer and stop at the end of line 16.

Yes, sir. Sixty-four (64).

A. Yep. Yep. The recruiting function, managing the recruiting function as it is today in 66. Filling positions that become vacant internally, looking for positions that need to be filled externally. As I mentioned earlier, steering the contracts for the contract work force side of business.

Q. Go to page 19, we will start at line 21.

Prior to becoming TX-64, have you ever had any experience in managing a recruiting function?

A. I have never -- I was never responsible for managing a recruiting function.

Q. Go to page 22, I will begin at line 25.

Prior to joining TX-64, had you ever worked in a Human Resources department?

A. I have never worked in a Human Resources department.

MR. MURPHY: Your Honor, that concludes the reading of Neal Gilmore.

THE COURT: Thank you.

MR. MURPHY: Your Honor, the final deposition we would like -- I'm sorry I want to check -- are we good?

MR. MOODY: No issues on that, thank you.

MR. ROZELSKY: No issues.

MR. MURPHY: The final reading we would like to do is that of Eva Burgmeier.

THE COURT: All right.

EXAM

BY MR. MURPHY:

Q. Begin at page 4, I will begin at line 14.

Good morning, Ms. Burgmeier. Am I saying that correctly?

A. Yes.

Q. Go to your page 7, line 21.

And you are from Germany, correct?

A. Yes.

Q. All right. Other than that one year in high school that you spent in the states, did you ever live in the United States prior to taking the TX-60 job in

Spartanburg?
A. No, I have not.
Q. And is BMW the only company you worked for?
A. In Germany, no, because I have worked for the German Bavarian government because part of the law degree, after you graduate from the university, you have two years of practical service and that is where you are employed with the government.
Q. Okay. We will talk about that a little bit later. Other than being employed by the Bavarian government, have you worked for anybody in your adult life other than BMW?
A. No. I mean, you are not counting high school jobs or something, correct?
Q. Let's go to page nine, I will begin at line eight.
Let me ask about the first job listed here. For about a year it says you were a Specialist HR Management Development Driving Experience, where was that?
A. That was a position with HR in Munich.
Q. In Munich?
A. Yes.
Q. What did you do in that position?
A. Mostly recruiting because the E-division, development division, was ramping up and growing a lot. So, mostly it was recruiting, but also being a partner

for the managers and any questions regarding their employees.

Q. Employees where?

A. Employees in the Development Driving Experience Division Organization at Munich, only at Munich.

Q. Only at Munich, that is what I was getting to.

A. In Munich.

Q. The next position says, Specialist Grading Development, Power Train, Driving Experience, Body Exterior, Interior Software, Electronics, where was that, ma'am?

A. In Munich.

Q. Okay. Tell me about that job, what did you do in that job?

A. It was -- the grading department was a newly founded department and we started to grade all positions in Munich. I was responsible for creating the respective positions in these development areas that I listed here and you just mentioned because we transitioned from one tariff contract to another wage structure. And to prepare this transition we had to get a basis created and implemented structure.

Q. Basis, B-a-s-i-s?

A. Yes.

Q. And the Basis structure, when you are grading

jobs, that is to comply with the German laws?
A. Yes.
Q. On compensation?
A. No, I mean yes and no. On the tariff structure, professional band, what we call it here, it is tied to a wage structure in the -- from tier two eight and above that is not covered by the tariff contract anymore.
Q. And what do you mean by the "tariff contract:
A. The contract that we, as employees, negotiate with the works council and the unions.
Q. So, all of these responsibilities that you have described to me relating to the operations in Munich?
A. Correct.
Q. And is that -- Munich is where the BMW AG is headquartered?
A. Yes.
Q. I see your next job listed was head of Grading E-division, what is that?
A. That is a section manager position with the disciplinary responsibilities for teams, so that was basically a promotion from a specialist function to a section manager function.
Q. Again, this relates solely to functions in Munich?
A. Yes.
Q. The next job I see, head of HR management, retail

outlet region south Bavaria, did I read that correctly?
A. Correct.
Q. Tell me about that position, please.
A. That is -- BMW AG owns dealerships, and these dealerships that are BMW AG dealerships, in the Bavarian region, they have their own dealership circle with an HR hat, and I took over the HR manager position.
Q. Okay. And these dealerships are all in Germany?
A. Yes.
Q. Looks like the next position you had was expert AR management?
A. Correct.
Q. And where was that?
THE COURT: I believe the question was, it looks like next position you had was expert "HR" management. I think you may have said "AR," but it is HR management, right?
MR. MURPHY: My apologies, it is HR. My apologies.
THE COURT: That is fine.

EXAM CONTINUED

BY MR. MURPHY:
Q. I will start again. It looks like the next position you had was expert HR management?
A. Correct.

Q. Okay. Where was that?
A. In Munich.
Q. What did you do in that position?
A. Similar to the first position, but on a higher level. So, more responsibility, being the one face to the customer, that E-development department for total vehicle, all the managers there. Doing performance assessments, facilitating them, doing individual salary planning, hiring people, disciplinary actions if something occurs, that is basically.
Q. Okay. For what unit or areas did you do this?
A. It is -- the organization is still called Development Total Vehicle.
Q. What is Development Total Vehicle?
A. They bring basically together power train, the interior, the software into the total vehicle car to make sure that everything goes along with each other and there are not problems. If you just bundle, for example, the engine into the body from a car, they have to make sure that everything --
Q. The engine is right for the transmission and that type of thing?
A. Yes, exactly.
Q. And the brakes are the right type?
A. So, it is overarching function.

Q. Okay. Is all that based in Munich?
A. Munich, but they, as far as I know, they also have some functions in Garching --
THE COURT: G-a-r-c-h-i-n-g, madame court reporter.

EXAM CONTINUED

BY MR. MURPHY:
Q. I'm sorry, can you spell that, please?
A. Yes. G-a-r-c-h-i-n-g. That is close to Munich. And if I recall correctly, they have some people in the United States, as well.
Q. Okay. Did you handle any HR issues in the United States that -- when you were in that position?
A. No. I had interaction with the HR colleagues that handled these interactions, but I was not responsible.
Q. Did they report to you?
A. No.
THE COURT: The question is, they didn't report to you.
MR. MURPHY: I'm sorry.

EXAM CONTINUED

BY MR. MURPHY:
Q. They didn't report to you?
A. No.

Q. Okay. Where were the HR colleagues in the United States that handled the issues for Development Total Vehicle?
A. New Jersey.
Q. So, are they part of BMW North America?
A. Yes.
Q. Let's go to the next position, Expert Planning and Steering. And I have not been able to say the name of that plant correctly , D-i-n-g-o-l-f-i-n-g. How is that pronounced?
A. Dingolfing.
Q. Dingolfing. I will try to do better. And Plant Dingolfing is in Germany?
A. Yes.
Q. So, were you at the plant?
A. Yes.
Q. Okay. What were your duties as Expert Planning and Steering at Plant Dingolfing?
A. Planning and Steering at Plant Dingolfing was working time -- excuse me -- time topics, shift models, production planning, production planning colleagues, negotiating a lot of contracts with the works council regarding working times, shift models, pay. Also head count, steering, and I was part of the production network, that is a circle to exchange info

share about what is going on in all BMW plants.
Q. In that position, to whom did you report?
A. I reported to -- do you want the name?
A. Yeah, if you could spell it out.
A. Yeah, the name is Karl, that is K-a-r-l; then a second name, H-e-i-n-z; last name is E-g-n-e-r. He has retired from the company.
Q. Okay. What was his position at the time you reported to him?
A. He was a manager of the Planning and Steering department.
Q. Okay. To whom did he report during that time?
A. To the HR VP of Plant Dingolfing, the name was, back then, was Uwe Bald, U-w-e; last name B-a-l-d.
Q. At this point in time, when you were Expert Planning and Steering, did they have function levels?
A. Yes.
Q. Okay. What was your function level when you were in that position?
A. Function level four.
Q. Okay. And Karl Heinz Egner, what function level was he?
A. Function level three.
Q. Mr. Bald, I assume, was function level two, Vice President?

A. Yes.
Q. And then for about seven months you were head of Planning and Steering at Plant R-e-g-e-n-s-b-u-r-g?
A. Yes.
Q. How do you say that?
A. Regensburg.
Q. Okay. I will say it wrong, but please stick with me?
A. Okay.
Q. Where is Plant Regensburg?
A. Plant Regensburg is in Bavaria, it has been eight months in Germany.
Q. So, was that the same job that basically Mr. Egner --
A. That Mr. Egner and -- excuse me -- Mr. Egner had in Dingolfing.
Q. Right.
A. Yes.
Q. So, you were then in a function level three position in 2019?
A. I was in a function level 3 position starting October 2019. Plant Regensburg is smaller than Plant Dingolfing, there was a difference in the grading in the function in the plant and Plant Regensburg was a function level four.

Q. So, when you became a level three, function level three, is when you moved to the last position that is on here, head of HR management?
A. Correct.
Q. Okay. We will talk about that in a minute. What were your duties then as head of Planning and Steering at Plant Regensburg?
A. Similar to the ones in Dingolfing, but in addition to it, I had disciplinary leadership and responsibility for the team. I was on a -- I had a higher reporting level, reporting to the head of HR at Plant Regensburg. So, topics like grade, that is how we want to incentivize innovations from our associates or absence. Management was also my responsibility. While I was at Dingolfing, I had colleagues who covered this. As a manager of this position, it was my responsibility in the end.
Q. When you were head of Planning and Steering in Plant Regensburg, how many people reported to you?
A. Okay. I think I have to think, if I recall correctly, it was seven.
Q. Okay. How many of those reported directly to you?
A. Seven.
Q. Seven were direct reports?

A. Yes.
Q. Okay. And how many employees were in Plant Regensburg?
A. Approximately, at that time, 8,000, if I recall correctly.
Q. How many are in Dingolfing?
A. I mean, at that time, 17,500.
Q. Let's move to the October 2019 time frame then, head of HR management. Where was that position located?
A. In Munich.
Q. Okay. At the AG headquarters, BMW AG?
A. I don't know what you mean with "headquarters," do you refer to a building or -- there are a lot of different entities and buildings there, so.
Q. Well, you tell me where you were in Munich.
A. I was -- I mean, the address is in Dostler, (phonetic). That is next to the four cylinder building.
Q. Four cylinder building?
A. Yes, it is next to it. That was where my office was and where I was located.
Q. Is that where HR management function is for plant -- excuse me strike that.
Is that where the HR management function is for BMW AG?

A. No, they are split, they are different locations. You try to sit closest to the business and we have a lot of different building.
Q. Okay.
A. It is very spread out.
Q. What were your duties as head of HR management? Well, let me ask, when you were head of HR management, are you head of HR management for BMW AG?
A. Yes.
Q. What were your duties as head of HR management for BMW AG?
A. I was responsible for, and my team, for the whole A Division and the P Division, all the managers there, and the works council, and the foundations we own.
Q. Works council?
A. Yes.
Q. And what else?
A. Foundations.
Q. Foundations. Okay.
A. As a first face to the customer, again, doing performance assessments, doing salary planning, doing hiring and recruiting, disciplinary actions if needed, and being a consultant and a business partner for the business for whatever HR topic they have.
Q. Okay. You have used the term "first face to the

customer," who was your customer?
A. The business. In this case, the A Division, the P Division managers, the head of foundation, the works council, respective employees.
Q. Okay. Let's walk through that. What is A Division?
A. A Division is every -- it is our CEO, all divisions that report directly to him.
Q. Okay. And what divisions were reporting directly to the CEO?
A. Legal, communications, audits, strategy, quality, HR for function level two and function level one.
Q. So, you were HR for HR?
A. Yes. Yes. Yeah, but, yeah, with the P Division I was.
Q. We will get to that.
A. Really HR for HR. Let me just go back because, yes, I don't think I have forgotten a division, but if I have, it will come to my mind.
Q. Now, these direct reports to the CEO, these divisions, are they all within Germany?
A. Yes.
Q. And the P Division is the production org?
A. No, it is HR.

Q. I'm sorry, okay. So what were your duties with regards to the P Division?
A. The same as I just mentioned for the A Division.
Q. Okay. And so were these duties that pertained to people employed in Germany?
A. Yes.
MR. MOODY: He transposed the words there on line 6.
THE COURT: Just read line 6 again.

EXAM CONTINUED

BY MR. MURPHY:
Q. Starting again at 6.
Okay. So these were duties that pertained to people employed in Germany?
A. Yes.
Q. Okay.
A. At Munich.
Q. At Munich?
A. Yes.
Q. When you were head of HR management for BMW AG, did you have any responsibility for anything happening at BMW in Spartanburg?
A. No.
Q. Did you have any responsibility for anything that was happening in New Jersey?

A. No.

Q. Did you have any responsibility for anything HR related to operations in the United States?

A. I -- no, not a responsibility, but we had a collaboration in the P network or we still have, more or less, in info share and best practice sharing, so you interact, but I was not responsible for any decisions outside of Munich.

Q. Go down to line 23.

Okay. Do you get your salary today from BMW AG or from BMW MC?

A. From BMW MC.

Q. I am going to read page 23, I am going to read the first question and then read the answer beginning on line 4.

Okay. And do all of your benefits come from BMW MC?

A. I know there are payments from AG due to some tax reasons because I have to file two tax reports, I am still taxed in Germany, but I am also taxed in the U.S., so that is a very complex payroll standpoint from a payroll. We have support in from Ernst and Young to file the tax reports. My salary is paid by BMW MC because I am employed by BMW MC right now.

Q. You still pay taxes in Germany?

A. Yes.
Q. Your medical coverage, do you have any medical coverage through Germany?
A. Yes.
Q. Okay.
A. But it is not employee provided, that health insurance is not employee provided in Germany, it is a private decision or personal decision to have health insurance and what kind of health insurance you have; it has nothing to do with the employer.
Q. Okay. Do you have any health insurance through BMW MC?
A. No.
Q. Go to page 31, line 20.
As TX-60 for BMW MC in Spartanburg, do you interact with anyone at BMW AG?
A. Yes, interaction meaning info shares, collaboration.
Q. Info shares, and what is the next word you used?
A. Collaboration.
Q. Collaboration. Okay.
A. Yes.
Q. What do you mean when you say info share with regard to your duties as TX-60?
A. Since we are part of the production network, it is

interesting and important to know what is going on in HR at all other plants we have globally because we run into similar issues or problems. And then it is always good to know how different plants might have cooked with those issues, what our best practices may be that you can also tryout.

Q. How does this info share take place? How does it work?

A. I mean, usually there is a bi-weekly call with all of the HR VPs, but on a lower level, basically on my level, Department Manager level. We have, I think, quarterly calls, we just report about the shutdowns, preparations for the shutdown, if there is an issue with the production, if you have lost volume as a plant, what do you do to get the additional shifts in to catch up on the volume, topics like this.

If we change our shift models, right now battery plant ramp-up is a big issue for us at Plant Spartanburg. Just reporting what status is wrapping up at this battery plant, for example.

Q. So, this is a quarterly call?

A. Yes, I would say it is quarterly, but, of course, as needed we just reach out to each other. I mean it happens fairly frequently that we just reach out to each other, not in a structured way.

Q. Are there quarterly calls like Zoom calls?
A. Teams.
Q. Microsoft Teams?
A. Yes.
Q. Do you participate in the bi-weekly call with the Vice Presidents?
A. As a proxy for Sherry if she is not available, yes, but Sherry McCraw is the standing member of that circle.
Q. How many bi-weekly calls have you participated in as a proxy for Sherry?
A. Talking about the HR network circle?
Q. The bi-weekly call with the Vice Presidents?
A. Okay. I would have to go back to my calendar, but I would say maybe ten.
Q. So, who is on those calls are not just people from Germany, but anywhere in the world, right?
A. Exactly. China, Hungary, Mexico, South Africa.
Q. So, it is not German specific?
A. No, it is production-network specific.
Q. In terms of you say as needed we reach out to each other, do you reach out only to individuals in Germany or do you reach out to people in other places in the United States or other countries?

A. We have a very good collaboration with Mexico as a P plant there we talk with --
Q. You can spell it?
A. D-e-b-r-e-c-e-n, because they also ramp-up a battery plant.
Q. Who?
A. That is a plant in Hungary, D-e-b-r-e-c-e-n. They are one year ahead of us with the battery plant, so it is valuable information you can get from them when they run into issues that might be similar here. Also China, New Jersey as well for we look at --
Q. I'm sorry?
A. If we talked about, for example -- excuse me -- if we talk about, for example, things that are U.S. specific because other countries won't help us with topics like this, if we have best practice shares on benefits topics, for example, what do they offer? What do they do? What worked out for them in comparison to what we did.
Q. Okay. Since you have been in TX-60 at BMW MC, how often have you interacted with the BMW AG folks in Germany?
A. Very frequently.
Q. Okay.
A. Because they are part of the production network,

as well.
Q. Okay. And on what kind of issues are you working with the people in BMW Germany?
A. Since it is production network, the same issues we talked to someone in Mexico or Hungary with a colleague there. We also talk about, for example, if we want to have something like parent leave, or talk about part-time options, they can give us an overview of what the production network does because they have this knowledge. And I don't have to go to every plant individually, so that is a big asset for us that we have the overview with them if you just want to do the research on how the production work operates to get an idea --
THE COURT REPORTER: Please slow down.
MR. MOODY: It is on 18.
THE WITNESS: Production work operates to get an idea initially. We talk about indirect head count at locations, what our needs are, how we will grow in the future, how much money we will need to cover this growth, how much money we will need for our compensation package to stay competitive. That is what we discuss.

EXAM CONTINUED

BY MR. MURPHY:

Q. And how often do you have those types of discussions with Germany?

A. Probably, I mean, I would not say every week, but basically every week, yeah. Not everyday, but weekly, definitely weekly.

Q. Let's go to page 39, line 5.

And does FO need to approve any changes to the organization structure in Spartanburg?

A. TX-6 takes this position. She is responsible for her organization. We consult with them and they support us with their expertise about best practices, about different scenarios you can think through, and the decision lies with Sherry McCraw, our TX-6 HR VP, what organization she wants to proceed and implement.

Q. Okay. So, is it your testimony that you do not need approval from FO for reorganizations or changes to the organizational structure in the TX-6 group in Spartanburg?

A. Not an approval. What they do is they discuss it to have transparency about all organizational changes in the company, but it is TX-6 decision what the organization will be like, and that is what they share in the circle, as far as I know. So, TX-6 decides

what the structure will be; it is her responsibility.

Q. Go to page 44, begin at line 10.

How did you learn about the position of TX-60 in Spartanburg in terms of it being an opportunity for you?

A. Speaking about TX-60 must have been some time end of September, beginning of October, that I had a discussion with Christine Petrasch. That she said they would have a project and need to pull Scott Medley or want to offer this project to Scott Medley opening up a position, that these positions would be filled with Kelly Dawsey, leaving an open position for 60. And since I was an international candidate and was open for international assignment with BMW wherever, she offered me the job.

Q. Go to page 45, line 5.

When did you first have discussions with anybody about a possible opening in HR in Spartanburg?

A. A possible opening, early September. I had a call with Dr. Englehorn, and I had an introduction meeting with him early in July just discussing that I was interested in an international assignment, but we did not specifically talk about options in Spartanburg. We were just talking and if I would be interested if some options would open up. We had a follow-up meeting in September.

Q. A what, ma'am?
A. A follow-up meeting.
Q. A follow-up meeting . Okay.
A. Because then, at that time, he was already here. There was a Skype meeting, and he mentioned that Christine Petrasch, the HR VP at that time, would end her international assignment in the next year. Did not talk about specific time frame. And that he favors to having a domestic local backfilling of this position because we had great experience in China with this structure. And if there would be an opportunity and there might be an opportunity to some changes in TX-6 themselves. If I would be interested in coming over to Spartanburg.
We did not talk about TX-60 specifically, that was later, and that was Christine mentioned with this project pulling Kelly over to 64 and opening up 60.
Q. Page 47, begin at line 17.
He told you that Christine would end her international assignment and he favors to bring a domestic or local to backfill the Vice President position. Did he tell you what that had to do with interest in you coming to Spartanburg?
A. I think it was just information. The other information that there might be some changes reporting

to the HR VP. That was more the topic. That there might be an opportunity to offer me one of the positions. And he also mentioned that it is quite crucial for an HR department to have someone who has a very good network with all of the production network partners, not only AG, but globally. That is what I had for my past functions and experiences.

Q. Line 16.

Now, in your prior positions with BMW, did you work in any country other than Germany?

A. No.

Q. Page 50, line 16.

You used the term awhile back "international candidate," what does that mean?

A. International candidate means that you go on a temporary assignment. For example, in my case, I had a BMW AG contract. I was not a US BMW employee, and I took over a temporary assignment at BMW MC; that is why I am international. If someone from MC takes over a position for a certain time frame anywhere else in a BMW entity outside of the U. S., this would be an international, as well.

Q. Okay. Do you have a contract with BMW MC?

A. No, we don't have a contract at BMW MC.

Q. Okay. When you say a "temporary assignment,"

for how long do you anticipate being at Spartanburg?
A. Overall, three years.
Q. When you say "overall three years," what do you mean?
A. I mean it is three years exactly, from first of February 2022 until first of January 2025, that is the time span as of now.
Q. Page 56, line 25.
At University Regensburg -- number 43, madame court reporter -- did you ever take -- don't let me throw you. I will start over again. Page 56, line 25.
At University Regensburg, did you ever take any courses in American law?
A. No.
Q. At Technical University, how do you say that last way?
A. Kaiserslautern; K-a-i-s-e-r-s-l-a-u-t-e-r-n.
Q. Did you take any courses in American law?
A. No.
Q. At University Regensburg, did you take any courses in human resources or personnel development in the United States?
A. No.
Q. At Technical University Kaiserslautern, did you take any courses in personnel, development, or Human

Resources in the United States?
A. No.
Q. Did you take any specific law courses at university?
A. In Germany?
Q. Yes?
A. What do you mean with "specific law courses"?
Q. Well, I have a little bit of understanding supposedly how it works there, but in the United States, you go to undergrad, you go to college for four years, then you go to a specific law school.
A. Okay.
Q. In Germany you go to --
A. First it starts with specific law and you cover all different things, like criminal law, public law, civil law, everything. Also you have police law, tax laws, you cover everything, but you can basically focus on one specified topic, and I had labor law, that was my focus area.
Q. And was your focus on labor law all labor laws of Germany?
A. German law.
Q. German law. Okay.
A. And specifically also Bavarian law because there are Bavarian laws. I have a Bavarian law degree, so

that is specific.

Q. Okay. Then you do like a training program or some kind of externship, I think you said it was with the government, correct?

A. Yes. So you have your law degree, and if you want to consider a career as a Judge, for example, you have to have two years of practical training, and it is different rotations. So, you work at a Court, you work as a prosecutor for a few months, you work with a private law firm for a few months, you work with the government for a few months, and you can also work for -- I think after four months with a company, labor law related, the rotation program to get experience.

Q. But all of these experiences relate to German law?

A. Correct.

Q. Or Bavarian law?

A. Correct.

MR. MURPHY: Go to page 60, please. Your Honor, I will begin at line 23. This next reference is to Plaintiff's exhibit 8, which is already in evidence.

THE COURT: Thank you.

EXAM CONTINUED.

BY MR. MURPHY:

Q. Ms. Burgmeier, I put in front of you -- excuse me strike that.

Ms. Burgmeier, I put in front of you exhibit number 2, which is BMW MC 306 through 309 and I am referring to those little numbers in the right-hand corner at the bottom. And I put in front of you also exhibit number 3, which is BMW MC documents 302 through 305.

MR. MURPHY: Your Honor, that is Plaintiff's exhibit number 46 offered without objection.

THE COURT: Plaintiff's 46 admitted without objection.

EXAM CONTINUED

BY MR. MURPHY:

Q. Beginning at line 4.

Do you recognize these documents?

A. I don't recognize document exhibit 2, I do recognize exhibit 3 as part of the preparation. I have seen this document in the past days for the first time.

Q. When did you become TX-60?

A. First of February 2022.

Q. So that is the revision date of exhibit 3, correct?

A. That is what it states, yes.

Q. And do you know who created exhibit number 3?

A. No, I don't know.

Q. Has there been a job function data sheet for TX-60

since the document that we have marked as exhibit 3?

A. I don't know.

Q. If you compare exhibit number 2 to exhibit number 3 you will see that the department numbers have changed, do you see that?

A. Yes.

THE COURT: Back up just a second. Would you, Mr. Murphy, would you read beginning at line 20 again.

MR. MURPHY: I apologize, Your Honor.

EXAM CONTINUED

BY MR. MURPHY:

Q. Question: If you compare exhibit number 2 to exhibit number 3, you will see that the department name has changed, do you see that?

A. Yes.

Q. Go to page 70, begin at line 7.

Ms. Burgmeier, do you know why a new job function data sheet was created with a revision date of February 1, 2022?

A. I don't know.

Q. Let's go back to page 63 at line 12.

Prior to becoming TX-60, did you have any experience in directing the preparation of information or required for compliance with United States or South Carolina laws?

MR. MOODY: Fourteen had an omission, Judge.
MR. MURPHY: I will try again.

EXAM CONTINUED

BY MR. MURPHY:

Q. Prior to becoming TX-60, did you have any experience in directing the preparation of information requested or required for compliance with United States or South Carolina laws?
A. No.
Q. Prior to becoming TX-60, did you have any experience in designing, evaluating, and modifying policies to make sure that programs are competitive and in compliance with legal requirements of the United States or South Carolina?
A. No.
Q. Prior to becoming TX-60, did you have any experience in obtaining cost-effective employee serving benefits, monitoring national benefits environment, or options and costs savings in the United States?
A. No.
Q. Prior to becoming TX-60, did you have any experience in complying with all reporting requirements of relevant government rules and regulations, including ERISA?
A. No.

Q. Line 18.
Prior to becoming TX-60, did you have any experience in contributing to the development of new compensation strategies through creative input combined with data analysis and a deep understanding of the company's future challenges to the extent it related to any compensation strategies related to the United States or South Carolina?
A. No.
Q. Line six.
Okay. Do you have any SHRM certifications?
A. No.
Q. SHRM.
THE COURT: S-H-R-M, madame court reporter.

EXAM CONTINUED

BY MR. MURPHY:
Q. Line -- I'm sorry, we will continue on.
When did you become a member of SHRM?
A. After I took over TX-60 in the first few months, I don't recall the exact date, but I think it was May 2022.
Q. Do you have any certifications from any other U.S. HR networks?
A. No.
Q. Line 17.

What is ERISA?
A. It is Employment Retirement Income Security Act.
Q. Have you dealt with ERISA prior to becoming TX-60?
A. No.
Q. Page 66, line 9.
Have you had any experience dealing with HIPAA?
A. No.
Q. Do you know what HIPAA is?
A. No.
MR. MURPHY: Madame court reporter, it is spelled, H-I-P-A-A.

EXAM CONTINUED

BY MR. MURPHY:
Q. Line 23.
For BMW production employees in Germany, how are their wages determined?
A. We have all production function grading based on the letter, you just covered the ERA, and based on what job they do. They get developed to this personal grade, respective personal grade, and a personal grade determines the payment.
Q. And who determines the payment that goes with a personal grade?
A. The tariff contract, it is written in the tariff contract.

Q. Who are parties to the tariff contract?
A. On the one side the IG Metall, that is a union, and on the other side the company representatives that are unionized with the IG Metall.
MR. MURPHY: Madame court reporter, it is spelled M-e-t-a-l-l.

EXAM CONTINUED

BY MR. MURPHY
Q. Begin on line 14.
Tell us how a work council works, what it does, and --
A. In Germany, at the AG you mean?
Q. Yes.
A. Work council has -- there is a lot that determines when a work council has to approve certain things, mostly HR topics, but also company's general decisions. For example, every transfer from one shop to the other has to be approved by the work council. Compensation changes have to be approved. They have to be involved when we change shift models, when we call office shift. They are the representative of the associate, if there is. For example, a performance issue and a discussion about performance or disciplinary actions, they are representatives of the associates.
Q. Go to page 69, please. Beginning at line 13.

Okay. Did you ever use the Mercer system in Germany?
A. No. I don't know if it is used, but I have never used it, no.
Q. Oak. Have you personally been involved in any OFCCP reporting?
A. The team prepares it, but I see it.
Q. Any other involvement?
A. In running reports for it, no.
Q. Page 70. Line 7.
I am sorry we did that.
Go to page 71, line 23.
Okay. What function levels -- I'm sorry, what personnel grades fall within function level three?
A. PG 10 and PG 11 -- sorry, PG 11 and PG 12. Sorry.
Q. Okay. Function level four?
A. Would be BMW MC PG 8, PG 9, and PG 10.
Q. Okay.
A. But you have to understand that grading the function levels and the PGs are independent structure. So there is no -- I mean, it is not happening because you takeover a function that the PG has changed, it is a separate decision that is also kicked off by your manager based on your performance. So one doesn't

necessarily mean the other and the other way around.

Q. Are you aware of anyone ever going from a function level four position to OFK?

A. No, no. I have never heard or don't know a case like this, no.

MR. MURPHY: Just a minute, Your Honor .

THE COURT: Yes, sir.

MR. MURPHY: Your Honor, that concludes the last reading.

THE COURT: All right. Anything else from this young lady?

MR. MCCOY: Nothing further, Your Honor.

THE COURT: Ma'am, I think I forgot to do this when you started, but -- and Mr. Murphy gave the information -- would you just state your name for the record?

THE WITNESS: Lisa Thweatt, T-h-w-e-a-t-t.

THE COURT: Thank you very much, you may step down.

We have been going for a while, so let's take a break.

MR. MURPHY: While we are on the record, I don't know if you want me to do this right now, Plaintiff has no more matter in reply.

THE COURT: Thank you.

Let's take a break and then we will come back in and proceed. Members of the jury, you may take a break at this time. Remember my previous admonition, do not discuss the case, form any final opinions about the case, or do any independent research about the case. So everyone may remain as you are while the jurors are excused.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: All right. As I understand it, all the testimony and evidence is in that is coming in?

MR. MURPHY: Yes, sir.

MR. MCCOY: Yes, sir.

MR. ROZELSKY: Yes, sir.

THE COURT: Well, what I would suggest is that we take a break and come back, I will bring the jury in and fill them in on our plans. I think we could go ahead and let them leave for the day and I will just ask them to come back in the morning and let them know what to expect tomorrow in terms of y'all making your arguments and charging. Is it safe, Madame Clerk, for me to tell them we will be providing lunch for them tomorrow?

THE CLERK: Yes.

THE COURT: Do I need to ask if anyone has any special needs they could tell you?

THE CLERK: If you could do that, that would be great.

THE COURT: Okay.

The Clerk tells me they been eating the snacks they have been provided so hopefully they don't have any special dietary needs, there may be one or two who have not been eating the snacks. Let's take a break and then we will come back in and let them go and then I will take up these other matters. Thank you.

(Whereupon, a short recess was held.)

THE COURT: We are on the record. We have been back there working on some things and I appreciate your patience. I will bring the jury in and let them know they will be released for the day, but I think it might be a good idea before we do that perhaps you have already done this, I think it might be a good idea if we just go through the exhibits and make sure that everyone is on the same page about what has come in and what has not. So, we can go off the record to do that so the court reporter doesn't have to take down everything. Might be a good idea if it is on the record, madame court reporter.

Ms. Rutgers read down.

THE CLERK: I can read it. Plaintiff exhibits that have been entered or admitted are 1 through 10,

12, 14 through 22, 24 through 29, 31, 37, 39, 41, 46 through 50, and 52, and 63.

THE COURT: Plaintiff's 13 has not been admitted.

THE CLERK: I do not have it.

THE COURT: Whoa, whoa, wait. Holdup just a minute. Is that -- is everybody in agreement with that, Mr. Murphy.

MR. MURPHY: Yes.

MR. MCCOY: Yes.

MR. ROZELSKY: Yes.

THE COURT: All right. Thank you.

Madame Clerk, move on to the Defendant's exhibits.

THE CLERK: Defendant's exhibits admitted are 1 through 7, 9 through 22, 23 through 34, 36. That is all I have for Defendants.

MR. MCCOY: That is correct.

MR. MURPHY: Okay.

THE COURT: 1 through 7, 9 through 22, 23 through 34, and 36.

MR. MURPHY: 1 through 7, 9 through 22, 23 through 34, and 36.

THE CLERK: Yes.

THE COURT: What sayeth BMW AG?

MR. ROZELSKY: We agree, Your Honor.

THE COURT: Okay.

THE COURT: All right. Is. There anything else we need to take up before I bring the jury in and release them?

MR. MURPHY: Not from the Plaintiff, Your Honor.

MR. MCCOY: Nothing, Your Honor.

MR. ROZELSKY: Nothing, Your Honor.

THE COURT: They will be released for the day. Is there any objection if the Clerk goes back to ask them if they have any special dietary needs?

MR. MURPHY: Of course not.

MR. MCCOY: No.

MR. ROZELSKY: So long as she doesn't write a book about it, Your Honor, we are fine.

THE COURT: Let's bring in the jury, please.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Members of the jury, welcome back. I have what I hope you will think is good news. The lawyers and the court staff and myself came in early today and we stayed after you left last night, did some work, the lawyers did some work overnight, and then we came in early this morning and did some work. And as a result of those efforts, we were able to streamline things significantly. So, we still have some work to

do on some legal matters, but I am going to be able to release you for the day. We will continue to work and I have to take up some motions, some legal motions, and depending on the outcome of those motions, this is tentatively what we may do tomorrow, what I think is appropriate to give you some idea of what we are going to do when we come back.

So, the Plaintiff has finished presenting her case and the Defendants have finished as well. So, all of the testimony and evidence is in. We will be working on these legal issues the rest of the day accounting for lunch, and then when you come back in the morning, I anticipate the lawyers will have an opportunity to make their closing arguments to you. And when they are finished, I will give you my instructions on the law that you will follow as you proceed with your deliberations.

We will be providing lunch for you tomorrow. Don't get too excited, it is not going to be a five-star lunch, it beats eating a saltine cracker. I don't know if any of you have been bringing your lunch, you are free to do that, the Clerk will -- I have asked that you stay just a few minutes after you go back to the jury room and the Clerk is going to come back with some -- with a menu so you can be looking over that and

if you have any special dietary needs, the lawyers have agreed she can come back there. You shouldn't talk to her about the case, she will not talk to you about the case.

With that, remember my previous admonition. Do not discuss the case with anyone, do not do any independent research using any type of tool of technology to do any research about the case, the matters involved in the case, the parties involved in the case. Don't look at any social media sites, websites, blogs. Don't consult any research material, such as dictionaries or encyclopedias or anything of that nature. Don't look at any news reports, should there be any about this case, and do not form any final opinion about the case because you still have to hear from the lawyers and receive information from me about the law to be followed in your deliberations.

So, with that I will hush and let you retire to the jury room and the Clerk, as I say, will be coming in to give you some information about lunch tomorrow. So, I hope you have a safe journey home and pleasant afternoon and evening. I would like to start at nine tomorrow. If you can get here by nine, I think that would put us in a good position to move forward, we will be efficient, but here again, it is downtown

Greenville and a lot of you are having to get on the interstate, so I don't want somebody getting a ticket or worse, you know, because you are trying to get here by nine o'clock.

You have been great, you have poured yourself into this case and we all appreciate it. So try to be here by nine, but be careful coming in.

And any exceptions to my comments?

MR. MURPHY: No, sir.

MR. MCCOY: No, Your Honor.

MR. ROZELSKY: None, Your Honor.

THE COURT: Hopefully we will see you back in the morning at nine. If you wait about five minutes the Clerk will be in with some information.

Thank you.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: All right. I would like to go ahead and address BMW AG's Rule 50 motion and give you my ruling on that now that I have had more time to review my notes and consider it.

Yesterday, BMW AG moved pursuant to Rule 50 of the Federal Rules of Civil Procedure for a judgment as a matter of law as to the Plaintiff's claims for race discrimination and sex discrimination. BMW AG advanced

several bases for this motion -- was that the basis of your motion, race and sex?

MR. ROZELSKY: Yes, Your Honor.

THE COURT: So, BMW AG advanced several bases for this motion, including the application of the Friendship Commerce and Navigation Treaty, also known as the FCN Treaty that exists between the United States and Germany. The Court denied from the bench BMW AG's motion for judgment as a matter of law with respect to all bases offered except for the FCN Treaty, which the Court took under advisement.

Having considered the matter, the Court concludes that even though the FCN Treaty may apply under these circumstances, it is not an automatic defense to a Title VII action. The Treaty does not afford blanket immunity. Although the Treaty permits German companies to choose German citizens to fill certain positions in their operations here, the Treaty does not permit discrimination on the basis of sex, race, or national origin, which is different from citizenship. And in the Court's view, based on the evidence presented thus far when viewed in the light most favorable to the Plaintiff as the non-moving party, there remain questions of fact as to BMW AG reasons for making any personnel decisions it made.

I incorporate my prior findings as to the relevant standard to be applied to a motion for judgment as a matter of law, including the provisions of Rule 50, and applicable case law previously cited.

So, I would deny BMW AG's Rule 50 motion to the extent it is based on the Treaty and that will be my ruling on that.

Ay other motions or matters we need to take up?

MR. MURPHY: Not from the Plaintiff, Your Honor.

MR. MCCOY: Your Honor, BMW MC would move for Rule 50 -- would like to argue a Rule 50 motion again.

THE COURT: All right.

MR. MCCOY: I will first of all beg the Court's indulgence because some of this will obviously be a repeat of what we did yesterday, I feel it is a little bit like Groundhog Day, but we need to make sure we get our argument in the record.

THE COURT: I understand. And let me say this, when I made my comments to the jury, it certainly was without prejudice for anyone to argue any motion. I felt like I had to give them something, so I don't want my remarks to the jury to be construed as my having some predisposition about the outcome of these motions which we have all anticipated.

MR. MCCOY: Understood, Your Honor.

Your Honor, BMW Manufacturing moves for judgment as a matter of law under Rule 50, the Federal Rules of Civil Procedure. As we discussed yesterday, the legal standard for granting such a motion is whether there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.

Ms. Dawsey in this case asserts causes of action against BMW Manufacturing for national origin under Title VII; race discrimination under Title VII and Section 1981; and sex discrimination under Title VII. She bears the burden of proof as to each of these causes of action. It is our position she has failed to submit sufficient evidence to establish that a reasonable juror could possibly decide in her favor on any of these causes of action.

And again, Your Honor, I know we talked about the issue of adverse employment action, we have briefed it, we talked about it. And so, like I said, I would just request that I be allowed to again raise that issue here because I do think it is important to this case.

First of all, the law is clear in the Fourth Circuit that under Title VII or Section 1981, the Fourth Circuit must -- or the Plaintiff must prove that she suffered an adverse employment action. I gave you the cites yesterday, Title VII is *Boone versus Goldin;*

Section 1981 is *Honor versus Booz-Allen Hamilton*.

We certainly know that the Supreme Court addressed the issue of adverse employment action in the case of *Muldrow versus City of St. Louis*, where the, Court, you know, changed the standard to say that: In the case of an alleged discriminatory transfer, that the Plaintiff must show, quote, some harm respecting an identifiable term or condition of employment, close quote.

You know, in *Muldrow,* again, we have a police sergeant who was transferred from a job with specialized intelligence division to a different role in a different department and her intelligence position was taken by a male employee. She argued that there was sex discrimination. After the transfer, her rank and pay remained the same, but she was able to show some harm because she no longer was in that specialized department and she lost her job benefits, including a preferable schedule and a vehicle she could drive home.

Based on the holding in *Muldrow*, it is Ms. Dawsey's burden to present evidence in this courtroom of at least some harm to the terms or conditions of employment as a result of BMW's Manufacturing decision to remove her from the TX-60 position and transfer her to the TX-64 position.

The facts here show that Plaintiff is in the TX-60 role, that Mr. Medley was being moved in the fall -- the decision was made in 2021 to move Mr. Medley to a special project which opened a vacancy in the TX-64 role. Ms. Petrasch told Ms. Dawsey in September of 2021 that Ms. McCraw would be the new TX-6, the new Vice President of Human Resources, and that an international from BMW AG would we coming to the TX-6 Department.

Ms. Dawsey was told about the reorganization of the department in late September. At that time, the plan was to move the -- bring in the international employee, Ms. Eva Burgmeier, we have talked about this morning, put her in TX-60, move Ms. Dawsey to TX-61, and move Corey Epps to TX-64. Shortly after that, within I think the next week, Ms. Petrasch had a meeting with Dr. Englehorn, the CEO, and Ms. McCraw, the incoming VP of HR, and the discussion was made or the determination was made that instead it would be better to move Mr. -- keep Mr. Epps in the TX-61 position where he was based upon his experience, his time spent in the 61 department, his time spent on the production floor, and it would be better to move Ms. Dawsey to TX-64 based upon her skills and talents, and I will talk more about that in a minute.

Ms. Dawsey testified that Ms. Petrasch, in early October, told her that at some point in time in the future, no definitive date ever given, no documentation ever provided, that the TX-64 position would be changed to a function level four position or -- excuse me -- would potentially be changed to a function level four position because the recruiting was going to get moved out of that department into, I believe, TX-65. Again, no change letter, no documentation; verbal conversation.

Ms. Dawsey admitted that during that conversation Ms. Petrasch never told her she would be demoted. Now, at the time of this conversation in October -- first week of October 2021, there is no doubt in this case, if you look at the job function data sheet for the position of TX-64, it is listed as a function level three position, which is the exact same function level as the TX-60 position that Ms. Dawsey held at the time.

Furthermore, the evidence has shown that Ms. Dawsey's department, TX-60, was responsible for preparing those job descriptions and, you know, therefore, it was under Ms. Dawsey's control as to the function level that showed up on those documents. Ms. Dawsey testified that if she was moved to the TX-64

job and if the TX-64 job was downgraded to a function level four position, then that might have a negative impact on her. But when asked during her direct examination by her lawyer, what the impact would be, she said, I cannot answer that. And the fact that she can't answer that shows the very speculative nature of this claim.

It is also important to note that Ms. Dawsey and none of the witnesses here that have testified in this case have indicated that there has ever been an employee of BMW MC who has had their pay or benefits downgraded or reduced as a result of a downgrade in function level. She did testify that under the misaligned personal grade policy that was put into place in July of 2021 that she issued letters to a group of employees stating that they would suffer -- potentially suffer a personal grade decrease within the next two years if they did not find a position with a higher function level. But, Ms. Dawsey admits that nothing ever happened to those people other than her issuing letters. And, furthermore, Ms. McCraw testified yesterday that that policy was done away with, one of the first things she did when she became VP of HR. None of those employees had a change to their personal grade -- a change to their function level.

Now, Ms. Dawsey also alleges TX-64 would have impacted -- a move to 64 would have impacted her chance for promotion. And as I noted yesterday, this was one of the primary allegations the Court used in denying our summary judgment motion, but the evidence in the record here is that that is simply not the case. The only way that Ms. Dawsey could ever have been promoted -- personal grade 11, she was capped out -- the only way she could get to personal grade 12 would be validated for a function level two position. She was never validated. There is no dispute about that. There was discussion at one point in time that she was interested in the VP of HR position, she met with Knudt Flor, she met with Christine Petrasch, and that did not go any further. Ms. Dawsey admitted she was never validated for that position. She couldn't have been promoted to a level function level two position because she had never been validated. So, the notion that because she was moving to a position TX-64 that possibly would be a function level four position in the future, and that somehow impacted her ability to be promoted, is simply not accurate.

You know, there was testimony in this case that the irony of that is that had Ms. Dawsey actually moved to the TX-64 Department, it would have given her more

experience, broader experience that actually would have made her a better candidate for function level two validation.

Now, Ms. Dawsey also has testified that when she left BMW MC she didn't actually have a position because she never got an offer letter to go to the 64 role. You know, it is her testimony that, yes, it was TX-60's responsibility to prepare offer letters, but Ms. Petrasch had never told her to prepare an offer letter.

Bottom line here is there were no offer letters prepared for anybody that were involved in this reorganization. You know, it is not like, you know, offer letters were prepared for certain people and just not Ms. Dawsey, they hadn't been prepared yet because the reorganization hadn't happened. It wasn't scheduled to happen until February of 2022. So, when Ms. Dawsey resigned the first -- on January 3rd of 2022, no offer letters had been prepared. As I noted also, Ms. Dawsey had never received any sort of change letter or anything like that indicating she was going to be downgraded in any fashion.

Now, as for Ms. Dawsey's position in the reorganized department, Ms. Petrasch testified that in early October -- Ms. Dawsey testified that in early

October, Ms. Petrasch told her she would be moving to TX-64 in February of 2022. On November 11th, Ms. Dawsey was in a meeting with Ms. Petrasch, with Dr. Englehorn, and with Ms. McCraw during which a PowerPoint was shown showing again Ms. Dawsey moving to TX-64. On December 13th, there were two meetings, one of them hosted by Ms. Dawsey in which she told her team members, I am going to be moving to TX-64. Ironically, that was three days after she had accepted another job, so she knew she wasn't moving to TX-64. And then subsequently, on December 13th, there was an all TX-6 meeting during which Ms. Petrasch showed the PowerPoint to the entire TX-6 Department, all 100 or so employees, and told them, again, Ms. Dawsey will be moving to TX-64. So, we believe the evidence conclusively establishes that Ms. Dawsey had a position in the organization and that position was TX-64.

Ms. Dawsey resigned from employment on January 3rd, her last day at BMW was January 14th, 2022 when she left BMW on that day. She still was in the TX-60 position, she had never been moved. There was no change to any term, condition, or privilege of her employment prior to the time that she resigned from employment.

Now, yesterday, if I heard Mr. Murphy

correctly, you know, he argued that there are really two adverse employment actions here: The first one being moving Ms. Dawsey out of her existing position of TX-60. Initially, I would point out to the Court that she was never actually moved out of the TX-60 position, there is no dispute about that. She was still in that role in January when she quit. But we also don't dispute that it was our plan all along to move her to the TX-64 position. So, when we put out the documentation in the call, the PowerPoint, the meetings, and everything else, the intent of BMW Manufacturing was that Ms. Dawsey would fill the TX-64 role starting in February of 2022.

Now, the thing that is interesting here is, you know, Mr. Murphy says moving her out of the job was an adverse employment action. Well, I don't think that is what the law says, simply moving an employee to a different job is not an adverse employment action, there has to be something that goes along with that, there has to be some harm, otherwise an employer could never transfer an employee to another job. I mean, there is no doubt whatsoever that the law says, employers have the right to make business decisions, employers have the right to make personnel decisions and move employees to the best fit for the organization. And so the

notion that just transferring Ms. Dawsey to a different role in the organization by itself is somehow an adverse employment action is not accurate. There has to be some harm that attaches to that movement. Our position is there is no such harm here.

And the second argument is that Ms. Dawsey was demoted by being moved from the 60 function to the 64 function. Now, we talked about this yesterday and, again, I want to just kind of briefly run through our arguments with regard to this whole demotion issue in the move to 64 because our position is, it is complete speculation and the Court cannot rely on speculation in order to get to the some harm standard.

Now, the Court, when it ruled against us on summary judgment, focused on the *Van Horn versus Del Toro* case, which is a new case, I know Mr. Murphy yesterday gave you the updated site for *Van Horn*, and I agree with him, it was just correcting an error, I believe, in the opinion, nothing of significance in terms of the holding that this Court relied on in its Order.

In *Van Horn*, there was a transfer, okay, or a planned transfer of an employee. The position to which the person was being transferred was going to require the employee to relocate. So, the harm is there.

There was no doubt about that. The position was requiring the employee to move. The employee also had said there was going to be changes to the level of responsibility that she had in those jobs, but there is no doubt that the jobs were clear, this is the job and it is located in a different state, different country, you have got to move to go take this job. The employee did not want to do so, and so rather than accept the transfer, the employee resigned from employment.

And so, you know, in *Van Horn* there was absolutely no dispute that the plaintiff would have suffered harm had she accepted the transfer. Based on the *Van Horn* decision, this Court ruled that Ms. Dawsey could show an adverse employment action, even though she never left BMW MC before she transferred to the 64 role because it was a less desirable position with a lower salary range and less prospects for advancement.

However, the testimony in court shows that this is not true. When Ms. Dawsey was told in early October that she was moving to 64, she admits that the 64 role, the job function data sheet, Defendant's exhibit 13, shows it as a function level three job. Her case here is built upon Ms. Petrasch's statement that at some point in the future, function level four would potentially be downgraded -- TX-64 would be potentially

downgraded to a function level four position. Again, requires speculation. When is that going to occur?

THE COURT: Did she say it was potential or did she say it was going to happen?

MR. MCCOY: My understanding is she said it would potentially happen.

THE COURT: Okay. Go ahead.

MR. MCCOY: In the *Van Horn* case, there was no such speculation required. Positions existed, and in this case the plaintiffs were going to suffer harm because you could look at the position and know that it required the employee to relocate to another state or country, that is not the case here. The only way to get to the same conclusion here is to speculate about what would have happened to TX-64 had Ms. Dawsey moved into that role.

Now, I pointed out yesterday, Your Honor, the recent Eleventh Circuit opinion in the *Zienni* case, *Zienni versus Mercedes-Benz U. S. International*. And in that case, the Eleventh Circuit held that -- where the plaintiff alleged harm that was based upon speculation, that was not sufficient to establish an adverse employment action. In that case, Mr. Zienni, who was a Muslim, was required to take regular prayer breaks. At times they were consistent with his scheduled breaks,

but at times they were not and so he would have to figure out how to step away from the production line while it was running to take a break. His supervisor caught him one of those times where he was away from the line when he was not supposed to be taking a break and told him, you know, that, basically, you can't do that. You can't take an unscheduled break. He was -- also claims he was told by Human Resources that if he didn't follow his supervisor's instructions, he potentially would be subject to discipline including termination.

Mr. Zienni on the plant shutdown over the December -- the December plant shutdown decided to leave Mercedes and go seek another job. So, no discipline, there is no dispute, no discipline of Mr. Zienni ever. But he argued that he was being discriminated against based on his religion by Mercedes.

THE COURT: In that case, I would have to go back and read it so I don't want to misquote it, but the plaintiff there was told by his supervisor that he could be referred for disciplinary action, but he was never referred for disciplinary action, correct?

MR. MCCOY: That is correct. He was never disciplined.

THE COURT: He quit before he got referred for

any disciplinary action?

MR. MCCOY: That is correct, Your Honor.

THE COURT: Okay. Thank you.

MR. MCCOY: The District Court in ruling against Mr. Zienni on summary judgment held that he could not establish an adverse employment action because the hypothetical things he was concerned about never actually happened, the potential for discipline, the potential for termination, none of that ever occurred. The Court noted in reality the only change to Zienni's employment occurred when he made the choice to resign from Mercedes-Benz and look for work elsewhere.

The Eleventh Circuit upheld that decision, as noted yesterday, it was an unpublished opinion, but in that decision -- the Eleventh Circuit specifically noted that the Supreme Court's decision in *Muldrow* did not change the fact that court is not allowed to speculate. An adverse employment action cannot be based upon speculation. In this case, in the *Zienni* case, the Court said, any risk of discipline that Zienni experienced was too speculative to show a change in term or condition of his employment.

Now, Mr. Murphy in the hearing yesterday brought up a couple other cases on line with this. First off, the *Ricks* and *Chardon* cases, which were the Supreme

Court cases, and I know Your Honor relied on these in the Order. I just want to note, and I brought this up in reply yesterday to Mr. Murphy's argument, both of those cases are different because they involve employees in an educational setting: one was a tenured professor, one was and administrator. In both of those cases, the employees were issued formal letters of -- in one case denial of tenure, which meant the employee would then be terminated; the other, a formal letter of termination. So, they were told you are going to be terminated. The issue in that case was not really the adverse employment action, but more so when did the adverse employment action actually occur.

In this case, we have no such formal written notice like we had in *Ricks* and *Chardon*, there is no letter, there is no documentation that says, you know, you are going to be in a function level four position. The only documentation here shows, we are going to move you to 64, we have a job function data sheet that shows 64 is a function Level three job, an equivalent job.

Sixty-four, keeping on, she was in TX-60, moving to 64, both are direct reports to the Vice President. Both are department managers. Both are function level three jobs. And interestingly, at the time she was -- this was all going on in October of

2021, Scott Medley was the person sitting in the 64 job, function level 3, personal grade 11, we looked at it, Ms. Dawsey and Mr. Medley were identical in terms of all of their pay and compensation benefits.

We also talked -- Mr. Murphy mentioned the *Herkert* case out of the Fourth Circuit, which was an ADA case, where the plaintiff had requested from her employer, which as I recall was the Social Security Administration, that she wanted to tele-work due to her disability. Her employer -- basically what they decided was, they needed to transfer her to a different role in order to allow her to tele-work. Well, when they transferred her, they moved her to a role where she no longer had supervisory authority. In the old role she was supervising, new role she was not.

So, there is no dispute in *Herkert* that the plaintiff was actually transferred; and there is no dispute she was no longer supervising employees once she was transferred. And the Court there reversed her summary judgment Order based on *Muldrow* saying that the plaintiff could, in fact, show some harm.

In contrast to *Herkert*, clearly Ms. Dawsey was never transferred, that didn't happen. The evidence shows that the 64 job to which she was going to be transferred was a function level three job and that she

would have been a Department Manager, direct report to the Vice President, just like she was in 60. And interestingly, we looked at an exhibit, and this is Defendant's exhibit 16 at page four, but there are actually more areas of responsibility in TX-64 than there are in TX-60. On the documentation prepared by Ms. Petrasch, there were eight areas for which TX-64 was responsible.

So we would argue, Your Honor, that the Eleventh Circuit opinion in the *Zienni* case is instructive to us here. That in our case, just like in Zienni, the adverse employment action, it is built upon speculation, and that is not allowed under Fourth Circuit law, under Eleventh Circuit law, under any law. You can't speculate to get to the adverse employment action.

Ms. Dawsey's case is based upon what might have happened had she not resigned and had she actually moved into the TX-64 position. We just don't know what would happen because it never actually happened.

So, it is our position she has failed to meet the some harm standard under *Muldrow* and that no reasonable jury could find she has met her legal burden to prove she suffered an adverse employment action. Accordingly, it is our position BMW MC is entitled to

summary judgment as to all of Plaintiff's claims under both Title VII and Section 1981.

Now, I addressed yesterday the race and sex discrimination claims, but I did not address the national origin discrimination claim, so if you would indulge me, I want to address the claims under Title VII with regard to national origin.

So, based upon the arguments that have previously been made in this case, particularly the arguments at summary judgment, it appears that Ms. Dawsey is asserting two claims from a national origin perspective, under Title VII, a Section 703(a)(1) claim, which is a disparate treatment claim based upon her national origin, and also a Section 703(a)(2) claim for misclassifying or classifying employees based upon their national origin.

I want to start, Your Honor, with the second claim, the 703(a)(2) claim. Now, if you look at 703(a)(2), what it does is it takes aim at discriminatory policies of general application by prohibiting an employer from limiting, segregating, or classifying employees or applicants for employment in any which would deprive or tend to deprive any individual of employment opportunities.

It is our position that Plaintiff's cause of

action under 703 -- under 703(a)(2) is not viable as a matter of law. I will initially point out I don't think the Fourth Circuit has ever issued an opinion on this issue, but there is an Eleventh Circuit opinion on this issue and the case is *Jefferson versus Sewon America, Incorporated* reported at 891 F.3d 911, that is a 2018, 11th Circuit decision.

In that case, the Eleventh Circuit held that Section 703(a)(2) cannot be used as the basis to challenge individual employment decisions. In this case, Ms. Dawsey seeks to challenge only individual employment decisions. She is claiming she was removed from TX-60, that she was -- removed from 60, being moved to 64, which was a demotion, those are individual employment actions; 703(a)(2) does not apply based upon the Eleventh Circuit's opinion.

It is also important to note that even if this Court were to determine that 703(a)(2) is viable here, the legal analysis of the claim under 703(a)(2) is consistent with an analysis under 703(a)(1). In other words, she still got to show adverse employment action and discriminatory intent. There is a case out of the Northern District of Georgia that followed not too long after the *Jefferson* case that held that -- that is *Crawford versus Atlanta Independent Schools Systems*, 218

U.S. District Lexis, 240500.

Now, in this case it certainly appears to us that the Plaintiff's 703(a)(2) claim is premised on the expat guidelines document, which I believe was Plaintiff's exhibit 17, Plaintiff's exhibit 17, Your Honor. The testimony in the record reveals certain important things about this document. First of all, the document was prepared in 2016, but Ms. Dawsey testified that she prepared the PowerPoint at the direction of Mr. Trauth; Mr. Trauth provided her the information she put it in the PowerPoint. Mr. Trauth has not been at BMW Manufacturing since the beginning of 2018. On the face of the document, there is a lot of discussion about the German words on the face of the document, what do they mean, but we heard was what that meant was that that document came out of a TX-6 workshop following a discussion in BMW MC senior management. There is no evidence Ms. McCraw, who is a member of senior management at the time, testified that document was never seen or approved by senior management, that expat guidelines document.

There has been zero testimony in this case that any of the decision-makers in the fall of 2021, that being Dr. Englehorn, Ms. McCraw, or Petrasch were even aware of the expat guidelines when those decisions were

made.

Now, Ms. Dawsey would have this Court believe that the expat guidelines were a policy of BMW Manufacturing that had to be followed, but that is not the case. I would direct the Court's attention -- I don't have the page number, but if the Court would look at the -- not the TX-64 or excuse me the TX-60, but the TX-65 page of that document, it has got the same chart where the team members, and on the side it has the same option one and option two, where it says, you know, option one is international TX-6 then TX-65 should be a domestic, and vice versa under option two. If you go look at TX-65, what you see is, again, it has got the same alternating standard, but in the fall of 2021 when the proposed changes are being made, the person sitting in TX-65 was Paul Sinanian. There was testimony in this Court that Mr. Sinanian is a domestic. And Mr. Sinanian was not being moved, he was being kept as TX-65 under Ms. McCraw when she came in, so you would have domestic, domestic. So, that policy is not even being followed by BMW Manufacturing.

Now, the burden is on Ms. Dawsey to establish that the expat guidelines limit, segregate, or classify employees based upon national origin. And throughout this case we have heard a lot of testimony about the

Germans versus the Americans. If you look carefully at the expat guidelines document, what you reveal is the word "German" and the word "American" do not appear in that document at all. That document simply states a preference for an international or a domestic candidate to fill the position regardless of the nationality of that candidate. And, Your Honor, I direct you to the case of *Douglas versus Eaton Corporation,* 577 Federal Appendix 520, that is a Sixth Circuit case from 2014. And in that case, the defendant had a documented preference for what they referred to as, quote, local candidates. The Court said, that language, local candidates, was not equivalent to national origin, that was not -- that was not discriminatory to have a preference for a local candidate.

So, it is our position that the 703(a)(2) claim is not viable, but even if it is viable, it is not a claim that should go to the jury because no reasonable jury could find, under those circumstances, that that policy does anything to limit, segregate, or classify employees based upon their national origin.

Now, there is also a (703(a)(1) claim, which is the disparate treatment claim under Title VII based on national origin. Again, Title VII, that Section of Title VII provides it shall be unlawful employment

practice to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's national origin. Even if the Court determines there was an adverse employment action, the Court still must find that my client's actions were motivated by unlawful national origin discrimination.

Now, in this case, I think the analysis is pretty simple, there is no dispute in this case Ms. Dawsey was in TX-60, she was the manager, the plan was to move her to 64, and Eva Burgmeier was going to come into TX-60; Ms. Burgmeier is a German. We don't deny that that was our plan. The only thing we would say is, it didn't happen. And it wasn't going to happen until February of 2022, Ms. Dawsey left before it ever happened.

You know, the evidence presented in the case by multiple witnesses showed that the decision to move Ms. Dawsey from TX-60 to TX-64 was based upon a number of legitimate business reasons. First of all, Dr. Englehorn and Ms. McCraw both talked about the importance of TX-64 to the organization given what was going on in 2021. And in particular, you know, the ramp-up of the business and the need for -- to recruit qualified employees to staff a battery plant, a

logistics center, and a body shop. And that the recruiting function of TX-64 was a critical role and it felt like Ms. Dawsey would be well suited to fill that role. There also were the critical areas of occupational safety and health which, of course, are significant in a plant of 11,000 people. Ms. -- Dr. Englehorn and Ms. McCraw both believed Ms. Dawsey would be a good fit for 64 based on her Planning and Steering background and her prior work with compensation, which would be critical for more recruiting stand point.

Finally, there is evidence, you have seen the red boxes I believe is Defendant's exhibit 4, which was the succession plan from June of -- June or July of 2021, that showed Ms. Dawsey highlighted in red because she had been in her position for at least four to five years. At that point in time, she had been in her job for almost seven years. It was time for her to move into a different role. And so there was already discussion in the succession planning process that she was going to potentially move to another area, in fact move to potentially another area outside of the Human Resources department.

THE COURT: Was it really potential? I mean, all of these plans, and charts, and meetings, she was

going. It wasn't -- I mean, it was the plan, right?

MR. MCCOY: Are you talking about the plan to move her to TX-64?

THE COURT: Yes.

MR. MCCOY: Yes, Your Honor, I have no doubt, that was a plan.

THE COURT: Okay.

MR. MCCOY: What I am talking about right now, the succession plan talking about potentially to moving her to a role outside of HR, that was just a possibility, that never was anything set in stone.

Again, Your Honor, we go back to, none of this actually happened. She was in TX-60 when she left BMW in January of 2022. She did not get transferred out of her position because she decided to leave and take another job prior to any of the changes occurring.

So it is our position that she cannot meet her burden of establishing that she was discriminated against based upon her national origin with regard to the move from TX-60 to TX-64.

Now, Your Honor, yesterday I addressed the arguments on race discrimination and sex discrimination, rather than repeat those here today, I would request if I could just incorporate those arguments by reference. I don't believe they have really changed much from what

we talked about yesterday.

And that leads me to a couple additional issues that I would like to address again, and I beg the Court's indulgence as I make my arguments.

Your Honor, in this case, Ms. Dawsey is seeking compensatory damages. It is our position that she should not be entitled to compensatory damages and that issue should not be presented to the jury based on the fact she has no evidence of actual loss or injury.

As the Fourth Circuit said in the case of *King versus McMillan,* 594 F.3d 301, it is a Fourth Circuit decision from 2010, the purpose of compensatory damages to make the injured plaintiff whole for losses actually suffered. It is Ms. Dawsey's burden to sufficiently articulate that she suffered demonstrable emotional distress, which includes demonstrating with specificity how her emotional distress was manifested, and that a causal connection existed between the emotional distress and the wrong committed by BMW Manufacturing. And that, Your Honor, comes from the Fourth Circuit Case of *Dennis versus Columbia Colleton Medical Center*, 290 F.3d 639. And in the case of *Price versus City of Charlotte*, again, a Fourth Circuit Case, 93 F.3d 1241, that is from 1996, the Court said, though a plaintiff's testimony standing alone may support a claim

of emotional distress, courts scrupulously analyze an award of compensatory damages.

In this case, Ms. Dawsey, first of all, concedes she hasn't received any treatment for mental or emotional distress, her claim here is based strictly upon her testimony in the courtroom. And so I did my best to track her as she was talking about the way that the actions of BMW Manufacturing had impacted her and these are the things I wrote down: It was a shock; I felt betrayed; trust was broken for me; I wanted to retire there; I never thought I would be looking for another job; I was exhausted by chaos and change; I am in disbelief that I would be replaced by a German; I could not sleep because it was all running around in my head. And she also testified that in December she was just trying to get to the two-week shutdown so that she could rest.

Now, Your Honor, we would submit to the Court that the testimony of both Ms. Dawsey and Sherrill Miller, her recruiter, undercuts this testimony regarding emotional distress. First of all, it is not in dispute in this case that Ms. Dawsey began to look for another job on September 10th, 2021, when she first met with Ms. Miller. On September 13th of 2021, Ms. Dawsey sent Ms. Miller an email with very detailed

instructions about her job search. This clearly was not a situation where she was just inquiring as to what else might be out there, she had specific instructions that were very detailed and you saw those in exhibit 27 that we presented to the Court. Throughout the fall of 2021, there were regular communications between Ms. Dawsey and Ms. Miller about the job search.

Now, September 10th, September 13th there is activity with regard to a job search. It is not disputed that on September 15th that was the first time Ms. Dawsey learned that Sherry McCraw would become the VP of HR; and it was not until September 30th that she learned that Ms. Burgmeier would come to the department and would fill the TX-60 position. So, the recruiting activities are initiated a couple of weeks before she even knows that there is going to -- that she is moving and that there is a German coming to take her role in TX-60.

THE COURT: Did you say September 15th?

MR. MCCOY: I did, Your Honor.

THE COURT: Okay thank you.

MR. MCCOY: So, Ms. Dawsey's actions in engaging the recruiter and paying her money to seek out job opportunities on her behalf before she ever knew anything about this reorganization plan that forms the

basis for this case shows that there is no legal basis to present the issue of compensatory damages to the jury.

Now, there is also the ending of her employment, which is important here. Ms. Dawsey testified that on December 10th of 2021 she accepted the job of Madewell Concrete, but she did not resign from employment with BMW until January 3rd of 2022, more than three weeks later. Now, I just indicated she testified when she was talking about how the decision impacted her that in December she was just trying to get to that break so she could rest. Well, we saw the evidence in the Madewell Concrete documents, and Ms. Dawsey admitted, that she had an exchange with the person at Madewell Concrete in which they were saying, you could start sooner if you want to, but instead Ms. Dawsey decided to accept the job, not inform BMW for more than three weeks, to stay for more than a month in a situation where she is telling us how awful the situation was.

I think that the Fourth Circuit's ruling in the *Dennis* case is very instructive here. In *Dennis*, the plaintiff resigned from employment after she was denied a promotion for what she believed were discriminatory reasons. At trial, she testified that the denial of the promotion was distressful and humiliating. That

she relied on getting the pay raise associated with the promotion. That she suffered financial strain after she resigned and she was able -- she was able to spend less time with her children after resigning because she had to work other jobs.

After the jury granted compensatory damages to the plaintiff in that case, Judge Norton granted a post-trial motion finding there was insufficient evidence to support a compensatory damage award. The Fourth Circuit upheld Judge Norton's opinion with regard to compensatory damages.

Now, in the *Price* case I mentioned earlier, the -- back up apologize. In Judge Norton's decision, he said the following:

"In *Price versus City of Charlotte*, this Court established on the basis of federal importation of tort principles into Civil Rights claims that a plaintiff's testimony standing alone may support a claim of emotional distress; however, in such a case, courts scrupulously analyze an award of compensatory damages. The injured party must reasonable and sufficiently explain

the circumstances of her injury and
not resort to mere conclusory
statements. The court further
explained that these principles
established that the injury must be
demonstrable and that the plaintiff
must show a causal connection
between the violation and her
emotional distress. Moreover, the
connection must be between the
distress and the violation itself
not the benefit denied."

THE COURT: Would you remind me the date of that opinion?

MR. MCCOY: The *Dennis* case, Your Honor?

THE COURT: Yes.

MR. MCCOY: That is Fourth Circuit 2002.

THE COURT: 2002. Thank you.

MR. MCCOY: Now, in the *Dennis* case, Judge Norton, you know, found that while she had explained the circumstances of her injury in the sense she described the reasons she felt upset and humiliated, she provided no demonstrable evidence of distress, such as testimony of a physical symptom or a doctor's diagnoses.

THE COURT: Didn't you have some testimony from

Ms. Dawsey that it took an emotional toll, but it also caused physical problems manifested in the form of stomach issues? She was concerned about her team? Her job? She couldn't sleep? She needed rest, but she couldn't get it? So, why isn't that a credibility issue for the trier of fact?

MR. MCCOY: Well, maybe it is, Your Honor, but it is also, I mean, look, I don't dispute that she -- doubted that -- that she testified she was having trouble sleeping, trying to get to the break to rest. She indicated there were physicals, I guess, symptoms she suffered. My issue is here, she resigned on December 10th. If things were as she said, why did she continue working at BMW for over a month after that? The two don't go -- the two are not consistent with each other.

THE COURT REPORTER: Did you say December 10th?

MR. MCCOY: She resigned on December 10th, yes. Under the standard articulated by the Fourth Circuit in *Dennis*, it is BMW MC's position that Plaintiff's testimony is insufficient as a matter of law to support a claim for compensatory damages.

We also move for judgment as a matter of law with regard to Plaintiff's claim for punitive damages. Again, Ms. Dawsey seeks to recover punitive damages

from BMW Manufacturing based upon her allegations of discrimination. The Fourth Circuit in *EEOC versus Consolidated Energy, Inc.,* and that is reported at 860 F.3d 131, it is a 2017 decision. In that case, the court stated the following about punitive damages in a Title VII action:

> "Punitive damages are allowed in a Title VII section only under limited circumstances. First, Title VII makes punitive damages and also compensatory damages available only in cases of intentional discrimination as opposed to cases that pursued on a disparate impact theory. And second, the plaintiff must demonstrate that his or her employer acted, quote, with malice or with reckless indifference to the plaintiff's federally protected rights, end quote. Punitive damages, in other words, are authorized, quote, in only a subset of cases involving intentional discrimination, close quote, in which the employer acts with the

requisite state of mind."

This high standard to establish a right to recover punitive damages was restated by the Fourth Circuit in the case of *Ward versus AutoZoners, LLC*, that is reported at 958 F.3d 254, that is a 2020 Fourth Circuit decision.

As the Supreme Court said in the *Kolstad versus American Dental Association*, case, 527 U. S. 526, 1999:

"This standard requires proof that the employer discriminated in the face of a perceived risk that its actions will violate federal law."

This is a high standard to meet. That is a quote out of the Consolidated Energy Case.

Here, Ms. Dawsey has no evidence establishing that BMW Manufacturing's actions were taken with the requisite state of mind to intentionally discriminate against her. Your Honor, this is not a case where my client sought to get rid of Ms. Dawsey. My client -- the testimony from every single one of our witnesses was Ms. Dawsey was a good employer, we wanted to keep her. My client's position was, we wanted to move her to TX-64 because we thought that was in the best interest of the business. But rather than accept this new role or proposed new role in the organization, Ms. Dawsey

decided to instead leave and take a job that she found as the head of HR at another local company. You know, again, my client doesn't fault her, she wanted to be a Vice President of Human Resources, and she has made her way there. So we certainly have no -- there is no dispute that my client is not upset that she left, the problem was that she left at a very bad time for our company because it left a hole in the organization. But if that is what she wanted, she had the right to do that. But this is not a case where BMW Manufacturing was pushing her out the door.

Importantly, the undisputed evidence in the record shows that Ms. Dawsey started looking for a job outside of BMW Manufacturing before she ever knew about the plan to move her to the TX-64 position or to bring Ms. Burgmeier, a German, in to fill the TX-60 role.

I have already talked about the expat guideline document, I know that Plaintiff obviously relies heavily on that document. Our position is, that is an old document, it was created under a prior Vice President of Human Resources, and none of the decision-makers, and keep in mind from her punitive damages standpoint, you know, in the *Kolstad* case, the Court focused on the decision-makers. None of the decision-makers saw or were even aware that expat

guidelines document existed.

Further, it is our position that expat guidelines document makes no reference no national origin. Again, it talks about domestic versus international. And, finally, as I noted earlier, the rules in that document, as plaintiff called them, a policy, a guideline, those rules were not always followed.

So, Your Honor, from a punitive damages perspective, this is a case where my client wanted to keep Ms. Dawsey, they wanted her to be in the 64 role, that was the expectation. Throughout the fall of 2021 when the new organization was presented, Ms. Dawsey went to the meetings, she presented to her team, she never indicated she was not going to be part of that organization until January 3rd when she said she was leaving. This was not a case where my client is pushing Ms. Dawsey out the door. It is a case where my client is trying to determine what the best structure for the TX-6 Department is going to be under a new administration with Ms. McCraw coming in.

Ms. Dawsey testified she wanted to remain in the TX-60 position for the remainder of her career, but BMW MC decided it would be best for her to move to a different role in the organization. The law in the

Fourth Circuit is clear that courts do not sit as super personnel agencies.

THE COURT: Say it again.

MR. MCCOY: That Courts do not sit as super personnel agencies. So this Court should not second guess business decisions being made by the company when we are trying to figure out who is the right person for the right role. I understand, this Court's role is to determine, is it discriminatory or not? From our perspective, The actions of BMW MC, in this case, coupled with the actions of Ms. Dawsey in seeking employment outside of BMW before any of these reorganization plans even occurred, lead to only one conclusion, which is that, as a matter of law, punitive damages should not be available in this case and should not be presented to the jury.

Your Honor, Mr. Moody I pointed out when I answered your question I left something out so I apologize.

THE COURT: Well, I didn't mean to throw you off.

MR. MCCOY: I am trying to figure out where I was.

MR. MOODY: I highlighted it for you.

MR. MCCOY: Nothing further, Your Honor, thank you.

MR. ROZELSKY: May I be heard briefly because I think I am adopting those, but I have a couple of amplifications because I think Mr. Murphy will be better suited responding all at once, is that okay?

THE COURT: It is all right with me. Hearing no objection, go ahead.

Give me just a minute.

MR. ROZELSKY: Yes, Your Honor.

THE COURT: Okay go ahead.

MR. ROZELSKY: Your Honor, just as we did yesterday, BMW AG adopts verbatim the arguments made by BMW MC in this case, but there were a couple of amplifications that I think are important to note. Mr. McCoy talked about the two adverse actions, one being moving the Plaintiff out of TX-60, the other being demoting her by going to TX-64. There is no allegation that BMW AG had anything to do with that second issue of moving plaintiff to TX-64. In fact, I think in argument yesterday Mr. Murphy may have even acknowledged that, but simply there is no -- no evidence whatsoever that BMW AG was involved in where Ms. Dawsey was going to be moved to.

Similarly, under the 703(a)(2) argument, Mr. McCoy talked about the expat guidelines. He pointed out the fact that none of the decision-makers,

that is Mr. Englehorn, Ms. McCraw, or Ms. Petrasch, were aware of the expat guidelines. There is no evidence, simply no evidence presented to this jury that BMW AG had any knowledge, had ever seen, had ever adopted, had ever addressed in any way the expat guidelines, and I that I is important to note.

Finally, and, again, we join in the compensatory and punitive damage arguments. From the punitive damage standpoint with the higher standard, again, there is simply no evidence that BMW AG intentionally discriminated in any fashion. We are even further removed than the decision-makers. I am not sure if Mr. Murphy is suggesting that showing integrated employer therefore makes BMW AG responsible for every action done, but I thought that it was important to put on the record that BMW AG, from at least the punitive standpoint and the higher standard, is further removed from this decision than even MC.

That is all I have. Thank you.

THE COURT: Thank you.

Mr. Murphy, I will be glad to hear from you. Do you need a break?

MR. MURPHY: Maybe a short break.

THE COURT: Let's take a short break. We have been going for a while. How long do you think you will

go? That is not a fair question? This went longer than I thought it would.

MR. MURPHY: We can talk off the record, if you wish.

(Whereupon, the following was heard off the record)

(Whereupon, a lunch recess was held.)

THE COURT: Mr. Murphy, I will be glad to hear from you.

MR. MURPHY: I believe Mr. Rozelsky wanted to be heard first.

MR. ROZELSKY: Your Honor, I just want to renew on behalf of BMW AG the motions that we made yesterday with regard to personal jurisdiction, integrated employer, and the Treaty. And I think Your Honor in denying the Treaty said that you did not believe that the Treaty protected the national origin discrimination and I am not sure if that was misstated or if that was in fact the ruling. I know it doesn't apply to the sex and race, but was it Your Honor's position also that it didn't apply to national origin?

THE COURT: It is my understanding the Treaty does not prohibit discrimination based on citizenship.

MR. ROZELSKY: Right.

THE COURT: And it is really not inconsistent with Title VII, which prohibits discrimination based on

national origin; do you disagree with that?

MR. ROZELSKY: I don't think so, but I think the cases distinguish between citizenship and national origin.

THE COURT: Right. Right.

MR. ROZELSKY: I just wanted to make sure because I thought your ruling earlier today spoke to national origin and not citizenship.

THE COURT: I believe I said, I hope I said:

"That although the Treaty permits German companies to choose German citizens to fill certain positions in their operations here; the Treaty does not permit discrimination on the basis of sex, race, or national origin, which is different from citizenship."

MR. ROZELSKY: Okay. Thank you.

THE COURT: Do you agree with that?

MR. ROZELSKY: I don't think so, but I think that it in fact allows the national origin discrimination to the extent that it is proven that there is national origin discrimination; my understanding of reading of the Treaty was it allowed that.

THE COURT: Okay.

MR. ROZELSKY: Thank you.

THE COURT: All right, Mr. Murphy.

MR. MURPHY: Thank you, Your Honor. The first thing I want to do is address the motions that were made here today and I will augment some of what I said yesterday with the additional testimony that came in at trial, in some cases it was more compelling than the that evidence I relied on before.

Mr. McCoy spent a lot of time on the adverse action issue. In fact, it may have been what he spent the most time on, but I want to be clear on the record it sounded like from your questioning you had already picked up on this, Ms. Dawsey, in referring to her discussion with Ms. Petrasch, Ms. Dawsey did not say that TX-64 would, quote, potentially, unquote, or some point in the future become maybe a function level four. This is the testimony about the October 4 discussion and she was very, very clear, after Ms. Petrasch said, it would be a function level four after the reorganization. And that was testimony that was taken on Wednesday morning. The only time the word "potential" was used, Your Honor, was in that one document where there were some notes when Ms. Dawsey had called my office and made some notes after speaking to an assistant of mine. That is where the word potential shows up and that is

prior to the October 4 discussion. So, we made that very clear on the record that while there was discussion about potential moves in September, on October 4 she was told it would be a function level four position after the reorganization.

Mr. McCoy then said that Ms. Dawsey admitted that Petrasch did not tell her that she would be demoted, that is not the testimony. Ms. Dawsey testified that Ms. Petrasch told her she would be going to a function level four position. The question to which he was referring was, did she use the word "demotion," and she truthfully said, no, she did not say demotion, and that was questioning from Mr. Moody.

Now, you don't have to use the word demotion. For example, if you are in a police force and you are being told that you are being moved from captain to lieutenant, they don't have to use the word demotion for you to know that is a demotion. So, again, that was -- Ms. Dawsey never admitted that she was not told she was being demoted.

Again, I talked about *Herkert* yesterday, H-e-r-k-e-r-t, and the standard set forth in that case. I won't read all of those quotes again, but there are two adverse actions and Mr. McCoy broke them out and made some arguments about both of them.

On the removal, he said people have to move. And we have this rule or this standard where people have to move. Well, that is not established in the evidence, they don't have to move. Ms. Petrasch acknowledged that there had been no prior discussion before this of moving Ms. Dawsey at all. You remember that I also put the portfolios, those annual reviews in front of Ms. Dawsey, and they have a section on the back in which if there is to be any discussion about future moves or moves in the upcoming year, they show up there in the portfolio. There was never a discussion about her moving, no discussion that she ever needed to move.

Ms. Dawsey also testified that she was never told she had to move. The only time it was suggested to her that she move, she did move. For example, Mr. Trauth, I believe -- it was Mr. Trauth or Mr. Flor suggested she go to HR operations, she went to HR operations.

Ms. McCraw also admitted, and Ms. Petrasch admitted that HR managers haven't moved to other departments or other areas. Everyone in the record who has been an HR manager has either left the company or either stayed in HR. Mr. Epps didn't move. And the truth is, the person who has moved at least the most, perhaps tied to Mr. Medley, I didn't count them, but

at least tied to Mr. Medley is Kelly Dawsey. So, the removal didn't come out of some policy that there is an expiration date on your job. And, in fact, I went through that with Ms. McCraw yesterday, and we went over the names of several long-time people who had never moved out of their jobs.

Much of Mr. McCoy's argument keeps bouncing back and forth between inconsistent positions. Half his argument seemed to be premised on the idea of nothing ever happened, this is all just wild speculation; and the other half of his arguments seemed to be that, look, we announced this. There was a meeting in November, and they showed the PowerPoint, there were meetings in December, and they showed the PowerPoint, everybody knew this was going to happen. I suggest that the evidence he relies on one defeats his argument on the other and they cancel each other out for purposes of judgment as a matter of law.

He challenged the idea of TX-60 and 64 being at different levels. In fact, at one point, he even said there was testimony they were equivalent positions, there was never, never testimony they were equivalent positions. Now, yesterday BMW, I think it was Ms. McCraw, started testimony she thought TX-64 was the most important position, and you saw what happened with

that testimony. But on the function level also if you recall, the early discussions with Ms. Petrasch in September when Ms. Dawsey was getting very concerned about the moves and the chaotic nature of what was happening, Ms. Petrasch said her goal was to keep Kelly at a function level three and that was to protect Kelly at a function level three, and that is why she originally slated her for TX-61, that was the other job that was actually graded at a function level three. On this issue of speculative, I read over lunch the *Zienni* case, I can't figure out how it has any application. *Zienni* had to do with a Muslim who was taking prayer breaks. And he was -- I am reading from the slip opinion from the court, quote, exposed to the risk, end quote, of discipline. But the Court went on to say, he was, quote, never disciplined or threatened to discipline. The employer never, quote, disciplined or threatened to discipline him. So, there was never a discussion about discipline. That is very different from this case when they say, you are going to TX-64 and it will be a function level four. If that is the closest case he can find, then I ought to be in pretty good shape.

Now, TX-64, this most important job in the plant or in HR, you have heard the testimony and the

jury heard the testimony today, it does not require any HR experience. Mr. Gilmore said he had never worked in HR. There was the Bailey testimony that we relied on by way of deposition, but which was read aloud to the Court. Mr. Epps agreed it was a function level four position. We also have exhibits 49 and 50, the Bailey and Gilmore documents that show it is a function level four position, and these guys were personal grade 9s, they were in a whole different level, two levels from a Kelly Dawsey.

They keep trying to point out Kelly they are saying is one of the top five paid managers, not executives, but the management level, top five in the plant. And now they are trying to compare her to somebody at function level nine, which they even pointed out, makes substantially less money.

Mr. McCoy said that Ms. Dawsey could not explain, when questioned by her lawyer, how the change would impact her. Well, that is absolutely not so. She talked about how a change in function level with X pay and how it affects the ability to advance, and that alone has been held -- limiting someone's ability to advance, that alone has been held to be a violation of the Act, and that is the *Armstrong versus Index Journal Company* case, 647 F.2d 441.

Ms. Dawsey testified that you can't go from a function level four to a function level two to this executive status, so it limited her ability to get promoted.

Now, you also just heard Ms. Burgmeier say exactly the same thing, and the jury heard that, as well.

On this personal grade reduction, I don't know what happened, but something flipped the switch on the other side of this room because, if you remember, Ms. Petrasch fought me and denied that the reductions in pay grade that Kelly Dawsey talked about ever happened. She said, no, nothing was ever done. Nothing was ever issued on that. Yesterday, Ms. McCraw confirmed, yes, it was. I think she said it was six people got letters and she had to revoke them. So, yes, that policy was obviously in place, as much as they try to runaway from their own policies right now, but Ms. McCraw confirmed, not only was it in place, it was in effect, it was operational, and it was affecting people. In fact, it was a big deal to her, and I get that. And she has a right to be upset about that. But that wasn't the story BMW was telling before. BMW was saying, we don't know anything about this, we didn't hear anything about this, we don't remember this, and it

never happened. Well, that got blown out of the water yesterday.

Now, again, I understand that they keep wanting to argue that the issue is whether the adverse action ever actually occurred, but they know *Ricks* and *Chardon*, and *Van Horn* stand squarely against that decision. The decision to remove Ms. Dawsey from TX-60 was complete and announced in October and again in December. If you remember also, Your Honor, we have Plaintiff's exhibit 4, this was the Franka Niessner email that announced Eva Burgmeier will assume a new responsibility for a new function in February. That announcement was made worldwide on December 3rd.

Now, if this is all speculative, not going to happen, why are they putting an email out to everyone about it? Of course it was done.

Moving to national origin, I read as much as I could of the *Jefferson* case, and I wasn't sure exactly what Mr. McCoy meant by that case, it sounded to my ears like he was saying there was not a private, one person cause of action for a violation of 703(a)(2), and I don't -- if that is what he meant, that is certainly not how I read the case. The case says that a 703(a)(2) claim has to be based on a company policy, not a discrete decision, but it doesn't say an individual

plaintiff can't bring a 703(a)(2) case, if that was the gist of his argument.

Let me first talk about the new evidence on national origin because this motion can be defeated with four words: "He wanted a German." Those four words came out of Ms. Petrasch's mouth on the stand. And if you notice, I didn't cross-examine her much on national origin or race because as I will go through in this argument, it was even better for me than I got in the deposition. But when she described what Dr. Englehorn wanted, I think you will find in the record four words, "he wanted a German," and that is it. That is the essence of this case and that is the national origin discrimination.

Now, Mr. McCoy cites another case for saying that "local" in another case didn't necessarily mean national origin, and I was aware of that, and that is why we were very specific when we laid foundations here about the meaning of domestic, international, expat, and global. They all mean very different things. And even Dr. Englehorn agreed, domestic -- remember I asked him, in China, what did you mean by domestic? A Chinese person. In Spartanburg, what do you mean by domestic? American. So, he agrees with the definition that domestic means American and that is really as far as you

need to go on this, but there is also testimony that expat and international, as used in Spartanburg, means somebody from Germany; global means somebody else from the global network. And nobody really quibbled with those definitions, and you see them all through documents that Kelly Dawsey didn't even create. If you remember the -- with Mr. Epps, we went through the successor planning chart that he came up that at that point in time had all Americans in TX-60 when TX-6 was international. And it had boxes that were color coded: expat was gray; domestic was blue. And he had that one job open that was slotted for an expat and it was colored in gray. So, the terms aren't unclear in this case, they define -- even Dr. Englehorn defined them and nobody quibbled with what that meant, what expat, international meant, what domestic meant. But you really only have to worry about domestic because the focus in a discrimination case is on the Plaintiff's status, not the status of others. So, if expatriate meant people from Jupiter or France and China it doesn't matter, it means not American. And her status is a domestic is what caused her to be discriminated against.

Now, all of that evidence by itself would be enough for national origin. Mr. Rozelsky -- and much of their focus is still arguing about the expat

guidelines. And for the reasons we have said yesterday, the reasons we argued in the motion in limine, the expat guidelines, of course, are evidence of national origin discrimination, but even without the expat guidelines, four words is enough to send this to the jury. He wanted a German. And never once in this case, I mean they tried denying, they knew about these expat guidelines, and Ms. McCraw even told the company line on that, these expat guidelines, what the heck are these things? They produced them. So, she finally admitted when I showed her the bate stamp BMW MC, she timely admitted in front of the jury, yeah, they are in our system. And as Kelly testified to, Ms. McCraw was in the senior management group, it was presented to and approved by.

And Kelly gave a lot of testimony about Johannes Trauth and he wanted this implemented, which is the same rule, by the way, that everybody has been following. That comes out of AG, including Dr. Englehorn, where he said I wanted a local in TX-6, and as Ms. Petrasch confirmed, he wanted a German in the other position. But Mr. Trauth never showed up to contradict anything Ms. Dawsey said. And they have known about this expat guideline issue for four years.

The fact they wanted a German because of TX-6

change also is confirmed by the fact that Ms. Burgmeier, nobody knew who she was. Mr. Epps is supposedly responsible for succession planning. He didn't know who she was. They never discussed her with him. His charts, when TX-6 was international, was all Americans. So, where did she come from? Well, we know that now. Ms. Petrasch pointed out when we were going through Claudia Koepnick's chart as to what should happen that Ms. Koepnick created that chart in July. And recall that Dr. Englehorn, when he first had these discussions about how to fill these positions while still at BMW AG in Munich, she is creating these charts over there in July and they are having the discussions with Ms. Burgmeier before any of them came to BMW MC.

Let me talk a moment about race again. We talked about this yesterday, so I will go through it very quickly. We know why Mr. Epps got the treatment he did, that is Plaintiff's exhibit 35, it states the reason and only one reason, he is a minority. But Ms. Petrasch gave us testimony, again, I didn't want to touch it on cross because it is better than anything I got in the deposition. She agreed with that statement in Plaintiff's exhibit 5.

THE COURT: This is Petrasch.

MR. MURPHY: Ms. Petrasch. And she said, yes, it

is important to have a minority because I want management that looks like our work force. That is really popular language from a few years ago, part of the DEI movement, it is also patently illegal. You can want and seek a diverse work force, which is great, and you do it right, that is great; fill in the box is not a legal way to do it. Slotting people into positions is not a legal way to do it. In fact, that was the very theory that was tried in the *Duvall* case that went to the Fourth Circuit that resulted in a ten million dollar punitive damage verdict. The employer said exactly the same thing. They grab the very fashionable quotes of the day and say, we want to look like our work force, so we are going to put more black people in there. That is not why you put black people in positions. There are many good effective legal ways to reach diversity without saying, and this person goes here because of this. That is patently unlawful. And she offered it right up on a silver platter.

That is why they would not allow Mr. Epps to go to TX-64 because that was going to be a function level four position, and as that chart showed, they had to keep him at function level three to show that they are promoting minorities. Nor did any of the other rationales being used for Ms. Dawsey applied to Mr.

Epps, including the moving around rationale. And as I mentioned yesterday and talked at some length, he was promoted again in violation of the guidelines, and that is that whole discussion we had about the audit and the unwritten rule in Germany that somehow overrode the written rules that you saw in Plaintiff's exhibit number 12.

On sex, Your Honor, I don't have anything new to add to my arguments from yesterday. I don't think anything else came out during the rest of the trial, I will just rely on those arguments.

Moving to the issue of damages, Your Honor, the first motion, the first part of the motion was on compensatory damages. You have seen similar arguments before in their motion in limine, ECF 153, and my response was at ECF 159, so you have heard some of this before. But the law has developed, yes, *Dennis* is a part of that law. And I thought it was apt that you asked for the year from that because there are cases subsequent to that that further define it. Including *Bryant versus Aiken Regional Medical Center*, which is all cited in our ECF 159, but that is 333 F.3d 536, which confirms that no corroboration is required. Why is that important? Because Mr. McCoy keeps pounding the nail that she never went to see a doctor. That she is

relying on her own testimony. Well, she can do that. Now, it may be a fair point for him to argue to the jury, it couldn't have been that bad if she didn't want to see a doctor, if he wants to make that argument to the jury he can, that is fine, but it has never been grounds, never been acceptable grounds as judgment as a matter of law. And we cited the *Westmoreland* case and that is the *Westmoreland versus Prince George's County* out of Maryland, 2013 Westlaw 6629054, District of Maryland, 2013 case, which does a good job of explaining why these types of issues, how one is affected by discrimination, what are the normal responses and the abnormal responses that you would expect from that, quintessential jury issues. The working people who sit in that box are in a far better position to assess the realities of the workday -- world and that is -- that is who our founder of fact should be on those issues.

But To go through some specific case law after *Dennis* at the Fourth Circuit, the published decision is *Bryant versus Aiken Regional Medical Centers*, 333, F.3d 536, I guess I just read that, and there was sufficient evidence and testimony when the plaintiff explained that she was, quote, embarrassed, frustrated, and angry, end quote; quote, very disgusted; quote, and

she quote didn't feel very good about coming to work, end quote. That testimony was sufficient to send compensatory damages to the jury and I got a lot more than that.

Following along with that is the *Taylor* case, *Taylor versus Republic Services*, 968 F.Supp.2d, 768 that is an Eastern District Virginia case from 2013. And then *Westmoreland*, a case I talked about a moment ago, there really wasn't that much testimony about the suffering caused by the plaintiff. Mostly, the plaintiff said it caused her serious stress. She felt ostracized. She was disappointed and forced to perform demanding traditional fire-fighting duties, which interfered with her child care arrangement. Again, that was enough to send to the jury. *Carter Behavioral Health* case, that is an EEOC versus Carter Behavioral Health Case, I think all of this is cited in my briefing on that motion, Eastern District of North Carolina, 2011 case. That was a nonjury case, but the plaintiff established enough for compensatory damages by, quote, describing experiencing recognized physical symptoms of distress, such as sleeplessness, headaches, and loss of appetite and weight.

So, the evidence we have in this case, you actually asked Mr. McCoy about this, but Ms. Dawsey

talked about feeling some shock. She talked about eating and throwing up what she had been eating. She told the jury about how she was exhausted, but still couldn't get to sleep. She talked about every day sitting in her car before going to work getting herself mentally prepared to be able to go in. And she said it took about a year and a half to get herself back to normal.

Now, their other arguments are equally confounding to me. They claim they are entitled to judgement as a matter of law on compensatory damages because Ms. Dawsey engaged a recruiter, and I don't get that. I don't get what that has anything to do with compensatory damages other than to support the fact that after 26 years of dedicated service and having never looked for a job while she was employed by BMW she finally got to the breaking point where she needed to look forward to keep her options open. But Mr. McCoy cites no law for the authority that if you look for a job or look to see what is out there you are barred as a matter of law from receiving compensatory damages in a discrimination case. So I don't know what rule he is relying on. I don't know the ends of that rule. How could Your Honor draft such an order and define the confines of that rule? If you go on one of these

websites for job searches or you go on LinkedIn and you click on a job, are you barred from damages in a discrimination case? I just don't know where that is coming from, but it certainly is not a Rule 50 motion.

He also argued that after she decided to leave in December, which is when she made the decision she was going to leave, she worked for a month. Again, I don't know how that is an argument about compensatory damages, factually it is not even true. When she made the decision to leave, which was, if I remember right, something around December 10 or that early mid-part of December, the plant was going into shut down. And when she resigned was actually the first day the plant was back up and operational, but her boss wasn't there because she was still on vacation in Germany. She had not worked a month between the times. There is not even a month between those two dates. But even if there were, and even if she pulled herself up every morning and dragged herself into work and put on a happy face and did her job, that does not deprive her of the right to seek compensatory damages.

Punitive damages. There is an interesting shift in this argument. Mr. McCoy started off with the correct standard, and punitive damages are awarded when a defendant discriminates against the plaintiff with

malice or reckless indifference to the federally protected rights of an aggrieved individual, and that is right from the statute. But then he said, you can't award them in this case because we never sought to get rid of Ms. Dawsey. That is not tied to the standard at all. The statute doesn't say, punitive damages when a defendant seeks to get rid of an aggrieved individual. It is not part of the standard. Whether they sought to get rid of her or not has nothing to do with whether they act with reckless indifference to Ms. Dawsey's rights.

His next argument, and I will get into that a little bit further in just a minute, but his next argument quickly was, we did it because we thought it was in the best interest of the business. Well, there is only one to argue that to the jury. I will answer it with four words: He wanted a German. He wanted a German. And this comes out of the mouth of the Vice President of Human Resource, who also testified, she knew about the policies, she knew about the policy against national origin discrimination, and she even brought up about the posters that were in the plant. So, she knows there is a law against this and stands up and says: Say he wanted a German.

Now, if that isn't reckless indifference to

federally protected rights, we would be hard pressed to come up with a better example. And that was the big part of the discussion in *Duvall* and the *Federal Express* cases, in which punitive -- in *Federal Express*, punitive damages were found to be appropriately submitted to the jury because the manager was aware of the employer's policy, well check; they acknowledge they are aware of their own policy, that is the one policy they actually acknowledged. They have been trained on the law, and Ms. Dawsey provided the testimony that all of the executives and all of the managers are trained on this. And, three, the individual was responsible for all personnel matters, that is Ms. Petrasch. So, all three factors in *Federal Express* apply in this case, and it is not even a close call on punitive damages.

Your Honor, I am not sure anything was raised new on some of these other issues relating to AG, but when this motion is concluded, I would like to move for judgment as a matter of law on the Friendship Treaty affirmative defense, but if I have addressed all of the other points, I don't have anything further on the motion on that side of the table right now.

THE COURT: All right.

MR. MCCOY: Your Honor, if I may have just a

moment.

THE COURT: Briefly.

MR. MCCOY: Yes, sir, I understand. First of all, let me point out because this is important, Mr. Murphy just cited to the *Duvall* case at 95 F.4th 778, a 2024 decision, the Fourth Circuit set-aside the punitive damage award in *Duvall*.

There has been testimony about this alleged statement from Ms. Petrasch that, quote, he wanted a German, I would -- I am not going to talk about the transcripts, but I would encourage Your Honor to search for that term in the transcript, I don't believe it is there -- I mean that phrase.

With regard to compensatory damages, Mr. Murphy said that, you know, he couldn't find any law to support my argument with regard to her job search. My point with the job search was not the fact of searching for a job is a bar to compensatory damages, it is the timing of it. The fact that she started searching for a job before she was ever discriminated against in any way is what I was arguing and why I think that is relevant to the compensatory damages. She was looking to leave BMW before she ever knew that a German was coming to her replace her or she was going to have to move.

He talked briefly about Mr. Bailey and Mr. Gilmore being the PG 9 employees in TX-64 after Ms. Dawsey left the company, the evidence also showed that the current person in TX-64 is Mr. Medley, who is a PG 11. And he is -- we put in evidence, I think it was Defendant's exhibit 9, shows that Mr. Medley has continued to receive pay increases since Ms. Dawsey left the company.

He talked about -- he argued that TX-60 and TX-64 were equivalent positions, they are. They are both function level threes, if you look at the job function data sheets, that is equivalent, Your Honor.

There is evidence in the record, as well, that Ms. Dawsey testified that it was -- it was a potential decrease to function level four. And so she may have testified in other places that Ms. Petrasch told her she was going to be downgraded to function level four; there appears to be inconsistent testimony by Ms. Dawsey on that issue. And that, Your Honor, does not prevent you from granting judgment as a matter of law.

She also -- there is also remains the issue of the speculative nature of the damage. Ms. Dawsey's testimony, this came out of her direct examination, not even on cross when she was asked, if TX-64 becomes a function level four, and if this policy is applied to

you that is in effect, that is the misaligned personal grade, what is the impact going to be? Her answer was, and I wrote this down in quotes: I cannot answer.

Finally, Your Honor, just to make sure this is clear, we have argued this over and over again, I wanted to reiterate sp that it is in the record, this is not a constructive discharge case, there is no allegation of constructive discharge with regard to Ms. Dawsey's resignation in this case.

THE COURT: I don't think there is any dispute about that.

MR. ROZELSKY: Your Honor, BMW AG adopts the arguments made by Mr. McCoy.

THE COURT: Give me just a second, Mr. Murphy.

Thank you, go ahead.

MR. MURPHY: Your Honor, a couple of things very, very quickly. With respect to *Duvall* vacating the punitive damage verdict is correct, and the reason they did that is the employer denied knowing the law that they were -- so they didn't know about the rights and recklessly violated it. That is why I believe that case sites the *Federal Express* case and *Federal Express,* I think that is the poster glancing case. We have discussed this before in other hearings, but I believe that is the case where the supervisor believes he

glanced at the, Know Your Rights poster, and that was enough to establish liability; they didn't have that in *Duvall,* and I believe that is why they tossed the punitives.

My point on *Duvall* was twofold: It has to do with the use of diversity as a justification for discriminating, that is a context I was citing it mand also I cited it in conjunction with the *Federal Express*. I am looking through my notes, and if you are searching he is right, it wasn't four words, he would like to hire a German, might be the closer quote, but if we have to go digging, we can ask the court reporter to find it, but it was said and that is why I didn't touch it. In fact, Ms. Petrasch not only said he would like to have a German, she went on to then justify that policy and that is why I knew not to touch it.

So that is all I had to offer, Your Honor. Do you want to hear my Friendship Treaty arguments now? Okay.

The Plaintiff moves for judgment as matter of law on BMW AG affirmative defense under the Friendship Treaty. My first point, and I think I have made all of this in briefing before in the summary judgment option to BMW AG, which is at ECF 104, we have hashed this out with the Court before. But my point here is, as I

mentioned before with respect to the jury charges, one, the Treaty doesn't give anything for the jury to decide, but point number one is BMW AG should not be allowed to raise this issue. The Treaty applies when a foreign corporation does something, takes an act, sends its executive here. They denied any involvement throughout this case. And in footnote 11 of my summary judgment opposition, I quote BMW AG's filings left and right saying, we have got nothing to do with this. Well, you can't take that position in court and then turn around and say, well, I had every right to do it. They have decided tactically in this case not to be associated with any of the decisions. Well then they can't say it is justified under a Treaty. And they bear the burden of proof on that. So, how do they satisfy their burden of proof when they deny doing the things they have to prove that they did?

THE COURT: Well, people play in the alternative all the time.

MR. MURPHY: It can't work that way, Your Honor, with an affirmative defense where you can't say, you know, I didn't shoot the guy, but if I did, it was self-defense, that is not an alternative. Alternative means, if this law doesn't cover it, then this law covers it. You don't get to change the facts and say,

oh, I lost another argument so I deny everything I just did and I will come over here and create another argument.

Pleading in the alternative means that I have got this claim, and if it doesn't fit that claim, then it fits this claim. For example, breach of contract. I got a breach of contract. If you find as a matter of law that I didn't have an operative contract, then I will have the alternative claims in equity. But I don't get to say, I got one set of facts for this, and I got another set of facts for this, and I can prove this set of facts by contradicting what I told the Court for this set of facts, that is not pleading in the alternative. That is estoppel.

The second reason Friendship Treaty doesn't apply, Your Honor, is because the position at issue here is with a domestic company. And we have already cited the *Avagliano* case, and it says it doesn't apply to domestic subsidiaries. If you take everything that BMW has been saying and they got up and told this jury, BMW MC makes all of the decisions in terms of hiring Ms. Petrasch, BMW MC made that decision. That is what they keep telling this jury, so how do you charge the jury on saying, hey, BMW MC is going to tell you it did it, AG is going to tell you it had nothing to do with it, but

now decide AG is covered by it. It can't be. That is what *Avagliano* says, Your Honor, it does not apply to domestic subsidiaries.

Now, Mr. Rozelsky has provided a case, and I acknowledge there are cases from other circuits that say that a subsidiary in the U.S. may assert rights under the Treaty. And there are some circuits who say that, I acknowledge that. But MC didn't. BMW MC never raised its affirmative defense, never raised the Treaty issue. So, even if the Fourth Circuit were to agree with those other circuits, they couldn't do so in this case.

Also, Your Honor, the Treaty does not apply to non-executive decisions. This was also the basis for your summary judgment ruling. And again I talked about this a little bit yesterday, but if we look at Plaintiff's exhibit 12, let's see what BMW itself says. It says function level one is executive level responsibility. Function level two is executive level responsibility. And that is the last time executive level responsibility is mentioned. Everything below that is just management responsibility. So, even if we use BMWs own policy, the Treaty could not apply. Even if somehow it could apply at BMW MC, which it can't, then BMW MC can't raise that issue now, and it never

has.

Ms. Petrasch also agreed when I asked her about function level one and function level two, she said yeah, those are the executive levels. You heard lots of testimony, they get all sorts of different treatment than everybody else with this OFK status. They have drawn a very, very hard line. In fact, they put in ample testimony how hard it is to get to that executive level. It can take years. I think the word "rigorous" was used. They guard that executive level dearly and TX-60 does not fall within it.

Another group, if somehow the Treaty could be applied to a non-executive position at a domestic subsidiary is whether Ms. Burgmeier has some technical expertise that you couldn't get in the United States, well, that clearly isn't true. The jury heard ample testimony from Ms. Burgmeier herself. She had no experience in this job. I mean, compensation system here and the compensation system in Germany, vastly different, worlds apart. There system is dictated by government regulation and mandatory union negotiation on every topic. Here, it is a free market, totally different systems.

Those oddly-worded questions I was reading to Ms. Burgmeier about whether she had any experience, we

were reading from the job description, Your Honor. When I went line by line and said, do you have any experience doing this in the U.S.? Do you have any experience doing this? These were lines right from the job description, and time after time she said, no, no, no, no, she had no expertise, unique to herself or unique to the position. She had no qualifications for the job, how could she have technical expertise?

Also, Your Honor, as I pointed out yesterday, the Treaty, if they could somehow show that it applies to a domestic subsidiary that never raised the issue, and could somehow show it is an executive when they didn't call it an executive, and they could somehow show it is a position with technical expertise when the person in that position denies having such expertise, they still have a problem. And that is, the Treaty will only go so far. It will go to a point of placing Ms. Burgmeier here, but not any decisions that happened to Ms. Dawsey. It doesn't say, if you are Japan or you are Germany, we have these treaties with all of our allies now. It doesn't say, you can send your people here and then do to our people whatever you choose. It doesn't say you can remove people from a position, it doesn't say you can demote them. It doesn't say you can treat them less favorably than somebody of another

race. You can't treat them less favorably than someone of another sex. It doesn't say any of that because if it meant that, the Treaty would just say, foreign corporations are not subject to our laws. And the courts have been very clear it doesn't say that.

So, there is about three or four levels of why this Treaty doesn't apply, but even if it could apply here, it wouldn't apply to these claims. And for those reasons, Your Honor, the Plaintiff is entitled to judgment as a matter of law as to BMW AG's affirmative defense of the Friendship Treaty.

THE COURT: I went back and looked at this and BMW AG in its answer to the amended complaint in paragraph 14 stated:

"As alleged, Plaintiff's claims are barred in whole or in part by Treaty international law and principles of comity."

And as I was reminded earlier in the trial, that was also raised as a part of the summary judgment proceedings. Is it really an affirmative defense? I was going down that track myself for a while, but is it an affirmative defense or is it just simply the law?

MR. MURPHY: It is an affirmative defense, sir. I am going to see if I can -- I thought we even had a

citation for that.

MR. ROZELSKY: Your Honor, a Treaty has a force of law.

MR. MURPHY: Your Honor, it is an affirmative defense. The case law that I cited. I cited two cases, and I am sure they are in that briefing. The first one is -- the Plaintiff's name is spelled *Urata*, U-r-a-t-a, versus *C-a-n-a-r-e Electric Company*, 2013 U.S. District Lexis 76820, and that is at star pages 17 and 18 if you use Lexis. That is District of New Jersey, May 10, 2013. The second case I cited was *Brune*, B-r-u-n-e, versus *Toyota Tech Center USA,* that is a 1997 U. S. District Lexis 6908, at star page 6, that is Eastern District Michigan, March 20, 1997. And the reason I think that is right is because it is absolutely the nature of affirmative defense. It is saying, even if you can prove these things, even if I admit everything you say, okay. For example, he produced a case to you about executives, and there is -- there is no issue of fact as to whether those people were executives. If they say we are bringing in an executive from headquarters from Japan, and you say that is national origin discrimination, it doesn't matter if I prove application of the Treaty. So, I do think the analysis of those two cases that I cited is correct. I

do think it is an affirmative defense.

It is also appropriate, Your Honor, that the party asserting the Treaty bear the burden of proof, and that is what an affirmative defense does. It puts the burden of proof on the party asserting the claim rather than having the plaintiff disprove application of the Treaty, the defendant would have to prove that the Treaty applies. So, I do think it is appropriate, it is an affirmative offense, and I cited those cases and I don't know if there are any more since our last briefing on that.

THE COURT: Thank you. Give me just a minute.

MR. ROZELSKY: Yes, Your Honor.

THE COURT: Okay. Mr. Rozelsky.

MR. ROZELSKY: Okay. I will try to be brief. At least going backwards from the affirmative offense issue. The *Fortino* case, which is Seventh circuit, 950 F.2d 389, it is interesting because the Court there addresses an issue as to whether it was even properly raised below and the court suggests in that case that based on international rules of comity that they would allow it to be raised at that point. But what is important is there are three kinds of cases. There is the *Sumitomo Shoji America* case, which 457 U.S. 176, and in that case the Supreme Court ruled that a foreign --

a domestic company could not articulate that it was -- it did not come under the Treaty. And then the *Fortino* case and the other case I handed up earlier, *Padilla*, I am not sure I am saying that right, I apologize, but those cases deal with where a foreign subsidiary, that is BMW MC, raises the rights of their parent Corp. What is missing is the situation that we have here, and that is that the Plaintiff has alleged that a foreign company, who is protected by the Treaty, is not allowed to assert its rights under the Treaty because of the fact that it is -- it is a domestic corporation. In the *Sumitomo* case before the United States Supreme Court, it was not the parent that was asserting the rights, it was the domestic corporation suggesting that it had rights, okay. So, I think there is a third set of cases that is not addressed in large part because I haven't seen any of these cases where the plaintiff in a single plaintiff case has alleged both the domestic and a foreign parent have both been the employer, okay. So, it is a unique understanding he wants to argue the integrated employer issue, that is fine. But I don't think that either the *Sumitomo* case or the *Fortino* line of cases prohibit me, the foreign company, who is subject to the Treaty, from asserting it when the allegations are that the foreign entity directed the

conduct. This idea that we can't plead in the alternative what the plaintiff has said, what he put before the jury was that Mr. Englehorn (sic) -- Dr. Englehorn while he was an employee of AC made a decision, okay. We have denied that he was acting on behalf of AC at the time, we have been --

THE COURT: AG?

MR. ROZELSKY: We have denied he was acting on behalf of AG, we have continuously denied it. But We are entitled if a jury concludes that AG made the decision, then we get the protection of the Treaty.

Now, I think at this point we concede that she is not an executive, that is not an issue, but the issue is, there is technical expertise. The Plaintiff first announced it in her own direct to her attorney voluntarily, said this is a very technical position, and every single person that got up after said this was a technical position, okay. What Mr. Murphy suggested is that it is -- you have to show not only that it is technical, but that you couldn't get that anywhere else, that is not in the Treaty. The Treaty doesn't say, you only get to use a technical expert if you can't find an American with the same technical expertise, there is no case law that suggests that.

I think I hit all of his issues. Your Honor

what is important, though, is Mr. Murphy stood up there and said, "He wanted a German," four words. He didn't say, and there is no evidence in the record, that whoever was making the decision wanted a German national versus wanted a German citizen, that is a jury issue. Just like this *Fortino* case and the *Sumitomo* case are talking about with regard to Japanese, that national origin and citizenship overlap. Your Honor asked the question, and I think the *Fortino* case very clearly says that the Treaty protects the decision-maker, that is, the foreign company, in the event that it is an issue of citizenship, but not one of national origin. Merely by stating that he is filing a national origin claim does ignore the citizenship issues. So, what Dr. Englehorn testified to, and what all the testimony we have heard from the stand was, is they wanted somebody who was a connection to the global network, okay. Does that mean that their grandparents had to be German to be a connection to the global network? He wanted a connection. If the words are, he wanted a German, we would submit that it is at least a jury issue as to whether he wanted a German citizen or a German national.

Thank you.

THE COURT: I want to go back to a question I

asked earlier, probably out of time, but if the jury finds that BMW AG is not an integrated employer with MC, where does that put your client?

MR. ROZELSKY: Out of the case.

THE COURT: And if the jury finds that they are integrated, they are an integrated employer, the two entities are integrated, as an integrated employer and bound together, are those Defendants entitled to the protections of the Treaty?

MR. ROZELSKY: At least, I believe, AG is. If the --

THE COURT: If they are integrated, aren't they -- you take a red ball of yarn and a blue ball of yarn and you integrate them, then the blue and the red are all meshed together, perhaps that is too simplistic. But so that is a question I have. If they are integrated employers, they are an employer, right?

MR. ROZELSKY: Right. They are purple.

THE COURT: Then does the Treaty come into play?

MR. ROZELSKY: I think it does. I may be misstating, it may be Fortino because I think it is important that --

THE COURT: I don't mean to cut you off, but *Sumitomo* was a Supreme Court case that came out in 1982. And it determined -- that case determined that an

American subsidiary and a Japanese parent was not protected by the Treaty because it was not technically a company of Japan. The *Fortino* case, which was the Seventh Circuit case came out in 1991, and I think that is the case where that wasn't even raised in the District Court, the Court said this is so important we are going to take it up anyway, but that case did not involve a contention that the parent had dictated the subsidiaries conduct. And that not permitting a Treaty defense, the Court held not permitting a Treaty defense would essentially nullify the parent's rights to choose its citizens for the specified positions. So, as I understand, I am not saying that I do, as I understand what we are talking about in this case is that a Plaintiff who is saying that AG dictated and controlled the decisions of MC, so the two should be treated as an integrated employer. And so why wouldn't the same reasoning in *Fortino*, I think Judge -- was it Posner?

MR. ROZELSKY: Yeah.

THE COURT: Wrote that, apply here? If the jury finds it is an integrated employer situation and the Treaty is not charged to the jury, wouldn't that also vitiate the protections of the Treaty and what Congress intended?

MR. ROZELSKY: Yes. Yes, Your Honor, I think

it would. I think it is interesting because in this case what Mr. Murphy is arguing is, AG made the decision. But if AG didn't make the decision and MC made the decision, well, they are so tightly aligned that it is as if AG made the decision. And I think Your Honor is right. It is the *Fortino* case exactly and it would vitiate the rights of my client, AG, under the Treaty.

But going back to your earlier question, I do believe that if it is determined that AG is an integrated employer, then MC gets the benefits of the Treaty, just as AG does, because they are essentially at that point one employer.

THE COURT: I didn't mean to throw you off.

MR. ROZELSKY: That is all I had on this issue. Excuse me one moment.

That is all, Your Honor, thank you.

THE COURT: Does MC have anything on this?

MR. MOODY: Your Honor, I know we are in a murky area of law, especially on the procedural posture based upon the integrated employer allegations by Plaintiff, and in light of all of that, we would request of the Court, to the extent that Mr. Murphy claims that we did not plead the Treaty, we would ask that we amend so that our pleadings conform to the arguments of AG.

THE COURT: Mr. Murphy?

MR. MURPHY: Your Honor, I have never heard of amending to conform to the pleadings of a separate party. You amend to conform to evidence, not to somebody else. And it has been four years they have been riding this horse, the same horse for four years where I am spending tens of thousands of dollars pouring through this stuff and now we get to trial and they want to change their strategy. So, no, there is no motion to amend to conform to another party's argument. If they want to get up and AG wants to change factually everything it said to the jury, then it needs to get up and tell the jury that.

But on this issue of the Treaty, Your Honor, they, again, they shift the arguments. The Treaty Article 8, Section 1 of the Treaty defines who is covered and you heard Mr. Rozelsky argue it is a technical position, technical position. The Treaty doesn't talk about technical positions.

THE COURT: I think it does.

MR. MURPHY: It talks about people who are technical experts.

THE COURT: Okay.

MR. MURPHY: There is a big difference because it focuses on the person and why they need to be brought

here. Does this person constitute a technical expert? Not whether the position is technical in nature and that is why we focus on Ms. Burgmeier and her expertise, which she had none. There is no question the job is somewhat technical in nature.

THE COURT: So, you are wanting judges to start making decisions about what a company determines is a technical -- somebody who has technical skills for a particular job?

MR. MURPHY: Judges make decisions like that everyday. Plus, you don't have to really sort through conflicting testimony on that. Ms. Burgmeier offered it all up and Ms. Petrasch also admitted she didn't have, if you look at the job description and what it requires, she doesn't have any of that. So, the focus is on the individual and what the individual brings and there is the rationale to it. You got somebody who has the way of doing things that has to be done here the way they are doing it there and that person has the expertise to do it here. They send them over, that is fine. We do the same thing, we send Americans over across seas to do that. That is not this case. But the focus is on the individual, not the position. If you had any questions for me along these other lines, I will be happy to answer them.

MR. ROZELSKY: May I reply real briefly to that issue?

THE COURT: Yes.

MR. ROZELSKY: The testimony was they wanted Ms. Burgmeier because she had a tie to the network, because she spoke and wrote German, because she understood how the capitalization and how the cafeteria plan, all of those things were technical aspects of the job, that was very clearly in the record.

MR. MOODY: Your Honor, Randy Moody would just like to read from page 48, lines four through seven of Ms. Burgmeier's reading, she said:

"And he also mentioned that it is quite crucial for an HR department to have someone who has a very good network with all of the production network partners, not only AG, but globally, period. That is what I have for my past functions and experiences."

So, for Mr. Murphy to claim that this Ms. Burgmeier didn't have any expertise, that is just not borne out by the reading. Your Honor, to the extent I asked to amend to the pleadings of AG and amend to the evidence, if he is going to bring out this

technicality, we have always viewed the Friendship Treaty since we have a separate defendant that asserted that Treaty to be covering all of the affected defendants here. And the *Sumitomo* case appeared to prevent us from doing that. If he is going to bring up the technicality on this integrated employer. We ask that we be amended to be protected by the Treaty as well.

THE COURT: Well, if it is determined that BMW MC and BMW AG are not an integrated employer. And if the effect of that is that AG is out. Then that leaves MC as a domestic corporation standing alone, you know. It is not uncommon in cases with more than one defendant at some point when the music stops there is only one chair. So, I am struggling a little bit about how MC would be able -- I am struggling a little bit to understand how MC would be able to benefit from the claims of the Treaty if it is standing there and the music has stopped, so to speak.

MR. MOODY: Your Honor, I am being passed a cut of Fortino, it says:

"Sumitomo held that an American subsidiary of a foreign parent is not protected by the Treaty, but no there is no contention that the

parent had dictated the subsidiaries discriminatory conduct. And the Court left open the question of whether the subsidiary might, in such a case, assert any of its parents Treaty rights."

Then the Court enters citations. It says: "We think it must be allowed to, in a case such as this, at least to the extent necessary to prevent the Treaty from being set at naught."

THE COURT: In footnote 19 in that case says. "We also express no views to whether *Sumitomo* may assert any article 81 rights of its parent."

MR. MURPHY: Your Honor, may I address that? First of all, this isn't MC's motion, but I can't think of anything more prejudicial to the handing of a four-year-old case where we have invested four years, a ton of money, and now over a week of trial time, and we are actually entertaining the notion that the jury could be informed that MC has a Treaty right to do this. If that was the case, and if they had raised that, I raised -- I raised integrated employer four years ago.

If they had timely raised that, we could have made decisions about that four years ago, but we pursued the course we did based on the pleadings that have been and the tactic they have taken in submission after submission to this Court with BMW AG saying it has nothing to do with it.

Had they taken a very different position early on in this Court, I may have taken a very different position as to AG. So any -- and I know there is a lot of moving parts here and we are dealing with moving parts on integrated employer, you are doing it -- moving parts on this Treaty. But at the end of this analysis is that this jury could possibly be charged that BMW -- that a position at BMW could be covered by the Treaty, then I am severely prejudiced by any such ruling, and it is exactly why there is a deadline in this Court's Order for the amendment of pleadings and for the raising of issues, because I may have made very different decisions four years ago about the handling of the case if this was a possibility. But I followed the scheduling order, they were subject to the same scheduling order, and now I think the light bulbs are going off, and they are saying, hey, let's frame it up this way. And, again, I can't think of anything more prejudicial to the Plaintiff than to entertain that

notion.

THE COURT: Thank you.

MR. ROZELSKY: Your Honor, on February 21, 2024, that is two years and two days ago as Your Honor just pointed out in paragraph 14, we alleged the claims were barred in whole or in part by Treaty International law or Principles of Comity.

THE COURT: AG did?

MR. ROZELSKY: AG did.

Then AG moved for summary judgment on those issues, which was, we are looking for the date, but I think it was at least a year ago. No, Your Honor, it was two years ago, I believe, when AG filed somewhere around February of 2024.

THE COURT: You raised it, I forgot about it, but it is in there.

MR. ROZELSKY: The point is, I understand his frustration, this is not, as very capable lawyers in this room and judges and law clerks have realized, the Treaty is not crystal clear because it doesn't come up much. And it is, to my knowledge, never come up in this scenario where somebody has sued the parent and the subsidiary, but we raised it. So, to suggest that there is this wholly surprise, I can't believe that you are saying this, is simply untrue, when a month ago or

however long ago where we were sending out the proposed jury charges, we proposed a charge, we put it in those verdict forms with this information on. So, we are not on day seven of trial we are going to go surprise, this has been out there. And whether or not Mr. Murphy and his client looked at this from a holistic standpoint to say, does this only apply to AG or does this apply to AG and maybe through my integrated employer also to MC? That is not really on us, Your Honor to make that argument.

MR. MURPHY: I think they should answer the question because I agree he raised it from the outset, AG did. When those pleadings came in, I looked at who raised it and why. If you look at their arguments throughout summary judgment, it was them running away from MC saying we had nothing to do with this. MC did it all. That is why we kept going the course we were going. Of course, he raised it. They, MC, all of these lawyers together made a tactical decision that MC would not raise that issue. They made that considered decision knowing full well the issue because their colleague is raising it, briefing it, he moved to dismiss on it, I think. There was two motions to dismiss, a motion for summary judgment on it. I am not saying for one minute I am surprised by the Treaty

issue, I have been working on this for years. What I am saying is, for them now to say, okay, that didn't work, let's now go for the opportunity for MC to say, oh, we are covered by the Treaty, that would be highly prejudicial. They made a decision. They chose the horse to ride on four years ago through all of this discovery, through two mediations, everything they put the Court, us, and the jury through, and this case may have gone very, very differently, and it is going to go very very differently if we start telling the jury they got the right to do it.

THE COURT: You are talking about MC?

MR. MURPHY: MC. Of course, AG can argue - if it is not, I'm arguing it can't, the Treaty doesn't apply, but I have never begrudged Mr. Rozelsky about arguing about the Treaty, he promptly raised it, appropriately raised it, and they made a tactical decision that only he would raise it.

MR. ROZELSKY: Your Honor, I am not sure what the number of mediations or how much money Mr. Murphy has spent affects this argument, but Mr. Murphy also made a tactical decision from day one, he said this is an integrated employment case, we treat these two companies as one. Look at the pleadings. Look at the caption, it says BMW AG and BMW AC -- MC collectively

BMW global. He made the decision, a tactical decision, to argue for four years this integrated employer. If it now comes back to bite him because he didn't anticipate that maybe MC would have the benefit of the Treaty, that is not surprise that something we have done, it is the results of his decision to enforce this integrated employer law, that is all.

THE COURT: All right. Well, let's take a break. I want to gather my notes and I will come back and give you a ruling and then we will move forward. Thank you.

(Whereupon, a short recess was held)

THE COURT: All right. Let's go on the record. I will try to address everything that has been raised, but I will rely on you to tell me if I omit anything.

We have the motions of BMW MC and BMW AG for judgment as a matter of law. Here is my ruling:

In accordance with the provisions of Rule 50 of the Federal Rules of Civil Procedure and the standard and case law previously cited, I find that the motions of BMW MC and BMW AG are hereby denied. As the Fourth Circuit noted in *Chaudhry versus Gallerizzo* in 1999 and other cases I have cited previously, judgment as a matter of law is appropriate only when the evidence can support only one reasonable conclusion.

Here, viewing the evidence in the light most favorable to the Plaintiff as the non-moving party, I find factual issues remain as to the matters raised in those motions, and accordingly, the same are respectfully denied.

As to BMW's motion -- excuse me -- let me go next to I believe AG had a motion as well on the Treaty, did you move?

MR. ROZELSKY: Yes, Your Honor, I moved on the Treaty, integrated employer and on the personal jurisdiction.

THE COURT: Well, I find that motion and its subparts or those motions should be denied based on the standard I have cited as I find. I think I have already ruled on the personal jurisdiction issue, but I find those motions should be denied for the same reasons previously noted and based on the standard set forth in the ruling, the relevant case law.

Next is the Plaintiff's motion for judgment as a matter of law as to the Treaty and one issue is whether or not the Treaty is an affirmative defense. We have -- when I say "we," my staff and I have done considerable research on matters relating to the Friendship Treaty between -- well the Friendship Treaty, this one is between Germany and the United States,

because I think Mr. Murphy noted there many countries who have a similar Treaty with the U. S. Courts have treated this different issue -- issue differently and here I find that the opinion of the U.S. District Court for the Middle District of Alabama Eastern division in the case of *Short versus Mando American Corporation*, is persuasive. That is found at 805 F.Supp.2d 1246, a 2011 case. In that case the Judge, in a very thorough opinion, addressed whether or not the FCN Treaty is an affirmative defense and noted that Rule 8(c) of the Federal Rules of Civil Procedure requires a party, when responding to a pleading to affirmatively state any avoidance or affirmative defense. The rule is designed to guarantee that the opposing party has notice of any additional issue that may be raised at trial so he or she is properly prepared to litigate it. The opinion cited, an Eleventh Circuit case, *Ingraham versus U.S.*, I-n-g-r-a-h-a-m 808 F.2d 1075.

To state that an affirmative defense has been described as any matter that does not tend to controvert the opposing party's *prima facie* case as determined by the applicable substantive law, citing Moore's Federal Practice, Second Edition 1995. In determining whether a particular argument is an affirmative defense, courts consider the logical relationship between the defense

and the cause of action and the likelihood that the plaintiff will be unfairly surprised if the defense does not appear in the pleadings.

The court determined that the Treaty was not an affirmative defense and that case did involve a claim of discrimination based on national origin. The Court cited the *Sumitomo* case and noted that the Supreme Court expressly reserved ruling on whether the subsidiary could assert the Treaty rights of its parent, which had not been argued. It talked about how courts had treated the issue.

The Court noted that while Title VII prohibits discrimination based on the basis of national origin, the FCN Treaty permits discrimination on the basis of citizenship.

It went on to say that when seeking to prove his discrimination claim, *Short* bears the ultimate burden of persuading the fact finder that MAC intentionally discriminated against him because of his national origin. In other words, if the FCN Treaty is applicable, it would be used to controvert Short's *prima facie* case of national origin discrimination, i. e., that the discrimination, if any, was based on the permissible criterion of citizenship and not on the impermissible criterion of national origin. As such,

it is not an affirmative offense, but must be pled in MAC's under Rule 8(c).

Of course it was pled here by BMW AG of the issue of the Treaty was pled, and it was raised in the motion for summary judgment: It was not pled by BMW MC, and that takes us next to BMW MC's motion to amend its pleadings.

Based on my finding that the Treaty is not an affirmative defense. Here, and in light of the scheduling order in place regarding the amendment of pleadings, and in the absence of any authority supporting such a motion here, I am going to deny the motion of BMW MC to amend its pleadings to seek the benefit of the Treaty, which is, as I understand it, based on an argument of BMW AG and not made to conform to the evidence, conform pleadings to the evidence. So, that motion is denied.

I believe I have addressed all of the motions, but if I have overlooked any, I invite you to bring those to my attention.

MR. ROZELSKY: Your Honor, I am not sure, maybe you intended to rule on Plaintiff's motion for directed verdict as to the Treaty. I think you addressed it as to whether it was an affirmative offense or not.

THE COURT: I am denying the Plaintiff's motion.

I find -- thank you. I find, based on the provisions of Rule 50 and the standard previously noted, and the case law cited, factual issues remain as to the issues raised in the motion regarding the Treaty and I will talk about this more in the charge conference.

And so this case in Alabama that I have discussed, again, that case determined that the Friendship Treaty is not an affirmative defense to a Title VII national origin discrimination claim. And again, it noted that if the FCN Treaty is applicable, it would be used to controvert *Short's prima facie* case of national origin discrimination, i.e., that the discrimination, if any, was based on permissible criteria and the citizenship, and not the impermissible criterion of national origin. So, I think that the Treaty and Title VII are consistent. And again we take that up when we talk about jury instructions, which we are about to do if there is nothing else. Is there anything else?

MR. MURPHY: No, Your Honor, I think I understand what you are saying why that is a charge issue, thank you.

MR. MCCOY: Nothing further from Defendant MC.

MR. ROZELSKY: Nothing from BMW AG -- AG.

THE COURT: All right. Ms. Rash is going to hand

out a draft of the jury instructions now that we are finished with these motions and I want to just -- I just want to talk briefly about those and then we will give you some time to look at them and then come back and take up anything else we need to address. Since I have the jury coming back at nine.

Okay. Let me just point out some things. Of course, page one I talk about the duties of the jury, find facts and follow the law.

Page two I talk about burden of proof.

Page three I talk about evidence and what is not evidence.

And then on page four discuss direct and circumstantial evidence, address credibility of witnesses.

And then on page 6 I talk about deposition testimony and discuss summary charts. So, this language indicates, based on our conversations, that you all are going to be using some charts and summaries that are not in evidence to help explain your view of the evidence and this just simply says charts and summary that were not admitted into evidence will not go in the jury room. And those are not evidence of proof of any facts and if they do not correctly reflect the evidence you should disregard them or the jury should disregard

them. And then for any summaries or charts that have been received into evidence, that those are only as good as any underlying evidence that supports them.

On page seven it notes that corporations and persons are equal before the law and then we get into note taking and specific claims. The language under specific claims on page seven is joint request number one verbatim, I believe.

And then we go on to talk about integrated employer. I think this is essentially Plaintiff's request number ten; BMW objected to part of that, but I think this is a good discussion of integrated employer, and, of course, I know you will look over it.

On page nine we get into employment discrimination under Title VII, and I think this was Plaintiff's three, but was modified to just quote the full statutory language as the Defendant suggested. And this also I think included Plaintiff's number two, but it again was modified to stick with the statutory language. And, again, I think that this language accurately reflects the law.

We discussed motivating factor also on page ten. And I think this was Plaintiff's six modified to quote the statute as suggested by the Defendants and we added the word "nondiscriminatory" as well.

Page 11 discusses adverse employment action, and I think it is a modified version of Plaintiff's 4, discrimination law applies equally, I think this is an accurate statement of the law.

Ultimate issue, then we go on to page 12 to discuss national origin discrimination in violation of Title VII. Up above that, when discussing ultimate issue from page 11 carrying over to page 12, I think we took that from Defendant's 2, it seemed to be a good place to put that. The national origin discrimination language includes some language suggested, I think, in Plaintiff's five. And there was an argument I think here that the -- an argument was made that the Plaintiff did not suffer adverse employment action, so we felt that language was appropriate.

Page 13 addresses sex discrimination in violation of Title VII. Race discrimination in violation of Title VII.

And then page 14 goes into race discrimination in violation of 1981. And we included joint request to charge number three verbatim, except we deleted the term "sex" because 1981 is strictly race. We discussed "but for causation," and included language from joint request four and six. We included language from joint request number five and we included some other language as

modified from Plaintiff's eight.

And then page 15 we talk about the Treaty.

And page 16 we talk about damages. We included the joint request number seven verbatim and I believe also language from joint request number eight, the compensatory damages.

We talk about punitive damages on page 17. We included language from joint request number nine. That discussion goes on to page 19 when we just get into the duty to deliberate and prohibition on outside research, use of technology.

Page 21 discusses the fact that you need to return a verdict and how to communicate with the Court.

So, I will give you some time to look over that and did we give them a proposed verdict form, as well? So, self-explanatory. You can read that so I won't go through all of that. I am happy to have a conversation about it. So, take some time and look over that and then we will come back and have a conversation.

(Whereupon, a short recess was held.)

THE COURT: All right. I will be glad to hear from you.

MR. MOODY: Judge, I think, hopefully, I can be brief on behalf of -- I think I speak on behalf of BMW Defendants, I am sure Mr. Rozelsky may disagree with me.

As to the jury instructions, we would like to note on page 10, it is the last sentence of the employment discrimination under Title VII, the last sentence there, we would just like to restate, for purposes of the record, our contention that we had on that motion that as a matter of law.

THE COURT: Can you read the sentence are you talking about?

MR. MOODY: Yes, Your Honor.

"The second section forbids an employer from maintaining a policy or practice, a general application, that deprives an individual of employment opportunities because of such individual's race, sex or national origin."

We just want to restate our argument that (a)(2) under the statute is not a separate cause of action and I think that will take care of that point.

The other one that we want to mention just to preserve our rights. The next one -- you want me to go to the page? Judge, if we are looking at the adverse employment action charge in the last sentence of that charge, says:

"Keep in mind that an adverse

employment action may occur when an
employer provides notice of or
communicates the action to the
employer rather than when the action
actually goes into effect."

That last sentence we would like to just state that that last sentence adds to the statute. That is not language that is in the statute, it is a summary judgment concept, it is a construct of the court, generally is not charged to juries from our general practice. And then as to that sentence, that is -- it looks to be derivative of the *Ricks* and the *Chardon* case, and those cases, as we have argued to the Court, deal with tenured professors dealing with definite objectively verifiable outcomes of termination, and we believe that is different in this case. And to the extent that that last sentence stays in, we believe that there needs to be a clarification. We would like for it not to be there, but if it is, that communicates the action is troublesome. So, what we would propose, if it stays, is that there be a sentence to the extent that: Nevertheless, the action communicated mist be concrete and not cause speculation on the impact to plaintiff. And perhaps some language about an objectively verifiable change, something like

that.

THE COURT: Read that one more time.

MR. MOODY: I will do my best, Judge.

THE COURT: I am trying to write it down.

MR. MOODY: Yes, sir. I will read slower.

THE COURT: Nevertheless --

MR. MOODY: Nevertheless, the action communicated must be concrete and not cause speculation on the impact to plaintiff. And perhaps a phrase of like an objectively verifiable change or something like that. But we were going as fast as we could, Judge.

THE COURT: Thank you.

MR. MOODY: Again, just -- I have two additional ones, just for purposes of the record. On the FCN Treaty, that second sentence says:

"This instruction applies only if
you determine that BMW AG is also an
employer of Plaintiff under the
integrated employer test."

We don't believe that sentence is correct because the integrated employer test does note operate independently or with the Treaty. And that sentence appears to narrow the scope of the Treaty when you read it that way. Likewise for BMW MC, we just want to -- we understand the Court's ruling on the judgment as a

matter of law. We just want to note for the record that we -- the limitation of BMW MC's use of the Treaty, we spent time on that, no need to rehash it, we just want to preserve that argument as well.

THE COURT: Thank you.

MR. MOODY: I think subject to being corrected by my colleagues, we would also note, for the reasons that we stated in our multiple Rule 50 motions, and I think for compensatory and punitive damages that was the Rule 50 that was made today, we don't believe a charge on compensatory and punitive damages is warranted in this case, but we are aware of the Court's ruling in this case.

THE COURT: Thank.

MR. ROZELSKY: Just to clarify that, the issue is not with regard to the charge for compensatory and punitive, it is the fact that they are included at all. Thank you, Your Honor. Nothing further from AG.

THE COURT: Mr. Murphy, do you want to respond to any of that?

MR. MURPHY: I do. Let me couple my response with my first point. You are asking to respond to --

THE COURT: If you want to respond to what they had to say.

MR. MURPHY: Let me start, I have got four issues

I would like to discuss.

THE COURT: Okay. That is. Fine go ahead.

Just a minute, let me get a different colored pen for yours. Okay, go ahead.

MR. MURPHY: Interesting, I am going to start on one sentence that Mr. Moody just spoke about on page 11, that last sentence under adverse employment action.

THE COURT: Same sentence?

MR. MURPHY: Same sentence, very different issue. In the second line of that sentence, it says, "may occur," and I believe to make that correct it should be occurs. *Ricks -- the impact of Ricks* and *Chardon* were that the plaintiff got thrown out of court. The Supreme Court did not say that is one of the times when a cause of action arises, they say that is when the cause of action arises. So, the correct statement of law is that an adverse employment action occurs when employer provides notice or communicates the action to the employee.

In response to their argument, this is not a summary judgment concept. The language that they propose to be used to append to this is not either a correct statement of law nor backed up by any authority. And the time for us to propose statements of law with authority was about a month ago nand so to just edit

these substantively on the fly with things that we did not provided to the Court earlier, I don't believe is proper. But I do believe if you look and think about the impact of *Ricks,* you will hopefully agree that it is not it might occur when the employer provides notice because what they are going to get up and argue to the jury, nothing ever happened, this never happened this never happened, this didn't occur, it is all speculative. That is why that is a really big issue. In fact, it is so big that the Magistrate Judge in this case proposed throwing the whole case out on that one issue, and so that is why that sentence is critical.

On national origin, and this will feed into my Treaty issue, you keep talking about citizenship and national origin refers to the country where a person born or to a person or ancestor's place of origin. Then you go into citizenship. Your Honor, I think if you search the entire transcript of this trial, I haven't, but I don't think you will ever see the word citizen used by anybody in this case. And so I understand your ruling on the judgment as a matter of law; however, I think it is confusing to the jury to interject an issue in this case that no party ever offered. Nothing was offered as to the citizenship of any person. We only ever focused on national origin

and to now talk about citizenship when they didn't raise it, I didn't raise it, and they didn't ask for this. That is why I think it gets confusing. At the bottom of page 12 when you say:

"Evidence that you conclude those the defendant decided to remove plaintiff from her TX-60 position and replace her with a German national based on Defendant's preference to have German citizens manage their affairs is not evidence of discrimination."

Boy, that sounds like a direction to them that they didn't discriminate. And the thing is, Judge, nobody has ever contended that that was an issue. Defendants never said, well, we wanted Burgmeier in there because she is a citizen of Germany. And I never contended that they wanted Burgmeier in there because she is a citizen of Germany, but to a layperson hearing that sentence, evidence that you conclude shows that defendants decided to remove plaintiff from her TX-60 position and replace her with a German national based on Defendant's preference to have German citizens manage their affairs, there was no evidence they preferred to have German citizens to manage their affairs, that was

not their position.

You also include in there German national, which is an issue of national origin. So we have got both issues in there mixed, but that sounds a lot like, I mean, if I were the defense, I would get up and say, we wanted a German citizen to manage our affairs. They hear you say that that is not discrimination, and that was never, there is no evidence of that, and that was never raised in the case. And that is on pages 12 and 13.

And for the same reason, Your Honor, I don't believe that the FCN Treaty should be charged because nobody ever -- I understand now and when I read your case I understand the distinction between citizenship and national origin that you were making based on that, whether it is an affirmative offense, et cetera, and I followed along with that. I am not trying to reargue judgment as a matter of law, but this was never in the case. The jury heard nothing about any of this. The jury heard nothing about the citizenship of any person involved in this case.

And then in the second paragraph it says:

"This means that German corporations doing business in the United States are permitted to choose German

citizens to fill positions in their operations here."

Well, let's break that down. They are permitted to choose German citizens, again citizenship has never been raised in the case and no evidence of citizenship. The second part, to fill certain positions in their operations here. BMW AG doesn't have operations here. BMW MC does and we know from *Sumitomo* the Treaty doesn't apply to them. Your Honor, those are my concerns about the jury charges.

MR. ROZELSKY: Your Honor. Mr. Murphy stood up about 30 minutes ago and said four words, he wanted a German. He didn't say he wanted a German of national origin. He didn't -- I mean, we had a sidebar at one point where Mr. Moody was asking questions of the witness about whether they were American citizens and Mr. Murphy said, wait, you can't talk about citizenship, you can't talk about national origin throughout the testimony. There are references to citizenship. I think otherwise how do you ever apply the Treaty if you can't distinguish between national origin and citizenship? We think the way you have written it is exactly the way it should be charged.

THE COURT: Thank you.

MR. MOODY: Your Honor, just briefly. We

endured the first day or two days of Germans and Americans and Germany and all those kinds of things. I think at one point Mr. Rozelsky had to object and Your Honor had to give a curative instruction about, you know, this is not about entire people groups. So this whole German issue has been here since day one and they started it that way and framed it that way.

I don't think national origin has come up a lot either as a legal phrase, but the German and American thing that they pitted us against one another apparently is throughout this case.

THE COURT: Thank you. Okay. Anything else?

MR. MURPHY: I think I would just be reiterating what I already said.

THE COURT: Okay. I appreciate that. All right. I will consider the points you raised tonight and we will gather back up in the morning, and if any changes are made we will take it up, take those up at that time.

MR. MOODY: Your Honor, may I ask a brief question so I don't mess up tomorrow?

THE COURT: Yes. I wanted to discuss, go ahead.

MR. MOODY: Does Your Honor have any prohibition from us using the instructions or the verdict form during closing?

THE COURT: Once it is set, I don't have an objection myself to that.

MR. MOODY: Thank you, Your Honor.

THE COURT: Okay.

MR. MURPHY: Your Honor, I don't know if you wanted to go over the verdict form. I don't have any objection to the form.

THE COURT: I thought about mentioning it, but I was afraid to. You don't have any objection to it?

MR. MOODY: No fear, Judge.

MR. MCCOY: We don't think one is necessary, but other than that.

MR. ROZELSKY: I would like to thank you for abbreviating BMW AG after putting it out the whole way the first time. Only going to have to say Bayerische Motoren Werke Atkiengesellschaft once.

THE COURT: I appreciate you staying late to look at all of this and provide your comments and hopefully we will get moving in the morning and I will look forward to seeing y'all then.

We have the jury coming in at nine, I know everybody is tired, and we have worked late, but maybe just be prepared to maybe start ten till or we can talk about this a little bit, ten till nine. Thank you. Have a good evening.

(Whereupon, the hearing concluded at 6:00 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR April 18, 2026
Date

'

**'11** [1] - 21:13
**'12** [1] - 21:13
**'13** [1] - 7:6
**'93** [1] - 20:23
**'96** [1] - 21:3

1

**1** [8] - 17:25, 20:5, 54:19, 62:25, 63:14, 63:19, 63:21, 149:16
**10** [8] - 20:18, 47:2, 59:15, 59:18, 62:25, 128:11, 141:10, 168:2
**100** [1] - 77:13
**104** [1] - 134:24
**1075** [1] - 160:18
**10th** [6] - 96:23, 97:8, 98:6, 101:13, 101:17, 101:18
**11** [11] - 12:1, 19:25, 59:15, 75:8, 85:2, 132:5, 135:7, 166:1, 166:8, 172:6
**11,000** [1] - 93:6
**11th** [2] - 77:2, 88:7
**12** [15] - 8:12, 12:1, 13:13, 13:15, 20:18, 54:21, 59:15, 63:1, 75:9, 124:7, 137:17, 166:5, 166:8, 174:4, 175:9
**1241** [1] - 95:24
**1246** [1] - 160:7
**13** [6] - 16:14, 58:25, 63:3, 80:21, 166:16, 175:10
**131** [1] - 102:4
**13th** [4] - 77:6, 77:11, 96:24, 97:8
**14** [7] - 6:13, 25:16, 58:9, 63:1, 140:14, 155:5, 166:19
**14th** [1] - 77:19
**15** [5] - 2:4, 9:4, 13:13, 13:16, 167:2
**153** [1] - 124:15
**159** [2] - 124:16, 124:22
**15th** [3] - 19:20, 97:10, 97:19
**16** [8] - 6:19, 15:2, 23:10, 24:10, 49:8, 49:12, 86:4, 167:3
**17** [10] - 3:13, 17:1, 18:13, 19:3, 48:18, 56:25, 89:5, 141:9, 167:7
**17,500** [1] - 36:7
**176** [1] - 142:24
**18** [4] - 45:16, 56:1, 141:9, 179:12
**19** [5] - 3:7, 18:13, 24:18, 153:13, 167:9
**1981** [6] - 70:10, 70:22, 71:1, 87:2, 166:20, 166:22
**1982** [1] - 146:24
**1991** [1] - 147:4
**1995** [1] - 160:23
**1996** [1] - 95:24
**1997** [2] - 141:12, 141:14
**1999** [2] - 103:8, 158:22
**1st** [1] - 24:7

2

**2** [6] - 9:5, 53:2, 53:15, 54:3, 54:12, 166:9
**2-1-2022** [1] - 3:12
**20** [6] - 6:22, 19:21, 21:18, 41:14, 54:8, 141:14
**2000** [1] - 6:22
**2001** [1] - 21:7
**2002** [2] - 100:17, 100:18
**2010** [1] - 95:12
**2011** [3] - 21:13, 126:18, 160:8
**2013** [9] - 7:6, 7:10, 8:13, 8:14, 125:9, 125:10, 126:7, 141:8, 141:11
**2014** [3] - 7:6, 8:15, 91:9
**2015** [3] - 7:7, 7:11, 8:17
**2016** [2] - 8:19, 89:8
**2017** [2] - 8:21, 102:4
**2018** [5] - 8:23, 21:25, 22:1, 88:7, 89:13
**2019** [3] - 34:20, 34:22, 36:8
**2020** [1] - 103:5
**2021** [14] - 72:3, 72:6, 73:14, 74:14, 85:1, 89:23, 90:14, 92:23, 93:15, 96:23, 96:24, 97:6, 98:6, 105:12
**2022** [16] - 3:13, 6:25, 10:7, 17:8, 50:6, 53:19, 54:19, 56:21, 76:17, 76:18, 77:2, 77:19, 78:13, 92:15, 94:14, 98:8
**2023** [4] - 11:21, 13:14, 22:13, 23:15
**2024** [3] - 131:6, 155:3, 155:14
**2025** [1] - 50:6
**2026** [2] - 1:4, 179:12
**207** [1] - 1:18
**21** [5] - 15:9, 24:18, 25:20, 155:3, 167:12
**218** [1] - 88:25
**22** [10] - 8:1, 8:12, 17:6, 18:13, 24:23, 63:1, 63:15, 63:19, 63:21
**23** [9] - 17:13, 40:9, 40:13, 52:19, 57:14, 59:12, 63:15, 63:19, 63:21
**24** [2] - 1:4, 63:1
**240500** [1] - 89:1
**25** [6] - 3:9, 9:13, 9:25, 24:23, 50:8, 50:11
**254** [1] - 103:5
**26** [1] - 127:15
**27** [1] - 97:4
**29** [3] - 18:2, 18:14, 63:1
**290** [1] - 95:21
**294** [1] - 1:22
**29601** [2] - 1:18, 2:5
**29602** [1] - 1:22
**29624** [1] - 2:7

3

**3** [11] - 6:19, 17:15, 34:21, 53:5, 53:16, 53:20, 53:23, 54:1, 54:4, 54:13, 85:2
**30** [1] - 176:12
**301** [1] - 95:11
**302** [1] - 53:5
**305** [1] - 53:6
**306** [1] - 53:2
**309** [1] - 53:2
**30th** [1] - 97:12
**31** [3] - 15:2, 41:14, 63:1
**315** [1] - 2:7
**31st** [1] - 19:20
**321** [6] - 13:7, 13:8, 13:12, 13:15, 13:23
**33** [1] - 16:14
**333** [2] - 124:22, 125:21
**34** [3] - 63:15, 63:20, 63:22
**35** [1] - 122:18
**36** [3] - 63:15, 63:20, 63:22
**37** [1] - 63:1
**389** [1] - 142:18
**39** [2] - 46:8, 63:1
**3rd** [5] - 76:18, 77:19, 98:8, 105:16, 118:13

4

**4** [10] - 22:9, 25:16, 40:15, 53:13, 93:13, 111:17, 112:1, 112:3, 118:10, 166:2
**41** [1] - 63:1
**43** [1] - 50:9
**44** [1] - 47:2
**441** [1] - 116:25
**45** [1] - 47:15
**457** [1] - 142:24
**46** [4] - 3:12, 53:8, 53:9, 63:2
**47** [1] - 48:18
**48** [1] - 151:11
**49** [4] - 9:9, 9:12, 17:1, 116:6

5

**5** [5] - 18:14, 19:3, 46:8, 47:15, 122:23
**50** [15] - 49:12, 63:2, 67:19, 67:22, 69:3, 69:5, 69:11, 70:2, 116:6, 128:4, 158:18, 163:2, 171:8, 171:10
**51** [1] - 17:25
**52** [4] - 3:13, 17:19, 17:21, 63:2
**520** [1] - 91:9
**526** [1] - 103:8
**527** [1] - 103:8
**53** [1] - 3:12
**536** [2] - 124:22, 125:22
**56** [2] - 50:8, 50:11
**577** [1] - 91:8
**594** [1] - 95:11

6

**6** [7] - 3:5, 10:25, 39:8, 39:9, 39:12, 141:13, 164:16
**60** [6] - 47:11, 48:17, 52:18, 79:7, 86:2, 88:13
**61** [1] - 72:22
**63** [2] - 54:21, 63:2
**639** [1] - 95:22
**64** [19] - 16:10, 48:17, 75:2, 76:6, 79:7, 79:11, 80:15, 80:20, 84:19, 84:20, 84:22, 85:1, 85:24, 88:14, 92:11, 93:8, 105:11, 114:19
**64)** [1] - 24:11
**647** [1] - 116:25
**66** [2] - 24:13, 57:5
**6629054** [1] - 125:9
**69** [1] - 58:25
**6908** [1] - 141:13
**6:00** [1] - 179:1

7

**7** [7] - 23:10, 25:20, 54:16, 59:10, 63:15, 63:19, 63:21
**70** [2] - 54:16, 59:10
**700** [1] - 2:4
**703** [1] - 88:1
**703(a)(1** [2] - 87:13, 91:22
**703(a)(1)** [1] - 88:20
**703(a)(2** [14] - 87:15, 87:18, 87:19, 88:1, 88:9, 88:15, 88:18, 88:19, 89:3, 91:16, 107:23, 118:21, 118:24, 119:1
**71** [1] - 59:12
**768** [1] - 126:6
**76820** [1] - 141:9
**778** [1] - 131:6
**7:22-CV-3738** [1] - 1:3

8

**8** [5] - 9:25, 19:21, 52:20, 59:18, 149:16
**8(c** [1] - 160:10
**8(c)** [1] - 162:2
**8,000** [1] - 36:4
**805** [1] - 160:7
**808** [1] - 160:18
**81** [1] - 153:15
**860** [1] - 102:3
**891** [1] - 88:6

9

**9** [11] - 10:18, 11:4, 11:11, 24:8, 57:5, 59:18, 63:15, 63:19, 63:21, 132:2, 132:6
**911** [1] - 88:6

**93** [1] - 95:23
**95** [1] - 131:5
**950** [1] - 142:17
**958** [1] - 103:5
**968** [1] - 126:6
**9:30** [1] - 4:1
**9s** [1] - 116:8

**A**

**a)(2** [1] - 168:17
**a.m** [1] - 4:1
**abbreviating** [1] - 178:14
**ability** [4] - 75:21, 116:21, 116:22, 117:3
**able** [11] - 13:10, 13:20, 32:8, 64:24, 65:1, 71:16, 99:3, 127:6, 152:16, 152:17
**abnormal** [1] - 125:13
**above-entitled** [1] - 179:7
**absence** [2] - 35:13, 162:11
**absolutely** [4] - 14:5, 80:11, 116:19, 141:15
**AC** [3] - 144:4, 144:6, 157:25
**accept** [3] - 80:8, 98:16, 103:24
**acceptable** [1] - 125:6
**accepted** [3] - 77:9, 80:12, 98:6
**accord** [1] - 16:22
**accordance** [1] - 158:18
**accordingly** [2] - 86:25, 159:4
**accounting** [1] - 65:12
**accurate** [3] - 75:22, 79:3, 166:4
**accurately** [1] - 165:21
**acknowledge** [3] - 130:7, 137:5, 137:8
**acknowledged** [3] - 107:19, 113:4, 130:9
**Act** [2] - 57:2, 116:24
**act** [2] - 129:10, 135:5
**acted** [1] - 102:17
**acting** [2] - 144:5, 144:8
**action** [46] - 68:15, 70:7, 70:12, 70:15, 70:17, 70:24, 71:3, 78:16, 78:18, 79:3, 80:14, 81:23, 82:21, 82:22, 83:1, 83:6, 83:18, 84:12, 84:13, 86:12, 86:16, 86:24, 88:1, 88:21, 92:5, 102:6, 108:15, 111:10, 118:5, 118:21, 161:1, 166:1, 166:14, 168:18, 168:23, 169:1, 169:3, 169:4, 169:20, 169:22, 170:7, 172:7, 172:15, 172:16, 172:17, 172:18
**actions** [15] - 23:22, 30:9, 37:22, 58:23, 78:2, 88:15, 92:6, 96:8, 97:22, 103:12, 103:16, 106:10, 106:11, 107:14, 112:24
**activities** [1] - 97:15
**activity** [1] - 97:9
**acts** [1] - 102:25
**actual** [1] - 95:9
**ADA** [1] - 85:6
**add** [1] - 124:9
**added** [7] - 18:11, 18:13, 18:14, 18:15, 21:25, 22:2, 165:24
**addition** [1] - 35:8
**additional** [5] - 42:15, 95:2, 111:6, 160:15, 170:13
**address** [10] - 36:17, 67:19, 87:4, 87:6, 95:3, 111:4, 153:17, 158:14, 164:5, 164:14
**addressed** [9] - 71:3, 87:3, 94:21, 108:5, 130:21, 143:16, 160:9, 162:18, 162:23
**addresses** [2] - 142:19, 166:16
**adds** [1] - 169:7
**Administration** [1] - 85:9
**administration** [2] - 24:3, 105:21
**administrator** [1] - 84:6
**admit** [1] - 141:17
**admits** [2] - 74:19, 80:20
**admitted** [15] - 53:9, 62:25, 63:3, 63:14, 73:11, 75:15, 98:13, 112:6, 112:19, 113:19, 113:20, 121:11, 121:12, 150:13, 164:22
**admonition** [2] - 61:3, 66:5
**adopted** [1] - 108:5
**adopting** [1] - 107:2
**adopts** [2] - 107:11, 133:12
**adult** [1] - 26:11
**advance** [2] - 116:21, 116:23
**advanced** [2] - 67:25, 68:4
**advancement** [1] - 80:17
**adverse** [28] - 70:17, 70:24, 71:3, 78:2, 78:16, 78:18, 79:2, 80:14, 81:22, 83:6, 83:18, 84:11, 84:12, 86:12, 86:15, 86:24, 88:21, 92:5, 107:14, 111:9, 112:24, 118:4, 166:1, 166:14, 168:22, 168:25, 172:7, 172:17
**advisement** [1] - 68:11
**affairs** [4] - 174:11, 174:24, 174:25, 175:6
**affected** [3] - 16:23, 125:12, 152:3
**affecting** [1] - 117:20
**affects** [2] - 116:21, 157:21
**affirmatively** [1] - 160:12
**afford** [1] - 68:16
**afraid** [1] - 178:9
**Africa** [1] - 43:19
**afternoon** [1] - 66:22
**AG** [81] - 5:3, 28:14, 29:4, 29:5, 36:12, 36:25, 37:8, 37:11, 39:20, 40:10, 40:18, 41:16, 44:21, 49:6, 49:17, 58:12, 63:24, 67:22, 67:25, 68:4, 68:24, 72:8, 107:11, 107:17, 107:21, 108:4, 108:10, 108:14, 108:16, 109:12, 121:19, 122:11, 130:18, 133:12, 134:21, 134:24, 135:3, 136:24, 137:1, 140:13, 144:7, 144:9, 144:10, 146:2, 146:10, 147:15, 148:2, 148:3, 148:5, 148:7, 148:10, 148:12, 148:25, 149:11, 151:17, 151:24, 152:10, 152:11, 154:5, 154:9, 155:8, 155:9, 155:10, 155:13, 156:7, 156:13, 157:13, 157:25, 158:16, 158:21, 159:7, 162:3, 162:15, 163:24, 170:17, 171:18, 176:7, 178:14
**AG's** [5] - 67:19, 68:8, 69:5, 135:8, 140:10
**agencies** [2] - 106:2, 106:5
**aggrieved** [2] - 129:2, 129:7
**ago** [13] - 123:3, 126:8, 153:25, 154:2, 154:19, 155:4, 155:12, 155:13, 155:25, 156:1, 157:6, 172:25, 176:12
**agree** [6] - 63:25, 79:18, 110:19, 137:10, 156:12, 173:4
**agreed** [5] - 66:2, 116:5, 119:21, 122:22, 138:2
**agreement** [2] - 4:7, 63:6
**agrees** [1] - 119:24
**ahead** [11] - 22:25, 44:8, 61:17, 67:18, 81:7, 107:6, 107:9, 133:15, 172:2, 172:4, 177:22
**AIDED** [1] - 2:9
**Aiken** [2] - 124:21, 125:21
**aim** [1] - 87:19
**AKTIENGESELLSCHAFT** [2] - 1:7, 1:21
**Alabama** [2] - 160:5, 163:6
**align** [2] - 16:8, 16:16
**aligned** [1] - 148:4
**aligning** [1] - 16:20
**allegation** [2] - 107:16, 133:8
**allegations** [4] - 75:4, 102:1, 143:25, 148:21
**alleged** [7] - 71:6, 81:21, 131:8, 140:15, 143:8, 143:18, 155:5
**alleges** [1] - 75:1
**Allen** [1] - 71:1
**allies** [1] - 139:21
**allow** [3] - 85:12, 123:20, 142:22
**allowed** [8] - 70:19, 83:17, 86:13, 102:7, 110:24, 135:3, 143:9, 153:9
**allows** [1] - 110:21
**almost** [1] - 93:18
**alone** [5] - 95:25, 99:20, 116:22, 116:23, 152:12
**aloud** [1] - 116:4
**alternating** [1] - 90:14
**alternative** [7] - 135:18, 135:23, 136:4, 136:9, 136:14, 144:2
**amend** [7] - 148:24, 149:4, 149:10, 151:24, 162:6, 162:13
**amended** [2] - 140:13, 152:7
**amending** [1] - 149:3
**amendment** [2] - 154:17, 162:10
**America** [3] - 32:5, 88:6, 142:24
**American** [13] - 50:13, 50:18, 91:3, 103:8, 119:24, 119:25, 120:21, 144:23, 147:1, 152:22, 160:6, 176:16, 177:9
**Americans** [5] - 91:1, 120:9, 122:5, 150:21, 177:2
**ample** [2] - 138:8, 138:16
**amplifications** [2] - 107:3, 107:13
**analysis** [6] - 56:5, 88:19, 88:20, 92:8, 141:25, 154:13
**analyze** [2] - 96:1, 99:23
**ancestor's** [1] - 173:16
**AND** [1] - 1:17
**ANDERSON** [1] - 2:7
**angry** [1] - 125:25
**announced** [4] - 114:12, 118:8, 118:11, 144:15
**announcement** [1] -

118:13
**annual** [1] - 113:7
**answer** [11] - 14:23, 24:9, 40:14, 74:5, 74:6, 129:16, 133:2, 133:3, 140:13, 150:25, 156:11
**answered** [1] - 106:18
**answers** [1] - 4:9
**anticipate** [3] - 50:1, 65:13, 158:4
**anticipated** [1] - 69:24
**anyway** [1] - 147:7
**apart** [1] - 138:20
**apologies** [2] - 29:18, 29:19
**apologize** [4] - 54:9, 99:13, 106:19, 143:4
**appear** [2] - 91:3, 161:3
**APPEARANCES** [2] - 1:16, 2:1
**appeared** [2] - 18:21, 152:4
**append** [1] - 172:22
**Appendix** [1] - 91:9
**appetite** [1] - 126:23
**applicable** [4] - 69:4, 160:22, 161:21, 163:10
**applicants** [1] - 87:22
**application** [6] - 68:5, 87:20, 115:11, 141:24, 142:6, 168:12
**applied** [4] - 69:2, 123:25, 132:25, 138:13
**applies** [5] - 135:4, 139:10, 142:8, 166:3, 170:16
**apply** [20] - 68:13, 88:15, 109:18, 109:20, 130:15, 136:16, 136:18, 137:2, 137:13, 137:23, 137:24, 140:7, 140:8, 147:20, 156:7, 157:14, 176:9, 176:20
**appreciate** [4] - 62:12, 67:6, 177:15, 178:17
**appropriate** [5] - 65:6, 142:2, 142:8, 158:24, 166:15
**appropriately** [2] - 130:5, 157:16
**approval** [2] - 46:18, 46:21
**approve** [2] - 46:9, 58:15
**approved** [4] - 58:18, 58:19, 89:20, 121:15
**approximation** [1] - 10:5
**April** [5] - 9:19, 10:6, 10:11, 11:20, 179:12
**apt** [1] - 124:18
**AR** [2] - 29:10, 29:16
**area** [7] - 20:25, 21:8, 24:6, 51:19, 93:21, 93:22, 148:20
**areas** [7] - 12:3, 27:18, 30:11, 86:5, 86:7, 93:4, 113:21
**argue** [11] - 69:11, 69:20, 86:9, 118:4, 125:2, 129:16, 143:20, 149:17, 157:13, 158:2, 173:6
**argued** [9] - 71:14, 78:1, 82:16, 121:2, 128:5, 132:9, 133:5, 161:10, 169:13
**arguing** [5] - 120:25, 131:21, 148:2, 157:14, 157:15
**argument** [28] - 69:17, 79:6, 84:3, 107:19, 107:23, 114:7, 114:9, 114:16, 119:2, 119:9, 125:4, 128:8, 128:23, 129:12, 129:14, 131:16, 136:1, 136:3, 149:10, 156:10, 157:21, 160:24, 162:15, 166:12, 166:13, 168:17, 171:4, 172:20
**arguments** [21] - 61:20, 65:14, 79:10, 87:8, 87:10, 94:22, 94:24, 95:4, 107:11, 108:8, 112:25, 114:11, 124:9, 124:11, 124:14, 127:9, 133:13, 134:18, 148:25, 149:15, 156:14
**arises** [2] - 172:15, 172:16
**Armstrong** [1] - 116:24
**arrangement** [1] - 126:14
**Article** [1] - 149:16
**article** [1] - 153:15
**articulate** [2] - 95:15, 143:1
**articulated** [1] - 101:19
**AS** [2] - 1:8, 1:10
**aside** [1] - 131:6
**aspect** [2] - 21:25, 22:2
**aspects** [1] - 151:8
**Assembly** [5] - 8:24, 10:22, 10:23, 11:3, 13:11
**assembly** [2] - 12:24, 13:19
**assert** [5] - 137:6, 143:10, 153:5, 153:15, 161:9
**asserted** [1] - 152:2
**asserting** [5] - 87:11, 142:3, 142:5, 143:13, 143:24
**asserts** [1] - 70:7
**assess** [1] - 125:16
**assessments** [2] - 30:8, 37:21
**asset** [1] - 45:11
**assignment** [7] - 47:13, 47:21, 48:7, 48:20, 49:16, 49:18, 49:25
**assist** [1] - 5:9
**assistant** [2] - 5:8, 111:24
**associate** [1] - 58:21
**associated** [2] - 99:1, 135:13
**associates** [2] - 35:13, 58:24
**Association** [1] - 103:8
**assume** [2] - 33:24, 118:11
**Atkiengesellschaft** [1] - 178:16
**Atlanta** [1] - 88:25
**attaches** [1] - 79:4
**attention** [2] - 90:5, 162:20
**attorney** [1] - 144:15
**audit** [1] - 124:4
**audits** [1] - 38:11
**augment** [1] - 111:5
**August** [1] - 6:22
**authority** [5] - 85:14, 127:19, 162:11, 172:23, 172:25
**authorized** [1] - 102:22
**automatic** [1] - 68:14
**AutoZoners** [1] - 103:4
**Avagliano** [2] - 136:18, 137:2
**available** [3] - 43:7, 102:11, 106:15
**avoidance** [1] - 160:13
**award** [5] - 96:2, 99:9, 99:23, 129:4, 131:7
**awarded** [1] - 128:24
**aware** [8] - 60:2, 89:25, 104:25, 108:2, 119:17, 130:6, 130:8, 171:12
**awful** [1] - 98:19
**awhile** [1] - 49:13
**ay** [1] - 69:8

**B**

**B-a-l-d** [1] - 33:14
**backed** [1] - 172:23
**backfill** [1] - 48:21
**backfilling** [1] - 48:9
**background** [2] - 9:23, 93:9
**backwards** [1] - 142:16
**bad** [3] - 13:4, 104:7, 125:3
**BAILEY** [1] - 3:4
**Bailey** [10] - 3:13, 6:9, 6:15, 17:14, 18:7, 23:8, 23:11, 116:3, 116:6, 132:1
**Bald** [1] - 33:14
**bald** [1] - 33:24
**ball** [2] - 146:13
**band** [1] - 28:5
**bar** [1] - 131:18
**barred** [4] - 127:20, 128:2, 140:16, 155:6
**based** [47] - 31:1, 57:17, 57:18, 59:25, 68:21, 69:6, 71:20, 72:21, 72:24, 80:12, 81:21, 82:17, 83:18, 85:20, 86:17, 87:8, 87:14, 87:16, 88:15, 90:24, 91:21, 91:23, 92:19, 93:8, 94:19, 95:8, 96:5, 102:1, 109:22, 109:25, 118:24, 142:21, 148:20, 154:3, 159:13, 159:17, 161:6, 161:13, 161:23, 162:8, 162:15, 163:1, 163:13, 164:18, 174:9, 174:22, 175:15
**baseline** [1] - 12:22
**bases** [3] - 68:1, 68:4, 68:10
**basis** [13] - 27:22, 27:23, 68:1, 68:19, 70:5, 88:9, 98:1, 99:16, 110:15, 137:14, 161:13, 161:14
**BASIS** [1] - 27:23
**Basis** [1] - 27:25
**bate** [1] - 121:11
**battery** [5] - 42:17, 42:20, 44:5, 44:8, 92:25
**Bavaria** [2] - 29:1, 34:11
**Bavarian** [7] - 26:5, 26:10, 29:5, 51:24, 51:25, 52:16
**BAYERISCHE** [2] - 1:6, 1:20
**Bayerische** [1] - 178:15
**bear** [2] - 135:15, 142:3
**bears** [2] - 70:11, 161:17
**beats** [1] - 65:20
**became** [3] - 11:10, 35:1, 74:23
**become** [5] - 24:14, 53:18, 56:18, 97:11, 111:16
**becomes** [1] - 132:24
**becoming** [8] - 24:19, 54:22, 55:5, 55:10, 55:16, 55:21, 56:2, 57:3
**BEFORE** [1] - 1:13
**beg** [2] - 69:13, 95:3
**began** [1] - 96:22
**Begin** [1] - 58:9
**begin** [12] - 6:13, 9:25, 15:9, 19:3, 24:23, 25:16, 26:15, 47:2, 48:18, 52:19, 54:16
**beginning** [7] - 4:5, 40:14, 47:6, 53:13, 54:8, 58:25, 89:12
**begrudged** [1] - 157:15
**behalf** [6] - 97:24, 109:12, 144:6, 144:9, 167:24

**Behavioral** [2] - 126:15, 126:16
**believes** [1] - 133:25
**below** [2] - 137:21, 142:20
**bench** [1] - 68:8
**benefit** [4] - 100:12, 152:17, 158:4, 162:14
**benefits** [8] - 40:16, 44:17, 55:18, 71:18, 74:11, 85:4, 148:11
**Benz** [2] - 81:19, 83:12
**best** [11] - 40:6, 42:5, 44:16, 46:13, 78:25, 96:7, 103:23, 105:19, 105:24, 129:15, 170:3
**betrayed** [1] - 96:10
**better** [9] - 32:12, 72:19, 72:23, 76:2, 107:3, 119:9, 122:21, 125:15, 130:2
**between** [15] - 7:6, 68:7, 95:18, 97:6, 100:8, 100:10, 110:3, 114:8, 128:16, 128:17, 159:24, 159:25, 160:25, 175:14, 176:21
**bi** [4] - 42:9, 43:5, 43:10, 43:13
**bi-weekly** [4] - 42:9, 43:5, 43:10, 43:13
**big** [7] - 42:18, 45:11, 117:21, 130:2, 149:24, 173:9, 173:10
**bit** [8] - 26:9, 51:8, 69:16, 129:13, 137:16, 152:15, 152:16, 178:24
**bite** [1] - 158:3
**black** [2] - 123:14, 123:15
**blanket** [1] - 68:16
**blogs** [1] - 66:11
**blown** [1] - 118:1
**blue** [3] - 120:11, 146:13, 146:14
**BMW** [148] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:2, 5:1, 5:3, 6:21, 11:13, 11:16, 11:18, 17:2, 20:20, 26:3, 26:12, 28:14, 29:4, 29:5, 32:5, 33:1, 36:12, 36:25, 37:8, 37:11, 39:20, 39:22, 40:10, 40:11, 40:12, 40:17, 40:23, 40:24, 41:12, 41:15, 41:16, 44:20, 44:21, 45:3, 47:13, 49:9, 49:17, 49:18, 49:20, 49:23, 49:24, 53:2, 53:5, 57:15, 59:18, 63:24, 67:19, 67:22, 67:25, 68:4, 68:8, 68:24, 69:5, 69:10, 70:1, 70:8, 72:8, 74:11, 76:5, 77:19, 77:20, 78:11, 80:15, 86:25, 89:12, 89:17, 90:3, 90:21, 94:13, 95:19, 96:8, 98:8, 98:17, 101:14, 101:20, 102:1, 103:16, 104:10, 104:14, 105:23, 106:10, 106:12, 107:11, 107:12, 107:17, 107:21, 108:4, 108:10, 108:14, 108:16, 109:12, 114:23, 117:23, 121:11, 122:11, 122:14, 127:16, 131:23, 133:12, 134:21, 134:24, 135:3, 135:8, 136:20, 136:21, 136:22, 136:24, 137:8, 137:17, 137:24, 137:25, 140:10, 140:13, 143:6, 146:2, 152:9, 152:10, 154:5, 154:14, 157:25, 158:1, 158:16, 158:21, 162:3, 162:5, 162:6, 162:13, 162:15, 163:24, 165:11, 167:24, 170:17, 170:24, 171:2, 176:7, 176:8, 178:14
**BMW's** [2] - 71:23, 159:6
**BMWs** [1] - 137:23
**Body** [1] - 27:9
**body** [4] - 12:23, 13:19, 30:19, 93:1
**book** [1] - 64:13
**Boone** [1] - 70:25
**Booz** [1] - 71:1
**Booz-Allen** [1] - 71:1
**born** [1] - 173:16
**borne** [1] - 151:23
**boss** [1] - 128:14
**bottom** [3] - 53:4, 76:11, 174:3
**bouncing** [1] - 114:7
**bound** [1] - 146:8
**box** [3] - 5:15, 123:6, 125:15
**BOX** [1] - 1:22
**boxes** [2] - 93:13, 120:10
**boy** [1] - 174:13
**brakes** [1] - 30:24
**breach** [2] - 136:6, 136:7
**break** [15] - 60:21, 61:1, 61:3, 61:16, 62:7, 82:3, 82:5, 82:7, 98:11, 101:10, 108:22, 108:23, 108:24, 158:9, 176:3
**breaking** [1] - 127:17
**breaks** [3] - 81:24, 81:25, 115:13
**BRIAN** [1] - 1:17
**Brian** [2] - 6:15, 19:8
**brief** [3] - 142:15, 167:24, 177:20
**briefed** [1] - 70:17
**briefing** [5] - 126:17, 134:23, 141:6, 142:10, 156:22
**briefly** [7] - 79:9, 107:1, 131:2, 132:1, 151:1, 164:3, 176:25
**bring** [14] - 4:14, 4:17, 30:15, 48:20, 61:16, 62:13, 64:3, 64:15, 72:12, 104:15, 119:1, 151:25, 152:5, 162:19
**bringing** [2] - 65:21, 141:21
**brings** [1] - 150:16
**broader** [1] - 76:1
**broke** [1] - 112:24
**broken** [1] - 96:10
**brought** [4] - 83:23, 84:2, 129:22, 149:25
**Brune** [1] - 141:11
**BRUNE** [1] - 141:11
**Bryant** [2] - 124:21, 125:21
**building** [4] - 36:14, 36:18, 36:19, 37:3
**buildings** [1] - 36:15
**built** [2] - 80:23, 86:12
**bulbs** [1] - 154:22
**bull** [1] - 179:12
**BULL** [1] - 2:6
**bundle** [1] - 30:18
**burden** [12] - 70:11, 71:21, 86:23, 90:22, 94:18, 95:14, 135:15, 135:16, 142:3, 142:5, 161:17, 164:10
**Burgmeier** [27] - 14:15, 16:13, 16:15, 25:12, 25:17, 52:24, 53:1, 54:17, 72:13, 92:11, 92:12, 97:13, 104:16, 117:5, 118:11, 122:1, 122:14, 138:14, 138:17, 138:25, 139:18, 150:3, 150:12, 151:5, 151:22, 174:16, 174:18
**BURGMEIER** [1] - 3:8
**Burgmeier's** [1] - 151:12
**business** [13] - 23:16, 24:17, 37:2, 37:23, 37:24, 38:2, 78:23, 92:20, 92:24, 103:24, 106:6, 129:15, 175:24
**BUSINESS** [2] - 1:8, 1:10
**buyer** [1] - 21:1
**BY** [21] - 6:12, 8:10, 9:15, 14:21, 15:12, 17:24, 19:2, 19:12, 25:15, 29:22, 31:7, 31:23, 39:11, 46:2, 52:23, 53:12, 54:11, 55:4, 56:16, 57:13, 58:8

### C

**CA** [1] - 1:3
**cafeteria** [1] - 151:7
**CAIN** [1] - 1:13
**Cain** [1] - 4:25
**calendar** [1] - 43:14
**CANARE** [1] - 141:8
**cancel** [1] - 114:17
**candidate** [7] - 47:12, 49:14, 49:15, 76:2, 91:5, 91:7, 91:15
**candidates** [3] - 15:14, 91:12, 91:13
**cannot** [6] - 74:5, 79:12, 83:18, 88:9, 94:17, 133:3
**capable** [1] - 155:18
**capitalization** [1] - 151:7
**capped** [1] - 75:8
**captain** [1] - 112:16
**caption** [1] - 157:25
**car** [3] - 30:16, 30:19, 127:5
**care** [2] - 126:14, 168:19
**career** [2] - 52:6, 105:23
**careful** [1] - 67:7
**carefully** [1] - 91:1
**Carolina** [5] - 54:25, 55:8, 55:14, 56:8, 126:18
**CAROLINA** [1] - 1:1
**carrying** [1] - 166:8
**carter** [1] - 126:15
**Carter** [1] - 126:16
**Case** [4] - 95:20, 95:23, 103:14, 126:17
**case** [193] - 5:1, 38:2, 49:16, 60:4, 61:4, 61:5, 65:9, 66:3, 66:4, 66:6, 66:8, 66:9, 66:10, 66:14, 66:15, 67:6, 69:4, 70:7, 70:20, 71:4, 71:6, 73:15, 74:10, 75:6, 75:23, 79:16, 80:22, 81:8, 81:10, 81:13, 81:18, 81:20, 81:23, 82:18, 83:19, 84:7, 84:11, 84:14, 85:6, 85:7, 86:10, 86:11, 86:17, 87:9, 88:5, 88:8, 88:11, 88:22, 88:24, 89:2, 89:22, 90:5, 90:25, 91:8, 91:9, 91:10, 92:8, 92:9, 92:17, 95:5, 95:10, 95:22, 96:3, 96:22, 98:1, 98:21, 99:7, 99:12, 99:22, 100:15, 100:19, 102:4, 103:4, 103:8, 103:18, 104:10, 104:23, 105:10, 105:17, 105:18, 106:10, 106:15, 107:12, 112:22, 115:11, 115:20, 115:22, 116:25, 118:18, 118:19, 118:23, 119:1, 119:13, 119:15, 119:16, 120:14, 120:18, 121:7, 123:9, 125:7, 125:10, 125:19, 126:5, 126:7, 126:8, 126:16, 126:19, 126:24, 127:22, 128:3, 129:4,

130:15, 131:5, 133:7, 133:9, 133:22, 133:23, 133:25, 135:7, 135:12, 136:18, 137:4, 137:12, 141:5, 141:11, 141:18, 142:17, 142:20, 142:24, 142:25, 143:3, 143:12, 143:18, 143:22, 144:24, 145:6, 145:9, 146:4, 146:24, 146:25, 147:3, 147:4, 147:5, 147:7, 147:14, 148:2, 148:6, 150:22, 152:4, 153:5, 153:9, 153:13, 153:20, 153:24, 154:20, 157:8, 157:23, 158:20, 159:18, 160:6, 160:8, 160:17, 160:21, 161:5, 161:7, 161:22, 163:3, 163:6, 163:7, 163:11, 169:13, 169:16, 171:12, 171:13, 173:11, 173:20, 173:23, 175:9, 175:14, 175:19, 175:21, 176:5, 177:11
**cases** [24] - 83:24, 83:25, 84:1, 84:4, 84:6, 102:12, 102:13, 102:23, 110:3, 111:7, 124:19, 130:4, 137:5, 141:5, 141:25, 142:9, 142:23, 143:5, 143:16, 143:17, 143:23, 152:13, 158:23, 169:13
**catch** [1] - 42:16
**caught** [1] - 82:4
**causal** [2] - 95:18, 100:7
**causation** [1] - 166:23
**caused** [4] - 101:2, 120:22, 126:10, 126:11
**causes** [3] - 70:7, 70:11, 70:15
**center** [1] - 93:1
**Center** [3] - 95:21, 124:21, 141:12
**Centers** [1] - 125:21
**Central** [1] - 16:19
**central** [1] - 23:24
**CEO** [4] - 38:7, 38:10, 38:21, 72:17
**certain** [7] - 49:20, 58:15, 68:18, 76:14, 89:6, 110:12, 176:6
**certainly** [6] - 69:19, 71:2, 89:2, 104:5, 118:22, 128:4
**CERTIFICATE** [1] - 179:4
**certifications** [2] - 56:11, 56:22
**certify** [1] - 179:5
**cetera** [1] - 175:16
**CFO** [1] - 23:1
**chair** [1] - 152:15
**challenge** [2] - 88:10, 88:11
**challenged** [1] - 114:19
**challenges** [1] - 56:6
**chance** [1] - 75:2
**change** [22] - 12:4, 22:7, 22:19, 42:17, 58:20, 73:9, 74:24, 76:20, 77:22, 83:10, 83:17, 83:21, 96:12, 116:18, 116:20, 122:1, 135:25, 149:9, 149:11, 169:25, 170:10
**changed** [8] - 18:14, 54:4, 54:14, 59:23, 71:5, 73:5, 73:6, 94:25
**changes** [11] - 14:7, 46:9, 46:18, 46:22, 48:12, 48:25, 58:19, 80:3, 90:15, 94:16, 177:18
**chaos** [1] - 96:12
**chaotic** [1] - 115:4
**Chardon** [5] - 83:25, 84:15, 118:6, 169:12, 172:12
**charge** [9] - 136:23, 156:2, 163:5, 163:21, 166:21, 168:23, 168:24, 171:10, 171:16
**charged** [5] - 147:22, 154:13, 169:10, 175:12, 176:23
**charges** [3] - 135:1, 156:2, 176:10
**charging** [1] - 61:21
**Charlotte** [2] - 95:23, 99:15
**chart** [5] - 90:8, 120:8, 122:8, 122:9, 123:22
**charts** [7] - 93:25, 122:5, 122:12, 164:17, 164:19, 164:21, 165:1
**Chaudhry** [1] - 158:22
**check** [2] - 25:7, 130:7
**CHIEF** [1] - 1:14
**Chief** [5] - 9:18, 9:21, 10:1, 10:13, 11:6
**child** [1] - 126:14
**Childers** [1] - 7:22
**Childers'** [1] - 7:23
**children** [1] - 99:4
**China** [5] - 43:18, 44:10, 48:10, 119:22, 120:20
**Chinese** [1] - 119:22
**choice** [1] - 83:11
**choose** [6] - 68:17, 110:11, 139:22, 147:11, 175:25, 176:4
**chose** [1] - 157:5
**Christine** [5] - 47:7, 48:6, 48:16, 48:19, 75:14
**circle** [5] - 29:6, 32:25, 43:9, 43:12, 46:25
**Circuit** [33] - 70:22, 70:23, 81:18, 81:20, 83:13, 83:15, 85:6, 86:10, 86:14, 88:3, 88:4, 88:7, 88:8, 91:9, 95:10, 95:11, 95:20, 95:23, 99:10, 100:17, 101:19, 102:2, 103:3, 103:5, 106:1, 123:10, 125:20, 131:6, 137:10, 147:4, 158:22, 160:17
**circuit** [1] - 142:17
**Circuit's** [2] - 88:16, 98:20
**circuits** [3] - 137:5, 137:7, 137:11
**circumstances** [5] - 68:14, 91:19, 100:1, 100:21, 102:9
**circumstantial** [1] - 164:14
**citation** [1] - 141:1
**citations** [1] - 153:7
**cited** [18] - 69:4, 124:22, 125:7, 126:17, 131:5, 134:8, 136:18, 141:5, 141:11, 141:25, 142:9, 158:20, 158:23, 159:14, 160:17, 161:7, 163:3
**cites** [3] - 70:25, 119:15, 127:19
**citing** [2] - 134:7, 160:22
**citizen** [6] - 145:5, 145:22, 173:20, 174:17, 174:19, 175:6
**citizens** [9] - 68:17, 110:12, 147:12, 174:10, 174:23, 174:25, 176:1, 176:4, 176:16
**citizenship** [22] - 68:21, 109:22, 110:3, 110:8, 110:17, 145:8, 145:12, 145:14, 161:15, 161:24, 163:14, 173:14, 173:17, 173:24, 174:1, 175:14, 175:20, 176:4, 176:6, 176:17, 176:19, 176:22
**City** [3] - 71:4, 95:22, 99:15
**Civil** [5] - 67:23, 70:3, 99:18, 158:19, 160:11
**civil** [1] - 51:16
**claim** [29] - 74:7, 87:5, 87:13, 87:15, 87:18, 88:19, 89:3, 91:16, 91:18, 91:22, 91:23, 95:25, 96:5, 99:20, 101:22, 101:24, 118:24, 127:10, 136:5, 136:6, 142:5, 145:13, 151:21, 161:5, 161:17, 163:9
**claiming** [1] - 88:12
**claims** [15] - 67:24, 82:8, 87:1, 87:4, 87:6, 87:11, 99:18, 136:9, 140:8, 140:15, 148:23, 152:18, 155:5, 165:6, 165:7
**CLARENCE** [1] - 3:4
**Clarence** [1] - 6:9
**clarification** [1] - 169:18
**clarify** [1] - 171:15
**classify** [2] - 90:23, 91:20
**classifying** [2] - 87:15, 87:22
**Claudia** [1] - 122:8
**clear** [11] - 12:13, 23:6, 70:21, 80:5, 106:1, 111:11, 111:18, 112:2, 133:5, 140:5, 155:20
**clearly** [5] - 85:22, 97:1, 138:16, 145:9, 151:9
**clerk** [1] - 5:11
**Clerk** [8] - 61:21, 62:4, 63:12, 64:9, 65:22, 65:24, 66:19, 67:14
**CLERK** [6] - 61:23, 62:1, 62:24, 63:4, 63:14, 63:23
**clerks** [1] - 155:19
**click** [1] - 128:2
**client** [10] - 103:19, 104:3, 104:6, 105:10, 105:17, 105:19, 146:3, 148:7, 156:6
**client's** [2] - 92:6, 103:22
**close** [5] - 20:10, 31:9, 71:8, 102:24, 130:16
**closer** [2] - 12:1, 134:11
**closest** [2] - 37:2, 115:22
**closing** [2] - 65:14, 177:25
**co** [1] - 15:16
**CO** [2] - 1:9, 2:2
**co-ops,and** [1] - 15:16
**coded** [1] - 120:10
**collaboration** [6] - 12:18, 40:5, 41:18, 41:20, 41:21, 44:1
**colleague** [2] - 45:5, 156:22
**colleagues** [5] - 31:14, 32:1, 32:22, 35:15, 171:7
**collectively** [1] - 157:25
**COLLECTIVELY** [2] - 1:7, 1:10
**college** [1] - 51:10
**Colleton** [1] - 95:21
**color** [1] - 120:10
**colored** [2] - 120:13, 172:3
**Columbia** [1] - 95:21
**combined** [1] - 56:4
**coming** [15] - 16:7, 24:2, 48:13, 48:23, 61:11, 66:19, 67:7, 72:8, 97:17, 105:21, 126:1, 128:4, 131:24,

164:6, 178:21
**comity** [2] - 140:18, 142:21
**Comity** [1] - 155:7
**commenced** [1] - 4:1
**comments** [3] - 67:8, 69:19, 178:18
**Commerce** [1] - 68:6
**committed** [1] - 95:19
**communicate** [1] - 167:13
**communicated** [2] - 169:23, 170:7
**communicates** [3] - 169:3, 169:20, 172:18
**communications** [2] - 38:11, 97:6
**companies** [3] - 68:17, 110:11, 157:24
**Company** [2] - 116:25, 141:8
**company** [20] - 26:3, 33:7, 46:23, 52:12, 58:3, 104:2, 104:8, 106:6, 113:22, 118:24, 121:8, 132:3, 132:8, 136:17, 143:1, 143:9, 143:23, 145:11, 147:3, 150:7
**company's** [2] - 56:6, 58:16
**compare** [3] - 54:3, 54:12, 116:14
**comparison** [1] - 44:18
**compelling** [1] - 111:7
**compensation** [11] - 14:10, 28:3, 45:22, 56:4, 56:7, 58:18, 85:4, 92:2, 93:10, 138:18, 138:19
**compensatory** [27] - 95:6, 95:7, 95:12, 96:2, 98:2, 99:6, 99:9, 99:11, 99:23, 101:22, 102:11, 108:8, 124:14, 126:3, 126:20, 127:11, 127:14, 127:21, 128:8, 128:21, 131:14, 131:18, 131:22, 167:6, 171:9, 171:11, 171:16
**competitive** [2] - 45:22, 55:12
**complaint** [1] - 140:13
**complete** [2] - 79:11, 118:8
**complex** [1] - 40:21
**compliance** [6] - 21:25, 22:2, 22:4, 54:24, 55:7, 55:13
**compliance-related** [1] - 22:4
**comply** [1] - 28:1
**complying** [1] - 55:22
**concede** [1] - 144:12
**concedes** [1] - 96:3
**concept** [2] - 169:9, 172:21
**concerned** [3] - 83:7, 101:3, 115:3
**concerns** [1] - 176:10
**conclude** [2] - 174:5, 174:20
**concluded** [2] - 130:19, 179:1
**concludes** [5] - 18:6, 25:3, 60:8, 68:13, 144:10
**conclusion** [3] - 81:14, 106:14, 158:25
**conclusively** [1] - 77:16
**conclusory** [1] - 100:2
**Concrete** [3] - 98:7, 98:13, 98:14
**concrete** [2] - 169:23, 170:8
**condition** [3] - 71:8, 77:22, 83:22
**conditions** [2] - 71:23, 92:2
**conduct** [3] - 144:1, 147:9, 153:2
**confer** [1] - 18:4
**conference** [2] - 4:5, 163:5
**confines** [1] - 127:25
**confirmed** [4] - 117:14, 117:19, 121:21, 122:1
**confirms** [1] - 124:23
**conflicting** [1] - 150:12
**conform** [6] - 148:25, 149:3, 149:4, 149:10, 162:15, 162:16
**confounding** [1] - 127:10
**confusing** [2] - 173:22, 174:3
**Congress** [1] - 147:23
**conjunction** [1] - 134:8
**connection** [6] - 95:18, 100:7, 100:10, 145:17, 145:19, 145:20
**consider** [4] - 52:6, 67:21, 160:25, 177:16
**considerable** [1] - 159:23
**consideration** [1] - 5:24
**considered** [2] - 68:12, 156:20
**consistent** [4] - 81:25, 88:20, 101:15, 163:16
**Consolidated** [2] - 102:3, 103:14
**constitute** [1] - 150:1
**construct** [1] - 169:9
**constructive** [2] - 133:7, 133:8
**construed** [1] - 69:22
**consult** [2] - 46:12, 66:11
**consultant** [1] - 37:23
**contact** [1] - 10:1
**containing** [1] - 5:18
**contended** [2] - 174:15, 174:18
**contention** [3] - 147:8, 152:25, 168:5
**context** [1] - 134:7
**contingent** [3] - 12:12, 12:13, 12:14
**continue** [3] - 56:17, 65:2, 101:14
**continued** [2] - 22:3, 132:7
**CONTINUED** [19] - 2:1, 8:9, 9:14, 14:20, 15:11, 17:23, 19:11, 29:21, 31:6, 31:22, 39:10, 46:1, 52:22, 53:11, 54:10, 55:3, 56:15, 57:12, 58:7
**continuously** [1] - 144:9
**contract** [21] - 12:14, 12:17, 12:18, 13:2, 13:24, 14:7, 14:16, 24:17, 27:20, 28:7, 28:8, 28:9, 49:17, 49:23, 49:24, 57:24, 57:25, 58:1, 136:6, 136:7, 136:8
**contracts** [3] - 24:4, 24:16, 32:22
**contradict** [1] - 121:22
**contradicting** [1] - 136:12
**contrast** [1] - 85:22
**contributing** [1] - 56:3
**control** [1] - 73:23
**controlled** [1] - 147:15
**controvert** [3] - 160:20, 161:21, 163:11
**conversation** [8] - 16:11, 16:12, 16:25, 73:10, 73:12, 73:13, 167:17, 167:19
**conversations** [1] - 164:18
**cooked** [1] - 42:4
**copy** [1] - 9:5
**Corey** [1] - 72:15
**corner** [1] - 53:4
**Corp** [1] - 143:6
**Corporation** [2] - 91:8, 160:6
**corporation** [4] - 135:5, 143:11, 143:14, 152:12
**corporations** [3] - 140:4, 165:4, 175:23
**correct** [30] - 4:11, 7:1, 9:5, 22:14, 22:23, 23:4, 23:7, 25:21, 26:14, 28:13, 29:2, 29:12, 29:25, 35:4, 52:4, 52:15, 52:17, 53:21, 63:17, 82:22, 82:23, 83:2, 128:24, 133:18, 141:25, 170:20, 172:11, 172:16, 172:23, 179:5
**corrected** [1] - 171:6
**correcting** [1] - 79:18
**corrective** [1] - 23:22
**correctly** [8] - 25:18, 29:1, 31:10, 32:9, 35:21, 36:5, 78:1, 164:24
**corroboration** [1] - 124:23
**cost** [2] - 21:10, 55:17
**cost-effective** [1] - 55:17
**costs** [1] - 55:19
**council** [9] - 28:10, 32:23, 37:14, 37:15, 38:4, 58:10, 58:14, 58:15, 58:18
**count** [6] - 12:19, 12:25, 13:22, 32:24, 45:18, 113:25
**counting** [1] - 26:13
**countries** [3] - 43:25, 44:15, 160:1
**country** [4] - 49:10, 80:6, 81:13, 173:15
**County** [1] - 125:8
**couple** [8] - 21:16, 83:24, 95:2, 97:15, 107:2, 107:12, 133:16, 171:21
**coupled** [1] - 106:11
**course** [12] - 42:22, 64:11, 93:5, 118:16, 121:3, 154:3, 156:17, 156:18, 157:13, 162:3, 164:8, 165:13
**courses** [6] - 50:13, 50:18, 50:21, 50:25, 51:3, 51:7
**court** [20] - 5:19, 31:4, 50:10, 56:14, 57:10, 58:5, 62:20, 62:22, 64:20, 80:18, 83:17, 100:3, 102:5, 115:14, 134:12, 135:10, 142:20, 161:4, 169:9, 172:13
**COURT** [145] - 1:1, 1:14, 2:6, 2:6, 4:4, 4:13, 4:16, 4:17, 4:20, 4:24, 5:2, 5:5, 5:10, 5:14, 6:10, 8:7, 9:10, 14:19, 15:10, 17:21, 18:5, 18:8, 18:16, 18:22, 18:25, 25:5, 25:13, 29:14, 29:20, 31:4, 31:19, 39:9, 45:15, 52:21, 53:9, 54:7, 56:14, 60:7, 60:10, 60:13, 60:18, 60:25, 61:10, 61:15, 61:24, 62:3, 62:11, 63:3, 63:5, 63:11, 63:19, 63:24, 64:1, 64:2, 64:8, 64:15, 64:18, 67:12, 67:18, 68:4, 69:12, 69:18, 81:3, 81:7, 82:18, 82:25, 83:3, 93:24, 94:4, 94:7, 97:19, 97:21, 100:13, 100:16, 100:18, 100:25, 101:17, 106:3, 106:20, 107:5,

107:9, 108:20, 108:24, 109:7, 109:21, 109:24, 110:5, 110:9, 110:19, 110:25, 111:2, 122:24, 130:24, 131:2, 133:10, 133:14, 135:18, 140:12, 142:12, 142:14, 144:7, 145:25, 146:5, 146:12, 146:19, 146:23, 147:20, 148:14, 148:18, 149:1, 149:20, 149:23, 150:6, 151:3, 152:9, 153:13, 155:2, 155:8, 155:15, 157:12, 158:8, 158:13, 159:12, 162:25, 163:25, 167:21, 168:7, 170:2, 170:4, 170:6, 170:12, 171:5, 171:14, 171:19, 171:23, 172:2, 172:8, 176:24, 177:12, 177:15, 177:22, 178:1, 178:4, 178:8, 178:17

**Court** [58] - 4:5, 5:9, 52:8, 68:8, 68:11, 68:12, 71:2, 71:5, 75:4, 78:4, 79:12, 79:14, 79:20, 80:13, 83:4, 83:10, 83:20, 84:1, 85:19, 88:18, 90:2, 90:6, 90:17, 91:12, 92:4, 92:5, 95:24, 96:18, 97:5, 99:16, 103:7, 104:24, 106:5, 115:15, 116:5, 134:25, 136:12, 142:18, 142:25, 143:13, 146:24, 147:6, 147:10, 148:23, 153:3, 153:7, 154:5, 154:8, 157:8, 160:4, 161:6, 161:7, 161:12, 167:13, 169:13, 172:14, 173:2

**Court's** [9] - 68:21, 69:13, 83:16, 90:5, 95:4, 106:8, 154:17, 170:25, 171:12

**courtroom** [2] - 71:22, 96:6

**Courts** [1] - 106:4

**courts** [7] - 96:1, 99:22, 106:1, 140:5, 160:2, 160:24, 161:10

**cover** [4] - 45:20, 51:14, 51:17, 135:24

**coverage** [2] - 41:2, 41:3

**covered** [7] - 28:7, 35:15, 57:18, 137:1, 149:17, 154:14, 157:4

**covering** [1] - 152:3

**covers** [1] - 135:25

**COVID** [1] - 13:10

**cracker** [1] - 65:20

**Crawford** [1] - 88:25

**create** [2] - 120:6, 136:2

**created** [5] - 27:22, 53:23, 54:18, 104:20, 122:9

**creating** [2] - 27:17, 122:12

**creative** [1] - 56:4

**credibility** [4] - 5:25, 101:5, 164:14

**criminal** [1] - 51:15

**criteria** [1] - 163:14

**criterion** [3] - 161:24, 161:25, 163:15

**critical** [4] - 93:2, 93:4, 93:10, 173:12

**cross** [3] - 119:7, 122:21, 132:24

**cross-examine** [1] - 119:7

**CRR** [2] - 2:6, 179:12

**crucial** [2] - 49:4, 151:14

**crystal** [1] - 155:20

**curative** [1] - 177:4

**current** [2] - 19:4, 132:4

**customer** [4] - 30:6, 37:20, 38:1

**cut** [2] - 146:23, 152:20

**CWF** [1] - 12:25

**cylinder** [2] - 36:18, 36:19

**D**

**D-e-b-r-e-c-e-n** [1] - 44:7

**D-i-n-g-o-l-f-i-n-g** [1] - 32:9

**D/B/A** [2] - 1:7, 1:10

**damage** [7] - 99:9, 108:8, 108:9, 123:11, 131:7, 132:22, 133:18

**damages** [43] - 95:6, 95:7, 95:12, 96:2, 98:2, 99:6, 99:11, 99:24, 101:22, 101:24, 101:25, 102:5, 102:7, 102:10, 102:11, 102:21, 103:3, 104:23, 105:9, 106:15, 124:12, 124:14, 126:3, 126:20, 127:11, 127:14, 127:21, 128:2, 128:9, 128:21, 128:22, 128:24, 129:6, 130:5, 130:16, 131:14, 131:18, 131:22, 167:3, 167:6, 167:7, 171:9, 171:11

**data** [7] - 53:25, 54:18, 56:5, 73:15, 80:21, 84:19, 132:12

**date** [9] - 10:5, 53:20, 54:18, 56:20, 73:3, 100:13, 114:3, 155:11, 179:12

**dates** [3] - 7:5, 7:9, 128:17

**DAWSEY** [1] - 1:3

**Dawsey** [99] - 6:16, 47:11, 70:7, 72:5, 72:10, 72:14, 72:23, 73:1, 73:11, 73:18, 73:25, 74:8, 74:19, 75:1, 75:7, 75:15, 75:24, 76:4, 76:15, 76:18, 76:20, 76:25, 77:3, 77:5, 77:7, 77:14, 77:16, 77:18, 78:3, 78:12, 79:1, 79:6, 80:13, 80:19, 81:15, 85:3, 85:22, 87:11, 88:11, 89:8, 90:2, 90:22, 92:10, 92:15, 92:19, 93:3, 93:7, 93:15, 95:5, 96:3, 96:19, 96:22, 96:25, 97:7, 97:11, 98:5, 98:13, 98:16, 101:1, 101:25, 103:15, 103:19, 103:21, 103:25, 104:13, 105:11, 105:13, 105:18, 105:22, 106:11, 107:21, 111:13, 111:14, 111:23, 112:6, 112:8, 112:19, 113:6, 113:8, 113:13, 114:1, 115:3, 116:10, 116:17, 117:1, 117:12, 118:7, 120:6, 121:23, 123:25, 126:25, 127:12, 129:5, 130:10, 132:3, 132:7, 132:14, 132:18, 139:19

**Dawsey's** [10] - 71:21, 73:21, 73:23, 76:23, 86:17, 95:14, 97:22, 129:10, 132:22, 133:9

**days** [4] - 53:17, 77:9, 155:4, 177:1

**deadline** [1] - 154:16

**deal** [3] - 117:21, 143:5, 169:14

**dealership** [1] - 29:6

**dealerships** [4] - 29:4, 29:5, 29:8

**dealing** [6] - 23:20, 23:21, 24:3, 57:6, 154:10, 169:14

**dealt** [1] - 57:3

**dearly** [1] - 138:11

**DEBRA** [1] - 2:6

**DEBRECEN** [1] - 44:4

**December** [17] - 13:12, 77:6, 77:11, 82:13, 96:15, 98:6, 98:11, 101:13, 101:17, 101:18, 114:14, 118:9, 118:13, 128:6, 128:11, 128:12

**decide** [3] - 70:14, 135:2, 137:1

**decided** [10] - 82:13, 85:11, 94:15, 98:16, 104:1, 105:24, 128:5, 135:12, 174:6, 174:21

**decides** [1] - 46:25

**decision** [49] - 41:8, 46:15, 46:23, 59:24, 71:24, 72:3, 80:13, 83:13, 83:15, 83:16, 88:7, 89:23, 92:18, 95:12, 98:10, 99:13, 102:4, 103:6, 104:22, 104:24, 104:25, 107:25, 108:12, 108:18, 118:7, 118:25, 125:20, 128:6, 128:10, 131:6, 136:22, 144:5, 144:11, 145:4, 145:10, 148:3, 148:4, 148:5, 156:19, 156:21, 157:5, 157:17, 157:22, 158:1, 158:6

**decision-maker** [1] - 145:10

**decision-makers** [6] - 89:23, 104:22, 104:24, 104:25, 107:25, 108:12

**decisions** [18] - 40:7, 58:16, 68:25, 78:23, 78:24, 88:10, 88:12, 89:25, 106:6, 135:13, 136:21, 137:14, 139:18, 147:16, 150:7, 150:10, 154:2, 154:19

**decrease** [2] - 74:17, 132:15

**dedicated** [1] - 127:15

**deep** [1] - 56:5

**defeated** [1] - 119:4

**defeats** [1] - 114:16

**defendant** [7] - 91:10, 128:25, 129:7, 142:7, 152:2, 152:13, 174:6

**DEFENDANT** [1] - 1:19

**Defendant** [3] - 5:1, 163:23, 165:17

**Defendant's** [9] - 63:12, 63:14, 80:21, 86:4, 93:13, 132:6, 166:9, 174:9, 174:23

**defendants** [3] - 152:4, 174:16, 174:21

**Defendants** [5] - 63:16, 65:9, 146:8, 165:24, 167:25

**DEFENDANTS** [1] - 1:12

**defense** [27] - 68:15, 130:21, 134:21, 135:21, 135:23, 137:9, 140:11, 140:21, 140:23, 140:24, 141:5, 141:16, 142:1, 142:4, 147:10, 159:21, 160:10, 160:13, 160:19, 160:24, 160:25, 161:2, 161:5, 162:9, 163:8, 175:5

**define** [3] - 120:14, 124:20, 127:24

**defined** [1] - 120:14

**defines** [1] - 149:16

**definite** [1] - 169:14

**definitely** [1] - 46:7

**definition** [1] - 119:24

**definitions** [1] -

120:5
**definitive** [1] - 73:3
**degree** [3] - 26:6, 51:25, 52:5
**DEI** [1] - 123:4
**Del** [1] - 79:15
**deleted** [1] - 166:21
**deliberate** [1] - 167:10
**deliberations** [2] - 65:17, 66:17
**delivers** [1] - 23:17
**demanding** [1] - 126:13
**demonstrable** [3] - 95:15, 100:6, 100:23
**demonstrate** [1] - 102:16
**demonstrating** [1] - 95:16
**demote** [1] - 139:24
**demoted** [4] - 73:13, 79:7, 112:8, 112:20
**demoting** [1] - 107:16
**demotion** [7] - 79:10, 88:14, 112:12, 112:13, 112:14, 112:17, 112:18
**denial** [2] - 84:8, 98:24
**denied** [14] - 68:8, 98:22, 100:12, 117:11, 133:19, 135:6, 144:5, 144:8, 144:9, 158:21, 159:5, 159:13, 159:16, 162:17
**denies** [1] - 139:15
**Dennis** [8] - 95:21, 98:21, 100:15, 100:19, 101:20, 124:17, 125:20
**Dental** [1] - 103:8
**deny** [5] - 69:5, 92:13, 135:16, 136:1, 162:12
**denying** [4] - 75:4, 109:14, 121:7, 162:25
**Department** [6] - 42:11, 72:9, 75:25, 77:13, 86:1, 105:20
**department** [38] - 12:23, 14:12, 15:5, 15:7, 16:2, 16:19, 16:20, 16:23, 16:24, 17:8, 20:10, 20:16, 20:22, 21:1, 21:19, 22:2, 22:5, 23:15, 24:25, 25:2, 27:15, 27:16, 30:6, 33:11, 49:4, 54:4, 54:13, 71:13, 71:17, 72:11, 72:22, 73:8, 73:21, 76:24, 84:23, 93:23, 97:13, 151:14
**departments** [4] - 13:18, 23:24, 23:25, 113:21
**deposition** [11] - 5:17, 5:21, 5:22, 6:5, 18:23, 25:6, 116:4, 119:10, 122:22, 164:16
**DEPOSITIONS** [1] - 3:3
**depositions** [1] - 4:7
**deprive** [3] - 87:23, 128:20
**deprives** [1] - 168:13
**derivative** [1] - 169:12
**described** [4] - 28:12, 100:22, 119:10, 160:20
**describing** [1] - 126:21
**description** [3] - 139:1, 139:5, 150:14
**descriptions** [1] - 73:22
**designated** [1] - 17:4
**designation** [1] - 19:13
**designed** [1] - 160:13
**designing** [1] - 55:11
**desirable** [1] - 80:16
**detailed** [2] - 96:25, 97:4
**determination** [1] - 72:19
**determine** [5] - 6:3, 88:18, 105:19, 106:9, 170:17
**determined** [8] - 57:16, 146:25, 148:10, 152:9, 160:21, 161:4, 163:7
**determines** [5] - 57:21, 57:22, 58:14, 92:4, 150:7
**determining** [1] - 160:23
**developed** [2] - 57:19, 124:17
**Development** [6] - 26:18, 27:4, 27:9, 30:13, 30:14, 32:2
**development** [11] - 7:16, 7:19, 21:3, 21:8, 21:10, 26:24, 27:18, 30:6, 50:21, 50:25, 56:3
**diagnoses** [1] - 100:24
**dialogue** [1] - 18:1
**dictated** [4] - 138:20, 147:8, 147:15, 153:1
**dictionaries** [1] - 66:12
**dietary** [3] - 62:6, 64:10, 66:1
**difference** [2] - 34:23, 149:24
**different** [36] - 16:20, 16:24, 24:5, 36:15, 37:1, 37:3, 42:4, 46:14, 51:15, 52:8, 68:20, 71:12, 78:18, 79:1, 80:6, 84:4, 85:11, 93:19, 105:25, 110:16, 114:20, 115:19, 116:9, 119:20, 138:5, 138:20, 138:23, 154:7, 154:8, 154:19, 160:3, 169:16, 172:3, 172:9
**differently** [4] - 18:21, 157:9, 157:10, 160:3
**digging** [1] - 134:12
**Dingolfing** [11] - 32:11, 32:12, 32:13, 32:18, 32:19, 33:13, 34:16, 34:23, 35:8, 35:15, 36:6
**direct** [10] - 35:25, 38:21, 74:3, 84:22, 86:1, 90:5, 91:7, 132:23, 144:15, 164:13
**directed** [2] - 143:25, 162:22
**directing** [2] - 54:23, 55:6
**direction** [2] - 89:10, 174:13
**directly** [3] - 35:22, 38:8, 38:9
**disability** [2] - 24:3, 85:10
**disagree** [2] - 110:1, 167:25
**disappointed** [1] - 126:12
**disbelief** [1] - 96:13
**disbursed** [1] - 12:25
**discharge** [2] - 133:7, 133:8
**disciplinary** [8] - 28:20, 30:9, 35:9, 37:22, 58:23, 82:21, 82:22, 83:1
**discipline** [9] - 82:10, 82:14, 82:15, 83:8, 83:20, 115:15, 115:17, 115:18, 115:19
**disciplined** [3] - 82:24, 115:16, 115:17
**discovery** [1] - 157:7
**discrete** [1] - 118:25
**discriminate** [3] - 92:1, 103:17, 174:14
**discriminated** [7] - 82:16, 94:18, 103:10, 108:11, 120:22, 131:20, 161:19
**discriminates** [1] - 128:25
**discriminating** [1] - 134:7
**discrimination** [47] - 67:25, 68:19, 70:9, 70:10, 71:15, 87:4, 87:5, 92:7, 94:22, 102:2, 102:13, 102:24, 109:16, 109:22, 109:25, 110:14, 110:21, 110:23, 119:14, 120:18, 121:4, 125:12, 127:22, 128:3, 129:21, 141:23, 161:6, 161:13, 161:14, 161:17, 161:22, 161:23, 163:9, 163:12, 163:13, 165:15, 166:3, 166:6, 166:10, 166:16, 166:17, 166:19, 168:3, 174:12, 175:7
**discriminatory** [7] - 71:6, 87:20, 88:22, 91:14, 98:23, 106:9, 153:2
**discuss** [9] - 45:23, 46:21, 61:4, 66:6, 164:13, 164:17, 166:6, 172:1, 177:22
**discussed** [7] - 11:7, 70:3, 122:4, 133:24, 163:7, 165:22, 166:22
**discusses** [2] - 166:1, 167:12
**discussing** [2] - 47:20, 166:7
**discussion** [23] - 10:13, 16:2, 17:9, 47:7, 58:22, 72:18, 75:12, 89:14, 89:17, 93:20, 111:14, 111:17, 112:1, 112:2, 113:5, 113:9, 113:11, 113:12, 115:19, 124:4, 130:3, 165:12, 167:9
**discussions** [6] - 17:3, 46:4, 47:16, 115:2, 122:10, 122:13
**disgusted** [1] - 125:25
**dismiss** [2] - 156:23, 156:24
**disparate** [3] - 87:13, 91:23, 102:14
**disprove** [1] - 142:6
**dispute** [12] - 75:11, 78:6, 78:8, 80:11, 82:15, 85:16, 85:18, 92:9, 96:22, 101:8, 104:6, 133:10
**disputed** [1] - 97:10
**disregard** [2] - 164:25
**distinction** [1] - 175:14
**distinguish** [2] - 110:3, 176:21
**distress** [11] - 95:16, 95:17, 95:18, 96:1, 96:5, 96:21, 99:21, 100:9, 100:11, 100:23, 126:22
**distressful** [1] - 98:25
**DISTRICT** [3] - 1:1, 1:1, 1:14
**district** [1] - 141:13
**District** [12] - 83:4, 88:23, 89:1, 125:9, 126:7, 126:18, 141:8, 141:10, 141:14, 147:6, 160:4, 160:5
**diverse** [1] - 123:5
**Diversity** [5] - 9:18, 9:22, 10:1, 10:13, 11:7
**diversity** [2] - 123:17, 134:6
**division** [7] - 21:9, 26:23, 26:24, 28:18, 38:19, 71:12, 160:5
**DIVISION** [1] - 1:2
**Division** [11] - 27:5, 37:13, 38:2, 38:3, 38:6, 38:7, 38:16,

38:24, 39:2, 39:3
**divisions** [3] - 38:8, 38:9, 38:22
**doctor** [2] - 124:25, 125:4
**doctor's** [1] - 100:24
**document** [24] - 5:18, 17:14, 53:15, 53:17, 54:1, 89:4, 89:7, 89:8, 89:13, 89:15, 89:16, 89:19, 89:21, 90:8, 91:2, 91:4, 104:18, 104:19, 104:20, 105:1, 105:3, 105:6, 111:22
**documentation** [6] - 73:4, 73:9, 78:10, 84:16, 84:18, 86:6
**documented** [1] - 91:10
**documents** [6] - 53:5, 53:14, 73:24, 98:13, 116:7, 120:6
**DOING** [2] - 1:8, 1:10
**dollar** [1] - 123:11
**dollars** [1] - 149:7
**domestic** [27] - 48:9, 48:21, 90:12, 90:17, 90:20, 91:5, 105:4, 119:19, 119:21, 119:22, 119:23, 119:25, 120:11, 120:16, 120:17, 120:22, 136:17, 136:19, 137:3, 138:13, 139:11, 143:1, 143:11, 143:14, 143:18, 152:12
**DONALD** [1] - 2:2
**done** [10] - 15:4, 15:6, 62:16, 74:22, 108:15, 117:13, 118:16, 150:18, 158:6, 159:22
**door** [2] - 104:11, 105:18
**Dostler** [1] - 36:17
**doubt** [5] - 73:15, 78:22, 80:1, 80:5, 94:5
**doubted** [1] - 101:9
**Douglas** [1] - 91:8
**down** [14] - 9:4, 17:13, 19:9, 40:9, 45:15, 60:19, 62:20, 62:23, 96:9, 128:12, 133:3, 140:22, 170:4, 176:3
**downgrade** [1] - 74:12
**downgraded** [6] - 74:1, 74:11, 76:22, 80:25, 81:1, 132:17
**downtown** [1] - 66:25
**Dr** [13] - 47:19, 72:17, 77:4, 89:24, 92:21, 93:7, 119:10, 119:21, 120:14, 121:19, 122:10, 144:4, 145:15
**draft** [2] - 127:24, 164:1
**dragged** [1] - 128:19
**drastically** [1] - 13:4
**drawn** [1] - 138:7
**drive** [1] - 71:19
**Driving** [3] - 26:18, 27:4, 27:9
**due** [2] - 40:18, 85:9
**duly** [1] - 5:12
**during** [14] - 8:2, 12:4, 15:3, 16:1, 17:2, 19:19, 19:22, 33:12, 73:11, 74:3, 77:4, 77:12, 124:10, 177:25
**duties** [13] - 12:3, 23:12, 23:14, 32:17, 35:6, 37:6, 37:10, 39:1, 39:4, 39:13, 41:24, 126:13, 164:8
**duty** [1] - 167:10
**Duvall** [7] - 123:9, 130:3, 131:5, 131:7, 133:17, 134:3, 134:5

**E**

**E-development** [1] - 30:6
**E-division** [2] - 26:23, 28:18
**E-g-n-e-r** [1] - 33:6
**early** [11] - 47:18, 47:20, 64:20, 64:23, 73:1, 76:25, 80:19, 115:2, 128:11, 154:7
**ears** [1] - 118:19
**easiest** [1] - 20:19
**Eastern** [4] - 126:7, 126:18, 141:13, 160:5
**eating** [5] - 62:4, 62:7, 65:20, 127:2
**Eaton** [1] - 91:8
**ECF** [4] - 124:15, 124:16, 124:22, 134:24
**edit** [1] - 172:25
**Edition** [1] - 160:23
**educational** [1] - 84:5
**Edward** [1] - 6:9
**EDWARD** [1] - 3:4
**EEOC** [2] - 102:2, 126:16
**effect** [5] - 6:4, 117:20, 133:1, 152:11, 169:5
**effective** [2] - 55:17, 123:16
**efficient** [1] - 66:25
**efforts** [2] - 16:16, 64:24
**Egner** [4] - 33:21, 34:14, 34:15
**eight** [6] - 26:15, 28:6, 34:11, 86:7, 167:1, 167:5
**either** [5] - 113:22, 113:23, 143:22, 172:22, 177:9
**Electric** [1] - 141:8
**Electronics** [1] - 27:10
**Eleventh** [10] - 81:18, 81:20, 83:13, 83:15, 86:10, 86:14, 88:4, 88:8, 88:16, 160:17
**ELLISON** [1] - 2:3
**elsewhere** [1] - 83:12
**email** [3] - 96:25, 118:11, 118:15
**embarrassed** [1] - 125:24
**emotional** [9] - 95:15, 95:17, 95:18, 96:1, 96:5, 96:21, 99:21, 100:9, 101:1
**employed** [7] - 17:2, 26:8, 26:10, 39:5, 39:14, 40:24, 127:16
**employee** [19] - 41:6, 41:7, 49:17, 55:17, 71:14, 72:13, 74:10, 78:17, 78:21, 79:23, 79:25, 80:2, 80:7, 80:9, 81:12, 84:8, 144:4, 172:19
**employees** [21] - 14:8, 27:2, 27:3, 27:4, 28:9, 36:2, 38:4, 57:15, 74:15, 74:23, 77:14, 78:24, 84:4, 84:7, 85:18, 87:16, 87:22, 90:24, 91:21, 92:25, 132:2
**employer** [43] - 41:10, 78:20, 85:8, 85:10, 87:21, 102:17, 102:25, 103:10, 103:21, 108:14, 109:13, 115:17, 123:11, 133:19, 143:19, 143:21, 146:2, 146:6, 146:7, 146:17, 147:17, 147:21, 148:11, 148:13, 148:21, 152:6, 152:10, 153:25, 154:11, 156:8, 158:2, 158:7, 159:10, 165:10, 165:12, 168:11, 169:2, 169:4, 170:18, 170:19, 170:21, 172:18, 173:5
**employer's** [1] - 130:7
**employers** [3] - 78:22, 78:23, 146:17
**employment** [47] - 70:17, 70:24, 71:3, 71:8, 71:23, 77:18, 77:23, 77:24, 78:2, 78:16, 78:18, 79:3, 80:9, 80:14, 81:23, 83:6, 83:11, 83:18, 83:22, 84:11, 84:12, 86:12, 86:15, 86:24, 87:22, 87:24, 88:10, 88:12, 88:15, 88:21, 91:25, 92:3, 92:5, 98:4, 98:7, 98:22, 106:12, 157:23, 165:14, 166:1, 166:14, 168:2, 168:14, 168:23, 169:1, 172:7, 172:17
**Employment** [1] - 57:2
**enabled** [1] - 12:19
**encourage** [1] - 131:11
**encyclopedias** [1] - 66:12
**end** [12] - 8:14, 10:11, 24:10, 35:17, 47:5, 48:6, 48:19, 102:20, 115:14, 125:25, 126:2, 154:12
**END** [1] - 179:2
**ending** [1] - 98:4
**ends** [1] - 127:23
**endured** [1] - 177:1
**Energy** [2] - 102:3, 103:14
**enforce** [1] - 158:6
**engaged** [1] - 127:12
**engaging** [1] - 97:22
**engine** [2] - 30:19, 30:21
**engineering** [4] - 7:15, 7:18, 7:19, 15:17
**Englehorn** [15] - 47:19, 72:17, 77:4, 89:24, 92:21, 93:7, 108:1, 119:10, 119:21, 120:14, 121:19, 122:10, 144:3, 144:4, 145:15
**entered** [2] - 23:15, 62:25
**enters** [1] - 153:7
**entertain** [1] - 154:25
**entertaining** [1] - 153:22
**entire** [3] - 77:13, 173:18, 177:5
**entities** [2] - 36:15, 146:7
**entitled** [8] - 5:23, 86:25, 95:7, 127:10, 140:9, 144:10, 146:8, 179:7
**entity** [2] - 49:21, 143:25
**entry** [1] - 20:24
**entry-level** [1] - 20:24
**environment** [1] - 55:18
**EOMDP** [2] - 7:16, 7:17
**Epps** [9] - 72:15, 72:20, 113:23, 116:5, 120:7, 122:2, 122:17, 123:20, 124:1
**equal** [1] - 165:5
**equally** [2] - 127:9, 166:3
**equity** [1] - 136:9
**equivalent** [6] - 84:20, 91:13, 114:21, 114:22, 132:10, 132:12
**ERA** [1] - 57:18
**ERISA** [3] - 55:24, 57:1, 57:3
**Ernst** [1] - 40:22
**error** [1] - 79:18
**especially** [1] - 148:20
**ESQ** [4] - 1:17, 1:21, 2:2, 2:3
**essence** [1] - 119:13
**essentially** [3] -

147:11, 148:12, 165:10
**establish** [7] - 12:22, 70:13, 81:22, 83:6, 90:22, 103:2, 134:2
**established** [4] - 99:16, 100:5, 113:3, 126:20
**establishes** [1] - 77:16
**establishing** [3] - 9:21, 94:18, 103:15
**estoppel** [1] - 136:14
**et** [1] - 175:16
**Eva** [5] - 14:15, 25:12, 72:13, 92:11, 118:11
**EVA** [1] - 3:8
**evaluating** [1] - 55:11
**evaluation** [1] - 8:11
**evening** [3] - 4:21, 66:22, 178:25
**event** [1] - 145:11
**everyday** [2] - 46:6, 150:11
**evidence** [57] - 52:20, 61:11, 65:10, 68:22, 70:13, 71:21, 73:20, 75:5, 77:15, 85:23, 89:18, 92:17, 93:12, 95:9, 98:12, 99:9, 100:23, 103:15, 104:12, 107:20, 108:3, 108:10, 111:8, 113:3, 114:16, 119:3, 120:23, 121:3, 125:23, 126:24, 132:3, 132:5, 132:13, 145:3, 149:4, 151:25, 158:24, 159:1, 162:16, 164:11, 164:12, 164:14, 164:20, 164:21, 164:22, 164:23, 164:24, 165:2, 165:3, 174:5, 174:11, 174:20, 174:24, 175:8, 176:5
**evidentiary** [1] - 70:5
**exact** [4] - 7:5, 7:9, 56:20, 73:17
**exactly** [10] - 20:7, 30:23, 43:18, 50:5, 117:6, 118:18, 123:12, 148:6, 154:16, 176:23
**EXAM** [20] - 8:9, 9:14, 14:20, 15:11, 17:23, 19:1, 19:11, 25:14, 29:21, 31:6, 31:22, 39:10, 46:1, 52:22, 53:11, 54:10, 55:3, 56:15, 57:12, 58:7
**Exam** [2] - 3:7, 3:9
**eXAM** [1] - 6:11
**examination** [2] - 74:4, 132:23
**examine** [1] - 119:7
**example** [16] - 12:16, 30:19, 42:20, 44:13, 44:14, 44:17, 45:6, 49:16, 52:6, 58:17, 58:22, 112:15, 113:15, 130:2, 136:6, 141:18
**except** [2] - 68:10, 166:21
**exceptions** [1] - 67:8
**exchange** [2] - 32:25, 98:14
**excited** [1] - 65:19
**excuse** [11] - 17:7, 21:4, 32:20, 34:15, 36:23, 44:13, 52:24, 73:6, 90:7, 148:16, 159:6
**excused** [1] - 61:7
**executive** [14] - 117:3, 135:6, 137:14, 137:18, 137:19, 137:20, 138:4, 138:8, 138:10, 138:13, 139:12, 139:13, 141:21, 144:13
**executives** [4] - 116:13, 130:11, 141:19, 141:20
**exempt** [4] - 15:4, 15:6, 15:14, 15:16
**exhausted** [2] - 96:12, 127:3
**exhibit** [32] - 9:5, 9:9, 17:15, 17:18, 17:19, 19:9, 52:20, 53:1, 53:5, 53:8, 53:15, 53:16, 53:20, 53:23, 54:1, 54:3, 54:12, 54:13, 80:21, 86:3, 86:4, 89:5, 93:13, 97:4, 118:10, 122:18, 122:23, 124:6, 132:6, 137:17
**exhibits** [5] - 62:17, 62:24, 63:13, 63:14, 116:6
**EXHIBITS** [1] - 3:10
**existed** [3] - 81:9, 95:18, 105:1
**existing** [1] - 78:3
**exists** [1] - 68:7
**expat** [23] - 89:4, 89:21, 89:25, 90:3, 90:23, 91:2, 104:17, 104:25, 105:2, 107:24, 108:2, 108:5, 119:19, 120:2, 120:11, 120:12, 120:15, 120:25, 121:3, 121:5, 121:8, 121:9, 121:23
**expatriate** [1] - 120:19
**expect** [2] - 61:20, 125:14
**expectation** [1] - 105:12
**experience** [20] - 20:20, 21:24, 24:20, 48:10, 52:13, 54:23, 55:6, 55:11, 55:17, 55:22, 56:3, 57:6, 72:21, 76:1, 116:2, 138:18, 138:25, 139:2, 139:3
**Experience** [3] - 26:18, 27:4, 27:9
**experienced** [1] - 83:21
**experiences** [3] - 49:7, 52:14, 151:20
**experiencing** [1] - 126:21
**Expert** [3] - 32:7, 32:17, 33:15
**expert** [5] - 29:10, 29:15, 29:24, 144:22, 150:1
**expertise** [11] - 46:13, 138:15, 139:6, 139:8, 139:14, 139:15, 144:14, 144:23, 150:3, 150:20, 151:22
**experts** [1] - 149:22
**expiration** [1] - 114:3
**explain** [3] - 99:25, 116:18, 164:20
**explained** [3] - 100:4, 100:20, 125:24
**explaining** [1] - 125:11
**explanatory** [1] - 167:16
**exposed** [1] - 115:14
**express** [1] - 153:14
**Express** [6] - 130:3, 130:4, 130:15, 133:22, 134:8
**expressly** [1] - 161:8
**extent** [8] - 56:6, 69:6, 110:22, 148:23, 151:24, 153:10, 169:17, 169:22
**Exterior** [1] - 27:10
**externally** [1] - 24:15
**externship** [1] - 52:3

**F**

**F.2d** [3] - 116:25, 142:18, 160:18
**F.3d** [8] - 88:6, 95:11, 95:22, 95:23, 102:4, 103:5, 124:22, 125:22
**F.4th** [1] - 131:5
**F.Supp.2d** [2] - 126:6, 160:7
**face** [7] - 30:5, 37:20, 37:25, 89:13, 89:14, 103:11, 128:20
**facie** [3] - 160:21, 161:22, 163:11
**facilitating** [2] - 15:20, 30:8
**fact** [31] - 18:10, 68:24, 74:5, 83:17, 85:21, 93:21, 95:9, 101:6, 107:18, 107:25, 109:17, 110:21, 111:10, 114:3, 114:20, 117:21, 121:25, 122:1, 123:8, 125:17, 127:14, 131:17, 131:19, 134:14, 138:7, 141:20, 143:11, 161:18, 167:12, 171:17, 173:10
**factor** [1] - 165:22
**factors** [1] - 130:14
**facts** [8] - 72:1, 135:25, 136:10, 136:11, 136:12, 136:13, 164:9, 164:24
**factual** [2] - 159:3, 163:3
**factually** [2] - 128:9, 149:11
**failed** [2] - 70:12, 86:21
**fair** [2] - 109:1, 125:2
**fairly** [1] - 42:24
**fairs** [2] - 15:8, 15:13
**fall** [7] - 59:14, 72:2, 89:23, 90:14, 97:5, 105:12, 138:11
**FANE** [1] - 1:21
**far** [8] - 12:6, 20:17, 31:2, 46:25, 68:22, 119:25, 125:15, 139:17
**fashion** [2] - 76:22, 108:11
**fashionable** [1] - 123:13
**fast** [1] - 170:11
**fault** [1] - 104:3
**favor** [1] - 70:14
**favorable** [2] - 68:23, 159:2
**favorably** [2] - 139:25, 140:1
**favors** [2] - 48:8, 48:20
**FCN** [9] - 68:7, 68:10, 68:13, 160:9, 161:14, 161:20, 163:10, 170:14, 175:12
**fear** [1] - 178:10
**FEBRUARY** [1] - 1:4
**February** [10] - 50:6, 53:19, 54:19, 76:17, 77:2, 78:13, 92:15, 118:12, 155:3, 155:14
**federal** [2] - 99:17, 103:12
**Federal** [12] - 67:23, 70:2, 91:8, 130:3, 130:4, 130:15, 133:22, 134:8, 158:19, 160:11, 160:22
**federally** [3] - 102:19, 129:1, 130:1
**feed** [1] - 173:13
**feedback** [1] - 18:1
**felt** [6] - 69:21, 93:3, 96:10, 100:22, 126:11, 166:14
**few** [7] - 18:11, 52:9, 52:10, 52:11, 56:19, 65:23, 123:3
**fifty** [1] - 17:21
**fifty-two** [1] - 17:21
**fighting** [1] - 126:13
**figure** [4] - 82:2, 106:7, 106:22, 115:11
**file** [2] - 40:19, 40:23
**filed** [1] - 155:13
**filing** [1] - 145:13
**filings** [1] - 135:8
**fill** [14] - 13:18, 13:24, 61:17, 68:17, 78:12, 91:6, 93:3, 97:14, 104:16,

110:12, 122:11, 123:6, 176:1, 176:6
**filled** [2] - 24:15, 47:10
**filling** [2] - 14:2, 24:13
**final** [4] - 25:6, 25:11, 61:4, 66:14
**finally** [6] - 93:12, 105:5, 108:7, 121:10, 127:17, 133:4
**finance** [5] - 21:19, 22:2, 22:5, 23:1, 23:3
**financial** [3] - 21:21, 21:23, 99:2
**finder** [1] - 161:18
**findings** [1] - 69:1
**fine** [6] - 29:20, 64:14, 125:5, 143:21, 150:21, 172:2
**finished** [4] - 65:8, 65:9, 65:15, 164:2
**fire** [1] - 126:13
**fire-fighting** [1] - 126:13
**firm** [1] - 52:10
**first** [45] - 5:12, 6:8, 7:3, 14:22, 26:16, 30:4, 37:20, 37:25, 40:14, 47:16, 50:5, 50:6, 51:14, 53:17, 53:19, 56:19, 69:13, 70:21, 73:14, 74:22, 76:18, 78:2, 83:24, 89:7, 92:20, 96:3, 96:21, 96:23, 97:10, 102:9, 109:10, 111:3, 119:3, 122:10, 124:13, 128:13, 131:3, 134:22, 141:6, 144:14, 153:18, 171:22, 177:1, 178:15
**fit** [3] - 78:25, 93:8, 136:5
**fits** [1] - 136:6
**five** [10] - 6:13, 8:6, 8:8, 65:19, 67:13, 93:16, 116:12, 116:13, 166:12, 166:25
**five-star** [1] - 65:19
**flamed** [1] - 6:16
**flipped** [1] - 117:9
**floor** [1] - 72:23
**Flor** [2] - 75:13, 113:16
**fly** [1] - 173:1
**FO** [2] - 46:9, 46:18
**focus** [8] - 51:17, 51:19, 51:20, 120:18, 120:25, 150:3, 150:15, 150:23
**focused** [3] - 79:15, 104:24, 173:25
**focuses** [1] - 149:25
**folks** [1] - 44:21
**follow** [6] - 47:24, 48:2, 48:3, 65:16, 82:9, 164:9
**follow-up** [3] - 47:24, 48:2, 48:3
**followed** [7] - 66:17, 88:23, 90:4, 90:21, 105:8, 154:20, 175:17
**following** [11] - 4:2, 4:18, 61:8, 64:16, 67:16, 89:17, 99:14, 102:5, 109:5, 121:18, 126:5
**follows** [1] - 5:13
**food** [6] - 12:7, 12:8, 20:7, 22:11, 23:16, 23:17
**footnote** [2] - 135:7, 153:13
**FOR** [3] - 1:1, 1:17, 1:19
**forbids** [1] - 168:10
**force** [19] - 12:12, 12:13, 12:14, 12:15, 12:17, 12:19, 13:1, 13:3, 13:25, 14:7, 14:16, 14:17, 14:25, 24:17, 112:15, 123:2, 123:5, 123:14, 141:2
**forced** [1] - 126:12
**foregoing** [1] - 179:5
**foreign** [10] - 135:4, 140:3, 142:25, 143:5, 143:8, 143:19, 143:23, 143:25, 145:11, 152:23
**forgot** [2] - 60:13, 155:15
**forgotten** [1] - 38:19
**form** [7] - 61:4, 66:14, 101:2, 167:15, 177:24, 178:6, 178:7
**formal** [3] - 84:7, 84:9, 84:14
**forms** [2] - 97:25, 156:3
**forth** [3] - 112:22, 114:8, 159:17
**Fortino** [10] - 142:17, 143:2, 143:22, 145:6, 145:9, 146:21, 147:3, 147:18, 148:6, 152:21
**forward** [5] - 5:10, 66:24, 127:18, 158:10, 178:20
**fought** [1] - 117:11
**foundation** [1] - 38:3
**foundations** [4] - 37:14, 37:18, 37:19, 119:18
**founded** [1] - 27:16
**founder** [1] - 125:17
**four** [63] - 9:2, 9:3, 10:18, 11:4, 11:11, 11:14, 19:24, 20:14, 21:7, 24:11, 33:20, 34:25, 36:18, 36:19, 51:10, 52:12, 59:17, 60:3, 73:5, 73:7, 74:2, 75:20, 80:24, 81:1, 84:17, 84:21, 86:4, 93:16, 111:16, 111:19, 112:4, 112:10, 115:21, 116:5, 116:8, 117:2, 119:5, 119:11, 121:5, 121:24, 123:22, 129:17, 132:15, 132:17, 132:25, 134:10, 140:6, 145:2, 149:5, 149:6, 151:11, 153:20, 153:25, 154:2, 154:19, 157:6, 158:2, 164:13, 166:24, 171:25, 176:12
**four-year-old** [1] - 153:20
**fourteen** [1] - 55:1
**Fourth** [22] - 70:21, 70:22, 85:6, 86:13, 88:3, 95:10, 95:11, 95:20, 95:23, 98:20, 99:10, 100:17, 101:19, 102:2, 103:3, 103:5, 106:1, 123:10, 125:20, 131:6, 137:10, 158:21
**frame** [4] - 36:8, 48:8, 49:20, 154:23
**framed** [1] - 177:7
**France** [1] - 120:20
**Franka** [1] - 118:10
**free** [2] - 65:22, 138:22
**frequently** [2] - 42:24, 44:23
**Friendship** [10] - 68:6, 130:20, 134:18, 134:21, 136:15, 140:11, 152:1, 159:24, 163:8
**front** [5] - 52:24, 53:1, 53:4, 113:7, 121:12
**frustrated** [1] - 125:24
**frustration** [1] - 155:18
**full** [4] - 13:20, 16:6, 156:21, 165:17
**function** [101] - 8:2, 8:4, 10:18, 10:19, 11:4, 11:10, 11:13, 19:23, 19:24, 20:1, 20:12, 21:3, 21:7, 21:14, 21:20, 22:9, 24:12, 24:13, 24:20, 24:22, 28:21, 28:22, 30:25, 33:16, 33:18, 33:20, 33:21, 33:23, 33:24, 34:19, 34:21, 34:24, 34:25, 35:1, 36:22, 36:24, 38:12, 53:25, 54:18, 57:17, 59:13, 59:14, 59:17, 59:21, 59:23, 60:2, 73:5, 73:6, 73:15, 73:17, 73:18, 73:24, 74:1, 74:12, 74:18, 74:25, 75:10, 75:17, 75:20, 76:2, 79:7, 79:8, 80:21, 80:22, 80:24, 81:1, 84:17, 84:19, 84:20, 84:24, 85:2, 85:25, 93:2, 111:16, 111:19, 112:4, 112:10, 115:1, 115:6, 115:7, 115:9, 115:21, 116:5, 116:7, 116:15, 116:20, 117:2, 118:12, 123:21, 123:23, 132:11, 132:12, 132:15, 132:17, 132:25, 137:18, 137:19, 138:3
**functions** [6] - 23:20, 23:25, 28:23, 31:3, 49:7, 151:19
**furthermore** [2] - 73:20, 74:21
**future** [7] - 45:20, 56:6, 73:3, 75:20, 80:24, 111:16, 113:9

## G

**G-a-r-c-h-i-n-g** [1] - 31:9
**Gallerizzo** [1] - 158:22
**Garching** [1] - 31:3
**GARCHING** [1] - 31:4
**gather** [2] - 158:9, 177:17
**general** [4] - 58:16, 87:20, 168:12, 169:10
**generally** [1] - 169:10
**George's** [1] - 125:8
**Georgia** [1] - 88:23
**German** [51] - 16:8, 26:5, 28:1, 43:20, 51:22, 51:23, 52:14, 68:17, 89:14, 91:3, 92:12, 96:13, 97:17, 104:16, 110:11, 119:5, 119:12, 121:6, 121:21, 121:25, 129:17, 129:18, 129:24, 131:10, 131:23, 134:11, 134:15, 145:2, 145:4, 145:5, 145:19, 145:21, 145:22, 151:6, 174:8, 174:10, 174:22, 174:23, 174:25, 175:2, 175:6, 175:23, 175:25, 176:4, 176:13, 177:6, 177:9
**Germans** [2] - 91:1, 177:1
**Germany** [38] - 16:7, 16:17, 16:19, 16:21, 25:21, 26:4, 29:8, 32:13, 34:12, 38:22, 39:5, 39:14, 40:20, 40:25, 41:3, 41:7, 43:17, 43:23, 44:22, 45:3, 46:4, 49:10, 51:5, 51:13, 51:21, 57:15, 58:12, 59:2, 68:8, 120:3, 124:5, 128:15, 138:19, 139:20, 159:25, 174:17, 174:19, 177:2
**Gilmore** [6] - 18:24, 19:5, 25:4, 116:2, 116:7, 132:2
**GILMORE** [1] - 3:6
**gist** [1] - 119:2
**given** [6] - 5:18, 6:4, 21:23, 73:3, 75:25, 92:22
**glad** [4] - 4:21, 108:21, 109:7, 167:21
**glanced** [1] - 134:1
**glancing** [1] - 133:23
**global** [6] - 119:20, 120:3, 120:4, 145:17, 145:19, 158:1
**globally** [3] - 42:2,

49:6, 151:18
**goal** [1] - 115:5
**Goldin** [1] - 70:25
**government** [7] - 26:5, 26:8, 26:11, 52:4, 52:11, 55:23, 138:21
**grab** [1] - 123:12
**grade** [19] - 11:4, 11:11, 11:14, 27:16, 35:12, 57:20, 57:23, 74:13, 74:16, 74:24, 75:8, 75:9, 85:2, 116:8, 117:8, 117:12, 133:2
**graded** [1] - 115:9
**grades** [1] - 59:14
**Grading** [2] - 27:8, 28:17
**grading** [5] - 27:15, 27:25, 34:23, 57:17, 59:20
**graduate** [1] - 26:6
**grandparents** [1] - 145:18
**granted** [2] - 99:6, 99:7
**granting** [2] - 70:4, 132:20
**gray** [2] - 120:11, 120:13
**great** [5] - 48:10, 62:2, 67:5, 123:5, 123:6
**GREENVILLE** [4] - 1:3, 1:18, 1:22, 2:5
**Greenville** [1] - 67:1
**Groundhog** [1] - 69:16
**grounds** [2] - 125:6
**group** [5] - 21:15, 46:19, 74:15, 121:14, 138:12
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**groups** [1] - 177:5
**grow** [1] - 45:19
**growing** [2] - 10:16, 26:24
**growth** [2] - 17:11, 45:21
**guarantee** [1] - 160:14
**guard** [1] - 138:10
**guess** [3] - 101:11, 106:6, 125:22
**guideline** [3] - 104:17, 105:7, 121:24
**guidelines** [17] - 89:4, 89:21, 89:25, 90:3, 90:23, 91:2, 105:1, 105:3, 107:24, 108:2, 108:6, 121:1, 121:3, 121:5, 121:8, 121:9, 124:3
**guy** [1] - 135:22
**guys** [1] - 116:8

**H**

**H-I-P-A-A** [1] - 57:11
**half** [3] - 114:8, 114:11, 127:7
**Hamilton** [1] - 71:1
**hand** [2] - 53:3, 163:25
**handed** [1] - 143:3
**handing** [1] - 153:19
**handle** [1] - 31:12
**handled** [2] - 31:15, 32:2
**handling** [1] - 154:19
**happy** [3] - 128:19, 150:25, 167:17
**hard** [3] - 130:1, 138:7, 138:8
**harm** [13] - 71:7, 71:16, 71:22, 78:20, 79:4, 79:5, 79:13, 79:25, 80:12, 81:10, 81:21, 85:21, 86:22
**hashed** [1] - 134:24
**hat** [1] - 29:7
**head** [21] - 12:19, 12:25, 13:21, 28:17, 28:25, 32:24, 34:2, 35:3, 35:6, 35:11, 35:18, 36:9, 37:6, 37:7, 37:8, 37:10, 38:3, 39:20, 45:18, 96:15, 104:2
**headaches** [1] - 126:22
**headquartered** [1] - 28:15
**headquarters** [3] - 36:12, 36:13, 141:22
**Health** [2] - 126:16, 126:17
**health** [10] - 20:7, 22:11, 23:18, 24:1, 24:5, 41:6, 41:8, 41:9, 41:11, 93:5
**hear** [7] - 66:15, 108:21, 109:7, 117:25, 134:18, 167:21, 175:7
**heard** [25] - 4:2, 4:18, 16:23, 60:4, 61:8, 64:16, 67:16, 77:25, 89:15, 90:25, 107:1, 109:5, 109:10, 115:25, 116:1, 117:5, 117:6, 124:16, 138:4, 138:16, 145:16, 149:2, 149:17, 175:19, 175:20
**hearing** [5] - 4:1, 83:23, 107:5, 174:19, 179:1
**hearings** [1] - 133:24
**heavily** [1] - 104:19
**heck** [1] - 121:9
**HEINZ** [1] - 33:6
**Heinz** [1] - 33:21
**held** [13] - 62:10, 73:19, 81:20, 83:5, 88:8, 88:24, 109:6, 116:22, 116:23, 147:10, 152:22, 158:12, 167:20
**help** [2] - 44:15, 164:20
**hereby** [1] - 158:21
**Herkert** [4] - 85:6, 85:16, 85:22, 112:21
**HERKERT** [1] - 112:22
**herself** [6] - 127:5, 127:7, 128:18, 128:19, 138:17, 139:6
**high** [4] - 25:23, 26:13, 103:2, 103:13
**higher** [5] - 30:4, 35:10, 74:18, 108:9, 108:17
**highlighted** [2] - 93:15, 106:23
**highly** [1] - 157:4
**HIPAA** [2] - 57:6, 57:8
**hire** [1] - 134:10
**hiring** [3] - 30:9, 37:22, 136:21
**hit** [1] - 144:25
**holding** [2] - 71:20, 79:20
**holdup** [1] - 63:5
**hole** [1] - 104:8
**holistic** [1] - 156:6
**home** [2] - 66:21, 71:19
**Honor** [118] - 4:12, 4:25, 5:3, 5:7, 5:8, 8:5, 9:8, 14:18, 15:9, 17:17, 18:4, 18:6, 18:9, 19:8, 25:3, 25:6, 52:18, 53:7, 54:9, 60:6, 60:8, 60:12, 63:25, 64:5, 64:6, 64:7, 64:14, 67:10, 67:11, 68:3, 69:9, 69:10, 69:25, 70:1, 70:16, 71:1, 81:17, 83:2, 84:1, 86:9, 87:17, 89:6, 91:7, 94:5, 94:12, 94:21, 95:5, 95:20, 96:18, 97:20, 100:15, 101:7, 103:18, 105:9, 106:17, 106:24, 107:8, 107:10, 109:11, 109:14, 111:3, 111:22, 118:9, 124:8, 124:12, 127:24, 130:17, 130:25, 131:11, 132:12, 132:19, 133:4, 133:12, 133:16, 134:17, 135:20, 136:16, 137:2, 137:13, 139:1, 139:9, 140:9, 141:2, 141:4, 142:2, 142:13, 144:25, 145:8, 147:25, 148:6, 148:17, 148:19, 149:2, 149:14, 151:10, 151:23, 152:20, 153:17, 155:3, 155:4, 155:12, 156:9, 157:19, 159:9, 162:21, 163:20, 168:9, 171:18, 173:17, 175:11, 176:9, 176:11, 176:25, 177:4, 177:20, 177:23, 178:3, 178:5
**Honor's** [1] - 109:19
**HONORABLE** [1] - 1:13
**hope** [4] - 4:21, 64:19, 66:21, 110:9
**hopefully** [5] - 62:5, 67:12, 167:23, 173:4, 178:18
**Horn** [7] - 79:15, 79:17, 79:22, 80:10, 80:13, 81:8, 118:6
**horse** [3] - 149:6, 157:6
**hosted** [1] - 77:7
**HR** [69] - 7:4, 7:10, 8:2, 8:16, 8:17, 8:19, 8:21, 9:22, 15:16, 16:20, 19:6, 20:22, 22:17, 26:17, 26:19, 28:25, 29:6, 29:7, 29:15, 29:16, 29:18, 29:24, 31:12, 31:14, 32:1, 33:13, 35:3, 35:11, 36:9, 36:22, 36:24, 37:6, 37:7, 37:8, 37:10, 37:24, 38:12, 38:14, 38:18, 38:25, 39:20, 40:2, 42:1, 42:10, 43:12, 46:15, 47:17, 48:6, 49:1, 49:4, 56:23, 58:16, 72:18, 74:23, 75:13, 94:10, 97:12, 104:2, 113:17, 113:20, 113:22, 113:23, 115:25, 116:2, 116:3, 151:14
**human** [1] - 50:21
**Human** [12] - 6:23, 6:25, 8:13, 24:25, 25:1, 50:25, 72:7, 82:8, 93:22, 104:4, 104:21, 129:19
**humiliated** [1] - 100:22
**humiliating** [1] - 98:25
**Hungary** [3] - 43:18, 44:7, 45:5
**hush** [1] - 66:18
**hypothetical** [1] - 83:7

**I**

**i.e** [1] - 163:12
**idea** [9] - 45:14, 45:18, 62:15, 62:16, 62:21, 65:6, 114:9, 114:19, 144:1
**identical** [1] - 85:3
**identifiable** [1] - 71:8
**IG** [2] - 58:2, 58:4
**ignore** [1] - 145:14
**II** [3] - 2:2, 3:4, 6:9
**illegal** [1] - 123:4
**immunity** [1] - 68:16
**impact** [9] - 74:3, 74:4, 102:14, 116:19, 133:2, 169:24, 170:8, 172:12, 173:4
**impacted** [5] - 75:2, 75:21, 96:8, 98:10
**impermissible** [2] - 161:25, 163:14
**implement** [1] - 46:16
**implemented** [2] - 27:22, 121:17
**importance** [1] - 92:22

**important** [18] - 42:1, 70:20, 74:8, 88:17, 89:7, 98:5, 107:13, 108:6, 108:16, 114:25, 115:24, 123:1, 124:24, 131:4, 142:23, 145:1, 146:22, 147:6
**importantly** [1] - 104:12
**importation** [1] - 99:17
**improved** [1] - 13:4
**IN** [1] - 1:1
**Inc** [1] - 102:3
**incentivize** [1] - 35:13
**include** [1] - 175:2
**included** [8] - 165:18, 166:20, 166:23, 166:24, 166:25, 167:3, 167:8, 171:17
**includes** [2] - 95:16, 166:11
**including** [8] - 55:23, 68:5, 69:3, 71:18, 82:10, 121:19, 124:1, 124:20
**Income** [1] - 57:2
**incoming** [1] - 72:18
**inconsistent** [3] - 109:24, 114:8, 132:18
**incorporate** [2] - 69:1, 94:24
**Incorporated** [1] - 88:6
**increases** [1] - 132:7
**independent** [3] - 59:21, 61:5, 66:7
**Independent** [1] - 88:25
**independently** [1] - 170:22
**INDEX** [1] - 3:2
**Index** [1] - 116:24
**indicated** [4] - 74:10, 98:9, 101:11, 105:15
**indicates** [1] - 164:18
**indicating** [1] - 76:21
**indifference** [4] - 102:18, 129:1, 129:10, 129:25
**indirect** [1] - 45:18
**individual** [14] - 30:8, 87:24, 88:10, 88:11, 88:14, 92:1, 118:25, 129:2, 129:7, 130:13, 150:16, 150:23, 168:13
**individual's** [2] - 92:3, 168:15
**individually** [1] - 45:11
**individuals** [1] - 43:23
**indulge** [1] - 87:6
**indulgence** [2] - 69:14, 95:4
**industrialization** [1] - 21:14
**info** [6] - 32:25, 40:6, 41:17, 41:19, 41:23, 42:7
**inform** [1] - 98:17
**information** [11] - 44:9, 48:24, 48:25, 54:23, 55:6, 60:15, 66:16, 66:20, 67:14, 89:11, 156:3
**informed** [1] - 153:23
**Ingraham** [1] - 160:17
**INGRAHAM** [1] - 160:18
**initiated** [1] - 97:15
**initiatives** [1] - 23:21
**injured** [2] - 95:13, 99:24
**injury** [4] - 95:9, 100:1, 100:5, 100:21
**innovations** [1] - 35:13
**input** [1] - 56:4
**inquiring** [1] - 97:2
**instead** [3] - 72:19, 98:16, 104:1
**instruction** [2] - 170:16, 177:4
**instructions** [8] - 65:15, 82:9, 97:1, 97:3, 163:17, 164:1, 168:1, 177:24
**instructive** [2] - 86:11, 98:21
**insufficient** [2] - 99:8, 101:21
**insurance** [4] - 41:7, 41:9, 41:11
**integrate** [1] - 146:14
**integrated** [27] - 108:14, 109:13, 143:21, 146:2, 146:6, 146:7, 146:12, 146:17, 147:17, 147:21, 148:11, 148:21, 152:6, 152:10, 153:25, 154:11, 156:8, 157:23, 158:2, 158:7, 159:10, 165:9, 165:12, 170:19, 170:21
**intelligence** [2] - 71:12, 71:13
**intended** [2] - 147:24, 162:22
**intent** [2] - 78:11, 88:22
**intentional** [2] - 102:12, 102:23
**intentionally** [3] - 103:17, 108:11, 161:18
**interact** [2] - 40:7, 41:16
**interacted** [1] - 44:21
**interaction** [2] - 31:14, 41:17
**interactions** [1] - 31:15
**interest** [3] - 48:23, 103:23, 129:15
**interested** [4] - 47:21, 47:23, 48:13, 75:12
**interesting** [6] - 42:1, 78:14, 128:22, 142:18, 148:1, 172:5
**interestingly** [2] - 84:24, 86:3
**interfered** [1] - 126:14
**Interior** [1] - 27:10
**interior** [1] - 30:16
**interject** [1] - 173:23
**internally** [1] - 24:14
**International** [2] - 81:19, 155:6
**international** [21] - 47:12, 47:13, 47:21, 48:7, 48:20, 49:13, 49:15, 49:19, 49:22, 72:8, 72:12, 90:11, 91:5, 105:5, 119:19, 120:2, 120:10, 120:16, 122:5, 140:17, 142:21
**interstate** [1] - 67:2
**INTO** [1] - 3:3
**introduction** [1] - 47:19
**invested** [1] - 153:20
**invite** [1] - 162:19
**involve** [3] - 84:4, 147:8, 161:5
**involved** [8] - 22:3, 58:19, 59:5, 66:9, 76:12, 107:21, 175:21
**involvement** [2] - 59:8, 135:6
**involves** [2] - 23:19, 24:2
**involving** [1] - 102:23
**ironically** [1] - 77:9
**irony** [1] - 75:24
**issue** [62] - 42:13, 42:18, 58:22, 70:6, 70:17, 70:19, 71:3, 79:10, 84:11, 88:4, 88:5, 95:8, 98:2, 101:6, 101:12, 107:17, 111:10, 115:10, 118:4, 121:24, 124:12, 132:19, 132:21, 135:4, 136:16, 137:10, 137:25, 139:11, 141:19, 142:17, 142:19, 143:21, 144:13, 145:5, 145:11, 145:21, 148:15, 149:14, 151:2, 156:20, 156:21, 157:1, 159:15, 159:20, 160:3, 160:15, 161:11, 162:4, 163:22, 166:5, 166:8, 171:15, 172:9, 173:9, 173:12, 173:14, 173:23, 174:15, 175:3, 177:6
**issued** [4] - 74:15, 84:7, 88:3, 117:14
**issues** [26] - 4:6, 25:9, 25:10, 31:12, 32:2, 42:3, 42:5, 44:10, 45:2, 45:4, 65:11, 95:2, 101:3, 125:11, 125:14, 125:18, 130:18, 144:25, 145:14, 154:18, 155:11, 159:3, 163:3, 171:25, 175:4
**issuing** [1] - 74:20
**itself** [5] - 22:7, 79:2, 100:11, 120:23, 137:17

**J**

**JACKSON** [1] - 2:3
**January** [9] - 8:23, 50:6, 76:18, 77:18, 77:19, 78:7, 94:14, 98:8, 105:16
**Japan** [3] - 139:19, 141:22, 147:3
**Japanese** [2] - 145:7, 147:1
**Jefferson** [3] - 88:5, 88:24, 118:18
**Jersey** [4] - 32:4, 39:25, 44:11, 141:10
**JFDS** [1] - 3:12
**job** [73] - 9:16, 9:19, 15:8, 15:13, 15:23, 25:25, 26:16, 27:13, 27:14, 28:17, 28:25, 34:13, 47:14, 53:25, 54:17, 57:19, 71:11, 71:18, 73:15, 73:22, 74:1, 77:10, 78:15, 78:18, 78:21, 80:5, 80:7, 80:21, 80:22, 82:14, 84:19, 84:20, 85:2, 85:24, 85:25, 93:17, 94:16, 96:12, 96:23, 97:1, 97:7, 97:9, 97:23, 98:6, 98:17, 101:4, 104:1, 104:13, 114:3, 115:8, 115:24, 120:12, 125:10, 127:16, 127:20, 128:1, 128:2, 128:20, 131:16, 131:17, 131:18, 131:20, 132:11, 138:18, 139:1, 139:4, 139:8, 150:4, 150:9, 150:14, 151:9
**jobs** [8] - 21:9, 26:14, 28:1, 80:4, 80:5, 84:24, 99:5, 114:6
**Johannes** [1] - 121:16
**join** [2] - 6:20, 108:7
**joined** [2] - 6:23, 6:25
**joining** [2] - 20:22, 24:24
**joint** [7] - 165:7, 166:20, 166:23, 166:24, 167:4, 167:5, 167:8
**Journal** [1] - 116:24
**journey** [1] - 66:21
**JUDGE** [1] - 1:14
**Judge** [17] - 4:25, 18:20, 52:6, 55:1, 99:7, 99:10, 99:13, 100:19, 147:18, 160:8, 167:23, 168:22, 170:3, 170:11, 173:10,

174:14, 178:10
**judged** [1] - 5:24
**judgement** [1] - 127:11
**judges** [3] - 150:6, 150:10, 155:19
**judgment** [33] - 67:23, 68:9, 69:2, 70:2, 75:5, 79:15, 83:5, 85:20, 87:1, 87:10, 101:23, 114:18, 125:6, 130:20, 132:20, 134:20, 134:23, 135:7, 137:15, 140:10, 140:20, 155:10, 156:15, 156:24, 158:17, 158:23, 159:19, 162:5, 169:9, 170:25, 172:21, 173:21, 175:18
**July** [5] - 47:20, 74:14, 93:14, 122:9, 122:13
**June** [3] - 13:12, 93:14
**Jupiter** [1] - 120:20
**juries** [1] - 169:10
**jurisdiction** [3] - 109:13, 159:11, 159:15
**juror** [1] - 70:13
**jurors** [2] - 4:13, 61:6
**JURY** [1] - 1:14
**jury** [75] - 4:3, 4:14, 4:17, 4:19, 4:20, 5:16, 6:3, 61:2, 61:9, 61:16, 62:13, 64:3, 64:15, 64:17, 64:18, 65:24, 66:19, 67:17, 69:19, 69:22, 70:6, 86:23, 91:18, 91:19, 95:8, 98:3, 99:6, 106:16, 108:3, 116:1, 117:6, 121:6, 121:12, 125:3, 125:5, 125:14, 126:3, 126:15, 127:3, 129:16, 130:6, 135:1, 135:2, 136:20, 136:23, 138:16, 144:3, 144:10, 145:5, 145:21, 146:1, 146:5, 147:20, 147:22, 149:12, 149:13, 153:22, 154:13, 156:2, 157:8, 157:10, 163:17, 164:1, 164:6, 164:8, 164:23, 164:25, 168:1, 173:7, 173:22, 175:19, 175:20, 176:10, 178:21
**justification** [1] - 134:6
**justified** [1] - 135:14
**justify** [1] - 134:15

**K**

**K-a-i-s-e-r-s-l-a-u-t-e-r-n** [1] - 50:17
**Kaiserslautern** [2] - 50:17, 50:24
**Karl** [2] - 33:5, 33:21
**KARL** [1] - 33:5
**keep** [12] - 72:20, 103:21, 104:22, 105:11, 115:5, 116:11, 118:3, 123:23, 127:18, 136:23, 168:25, 173:14
**keeping** [1] - 84:21
**keeps** [2] - 114:7, 124:24
**KELLY** [1] - 1:3
**Kelly** [13] - 6:16, 6:17, 47:11, 48:17, 114:1, 115:5, 115:6, 116:10, 116:11, 117:12, 120:6, 121:13, 121:16
**kept** [2] - 90:18, 156:17
**kicked** [1] - 59:24
**kind** [4] - 41:9, 45:2, 52:3, 79:9
**kinds** [7] - 21:11, 21:21, 23:20, 24:3, 24:5, 142:23, 177:2
**King** [1] - 95:10
**knowing** [2] - 133:19, 156:21
**knowledge** [3] - 45:10, 108:4, 155:21
**known** [2] - 68:6, 121:23
**knows** [2] - 97:16, 129:23
**Knudt** [1] - 75:13
**Koepnick** [1] - 122:9
**Koepnick's** [1] - 122:8
**Kolstad** [2] - 103:7, 104:23
**KURT** [1] - 1:21

**L**

**labor** [4] - 51:18, 51:20, 52:12
**lady** [2] - 6:16, 60:11
**laid** [1] - 119:18
**language** [18] - 91:12, 123:3, 164:18, 165:6, 165:17, 165:20, 166:11, 166:15, 166:23, 166:24, 166:25, 167:5, 167:8, 169:8, 169:24, 172:21
**large** [1] - 143:16
**larger** [1] - 21:15
**last** [17] - 19:9, 33:6, 33:14, 35:2, 50:15, 60:8, 64:21, 77:19, 137:20, 142:10, 168:2, 168:3, 168:23, 169:6, 169:7, 169:17, 172:7
**late** [3] - 72:11, 178:17, 178:22
**lateral** [3] - 10:15, 10:17, 11:1
**law** [88] - 26:5, 50:13, 50:18, 51:3, 51:7, 51:11, 51:14, 51:15, 51:16, 51:18, 51:20, 51:22, 51:23, 51:24, 51:25, 52:5, 52:10, 52:12, 52:14, 52:16, 65:16, 66:17, 67:24, 68:9, 69:3, 69:4, 70:2, 70:21, 78:17, 78:22, 86:14, 88:2, 101:21, 101:23, 103:12, 105:25, 106:14, 114:18, 124:17, 124:18, 125:7, 125:19, 127:11, 127:19, 127:21, 129:23, 130:10, 130:20, 131:15, 132:20, 133:19, 134:21, 135:24, 136:8, 140:10, 140:17, 140:23, 141:3, 141:5, 144:24, 148:20, 155:6, 155:19, 158:7, 158:17, 158:20, 158:24, 159:18, 159:20, 160:22, 163:3, 164:9, 165:5, 165:21, 166:3, 166:4, 168:6, 171:1, 172:17, 172:23, 172:24, 173:22, 175:18
**laws** [7] - 28:1, 51:17, 51:20, 51:25, 54:25, 55:8, 140:4
**lawyer** [2] - 74:4, 116:18
**lawyers** [8] - 5:19, 64:20, 64:22, 65:13, 66:1, 66:16, 155:18, 156:19
**layperson** [1] - 174:19
**lead** [3] - 7:12, 7:15, 106:13
**leadership** [1] - 35:9
**leads** [1] - 95:2
**learn** [3] - 9:16, 22:15, 47:3
**learned** [2] - 97:11, 97:13
**least** [10] - 71:22, 93:16, 108:17, 113:24, 114:1, 142:16, 145:21, 146:10, 153:10, 155:12
**leave** [10] - 11:18, 45:7, 61:18, 82:13, 94:15, 104:1, 128:5, 128:7, 128:10, 131:23
**leaves** [1] - 152:11
**leaving** [2] - 47:11, 105:17
**left** [18] - 11:13, 11:16, 11:19, 64:21, 76:5, 77:20, 80:15, 92:15, 94:13, 104:6, 104:7, 104:8, 106:18, 113:22, 132:3, 132:7, 135:8, 153:3
**legal** [13] - 38:11, 55:13, 65:1, 65:3, 65:11, 70:4, 86:23, 88:19, 98:1, 123:7, 123:8, 123:16, 177:9
**legally** [1] - 70:5
**legitimate** [1] - 92:20
**length** [1] - 124:2
**less** [7] - 40:6, 80:16, 80:17, 99:4, 116:16, 139:25, 140:1
**letter** [8] - 9:5, 57:18, 73:9, 76:6, 76:10, 76:20, 84:9, 84:16
**letters** [8] - 74:15, 74:20, 76:8, 76:11, 76:14, 76:19, 84:7, 117:16
**level** [92] - 8:3, 8:4, 10:13, 10:18, 10:19, 11:4, 11:11, 11:14, 17:4, 19:23, 19:24, 20:12, 20:15, 20:24, 21:7, 21:14, 22:9, 30:5, 33:18, 33:20, 33:21, 33:23, 33:24, 34:19, 34:21, 34:25, 35:1, 35:11, 38:12, 42:10, 42:11, 59:14, 59:17, 60:3, 73:5, 73:7, 73:17, 73:18, 73:24, 74:2, 74:12, 74:18, 74:25, 75:10, 75:17, 75:20, 76:2, 80:3, 80:22, 80:24, 81:1, 84:17, 84:20, 84:24, 85:2, 85:25, 111:16, 111:19, 112:4, 112:10, 115:1, 115:6, 115:7, 115:9, 115:21, 116:5, 116:7, 116:9, 116:13, 116:15, 116:20, 117:2, 123:21, 123:23, 132:11, 132:15, 132:17, 132:25, 137:18, 137:19, 137:21, 138:3, 138:9, 138:10
**levels** [7] - 33:16, 59:13, 59:21, 114:20, 116:9, 138:4, 140:6
**LEWIS** [1] - 2:3
**Lexis** [4] - 89:1, 141:9, 141:10, 141:13
**liability** [1] - 134:2
**lies** [1] - 46:15
**lieutenant** [1] - 112:17
**life** [1] - 26:12
**light** [5] - 68:22, 148:22, 154:22, 159:1, 162:9
**likelihood** [1] - 161:1
**likewise** [1] - 170:24
**limine** [2] - 121:3, 124:15
**limit** [2] - 90:23, 91:20
**limitation** [1] - 171:2
**limited** [2] - 102:8, 117:3
**limiting** [2] - 87:21, 116:22
**line** [68] - 6:13, 6:19, 8:1, 8:12, 9:4, 9:12, 9:25, 10:25, 12:2, 15:2, 15:9, 15:25, 16:14, 17:1, 17:6, 17:13, 17:25, 18:13, 18:14, 19:3, 19:21, 19:25, 20:18, 23:10, 24:8, 24:10, 24:18,

24:23, 25:16, 25:20, 26:15, 39:7, 39:9, 40:9, 40:15, 41:14, 46:8, 47:2, 47:15, 48:18, 49:8, 49:12, 50:8, 50:11, 52:19, 53:13, 54:8, 54:16, 54:21, 56:1, 56:10, 56:25, 57:5, 57:14, 58:9, 58:25, 59:10, 59:12, 76:11, 82:2, 82:5, 83:24, 121:9, 138:7, 139:2, 143:22, 172:10
**Line** [1] - 56:17
**lines** [4] - 18:11, 139:4, 150:24, 151:11
**LinkedIn** [1] - 128:1
**LISA** [1] - 5:12
**Lisa** [1] - 60:17
**listed** [4] - 26:16, 27:19, 28:17, 73:16
**litigate** [1] - 160:16
**live** [1] - 25:24
**LLC** [3] - 1:9, 2:2, 103:4
**LLP** [1] - 1:21
**local** [8] - 48:9, 48:21, 91:11, 91:12, 91:15, 104:2, 119:16, 121:20
**located** [3] - 36:10, 36:21, 80:6
**locations** [2] - 37:1, 45:19
**logical** [1] - 160:25
**logistics** [3] - 12:24, 13:19, 93:1
**long-time** [1] - 114:5
**look** [30] - 44:11, 66:10, 66:13, 73:15, 81:11, 83:12, 87:18, 90:6, 90:13, 91:1, 96:22, 101:8, 114:12, 123:13, 127:18, 127:19, 127:20, 132:11, 137:16, 150:14, 156:14, 157:24, 164:4, 165:13, 167:14, 167:18, 173:3, 178:17, 178:19
**looked** [6] - 85:2, 86:3, 127:16, 140:12, 156:6, 156:13
**looking** [9] - 16:19, 24:14, 65:25, 96:11, 104:13, 131:22, 134:9, 155:11, 168:22
**looks** [6] - 21:16, 29:10, 29:14, 29:23, 123:2, 169:12
**loss** [2] - 95:9, 126:22
**losses** [1] - 95:13
**lost** [3] - 42:14, 71:18, 136:1
**Louis** [1] - 71:4
**lower** [2] - 42:10, 80:16
**lunch** [8] - 61:22, 65:12, 65:18, 65:20, 65:21, 66:20, 109:6, 115:10

**M**

**M-e-t-a-l-l** [1] - 58:6
**ma'am** [4] - 5:10, 27:11, 48:1, 60:13
**Ma'am** [1] - 5:14
**MAC** [1] - 161:18
**MAC's** [1] - 162:2
**madame** [5] - 31:4, 50:9, 56:14, 58:5, 62:22
**Madame** [3] - 57:10, 61:21, 63:12
**Madewell** [3] - 98:6, 98:12, 98:14
**Magistrate** [1] - 173:10
**MAIN** [1] - 2:4
**maintaining** [1] - 168:11
**maker** [1] - 145:10
**makers** [6] - 89:23, 104:22, 104:24, 104:25, 107:25, 108:12
**male** [1] - 71:14
**malice** [2] - 102:17, 129:1
**manage** [4] - 174:11, 174:23, 174:25, 175:6
**management** [27] - 7:16, 7:19, 15:17, 21:10, 22:11, 28:25, 29:11, 29:15, 29:16, 29:24, 35:3, 35:14, 36:9, 36:22, 36:24, 37:6, 37:7, 37:8, 37:10, 39:20, 89:17, 89:19, 89:20, 116:13, 121:14, 123:2, 137:22
**Management** [1] - 26:17
**Manager** [2] - 42:11, 86:1
**manager** [13] - 7:24, 11:3, 19:6, 21:11, 28:19, 28:22, 29:7, 33:10, 35:16, 59:25, 92:10, 113:22, 130:6
**managers** [8] - 27:1, 30:7, 37:13, 38:3, 84:23, 113:20, 116:12, 130:12
**managing** [8] - 21:15, 23:16, 23:17, 23:18, 23:23, 24:12, 24:20, 24:22
**mand** [1] - 134:7
**mandatory** [1] - 138:21
**Mando** [1] - 160:6
**manifested** [2] - 95:17, 101:2
**MANUFACTURING** [2] - 1:9, 2:2
**Manufacturing** [12] - 70:1, 70:8, 71:24, 78:12, 89:12, 90:4, 90:21, 95:19, 96:8, 102:1, 104:10, 104:14
**Manufacturing's** [1] - 103:16
**March** [2] - 18:2, 141:14
**marked** [2] - 17:15, 54:1
**market** [1] - 138:22
**Marketing** [1] - 19:6
**Maryland** [2] - 125:9, 125:10
**material** [2] - 18:12, 66:11
**matter** [30] - 60:24, 67:24, 68:9, 68:12, 69:3, 70:2, 88:2, 101:21, 101:23, 106:14, 114:18, 120:21, 125:7, 127:11, 127:21, 130:20, 132:20, 134:20, 136:7, 140:10, 141:23, 158:17, 158:24, 159:20, 160:20, 168:6, 171:1, 173:21, 175:18, 179:7
**matters** [7] - 62:9, 65:1, 66:9, 69:8, 130:13, 159:3, 159:23
**MAU** [1] - 14:4
**MC** [63] - 5:1, 40:11, 40:12, 40:17, 40:23, 40:24, 41:12, 41:15, 44:20, 49:18, 49:19, 49:23, 49:24, 53:2, 53:5, 59:18, 69:10, 74:11, 76:5, 80:15, 86:25, 89:17, 105:24, 106:10, 107:12, 108:18, 121:11, 122:14, 136:21, 136:22, 136:24, 137:8, 137:24, 137:25, 143:6, 146:2, 147:16, 148:3, 148:11, 148:18, 152:10, 152:12, 152:15, 152:17, 153:23, 156:8, 156:16, 156:18, 156:19, 157:3, 157:12, 157:13, 157:25, 158:4, 158:16, 158:21, 162:6, 162:13, 163:23, 170:24, 176:8
**MC's** [4] - 101:20, 153:18, 162:6, 171:2
**McCoy** [13] - 107:14, 107:24, 111:9, 112:6, 112:24, 116:17, 118:19, 119:15, 124:24, 126:25, 127:18, 128:23, 133:13
**MCCOY** [35] - 2:3, 4:11, 19:8, 60:12, 61:13, 63:9, 63:17, 64:6, 64:12, 67:10, 69:10, 69:13, 69:25, 81:5, 81:8, 82:23, 83:2, 83:4, 94:2, 94:5, 94:8, 97:20, 97:22, 100:15, 100:17, 100:19, 101:7, 101:18, 106:4, 106:22, 106:24, 130:25, 131:3, 163:23, 178:11
**McCoy's** [1] - 114:7
**McCraw** [29] - 9:17, 10:12, 14:15, 16:13, 16:15, 17:3, 18:2, 23:5, 43:8, 46:15, 72:6, 72:17, 74:21, 77:4, 89:18, 89:24, 90:19, 92:21, 93:7, 97:11, 105:21, 108:1, 113:19, 114:4, 114:24, 117:14, 117:19, 121:8, 121:13
**MCDUFFIE** [1] - 2:7
**McMillan** [1] - 95:11
**mean** [38] - 13:16, 14:13, 19:14, 26:13, 28:4, 28:8, 36:7, 36:13, 36:17, 41:23, 42:9, 42:23, 46:5, 49:14, 50:4, 50:5, 51:7, 58:12, 59:22, 60:1, 78:21, 89:15, 93:24, 94:1, 101:8, 106:20, 119:16, 119:20, 119:22, 119:23, 121:7, 131:13, 138:18, 145:18, 146:23, 148:14, 175:5, 176:14
**meaning** [3] - 13:7, 41:17, 119:19
**means** [10] - 10:17, 13:17, 49:15, 119:25, 120:2, 120:3, 120:21, 135:24, 136:4, 175:23
**meant** [10] - 17:12, 84:8, 89:16, 118:19, 118:22, 120:15, 120:16, 120:20, 140:3
**media** [1] - 66:10
**mediations** [2] - 157:7, 157:20
**medical** [2] - 41:2
**Medical** [3] - 95:21, 124:21, 125:21
**Medley** [11] - 15:24, 47:8, 47:9, 72:2, 72:3, 85:1, 85:3, 113:25, 114:1, 132:4, 132:6
**meet** [3] - 86:21, 94:17, 103:13
**meeting** [9] - 47:19, 47:24, 48:2, 48:3, 48:5, 72:16, 77:3, 77:12, 114:12
**meetings** [6] - 12:22, 77:6, 78:11, 93:25, 105:14, 114:14
**member** [3] - 43:8, 56:18, 89:18
**members** [6] - 4:20, 5:16, 61:2, 64:18, 77:8, 90:9
**mental** [1] - 96:4
**mentally** [1] - 127:6
**mention** [1] - 168:20
**mentioned** [12] - 24:16, 27:19, 39:3, 48:5, 48:16, 49:3, 85:5, 99:12, 124:2, 135:1, 137:21, 151:13
**mentioning** [1] - 178:8
**menu** [1] - 65:25
**Mercedes** [4] - 81:19, 82:14, 82:17,

83:12
**Mercedes-Benz** [2] - 81:19, 83:12
**Mercer** [1] - 59:1
**mere** [1] - 100:2
**merely** [1] - 145:12
**meshed** [1] - 146:15
**mess** [1] - 177:21
**met** [5] - 6:15, 75:13, 75:14, 86:23, 96:24
**Metall** [2] - 58:2, 58:4
**Mexico** [4] - 16:21, 43:18, 44:1, 45:5
**mic** [1] - 15:8
**Michigan** [1] - 141:14
**microphone** [1] - 4:15
**Microsoft** [1] - 43:3
**mid** [1] - 128:11
**mid-part** [1] - 128:11
**middle** [1] - 22:10
**Middle** [1] - 160:5
**might** [15] - 16:24, 42:4, 44:10, 48:12, 48:25, 49:2, 62:14, 62:16, 62:21, 74:2, 86:17, 97:3, 134:11, 153:4, 173:5
**Miller** [4] - 96:20, 96:24, 96:25, 97:7
**million** [1] - 123:11
**mind** [6] - 19:8, 38:20, 103:1, 103:17, 104:22, 168:25
**mine** [1] - 111:24
**minorities** [1] - 123:24
**minority** [2] - 122:19, 123:1
**minus** [1] - 13:8
**minute** [9] - 35:5, 60:6, 63:6, 72:25, 107:7, 129:13, 142:12, 156:25, 172:3
**minutes** [3] - 65:23, 67:13, 176:12
**misaligned** [2] - 74:13, 133:1
**misclassifying** [1] - 87:15
**misquote** [1] - 82:19
**missing** [1] - 143:7
**misstated** [1] - 109:17
**misstating** [1] - 146:21
**mist** [1] - 169:23
**mixed** [1] - 175:4
**models** [4] - 32:21, 32:23, 42:17, 58:20
**modified** [5] - 165:16, 165:19, 165:23, 166:2, 167:1
**modifying** [1] - 55:11
**moment** [5] - 18:4, 122:15, 126:8, 131:1, 148:16
**money** [6] - 45:20, 45:21, 97:23, 116:16, 153:21, 157:20
**monitoring** [1] - 55:18
**month** [8] - 10:5, 98:18, 101:14, 128:7, 128:16, 128:17, 155:25, 172:25
**months** [9] - 11:24, 11:25, 34:2, 34:12, 52:9, 52:10, 52:11, 52:12, 56:19
**Moody** [2] - 106:17, 151:10
**MOODY** [24] - 2:2, 4:25, 18:9, 18:19, 25:9, 39:7, 45:16, 55:1, 106:23, 148:19, 151:10, 152:20, 167:23, 168:9, 170:3, 170:5, 170:7, 170:13, 171:6, 176:25, 177:20, 177:23, 178:3, 178:10
**moody** [4] - 4:24, 112:13, 172:6, 176:15
**Moore's** [1] - 160:22
**moreover** [1] - 100:9
**morning** [10] - 25:17, 61:19, 64:23, 65:13, 67:13, 72:14, 111:21, 128:19, 177:17, 178:19
**most** [8] - 9:1, 15:16, 68:23, 111:11, 113:24, 114:25, 115:24, 159:1
**mostly** [4] - 26:23, 26:25, 58:16, 126:10
**motion** [37] - 67:19, 68:1, 68:2, 68:5, 68:9, 69:2, 69:5, 69:11, 69:20, 70:4, 75:5, 99:8, 119:4, 121:2, 124:13, 124:15, 126:18, 128:4, 130:19, 130:23, 149:9, 153:18, 156:24, 159:6, 159:7, 159:12, 159:19, 162:5, 162:6, 162:12, 162:13, 162:17, 162:22, 162:25, 163:4, 168:5
**motions** [16] - 65:3, 65:4, 69:8, 69:23, 109:12, 111:4, 156:23, 158:16, 158:20, 159:4, 159:13, 159:16, 162:18, 164:2, 171:8
**motivated** [1] - 92:6
**motivating** [1] - 165:22
**MOTOREN** [2] - 1:6, 1:20
**Motoren** [1] - 178:16
**mouth** [2] - 119:6, 129:18
**move** [43] - 10:15, 11:1, 21:19, 36:8, 63:12, 66:24, 69:10, 72:3, 72:12, 72:14, 72:15, 72:20, 72:23, 75:2, 78:8, 78:24, 79:11, 80:2, 80:7, 84:18, 92:11, 92:18, 93:18, 93:21, 93:22, 94:2, 94:20, 101:23, 103:22, 104:15, 105:24, 113:1, 113:3, 113:4, 113:12, 113:14, 113:15, 113:23, 130:19, 131:25, 158:10, 159:8
**moved** [26] - 8:23, 21:2, 21:13, 22:10, 35:2, 67:22, 72:2, 73:8, 73:25, 75:24, 77:21, 78:5, 79:7, 81:15, 85:13, 86:18, 88:14, 90:18, 107:22, 112:16, 113:20, 113:24, 114:6, 155:10, 156:22, 159:9
**movement** [2] - 79:4, 123:4
**moves** [6] - 70:1, 112:3, 113:9, 113:10, 115:4, 134:20
**moving** [26] - 68:23, 75:19, 77:1, 77:5, 77:8, 77:10, 77:15, 78:3, 78:15, 78:17, 80:20, 84:22, 94:9, 97:16, 107:15, 107:18, 113:6, 113:12, 118:17, 124:1, 124:12, 154:10, 154:12, 159:2, 178:19
**MR** [181] - 4:10, 4:11, 4:12, 4:15, 4:25, 5:3, 5:7, 6:8, 6:12, 8:5, 8:8, 8:10, 9:8, 9:12, 9:15, 14:18, 14:21, 15:9, 15:12, 17:17, 17:24, 18:4, 18:6, 18:9, 18:19, 18:23, 19:2, 19:8, 19:10, 19:12, 25:3, 25:6, 25:9, 25:10, 25:11, 25:15, 29:18, 29:22, 31:7, 31:21, 31:23, 39:7, 39:11, 45:16, 46:2, 52:18, 52:23, 53:7, 53:12, 54:9, 54:11, 55:1, 55:2, 55:4, 56:16, 57:13, 58:5, 58:8, 60:6, 60:8, 60:12, 60:22, 61:12, 61:13, 61:14, 63:8, 63:9, 63:10, 63:17, 63:18, 63:21, 63:25, 64:5, 64:6, 64:7, 64:11, 64:12, 64:13, 67:9, 67:10, 67:11, 68:3, 69:9, 69:10, 69:13, 69:25, 81:5, 81:8, 82:23, 83:2, 83:4, 94:2, 94:5, 94:8, 97:20, 97:22, 100:15, 100:17, 100:19, 101:7, 101:18, 106:4, 106:22, 106:23, 106:24, 107:1, 107:8, 107:10, 108:23, 109:3, 109:9, 109:11, 109:23, 110:2, 110:6, 110:18, 110:20, 111:1, 111:3, 122:25, 130:25, 131:3, 133:12, 133:16, 135:20, 140:24, 141:2, 141:4, 142:13, 142:15, 144:8, 146:4, 146:10, 146:18, 146:20, 147:19, 147:25, 148:15, 148:19, 149:2, 149:21, 149:24, 150:10, 151:1, 151:4, 151:10, 152:20, 153:17, 155:3, 155:9, 155:17, 156:11, 157:13, 157:19, 159:9, 162:21, 163:20, 163:23, 163:24, 167:23, 168:9, 170:3, 170:5, 170:7, 170:13, 171:6, 171:15, 171:21, 171:25, 172:5, 172:9, 176:11, 176:25, 177:13, 177:20, 177:23, 178:3, 178:5, 178:10, 178:11, 178:13
**Muldrow** [6] - 71:4, 71:10, 71:20, 83:16, 85:20, 86:22
**multiple** [2] - 92:18, 171:8
**Munich** [21] - 26:19, 26:20, 27:5, 27:6, 27:7, 27:12, 27:17, 28:12, 28:14, 28:23, 30:2, 31:1, 31:2, 31:9, 36:11, 36:16, 39:17, 39:18, 40:8, 122:12
**murky** [1] - 148:19
**MURPHY** [82] - 1:17, 1:17, 4:10, 4:15, 5:7, 6:8, 6:12, 8:5, 8:10, 9:8, 9:12, 9:15, 14:18, 14:21, 15:9, 15:12, 17:17, 17:24, 18:4, 18:6, 18:23, 19:2, 19:10, 19:12, 25:3, 25:6, 25:11, 25:15, 29:18, 29:22, 31:7, 31:21, 31:23, 39:11, 46:2, 52:18, 52:23, 53:7, 53:12, 54:9, 54:11, 55:2, 55:4, 56:16, 57:10, 57:13, 58:5, 58:8, 60:6, 60:8, 60:22, 61:12, 63:8, 63:18, 63:21, 64:5, 64:11, 67:9, 69:9, 108:23, 109:3, 109:9, 111:3, 122:25, 133:16, 135:20, 140:24, 141:4, 149:2, 149:21, 149:24, 150:10, 153:17, 156:11, 157:13, 163:20, 171:21, 171:25, 172:5, 172:9, 177:13, 178:5
**Murphy** [38] - 3:5, 3:7, 3:9, 4:7, 4:23, 5:6, 6:7, 6:15, 54:8, 60:14, 63:7, 77:25, 78:15, 79:16, 83:23, 85:5, 107:3, 107:19, 108:13, 108:21, 109:7, 111:2, 131:5, 131:14, 133:14, 144:18, 145:1, 148:2, 148:23, 149:1, 151:21, 156:5,

157:20, 157:21, 160:1, 171:19, 176:11, 176:17
**Murphy's** [1] - 84:3
**music** [2] - 152:14, 152:19
**Muslim** [2] - 81:24, 115:12
**must** [13] - 47:5, 70:23, 71:7, 92:5, 99:24, 100:5, 100:7, 100:10, 102:16, 153:8, 162:1, 170:8

**N**

**nail** [1] - 124:25
**name** [11] - 20:11, 32:8, 33:3, 33:5, 33:6, 33:13, 33:14, 54:13, 60:15, 141:7
**names** [2] - 20:6, 114:5
**nand** [1] - 172:25
**narrow** [1] - 170:23
**national** [61] - 55:18, 68:20, 70:8, 87:5, 87:7, 87:11, 87:14, 87:16, 90:24, 91:13, 91:21, 91:24, 92:4, 92:7, 94:19, 105:3, 109:16, 109:20, 110:1, 110:3, 110:7, 110:16, 110:21, 110:22, 118:17, 119:4, 119:7, 119:13, 119:17, 120:24, 121:4, 129:21, 141:22, 145:4, 145:7, 145:12, 145:13, 145:23, 161:6, 161:13, 161:19, 161:22, 161:25, 163:9, 163:12, 163:15, 166:6, 166:10, 168:16, 173:13, 173:15, 173:25, 174:9, 174:22, 175:2, 175:3, 175:15, 176:13, 176:18, 176:21, 177:8
**nationality** [1] - 91:6
**nature** [7] - 66:13, 74:6, 115:4, 132:22, 141:16, 150:2, 150:5
**naught** [1] - 153:12
**Navigation** [1] - 68:6
**NC** [1] - 15:14
**NCA&T** [1] - 15:13
**NEAL** [1] - 3:6
**Neal** [2] - 18:24, 25:4
**necessarily** [2] - 60:1, 119:16
**necessary** [2] - 153:10, 178:11
**need** [19] - 4:15, 12:25, 24:15, 45:20, 45:21, 46:9, 46:18, 47:8, 61:24, 64:3, 69:8, 69:16, 92:24, 108:22, 120:1, 149:25, 164:5, 167:12, 171:3
**needed** [10] - 12:23, 13:1, 13:24, 37:22, 42:23, 43:22, 85:11, 101:4, 113:12, 127:17
**needs** [8] - 18:19, 45:19, 61:25, 62:6, 64:10, 66:1, 149:12, 169:18
**negative** [4] - 13:7, 13:15, 13:23, 74:2
**negotiate** [1] - 28:9
**negotiating** [1] - 32:22
**negotiation** [1] - 138:21
**network** [16] - 32:25, 40:5, 41:25, 43:12, 43:21, 44:25, 45:4, 45:9, 49:5, 120:4, 145:17, 145:19, 151:5, 151:16, 151:17
**networks** [1] - 56:23
**never** [60] - 6:15, 24:21, 25:1, 59:3, 60:4, 73:12, 75:10, 75:15, 75:18, 76:6, 76:9, 76:20, 77:21, 78:5, 78:20, 80:15, 82:21, 82:23, 83:7, 85:23, 86:20, 89:20, 94:11, 96:11, 105:15, 112:19, 113:11, 113:13, 114:5, 114:22, 115:16, 115:17, 115:18, 116:2, 118:1, 121:6, 121:22, 122:4, 124:25, 125:5, 125:6, 127:15, 129:4, 137:8, 137:9, 137:25, 139:11, 149:2, 155:21, 157:15, 173:7, 173:8, 174:16, 174:17, 175:8, 175:9, 175:18, 176:5
**nevertheless** [3] - 169:22, 170:6, 170:7
**new** [15] - 54:17, 56:3, 72:6, 79:16, 85:15, 103:24, 103:25, 105:13, 105:20, 118:11, 118:12, 119:3, 124:8, 130:18
**New** [4] - 32:4, 39:25, 44:11, 141:10
**newly** [1] - 27:15
**news** [2] - 64:19, 66:13
**next** [22] - 14:22, 18:23, 27:8, 28:17, 28:25, 29:10, 29:15, 29:23, 32:7, 36:18, 36:20, 41:19, 48:7, 52:19, 72:16, 74:17, 129:12, 129:13, 159:7, 159:19, 162:6, 168:21
**Niessner** [1] - 118:10
**night** [1] - 64:21
**nine** [14] - 11:14, 19:25, 26:15, 66:22, 66:23, 67:4, 67:7, 67:13, 116:15, 164:6, 165:14, 167:8, 178:21, 178:24
**NO** [1] - 1:3
**nobody** [5] - 120:4, 120:15, 122:2, 174:15, 175:13
**non** [6] - 15:4, 15:6, 68:23, 137:14, 138:13, 159:2
**non-executive** [2] - 137:14, 138:13
**non-exempt** [2] - 15:4, 15:6
**non-moving** [2] - 68:23, 159:2
**nondiscriminatory** [1] - 165:25
**none** [9] - 67:11, 74:9, 74:23, 83:9, 94:12, 104:21, 104:24, 107:25, 150:4
**nonjury** [1] - 126:19
**normal** [2] - 125:12, 127:8
**North** [2] - 32:5, 126:18
**Northern** [1] - 88:23
**Norton** [2] - 99:7, 100:20
**Norton's** [2] - 99:10, 99:13
**note** [10] - 74:8, 84:2, 88:17, 107:13, 108:6, 165:6, 168:1, 170:21, 171:1, 171:7
**noted** [14] - 75:3, 76:19, 83:10, 83:14, 83:15, 105:5, 158:22, 159:17, 160:1, 160:10, 161:7, 161:12, 163:2, 163:10
**notes** [7] - 67:21, 111:23, 111:24, 134:9, 158:9, 165:4, 179:6
**Nothing** [1] - 171:18
**nothing** [22] - 41:10, 60:12, 64:6, 64:7, 74:19, 79:19, 106:24, 114:9, 117:13, 129:9, 135:9, 136:25, 154:6, 156:16, 163:18, 163:23, 163:24, 173:7, 173:24, 175:19, 175:20
**notice** [6] - 84:15, 119:7, 160:14, 169:2, 172:18, 173:5
**notion** [4] - 75:18, 79:1, 153:22, 155:1
**November** [4] - 20:5, 24:7, 77:2, 114:13
**nullify** [1] - 147:11
**Number** [1] - 8:8
**number** [24] - 21:1, 21:9, 50:9, 53:2, 53:5, 53:8, 53:23, 54:3, 54:12, 54:13, 90:6, 92:19, 124:6, 135:3, 157:20, 165:7, 165:11, 165:18, 166:21, 166:25, 167:4, 167:5, 167:8
**numbers** [2] - 53:3, 54:4
**numeral** [1] - 8:6

**O**

**o'clock** [1] - 67:4
**oak** [1] - 59:5
**object** [1] - 177:3
**objected** [1] - 165:11
**objection** [11] - 17:20, 17:22, 18:17, 18:22, 53:8, 53:10, 64:9, 107:6, 178:2, 178:7, 178:9
**objections** [1] - 5:21
**objectively** [3] - 169:15, 169:25, 170:10
**obtaining** [1] - 55:17
**obviously** [3] - 69:14, 104:18, 117:17
**occupational** [5] - 20:8, 22:11, 24:1, 24:5, 93:5
**occur** [6] - 81:2, 84:13, 169:1, 172:11, 173:5, 173:8
**occurred** [4] - 83:9, 83:11, 106:13, 118:5
**occurring** [1] - 94:16
**occurs** [3] - 30:10, 172:12, 172:17
**October** [15] - 19:20, 34:22, 36:8, 47:6, 73:2, 73:14, 76:25, 77:1, 80:19, 84:25, 111:17, 112:1, 112:3, 118:8
**oddly** [1] - 138:24
**oddly-worded** [1] - 138:24
**OF** [4] - 1:1, 3:3, 179:2, 179:4
**OFCCP** [1] - 59:6
**offense** [5] - 142:9, 142:16, 162:1, 162:24, 175:16
**offer** [11] - 9:5, 44:17, 47:9, 49:2, 76:6, 76:8, 76:9, 76:11, 76:14, 76:19, 134:17
**offered** [12] - 9:17, 9:19, 11:6, 17:19, 17:21, 47:13, 53:8, 68:10, 123:19, 150:12, 173:24
**office** [3] - 36:20, 58:20, 111:23
**Officer** [5] - 9:18, 9:22, 10:2, 10:13, 11:7
**OFK** [2] - 60:3, 138:6
**often** [2] - 44:21, 46:3
**old** [3] - 85:14, 104:20, 153:20
**omission** [1] - 55:1
**omit** [1] - 158:15
**ON** [1] - 3:3
**once** [5] - 85:18, 107:4, 121:6, 178:1, 178:16
**one** [66] - 25:23, 27:20, 30:5, 38:13, 44:8, 49:2, 51:18, 58:2, 58:17, 59:25, 62:6, 74:22, 75:3, 75:12, 77:7, 78:2,

82:4, 84:5, 84:6, 84:7, 90:10, 90:11, 103:20, 106:13, 107:14, 111:22, 114:16, 114:20, 116:12, 118:20, 120:11, 122:19, 125:11, 127:25, 129:16, 130:8, 135:1, 135:3, 136:10, 137:18, 138:3, 141:6, 145:12, 148:13, 148:16, 152:13, 152:14, 156:25, 157:22, 157:24, 158:25, 159:20, 159:25, 164:8, 165:8, 168:20, 168:21, 170:2, 172:6, 172:14, 173:11, 176:14, 177:3, 177:6, 177:10, 178:11
**ones** [2] - 35:8, 170:14
**open** [8] - 13:17, 15:19, 47:11, 47:12, 47:24, 120:12, 127:18, 153:3
**opened** [1] - 72:4
**opening** [4] - 47:9, 47:17, 47:18, 48:17
**operate** [1] - 170:21
**operates** [2] - 45:13, 45:17
**operational** [4] - 7:12, 7:14, 117:20, 128:14
**operations** [11] - 7:16, 7:19, 28:12, 40:3, 68:18, 110:13, 113:17, 113:18, 176:2, 176:7, 176:8
**operative** [1] - 136:8
**opinion** [14] - 66:15, 79:19, 81:18, 83:14, 86:10, 88:3, 88:4, 88:16, 99:10, 100:14, 115:14, 160:4, 160:9, 160:16
**opinions** [1] - 61:4
**opportunities** [3] - 87:24, 97:24, 168:14
**opportunity** [10] - 21:19, 22:7, 22:18, 22:19, 47:4, 48:11, 48:12, 49:2, 65:14, 157:3
**opposed** [1] - 102:13
**opposing** [2] - 160:14, 160:21
**opposition** [1] - 135:8
**ops,and** [1] - 15:16
**option** [5] - 90:10, 90:11, 90:12, 134:23
**options** [5] - 45:8, 47:22, 47:24, 55:19, 127:18
**order** [6] - 79:13, 85:12, 127:24, 154:21, 154:22, 162:10
**Order** [4] - 79:21, 84:2, 85:20, 154:17
**org** [1] - 38:24
**organization** [14] - 30:12, 46:10, 46:12, 46:16, 46:24, 77:17, 78:25, 79:2, 92:22, 103:25, 104:8, 105:13, 105:16, 105:25
**Organization** [1] - 27:5
**organizational** [2] - 46:19, 46:22
**origin** [56] - 68:20, 70:8, 87:5, 87:7, 87:12, 87:14, 87:16, 90:24, 91:13, 91:21, 91:24, 92:4, 92:7, 94:19, 105:4, 109:16, 109:20, 110:1, 110:4, 110:8, 110:16, 110:21, 110:23, 118:17, 119:4, 119:8, 119:13, 119:17, 120:24, 121:4, 129:21, 141:23, 145:8, 145:12, 145:13, 161:6, 161:13, 161:20, 161:22, 161:25, 163:9, 163:12, 163:15, 166:6, 166:10, 168:16, 173:13, 173:15, 173:16, 173:25, 175:3, 175:15, 176:14, 176:18, 176:21, 177:8
**originally** [1] - 115:8
**ostracized** [1] - 126:12
**otherwise** [2] - 78:20, 176:20
**ought** [1] - 115:22
**outcome** [2] - 65:4, 69:23
**outcomes** [1] - 169:15
**outlet** [1] - 29:1
**outset** [1] - 156:12
**outside** [11] - 4:2, 5:19, 40:8, 49:21, 61:8, 67:16, 93:22, 94:10, 104:14, 106:12, 167:10
**overall** [2] - 50:2, 50:3
**overarching** [1] - 30:25
**overlap** [1] - 145:8
**overlooked** [1] - 162:19
**overnight** [1] - 64:22
**overrode** [1] - 124:5
**oversaw** [1] - 12:18
**overview** [2] - 45:8, 45:12
**own** [7] - 29:6, 37:14, 117:18, 125:1, 130:8, 137:23, 144:15
**owns** [1] - 29:4

**P**

**p.m** [1] - 179:1
**package** [1] - 45:22
**Padilla** [1] - 143:3
**page** [65] - 6:13, 6:19, 8:12, 9:25, 15:2, 16:14, 17:1, 17:25, 18:14, 19:3, 19:21, 19:25, 20:18, 23:10, 24:18, 24:23, 25:16, 25:20, 26:15, 40:13, 41:14, 46:8, 47:2, 47:15, 48:18, 49:12, 50:8, 50:11, 52:18, 54:16, 54:21, 57:5, 58:25, 59:10, 59:12, 62:18, 86:4, 90:6, 90:8, 141:13, 151:11, 164:8, 164:10, 164:11, 164:13, 164:16, 165:4, 165:7, 165:14, 165:22, 166:1, 166:5, 166:8, 166:16, 166:19, 167:2, 167:3, 167:7, 167:9, 167:12, 168:2, 168:22, 172:6, 174:4
**pages** [2] - 141:9, 175:9
**paid** [3] - 14:8, 40:23, 116:12
**paint** [2] - 12:23, 13:19
**paragraph** [3] - 140:14, 155:5, 175:22
**parent** [11] - 45:7, 143:6, 143:13, 143:19, 147:1, 147:8, 152:23, 153:1, 153:16, 155:22, 161:9
**parent's** [1] - 147:11
**parents** [1] - 153:6
**part** [21] - 9:1, 26:5, 32:5, 32:24, 41:25, 44:25, 45:8, 53:16, 105:15, 123:3, 124:13, 124:18, 128:11, 129:8, 130:3, 140:16, 140:20, 143:16, 155:6, 165:11, 176:6
**part-time** [1] - 45:8
**participate** [1] - 43:5
**participated** [1] - 43:10
**particular** [3] - 92:23, 150:9, 160:24
**particularly** [1] - 87:9
**parties** [3] - 4:6, 58:1, 66:9
**partner** [2] - 26:25, 37:23
**partners** [2] - 49:6, 151:17
**parts** [3] - 154:10, 154:11, 154:12
**party** [11] - 5:20, 68:23, 70:6, 99:24, 142:3, 142:5, 149:4, 159:2, 160:11, 160:14, 173:23
**party's** [2] - 149:10, 160:21
**passed** [1] - 152:20
**past** [3] - 49:7, 53:17, 151:19
**patently** [2] - 123:4, 123:18
**patience** [1] - 62:13
**Paul** [1] - 90:16
**pay** [10] - 14:7, 32:24, 40:25, 71:15, 74:11, 85:4, 99:1, 116:21, 117:12, 132:7
**paying** [1] - 97:23
**payment** [2] - 57:21, 57:22
**payments** [1] - 40:18
**payroll** [2] - 40:21, 40:22
**pen** [1] - 172:3
**people** [29] - 24:2, 30:9, 31:10, 35:19, 39:5, 39:14, 43:16, 43:24, 45:3, 74:20, 76:14, 93:6, 113:1, 113:2, 114:5, 117:15, 117:21, 120:20, 123:7, 123:15, 125:15, 135:18, 139:21, 139:22, 139:23, 141:20, 149:21, 177:5
**perceived** [1] - 103:11
**perform** [1] - 126:12
**performance** [6] - 8:11, 30:7, 37:21, 58:22, 58:23, 59:25
**perhaps** [5] - 62:15, 113:25, 146:15, 169:24, 170:9
**period** [2] - 22:8, 151:18
**permanent** [2] - 14:17, 15:1
**permissible** [2] - 161:24, 163:13
**permit** [2] - 68:19, 110:14
**permits** [3] - 68:16, 110:10, 161:14
**permitted** [2] - 175:25, 176:4
**permitting** [2] - 147:9, 147:10
**person** [19] - 79:24, 85:1, 90:15, 98:14, 106:7, 113:24, 118:20, 119:23, 123:17, 132:4, 139:15, 144:17, 149:25, 150:1, 150:19, 173:15, 173:16, 173:25, 175:20
**personal** [20] - 11:4, 11:11, 11:14, 41:8, 57:19, 57:20, 57:23, 74:13, 74:16, 74:24, 75:8, 75:9, 85:2, 109:13, 116:8, 117:8, 133:1, 159:10, 159:15
**personally** [1] - 59:5
**personnel** [8] - 50:21, 50:25, 59:14, 68:25, 78:24, 106:2, 106:5, 130:13
**persons** [1] - 165:5
**perspective** [3] - 87:12, 105:10, 106:10
**persuading** [1] - 161:18
**persuasive** [1] -

160:7
**pertained** [2] - 39:4, 39:13
**Petrasch** [36] - 47:7, 48:6, 72:5, 72:16, 73:1, 73:12, 75:14, 76:9, 76:24, 77:1, 77:3, 77:12, 86:7, 89:24, 108:1, 111:14, 111:18, 112:7, 112:9, 113:4, 113:19, 115:2, 115:5, 117:11, 121:20, 122:7, 122:20, 122:24, 122:25, 130:14, 131:9, 132:16, 134:14, 136:22, 138:2, 150:13
**Petrasch's** [2] - 80:23, 119:6
**PG** [12] - 10:18, 10:19, 59:15, 59:18, 59:23, 132:2, 132:5
**PGs** [1] - 59:21
**phoned** [1] - 22:17
**phonetic)** [1] - 36:18
**phrase** [3] - 131:13, 170:9, 177:9
**physical** [3] - 100:24, 101:2, 126:21
**physicals** [1] - 101:11
**picked** [1] - 111:13
**pitted** [1] - 177:10
**place** [7] - 42:7, 74:14, 117:17, 117:19, 162:10, 166:10, 173:16
**places** [2] - 43:24, 132:16
**placing** [1] - 139:17
**PLAINTIFF** [2] - 1:4, 1:17
**plaintiff** [31] - 9:11, 62:24, 80:11, 81:21, 82:20, 85:7, 85:17, 85:21, 95:13, 98:22, 99:7, 100:6, 102:15, 105:6, 107:18, 119:1, 125:23, 126:10, 126:11, 126:19, 128:25, 142:6, 143:17, 143:18, 144:2, 161:2, 169:24, 170:9, 172:13, 174:7, 174:21
**Plaintiff** [20] - 60:23, 64:5, 65:8, 68:23, 69:9, 70:23, 71:7, 72:1, 104:18, 107:15, 134:20, 140:9, 143:8, 144:14, 147:15, 148:21, 154:25, 159:2, 166:13, 170:18
**Plaintiff's** [33] - 9:12, 17:18, 17:19, 52:20, 53:7, 53:9, 63:3, 67:24, 87:1, 87:25, 89:3, 89:5, 101:20, 101:24, 118:10, 120:18, 122:18, 122:23, 124:6, 137:17, 140:15, 141:7, 159:19, 162:22, 162:25, 165:10, 165:16, 165:18, 165:23, 166:2, 166:12, 167:1
**plaintiff's** [3] - 95:25, 99:19, 102:19
**PLAINTIFF'S** [1] - 3:11
**plaintiffs** [1] - 81:10
**plan** [12] - 72:12, 78:8, 92:10, 92:13, 93:14, 94:1, 94:2, 94:6, 94:9, 97:25, 104:15, 151:8
**planned** [1] - 79:23
**Planning** [8] - 32:7, 32:17, 33:10, 33:16, 34:3, 35:6, 35:18, 93:8
**planning** [8] - 30:9, 32:19, 32:21, 37:21, 93:20, 120:8, 122:3
**plans** [3] - 61:17, 93:25, 106:13
**plant** [24] - 12:20, 23:18, 23:19, 32:9, 32:15, 34:24, 36:22, 42:15, 42:18, 42:20, 44:2, 44:5, 44:7, 44:8, 45:10, 82:12, 82:13, 92:25, 93:6, 115:25, 116:14, 128:12, 128:13, 129:22
**Plant** [15] - 32:12, 32:18, 32:19, 33:13, 34:3, 34:10, 34:11, 34:22, 34:24, 35:7, 35:11, 35:19, 36:2, 42:18
**plants** [5] - 16:8, 16:21, 33:1, 42:2, 42:4
**platter** [1] - 123:19
**play** [2] - 135:18, 146:19
**plead** [2] - 144:1, 148:24
**pleading** [3] - 136:4, 136:13, 160:12
**pleadings** [12] - 148:25, 149:3, 151:24, 154:3, 154:17, 156:13, 157:24, 161:3, 162:7, 162:11, 162:13, 162:16
**pleasant** [1] - 66:21
**pled** [4] - 162:1, 162:3, 162:4, 162:5
**plus** [1] - 150:11
**point** [32] - 21:21, 33:15, 73:2, 75:12, 78:4, 80:24, 88:2, 93:11, 93:17, 111:16, 114:20, 116:11, 120:9, 125:2, 127:17, 131:4, 131:17, 134:5, 134:22, 134:25, 135:3, 139:17, 142:22, 144:12, 148:13, 152:14, 155:17, 164:7, 168:19, 171:22, 176:15, 177:3
**pointed** [7] - 81:17, 106:17, 107:25, 116:15, 122:7, 139:9, 155:5
**points** [2] - 130:22, 177:16
**police** [3] - 51:16, 71:10, 112:15
**policies** [4] - 55:12, 87:20, 117:18, 129:20
**policy** [17] - 74:14, 74:22, 90:3, 90:20, 91:20, 105:7, 114:2, 117:17, 118:24, 129:20, 130:7, 130:8, 130:9, 132:25, 134:15, 137:23, 168:11
**popular** [1] - 123:3
**Portfolio** [1] - 3:13
**portfolio** [1] - 113:11
**portfolios** [1] - 113:7
**PORTIONS** [1] - 3:3
**position** [123] - 7:23, 9:17, 10:3, 10:10, 11:23, 12:5, 19:4, 19:13, 20:24, 21:14, 21:16, 22:16, 26:19, 26:22, 27:8, 28:19, 29:3, 29:7, 29:10, 29:15, 29:24, 30:3, 30:4, 31:13, 32:7, 33:2, 33:8, 33:19, 34:20, 34:21, 35:2, 35:16, 36:9, 46:11, 47:3, 47:10, 47:11, 48:9, 48:22, 49:20, 60:3, 66:24, 70:12, 71:13, 71:25, 72:20, 73:4, 73:5, 73:7, 73:16, 73:17, 73:18, 74:2, 74:18, 75:10, 75:13, 75:16, 75:17, 75:19, 75:20, 76:5, 76:23, 77:16, 77:17, 77:21, 78:3, 78:5, 78:9, 79:4, 79:11, 79:23, 80:1, 80:16, 81:1, 81:11, 84:17, 86:19, 86:21, 86:25, 87:25, 91:6, 91:16, 93:16, 94:15, 94:17, 95:6, 97:14, 101:20, 103:22, 104:15, 104:19, 105:2, 105:23, 109:19, 112:4, 112:10, 114:25, 116:6, 116:8, 121:21, 123:22, 125:16, 135:10, 136:16, 138:13, 139:7, 139:14, 139:15, 139:23, 144:16, 144:18, 149:18, 150:2, 150:23, 154:7, 154:9, 154:14, 174:7, 174:22, 175:1
**positions** [28] - 7:10, 13:17, 13:24, 15:15, 15:18, 15:19, 20:15, 24:14, 24:15, 27:16, 27:18, 47:10, 49:3, 49:9, 68:18, 81:9, 110:12, 114:8, 114:21, 114:23, 122:11, 123:8, 123:16, 132:10, 147:12, 149:19, 176:1, 176:7
**positive** [3] - 13:13, 13:15
**Posner** [1] - 147:18
**possibility** [3] - 17:9, 94:10, 154:20
**possible** [2] - 47:17, 47:18
**possibly** [3] - 70:14, 75:19, 154:13
**post** [1] - 99:8
**post-trial** [1] - 99:8
**poster** [2] - 133:23, 134:1
**posters** [1] - 129:22
**posture** [1] - 148:20
**potential** [9] - 10:16, 81:3, 83:8, 83:9, 93:24, 111:21, 111:25, 112:3, 132:14
**potentially** [10] - 73:6, 74:16, 80:25, 81:6, 82:10, 93:21, 93:22, 94:9, 111:15
**pounding** [1] - 124:24
**poured** [1] - 67:5
**pouring** [1] - 149:7
**power** [1] - 30:15
**Power** [1] - 27:9
**PowerPoint** [7] - 77:5, 77:13, 78:10, 89:9, 89:11, 114:13, 114:14
**practical** [2] - 26:7, 52:7
**Practice** [1] - 160:23
**practice** [5] - 40:6, 44:16, 92:1, 168:12, 169:11
**practices** [2] - 42:5, 46:13
**prayer** [2] - 81:24, 115:12
**predisposition** [1] - 69:23
**preferable** [1] - 71:18
**preference** [5] - 91:5, 91:11, 91:15, 174:10, 174:23
**preferred** [1] - 174:24
**prejudice** [1] - 69:20
**prejudiced** [1] - 154:15
**prejudicial** [3] - 153:19, 154:25, 157:5
**premised** [2] - 89:3, 114:9
**preparation** [3] - 53:16, 54:23, 55:6
**preparations** [1] - 42:13
**prepare** [3] - 27:21, 76:8, 76:9
**prepared** [10] - 76:12, 76:14, 76:15, 76:19, 86:6, 89:8, 89:9, 127:6, 160:16, 178:23
**prepares** [1] - 59:7
**preparing** [1] - 73:22

**presence** [6] - 4:3, 4:18, 5:19, 61:9, 64:16, 67:17
**present** [5] - 6:1, 6:8, 18:24, 71:21, 98:2
**presented** [13] - 5:17, 22:7, 22:9, 22:18, 68:22, 92:17, 95:8, 97:5, 105:13, 105:14, 106:16, 108:3, 121:14
**presenting** [1] - 65:8
**preserve** [5] - 18:10, 18:12, 18:16, 168:21, 171:4
**President** [10] - 14:14, 22:17, 33:25, 48:21, 72:7, 84:23, 86:2, 104:4, 104:21, 129:19
**Presidents** [2] - 43:6, 43:13
**pressed** [1] - 130:1
**pretty** [3] - 20:10, 92:9, 115:22
**prevent** [3] - 132:19, 152:5, 153:11
**previous** [2] - 61:3, 66:5
**previously** [6] - 69:4, 87:9, 158:20, 158:23, 159:17, 163:2
**Price** [3] - 95:22, 99:12, 99:15
**prima** [3] - 160:21, 161:22, 163:11
**primary** [1] - 75:4
**Prince** [1] - 125:8
**principles** [3] - 99:18, 100:4, 140:17
**Principles** [1] - 155:7
**private** [3] - 41:8, 52:10, 118:20
**privilege** [1] - 77:22
**privileges** [1] - 92:3
**problem** [3] - 13:11, 104:7, 139:16
**problem-solving** [1] - 13:11
**problems** [5] - 23:21, 23:23, 30:18, 42:3, 101:2
**procedural** [1] - 148:20
**Procedure** [4] - 67:23, 70:3, 158:19, 160:11
**proceed** [4] - 4:22, 46:16, 61:2, 65:16
**proceedings** [1] - 140:21
**process** [2] - 16:7, 93:20
**produced** [2] - 121:10, 141:18
**production** [19] - 13:18, 32:21, 32:25, 38:24, 41:25, 42:14, 43:21, 44:25, 45:4, 45:9, 45:13, 45:17, 49:5, 57:15, 57:17, 72:22, 82:2, 151:16
**production-network** [1] - 43:21
**professional** [1] - 28:5
**professor** [1] - 84:5
**professors** [1] - 169:14
**program** [6] - 7:16, 7:17, 7:20, 15:17, 52:2, 52:13
**programs** [5] - 7:12, 7:13, 7:15, 7:24, 55:12
**prohibit** [2] - 109:22, 143:23
**prohibiting** [1] - 87:21
**prohibition** [2] - 167:10, 177:23
**prohibits** [2] - 109:25, 161:12
**project** [8] - 21:20, 22:3, 22:5, 47:8, 47:9, 48:17, 72:4
**projects** [6] - 21:15, 21:21, 21:22, 21:23, 22:4, 23:3
**promoted** [5] - 75:7, 75:16, 75:21, 117:4, 124:3
**promoting** [1] - 123:24
**promotion** [6] - 17:10, 28:21, 75:3, 98:23, 98:25, 99:2
**promptly** [1] - 157:16
**pronounced** [1] - 32:10
**proof** [8] - 70:11, 103:9, 135:15, 135:16, 142:3, 142:5, 164:10, 164:23
**proper** [1] - 173:3
**properly** [2] - 142:19, 160:16
**propose** [3] - 169:21, 172:22, 172:24
**proposed** [6] - 90:15, 103:25, 156:1, 156:2, 167:15, 173:11
**prosecutor** [1] - 52:9
**prospects** [1] - 80:17
**protect** [1] - 115:6
**protected** [8] - 102:19, 109:16, 129:2, 130:1, 143:9, 147:2, 152:7, 152:24
**protection** [1] - 144:11
**protections** [2] - 146:9, 147:23
**protects** [1] - 145:10
**prove** [8] - 70:23, 86:24, 135:17, 136:11, 141:17, 141:23, 142:7, 161:16
**proven** [1] - 110:22
**provide** [2] - 23:11, 178:18
**provided** [9] - 41:6, 41:7, 62:5, 73:4, 89:10, 100:23, 130:10, 137:4, 173:2
**provider** [1] - 23:17
**providers** [3] - 13:25, 14:8, 24:5
**provides** [4] - 91:25, 169:2, 172:18, 173:5
**providing** [3] - 4:9, 61:22, 65:18
**provisions** [3] - 69:3, 158:18, 163:1
**proxy** [2] - 43:7, 43:11
**public** [1] - 51:15
**published** [1] - 125:20
**pull** [1] - 47:8
**pulled** [1] - 128:18
**pulling** [1] - 48:17
**punitive** [26] - 101:24, 101:25, 102:5, 102:7, 102:10, 102:20, 103:3, 104:22, 105:9, 106:14, 108:8, 108:9, 108:17, 123:11, 128:22, 128:24, 129:6, 130:4, 130:5, 130:16, 131:7, 133:18, 167:7, 171:9, 171:11, 171:17
**punitives** [1] - 134:4
**purchasing** [8] - 20:25, 21:1, 21:9, 21:12, 21:18, 21:23, 22:23
**purple** [1] - 146:18
**purpose** [1] - 95:12
**purposes** [3] - 114:17, 168:4, 170:14
**purposing** [1] - 21:8
**pursuant** [1] - 67:22
**pursued** [2] - 102:14, 154:2
**pushing** [2] - 104:11, 105:18
**put** [20] - 52:24, 53:1, 53:4, 66:24, 72:14, 74:14, 78:9, 89:11, 108:16, 113:6, 123:14, 123:15, 128:19, 132:5, 138:7, 144:2, 146:3, 156:2, 157:7, 166:10
**puts** [1] - 142:4
**putting** [2] - 118:15, 178:14

## Q

**qualifications** [1] - 139:7
**qualified** [1] - 92:25
**quality** [1] - 38:12
**quarterly** [4] - 42:12, 42:21, 42:22, 43:1
**questioned** [1] - 116:18
**questioning** [2] - 111:12, 112:13
**questions** [7] - 4:8, 5:20, 27:1, 68:24, 138:24, 150:24, 176:15
**quibbled** [2] - 120:4, 120:15
**quickly** [3] - 122:17, 129:14, 133:17
**quintessential** [1] - 125:14
**quit** [2] - 78:7, 82:25
**quite** [2] - 49:3, 151:14
**quote** [25] - 71:7, 71:9, 91:11, 102:17, 102:20, 102:22, 102:24, 103:13, 111:15, 115:14, 115:15, 115:16, 115:17, 125:24, 125:25, 126:1, 126:2, 126:20, 131:9, 134:11, 135:8, 165:16, 165:23
**quotes** [3] - 112:23, 123:13, 133:3

## R

**race** [15] - 67:24, 68:2, 68:20, 70:9, 87:3, 94:22, 109:18, 110:15, 119:8, 122:15, 140:1, 166:17, 166:19, 166:22, 168:15
**raise** [8] - 70:19, 99:1, 135:4, 137:25, 156:20, 157:18, 174:1, 174:2
**raised** [27] - 130:17, 137:9, 139:11, 140:20, 142:20, 142:22, 147:5, 153:24, 153:25, 154:1, 155:15, 155:23, 156:12, 156:14, 156:18, 157:16, 157:17, 158:14, 159:3, 160:15, 162:4, 163:4, 175:9, 176:5, 177:16
**raises** [1] - 143:6
**raising** [2] - 154:18, 156:22
**ramp** [3] - 42:18, 44:4, 92:24
**ramp-up** [3] - 42:18, 44:4, 92:24
**ramping** [1] - 26:24
**RANDLE** [1] - 2:2
**Randy** [1] - 151:10
**range** [1] - 80:17
**rank** [1] - 71:15
**rash** [1] - 163:25
**rather** [5] - 80:8, 94:23, 103:24, 142:5, 169:4
**rationale** [2] - 124:1, 150:17
**rationales** [1] - 123:25
**reach** [6] - 42:23, 42:24, 43:22, 43:23, 43:24, 123:17
**READ** [1] - 3:3
**read** [28] - 4:7, 5:22, 6:2, 14:22, 24:8, 24:9, 29:1, 39:9, 40:13, 40:14, 54:8, 62:23, 62:24, 82:19, 112:23, 115:10, 116:4, 118:17, 118:23, 125:22, 151:11, 167:16, 168:7, 170:2, 170:5, 170:23, 175:13
**reading** [10] - 18:7,

25:4, 25:11, 60:9, 110:23, 115:13, 138:24, 139:1, 151:12, 151:23
**readings** [1] - 5:8
**ready** [1] - 4:22
**real** [1] - 151:1
**realities** [1] - 125:16
**reality** [1] - 83:10
**realized** [1] - 155:19
**really** [16] - 9:1, 38:18, 78:1, 84:11, 93:24, 94:25, 109:24, 119:25, 120:4, 120:17, 123:3, 126:9, 140:21, 150:11, 156:9, 173:9
**reargue** [1] - 175:17
**reason** [6] - 122:19, 133:18, 136:15, 141:14, 175:11
**reasonable** [6] - 70:6, 70:13, 86:23, 91:18, 99:25, 158:25
**reasoning** [1] - 147:18
**reasons** [10] - 40:19, 68:24, 92:20, 98:24, 100:22, 121:1, 121:2, 140:9, 159:16, 171:7
**receive** [3] - 8:11, 66:16, 132:7
**received** [4] - 9:6, 76:20, 96:4, 165:2
**receiving** [1] - 127:21
**recent** [1] - 81:18
**recess** [4] - 62:10, 109:6, 158:12, 167:20
**reckless** [4] - 102:18, 129:1, 129:10, 129:25
**recklessly** [1] - 133:21
**recognize** [4] - 17:14, 53:14, 53:15, 53:16
**recognized** [1] - 126:21
**RECORD** [1] - 3:3
**record** [30] - 4:4, 8:6, 9:8, 17:17, 18:9, 18:12, 60:16, 60:22, 62:11, 62:19, 62:22, 69:17, 75:5, 89:6, 104:13, 108:16, 109:3, 109:5, 111:11, 112:2, 113:21, 119:11, 132:13, 133:6, 145:3, 151:9, 158:13, 168:5, 170:14, 171:1
**recover** [2] - 101:25, 103:2
**recovery** [1] - 13:9
**recruit** [1] - 92:24
**recruited** [1] - 7:14
**recruiter** [3] - 96:20, 97:23, 127:12
**recruiting** [17] - 15:4, 15:6, 15:14, 16:24, 20:1, 22:12, 24:12, 24:13, 24:20, 24:22, 26:23, 26:25, 37:22, 73:7, 93:2, 93:11, 97:14
**Recruiting** [1] - 19:6
**red** [5] - 13:7, 93:13, 93:15, 146:13, 146:14
**reduced** [1] - 74:12
**reduction** [1] - 117:8
**reductions** [1] - 117:11
**refer** [2] - 15:18, 36:14
**reference** [3] - 52:19, 94:24, 105:3
**references** [1] - 176:19
**referred** [4] - 82:21, 82:22, 82:25, 91:11
**referring** [3] - 53:3, 111:13, 112:11
**refers** [1] - 173:15
**reflect** [1] - 164:24
**reflects** [1] - 165:21
**regard** [13] - 41:24, 79:10, 87:7, 94:19, 97:9, 99:10, 101:24, 109:13, 131:14, 131:16, 133:8, 145:7, 171:16
**regarding** [5] - 27:1, 32:23, 96:21, 162:10, 163:4
**regardless** [1] - 91:6
**regards** [1] - 39:2
**REGENSBURG** [1] - 34:3
**Regensburg** [12] - 34:6, 34:10, 34:11, 34:22, 34:24, 35:7, 35:11, 35:19, 36:3, 50:9, 50:12, 50:20
**region** [2] - 29:1, 29:6
**Regional** [2] - 124:21, 125:21
**regular** [2] - 81:24, 97:6
**regulation** [1] - 138:21
**regulations** [1] - 55:23
**rehash** [1] - 171:3
**reiterate** [1] - 133:6
**reiterating** [1] - 177:13
**rejoined** [1] - 17:8
**relate** [1] - 52:14
**related** [7] - 21:22, 22:4, 40:3, 52:13, 56:6, 56:7
**relates** [1] - 28:23
**relating** [3] - 28:12, 130:18, 159:23
**relationship** [1] - 160:25
**release** [2] - 64:4, 65:2
**released** [2] - 62:14, 64:8
**relevant** [4] - 55:23, 69:2, 131:22, 159:18
**relied** [5] - 79:20, 84:1, 99:1, 111:8, 116:3
**relies** [2] - 104:18, 114:16
**religion** [1] - 82:17
**relocate** [2] - 79:25, 81:12
**rely** [3] - 79:12, 124:11, 158:15
**relying** [2] - 125:1, 127:23
**remain** [5] - 61:6, 68:24, 105:22, 159:3, 163:3
**remainder** [1] - 105:23
**remained** [1] - 71:16
**remains** [1] - 132:21
**remarks** [1] - 69:22
**remember** [9] - 61:3, 66:5, 113:6, 117:10, 117:25, 118:9, 119:21, 120:7, 128:10
**remind** [1] - 100:13
**reminded** [1] - 140:19
**removal** [2] - 113:1, 114:2
**remove** [5] - 71:24, 118:7, 139:23, 174:6, 174:21
**removed** [4] - 88:12, 88:13, 108:12, 108:18
**renew** [1] - 109:11
**reorganization** [7] - 72:10, 76:13, 76:16, 97:25, 106:13, 111:19, 112:5
**reorganizations** [1] - 46:18
**reorganized** [1] - 76:24
**repeat** [2] - 69:15, 94:23
**replace** [3] - 131:24, 174:8, 174:22
**replaced** [1] - 96:13
**reply** [4] - 5:7, 60:24, 84:3, 151:1
**REPLY** [1] - 3:3
**report** [9] - 7:21, 31:17, 31:19, 31:24, 33:2, 33:12, 38:8, 42:12, 86:1
**reported** [7] - 33:3, 33:9, 35:19, 35:22, 88:6, 102:3, 103:5
**REPORTER** [5] - 2:6, 2:6, 45:15, 101:17, 179:4
**reporter** [8] - 31:5, 50:10, 56:14, 57:10, 58:5, 62:20, 62:22, 134:12
**reporting** [7] - 35:10, 35:11, 38:9, 42:19, 48:25, 55:22, 59:6
**reports** [7] - 35:25, 38:21, 40:19, 40:23, 59:9, 66:13, 84:22
**represent** [1] - 6:16
**representative** [1] - 58:21
**representatives** [2] - 58:3, 58:24
**Republic** [1] - 126:6
**republished** [2] - 18:18, 18:20
**request** [11] - 70:19, 94:23, 148:22, 165:7, 165:11, 166:20, 166:23, 166:24, 167:4, 167:5, 167:8
**REQUESTED** [1] - 179:2
**requested** [2] - 55:7, 85:7
**require** [2] - 79:24, 116:1
**required** [6] - 54:24, 55:7, 81:9, 81:12, 81:24, 124:23
**requirements** [2] - 55:13, 55:22
**requires** [4] - 81:2, 103:9, 150:15, 160:11
**requiring** [1] - 80:2
**requisite** [2] - 103:1, 103:17
**research** [7] - 45:13, 61:5, 66:7, 66:8, 66:11, 159:23, 167:10
**reserved** [1] - 161:8
**resign** [2] - 83:11, 98:7
**resignation** [2] - 11:20, 133:9
**resigned** [10] - 76:18, 77:18, 77:23, 80:9, 86:18, 98:22, 99:3, 101:12, 101:18, 128:13
**resigning** [1] - 99:4
**resolved** [1] - 4:6
**resort** [1] - 100:2
**Resource** [1] - 129:19
**resources** [1] - 50:21
**Resources** [11] - 6:23, 6:25, 8:13, 24:25, 25:1, 51:1, 72:7, 82:8, 93:23, 104:4, 104:21
**respect** [5] - 4:6, 68:9, 92:2, 133:17, 135:1
**respectfully** [1] - 159:5
**respecting** [1] - 71:7
**respective** [3] - 27:18, 38:4, 57:20
**respond** [3] - 171:19, 171:22, 171:23
**responding** [2] - 107:4, 160:12
**response** [3] - 124:16, 171:21, 172:20
**response)** [1] - 6:18
**responses** [2] - 125:13
**responsibilities** [5] - 12:12, 14:6, 16:3, 28:11, 28:20
**responsibility** [18] - 12:4, 30:5, 35:9, 35:14, 35:16, 39:21, 39:24, 40:2, 40:4, 47:1, 76:8, 80:4, 86:5, 118:12, 137:19, 137:20, 137:21, 137:22
**responsible** [12] - 14:15, 24:21, 27:17, 31:16, 37:12, 40:7,

46:11, 73:21, 86:8, 108:14, 122:3, 130:13
**rest** [6] - 65:11, 96:17, 98:12, 101:4, 101:10, 124:10
**restate** [2] - 168:4, 168:17
**restated** [1] - 103:3
**rests** [1] - 5:1
**result** [3] - 64:24, 71:23, 74:12
**resulted** [1] - 123:10
**results** [1] - 158:6
**retail** [1] - 28:25
**retire** [2] - 66:18, 96:11
**retired** [1] - 33:7
**Retirement** [1] - 57:2
**return** [1] - 167:13
**reveal** [1] - 91:2
**reveals** [1] - 89:6
**reversed** [1] - 85:19
**review** [1] - 67:20
**reviews** [1] - 113:7
**revision** [2] - 53:20, 54:18
**revoke** [1] - 117:16
**Ricks** [7] - 83:25, 84:15, 118:5, 169:12, 172:12, 173:4
**rid** [4] - 103:19, 129:5, 129:7, 129:9
**ride** [1] - 157:6
**riding** [1] - 149:6
**right-hand** [1] - 53:3
**Rights** [2] - 99:18, 134:1
**rights** [16] - 102:20, 129:2, 129:11, 130:1, 133:20, 137:6, 143:6, 143:10, 143:14, 143:15, 147:11, 148:7, 153:6, 153:16, 161:9, 168:21
**rigorous** [1] - 138:10
**risk** [3] - 83:20, 103:11, 115:14
**role** [36] - 9:21, 9:22, 9:24, 21:18, 21:20, 22:3, 22:5, 22:9, 22:12, 23:2, 71:12, 72:2, 72:5, 76:7, 78:7, 78:13, 79:2, 80:15, 80:20, 81:16, 85:12, 85:13, 85:14, 85:15, 93:2, 93:4, 93:19, 94:10, 97:17, 103:24, 103:25, 104:16, 105:11, 105:25, 106:8
**roles** [1] - 21:11
**roman** [1] - 8:6
**room** [5] - 65:24, 66:19, 117:10, 155:19, 164:23
**rotation** [1] - 52:13
**rotations** [1] - 52:8
**roughly** [4] - 21:18, 22:1, 22:6, 22:10
**ROZELSKY** [46] - 1:21, 4:12, 5:3, 8:8, 25:10, 61:14, 63:10, 63:25, 64:7, 64:13, 67:11, 68:3, 107:1, 107:8, 107:10, 109:11, 109:23, 110:2, 110:6, 110:18, 110:20, 111:1, 133:12, 141:2, 142:13, 142:15, 144:8, 146:4, 146:10, 146:18, 146:20, 147:19, 147:25, 148:15, 151:1, 151:4, 155:3, 155:9, 155:17, 157:19, 159:9, 162:21, 163:24, 171:15, 176:11, 178:13
**Rozelsky** [8] - 109:9, 120:24, 137:4, 142:14, 149:17, 157:15, 167:25, 177:3
**RPR** [2] - 2:6, 179:12
**rule** [9] - 5:21, 113:2, 121:18, 124:5, 127:22, 127:23, 127:25, 160:13, 162:22
**Rule** [14] - 67:19, 67:22, 69:3, 69:5, 69:11, 70:2, 128:4, 158:18, 160:10, 162:2, 163:2, 171:8, 171:9
**ruled** [4] - 79:14, 80:13, 142:25, 159:15
**rules** [5] - 55:23, 105:6, 105:7, 124:6, 142:21
**Rules** [4] - 67:23, 70:3, 158:19, 160:11
**ruling** [15] - 67:20, 69:7, 83:4, 98:20, 109:18, 110:7, 137:15, 154:16, 158:10, 158:17, 159:18, 161:8, 170:25, 171:12, 173:21
**run** [5] - 13:20, 13:21, 42:2, 44:10, 79:9
**runaway** [1] - 117:18
**running** [4] - 59:9, 82:3, 96:14, 156:15
**Rutgers** [1] - 62:23
**Ryan** [2] - 7:22, 7:23

**S**

**s/Debra** [1] - 179:12
**safe** [2] - 61:21, 66:21
**safety** [7] - 20:8, 22:11, 23:19, 23:20, 23:22, 93:5
**salary** [6] - 14:16, 30:9, 37:21, 40:10, 40:23, 80:17
**saltine** [1] - 65:20
**satisfy** [1] - 135:16
**savings** [1] - 55:19
**saw** [5] - 97:4, 98:12, 104:25, 114:25, 124:6
**sayeth** [1] - 63:24
**SC** [5] - 1:3, 1:18, 1:22, 2:5, 2:7
**scenario** [1] - 155:22
**scenarios** [1] - 46:14
**schedule** [1] - 71:19
**scheduled** [2] - 76:17, 81:25
**scheduling** [3] - 154:21, 154:22, 162:10
**school** [3] - 25:24, 26:13, 51:11
**Schools** [1] - 88:25
**scope** [2] - 14:9, 170:23
**Scott** [4] - 15:24, 47:8, 47:9, 85:1
**scrupulously** [2] - 96:1, 99:22
**search** [7] - 97:1, 97:7, 97:9, 131:11, 131:16, 131:17, 173:18
**searches** [1] - 128:1
**searching** [3] - 131:17, 131:19, 134:9
**seas** [1] - 150:22
**seat** [1] - 5:14
**Second** [1] - 160:23
**second** [17] - 7:2, 14:18, 33:6, 54:7, 79:6, 87:17, 102:15, 106:5, 107:17, 133:14, 136:15, 141:11, 168:10, 170:15, 172:10, 175:22, 176:6
**Section** [9] - 70:10, 70:22, 71:1, 87:2, 87:12, 87:14, 88:9, 91:24, 149:16
**section** [6] - 21:11, 28:19, 28:22, 102:8, 113:8, 168:10
**Security** [2] - 57:2, 85:8
**see** [17] - 16:11, 28:17, 28:25, 54:4, 54:5, 54:13, 54:14, 59:7, 67:12, 90:13, 120:5, 124:25, 125:4, 127:20, 137:17, 140:25, 173:19
**seeing** [1] - 178:20
**seek** [5] - 82:14, 97:23, 123:5, 128:21, 162:13
**seeking** [3] - 95:5, 106:11, 161:16
**seeks** [3] - 88:11, 101:25, 129:7
**segregate** [2] - 90:23, 91:20
**segregating** [1] - 87:21
**self** [2] - 135:23, 167:16
**self-defense** [1] - 135:23
**self-explanatory** [1] - 167:16
**send** [6] - 121:5, 126:2, 126:15, 139:21, 150:20, 150:21
**sending** [1] - 156:1
**sends** [1] - 135:5
**senior** [4] - 89:17, 89:19, 89:20, 121:14
**sense** [2] - 17:11, 100:21
**sent** [1] - 96:25
**sentence** [19] - 168:2, 168:3, 168:7, 168:23, 169:6, 169:7, 169:11, 169:17, 169:21, 170:15, 170:20, 170:22, 172:6, 172:7, 172:8, 172:9, 172:10, 173:12, 174:20
**separate** [4] - 59:24, 149:3, 152:2, 168:18
**September** [14] - 47:6, 47:18, 47:25, 72:5, 72:11, 96:23, 96:24, 97:8, 97:10, 97:12, 97:19, 112:3, 115:3
**sergeant** [1] - 71:11
**serious** [1] - 126:11
**service** [9] - 12:7, 12:8, 20:7, 22:12, 23:16, 23:17, 23:18, 26:7, 127:15
**Services** [1] - 126:6
**serving** [1] - 55:17
**set** [11] - 94:11, 112:22, 131:6, 136:10, 136:11, 136:12, 136:13, 143:16, 153:11, 159:17, 178:1
**set-aside** [1] - 131:6
**setting** [1] - 84:5
**seven** [10] - 34:2, 35:21, 35:24, 35:25, 93:18, 151:11, 156:4, 165:4, 165:7, 167:4
**Seventh** [2] - 142:17, 147:4
**several** [3] - 68:1, 68:4, 114:5
**severely** [1] - 154:15
**Sewon** [1] - 88:5
**sex** [14] - 67:25, 68:2, 68:19, 70:10, 71:14, 87:3, 94:22, 109:18, 110:15, 124:8, 140:2, 166:16, 166:22, 168:15
**shall** [1] - 91:25
**shape** [1] - 115:23
**share** [5] - 33:1, 40:6, 41:23, 42:7, 46:24
**shares** [3] - 41:17, 41:19, 44:16
**sharing** [1] - 40:6
**sheet** [5] - 53:25, 54:18, 73:16, 80:21, 84:19
**sheets** [1] - 132:12
**Sherrill** [1] - 96:19
**Sherry** [8] - 9:17, 14:15, 23:5, 43:7, 43:8, 43:11, 46:15, 97:11
**shift** [7] - 32:20, 32:23, 42:17, 58:20, 128:23, 149:15
**shifts** [1] - 42:15
**shock** [2] - 96:9, 127:1
**Shoji** [1] - 142:24

**shoot** [1] - 135:22
**shop** [5] - 12:23, 12:24, 13:19, 58:17, 93:1
**Short** [2] - 160:6, 161:17
**short** [5] - 62:10, 108:23, 108:24, 158:12, 167:20
**Short's** [2] - 161:21, 163:11
**shortly** [1] - 72:15
**show** [15] - 71:7, 71:16, 72:1, 80:14, 83:21, 85:21, 88:21, 100:7, 113:10, 116:7, 123:23, 139:10, 139:12, 139:13, 144:19
**showed** [10] - 73:24, 77:12, 92:18, 93:15, 114:13, 114:14, 121:11, 121:22, 123:22, 132:3
**showing** [2] - 77:5, 108:13
**shown** [2] - 73:20, 77:5
**shows** [11] - 74:6, 80:18, 80:22, 84:18, 84:19, 85:24, 98:1, 104:13, 111:25, 132:6, 174:20
**SHRM** [4] - 56:11, 56:13, 56:14, 56:18
**shut** [1] - 128:12
**shutdown** [4] - 42:13, 82:12, 82:13, 96:16
**shutdowns** [1] - 42:12
**sic** [1] - 144:3
**side** [8] - 20:8, 23:22, 24:17, 58:2, 58:3, 90:9, 117:10, 130:23
**sidebar** [1] - 176:14
**significance** [1] - 79:19
**significant** [2] - 24:4, 93:6
**significantly** [1] - 64:25
**silver** [1] - 123:19
**similar** [6] - 30:4, 35:8, 42:3, 44:10, 124:14, 160:2
**similarly** [1] - 107:23
**simple** [1] - 92:9
**simplistic** [1] - 146:15
**simply** [10] - 75:6, 75:21, 78:17, 91:4, 107:20, 108:3, 108:10, 140:23, 155:25, 164:21
**Sinanian** [1] - 90:16
**sinanian** [2] - 90:17, 90:18
**single** [3] - 103:20, 143:18, 144:17
**sit** [4] - 37:2, 106:1, 106:4, 125:15
**site** [1] - 79:17
**sites** [2] - 66:10, 133:22
**sitting** [3] - 85:1, 90:15, 127:5
**situation** [5] - 97:2, 98:18, 98:19, 143:7, 147:21
**six** [4] - 56:10, 117:15, 165:23, 166:24
**Sixth** [1] - 91:9
**Sixty** [2] - 24:11, 84:21
**Sixty-four** [2] - 24:11, 84:21
**skills** [3] - 13:11, 72:24, 150:8
**Skype** [1] - 48:5
**slash** [1] - 7:15
**slated** [1] - 115:8
**sleep** [3] - 96:14, 101:4, 127:4
**sleeping** [1] - 101:10
**sleeplessness** [1] - 126:22
**slip** [1] - 115:13
**slotted** [1] - 120:12
**slotting** [1] - 123:7
**slow** [2] - 13:9, 45:15
**slower** [1] - 170:5
**smaller** [1] - 34:22
**snacks** [2] - 62:4, 62:7
**social** [1] - 66:10
**Social** [1] - 85:8
**software** [1] - 30:16
**Software** [1] - 27:10
**solely** [1] - 28:23
**solving** [1] - 13:11
**someone** [5] - 45:5, 49:4, 49:19, 140:1, 151:15
**sometimes** [2] - 13:20
**somewhat** [1] - 150:5
**somewhere** [1] - 155:13
**sooner** [1] - 98:15
**sorry** [16] - 4:24, 6:24, 7:14, 8:12, 10:23, 12:16, 25:7, 31:8, 31:21, 39:1, 44:12, 56:17, 59:11, 59:13, 59:15, 59:16
**sort** [2] - 76:20, 150:11
**sorts** [1] - 138:5
**sought** [3] - 103:19, 129:4, 129:8
**sounded** [2] - 111:12, 118:19
**sounds** [2] - 174:13, 175:4
**South** [5] - 43:18, 54:24, 55:8, 55:14, 56:8
**SOUTH** [3] - 1:1, 2:4, 2:7
**south** [1] - 29:1
**sp** [1] - 133:6
**span** [1] - 50:7
**Spartanburg** [17] - 10:2, 16:16, 16:21, 26:1, 39:22, 41:15, 42:19, 46:10, 46:20, 47:4, 47:17, 47:22, 48:14, 48:23, 50:1, 119:23, 120:2
**SPARTANBURG** [1] - 1:2
**speaking** [2] - 47:5, 111:24
**special** [5] - 61:25, 62:6, 64:10, 66:1, 72:4
**specialist** [1] - 28:21
**Specialist** [2] - 26:17, 27:8
**specialized** [2] - 71:11, 71:17
**specific** [15] - 10:5, 43:20, 43:21, 44:15, 48:8, 51:3, 51:7, 51:11, 51:14, 52:1, 97:3, 119:18, 125:19, 165:6, 165:7
**specifically** [4] - 47:22, 48:15, 51:24, 83:15
**specificity** [1] - 95:16
**specified** [2] - 51:18, 147:12
**speculate** [3] - 81:14, 83:17, 86:15
**speculation** [10] - 79:12, 81:2, 81:9, 81:21, 83:19, 86:13, 114:10, 169:23, 170:8
**speculative** [6] - 74:6, 83:21, 115:10, 118:14, 132:22, 173:9
**spell** [3] - 31:8, 33:4, 44:3
**spelled** [3] - 57:10, 58:5, 141:7
**SPENCER** [1] - 1:21
**spend** [1] - 99:3
**spending** [1] - 149:7
**spent** [7] - 25:24, 72:21, 72:22, 111:9, 111:10, 157:21, 171:3
**split** [1] - 37:1
**splitting** [2] - 16:2, 16:3
**spread** [1] - 37:5
**squarely** [1] - 118:6
**St** [1] - 71:4
**staff** [5] - 13:20, 20:24, 64:20, 92:25, 159:22
**stamp** [1] - 121:11
**stand** [5] - 6:3, 93:11, 118:6, 119:6, 145:16
**standard** [21] - 69:2, 70:4, 71:5, 79:13, 86:22, 90:14, 101:19, 103:2, 103:9, 103:13, 108:9, 108:17, 112:22, 113:2, 128:24, 129:5, 129:8, 158:19, 159:14, 159:17, 163:2
**standing** [5] - 43:8, 95:25, 99:20, 152:12, 152:18
**standpoint** [5] - 40:21, 104:23, 108:9, 108:17, 156:6
**stands** [1] - 129:23
**star** [3] - 65:19, 141:9, 141:13
**start** [14] - 6:20, 19:3, 19:4, 24:18, 29:23, 50:11, 66:22, 87:17, 98:15, 150:6, 157:10, 171:25, 172:5, 178:23
**started** [9] - 12:9, 20:23, 27:16, 60:14, 104:13, 114:24, 128:23, 131:19, 177:7
**starting** [3] - 34:21, 39:12, 78:13
**starts** [1] - 51:14
**state** [10] - 8:5, 15:14, 60:15, 80:6, 81:12, 103:1, 103:17, 160:12, 160:19, 169:6
**statement** [6] - 80:23, 122:22, 131:9, 166:4, 172:16, 172:23
**statements** [2] - 100:3, 172:24
**STATES** [3] - 1:1, 1:14, 2:6
**states** [4] - 25:24, 53:22, 91:4, 122:18
**States** [19] - 25:25, 31:11, 31:13, 32:2, 40:3, 43:25, 50:22, 51:1, 51:10, 54:24, 55:7, 55:14, 55:19, 56:7, 68:7, 138:15, 143:12, 159:25, 175:24
**stating** [2] - 74:15, 145:13
**status** [6] - 42:19, 117:3, 120:19, 120:21, 138:6
**statute** [6] - 129:3, 129:6, 165:24, 168:18, 169:7, 169:8
**statutory** [2] - 165:17, 165:19
**stay** [4] - 16:9, 45:22, 65:23, 98:17
**stayed** [2] - 64:21, 113:23
**staying** [1] - 178:17
**stays** [2] - 169:17, 169:21
**steering** [3] - 23:19, 24:16, 32:24
**Steering** [9] - 32:8, 32:18, 32:19, 33:10, 33:16, 34:3, 35:6, 35:18, 93:9
**stenographic** [1] - 179:6
**STENOTYPE/ COMPUTER** [1] - 2:9
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:9
**step** [2] - 60:18, 82:2
**STEPHENSON** [1] - 1:17
**stick** [2] - 34:7, 165:19
**still** [21] - 8:16, 8:17, 8:19, 8:21, 11:13, 18:13, 30:12, 40:5, 40:20, 40:25, 64:25, 66:15, 77:20, 78:6,

88:21, 92:5, 120:25, 122:11, 127:3, 128:15, 139:16
**stomach** [1] - 101:3
**stone** [1] - 94:11
**stood** [2] - 145:1, 176:11
**stop** [1] - 24:9
**stopped** [1] - 152:19
**stops** [1] - 152:14
**story** [1] - 117:23
**strain** [1] - 99:2
**strategies** [2] - 56:4, 56:7
**strategy** [2] - 38:11, 149:9
**streamline** [1] - 64:24
**STREET** [3] - 1:18, 2:4, 2:7
**stress** [1] - 126:11
**strictly** [2] - 96:5, 166:22
**strike** [4] - 6:24, 22:20, 36:23, 52:25
**structure** [13] - 16:16, 16:17, 27:21, 27:22, 27:25, 28:4, 28:6, 46:10, 46:19, 47:1, 48:11, 59:21, 105:19
**structured** [1] - 42:25
**struggling** [2] - 152:15, 152:16
**student** [4] - 7:12, 7:13, 7:15, 7:24
**stuff** [2] - 15:20, 149:8
**subject** [5] - 82:10, 140:4, 143:24, 154:21, 171:6
**submission** [2] - 154:4, 154:5
**submit** [3] - 70:12, 96:18, 145:21
**submitted** [1] - 130:6
**subparts** [1] - 159:13
**subsequent** [1] - 124:20
**subsequently** [1] - 77:11
**subset** [1] - 102:22
**subsidiaries** [4] - 136:19, 137:3, 147:9, 153:1
**subsidiary** [9] - 137:6, 138:14, 139:11, 143:5, 147:1, 152:23, 153:4, 155:23, 161:8
**substantially** [1] - 116:16
**substantive** [1] - 160:22
**substantively** [1] - 173:1
**succeeded** [1] - 23:8
**succession** [4] - 93:14, 93:20, 94:9, 122:3
**successor** [1] - 120:8
**sued** [1] - 155:22
**suffer** [4] - 74:16, 81:10, 166:14
**suffered** [7] - 70:24, 80:12, 86:24, 95:14, 95:15, 99:2, 101:12
**suffering** [1] - 126:10
**sufficient** [5] - 70:5, 70:13, 81:22, 125:23, 126:2
**sufficiently** [2] - 95:14, 99:25
**suggest** [3] - 61:15, 114:15, 155:23
**suggested** [6] - 113:14, 113:17, 144:18, 165:17, 165:24, 166:11
**suggesting** [2] - 108:13, 143:14
**suggests** [2] - 142:20, 144:24
**SUITE** [1] - 2:4
**suited** [2] - 93:3, 107:4
**Sumitomo** [10] - 142:24, 143:12, 143:22, 145:6, 146:24, 152:4, 152:22, 153:15, 161:7, 176:9
**summaries** [2] - 164:19, 165:1
**summary** [18] - 75:5, 79:15, 83:5, 85:20, 87:1, 87:10, 134:23, 135:7, 137:15, 140:20, 155:10, 156:15, 156:24, 162:5, 164:17, 164:21, 169:8, 172:21
**super** [2] - 106:1, 106:4
**supervising** [2] - 85:15, 85:18
**supervisor** [3] - 82:3, 82:20, 133:25
**supervisor's** [1] - 82:9
**supervisory** [1] - 85:14
**supplier** [5] - 21:2, 21:8, 21:10, 21:22, 21:23
**supplier-related** [1] - 21:22
**support** [9] - 40:22, 46:13, 95:25, 99:9, 99:20, 101:21, 127:14, 131:16, 158:25
**supporting** [1] - 162:12
**supports** [1] - 165:3
**supposed** [1] - 82:5
**supposedly** [2] - 51:9, 122:2
**Supreme** [9] - 71:2, 83:16, 83:25, 103:7, 142:25, 143:12, 146:24, 161:7, 172:14
**surprise** [3] - 155:24, 156:4, 158:5
**surprised** [2] - 156:25, 161:2
**switch** [1] - 117:9
**sworn** [3] - 5:11, 5:12, 5:18
**symptom** [1] - 100:24
**symptoms** [2] - 101:11, 126:21
**syntax** [1] - 18:15
**system** [5] - 59:1, 121:13, 138:18, 138:19, 138:20
**systems** [1] - 138:23
**Systems** [1] - 88:25

### T

**T-h-w-e-a-t-t** [1] - 60:17
**table** [1] - 130:23
**tactic** [1] - 154:4
**tactical** [4] - 156:19, 157:17, 157:22, 158:1
**tactically** [1] - 135:12
**takeover** [1] - 59:23
**talents** [1] - 72:24
**talks** [2] - 105:4, 149:21
**tariff** [7] - 27:20, 28:4, 28:7, 28:8, 57:24, 58:1
**tax** [4] - 40:18, 40:19, 40:23, 51:16
**taxed** [2] - 40:20
**taxes** [1] - 40:25
**Taylor** [2] - 126:5, 126:6
**team** [7] - 35:10, 37:12, 59:7, 77:8, 90:9, 101:3, 105:14
**teams** [2] - 28:20, 43:2
**Teams** [1] - 43:3
**Tech** [1] - 141:12
**Technical** [2] - 50:15, 50:24
**technical** [19] - 138:14, 139:8, 139:14, 144:14, 144:16, 144:18, 144:20, 144:22, 144:23, 149:18, 149:19, 149:22, 150:1, 150:2, 150:5, 150:8, 151:8
**technicality** [2] - 152:1, 152:6
**technically** [1] - 147:2
**technology** [4] - 23:24, 23:25, 66:8, 167:11
**tele** [2] - 85:9, 85:12
**tele-work** [2] - 85:9, 85:12
**temporary** [3] - 49:16, 49:18, 49:25
**ten** [11] - 11:24, 11:25, 12:2, 15:25, 22:6, 43:15, 123:10, 165:11, 165:22, 178:23, 178:24
**tend** [2] - 87:23, 160:20
**tens** [1] - 149:7
**tentatively** [1] - 65:5
**tenure** [1] - 84:8
**tenured** [2] - 84:5, 169:14
**term** [7] - 37:25, 49:13, 71:8, 77:22, 83:21, 131:12, 166:21
**terminated** [2] - 84:9, 84:10
**termination** [4] - 82:11, 83:9, 84:9, 169:15
**terms** [11] - 13:2, 14:6, 43:22, 47:4, 61:20, 71:22, 79:20, 85:3, 92:2, 120:13, 136:21
**test** [2] - 170:19, 170:21
**testified** [24] - 5:13, 73:1, 73:25, 74:9, 74:21, 76:4, 76:24, 76:25, 89:9, 89:19, 96:15, 98:5, 98:9, 98:24, 101:9, 105:22, 112:9, 113:13, 117:1, 121:13, 129:19, 132:14, 132:16, 145:15
**testify** [1] - 74:13
**testimony** [55] - 5:16, 5:18, 5:23, 6:2, 6:4, 6:8, 46:17, 61:11, 65:10, 75:23, 76:7, 80:18, 89:6, 89:22, 90:16, 90:25, 95:25, 96:6, 96:19, 96:20, 99:19, 100:24, 100:25, 101:21, 103:20, 111:6, 111:17, 111:20, 112:8, 114:21, 114:22, 114:24, 115:1, 115:25, 116:1, 116:3, 120:1, 121:16, 122:20, 125:1, 125:23, 126:2, 126:9, 130:11, 131:8, 132:18, 132:23, 138:5, 138:8, 138:17, 145:15, 150:12, 151:4, 164:17, 176:19
**THE** [155] - 1:1, 1:1, 1:13, 1:17, 1:19, 3:3, 4:4, 4:13, 4:16, 4:17, 4:20, 4:24, 5:2, 5:5, 5:10, 5:14, 6:10, 8:7, 9:10, 14:19, 15:10, 17:21, 18:5, 18:8, 18:16, 18:22, 18:25, 25:5, 25:13, 29:14, 29:20, 31:4, 31:19, 39:9, 45:15, 45:17, 52:21, 53:9, 54:7, 56:14, 60:7, 60:10, 60:13, 60:17, 60:18, 60:25, 61:10, 61:15, 61:23, 61:24, 62:1, 62:3, 62:11, 62:24, 63:3, 63:4, 63:5, 63:11, 63:14, 63:19, 63:23, 63:24, 64:1, 64:2, 64:8, 64:15, 64:18, 67:12, 67:18, 68:4, 69:12, 69:18, 81:3, 81:7, 82:18, 82:25, 83:3, 93:24,

94:4, 94:7, 97:19, 97:21, 100:13, 100:16, 100:18, 100:25, 101:17, 106:3, 106:20, 107:5, 107:9, 108:20, 108:24, 109:7, 109:21, 109:24, 110:5, 110:9, 110:19, 110:25, 111:2, 122:24, 130:24, 131:2, 133:10, 133:14, 135:18, 140:12, 142:12, 142:14, 144:7, 145:25, 146:5, 146:12, 146:19, 146:23, 147:20, 148:14, 148:18, 149:1, 149:20, 149:23, 150:6, 151:3, 152:9, 153:13, 155:2, 155:8, 155:15, 157:12, 158:8, 158:13, 159:12, 162:25, 163:25, 167:21, 168:7, 170:2, 170:4, 170:6, 170:12, 171:5, 171:14, 171:19, 171:23, 172:2, 172:8, 176:24, 177:12, 177:15, 177:22, 178:1, 178:4, 178:8, 178:17
**themselves** [1] - 48:13
**theory** [2] - 102:15, 123:9
**therefore** [2] - 73:23, 108:14
**third** [1] - 143:15
**thorough** [1] - 160:8
**thousands** [1] - 149:7
**threatened** [2] - 115:16, 115:18
**three** [32] - 5:8, 9:2, 17:4, 20:15, 21:14, 33:23, 34:19, 35:1, 35:2, 50:2, 50:3, 50:5, 59:14, 73:17, 77:9, 80:22, 84:20, 84:24, 85:25, 98:8, 98:17, 115:6, 115:7, 115:9, 123:23, 130:12, 130:14, 140:6, 142:23, 164:11, 165:16, 166:21
**threes** [1] - 132:11
**throughout** [8] - 12:19, 90:24, 97:5, 105:12, 135:6, 156:15, 176:18, 177:11
**throw** [3] - 50:11, 106:20, 148:14
**throwing** [2] - 127:2, 173:11
**thrown** [1] - 172:13
**Thweatt** [2] - 5:9, 60:17
**THWEATT** [1] - 5:12
**ticket** [1] - 67:2
**tie** [1] - 151:5
**tied** [4] - 28:5, 113:25, 114:1, 129:5
**tier** [1] - 28:6
**tightly** [1] - 148:4
**timely** [2] - 121:12, 154:1
**timing** [1] - 131:19
**TIMOTHY** [1] - 1:13
**tired** [1] - 178:22
**Title** [24] - 68:15, 70:9, 70:10, 70:22, 70:25, 87:2, 87:6, 87:12, 91:23, 91:24, 91:25, 102:6, 102:8, 102:9, 109:25, 161:12, 163:9, 163:16, 165:15, 166:7, 166:17, 166:18, 168:3
**today** [9] - 20:13, 24:13, 40:10, 64:21, 94:23, 110:7, 111:5, 116:1, 171:10
**together** [5] - 24:1, 30:15, 146:8, 146:15, 156:19
**toll** [1] - 101:1
**tomorrow** [7] - 61:20, 61:22, 65:5, 65:18, 66:20, 66:23, 177:21
**ton** [1] - 153:21
**tonight** [1] - 177:16
**took** [7] - 29:7, 49:18, 56:19, 68:11, 101:1, 127:7, 166:9
**tool** [1] - 66:7
**top** [2] - 116:12, 116:13
**topic** [4] - 37:24, 49:1, 51:18, 138:22
**topics** [6] - 32:20, 35:12, 42:16, 44:16, 44:17, 58:16
**Toro** [1] - 79:16
**tort** [1] - 99:17
**tossed** [1] - 134:3
**total** [2] - 30:6, 30:16
**Total** [3] - 30:13, 30:14, 32:2
**totally** [1] - 138:22
**touch** [3] - 122:21, 134:13, 134:16
**towards** [1] - 8:14
**Toyota** [1] - 141:12
**track** [2] - 96:7, 140:22
**traditional** [1] - 126:13
**Train** [1] - 27:9
**train** [1] - 30:15
**trained** [2] - 130:10, 130:12
**training** [5] - 7:25, 15:17, 23:11, 52:2, 52:7
**TRANSCRIPT** [1] - 179:2
**transcript** [4] - 18:21, 131:12, 173:18, 179:6
**TRANSCRIPTION** [1] - 2:9
**transcripts** [1] - 131:11
**transfer** [10] - 58:17, 71:6, 71:15, 71:25, 78:21, 79:22, 79:23, 80:9, 80:12, 85:11
**transferred** [9] - 71:11, 79:24, 80:15, 85:13, 85:17, 85:19, 85:23, 85:25, 94:14
**transferring** [1] - 79:1
**transition** [1] - 27:21
**transitioned** [1] - 27:20
**transmission** [1] - 30:21
**transparency** [1] - 46:22
**transposed** [1] - 39:7
**Trauth** [7] - 89:10, 89:11, 113:16, 121:17, 121:22
**treat** [3] - 139:25, 140:1, 157:23
**treated** [3] - 147:16, 160:3, 161:11
**treaties** [1] - 139:20
**treatment** [5] - 87:13, 91:23, 96:4, 122:17, 138:5
**Treaty** [106] - 68:6, 68:7, 68:10, 68:13, 68:15, 68:16, 68:18, 69:6, 109:14, 109:15, 109:21, 110:10, 110:13, 110:24, 130:20, 134:18, 134:22, 135:2, 135:4, 135:14, 136:15, 137:7, 137:9, 137:13, 137:23, 138:12, 139:10, 139:16, 140:3, 140:7, 140:11, 140:16, 141:2, 141:24, 142:3, 142:7, 142:8, 143:2, 143:9, 143:10, 143:24, 144:11, 144:21, 145:10, 146:9, 146:19, 147:2, 147:9, 147:10, 147:22, 147:23, 148:8, 148:12, 148:24, 149:14, 149:15, 149:16, 149:18, 152:2, 152:3, 152:7, 152:18, 152:24, 153:6, 153:11, 153:23, 154:12, 154:15, 155:6, 155:20, 156:25, 157:4, 157:14, 157:16, 158:5, 159:7, 159:10, 159:20, 159:21, 159:24, 160:2, 160:9, 161:4, 161:9, 161:14, 161:20, 162:4, 162:8, 162:14, 162:23, 163:4, 163:8, 163:10, 163:16, 167:2, 170:15, 170:22, 170:23, 171:2, 173:14, 175:12, 176:9, 176:20
**TRIAL** [1] - 1:14
**trial** [16] - 4:3, 4:19, 9:9, 61:9, 64:17, 67:17, 98:24, 99:8, 111:7, 124:10, 140:19, 149:8, 153:21, 156:4, 160:15, 173:18
**tried** [2] - 121:7, 123:9
**trier** [1] - 101:6
**trouble** [1] - 101:10
**troublesome** [1] - 169:20
**true** [3] - 80:19, 128:9, 138:16
**trust** [1] - 96:10
**truth** [2] - 6:4, 113:24
**truthfully** [1] - 112:12
**try** [7] - 32:12, 37:2, 55:2, 67:6, 117:17, 142:15, 158:14
**trying** [13] - 11:19, 16:8, 67:3, 96:16, 98:11, 101:10, 105:19, 106:7, 106:22, 116:11, 116:14, 170:4, 175:17
**tryout** [1] - 42:6
**turn** [1] - 135:10
**turned** [1] - 11:20
**two** [44] - 9:20, 14:22, 17:21, 21:17, 26:7, 28:6, 33:24, 38:12, 40:19, 52:7, 62:6, 74:17, 75:10, 75:17, 76:2, 77:6, 78:2, 87:11, 90:10, 90:12, 96:16, 101:15, 107:14, 112:24, 116:9, 117:2, 128:17, 137:19, 138:3, 141:5, 141:25, 146:6, 147:16, 155:4, 155:13, 156:23, 157:7, 157:23, 164:10, 165:18, 170:13, 177:1
**two-week** [1] - 96:16
**twofold** [1] - 134:5
**TX-4** [5] - 9:16, 10:20, 10:22, 10:23, 11:1
**TX-6** [21] - 10:3, 10:19, 11:2, 16:25, 46:11, 46:15, 46:19, 46:23, 46:25, 48:12, 72:6, 72:8, 77:12, 77:13, 89:16, 90:11, 105:20, 120:9, 121:20, 121:25, 122:5
**TX-60** [48] - 3:12, 20:15, 25:25, 41:15, 41:24, 44:20, 47:3, 47:5, 48:15, 53:18, 53:25, 54:22, 55:5, 55:10, 55:16, 55:21, 56:2, 56:19, 57:3, 71:24, 72:2, 72:14, 73:18, 73:21, 77:20, 78:4, 78:5, 84:21, 86:6, 88:13, 90:7, 92:10, 92:12, 92:19, 94:13, 94:20, 97:14, 97:18, 104:16,

105:23, 107:15, 114:19, 118:7, 120:9, 132:9, 138:11, 174:7, 174:21
**TX-60's** [1] - 76:8
**TX-61** [4] - 20:15, 72:14, 72:20, 115:8
**TX-64** [73] - 9:6, 9:18, 9:20, 10:9, 10:21, 11:10, 11:16, 12:3, 12:4, 12:7, 12:9, 12:11, 15:3, 15:22, 16:1, 19:15, 19:17, 19:19, 19:22, 20:1, 20:4, 20:6, 20:12, 22:8, 22:11, 22:15, 23:12, 23:14, 24:19, 24:24, 71:25, 72:4, 72:15, 72:24, 73:4, 73:16, 73:25, 74:1, 75:1, 75:19, 75:25, 77:2, 77:6, 77:8, 77:10, 77:15, 77:17, 78:9, 78:12, 80:25, 81:15, 86:5, 86:7, 86:19, 90:7, 92:19, 92:22, 93:2, 94:3, 94:20, 103:22, 104:15, 107:16, 107:18, 111:15, 114:24, 115:20, 115:24, 123:21, 132:2, 132:4, 132:10, 132:24
**TX-65** [6] - 73:8, 90:8, 90:11, 90:13, 90:16, 90:18
**TX-66** [2] - 19:16, 19:17
**type** [3] - 30:22, 30:24, 66:7
**types** [2] - 46:3, 125:11

**U**

**U.S** [10] - 40:20, 44:14, 56:22, 89:1, 137:6, 139:3, 141:8, 142:24, 160:4, 160:17
**ultimate** [3] - 161:17, 166:5, 166:7
**unclear** [1] - 120:13
**uncommon** [1] - 152:13
**under** [42] - 68:11, 68:14, 70:2, 70:8, 70:9, 70:10, 70:22, 73:23, 74:13, 86:13, 86:14, 86:22, 87:1, 87:6, 87:12, 88:1, 88:19, 88:20, 90:12, 90:19, 91:19, 91:23, 101:19, 102:8, 104:20, 105:20, 107:23, 134:21, 135:14, 137:6, 143:2, 143:10, 148:7, 162:2, 165:6, 165:15, 168:3, 168:18, 170:18, 172:7
**undercuts** [1] - 96:20
**undergrad** [1] - 51:10
**underlying** [1] - 165:3
**understood** [2] - 69:25, 151:7
**undisputed** [1] - 104:12
**unfairly** [1] - 161:2
**union** [2] - 58:2, 138:21
**unionized** [1] - 58:4
**unions** [1] - 28:10
**unique** [3] - 139:6, 143:20
**unit** [1] - 30:11
**UNITED** [3] - 1:1, 1:14, 2:6
**United** [19] - 25:25, 31:11, 31:12, 32:1, 40:3, 43:25, 50:22, 51:1, 51:9, 54:24, 55:7, 55:13, 55:19, 56:7, 68:7, 138:15, 143:12, 159:25, 175:24
**University** [5] - 50:9, 50:12, 50:15, 50:20, 50:24
**university** [2] - 26:6, 51:4
**unlawful** [3] - 91:25, 92:6, 123:18
**unpublished** [1] - 83:14
**unquote** [1] - 111:15
**unscheduled** [1] - 82:7
**untrue** [1] - 155:25
**unwritten** [1] - 124:5
**up** [61] - 5:11, 5:14, 16:2, 16:3, 26:24, 42:16, 42:18, 42:19, 44:4, 47:9, 47:24, 48:2, 48:3, 48:17, 54:7, 62:9, 64:3, 65:3, 69:8, 73:24, 83:24, 84:2, 92:24, 99:13, 111:13, 111:25, 113:10, 120:8, 121:22, 123:19, 127:2, 128:14, 128:18, 129:22, 129:23, 130:2, 136:20, 143:3, 144:17, 145:1, 147:7, 149:11, 149:12, 150:13, 152:5, 154:23, 155:20, 155:21, 163:17, 164:5, 166:7, 172:23, 173:6, 175:5, 176:11, 177:8, 177:17, 177:18, 177:21
**upcoming** [1] - 113:10
**updated** [1] - 79:17
**upheld** [2] - 83:13, 99:10
**upset** [3] - 100:22, 104:6, 117:22
**Urata** [1] - 141:7
**URATA** [1] - 141:7
**US** [1] - 49:17
**USA** [1] - 141:12
**Uwe** [1] - 33:14
**UWE** [1] - 33:14

**V**

**vacancy** [1] - 72:4
**vacant** [1] - 24:14
**vacating** [1] - 133:17
**vacation** [1] - 128:15
**validated** [4] - 75:9, 75:11, 75:15, 75:18
**validation** [1] - 76:3
**valuable** [1] - 44:9
**value** [1] - 6:4
**Van** [7] - 79:15, 79:17, 79:22, 80:10, 80:13, 81:8, 118:6
**various** [1] - 21:11
**vastly** [1] - 138:19
**vehicle** [3] - 30:7, 30:16, 71:19
**Vehicle** [3] - 30:13, 30:14, 32:3
**verbal** [1] - 73:9
**verbatim** [4] - 107:11, 165:8, 166:21, 167:4
**verdict** [8] - 123:11, 133:18, 156:3, 162:23, 167:13, 167:15, 177:24, 178:6
**verifiable** [3] - 169:15, 169:25, 170:10
**versa** [1] - 90:12
**version** [1] - 166:2
**versus** [29] - 70:25, 71:1, 71:4, 79:15, 81:19, 88:5, 88:25, 91:1, 91:8, 95:11, 95:21, 95:22, 99:15, 102:2, 103:4, 103:7, 105:4, 116:24, 124:21, 125:8, 125:21, 126:6, 126:16, 141:8, 141:12, 145:5, 158:22, 160:6, 160:17
**VERSUS** [1] - 1:5
**VI** [1] - 1:15
**viable** [4] - 88:1, 88:18, 91:17
**Vice** [12] - 14:14, 22:17, 33:24, 43:6, 43:13, 48:21, 72:7, 84:22, 86:2, 104:4, 104:20, 129:18
**vice** [1] - 90:12
**view** [3] - 21:21, 68:21, 164:20
**viewed** [2] - 68:22, 152:1
**viewing** [1] - 159:1
**views** [1] - 153:14
**VII** [24] - 68:15, 70:9, 70:10, 70:22, 70:25, 87:2, 87:6, 87:12, 91:23, 91:24, 91:25, 102:6, 102:8, 102:9, 109:25, 161:12, 163:9, 163:16, 165:15, 166:7, 166:17, 166:18, 168:3
**violate** [1] - 103:12
**violated** [1] - 133:21
**violation** [9] - 100:8, 100:11, 116:23, 118:21, 124:3, 166:6, 166:17, 166:18, 166:20
**Virginia** [1] - 126:7
**vitiate** [2] - 147:23, 148:7
**VOLUME** [1] - 1:15
**volume** [2] - 42:14, 42:16
**voluntarily** [1] - 144:16
**VP** [8] - 33:13, 46:15, 48:6, 49:1, 72:18, 74:23, 75:13, 97:12
**VPs** [1] - 42:10

**W**

**wage** [2] - 27:20, 28:6
**wages** [1] - 57:16
**wait** [3] - 63:5, 67:13, 176:17
**walk** [2] - 20:20, 38:5
**wants** [4] - 46:16, 125:4, 143:20, 149:11
**Ward** [1] - 103:4
**warranted** [1] - 171:11
**water** [1] - 118:1
**ways** [1] - 123:16
**website** [2] - 15:18, 15:19
**websites** [2] - 66:11, 128:1
**Wednesday** [1] - 111:20
**week** [7] - 9:19, 46:5, 46:6, 72:16, 73:14, 96:16, 153:21
**weekly** [6] - 42:9, 43:5, 43:10, 43:13, 46:6, 46:7
**weeks** [3] - 97:15, 98:8, 98:17
**weighed** [1] - 5:25
**weight** [2] - 6:4, 126:23
**welcome** [2] - 4:20, 64:18
**Werke** [1] - 178:16
**WERKE** [2] - 1:6, 1:20
**Westlaw** [1] - 125:9
**Westmoreland** [3] - 125:7, 125:8, 126:8
**whatsoever** [2] - 78:22, 107:20
**WHITSETT** [1] - 1:18
**whoa** [2] - 63:5
**whole** [11] - 16:18, 37:12, 79:10, 95:13, 116:9, 124:4, 140:16, 155:6, 173:11, 177:6, 178:14
**wholly** [1] - 155:24
**wild** [1] - 114:10
**wish** [2] - 18:23, 109:4
**witness** [7] - 4:8, 5:15, 5:18, 5:20, 6:1, 6:2, 176:16
**WITNESS** [2] - 45:17, 60:17
**witnesses** [5] - 5:4, 74:9, 92:18, 103:20,

164:15
**word** [13] - 18:13, 18:15, 41:19, 91:3, 111:21, 111:25, 112:11, 112:14, 112:17, 138:9, 165:25, 173:19
**worded** [1] - 138:24
**words** [16] - 14:23, 18:10, 39:7, 88:21, 89:14, 102:21, 119:5, 119:11, 121:5, 129:17, 134:10, 145:2, 145:20, 161:20, 176:12
**workday** [1] - 125:16
**works** [7] - 28:10, 32:23, 37:14, 37:15, 38:3, 51:9, 58:10
**workshop** [1] - 89:16
**world** [2] - 43:17, 125:17
**worlds** [1] - 138:20
**worldwide** [1] - 118:13
**worry** [1] - 120:17
**worse** [1] - 67:3
**wrapping** [1] - 42:19
**write** [2] - 64:13, 170:4
**written** [5] - 18:21, 57:24, 84:14, 124:6, 176:22
**wrote** [4] - 96:9, 133:3, 147:20, 151:6

Y

**y'all** [2] - 61:20, 178:20
**yarn** [2] - 146:13
**year** [11] - 13:8, 22:14, 25:23, 26:17, 44:8, 48:7, 113:10, 124:19, 127:7, 153:20, 155:12
**years** [31] - 9:2, 9:3, 21:2, 21:16, 21:17, 21:18, 22:6, 26:7, 50:2, 50:3, 50:5, 51:11, 52:7, 74:17, 93:17, 93:18, 121:24, 123:3, 127:15, 138:9, 149:5, 149:6, 153:20, 153:25, 154:2, 154:19, 155:4, 155:13, 157:1, 157:6, 158:2
**yesterday** [31] - 67:22, 69:15, 70:3, 70:25, 74:21, 75:3, 77:25, 79:8, 79:17, 81:17, 83:14, 83:23, 84:3, 87:3, 94:21, 95:1, 107:11, 107:19, 109:12, 111:6, 112:21, 114:4, 114:23, 117:14, 118:2, 121:2, 122:16, 124:2, 124:9, 137:16, 139:9
**Young** [1] - 40:22
**young** [1] - 60:11
**yourself** [1] - 67:5

Z

**zero** [1] - 89:22
**Zienni** [12] - 81:18, 81:19, 81:23, 82:12, 82:15, 83:5, 83:19, 83:20, 86:10, 86:12, 115:10, 115:12
**Zienni's** [1] - 83:10
**Zoom** [1] - 43:1