No. 26-1793

# In the United States Court of Appeals for the Fourth Circuit

KELLY DAWSEY,

*Plaintiff-Appellee*,

v.

BMW MANUFACTURING CO., LLC,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of South Carolina

**JOINT APPENDIX**
**VOLUME V OF VI**


Charles E. Johnson
Brendan P. Biffany
Aryana Ainolhayat
ROBINSON, BRADSHAW & HINSON, P.A.
600 South Tryon Street
Suite 2300
Charlotte, North Carolina 28202
704.377.2536

*Counsel for Defendant-Appellant BMW Manufacturing Co., LLC*

Brian P. Murphy
STEPHENSON AND MURPHY, LLC
207 Whitsett Street
Greenville, South Carolina 29601
864.370.9400

*Counsel for Plaintiff-Appellee Kelly Dawsey*

## TABLE OF CONTENTS

Page

**Volume I**

Judgment (DE 217) .................................................................. JA1

Amended Judgment (DE 236)........................................................ JA2

Order Awarding Backpay (DE 238) ............................................... JA3

Second Amended Judgment (DE 239) ............................................JA22

May 13, 2026 Post-Trial Motion Hearing Transcript (DE 272) ........JA23

**Volume II**

District Court Docket Sheet ........................................................JA112

Plaintiff's Amended Complaint (DE 20) ........................................JA142

BMW MC's Answer to Amended Complaint (DE 40)......................JA158

BMW AG's Answer to Amended Complaint (DE 96)......................JA171

Report of Magistrate Judge (DE 113)............................................JA182

Order (DE 119) ...............................................................................JA200

February 12, 2026 Strikes for Cause Transcript (DE 246) ............JA219

February 17, 2026 Trial Transcript, Volume I (DE 247) ................JA247

Opening Statement by Counsel for Plaintiff ..........................JA316

Opening Statement by Counsel for Defendant BMW MC .....JA319

Opening Statement by Counsel for Defendant BMW AG ......JA315

Kelly Dawsey, Direct Examination.......................................JA334

February 18, 2026 Trial Transcript, Volume II (DE 248) ..............JA452

Kelly Dawsey, Direct Examination (cont'd)...........................JA457

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC ....................................JA562

**Volume III**

February 19, 2026 Trial Transcript, Volume III (DE 249).............JA684

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC (cont'd) ............................................................JA688

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW AG.................................................................................JA754

Robert Englehorn, Direct Examination by Counsel for Defendant BMW MC ........................................................JA797

Robert Englehorn, Cross Examination by Counsel for Defendant BMW AG .........................................................JA851

Robert Englehorn, Cross Examination by Counsel for Plaintiff...........................................................................JA859

Robert Englehorn, Redirect Examination by Counsel for Defendant BMW MC........................................................JA906

Robert Englehorn, Recross Examination by Counsel for Plaintiff...........................................................................JA910

February 20, 2026 Trial Transcript, Volume IV (DE 250).............JA942

Christine Petrasch, Direct Examination by Counsel for Defendant BMW MC .......................................................JA946

Christine Petrasch, Cross Examination by Counsel for Defendant BMW AG ......................................................JA1032

Christine Petrasch, Cross Examination by Counsel for Plaintiff.........................................................................JA1056

Christine Petrasch, Redirect Examination by Counsel for Defendant BMW MC......................................................JA1133

Christine Petrasch, Recross Examination by Counsel for Defendant BMW AG ........................................................JA1138

**Volume IV**

February 23, 2026 Trial Transcript, Volume V (DE 251) .............JA1164

Corey Epps, Direct Examination by Counsel for Defendant BMW MC ....................................................................JA1169

Corey Epps, Cross Examination by Counsel for Defendant BMW AG.....................................................................JA1194

Corey Epps, Cross Examination by Counsel for Plaintiff ....JA1198

Corey Epps, Redirect Examination by Counsel for Defendant BMW MC ....................................................................JA1210

Corey Epps, Recross Examination by Counsel for Defendant BMW AG ....................................................................JA1211

Sherill Miller, Direct Examination by Counsel for Defendant BMW MC ....................................................................JA1276

Sherill Miller, Cross Examination by Counsel for Plaintiff.....................................................................JA1297

Sherry McCraw, Direct Examination by Counsel for Defendant BMW MC........................................................JA1304

Sherry McCraw, Cross Examination by Counsel for Defendant BMW AG ........................................................JA1383

Sherry McCraw, Cross Examination by Counsel for Plaintiff ....................................................................JA1384

Sherry McCraw, Redirect Examination by Counsel for Defendant BMW MC ........................................................JA1419

February 24, 2026 Trial Transcript, Volume VI (DE 252) ............ JA1460

Clarence Edward Bailey, II, Examination by Deposition Testimony ............ JA1465

Neal Gilmore, Examination by Deposition Testimony ......... JA1478

Eva Burgmeier, Examination by Deposition Testimony ...... JA1484

Charge Conference ............ JA1622

**Volume V**

February 25, 2026 Trial Transcript, Volume VII (DE 253) .......... JA1666

Charge Conference (cont'd) ............ JA1669

Closing Argument by Counsel for Plaintiff ............ JA1678

Closing Argument by Counsel for Defendant BMW MC...... JA1723

Closing Argument by Counsel for Defendant BMW AG ...... JA1766

Rebuttal Closing Argument by Counsel for Plaintiff ........... JA1788

Jury Charge ............ JA1794

Verdict ............ JA1830

Jury Polled ............ JA1832

Verdict Form (DE 216) ............ JA1862

March 13, 2026 Post-Trial Damages Hearing Transcript (DE 254) ............ JA1868

Kelly Dawsey, Direct Examination ............ JA1874

Kelly Dawsey, Cross Examination by Counsel for Defendant BMW MC ............ JA1855

Kelly Dawsey, Redirect Examination ............ JA1904

John E. Gibson, Jr., Direct Examination by Counsel for

Plaintiff.....JA1909

John E. Gibson, Jr., Cross Examination by Counsel for Defendant BMW MC.....JA1926

John E. Gibson, Jr., Redirect Examination by Counsel for Plaintiff.....JA1983

Closing Statement by Counsel for Defendant BMW MC.....JA1989

Closing Statement by Counsel for Plaintiff.....JA2003

Consent Motion to Amend/Correct Judgment (DE 231).....JA2031

Order Granting Consent Motion to Amend/Correct Judgment (DE 235).....JA2034

Motion for Judgment as a Matter of Law or in the Alternative Motion for a New Trial (DE 237).....JA2036

Joint Proposed Jury Charges (DE 240-1).....JA2059

Notice of Appeal (DE 265).....JA2062

Amended Notice of Appeal (DE 275).....JA2064

**Vol VI**

Trial Exhibits

Plaintiff's Exhibit 1 (Plaintiff's Resume, Dec. 2021).....JA2066

Plaintiff's Exhibit 2 (Plant Spartanburg Organization Chart).....JA2069

Plaintiff's Exhibit 3 (Petrasch Jan. 10, 2022 email to HR network).....JA2070

Plaintiff's Exhibit 4 (Petrasch Dec. 3, 2021 email).....JA2074

Plaintiff's Exhibit 5 (TX-6 Organization Structure Development Step 2 – for April 2021).....JA2077

Plaintiff's Exhibit 6 (TX-6 and TX-60 Info-Share Documentation, Sept. 29, 2021) ....JA2078

Plaintiff's Exhibit 7 (T-Vorhalt Request) ....JA2080

Plaintiff's Exhibit 8 (TX-60 Job Function Data Sheet, Rev. April 1, 2019) ....JA2081

Plaintiff's Exhibit 9 (TX-61 Job Function Data Sheet, Rev. March 1, 2020) ....JA2085

Plaintiff's Exhibit 10 (Exempt Organizational Structure, Aug. 2021) ....JA2088

Plaintiff's Exhibit 12 (Exempt Organizational Structure, Sept. 2021) ....JA2100

Plaintiff's Exhibit 14 (Plaintiff's Portfolio 2020) ....JA2112

Plaintiff's Exhibit 15 (Plaintiff's Portfolio 2019) ....JA2117

Plaintiff's Exhibit 16 (Plaintiff's Portfolio 2018) ....JA2122

Plaintiff's Exhibit 17 (Expat Guidelines for Plant Spartanburg, Jan. 8, 2016) ....JA2126

Plaintiff's Exhibit 18 (TX-6 Organizational Overview) ....JA2141

Plaintiff's Exhibit 19 (Plaintiff's Compensation Change Statement, March 20, 2021) ....JA2142

Plaintiff's Exhibit 20 (Overview on Reference Partner input during the promotion procedure, Oct. 2010) ....JA2143

Plaintiff's Exhibit 21 (Petrasch Text to Plaintiff, Oct. 1, 2021) ....JA2144

Plaintiff's Exhibit 22 (International Grading FLIV Approval Committee TS Spartanburg) ....JA2145

Plaintiff's Exhibit 24 (June 3, 2021 email from Plaintiff to Epps, Suber and Sanders attaching Project Misaligned PG Overview PowerPoint)........................................................JA2146

Plaintiff's Exhibit 25 (Jan. 1, 2021 email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian re: "as discussed" topics)............................................................JA2152

Plaintiff's Exhibit 26 (March 19, 2021 email from Petrasch to Belinski attaching 2021 Review TX-60 Org) ........................JA2154

Plaintiff's Exhibit 27 (April 8, 2021 email from Petrasch to Plaintiff re: draft job descriptions for VP HR and Manager of Recruiting)...............................................................JA2161

Plaintiff's Exhibit 28 (Email from Petrasch to Plaintiff re: HR Compact submittals)....................................................JA2163

Plaintiff's Exhibit 29 (TX-61 Job Function Data Sheet, rev. date Oct. 24, 2021)...........................................................JA2166

Plaintiff's Exhibit 31 (March 3, 2021 email from Petrasch to Plaintiff re: P&S TX-6).....................................................JA2169

Plaintiff's Exhibit 37 (Sept. 23, 2021 email from Petrasch to Koepnick and Burgmeier re: PE-TAG PE-Kreis) .................JA2170

Plaintiff's Exhibit 39 (Jan. 4, 2022 email from Petrasch to Hacker) ...................................................................JA2173

Plaintiff's Exhibit 41 (Jan. 5, 2022 email from Petrasch to Burghardt re: Plaintiff's resignation) .................................JA2174

Plaintiff's Exhibit 46 (TX-60 Job Function Data Sheet, Feb. 1, 2022) ...................................................................JA2175

Plaintiff's Exhibit 47 (HRIS Screenshots re Epps Employment) ..............................................................JA2179

Plaintiff's Exhibit 48 (Personnel Development Succession Planning, June 19, 2020) ..................................................JA2183

Plaintiff's Exhibit 49 (BMW Group Plant Spartanburg, Memo to Eddie Bailey re: Compensation Statement, April 19, 2023) ....................JA2185

Plaintiff's Exhibit 50 (BMW Group Plant Spartanburg, Memo to Neal Gilmore Compensation Statement, April 19, 2023) ....................JA2186

Plaintiff's Exhibit 52 (Portfolio 2022 – Eddie Bailey, March 2023)....................JA2187

Plaintiff's Exhibit 63 (April 21, 2021 Burgmeier email re: P-Circle) ....................JA2191

Defendant's Exhibit 1 (BMW MC Job Offer Letter, April 25, 1995) ....................JA2192

Defendant's Exhibit 2 (Morse & Savage copy of Plaintiff's Resume) ....................JA2194

Defendant's Exhibit 3 (BMW MC Implementation of Exempt Grading, Salary, Bonus and Benefits Structure Effective Aug. 2001)....................JA2197

Defendant's Exhibit 4 (Personnel Development/Succession Planning PowerPoint, June 2021) ....................JA2209

Defendant's Exhibit 5 (TX-6 Organizational Overview PowerPoint, Jan. 2022) ....................JA2221

Defendant's Exhibit 6 (Documents related to promotions, salary increases, and bonuses (2014-2021)) ....................JA2226

Defendant's Exhibit 7 (HR Records re: Plaintiff's Position/Pay History) ....................JA2236

Defendant's Exhibit 9 (HR Records on Scott Medley Position/Pay History, 2007 – 2025)....................JA2240

Defendant's Exhibit 10 (July 19, 2021 Email from Petrasch to Koepnick re: Succession)....................JA2242

Defendant's Exhibit 11 (TX-60 Job Function Data Sheet, Feb. 1, 2022) ....................JA2244

Defendant's Exhibit 12 (TX-61 Job Function Data Sheet, Oct. 24, 2021 ....................JA2252

Defendant's Exhibit 13 (TX-64 Job Function Data Sheet, May 1, 2019) ....................JA2261

Defendant's Exhibit 14 (June 3, 2021 Email from Plaintiff to Epps re: "Project Misaligned" PowerPoint) ....................JA2265

Defendant's Exhibit 15 (Jan. 21, 2021 Email from Petrasch to Plaintiff, Epps, Medley, Keith and Sinanian with Topics for Network to HR Team) ....................JA2271

Defendant's Exhibit 16 (Substructure HR Plant Spartanburg, TX-6, Nov. 2019) ....................JA2273

Defendant's Exhibit 17 (Sherry McCraw BMW MC Position History) ....................JA2277

Defendant's Exhibit 18 (Sept 23, 2021 Email from Petrasch to Englehorn attaching PowerPoint for PE Tax TX-6 Presentation) ....................JA2278

Defendant's Exhibit 19 (TX-6 and TX-60 Info-Share Documents for Plaintiff and Petrasch with Handwritten Notes, Sept. 29, 2021) ....................JA2280

Defendant's Exhibit 20 (Oct. 1, 2021 Email from Petrasch to Koepnick with Org. Chart) ....................JA2284

Defendant's Exhibit 21 (Sept. 23, 2021 Email from Petrasch to Sanders re: Epps' Promotion) ....................JA2288

Defendant's Exhibit 22 (Oct. 1, 2021 Email from Petrasch to McCraw re: Upgrading Epps to G11) ....................JA2290

Defendant's Exhibit 23 (TX-6 - HR Workshop VI / Management Workshop Agenda, Nov. 11, 2021) ....................JA2291

Defendant's Exhibit 24 (TX-6 Reorganization PowerPoint, Aug. 2019)....................JA2293

Defendant's Exhibit 25 (Dec. 10, 2021 Email from Petrasch to HR Team re: Meeting on TX-6 Organization)....................JA2308

Defendant's Exhibit 26 (Dec. 13, 2021 Email from Petrasch to Plaintiff and Medley attaching TX-6 PowerPoint)....................JA2309

Defendant's Exhibit 27 (Documents Produced by Miller in response to Subpoena issued to Morse & Savage)....................JA2323

Defendant's Exhibit 28 (Morse & Savage Consultant Agreement signed by Plaintiff, Sept. 2021)....................JA2354

Defendant's Exhibit 29 (Plaintiff's Check to Morse & Savage, Sept. 16, 2021)....................JA2355

Defendant's Exhibit 30 (Madewell Concrete Offer Letter to Plaintiff, Dec. 10, 2021)....................JA2356

Defendant's Exhibit 31 (Dec. 9, 2021 Email from Petrasch to all HR Team re: TX-6 Circle)....................JA2370

Defendant's Exhibit 32 (Plaintiff's Notes, Sept. 27, 2021)....................JA2371

Defendant's Exhibit 33 (Jan. 3, 2022 Email from Petrasch to McCraw attaching Plaintiff's Resignation Notice)....................JA2372

Defendant's Exhibit 34 (Plaintiff's Resignation letter, Jan. 3, 2022)....................JA2374

Defendant's Exhibit 36 (GSP International Airport Offer of Employment, July 1, 2022)....................JA2375

Economic Damages Hearing Exhibits

Plaintiff's Exhibit 53 (BMW Salary History)....................JA2377

Plaintiff's Exhibit 54 (BMW RSA Statement)....................JA2379

Plaintiff's Exhibit 55 (Summary Page Regarding Retirement Contributions....JA2380

Plaintiff's Exhibit 56 (Madewell 2022 W-2)....JA2381

Plaintiff's Exhibit 57 (GSP Annual Compensation Statements) ....JA2382

Plaintiff's Exhibit 58 (2022 GSP W-2) ....JA2390

Plaintiff's Exhibit 59 (2023 GSP W-2) ....JA2391

Plaintiff's Exhibit 60 (2024 GSP W-2) ....JA2392

Plaintiff's Exhibit 61 (2025 GSP W-2) ....JA2393

Plaintiff's Exhibit 62 (Dec. 22, 2025 Expert Report of John E. Gibson)....JA2398

Defendant's Exhibit 38 (Jan. 18, 2023 Expert Report of John E. Gibson) ....JA2413

Defendant's Exhibit 39 (Oct. 31, 2025 Expert Report of John E. Gibson) ....JA2427

Defendant's Exhibit 40 (Dec. 1, 2025 Expert Report of John E. Gibson) ....JA2441

Defendant's Exhibit 41 (Dec. 22, 2025 Expert Report of John E. Gibson) ....JA2456

Defendant's Exhibit 42 (Nov. 20, 2025 Expert Rebuttal Report of Nicholas R. Harris)....JA2471

Defendant's Exhibit 55 (Plaintiff BMW MC Earning Statement 2019-2022) ....JA2501

20142541

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

KELLY DAWSEY, PLAINTIFF,

VERSUS

BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP,

BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP

DEFENDANTS.

CA. NO. 7:22-CV-3738
GREENVILLE, SC
FEBRUARY 25, 2026

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
JURY TRIAL
VOLUME VII

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT: KURT ROZELSKY, ESQ.
SPENCER FANE LLP
P O BOX 294
GREENVILLE, SC 29602

APPEARANCES CONTINUED

| | |
|---|---|
| BMW MANUFACTURING CO LLC: | DONALD RANDLE MOODY, II, ESQ.<br>ELLISON MCCOY, ESQ.<br>JACKSON LEWIS<br>15 SOUTH MAIN STREET<br>SUITE 700<br>GREENVILLE, SC 29601 |
| COURT REPORTER: | DEBRA R. BULL, RPR, CRR<br>UNITED STATES COURT REPORTER<br>315 SOUTH MCDUFFIE STREET<br>ANDERSON, SC 29624 |

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

*** *** *** *** ***

INDEX

CLOSING ARGUMENT BY MR. MURPHY 13
CLOSING ARGUMENT BY MR. MOODY 59
CLOSING ARGUMENT BY MR. ROZELSKY 101
CLOSING ARGUMENT IN REPLY BY MR. MURPHY 123
CHARGE TO THE JURY 129
VERDICT 165

(Whereupon, the hearing commenced at 9:14 a.m.)

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: After our charge conference yesterday, we took your comments and last night produced an updated version of the jury instructions, and you have been provided with those, and you had some time to look over them, specifically on page 11. I think each side had concerns about the second sentence on page 11 under "adverse employment action," and that sentence has been revised to read as follows:

"You may find that an adverse employment action occurs when an employer provides notice of or communicates a future action to the employee rather than when such future action actually goes into effect if you find that the notice was of a non-speculative disadvantageous change in an employment term or condition."

Page 13. The Plaintiff objected to "national," and so that portion of the starting paragraph at top of page 13 now reads:

"Evidence that you conclude shows

that Defendants decided to remove Plaintiff from her TX-60 position and replace her with a German based on Defendant's preference to have German citizens manage their affairs is not evidence of discrimination. Evidence that you find shows that Plaintiff's American national origin was a motivating factor in that decision, however, evidence of unlawful discrimination.

On page 15 we added a parenthetical that says: "FCN Treaty" behind the words, "The Friendship, Commerce, and Navigation Treaty," so the acronym and heading was clear. Those are the changes.

If you have any comments about those I am happy to hear them at this time.

MR. MURPHY: Your Honor, appreciate the change on page 11. I understand the extra language you added to balance their concerns. I still have, Your Honor, with the changes yesterday at page 12 to 13 had serious concerns went beyond the word national. In fact, as it now reads, the sentence about what is in evidence -- what is not evidence of discrimination actually refers

to the facts of the case in terms of, you say:

"Evidence you conclude shows the Defendants decided to remove the Plaintiff from her TX position and replace her with a German based on Defendant's preference to have German citizens manage their affairs is not evidence of discrimination."

That is not balanced with the next sentence. So, what they hear is evidence of removal is not discrimination, but evidence that her nationality was at issue is evidence.

And my second part to the objection, Your Honor, wasn't just to the word -- use of the word "national," it was that:

"A party is entitled to a jury charge when there is evidence offered during the trial that would support that charge."

And this is why I got so upset about this, we have not once ever said "citizenship." They didn't -- they never stood up and told this jury, we did it because Burgmeier was a German citizen. Instead, Dr. Englehorn said, her nationality had nothing to do with it, it was irrelevant. So, before a party is

entitled to a charge, there has got to be evidence to support that charge under the law. All we have done is throw a new buzz word that they can use in closing, connect up to your charge here, but removing her from her position is not evidence of discrimination, and that is why I was objecting and I respectfully maintain that objection to this point.

Same with the FCN Treaty, Your Honor, just like to very briefly restate from yesterday, again, they offered no evidence that would support a charge on the FCN Treaty. First of all, the jury never heard anything about a Treaty. Jury never heard any decision-maker say, well, we were relying on this Treaty. Englehorn says whatever the Treaty says is completely irrelevant, whether you call it citizenship or you call it national origin, he says it was irrelevant. He is the one who made the decision to bring her here. And if he says this is not an issue, again, we are just throwing the defense a buzz word that can hang on giving them a charge that is unsupported by the evidence. And it sounds like the bench is telling the jury, because of this, she doesn't have a claim for national origin discrimination. The Treaty allows it. And to think the jury can draw that fine distinction when it wasn't developed at trial is

asking too much. If that was an issue at trial, whether it was her citizenship or her nationality, the last four years would have been spent on that issue. And we would have developed and we would have put testimony on, but that was not an issue, the jury heard nobody, if I can recall, and I will freely admit I have not recalled everything a hundred percent correct during the course of this trial, but I don't believe we ever, ever used that word.

Now, it is their defense, so they could have put up a witness to say, we relied on citizenship, and we want to bring Germans in based on their citizenship for this position, we still would have had all of those legal arguments, but you already ruled on those, and I understand. But nobody ever said that, and, therefore, we are not allowed to a charge on any of this, and for that reason I respectfully maintain my objection.

THE COURT: Okay. Thank you. Glad to hear from BMW MC.

MR. MCCOY: Your Honor, I think we are okay with the changes, just in response to Mr. Murphy's comments. First of all, Your Honor is charging on the law and the law is that, you know, using somebody's citizenship versus national origin is not a violation of the law, so I think it is an accurate statement.

With regard to the Treaty, this issue was argued yesterday in Mr. Murphy's Rule 50 motion. The Treaty has been asserted by BMW AG from the outset of this case as a defense. Your honor denied his motion, I don't think there is any dispute that the Treaty is a proper charge in this case.

MR. ROZELSKY: The only thing I would add, Your Honor, in the *Fortino* case, *Fortino versus Quasar* that we talked about at length yesterday, it was very clear that Judge Posner said it didn't matter even that they raised it. It is the law of the land. We also didn't hear any testimony about the specific statutory Title VII claims during the testimony because it is the law, that is what applies. Your Honor, we have no objection to how you have charged it because it is the law, it is what the Treaty is. So, the suggestion that somehow we now get a hook, that hook has always been there, the law has always been the same for the last four years. It has been the same on this issue and we have argued it in our answer three-and-a-half years ago, and we have argued it in summary judgment, we have argued it ad nauseam, we think it is a proper charge.

THE COURT: Thank you.

MR. MCCOY: Your Honor, I have one additional issue to raise, and I apologize for the last minute, but

we realized last night with regard to the verdict form, we have a concern because under the race discrimination claim, there is a Title VII claim and a Section 1981 claim. As Your Honor knows, Title VII has damage caps for compensatory and punitive damages, Section 1981 does not. Our concern is that we have a single blank, and if there is a number filled in there and the jury finds that there was race discrimination, if that number happens to be over the cap, we have no way of determining whether they awarded damages under Title VII or Section 1981. And so it could create an issue in terms of addressing any problems with a verdict that is in excess of those damage caps. So, we think there may need to be a correction on the verdict form just to acknowledge the Section 1981 claim and to ask the jury if their -- to the extent they award any compensatory or punitive damages, are any of those attributable to the race discrimination claim under Section 1981.

THE COURT: Show me where you set that out on your proposed verdict form that you were required to submit and that you did submit?

MR. MCCOY: I don't think I can, Your Honor. Again --

THE COURT: Why not? You knew there was a deadline.

MR. MCCOY: I understand, Your Honor.

THE COURT: Yesterday I made it clear after you were given the instructions that we were going to stay here and iron out and resolve any issues with respect to the instructions and the verdict form, and you all went your separate ways and talked about that. I didn't send for you. You came back in and told me when you were ready, and nobody said anything. In fact, what was said was, we are fine with the verdict form.

Anybody else want to be heard on that? What is your response, Mr. Murphy?

MR. MURPHY: Same as yours, Your Honor.

MR. ROZELSKY: I have no issue with this, Your Honor.

THE COURT: Okay.

Well, my inclination is to leave it as is for now. We have handled it the same way in other cases and I am thinking in the *Carter* case the parties had to deal with that issue, but it was not a problem, but I hesitate to rely on my memory. That case has been referred to by both sides I think during the course of the trial.

Okay. Anything else?

MR. ROZELSKY: Your Honor, just logistically, I think Mr. Murphy said he was going to take roughly an

hour, Mr. Moody said roughly an hour, does Your Honor intend to take a break between arguments or after those two? I am just trying to plan whether we are going to sit for two-and-a-half hours straight or whether you are going to have the jury get up and recess for a few minutes.

THE COURT: We will probably take some breaks.

MR. ROZELSKY: Thank you, Your Honor.

THE COURT: Short breaks.

I think there was an issue about the exhibit sheets going back to the jury or you have resolved that?

MR. MCCOY: I think the issue is the exhibit sheets include damages exhibits and so they are listed on there by name and they are not entered, obviously.

THE COURT: Is someone wanting them to go back with the jury?

MR. MOODY: No, Your Honor.

THE COURT: Okay.

All right. Well, is there anything else before we bring the jury in? You ready to go, Mr. Murphy?

MR. MURPHY: Yes, Your Honor.

THE COURT: Okay. All right. I am going to ask that y'all police yourselves on the time, and if you go over, I don't know how to get your attention without disrupting the conclusion of your argument, but I think

you said you had a timer.

Okay.

MR. MURPHY: I need one.

THE COURT: All right. Well, let's bring in the jury.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Welcome back, members of the jury. I hope you had a good evening. We are now at the stage of the trial where the attorneys will be making their closing arguments beginning with the Plaintiff. Depending on how long each argument goes we may -- we will probably take some breaks in between. Remember what the lawyers say is not evidence, but they will be giving you their thoughts about what the evidence in the case shows, but what they tell you is not evidence.

Mr. Murphy.

MR. MURPHY: Thank you, Your Honor. Well, good morning. One of the toughest things I have to do as a Plaintiff's lawyer and Ms. Thweatt has to deal with every single day is to answer calls and emails from people who are upset, they have been fired, something has happened to them at work and they want to go after their employer. And the toughest thing that Lisa and I have to deal with is getting them to understand what

this is really like. You got a little taste of it. It is nothing like what people expect. People's expectations come from TV and movies and they think you go in, you hire a lawyer, and he gets up, throws his arms around, says something, and the witness says something dramatic, 20 minutes later you get justice. It sounds great, right? But that is not reality, is it?

This has been four long years in this case to get to this point. And you can see what we have been up against for four years, what they have thrown at us this entire time, and there aren't many people like Kelly Dawsey who can endure such a fight, but she has.

But we know you have made sacrifices, too. You have had to sit in this chair and listen to the boring details about 60, 61, what is a function level, what is a personal grade. Yeah, you must have been killing yourselves at some point. But we were very impressed and everybody I think involved in the case remarked about how attentive this jury has been, we see you leaning into the screen and reading the details. All I can tell you is on behalf of Greg, and Kelly, and myself, thank you. Thank you for giving her these days in court. And thank you for giving her the opportunity to get justice that we could never get from that side of

the room.

So, what is a closing argument? Well, closing argument is my opportunity now to connect the dots in this case, try to piece it altogether. You saw one document here, you may have thought, I don't know why they are talking about that; you see another document over here, I am not sure why he is saying that or why that is important, well, here is my opportunity to try to pull that together for you and tell you how it works in terms of the case.

So, what is the basic role of a juror? The basic role of juror is to determine what happened. We don't agree with all of them on what happened. You heard witnesses get in that stand, take an oath, and tell very different stories. And under our Constitution, only one body can determine what happened, and that is you ten people who didn't know each other before last week, you are the only people who can make that decision. And in making that decision, one of the most important things to figure out is, who is telling the truth? You can't reconcile what Kelly says with what Ms. Petrasch says. You can't reconcile these stories. You have to believe one or the other.

So how do you do that? How do you assess

witness credibility? You determine that. Let me give you one suggestion, I noticed this happen in a trial very early in may career, a long time ago. And then I had the next juror talk to me after a trial and tell me, this is how they knew. The juror told me, you can tell when someone is telling the truth when they answer questions from the other side's your lawyer. When you answer questions from your own lawyer it is easy, right? Everybody is prepared, any good lawyer, and those are certainly great lawyers, you are not going to give your own people questions that you don't want to hear the answer to. But how do those people act when they are on cross? Start with Kelly. She answered all of my questions, you expect that. How was she with Mr. Moody when he cross-examined her? She was unflappable. He never nailed her once on anything. He had her on the stand as long as I did, remember that? Kelly -- all we had to do to prove Kelly's case was put up Kelly. Everything else that has happened in the last two weeks has been their witnesses. But he never got to her. Not once. Not one detail could he get her on.

Now, we will talk about some of the other witnesses. Dr. Englehorn, he is the President, CEO, he doesn't like being questioned. Okay. He is not he

-- to have somebody pushing back on him when he says something, says that is not the way it is, and you saw his demeanor when I started suggesting, no, what you are telling me is not the way it is.

THE COURT: Mr. Murphy, I am sorry to interrupt you, but I just wanted to point out that your screen is changing, but ours is not.

MR. MURPHY: Your Honor, I greatly appreciate that. I wondered why my one picture didn't get more laughs.

THE COURT: If we need to take a break, it won't eat into your time.

MR. MURPHY: Okay. That was smooth. I think I was talking about Dr. Englehorn and his demeanor when we started cross-examination and you observed that yourself. I am not going to sit here, don't worry, in this closing and tell you every little single thing you heard or saw. If it didn't sink in, that is on me.

Ms. Petrasch, the same thing. She answered questions very well for her lawyers, when I asked her question, word salad. Even when he showed her her deposition, the answer she gave, word salad. Okay. That is not someone who is trying to get the truth out, that is someone who is trying to deflect.

You saw it with Ms. McCraw. Talked about one

of the moments with Ms. McCraw in a little bit here, but she was not the same person on cross as she was on direct and that is how you assess witness credibility.

Now, you will hear the Judge talk about adverse employment actions and there are two in this instance, and, yes, they are related. The first is Kelly's removal from TX-60. The second is demotion. Now, let's talk first about the removal. Dr. Englehorn agreed with me on one thing, he said who should be in what position, the most important factor is who is the most qualified for that job? Is that something we have been told all our working life, all told to believe? Who is the most qualified? See, for Kelly, TX-60 was her career. Okay. She had moved around, moved around, worked herself up, started at another company, came here after five years of experience, more than most of these other HR people have. Started in an entry-level position, moves around, works her way up. That to date was the pinnacle of her career. You heard among the managers she is one of the top five in the plant.

For Eva Burgmeier it was, to use her words, a temporary assignment. A short stop over for function level two for Burgmeier; for Kelly this was her job, this was her career.

So, let's look at these qualifications: For Kelly at this point she has had 31 years of HR experience in South Carolina, Savannah River Site and BMW; Eva Burgmeier never worked in the U.S. Kelly, six years in TX-60 with excellent reviews. Eva Burgmeier never worked in TX-60; Kelly experienced dealing with U.S. and South Carolina employment regulations and government agencies and we named a bunch of those; Ms. Burgmeier no such experience, you heard that from herself yesterday during the readings. Kelly has the highest SHRM certification in the U.S. for Human Resource generalities; Ms. Burgmeier has no certifications. Even the lowest one.

You look at the list, take national origin out of it, who is most qualified for the job? I think the case becomes a whole lot clearer.

Let's talk about performance. For Kelly, don't listen to my opinion of her performance, let's look at what BMW said of her performance. Kelly's foundation and success factor is her deep and broad knowledge about all HR business practices. She is the key player within HR for strategy, development of new concepts and HR steering. Kelly is my role model. She is passionate, open, honest, and reliable. Okay. What do we know about Eva Burgmeier? Nothing. They

didn't put any performance reviews for Eva Burgmeier. They didn't even bring her, they didn't want you to meet her. You heard the evidence. She is still working for them, but now one of these Vice Presidents can go anywhere, be anywhere they want, they got her. They weren't going to show her to you. But from this, BMW asks you to assume that Ms. Burgmeier is the most qualified.

Another big issue in this case -- oh, the other point is one that Mr. Epps made, nobody knew her. He is the guy in charge of succession planning in TX-61, never heard her name before.

Now, a big issue in this case, we claim, is on the second point, demotion. We say going from TX-60, a function level three position to TX-64, a function level four position, is a demotion. Their argument is, but she admitted that she wasn't told it was a demotion, it was never said. She agreed that Ms. Petrasch did not use the word demotion, but on October 4th, Ms. Petrasch specifically told Kelly, you are going from 60 now to 64, and it is going to be a function level four position. They want to deny that. They will get up and tell you that TX-64 was a function level three, well here is the testimony you can consider on that, first of all is Kelly's. It is her department, she

knows the grades and the function levels. You have the testimony of Mr. Epps, who said the function level three positions were 60 and 61. You have Mr. Bailey's testimony, he ought to know, he was in the job, right? And he is a personal grade 9 at function level four. You have Mr. Gilmore's testimony, he also says it is a function level four, those were two of the readings you heard yesterday. And you heard Ms. McCraw's testimony, she is the one who offered these guys a job at function level four.

There are the offer letters for Bailey and Gilmore that we put in front of Ms. McCraw, Plaintiff's 49 and 50. While Ms. McCraw would like to toe the company line and say, hey, it is an ungraded position, that is her document, but the grade is squarely on it, function level four. So, when they get up and tell you something like, well, it was really a function level three, it wasn't officially graded, don't fall for it. Their own documents disprove that.

And it wasn't speculative that it was going to be a function level four, when you dig into the documents, that is exactly what they say.

You may recall there was a lot of discussion with Ms. Petrasch over this email and that parenthetical. And you remember after Kelly resigned

she tells Germany, who claims to have no involvement in this case, that there are two options for TX-64 and here is that language in the parenthetical, and she finally acknowledged that language says, either way, it is going to be a function level four position. Nothing in there saying that this was ever a function level three position, it was treated as a function level three position only when Mr. Medley was in it, and you heard testimony from Kelly about that. And I will talk to you in a few minutes about that why they did that for Mr. Medley and wouldn't do it for Kelly.

Now, if you got confused by this function level stuff, I don't blame you, it is confusing. I believe they are going to try to confuse it more by trying to tell you there can be more than two function level threes, there never were. Let me walk you through what happened on that. You will have the exhibits, you can go through it. If you line them up by date, you will see that what I am about to tell you is what happened. You go back before all of this happened and this is consistent with what Mr. Epps said, there are two function level three positions in the department. And those are the two that were one of the highest five paid managers in the plant, Kelly and Scott Medley, TX-60 and TX-61.

Now, a few years ago Mr. Medley moved to the newly created TX-64 position. How did that get a function level three if they claim they have never graded the positions? Kelly explained that and that is because Ms. Petrasch said we are going to let Scott take the function level three with him to TX-64. As you saw from those policy books, function levels don't move with a person, personal grade moves with a person, but that is what Ms. Petrasch did, she did it to protect Mr. Medley and keep him at a function level three.

So, what happened to the function level three that was attached to TX-61? Well, they just moved that to a function level four. I am going to talk about that because that was a big moment in this case. The timing of that is critical. So they switched and put the three on 64 and TX-61 was redesignated by Ms. Petrasch as a four, in December of 2020, remember that, December of 2020, I am going to come back to it.

Now, Mr. Medley moved from TX-64 to the project, that kind of freed up that three again, didn't it? So, what did they do? They took that three and they put it back on TX-61. So, the two function level threes were once again TX-60 and TX-61. There was no point in time that three positions were ever designated function level three. If they tell you there is, what

I challenge them to do is put the job function data sheet in front of you, three of them with the same date, show me three different function level three positions. I challenge them to do that in their closing, because I don't think they can do it. I have been through these documents a thousand times, you can't do it.

Now, why does all of this matter, this fussing about function levels? It matters because BMW says it matters. It makes very important distinctions on where you are on the hierarchy based on what level you are. Function level one we talked about, only one of those, the President. Function level two, that is the other executive level, that is those OFKs, or the Vice Presidents, okay. And Ms. McCraw talked to you about the rarified air of being a Vice President, and how hard it takes, and it takes years and everything. Then you get to level three, that is Department Manager, that is the TX-60 and 61. In a nutshell, you can read for yourself, that is the manager of managers. Okay.

They designated a separate level for manager, function level four, not the manager of managers, just a manager. Where you are in this hierarchy, as you saw, determines everything for your career at BMW: Affects your pay, affects where you are in this pecking order,

whether you are going up the ladder or you are going down the ladder; it affects your bonus; the personal grade and function level working together figures -- impacts where your salary is going to be. So it affects pay, and it affects bonus. And as we will see in a few moments, it affects your ability to move up because everybody agrees Kelly is not just sitting there trying to fill a chair, she is trying to move her career forward, she is not done.

Moving down a personal grade or having your personal grade higher than your function level, which is what happens when they put a personal grade 11, like Kelly, into a function level four job, they have specific policy on that. What happens? Bad things happen. They don't happen right away, but bad things happen under that policy, and Kelly talked about that policy. She didn't like that policy probably anymore than Ms. McCraw liked that policy. And to this, I will give Ms. McCraw some credit, she is sticking up for her people on that, and that is good. Kelly would probably agree with her, but Germany dictated that they put this policy in place and it requires that you scale somebody down, and you bring their personal grade down in line with that chart we just saw because, as you can see, a personal grade 11 can't be in a level four job.

This is the first policy that you will have BMW tried to runaway from. Ms. Petrasch got up there and said, oh, I don't think that was ever implemented. I don't think those letters ever went out. I don't think they ever did anything with that. You know, this must have been some lark of Kelly's that she had in her drawer or something. No, we never did anything like that, well, that blew up. Ms. McCraw acknowledged, oh, yeah it happened. I believe she said she had six of her employees got letters. Blew Ms. Petrasch's story right out of the water. Ms. McCraw remembers it because Ms. McCraw mad that some of her employees were being affected, by policy. Again, I don't have to take any issue with Ms. McCraw being upset with that, she is sticking up for her people, which is fine. But That is not the story BMW is trying to tell you. BMW is trying to tell you, we don't know about this policy. Obviously, it didn't happen. Why do they want to tell you that? Because they want you to believe it wasn't going to happen to Kelly. Oh, she has got us, yep. We put her in a job that doesn't match, she is going to get cut, let's say we don't know anything about it. Well, that didn't work out for them either.

Function level four and the opportunity to advance. Kelly testified no four ever goes to a two

and she was going to a four. Where did she want to go? We all know she wanted to go to two; no four ever goes to a two. Then yesterday you heard sworn testimony of Ms. Burgmeier, are you aware of anyone going from a function level four position to OFK? No, no, I have never heard or don't know a case like this. So, you got two people from two completely different continents, one through Ms. Burgmeier who has had worldwide responsibilities for people all over the world, and she tells you people don't go from a four to a two, but they are putting Kelly in a four. That is why it is a demotion. That is how it affects her career track, her pay, that is why she is so upset.

You heard Ms. McCraw then get up and tell you that this TX-64 position where they put, after Kelly, the lowest paid managers, the personal grade nine level, four guys, remember how much lower pay they were? She is now trying to tell you TX-64 was the most important job in the department. It is the lowest grade at the management level, you just saw that. The lowest grade. Kelly is one of the top five paid people at the management level, they are putting people in jobs where they are saying it is the most important and they are putting the lowest paid and lowest rated people in. Mr. Bailey is a personal grade nine. Mr. Gilmore

had no prior HR experience and we looked at those job function data sheets. TX-60, you have to be in HR ten years to be TX-60. TX-64, no HR experience required. And now they don't even want to argue those two jobs are equivalent, they are saying TX-64 is more important than TX-60. Again, look at their actions, don't listen to their words. If TX-64 was the most important job, it would be the highest paying one, that is just basic logic.

Now, we have three claims that we would like you to consider: First is national origin; second is sex; and third is race discrimination, I will walk you through these.

Under national origin, you will hear the Judge talk about discrimination and you will hear him talk about segregation and classification. Everybody has an idea, understanding of the word discriminate. Segregate and classifying are unique because most companies don't do this anymore. Back in the mill days, you know, they would have a black department and a white department, and women jobs and men jobs, and you could apply for certain things within your own identity or race or gender, but you couldn't work in the other departments. So, a long time ago, in fact it took effect the year I was born, Congress passed a law and

they included that provision to specifically address that, and most employers don't do this, but BMW is the rare bird it does. They set aside boxes and we will see them, based on your national origin.

We saw that, we will see it again in some of these upcoming slides, so that is the two theories. So, why did Kelly have to leave TX-60? Ms. Petrasch was clear, Dr. Englehorn -- what Dr. Englehorn wanted, national origin is at the core of both moves. He wanted a local or domestic, and you heard Dr. Englehorn say, you know, in China a local or domestic is a Chinese person; in Spartanburg, a local or domestic is an American. He wanted an American TX-6. They can't say national origin is irrelevant. They admit that. They admit he is still in that position. And you know, you saw under the guidelines where we go through them, that that automatically means, under their classification system, TX-60, if there is -- if the Vice President is a domestic or an American then TX-60 has to be expat or international, which the testimony is means German.

You have Kelly's testimony and documentation as to what Ms. Petrasch told her. You have Dr. Englehorn's testimony, he defends this whole thing, I wanted a local -- somebody of local national origin as my TX-6. He doesn't deny it. He said it worked well

for him in China. Folks, this ain't China, okay. He didn't have to deal with Title VII in China. But our Congress passed these laws to protect us. They didn't have the expat guidelines, couldn't be any clearer. If TX-6 is an American, TX-60 is German; if TX-6 is German, TX-60 is American.

And we are going to talk about what they have done through the years. Let me go through the first, Kelly's testimony and documentation. These are her notes she wrote down exactly at the time what Ms. Petrasch told her, and they go through right to the rule. The only way to get an American TX-6 is to have an expat in TX-60, that is what was said and documented at the time. Ms. Petrasch didn't come up with anything to refute that. Mrs. Petrasch testified Dr. Englehorn was filling TX-6 with a domestic, again, that is national origin, and he wanted a German in the TX-6 org. She said that. He didn't say, I want the best qualified person in TX-60; he said, I want to get a German in here. And that came straight from Ms. Petrasch.

The expat guidelines, this is the second policy they tried to runaway from acting like this is just something Kelly created and stuck in her drawer somewhere, well, that was not the testimony. Expat

guidelines were approved by the Vice President, in fact he drove it, it was Johannes Trauth at the time, okay, from BMW AG. He comes here for a cup of coffee and a job and he dictates that these governed the place. Kelly protested about them, said you can't do that here, you can't create these positions and slot them by national origin, but that is exactly what he directed. If you remember, they color code it, we will come back to color coding in a while because they tried to blame that on Kelly. The green boxes are international or domestic and you heard that means German; red is domestic, which is, as you heard, American here; and any place else in the world is considered global. That is the three codes; ain't no global jobs on that list. It is just you are either German or you are American. And they give you two options: TX-6 international, TX-60 is domestic or TX-6 is domestic, TX-60 is international. Top right-hand corner, they tell you where they are going to get the expat from, right? It says right there, AG. And that was presented to and approved by, over Kelly's objection, the senior management group. Finally Ms. McCraw had to admit when I showed her BMW produced the document yeah, we had it. Yeah, it was on our drive.

That is the second policy of theirs that they

denied knowing about, but I tell you, actions speak louder than words. You kept hearing them testify, there really aren't that many Germans over in HR, sometimes there is only one. They need to explain this. What are the odds that five times in a row the nationality of TX-6 is different than the nationality of TX-60? Five times in a row. Some of you may have a background in statistics, I hope so. I can't do simple math. But if you have very few Germans in a department, what is the chance that two positions line up exactly alternating nationality five times in a row, including today with Bianca Siemens, who you heard Ms. Petrasch acknowledged is a German, is there with Sherry McCraw, the American, in TX-6.

Actions speak louder than words. They can sit up here and deny everything left and right, and say, no, no, no, explain that. Explain how that happens five times in a row if that is not your policy.

Now, on this classification issue, you have a document that we discussed with Mr. Epps. And I point it out for a couple of reasons. First of all, they want you to believe that Kelly did the color coding, Kelly did the stuff that they didn't know about with calling people international and domestic. Well, here is their own succession planning document for Mr. Epps's

department. Ms. Dawsey had nothing to do with that. Look at the right-hand side, the same color coding scheme. And look at that box under Mr. Sinanian set-aside for an expat in gray. It wasn't Kelly. They want to try to put all of this on Kelly, but she had nothing to do with this document, but there it is plainly.

What is the other important aspect of that? That document was created when Ms. Petrasch was the Vice President. Ms. Petrasch, as you know, is German. Look at all of the candidates for TX-60, they are all American. Kelly didn't do that, but then look at this document, we are going to probably talk about this a couple of times. This is the other succession planning document. This was the one created by Claudia Koepnick at BMW AG. This was created after they knew they were going to make a change, Ms. Petrasch was coming back to Germany, they had known that for some time. And look at what all of a sudden happens to nationality of every candidate under TX-60? They become German. Two Germans, never showed up on the radar at BMW MC because BMW AG is the one making the calls.

And here is another interesting point, this happened really fast during Ms. Petrasch's testimony. But when she was giving me one of her word salads, she

pointed out the footer on this document. She acknowledges Ms. Koepnick created it when she said, and look, she did it in July, exactly. That is why I blew that up.

These moves were laid out in July of 2021 by BMW AG. Everything else is a smoke screen. They knew Ms. Petrasch was coming back, all the candidates become German, isn't that what happened? They moved Kelly out just like BMW AG said in July.

Now, I want to address Mr. Epps's testimony for just a second before we get back to some more national origin evidence. A strange thing happened, I thought, during Mr. Epps's testimony and it caught us by surprise. He said a couple of times Kelly and I weren't speaking. Did you notice he didn't look at her? That struck as odd because as you see from Kelly's performance review, she got along with everyone when they were there, what is going on? What is the tension? What is happening. I got a little bit of a hint in Kelly's direct, and this may have hit you or not hit you, but Mr. Moody put up this document, and he kept getting trying to get Kelly to say that TX-61, that is Mr. Epps's position, was changed to a function level four in October of 2021. And this was one thing Kelly would not back up, well you can't tell that from

this document. Sure you can, the prior document shows it was a function level three and this document shows it is a function level four. You changed it in October. She goes, no, you would have to look at the SAP records to answer that. He didn't like that answer. I thought it was odd and I am thinking he is trying to show that Kelly changed Mr. Epps's job from a three to a four after she was told she is being moved and demoted? Then I see Mr. Epps upset with Kelly and it started to click, that must have been what they told him. And that is why he was angry. You saw him, he is a nice guy. Mr. Epps is a good person, probably a good guy to work with. Why does he all of a sudden have this beef with Kelly? It is because of this story. And that is why I spent so much time on that story when Ms. McCraw was up because she said the same thing. She sat here under oath and told you folks that function -- the function level TX-61 was changed by Kelly after Kelly was told she is being moved, tried to shift the focus to Kelly, look at what she did, look at what she did. She did that guy dirty, right?

Ms. McCraw knows that isn't true. Remember Kelly's testimony, you have to look at the SAP records, that is the records where changes are entered and you can see on the screens when they are entered, and there

you have it. The change to TX-61 from a function level three to a function level four was made in December of 2020. And when they get up here and tell you it was done in October of 2021, they know that is not true. That document was in evidence. It is their SAP record, this is no surprise to them. They just thought they could getaway with it. They thought, well, we need a good story here and I guess they thought it was going to be a good story, and I guess it got Mr. Epps mad at us, but they can't walk away from that. What you are looking at right there, the SAP record, is the truth.

Now, further evidence that national origin is what drives this is the whole history of TX-600, that is one of the positions that reports to Kelly. She talked to you about hiring a gentleman named Stephan Dombrowski, do you remember the list she was given to hire Steven Dombrowski? All Germans. She had to pick from a list that BMW AG sent of Germans. When he left, Ms. Petrasch wrote this email, Germany is planning to replace Stephan with an expat because that is what Germany does. They tried to get Ms. McCraw to get up there and say, I speak German, let me interpret the emails, I don't think that is what they really say, that is what Ms. Petrasch says. She is German. She is telling you right there in here email, with five

exclamation points, what is happening. They are making decisions based on national origin. Again, actions speak louder than words. They can't runaway from those actions.

Sex discrimination, that probably didn't jump out at you as much. That is where you find the issues in the details.

All right. You have got Mr. Medley and Mr. Epps. Mr. Medley goes to TX-64 as a function level three okay because they want to protect him. Kelly goes, because he was in a function level three position, so he goes to a function level three to TX-64. What do they do? They protect him and keep him at that level. Kelly goes from function level three to the same position at TX-64, and what do they do? They lower the grade, they treated them differently.

Mr. Epps is having a meteoric rise through the range, we don't begrudge him of that. Again, I think he is a good guy. But you can't justify his rise based on any policy, in fact, the policy prohibits what they are doing to increase him. He gets two personal grade promotions in a very short time period and he gets a function level bump when Mr. Medley goes to that project. They say, okay, you can have the three, he goes from four to three, and he gets two personal grade

promotions, he never moved. He is doing the same dang job that he was always doing. Kelly kind of put it well, that guy is going up and I am headed down.

Why? Why are they doing that? We will get to that more in a minute, but you can't say Kelly got the same treatment or the same breaks as the guys got. The guys they always protect; Kelly headed back down. Ms. Burgmeier needs an assignment so she can go to function level two. Race discrimination.

Mr. Epps never had to move from TX-61 and was nine years in that one department, that is fine. I hope he is doing a good job and didn't have to move, but the same expectations aren't being put on Kelly. Now they are faulting her for not moving enough, but the truth is, she has moved as much or more as anyone in HR in her career. So, it is not about movement.

Again, he received these two quick promotions and he was promoted outside of the guidelines. They put him up to a personal grade 11, which as you have seen many times, does not fit in a function level four. Why? They told you why. This is Plaintiff's exhibit 5. The only reason they give for this, he is a minority.

Ms. Petrasch got up and said yeah, yeah, I think that is a good idea. We have got minorities in

the plant, we want management that looks like our work force. Well, folks, that is patently unlawful race discrimination. Diversity, good. Diversity efforts have made a lot of companies stronger and there are legal ways of doing it, there are good ways of doing it, they lift people up in the jobs they are qualified for, who were previously shut out of such jobs for ridiculous arbitrary reasons and nobody should have to go through that. But these diversity and DEI things you heard Mr. Bailey talk about the DEI, those went off the rails. When you are starting to fill seats and fill jobs because you want to make yourself look good by having a minority, that is not right; that is discrimination. Doesn't matter how good it makes you feel about doing it. Go back to what Dr. Englehorn said, jobs should be filled by who is the most qualified.

Now, they give an excuse for this. They say, well, he is going to be promoted to a function level three, he never moved to another job, they just changed it. This guy didn't have to do anything. I am sure he was doing fine, not trying to put him down, but he never moved. So, he is in a personal grade 11 in a function level four job that everybody else has said is a function four job, it doesn't fit. So, Kelly and her staff point that out. There is a problem with this

promotion, it is outside the guidelines. Those are the written guidelines we have already seen. And that is Kelly's job is to monitor and enforce those guidelines.

What does Ms. Petrasch say? There is a rule in Germany, which supposedly has nothing to do with this, if there is a position within the next 12 months on the horizon it is no problem, so all should be good. There was no other position on the horizon, he never moved. Where was this rule? I asked Ms. Petrasch, where is this rule? It wasn't a rule at BMW MC, no, it is a rule in Germany. Is it written down? I don't know. So, unwritten rules from Germany somehow make their way over here to be applied to get whatever result they want.

So she sends her a text, did that to cover you in the audits, not an email, nothing that could be traced. That is the workaround they did so that they could promote Corey Epps while demoting Kelly Dawsey so Ms. Petrasch can say, I have got a minority in management.

So, let's talk about their excuses. First they say Kelly did not move around. It is a shame she didn't go around getting more jobs and move to technology. It is a shame she didn't move around to more jobs. Well, Ms. Petrasch confirmed that you can

move up the ladder solely within HR. Judge them by their actions, not their words. Look at Ms. Burgmeier, never served a day outside of HR. It didn't hurt her career, did it?

Nobody moved more within HR than Kelly, I believe that. Mr. Medley might be close, they might be tied, I don't know, but I don't think they can show anybody moved more than Kelly. Ms. Burgmeier never moved. Mr. Epps stayed in TX-61 for a total of about nine years, he said nine or ten years. And none of the HR managers go to other departments.

They talk about people coming in from other departments, and that is true, but once you are HR manager, none of them, in the time Kelly was there, ever went to another department. It is just another smoke screen.

And why are they doing it? To try to take your focus off of what they did and try to put all of this on Kelly, but none of it is working. Deflections and distractions. Again, that chart I showed you, five in a row, I would love to hear their answer to that. Instead what are they going to do? They are going to talk about Kelly. We sat here last week, I put up one witness, who are they putting up? They put up the recruiter. They are putting up all of this stuff. Why?

Because they don't want to talk about Kelly. They are trying to get you think, oh, I don't like what she did here. Look what she did in October 2021, she screwed that Mr. Epps guy, he is a good guy, she screwed him.

All of these are tactics to take your eye off the ball. First one being Kelly is not qualified for TX-6. Look at the job descriptions. Look at the performance reviews. And Dr. Englehorn certainly didn't help them any with this when he said, we never had such talent in HR. I said, such talent as Kelly Dawsey? And he said, yes.

They go through a whole rigamarole about boo hoo hoo, Kelly's resignation was really inconvenient for us. How dare her go on vacation while I am still -- how dare her resign while I am still on vacation in Germany, that wasn't good for me. Okay. What are they trying to do? They are just trying to shift the focus to Kelly. And she explained all of that. The plant was closed the second part of December, so she resigned when she was ready to in January. She didn't owe them any notice. She still gave them a notice. When she showed up every day to work, she did her job, she didn't cause problems, she didn't act out, she didn't go around her coworkers and say, you know, I really feel like I am getting screwed. I feel like BMW -- she

never did that. She was a professional until the last day she received a paycheck from BMW, and even after she has never unfairly attacked that company, besmirched that company. Even through recruiter Sherrill Miller. She kept her business private, she didn't go out in the community and hurt that company or badmouth them.

Here is the big one, they are spending a lot of time on this. Oh, look, Kelly started looking at jobs before she was actually demoted. Again, it is just a smoke screen just to distract you. So she testified for a long time about that, okay. Greg bumped into Ms. Miller, you heard her talk about that, he is working in a house, she is helping the person, and that is how they met. It is Kelly who got in contact with her as Kelly testified she agreed to look what is out there, people do that all of the time. I imagine many of you have jobs, and at certain points say, well, I want to see what is out there. You see what is out there, are you quitting? No. You are getting the process going, you are covering your bases. And why was she doing that? She had s kid graduating high school at least one, she had kids in college, she needs to protect herself.

And Ms. Petrasch told her to protect herself. Ms. Petrasch told her later in December, you need to be

looking in other places. You need to be looking outside of HR. She knows what is going to happen when Ms. McCraw gets in there and starts becoming Kelly's boss. She is helpful at that point trying to push her in the right dissection, so Kelly does what any smart person does, she starts the process. I even asked Ms. Miller, it turns out didn't say anything to hurt us, isn't that common people will look around, see, and then maybe decide to stay or? Yeah, yeah, it is very, very common.

So, the timing of Kelly talking to Ms. Miller has nothing to do with whether she is discriminated against. They are just trying to say look over here, don't look over there. They are trying to distract your attention. That is why BMW is talking about these things. Because you ask what is Kelly -- I mean, if you go on LinkedIn, are you somehow you don't have a claim if you look at the classified ads in the paper somehow we didn't discriminate against you? No, those two things have nothing to do with each other.

Did BMW use national origin to fill in jobs? That question is answered. If I haven't convinced you of that by this point, then I have failed Kelly. So they don't want to talk about that. They want to say look at Kelly. Look at what Kelly is doing, what she is

up to. Never once did Kelly ever quit herself of being anything other than professional.

The other big line, it is all speculation. This is one of my favorites, why are they saying it is all speculation? Yeah, it might not have happened. Maybe it would have happened, maybe it wouldn't have happened. Well, let me ask this, if it wasn't the plan to move her to TX-64, why did Dr. Englehorn say the department was so screwed up for a year and a half because she wasn't in the position? Remember he said he had the dream team set up, okay. The perfect set up in HR with her in TX-64, but they are going to get up and tell you, it is all speculative. Nothing is speculative.

What Ms. Petrasch said on October 4th when she announced the change, I think the Judge is going to charge you that a cause of action occurs, the discrimination occurs when it is announced to the employee or communicated to the employee, not when it happens. They say nothing happened, nothing happened, nothing happened, that is not the analysis for discrimination. If you are standing on the train tracks and the train is coming at you and that conductor says, I am going to hit, you I am going to hit you, he is pulling that horn, you don't have to wait for the

train to hit you. Him pulling that horn saying, you are in trouble or something is going to happen is all it takes, so listen very closely, it is the communication or the announcement of the decision that is at issue. This whole stuff about she quit before it happened is just another smoke screen.

But there is the October 4th discussion. In September discussions, things were about what potentially might happen. In October, Ms. Petrasch, October 4th to be exact, Ms. Petrasch tells her, here is what is happening, you are not going to TX-61, you are going to go to TX-64, and it will be a function level four position. Already gone through that, the evidence always shows that it was.

You have the November meeting where they held a meeting to introduce the managers in TX-6 to their new boss, Ms. McCraw, who stood around for all of five minutes for that meeting and then left. After she left, she didn't reach out to Kelly to have any discussions with her about the future of the department, her contributions to the department, what she wanted, just went silent on her. They announced it November 4th. They showed this PowerPoint. They told you, this is going to happen.

Then they had a meeting with everybody in

December, showed the PowerPoints. Told Kelly to inform her department, she did as she was told. They told her, this is going to happen. That is a problem for them. They did that early, so what are they going to get up here and tell you? Well, maybe it wouldn't have happened. If it wasn't going to happen, how was it screwed up for a year and a half by her not being in the job? Of course that was the plan. If they weren't sold off it was speculative, then show us one document because I have showed you a whole bunch, show us one document that says it was never going to happen, just one. I challenge Mr. Moody to put up one document that shows that.

Now, let's talk about BMW AG. You heard there is an AG and an MC, and you heard that we sued both. Why did we sue both? Well, we spent a lot of time with Kelly on that, and I am not going to bore you with it. Again, going through it, everything she had to do, every job she wanted to fill, if you remember that T-Vorholt request, she has to go through all of the channels in Germany to get anything approved. They are going to sit here and tell you BMW MC makes all of the decisions. If they make all of the decisions, how did they explain her going requesting approval for positions, grading for positions, funding for

positions all out of Munich? You saw the function level four approval committee that nobody in the U.S. sits on, they even dictate what the function level four jobs are. They do the succession planning for here, and you saw that Ms. Burgmeier was in Munich, she was asking for Kelly's information because they are going to do the succession planning there.

We showed you Plaintiff's exhibit 2, which was a work chart, and at the bottom it says, BMW MC will not even be producing its own org charts anymore, we will do that here in Germany. They did everything. They dictated everything.

So, you are going to hear the Judge, I believe, talk about the integrated employer test, and there are four considerations to that, but let's focus on the decision at issue here, how did it happen? Well, I just showed you a slide where Ms. Koepnick sketched this out in July of 2021. Dr. Englehorn and Ms. Burgmeier are still at BMW AG. Dr. Englehorn testified at the forthcoming hearing, he discussed the decision with Barbara Burghardt and Ilka Horstmeier, we know both are at BMW AG. We have that slide I just showed you, Ms. Koepnick's slide, where she created the chart and there it is again. And again there is that footer that Ms. Petrasch inadvertently noted that slide was made in

July.

So, the integrated employer test, there are four factors: Common management, you saw lots of evidence of common management. Again, the whole bridge to Germany concept that Dr. Englehorn was testifying to, that was Kelly's job. She told you she was in touch and working with different folks in Germany all the time and so did Ms. Burgmeier. And they said she was an excellent bridge to Germany.

Inner relationship between operations, you heard plenty of evidence to that. In fact, to the outside world, when you look at these exhibits, you will notice one thing interesting, look at the logos. You won't see on the publications any logos that says BMW Manufacturing or BMW AG, you are going to see BMW Group, because in reality that is how they think of themselves, that is how they market themselves, that is how they show themselves to the world as one big integrated group.

Centralized control of labor relations. Well, I could keep you here all day going through that, but every policy, everything had to be dictated by Germany, including the policies that they now try to disavow, like personal grade reduction. Kelly talked to you about there used to be four personal grades at a

function level, Germany said no, you can only have three. They dictate every little detail. You want to create a position in the paint shop? You have to go through this whole T-Vorholt request and start talking to Germany, they control everything. Their folks imposed this alternating TX-6, TX-60 rule based on national origin, that was Mr. Trauth.

The degree of common ownership and financial control. I mean, they sat up here yesterday and said we have our own P and L, we control our own finances. That wasn't the evidence. They didn't actually back that up with anything. What we backed our story up with was emails from Kelly and emails Ms. Petrasch to the P Circle people requesting this, requesting this, requesting this, they had to do everything to get permission because the money comes from Germany. They have taken over everything down to the detail of, we are going to do the org charts. Filling a position below hers, TX-600, we are going to give you a list to pick from. We are going to send an expat. Germany controlled every aspect of that.

There is another issue you are going to hear about and it may surprise you for hearing about the first time and that is what is called a Treaty of Friendship. I suggest to you that their position is

the Treaty of Friendship is just another smoke screen. I want you to listen for one word during their closing, see if you hear the word "citizen" or "citizenship." See if they say that because that will tell you where they are going on this. You did not hear me, you did not hear Kelly ever stand up and tell you we are basing our claims on citizenship. Citizenship and national origin are two completely different things.

But there is this Treaty out there in certain circumstances that allows foreign companies to bring people over based on citizenship, as I understand it, the Judge will give you the correct instruction own it, based on citizenship, but that is not a defense to national origin discrimination. That may sound like a funny distinction, but it is very important and that is why we never used the word citizen or citizenship. More importantly than not using the word, did I ever introduce citizenship in this case? Did I ever ask, you are from this, but what are you a citizen of? What is your citizenship? No because it is irrelevant in this case, it is another smoke screen. Do not confuse citizenship with national origin.

This case is about national origin, the smoke screen is about citizenship. So if they want to talk about citizenship, if you hear that word coming out of

their mouth, I want you to think, well, that Murphy guy said that they never mentioned it, and you guys discuss, if I am wrong, you get to say I am wrong, but we never introduced that. We never asked somebody what they are a citizen of.

Let me turn to the issue of damages really quickly. The first form of damages the juries in these cases once you hear all of this evidence you award two forms of damages: compensatory and punitive damages. Compensatory damages are what compensates the person for the distress, the upset, for being discriminated against. You heard Kelly talk about after 26 years upon question of loyalty to this company and acting only in their interest, you heard her testify about what this did to her. It may not be really clear why she should have been so upset at the time, I hope you understand these personal grades and going down the hierarchy keeps you from going back up. I hope you can think what it was like for her to be in a job she loved, being doing really well in a job she loved, that is the dream, right? Some of us can do well on a job, but we don't really like the job. Sometimes we really like the job maybe we aren't really great at it, she had it all. And she was giving them everyday anything that they could reasonably suspect -- expect, to the point that

Dr. Englehorn said we never had such talent. And they took that all away from her. They took that away from her so Ms. Burgmeier could stop off here on a temporary assignment on her way to function level two, they said that is no big deal. Well, if you have ever had a job you loved, that you were good at, ask yourself, is that a big deal? That is why we have juries. Lawyers don't understand these things. They don't have that type of job. I mean, I work for myself. If I am unhappy, there is only one guy to blame, okay.

When you have to work for these multi-national corporations and you work in these big organizations, wow, what a great thing to have a job that you love that you are good at. If they are going to tell you that is not worth anything, you draw on your own life experiences on that.

Kelly talked about what that was like. You read her reviews, she was pleasant, outgoing, professional, she is the model. She couldn't sleep at night, she was dead tired. She threw up when she ate, she couldn't get over this. And she said I think she said took about a year so, somewhere around that, until she ever got after she left BMW until she ever got back to normal. That is what they put her through after she gave them the best 26 years of her career. What is

that worth? You want me to give a number? I am not going to give you a number because what I just said is why I truly believe, only you can come up with that number. My opinion of that number doesn't mean anything. They are going to tell you don't give her a dime, okay. You need to determine what that is worth.

Punitive damages. What are punitive damages? I used to hate punitive damages, it seemed like a lottery type thing or some kind of found money until I realized that punitive damages is the only thing that speaks to a company. If you just awarded compensatory damages to her, okay, what is the amount? They will be fine, okay. Because these people only speak in terms of numbers, they call their employees by number. They only understand numbers, okay.

You think they are all here and been here for four years because they are not worried about that number? The only way BMW is going to change its way is if it is told what we South Carolinians think about their practices here. This is not China. This is not Germany. This is the United States of America, we have laws. They don't believe they have to follow those laws. You are the only ten people in the world that can tell them otherwise because if you don't return a verdict for Kelly, and if you don't make that verdict

something that they will feel and care about, nothing is going to change. Nothing is going to change because if they can do this to her, they can do it to anybody. You see it in the charts, they do it in the organization, but they are not going to change because little old Brian Murphy filed this lawsuit four years ago. They are only going to change if these ten people sitting in this box tell them they need to change and that is why we have juries. That is the only way you can speak to them.

So I have come around, I no longer hate the punitive damages, it is necessary. The Judge will give you the standard for punitive damages. It is the only thing that will wake up that company and tell them it is more expensive to break the law than follow the law. If you are better off breaking the law than following the law, why follow the law? And the only thing that is going to make a difference to them is if there is a significant punitive damage, not to enrich Kelly, but to make them change.

And for that you are going to get a verdict form, ladies and gentlemen. And I am almost done. The verdict form is really kind of in two parts. It will look a little confusing when you get it, there are some legal reasons that the Judge is doing this to

protect both parties, but are you going to have a series of questions, but there is one first question that is going to decide which pages you go to. The first question on the first page is, do you find BMW AG was an employer of the plaintiff? That is that whole are they -- is there common management? Do they control the labor relations aspect? Okay. You listen to the law, you will make that decision. If you find for -- basically do we let BMW AG or Germany out of the case, yes or no. We ask that you check yes to that. If you do, then you will start answering the questions on page 2 and they are very simple. On national origin, you find for the plaintiff or the defendant, of course, we ask that you find for the plaintiff. Same question for sex, same question for race. Now, race will have two parts because there are two statutes, the Judge will explain that. Race discrimination is the same, causation is a little bit different. It is motivating factor. All we have to prove for Title VII is that national origin or race or sex was just one of the factors they considered, they don't have to show it is the only factor, sole factor. Just that it was considered. And five in a row, their own policy, their own document show it was considered. But race we have to show that what happened to Ms. Dawsey would have been

different but for her race. In other words, had she been a minority like Corey Epps, would this have happened to her? And we think the answer to that is easy, no. Look at what happened to Mr. Epps and that answers the question for yourself. But it is a slightly different legal standard, so you answer race twice.

Now, if you let BMW Germany out of the case, you actually start on page four, same questions, but only as to BMW MC.

Now, if as you hope -- we hope, you find for Ms. Dawsey on any of the claims, you come to the last page, and that is where you will put in the amount of compensatory damages and the amount of punitive damages. And again I don't think anybody should tell you what to put in that, I trust you ten people to fill those lines out as you see fit.

So, I will end here where I began and that is with a thank you. Again, you have been patient, you have been very attentive. I may have an opportunity to address you in reply and, again, please think about these things, focus on their actions, not their words. Focus on what this case is about, it is not about Kelly, what Kelly did, it is about them and what the did.

Thank you.

THE COURT: All right. Members of the jury, we will take a short break and then come back and hear from the Defendants. Remember my previous admonition, do not discuss the case, do any independent research about the case, or form any final opinions about the case. Everyone remain seated while the jurors are excused, thank you.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: We will take about a ten minute or so recess.

MR. ROZELSKY: Your Honor, I presume Mr. Murphy went about fifteen minutes over, you will give us some discretion if we have to go over our suggested time?

THE COURT: Well, the IT screen issue occurred about ten thirty five and it is about 10:45, so, yes.

MR. ROZELSKY: Thank you.

(Whereupon, a short recess was held.)

THE COURT: BMW MC ready?

MR. MOODY: Yes, Your Honor.

THE COURT: Bring in the jury, please.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: All right. Members of the your, we

will now hear closing argument on behalf of BMW MC.

MR. MOODY: Thank you, Judge Cain.

She quit. She left. She resigned.

Now, I have considered just saying those three phrases and going and sitting down because that is what this case reflects and what you have heard after six days of testimony. She quit. But Mr. Murphy said a whole lot of things that I feel like BMW MC needs to respond to.

Ladies and gentlemen of the jury, what you just heard was not evidence, it is story telling. Let's come book to the facts. You must answer one question, what happened to her? What happened to her? Not what might have happened, not what she feared might happen, not what she wrote in her notebook when she was working with her lawyer, it is what actually happened. And the answer is simple, nothing changed. There was no demotion, there was no pay cut, there was no reduction in personal grade, no change letter. There was no document said you are going to get demoted. No movement from TX-60 to TX-64. She resigned. That is the case. And this case is nothing other than she left us at BMW MC and she is now the Vice President of Human Resources at GSP International Airport.

Now, there was a lot of testimony from

Ms. Dawson and you heard her talk about her ambition that she wanted to be a Vice President. Well, she is the Vice President outside of BMW MC. And after listening to lots of testimony, it may seem as though it is really complicated, you may be asking yourself, what is the case really about? Well, this is not a case about department codes, function levels, personal grades, all of those things, all of those exhibits that you have been shown. This is not a case about who did what and where they are located. And this is not a case about someone being treated adversely because she is white, female, and American.

At the core of this case, this is a case about sour grapes and bitterness. It is a case about Ms. Dawsey's inability to accept the decision to make another white female, American, the Vice President of Human Resources at BMW MC. Someone who hadn't spent time in HR; someone who had not come up through the ranks of HR; someone who had not spent the time in the department, but ultimately this is a case about Ms. Dawsey's inability to understand the philosophy and the business culture of BMW MC, and it is these very qualities, the broad experience across the company and what we do in the technologies that made Ms. McCraw the better fit for senior leadership and the Vice President

of Human Resources.

Ms. McCraw, who was described in Ms. Dawsey's notes as being associate friendly. And how do we know this? Because Ms. Dawsey's actions speak louder than words.

Mr. Murphy and I disagree on a lot of things, buy we do agree that the actions speak louder than words and it is Ms. Dawsey's actions. What was the one thing that Ms. Dawsey knew on September 16th when she wrote a check to pay a recruiter to get her a job outside of BMW MC? The one thing she knew is Sherry McCraw is about to be the successor to Christine Petrasch. She knew she wasn't going to get the TX-6 job when Christine Petrasch left. And at that point she didn't care where she might land in the reorganization that was continuing at BMW MC. We have seen pictures, charts, reorganizations from 2018, '19, it looks like the whole place is under reorganization most of the time, but you know what? Ms. Dawsey wasn't going to be around when it happened because she wasn't going to be the Vice President.

And, frankly, the actions in this case, using your common sense, might reflect that she was leaving BMW MC at a time that might cause the most chaos and disruption because that is what she thought BMW deserved

after putting her through what she described a year of chaos; a year of chaos. Simply, the only thing that makes sense in this case, ladies and gentlemen.

You don't need to be an HR expert to be on this jury to understand -- you don't have to understand all of the HR and the corporate buzz words or HR buzz words to see what really happened here. Underneath all of this, it is a simple explanation.

Ms. Dawsey's explanation, you might recall from her testimony, doesn't make sense, and here is an example. You recall when she testified that she hired a recruiter because she wanted a better work-life balance because she was working 12 to 15 hour days as a TX-60, do you remember that? Want a better work-life balance, working 12 to 16 hour days. Then she also testified that she intended to stay in TX-60 until she retired and would have done so if BMW had not planned to move her to another Department Manager role. Both of those things cannot be true, those are wild contradictions on the same day of testimony.

So, she claims that the entire basis for her claims against BMW is that she was going to be moved in to a position that might end up in a function level four, yet she never asked for assurances from anyone that that might not happen. She never raised

objections and she could have done so.

What do we know? We know that her office was 50 yards from where the Vice President sits. Her office is 50 yards from where the CEO sits. We know that the legal department is on-site at the plant and she could go there. People that she worked with in the role of TX-60, but she didn't say anything. She didn't object, she didn't protest. This is someone who was making over $240,000 a year in salary and bonus and had regular access to all of the senior leadership and she didn't do anything.

Not only that, she is an experienced HR professional who has all of the alphabet after her signature with all of those certifications. She knows discrimination policy, she knows all of those things, and she did nothing. She didn't go talk to anyone. She knows how to raise concerns, why didn't she? And the answer to that, ladies and gentlemen, is she had already decided to leave and that is really important.

She had decided to leave, and we have actions that reflect that, before she knew anything about an international person coming to BMW MC in the TX-6 Department. She had decided to leave because she was being passed over for TX-6, a job she coveted, and given, frankly, to someone she didn't feel Sherry McCraw

deserved it. That is all that makes sense in this case. She was angry, she decided to get BMW back, and that is why she waited three weeks to let anybody know that she had accepted another job. That is why she left at the time when she thought it would be the most disruptive and regardless of the impact it would have, even on her team, those people who had worked for her for seven years. People that looked to her for leadership and support. And she didn't give those people a second thought because it was, and she corrected me at the end of day one, none of their business. She admitted that she lied to the very team who she worked with for seven years. She quit, she left, she resigned, or in her words, she chose to leave.

Seven days ago, Mr. Murphy told you this case was about discrimination. We listened to him for over an hour this morning, same discrimination. National origin, race, sex, that is a whole lot of different areas. And after six days of evidence we know what this is about. It is about chaotic communications. Dawsey -- Ms. Dawsey testified that she was exhausted after a year of chaos. It is about a reorganization of a Human Resources Department that was continuing. It was about a new CEO and President, it is about a new Vice President of Human Resources, it is about

succession, it is about change, it is about facing a challenging future, it is about maintaining a leading position in the automotive industry. It is about business decisions that sustain the top plant in the entire BMW Global production network. And, man, doesn't that make us proud here? The top plant.

And most importantly, this is about a plan reorganization. This is not some happenstance that just popped out of nowhere that only affects Kelly Dawson, we got a President, we got a Vice President of Human Resources, we have an entire leadership team changing. This is about business-making decisions to improve and consistently pursue excellence. This is not a demotion, this is not a pay cut, this is not a termination; this is a resignation.

She decided to leave before any changes happened and you cannot be discriminated against by something that never happened. The last day she walked out of Plant Spartanburg, she was the TX-60. Her email signature on the resignation email has all of her position and she sent it on BMW MC's email, and she is TX-60. The day she walked out of the plant, she was making as much money as she ever made, and she left it.

Let's start with what did not happen, ladies and gentlemen. Ms. Dawsey was not fired, she was not

demoted, she never received a reduction in pay, she never received a reduction in her personal grade, she never received a change letter. You know, they keep saying never, received an offer letter, she never received a letter saying, hey, you are getting demoted because it wasn't a demotion.

Remember I asked her, what day would you be demoted? Don't know. What month, would you be demoted? Don't know. What year would you be demoted? She wasn't sure. She never worked a single day in TX-64. She admitted all of that. On cross-examination we confirmed her salary at $202,450, she was personal grade 11. She stayed at personal grade 11. She earned almost 40,000 more than Mr. Corey Epps. And I agree with Mr. Murphy, he is a good man. And you recall that Ms. Dawsey didn't think $40,000 was significant. We know she had equalized with Scott Medley in compensation. And we know she accepted the job on December 10th, she resigned on January 3rd, she worked through January 14th, and she told Dr. Englehorn she had chosen to leave. These are not statements of the defense, these are not defense arguments, these are her admissions. It is not what I think, it is what came out in the testimony.

Now, we know she hired a recruiter, we know

she paid $1,500 to somebody to get another job. We know she interviewed elsewhere on several occasions. And we also know that she accepted another job, so before anything -- any change happened at BMW, she was already out the door, ladies and gentlemen. Leaving by choice is not discrimination, it is a decision, and her decision to leave us is not discrimination.

Time line. Remember I stood here and said, let's take about a time line. We think a time line is very important. She knew she was leaving weeks before she resigned. This was not forced. This was not sudden. And we know that the husband, Mr. Dawsey, ran into a recruiter doing his business and the recruiter happened to be a concerned neighbor looking out for an elderly person and so that is how they ran into one another. Do you remember when Ms. Miller came in here? Independent witness. We had to subpoena her to say you have to come to Court. She came to Court, independent. Ms. Miller testified that the September 8th email that you have in exhibit 27 was the first electronic communication between the two that we have, but she testified that her recollection was that she had met Mr. Dawsey some time within 60 days before she received the September 8th email. So, if you are talking about time line and 60 days before September, that means

there was an encounter, a recruiter, and we know that Kelly Dawsey was in a year of chaos, so there were thoughts and considerations of her husband thinking his wife might want this recruiter some time in the summer. This was all planned and that matters because if she decided to leave before any change occurred, before any prospective changes that are speculative, might not happen, might not ever occur, did not cause the resignation.

And in fact, there is a lot out there. And I just want to say I have had the privilege or burden of being on a jury recently. It is really, really hard work. And after three days of my service on the jury, my brain was scrambled to eggs because of all of the information that comes at you. Y'all have been going for seven days and you have worked hard. So, there is all of these evidence binders that will go back, Judge Cain will charge on that, and we will send the evidence that is admitted in the case, that will go back with you. But in considering everything that has been sent your way, I asked my team because y'all know I can't do it, I need some kind of something that the jury can look at and let's talk about the time line. So, we have prepared a short time line with some slides so that y'all can see that to maybe help focus your energies

after all of this information. So, Ms. Fowler, if you would, please, queue that up.

All right. Ladies and gentlemen, I don't know if any of you are taking notes, if you find any of this important, please note it because this document will not be -- will not be back there with you in the jury room. I will try to melt into the wall right here so you can look into the screen.

We know from the time line in August 2021, Dr. Englehorn has announced he is coming to Spartanburg as the new CEO and President, it is August of 2021. On September 8th, as I mentioned, Ms. Dawsey's husband contacts the recruiter, Sherrill Miller, and that is in the exhibit, to confirm that is Defendant's 27; it is a bunch of emails between Ms. Dawsey and the recruiter, okay. On September 10th, we know that Ms. Dawsey meets virtually with Ms. Miller, that, again, is Defendant's 27. And we know on September 13th, Ms. Dawsey emails Ms. Miller to provide instructions regarding her job search. Again, that is in Defendant's 27.

Now, Ms. Fowler, next page, please.

This is an important document contained in Defendant's 27, ladies and gentlemen. And when you get the notebook, you have been looking at a lot of screens,

it is going to be a group of documents like this. If you page on over in the documents, and I am going to make a mess again, they have numbers at the bottom. I don't know if you can see that in this group, so I will refer to numbers for your notes. And what we are showing you on the screen actually are these two pages early in the exhibit, and it is the Monday, September 13th email that Ms. Dawsey sends to the recruiter. It is a long email that says, list of companies that I am, in all caps, I am interested in pursuing in caps. List of companies I am not interested in pursuing. Recruiting companies, consulting companies to avoid. Positions interested in pursuing. That is pages five and six.

We also know that on pages eight and nine, we have this list of companies that she is interested in, lots of big names there; companies not interested in pursuing, lots of big names, familiar names there; and then she categorizes the recruiting companies to avoid; and then the snapshot the positions interested in exploring. And that would be pages eight and nine, ladies and gentlemen.

This is all occurring before any changes have been announced in the department, before she knows Sherry McCraw is going to be the VP of HR. All right.

So, I think I have just summarized that without looking at the slide. So, we know September 15th she learns that Sherry McCraw is the new VP. September 15th also happens to be the date that Ms. Miller sends the consultant agreement y'all, saw that is Defendant's 28. September 16th we know that Ms. Dawsey gives Ms. Miller a check dated September 16th, for fifteen hundred dollars. So, the day after she finds out Ms. McCraw is going to be the TX-6, she is scratching a check and paying a recruiter, which Ms. Miller said, is a reverse arrangement. Usually recruiters find a job and get paid by the employer; she is proactively taking action and spending money to get another job.

All right. Ms. Fowler, next page.

September 27th, we know that Ms. Dawsey contacts her attorney's office for the first time. And in her notes she indicates potential pay cut and function level issues, that is in the Defendant's 32. Do you see that? In her own writing "potential." "Cut in pay potentially." Speculation. Might not happen.

We know from her notes that on September 28th she actually meets with Mr. Murphy, and guess what -- no, go back Ms. Fowler, let me talk about that one. She has this in her notes on Defendant's 32, she starts doing a grid, and she puts words like German, and A, and

Gs, and they really like to talk about Germans and Americans in their case.

So, let's go to the next page, Ms. Fowler, thank you.

On September 30th, we know that Ms. Dawsey learns that Eva Burgmeier will come to the HR Department at Plant Spartanburg, that is Defendant's 19. On October 1, we know that Ms. Christine Petrasch meets with Dr. Englehorn and Sherry McCraw to discuss the proposed changes to the HR Department. That is the meeting where Ms. McCraw says, hey, you know, Corey needs to stay in 61, he has just been a Department Manager for a short period of time. They like to talk about him being in HR for nine years, but he has just been a Department Manager for a few years, just getting his promotion and, you know, he is a likeable manager where people in the plant are knocking the door to get him to come work in their departments because he had been in assembly, logistics, and other areas. But he has his degree in HR and he finally is a Department Manager there.

So, she says, no, leave Corey there, he is good with associate relations, again, an associate-friendly VP of HR who recognizes what the folks who are out there rolling up their sleeves, doing

the hard work, what they need out of HR. And Corey is meeting that need. And Ms. McCraw recommends, recognizing Ms. Dawsey's strengths, and abilities, and talents, that she would be good in TX-64 because she can manage contracts, she can help with recruiting, which was a big thing on her resume to other companies that she is good at recruiting, and so that happens on October 4th.

Let's go to the next one.

We know as a result of the job function data sheet that the function level for TX-64 has always been listed as function level three. There is no other job description that has a different function level, it just doesn't happen.

Next one, Ms. Fowler, for the time line.

November 11, 2021, the TX-6 workshop during -- it is shown that the revised organization is announced to all department managers, that is Ms. Dawsey, that is Corey Epps, that is Michelle Keith, that is Scott Medley, that is Paul Sinanian, so that is the November 1st meeting which Mr. Murphy dismisses as McCraw just showing up for five minutes.

So, we see on the next document, that is your November 11th, so all of the department managers know the changes, next one, Ms. Fowler.

You see these organizational changes, the header is a start date of 2-22, Ms. Dawsey is there, you see all of the disciplines that -- and areas and function areas, and that is the slide that is shown to the department managers.

Let's go to the next one, Ms. Fowler, thank you.

November 30th, we know that Sherrill Miller connects Ms. Dawsey with Madewell Concrete, that is on Defendant's 30. There was testimony prior to that that Ms. Dawsey had interviewed with Bosch. On December 3rd, Ms. Dawsey interviews with Madewell Concrete, that is again exhibit 30. On December 6th, the offer is extended by Madewell Concrete, that is exhibit 30. And then on December 8th, while negotiating her offer, Ms. Dawsey attends a meeting with Christine Petrasch, Robert Englehorn, and all the HR Department managers to discuss 2022 targets at BMW MC. That is Defendant's 31.

Next one, Ms. Fowler.

And again, this is Defendant's 31. You see the Department's planning for the new year, getting ready to go. And Ms. Christine says, let us say thank you to all of you for that, we really appreciate your hard work.

So, in the midst of planning for the next year

at BMW -- next one Ms. Fowler -- we have on December 9th, and again this is going to be in exhibit 30, exhibit 30 is a chunky exhibit, as well, and that contains the communications between Ms. Dawsey and Madewell Concrete. So, 27 is the recruiter, 30 is Madewell Concrete.

And on December 9th Sara Middleton from Madewell Concrete notes that they accept Dawsey's start date of January 31, 2022, but they would, quote, gladly have her start sooner. That was just a little graphic of that communication.

On December 10th we know Ms. Dawsey accepts the offer from Madewell Concrete and she plans her resignation for January 3rd of 2022 and her last day at BMW as of January 14th.

So, ladies and gentlemen, it is December 10th. She knows she is leaving and she is telling folks when she is leaving and when she will start at Madewell Concrete. Madewell says, we will gladly have you now, but Ms. Dawsey stays at BMW MC. Why does she do that? She has so much job stress, all of these symptoms that she described there without going to a doctor, not going to a therapist, and only going to a lawyer.

Next one, Ms. Fowler.

That is the job offer, you have seen that

USCA4 Appeal: 26-1793 Doc: 16-5 Filed: 09/03/2026 Pg: 88 of 412


before. Let's go to the next page.

December 10th, Ms. Petrasch emails Ms. Dawsey with the presentation to her team on Monday, December 13th, 2021. Remember, December 10th and December 13th are important days at BMW MC because December 10th Ms. Petrasch and the Department Manager is taking about, we are going to roll out the new organization on Monday, December 13th. Ms. Dawsey actually has a pre-meeting with her team that Monday morning and that is what Ms. Petrasch is talking about, here is the presentation, this is for your pre-meeting, and, you know, we will have the entire department where we announce the new organization at that time to everyone.

So, we see at 8:00 a.m. she meets with her entire TX-60 team to notify them of the reorganization; at 8:30 she meets with the entire department to notify them of the reorganization.

Let's go to the next one just so the jury can see that.

This is the email that reflects she is sending the slides.

Next one, Ms. Fowler.

Here is the slide again, we have seen that before, we saw that in November, nothing has changed there. Really important job, you know, they may

dismiss TX-64, but recruiting, health management, safety -- safety is pretty important in a manufacturing environment if any of you have been in manufacturing. Health is important in manufacturing if any of you have been in manufacturing. Recruiting, if you don't have people, the line doesn't run. And then gastro, the cafeterias. This is a large organization with 11,000 people. Some of you may work in healthcare, you know that the ability to eat your worksite is extremely important. In all areas that Ms. Dawsey would do really, really well at to improve BMW MC.

Next one, Ms. Fowler.

January 2022, production starts back up at Plant Spartanburg, and then on January 3rd, 2022, Ms. Dawsey calls Christine Petrasch, who was on vacation, to resign. She then submits her resignation letter, which is there, and she does it on January 3rd, basically, a Monday, saying, you know, you got me for Monday through Friday, Monday through Friday.

Next page.

Her last day at BMW MC in the TX-60 role was January 14th. We know she was personal grade 11, and, ladies and gentlemen, you may recall January 3rd is really bad timing at the plant. They have been down, production is starting back up, so it was not -- it

was not a good day to receive Ms. Dawsey's resignation.

January 31st is the date that Ms. Dawsey starts employment at Madewell Concrete as their top HR official. And she testified that she, in July of '22, receives an offer letter to become the VP of HR at GSP Airport. We see it there, the offer for the position of Vice President and Chief of Human Resources Officer. So, she got the title, that was her ambition.

All right. So, you have heard, I hope that time line was helpful, lots of things going on, so we tried to summarize those exhibits so the confusion that may exist might be removed.

Here is what we know, ladies and gentlemen. After September 22nd, when she met with Mr. Murphy, we have some self-serving notes. There is a note in there that refers to JT, Johannes Trauth. So she was going historical on us, saying that, you know, recruiting may be removed from TX-64, that is Johannes Trauth, he was there back in 2018. So, she is getting in her head about what might happen, not what was in existence. But her decision to leave BMW and the fact that that was made before anything happened breaks any kind of causation on any adverse -- alleged adverse employment action.

So TX-64 it is, it is not a demotion, I told

you about and hopefully you remember her testimony, heard about function level four from the other side using brochures and snippets of anecdotal information, but what matters is the law. Did she suffer an adverse employment action? You will hear from Judge Cain and the law in his instructions and not my reading, but his instruction when it talks about adverse employment action has a phrase, I believe, that says, "an adverse employment action is something that has non-speculative disadvantage change in an employment term or condition." Non speculative. Disadvantaged change. That didn't happen here. We know that TX-64 was a direct report to the VP. It was a critical role during a huge expansion. She was responsible for recruiting during a 1,000-person hiring range. So "she," it is Ms. McCraw, if Ms. Dawsey had assumed that position, which she didn't. And we know that Sherry McCraw called it one of the most important roles and you saw how Mr. Murphy tried to mock that term, most important role.

We know that Scott Medley now has landed back in 64. The man who was in the position, who went to the project is now back. And you remember what his compensation looked like? It has gone up more than 20,000 dollars since these four years. So, he has done nothing but go up.

A function level three was there at all times when she was there. But here is the key, she never moved into it, she never had a pay cut, no personal grade reduction, and no implemented downgrade or demotion that they talk about. No changes to her and her compensation, terms, conditions, or privileges of employment.

I want to say one other thing about 64, you remember when we looked at that one exhibit, I think it is Defendant's exhibit 16, page 4 -- Ms. Fowler, do you have that? And we were talking -- there was a potential external candidate, you remember this one? This is exhibit 16, page 4, look at all of those areas under 64. There was testimony in this case that Ms. Christine Petrasch was looking at an external candidate at Hubbell Lighting, one of the reasons that Ms. Dawsey didn't want to be a candidate at Hubbell Lighting was that BMW MC had considered a person at Hubbell for 64 to be the launching pad to be Ms. Dawsey's successor. Those are plans, those are ideas about what 64 was going to look like.

And we know that Ms. Dawsey left us, so a lot of things had to be removed and re-geared from that role. The organization continues to be in a state of flux and there is no grade on that position.

You heard about Mr. Murphy talk about Bailey and Gilmore. Ms. McCraw basically was trying to buy time to put people in that position that she knew from other technologies and she trusted and to find the right person. With the benefit of time, we now know that Scott Medley is back in TX-64 and we just see t hat his compensation just continues to go up and he is still at PG 11 with no decrease, and that is Defendant's exhibit 9. You can see on the right there in the middle it is PG 11, and you can see his compensation continues to increase.

And all of this function level stuff is a red herring because personal grade determines your compensation benefits, et cetera. PG 11.

So, there was no demotion, never happened.

Let's talk briefly about the witnesses that we called and hopefully you recall their testimony, I am going to just hit on a couple of points.

Our first witness was the President and CEO of BMW MC, Robert Englehorn, Dr. Robert Englehorn. He explained to you that Spartanburg is part of a Global Production Network. It is a plant that has to compete internally for future models. It exports vehicles to over 120 countries. We, in South Carolina, are launching electric vehicles, top secret stuff happens

over there. We are building a battery plant. We are expanding operations. We have got a press shop, we have a logistic center coming, we are hiring thousands. And he testified calmly and clearly that he selected Ms. Sherry McCraw to be TX-6. He believed she was best for the VP of HR, national origin was not a factor. He wanted the best person for each role. He never demoted Kelly Dawsey, he never reduced her pay. He was surprised when she resigned. He asked to meet with Ms. Dawsey at a critical time of the plant reboot, and Ms. Dawsey told him, she was upset she was not a candidate for the VP role.

Ask yourselves, did Dr. Englehorn, Robert, appear to be hiding anything or did he sound like a CEO that was managing an international plant under a massive expansion? Did he sound like someone who would be an inspirational leader and someone that you would want to be on his team? There were a couple of moments that were humorous because things are lost in translation, and he used the word "unscrewed," that may stick with me for a long time. I might use it myself. That was authentic and spontaneous.

And he also said they were all in the same boat; if you have a problem, raise your hand, we are all here to go the extra mile. That note was actually in

Ms. Dawsey's notebook, she wrote it down. That is why I know she heard it. When you have the President and CEO inviting you if you have a problem, raise your hand, we are all in this together, we are part of a team. You know, he was a world-class rower back in the day. World championship competition. So, he is using that teamwork mentality that athletes have to say, let's go together and let's endure it, let's go the extra mile; she does nothing.

She admits she never went to him with an issue. And let's remember that he was in the United States Court and English is not his first language. I am not sure if it is his second, third, or fourth language, but that is an impressive person. And we can see why he is the President and CEO of the top plant in the BMW Global Production Network.

Christine, let's talk about her. She was our second witness. You remember she said "yoo-hoo" instead of uh-huh (affirmative response). She was also very candid when she said, nobody likes HR. My son, who is a 26-year-old working for Milwaukee Tool, calls his HR Department the department of no. And, unfortunately, I think many of us, through our working lives, have that opinion. What is going on at BMW MC? A re-organization, new leadership, a new VP that is

associate-friendly, and let's just talk about Christine just briefly. She came from Bavaria, Germany, that is true. Her body clock was seven hours a head of us. And at five o'clock she was really ahead of us. She was steady, resolute, and she testified that she did not say the things that Kelly Dawsey put in her notebook. Ms. Petrasch explains, succession planning happens every year, the red box means change is coming, you remember those exhibits. It means time in a role, and if moves should happen, if there is a place to go, rotation for every five years is common, and TX-64 was created 2019, recruiting is mission critical. And Corey Epps promotion followed a portfolio discussion.

She also gave you the testimony about Kelly never being validated for function level two. This whole promotion stuff, another red herring. Kelly Dawsey was at the top. She was in the top five compensated department managers, and without validation, she wasn't moving forward. You have to be validated to move to level two, that is the process. Kelly admitted that she never followed up, never self nominated, and never pursued nomination. You have the testimony from her that said the previous President, Knudt Flor, invited her to call at any time or come to my office at any time to discuss it, and that was in 2018, 2019.

She never did. So, actions or a failure to act reveal what is really going on. She did not take the steps to validate. Instead, she stayed anchored down in TX-60, getting paid in the top five of the plant because she was in charge of what people got paid, including herself.

You have heard a lot about this bridge to Germany, let's but remind ourselves of the actual facts in this case. The President chose an American to be t he Vice President of HR. Stephan Dombrowski left in July of 2021. He was the sole person, other than Christine Petrasch, who could read and speak German in a department of a hundred people. No internationals were in that department other than Petrasch. We don't have a policy that says German only. The guideline that she references uses domestic and international, not nationality. And the only person that knew anything about these alleged guidelines is the person who wrote them, Ms. Dawsey. So, do you have those or do I need ELMO?

Do you have 17?

Beg the Court's indulgence.

THE COURT: Yes.

MR. MOODY: I am bouncing around on Ms. Fowler.

Ms. Fowler, in that bottom left, can you highlight

right above that confidential stamp? Is that possible? Can you blow that up?

Look at that. Where is this guideline coming from? Kelly Dawsey, her department. Remember that senior management approved this, it is in the minutes, no, it is not. This is a workshop that Kelly Dawsey did. And we have looked at the face sheet, the expat guidelines for Plant Spartanburg, it is talking about there are often questions about where international can even go. Most of these positions are boxed in red saying no internationals, we are protecting domestics, only domestics can be in most of these. Ms. Dawsey put these together, and we would submit to you, that she put it together because Johannes Trauth was the VP of HR, she had gotten to the top at TX-60, and this is a mechanism for her to protect that position because on each page it says, TX-60 put this together.

And if you look at 65, that is page nine, Ms. Fowler.

Look here, they keep focusing on TX-60 saying a domestic/international and that has to happen. Look at 65 is arranged the same way. And we don't ever talk about having an international in 65. We don't ever hear discussion about a German having to be in 65 because it is international/domestic has to rotate.

Again, this is a creation of Ms. Dawsey from 2015 and that is part of the story that they are telling you.

So, we have a company here in Greenville/Spartanburg that serves the world. This is a global marketplace. This is a global international production network, production follows the market. International sign-ups or comments. That is not discrimination. That is how corporations with an elite talent base and a purpose to serve the international market with a luxury product, that is how they operate. They put the best in. They borrow talent from other facilities. They push forward best practices. They continually improve. And when you are in a position for a while, it gets a little stale, we can all attest to that. Sometimes change is good for the company and change is good for us.

There is no rule that says a German has to be in a position, that is a made-up concept. Her own expat guidelines don't use German, they don't use American, they use domestic and international, and we showed you. The people in her department, they are all boxed out as domestics, regardless of what their name looks like, regardless of what their national origin should be, it is that they were working at Plant Spartanburg and they are domestic.

We saw Kavit, remember him? The bald-headed fellow? Man of Indian national origin. He is an American citizen, and guess what? This lady put him up to be a function level two, so he validated for function level two, and Kavit, a domestic, went to Germany for three years to work in assembly to improve himself, to bring talent and abilities that they are doing at a plant over in Munich back to Plant Spartanburg or wherever his next assignments are. That is how elite companies operate by leveraging talent, improving talent, and bringing the best of the world here, and sending our best to the world. There is no German rule. That is a creation of them.

In fact, Dr. Englehorn selected a white female American to be the VP of HR. That refutes any argument that the change going on at BMW MC were only based on national origin, sex, or race. He chose someone who is the same category and everything that Ms. Dawsey is alleging.

So, let's talk about Corey Epps real quick. This is a distraction, ladies and gentlemen. You heard first and only minority candidate, and they want you to be upset about that, but here are the facts. He earned $168,000, she earned over $200,000. He did not replace her, he did not reduce her pay, he did not

cause her resignation. This is not a comparative case, it is a distraction. She admits he mentioned meteoric rise. She admits that she moved two personal grades in a year and a half. We also saw evidence that she opposed this man moving two personal grades in two years, and she had already, in 2015, moved in a year and a half two grades. Why is she objecting to this man moving two personal grades? Made almost $40,000 less than her. That is a big difference in pay.

She is asking you to say that this is discrimination on the basis of race and points the finger at Corey Epps. Does that make sense? Do you remember what she said? He was moving up, I think Mr. Murphy said, and she was heading down. I think she testified she was moving down. That is just not true. This man testified that he earned everything. Drove from Chapin for over 20 years for his multiple jobs at MC. He testified that he and Kelly were not talking so he took the high road on the stand. And because she is using him in this case to claim race discrimination, do you think he might be offended?

She rejects his accomplishments of everything he has done at MC. He has an HR degree from Darla Moore School of Business at USC. And then she uses this lawsuit to point to him and say race discrimination?

Yeah, you doggone right he has the ability to maybe be upset about that.

Let me remind you, he works for Scout Motors as the top HR person for production at Scout Motors. We had to subpoena him to come, and he did.

Corey simply caught up with Kelly on the personal grade. He did not get treated more favorably than here, that is not discrimination.

Sherry McCraw. Actually I have been challenged by Mr. Murphy, and I am an old brain-injured football player, so I have been challenged, now I think I need to reply. Do you have Defendant's 11, 12 and 13? Remember he said, see if they on the defense side can put up some job description to show that there are more than two function level threes? Let's do it.

Ms. Bull we are looking at Defendant's 11, I think.

Ladies and gentlemen, look at the date. Let's go on over, Ms. Fowler, if you could a few pages, to 306. All right.

Do you see that April 1, 2019, TX-60, that is function level three, okay.

Ms. Fowler -- I am going to go faster than Ms. Fowler can, let's go the exhibit 12, page 316, keep going.

You see the date there? April 1, 2019, TX-61, that is function level three. That is before it got changed in October 24th of '21, but we see that that is function level three. Remember she said, hey, I want to go to 61 because Christine said she would give me a function level three and protect my function level three.

Let's go on over to exhibit 13, Ms. Fowler.

May 1st, 2019, Defendant's exhibit 13, look a there. TX-64, function level three. Ladies and gentlemen, I think we met the challenge.

Sherry McCraw, employee number 39, she is a builder. I am low on time, I will cut through some stuff, I don't want to bore you anymore since you have been here for seven days. She made the pitch to bring more models here at the BMW MC. Describes 64 as operational, critical. He said something that is interesting, she knows what was going to happen when Ms. McCraw is going to become her boss. Ms. McCraw sat up here and said, Ms. Dawsey never gave me a chance, she left. What we do know, through the passage of time, that the folks in the factory working forty hours a week for a living, there was a 25 percent wage increase for them since there has been change. The maintenance wages are up 36 percent, 36 percent. This

is a department change with growth and she views everybody as important. But, again, Ms. Dawsey didn't give her a chance. And you know what, Scott Medley is back in 64, PG 11.

Let's talk about Ms. Dawsey. She admits that she lied and that she was looking out for herself. Remember that day? Mr. Rozelsky asked some questions, she lied to her team. Even though she had another job, she told -- she chose not to tell her team. So, she admits she lies when it is in her best interest.

Judge Cain will instruct you on the credibility of witnesses. I ask you, is Kelly Dawsey telling the whole truth or does she just give you a version of the story that looks out for herself and is based on documents that she created or she was otherwise involved in to help her case? Speculation, guesswork, her word, potentially dominate this case because nothing happened to her. Remember her testimony, she cannot give a date, month, or year of when the alleged demotion might occur.

Ladies and gentlemen, the burden on this case is on Plaintiff to prove things by a preponderance of the evidence. There is a song that as I age I understand more, it is by the Rolling Stones, says, you can't always get what you want, but if you try

sometimes, you might just find you get what you need. I think that case is a lot like what has happened in this courtroom. She wanted to be Vice President of HR really, really bad. You will see in the deal, September 30 she is sending an email to the recruiter. There was a VP of HR at Dark Points, she said, oh, this came across, let's go after this one. She is going after titles, ladies and gentlemen. She wants that title and that is her right to do so. It is fine. Just don't come in here and sue BMW MC claiming you have been discriminated against on three classifications. He makes a big deal about all of these people over here, you are doggone right there is a lot of people over there. Because she alleges that we broke the law. We did not break the law. We will be more BMW, we will have a fighting spirit, and we will reflect on our leadership at BMW. So, when somebody says we have done something we didn't do, we are going to fight back. And that is our right in this court, United States District Court for the District of South Carolina, standing before the Chief Judge, we are proud to be here.

And hid insinuation that there is something wrong with that is not fair. Just like the personal grade guidelines that she did away with, it was unfair.

Was she unpopular because she was doing some unpopular things? Maybe so. Did that contribute to her job satisfaction, job stress? Probably so. She lost her entire benefits department, lots of change and challenges. She was responsible for wildly unpopular things and she made the decision to hire a recruiter. That is fine. Don't come into Court and attack us because we struggled to find the right people to go in 64 and then claim it is the wrong function level.

She wanted to be valued, that is fine. That is a subjective emotion everybody is entitled to have. And she went and found what she needed. That is great, fantastic. She is not going to talk to leaders, she was a leader, and she decided to leave, go to a lawyer, work a plan, and now she has the Vice President title. This is -- trying to make -- Mr. Murphy tried to make this analogy about she is standing on the track and the train is coming. Well, ladies and gentlemen, she wasn't standing on a track with any train coming, and even if she was standing on a track, she got off the track, nothing happened. Nothing happened. That is the frustrating thing here. Six days of evidence and nothing happened.

Now, as I close, Your Honor, broken trust, undermined, betrayed, Sherry is associate-friendly.

She claims that bringing a German in would move the department backwards, Ms. Dawsey did in her notes. She is asking you for money for something that never happened. Didn't go to a doctor, didn't go to a therapist. She was responsible for the associate family medical center. She could have driven right over there and said, hey, I am having trouble sleeping, can I get some help? That will do it. We don't have any documents, you know, to test whether she had any of these symptoms, just what she says.

And, basically, ladies and gentlemen, because she made her own choices, she is asking to send a bill to BMW and for y'all to put in the amount of that bill of money that she receives. You do not punish BMW because Ms. Dawsey assumes the worst and chooses to leave. To render a verdict in her favor is to basically create a reality that did not exist, construct a reality on something that never happened. Nothing bad happened to her, she quit.

Now the law. Plaintiff must prove, and on the basis of national origin, sex, race, that she suffered an adverse employment action, and he says demotion, we disagree with all of that. She didn't have any adverse employment action. And even if there were one, she has to show that it is non-speculative and

it is a disadvantage change to her. You can't skip that first step. So she stopped it, stop. No, it didn't happen.

Secondly, because of race, sex, national origin, no, that didn't happen either. So, without an adverse action, this case ends. She admitted to you, no demotion, no pay cut, no reduction in personal grade, no implemented change, she resigned. The burden of proof is on the Plaintiff, not suspicion, not speculation, not interpretation, proof. After seven days, there is no proof of a demotion, pay cut, termination, et cetera. What we do have prove of is t hat she paid a recruiter, she sought a top HR job, she sought to be valued, it was a voluntary resignation, and she was a highly compensated executive who left for another opportunity. Ms. Dawsey is now a Vice President and good for her.

Since day one y'all have been extremely attentive. Thank you for your indulgence in listening to me. I personally experienced it, had to be brutal some days, and I know some of you went home and probably needed to do some work to keep ahead from where you are in life, so we, on behalf of BMW MC, we thank you for that.

You have seen the documents, you have heard the

admissions, you have heard seen the time line, you have heard from our President and CEO, you have heard from two Vice Presidents of Human Resources, we brought in the leaders so that you can hear from them. You have heard from the recruiter that said Dawsey wanted to slow down. Hey, I am on the fifth floor of life, I understand wanting to slow down when you get your kids out of the house. You don't want long days.

Ms. Dawsey is retiring in two years. She has accomplished a lot in life and we can all understand not wanting to work 12 to 15 hour days, she wants to slow down. She made that choice, she is now a Vice President, great for her. You see all kinds of leaders at BMW MC. People that go international, accomplished people. I can't imagine going to China to work. This is a culture of going where you are needed when the business needs you. The business needed her in TX-64 and asked her to do that. And she did not respond in a positive way because she left. And she sat on her decision because it was none of our business.

Now, the question on the verdict form is not whether BMW was perfect, not whether change is uncomfortable, the burden is not on BMW to prove our innocence, the burden is on Ms. Dawsey to prove discrimination. The question, ladies and gentlemen,

is simple: Did BMW MC discriminate against her. The answer is no. Did Ms. Dawsey choose to leave before anything happened? The answer is yes. You cannot punish a company because someone assumed the worst and chose to leave.

Do you have that form, Mr. McCoy?

Now, Ms. Rutgers, can I use that? Feel like I need to.

You are going to get this verdict form that Mr. Murphy talked about. He is right, the first question deals with BMW AG, I guess I should put it down since you have a screen, sorry about that.

So this is the verdict form. And number one talks about this integrated employer thing, Mr. Rozelsky will talk to you about that. And Mr. Rozelsky will talk to you about item one.

Where it comes to BMW MC on the second page that again will be BMW AG, Mr. Rozelsky will talk to you about that. BMW MC would ask, listen to Mr. Rozelsky as it pertains to AG, and if you answered no to that, then you come to BMW MC. All right.

And in all of these questions, we are asking you, ladies and gentlemen, on all of these questions to check we find for BMW Manufacturing on the claim of national origin, discrimination under Title VII, we

ask you to check that.

On Plaintiff's claims against BMW Manufacturing for sex discrimination under Title VII, and we think that is alleging Scott Medley got better treatment, we ask that you check that.

On number 8, Plaintiff's claim against BMW Manufacturing for race discrimination, this is the Corey Epps one, we ask you to check no, say we find for BMW Manufacturing.

And lastly, I think, as the claim for race discrimination under 1981, this is Corey Epps, we ask that you find for BMW Manufacturing.

Now, when you find for BMW Manufacturing on all of those, you can stop and you don't have to go to this sheet. And I have been in this chair representing plaintiffs, and, you know, when you ask for money you have to be careful. So, I am going to ask you to do something: As a Defendant, representing this fine company, and the fine people who work at the Plant Spartanburg, we ask you to put zero in those blanks. To recognize that BMW MC has the right to defend itself and to defend the fact that it did not discriminate against Kelly Dawsey. There was no -- she wasn't demoted, she wasn't cut, she wasn't replaced, she wasn't harmed, she left. And because of that, the only

fair verdict in this case and the only verdict supported by the evidence is for BMW MC. Ladies and gentlemen, she quit.

You please go back there and do your duty. Please find what the evidence reveals and that BMW MC is entitled to the verdict. And once you do that and you return it, we can all be like Ms. Dawsey and we can leave this courthouse.

Thank you very much.

THE COURT: Let's take about a ten-minute break, we will come back here and hear from BMW AG. Remember my instructions, do not discuss the case, do not do any research about the case, do not form any final opinions about the case. You haven't seen the exhibits together yet, you have seen them as they have been introduced, and I appreciate your cooperation. Everyone remain seated while the jurors are excused.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: All right. Take about a ten-minute break.

MR. ROZELSKY: Thank you, Your Honor.

THE COURT: All rise.

(Whereupon, a lunch recess was held.)

THE COURT: Let's bring in the jury.

(Whereupon, the following was heard in the presence of the trial jury.)

THE COURT: Welcome back, members of the jury. Due to a communication snafu that was totally my part, I was told when you went back into the jury room, lunch was on the table. I thought it would be a cruel joke to have you see your lunch and then have to come back. I conferred with the lawyers and parties and they all agreed for you to go ahead and eat lunch. We are back and ready to hear from BMW AG.

MR. ROZELSKY: Ladies and gentlemen, I thought I was going to start by saying, I am the only thing between you and lunch. I hope that your blood sugar stays up. I promise t hat I will not be as long as the lawyers before me.

But I want to thank you, first, for your patience. This has been six long days, I know it because we have been sitting over there, I know how hard it is coming in and out of your seat.

You have heard from six live witnesses, three depositions. You have heard about guidelines, goals, targets, policies. I am fairly certain you have heard more about HR than you have ever wanted to in your life. There is a scooch more, and I apologize.

I understand it can be confusing, you heard

about this morning, from Mr. Murphy, about manager of managers. We heard Ms. Dawsey talk about that is when I was manager of the department and then I went to be a Department Manager. You don't need to worry about all of those things.

You remember last Tuesday morning I said to you that this is a puzzle. You will get all the pieces to the puzzle; you now have all of those pieces. My job over the next thirty minutes is to help you understand how those pieces go on the verdict form so that you can make an informed decision, so that you can do justice because that is what we have asked.

Now, I want to let you in on a little secret. Not every exhibit you saw is important to figure out that puzzle. And a lot of the pieces of that puzzle that might help make it clear, we didn't get. When I say we didn't get, Ms. Dawsey and her attorney didn't give you that evidence and that becomes important when the Judge talks to you about the burden of proof and that Ms. Dawsey has to prove these things to you.

Now, you have heard an awful lot of talk from some great lawyers and you saw a lot of documents. The clerk is going to hand you this when you go back in the jury room, these are all of the Plaintiff's exhibits, okay. You get them all to come back with you. Make

sure that if you are looking for a document that is not there, those are the Plaintiff's exhibits. Ask yourself why it is not there. You know, the email that came from Germany saying this? Or the email coming from Germany saying that? They are not in there.

Now, you have heard over two-and-a-half hours from really good lawyers, my role in this case is much narrower, it is a lot easier. I do note represent BMW MC, I represent BMW AG. I wore the flag today so you would remember I was the AG guy.

Now, you have heard AG called several things, you have heard it called Germany, shorthand, Germany. The fact was that AG stands for all of Germany, I don't represent all of Germany. I don't represent 85 million people. I represent BMW Atkiengesellschaft, BMW AG. So, why is that important? Because at the end of the day, there are really only two questions that you need to decide, did BMW AG employ Ms. Dawsey? That is a very important question. Secondly, if you find that BMW AG did employ Ms. Dawsey, did she prove that they discriminated against her?

Now, it is really one question, but the Plaintiff has filed three different claims and really four claims if you count the different statutes, but at the end of the day, this is a case about whether or not

Ms. Dawsey was moved because she was an American -- a national origin American, that is what this case is about. And the answer to that very simply is no. So, what did we hear? We heard Ms. Dawsey on the stand say a couple of things. She said I work for BMW Manufacturing Company in Spartanburg, South Carolina. I was required by BMW Manufacturing, not AG. I was paid by BMW Manufacturing, not AG. I was evaluated by BMW Manufacturing, not AG. I was promoted many times by BMW Manufacturing, not AG. I was supervised by TX-6, the Vice President of Human Resources, at BMW Manufacturing. Ms. Dawsey said, I have never been employed by AG, never received a paycheck from AG, never reported to a German manager, never supervised any AG employees.

So, how do we get to why I am here? You heard last Tuesday morning Mr. Murphy said, you are going to hear a lot about Germany because they say they shouldn't be here. Guess what? Seven days later, still not certain why we are here, okay.

Undisputed, BMW MC was her employer. So, what does Mr. Murphy and Ms. Dawsey have to do? Well, they have to show you some other way to claim that BMW AG represents or is the employer. What the Judge is going to show you is a verdict form, you will have this back

in the room. What is the very first question on that? The most important question with regards to BMW AG, do you find Bayerische Motoren Werke Atkiengesellschaft, also known as BMW AG, was an employer of Plaintiff? Check yes or no. Very first question you are going to get.

So, how do you figure that out? I mean, I am sure some of you right now is saying, she said she was MC. We heard a little bit about the integrated employer, the Judge is going to charge you about this concept of integrated employer. What is an integrated employer? It is where a parent company so controls the subsidiary that they are considered one player. Now, ask yourself when you look at these exhibits, where is that evidence of that control? Does it come from AG showing the control? Or does it come from Ms. Dawsey saying they control this? We couldn't do anything without asking.

And the verdict form is going to say, if the Plaintiff fails to prove that BMW AG and BMW MC are so interrelated or integrated they should be considered a single employer, if you check no, which we believe is the correct answer, you don't have to talk about AG anymore in that jury room. No more discussion about AG. It is now a question of whether MC did anything to

discriminate, which we would, again, submit they did not.

Now, the integrated employer test, you saw Mr. Murphy show, it had four different parts. Let's talk about those four rules. One the degree to which the two companies have common management, okay. Remember, you heard Dr. Englehorn say, I am the President and CEO of BMW MC, I have final authority over all hiring at BMW MC. He didn't say, you know, sometimes I got to call these people and ask if I am allowed to have permission or not. He talked about alignment, and we will talk about that in a little bit. But who made the decisions with regard to Ms. Dawsey? Dr. Englehorn said, I, alone, made the decision to place Ms. McCraw in the TX-6 position. And then with my VP, Christine Petrasch, that Ms. Petrasch said -- or together they made the decision on Eva Burgmeier going into TX-60. Is there any discussion, any testimony that anyone in Germany moved Ms. Dawsey? Was involved in moving her from TX-60 to 61 to 64? There is no testimony about that.

When Mr. Murphy was talking about the adverse actions, one of the things he said is they removed her from her position and they moved her to a different spot. There isn't testimony that goes to that. But

there is also no testimony from -- Plaintiff has presented no testimony from anyone at BMW AG that they say they report to Dr. Englehorn or that they do the same job. They are two separate companies, one in Germany, that oversees a lot of subsidiaries worldwide, 150,000 employees in the system, and one here in South Carolina overseeing the facility.

Plaintiff also presented zero evidence of common management. There has been no evidence in the record of that. Now, these are not, you have to get all four, but you get to decide, were they so integrated, so controlling that you should treat AG as if it is MC?

You heard about interrelation of operations, and you heard witness after witness say, we information share, that is practices. You saw an email, had some things that were highlighted, some things that weren't highlighted, what things were shared with Germany and the worldwide network, the other ones are local. It is information sharing.

And then the most important, the Judge will tell you, is whether the companies have centralized control of labor relations. Remember, corporate structure is not centralized control. BMW AG is a global parent. It provides strategic framework, global benchmarking, broad organizational guidance, succession planning and

structure, international candidates.

Now, Mr. Murphy has talked an awful lot about those items as if they were directives to BMW MC. He talked about how when BMW AG knew of international candidates in Germany and they put them on a list, somehow that was dictating to BMW MC. What did Dr. Englehorn say on the stand? He said, I knew of Eva Burgmeier. I knew of her and there is this little twist that came about I think yesterday where it was, well Dr. Burgmeier (sic) was still AG at the time that he met Eva Burgmeier, therefore, so this was an AG position. Dr. Englehorn knew he was coming to BMW MC to be the President, he wanted the best team. He wanted to promote people.

What did they talk about when they were talking about how do they do job selection? What is best for the company, who is the most qualified person, how does it help the person? Has it helped them in their career when they are moving? That is what they talked about. And so when he looked at Eva Burgmeier, he looked at somebody who had worked all over the global network for BMW AG and said, I want that knowledge. I want that person. He didn't say, I want that this German national origin, he said, I want Eva Burgmeier because she knows -- she was a labor lawyer, she had worked at

Plant Regensburg and Dingolfing, she had been all over, she knew all of that information and she could bring it to help MC.

I was thinking about the movement and you have heard a lot of testimony about people moving around, and that that is a cultural thing at BMW. I have three older brothers, they were all in the Air Force. It was wonderful for me because every three years I got different places to visit. But they move every three years, for their career, they would move somewhere else and they were going learn something else and broaden it. So, as they rose up through the ranks, they had knowledge from all over, not just from this one base, not just from this one group of people.

You heard about FO circles. I am not sure if I understand how FO circles work, I heard Ms. McCraw say they check boxes and they create boxes. And you may laugh, say, really, you have folks who make boxes? They are trying to figure out how things fit in the head count. They are not telling, as Ms. McCraw said, they are not saying I can't have the people. Now, there is a struggle when they are trying to figure out how to pay and you heard a little bit about that.

You also heard about a validation process. Oh, it is this controlling Germany is a validation process.

A validation process is normally people getting towards the higher end of this, they are looking and saying, do you have any managers around or Vice Presidents around that maybe that say, you should be a Vice President because there is a lot of responsibility.

I heard -- I think we saw a snippet from Ms. Burgmeier's deposition where she said, I have never seen anyone go from a four to a two. Well, you know why? First of all, you go from a four to a three, but you don't go from a three to a two unless you are validated. So, whether Ms. Dawsey was a two or three, it didn't matter. Actually, a three or four, it didn't matter because until she was validated, she wouldn't move to that VP position.

You have heard an awful lot about function levels, personal grades, all of those things. None of that was being done by BMW AG with regard to Ms. Dawsey. There is not a single document that the Plaintiff has presented. You remember when Ms. Dawsey was on the stand and she kept saying, I can't answer that without the document, I need the SAP document, I need the document. Don't you think she needs the document that shows that BMW AG was somehow controlling? She showed you some documents, and if you look at them you will see that those are all documents from BMW MC writing to BMW

AG with one exception, you remember it, it was right after she had resigned, and it said, happy new year team. Team it is 2022. We want to be a better team in 2022. That is the control that she has proven.

A parent company can set standards, can provide guidance, can share best practices and still not be legally responsible for a subsidiary's employment decision. This is just normal corporate governance. This is how a multi-national company operates.

But there is a legal difference between providing framework and controlling employment decisions. You heard me, probably ad nauseam, ask every single one of these executives from BMW MC, did AG control those decisions?

Now, Mr. Murphy says, well, there is centralized control, look at this document, this expat guidelines. And what he said to you, and it may have been just a mistake, but what he said to you is, they were done by Johannes Trauth of BMW AG, that is what he said, BMW AG. That was not what Johannes Trauth was doing when those documents were created. He was in TX-6. He was the Vice President of Human Resources at BMW Manufacturing Company. What you will not see in those exhibits is a single document from somebody in Germany saying, we approve these, they are policies,

they need to be enforced.

So, when you don't have that, what do you do? Well, look, look at this chart, this is how it always worked out, okay. It is not a policy of BMW AG that whomever was running BMW MC was choosing how to organize efficiently and appropriately the HR Department.

Every single one of these executives, the President and CEO, the former Vice President of HR, the current Vice President of HR, I asked them all the same question, and I said, does BMW MC alone control BMW MC's hiring and personnel decisions? All three of them said yes. They also, BMW AG did not control MC's HR in any meaningful way. They said that BMW AG did not dictate any part of TX-6's work or TX-60's work. All three of them acknowledge that.

They said BMW AG did not control MC's employment practices and decisions. They didn't dominate and seize HR operations in any way. They said that BMW AG and BMW MC merely shared resources and best practices. But that BMW AG did not make any final decisions regarding a single employment matter at MC.

Now, the last element of this integrated employer task is whether or not there was common ownership. Ms. McCraw, who was the former CFO testified BMW MC is separately organized, it has its own separate

financial records, own separate profit and loss, it is a different company. Okay.

So, when you look at the integrated employer test, I will go back to this, the question that you are asked is, do you find that BMW AG was an employer of Plaintiff? And if you check that box no, right below it it says, if you answer yes, go to number two. If you answered no, go to question six. Mr. Moody shows you what happens when it is question six because then we are just talking about BMW MC. Once you have decided that BMW AG is not an integrated employer, you don't have to talk about AG any more.

Unfortunately, because I would like to sit down and just say that is it. This is my only chance to get to speak to you, Mr. Murphy will be able to get up and be able to respond a little bit. So, there are a few more things I need to talk to you about, and one of which is a reminder. BMW AG is not Germany. Why is that important? Because through out this case what you heard Mr. Murphy do with every witness nearly, was to say, well, Germany said this, Germany said that. BMW said this. Why? Because he wanted to just confuse it to treat them as one, to treat AG as all of Germany. To treat BMW as BMW Group. And so if somebody in China makes a decision, by golly, it is BMW Group. And if

somebody in Germany is told about a decision that has been made, by golly they have made that choice.

When you hear testimony that says, I spoke with Germany, it does not mean that Germany dictated any part of a decision about Kelly Dawsey. You need to find evidence that they were involved with it, they were integrated. Remember, there is no document from AG ordering Kelly to be removed, directing her to be replaced, instructing her pay to be cut. In fact, there is no MC document saying that either. There is No AG email or memo saying, hey, let's put Eva Burgmeier in TX-60. You saw an AG email or memo moving Kelly Dawsey to TX-61 or TX-64. You heard Ms. Petrasch say on the stand, I originally wanted to put her on 61, but I deferred to the new Vice President, she wanted her in 64. That was the decision. There is no testimony anywhere, not by Ms. Dawsey, not by anyone that said before we moved her from 60 to 61 or 61 to 64, we had to call Germany to get permission. Didn't happen. In fact, I would suspect that if you asked the people at Germany at the time if this was happening, their question would be, who is Kelly Dawsey?

Now, Kelly was an excellent employee, no doubt about that. We saw the portfolios. She got great reviews. And that is the reason that they wanted to

move her into another position. But, Dr. Englehorn said on the stand, I, alone, made the decision. Ms. Petrasch proposed the reorganization, Ms. McCraw realized the structure, all three of those, who acknowledged their role, are BMW MC employees right here in Spartanburg.

The only testimony about BMW AG's alleged involvement comes from Ms. Dawsey herself. You will remember that you were shown a document, you may not remember the first page of this because it was only shown for a second, but this is -- this is from a meeting that occurred on September 29th, 2021. What is important is the next page. And you saw this just a few moments ago. Mr. Murphy showed you that and he said, look right here, the need of international. Now remember, this is Ms. Dawsey's handwritten notes where she claims Ms. Petrasch told her. What does it say? Only way to get local TX-6 is to have I-n-t-l, international, TX-60, to be a bridge to Germany. Then she writes, already discussed with P and T and it is done. From this self-serving handwritten note from a meeting with BMW MC employee Christine Petrasch, Plaintiff says, BMW AG is lying, that just can't be.

It is also important that you remember this document, okay. And the reason it is important is

because it doesn't say the only way to get a local TX-6 is to have a German national origin in TX-60. And then it doesn't say that BMW AG decided it, it says it was discussed. And they want to go from discussed to dictated to decided it to they are liable and we should send them a message because it was told to them by Dr. Englehorn.

Now, Mr. Murphy got up here and said to you this morning that, you know how to tell the truth? Listen to what they say on cross examination. Are they evasive? Are they answering the question? Do they say, I can't answer that without looking at the SAP and the other documents or are they answering? You know what is really important? I asked Ms. Dawsey, you really wanted to be the VP of HR, didn't you? What did she say? No, I didn't want to be. I just expressed an interest. But most importantly, Ms. Dawsey stood on that stand and I asked her, I said, is it ever okay to lie? Remember that answer? She hesitated. She said, you know, I had to put myself first. Normally I wouldn't lie, but these weren't normal circumstances.

When Kelly wrote this note that they are relying on this conversation with Ms. Petrasch, were those normal circumstances? Three days after she had already talked to a lawyer about potentially bringing a lawsuit?

But what is the other piece of the puzzle? What is the other half of this document? This is Ms. Dawsey saying, this is what Ms. Petrasch told me. What did Ms. Petrasch say? I didn't say that. We had a conversation, I told her she was moving to 64. Did you get any push back from her? No. Where is the email from anyone, MC or AG, that says, this is what we are doing. I defy you to find an email that says "demoted" in there. It doesn't say it, okay.

The last piece I want to talk to you about is the Judge is going to talk to you about the Treaty. I know you haven't heard anything about the Treaty and you may be confused about why there is a Treaty and it is important because after World War II when the United States wanted to invest in other countries and other countries wanted to invest in the United States, they created a series of treaties, and they are called the Friendship, Commerce, and Navigation Treaty. And they have some slight differences, but they all basically say the same thing and that is that:

"Nationals and companies of either party may be permitted to engage, within the territories of the other party, accountants or other technical experts, executive

personnel, attorneys, agents, or
other specialists of their choice."

What does that mean? It means a German company, like BMW AG, doing business in the United States, is permitted to choose German citizens to fill certain technical or other specialist positions of their choice. Now, Mr. Murphy is probably going to get back up here and say, they have denied they have done anything, that is right. We don't believe we did anything in that decision, but if you decide that we are the integrated employer and somehow we are implicated in a decision that involves national origin, okay, then the Treaty applies.

Now, I, too, like a challenge, but I am not going to bite on Mr. Murphy's challenge when he said, they are not even going to talk about citizenship, I dare them to talk about citizenship. You know why citizenship is important? The Treaty allows you to place citizens in a slot, but not discriminate on national origin. Mr. Murphy said, you haven't heard one citizenship brought up all week, last week, didn't hear the word. You know what else you didn't hear? I made a choice on somebody's national origin. What is national origin? It means three of my four grandparents were something, okay. You didn't hear, I want a

German because their lineage is German. You heard, I want a bridge to Germany from an international, somebody who has experience in the international global network. You heard about Stephan Dombrowski, who was in Ms. Dawsey's team, and he was the German reading, the German writer, the person who had knowledge of the German HR. He was going back, he went back, in fact. Ms. Dawsey said that Germany dictated who she should hire, but she didn't hire him, she didn't say, I got in trouble because I told Germany, yes, you want to bring an expat and I don't want an expat, she just did it. So, this idea that you can't even blow your nose without asking Germany, it is just not there.

I had a challenge from Mr. Murphy in his rebuttal. Show a single slide, any slide that is in the evidence where it says, this is a German slot, this is an American slot. I chose Ms. McCraw or I chose Ms. Dawsey because she is an American of national origin. No, it didn't happen because that is not what this was about. This was about, I want somebody who is technical. Remember on direct examination, Ms. Dawsey sat up there and she said, I loved TX-60 because it was a technical position. You needed to know things. Fact: She wants you to believe that you needed to know all of the intricacies of ERISA and something called

OFCCP, despite having people on her team which were subject matter specialists. What you needed, what that technical position was, what the specialist was needed for was to know what is going on in best practices in other plants.

Now, we heard about Eva Burgmeier. We heard a lot of testimony from her read. One of the most crucial things she says is, it is quite crucial for an HR Department to have someone who has a very good network with all of the production network partners. Not only AG, but globally. That is what I had for my past functions and experience.

Now, Mr. Murphy showed you a chart that said she was not SHRM certified, she did not have this information or that information. And you heard her testify about what she did when she was in AG HR. Remember? She said she worked with issues that involved Development Total Vehicle with New Jersey, so part of BMW North America. She said that she was in a position of Expert Planning and Steering and had been -- at Plant Dingolfing, which you heard was the only plant I think in the system that is larger than Plant Spartanburg. She testified that she had duties involving expert planning at Dingolfing working on time topics, shift models, production planning, production

planning colleagues, negotiating contracts with the works council regarding work time and shift models. She was involved in head count steering. She was involved in the production network. She was involved with exchange informationship. She was involved at Plant Regensburg. She was involved in HR for HR. But yet somehow she can't be a specialist or a technical expert because she didn't join SHRM and get certification, according to Ms. Dawsey.

There is no document that you are going to see that says, I want a German citizen or a German national origin, it is going to say I wanted an international with a bridge. And you have heard why that bridge is so important.

I am almost finished, Your Honor.

Mr. Murphy showed you a document this morning and said, look at this. Look at this. It is clear that Germany was saying that Eva Burgmeier should be in TX-60. What he didn't show you was the first page of Plaintiff's exhibit 37. This chart goes to Ms. Koepnick in Germany from who? Christine Petrasch, TX-6.

Judge Cain is going to talk to you about this national origin issue. And he is going to tell you that the national origin refers to a country where a person is born or to a person's ancestors place of origin.

And he is going to talk about citizenship, referring to a person, who by either birth or nationalization, is a member of a political community owing allegiance to the community and being entitled to enjoy all of its Civil Rights and protections. You may think to yourself, why are we getting that definition? Well, you are getting that definition because Ms. Dawsey filed a lawsuit against not just her employer, but her employer's parent company. And we have been at this for four years and she says they did it because of my national origin. What did she say when she went to meet with Dr. Englehorn? I didn't like it that you replaced me with a German. She didn't say, I didn't like it because the person you replaced with me is not SHRM certified. She didn't say this person is not qualified. She didn't say, it won't broaden my horizons to go to 64. She said, replaced me with a German. And what did Dr. Englehorn say all along? I want a bridge to Germany. If that bridge was Ms. Dawsey because Ms. Dawsey had been -- had done an international assignment and had spent that time in Plant Regensburg or Plant Dingolfing or BMW AG headquarters for HR, she could have been that bridge. The bridge had nothing to do with the national origin, it had to do with experience.

I could have gone on, but I think I am over time so I don't want to keep giving you those Eva Burgmeier statistics. Just know that she was every bit as qualified or more qualified to be the bridge.

Mr. Murphy said earlier today that Ms. Dawsey was the best qualified for TX-60. And remember what Dr. Englehorn and Christine Petrasch talked about, we try to do what is best for the company. What is best for that position. And what is best for the person. It isn't always the absolute best qualified at that moment should be in a role, we want to grow people. You have heard that growth being talked about all along.

Remember again in opening statements Mr. Murphy said, you may not understand why I am talking about Germany because they say they shouldn't have been sued. He was right. We still don't know why.

Thank you.

THE COURT: Any reply Mr. Murphy?

MR. MURPHY: Yes, Your Honor.

THE COURT: As we discussed about ten minutes?

MR. MURPHY: I will try my best, Your Honor.

I will quickly run through this.

Mr. Rozelsky said there is not one document, one slide that shows Germany was involved in the decision to remove Kelly Dawsey. That was most of his

argument, one slide defeats it. Back here, and he just touched on this a little while ago, yes, this is attached to emails going back and forth between Ms. Petrasch, but Ms. Petrasch testified that Claudia Koepnick created that document. In fact, she pointed out the footer that shows it is PM 6 and Ms. Koepnick created that slide in July of 2021. So when he says there is not one single document and he challenges me to produce one, there it is.

Now, as to Mr. Moody's argument, did I call it? I said the case was about these moves and why they made the decision, but what they are going to do is get up here and talk to you, look what Kelly did, look what Kelly did. First three phrases out of his mouth. She quit, she left, she resigned. By the way, those are all the same thing, but that is where he started. Look what she did, she quit. How dare her. How dare her.

She lied. Let's talk about that. The lie, the big lie. You may be asking yourself, what did she lie about? What was the lie? There was no lie. The lie is that she gave a presentation to her group in December, that she was told to give, that said she was going to TX-64. That is the lie that she told. Now, why is she doing that in December? She is not going to go and tell her group something she hasn't told her

boss. Her boss ain't around. Her boss is back in Germany on one of those long vacations they take. In fact, she wasn't even back in January, talking about January 3 being a really critical date, well it wasn't for Ms. Petrasch, she is still on vacation. At some point Kelly had to do what she didn't want to do and call her on the phone while she is in Germany. But she is not going to go to her team and say, I didn't tell upper management this, but guess what, this is what I am going to do, that would have been so unprofessional. So unprofessional.

She looked for a job. Well, I addressed that before. She started that process to see what was out there. Kelly was very clear, she did not make the decision to leave BMW until December. That is when she made the decision.

This is going to be a very, very important point that also defeats Mr. Moody's arguments. He says this never happened. He kept saying, it never happened, it never happened. She quit before it actually ever happened, it is not discrimination. No. I believe what the Judge is going to find, and this is on that point called adverse employment action, I think what he is going to charge you is:

"You may find that an adverse

employment action occurs when an employer provides notice of or communicates a future action to the employee rather than when such future action actually goes into effect if you find that the notice was of a non-speculative disadvantageous change in an employment term or condition."

It is when the announcement is communicated. Don't be fooled. Don't buy into what they are saying. That is what I believe the Judge is going to charge you and that is the law.

Now, Mr. Moody says he took up my challenge. I said, show three job function data sheets on the same date showing more than two function level three positions. He threw three up there, and said, I guess I met that challenge. Well, take your time, it is Defendant's 11, 12 and 13. No, we didn't, different dates. Different dates. Two of them in the same date in April 2019, and then the other one was May of 2019. He does not have any three on the same date. They made those changes and he didn't show you the SAP to show you when it was made. He did not meet that challenge.

Now they are even accusing Kelly of scheming

against them back in -- when the expat guidelines, they said, oh, she just created those expat guidelines to protect herself. She didn't create the expat guidelines. She did the presentation at the direction of Mr. Trauth. She didn't come up with them, she protested them. That was years before any of this came up.

Mr. Moody said there is no German rule, there is no rule about Germans coming in. Remember what Ms. Petrasch said? Ms. Petrasch said, Dr. Englehorn wanted a local in TX-6 and he wanted me to bring in a German. Her words, not my words, her words. And when Mr. Rozelsky said there is no evidence they want to bring them in because they are German, Ms. Petrasch said it on the stand under oath, she used the word "German."

They say there is no evidence that there are German and American roles. I said they are not going to want to talk about this. Actions speak louder than words, they can't getaway from that. Five times in a row and they are going to sit there and tell you that national origin had nothing to do with this.

Very quickly on the citizenship Treaty. You heard no evidence about citizenship. Now, Mr. Rozelsky says we had nothing to do with the

decisions; therefore, the Treaty has nothing to do with this case. So, why is he raising it? Well, it is kind of like the guy who says, you know, I didn't shoot that guy, but if I did, it was self-defense. Well, you don't know what to believe when you hear somebody say something like that, you can't talk out of both sides of your mouth. We have not talked out of both sides of our mouth. Only one group has talked out of both sides of their mouth and they really are trying starting to separate themselves, aren't they? They are really trying to getaway from each other as this trial goes on. You know why? Because they know what is about to happen and that is what corporations are like. Nobody owns anything, no one is going to take responsibility for anything, if you get hauled into court, well, you just start separating yourselves.

They keep talking about the move to bring Ms. Burgmeier in, but they never answered the one simple question, if the opening was in TX-64, why didn't they just put Ms. Burgmeier in TX-64? That would have been real simple to do. Why not? Well, we know the answer why not.

Now everything has gone -- I will tell you what it is. You have already seen it. Both Kelly and Ms. Burgmeier testified because if you go to function

level four, you can't get to function level two. And where was Ms. Burgmeier headed? To function level two. That is why they couldn't put her into TX-64.

Mr. Moody says one of his favorite songs is you can't always get what you want, but all Kelly Dawsey ever wanted was equality. That is all she ever wanted was equal treatment. And by golly she can get that because that is the law. Maybe they don't want to give her everything she wants or that the law requires, that means you have to. You heard these closing arguments, they don't get it. They still think they can get up here and just say anything to you, you will believe anything they say, and they can dodge any issue. They need to be told -- these people need to be told, and they need to be told in the only language they understand. And the only ten people on this globe that can make this change and make sure that we get what we want because we get what the law requires is you ten folks, and I hope you go back there and you come out and you give them all the justice and equality they have given Kelly Dawsey.

Thank you.

THE COURT: Thank you to all of the attorneys and the parties.

Members of the jury, it is now time for me to

instruct you on the law that you will use when you go back to commence your deliberations. You will have copies of these instructions with you, so you may want to keep that in mind in terms of if you want to take notes now.

I want to talk about the duties of the jury to find facts and follow the law first. Members of the jury, now that you have heard all the evidence and the arguments of the lawyers, it is my duty to instruct you on the law which applies to this case. These instructions will be in three parts: first, the instructions on general rules that define and control the jury's duties; secondly, the instructions that state the rules of law you must apply, i. e., what the Plaintiff must prove to make the case; and third, some rules for your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts, you must apply the law as I give it to you. You are bound to accept the rules of law as I give them to you whether you agree with them or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means you must decide the case solely on the evidence before you and according to the law. You will recall that you took an oath promising

to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. And you must not read into these instructions or into anything may have said or done as any suggestion as to what verdict you should return, that is a matter entirely for you to decide.

Now, I want to discuss burden of proof.

At the beginning of the case, I told you that Plaintiff has the burden of proving the case by a preponderance of the evidence. That means that the Plaintiff has to produce evidence which, considered in light of all the facts, leads you to believe that what the Plaintiff claims is more likely true than not. To put it differently, if you were to put the Plaintiff's and the Defendant's evidence on opposite sides of the scales, the Plaintiff would have to make the scales tip slightly on her side. If the Plaintiff fails to meet this burden, the verdict must be for the Defendants. Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt, that is a stricter standard, i. e., it requires more proof than a preponderance of evidence. The reasonable doubt standard does not apply to a civil case and you should, therefore, put it out of your mind.

Now let's talk about what is evidence and what is not evidence.

The evidence from which you are to decide the facts consist of: one, the sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness; two, the exhibits which have been received into evidence; and three, any facts to which all the lawyers have agreed to stipulate or that I instruct you to find.

What is not in evidence?

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you.

One, arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of the facts controls.

Two, questions and objections by lawyers are not evidence. Attorneys have a duty to their clients

to object when they believe a question is improper under the Rules of Evidence. You should not be influenced by the objection or by the Court's ruling on it.

Three, testimony that has been excluded or stricken or that you have been instructed to disregard is not evidence and must not be considered. In addition, if testimony or exhibits have been received only for a limited purpose, you must follow the limiting instructions I have given you.

Four, anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eye witness. Circumstantial evidence, on the other hand, is indirect evidence, that is, proof of a chain of facts from which you could find that another fact exists, even though it has not been proved directly. You are entitled to consider both kinds of evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence. It is for you to decide whether a fact has been proved by circumstantial evidence. In making that decision, you

must consider all the evidence in the light of reason, common sense, and experience.

Now I want to discuss credibility of witnesses.

In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may disbelieve all or any part of any witness's testimony. In making that decision, you may take into account a number of factors including the following:

One, was the witness able to see or hear or know the things about which the witness testified?

Two, how well was the witness able to recall and describe those things?

Three, what was the witness's manner while testifying?

Four, did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party, or any matter involved in the case?

Five, how reasonable was the witness's testimony in light of all the evidence in the case?

Six, was the witness's testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses, or by other evidence?

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail. These are some of the factors you may consider in deciding whether to believe testimony.

The weight of the evidence presented by each side does not necessarily depend on the number of witnesses testifying for one side or the other. You must consider all the evidence in the case, and you may decide that the testimony of a smaller number of witnesses on one side has greater weight than that of a larger number on the other. All of these are matters for you to consider in finding the facts.

During the trial of this case, certain testimony has been read to you by way of deposition. A deposition is the sworn recorded answers to questions a witness is asked in advance of a trial. The deposition testimony of a witness who, for some reason, cannot be present to testify from the witness stand, is usually presented in writing under oath in the form of a deposition. Such testimony is entitled to the same consideration, and insofar as possible, you should

weigh the credibility of the deposition testimony in the same manner as if the witness had been present.

Now I will discuss summary charts.

During closing arguments, the attorneys showed you certain charts and summaries in order to help explain their view of the evidence in this case. These charts and summaries were not admitted into evidence and will not go into the jury room with you. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from your own recollection of the underlying evidence.

For any summaries or charts that have been received into evidence to illustrate facts brought out in the testimony of some witnesses, remember that the charts and summaries are only as good as the underlying evidence that supports them. If they do not correctly reflect the facts shown by the evidence in the case, you should disregard them and determine the facts from the evidence. You should, therefore, give them such weight you think the underlying evidence deserves.

I want to talk about corporations and persons being equal before the law.

This case should be considered and decided by

you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as a private individual. All persons, including corporations, partnerships, unincorporated associations, and other organizations stand equal before the law, are to be dealt with as equals in a court of justice, and are entitled to the same fair and conscientious consideration by you as any other person would be entitled to.

Some of you have taken notes during the trial. Remember that the notes are for your own personal use. They are not to be given to or read to anyone else and they are not to be used in place of your memory.

I will now instruct you on the specific rules of law that apply in this case including specific claims.

Plaintiff alleges that Defendants discriminated against her on the basis of her national origin, sex, and/or race.

Plaintiff has brought discrimination claims under two different laws. The first law is Title VII of the Civil Rights Act of 1964 as amended, often called Title VII, which prohibits discrimination based on national origin, race, or sex.

The second law is 42, United States Code, Section 1981 or Section 1981, which also prohibits discrimination based on race.

I want to discuss the term integrated employer. Both Title VII and Section 1981 prohibit discrimination by employers. Plaintiff was directly employed by BMW MC and, therefore, BMW MC qualifies as Plaintiff's employer under Title VII and Section 1981. You must also decide whether BMW AG was an employer of Plaintiff. The integrated employer test is used to determine whether a parent company and a subsidiary company are so interrelated that they can be considered a single employer for purposes of Title VII or Section 1981.

Under the integrated employer test, a parent company could potentially be held liable for employment actions taken by its subsidiary even if the parent company did not directly employ the Plaintiff.

In making the determination as to whether to treat separate corporation entities as integrated employers, you should consider the following factors: A, the degree to which two companies have common management; B, the interrelation of operations, if any, between the two companies; C, whether the companies have centralized control of labor relations; and, D, the degree of common ownership or financial

control between the companies.

Although no single factor of this integrated employer test is conclusive, the third factor regarding centralized control is the most critical. Relevant to this factor is consideration of whether or not BMW AG had control over day-to-day employment decisions of BMW MC. Again, however, the centralized control factor is only one factor in determining whether BMW AG is also Plaintiff's employer.

Question one on the verdict form you will be provided asks, do you find that Bayerische Motoren Werke Aktiengesellschaft, also known as BMW AG, was an employer of plaintiff? If you determine that BMW MC and BMW AG are integrated employers, you would answer yes. If you determine that BMW MC and BMW AG are not integrated employers, you would answer no.

Now I will instruct you on the law that applies to Plaintiff's national origin, race, and sex discrimination claims under Title VII. Then I will explain the law that applies to Plaintiff's race claim under Section 1981.

Employment discrimination under Title VII. Title VII, found at 42, United States Code, Section 2000e-2(a), makes it unlawful for an employer:

One, to fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or

Two, to limit, segregate, or classify its employees or applicants for employment in any way, which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect her status as an employee because of such individual's race, color, religion, sex, or national origin.

The first section I quoted forbids an employer from making individual decisions discriminating against individual employees on the basis of race, sex, or national origin. The second section forbids an employer from maintaining a policy or practice of general application that deprives an individual of employment opportunities because of such individual's race, sex, or national origin.

Now I want to discuss the concept of motivating factor.

Under Title VII, an unlawful employment practice is established when the complaining party demonstrates that race, sex, or national origin was a motivating factor for any employment practice, even though other

nondiscriminatory factors also may have motivated the practice. Therefore, to prove a discrimination claim under Title VII, Plaintiff must prove by a preponderance of evidence that her national origin, her race and/or her sex was a motivating factor for the treatment about which she complains.

You have heard the term adverse employment action. Title VII prohibits employers from taking adverse actions against an employee based on a protected characteristic, such as national origin, race, or sex. Thus, Plaintiff must show by a preponderance of evidence, as a part of her discrimination claims, that she suffered an adverse employment action.

To do so, Plaintiff must show she suffered some disadvantageous change in an employment term or condition. You may find that an adverse employment action occurs when an employer provides notice of or communicates a future action to the employee rather than when such future action actually goes into effect if you find that the notice was of a non speculative disadvantageous change in an employment term or condition.

The standard for proving discrimination does not vary based on whether the Plaintiff is a member of a majority group. Plaintiff is not required to satisfy a

different or higher standard based on her particular race, sex, or national origin.

When an employer claims that it acted for a lawful reason, the issue is whether the reason given by Defendant for the actions about which Plaintiff complains were its actual reasons. In other words, the ultimate issue you must determine is whether the Defendant took the challenged action for a discriminatory reason, as the Plaintiff contends, or whether it did so for a legitimate business reason, as the Defendant contends. Your focus, as the trier of fact, must be on Defendant's motivation, not on its business judgment. Under Title VII, an employer has the right to make its own business decisions, be they wise or unwise, so long as those decisions are not based on unlawful reasons.

Now I will discuss national origin discrimination in violation of Title VII.

Plaintiff claims that Defendants discriminated against her on the basis of her national origin, which is forbidden by Title VII. In order to prove her claim, Plaintiff must prove by a preponderance of evidence that her national origin was a motivating factor for the Defendant's decisions or actions about which she complains. As I have explained, Plaintiff

must also show that she suffered an adverse employment action, meaning that she suffered some disadvantageous change in an employment term or condition as a result of Defendant's decisions or actions.

While Title VII forbids discrimination based on national origin, it does not forbid discrimination based on citizenship. National origin refers to the country where a person was born or to a person's or her ancestor's place of origin. Citizenship refers to a person who, by either birth or naturalization, is a member of a political community, owing allegiance to the community and being entitled to enjoy all its civil rights and protections. Thus, Plaintiff must prove by a preponderance of the evidence that her national origin, as distinguished from her citizenship, was a motivating factor in Defendant's conduct about which Plaintiff complains. Evidence which you conclude shows that Defendant decided to remove Plaintiff from her TX-60 position and replace her with a German based on Defendant's preference to have German citizens manage their affairs is not evidence of discrimination. Evidence that you find shows that Plaintiff's American national origin was a motivating factor in that decision, however, is evidence of unlawful discrimination.

Next I will talk about sex discrimination and race discrimination in violation of Title VII.

Plaintiff also claims that Defendants discriminated against her based on sex in violation of Title VII. To prove this claim, Plaintiff must prove by a preponderance of the evidence that her sex was a motivating factor for the treatment about which she complains and that she suffered an adverse employment action meaning that she suffered some disadvantageous change in an employment term or condition.

Finally, Plaintiff claims that Defendants discriminated against her in violation of Title VII based on her race. To prove this claim, Plaintiff must prove by a preponderance of the evidence that her race was a motivating factor for the treatment about which she complains and that she suffered an adverse employment action, meaning that she suffered some disadvantageous change in an employment term or condition.

Now, I will discuss race discrimination in violation of Section 1981. As you will recall, I explained that Plaintiff has brought race discrimination claims under two different statues, Title VII and Section 1981. I have already explained Title VII. In determining whether the Defendant acted -- excuse me --

when determining whether the Defendant acted based on Plaintiff's race, the standard for causation, or whether the Defendant acted on the basis of race differs under Title VII and Section 1981.

I will now discuss but for causation.

As I explained earlier, under Title VII, Plaintiff must prove that her race was a motivating factor for the treatment about which she complains.

Under Section 1981, however, Plaintiff must prove that her race was a, quote, but for, close quote, cause of the Defendant's actions about which Plaintiff complains.

To show that race is a but for cause, Plaintiff must prove by a preponderance of the evidence that the actions about which she complains would not have occurred in the absence of race discrimination. Plaintiff must demonstrate that but for the Defendant's unlawful conduct, her alleged injury would not have occurred. Plaintiff is not required to prove that race discrimination was the sole cause of Defendant's alleged actions; an event can have more than one but for cause.

Now, I want to talk about the FCN Treaty. I have one additional instruction to give you with respect to Plaintiff's discrimination claims. This instruction applies only if you determine that BMW AG is also an

employer of Plaintiff under the integrated employer test A Treaty is an international agreement between two or more countries. The Friendship, Commerce, and Navigation Treaty, also referred to as the FCN Treaty, that exists between the United States and Germany provides, in pertinent part, the following: Nationals and companies of either party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents, and other specialists of their choice.

This means that German corporations doing business in the United States are permitted to choose German citizens to fill certain positions in their operations here and American corporations doing business in Germany are permitted to choose American citizens to fill certain positions in their operations over there. Although the Treaty allows such corporations to make personnel decisions based on citizenship, it does not permit discrimination on the basis of national origin, which as I have explained, is different from citizenship. The Treaty is consistent with Title VII; as I have explained, Title VII forbids Defendants from discriminating based on national origin, not citizenship. The Treaty also does not permit

discrimination based on race or sex. And again this instruction applies only if you conclude that BMW AG and BMW MC are a single integrated employer for purposes of Plaintiff's discrimination claims. In other words, you should only consider the Treaty if you answer yes to question one on the verdict form which asks if BMW AG is an employer of plaintiff. If, however, you conclude that BMW AG is not Plaintiff's employer, then do not consider this instruction regarding the Treaty.

Now I will address damages. If you find for Plaintiff on any of her claims, the next issue you must address is an award of damages. I will discuss compensatory damages and then punitive damages.

The law permits you to award compensatory damages if you decide that it is appropriate.

Compensatory damages are an amount of money awarded to the Plaintiff to compensate her for emotional pain, suffering, inconvenience, or mental anguish for being discriminated against in violation of Title VII or Section 1981. While a Plaintiff's testimony, standing alone, can support an award of compensatory damages, the evidence of the alleged harm must be demonstrable, genuine, and adequately explained. In other words, the Plaintiff bears the burden of sufficiently articulating and establishing that she suffered a

genuine injury. Mere conclusory statements by Plaintiff are not enough. Additionally, compensatory damages are meant to compensate the Plaintiff for a harm that resulted from a violation of Title VII or Section 1981 and are not allowed to punish or penalize the Defendants. Any award of damages must be based on evidence and not speculation or guesswork.

If you determine Plaintiff is entitled to compensatory damages in this case, such damages will not include lost, back, or future wages. That issue will be decided separately by the Court if you find that Plaintiff has proven that Defendant discriminated against her.

If you find that Plaintiff has proven a Title VII or Section 1981 claim, then you may consider whether punitive damages are appropriate, and, if so, what amount. A Plaintiff seeking punitive damages on a Title VII or Section 1981 claim must prove that her employer acted with the requisite state of mind, that is, that it engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of the Plaintiff. The term malice and reckless indifference refer to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

Malice and reckless indifference means:

One, that the employer's decisionmaker discriminateed in the face of a perceived risk that the decision would violate federal law;

Two, that the decisionmaker was a principal or served the employer in a managerial capacity;

Three, that the decision-maker acted within the scope of his employment in making the challenged decision;

And, four, that the employer failed to engage in good-faith efforts to comply with the law.

An employer cannot be liable for a discriminatory employment decision of a managerial employee where their decision was contrary to the employer's good-faith efforts to comply with Title VII or Section 1981. In other words, you cannot award punitive damages if you find that the decisionmaker's malice or reckless indifference was contrary to Defendant's good-faith efforts to prevent discrimination in the workplace. It is Defendant's burden to establish that it has engaged in good-faith effort to comply with the law such that it may avoid punitive damages for conduct by one of its managers or supervisors that might otherwise warrant a punitive damages award. In determining whether Defendants made

good-faith efforts to prevent discrimination in the workplace, you may consider whether it had any anti-discrimination policies, trainings, and education for its employers; however the mere existence of a compliance policy will not alone insulate an employer from punitive damages liability. Rather, in order to avoid liability for the discriminatory acts as one of its managerial officials, an employer maintaining such compliance policy must also take affirmative steps to ensure its implementation.

If you find that the Plaintiff is entitled to an award of punitive damages, some relevant factors to consider in determining the amount of punitive damages that should be awarded include:

One, whether Defendants should be punished for the conduct;

Two, whether punitive damages are necessary to deter future similar wrongful conduct by the Defendants;

Three, whether an award of punitive damages will deter others from engaging in similar wrongful conduct;

Four, the degree to which a Defendant should be punished, or the degree to which a punitive damages award will act as a deterrent;

And, five, the financial resources of the

Defendants.

Some final admonitions. I want to address your duty to deliberate.

When you retire to the jury room, you should first elect one person from among you to serve as your foreperson. The foreperson you select will preside over the deliberations and speak for the jury here in court. After electing your foreperson, you must wait until I instruct you that deliberations may begin before you start discussing the case with your fellow jurors. When you go to the jury room, constantly keep in mind that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence presented here in this courtroom. Remember also that your verdict must isn't unanimous. In order to return a verdict, it must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for himself or herself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not

surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember that at all times, you are not partisans, you are judges, judges of the facts. Your sole interest is to seek the truth from the evidence presented to you.

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal issues in the case, or individuals, or other entities involved in the case. This means you may not use any electronic device or media, such as a phone, computer or tablet, the internet, any text or instant messaging service, any social media apps such as X, Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and SnapChat to research or communicate about what you have seen and heard in this courtroom. These restrictions continue during deliberations because it is essential under our Constitution that you decide this case based solely on the evidence and law presented in this courtroom.

Information you find on the internet or through social media might be incomplete, misleading, or inaccurate. And as I noted in my instructions at the start of the trial, even using your smart phones, tablets, and computers and the news and social media apps on those devices may inadvertently expose you to certain notices such as pop-ups or advertisements that could influence your consideration of the matters you have heard about in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have, and it is important that you decide this case solely on the evidence presented during the trial without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform at the earliest opportunity, should you learn about or share any information about this case outside of this courtroom or the jury room, or if you learn that another juror has done so.

In a moment you will be given a verdict form. Please read the questions and follow the instructions carefully. After you have received a unanimous agreement on a verdict, your foreperson will fill in the form that has been given to you, sign it, and date

it, and advise the bailiff outside your door that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff. Such note must be dated and signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed and dated writing, and I will communicate with any member of the jury on anything concerning the case only in writing or orally here in open court.

Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise until after you have reached a unanimous verdict or have been discharged. During your deliberations, you must not communicate with or provide any information to anyone by any means about this case, and, again, you may not use any electronic device or media, such as a telephone, mobile device, or computer, any internet, any internet service, or any text or instant messaging service, or any internet chatroom, blog, or website, such as Facebook, Instagram, MySpace, LinkedIn, YouTube, or X, formerly known as Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept

your verdict.

I want to mention the verdict form. The verdict form is six pages in length. The first question is, do you find that BMW AG was an employer of Plaintiff? And there is a place for you to check yes or check no. If you answer yes to question one, proceed to question two. If you answered no to question one, skip questions two through five and proceed to question six found on page 4. If you answer yes to this first question, then you go on to questions two through five.

Question two is on Plaintiff's claim against Defendants for national origin discrimination or Title VII, you check one that you find for the Plaintiff or that you find for the defendants.

Question three regards Plaintiff's claim against Defendants for sex discrimination under Title VII, and, again, you have a place to check whether you find for the Plaintiff or the Defendants.

Question four regards Plaintiff's claim against Defendants for race discrimination. Again, you would either check that you find for the Plaintiff or the Defendants.

Question five is on Plaintiff's claim against Defendants for race discrimination under Section 1981, and you would check that you find for the Plaintiff or

you find for the Defendants. If you answered yes to question one and therefore answered questions two through five, you do not answer questions six through nine, and you skip to page 6.

If you answered no to question one, you proceed with question six through nine, which asks if on the Plaintiff's claim against BMW MC, do you find for the Plaintiff or do you find for Defendant, BMW Manufacturing Company LLL.

Question seven is on Plaintiff's claim for sex discrimination. If you find for the Plaintiff you would so indicate. If you find for the Defendant, BMW Manufacturing Company LLL, you would check that choice.

And question eight regards Plaintiff's claim for race discrimination under Title VII. If you find for the Plaintiff, so indicate. If you find for Defendant, BMW company LLC, indicate such.

Question nine is the claim for race discrimination under Section 1981. If you find for the Plaintiff, you would so indicate. If you find for the Defendant, BMW Company LLC, you would so indicate.

If you did not find for the Plaintiff as to any of her claims, your deliberation would be done, the jury foreperson would certify the verdict by signing and dating the form where indicated. If you did find for

the Plaintiff on any of the claims on the questions two through five or six through nine, you would answer the questions regarding damages under the damages section. There is a place for you to indicate any award for compensatory damages and the amount and a place for you to indicate and write in the amount of any punitive damages, if awarded.

Again, your decision must be unanimous. Do not draw any inference from the order of the choices on the verdict form, including the choices of yes or no, or order of the choices of as to whether you find for Plaintiff or Defendants, one had to come first and you should not draw any inference from that order on the verdict form.

So, please retire now to your jury room, but do not begin your deliberations so that I may take up final matters with the attorneys. Please do not begin your deliberations until after the courtroom deputy brings you the exhibits and directs you to begin your deliberations. Everyone remain seat while the jurors are excused.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: All right. Any objections, concerns, or comments about the instructions or my

description of the verdict form which have not already been raised?

MR. MURPHY: Not that have not already been raised, Your Honor, but don't I have to put it on the record what they are just very quickly?

THE COURT: If you want to go through it again, go ahead.

MR. MURPHY: I don't want to go through it in detail, but for the reasons stated before, Plaintiff respectfully excepts to the second paragraph of national origin discrimination, which is on pages 12 and 13, and for the same reasons stated before to the charge regarding the FCN Treaty.

Thank you, sir.

THE COURT: Yes, sir.

MR. MCCOY: Your Honor, we would just reiterate our same objections we made yesterday, in particular to the fact that a compensatory damages and a punitive damages instruction was given, we do not believe that those were warranted in this case.

THE COURT: All right.

MR. ROZELSKY: Your Honor, BMW AG joins with BMW MC.

THE COURT: Thank you. Well, for the reasons I previously have given, I would -- I find that the

instructions as presented and the verdict form as presented is correct. I will just make some additional comments in the event I didn't make it clear on the record earlier.

In particular, I believe I addressed earlier the comments from yesterday regarding adverse employment action and I believe what is included in the instructions is correct.

In terms of the national origin issue, again, and also to the objection of use of the term "citizen," the trial had many references to Germans and Americans, there was an objection when the defense wanted to discuss citizenship. I believe the provisions of the instructions regarding national origin discrimination are correct. There was also reference to German employees, U.S., or American employees. I think we have addressed that correctly.

And also I wanted to mention the Treaty as well, the objections with respect to the Treaty, if I did not make that clear, I think that the Treaty was put into issue both in the pleadings and in the position of Plaintiff in trial when Plaintiff took the position that BMW MC and BMW AG were collectively the BMW Group, which touted its integrated nature and the Defendants operated as a single enterprise. The complaint

contains many allegations referring to German nationals. In any event, I agree with the Defendant that the FCN Treaty is part of the law that applies in this case and it should be included in the jury instructions.

I believe as to any other objections that the charge correctly states the law as applied to this case.

With respect to the issue of damages, including damages on the verdict form, that issue was raised today regarding whether punitive damages should be separated out in the verdict form for findings based on Title VII claims and the Section 1981 claim. Recovering under Title VII is capped by statute pertinent to this case, in which it is uncontested that the Defendant employed greater than 500 employees, the applicable cap is found in 42 USC 1981a(b)(3)(D), which indicates that the sum of the amount of compensatory damages awarded under the section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section shall not exceed, for each complaining party, 300,00 dollars, as noted in 42 USC 1981a(b)(1). This cap does not limit the scope of or the relief available under Section 1981.

In other words, the cap applies to Plaintiff's

Title VII claims, but does not apply to the Plaintiff's 1981 claim; however, by statute, it is improper for the court to inform the jury of such caps. In fact the statute says that the court "shall not" do so, noted in 42 USC 1981a(c)(2).

The Court declines to change the verdict form to separate out potential punitive damages as to the Title VII versus the Section 1981 claims. As noted by the Court previously, no such request was made in the Defendant's proposed verdict forms submitted in accordance with a schedule set by the Court. Additionally, the Court reserved time yesterday for the parties to raise any issue regarding the verdict form or jury instruction, and the Court informed the parties that any objection should be raised at that time. This request was not made until this morning.

Additionally, the Court finds that separating out punitive damages could confuse the jury as the compensatory damages are joined for purposes of all claims, and having the punitive damages separated out without explanation would have the potential to confuse the jury. As noted, the Court would be unable to cure this confusion by an instruction as it is not permitted to inform the jury of the cap of combined punitive and compensatory damages in Title VII cases.

Additionally, the Court finds that separating out the damages in such a way could result in potential of a double recovery and overcomplicating the issues the jury has been asked to resolve.

Finally, I find that the instructions construed as a whole and in light of the entire record adequately inform the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of any party.

So, if there is nothing else, we will send copies of the instructions, and a verdict form, as well as the exhibits to the jury.

Anything before I do that?

MR. MURPHY: Nothing from the Plaintiff, and thank you, Your Honor.

MR. MCCOY: Nothing further from Defendant BMW MC.

MR. ROZELSKY: Nothing from BMW AG, thank you, Your Honor.

THE COURT: Thank you. Madame Clerk.

Before we take a recess, I just want to take a moment to commend the attorneys for the fine work you have done in this case, commend the parties as well. Regardless of what result the jury reaches, the parties have been well represented and it is always a good thing when you have good lawyers who prepare the case and know

the law, and I appreciate that from a professional standpoint.

Thank you, we will be in recess.

(Whereupon, at 3:25 the jury began deliberating.)

(Whereupon, at 4:09 the following was heard in open court.)

THE COURT: Let's go on the record. We have received a note from the jury and I just wanted to make you aware of it. The note says:

"Can we turn on the AC? Signed by David Brooks."

So, I have asked the clerk's office to reach out to maintenance, but it might be necessary, I don't know, for the maintenance tech to go in or about the jury room. Is there any objection, if that is necessary, if he does that with the Clerk.

MR. MURPHY: Of course, not, Your Honor.

MR. MCCOY: No problem with us.

MR. ROZELSKY: No problem, Your Honor.

THE COURT: Thank you. That is all I have.

(Whereupon, at 5:38 the following was heard in open court.)

THE COURT: A note was received from the jury.

All right. We are on the record and the jury has sent us a note, I will read it. It will be made a part

of the record. It is, of course, dated today's date. And it says:

"What is it that she never actually went to TX-64 but it was said in a meeting question mark. You said something about the potential move."

And it is signed, I believe, by the same gentleman who previously signed the other note brought in. And the attorneys have looked at my response and in agreement and I will ask them to confirm that on the record, but here is my responses, it is dated 2-25-26:

"Dear members of the jury: In response to your question, I am not able to comment on specific testimony or evidence; however, I refer you to the section in the written jury instructions regarding, quote, adverse employment action, on top of page 11 as well as the remaining charges as a whole.

Thank you, Timothy M Cain U.S. District Judge."

And, of course, I believe they have two copies of the instructions back in the jury room; is this acceptable?

MR. MURPHY: Yes, Your Honor.
MR. MCCOY: Yes, Your Honor.
MR. ROZELSKY: Yes, Your Honor.
THE COURT: Thank you.
(Whereupon, at 5:55 the jury resumed deliberating.)
(Whereupon, at 6:29 the following was heard in open court.)
THE COURT: I am informed that we have a verdict so we will bring the jury in.
(Whereupon, the following was heard in the presence of the trial jury.)
THE COURT: All right. Juror number 7. Are you the foreperson and the jury has reached a verdict?
THE FOREPERSON: Yes.
THE COURT: It is unanimous?
THE FOREPERSON: Yes.
THE COURT: You have provided the form to the clerk?
THE FOREPERSON: Yes.
THE COURT: The clerk will publish the verdict.
THE CLERK: In the case of Kelly Dawsey versus Bayerische Motoren Werke Atkiengesellschaft and BMW Manufacturing Company LLL, we, the jury, unanimously find as follows.
That Bayerische Motoren Werke

Atkiengesellschaft, also known as BMW AG, was an employer of Plaintiff; they answered no.

On Plaintiff's claim against BMW Manufacturing Company LLL, also known as BMW MC, for national origin discrimination under Title VII, we, the jury, find for the Plaintiff.

On Plaintiff's claim against BMW Manufacturing Company LLL for sex discrimination under Title VII, we, the jury, find for the Defendant, BMW Manufacturing Company LLL.

On Plaintiff's claim against BMW Manufacturing Company LLL for race discrimination under Title VII, we, the jury, find for the Defendant, BMW Manufacturing Company LLL.

On Plaintiff's claim against BMW Manufacturing LLC for race discrimination under Section 1981 we, the jury, find for the Defendant, BMW Manufacturing Company LLL.

We award compensatory damages in the amount of 100,000 dollars. We award punitive damages in the amount of 5 million dollars.

This is the unanimous decision of the jury signed by your jury foreperson and dated this day February 25th, 2026. Is this the verdict of you and each of you, so say you one, so say you all?

(Whereupon, the jury panel responded in the affirmative.)

THE COURT: All right. I will ask the clerk to poll the jury.

THE CLERK: Juror 51, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror number 7, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 117, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 190, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 140, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 17, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 173, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 153, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: Juror 35, was the verdict as read your true verdict?

THE JUROR: Yes.

THE CLERK: And juror 138, was the verdict as read your true verdict?

THE JUROR: Yes.

THE COURT: Thank you, Madame Clerk. Anything before the jury is released?

MR. MURPHY: Nothing from the Plaintiff, Your Honor.

MR. MCCOY: Nothing at this time.

MR. ROZELSKY: Nothing, Your Honor.

THE COURT: Members of the jury, on behalf of the parties and the Court, I want to again thank you for the careful attention that you have given to the case and the service you have provided. It is the most important service a citizen can provide, I believe, outside of military service. I hope you have had a positive experience and you have new insight in the way the federal court system works. Normally, I would come back and thank you personally, but I have some other matters to address with the parties and the

attorneys and I know it is dark outside, so I will just leave you with our thanks.

You don't have to discuss your verdict with anyone, you never have to do that, it is up to you. And with that, safe travels going home. Thank you.

(Whereupon, the following was heard outside the presence of the trial jury.)

THE COURT: All right. Anything else today?

MR. MURPHY: Not from Plaintiff, Your Honor.

THE COURT: I think the Plaintiff was present, I don't know that any of the defense representatives were in, so you may want to share the verdict with them before you go any further .

MR. MCCOY: I think he just did. Give us just a second.

MR. MCCOY: Your Honor, we don't have anything to add, obviously we will have post-trial motions to file, we will file those in a timely manner.

THE COURT: We will also need to address scheduling for the economic damages, so if it is agreeable, we will look at the calendar and coordinate that with you all.

MR. MCCOY: Thank you, Your Honor.

THE COURT: Okay. Well, I want to again commend y'all for doing such a fine job in this case.

Thank you.

(Whereupon, the hearing concluded at 6:40 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR April 19, 2026
Date

**$**

**$1,500** [1] - 67:1
**$168,000** [1] - 88:24
**$200,000** [1] - 88:24
**$202,450** [1] - 66:12
**$240,000** [1] - 63:9
**$40,000** [2] - 66:16, 89:8

**'**

**'19** [1] - 61:17
**'21** [1] - 91:3
**'22** [1] - 78:4

**1**

**1** [3] - 72:8, 90:21, 91:1
**1,000-person** [1] - 79:15
**100,000** [1] - 166:20
**101** [1] - 3:4
**10:45** [1] - 58:17
**10th** [7] - 66:19, 69:16, 75:12, 75:16, 76:2, 76:4, 76:5
**11** [19] - 4:8, 4:9, 5:20, 25:12, 25:25, 38:19, 39:22, 66:13, 66:14, 73:16, 77:22, 81:8, 81:10, 81:14, 90:12, 90:16, 92:4, 126:19, 164:19
**11,000** [1] - 77:7
**117** [1] - 167:11
**11th** [1] - 73:24
**12** [9] - 5:22, 40:6, 62:13, 62:15, 90:12, 90:24, 97:11, 126:19, 158:11
**120** [1] - 81:24
**123** [1] - 3:5
**129** [1] - 3:6
**13** [9] - 3:2, 4:22, 4:24, 5:22, 90:12, 91:8, 91:9, 126:19, 158:11
**138** [1] - 168:7
**13th** [5] - 69:18, 70:8, 76:4, 76:5, 76:8
**140** [1] - 167:17
**14th** [3] - 66:20, 75:15, 77:22
**15** [4] - 2:4, 5:12, 62:13, 97:11
**150,000** [1] - 107:6
**153** [1] - 168:1
**15th** [2] - 71:2, 71:3
**16** [3] - 62:15, 80:10, 80:13
**165** [1] - 3:7
**16th** [3] - 61:9, 71:6, 71:7
**17** [2] - 85:21, 167:20
**173** [1] - 167:23
**19** [2] - 72:7, 170:13
**190** [1] - 167:14
**1964** [1] - 137:23
**1981** [28] - 10:3, 10:5, 10:11, 10:15, 10:18, 99:11, 138:2, 138:5, 138:8, 138:13, 139:21, 144:21, 144:24, 145:4, 145:9, 147:20, 148:5, 148:15, 148:18, 149:16, 155:24, 156:19, 160:11, 160:24, 161:2, 161:8, 166:16
**1981a(b)(1)** [1] - 160:22
**1981a(b)(3)(D** [1] - 160:15
**1981a(c)(2)** [1] - 161:5
**1st** [2] - 73:21, 91:9

**2**

**2** [2] - 48:8, 56:12
**2-22** [1] - 74:2
**2-25-26** [1] - 164:11
**20** [2] - 14:6, 89:17
**20,000** [1] - 79:24
**2000e-2(a** [1] - 139:24
**2015** [2] - 87:1, 89:6
**2018** [3] - 61:17, 78:19, 84:25
**2019** [7] - 84:11, 84:25, 90:21, 91:1, 91:9, 126:21
**2020** [3] - 23:17, 23:18, 36:3
**2021** [12] - 34:5, 34:24, 36:4, 42:3, 48:18, 69:9, 69:11, 73:16, 76:4, 85:11, 115:12, 124:7
**2022** [7] - 74:18, 75:9, 75:14, 77:13, 77:14, 111:3, 111:4
**2026** [3] - 1:4, 166:24, 170:13
**207** [1] - 1:18
**22nd** [1] - 78:14
**24th** [1] - 91:3
**25** [2] - 1:4, 91:23
**25th** [1] - 166:24
**26** [2] - 52:12, 53:25
**26-year-old** [1] - 83:21
**27** [6] - 67:20, 69:14, 69:18, 69:21, 69:24, 75:5
**27th** [1] - 71:15
**28** [1] - 71:5
**28th** [1] - 71:21
**294** [1] - 1:22
**29601** [2] - 1:18, 2:5
**29602** [1] - 1:22
**29624** [1] - 2:7
**29th** [1] - 115:12

**3**

**3** [1] - 125:4
**30** [7] - 74:10, 74:13, 74:14, 75:2, 75:3, 75:5, 93:5
**300,00** [1] - 160:22
**306** [1] - 90:20
**30th** [2] - 72:5, 74:8
**31** [4] - 19:2, 74:19, 74:21, 75:9
**315** [1] - 2:7
**316** [1] - 90:24
**31st** [1] - 78:2
**32** [2] - 71:18, 71:24
**35** [1] - 168:4
**36** [2] - 91:25
**37** [1] - 121:20
**39** [1] - 91:12
**3:25** [1] - 163:4
**3rd** [6] - 66:19, 74:12, 75:14, 77:14, 77:17, 77:23

**4**

**4** [3] - 80:10, 80:13, 155:9
**40,000** [1] - 66:14
**42** [5] - 138:1, 139:23, 160:15, 160:22, 161:5
**49** [1] - 21:13
**4:09** [1] - 163:5
**4th** [6] - 20:19, 45:15, 46:7, 46:10, 46:23, 73:8

**5**

**5** [2] - 38:22, 166:21
**50** [4] - 9:2, 21:13, 63:2, 63:4
**500** [1] - 160:14
**51** [1] - 167:5
**59** [1] - 3:3
**5:38** [1] - 163:21
**5:55** [1] - 165:5

**6**

**6** [2] - 124:6, 156:4
**60** [6] - 14:16, 20:21, 21:3, 67:23, 67:25, 114:18
**61** [9] - 14:16, 21:3, 24:19, 72:12, 91:5, 106:20, 114:14, 114:18
**64** [15] - 20:21, 23:16, 79:21, 80:8, 80:14, 80:19, 80:21, 91:16, 92:4, 94:9, 106:20, 114:16, 114:18, 117:5, 122:17
**65** [4] - 86:18, 86:22, 86:23, 86:24
**6:29** [1] - 165:6
**6:40** [1] - 170:2
**6th** [1] - 74:13

**7**

**7** [2] - 165:12, 167:8
**700** [1] - 2:4
**7:22-CV-3738** [1] - 1:3

**8**

**8** [1] - 99:6
**85** [1] - 103:14
**8:00** [1] - 76:14
**8:30** [1] - 76:16
**8th** [4] - 67:19, 67:24, 69:12, 74:15

**9**

**9** [2] - 21:5, 81:9
**9:14** [1] - 4:1
**9th** [2] - 75:2, 75:7

**A**

**a.m** [2] - 4:1, 76:14
**abilities** [2] - 73:3, 88:7
**ability** [3] - 25:6, 77:9, 90:1
**able** [5] - 113:15, 113:16, 134:11, 134:13, 164:14
**above-entitled** [1] - 170:8
**absence** [1] - 145:16
**absolute** [1] - 123:10
**AC** [1] - 163:10
**accept** [4] - 60:15, 75:8, 130:19, 154:25
**acceptable** [1] - 164:25
**accepted** [3] - 64:4, 66:18, 67:3
**accepts** [1] - 75:12
**access** [1] - 63:10
**accomplished** [2] - 97:10, 97:14
**accomplishments** [1] - 89:22
**accordance** [1] - 161:11
**according** [2] - 121:9, 130:24
**account** [1] - 134:9
**accountants** [2] - 117:24, 146:9
**accurate** [1] - 8:25
**accusing** [1] - 126:25
**acknowledge** [2] - 10:15, 112:15
**acknowledged** [4] - 22:4, 26:8, 32:13, 115:5
**acknowledges** [1] - 34:2
**acronym** [1] - 5:15
**act** [4] - 16:12, 42:23, 85:1, 150:24
**Act** [1] - 137:23
**acted** [6] - 142:3, 144:25, 145:1, 145:3, 148:19, 149:7
**acting** [3] - 30:23, 52:13, 148:24
**action** [29] - 4:10, 4:13, 4:15, 4:17, 45:17, 71:12, 78:24, 79:5, 79:8, 79:9, 95:22, 95:24, 96:6, 125:23, 126:1, 126:3, 126:5, 137:1, 141:8, 141:13, 141:17, 141:18, 141:19, 142:8, 143:2, 144:9, 144:17, 159:7, 164:18
**actions** [24] - 18:5, 28:6, 32:1, 32:15, 37:2, 37:4, 41:2, 57:22, 61:4, 61:7, 61:8, 61:22, 63:20, 85:1, 106:23, 127:19, 138:16, 141:9, 142:5, 142:24, 143:4, 145:11, 145:15,

145:21
**acts** [1] - 150:7
**actual** [2] - 85:8, 142:6
**ad** [2] - 9:22, 111:12
**add** [2] - 9:7, 169:17
**added** [2] - 5:12, 5:20
**addition** [1] - 133:7
**additional** [3] - 9:24, 145:23, 159:2
**additionally** [4] - 148:2, 161:12, 161:17, 162:1
**address** [8] - 29:1, 34:10, 57:21, 147:10, 147:12, 151:2, 168:25, 169:19
**addressed** [3] - 125:12, 159:5, 159:17
**addressing** [1] - 10:12
**adequately** [2] - 147:23, 162:6
**admissions** [2] - 66:23, 97:1
**admit** [4] - 8:6, 29:14, 29:15, 31:22
**admits** [5] - 83:10, 89:2, 89:3, 92:5, 92:10
**admitted** [7] - 20:17, 64:11, 66:11, 68:19, 84:20, 96:6, 136:7
**admonition** [1] - 58:4
**admonitions** [1] - 151:2
**ads** [1] - 44:18
**advance** [2] - 26:25, 135:20
**adverse** [23] - 4:10, 4:12, 18:4, 78:23, 79:4, 79:7, 79:8, 95:22, 95:24, 96:6, 106:22, 125:23, 125:25, 141:7, 141:9, 141:13, 141:16, 143:1, 144:8, 144:16, 159:6, 164:18
**adversely** [2] - 60:11, 140:9
**advertisements** [1] - 153:7
**advise** [1] - 154:1
**affairs** [3] - 5:5, 6:7, 143:21
**affect** [1] - 140:9
**affected** [1] - 26:13
**affects** [8] - 24:24, 24:25, 25:2, 25:4, 25:5, 25:6, 27:12, 65:9
**AG** [90] - 9:3, 31:3, 31:20, 33:16, 33:22, 34:6, 34:9, 36:18, 47:14, 47:15, 48:19, 48:22, 49:15, 56:4, 56:9, 98:11, 98:18, 98:20, 100:11, 101:10, 103:9, 103:10, 103:11, 103:13, 103:15, 103:18, 103:20, 104:7, 104:8, 104:9, 104:10, 104:13, 104:15, 104:23, 105:2, 105:4, 105:15, 105:20, 105:23, 105:25, 107:2, 107:12, 107:23, 108:4, 108:10, 108:11, 108:22, 110:17, 110:23, 111:1, 111:14, 111:19, 111:20, 112:4, 112:12, 112:13, 112:16, 112:18, 112:20, 113:5, 113:11, 113:12, 113:18, 113:23, 114:7, 114:11, 114:12, 115:23, 116:3, 117:7, 118:4, 120:11, 120:16, 122:22, 138:9, 139:5, 139:8, 139:12, 139:14, 139:15, 145:25, 147:2, 147:6, 147:8, 155:4, 158:22, 159:23, 162:17, 166:1
**AG's** [1] - 115:7
**age** [1] - 92:23
**agencies** [1] - 19:8
**agents** [2] - 118:1, 146:10
**ago** [8] - 9:20, 16:3, 23:1, 28:24, 55:6, 64:15, 115:14, 124:2
**agree** [6] - 15:13, 25:21, 61:7, 66:15, 130:20, 160:2
**agreeable** [1] - 169:21
**agreed** [5] - 18:9, 20:18, 43:15, 101:9, 132:8
**agreement** [5] - 71:5, 146:2, 151:19, 153:24, 164:10
**agrees** [1] - 25:7
**ahead** [4] - 84:4, 96:22, 101:9, 158:7
**AIDED** [1] - 2:9
**ain't** [3] - 30:1, 31:14, 125:1
**Air** [1] - 109:7
**air** [1] - 24:16
**Airport** [2] - 59:24, 78:6
**AKTIENGESELLSCHAFT** [2] - 1:7, 1:21
**Aktiengesellschaft** [1] - 139:12
**alignment** [1] - 106:12
**allegations** [1] - 160:1
**alleged** [7] - 78:23, 85:18, 92:19, 115:7, 145:18, 145:20, 147:22
**alleges** [2] - 93:14, 137:18
**allegiance** [2] - 122:3, 143:11
**alleging** [2] - 88:19, 99:4
**allowed** [3] - 8:16, 106:11, 148:5
**allows** [4] - 7:24, 51:10, 118:18, 146:18
**almost** [4] - 55:22, 66:14, 89:8, 121:15
**alone** [5] - 106:14, 112:10, 115:2, 147:21, 150:5
**alphabet** [1] - 63:13
**alternating** [2] - 32:11, 50:6
**altogether** [1] - 15:4
**ambition** [2] - 60:1, 78:8
**amended** [1] - 137:23
**America** [2] - 54:21, 120:19
**American** [26] - 5:8, 29:13, 29:19, 30:5, 30:6, 30:12, 31:12, 31:15, 32:14, 33:12, 60:12, 60:16, 85:9, 87:19, 88:3, 88:15, 104:1, 104:2, 119:17, 119:18, 127:18, 143:22, 146:15, 146:16, 159:16
**Americans** [2] - 72:2, 159:11
**amount** [13] - 54:12, 57:13, 57:14, 95:13, 147:16, 148:17, 150:13, 157:5, 157:6, 160:16, 160:20, 166:19, 166:21
**analogy** [1] - 94:17
**analysis** [1] - 45:21
**ancestor's** [1] - 143:9
**ancestors** [1] - 121:25
**anchored** [1] - 85:3
**AND** [1] - 1:17
**ANDERSON** [1] - 2:7
**anecdotal** [1] - 79:3
**angry** [2] - 35:11, 64:2
**anguish** [2] - 147:18, 160:18
**announce** [1] - 76:12
**announced** [6] - 45:16, 45:18, 46:22, 69:10, 70:24, 73:18
**announcement** [2] - 46:4, 126:10
**answer** [30] - 9:20, 13:21, 16:6, 16:8, 16:12, 17:22, 35:5, 41:21, 57:3, 57:6, 59:12, 59:17, 63:18, 98:2, 98:3, 104:3, 105:23, 110:20, 113:7, 116:12, 116:19, 128:21, 139:14, 139:16, 147:5, 155:6, 155:9, 156:3, 157:2
**answered** [11] - 16:13, 17:19, 44:22, 98:20, 113:8, 128:18, 155:7, 156:1, 156:2, 156:5, 166:2
**answering** [3] - 56:11, 116:11, 116:13
**answers** [2] - 57:5, 135:19
**anti** [1] - 150:3
**anti-discrimination** [1] - 150:3
**apologize** [2] - 9:25, 101:24
**appear** [1] - 82:14
**APPEARANCES** [2] - 1:16, 2:1
**applicable** [1] - 160:14
**applicants** [1] - 140:7
**application** [1] - 140:17
**applied** [2] - 40:13, 160:6
**applies** [9] - 9:14, 118:13, 130:10, 139:17, 139:20, 145:25, 147:2, 160:3, 160:25
**apply** [6] - 28:22, 130:14, 130:18, 131:24, 137:17, 161:1
**appreciate** [5] - 5:19, 17:8, 74:24, 100:16, 163:1
**appropriate** [2] - 147:15, 148:16
**appropriately** [1] - 112:6
**approval** [2] - 47:24, 48:2
**approve** [1] - 111:25
**approved** [4] - 31:1, 31:20, 47:21, 86:5
**apps** [2] - 152:19, 153:5
**April** [4] - 90:21, 91:1, 126:21, 170:13
**arbitrary** [1] - 39:8
**areas** [6] - 64:19, 72:19, 74:3, 74:4, 77:10, 80:13
**argue** [1] - 28:4
**argued** [4] - 9:2, 9:20, 9:21
**argument** [9] - 12:25, 13:12, 15:2, 15:3, 20:16, 59:1, 88:15, 124:1, 124:10
**ARGUMENT** [4] - 3:2, 3:3, 3:4, 3:5
**arguments** [10] - 8:14, 12:2, 13:11, 66:22, 125:18, 129:10, 130:9, 132:16, 132:19, 136:4
**arms** [1] - 14:5
**arranged** [1] - 86:22
**arrangement** [1] - 71:11
**articulating** [1] - 147:25
**AS** [2] - 1:8, 1:10
**aside** [2] - 29:3, 33:4
**aspect** [3] - 33:8, 50:21, 56:7
**assembly** [2] - 72:19, 88:6
**asserted** [1] - 9:3
**assess** [2] - 15:25, 18:3

**assignment** [4] - 18:23, 38:8, 53:4, 122:21
**assignments** [1] - 88:9
**associate** [6] - 61:3, 72:23, 72:24, 84:1, 94:25, 95:5
**associate-friendly** [3] - 72:24, 84:1, 94:25
**associations** [1] - 137:6
**assume** [1] - 20:7
**assumed** [2] - 79:16, 98:4
**assumes** [1] - 95:15
**assurances** [1] - 62:24
**ate** [1] - 53:20
**athletes** [1] - 83:7
**Atkiengesellschaft** [4] - 103:15, 105:3, 165:22, 166:1
**attached** [2] - 23:12, 124:3
**attack** [1] - 94:7
**attacked** [1] - 43:3
**attempt** [1] - 154:7
**attends** [1] - 74:16
**attention** [3] - 12:24, 44:15, 168:18
**attentive** [3] - 14:20, 57:20, 96:19
**attest** [1] - 87:14
**attorney** [1] - 102:17
**attorney's** [1] - 71:16
**attorneys** [10] - 13:10, 118:1, 129:23, 132:25, 136:4, 146:10, 157:17, 162:21, 164:9, 169:1
**attributable** [1] - 10:17
**audits** [1] - 40:16
**August** [2] - 69:9, 69:11
**authentic** [1] - 82:22
**authority** [1] - 106:8
**automatically** [1] - 29:17
**automotive** [1] - 65:3
**available** [1] - 160:23
**avoid** [4] - 70:12, 70:19, 149:22, 150:7
**award** [14] - 10:16, 52:8, 147:12, 147:14, 147:21, 148:6, 149:16, 149:25, 150:12, 150:19, 150:24, 157:4, 166:19, 166:20
**awarded** [7] - 10:10, 54:11, 147:17, 150:14, 157:7, 160:16, 160:20
**aware** [2] - 27:4, 163:9
**awareness** [1] - 148:25
**awful** [3] - 102:21, 108:2, 110:15

**B**

**backed** [1] - 50:12
**background** [1] - 32:8
**backwards** [1] - 95:2
**bad** [5] - 25:14, 25:15, 77:24, 93:4, 95:19
**badmouth** [1] - 43:6
**Bailey** [4] - 21:11, 27:25, 39:10, 81:1
**Bailey's** [1] - 21:3
**bailiff** [2] - 154:1, 154:5
**balance** [3] - 5:21, 62:13, 62:15
**balanced** [1] - 6:9
**bald** [1] - 88:1
**bald-headed** [1] - 88:1
**ball** [1] - 42:6
**Barbara** [1] - 48:21
**base** [3] - 87:9, 109:13, 151:12
**based** [30] - 5:3, 6:5, 8:12, 24:11, 29:4, 37:2, 37:19, 50:6, 51:11, 51:13, 88:16, 92:14, 137:24, 138:3, 141:9, 141:24, 142:1, 142:16, 143:5, 143:7, 143:19, 144:4, 144:13, 145:1, 146:19, 146:24, 147:1, 148:6, 152:24, 160:10
**bases** [1] - 43:20
**basic** [3] - 15:11, 15:12, 28:8
**basing** [1] - 51:6
**basis** [8] - 62:21, 89:11, 95:21, 137:19, 140:14, 142:20, 145:3, 146:20
**battery** [1] - 82:1
**Bavaria** [1] - 84:2
**BAYERISCHE** [2] - 1:6, 1:20
**Bayerische** [4] - 105:3, 139:11, 165:22, 165:25
**bears** [1] - 147:24
**become** [4] - 33:20, 34:7, 78:5, 91:19
**becomes** [3] - 19:16, 102:18, 154:3
**becoming** [1] - 44:3
**beef** [1] - 35:14
**BEFORE** [1] - 1:13
**beg** [1] - 85:22
**began** [2] - 57:18, 163:4
**begin** [4] - 151:9, 157:16, 157:17, 157:19
**beginning** [3] - 13:11, 131:1, 131:9
**begrudge** [1] - 37:18
**behalf** [4] - 14:22, 59:1, 96:23, 168:16
**behind** [1] - 5:13
**below** [2] - 50:18, 113:6
**bench** [1] - 7:22
**benchmarking** [1] - 107:24
**benefit** [1] - 81:5
**benefits** [2] - 81:14, 94:4
**besmirched** [1] - 43:3
**best** [20] - 30:18, 53:25, 82:5, 82:7, 87:11, 87:12, 88:11, 88:12, 92:10, 108:13, 108:16, 111:6, 112:19, 120:4, 123:6, 123:8, 123:9, 123:10, 123:21
**betrayed** [1] - 94:25
**better** [6] - 55:16, 60:25, 62:12, 62:14, 99:4, 111:3
**between** [14] - 12:2, 13:13, 49:10, 67:21, 69:15, 75:4, 101:13, 111:10, 124:3, 137:1, 138:23, 139:1, 146:2, 146:5
**beyond** [2] - 5:23, 131:21
**Bianca** [1] - 32:12
**bias** [1] - 134:18
**big** [15] - 20:9, 20:13, 23:14, 43:7, 45:3, 49:18, 53:5, 53:7, 53:12, 70:17, 70:18, 73:6, 89:9, 93:12, 124:19
**bill** [2] - 95:12, 95:13
**binders** [1] - 68:17
**bird** [1] - 29:3
**birth** [2] - 122:2, 143:10
**bit** [8] - 18:1, 34:19, 56:18, 105:9, 106:12, 109:23, 113:16, 123:3
**bite** [1] - 118:15
**bitterness** [1] - 60:14
**black** [1] - 28:20
**blame** [3] - 22:13, 31:9, 53:10
**blank** [1] - 10:6
**blanks** [1] - 99:20
**blew** [2] - 26:8, 34:3
**Blew** [1] - 26:10
**blog** [1] - 154:22
**blood** [1] - 101:13
**blow** [2] - 86:2, 119:12
**BMW** [205] - 1:7, 1:8, 1:9, 1:10, 1:11, 2:2, 8:19, 9:3, 19:4, 19:19, 20:6, 24:9, 24:24, 26:1, 26:16, 29:2, 31:3, 31:22, 33:16, 33:21, 33:22, 34:5, 34:9, 36:18, 40:10, 42:25, 43:2, 44:15, 44:21, 47:14, 47:22, 48:9, 48:19, 48:22, 49:14, 49:15, 53:23, 54:18, 56:4, 56:9, 57:8, 57:10, 58:20, 59:1, 59:8, 59:23, 60:3, 60:17, 60:22, 61:10, 61:16, 61:24, 61:25, 62:17, 62:22, 63:22, 64:2, 65:5, 65:21, 67:4, 74:18, 75:1, 75:15, 75:20, 76:5, 77:11, 77:21, 78:21, 80:18, 81:20, 83:15, 83:24, 88:16, 91:16, 93:10, 93:15, 93:17, 95:13, 95:14, 96:23, 97:14, 97:22, 97:23, 98:1, 98:11, 98:17, 98:18, 98:19, 98:21, 98:24, 99:2, 99:6, 99:8, 99:12, 99:13, 99:21, 100:2, 100:5, 100:11, 101:10, 103:8, 103:9, 103:15, 103:18, 103:20, 104:5, 104:7, 104:8, 104:9, 104:10, 104:11, 104:21, 104:23, 105:2, 105:4, 105:20, 106:8, 106:9, 107:2, 107:23, 108:3, 108:4, 108:6, 108:12, 108:22, 109:6, 110:17, 110:23, 110:25, 111:13, 111:19, 111:20, 111:23, 112:4, 112:5, 112:10, 112:12, 112:13, 112:16, 112:18, 112:19, 112:20, 112:25, 113:5, 113:10, 113:11, 113:18, 113:21, 113:24, 113:25, 115:5, 115:7, 115:22, 115:23, 116:3, 118:4, 120:19, 122:22, 125:15, 138:6, 138:7, 138:9, 139:5, 139:6, 139:8, 139:12, 139:13, 139:14, 139:15, 145:25, 147:2, 147:3, 147:6, 147:8, 155:4, 156:7, 156:8, 156:12, 156:17, 156:21, 158:22, 159:23, 162:16, 162:17, 165:22, 166:1, 166:3, 166:4, 166:7, 166:9, 166:11, 166:13, 166:15, 166:17
**boat** [1] - 82:23
**body** [2] - 15:16, 84:3
**bonus** [3] - 25:2, 25:5, 63:9
**boo** [1] - 42:12
**book** [1] - 59:12
**books** [1] - 23:7
**bore** [2] - 47:17, 91:14
**boring** [1] - 14:16
**born** [3] - 28:25, 121:25, 143:8
**borrow** [1] - 87:11
**Bosch** [1] - 74:11
**boss** [6] - 44:4, 46:17, 91:19, 125:1
**bottom** [3] - 48:9, 70:3, 85:25
**bouncing** [1] - 85:24
**bound** [1] - 130:19
**BOX** [1] - 1:22
**box** [4] - 33:3, 55:8, 84:8, 113:6
**boxed** [2] - 86:10,

87:21
**boxes** [5] - 29:3, 31:10, 109:17, 109:18
**brain** [2] - 68:14, 90:10
**brain-injured** [1] - 90:10
**break** [7] - 12:2, 17:11, 55:15, 58:3, 93:15, 100:10, 100:21
**breaking** [1] - 55:16
**breaks** [5] - 12:7, 12:9, 13:13, 38:6, 78:22
**BRIAN** [1] - 1:17
**Brian** [1] - 55:6
**bridge** [12] - 49:4, 49:9, 85:7, 115:19, 119:2, 121:13, 122:19, 122:23, 122:24, 123:4
**briefly** [3] - 7:9, 81:16, 84:2
**bring** [17] - 7:18, 8:12, 12:20, 13:4, 20:2, 25:23, 51:10, 58:22, 88:7, 91:15, 100:25, 109:2, 119:10, 127:11, 127:14, 128:17, 165:9
**bringing** [3] - 88:11, 95:1, 116:25
**brings** [1] - 157:19
**broad** [3] - 19:20, 60:23, 107:25
**broaden** [2] - 109:11, 122:16
**brochures** [1] - 79:3
**broke** [1] - 93:14
**broken** [1] - 94:24
**Brooks** [1] - 163:11
**brothers** [1] - 109:7
**brought** [6] - 97:3, 118:21, 136:15, 137:21, 144:22, 164:8
**brutal** [1] - 96:20
**builder** [1] - 91:13
**building** [1] - 82:1
**BULL** [1] - 2:6
**bull** [2] - 90:16, 170:13
**bump** [1] - 37:23
**bumped** [1] - 43:11
**bunch** [3] - 19:8, 47:10, 69:15
**burden** [11] - 68:11, 92:21, 96:8, 97:23, 97:24, 102:19, 131:8, 131:10, 131:19, 147:24, 149:20
**Burghardt** [1] - 48:21
**Burgmeier** [34] - 6:23, 18:22, 18:24, 19:4, 19:5, 19:9, 19:12, 19:25, 20:1, 20:7, 27:4, 27:8, 38:8, 41:2, 41:8, 48:5, 48:18, 49:8, 53:3, 72:6, 106:17, 108:8, 108:10, 108:11, 108:20, 108:24, 114:11, 120:6, 121:18, 123:3, 128:18, 128:20, 128:25, 129:2
**Burgmeier's** [1] - 110:7
**business** [16] - 19:21, 43:5, 60:22, 64:11, 65:4, 65:12, 67:13, 97:17, 97:20, 118:4, 142:10, 142:13, 142:14, 146:13, 146:15
**BUSINESS** [2] - 1:8, 1:10
**Business** [1] - 89:24
**business-making** [1] - 65:12
**buy** [3] - 61:7, 81:2, 126:11
**buzz** [4] - 7:3, 7:19, 62:6
**BY** [4] - 3:2, 3:3, 3:4, 3:5

**C**

**CA** [1] - 1:3
**cafeterias** [1] - 77:7
**Cain** [6] - 59:2, 68:18, 79:5, 92:11, 121:22, 164:21
**CAIN** [1] - 1:13
**calendar** [1] - 169:21
**calmly** [1] - 82:4
**candid** [1] - 83:20
**candidate** [6] - 33:20, 80:12, 80:16, 80:17, 82:12, 88:22
**candidates** [4] - 33:11, 34:7, 108:1, 108:5
**cannot** [8] - 62:19, 65:17, 92:18, 98:3, 135:21, 149:12, 149:16, 152:13
**cap** [5] - 10:9, 160:14, 160:23, 160:25, 161:24
**capacity** [1] - 149:6
**capped** [1] - 160:12
**caps** [5] - 10:4, 10:13, 70:10, 161:3
**care** [2] - 55:1, 61:14
**career** [12] - 16:3, 18:14, 18:19, 18:25, 24:24, 25:8, 27:12, 38:16, 41:4, 53:25, 108:18, 109:10
**careful** [2] - 99:17, 168:18
**carefully** [1] - 153:23
**Carolina** [6] - 19:3, 19:7, 81:24, 93:20, 104:6, 107:7
**CAROLINA** [1] - 1:1
**Carolinians** [1] - 54:19
**Carter** [1] - 11:18
**case** [108] - 6:1, 9:4, 9:6, 9:8, 11:18, 11:20, 13:16, 14:9, 14:19, 15:4, 15:10, 16:18, 19:16, 20:9, 20:13, 22:2, 23:14, 27:6, 51:18, 51:21, 51:23, 56:9, 57:8, 57:23, 58:5, 58:6, 59:6, 59:22, 60:6, 60:7, 60:9, 60:11, 60:13, 60:14, 60:20, 61:22, 62:3, 64:1, 64:15, 68:19, 72:2, 80:14, 85:9, 89:1, 89:20, 92:16, 92:17, 92:21, 93:2, 96:6, 100:1, 100:12, 100:13, 100:14, 103:7, 103:25, 104:2, 113:19, 124:11, 128:2, 130:10, 130:15, 130:18, 130:23, 131:1, 131:9, 131:10, 131:24, 133:12, 134:18, 134:19, 134:21, 135:12, 135:17, 136:6, 136:11, 136:19, 136:25, 137:17, 148:9, 151:10, 151:20, 152:11, 152:12, 152:13, 152:14, 152:15, 152:24, 153:10, 153:14, 153:18, 154:10, 154:17, 154:24, 154:25, 158:20, 160:3, 160:6, 160:12, 162:22, 162:25, 165:21, 168:18, 169:25
**cases** [4] - 11:17, 52:8, 131:20, 161:25
**categorizes** [1] - 70:19
**category** [1] - 88:18
**caught** [2] - 34:13, 90:6
**causation** [4] - 56:18, 78:23, 145:2, 145:5
**center** [2] - 82:3, 95:6
**centralized** [7] - 49:20, 107:21, 107:23, 111:16, 138:24, 139:4, 139:7
**CEO** [11] - 16:24, 63:4, 64:24, 69:11, 81:19, 82:14, 83:3, 83:15, 97:2, 106:8, 112:8
**certain** [12] - 28:22, 43:17, 51:9, 101:22, 104:20, 118:5, 132:13, 135:17, 136:5, 146:14, 146:17, 153:6
**certainly** [2] - 16:10, 42:8
**CERTIFICATE** [1] - 170:5
**certification** [2] - 19:11, 121:9
**certifications** [2] - 19:13, 63:14
**certified** [2] - 120:14, 122:15
**certify** [2] - 156:24, 170:6
**cetera** [2] - 81:14, 96:12
**CFO** [1] - 112:24
**chain** [1] - 133:18
**chair** [3] - 14:15, 25:8, 99:15
**challenge** [10] - 24:1, 24:4, 47:12, 91:11, 118:14, 118:15, 119:14, 126:14, 126:18, 126:24
**challenged** [4] - 90:9, 90:11, 142:8, 149:8
**challenges** [2] - 94:5, 124:8
**challenging** [1] - 65:2
**championship** [1] - 83:6
**chance** [4] - 32:10, 91:20, 92:3, 113:14
**change** [38] - 4:20, 5:19, 33:17, 36:1, 45:16, 54:18, 55:2, 55:5, 55:7, 55:8, 55:20, 59:19, 65:1, 66:3, 67:4, 68:6, 79:10, 79:11, 84:8, 87:15, 87:16, 88:16, 91:24, 92:1, 94:4, 96:1, 96:8, 97:22, 126:8, 129:17, 141:15, 141:21, 143:3, 144:10, 144:18, 151:24, 161:6
**changed** [8] - 34:23, 35:3, 35:7, 35:18, 39:19, 59:17, 76:24, 91:3
**changes** [12] - 5:16, 5:22, 8:21, 35:24, 65:16, 68:7, 70:23, 72:10, 73:25, 74:1, 80:5, 126:23
**changing** [2] - 17:7, 65:11
**channels** [1] - 47:21
**chaos** [5] - 61:24, 62:2, 64:22, 68:2
**chaotic** [1] - 64:20
**Chapin** [1] - 89:17
**characteristic** [1] - 141:10
**CHARGE** [1] - 3:6
**charge** [20] - 4:4, 6:17, 6:19, 7:1, 7:2, 7:4, 7:10, 7:20, 8:16, 9:6, 9:22, 20:11, 45:17, 68:18, 85:5, 105:10, 125:24, 126:12, 158:12, 160:6
**charged** [1] - 9:15
**charges** [1] - 164:20
**charging** [1] - 8:22
**chart** [7] - 25:24, 41:20, 48:9, 48:23, 112:3, 120:13, 121:20
**charts** [10] - 48:10, 50:18, 55:4, 61:16, 136:3, 136:5, 136:7, 136:11, 136:14, 136:17
**chatroom** [1] - 154:21
**check** [19] - 56:10, 61:10, 71:7, 71:9,

98:24, 99:1, 99:5, 99:8, 105:5, 105:22, 109:17, 113:6, 155:5, 155:6, 155:13, 155:17, 155:21, 155:25, 156:13
**CHIEF** [1] - 1:14
**Chief** [2] - 78:7, 93:21
**China** [7] - 29:11, 30:1, 30:2, 54:20, 97:15, 113:24
**Chinese** [1] - 29:11
**choice** [8] - 67:6, 97:12, 114:2, 118:2, 118:6, 118:23, 146:11, 156:13
**choices** [4] - 95:12, 157:9, 157:10, 157:11
**choose** [4] - 98:2, 118:5, 146:13, 146:16
**chooses** [1] - 95:15
**choosing** [1] - 112:5
**chose** [7] - 64:14, 85:9, 88:17, 92:9, 98:5, 119:17
**chosen** [1] - 66:21
**Christine** [15] - 61:12, 61:13, 72:8, 74:16, 74:23, 77:15, 80:15, 83:17, 84:1, 85:12, 91:5, 106:16, 115:22, 121:21, 123:7
**chunky** [1] - 75:3
**Circle** [1] - 50:14
**circles** [2] - 109:15, 109:16
**circumstances** [3] - 51:10, 116:21, 116:24
**circumstantial** [3] - 133:15, 133:17, 133:25
**citizen** [9] - 6:23, 51:3, 51:16, 51:19, 52:5, 88:3, 121:11, 159:10, 168:20
**citizens** [7] - 5:5, 6:7, 118:5, 118:19, 143:20, 146:14, 146:16
**citizenship** [31] - 6:21, 7:15, 8:2, 8:11, 8:12, 8:23, 51:3, 51:7, 51:11, 51:13, 51:16, 51:18, 51:20, 51:22, 51:24, 51:25, 118:16, 118:17, 118:18, 118:21, 122:1, 127:23, 127:24, 143:7, 143:9, 143:15, 146:19, 146:22, 146:25, 159:13
**civil** [2] - 131:24, 143:12
**Civil** [2] - 122:4, 137:23
**claim** [36] - 7:23, 10:3, 10:4, 10:15, 10:18, 20:13, 23:3, 44:18, 89:20, 94:9, 98:24, 99:6, 99:10, 104:23, 139:20, 141:2, 142:22, 144:5, 144:13, 148:15, 148:18, 155:11, 155:15, 155:19, 155:23, 156:7, 156:10, 156:14, 156:18, 160:11, 161:2, 166:3, 166:7, 166:11, 166:15
**claiming** [1] - 93:10
**claims** [31] - 9:13, 22:1, 28:10, 51:7, 57:12, 62:21, 62:22, 95:1, 99:2, 103:23, 103:24, 115:17, 131:14, 137:17, 137:21, 139:19, 141:12, 142:3, 142:19, 144:3, 144:11, 144:23, 145:24, 147:4, 147:11, 156:23, 157:1, 160:11, 161:1, 161:8, 161:20
**class** [1] - 83:5
**classification** [3] - 28:16, 29:17, 32:19
**classifications** [1] - 93:11
**classified** [1] - 44:18
**classify** [1] - 140:6
**classifying** [1] - 28:18
**Claudia** [2] - 33:15, 124:4
**clear** [10] - 5:16, 9:9, 11:2, 29:8, 52:15, 102:16, 121:17, 125:14, 159:3, 159:20
**clearer** [2] - 19:16, 30:5
**clearly** [1] - 82:4
**CLERK** [11] - 165:21, 167:5, 167:8, 167:11, 167:14, 167:17, 167:20, 167:23, 168:1, 168:4, 168:7
**clerk** [4] - 102:23, 165:18, 165:20, 167:3
**Clerk** [3] - 162:19, 163:16, 168:10
**clerk's** [1] - 163:12
**click** [1] - 35:10
**clients** [1] - 132:25
**clock** [1] - 84:3
**close** [3] - 41:6, 94:24, 145:10
**closed** [1] - 42:19
**closely** [1] - 46:3
**CLOSING** [4] - 3:2, 3:3, 3:4, 3:5
**closing** [11] - 7:3, 13:11, 15:2, 17:17, 24:5, 51:2, 59:1, 129:10, 132:18, 136:4
**CO** [2] - 1:9, 2:2
**Code** [2] - 138:1, 139:23
**code** [1] - 31:8
**codes** [2] - 31:14, 60:7
**coding** [3] - 31:9, 32:22, 33:2
**coffee** [1] - 31:3
**colleagues** [1] - 121:1
**collectively** [1] - 159:23
**COLLECTIVELY** [2] - 1:7, 1:10
**college** [1] - 43:22
**color** [6] - 31:8, 31:9, 32:22, 33:2, 140:4, 140:11
**combined** [1] - 161:24
**coming** [16] - 33:17, 34:7, 41:12, 45:23, 51:25, 63:22, 69:10, 82:3, 84:8, 86:3, 94:18, 94:19, 101:19, 103:4, 108:12, 127:9
**commence** [1] - 130:2
**commenced** [1] - 4:1
**commend** [3] - 162:21, 162:22, 169:25
**comment** [1] - 164:14
**comments** [7] - 4:5, 5:17, 8:21, 87:7, 157:25, 159:3, 159:6
**Commerce** [3] - 5:14, 117:18, 146:3
**committee** [1] - 48:2
**common** [14] - 44:8, 44:10, 49:3, 49:4, 50:8, 56:6, 61:23, 84:11, 106:6, 107:8, 112:23, 134:2, 138:21, 138:25
**communicate** [7] - 152:11, 152:21, 154:4, 154:8, 154:9, 154:16, 154:24
**communicated** [2] - 45:19, 126:10
**communicates** [3] - 4:15, 126:3, 141:18
**communication** [4] - 46:3, 67:21, 75:11, 101:4
**communications** [2] - 64:20, 75:4
**community** [6] - 43:6, 122:3, 122:4, 137:2, 143:11, 143:12
**companies** [21] - 28:19, 39:4, 51:10, 70:9, 70:11, 70:12, 70:16, 70:17, 70:19, 73:6, 88:10, 106:6, 107:4, 107:21, 117:21, 138:21, 138:23, 138:24, 139:1, 146:7
**Company** [12] - 104:6, 111:23, 156:9, 156:13, 156:21, 165:23, 166:4, 166:8, 166:10, 166:12, 166:14, 166:17
**company** [26] - 18:15, 21:14, 43:3, 43:4, 43:6, 52:13, 54:11, 55:14, 60:23, 87:3, 87:15, 98:4, 99:19, 105:12, 108:17, 111:5, 111:9, 113:2, 118:3, 122:9, 123:8, 138:11, 138:15, 138:17, 156:17
**comparative** [1] - 89:1
**compensate** [2] - 147:17, 148:3
**compensated** [2] - 84:18, 96:15
**compensates** [1] - 52:10
**compensation** [7] - 66:18, 79:23, 80:6, 81:7, 81:10, 81:14, 140:2
**compensatory** [18] - 10:5, 10:16, 52:9, 52:10, 54:11, 57:14, 147:13, 147:14, 147:16, 147:21, 148:2, 148:9, 157:5, 158:18, 160:16, 161:19, 161:25, 166:19
**compete** [1] - 81:22
**competition** [1] - 83:6
**complaining** [2] - 140:23, 160:21
**complains** [9] - 141:6, 142:6, 142:25, 143:17, 144:8, 144:16, 145:8, 145:12, 145:15
**complaint** [1] - 159:25
**completely** [3] - 7:15, 27:7, 51:8
**compliance** [2] - 150:5, 150:9
**complicated** [1] - 60:5
**comply** [3] - 149:11, 149:15, 149:22
**computer** [2] - 152:17, 154:19
**computers** [1] - 153:5
**concept** [4] - 49:5, 87:18, 105:11, 140:20
**concepts** [1] - 19:23
**concern** [2] - 10:2, 10:6
**concerned** [1] - 67:14
**concerning** [2] - 134:18, 154:10
**concerns** [5] - 4:9, 5:21, 5:23, 63:17, 157:25
**conclude** [5] - 4:25, 6:2, 143:17, 147:2, 147:7
**concluded** [1] - 170:2
**conclusion** [1] - 12:25
**conclusive** [1] - 139:3
**conclusory** [1] - 148:1
**Concrete** [9] - 74:9, 74:12, 74:14, 75:5, 75:6, 75:8, 75:13, 75:19, 78:3
**condition** [8] - 4:21, 79:10, 126:9, 141:16,

141:22, 143:3, 144:10, 144:19
**conditions** [2] - 80:6, 140:3
**conduct** [7] - 143:16, 145:18, 149:23, 150:16, 150:18, 150:21, 154:25
**conductor** [1] - 45:23
**conference** [1] - 4:4
**conferred** [1] - 101:8
**confidential** [1] - 86:1
**confirm** [2] - 69:14, 164:10
**confirmed** [2] - 40:25, 66:12
**confuse** [5] - 22:14, 51:21, 113:22, 161:18, 161:21
**confused** [2] - 22:12, 117:13
**confusing** [4] - 22:13, 55:24, 101:25, 162:8
**confusion** [2] - 78:11, 161:23
**Congress** [2] - 28:25, 30:3
**connect** [2] - 7:4, 15:3
**connects** [1] - 74:9
**conscientious** [1] - 137:9
**consider** [17] - 20:24, 28:11, 132:11, 132:14, 133:21, 134:1, 134:5, 135:3, 135:7, 135:12, 135:16, 138:20, 147:5, 147:9, 148:15, 150:2, 150:13
**consideration** [5] - 135:25, 137:10, 139:5, 151:22, 153:8
**considerations** [2] - 48:15, 68:3
**considered** [12] - 31:13, 56:21, 56:23, 56:24, 59:4, 80:18, 105:13, 105:21, 131:12, 133:6, 136:25, 138:12
**considering** [1] - 68:20
**consist** [1] - 132:4
**consistent** [2] - 22:21, 146:22
**consistently** [1] - 65:13
**constantly** [1] - 151:11
**Constitution** [2] - 15:16, 152:24
**construct** [1] - 95:18
**construed** [1] - 162:5
**consult** [1] - 151:17
**consultant** [1] - 71:5
**consulting** [1] - 70:12
**contact** [1] - 43:14
**contacts** [2] - 69:13, 71:16
**contained** [1] - 69:23
**contains** [2] - 75:4, 160:1
**contends** [2] - 142:9, 142:11
**continents** [1] - 27:7
**continually** [1] - 87:13
**continue** [1] - 152:22
**CONTINUED** [1] - 2:1
**continues** [3] - 80:24, 81:7, 81:10
**continuing** [2] - 61:15, 64:23
**contracts** [2] - 73:5, 121:1
**contradicted** [1] - 134:22
**contradiction** [1] - 135:3
**contradictions** [1] - 62:20
**contrary** [2] - 149:14, 149:18
**contribute** [1] - 94:2
**contributions** [1] - 46:21
**control** [22] - 49:20, 50:5, 50:9, 50:10, 56:6, 105:15, 105:16, 105:17, 107:21, 107:23, 111:4, 111:14, 111:16, 112:10, 112:12, 112:16, 130:12, 138:24, 139:1, 139:4, 139:6, 139:7
**controlled** [1] - 50:21
**controlling** [5] - 107:12, 109:25, 110:23, 111:11, 162:7
**controls** [2] - 105:12, 132:23
**conversation** [2] - 116:23, 117:5
**conviction** [1] - 152:1
**convinced** [2] - 44:22, 151:25
**cooperation** [1] - 100:16
**coordinate** [1] - 169:21
**copies** [3] - 130:3, 162:11, 164:23
**core** [2] - 29:9, 60:13
**Corey** [13] - 40:18, 57:2, 66:14, 72:11, 72:22, 73:1, 73:19, 84:12, 88:20, 89:12, 90:6, 99:7, 99:11
**corner** [1] - 31:18
**corporate** [3] - 62:6, 107:22, 111:8
**corporation** [2] - 137:3, 138:19
**corporations** [8] - 53:12, 87:8, 128:13, 136:23, 137:5, 146:12, 146:15, 146:18
**correct** [7] - 8:7, 51:12, 105:23, 159:2, 159:8, 159:15, 170:6
**corrected** [1] - 64:10
**correction** [1] - 10:14
**correctly** [4] - 136:10, 136:18, 159:17, 160:6
**council** [1] - 121:2
**count** [3] - 103:24, 109:20, 121:3
**countries** [4] - 81:24, 117:15, 117:16, 146:3
**country** [2] - 121:24, 143:8
**couple** [6] - 32:21, 33:14, 34:14, 81:18, 82:18, 104:5
**course** [8] - 8:8, 11:21, 47:8, 56:13, 151:23, 163:17, 164:1, 164:23
**court** [12] - 14:24, 93:19, 128:16, 137:8, 151:8, 154:11, 161:3, 161:4, 163:6, 163:22, 165:7, 168:23
**Court** [16] - 67:18, 83:12, 93:20, 94:7, 133:11, 148:11, 161:6, 161:9, 161:11, 161:12, 161:14, 161:17, 161:22, 162:1, 168:17
**COURT** [57] - 1:1, 1:14, 2:6, 2:6, 4:4, 8:18, 9:23, 10:19, 10:24, 11:2, 11:15, 12:7, 12:9, 12:15, 12:18, 12:22, 13:4, 13:8, 17:5, 17:11, 58:2, 58:11, 58:16, 58:20, 58:22, 58:25, 85:23, 100:10, 100:20, 100:23, 100:25, 101:3, 123:18, 123:20, 129:23, 157:24, 158:6, 158:15, 158:21, 158:24, 162:19, 163:7, 163:20, 163:23, 165:4, 165:8, 165:12, 165:15, 165:17, 165:20, 167:3, 168:10, 168:16, 169:8, 169:10, 169:19, 169:24
**Court's** [2] - 85:22, 133:3
**courthouse** [1] - 100:8
**courtroom** [9] - 93:3, 151:14, 152:22, 152:25, 153:9, 153:16, 153:19, 154:2, 157:18
**cover** [1] - 40:15
**covering** [1] - 43:20
**coveted** [1] - 63:24
**coworkers** [1] - 42:24
**create** [6] - 10:11, 31:6, 50:3, 95:17, 109:17, 127:3
**created** [14] - 23:2, 30:24, 33:9, 33:15, 33:16, 34:2, 48:23, 84:11, 92:15, 111:21, 117:17, 124:5, 124:7, 127:2
**creation** [2] - 87:1, 88:13
**credibility** [5] - 16:1, 18:3, 92:11, 134:3, 136:1
**credit** [1] - 25:19
**criminal** [1] - 131:20
**critical** [7] - 23:15, 79:13, 82:10, 84:12, 91:17, 125:4, 139:4
**cross** [7] - 16:13, 16:15, 17:15, 18:2, 66:12, 116:10, 132:5
**cross-examination** [3] - 17:15, 66:12, 132:5
**cross-examined** [1] - 16:15
**CRR** [2] - 2:6, 170:13
**crucial** [2] - 120:7, 120:8
**cruel** [1] - 101:6
**cultural** [1] - 109:6
**culture** [2] - 60:22, 97:16
**cup** [1] - 31:3
**cure** [1] - 161:22
**current** [1] - 112:9
**cut** [11] - 26:22, 59:18, 65:14, 71:17, 71:19, 80:3, 91:13, 96:7, 96:11, 99:24, 114:9

**D**

**D/B/A** [2] - 1:7, 1:10
**damage** [3] - 10:4, 10:13, 55:19
**damages** [60] - 10:5, 10:10, 10:17, 12:13, 52:6, 52:7, 52:9, 52:10, 54:7, 54:8, 54:10, 54:12, 55:12, 55:13, 57:14, 147:10, 147:12, 147:13, 147:15, 147:16, 147:21, 148:3, 148:6, 148:9, 148:16, 148:17, 149:17, 149:23, 149:25, 150:6, 150:12, 150:13, 150:17, 150:19, 150:23, 157:3, 157:5, 157:7, 158:18, 158:19, 160:7, 160:8, 160:9, 160:16, 160:20, 161:7, 161:18, 161:19, 161:20, 161:25, 162:2, 166:19, 166:20, 169:20
**dang** [1] - 38:1
**dare** [5] - 42:14, 42:15, 118:17, 124:17
**dark** [1] - 169:1
**Dark** [1] - 93:6
**Darla** [1] - 89:23
**data** [4] - 24:1, 28:2,

73:10, 126:15
**date** [17] - 18:19, 22:18, 24:3, 71:4, 74:2, 75:8, 78:2, 90:18, 91:1, 92:19, 125:4, 126:16, 126:20, 126:22, 153:25, 164:1, 170:13
**dated** [6] - 71:7, 154:5, 154:8, 164:1, 164:11, 166:23
**dates** [2] - 126:20
**dating** [1] - 156:25
**David** [1] - 163:11
**dawsey** [1] - 80:17
**DAWSEY** [1] - 1:3
**Dawsey** [97] - 14:13, 33:1, 40:18, 42:10, 56:25, 57:12, 61:9, 61:19, 64:21, 65:25, 66:16, 67:12, 67:23, 68:2, 69:15, 69:16, 69:19, 70:8, 71:6, 71:15, 72:5, 73:19, 74:2, 74:9, 74:11, 74:12, 74:16, 75:4, 75:12, 75:20, 76:2, 76:8, 77:10, 77:15, 78:2, 79:16, 80:22, 82:8, 82:10, 82:11, 84:6, 84:17, 85:19, 86:4, 86:6, 86:12, 87:1, 88:18, 91:20, 92:2, 92:5, 92:12, 95:2, 95:15, 96:16, 97:5, 97:9, 97:24, 98:2, 99:23, 100:7, 102:2, 102:17, 102:20, 103:18, 103:20, 104:1, 104:4, 104:12, 104:22, 105:16, 106:13, 106:19, 110:11, 110:17, 110:19, 114:5, 114:12, 114:17, 114:22, 115:8, 116:14, 116:17, 117:2, 119:8, 119:18, 119:21, 121:9, 122:7, 122:20, 123:5, 123:25, 129:5, 129:21, 165:21
**Dawsey's** [14] - 60:15, 60:21, 61:2, 61:4, 61:8, 62:9, 69:12, 73:3, 75:8, 78:1, 80:20, 83:1, 115:16, 119:5
**Dawson** [2] - 60:1, 65:9
**day-to-day** [1] - 139:6
**days** [21] - 14:23, 28:20, 59:7, 62:13, 62:15, 64:15, 64:19, 67:23, 67:25, 68:13, 68:16, 76:5, 91:15, 94:22, 96:11, 96:21, 97:8, 97:11, 101:17, 104:19, 116:24
**dead** [1] - 53:20
**deadline** [1] - 10:25
**deal** [8] - 11:19, 13:20, 13:25, 30:2, 53:5, 53:7, 93:4, 93:12
**dealing** [1] - 19:6
**deals** [1] - 98:11
**dealt** [1] - 137:8
**Dear** [1] - 164:12
**DEBRA** [1] - 2:6
**December** [23] - 23:17, 36:2, 42:19, 43:25, 47:1, 66:19, 74:11, 74:13, 74:15, 75:1, 75:7, 75:12, 75:16, 76:2, 76:3, 76:4, 76:5, 76:8, 124:22, 124:24, 125:15
**decide** [18] - 44:9, 56:3, 103:18, 107:11, 118:10, 130:23, 131:7, 132:3, 133:12, 133:23, 133:24, 134:6, 135:13, 138:9, 147:15, 151:20, 152:24, 153:14
**decided** [15] - 5:1, 6:3, 63:19, 63:20, 63:23, 64:2, 65:16, 68:6, 94:14, 113:10, 116:3, 116:5, 136:25, 143:18, 148:11
**deciding** [4] - 132:14, 134:4, 135:1, 135:7
**decision** [40] - 5:10, 7:13, 7:17, 15:19, 15:20, 46:4, 48:16, 48:20, 56:8, 60:15, 67:6, 67:7, 78:21, 94:6, 97:20, 102:11, 106:14, 106:17, 111:8, 113:25, 114:1, 114:5, 114:16, 115:2, 118:10, 118:11, 123:25, 124:12, 125:15, 125:16, 133:25, 134:8, 143:24, 149:4, 149:7, 149:9, 149:13, 149:14, 157:8, 166:22
**decision-maker** [2] - 7:13, 149:7
**decisionmaker** [2] - 149:2, 149:5
**decisionmaker's** [1] - 149:17
**decisions** [19] - 37:2, 47:23, 65:4, 65:12, 106:13, 111:12, 111:14, 112:11, 112:17, 112:20, 128:1, 139:6, 140:13, 142:14, 142:15, 142:24, 143:4, 146:19
**declines** [1] - 161:6
**decrease** [1] - 81:8
**deep** [1] - 19:20
**defeats** [2] - 124:1, 125:18
**defend** [2] - 99:21, 99:22
**defendant** [1] - 56:13
**Defendant** [20] - 99:18, 142:5, 142:8, 142:11, 143:18, 144:25, 145:1, 145:3, 148:12, 150:22, 156:8, 156:12, 156:16, 156:21, 160:2, 160:13, 162:16, 166:9, 166:13, 166:17
**DEFENDANT** [1] - 1:19
**Defendant's** [31] - 5:4, 6:6, 69:14, 69:18, 69:21, 69:24, 71:5, 71:18, 71:24, 72:7, 74:10, 74:18, 74:21, 80:10, 81:8, 90:12, 90:16, 91:9, 126:19, 131:16, 142:12, 142:24, 143:4, 143:16, 143:20, 145:11, 145:17, 145:20, 149:19, 149:20, 161:10
**defendants** [1] - 155:14
**DEFENDANTS** [1] - 1:12
**Defendants** [23] - 5:1, 6:3, 58:4, 131:19, 137:18, 142:19, 144:3, 144:11, 146:23, 148:6, 149:25, 150:15, 150:18, 151:1, 155:12, 155:16, 155:18, 155:20, 155:22, 155:24, 156:1, 157:12, 159:24
**defends** [1] - 29:23
**defense** [10] - 7:19, 8:10, 9:4, 51:13, 66:22, 90:13, 128:4, 159:12, 169:11
**deferred** [1] - 114:15
**define** [1] - 130:12
**definition** [2] - 122:6, 122:7
**deflect** [1] - 17:24
**deflections** [1] - 41:19
**defy** [1] - 117:8
**degree** [8] - 50:8, 72:20, 89:23, 106:5, 138:21, 138:25, 150:22, 150:23
**DEI** [2] - 39:9, 39:10
**deliberate** [2] - 151:3, 151:18
**deliberating** [2] - 163:4, 165:5
**deliberation** [1] - 156:23
**deliberations** [13] - 130:2, 130:16, 151:7, 151:9, 151:23, 152:9, 152:23, 153:11, 154:4, 154:16, 157:16, 157:18, 157:20
**demeanor** [2] - 17:3, 17:14
**demonstrable** [1] - 147:22
**demonstrate** [1] - 145:17
**demonstrates** [1] - 140:23
**demoted** [11] - 35:8, 43:9, 59:20, 66:1, 66:5, 66:8, 66:9, 82:7, 99:24, 117:9
**demoting** [1] - 40:18
**demotion** [16] - 18:7, 20:14, 20:16, 20:17, 20:19, 27:12, 59:18, 65:14, 66:6, 78:25, 80:5, 81:15, 92:19, 95:23, 96:7, 96:11
**denied** [3] - 9:4, 32:1, 118:8
**deny** [3] - 20:22, 29:25, 32:16
**Department** [15] - 24:18, 62:18, 63:23, 64:23, 72:6, 72:10, 72:12, 72:15, 72:20, 74:17, 76:6, 83:22, 102:4, 112:6, 120:9
**department** [32] - 20:25, 22:22, 27:19, 28:20, 28:21, 32:10, 33:1, 38:11, 41:15, 45:9, 46:20, 46:21, 47:2, 60:7, 60:20, 63:5, 70:24, 73:18, 73:24, 74:5, 76:12, 76:16, 83:22, 84:18, 85:13, 85:14, 86:4, 87:21, 92:1, 94:4, 95:2, 102:3
**Department's** [1] - 74:22
**departments** [4] - 28:24, 41:11, 41:13, 72:18
**deposition** [7] - 17:22, 110:7, 135:18, 135:19, 135:20, 135:24, 136:1
**depositions** [1] - 101:21
**deprive** [2] - 140:8
**deprives** [1] - 140:17
**deputy** [1] - 157:18
**describe** [1] - 134:14
**described** [3] - 61:2, 62:1, 75:22
**Describes** [1] - 91:16
**description** [3] - 73:13, 90:14, 158:1
**descriptions** [1] - 42:7
**deserved** [2] - 61:25, 64:1
**deserves** [1] - 136:22
**designated** [2] - 23:24, 24:21
**despite** [1] - 120:1
**detail** [5] - 16:21, 50:2, 50:17, 135:6, 158:9
**details** [3] - 14:16, 14:21, 37:7
**deter** [2] - 150:18, 150:20
**determination** [1] - 138:18
**determine** [12] - 15:12, 15:16, 16:1, 54:6, 136:12, 136:20, 138:10, 139:13, 139:15, 142:7,

145:25, 148:8
**determines** [2] - 24:24, 81:13
**determining** [6] - 10:10, 139:8, 144:25, 145:1, 149:25, 150:13
**deterrent** [1] - 150:24
**developed** [2] - 7:25, 8:4
**Development** [1] - 120:18
**development** [1] - 19:22
**device** [3] - 152:16, 154:18, 154:19
**devices** [1] - 153:6
**dictate** [3] - 48:3, 50:2, 112:14
**dictated** [6] - 25:21, 48:12, 49:22, 114:4, 116:5, 119:8
**dictates** [1] - 31:4
**dictating** [1] - 108:6
**differ** [1] - 132:21
**difference** [3] - 55:18, 89:9, 111:10
**differences** [1] - 117:19
**different** [23] - 15:15, 24:3, 27:7, 32:6, 49:7, 51:8, 56:18, 57:1, 57:6, 64:18, 73:13, 103:23, 103:24, 106:4, 106:24, 109:9, 113:2, 126:19, 126:20, 137:22, 142:1, 144:23, 146:21
**differently** [2] - 37:16, 131:15
**differs** [1] - 145:3
**dig** [1] - 21:21
**dime** [1] - 54:6
**Dingolfing** [4] - 109:1, 120:21, 120:24, 122:22
**direct** [8] - 18:3, 34:20, 79:12, 119:21, 132:5, 133:14, 133:15
**directed** [1] - 31:7
**directing** [1] - 114:8
**direction** [1] - 127:4
**directives** [1] - 108:3
**directly** [3] - 133:20, 138:6, 138:17
**directs** [1] - 157:19
**dirty** [1] - 35:21
**disadvantage** [2] - 79:10, 96:1
**disadvantaged** [1] - 79:11
**disadvantageous** [7] - 4:20, 126:8, 141:15, 141:21, 143:2, 144:9, 144:18
**disagree** [2] - 61:6, 95:23
**disavow** [1] - 49:23
**disbelieve** [1] - 134:7
**discharge** [1] - 139:25
**discharged** [1] - 154:15
**disciplines** [1] - 74:3
**discretion** [1] - 58:15
**discriminate** [7] - 28:17, 44:19, 98:1, 99:22, 106:1, 118:19, 140:1
**discriminated** [11] - 44:12, 52:11, 65:17, 93:11, 103:21, 137:18, 142:19, 144:4, 144:12, 147:19, 148:12
**discriminateed** [1] - 149:3
**discriminating** [2] - 140:13, 146:24
**discrimination** [77] - 5:6, 5:11, 5:25, 6:8, 6:11, 7:5, 7:23, 10:2, 10:8, 10:18, 28:12, 28:15, 37:5, 38:9, 39:3, 39:13, 45:18, 45:22, 51:14, 56:17, 63:15, 64:16, 64:17, 67:6, 67:7, 87:8, 89:11, 89:20, 89:25, 90:8, 97:25, 98:25, 99:3, 99:7, 99:11, 125:21, 137:21, 137:24, 138:3, 138:5, 139:19, 139:22, 141:2, 141:12, 141:23, 142:18, 143:5, 143:6, 143:21, 143:25, 144:1, 144:2, 144:20, 144:22, 145:16, 145:20, 145:24, 146:20, 147:1, 147:4, 148:25, 149:19, 150:1, 150:3, 155:12, 155:16, 155:20, 155:24, 156:11, 156:15, 156:19, 158:11, 159:14, 166:5, 166:8, 166:12, 166:16
**discriminatory** [4] - 142:9, 148:20, 149:13, 150:7
**discuss** [19] - 52:3, 58:5, 72:9, 74:18, 84:25, 100:12, 131:8, 134:3, 136:3, 138:4, 140:20, 142:17, 144:20, 145:5, 147:12, 152:9, 153:10, 159:13, 169:3
**discussed** [6] - 32:20, 48:20, 115:20, 116:4, 123:20
**discussing** [1] - 151:10
**discussion** [6] - 21:23, 46:7, 84:13, 86:24, 105:24, 106:18
**discussions** [2] - 46:8, 46:20
**dislikes** [1] - 130:22
**dismiss** [1] - 77:1
**dismisses** [1] - 73:22
**disprove** [1] - 21:19
**dispute** [1] - 9:5
**disregard** [3] - 133:5, 136:11, 136:20
**disrupting** [1] - 12:25
**disruption** [1] - 61:25
**disruptive** [1] - 64:5
**dissection** [1] - 44:5
**distinction** [2] - 7:25, 51:15
**distinctions** [1] - 24:10
**distinguished** [1] - 143:15
**distract** [2] - 43:10, 44:14
**distraction** [2] - 88:21, 89:2
**distractions** [1] - 41:20
**distress** [1] - 52:11
**DISTRICT** [3] - 1:1, 1:1, 1:14
**District** [3] - 93:20, 164:22
**diversity** [3] - 39:3, 39:9
**DIVISION** [1] - 1:2
**doctor** [2] - 75:22, 95:4
**document** [42] - 15:5, 15:6, 21:15, 31:23, 32:20, 32:25, 33:6, 33:9, 33:13, 33:15, 34:1, 34:21, 35:1, 35:2, 36:5, 47:9, 47:11, 47:12, 56:24, 59:20, 69:5, 69:23, 73:23, 103:1, 110:18, 110:21, 110:22, 111:16, 111:24, 114:7, 114:10, 115:9, 115:25, 117:2, 121:10, 121:16, 123:23, 124:5, 124:8
**documentation** [2] - 29:21, 30:9
**documented** [1] - 30:13
**documents** [13] - 21:19, 21:22, 24:6, 70:1, 70:2, 92:15, 95:9, 96:25, 102:22, 110:24, 110:25, 111:21, 116:13
**dodge** [1] - 129:13
**doggone** [2] - 90:1, 93:13
**DOING** [2] - 1:8, 1:10
**dollars** [5] - 71:8, 79:24, 160:22, 166:20, 166:21
**Dombrowski** [4] - 36:16, 36:17, 85:10, 119:4
**domestic** [14] - 29:10, 29:11, 29:12, 29:19, 30:16, 31:11, 31:12, 31:17, 32:24, 85:16, 87:20, 87:25, 88:5
**domestic/ international** [1] - 86:21
**domestics** [3] - 86:11, 86:12, 87:22
**dominate** [2] - 92:17, 112:17
**DONALD** [1] - 2:2
**done** [20] - 7:2, 25:9, 30:8, 36:4, 55:22, 62:17, 63:1, 79:25, 89:23, 93:17, 110:17, 111:19, 115:21, 118:8, 122:20, 131:6, 134:23, 153:20, 156:23, 162:22
**door** [3] - 67:5, 72:17, 154:1
**dots** [1] - 15:3
**double** [1] - 162:3
**doubt** [3] - 114:23, 131:21, 131:23
**down** [22] - 25:2, 25:10, 25:23, 30:10, 38:3, 38:7, 39:21, 40:11, 50:17, 52:17, 59:5, 77:24, 83:1, 85:3, 89:14, 89:15, 97:6, 97:7, 97:12, 98:11, 113:13
**downgrade** [1] - 80:4
**Dr** [34] - 6:24, 16:24, 17:14, 18:8, 29:8, 29:10, 29:23, 30:15, 39:15, 42:8, 45:8, 48:18, 48:19, 49:5, 53:1, 66:20, 69:10, 72:9, 81:20, 82:13, 88:14, 106:7, 106:14, 107:3, 108:7, 108:10, 108:12, 115:1, 116:7, 122:12, 122:18, 123:7, 127:10
**dramatic** [1] - 14:6
**draw** [4] - 7:24, 53:15, 157:9, 157:13
**drawer** [2] - 26:7, 30:24
**dream** [2] - 45:11, 52:20
**drive** [1] - 31:24
**driven** [1] - 95:6
**drives** [1] - 36:13
**drove** [2] - 31:2, 89:16
**due** [1] - 101:4
**during** [19] - 6:18, 8:8, 9:13, 11:21, 19:10, 33:24, 34:13, 51:2, 73:16, 79:13, 79:14, 135:17, 136:4, 137:12, 152:22, 153:11, 153:14, 154:3, 154:15
**duties** [3] - 120:23, 130:6, 130:13
**duty** [7] - 100:4, 130:9, 130:17, 132:25, 151:3, 151:12, 151:17

### E

**earliest** [1] - 153:17
**early** [3] - 16:3, 47:4, 70:7
**earned** [4] - 66:14, 88:24, 89:16
**easier** [1] - 103:8
**easy** [2] - 16:8, 57:4
**eat** [3] - 17:12, 77:9, 101:9

**economic** [1] - 169:20
**education** [1] - 150:3
**effect** [5] - 4:18, 28:25, 126:6, 141:19, 152:2
**efficiently** [1] - 112:6
**effort** [1] - 149:21
**efforts** [5] - 39:3, 149:11, 149:15, 149:19, 150:1
**eggs** [1] - 68:14
**eight** [3] - 70:15, 70:21, 156:14
**either** [10] - 22:4, 26:23, 31:15, 96:5, 114:10, 117:21, 122:2, 143:10, 146:7, 155:21
**elderly** [1] - 67:15
**elect** [1] - 151:5
**electing** [1] - 151:8
**electric** [1] - 81:25
**electronic** [3] - 67:20, 152:16, 154:18
**element** [1] - 112:22
**elite** [2] - 87:8, 88:10
**ELLISON** [1] - 2:3
**ELMO** [1] - 85:20
**elsewhere** [1] - 67:2
**email** [20] - 21:24, 36:19, 36:25, 40:16, 65:19, 65:20, 65:21, 67:19, 67:24, 70:8, 70:9, 76:20, 93:5, 103:3, 103:4, 107:15, 114:11, 114:12, 117:7, 117:8
**emails** [8] - 13:21, 36:23, 50:13, 69:15, 69:19, 76:2, 124:3
**emotion** [1] - 94:11
**emotional** [2] - 147:17, 160:17
**employ** [3] - 103:18, 103:20, 138:17
**employed** [3] - 104:13, 138:6, 160:13
**employee** [11] - 4:16, 45:19, 91:12, 114:23, 115:22, 126:4, 140:10, 141:9, 141:18, 149:14
**employees** [11] - 26:10, 26:12, 54:14, 104:15, 107:6, 115:5, 140:7, 140:14, 159:16, 160:14
**employer** [50] - 4:14, 13:24, 48:14, 49:2, 56:5, 71:12, 98:14, 104:21, 104:24, 105:4, 105:10, 105:11, 105:12, 105:22, 106:3, 112:23, 113:3, 113:5, 113:11, 118:11, 122:8, 126:2, 138:4, 138:8, 138:9, 138:10, 138:13, 138:14, 139:3, 139:9, 139:13, 139:24, 140:12, 140:16, 141:17, 142:3, 142:13, 146:1, 147:3, 147:7, 147:8, 148:19, 149:6, 149:10, 149:12, 150:5, 150:8, 155:4, 166:2
**employer's** [4] - 122:8, 148:23, 149:2, 149:15
**employers** [7] - 29:2, 138:6, 138:20, 139:14, 139:16, 141:8, 150:4
**employment** [45] - 4:10, 4:13, 4:21, 18:5, 19:7, 78:3, 78:23, 79:5, 79:7, 79:9, 79:10, 80:7, 95:22, 95:24, 111:7, 111:11, 112:16, 112:21, 125:23, 126:1, 126:9, 138:15, 139:6, 139:22, 140:3, 140:7, 140:9, 140:18, 140:22, 140:25, 141:7, 141:13, 141:15, 141:16, 141:21, 143:1, 143:3, 144:8, 144:10, 144:17, 144:18, 149:8, 149:13, 159:6, 164:18
**encounter** [1] - 68:1
**end** [6] - 57:18, 62:23, 64:10, 103:16, 103:25, 110:2
**END** [1] - 170:3
**ends** [1] - 96:6
**endure** [2] - 14:13, 83:8
**energies** [1] - 68:25
**enforce** [1] - 40:3
**enforced** [1] - 112:1
**engage** [3] - 117:22, 146:8, 149:10
**engaged** [2] - 148:20, 149:21
**engaging** [2] - 148:25, 150:20
**Englehorn** [35] - 6:24, 7:14, 16:24, 17:14, 18:8, 29:8, 29:10, 30:15, 39:15, 42:8, 45:8, 48:18, 48:19, 49:5, 53:1, 66:20, 69:10, 72:9, 74:17, 81:20, 82:13, 88:14, 106:7, 106:14, 107:3, 108:7, 108:12, 115:1, 116:7, 122:12, 122:18, 123:7, 127:10
**Englehorn's** [1] - 29:23
**English** [1] - 83:12
**enjoy** [2] - 122:4, 143:12
**enjoyment** [1] - 160:19
**enrich** [1] - 55:19
**ensure** [1] - 150:10
**entered** [3] - 12:14, 35:24, 35:25
**enterprise** [1] - 159:25
**entire** [9] - 14:12, 62:21, 65:5, 65:11, 76:12, 76:15, 76:16, 94:4, 162:6
**entirely** [1] - 131:7
**entities** [2] - 138:19, 152:15
**entitled** [14] - 6:16, 7:1, 94:11, 100:6, 122:4, 133:20, 135:24, 137:3, 137:9, 137:11, 143:12, 148:8, 150:11, 170:8
**entry** [1] - 18:18
**entry-level** [1] - 18:18
**environment** [1] - 77:3
**Epps** [22] - 20:10, 21:2, 22:21, 32:20, 35:9, 35:12, 36:9, 37:9, 37:17, 38:10, 40:18, 41:9, 42:4, 57:2, 57:4, 66:15, 73:19, 84:12, 88:20, 89:12, 99:8, 99:11
**Epps's** [5] - 32:25, 34:10, 34:13, 34:23, 35:7
**equal** [6] - 129:7, 133:22, 136:24, 137:1, 137:2, 137:7
**equality** [2] - 129:6, 129:20
**equalized** [1] - 66:17
**equally** [1] - 131:4
**equals** [1] - 137:8
**equivalent** [1] - 28:5
**ERISA** [1] - 119:25
**erroneous** [1] - 151:25
**ESQ** [4] - 1:17, 1:21, 2:2, 2:3
**essential** [1] - 152:23
**establish** [1] - 149:21
**established** [1] - 140:23
**establishing** [1] - 147:25
**et** [2] - 81:14, 96:12
**Eva** [15] - 18:22, 19:4, 19:5, 19:25, 20:1, 72:6, 106:17, 108:7, 108:11, 108:20, 108:24, 114:11, 120:6, 121:18, 123:2
**evaluated** [1] - 104:8
**evasive** [1] - 116:11
**evening** [1] - 13:9
**event** [3] - 145:21, 159:3, 160:2
**everyday** [1] - 52:24
**evidence** [112] - 4:25, 5:6, 5:7, 5:10, 5:24, 5:25, 6:2, 6:8, 6:10, 6:11, 6:12, 6:17, 7:1, 7:5, 7:10, 7:21, 13:14, 13:15, 13:16, 20:3, 34:12, 36:5, 36:12, 46:14, 49:3, 49:11, 50:11, 52:8, 59:11, 64:19, 68:17, 68:18, 89:4, 92:23, 94:22, 100:2, 100:5, 102:18, 105:15, 107:8, 107:9, 114:6, 119:16, 127:13, 127:17, 127:24, 130:8, 130:18, 130:24, 131:11, 131:12, 131:16, 131:23, 132:1, 132:2, 132:3, 132:7, 132:10, 132:12, 132:13, 132:17, 132:20, 132:25, 133:6, 133:11, 133:12, 133:14, 133:15, 133:17, 133:18, 133:21, 133:23, 133:25, 134:1, 134:5, 134:21, 134:25, 135:9, 135:12, 136:6, 136:7, 136:9, 136:11, 136:13, 136:15, 136:18, 136:19, 136:21, 136:22, 141:4, 141:12, 142:23, 143:14, 143:17, 143:21, 143:22, 143:24, 144:6, 144:14, 145:14, 147:22, 148:7, 151:13, 151:22, 152:2, 152:7, 152:10, 152:25, 153:12, 153:14, 164:15
**Evidence** [1] - 133:2
**exact** [1] - 46:10
**exactly** [5] - 21:22, 30:10, 31:7, 32:11, 34:3
**examination** [5] - 17:15, 66:12, 116:10, 119:21, 132:5
**examine** [1] - 151:24
**examined** [1] - 16:15
**example** [1] - 62:11
**exceed** [1] - 160:21
**excellence** [1] - 65:13
**excellent** [3] - 19:5, 49:8, 114:23
**except** [1] - 154:8
**exception** [1] - 111:1
**excepts** [1] - 158:10
**excess** [1] - 10:13
**exchange** [1] - 121:5
**exclamation** [1] - 37:1
**excluded** [1] - 133:4
**excuse** [2] - 39:17, 144:25
**excused** [3] - 58:7, 100:17, 157:21
**excuses** [1] - 40:21
**executive** [4] - 24:14, 96:15, 117:25, 146:9
**executives** [2] - 111:13, 112:7
**exhausted** [1] - 64:21
**exhibit** [21] - 12:10, 12:12, 38:21, 48:8, 67:20, 69:14, 70:7, 74:13, 74:14, 75:2, 75:3, 80:9, 80:10, 80:13, 81:8, 90:24,

91:8, 91:9, 102:14, 121:20
**exhibits** [16] - 12:13, 22:17, 49:12, 60:8, 78:11, 84:9, 100:14, 102:24, 103:2, 105:14, 111:24, 132:6, 132:12, 133:7, 157:19, 162:12
**exist** [2] - 78:12, 95:17
**existence** [2] - 78:20, 150:4
**exists** [2] - 133:19, 146:5
**expanding** [1] - 82:2
**expansion** [2] - 79:14, 82:16
**expat** [17] - 29:19, 30:4, 30:13, 30:22, 30:25, 31:19, 33:4, 36:20, 50:20, 86:7, 87:18, 111:16, 119:11, 127:1, 127:2, 127:3
**expect** [4] - 14:2, 16:14, 52:25, 153:16
**expectations** [2] - 14:3, 38:13
**expensive** [1] - 55:15
**experience** [11] - 18:16, 19:3, 19:9, 28:1, 28:3, 60:23, 119:3, 120:12, 122:25, 134:2, 168:22
**experienced** [3] - 19:6, 63:12, 96:20
**experiences** [1] - 53:16
**Expert** [1] - 120:20
**expert** [3] - 62:4, 120:24, 121:8
**experts** [2] - 117:25, 146:9
**explain** [7] - 32:4, 32:17, 47:24, 56:17, 136:6, 139:20
**explained** [10] - 23:4, 42:18, 81:21, 142:25, 144:22, 144:24, 145:6, 146:21, 146:23, 147:23
**explains** [1] - 84:7
**explanation** [3] - 62:8, 62:9, 161:21
**exploring** [1] - 70:21
**exports** [1] - 81:23
**expose** [1] - 153:6
**expressed** [1] - 116:16
**extended** [1] - 74:14
**extent** [1] - 10:16
**external** [2] - 80:12, 80:15
**extra** [3] - 5:20, 82:25, 83:8
**extremely** [2] - 77:9, 96:18
**eye** [2] - 42:5, 133:16

**F**

**face** [2] - 86:7, 149:3
**Facebook** [2] - 152:19, 154:22
**facilities** [1] - 87:12
**facility** [1] - 107:7
**facing** [1] - 65:1
**fact** [24] - 5:23, 11:8, 28:24, 31:1, 37:20, 49:11, 68:10, 78:21, 88:14, 99:22, 103:13, 114:9, 114:20, 119:7, 119:24, 124:5, 125:3, 133:16, 133:19, 133:24, 135:6, 142:12, 158:18, 161:3
**factor** [21] - 5:9, 18:10, 19:20, 56:19, 56:22, 82:6, 139:2, 139:3, 139:5, 139:7, 139:8, 140:21, 140:25, 141:5, 142:24, 143:16, 143:23, 144:7, 144:15, 145:8
**factors** [7] - 49:3, 56:21, 134:9, 135:7, 138:20, 141:1, 150:12
**factory** [1] - 91:22
**facts** [23] - 6:1, 59:12, 85:8, 88:23, 130:7, 130:17, 130:18, 131:13, 132:4, 132:8, 132:14, 132:21, 132:22, 133:18, 134:4, 135:16, 136:9, 136:10, 136:12, 136:15, 136:19, 136:20, 152:6
**fail** [1] - 139:25
**failed** [2] - 44:23, 149:10
**fails** [2] - 105:20, 131:18
**failure** [1] - 85:1
**fair** [4] - 93:24, 100:1, 137:4, 137:9
**fairly** [1] - 101:22
**faith** [5] - 149:11, 149:15, 149:19, 149:21, 150:1
**fall** [1] - 21:18
**falsehood** [1] - 135:4
**familiar** [1] - 70:18
**family** [1] - 95:6
**FANE** [1] - 1:21
**fantastic** [1] - 94:13
**fast** [1] - 33:24
**faster** [1] - 90:23
**faulting** [1] - 38:14
**favor** [1] - 95:16
**favorably** [1] - 90:7
**favorite** [1] - 129:4
**favorites** [1] - 45:4
**FCN** [7] - 5:13, 7:8, 7:11, 145:22, 146:4, 158:13, 160:2
**feared** [1] - 59:14
**February** [1] - 166:24
**FEBRUARY** [1] - 1:4
**federal** [3] - 148:24, 149:4, 168:23
**federally** [1] - 148:21
**fellow** [5] - 88:2, 151:10, 151:22, 152:3, 153:11
**female** [3] - 60:12, 60:16, 88:14
**few** [9] - 12:5, 22:10, 23:1, 25:5, 32:9, 72:15, 90:19, 113:16, 115:13
**fifteen** [2] - 58:14, 71:7
**fifth** [1] - 97:6
**fight** [2] - 14:13, 93:18
**fighting** [1] - 93:16
**figure** [5] - 15:20, 102:14, 105:7, 109:19, 109:22
**figures** [2] - 25:3, 136:10
**file** [2] - 169:17, 169:18
**filed** [3] - 55:6, 103:23, 122:7
**fill** [10] - 25:8, 39:11, 44:21, 47:19, 57:16, 118:5, 146:14, 146:17, 153:24
**filled** [2] - 10:7, 39:16
**filling** [2] - 30:16, 50:18
**final** [6] - 58:6, 100:13, 106:8, 112:20, 151:2, 157:17
**finally** [4] - 22:4, 31:22, 72:20, 144:11
**Finally** [1] - 162:5
**finances** [1] - 50:10
**financial** [4] - 50:8, 113:1, 138:25, 150:25
**findings** [1] - 160:10
**fine** [13] - 7:25, 11:9, 26:15, 38:11, 39:21, 54:13, 93:9, 94:7, 94:10, 99:18, 99:19, 162:21, 169:25
**finger** [1] - 89:12
**finished** [1] - 121:15
**fired** [2] - 13:22, 65:25
**first** [39] - 7:11, 8:22, 18:6, 18:8, 20:25, 26:1, 28:11, 30:8, 32:21, 40:21, 42:6, 50:24, 52:7, 56:2, 56:3, 56:4, 67:20, 71:16, 81:19, 83:12, 88:22, 96:2, 98:10, 101:16, 105:1, 105:5, 110:9, 115:10, 116:20, 121:19, 124:14, 130:7, 130:11, 137:22, 140:12, 151:5, 155:3, 155:9, 157:12
**fit** [5] - 38:20, 39:24, 57:17, 60:25, 109:19
**five** [27] - 18:16, 18:20, 22:23, 27:21, 32:5, 32:7, 32:11, 32:18, 36:25, 41:20, 46:17, 56:23, 58:17, 70:13, 73:22, 84:4, 84:11, 84:17, 85:4, 127:20, 134:20, 150:25, 155:8, 155:10, 155:23, 156:3, 157:2
**flag** [1] - 103:9
**floor** [1] - 97:6
**Flor** [1] - 84:23
**flux** [1] - 80:24
**FO** [2] - 109:15, 109:16
**focus** [8] - 35:20, 41:18, 42:17, 48:15, 57:22, 57:23, 68:25, 142:11
**focusing** [1] - 86:20
**folks** [10] - 30:1, 35:17, 39:2, 49:7, 50:5, 72:25, 75:17, 91:22, 109:18, 129:19
**follow** [7] - 54:22, 55:15, 55:17, 130:7, 131:2, 133:8, 153:22
**followed** [2] - 84:13, 84:21
**following** [17] - 4:2, 13:6, 55:17, 58:9, 58:23, 100:18, 101:1, 131:2, 134:10, 138:20, 146:6, 157:22, 163:5, 163:21, 165:6, 165:10, 169:6
**follows** [3] - 4:11, 87:6, 165:24
**fooled** [1] - 126:11
**football** [1] - 90:10
**footer** [3] - 34:1, 48:24, 124:6
**FOR** [3] - 1:1, 1:17, 1:19
**forbid** [1] - 143:6
**forbidden** [1] - 142:21
**forbids** [4] - 140:12, 140:15, 143:5, 146:23
**force** [1] - 39:2
**Force** [1] - 109:7
**forced** [1] - 67:11
**foregoing** [1] - 170:6
**foreign** [1] - 51:10
**foreperson** [8] - 151:6, 151:8, 153:24, 154:6, 156:24, 165:13, 166:23
**FOREPERSON** [3] - 165:14, 165:16, 165:19
**forget** [1] - 135:2
**form** [35] - 10:1, 10:14, 10:20, 11:5, 11:9, 52:7, 55:22, 55:23, 58:6, 97:21, 98:6, 98:9, 98:13, 100:13, 102:10, 104:25, 105:19, 135:23, 139:10, 147:6, 153:21, 153:25, 155:2, 155:3, 156:25, 157:10, 157:14, 158:1, 159:1, 160:8, 160:10, 161:6, 161:13, 162:11, 165:17
**former** [2] - 112:8, 112:24
**formerly** [1] - 154:23
**forms** [2] - 52:9, 161:10
**forth** [1] - 124:3

**forthcoming** [1] - 48:20
**Fortino** [2] - 9:8
**forty** [1] - 91:22
**forward** [3] - 25:9, 84:19, 87:12
**foundation** [1] - 19:20
**Four** [1] - 133:10
**four** [59] - 8:3, 9:18, 14:9, 14:11, 20:16, 20:22, 21:6, 21:7, 21:10, 21:16, 21:21, 22:5, 23:13, 23:17, 24:22, 25:13, 25:25, 26:24, 26:25, 27:1, 27:2, 27:5, 27:10, 27:11, 27:17, 34:24, 35:3, 35:8, 36:2, 37:25, 38:20, 39:23, 39:24, 46:13, 48:2, 48:3, 48:15, 49:2, 49:25, 54:17, 55:6, 57:9, 62:24, 79:2, 79:24, 103:24, 106:4, 106:5, 107:11, 110:8, 110:9, 110:12, 118:24, 122:9, 129:1, 134:17, 149:10, 150:22, 155:19
**fourth** [1] - 83:13
**Fowler** [21] - 69:1, 69:22, 71:14, 71:23, 72:3, 73:15, 73:25, 74:6, 74:20, 75:1, 75:24, 76:22, 77:12, 80:10, 85:24, 85:25, 86:19, 90:19, 90:23, 90:24, 91:8
**framework** [2] - 107:24, 111:11
**frankly** [2] - 61:22, 63:25
**freed** [1] - 23:20
**freely** [1] - 8:6
**Friday** [2] - 77:19
**friendly** [4] - 61:3, 72:24, 84:1, 94:25
**Friendship** [5] - 5:14, 50:25, 51:1, 117:18, 146:3
**front** [2] - 21:12, 24:2
**frustrating** [1] - 94:22
**function** [90] - 14:16, 18:23, 20:15, 20:21, 20:23, 21:1, 21:2, 21:5, 21:7, 21:10, 21:16, 21:17, 21:21, 22:5, 22:6, 22:7, 22:12, 22:15, 22:22, 23:3, 23:6, 23:7, 23:10, 23:11, 23:13, 23:22, 23:25, 24:1, 24:3, 24:9, 24:12, 24:13, 24:22, 25:3, 25:11, 25:13, 26:24, 27:5, 28:2, 34:23, 35:2, 35:3, 35:17, 35:18, 36:1, 36:2, 37:9, 37:11, 37:12, 37:14, 37:23, 38:9, 38:20, 39:18, 39:23, 39:24, 46:12, 48:1, 48:3, 50:1, 53:4, 60:7, 62:23, 71:18, 73:10, 73:11, 73:12, 73:13, 74:4, 79:2, 80:1, 81:12, 84:15, 88:4, 88:5, 90:15, 90:22, 91:2, 91:4, 91:6, 91:10, 94:9, 110:15, 126:15, 126:16, 128:25, 129:1, 129:2
**functions** [1] - 120:12
**funding** [1] - 47:25
**funny** [1] - 51:15
**fussing** [1] - 24:8
**future** [12] - 4:15, 4:17, 46:20, 65:2, 81:23, 126:3, 126:5, 141:18, 141:19, 148:10, 150:18, 160:17

### G

**gastro** [1] - 77:6
**geared** [1] - 80:23
**gender** [1] - 28:23
**general** [2] - 130:12, 140:17
**generalities** [1] - 19:12
**gentleman** [2] - 36:15, 164:7
**gentlemen** [23] - 55:22, 59:10, 62:3, 63:18, 65:25, 67:5, 69:3, 69:24, 70:22, 75:16, 77:23, 78:13, 88:21, 90:18, 91:11, 92:21, 93:8, 94:18, 95:11, 97:25, 98:23, 100:2, 101:11
**genuine** [2] - 147:23, 148:1
**German** [52] - 5:3, 5:5, 6:5, 6:7, 6:23, 29:20, 30:5, 30:6, 30:17, 30:20, 31:11, 31:15, 32:13, 33:10, 33:20, 34:8, 36:22, 36:24, 71:25, 85:12, 85:15, 86:24, 87:17, 87:19, 88:13, 95:1, 104:14, 108:23, 116:2, 118:3, 118:5, 119:1, 119:5, 119:6, 119:7, 119:16, 121:11, 122:13, 122:18, 127:8, 127:12, 127:14, 127:16, 127:18, 143:19, 143:20, 146:12, 146:14, 159:15, 160:1
**Germans** [9] - 8:12, 32:3, 32:9, 33:21, 36:17, 36:18, 72:1, 127:9, 159:11
**Germany** [61] - 22:1, 25:21, 33:18, 36:19, 36:21, 40:5, 40:11, 40:12, 42:15, 47:21, 48:11, 49:4, 49:7, 49:9, 49:22, 50:1, 50:5, 50:16, 50:20, 54:21, 56:9, 57:8, 84:2, 85:8, 88:6, 103:4, 103:5, 103:12, 103:13, 103:14, 104:18, 106:19, 107:5, 107:17, 108:5, 109:25, 111:25, 113:18, 113:21, 113:23, 114:1, 114:4, 114:19, 114:21, 115:19, 119:2, 119:8, 119:10, 119:13, 121:18, 121:21, 122:19, 123:15, 123:24, 125:2, 125:7, 146:5, 146:16
**getaway** [3] - 36:7, 127:20, 128:11
**Gilmore** [3] - 21:12, 27:25, 81:2
**Gilmore's** [1] - 21:6
**given** [12] - 11:3, 36:16, 63:25, 129:21, 133:9, 137:14, 142:4, 153:21, 153:25, 158:19, 158:25, 168:18
**glad** [1] - 8:18
**gladly** [2] - 75:9, 75:19
**global** [8] - 31:13, 31:14, 87:5, 107:23, 107:24, 108:21, 119:3
**Global** [3] - 65:5, 81:21, 83:16
**globally** [1] - 120:11
**globe** [1] - 129:16
**goals** [1] - 101:21
**golly** [3] - 113:25, 114:2, 129:7
**good-faith** [5] - 149:11, 149:15, 149:19, 149:21, 150:1
**governance** [1] - 111:8
**governed** [1] - 31:4
**government** [1] - 19:8
**grade** [31] - 14:17, 21:5, 21:15, 23:8, 25:3, 25:10, 25:11, 25:12, 25:23, 25:25, 27:16, 27:20, 27:21, 27:25, 37:16, 37:21, 37:25, 38:19, 39:22, 49:24, 59:19, 66:2, 66:13, 66:14, 77:22, 80:4, 80:25, 81:13, 90:7, 93:25, 96:7
**graded** [2] - 21:18, 23:4
**grades** [9] - 21:1, 49:25, 52:17, 60:8, 89:3, 89:5, 89:7, 89:8, 110:16
**grading** [1] - 47:25
**graduating** [1] - 43:21
**grandparents** [1] - 118:24
**grapes** [1] - 60:14
**graphic** [1] - 75:10
**gray** [1] - 33:4
**great** [8] - 14:7, 16:10, 52:23, 53:13, 94:12, 97:13, 102:22, 114:24
**greater** [2] - 135:14, 160:14
**greatly** [1] - 17:8
**green** [1] - 31:10
**GREENVILLE** [4] - 1:3, 1:18, 1:22, 2:5
**Greenville/ Spartanburg** [1] - 87:4
**Greg** [2] - 14:22, 43:11
**grid** [1] - 71:25
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**Group** [4] - 49:15, 113:24, 113:25, 159:23
**group** [9] - 31:21, 49:19, 70:1, 70:4, 109:14, 124:21, 124:25, 128:8, 141:25
**grow** [1] - 123:11
**growth** [2] - 92:1, 123:12
**Gs** [1] - 72:1
**GSP** [2] - 59:24, 78:5
**guess** [8] - 36:8, 36:9, 71:22, 88:3, 98:11, 104:19, 125:9, 126:17
**guesswork** [2] - 92:16, 148:7
**guidance** [2] - 107:25, 111:6
**guideline** [2] - 85:15, 86:3
**guidelines** [17] - 29:16, 30:4, 30:22, 31:1, 38:18, 40:1, 40:2, 40:3, 85:18, 86:8, 87:19, 93:25, 101:21, 111:17, 127:1, 127:2, 127:4
**guy** [14] - 20:11, 35:12, 35:21, 37:19, 38:3, 39:20, 42:4, 52:2, 53:10, 103:10, 128:3, 128:4
**guys** [5] - 21:10, 27:17, 38:6, 38:7, 52:2

### H

**half** [8] - 9:20, 12:4, 45:9, 47:7, 89:4, 89:6, 103:6, 117:2
**hand** [6] - 31:18, 33:2, 82:24, 83:4, 102:23, 133:17
**handled** [1] - 11:17
**hands** [1] - 137:4
**handwritten** [2] - 115:16, 115:21
**hang** [1] - 7:20
**happenstance** [1] - 65:8
**happy** [2] - 5:17, 111:2
**hard** [6] - 24:16, 68:12, 68:16, 73:1, 74:24, 101:18
**harm** [2] - 147:22, 148:3
**harmed** [1] - 99:25
**hat** [3] - 81:6, 96:13,

101:14
**hate** [2] - 54:8, 55:11
**hauled** [1] - 128:15
**head** [4] - 78:19, 84:3, 109:19, 121:3
**headed** [4] - 38:3, 38:7, 88:1, 129:2
**header** [1] - 74:2
**heading** [2] - 5:15, 89:14
**headquarters** [1] - 122:23
**health** [2] - 77:1, 77:4
**healthcare** [1] - 77:8
**hear** [31] - 5:18, 6:10, 8:18, 9:12, 16:12, 18:4, 28:14, 28:15, 41:21, 48:13, 50:22, 51:3, 51:5, 51:6, 51:25, 52:8, 58:3, 59:1, 79:5, 86:24, 97:4, 100:11, 101:10, 104:4, 104:18, 114:3, 118:22, 118:25, 128:5, 134:11
**heard** [97] - 4:2, 7:11, 7:12, 8:6, 11:10, 13:6, 15:14, 17:18, 18:19, 19:9, 20:3, 20:12, 21:8, 22:8, 27:3, 27:6, 27:14, 29:10, 31:11, 31:12, 32:12, 39:9, 43:12, 47:14, 47:15, 49:10, 52:12, 52:14, 58:9, 58:23, 59:6, 59:11, 60:1, 78:9, 79:2, 81:1, 83:2, 85:7, 88:22, 96:25, 97:1, 97:2, 97:5, 100:18, 101:1, 101:20, 101:21, 101:22, 101:25, 102:2, 102:21, 103:6, 103:11, 103:12, 104:4, 104:16, 105:9, 106:7, 107:13, 107:14, 109:5, 109:15, 109:16, 109:23, 109:24, 110:6, 110:15, 111:12, 113:20, 114:13, 117:12, 118:20, 119:1, 119:4, 120:6, 120:15, 120:21, 121:13, 123:12, 127:24, 129:10, 130:8, 131:21, 133:10, 141:7, 152:21, 153:8, 153:12, 157:22, 163:5, 163:21, 165:6, 165:10, 169:6
**hearing** [5] - 4:1, 32:2, 48:20, 50:23, 170:2
**held** [4] - 46:15, 58:19, 100:24, 138:15
**help** [11] - 42:9, 68:25, 73:5, 92:16, 95:8, 102:9, 102:16, 108:18, 109:3, 132:19, 136:5
**helped** [1] - 108:18
**helpful** [2] - 44:4, 78:10
**helping** [1] - 43:13
**herring** [2] - 81:13, 84:16
**herself** [11] - 18:15, 19:10, 43:23, 43:24, 45:1, 85:6, 92:6, 92:14, 115:8, 127:3, 151:21
**hesitate** [2] - 11:20, 151:24
**hesitated** [1] - 116:19
**hid** [1] - 93:23
**hiding** [1] - 82:14
**hierarchy** [3] - 24:11, 24:23, 52:17
**high** [2] - 43:21, 89:19
**higher** [3] - 25:11, 110:2, 142:1
**highest** [3] - 19:11, 22:23, 28:8
**highlight** [1] - 85:25
**highlighted** [2] - 107:16, 107:17
**highly** [1] - 96:15
**himself** [2] - 88:7, 151:21
**hint** [1] - 34:20
**hire** [6] - 14:4, 36:17, 94:6, 119:9, 139:25
**hired** [2] - 62:11, 66:25
**hiring** [5] - 36:15, 79:15, 82:3, 106:9, 112:11
**historical** [1] - 78:17
**history** [1] - 36:13
**hit** [6] - 34:20, 34:21, 45:24, 46:1, 81:18
**holding** [1] - 137:2
**home** [2] - 96:21, 169:5
**honest** [2] - 19:24, 152:1
**honor** [1] - 9:4
**Honor** [43] - 5:19, 5:21, 6:13, 7:8, 8:20, 8:22, 9:8, 9:14, 9:24, 10:4, 10:22, 11:1, 11:12, 11:14, 11:24, 12:1, 12:8, 12:17, 12:21, 13:18, 17:8, 58:13, 58:21, 94:24, 100:22, 121:15, 123:19, 123:21, 158:4, 158:16, 158:22, 162:15, 162:18, 163:17, 163:19, 165:1, 165:2, 165:3, 168:13, 168:15, 169:9, 169:16, 169:23
**HONORABLE** [1] - 1:13
**hoo** [3] - 42:12, 42:13, 83:18
**hook** [2] - 9:17
**hope** [11] - 13:9, 32:8, 38:12, 52:16, 52:18, 57:11, 78:9, 101:13, 129:19, 168:21
**hopefully** [2] - 79:1, 81:17
**horizon** [2] - 40:7, 40:8
**horizons** [1] - 122:17
**horn** [2] - 45:25, 46:1
**Horstmeier** [1] - 48:21
**hour** [6] - 12:1, 62:13, 62:15, 64:17, 97:11
**hours** [4] - 12:4, 84:3, 91:22, 103:6
**house** [2] - 43:13, 97:8
**HR** [58] - 18:17, 19:2, 19:21, 19:22, 19:23, 28:1, 28:2, 28:3, 32:3, 38:15, 41:1, 41:3, 41:5, 41:11, 41:13, 42:10, 44:2, 45:12, 60:18, 60:19, 62:4, 62:6, 63:12, 70:25, 72:6, 72:10, 72:14, 72:20, 72:24, 73:1, 74:17, 78:3, 78:5, 82:6, 83:20, 83:21, 85:10, 86:14, 88:15, 89:23, 90:4, 93:3, 93:6, 96:13, 101:23, 112:6, 112:8, 112:9, 112:12, 112:18, 116:15, 119:7, 120:8, 120:16, 121:6, 122:23
**Hubbell** [3] - 80:16, 80:17, 80:19
**huge** [1] - 79:13
**Human** [11] - 19:11, 59:23, 60:17, 61:1, 64:23, 64:25, 65:10, 78:7, 97:3, 104:11, 111:22
**humorous** [1] - 82:19
**hundred** [3] - 8:7, 71:7, 85:13
**hurt** [3] - 41:3, 43:6, 44:7
**husband** [3] - 67:12, 68:3, 69:12

**I**

**idea** [3] - 28:17, 38:25, 119:12
**ideas** [1] - 80:21
**identity** [1] - 28:22
**ignore** [1] - 131:3
**II** [2] - 2:2, 117:14
**Ilka** [1] - 48:21
**illustrate** [1] - 136:15
**imagine** [2] - 43:16, 97:15
**impact** [1] - 64:6
**impacts** [1] - 25:4
**impartial** [1] - 151:22
**implementation** [1] - 150:10
**implemented** [3] - 26:3, 80:4, 96:8
**implicated** [1] - 118:11
**important** [41] - 15:8, 15:20, 18:10, 24:10, 27:19, 27:23, 28:5, 28:7, 33:8, 51:15, 63:19, 67:10, 69:5, 69:23, 76:5, 76:25, 77:2, 77:4, 77:10, 79:18, 79:19, 92:2, 102:14, 102:18, 103:16, 103:19, 105:2, 107:20, 113:19, 115:13, 115:24, 115:25, 116:14, 117:14, 118:18, 121:14, 125:17, 131:4, 135:6, 153:13, 168:20
**importantly** [3] - 51:17, 65:7, 116:17
**imposed** [1] - 50:6
**impressed** [1] - 14:19
**impressive** [1] - 83:14
**improper** [2] - 133:1, 161:2
**improve** [4] - 65:12, 77:11, 87:13, 88:6
**improving** [1] - 88:11
**IN** [2] - 1:1, 3:5
**inability** [2] - 60:15, 60:21
**inaccurate** [1] - 153:2
**inadvertently** [2] - 48:25, 153:6
**inclination** [1] - 11:16
**include** [3] - 12:13, 148:10, 150:14
**included** [3] - 29:1, 159:7, 160:4
**including** [9] - 32:12, 49:23, 85:5, 134:9, 137:5, 137:17, 154:13, 157:10, 160:7
**incomplete** [1] - 153:2
**inconvenience** [2] - 147:18, 160:18
**inconvenient** [1] - 42:13
**increase** [3] - 37:21, 81:11, 91:24
**independent** [3] - 58:5, 67:17, 67:18
**INDEX** [1] - 3:1
**Indian** [1] - 88:2
**indicate** [7] - 156:12, 156:16, 156:17, 156:20, 156:21, 157:4, 157:6
**indicated** [1] - 156:25
**indicates** [2] - 71:17, 160:15
**indifference** [4] - 148:21, 148:23, 149:1, 149:18
**indirect** [1] - 133:17
**individual** [8] - 137:5, 140:1, 140:2, 140:8, 140:13, 140:14, 140:17, 151:20
**individual's** [3] - 140:4, 140:10, 140:18
**individuals** [1] -

152:15
**indulgence** [2] - 85:22, 96:19
**industry** [1] - 65:3
**inference** [2] - 157:9, 157:13
**influence** [2] - 153:7, 153:15
**influenced** [2] - 130:21, 133:2
**inform** [5] - 47:1, 153:17, 161:3, 161:24, 162:7
**information** [13] - 48:6, 68:15, 69:1, 79:3, 107:14, 107:19, 109:2, 120:15, 153:1, 153:18, 154:17, 154:24
**informationship** [1] - 121:5
**informed** [3] - 102:11, 161:14, 165:8
**injured** [1] - 90:10
**injury** [2] - 145:18, 148:1
**inner** [1] - 49:10
**innocence** [1] - 97:24
**innocent** [1] - 135:4
**insight** [1] - 168:22
**insinuation** [1] - 93:23
**insofar** [1] - 135:25
**inspirational** [1] - 82:17
**Instagram** [2] - 152:19, 154:22
**instance** [1] - 18:5
**instant** [2] - 152:18, 154:21
**instead** [4] - 6:23, 41:22, 83:18, 85:3
**instruct** [7] - 92:11, 130:1, 130:9, 132:9, 137:16, 139:17, 151:9
**instructed** [1] - 133:5
**instructing** [1] - 114:9
**instruction** [9] - 51:12, 79:7, 145:23, 145:24, 147:2, 147:9, 158:19, 161:14, 161:23
**instructions** [25] - 4:6, 11:3, 11:5, 69:19, 79:6, 100:12, 130:3, 130:11, 130:12, 130:13, 131:2, 131:5, 133:9, 153:3, 153:12, 153:22, 157:25, 159:1, 159:8, 159:14, 160:4, 162:5, 162:11, 164:17, 164:24
**insulate** [1] - 150:5
**integrated** [25] - 48:14, 49:2, 49:18, 98:14, 105:9, 105:11, 105:21, 106:3, 107:11, 112:22, 113:3, 113:11, 114:7, 118:10, 138:4, 138:10, 138:14, 138:19, 139:2, 139:14, 139:16, 146:1, 147:3, 159:24
**intend** [1] - 12:2
**intended** [2] - 62:16, 132:19
**intentional** [1] - 135:4
**interest** [5] - 52:14, 92:10, 116:17, 134:17, 152:7
**interested** [6] - 70:10, 70:11, 70:13, 70:16, 70:17, 70:20
**interesting** [3] - 33:23, 49:13, 91:18
**internally** [1] - 81:23
**International** [1] - 59:24
**international** [24] - 29:20, 31:10, 31:16, 31:17, 32:24, 63:22, 82:15, 85:16, 86:9, 86:23, 87:5, 87:7, 87:9, 87:20, 97:14, 108:1, 108:4, 115:15, 115:19, 119:2, 119:3, 121:12, 122:21, 146:2
**international/ domestic** [1] - 86:25
**internationals** [2] - 85:13, 86:11
**internet** [5] - 152:18, 153:1, 154:20, 154:21
**interpret** [2] - 36:22, 132:20
**interpretation** [1] - 96:10
**interrelated** [2] - 105:21, 138:12
**interrelation** [2] - 107:13, 138:22
**interrupt** [1] - 17:5
**interviewed** [2] - 67:2, 74:11
**interviews** [1] - 74:12
**INTL** [1] - 115:18
**intricacies** [1] - 119:25
**introduce** [2] - 46:16, 51:18
**introduced** [2] - 52:4, 100:15
**invest** [2] - 117:15, 117:16
**invited** [1] - 84:24
**inviting** [1] - 83:3
**involved** [13] - 14:19, 92:15, 106:19, 114:6, 120:17, 121:3, 121:4, 121:5, 121:6, 123:24, 134:19, 152:15
**involvement** [2] - 22:1, 115:8
**involves** [1] - 118:12
**involving** [1] - 120:24
**iron** [1] - 11:4
**irrelevant** [5] - 6:25, 7:15, 7:17, 29:14, 51:20
**issue** [34] - 6:12, 7:18, 8:1, 8:3, 8:5, 9:1, 9:19, 9:25, 10:11, 11:13, 11:19, 12:10, 12:12, 20:9, 20:13, 26:14, 32:19, 46:4, 48:16, 50:22, 52:6, 58:16, 83:10, 121:23, 129:13, 142:4, 142:7, 147:11, 148:10, 159:9, 159:21, 160:7, 160:8, 161:13
**issues** [6] - 11:4, 37:6, 71:18, 120:17, 152:14, 162:3
**IT** [1] - 58:16
**item** [1] - 98:16
**items** [1] - 108:3
**itself** [1] - 99:21

## J

**JACKSON** [1] - 2:3
**January** [14] - 42:20, 66:19, 66:20, 75:9, 75:14, 75:15, 77:13, 77:14, 77:17, 77:22, 77:23, 78:2, 125:3, 125:4
**Jersey** [1] - 120:18
**job** [59] - 18:11, 18:24, 19:15, 21:4, 21:10, 24:1, 25:13, 25:25, 26:21, 27:19, 28:1, 28:7, 31:4, 35:7, 38:2, 38:12, 39:19, 39:23, 39:24, 40:3, 42:7, 42:22, 47:8, 47:19, 49:6, 52:19, 52:20, 52:21, 52:22, 53:5, 53:9, 53:13, 61:10, 61:13, 63:24, 64:4, 66:19, 67:1, 67:3, 69:20, 71:11, 71:13, 73:10, 73:12, 75:21, 75:25, 76:25, 90:14, 92:8, 94:2, 94:3, 96:13, 102:8, 107:4, 108:16, 125:12, 126:15, 169:25
**jobs** [16] - 27:23, 28:4, 28:21, 31:14, 39:6, 39:7, 39:11, 39:15, 40:23, 40:25, 43:8, 43:17, 44:21, 48:3, 89:17
**Johannes** [6] - 31:2, 78:16, 78:18, 86:14, 111:19, 111:20
**join** [1] - 121:8
**joined** [1] - 161:19
**joins** [1] - 158:22
**joke** [1] - 101:6
**JT** [1] - 78:16
**judge** [1] - 41:1
**Judge** [23] - 9:10, 18:4, 28:14, 45:16, 48:13, 51:12, 55:12, 55:25, 56:16, 59:2, 68:17, 79:5, 92:11, 93:21, 102:19, 104:24, 105:10, 107:20, 117:11, 121:22, 125:22, 126:12, 164:22
**JUDGE** [1] - 1:14
**judges** [2] - 152:6
**judgment** [3] - 9:21, 142:13, 151:20
**July** [8] - 34:3, 34:5, 34:9, 48:18, 49:1, 78:4, 85:11, 124:7
**jump** [1] - 37:5
**juries** [3] - 52:7, 53:7, 55:9
**JUROR** [10] - 167:7, 167:10, 167:13, 167:16, 167:19, 167:22, 167:25, 168:3, 168:6, 168:9
**juror** [16] - 15:11, 15:12, 16:4, 16:5, 153:20, 165:12, 167:5, 167:8, 167:11, 167:14, 167:17, 167:20, 167:23, 168:1, 168:4, 168:7
**jurors** [8] - 58:7, 100:17, 151:10, 151:17, 151:23, 152:3, 153:11, 157:20
**JURY** [2] - 1:14, 3:6
**jury** [87] - 4:3, 4:6, 6:16, 6:22, 7:11, 7:12, 7:22, 7:24, 8:5, 10:7, 10:15, 12:5, 12:11, 12:16, 12:20, 13:5, 13:7, 13:8, 14:20, 58:2, 58:10, 58:22, 58:24, 59:10, 62:5, 68:12, 68:13, 68:22, 69:6, 76:18, 100:19, 100:25, 101:2, 101:3, 101:5, 102:24, 105:24, 129:25, 130:6, 130:8, 136:8, 151:4, 151:7, 151:11, 153:19, 154:7, 154:10, 154:13, 156:24, 157:15, 157:23, 160:4, 161:3, 161:14, 161:18, 161:22, 161:24, 162:4, 162:7, 162:8, 162:12, 162:23, 163:4, 163:8, 163:15, 163:23, 163:24, 164:12, 164:17, 164:24, 165:5, 165:9, 165:11, 165:13, 165:23, 166:5, 166:9, 166:13, 166:17, 166:22, 166:23, 167:1, 167:4, 168:11, 168:16, 169:7
**jury's** [1] - 130:13
**justice** [5] - 14:6, 14:25, 102:11, 129:20, 137:8
**justify** [1] - 37:19

## K

**Kavit** [2] - 88:1, 88:5
**keep** [12] - 23:10, 37:13, 49:21, 66:3, 86:20, 90:25, 96:22, 123:2, 128:17, 130:4, 135:2, 151:11
**keeps** [1] - 52:17
**Keith** [1] - 73:20
**KELLY** [1] - 1:3
**Kelly** [118] - 14:13, 14:22, 15:22, 16:13,

16:18, 16:19, 18:13, 18:24, 19:2, 19:4, 19:6, 19:10, 19:17, 19:23, 20:20, 21:25, 22:9, 22:11, 22:24, 23:4, 25:7, 25:13, 25:16, 25:20, 26:20, 26:25, 27:11, 27:15, 27:21, 29:7, 30:24, 31:5, 31:10, 32:22, 32:23, 33:4, 33:5, 33:12, 34:8, 34:14, 34:22, 34:25, 35:7, 35:9, 35:14, 35:18, 35:19, 35:20, 36:14, 37:10, 37:14, 38:2, 38:5, 38:7, 38:13, 39:24, 40:18, 40:22, 41:5, 41:8, 41:14, 41:19, 41:23, 42:1, 42:6, 42:10, 42:18, 43:8, 43:14, 43:15, 44:5, 44:11, 44:16, 44:23, 44:25, 45:1, 46:19, 47:1, 47:17, 49:24, 50:13, 51:6, 52:12, 53:17, 54:25, 55:20, 57:24, 65:9, 68:2, 82:8, 84:6, 84:14, 84:16, 84:20, 86:4, 86:6, 89:18, 90:6, 92:12, 99:23, 114:5, 114:8, 114:12, 114:22, 114:23, 116:22, 123:25, 124:13, 124:14, 125:6, 125:14, 126:25, 128:24, 129:5, 129:21, 165:21
**Kelly's** [16] - 16:18, 18:6, 19:19, 20:25, 26:6, 29:21, 30:9, 31:21, 34:16, 34:20, 35:23, 40:3, 42:13, 44:3, 48:6, 49:6
**kept** [5] - 32:2, 34:22, 43:5, 110:20, 125:19
**key** [2] - 19:22, 80:2
**kid** [1] - 43:21
**kids** [2] - 43:22, 97:7
**killing** [1] - 14:18
**kind** [7] - 23:20, 38:2, 54:9, 55:23, 68:22, 78:22, 128:3
**kinds** [3] - 97:13, 133:14, 133:21
**knocking** [1] - 72:17
**knowing** [1] - 32:1
**knowledge** [5] - 19:21, 108:22, 109:13, 119:6, 148:23
**known** [6] - 33:18, 105:4, 139:12, 154:23, 166:1, 166:4
**knows** [11] - 10:4, 21:1, 35:22, 44:2, 63:14, 63:15, 63:17, 70:24, 75:17, 91:18, 108:25
**Knudt** [1] - 84:23
**Koepnick** [6] - 33:15, 34:2, 48:17, 121:20, 124:5, 124:6
**Koepnick's** [1] - 48:23
**KURT** [1] - 1:21

## L

**labor** [5] - 49:20, 56:7, 107:22, 108:25, 138:24
**ladder** [3] - 25:1, 25:2, 41:1
**ladies** [23] - 55:22, 59:10, 62:3, 63:18, 65:24, 67:5, 69:3, 69:24, 70:22, 75:16, 77:23, 78:13, 88:21, 90:18, 91:10, 92:21, 93:8, 94:18, 95:11, 97:25, 98:23, 100:2, 101:11
**lady** [1] - 88:3
**laid** [1] - 34:5
**land** [2] - 9:11, 61:15
**landed** [1] - 79:20
**language** [6] - 5:20, 22:3, 22:4, 83:12, 83:13, 129:15
**lapse** [1] - 135:4
**large** [1] - 77:7
**larger** [2] - 120:22, 135:15
**lark** [1] - 26:6
**last** [18] - 4:5, 8:3, 9:18, 9:25, 10:1, 15:18, 16:20, 41:23, 43:1, 57:12, 65:18, 75:14, 77:21, 102:6, 104:17, 112:22, 117:10, 118:21
**lastly** [1] - 99:10
**laugh** [1] - 109:18
**laughs** [1] - 17:10
**launching** [2] - 80:19, 81:25
**law** [50] - 7:2, 8:22, 8:23, 8:24, 9:11, 9:13, 9:15, 9:18, 28:25, 55:15, 55:16, 55:17, 56:7, 79:4, 79:6, 93:14, 93:15, 95:20, 126:13, 129:8, 129:9, 129:18, 130:1, 130:7, 130:10, 130:14, 130:19, 130:20, 130:25, 133:21, 136:24, 137:7, 137:17, 137:22, 138:1, 139:17, 139:20, 147:14, 148:24, 149:4, 149:11, 149:22, 152:10, 152:25, 153:13, 160:3, 160:6, 163:1
**lawful** [1] - 142:4
**laws** [4] - 30:3, 54:22, 54:23, 137:22
**lawsuit** [4] - 55:6, 89:25, 116:25, 122:7
**lawyer** [10] - 13:20, 14:4, 16:7, 16:8, 16:9, 59:16, 75:23, 94:14, 108:25, 116:25
**lawyers** [15] - 13:14, 16:10, 17:20, 53:7, 101:8, 101:15, 102:22, 103:7, 130:9, 132:8, 132:16, 132:17, 132:22, 132:24, 162:25
**leader** [2] - 82:17, 94:14
**leaders** [3] - 94:13, 97:4, 97:13
**leadership** [6] - 60:25, 63:10, 64:8, 65:11, 83:25, 93:17
**leading** [1] - 65:2
**leads** [1] - 131:13
**leaning** [1] - 14:21
**learn** [4] - 109:11, 152:13, 153:18, 153:20
**learns** [2] - 71:2, 72:6
**least** [1] - 43:22
**leave** [19] - 11:16, 29:7, 63:19, 63:20, 63:23, 64:14, 65:16, 66:21, 67:7, 68:6, 72:22, 78:21, 94:14, 95:16, 98:2, 98:5, 100:8, 125:15, 169:2
**leaving** [5] - 61:23, 67:5, 67:10, 75:17, 75:18
**left** [19] - 32:16, 36:18, 46:18, 46:19, 53:23, 59:3, 59:22, 61:14, 64:4, 64:13, 65:23, 80:22, 85:10, 85:25, 91:21, 96:15, 97:19, 99:25, 124:15
**legal** [8] - 8:14, 39:5, 55:25, 57:6, 63:5, 111:10, 152:14, 162:7
**legally** [1] - 111:7
**legitimate** [1] - 142:10
**length** [2] - 9:9, 155:3
**less** [1] - 89:8
**letter** [6] - 59:19, 66:3, 66:4, 66:5, 77:17, 78:5
**letters** [3] - 21:11, 26:4, 26:10
**level** [89] - 14:16, 18:18, 18:24, 20:15, 20:16, 20:21, 20:23, 21:2, 21:5, 21:7, 21:10, 21:16, 21:17, 21:21, 22:5, 22:6, 22:7, 22:12, 22:15, 22:22, 23:3, 23:6, 23:10, 23:11, 23:13, 23:22, 23:25, 24:3, 24:11, 24:12, 24:13, 24:14, 24:18, 24:21, 24:22, 25:3, 25:11, 25:13, 25:25, 26:24, 27:5, 27:17, 27:20, 27:22, 34:24, 35:2, 35:3, 35:18, 36:1, 36:2, 37:9, 37:11, 37:12, 37:13, 37:14, 37:23, 38:9, 38:20, 39:18, 39:23, 46:12, 48:1, 48:3, 50:1, 53:4, 62:23, 71:18, 73:11, 73:12, 73:13, 79:2, 80:1, 81:12, 84:15, 84:20, 88:4, 88:5, 90:15, 90:22, 91:2, 91:4, 91:6, 91:10, 94:9, 126:16, 129:1, 129:2
**levels** [5] - 21:1, 23:7, 24:9, 60:7, 110:16
**leveraging** [1] - 88:10
**LEWIS** [1] - 2:3
**liability** [2] - 150:6, 150:7
**liable** [3] - 116:5, 138:15, 149:12
**lie** [9] - 116:19, 116:21, 124:18, 124:19, 124:20, 124:21, 124:23
**lied** [4] - 64:12, 92:6, 92:8, 124:18
**lies** [1] - 92:10
**life** [10] - 18:12, 53:15, 62:12, 62:14, 96:23, 97:6, 97:10, 101:23, 137:3, 160:19
**lift** [1] - 39:6
**light** [4] - 131:13, 134:1, 134:21, 162:6
**Lighting** [2] - 80:16, 80:18
**likeable** [1] - 72:16
**likely** [1] - 131:14
**limit** [2] - 140:6, 160:23
**limited** [1] - 133:8
**limiting** [1] - 133:9
**line** [16] - 21:14, 22:18, 25:23, 32:10, 45:3, 67:8, 67:9, 67:25, 68:23, 68:24, 69:9, 73:15, 77:6, 78:10, 97:1
**lineage** [1] - 119:1
**lines** [1] - 57:16
**LinkedIn** [3] - 44:17, 152:20, 154:23
**Lisa** [1] - 13:24
**list** [10] - 19:14, 31:14, 36:16, 36:18, 50:19, 70:9, 70:10, 70:16, 108:5, 132:15
**listed** [2] - 12:13, 73:12
**listen** [8] - 14:15, 19:18, 28:6, 46:3, 51:2, 56:7, 98:19, 116:10
**listened** [1] - 64:16
**listening** [2] - 60:4, 96:19
**live** [1] - 101:20
**lives** [1] - 83:23
**living** [1] - 91:23
**LLC** [5] - 1:9, 2:2, 156:17, 156:21, 166:16
**LLL** [9] - 156:9, 156:13, 165:23, 166:4, 166:8, 166:10, 166:12, 166:14, 166:18
**LLP** [1] - 1:21
**local** [9] - 29:10,

29:11, 29:12, 29:24, 107:18, 115:18, 116:1, 127:11
**located** [1] - 60:10
**logic** [1] - 28:9
**logistic** [1] - 82:3
**logistically** [1] - 11:24
**logistics** [1] - 72:19
**logos** [2] - 49:13, 49:14
**look** [56] - 4:8, 19:1, 19:14, 19:19, 28:6, 33:2, 33:3, 33:11, 33:12, 33:18, 34:3, 34:15, 35:4, 35:20, 35:23, 39:12, 41:2, 42:3, 42:7, 43:8, 43:15, 44:8, 44:13, 44:14, 44:18, 44:25, 49:12, 49:13, 55:24, 57:4, 68:23, 69:8, 80:13, 80:21, 86:3, 86:18, 86:20, 86:21, 90:18, 91:9, 105:14, 110:24, 111:16, 112:3, 113:3, 115:15, 121:17, 124:13, 124:16, 169:21
**looked** [9] - 28:1, 64:8, 79:23, 80:9, 86:7, 108:20, 125:12, 164:9
**looking** [13] - 36:11, 43:8, 44:1, 67:14, 69:25, 71:1, 80:15, 90:16, 92:6, 103:1, 110:2, 116:12
**looks** [4] - 39:1, 61:17, 87:22, 92:14
**loss** [2] - 113:1, 160:18
**losses** [2] - 160:17, 160:19
**lost** [3] - 82:19, 94:3, 148:10
**lottery** [1] - 54:9
**louder** [6] - 32:2, 32:15, 37:3, 61:4, 61:7, 127:19
**love** [2] - 41:21, 53:13
**loved** [4] - 52:19, 52:20, 53:6, 119:22
**low** [1] - 91:13
**lower** [2] - 27:17, 37:15
**lowest** [6] - 19:13, 27:16, 27:19, 27:21, 27:24
**loyalty** [1] - 52:13
**lunch** [5] - 100:24, 101:5, 101:7, 101:9, 101:13
**luxury** [1] - 87:10
**lying** [1] - 115:23

**M**

**mad** [2] - 26:12, 36:9
**Madame** [2] - 162:19, 168:10
**made-up** [1] - 87:18
**Madewell** [10] - 74:9, 74:12, 74:14, 75:5, 75:6, 75:7, 75:13, 75:18, 75:19, 78:3
**MAIN** [1] - 2:4
**maintain** [2] - 7:6, 8:17
**maintaining** [3] - 65:2, 140:16, 150:8
**maintenance** [3] - 91:25, 163:13, 163:14
**majority** [1] - 141:25
**maker** [2] - 7:13, 149:7
**malice** [4] - 148:21, 148:22, 149:1, 149:18
**man** [7] - 65:5, 66:15, 79:21, 88:2, 89:5, 89:7, 89:16
**manage** [4] - 5:5, 6:7, 73:5, 143:20
**management** [14] - 27:20, 27:22, 31:21, 39:1, 40:20, 49:3, 49:4, 56:6, 77:1, 86:5, 106:6, 107:9, 125:9, 138:22
**Manager** [7] - 24:18, 62:18, 72:13, 72:15, 72:21, 76:6, 102:4
**manager** [9] - 24:20, 24:21, 24:22, 24:23, 41:14, 72:16, 102:1, 102:3, 104:14
**managerial** [3] - 149:6, 149:13, 150:8
**managers** [15] - 18:20, 22:24, 24:20, 24:22, 27:16, 41:11, 46:16, 73:18, 73:24, 74:5, 74:17, 84:18, 102:2, 110:3, 149:23
**managing** [1] - 82:15
**manner** [3] - 134:15, 136:2, 169:18
**manufacturing** [4] - 77:2, 77:3, 77:4, 77:5
**MANUFACTURING** [2] - 1:9, 2:2
**Manufacturing** [24] - 49:15, 98:24, 99:2, 99:7, 99:9, 99:12, 99:13, 104:6, 104:7, 104:8, 104:9, 104:10, 104:12, 111:23, 156:9, 156:13, 165:23, 166:3, 166:7, 166:9, 166:11, 166:14, 166:15, 166:17
**mark** [1] - 164:5
**market** [3] - 49:17, 87:6, 87:10
**marketplace** [1] - 87:5
**massive** [1] - 82:15
**match** [1] - 26:21
**math** [1] - 32:9
**matter** [10] - 9:10, 24:8, 39:14, 110:12, 110:13, 112:21, 120:2, 131:7, 134:19, 170:8
**matters** [9] - 24:9, 24:10, 68:5, 79:4, 135:15, 152:14, 153:8, 157:17, 168:25
**MC** [75] - 8:19, 33:21, 40:10, 47:15, 47:22, 48:9, 57:10, 58:20, 59:1, 59:8, 59:23, 60:3, 60:17, 60:22, 61:11, 61:16, 61:24, 63:22, 74:18, 75:20, 76:5, 77:11, 77:21, 80:18, 81:20, 83:24, 88:16, 89:18, 89:23, 91:16, 93:10, 96:23, 97:14, 98:1, 98:17, 98:19, 98:21, 99:21, 100:2, 100:5, 103:9, 104:21, 105:9, 105:20, 105:25, 106:8, 106:9, 107:12, 108:3, 108:6, 108:12, 109:3, 110:25, 111:13, 112:5, 112:10, 112:19, 112:21, 112:25, 113:10, 114:10, 115:5, 115:22, 117:7, 138:7, 139:7, 139:13, 139:15, 147:3, 156:7, 158:23, 159:23, 162:16, 166:4
**MC's** [4] - 65:21, 112:11, 112:12, 112:16
**MCCOY** [14] - 2:3, 8:20, 9:24, 10:22, 11:1, 12:12, 158:16, 162:16, 163:18, 165:2, 168:14, 169:14, 169:16, 169:23
**McCoy** [1] - 98:6
**McCraw** [44] - 17:25, 18:1, 21:12, 21:13, 24:15, 25:18, 25:19, 26:8, 26:11, 26:12, 26:14, 27:14, 31:22, 32:14, 35:16, 35:22, 36:21, 44:3, 46:17, 60:24, 61:2, 61:11, 63:25, 70:25, 71:3, 71:8, 72:9, 72:11, 73:2, 73:22, 79:15, 79:17, 81:2, 82:5, 90:9, 91:12, 91:19, 106:15, 109:16, 109:20, 112:24, 115:3, 119:17
**McCraw's** [1] - 21:9
**MCDUFFIE** [1] - 2:7
**mean** [7] - 44:16, 50:9, 53:9, 54:4, 105:7, 114:4, 118:3
**meaning** [3] - 143:2, 144:9, 144:17
**meaningful** [1] - 112:13
**means** [16] - 29:17, 29:20, 31:11, 67:25, 84:8, 84:9, 118:3, 118:24, 129:10, 130:23, 131:11, 146:12, 149:1, 152:12, 152:16, 154:17
**meant** [1] - 148:3
**mechanism** [1] - 86:16
**media** [5] - 152:17, 152:19, 153:2, 153:5, 154:19
**medical** [1] - 95:6
**Medley** [16] - 22:8, 22:11, 22:24, 23:1, 23:10, 23:19, 37:8, 37:9, 37:23, 41:6, 66:18, 73:20, 79:20, 81:6, 92:3, 99:4
**meet** [5] - 20:2, 82:9, 122:11, 126:24, 131:18
**meeting** [13] - 46:15, 46:16, 46:18, 46:25, 72:11, 73:2, 73:21, 74:16, 76:8, 76:11, 115:12, 115:22, 164:5
**meets** [5] - 69:17, 71:22, 72:8, 76:14, 76:16
**melt** [1] - 69:7
**member** [5] - 122:3, 141:24, 143:11, 154:7, 154:9
**members** [9] - 13:8, 58:2, 58:25, 101:3, 129:25, 130:7, 154:6, 164:12, 168:16
**memo** [2] - 114:11, 114:12
**memory** [4] - 11:20, 132:22, 135:4, 137:15
**men** [1] - 28:21
**mental** [2] - 147:18, 160:18
**mentality** [1] - 83:7
**mention** [2] - 155:2, 159:18
**mentioned** [3] - 52:2, 69:12, 89:2
**mere** [3] - 148:1, 150:4, 152:3
**merely** [1] - 112:19
**mess** [1] - 70:3
**message** [1] - 116:6
**messaging** [2] - 152:18, 154:21
**met** [6] - 43:14, 67:22, 78:14, 91:11, 108:11, 126:18
**meteoric** [2] - 37:17, 89:2
**Michelle** [1] - 73:19
**middle** [1] - 81:9
**Middleton** [1] - 75:7
**midst** [1] - 74:25
**might** [26] - 41:6, 45:5, 46:9, 59:14, 61:15, 61:23, 61:24, 62:9, 62:23, 62:25, 68:4, 68:7, 68:8, 71:20, 78:12, 78:20, 82:21, 89:21, 92:19, 93:1, 102:16, 149:24, 153:2, 163:13
**mile** [2] - 82:25, 83:9
**military** [1] - 168:21
**mill** [1] - 28:19
**Miller** [13] - 43:4, 43:12, 44:7, 44:11, 67:16, 67:19, 69:13, 69:17, 69:19, 71:4, 71:6, 71:10, 74:8
**million** [2] - 103:14,

166:21
**Milwaukee** [1] - 83:21
**mind** [5] - 130:4, 131:25, 135:2, 148:19, 151:11
**minorities** [1] - 38:25
**minority** [5] - 38:23, 39:13, 40:19, 57:2, 88:22
**minute** [5] - 9:25, 38:5, 58:11, 100:10, 100:20
**minutes** [9] - 12:6, 14:6, 22:10, 46:18, 58:14, 73:22, 86:5, 102:9, 123:20
**misleading** [2] - 153:2, 162:8
**mission** [1] - 84:12
**mistake** [1] - 111:18
**mobile** [1] - 154:19
**mock** [1] - 79:19
**model** [2] - 19:23, 53:19
**models** [4] - 81:23, 91:16, 120:25, 121:2
**moment** [4] - 23:14, 123:11, 153:21, 162:21
**moments** [4] - 18:1, 25:6, 82:18, 115:14
**Monday** [7] - 70:7, 76:3, 76:7, 76:9, 77:18, 77:19
**money** [8] - 50:16, 54:9, 65:23, 71:13, 95:3, 95:14, 99:16, 147:16
**monitor** [1] - 40:3
**month** [2] - 66:8, 92:19
**months** [1] - 40:6
**moody** [8] - 12:1, 16:15, 34:21, 47:12, 113:8, 126:14, 127:8, 129:4
**MOODY** [6] - 2:2, 3:3, 12:17, 58:21, 59:2, 85:24
**moody's** [2] - 124:10, 125:18
**Moore** [1] - 89:23
**morning** [9] - 13:19, 64:17, 76:9, 102:1, 102:6, 104:17, 116:9, 121:16, 161:16
**most** [29] - 15:20, 18:10, 18:11, 18:13, 18:16, 19:15, 20:7, 27:18, 27:23, 28:7, 28:18, 29:2, 39:16, 61:18, 61:24, 64:5, 65:7, 79:18, 79:19, 86:10, 86:12, 105:2, 107:20, 108:17, 116:17, 120:7, 123:25, 139:4, 168:19
**motion** [2] - 9:2, 9:4
**motions** [1] - 169:17
**motivated** [1] - 141:1
**motivating** [11] - 5:9, 56:18, 140:20, 140:24, 141:5, 142:23, 143:16, 143:23, 144:7, 144:15, 145:7
**motivation** [1] - 142:12
**MOTOREN** [2] - 1:6, 1:20
**Motoren** [4] - 105:3, 139:11, 165:22, 165:25
**Motors** [2] - 90:3, 90:4
**mouth** [5] - 52:1, 124:14, 128:7, 128:8, 128:9
**move** [19] - 23:7, 25:6, 25:8, 38:10, 38:12, 40:22, 40:23, 40:24, 41:1, 45:8, 62:18, 84:20, 95:1, 109:9, 109:10, 110:14, 115:1, 128:17, 164:6
**moved** [24] - 18:14, 23:1, 23:12, 23:19, 34:8, 35:8, 35:19, 38:1, 38:15, 39:19, 39:22, 40:8, 41:5, 41:8, 41:9, 62:22, 80:3, 89:3, 89:6, 104:1, 106:19, 106:24, 114:18
**movement** [3] - 38:16, 59:21, 109:4
**moves** [6] - 18:18, 23:8, 29:9, 34:5, 84:9, 124:11
**movies** [1] - 14:3
**moving** [12] - 25:10, 38:14, 84:19, 89:5, 89:7, 89:13, 89:15, 106:20, 108:19, 109:5, 114:12, 117:5
**MR** [50] - 3:2, 3:3, 3:4, 3:5, 5:19, 8:20, 9:7, 9:24, 10:22, 11:1, 11:12, 11:13, 11:24, 12:8, 12:12, 12:17, 12:21, 13:3, 13:18, 17:8, 17:13, 58:13, 58:18, 58:21, 59:2, 85:24, 100:22, 101:11, 123:19, 123:21, 158:3, 158:8, 158:16, 158:22, 162:14, 162:16, 162:17, 163:17, 163:18, 163:19, 165:1, 165:2, 165:3, 168:12, 168:14, 168:15, 169:9, 169:14, 169:16, 169:23
**multi** [2] - 53:11, 111:9
**multi-national** [2] - 53:11, 111:9
**multiple** [1] - 89:17
**Munich** [3] - 48:1, 48:5, 88:8
**Murphy** [40] - 11:11, 11:25, 12:20, 13:17, 17:5, 52:1, 55:6, 58:13, 59:7, 61:6, 64:15, 66:15, 71:22, 73:21, 78:14, 79:18, 81:1, 89:14, 90:10, 94:16, 98:10, 102:1, 104:17, 104:22, 106:4, 106:22, 108:2, 111:15, 113:15, 113:20, 115:14, 116:8, 118:7, 118:20, 119:14, 120:13, 121:16, 123:5, 123:13, 123:18
**MURPHY** [20] - 1:17, 1:17, 3:2, 3:5, 5:19, 11:12, 12:21, 13:3, 13:18, 17:8, 17:13, 123:19, 123:21, 158:3, 158:8, 162:14, 163:17, 165:1, 168:12, 169:9
**Murphy's** [3] - 8:21, 9:2, 118:15
**must** [47] - 14:17, 26:5, 35:10, 59:12, 95:20, 130:14, 130:15, 130:18, 130:21, 130:23, 131:2, 131:4, 131:19, 133:6, 133:8, 134:1, 134:4, 134:5, 135:12, 138:8, 141:3, 141:11, 141:14, 142:7, 142:12, 142:22, 143:1, 143:13, 144:5, 144:14, 145:7, 145:9, 145:14, 145:17, 147:11, 147:22, 148:6, 148:18, 150:9, 151:8, 151:15, 151:16, 151:20, 152:11, 154:5, 154:16, 157:8
**MySpace** [1] - 154:22

**N**

**nailed** [1] - 16:16
**name** [3] - 12:14, 20:12, 87:22
**named** [2] - 19:8, 36:15
**names** [3] - 70:17, 70:18
**narrower** [1] - 103:8
**national** [76] - 4:22, 5:8, 5:23, 6:14, 7:16, 7:23, 8:24, 19:14, 28:11, 28:14, 29:4, 29:9, 29:14, 29:24, 30:17, 31:7, 34:11, 36:12, 37:2, 44:21, 50:7, 51:7, 51:14, 51:22, 51:23, 53:11, 56:12, 56:20, 64:17, 82:6, 87:23, 88:2, 88:17, 95:21, 96:4, 98:25, 104:2, 108:24, 111:9, 116:2, 118:12, 118:20, 118:23, 118:24, 119:18, 121:11, 121:23, 121:24, 122:10, 122:24, 127:22, 137:19, 137:25, 139:18, 140:4, 140:11, 140:15, 140:19, 140:24, 141:4, 141:10, 142:2, 142:17, 142:20, 142:23, 143:6, 143:7, 143:14, 143:23, 146:20, 146:24, 155:12, 158:10, 159:9, 159:14, 166:4
**nationality** [8] - 6:11, 6:24, 8:2, 32:6, 32:11, 33:19, 85:17
**nationalization** [1] - 122:2
**nationals** [3] - 117:21, 146:6, 160:1
**naturalization** [1] - 143:10
**nature** [1] - 159:24
**nauseam** [2] - 9:22, 111:12
**Navigation** [3] - 5:14, 117:18, 146:4
**nearly** [1] - 113:20
**necessarily** [1] - 135:10
**necessary** [5] - 55:12, 150:17, 154:3, 163:13, 163:16
**need** [30] - 10:14, 13:3, 17:11, 32:4, 36:7, 43:25, 44:1, 54:6, 55:8, 62:4, 68:22, 73:1, 73:2, 85:19, 90:11, 93:1, 98:8, 102:4, 103:17, 110:21, 112:1, 113:17, 114:5, 115:15, 129:14, 129:15, 135:3, 169:19
**needed** [8] - 94:12, 96:22, 97:16, 97:17, 119:23, 119:24, 120:2, 120:3
**needs** [6] - 38:8, 43:22, 59:8, 72:12, 97:17, 110:22
**negotiating** [2] - 74:15, 121:1
**neighbor** [1] - 67:14
**network** [8] - 65:5, 87:6, 107:18, 108:21, 119:4, 120:9, 120:10, 121:4
**Network** [2] - 81:22, 83:16
**never** [66] - 6:22, 7:11, 7:12, 14:25, 16:16, 16:21, 19:4, 19:6, 20:12, 20:18, 22:16, 23:3, 26:7, 27:6, 33:21, 38:1, 38:10, 39:19, 39:22, 40:8, 41:3, 41:8, 42:9, 43:1, 43:3, 45:1, 47:11, 51:16, 52:2, 52:4, 53:1, 62:24, 62:25, 65:18, 66:1, 66:2, 66:3, 66:4, 66:10, 80:2, 80:3, 81:15, 82:7, 82:8, 83:10, 84:15, 84:21, 84:22, 85:1, 91:20, 95:3, 95:18, 104:12, 104:13, 104:14, 110:7, 125:19, 125:20, 128:18,

164:3, 169:4
**New** [1] - 120:18
**new** [15] - 7:3, 19:22, 46:16, 64:24, 69:11, 71:3, 74:22, 76:7, 76:12, 83:25, 111:2, 114:15, 168:22
**newly** [1] - 23:2
**news** [1] - 153:5
**next** [25] - 6:9, 16:4, 40:6, 69:22, 71:14, 72:3, 73:9, 73:15, 73:23, 73:25, 74:6, 74:20, 74:25, 75:1, 75:24, 76:1, 76:18, 76:22, 77:12, 77:20, 88:9, 102:9, 115:13, 144:1, 147:11
**nice** [1] - 35:11
**night** [3] - 4:5, 10:1, 53:20
**nine** [13] - 27:16, 27:25, 38:11, 41:10, 70:15, 70:21, 72:14, 86:18, 156:4, 156:6, 156:18, 157:2
**NO** [1] - 1:3
**nobody** [9] - 8:6, 8:15, 11:8, 20:10, 39:8, 41:5, 48:2, 83:20, 128:14
**nominated** [1] - 84:21
**nomination** [1] - 84:22
**non** [6] - 4:19, 79:9, 79:11, 95:25, 126:7, 141:20
**non-speculative** [4] - 4:19, 79:9, 95:25, 126:7
**nondiscriminatory** [1] - 141:1
**none** [6] - 41:10, 41:14, 41:19, 64:11, 97:20, 110:16
**nonpecuniary** [1] - 160:19
**normal** [4] - 53:24, 111:8, 116:21, 116:24
**normally** [3] - 110:1, 116:20, 168:23
**North** [1] - 120:19
**nose** [1] - 119:12
**note** [13] - 69:5, 78:15, 82:25, 103:8, 115:21, 116:22, 154:5, 163:8, 163:9, 163:23, 163:25, 164:8
**notebook** [4] - 59:15, 69:25, 83:1, 84:6
**noted** [6] - 48:25, 153:3, 160:22, 161:4, 161:8, 161:22
**notes** [15] - 30:10, 61:3, 69:4, 70:5, 71:17, 71:21, 71:24, 75:8, 78:15, 95:2, 115:16, 130:5, 137:12, 137:13, 170:7
**nothing** [38] - 6:24, 14:2, 19:25, 22:5, 33:1, 33:6, 40:5, 40:16, 44:12, 44:20, 45:13, 45:20, 45:21, 55:1, 55:2, 59:17, 59:22, 63:16, 76:24, 79:25, 83:9, 92:17, 94:21, 94:23, 95:19, 122:24, 127:22, 127:25, 128:1, 162:10, 162:14, 162:16, 162:17, 168:12, 168:14, 168:15
**notice** [10] - 4:14, 4:18, 34:15, 42:21, 49:12, 126:2, 126:6, 141:17, 141:20
**noticed** [1] - 16:2
**notices** [1] - 153:6
**notify** [2] - 76:15, 76:16
**November** [7] - 46:15, 46:22, 73:16, 73:21, 73:24, 74:8, 76:24
**nowhere** [1] - 65:9
**number** [18] - 10:7, 10:8, 54:1, 54:2, 54:4, 54:14, 54:18, 91:12, 98:13, 99:6, 113:7, 134:9, 135:10, 135:13, 135:15, 165:12, 167:8
**numbers** [4] - 54:14, 54:15, 70:3, 70:5
**numerically** [1] - 154:13
**nutshell** [1] - 24:19

**O**

**o'clock** [1] - 84:4
**oath** [5] - 15:14, 35:17, 127:15, 130:25, 135:23
**object** [2] - 63:7, 133:1
**objected** [1] - 4:22
**objecting** [2] - 7:6, 89:7
**objection** [10] - 6:13, 7:7, 8:17, 9:14, 31:21, 133:3, 159:10, 159:12, 161:15, 163:15
**objections** [6] - 63:1, 132:24, 157:24, 158:17, 159:19, 160:5
**observed** [1] - 17:15
**Obviously** [1] - 26:18
**obviously** [2] - 12:14, 169:17
**occasions** [1] - 67:2
**occur** [2] - 68:8, 92:20
**occurred** [5] - 58:16, 68:6, 115:12, 145:16, 145:19
**occurring** [1] - 70:23
**occurs** [5] - 4:13, 45:17, 45:18, 126:1, 141:17
**October** [12] - 20:19, 34:24, 35:3, 36:4, 42:3, 45:15, 46:7, 46:9, 46:10, 72:8, 73:8, 91:3
**odd** [2] - 34:16, 35:6
**odds** [1] - 32:5
**OF** [3] - 1:1, 170:3, 170:5
**OFCCP** [1] - 120:1
**offended** [1] - 89:21
**offer** [8] - 21:11, 66:4, 74:13, 74:15, 75:13, 75:25, 78:5, 78:6
**offered** [3] - 6:18, 7:10, 21:9
**office** [5] - 63:2, 63:3, 71:16, 84:24, 163:12
**Officer** [1] - 78:7
**official** [1] - 78:4
**officially** [1] - 21:18
**officials** [1] - 150:8
**OFK** [1] - 27:5
**OFKs** [1] - 24:14
**often** [2] - 86:9, 137:23
**old** [2] - 55:5, 90:10
**older** [1] - 109:7
**on-site** [1] - 63:5
**once** [9] - 6:21, 16:16, 16:21, 23:23, 41:13, 45:1, 52:8, 100:6, 113:10
**one** [124] - 7:17, 9:24, 13:3, 13:19, 15:4, 15:16, 15:20, 15:23, 16:2, 16:21, 17:9, 17:25, 18:9, 18:20, 19:13, 20:4, 20:10, 21:9, 22:23, 24:12, 27:8, 27:21, 28:8, 32:4, 33:15, 33:22, 33:25, 34:24, 36:14, 38:11, 41:23, 42:6, 43:7, 43:22, 45:4, 47:9, 47:10, 47:12, 49:13, 49:18, 51:2, 53:10, 56:2, 56:20, 59:12, 61:8, 61:11, 64:11, 67:15, 71:23, 73:9, 73:15, 73:25, 74:6, 74:20, 75:1, 75:24, 76:18, 76:22, 77:12, 79:17, 80:8, 80:9, 80:12, 80:16, 93:7, 95:25, 96:18, 98:13, 98:16, 99:8, 103:22, 105:13, 106:5, 106:23, 107:4, 107:6, 109:13, 109:14, 111:1, 111:13, 112:7, 113:17, 113:23, 118:21, 120:7, 123:23, 123:24, 124:1, 124:8, 124:9, 125:2, 126:21, 128:8, 128:14, 128:18, 129:4, 132:4, 132:16, 134:11, 135:11, 135:14, 139:8, 139:10, 139:25, 145:21, 145:23, 147:6, 149:2, 149:23, 150:7, 150:15, 151:5, 151:17, 154:6, 155:6, 155:7, 155:13, 156:2, 156:5, 157:12, 166:25
**ones** [1] - 107:18
**open** [5] - 19:24, 154:11, 163:5, 163:21, 165:6
**opening** [3] - 123:13, 128:19, 132:18
**operate** [2] - 87:10, 88:10
**operated** [1] - 159:25
**operates** [1] - 111:9
**operational** [1] - 91:17
**operations** [7] - 49:10, 82:2, 107:13, 112:18, 138:22, 146:15, 146:17
**opinion** [5] - 19:18, 54:4, 83:24, 151:25, 152:2
**opinions** [3] - 58:6, 100:13, 130:22
**opportunities** [2] - 140:9, 140:18
**opportunity** [7] - 14:24, 15:3, 15:8, 26:24, 57:20, 96:16, 153:17
**opposed** [1] - 89:4
**opposite** [1] - 131:16
**options** [2] - 22:2, 31:16
**orally** [1] - 154:11
**order** [8] - 24:25, 136:5, 142:21, 150:6, 151:15, 157:9, 157:11, 157:13
**ordering** [1] - 114:8
**org** [3] - 30:17, 48:10, 50:18
**organization** [7] - 55:4, 73:17, 76:7, 76:13, 77:7, 80:24, 83:25
**organizational** [2] - 74:1, 107:25
**organizations** [2] - 53:12, 137:7
**organize** [1] - 112:5
**organized** [1] - 112:25
**origin** [73] - 5:8, 7:16, 7:23, 8:24, 19:14, 28:11, 28:14, 29:4, 29:9, 29:14, 29:24, 30:17, 31:7, 34:12, 36:12, 37:2, 44:21, 50:7, 51:8, 51:14, 51:22, 51:23, 56:12, 56:20, 64:18, 82:6, 87:23, 88:2, 88:17, 95:21, 96:4, 98:25, 104:2, 108:24, 116:2, 118:12, 118:20, 118:23, 118:24, 119:19, 121:12, 121:23, 121:24, 121:25, 122:10, 122:24, 127:22, 137:19, 137:25, 139:18, 140:5, 140:11, 140:15, 140:19, 140:24, 141:4, 141:10, 142:2, 142:17, 142:20,

142:23, 143:6, 143:7, 143:9, 143:15, 143:23, 146:20, 146:24, 155:12, 158:11, 159:9, 159:14, 166:4
**originally** [1] - 114:14
**otherwise** [6] - 54:24, 92:15, 140:1, 140:9, 149:24, 154:14
**ought** [1] - 21:4
**ourselves** [1] - 85:8
**outcome** [1] - 134:18
**outgoing** [1] - 53:18
**outset** [1] - 9:3
**outside** [18] - 4:2, 38:18, 40:1, 41:3, 44:1, 49:11, 58:9, 60:3, 61:10, 100:18, 152:13, 153:16, 153:19, 154:1, 157:22, 168:21, 169:1, 169:6
**overcomplicating** [1] - 162:3
**overseeing** [1] - 107:7
**oversees** [1] - 107:5
**owe** [1] - 42:20
**owing** [2] - 122:3, 143:11
**own** [21] - 16:8, 16:11, 21:19, 28:22, 32:25, 48:10, 50:10, 51:12, 53:15, 56:23, 56:24, 71:19, 87:18, 95:12, 112:25, 113:1, 136:12, 137:13, 142:14, 151:24
**ownership** [3] - 50:8, 112:24, 138:25
**owns** [1] - 128:14

**P**

**p.m** [1] - 170:2
**pad** [1] - 80:19
**page** [29] - 4:8, 4:9, 4:22, 4:24, 5:12, 5:20, 5:22, 56:4, 56:11, 57:9, 57:13, 69:22, 70:2, 71:14, 72:3, 76:1, 77:20, 80:10, 80:13, 86:17, 86:18, 90:24, 98:17, 115:10, 115:13, 121:19, 155:9, 156:4, 164:19
**pages** [8] - 56:3, 70:6, 70:13, 70:15, 70:21, 90:19, 155:3, 158:11
**paid** [10] - 22:24, 27:16, 27:21, 27:24, 67:1, 71:12, 85:4, 85:5, 96:13, 104:8
**pain** [2] - 147:18, 160:17
**paint** [1] - 50:3
**panel** [1] - 167:1
**paper** [1] - 44:18
**paragraph** [2] - 4:23, 158:10
**parent** [7] - 105:12, 107:23, 111:5, 122:8, 138:11, 138:14, 138:16
**parenthetical** [3] - 5:12, 21:25, 22:3
**part** [14] - 6:13, 42:19, 81:21, 83:4, 87:2, 101:4, 112:14, 114:5, 120:18, 134:7, 141:12, 146:6, 160:3, 163:25
**particular** [3] - 142:1, 158:17, 159:5
**parties** [10] - 11:18, 56:1, 101:8, 129:24, 161:13, 161:14, 162:22, 162:23, 168:17, 168:25
**partisans** [1] - 152:6
**partners** [1] - 120:10
**partnerships** [1] - 137:6
**parts** [4] - 55:23, 56:16, 106:4, 130:11
**party** [9] - 6:16, 6:25, 117:22, 117:24, 134:19, 140:23, 146:7, 160:21, 162:9
**Party** [1] - 146:8
**passage** [1] - 91:21
**passed** [3] - 28:25, 30:3, 63:24
**passionate** [1] - 19:24
**past** [1] - 120:11
**patently** [1] - 39:2
**patience** [1] - 101:17
**patient** [1] - 57:19
**Paul** [1] - 73:20
**pay** [18] - 24:25, 25:5, 27:13, 27:17, 59:18, 61:10, 65:14, 66:1, 71:17, 71:20, 80:3, 82:8, 88:25, 89:9, 96:7, 96:11, 109:22, 114:9
**paycheck** [2] - 43:2, 104:13
**paying** [2] - 28:8, 71:10
**pecking** [1] - 24:25
**pecuniary** [1] - 160:17
**penalize** [1] - 148:5
**people** [56] - 13:22, 14:2, 14:12, 15:17, 15:18, 16:11, 16:12, 18:17, 25:20, 26:15, 27:7, 27:9, 27:10, 27:21, 27:22, 27:24, 32:24, 39:6, 41:12, 43:16, 44:8, 50:14, 51:11, 54:13, 54:23, 55:7, 57:16, 63:6, 64:7, 64:8, 64:9, 72:17, 77:6, 77:8, 81:3, 85:5, 85:13, 87:21, 93:12, 93:13, 94:8, 97:15, 99:19, 103:15, 106:10, 108:14, 109:5, 109:14, 109:21, 110:1, 114:20, 120:1, 123:11, 129:14, 129:16, 135:2
**People** [1] - 97:14
**people's** [1] - 14:2
**perceived** [1] - 149:3
**percent** [4] - 8:7, 91:23, 91:25
**perfect** [2] - 45:11, 97:22
**performance** [6] - 19:17, 19:18, 19:19, 20:1, 34:17, 42:8
**period** [2] - 37:22, 72:13
**permission** [3] - 50:16, 106:11, 114:19
**permit** [2] - 146:20, 146:25
**permits** [2] - 133:21, 147:14
**permitted** [7] - 117:22, 118:5, 146:7, 146:13, 146:16, 153:10, 161:23
**person** [32] - 18:2, 23:8, 29:12, 30:19, 35:12, 43:13, 44:6, 52:10, 63:22, 67:15, 80:18, 81:5, 82:7, 83:14, 85:11, 85:17, 85:18, 90:4, 108:17, 108:18, 108:23, 119:6, 121:24, 122:2, 122:14, 122:15, 123:9, 137:10, 143:8, 143:10, 151:5
**person's** [2] - 121:25, 143:8
**personal** [35] - 14:17, 21:5, 23:8, 25:2, 25:10, 25:11, 25:12, 25:23, 25:25, 27:16, 27:25, 37:21, 37:25, 38:19, 39:22, 49:24, 49:25, 52:17, 59:19, 60:7, 66:2, 66:13, 77:22, 80:3, 81:13, 89:3, 89:5, 89:8, 90:7, 93:24, 96:7, 110:16, 130:22, 137:13
**personally** [2] - 96:20, 168:24
**personnel** [4] - 112:11, 118:1, 146:10, 146:19
**persons** [3] - 136:23, 137:1, 137:5
**pertains** [1] - 98:20
**pertinent** [2] - 146:6, 160:12
**Petrasch** [63] - 15:22, 17:19, 20:18, 20:20, 21:24, 23:5, 23:9, 23:16, 26:2, 29:7, 29:22, 30:11, 30:14, 30:15, 30:21, 32:13, 33:9, 33:10, 33:17, 34:7, 36:19, 36:24, 38:24, 40:4, 40:9, 40:19, 40:25, 43:24, 43:25, 45:15, 46:9, 46:10, 48:25, 50:13, 61:12, 61:13, 72:8, 74:16, 76:2, 76:6, 76:10, 77:15, 80:15, 84:7, 85:12, 85:14, 106:16, 114:13, 115:3, 115:17, 115:22, 116:23, 117:3, 117:4, 121:21, 123:7, 124:4, 125:5, 127:10, 127:14
**Petrasch's** [2] - 26:10, 33:24
**PG** [4] - 81:8, 81:10, 81:14, 92:4
**philosophy** [1] - 60:21
**phone** [2] - 125:7, 152:17
**phones** [1] - 153:4
**phrase** [1] - 79:8
**phrases** [2] - 59:5, 124:14
**pick** [2] - 36:17, 50:19
**picture** [1] - 17:9
**pictures** [1] - 61:16
**piece** [3] - 15:4, 117:1, 117:10
**pieces** [4] - 102:7, 102:8, 102:10, 102:15
**pinnacle** [1] - 18:19
**pitch** [1] - 91:15
**place** [14] - 25:22, 31:4, 31:13, 61:18, 84:10, 106:14, 118:19, 121:25, 137:15, 143:9, 155:5, 155:17, 157:4, 157:5
**places** [2] - 44:1, 109:9
**plainly** [1] - 33:7
**plaintiff** [15] - 56:5, 56:13, 56:14, 95:20, 107:8, 137:18, 137:21, 138:6, 139:13, 141:25, 142:19, 144:3, 145:17, 145:19, 147:7
**PLAINTIFF** [2] - 1:4, 1:17
**Plaintiff** [73] - 4:22, 5:2, 6:4, 13:11, 92:22, 96:9, 103:23, 105:4, 105:20, 107:1, 110:18, 113:6, 115:23, 130:15, 131:10, 131:12, 131:14, 131:17, 131:18, 138:9, 138:17, 141:3, 141:11, 141:14, 141:24, 142:5, 142:9, 142:22, 142:25, 143:13, 143:17, 143:18, 144:5, 144:11, 144:13, 144:22, 145:7, 145:9, 145:11, 145:13, 146:1, 147:11, 147:17, 147:24, 148:2, 148:3, 148:8, 148:12, 148:14, 148:17, 148:22, 150:11, 155:5, 155:13, 155:18, 155:21, 155:25, 156:8, 156:11, 156:16, 156:20, 156:22, 157:1, 157:12, 158:9,

159:22, 162:14, 166:2, 166:6, 168:12, 169:9, 169:10
**Plaintiff's** [34] - 5:8, 13:20, 21:12, 38:21, 48:8, 99:2, 99:6, 102:24, 103:2, 121:20, 131:15, 138:7, 139:9, 139:18, 139:20, 143:22, 145:2, 145:24, 147:4, 147:8, 147:20, 155:11, 155:15, 155:19, 155:23, 156:7, 156:10, 156:14, 160:25, 161:1, 166:3, 166:7, 166:11, 166:15
**plaintiffs** [1] - 99:16
**plan** [5] - 12:3, 45:8, 47:8, 65:7, 94:15
**planned** [2] - 62:17, 68:5
**planning** [13] - 20:11, 32:25, 33:14, 36:19, 48:4, 48:7, 74:22, 74:25, 84:7, 107:25, 120:24, 120:25, 121:1
**Planning** [1] - 120:20
**plans** [2] - 75:13, 80:20
**plant** [18] - 18:21, 22:24, 39:1, 42:18, 63:5, 65:4, 65:6, 65:22, 72:17, 77:24, 81:22, 82:1, 82:10, 82:15, 83:15, 85:4, 88:8, 120:21
**Plant** [13] - 65:19, 72:7, 77:14, 86:8, 87:24, 88:8, 99:19, 109:1, 120:21, 120:22, 121:6, 122:22
**plants** [1] - 120:5
**player** [3] - 19:22, 90:11, 105:13
**pleadings** [1] - 159:21
**pleasant** [1] - 53:18
**plenty** [1] - 49:11
**PM** [1] - 124:6
**point** [19] - 7:7, 14:10, 14:18, 17:6, 19:2, 20:10, 20:14, 23:24, 32:20, 33:23, 39:25, 44:4, 44:23, 52:25, 61:14, 89:25, 125:6, 125:18, 125:23
**pointed** [2] - 34:1, 124:5
**points** [4] - 37:1, 43:17, 81:18, 89:11
**Points** [1] - 93:6
**police** [1] - 12:23
**policies** [4] - 49:23, 101:22, 111:25, 150:3
**policy** [23] - 23:7, 25:14, 25:16, 25:17, 25:18, 25:22, 26:1, 26:13, 26:17, 30:22, 31:25, 32:18, 37:20, 49:22, 56:23, 63:15, 85:15, 112:4, 140:16, 150:5, 150:9
**political** [2] - 122:3, 143:11
**poll** [1] - 167:4
**pop** [1] - 153:7
**pop-ups** [1] - 153:7
**popped** [1] - 65:9
**portfolio** [1] - 84:13
**portfolios** [1] - 114:24
**portion** [1] - 4:23
**position** [50] - 5:2, 6:4, 7:5, 8:13, 18:10, 18:18, 20:15, 20:16, 20:22, 21:14, 22:5, 22:7, 22:8, 23:2, 27:5, 27:15, 29:15, 34:23, 37:11, 37:15, 40:6, 40:8, 45:10, 46:13, 50:3, 50:18, 50:25, 62:23, 65:3, 65:21, 78:6, 79:16, 79:21, 80:25, 81:3, 86:16, 87:13, 87:18, 106:15, 106:24, 108:12, 110:14, 115:1, 119:23, 120:3, 120:19, 123:9, 143:19, 159:21, 159:22
**positions** [18] - 21:3, 22:22, 23:4, 23:24, 24:4, 31:6, 32:10, 36:14, 47:25, 48:1, 70:13, 70:20, 86:10, 118:6, 126:17, 146:14, 146:17
**positive** [2] - 97:19, 168:22
**Posner** [1] - 9:10
**possible** [2] - 86:1, 135:25
**post** [1] - 169:17
**post-trial** [1] - 169:17
**potential** [7] - 71:17, 71:19, 80:12, 161:7, 161:21, 162:2, 164:6
**potentially** [5] - 46:9, 71:20, 92:17, 116:25, 138:15
**PowerPoint** [1] - 46:23
**PowerPoints** [1] - 47:1
**practice** [5] - 140:16, 140:22, 140:25, 141:2, 148:20
**practices** [8] - 19:21, 54:20, 87:12, 107:15, 111:6, 112:17, 112:19, 120:4
**pre** [2] - 76:8, 76:11
**pre-meeting** [2] - 76:8, 76:11
**preference** [3] - 5:4, 6:6, 143:20
**prejudice** [2] - 134:18, 162:9
**prejudices** [1] - 130:22
**prepare** [1] - 162:25
**prepared** [2] - 16:9, 68:24
**preponderance** [10] - 92:22, 131:11, 131:23, 141:4, 141:11, 142:22, 143:14, 144:6, 144:14, 145:14
**presence** [9] - 4:3, 13:6, 58:10, 58:23, 100:19, 101:1, 157:23, 165:10, 169:7
**present** [3] - 135:22, 136:2, 169:10
**presentation** [4] - 76:3, 76:10, 124:21, 127:4
**presented** [13] - 31:20, 107:2, 107:8, 110:19, 135:9, 135:23, 151:14, 152:8, 152:11, 152:25, 153:14, 159:1, 159:2
**preside** [1] - 151:6
**President** [39] - 16:24, 24:13, 24:16, 29:18, 31:1, 33:10, 59:23, 60:2, 60:3, 60:16, 60:25, 61:21, 63:3, 64:24, 64:25, 65:10, 69:11, 78:7, 81:19, 83:2, 83:15, 84:23, 85:9, 85:10, 93:3, 94:15, 96:17, 97:2, 97:13, 104:11, 106:8, 108:13, 110:4, 111:22, 112:8, 112:9, 114:15
**Presidents** [4] - 20:4, 24:15, 97:3, 110:3
**press** [1] - 82:2
**presume** [1] - 58:13
**pretty** [1] - 77:2
**prevent** [2] - 149:19, 150:1
**previous** [2] - 58:4, 84:23
**previously** [4] - 39:7, 158:25, 161:9, 164:8
**principal** [1] - 149:5
**principles** [1] - 162:7
**private** [2] - 43:5, 137:4
**privilege** [1] - 68:11
**privileges** [2] - 80:6, 140:3
**proactively** [1] - 71:12
**problem** [8] - 11:19, 39:25, 40:7, 47:3, 82:24, 83:3, 163:18, 163:19
**problems** [2] - 10:12, 42:23
**proceed** [3] - 155:6, 155:8, 156:5
**process** [7] - 43:20, 44:6, 84:20, 109:24, 109:25, 110:1, 125:13
**produce** [2] - 124:9, 131:12
**produced** [2] - 4:5, 31:23
**producing** [1] - 48:10
**product** [1] - 87:10
**production** [10] - 65:5, 77:13, 77:25, 87:6, 90:4, 120:10, 120:25, 121:4
**Production** [2] - 81:22, 83:16
**professional** [5] - 43:1, 45:2, 53:19, 63:13, 163:1
**profit** [1] - 113:1
**prohibit** [1] - 138:5
**prohibits** [4] - 37:20, 137:24, 138:2, 141:8
**project** [3] - 23:20, 37:24, 79:22
**promise** [1] - 101:14
**promising** [1] - 130:25
**promote** [2] - 40:18, 108:14
**promoted** [3] - 38:18, 39:18, 104:9
**promotion** [4] - 40:1, 72:16, 84:13, 84:16
**promotions** [3] - 37:22, 38:1, 38:17
**proof** [10] - 96:9, 96:10, 96:11, 102:19, 131:8, 131:21, 131:22, 133:15, 133:18, 136:9
**proper** [2] - 9:6, 9:22
**proposed** [4] - 10:20, 72:10, 115:3, 161:10
**prospective** [1] - 68:7
**protect** [11] - 23:9, 30:3, 37:10, 37:13, 38:7, 43:23, 43:24, 56:1, 86:16, 91:6, 127:3
**protected** [2] - 141:9, 148:22
**protecting** [1] - 86:11
**protections** [2] - 122:5, 143:13
**protest** [1] - 63:8
**protested** [2] - 31:5, 127:6
**proud** [2] - 65:6, 93:21
**prove** [25] - 16:18, 56:19, 92:22, 95:20, 96:12, 97:23, 97:24, 102:20, 103:20, 105:20, 130:15, 141:2, 141:3, 142:21, 142:22, 143:13, 144:5, 144:13, 144:14, 145:7, 145:10, 145:14, 145:19, 148:18
**proved** [2] - 133:20, 133:24
**proven** [3] - 111:4, 148:12, 148:14
**provide** [4] - 69:19, 111:5, 154:16, 168:20
**provided** [4] - 4:7, 139:11, 165:17, 168:19
**provides** [5] - 4:14, 107:24, 126:2, 141:17, 146:6

**providing** [1] - 111:11
**proving** [2] - 131:10, 141:23
**provision** [1] - 29:1
**provisions** [1] - 159:13
**publications** [1] - 49:14
**publish** [1] - 165:20
**pull** [1] - 15:9
**pulling** [2] - 45:25, 46:1
**punish** [3] - 95:14, 98:4, 148:5
**punished** [2] - 150:15, 150:23
**punitive** [32] - 10:5, 10:17, 52:9, 54:7, 54:8, 54:10, 55:12, 55:13, 55:19, 57:14, 147:13, 148:16, 148:17, 149:17, 149:22, 149:24, 150:6, 150:12, 150:13, 150:17, 150:19, 150:23, 157:6, 158:18, 160:9, 160:20, 161:7, 161:18, 161:20, 161:24, 166:20
**purpose** [3] - 87:9, 133:8, 152:3
**purposes** [3] - 138:13, 147:3, 161:19
**pursue** [1] - 65:13
**pursued** [1] - 84:22
**pursuing** [4] - 70:10, 70:11, 70:13, 70:18
**push** [3] - 44:4, 87:12, 117:6
**pushing** [1] - 17:1
**put** [47] - 8:4, 8:11, 16:19, 20:1, 21:12, 23:15, 23:22, 24:1, 25:12, 25:21, 26:21, 27:15, 33:5, 34:21, 38:2, 38:13, 38:19, 39:21, 41:18, 41:23, 41:24, 47:12, 53:24, 57:13, 57:16, 81:3, 84:6, 86:12, 86:13, 86:17, 87:11, 88:3, 90:14, 95:13, 98:11, 99:20, 108:5, 114:11, 114:14, 116:20, 128:20, 129:3, 131:15, 131:25, 158:4, 159:20
**puts** [1] - 71:25
**putting** [6] - 27:11, 27:22, 27:24, 41:24, 41:25, 62:1
**puzzle** [5] - 102:7, 102:8, 102:15, 117:1

**Q**

**qualifications** [1] - 19:1
**qualified** [14] - 18:11, 18:13, 19:15, 20:8, 30:19, 39:6, 39:16, 42:6, 108:17, 122:16, 123:4, 123:6, 123:10
**qualifies** [1] - 138:7
**qualities** [1] - 60:23
**Quasar** [1] - 9:8
**questioned** [1] - 16:25
**questions** [22] - 16:7, 16:8, 16:11, 16:14, 17:20, 56:2, 56:11, 57:9, 86:9, 92:7, 98:22, 98:23, 103:17, 132:24, 135:19, 153:22, 155:8, 155:10, 156:2, 156:3, 157:1, 157:3
**queue** [1] - 69:2
**quick** [2] - 38:17, 88:20
**quickly** [4] - 52:7, 123:22, 127:23, 158:5
**quit** [10] - 45:1, 46:5, 59:3, 59:7, 64:13, 95:19, 100:3, 124:15, 124:17, 125:20
**quite** [1] - 120:8
**quitting** [1] - 43:19
**quote** [4] - 75:9, 145:10, 164:18
**quoted** [1] - 140:12

**R**

**race** [55] - 10:2, 10:8, 10:18, 28:12, 28:23, 38:9, 39:2, 56:15, 56:17, 56:20, 56:24, 57:1, 57:6, 64:18, 88:17, 89:11, 89:20, 89:25, 95:21, 96:4, 99:7, 99:10, 137:20, 137:25, 138:3, 139:18, 139:20, 140:4, 140:11, 140:14, 140:19, 140:24, 141:5, 141:10, 142:2, 144:2, 144:13, 144:15, 144:20, 144:22, 145:2, 145:3, 145:7, 145:10, 145:13, 145:16, 145:19, 147:1, 155:20, 155:24, 156:15, 156:18, 166:12, 166:16
**radar** [1] - 33:21
**rails** [1] - 39:10
**raise** [5] - 9:25, 63:17, 82:24, 83:3, 161:13
**raised** [6] - 9:11, 62:25, 158:2, 158:4, 160:8, 161:15
**raising** [1] - 128:2
**ran** [2] - 67:12, 67:15
**RANDLE** [1] - 2:2
**range** [2] - 37:18, 79:15
**ranks** [2] - 60:19, 109:12
**rare** [1] - 29:3
**rarified** [1] - 24:16
**rated** [1] - 27:24
**rather** [4] - 4:16, 126:4, 141:18, 150:6
**re** [3] - 80:23, 83:25, 151:24
**re-examine** [1] - 151:24
**re-geared** [1] - 80:23
**re-organization** [1] - 83:25
**reach** [2] - 46:19, 163:12
**reached** [2] - 154:14, 165:13
**reaches** [1] - 162:23
**reaching** [2] - 132:11, 151:18
**read** [20] - 4:11, 24:19, 53:18, 85:12, 120:7, 131:4, 135:18, 137:14, 153:22, 163:25, 167:5, 167:9, 167:11, 167:14, 167:17, 167:20, 167:23, 168:1, 168:4, 168:7
**reading** [3] - 14:21, 79:6, 119:5
**readings** [2] - 19:10, 21:8
**reads** [2] - 4:24, 5:24
**ready** [7] - 11:8, 12:20, 42:20, 58:20, 74:22, 101:10, 154:2
**real** [2] - 88:20, 128:21
**reality** [4] - 14:7, 49:16, 95:17, 95:18
**realized** [3] - 10:1, 54:10, 115:4
**really** [40] - 14:1, 21:17, 32:3, 33:24, 36:23, 42:13, 42:24, 52:6, 52:15, 52:20, 52:22, 52:23, 55:23, 60:5, 60:6, 62:7, 63:19, 68:12, 72:1, 74:24, 76:25, 77:11, 77:24, 84:4, 85:2, 93:4, 103:7, 103:17, 103:22, 103:23, 109:18, 116:14, 125:4, 128:9, 128:11
**reason** [11] - 8:17, 38:22, 114:25, 115:25, 134:1, 135:21, 142:4, 142:9, 142:10, 153:16
**reasonable** [3] - 131:21, 131:23, 134:20
**reasonably** [1] - 52:25
**reasons** [9] - 32:21, 39:8, 55:25, 80:16, 142:6, 142:16, 158:9, 158:12, 158:24
**reboot** [1] - 82:10
**rebuttal** [1] - 119:15
**recalled** [1] - 8:7
**receive** [1] - 78:1
**received** [17] - 38:17, 43:2, 66:1, 66:2, 66:3, 66:4, 66:5, 67:23, 104:13, 132:7, 132:12, 133:7, 133:12, 136:15, 153:23, 163:8, 163:23
**receives** [2] - 78:5, 95:14
**recently** [1] - 68:12
**recess** [6] - 12:5, 58:12, 58:19, 100:24, 162:20, 163:3
**reckless** [4] - 148:21, 148:23, 149:1, 149:18
**recognize** [1] - 99:21
**recognizes** [1] - 72:24
**recognizing** [1] - 73:3
**recollection** [2] - 67:22, 136:13
**recommends** [1] - 73:2
**reconcile** [2] - 15:21, 15:23
**record** [10] - 36:5, 36:11, 107:9, 158:5, 159:4, 162:6, 163:7, 163:24, 164:1, 164:11
**recorded** [1] - 135:19
**records** [4] - 35:4, 35:23, 35:24, 113:1
**recovering** [1] - 160:11
**recovery** [1] - 162:3
**recruiter** [18] - 41:25, 43:4, 61:10, 62:12, 66:25, 67:13, 68:1, 68:4, 69:13, 69:15, 70:8, 71:10, 75:5, 93:5, 94:6, 96:13, 97:5
**recruiters** [1] - 71:11
**recruiting** [9] - 70:12, 70:19, 73:5, 73:7, 77:1, 77:5, 78:17, 79:14, 84:12
**red** [5] - 31:11, 81:12, 84:8, 84:16, 86:10
**redesignated** [1] - 23:16
**reduce** [1] - 88:25
**reduced** [1] - 82:8
**reduction** [6] - 49:24, 59:18, 66:1, 66:2, 80:4, 96:7
**refer** [3] - 70:5, 148:23, 164:16
**reference** [1] - 159:15
**references** [2] - 85:16, 159:11
**referred** [2] - 11:21, 146:4
**referring** [2] - 122:1, 160:1
**refers** [5] - 5:25, 78:16, 121:24, 143:7, 143:9
**reflect** [5] - 61:23, 63:21, 93:16, 136:10, 136:19
**reflects** [2] - 59:6, 76:20
**refuse** [1] - 139:25
**refute** [1] - 30:15
**refutes** [1] - 88:15
**regard** [4] - 9:1, 10:1, 106:13, 110:17

**regarding** [12] - 69:20, 112:21, 121:2, 139:3, 147:9, 157:3, 158:13, 159:6, 159:14, 160:9, 161:13, 164:17
**regardless** [5] - 64:6, 87:22, 87:23, 132:6, 162:23
**regards** [4] - 105:2, 155:15, 155:19, 156:14
**Regensburg** [3] - 109:1, 121:6, 122:22
**regular** [1] - 63:9
**regulations** [1] - 19:7
**reiterate** [1] - 158:16
**rejects** [1] - 89:22
**related** [1] - 18:6
**relations** [5] - 49:20, 56:7, 72:23, 107:22, 138:24
**relationship** [1] - 49:10
**released** [1] - 168:11
**relevant** [2] - 139:4, 150:12
**reliable** [1] - 19:24
**relied** [1] - 8:11
**relief** [1] - 160:23
**religion** [2] - 140:4, 140:11
**rely** [1] - 11:20
**relying** [2] - 7:13, 116:22
**remain** [3] - 58:7, 100:16, 157:20
**remaining** [1] - 164:20
**remarked** [1] - 14:20
**remember** [54] - 13:13, 16:17, 21:25, 23:17, 27:17, 31:8, 35:22, 36:16, 45:10, 47:19, 58:4, 62:14, 66:7, 67:8, 67:16, 76:4, 79:1, 79:22, 80:9, 80:12, 83:11, 83:18, 84:8, 86:4, 88:1, 89:13, 90:13, 91:4, 92:7, 92:18, 100:11, 102:6, 103:10, 106:7, 107:22, 110:19, 111:1, 114:7, 115:9, 115:10, 115:16, 115:24, 116:19, 119:21, 120:17, 123:6, 123:13, 127:9, 132:21, 136:16, 137:13, 151:14, 152:5, 154:12
**remembers** [1] - 26:11
**remind** [2] - 85:8, 90:3
**reminder** [1] - 113:18
**removal** [3] - 6:10, 18:7, 18:8
**remove** [4] - 5:1, 6:3, 123:25, 143:18
**removed** [5] - 78:12, 78:18, 80:23, 106:23, 114:8
**removing** [1] - 7:4
**render** [1] - 95:16
**reorganization** [7] - 61:15, 61:18, 64:22, 65:8, 76:15, 76:17, 115:3
**reorganizations** [1] - 61:17
**replace** [5] - 5:3, 6:5, 36:20, 88:25, 143:19
**replaced** [5] - 99:24, 114:9, 122:12, 122:14, 122:17
**reply** [3] - 57:21, 90:12, 123:18
**REPLY** [1] - 3:5
**report** [2] - 79:12, 107:3
**reported** [1] - 104:14
**REPORTER** [3] - 2:6, 2:6, 170:5
**reports** [1] - 36:14
**represent** [5] - 103:8, 103:9, 103:14, 103:15
**representatives** [1] - 169:11
**represented** [1] - 162:24
**representing** [2] - 99:15, 99:18
**represents** [1] - 104:24
**request** [4] - 47:20, 50:4, 161:9, 161:16
**REQUESTED** [1] - 170:3
**requesting** [4] - 47:24, 50:14, 50:15
**required** [5] - 10:20, 28:3, 104:7, 141:25, 145:19
**requires** [4] - 25:22, 129:9, 129:18, 131:22
**requisite** [1] - 148:19
**research** [4] - 58:5, 100:13, 152:20, 154:25
**reserved** [1] - 161:12
**resign** [2] - 42:15, 77:16
**resignation** [9] - 42:13, 65:15, 65:20, 68:9, 75:14, 77:16, 78:1, 89:1, 96:14
**resigned** [11] - 21:25, 42:19, 59:3, 59:21, 64:13, 66:19, 67:11, 82:9, 96:8, 111:2, 124:15
**resolute** [1] - 84:5
**resolve** [2] - 11:4, 162:4
**resolved** [1] - 12:11
**Resource** [1] - 19:12
**Resources** [10] - 59:24, 60:17, 61:1, 64:23, 64:25, 65:11, 78:7, 97:3, 104:11, 111:22
**resources** [2] - 112:19, 150:25
**respect** [5] - 11:4, 140:2, 145:23, 159:19, 160:7
**respectfully** [3] - 7:6, 8:17, 158:10
**respond** [3] - 59:9, 97:18, 113:16
**responded** [1] - 167:1
**response** [4] - 8:21, 11:11, 164:9, 164:13
**response)** [1] - 83:19
**responses** [1] - 164:11
**responsibilities** [1] - 27:9
**responsibility** [2] - 110:5, 128:15
**responsible** [4] - 79:14, 94:5, 95:5, 111:7
**restate** [1] - 7:9
**restrictions** [1] - 152:22
**result** [5] - 40:13, 73:10, 143:3, 162:2, 162:23
**resulted** [1] - 148:4
**resume** [1] - 73:6
**resumed** [1] - 165:5
**retire** [2] - 151:4, 157:15
**retired** [1] - 62:17
**retiring** [1] - 97:9
**return** [5] - 54:24, 100:7, 131:7, 151:15, 154:2
**returning** [1] - 152:3
**reveal** [1] - 85:1
**reveals** [1] - 100:5
**reverse** [1] - 71:10
**review** [1] - 34:17
**reviews** [5] - 19:5, 20:1, 42:8, 53:18, 114:25
**revised** [2] - 4:11, 73:17
**ridiculous** [1] - 39:7
**rigamarole** [1] - 42:12
**right-hand** [2] - 31:18, 33:2
**rights** [2] - 143:13, 148:22
**Rights** [2] - 122:5, 137:23
**rise** [4] - 37:17, 37:19, 89:3, 100:23
**risk** [1] - 149:3
**River** [1] - 19:3
**road** [1] - 89:19
**Robert** [4] - 74:17, 81:20, 82:13
**role** [15] - 15:11, 15:12, 19:23, 62:18, 63:6, 77:21, 79:13, 79:19, 80:23, 82:7, 82:12, 84:9, 103:7, 115:5, 123:11
**roles** [2] - 79:18, 127:18
**roll** [1] - 76:7
**rolling** [1] - 72:25
**Rolling** [1] - 92:24
**room** [13] - 15:1, 69:6, 101:5, 102:24, 105:1, 105:24, 136:8, 151:4, 151:11, 153:19, 157:15, 163:15, 164:24
**rose** [1] - 109:12
**rotate** [1] - 86:25
**rotation** [1] - 84:10
**roughly** [2] - 11:25, 12:1
**row** [7] - 32:5, 32:7, 32:11, 32:18, 41:21, 56:23, 127:21
**rower** [1] - 83:5
**Rozelsky** [8] - 92:7, 98:15, 98:16, 98:18, 98:19, 123:23, 127:13, 127:25
**ROZELSKY** [15] - 1:21, 3:4, 9:7, 11:13, 11:24, 12:8, 58:13, 58:18, 100:22, 101:11, 158:22, 162:17, 163:19, 165:3, 168:15
**RPR** [2] - 2:6, 170:13
**rule** [11] - 30:12, 40:4, 40:9, 40:10, 40:11, 50:6, 87:17, 88:13, 127:8, 127:9
**Rule** [1] - 9:2
**ruled** [1] - 8:14
**Rules** [1] - 133:2
**rules** [7] - 40:12, 106:5, 130:12, 130:14, 130:16, 130:20, 137:16
**ruling** [1] - 133:3
**run** [2] - 77:6, 123:22
**runaway** [3] - 26:2, 30:23, 37:3
**running** [1] - 112:5
**Rutgers** [1] - 98:7

## S

**s/Debra** [1] - 170:13
**sacrifices** [1] - 14:14
**safe** [1] - 169:5
**safety** [2] - 77:2
**salad** [2] - 17:21, 17:22
**salads** [1] - 33:25
**salary** [3] - 25:4, 63:9, 66:12
**SAP** [7] - 35:4, 35:23, 36:5, 36:11, 110:21, 116:12, 126:23
**Sara** [1] - 75:7
**sat** [7] - 35:17, 41:23, 50:9, 91:19, 97:19, 119:22, 131:20
**satisfaction** [1] - 94:3
**satisfy** [1] - 141:25
**Savannah** [1] - 19:3
**saw** [27] - 15:4, 17:2, 17:18, 17:25, 23:6, 24:23, 25:24, 27:20, 29:5, 29:16, 35:11, 48:1, 48:4, 49:3, 71:5, 76:24, 79:18, 88:1, 89:4, 102:14, 102:22, 106:3, 107:15, 110:6, 114:12, 114:24, 115:13

**SC** [5] - 1:3, 1:18, 1:22, 2:5, 2:7
**scale** [1] - 25:22
**scales** [2] - 131:17
**schedule** [1] - 161:11
**scheduling** [1] - 169:20
**scheme** [1] - 33:3
**scheming** [1] - 126:25
**school** [1] - 43:22
**School** [1] - 89:24
**scooch** [1] - 101:24
**scope** [2] - 149:8, 160:23
**Scott** [8] - 22:24, 23:5, 66:17, 73:20, 79:20, 81:6, 92:3, 99:4
**Scout** [2] - 90:3, 90:4
**scrambled** [1] - 68:14
**scratching** [1] - 71:9
**screen** [13] - 14:21, 17:6, 34:6, 41:16, 43:10, 46:6, 51:1, 51:21, 51:24, 58:16, 69:8, 70:6, 98:12
**screens** [2] - 35:25, 69:25
**screwed** [5] - 42:3, 42:4, 42:25, 45:9, 47:7
**search** [1] - 69:20
**seat** [2] - 101:19, 157:20
**seated** [2] - 58:7, 100:17
**seats** [1] - 39:11
**second** [18] - 4:9, 6:13, 18:7, 20:14, 28:11, 30:22, 31:25, 34:11, 42:19, 64:9, 83:13, 83:18, 98:17, 115:11, 138:1, 140:15, 158:10, 169:15
**secondly** [3] - 96:4, 103:19, 130:13
**secret** [2] - 81:25, 102:13
**section** [6] - 140:12, 140:15, 157:3, 160:17, 160:21, 164:16
**Section** [27] - 10:3, 10:5, 10:11, 10:15, 10:18, 138:2, 138:5, 138:8, 138:13, 139:21, 139:23, 144:21, 144:24, 145:4, 145:9, 147:20, 148:4, 148:15, 148:18, 149:16, 155:24, 156:19, 160:11, 160:24, 161:8, 166:16
**see** [48] - 14:10, 14:20, 15:6, 18:13, 22:19, 25:5, 25:24, 29:3, 29:5, 34:16, 35:9, 35:25, 43:18, 44:8, 49:14, 49:15, 51:3, 51:4, 55:4, 57:17, 62:7, 68:25, 70:4, 71:19, 73:23, 74:1, 74:3, 74:21, 76:14, 76:19, 78:6, 81:6, 81:9, 81:10, 83:14, 90:13, 90:21, 91:1, 91:3, 93:4, 97:13, 101:7, 110:24, 111:23, 121:10, 125:13, 134:11
**seek** [1] - 152:7
**seeking** [1] - 148:17
**seem** [1] - 60:4
**segregate** [2] - 28:18, 140:6
**segregation** [1] - 28:16
**seize** [1] - 112:18
**select** [1] - 151:6
**selected** [2] - 82:4, 88:14
**selection** [1] - 108:16
**self** [4] - 78:15, 84:21, 115:21, 128:4
**self-defense** [1] - 128:4
**self-serving** [2] - 78:15, 115:21
**send** [7] - 11:7, 50:20, 68:18, 95:12, 116:6, 154:4, 162:10
**sending** [3] - 76:20, 88:12, 93:5
**sends** [3] - 40:15, 70:8, 71:4
**senior** [4] - 31:21, 60:25, 63:10, 86:5
**sense** [6] - 61:23, 62:3, 62:10, 64:1, 89:12, 134:2
**sent** [4] - 36:18, 65:21, 68:20, 163:25
**sentence** [4] - 4:9, 4:10, 5:24, 6:9
**separate** [8] - 11:6, 24:21, 107:4, 112:25, 113:1, 128:10, 138:19, 161:7
**separated** [2] - 160:9, 161:20
**separately** [2] - 112:25, 148:11
**separating** [3] - 128:16, 161:17, 162:1
**September** [19] - 46:8, 61:9, 67:19, 67:24, 67:25, 69:12, 69:16, 69:18, 70:7, 71:2, 71:3, 71:6, 71:7, 71:15, 71:21, 72:5, 78:14, 93:5, 115:12
**series** [2] - 56:1, 117:17
**serious** [1] - 5:22
**serve** [2] - 87:9, 151:5
**served** [2] - 41:3, 149:6
**serves** [1] - 87:4
**service** [7] - 68:13, 152:18, 154:20, 154:21, 168:19, 168:20, 168:21
**serving** [2] - 78:15, 115:21
**session** [1] - 133:11
**set** [7] - 10:19, 29:3, 33:4, 45:11, 111:5, 161:11
**set-aside** [1] - 33:4
**seven** [9] - 64:7, 64:12, 64:15, 68:16, 84:3, 91:15, 96:10, 104:19, 156:10
**several** [2] - 67:2, 103:11
**sex** [27] - 28:12, 37:5, 56:15, 56:20, 64:18, 88:17, 95:21, 96:4, 99:3, 137:19, 137:25, 139:18, 140:4, 140:11, 140:14, 140:19, 140:24, 141:5, 141:11, 142:2, 144:1, 144:4, 144:6, 147:1, 155:16, 156:10, 166:8
**shall** [3] - 146:7, 160:21, 161:4
**shame** [2] - 40:22, 40:24
**share** [4] - 107:15, 111:6, 153:18, 169:12
**shared** [2] - 107:17, 112:19
**sharing** [1] - 107:19
**sheet** [4] - 24:2, 73:11, 86:7, 99:15
**sheets** [4] - 12:11, 12:13, 28:2, 126:15
**Sherrill** [3] - 43:4, 69:13, 74:8
**Sherry** [11] - 32:14, 61:11, 63:25, 70:25, 71:3, 72:9, 79:17, 82:5, 90:9, 91:12, 94:25
**shift** [4] - 35:19, 42:17, 120:25, 121:2
**shoot** [1] - 128:3
**shop** [2] - 50:3, 82:2
**short** [7] - 12:9, 18:23, 37:22, 58:3, 58:19, 68:24, 72:13
**shorthand** [1] - 103:12
**show** [25] - 10:19, 20:6, 24:3, 35:7, 41:7, 47:9, 47:10, 49:18, 56:21, 56:24, 56:25, 90:14, 95:25, 104:23, 104:25, 106:4, 119:15, 121:19, 126:15, 126:23, 141:11, 141:14, 143:1, 145:13
**showed** [17] - 17:21, 31:22, 33:21, 41:20, 42:22, 46:23, 47:1, 47:10, 48:8, 48:17, 48:22, 87:20, 110:23, 115:14, 120:13, 121:16, 136:4
**showing** [4] - 70:6, 73:22, 105:16, 126:16
**shown** [7] - 60:9, 73:17, 74:4, 115:9, 115:11, 136:10, 136:19
**shows** [14] - 4:25, 5:7, 6:2, 13:16, 35:1, 35:2, 46:14, 47:13, 110:23, 113:8, 123:24, 124:6, 143:17, 143:22
**SHRM** [4] - 19:11, 120:14, 121:8, 122:14
**shut** [1] - 39:7
**sic** [1] - 108:10
**side** [9] - 4:9, 14:25, 33:2, 79:2, 90:13, 131:18, 135:10, 135:11, 135:14
**side's** [1] - 16:7
**sides** [5] - 11:21, 128:7, 128:8, 128:9, 131:16
**Siemens** [1] - 32:12
**sign** [2] - 87:7, 153:25
**sign-ups** [1] - 87:7
**signature** [2] - 63:14, 65:20
**signed** [6] - 154:6, 154:8, 163:10, 164:7, 164:8, 166:23
**significant** [2] - 55:19, 66:17
**signing** [1] - 156:24
**silent** [1] - 46:22
**similar** [3] - 137:3, 150:18, 150:20
**simple** [7] - 32:9, 56:12, 59:17, 62:8, 98:1, 128:18, 128:21
**simply** [3] - 62:2, 90:6, 104:3
**Sinanian** [2] - 33:3, 73:20
**single** [17] - 10:6, 13:21, 17:17, 66:10, 105:22, 110:18, 111:13, 111:24, 112:7, 112:21, 119:15, 124:8, 131:3, 138:12, 139:2, 147:3, 159:25
**sink** [1] - 17:18
**sit** [7] - 12:4, 14:15, 17:16, 32:15, 47:22, 113:13, 127:21
**site** [1] - 63:5
**Site** [1] - 19:3
**sits** [3] - 48:2, 63:3, 63:4
**sitting** [4] - 25:7, 55:7, 59:5, 101:18
**six** [16] - 19:4, 26:9, 59:6, 64:19, 70:14, 94:22, 101:17, 101:20, 113:8, 113:9, 134:22, 155:3, 155:9, 156:3, 156:6, 157:2
**sketched** [1] - 48:17
**skip** [3] - 96:1, 155:8, 156:4
**sleep** [1] - 53:19
**sleeping** [1] - 95:7
**sleeves** [1] - 72:25
**slide** [12] - 48:17, 48:22, 48:23, 48:25, 71:2, 74:4, 76:23, 119:15, 123:24, 124:1, 124:7

**slides** [3] - 29:6, 68:24, 76:21
**slight** [1] - 117:19
**slightly** [2] - 57:6, 131:18
**slot** [4] - 31:6, 118:19, 119:16, 119:17
**slow** [3] - 97:5, 97:7, 97:11
**small** [1] - 135:6
**smaller** [1] - 135:13
**smart** [2] - 44:5, 153:4
**smoke** [7] - 34:6, 41:15, 43:10, 46:6, 51:1, 51:21, 51:23
**smooth** [1] - 17:13
**snafu** [1] - 101:4
**SnapChat** [1] - 152:20
**snapshot** [1] - 70:20
**snippet** [1] - 110:6
**snippets** [1] - 79:3
**social** [3] - 152:19, 153:1, 153:5
**sold** [1] - 47:9
**sole** [4] - 56:22, 85:11, 145:20, 152:7
**solely** [6] - 41:1, 130:24, 133:12, 152:2, 152:24, 153:14
**someone** [15] - 12:15, 16:6, 17:23, 17:24, 60:11, 60:17, 60:18, 60:19, 63:8, 63:25, 82:16, 82:17, 88:17, 98:4, 120:9
**sometimes** [6] - 32:4, 52:22, 87:15, 93:1, 106:10, 135:2
**somewhere** [3] - 30:25, 53:22, 109:10
**son** [1] - 83:20
**song** [1] - 92:23
**songs** [1] - 129:4
**sooner** [1] - 75:10
**sorry** [2] - 17:5, 98:12
**sought** [2] - 96:13, 96:14
**sound** [3] - 51:14, 82:14, 82:16
**sounds** [2] - 7:21, 14:7
**sour** [1] - 60:14
**sources** [1] - 152:13
**SOUTH** [3] - 1:1, 2:4, 2:7
**South** [7] - 19:3, 19:7, 54:19, 81:24, 93:20, 104:6, 107:6
**Spartanburg** [13] - 29:12, 65:19, 69:10, 72:7, 77:14, 81:21, 86:8, 87:24, 88:9, 99:20, 104:6, 115:6, 120:23
**SPARTANBURG** [1] - 1:2
**speaking** [1] - 34:15
**speaks** [1] - 54:11
**specialist** [3] - 118:6, 120:3, 121:7
**specialists** [3] - 118:2, 120:2, 146:10
**specific** [5] - 9:12, 25:14, 137:16, 137:17, 164:14
**specifically** [3] - 4:8, 20:20, 29:1
**speculation** [6] - 45:3, 45:5, 71:20, 92:16, 96:10, 148:7
**speculative** [11] - 4:19, 21:20, 45:13, 45:14, 47:9, 68:7, 79:9, 79:11, 95:25, 126:7, 141:20
**SPENCER** [1] - 1:21
**spending** [2] - 43:7, 71:13
**spent** [6] - 8:3, 35:15, 47:16, 60:17, 60:19, 122:21
**spirit** [1] - 93:16
**spontaneous** [1] - 82:22
**spot** [1] - 106:25
**squarely** [1] - 21:15
**staff** [1] - 39:25
**stage** [1] - 13:9
**stale** [1] - 87:14
**stamp** [1] - 86:1
**stand** [13] - 15:14, 16:17, 51:6, 89:19, 104:4, 108:7, 110:20, 114:14, 115:2, 116:18, 127:15, 135:22, 137:7
**standard** [7] - 55:13, 57:6, 131:22, 131:24, 141:23, 142:1, 145:2
**standards** [1] - 111:5
**standing** [7] - 45:22, 93:21, 94:17, 94:19, 94:20, 137:1, 147:20
**standpoint** [1] - 163:2
**stands** [2] - 103:13, 154:13
**start** [13] - 16:13, 50:4, 56:11, 57:9, 65:24, 74:2, 75:8, 75:10, 75:18, 101:12, 128:16, 151:10, 153:3
**started** [8] - 17:3, 17:15, 18:15, 18:17, 35:9, 43:8, 124:16, 125:13
**starting** [4] - 4:23, 39:11, 77:25, 128:10
**starts** [5] - 44:3, 44:6, 71:24, 77:13, 78:2
**state** [3] - 80:24, 130:14, 148:19
**statement** [1] - 8:25
**statements** [5] - 66:21, 123:13, 132:16, 132:18, 148:1
**states** [1] - 160:6
**States** [10] - 54:21, 83:11, 93:19, 117:15, 117:16, 118:4, 138:1, 139:23, 146:5, 146:13
**STATES** [3] - 1:1, 1:14, 2:6
**stations** [1] - 137:3
**statistics** [2] - 32:8, 123:3
**statues** [1] - 144:23
**status** [1] - 140:10
**statute** [3] - 160:12, 161:2, 161:4
**statutes** [2] - 56:16, 103:24
**statutory** [1] - 9:12
**stay** [4] - 11:3, 44:9, 62:16, 72:12
**stayed** [3] - 41:9, 66:13, 85:3
**stays** [2] - 75:20, 101:14
**steady** [1] - 84:5
**Steering** [1] - 120:20
**steering** [2] - 19:23, 121:3
**stenographic** [1] - 170:7
**STENOTYPE/ COMPUTER** [1] - 2:9
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:9
**step** [1] - 96:2
**Stephan** [4] - 36:15, 36:20, 85:10, 119:4
**STEPHENSON** [1] - 1:17
**steps** [2] - 85:2, 150:9
**Steven** [1] - 36:17
**stick** [1] - 82:20
**sticking** [2] - 25:19, 26:15
**still** [15] - 5:21, 8:13, 20:3, 29:15, 42:14, 42:15, 42:21, 48:19, 81:7, 104:19, 108:10, 111:6, 123:16, 125:5, 129:11
**stipulate** [1] - 132:8
**Stones** [1] - 92:24
**stood** [4] - 6:22, 46:17, 67:8, 116:17
**stop** [4] - 18:23, 53:3, 96:2, 99:14
**stopped** [1] - 96:2
**stories** [2] - 15:15, 15:23
**story** [10] - 26:10, 26:16, 35:14, 35:15, 36:8, 36:9, 50:12, 59:11, 87:2, 92:14
**straight** [2] - 12:4, 30:20
**strange** [1] - 34:12
**strategic** [1] - 107:24
**strategy** [1] - 19:22
**STREET** [3] - 1:18, 2:4, 2:7
**strengths** [1] - 73:3
**stress** [2] - 75:21, 94:3
**stricken** [1] - 133:5
**stricter** [1] - 131:22
**stronger** [1] - 39:4
**struck** [1] - 34:16
**structure** [3] - 107:22, 108:1, 115:4
**struggle** [1] - 109:22
**struggled** [1] - 94:8
**stuck** [1] - 30:24
**stuff** [8] - 22:13, 32:23, 41:25, 46:5, 81:12, 81:25, 84:16, 91:14
**subject** [1] - 120:2
**subjective** [1] - 94:11
**submit** [4] - 10:21, 86:13, 106:1
**submits** [1] - 77:16
**submitted** [1] - 161:10
**subpoena** [2] - 67:17, 90:5
**subsidiaries** [1] - 107:5
**subsidiary** [3] - 105:13, 138:11, 138:16
**subsidiary's** [1] - 111:7
**success** [1] - 19:20
**succession** [8] - 20:11, 32:25, 33:14, 48:4, 48:7, 65:1, 84:7, 107:25
**successor** [2] - 61:12, 80:20
**sudden** [3] - 33:19, 35:13, 67:12
**sue** [2] - 47:16, 93:10
**sued** [2] - 47:15, 123:15
**suffer** [1] - 79:4
**suffered** [10] - 95:22, 141:13, 141:14, 143:1, 143:2, 144:8, 144:9, 144:16, 144:17, 147:25
**suffering** [2] - 147:18, 160:18
**sufficiently** [1] - 147:24
**sugar** [1] - 101:13
**suggest** [1] - 50:25
**suggested** [1] - 58:15
**suggesting** [1] - 17:3
**suggestion** [3] - 9:16, 16:2, 131:6
**SUITE** [1] - 2:4
**sum** [1] - 160:15
**summaries** [5] - 136:5, 136:7, 136:12, 136:14, 136:17
**summarize** [1] - 78:11
**summarized** [1] - 71:1
**summary** [2] - 9:21, 136:3
**summer** [1] - 68:4
**supervised** [2] - 104:10, 104:14
**supervisors** [1] - 149:24
**support** [5] - 6:19, 7:2, 7:10, 64:9, 147:21
**supported** [1] - 100:1
**supports** [1] - 136:18
**supposedly** [1] - 40:5
**surprise** [3] - 34:14,

36:6, 50:23
**surprised** [1] - 82:9
**surrender** [1] - 152:1
**suspect** [2] - 52:25, 114:20
**suspicion** [1] - 96:9
**sustain** [1] - 65:4
**switched** [1] - 23:15
**sworn** [4] - 27:3, 132:4, 135:19, 151:12
**sympathy** [1] - 130:23
**symptoms** [2] - 75:21, 95:10
**system** [4] - 29:18, 107:6, 120:22, 168:23

**T**

**T-Vorholt** [2] - 47:20, 50:4
**table** [1] - 101:6
**tablet** [1] - 152:17
**tablets** [1] - 153:4
**tactics** [1] - 42:5
**talent** [8] - 42:10, 53:1, 87:9, 87:11, 88:7, 88:10, 88:11
**talents** [1] - 73:4
**talks** [3] - 79:7, 98:14, 102:19
**targets** [2] - 74:18, 101:22
**task** [1] - 112:23
**taste** [1] - 14:1
**team** [19] - 45:11, 64:7, 64:12, 65:11, 68:21, 76:3, 76:9, 76:15, 82:18, 83:5, 92:8, 92:9, 108:13, 111:3, 119:5, 120:1, 125:8
**teamwork** [1] - 83:7
**tech** [1] - 163:14
**technical** [7] - 117:25, 118:6, 119:21, 119:23, 120:3, 121:7, 146:9
**technologies** [2] - 60:24, 81:4
**technology** [1] - 40:24
**telephone** [1] - 154:19
**temporary** [2] - 18:23, 53:3
**ten** [13] - 15:17, 28:2, 41:10, 54:23, 55:7, 57:16, 58:11, 58:17, 100:10, 100:20, 123:20, 129:16, 129:18
**ten-minute** [2] - 100:10, 100:20
**tend** [1] - 140:8
**tension** [1] - 34:19
**term** [13] - 4:21, 79:10, 79:19, 126:9, 138:4, 141:7, 141:15, 141:21, 143:3, 144:10, 144:18, 148:22, 159:10
**termination** [2] - 65:15, 96:12
**terms** [8] - 6:1, 10:12, 15:10, 54:14, 80:6, 130:4, 140:2, 159:9
**territories** [2] - 117:23, 146:8
**test** [9] - 48:14, 49:2, 95:9, 106:3, 113:4, 138:10, 138:14, 139:3, 146:1
**testified** [21] - 26:25, 30:15, 43:10, 43:15, 48:19, 62:11, 62:16, 64:21, 67:19, 67:22, 78:4, 82:4, 84:5, 89:15, 89:16, 89:18, 112:24, 120:23, 124:4, 128:25, 134:12
**testify** [4] - 32:2, 52:14, 120:16, 135:22
**testifying** [3] - 49:5, 134:16, 135:11
**testimony** [62] - 8:5, 9:12, 9:13, 20:24, 21:2, 21:4, 21:6, 21:9, 22:9, 27:3, 29:20, 29:21, 29:23, 30:9, 30:25, 33:24, 34:10, 34:13, 35:23, 59:7, 59:25, 60:4, 62:10, 62:20, 66:24, 74:10, 79:1, 80:14, 81:17, 84:14, 84:22, 92:18, 106:18, 106:21, 106:25, 107:1, 107:2, 109:5, 114:3, 114:16, 115:7, 120:7, 132:4, 132:12, 133:4, 133:7, 133:16, 134:6, 134:8, 134:20, 134:22, 134:24, 135:8, 135:13, 135:18, 135:21, 135:24, 136:1, 136:16, 147:20, 164:15
**text** [3] - 40:15, 152:18, 154:20
**THE** [83] - 1:1, 1:1, 1:13, 1:17, 1:19, 3:6, 4:4, 8:18, 9:23, 10:19, 10:24, 11:2, 11:15, 12:7, 12:9, 12:15, 12:18, 12:22, 13:4, 13:8, 17:5, 17:11, 58:2, 58:11, 58:16, 58:20, 58:22, 58:25, 85:23, 100:10, 100:20, 100:23, 100:25, 101:3, 123:18, 123:20, 129:23, 157:24, 158:6, 158:15, 158:21, 158:24, 162:19, 163:7, 163:20, 163:23, 165:4, 165:8, 165:12, 165:14, 165:15, 165:16, 165:17, 165:19, 165:20, 165:21, 167:3, 167:5, 167:7, 167:8, 167:10, 167:11, 167:13, 167:14, 167:16, 167:17, 167:19, 167:20, 167:22, 167:23, 167:25, 168:1, 168:3, 168:4, 168:6, 168:7, 168:9, 168:10, 168:16, 169:8, 169:10, 169:19, 169:24
**theirs** [1] - 31:25
**themselves** [5] - 49:16, 49:17, 49:18, 128:10, 136:9
**theories** [1] - 29:6
**therapist** [2] - 75:23, 95:5
**therefore** [9] - 8:15, 108:11, 128:1, 131:25, 135:3, 136:21, 138:7, 141:2, 156:2
**thinking** [4] - 11:18, 35:6, 68:3, 109:4
**third** [4] - 28:12, 83:13, 130:15, 139:3
**thirty** [2] - 58:17, 102:9
**thoughts** [2] - 13:15, 68:3
**thousand** [1] - 24:6
**thousands** [1] - 82:3
**three** [73] - 9:20, 20:15, 20:23, 21:2, 21:18, 22:7, 22:22, 23:3, 23:6, 23:10, 23:11, 23:16, 23:20, 23:21, 23:24, 23:25, 24:2, 24:3, 24:18, 28:10, 31:14, 35:2, 35:7, 36:2, 37:10, 37:11, 37:12, 37:14, 37:24, 37:25, 39:19, 50:2, 59:4, 64:3, 68:13, 73:12, 80:1, 88:6, 90:22, 91:2, 91:4, 91:6, 91:7, 91:10, 93:11, 101:20, 103:23, 109:6, 109:8, 109:9, 110:9, 110:10, 110:11, 110:12, 112:11, 112:15, 115:4, 116:24, 118:24, 124:14, 126:15, 126:16, 126:17, 126:22, 130:11, 132:7, 133:4, 134:15, 149:7, 150:19, 155:15
**three-and-a-half** [1] - 9:20
**threes** [3] - 22:16, 23:23, 90:15
**threw** [2] - 53:20, 126:17
**throughout** [1] - 152:9
**throw** [1] - 7:3
**throwing** [1] - 7:19
**thrown** [1] - 14:11
**throws** [1] - 14:4
**Thweatt** [1] - 13:20
**tied** [1] - 41:7
**timely** [1] - 169:18
**timer** [1] - 13:1
**timing** [3] - 23:14, 44:11, 77:24
**TIMOTHY** [1] - 1:13
**Timothy** [1] - 164:21
**tip** [1] - 131:17
**tired** [1] - 53:20
**Title** [48] - 9:12, 10:3, 10:4, 10:10, 30:2, 56:19, 98:25, 99:3, 137:22, 137:24, 138:5, 138:8, 138:13, 139:19, 139:22, 139:23, 140:22, 141:3, 141:8, 142:13, 142:18, 142:21, 143:5, 144:2, 144:5, 144:12, 144:23, 144:24, 145:4, 145:6, 146:22, 146:23, 147:19, 148:4, 148:14, 148:18, 149:15, 155:12, 155:16, 156:15, 160:10, 160:12, 161:1, 161:7, 161:25, 166:5, 166:8, 166:12
**title** [3] - 78:8, 93:9, 94:15
**titles** [1] - 93:8
**TO** [1] - 3:6
**today** [5] - 32:12, 103:9, 123:5, 160:8, 169:8
**today's** [1] - 164:1
**toe** [1] - 21:13
**together** [9] - 15:9, 25:3, 83:4, 83:8, 86:13, 86:14, 86:17, 100:14, 106:17
**took** [11] - 4:5, 23:21, 28:24, 53:2, 53:22, 89:19, 126:14, 130:25, 142:8, 159:22
**Tool** [1] - 83:21
**top** [16] - 4:23, 18:20, 27:21, 31:18, 65:4, 65:6, 78:3, 81:25, 83:15, 84:17, 85:4, 86:15, 90:4, 96:13, 164:19
**topics** [1] - 120:25
**total** [1] - 41:9
**Total** [1] - 120:18
**totally** [1] - 101:4
**touch** [1] - 49:6
**touched** [1] - 124:2
**toughest** [2] - 13:19, 13:24
**touted** [1] - 159:24
**towards** [1] - 110:1
**traced** [1] - 40:17
**track** [5] - 27:12, 94:17, 94:19, 94:20, 94:21
**tracks** [1] - 45:23
**train** [5] - 45:22, 45:23, 46:1, 94:18, 94:19
**trainings** [1] - 150:3
**TRANSCRIPT** [1] - 170:3
**transcript** [1] - 170:7
**TRANSCRIPTION** [1] - 2:9
**translation** [1] - 82:19
**Trauth** [8] - 31:2, 50:7, 78:16, 78:18, 86:14, 111:19, 111:20, 127:5

**travels** [1] - 169:5
**treat** [5] - 107:12, 113:23, 113:24, 138:19
**treated** [4] - 22:7, 37:16, 60:11, 90:7
**treaties** [1] - 117:17
**treatment** [7] - 38:6, 99:4, 129:7, 141:6, 144:7, 144:15, 145:8
**Treaty** [37] - 5:13, 5:15, 7:8, 7:11, 7:12, 7:14, 7:24, 9:1, 9:3, 9:5, 9:16, 50:24, 51:1, 51:9, 117:11, 117:12, 117:13, 117:18, 118:12, 118:18, 127:23, 128:1, 145:22, 146:2, 146:4, 146:18, 146:22, 146:25, 147:5, 147:9, 158:13, 159:18, 159:19, 159:20, 160:3
**TRIAL** [1] - 1:14
**trial** [28] - 4:3, 6:18, 7:25, 8:1, 8:8, 11:22, 13:7, 13:10, 16:2, 16:4, 58:10, 58:24, 100:19, 101:2, 128:11, 133:13, 135:17, 135:20, 137:4, 137:12, 153:4, 153:15, 157:23, 159:11, 159:22, 165:11, 169:7, 169:17
**tried** [8] - 26:2, 30:23, 31:9, 35:19, 36:21, 78:11, 79:19, 94:16
**trier** [1] - 142:11
**trouble** [3] - 46:2, 95:7, 119:10
**true** [17] - 35:22, 36:4, 41:13, 62:19, 84:3, 89:15, 131:14, 167:6, 167:9, 167:12, 167:15, 167:18, 167:21, 167:24, 168:2, 168:5, 168:8
**truly** [1] - 54:3
**trust** [2] - 57:16, 94:24
**trusted** [1] - 81:4
**truth** [8] - 15:21, 16:6, 17:23, 36:11, 38:15, 92:13, 116:9, 152:7
**try** [11] - 15:4, 15:8, 22:14, 33:5, 41:17, 41:18, 49:23, 69:7, 92:25, 123:8, 123:21
**trying** [24] - 12:3, 17:23, 17:24, 22:14, 25:7, 25:8, 26:16, 27:18, 34:22, 35:6, 39:21, 42:2, 42:16, 42:17, 44:4, 44:13, 44:14, 81:2, 94:16, 109:19, 109:22, 128:9, 128:11
**Tuesday** [2] - 102:6, 104:17
**turn** [2] - 52:6, 163:10
**turns** [1] - 44:7
**TV** [1] - 14:3
**twice** [1] - 57:7
**twist** [1] - 108:9
**Twitter** [1] - 154:23
**two** [79] - 12:3, 12:4, 16:20, 18:5, 18:24, 21:7, 22:2, 22:15, 22:22, 22:23, 23:22, 24:13, 26:25, 27:2, 27:3, 27:7, 27:10, 28:4, 29:6, 31:16, 32:10, 33:20, 37:21, 37:25, 38:9, 38:17, 44:20, 51:8, 52:8, 53:4, 55:23, 56:15, 56:16, 67:21, 70:6, 84:15, 84:20, 88:4, 88:5, 89:3, 89:5, 89:6, 89:7, 90:15, 97:3, 97:9, 103:6, 103:17, 106:6, 107:4, 110:8, 110:10, 110:11, 113:7, 126:16, 126:20, 129:1, 129:2, 132:6, 132:24, 133:14, 134:13, 137:22, 138:21, 138:23, 140:6, 144:23, 146:2, 149:5, 150:17, 155:7, 155:8, 155:10, 155:11, 156:2, 157:1, 164:23
**two-and-a-half** [2] - 12:4, 103:6
**TX** [1] - 6:4
**TX-6** [27] - 29:13, 29:25, 30:5, 30:6, 30:12, 30:16, 30:17, 31:16, 31:17, 32:6, 32:14, 42:7, 46:16, 50:6, 61:13, 63:22, 63:24, 71:9, 73:16, 82:5, 104:11, 106:15, 111:22, 115:18, 116:1, 121:21, 127:11
**TX-6's** [1] - 112:14
**TX-60** [47] - 5:2, 18:7, 18:13, 19:5, 19:6, 20:14, 22:25, 23:23, 24:19, 28:2, 28:3, 28:6, 29:7, 29:18, 29:19, 30:5, 30:6, 30:13, 30:19, 31:16, 31:17, 32:7, 33:11, 33:20, 50:6, 59:21, 62:14, 62:16, 63:7, 65:19, 65:22, 76:15, 77:21, 85:3, 86:15, 86:17, 86:20, 90:21, 106:18, 106:20, 114:12, 115:19, 116:2, 119:22, 121:19, 123:6, 143:19
**TX-60's** [1] - 112:14
**TX-600** [2] - 36:13, 50:19
**TX-61** [14] - 20:11, 22:25, 23:12, 23:16, 23:22, 23:23, 34:22, 35:18, 36:1, 38:10, 41:9, 46:11, 91:1, 114:13
**TX-64** [35] - 20:15, 20:23, 22:2, 23:2, 23:6, 23:19, 27:15, 27:18, 28:3, 28:5, 28:7, 37:9, 37:12, 37:15, 45:8, 45:12, 46:12, 59:21, 66:11, 73:4, 73:11, 77:1, 78:18, 78:25, 79:12, 81:6, 84:11, 91:10, 97:17, 114:13, 124:23, 128:19, 128:20, 129:3, 164:4
**type** [2] - 53:8, 54:9

**U**

**U.S** [6] - 19:4, 19:7, 19:11, 48:2, 159:16, 164:21
**ultimate** [1] - 142:7
**ultimately** [1] - 60:20
**unable** [1] - 161:22
**unanimous** [7] - 151:15, 151:16, 153:23, 154:14, 157:8, 165:15, 166:22
**unanimously** [1] - 165:23
**uncomfortable** [1] - 97:23
**uncontested** [1] - 160:13
**under** [50] - 4:10, 7:2, 10:2, 10:10, 10:18, 15:15, 25:16, 28:14, 29:16, 29:17, 33:3, 33:20, 35:17, 61:18, 80:14, 82:15, 98:25, 99:3, 99:11, 127:15, 133:1, 135:23, 137:22, 138:8, 138:14, 139:19, 139:21, 139:22, 140:22, 141:3, 142:13, 144:23, 145:4, 145:6, 145:9, 146:1, 152:23, 155:16, 155:24, 156:15, 156:19, 157:3, 160:11, 160:16, 160:20, 160:24, 166:5, 166:8, 166:12, 166:16
**underlying** [3] - 136:13, 136:17, 136:22
**undermined** [1] - 94:25
**underneath** [1] - 62:7
**undisputed** [1] - 104:21
**undue** [1] - 153:15
**unfair** [1] - 93:25
**unfairly** [1] - 43:3
**unflappable** [1] - 16:16
**unfortunately** [2] - 83:22, 113:13
**ungraded** [1] - 21:14
**unhappy** [1] - 53:9
**unincorporated** [1] - 137:6
**unique** [1] - 28:18
**United** [10] - 54:21, 83:11, 93:19, 117:14, 117:16, 118:4, 138:1, 139:23, 146:5, 146:13
**UNITED** [3] - 1:1, 1:14, 2:6
**unlawful** [7] - 5:11, 39:2, 139:24, 140:22, 142:16, 143:24, 145:18
**unless** [1] - 110:10
**unpopular** [3] - 94:1, 94:5
**unprofessional** [2] - 125:10, 125:11
**unscrewed** [1] - 82:20
**unsupported** [1] - 7:21
**unwise** [1] - 142:15
**unwritten** [1] - 40:12
**up** [90] - 6:22, 7:4, 8:11, 12:5, 14:4, 14:11, 16:19, 18:15, 18:18, 20:23, 21:16, 22:18, 23:20, 25:1, 25:6, 25:19, 26:2, 26:8, 26:15, 27:14, 30:14, 32:11, 32:16, 33:21, 34:4, 34:21, 34:25, 35:16, 36:3, 36:21, 38:3, 38:19, 38:24, 39:6, 41:1, 41:23, 41:24, 41:25, 42:22, 45:1, 45:9, 45:11, 45:12, 47:5, 47:7, 47:12, 50:9, 50:11, 50:12, 51:6, 52:18, 53:20, 54:3, 55:14, 60:18, 62:23, 69:2, 72:25, 73:22, 77:13, 77:25, 79:23, 79:25, 81:7, 84:21, 86:2, 87:18, 88:3, 89:13, 90:6, 90:14, 91:20, 91:25, 101:14, 109:12, 113:15, 116:8, 118:7, 118:21, 119:22, 124:12, 126:14, 126:17, 127:5, 127:7, 129:11, 157:16, 169:4
**upcoming** [1] - 29:6
**updated** [1] - 4:6
**upper** [1] - 125:9
**ups** [2] - 87:7, 153:7
**upset** [10] - 6:20, 13:22, 26:14, 27:13, 35:9, 52:11, 52:16, 82:11, 88:23, 90:2
**USC** [4] - 89:24, 160:15, 160:22, 161:5
**uses** [2] - 85:16, 89:24

**V**

**vacation** [4] - 42:14, 42:15, 77:16, 125:5
**vacations** [1] - 125:2
**validate** [1] - 85:3
**validated** [5] - 84:15, 84:19, 88:4, 110:11, 110:13
**validation** [4] - 84:18, 109:24, 109:25, 110:1
**valued** [2] - 94:10, 96:14

**vary** [1] - 141:24
**Vehicle** [1] - 120:18
**vehicles** [2] - 81:23, 81:25
**VERDICT** [1] - 3:7
**verdict** [72] - 10:1, 10:12, 10:14, 10:20, 11:5, 11:9, 54:25, 55:21, 55:23, 95:16, 97:21, 98:9, 98:13, 100:1, 100:6, 102:10, 104:25, 105:19, 131:6, 131:19, 132:11, 139:10, 147:6, 151:13, 151:15, 151:16, 152:4, 153:21, 153:24, 154:15, 155:1, 155:2, 155:3, 156:24, 157:10, 157:14, 158:1, 159:1, 160:8, 160:10, 161:6, 161:10, 161:13, 162:11, 165:8, 165:13, 165:20, 166:24, 167:5, 167:6, 167:8, 167:9, 167:11, 167:12, 167:14, 167:15, 167:17, 167:18, 167:20, 167:21, 167:23, 167:24, 168:1, 168:2, 168:4, 168:5, 168:7, 168:8, 169:3, 169:12
**version** [2] - 4:6, 92:13
**VERSUS** [1] - 1:5
**versus** [4] - 8:24, 9:8, 161:8, 165:21
**Vice** [29] - 20:4, 24:14, 24:16, 29:18, 31:1, 33:9, 59:23, 60:2, 60:3, 60:16, 60:25, 61:20, 63:3, 64:25, 65:10, 78:7, 85:10, 93:3, 94:15, 96:16, 97:3, 97:12, 104:11, 110:3, 110:4, 111:22, 112:8, 112:9, 114:15
**view** [2] - 136:6, 151:18
**views** [2] - 92:1, 151:24
**VII** [49] - 1:15, 9:13, 10:3, 10:4, 10:10, 30:2, 56:19, 98:25, 99:3, 137:22, 137:24, 138:5, 138:8, 138:13, 139:19, 139:22, 139:23, 140:22, 141:3, 141:8, 142:13, 142:18, 142:21, 143:5, 144:2, 144:5, 144:12, 144:23, 144:24, 145:4, 145:6, 146:22, 146:23, 147:19, 148:4, 148:15, 148:18, 149:15, 155:13, 155:16, 156:15, 160:10, 160:12, 161:1, 161:8, 161:25, 166:5, 166:8, 166:12
**violate** [1] - 149:4
**violation** [10] - 8:24, 142:18, 144:2, 144:4, 144:12, 144:21, 147:19, 148:4, 148:24, 151:12
**violence** [1] - 151:19
**virtually** [1] - 69:17
**visit** [1] - 109:9
**VOLUME** [1] - 1:15
**voluntary** [1] - 96:14
**Vorholt** [2] - 47:20, 50:4
**VP** [14] - 70:25, 71:3, 72:24, 78:5, 79:13, 82:6, 82:12, 83:25, 86:14, 88:15, 93:6, 106:15, 110:14, 116:15

**W**

**wage** [1] - 91:23
**wages** [2] - 91:25, 148:10
**wait** [2] - 45:25, 151:8
**waited** [1] - 64:3
**wake** [1] - 55:14
**walk** [3] - 22:16, 28:12, 36:10
**walked** [2] - 65:18, 65:22
**wall** [1] - 69:7
**wants** [4] - 93:8, 97:11, 119:24, 129:9
**War** [1] - 117:14
**warrant** [1] - 149:24
**warranted** [1] - 158:20
**water** [1] - 26:11
**ways** [3] - 11:6, 39:5
**website** [1] - 154:22
**week** [5] - 15:18, 41:23, 91:23, 118:21
**weeks** [3] - 16:20, 64:3, 67:10
**weigh** [1] - 136:1
**weight** [6] - 133:22, 133:23, 135:9, 135:14, 136:22, 152:1
**welcome** [2] - 13:8, 101:3
**WERKE** [2] - 1:6, 1:20
**Werke** [4] - 105:3, 139:11, 165:22, 165:25
**WhatsApp** [1] - 152:20
**white** [4] - 28:21, 60:12, 60:16, 88:14
**WHITSETT** [1] - 1:18
**whole** [16] - 19:16, 29:23, 36:13, 42:12, 46:5, 47:10, 49:4, 50:4, 56:5, 59:8, 61:17, 64:18, 84:16, 92:13, 162:6, 164:20
**wife** [1] - 68:4
**wild** [1] - 62:19
**wildly** [1] - 94:5
**wise** [1] - 142:15
**witness** [23] - 8:11, 14:5, 16:1, 18:3, 41:24, 67:17, 81:19, 83:18, 107:14, 113:20, 132:6, 133:16, 134:11, 134:12, 134:13, 134:17, 134:23, 135:1, 135:20, 135:21, 135:22, 136:2
**witness's** [4] - 134:8, 134:15, 134:20, 134:22
**witnesses** [13] - 15:14, 16:20, 16:24, 81:16, 92:12, 101:20, 132:5, 132:17, 134:3, 134:24, 135:11, 135:14, 136:16
**women** [1] - 28:21
**wondered** [1] - 17:9
**wonderful** [1] - 109:8
**word** [20] - 5:23, 6:14, 7:3, 7:19, 8:9, 17:21, 17:22, 20:19, 28:17, 33:25, 51:2, 51:3, 51:16, 51:17, 51:25, 82:20, 92:16, 118:22, 127:15
**words** [24] - 5:13, 18:22, 28:7, 32:2, 32:15, 37:3, 41:2, 57:1, 57:22, 61:5, 61:7, 62:6, 64:14, 71:25, 127:12, 127:20, 142:6, 147:4, 147:23, 149:16, 160:25
**wore** [1] - 103:9
**work-life** [2] - 62:12, 62:14
**workaround** [1] - 40:17
**workplace** [2] - 149:20, 150:2
**works** [5] - 15:9, 18:18, 90:3, 121:2, 168:23
**workshop** [2] - 73:16, 86:6
**worksite** [1] - 77:9
**World** [1] - 117:14
**world** [10] - 27:9, 31:13, 49:12, 49:18, 54:23, 83:5, 83:6, 87:4, 88:11, 88:12
**world-class** [1] - 83:5
**worldwide** [3] - 27:8, 107:5, 107:18
**worried** [1] - 54:17
**worry** [2] - 17:16, 102:4
**worst** [2] - 95:15, 98:4
**worth** [4] - 53:15, 54:1, 54:6, 137:2
**wow** [1] - 53:13
**write** [1] - 157:6
**writer** [1] - 119:6
**writes** [1] - 115:20
**writing** [5] - 71:19, 110:25, 135:23, 154:9, 154:10
**written** [3] - 40:2, 40:11, 164:17
**wrongful** [2] - 150:18, 150:20
**wrote** [7] - 30:10, 36:19, 59:15, 61:9, 83:1, 85:18, 116:22

**Y**

**y'all** [8] - 12:23, 68:15, 68:21, 68:25, 71:5, 95:13, 96:18, 169:25
**yards** [2] - 63:3, 63:4
**year** [17] - 28:25, 45:9, 47:7, 53:22, 62:1, 62:2, 63:9, 64:22, 66:9, 68:2, 74:22, 74:25, 84:8, 89:4, 89:6, 92:19, 111:2
**years** [33] - 8:3, 9:19, 9:20, 14:9, 14:11, 18:16, 19:2, 19:5, 23:1, 24:17, 28:3, 30:8, 38:11, 41:10, 52:12, 53:25, 54:17, 55:6, 64:8, 64:13, 72:14, 72:15, 79:24, 84:11, 88:6, 89:5, 89:17, 97:9, 109:8, 109:10, 122:9, 127:6
**yesterday** [14] - 4:5, 5:22, 7:9, 9:2, 9:9, 11:2, 19:10, 21:8, 27:3, 50:9, 108:9, 158:17, 159:6, 161:12
**yoo** [1] - 83:18
**yoo-hoo** [1] - 83:18
**yourself** [10] - 17:16, 24:20, 39:12, 53:6, 57:5, 60:5, 103:3, 105:14, 122:5, 124:19
**yourselves** [4] - 12:23, 14:18, 82:13, 128:16
**YouTube** [2] - 152:20, 154:23

**Z**

**zero** [2] - 99:20, 107:8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| Kelly Dawsey,<br><br>Plaintiff,<br><br>v.<br><br>Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC,<br><br>Defendants. | Civil Action No. 7:22-cv-3738-TMC<br><br>**VERDICT FORM** |

We, the jury, unanimously find as follows:

**Integrated Employer**

1. Do you find that **Bayerische Motoren Werke Aktiengesellschaft**, also known as "**BMW AG**" was an employer of Plaintiff? [check one:]

Yes ________

No ✓

**If you answered "Yes" as to Question 1, proceed to Question 2. If you answered "No" as to Question 1, skip Questions 2 – 5 and proceed to Question 6, found on page 4.**

**Answer Questions 2 – 5 ONLY if you found BMW AG to be an employer of Plaintiff and answered "Yes" to Question 1. Otherwise, proceed to Question 6 on page 4.**

2. On **Plaintiff's** claim against **Defendants** for national origin discrimination under Title VII, [check one:]

_____ We, the jury, find for the **Plaintiff**.

OR

_____ We, the jury, find for the **Defendants.**

3. On **Plaintiff's** claim against **Defendants** for sex discrimination under Title VII, [check one:]

_____ We, the jury, find for the **Plaintiff.**

OR

_____ We, the jury, find for the **Defendants.**

4. On **Plaintiff's** claim against **Defendants** for race discrimination under Title VII, [check one:]

_____ We, the jury, find for the **Plaintiff.**

OR

_____ We, the jury, find for the **Defendants.**

5. On **Plaintiff's** claim against **Defendants** for race discrimination under Section 1981, [check one:]

_____ We, the jury, find for the **Plaintiff.**

OR

_____ We, the jury, find for the **Defendants.**

**If you answered "Yes" to Question 1 (and, therefore, answered Questions 2 – 5), do not answer Questions 6 – 9. Skip to page 6. If you answered "No" to Question 1, please proceed with Questions 6 – 9.**

6. On **Plaintiff's** claim against **BMW Manufacturing Co., LLC,** also known as "**BMW MC**" for national origin discrimination under Title VII, [check one:]

 √ We, the jury, find for the **Plaintiff**.

 OR

 ______ We, the jury, find for the **Defendant BMW Manufacturing Co., LLC**.

7. On **Plaintiff's** claim against **BMW Manufacturing Co., LLC** for sex discrimination under Title VII, [check one:]

 ______ We, the jury, find for the **Plaintiff.**

 OR

 √ We, the jury, find for the **Defendant BMW Manufacturing Co., LLC.**

**8.** On **Plaintiff's** claim against **BMW Manufacturing Co., LLC** for race discrimination under Title VII, [check one:]

_____ We, the jury, find for the **Plaintiff.**

OR

__√__ We, the jury, find for the **Defendant BMW Manufacturing Co., LLC.**

**9.** On **Plaintiff's** claim against **BMW Manufacturing Co., LLC** for race discrimination under Section 1981, [check one:]

_____ We, the jury, find for the **Plaintiff.**

OR

__√__ We, the jury, find for the **Defendant BMW Manufacturing Co., LLC.**

**If you did not find for Plaintiff as to any of her claims, your deliberations are done. The Jury Foreperson should certify your verdict by signing and dating the form where indicated below.**

**If you did find for Plaintiff on any of the claims in Questions 2 – 5 or Questions 6 – 9, please answer the following questions regarding damages prior to having the Jury Foreperson certify your verdict by signing and dating the form where indicated below.**

**Damages**

1. **We award compensatory damages in the amount of:**

$ 100,000.00

2. **We award punitive damages in the amount of:**

$ 5,000,000.00

This is the unanimous decision of the jury.

Signed [redacted]
Foreperson

Date: February 25, 2026.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| KELLY DAWSEY,<br><br>PLAINTIFF,<br><br>VERSUS<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP,<br><br>BMW MANUFACTURING CO LLC, COLLECTIVELY D/B/A BMW GROUP DOING BUSINESS AS BMW GROUP<br><br>DEFENDANTS. | CA. NO. 7:22-CV-3738<br>GREENVILLE, SC<br>MARCH 13, 2026 |

BEFORE THE HONORABLE TIMOTHY M. CAIN
UNITED STATES CHIEF DISTRICT COURT JUDGE
BENCH TRIAL

APPEARANCES:

FOR THE PLAINTIFF: BRIAN P. MURPHY, ESQ.
STEPHENSON AND MURPHY
207 WHITSETT STREET
GREENVILLE, SC 29601

FOR THE DEFENDANT: BMW MANUFACTURING CO LLC: DONALD RANDLE MOODY, II, ESQ.
ELLISON MCCOY, ESQ.
JACKSON LEWIS
15 SOUTH MAIN STREET
SUITE 700
GREENVILLE, SC 29601

APPEARANCES CONTINUED

COURT REPORTER: DEBRA R. BULL, RPR, CRR
UNITED STATES COURT REPORTER
315 SOUTH MCDUFFIE STREET
ANDERSON, SC 29624

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

*** *** *** *** ***

INDEX

KELLY DAWSEY
Direct exam by Mr. Murphy 7
Cross exam by Mr. McCoy 18
Redirect exam by Mr. Murphy 37
JOHN E. GIBSON, JR.
Direct exam by Mr. Murphy 42
Cross exam by Mr. Moody 59
Redirect exam by Mr. Murphy 116
By the Court 119
Closing statement by Mr. Moody 122
Closing statement by Mr. Murphy 136

EXHIBITS

PLAINTIFF

53 BMW salary history 9
54 BMW RSA statement 14
55 Summary page re retirement contributions 13
56 Madewell 2022 W-2 15
57 GSP annual compensation statements 16
58 2022 GSP W-2 17
59 2023 GSP W-2 17
60 2024 GSP W-2 17
61 2025 GSP W-2 17
62 12-22-25 report of John E. Gibson 57

DEFENSE

36a Unredacted copy of 7/1/2022 offer letter
From GSP Airport 28
38 John E. Gibson, Jr., expert report number 1
Dated January 2023 64
39 John E. Gibson, Jr., expert report number 2
Dated October 2025 67
40 John E. Gibson, Jr., expert report number 3
Dated December 2025 80
41 John E. Gibson, Jr., expert report number 4
Dated December 2025 81
42 Expert rebuttal report of Nicholas R. Harris
Dated November 2025 70
55 Kelly Dawsey BMW MC earnings statement
2019-2022 10

(Whereupon, the hearing commenced at 9:44 a.m.)

THE COURT: Please be seated.

All right. Let's go on the record. This is the matter of Dawsey versus BMW. This case 7:22-CV-3738. This matter is before the Court for a bench trial with the remaining portion of the case, a jury trial having been held previously resulting in a verdict, and so I believe the parties are present with their attorneys and I will be glad to hear from you however you want to proceed.

MR. MCCOY: Your Honor, before we start talking about economic damages, I wanted to just real quickly talk, and I spoke with Mr. Murphy about this a couple of days ago. He has now filed a petition for attorney's fees, which I guess we would both say is a partial motion because there is more that will be needed to add to it. We wanted to just request of the Court if we could maybe establish some sort of a briefing schedule on that. What we are trying to avoid, is obviously, he filed his motion on Wednesday, we would have to respond within two weeks, he would supplement, we would respond. I am sure Your Honor does not want to see multiple briefs on attorney's fees, so and we are happy if you want us to put something together for you, I want to raise that as an issue.

THE COURT: If you all can get together and put something together that suits everybody and get it to me, I am sure it will be reasonable.

MR. MCCOY: Thank you.

THE COURT: I would rather do that than issue something and then you have to file something to extend a deadline because of other obligations, so happy for you to do that. When do you think you can put something together?

MR. MCCOY: If we don't do it this afternoon, we can certainly have it by Monday.

THE COURT: Well, I am not pushing you. I just learned if I don't put some time in, I have to come back and revisit it, but I don't expect I will have to do that with y'all. If you can get it to me by Tuesday, is that okay?

MR. MCCOY: Perfect, thank you.

THE COURT: Does that suit you, Mr. Murphy?

MR. MURPHY: Yes, sir, thank you.

THE COURT: Okay. Anything else we need to take up before we get started logistically? If not, I will be glad to hear from you.

MR. MURPHY: Thank you, Your Honor. I would like to put Ms. Dawsey back on the stand.

THE COURT: Ma'am, please come up here and be

sworn.

KELLY DAWSEY, having been first duly sworn, testified as follows:

THE COURT: Come around here and be seated.

Mr. Murphy.

DIRECT EXAM

BY MR. MURPHY:

Q. Kelly, I want to review a couple of facts that were touched on during the jury trial. To be clear, when did you make the decision to leave BMW?

A. I -- in December 2021.

Q. And why?

A. Because I had been discriminated against.

Q. And did you explain that to Dr. Englehorn when you met him?

A. I did.

Q. Let's just talk a few minutes about BMW, with what year did you start at BMW?

A. 1995.

Q. And what was your -- I think there may have been some confusion about this, what was your actual last date of employment at BMW?

A. Monday, January 17th, 2022.

Q. Okay. Why wasn't it the 14th as indicated on your resignation?

A. So, my last day in the Plant was Friday, the 14th, and over the weekend I worked to prepare a turnover document for Eva, who was coming in behind me, and turned in my computer that Monday. So, at that point my date was adjusted to Monday, the 17th.

MR. MURPHY: Your Honor, could I have just a second?

THE COURT: Yes.

MR. MURPHY: I wanted to raise one issue. I didn't introduce everybody with me, my second witness is now in the courtroom is Mr. Gibson. We didn't address sequestration.

MR. MCCOY: Your Honor, I think it would be best if Mr. Gibson was sequestered.

MR. MURPHY: I don't have any objection to that.

THE COURT: I will let you chat with him and explain what that means.

MR. MURPHY: Is the attorney room okay for him?

MR. MCCOY: That is fine.

MR. MURPHY: Just wait in there.

MR. MURPHY: Sorry about that, Your Honor, I thought I would clear it up.

THE COURT: I appreciate it.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Let's look, if we could, at Plaintiff's exhibit 53. Ms. Dawsey, can you identify what this is?

A. Yes, this is my personnel record in totality from SAP.

Q. And does it indicate what your final salary rate was?

A. It does.

Q. And what is that?

A. Two hundred two thousand, four-hundred fifty dollars ($202,450).

MR. MURPHY: Without objection, I believe, I move to admit Plaintiff's exhibit 53.

THE COURT: Admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. While we are at it, let's look at Defendant's exhibit 65 and identify what these documents are.

MR. MCCOY: That is 55.

MR. MURPHY: Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Let's look at Defendant's exhibit 55. Can you identify what these documents are?

A. Yes, this is my statement of earnings and deductions.

MR. MURPHY: Your Honor, without objection, I move for the admission of Defendant's exhibit 55.

THE COURT: Admitted without objection.

CROSS EXAM CONTINUED

BY MR. MURPHY:

Q. You talked at trial about different bonuses, let's just review them very quickly. What is a plant bonus?

A. A plant bonus is a bonus awarded based on goal achievement for plant targets.

Q. And an individual bonus?

A. An individual bonus is based on personal achievement relating to the portfolio score.

Q. And high performance bonus, what was that?

A. High performance bonus is a discretionary bonus assigned by the supervisor of the individual based on performance for that year.

Q. And in 2021, did you receive all three types of bonuses?

A. I think I did. I would have to see my communication to confirm.

Q. Let me show you, it has been already admitted as Plaintiff's exhibit 19, does this refresh your

recollection as to whether you received all three types of bonuses in 2021?
A. Yes, thank you. So, in March of 2021, I received a high performance bonus, $6,000.
THE COURT: What exhibit was that?
MR. MURPHY: Plaintiff's 19.
THE COURT: Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. These various bonuses, regardless of what they were, are they all reflected in W-2 income?
A. Yes, they are.
Q. Let's talk for a second about benefits. Are you familiar with the medical retiree benefit, the plan?
A. Yes.
Q. As it existed when you were there?
A. Yes.
Q. Can you just tell the Court how that worked and what that was?
A. So, based on tenure and age, at age 60 there is an eligibility for retirement and retiree medical premiums are paid between age 60 and Medicare eligibility.
Q. And did you provide information of that to Mr. Gibson?

A. I did.
Q. In terms of retirement income or savings, when you -- you testified at trial there was a certain type of plan when you started, what was that?
A. That was a defined benefit pension plan.
Q. Okay. Did that change at some point?
A. It did.
Q. To what?
A. In 2019, the defined benefit plan was frozen and shifted to a defined contribution plan called retirement income account or RIA.
Q. And how did that work? Did the company provide money for that benefit?
A. So, that was a single contribution annually based on tenure, and age, and percent of salary.
Q. And in addition to that, was there a savings plan of some kind?
A. 401K, correct.
Q. And how did that work?
A. So, that was a percent contribution match to the employee contribution up to a certain percent.
Q. Okay. And do you know what that percent was?
A. I think 60 cents on the dollar up to six percent.
Q. Let me show you a document. I would have to see the document. Let me show you what we have marked as

Plaintiff's exhibit 55 under retirement. Are you familiar with this document?
A. I am.
Q. What is it?
A. It is a brochure with highlights of benefits.
Q. Okay. What does it say about the 401K?
A. Sixty cent match for each dollar you contribute up to six percent of your base pay.
MR. MURPHY: I believe with that admission move for the admission of 55, Plaintiff's 55.
THE COURT: Admitted without objection.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Ms. Dawsey I am showing you a document marked Plaintiff's exhibit 54, can you identify it?
A. Yes. This is my retirement savings statement.
Q. As of what date?
A. Statement period January 1st, '21 through December 31, '21.
Q. So what monies -- your ending balance was what?
A. My vested balance 992,004.09.
Q. And what comprises that? Is it just the 401? The other retirement money in there?
A. In 2021 this would be my contributions to 401K, the company match to 401K, as well as the RIA payment

was made into the 401 account as well.
Q. What is the 31,500 number, do you know?
A. I don't. I would have to research that.
MR. MURPHY: Without objection, I believe, I move for the admission of 54.
THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. All right. Let's talk about the Madewell job then. What was your starting salary at Madewell?
A. One hundred fifty thousand dollars ($150,000).
Q. Okay. And were there bonuses or did you receive any bonuses while you were at Madewell?
A. I did not.
Q. How long were you at Madewell?
A. Approximately six months.
Q. Okay. Beginning when?
A. End of January 2022.
Q. And ending when?
A. Middle of July, 2022.
Q. So, all of that information would be -- all of your compensation was in the year 2022 from Madewell?
A. Correct.
Q. And when you left Madewell, did you have another job lined up?

A. I did.
Q. And which job was that?
A. Vice President Human Resources at the Greenville Spartanburg Airport District.
Q. And did that job that you accepted pay more than what you were making at Madewell?
A. It did.
Q. Let me ask you if you can identify the document we marked as Plaintiff's exhibit 56.
A. Yes, this is my federal tax return 2022 from Madewell earnings.
Q. This would be the only W-2 you have income on from Madewell?
A. Correct.
MR. MURPHY: Your Honor, I believe without objection, we offer Plaintiff's 56.
THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Let me just walk through some of these other documents. Can you tell us what Plaintiff's exhibit 57 is?
A. This is my total compensation statement from 2024, I think the previous was 2025 from GSP airport.
Q. So, the first page is showing what year?

A. 2025.
Q. Third page is showing what year?
A. 2024.
Q. The fifth page is showing what year?
A. 2023.
Q. The seventh page is showing what year?
A. 2022.
Q. That would have been your first year there?
A. Correct.
MR. MURPHY: Your Honor, I believe without objection, we move for the admission of 57.
THE COURT: Admitted.

DIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Can you tell the Court what Plaintiff's 58 is?
A. This is my W-2 from 2022 from GSP Airport.
Q. And what is Plaintiff's 59?
A. W-2, 2023 GSP Airport.
Q. And 60?
A. 2024 W-2 GSP Airport.
Q. And 61 is what?
A. 2025 W-2 GSP Airport.
Q. Okay.
MR. MURPHY: Your Honor, I believe without objection, move for the admission of Plaintiff's

exhibits 58 through 61.

THE COURT: So moved.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. While you were at -- you have been at the Airport, have you received any kind of incentive pay or bonus payments?

A. Yes.

Q. Is that all in your W-2 income?

A. Yes.

Q. How have things gone for you at the Airport employment wise?

A. Very good.

Q. Do you have any plans to leave that employment?

A. I do not.

Q. Before you retire?

A. I do not.

Q. Okay. I am sorry to have to ask you this, I need it in the record, what is your date of birth?

A. July 5th, 1968.

Q. When you were at BMW, did you have an idea of when you planned to retire?

A. I did.

Q. What was your plan?

A. Age 60.

Q. Did you report that to Mr. Gibson?
A. I did.
Q. Why did you choose age 60?
A. Age 60 I was eligible to retire and had planned to.
Q. Have your retirement plans changed since you left BMW?
A. Yes.
Q. How so?
A. I feel that I will need to work a little bit longer.
Q. Okay. You understand that Mr. Gibson has done a report based on your retirement age of 60, correct?
A. Correct.
Q. If the Court decides to make you whole in terms of remedy, are you still willing to abide by that age 60 retirement date?
A. Yes, I will.
MR. MURPHY: Your Honor, I don't have any further questions at this time.
MR. MCCOY: I need to use the ELMO, Ms. Rutgers.

CROSS EXAM

BY MR. MCCOY:
Q. Good morning, Ms. Dawsey.
A. Good morning.

Q. One clarification from your testimony, I just want to make sure the record is clear on this, let me find the exhibit number. Looked at I believe it was -- I believe it was Plaintiff's exhibit 19, but we looked at your bonus you said March of 2021, your letter that confirmed your bonus; do you recall that?
A. Yes.
Q. And that bonus actually was your bonus -- calendar year 2020?
A. For performance year, yes, 2020.
Q. I wanted to be sure because in 2021, the bonus related to calendar year 2021 would be paid in 2022, correct?
A. Correct.
Q. You were not there when that bonus was paid, correct?
A. That is correct.
Q. You testified you are currently employed as Vice President and Chief Human Resources officer at GSP Airport?
A. Yes.
Q. That is a higher level position than you ever attained at BMW MC, correct?
A. Correct.
Q. Now, we looked a minute ago at or Mr. Murphy

showed you briefly a document marked as Plaintiff's exhibit 57, which contained your compensation records, total compensation records from GSP airport, and I just want to flip through these real quick and look at them in a little more detail. I will show you, first of all, I believe you indicated, but when did you actually start working for GSP airport?
A. August 2022, I think it was August first.
Q. So, this appears to be, I believe, your total compensation record from 2022 at GSP airport?
A. Correct.
Q. And that is obviously a partial year, you didn't start until August, correct?
A. August through December.
Q. Okay. And your total compensation was a little shy of 93 thousand dollars?
A. Correct.
Q. And then we will look at the next page, which is Dawsey 2906, is that your total compensation from calendar year 2023 from GSP airport?
A. Yes.
Q. That year your total compensation from GSP airport was 266,608 dollars?
A. And 88 cents.
Q. Okay. Thank you.

Then let's look at the next page, is this your total compensation from GSP Airport in calendar year 2024?

A. Correct.

Q. Your total compensation there was 298,416.80?

A. Correct.

Q. And then finally, let's look at again, this is a document that was produced to us, and this shows again 2025 total compensation; is that correct?

A. This one I would have to know the date that I produced it to know if it is a full year.

Q. I believe if you look in the upper left corner, 11-26-25?

A. So, this would be through November, the date that I pulled it.

Q. It would be another month of pay?

A. Correct.

Q. We looked just a second ago from your 2024 compensation and it was $298,416.88, correct?

A. That sounds right.

Q. And in calendar year 2025, did you suffer -- did you earn more pay than you did in 2024?

A. I would have, yes.

Q. Now, a few minutes ago Mr. Murphy showed you this document which is marked as Defendant's exhibit 55,

which I believe you testified was your 2021 -- I believe it was -- I'm sorry, I am on the wrong page, excuse me. Let's try again.

Let's look at this. Mr. Murphy showed you this, I don't know if you can see it.

A. I can see it.

Q. So, this is your 2021 compensation -- year end statement of earnings from BMW Manufacturing?

A. As of pay date 12-31-21.

Q. That would be the last day of the year?

A. Yes.

MR. MURPHY: Is that 55?

MR. MCCOY: Yes. The bates number is 1914.

MR. MURPHY: Thank you. Sorry about that.

CROSS EXAM CONTINUED

BY MR. MCCOY:

Q. And, Ms. Dawsey, if we look down at -- in that upper section there is an earnings total there, do you see that? I realize it is a little bit small, it says $266,999.73, do you see that?

A. I do.

Q. And were those your earnings from calendar year 2021 at BMW Manufacturing?

A. Correct.

Q. That was your last full year at BMW Manufacturing?

A. Correct.
Q. In fact, a few days later you turned in your resignation?
A. A couple -- yeah, yeah, exactly, January 22.
Q. All right. So, if we go back for just a second. So, in calendar year 2021, you earn $266,000 from BMW MC. And we go back to the document we looked at just a minute ago, which I believe is your GSP Airport compensation from calendar year 2023, correct?
A. Correct.
Q. You earned that year from GSP Airport 266,898.88?
A. Total compensation.
Q. Would you agree with me that your total compensation from GSP in 2023 was equivalent to your compensation from BMW in 2021?
A. No, not equivalent.
Q. All right. Mrs. Dawsey, I know during the jury portion of the trial there was discussions about your communications with Ms. Sherrill Miller who was a recruiter, correct?
A. Correct.
Q. And you first spoke with Ms. Miller, I believe, on September 10th of 2021; does that sound correct?
A. Around there. I would have to see the document, but around there, yes.

Q. And during your initial conversation with Ms. Miller, you told her that you wanted a job where you didn't have to work as many hours as you were working at BMW Manufacturing, correct?

A. I told her I needed less hours than 12 to 15 hours a day for a better work-life balance.

Q. You said you were looking for a different culture, right?

A. Yes.

Q. And following that initial meeting with Ms. Miller, you then prepared a detail list of positions and companies in which you were interested, correct?

A. Correct.

Q. And I believe you sent that information to Ms. Miller on Monday, September 13th of 2021; does that sound right?

A. It does.

Q. And on Monday, September 13th of 2021, when you sent that information to Ms. Miller, you did not know that Sherry McCraw was going to become the Vice President of Human Resources at BMW Manufacturing, did you?

A. Correct.

Q. You didn't know that Eva Bergmeier was going to come to BMW Manufacturing, did you?

A. Correct.
Q. You didn't know that you were going to be moved, transferred out of the TX-60 position on September 13th, did you?
A. Did not, correct.
Q. And you didn't know on September 13th the plan was to move you to the TX-64 position, did you?
A. Correct.
Q. And then on September 16th, you paid $1,500 to Ms. Miller to assist you in looking for a new job, correct?
A. Correct.
Q. And between September 10th of 2021 and early December of 2021, you communicated with Ms. Miller on roughly a weekly basis about your job search, right?
A. Correct.
Q. And during that job search you were seeking positions that paid in the range of 130 to $150,000, weren't you?
A. That was not my range, that was a range that Sherrill put on.
Q. And that range is more than $50,000 less than you were making at BMW Manufacturing at that time, right?
A. That was not my range.
Q. The range you are talking about, the range

Ms. Miller put on it?
A. You would have to ask her.
Q. Okay. Now, in early December you interviewed for a job as the top HR person at Madewell Concrete, correct?
A. Correct.
Q. And on December 6th of 2021, Madewell made you an offer of employment as their director of HR; is that right?
A. Correct.
Q. And the salary, as you testified just a minute ago for that position, was $150,000?
A. Correct.
Q. And on December 10th you accepted -- you formally accepted that offer of employment with Madewell, didn't you?
A. Verbally accepted.
Q. Okay. That was an acceptance, though?
A. I verbally accepted the job offer.
Q. And at that time you told Madewell that it was your plan to wait until January 3rd to give your two weeks' notice to BMW and you would plan to start at Madewell on January 31st, right?
A. Correct.
Q. In keeping with that plan, January 3rd you

notified Ms. Petrasch that you were planning to resign from employment?
A. Correct.
Q. And during your conversation with Ms. Petrasch, you told her you had found a job with another local company as the top HR person, right?
A. Correct.
Q. And we talked just a minute ago, January 14th was your last day in the Plant, right?
A. Correct.
Q. I understand your testimony this morning is that you worked on a project over the weekend, had your computer at home, but you didn't go back to the plant on the 17th?
A. Correct.
Q. And did you start work at Madewell on January 31st at this point?
A. I did.
Q. And you only worked at Madewell for five or six months; is that right?
A. Correct.
Q. July 1st, 2022 you received an offer to become the Vice President and Chief Human Resources officer at GSP?
A. Around about there, I would have to see the letter.

MR. MCCOY: Well okay. I will be glad to oblige. Judge, this is Defendant's exhibit 36, which I believe we used in the jury portion of the trial, but at the time I believe we may have redacted some of the information, the salary information out of this. I guess we need to figure out if it was admitted to replace it with this version that shows the dollar figures.

THE COURT: I am showing that Defendant's 36 was admitted.

Go off the record and talk with the court reporter and clerk to have it admitted without the redactions.

MR. MURPHY: Was it redacted?

MR. MCCOY: At the bottom.

THE COURT: Go back on the record, we would have the unredacted exhibit 36 marked and entered as 36-A if that suits y'all.

MR. MCCOY: I am fine with that. I don't believe there was any objection to the admission of this.

THE COURT: All right.

MR. MCCOY: Thank you, Your Honor.

THE COURT: Thank you.

CROSS EXAM CONTINUED

BY MR. MCCOY:

Q. Ms. Dawsey, I asked you on July 1, 2022, did you

receive an offer of employment from GSP Airport?
A. Correct.
Q. The salary for that position at GSP Airport was $175,000 at the time you were hired, correct?
A. Correct.
Q. And included, I guess if you look at the second paragraph of exhibit 36-A, there is a reference to certain benefits to which you would be entitled, and that included health, dental, and vision insurance?
A. Correct.
Q. Also it stated you would participate in the South Carolina Retirement System?
A. Correct.
Q. And there is eligibility for the South Carolina Deferred Compensation Program?
A. Correct.
Q. And then if you look down at the bottom of the section below where your salary is listed, you also got a 500 dollar a month car allowance?
A. Correct.
Q. Monthly cellphone allowance of 120 dollars?
A. Correct.
Q. And then there is also reference to the employee incentive pay plan, what is that?
A. It is a bonus, annual bonus.

Q. Have you received that annual bonus since you have been employed at GSP?
A. First year I was not eligible, after that I have, yes.
Q. Thank you, ma'am.
I take it you accepted the offer with GSP?
A. I did.
Q. I believe you said you started in August of 2022?
A. Correct.
Q. Do you recall the specific date you started?
A. I think it was August 1st.
Q. And you are still employed as the Vice President Chief Human Resource Officer at GSP today?
A. I am.
Q. Do you continue to receive all of the benefits that were set forth in your offer letter?
A. I do.
Q. Do you receive any additional benefits from GSP beyond what was in the offer letter?
A. I do not.
Q. I want to circle back for just a second and talk -- just a couple of questions going back to your time at BMW Manufacturing. The pay and benefits of salaried employees at BMW Manufacturing are dictated by that individual's personal grade, correct?

A. The pay band is based on the function level. The placement in the band is based on the personal grade.
Q. So, if I understand you correctly, if somebody had a different personal grade and they are in a function level 3 position, they have different personal grades, their salary could be different?
A. You would have to clarify that question.
Q. Well, you indicated there is a pay band, right?
A. Correct.
Q. There is a pay band based on the function level of the position?
A. Correct.
Q. And the personal grade determines what your salary is and would the pay band be larger for a higher personal grade?
A. So, the personal grade, that is what is called the upper personal grade on that function level, has a higher target compensation. Middle would be at the 100 percent and a lower personal grade would have a lower target.
Q. Okay. Ms. Dawsey, you are not aware of any situation at BMW Manufacturing where the company reduced the personal grade of a salaried employee, are you?
A. Yes, I am.
Q. You are aware of somebody's personal grade being

reduced?
A. I communicated to several employees in the middle of 2021 that their personal grade was going to be decreased, yes.
Q. I understand you communicated to them, were you there? Did their personal grade actually get reduced?
A. It did not get reduced I, of course, left.
Q. You heard Ms. McCraw testify that that never happened.
A. I did.
Q. You are not aware of any instance at BMW Manufacturing where the company reduced the pay or benefits of a salaried employee as a result of a transfer, demotion, or change in function level, are you?
A. I just communicated to you that I communicated the policy that went into place in 2021 that those personal grades that were outside of their function levels were going to change.
Q. Okay. And that never actually happened, did it?
A. Not while I was there, correct.
Q. Now, Ms. Dawsey, when you left BMW in January of 2022, your base pay, as we looked at already, was, I believe, $202,450?
A. That sounds correct.

Q. And when you left BMW in January of 2022, you were a personal grade 11?
A. Correct.
Q. You were, when you left BMW in January of 2022, you were still in a TX-60 position?
A. Correct.
Q. Now, at that same time when you left, Scott Medley was in the TX-64 position, correct?
A. Correct.
Q. And Mr. Medley was also earning a salary of $202,450, wasn't he?
A. I think that is correct, I would have to see the document, but, yes.
Q. Mr. Medley was also a personal grade 11, wasn't he?
A. Correct.
Q. Now, at the time that you left BMW Manufacturing in January of 2022, you were aware that the plan was for BMW Manufacturing to transfer you to the TX-64 position, correct?
A. I had seen my name on a PowerPoint, yes.
Q. But you never actually transferred to TX-64 before you left, did you?
A. Correct.
Q. And you also didn't receive anything in writing

from BMW Manufacturing that indicated that you would -- your pay or benefits would be reduced in any way related to a transfer to TX-64, did you?
A. I never received an offer from BMW.
Q. And you also never received a change letter?
A. I never received a document from BMW.
Q. In the fall of 2021, TX-64 had never been formally graded, had it?
A. Correct.
Q. Your testimony during the jury portion of the trial was that in the fall of 2021 when Ms. Petrasch met with you about the TX-64 position and moving you from TX-60 to TX-64, the 64 position would be graded as a function level four, is that what she told you?
A. Yes, she did.
Q. Ms. Petrasch never told you when that would happen, did she?
A. She told me at the time of the changes that recruiting was going to be moved out and TX-64 would be a function level four.
Q. And when were the changes going to take place?
A. February of 2022.
Q. You weren't there in February of 2022, were you?
A. Correct.
Q. But Ms. Petrasch, in that same communication, she

never told you your pay and benefits were going to be cut if TX-64 was a function level four position?
A. She told me it would be a function level four, and based on my knowledge as the compensation manager, I knew what was going to happen.
Q. That is based on your knowledge, that is not what she told you, though, right?
A. She told me function level four.
Q. And so your knowledge was based upon the policy that you had put in place earlier that year?
A. The policy that BMW put in place.
Q. That you, as TX-60 --
A. That I implemented.
A. Correct.
Q. The same policy that we just talked about that Ms. McCraw removed?
A. Correct.
Q. Now, at trial you heard the testimony that Mr. Medley is currently in the TX-64 position, correct?
A. Currently now?
Q. Yes.
A. I don't know. I don't know where Scott is right now.
Q. Well, my question is, you heard the testimony from Ms. McCraw at trial that Mr. Medley is currently in the

TX-64 position, didn't you?
A. I don't recall that but -- yeah, I don't recall that.
Q. All right. Fair enough.
Now, do you recall at trial seeing that Mr. Medley is still a personal grade 11 based on the SAP records?
A. Yes.
Q. Do you recall seeing the documentation at trial that Mr. Medley has received pay increases every year since you left BMW?
A. I do.
Q. On December 10th of 2021, you made the decision to leave BMW to take a position at Madewell, correct?
A. Correct.
Q. And when you accepted the job at Madewell in December of 2021, you knew that you were taking a 50 thousand dollar pay cut, right?
A. I did.
Q. And in January of 2022, you were not terminated by BMW, were you?
A. I was not.
Q. In fact, when you walked out the door in January of 2022, you still had a job at BMW, didn't you?
A. Yes, I did.

Q. You walked away from that job that paid you $202,450 didn't you?
A. Out of necessity because I had been discriminated against, yes.
Q. But you walked out the door taking a 50 thousand dollar pay cut?
A. I did.
MR. MCCOY: Thank you, Ms. Dawsey. That is all the questions I have.
MR. MURPHY: I have a couple, Your Honor.
THE COURT: All right.

REDIRECT EXAM CONTINUED

BY MR. MURPHY:
Q. Just so the record is clear, do all personal grade 11 get paid the same amount?
A. Not necessarily, no.
Q. Okay.
MR. MURPHY: I don't have anything further, Your Honor.
THE COURT: All right. Thank you, ma'am. You may return to your seat.
Your next witness will be Mr. Gibson?
MR. MURPHY: Yes, sir.
THE COURT: Let's take a short break before we start.

(Whereupon, a short recess was held.)

THE COURT: All right. I will be glad to hear from you.

MR. MOODY: As we go back on the record, we would just like to note on behalf of BMW MC that Mr. Gibson is an individual we filed a motion to exclude, motion in limine on. It is ECF 156. We would just like to note that for the record for the reasons that are contained in that motion.

THE COURT: So, are you renewing your motion?

MR. MOODY: Yes, Your Honor, we would like to.

THE COURT: Mr. Murphy, do you have any response in addition to what you already submitted?

MR. MURPHY: Not in addition to what we already submitted.

THE COURT: All right. Well, let me go ahead and address that. I believe I previously ruled that motion was moot by reason of the fact that Mr. Gibson's testimony would be presented at the bench trial, and so BMW has now taken the motion that -- I think asserting it is no longer moot and reasserting the motion. So, let me go ahead and rule on that.

Prior to the trial, of course, Defendant BMW MC filed a motion in limine to exclude the testimony and reports of Mr. Gibson, that was at ECF number 56 (sic).

As noted, the parties subsequently agreed that the issue of economic damages should not be submitted to the jury, but should be tried to the bench instead; therefore, the Court determined that motion in limine to exclude the testimony and reports of Mr. Gibson should be denied as moot. That order is at ECF 186.

A jury trial was conducted concluding with a jury verdict in favor of Plaintiff as to her national origin discrimination claim, and an award of both compensatory and punitive damages, and so by agreement of the parties, we proceeded today with the economic damages bench trial.

To the extent the motion is no longer moot, I will deny it. The rationale underlying pretrial motions in limine does not apply in a bench trial where it is presumed the Judge will disregard inadmissible evidence and rely only on competent evidence. This is noted in the case of *Aspen American Insurance Company versus Landstar Ranger, Inc.*, 225 Westlaw 3527655, a 2025 Middle District of Florida case.

Arguably, in order for the Court to address the admissibility of the testimony, the expert's testimony would have to be proffered, this would make no sense in the context of a bench trial. Indeed, the purpose of a motion in limine is to permit the pretrial resolution of

evidentiary disputes without having to present potentially prejudicial evidence in front of a jury.

I would also note the case of *Wright versus Nelson* 2026 Westlaw 447957, a Southern District of Indiana case from February of this year noting that because that matter was a bench trial, motions in limine were not necessary to prevent prejudicial evidence from being shown to the jury.

I conclude that it is unnecessary in a bench trial to determine whether particular evidence should be excluded prior to the start of the trial, and so I would deny the motion in limine to exclude the testimony and reports of Mr. Gibson. Certainly I will have to consider what should be considered and how much weight to give such testimony, and I am confident that able counsel for the Defendant will conduct an appropriate and meaningful cross-examination.

Thank you.

MR. MOODY: Thanks for the consideration, Judge.

THE COURT: Okay.

MR. MURPHY: While we are on that line of thought, this may save time, when they cross Mr. Gibson, I believe they are intending to introduce exhibits to which I objected, specifically 37, 38, 39. And I misunderstood from the description which -- what 40 was,

I see now they are referring now to a December 1 draft, but not the final report. I have objected to those on relevance grounds. It is less of an issue, obviously, with us not going in front of the jury, but my main point on that was the drafts are not the final report, what is relevant is the final report. And so they will move to admit some or all of these, it will be subject to that objection, but I understand the spirit in which you just ruled and letting stuff in since the jury isn't here. I just wanted to state that for the record.

THE COURT: All right. Thank you.

Anything else? Did you want to say anything about that?

MR. MOODY: I mean, Your Honor, those are reports that he produced to us. It just shows the methodology and his credibility that this Court will have to determine.

THE COURT: All right. Mr. Murphy.

MR. MURPHY: Okay. Plaintiff calls John E. Gibson, Jr.

THE COURT: Sir, please come right here to be sworn.

JOHN E. GIBSON, JR., having been first duly sworn, testified as follows:

THE COURT: Please come around and have a seat in

the witness box to my left.

Mr. Murphy.

DIRECT EXAM

BY MR. MURPHY:

Q. Would you give the Court your full name, please?

A. John Ellis Gibson, Jr.

Q. And what do you go by?

A. Jay.

Q. Mr. Gibson, what is your current employment status?

A. Retired or semi-retired.

Q. And when did you retire?

A. July of 2025.

Q. And prior to retiring, where did you work?

A. Elliott Davis LLC.

Q. And for what years did you work at Elliott Davis?

A. 1984 to 2025 with a couple of detours to private industry.

THE COURT: Excuse me just a minute. Could you pull that microphone a little closer? There is a sweet spot. I want to make sure everybody on this side of the room can hear you.

THE WITNESS: Yes, sir.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Tell the Court about your experience at Elliott Davis, positions you held, and what you did there.

A. The most recent position I had before I retired was leader of our forensic pay raise litigation support group as a shareholder at the firm. Prior to that, I was in our audit practice, and prior to that I was in sort of our general practice.

Q. Okay. And as head of forensic valuation litigation support, tell the Court what your duties were or what you did in that position.

A. I managed the group or led the group of about 20 to 30 individuals, depending upon the time of and the years. We handled various types of engagements, it could be business appraisals for various purposes, income taxes, date, tax, litigation, M and A, shareholder disputes, et cetera.

Also, family law matters that required financial expertise, whether it be income analysis, business appraisal, determining marital assets versus non-marital assets, retirement account valuations, et cetera.

And litigation support group. Did commercial litigation related to breach of contract type disputes

and other disputes on intellectual property, personal injury, et cetera.

Q. And in that position, did you testify as an expert in cases?

A. Yes.

Q. All right. Let me show you a document that has been marked Plaintiff's exhibit 62, and you have a paper copy there in front of you if you prefer to look at that. I want to take you to Exhibit B, which is page 11 of Plaintiff's exhibit 62, and ask you to --

THE CLERK: I hate to interrupt, but our screen is still blank.

MR. MURPHY: That is my fault.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Take you to Exhibit B of your report and just tell the Court what that is.

A. This was my testimony experience for the four years prior to 2025.

Q. Were any of these employment discrimination cases like what Ms. Dawsey has brought?

A. No, sir.

Q. Do any of these cases involve calculating lost income and lost wages?

A. There would be -- not on this page.

Q. Have you been retained and offered opinions before on -- that involve calculating lost income and lost wages?
A. Yes.
Q. And is there anything unique to calculating lost income that requires any special or additional training other than what you acquired during your career?
A. No, sir.
Q. So Exhibit B here, these are cases where you actually testified in court or in arbitration; is that correct?
A. I believe there is a couple on here that were just in deposition, looks like two maybe.
Q. You have been qualified as an expert before in the area of economic damages?
A. Yes.
Q. Has any court ever refused to qualify you as an economic expert?
A. No, sir.
Q. Tell the Court your education.
A. I have a Bachelor's degree from Wofford college in accounting and economics.
Q. What year did you receive that?
A. 1984.
Q. So, the record is clear, what is Plaintiff's

exhibit 62?
A. It is my expert report in this matter.
Q. And if I take you to pages nine to ten of it, can you tell the Court what this is?
A. It is my professional overview listing education and prior employment.
Q. And is it accurate or materially accurate?
A. Yes.
Q. And who prepared this report, Plaintiff's exhibit 62?
A. I did.
Q. Did you have assistance?
A. Yes. We started this engagement while I was actively at Elliott Davis, and then the updated reports were prepared while I was retired with assistance from Elliott Davis employees.
Q. Okay. Was it normal to have employees assist you in preparing your expert opinions?
A. Yes.
Q. All right. I want to talk for a minute about the scope of your opinion. What are you offering an opinion on in this case?
A. I was asked to determine the earnings Ms. Dawsey might have if she had stayed in the same position at BMW versus the compensation or earnings she had after she

left BMW.
Q. Okay. Were you asked or are you seeking to give an opinion on whether BMW did anything wrong?
A. No.
Q. Are you offering an opinion on any facts that Ms. Dawsey and BMW dispute?
A. No.
Q. Are you offering any opinion on mitigation efforts or employability?
A. No.
Q. Are you offering any vocational rehab-type testimony?
A. No.
Q. So, the calculations you performed, would those vary based on whether Kelly Dawsey resigned or was terminated?
A. No.
Q. And would your calculations vary based on whether the resignation was considered voluntary or involuntary?
A. No.
Q. And does Plaintiff's exhibit 62 accurately reflect your opinion in this matter?
A. Yes.
MR. MURPHY: Your Honor, at this point we move to qualify Mr. Gibson as an expert to testify as to the

economic losses Ms. Dawsey has incurred as a result of the cessation of her employment at BMW.

THE COURT: Any objection to the witness being qualified as an expert?

MR. MOODY: Your Honor, may I ask one question of the witness.

THE COURT: Yes.

CROSS EXAM

BY MR. MOODY:

Q. Mr. Gibson, am I clear hearing you from your deposition and today, after an entire career of forensic evaluation, that you have done all of these other disciplines, income tax, business appraisal, et cetera, and this is the first employment law case that you have testified in now that you are retired?

A. Yes, sir.

MR. MOODY: That is the only question, Judge. The position would be, Judge, he has never been offered or testified as an expert in employment litigation before. He talked about shareholder disputes, family law matters, retirement accounts, commercial litigation, intellectual property, personal injury, it is totally different from what we do in Title VII in this court. That would be our objection.

THE COURT: Any response to that?

MR. MURPHY: Your Honor, he doesn't have to have prior testimony experience in exactly the same issue, you just have to show the person has the requisite skills and knowledge to render an opinion, and he has testified he has that. He has done this in other contexts, not in an employment case, but he has done the same type of work in other cases. He has the experience and any other objection would go to the weight, but not the qualifications of the expert.

EXAM

THE COURT:

Q. Mr. Gibson, the type of calculations you made and the methods you used to develop your report, are those consistent with the types of calculations you have made and reports you have issued in other types of matters for which you have been qualified to testify?

A. They are similar, yes, sir.

THE COURT: Okay. I am going to overrule the objection and find the witness to be qualified to testify as an expert within the field for which he has been proffered.

MR. MURPHY: Thank you.

DIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. Prior to issuing this report, Plaintiff's exhibit

62, did you provide earlier draft reports?
A. Yes.
Q. Why did you do earlier drafts?
A. We were engaged first in this matter, I believe, at the end of 2022, and we issued a report in January of 2023 with an initial calculation.
We were contacted -- I was contacted again in October of '25 and provided additional information that I did not have at that time I did the initial report, which I utilized in preparing a second report draft.
And then from there I believe there were two other versions based on some additional information and changes that I considered between October and December of 2025.
Q. And is that common to have draft reports and then a final report?
A. Yes.
Q. And then coming to your final conclusions in Plaintiff's exhibit 62, did you take into account input you received from BMW and information they provided?
A. I was provided an expert report from BMW and it had some things in there that I considered and used or changed my approach on related to that report.
Q. And just to be clear, as a result of this additional information you got over the course of the

case, did the numbers go up or did they go down?
A. They went down from the initial version in 2023 to the October '25 version and t hen the final version it was down from that version as well.
Q. Okay. Now, when you are putting information together to give an expert opinion, is it common to rely on information from the party that hired you for information?
A. Yes.
Q. I want to just talk about a couple of issues on methodology, then I will have you explain the report to the Court.
In terms of a starting point for damages, what pay rate did you use in your methodology?
A. So, for the BMW compensation and benefits started with Ms. Dawsey's last year of employment 2021, we reviewed payroll records of W-2 forms for 2017 through 2021 related to her earnings and benefits.
Q. Okay. And from what date did you start measuring the damages?
A. January 17th, 2022.
Q. Okay. And what date did you use for the end of the lost pay, back pay, and front-pay analysis?
A. July 5th, 2028.
Q. What happens on July 5th, 2028?

A. Ms. Dawsey turns 60, and she indicated she had planned to retire at the age of 60.

Q. When you normally do these analysis, what dates do you use for an end date?

A. You could use work life expectancy or some other date as may be appropriate.

Q. Okay. If you use work life expectancy in your report, would Ms. Dawsey's damages go up or go down?

A. I didn't look at the work life expectancy tables, but based on prior experience, I would think it would be fairly similar to the time frame of her early retirement.

Q. What kind of income is reflected on a W-2?

A. It would be all taxable compensation, including base pay, bonuses, other taxable benefits, such as employer 401K match, phone allowance, vehicle allowance, et cetera anything that is taxable compensation.

Q. Are there certain benefits employers provide and list on compensation statements that are not part of W-2 income?

A. I don't recall any there. The employee's 401K contribution is nontaxable, but it would still be reflected on the W-2 as it is included in Medicare wages.

Q. Is use of W-2 income appropriate for measuring lost income?
A. Yes.
Q. Why?
A. It encompasses compensation that is taxable.
Q. In your report, what did you do to calculate Ms. Dawsey's future wage growth?
A. Oh, I looked at the average -- looked at compensation increases year over year and took an average.
Q. Compensation increases year over year for who?
A. Ms. Dawsey.
Q. And is that an accepted means of projecting growth?
A. Yes.
Q. Okay. What I would like for you to do now, if you would, walk the Court through your report and then explain your conclusions in whatever is the easiest way for you.
A. On page 5, talk about -- I talk about future compensation. And as I just said, I started looking at her compensation from BMW from 2017 through 2021. Calculated her future salary based on an increase of 3.27 percent, which was the average of those increases from that period.

In addition to her base salary, based on review of the W-2, she had additional compensation, took it up to the W-2 amount, which would include bonuses, company vehicle, and other employee benefits. Looked at the additional compensation compared to her base over that same time period, and the average was 30.36 percent, which I used in the future as well.

And then for benefits, BMW has a 401K matching program and a retirement income account that is funded by BMW. I looked at the retirement contributions of the RIA account and the employer match, and then the average percentage of her retirement contributions compared to her salary were 7.7 to 11.1, and I used the average of nine-and-a-half percent going forward. I increased that one percent when she reached age 55, age 60, as the retirement income account plan had a one percent increase when the employee reached age 55 and 60.

And then I also computed her retiree medical payments and increased them, I believe it says two-and-a-half percent in the report as I was preparing for this yesterday, I notice I used 2.83 percent in the calculation. The 2.83 percent is an average of the cost of living adjustment or Social Security, I used that instead of two-and-a-half percent.

The total of those, the base pay, additional compensation, and future amount of the 2.1 million dollars for the period January 17, 2022 through July 5th, 2028, plus the additional five years to 2033 for the retiree medical payments, that was only a five year period for that.

Use the same analysis or process to determine the mitigating compensation related to her employment at Madewell Home Services for part of 2022 and GSP Airport District, where she currently works. I looked at her salary, actual salary for '23, '22, '23, '24 for GSP, and I determined that her increases for '23 and '24 were 6.2 percent average, so I used that average as her future annual increase for GSP's compensation.

GSP also has an incentive plan that provides an incentive of between five and ten percent of base salary. She was in the bracket that would receive a ten percent bonus, her actual bonus or incentive was less than one year, but it was ten percent, I believe, in '24, I used the ten percent in the future amount going forward.

In addition, there is monthly vehicle, phone allowance, and group term life insurance. I included those in my analysis. I did not increase the vehicle and phone allowance amounts. I did increase the

long-term life insurance by an average of six percent, which is based on an increase for the -- during the actual period.

And also included her 401K with GSP. She had been contributing five percent, they matched up to five percent of gross income, so I included that as her mitigating compensation benefit retirement for GSP. The total of the future compensation for and actual future and actual compensation for GSP was approximately 1.5 million dollars.

Then I, on exhibit C-1, I took those amounts and for the future, past the trial date of February 17th, 2026, I computed a present value of those future benefits back to today's dollars using a discount rate derived from U.S. Treasury rates between 3.5 and 3.9 percent. And the concluded future value -- present value of future loss compensation was 605,118.

Q. When you say "present value of future loss compensation of 605,118," does that number also include the back pay number?

A. Yes.

Q. Just so the record is clear, what is the purpose of present valuing future losses?

A. Present value is -- you put the future compensation or future losses back in today's dollars

based on that discount rate.
Q. Okay. So, are you reducing the number? Increasing the number?
A. It would reduce the number.
Q. What is the theory of -- why are you reducing the number of future damages?
A. Because you expect some growth in the future and you are bringing her back to today's dollars.
Q. So, to be clear, under your analysis, what amount would fully compensate Ms. Dawsey for the past and future economic losses she has from the cessation of her employment at BMW?
A. Six hundred five thousand, one-hundred eighteen dollars ($605,118).
MR. MURPHY: Your Honor, at this time I move -- this has not been stipulated, I move for the admission of Plaintiff's exhibit 62.
MR. MOODY: Your Honor, I will abide by this Court's orders previously and we will cross him on it.
THE COURT: Thank you. Sixty-two (62) is admitted.
MR. MURPHY: Your Honor, no further questions at this time.
THE COURT: Okay. Do you need a break or keep going?

MR. MOODY: Judge, I would appreciate a quick one.

THE COURT: We will take a short break. I am not trying to hold anybody up. It seems like we are okay on time.

MR. MOODY: We are moving faster than we anticipated, Judge.

THE COURT: I have to be here all day anyway.

Sir, you may also take a break, but do not discuss your testimony with anyone during the break, okay.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

(Whereupon, a short recess was held)

THE COURT: Before we start with the cross-examination, it may be prudent for us to just get on the record that everyone agrees that all of the exhibits admitted during the jury portion of the trial will also be deemed admitted for this portion of the trial subject to any objections made to those exhibits that I have ruled on, is that okay?

MR. MURPHY: Yeah. And I think probably the testimony, as well, if the Court wants to reuse it. I obviously did not go through all of the background and foundation with Ms. Dawsey, I assumed you were taking

into account the jury trial record. So, no objection from me.

THE COURT: Testimony and exhibits.

MR. MCCOY: None from us either, Your Honor.

THE COURT: All right.

MR. MCCOY: I can't speak to all of Germany.

THE COURT: I can't take credit for that because the court reporter reminded me of it and I appreciate that. It is wonderful to have good people keep it between the rails, so to speak.

Okay, Mr. Moody.

MR. MOODY: Yes, sir. And for the record, I have a little bit of an asthma issue this morning. I apologize for coughing into the microphones, I tried to take care of that during the break. But I will do my best.

THE COURT: I understand. And if at any point in time you need to take a break. You let us know.

MR. MOODY: Judge, I certainly appreciate that.

CROSS EXAM

BY MR. MOODY:

Q. Mr. Gibson, good to see you. As you recall, I am Randy Moody. I think I deposed you on December 4th or somewhere about that. I want to go through and thank you for going through your report, but obviously

my job is to cross-examine you like I did in your deposition. And as you know, you issued another report following the deposition that I have not had an opportunity to talk to you about. Let's see if we can find some things to agree on.

Mr. Gibson, do you recall when I deposed you in early December, that you agreed with me that if Ms. Dawsey did not leave BMW, that she would have zero damages; do you remember that?

A. I remember that, yes, sir.

Q. You agree if she did not leave BMW, she would have zero damages, right?

A. After more thought and consideration, it is beyond my scope.

Q. Okay.

A. I don't have the context of what was going on between BMW and Ms. Dawsey.

Q. All right. So, but you testified that day under oath to tell the truth, nothing but the truth, so help you God, and you said zero damages, didn't you, sir?

A. At that day, yes, sir.

Q. Thank you so much.

And today you are crawfishing on us a little bit saying that is beyond my scope. Is that fair for me to characterize it that way?

A. I am saying, after additional consideration, I don't have the context or knowledge to answer that question.
Q. Yeah, and you have never testified in an employment law case before, have you, sir?
A. No, sir.
Q. You don't have training in employment law cases, do you, sir?
A. I have looked at examples, I have read stuff on employment law cases. I do not have testimony experience.
Q. And you consulted the report of Nick Harris in this case, right?
A. Yes, sir.
Q. And he had some statements about, you know, qualifications in employment law case, do you recall those?
A. It has been a while since I looked at it.
Q. Well, we will get to that.
All right. So, let's talk about the fact that we have multiple reports from you in this case, right?
A. Correct.
Q. And those multiple reports were a result of a number factors, some of them being information that you did get from Ms. Dawsey, correct?

A. Correct.
Q. Information that you did not receive from Ms. Dawsey, correct?
A. I don't have all the particulars of what information you are referring to.
Q. No. I am just saying, there were things that you did not get from Ms. Dawsey and you had to do a supplemental report when you did get information, right?
A. I don't recall those issues.
Q. That is fine. But you worked with Mr. Murphy on all of these reports, didn't you?
A. Yes, sir.
Q. And let's see if I -- Judge, I know that Mr. Murphy has some objections, so I will have to do it the old-fashioned way.
Let's look at what we have marked as Defendant's exhibit 38. So, Mr. Gibson what we marked as Defendant's exhibit 38 is entitled "Expert Report of John E. Gibson Jr.," with all of the alphabet behind it. It says "Confidential," has Elliott Davis logo on it, do you remember this one, sir?
A. Yes, sir.
Q. Is this your report that you prepared January 18th of 2023?
A. Yes, sir.

Q. Okay. And I will represent to the Court and Mr. Murphy that everything in this exhibit is as you provided it to us. And do you recall -- let me see, Mr. Gibson, if I can get there real quick, that you gave a summary opinion that Ms. Dawsey's losses in exhibit C 1, is that number right there the correct number for your opinion?
A. Yes, sir.
Q. Okay. So, in January of 2023 you opined that her losses were $829,537, correct?
A. Correct.
Q. And this is the summary sheet on page four; would that be correct, sir?
A. Yes, sir.
Q. And the present value of lost -- the back pay at that time was $164,462, right?
A. Yes, sir.
Q. And then the front pay was you had 624,918, correct?
A. Correct.
Q. And then post retirement you had at 40,157, right?
A. Correct.
Q. Now, over time those numbers change, don't they?
A. Yes, sir.
Q. And the back pay number gets bigger and the front

pay gets smaller?
A. Correct.
Q. And then your total number gets down in the 500,000 range and the 600,000 range, right?
A. Correct.
Q. And you remember when I deposed you, based upon information I had at that time, you admitted there were a number of errors, omissions and mistakes in the reports that we had received, do you agree with me?
A. Yes, sir.
Q. Thank you.
MR. MOODY: Your Honor, based on Mr. Gibson's acknowledging this is his report, we move for the admission of Defendant's exhibit 38, which is his report from January 18th, 2023.
MR. MURPHY: My prior objection, Your Honor.
THE COURT: Objection is overruled and Defendant's 38 is admitted.
MR. MOODY: Thank you, Your Honor.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Brings back old memories, I enjoy this the old-fashioned way.
Mr. Gibson I will show you the next thing we received from you, it is Defendant's exhibit 39. Do

you see that, sir?
A. Yes, sir.
Q. All right. This is your cover sheet and the same cover sheet except for the fact that the date is different, it says "October 31st, 2025," correct?
A. Correct.
Q. And I think the "Elliott Davis" logo has also been removed, correct?
A. Correct.
Q. As far as this report, I will represent to you, the Court, and Mr. Murphy, that this is how you produced it to us. So, as of this date of October 31st, 2025, your summary sheet on page four of this report indicates the back pay number is now $414,624, which has gone up significantly, right? From your previous report?
A. Because the dates changed, yes, sir.
Q. Okay. And then the front pay is at 207,192, correct?
A. Correct.
Q. And the post-retirement is at 40,886, a little bit of alteration in that number, whatever that may be, for a total amount of 662,702, correct?
A. Correct.
Q. We have gone down, you know, over a hundred thousand dollars, right?

A. Yes, sir.
Q. And in the passage of time, why did the numbers go down over a hundred thousand dollars, sir?
A. At the October '25 date, I had Ms. Dawsey's actual compensation for GSP in '23 and '24, which were supplemented into the report, which increased her mitigating compensation.
Q. Thank you.
A. In addition, the BMW compensation was reduced slightly, as I noted that in the initial report, I believe it was a vehicle allowance maybe, I would have to look back at that exhibit, but I believe it had been double counted, so I took it out of the initial report. And I think there was a slight difference in the retirement between reports on the BMW, which brought the number down.
Q. Okay. So, through the passage of time, the number dropped over a hundred thousand dollars, almost two hundred thousand dollars, and you actually had some real data from Ms. Dawsey that increased her mitigating compensation, correct?
A. Correct.
Q. All right. And if you look at your exhibit C-1 here, that is that 662,702, that is the takeoff, correct?

A. Yes, sir.
Q. According to the summary on page four, whatever that was, correct?
A. Correct.
MR. MOODY: Your Honor, based upon Mr. Gibson acknowledging and testifying about this second report, Defendant's exhibit 39, we move for its admission.
MR. MURPHY: Same objection.
THE COURT: Overruled, it is admitted. Thank you.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. And, Mr. Gibson, you testified that in between the second report and then the next report that is coming in, December 1st, you received a report from an expert on behalf of BMW; do you recall that?
A. Yes, sir.
Q. And when you considered that report, you made some material changes from your second to third report, would you agree with me?
A. I believe I also got some additional information in addition to that expert report.
Q. Do you remember testifying that you considered Mr. Harris's critique and you made changes?
A. Yes, I remember that.

Q. So, I am going to show you what has been marked as Defendant's exhibit 42; do you see that, sir?
A. Yes, sir.
Q. Do you recall this being Mr. Harris's report that you considered in coming to your subsequent opinions?
A. Yes, sir.
Q. All right.
Q. Do you recall seeing the table of contents, sir?
MR. MURPHY: Your Honor.
THE COURT: Sir?
MR. MURPHY: I don't believe this is being offered as an exhibit, so I would have to object to him being questioned on if they are trying to admit the contents, or get into the contents of this exhibit, I don't believe this was on their list. And it is not impeachment materials, so I have to object to getting into the contents of this.
THE COURT: I don't see Defendant's 42 on the list of exhibits Defendants provided in response to my request about how this hearing was going to go. I am looking at the Jackson Lewis email of March 4th, 2026.
MR. MOODY: Your Honor, I think that is correct. I didn't anticipate his witness talking about what my fellow did in the opinions and the critiques. So, when he testified about it, he opened the door to this.

THE COURT: When he testified in response to --

MR. MOODY: Today.

THE COURT: -- to your questions about what your expert said?

MR. MOODY: To Mr. Murphy's questions. He said, I considered the BMW expert.

MR. MURPHY: Your Honor, that was the testimony before. That is not a reason not to mark it as an exhibit or try to use it, that is not a surprise of any kind. That has always been -- our position has always been he has taken information. So, This is information that was known to them. If they are going to try to refer to it, it should have been listed as an exhibit. Again, this is not impeachment, so I think they are just trying to backdoor in exhibits that weren't listed, so I have to maintain my objection.

MR. MOODY: Your Honor, we are not trying to backdoor in any exhibit, this was an exhibit that was premarked in the books way long ago. We didn't anticipate we would need to use it today until he talked about it, that is why I want to use it because he did it in his direct.

THE COURT: So, are you offering it for a limited purpose?

MR. MOODY: Yes, Your Honor. I am trying to

find out what he considered.

MR. MURPHY: He didn't ask him that question.

MR. MOODY: Well, I am going to.

THE COURT: Well, I will overrule the objection insofar as you are going to ask him questions about this based upon his testimony on direct, but that is for a limited purpose and not for the purpose of providing opinions from an expert who is not going to be testifying today.

MR. MOODY: I am not trying to do that, Judge.

THE COURT: Okay.

MR. MOODY: I just want to know what his world was, especially in light of the fact that he has not previously been involved in one of these cases.

THE COURT: Okay.

MR. MOODY: That is where I am trying to go.

THE COURT: All right.

MR. MOODY: Thank you, Judge.

THE COURT: This is 42?

MR. MOODY: Yes, Your Honor. Are you ready for me?

THE COURT: Yes, go ahead.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Mr. Gibson, did you see the table of contents and

read this report fully?
A. Yes, sir.
Q. All right. So, you saw the basis for opinions that Mr. Harris had and you had an opportunity to reply to all of those; is that correct?
A. I had an opportunity to consider, yes.
Q. Great. That works for me.
If we go to the next page, you didn't see any reason that Mr. Harris would not be qualified as an economic expert like yourself, did you?
MR. MURPHY: Objection, Your Honor. This goes beyond the scope of his testimony and his expertise. He is not here to opine on the expertise of another person who is not even going to testify in this matter. And all he is going to try to do is walk him through this report and get you to hear the report that is not an exhibit.
THE COURT: He says he is not, but we will see. I sustain the objection as to questions about the other person's expertise or qualifications.
MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Do you see on page six, did you see any misstatement of your opinions by Mr. Harris, sir?

A. No, sir.
Q. Thank you.
THE COURT: That was page six?
MR. MOODY: Yes, Your Honor.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Would you agree on page seven that your calculation as a measure of loss is attributable to her decision to resign from BMW?
A. My loss is -- are calculated based on if she had stayed, it didn't really have anything to do with resigning or not resigning. Whether she had stayed, what would her compensation be at her position versus her mitigating compensation for alternative employment.
Q. You see where Mr. Harris noted some treatises regarding the Practice Aid for measuring damages involving individuals? Did you go consult that Practice Aid of the American Institute of Certified Public Accountants, sir?
A. I recognize that Practice Aid, yes, sir.
Q. Did you go consult that Practice Aid in formulating your opinion?
A. I have reviewed that Practice Aid.
Q. The provision that he cited, did you go consult it after reading his report?

A. Yes, sir.
Q. Did that change the basis of any of your opinion about reading the treatise that Mr. Harris cited?
A. No, sir.
Q. Okay. Thank you.
Likewise, he cited the Litigation Services Handbook, the Role of a Financial Expert, did you consult that before doing your reports in this case?
A. Yes, sir.
Q. Before your first report?
A. I believe so.
Q. You see on page nine there is a statement:
"Thus, had Ms. Dawsey simply continued her employment with BMW until she commenced her employment with GSP, her alleged lost earnings would be nominal, if anything."
Do you see that statement?
A. Yes.
Q. Do you agree with that statement?
MR. MURPHY: Your Honor, again, this is beyond the scope of expertise. All he is trying to do is backdoor in an opinion that is not admissible, not before this Court. He has testified what the scope of his opinion is. He is measuring simply the damages

from one point to another without regard to what caused them or whether it is tied to a resignation or not. So, I don't think he can be cross-examined on the basis of somebody else's report. All that is doing is back-dooring in an exhibit they never identified for this purpose and he is not questioning him about his opinion, he is questioning him about Mr. Harris's opinion.

MR. MOODY: Cross-examination, Judge.

THE COURT: Well, you are asking him about an opinion of an expert who is not testifying and who has provided a report that has been admitted for a limited purpose. You can ask him -- my impression was you were going to ask him questions about what in Mr. Harris's report that he relied on in preparing one of his reports.

MR. MOODY: Yes, sir.

THE COURT: I think this question goes beyond that.

MR. MOODY: Let me see if I can ask it in an affirmative way.

THE COURT: All right. So, you are withdrawing that question?

MR. MOODY: Yes, Your Honor.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Mr. Gibson, did you consider whether if Ms. Dawsey stayed at BMW until she took the job at GSP what amount of damages she would have?

A. No, sir.

Q. You did not consider that at all?

A. No, sir.

Q. If you had considered whether she had stayed at BMW and waited to go to GSP, would her damage amount be significantly reduced from your 605 number?

A. I did not know that because I had not been engaged to do that, and did not have an analysis.

Q. I am asking you --

A. I can't do that in a simple question. It took me hours to analyze everything else. I haven't analyzed your situation that you are asking me to do.

THE COURT: He is not asking you for a number, he is just asking what impact it would have. If you are not able to answer that.

THE WITNESS: I am not able to answer it because I don't have all of the facts related to what that could be.

THE COURT: Okay. Go ahead.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. All right. Were you aware that Mr. Harris said it would be nominal, did you not consider that, sir?

A. No.

MR. MURPHY: Your Honor, that is what you just ruled on five minutes ago. That is what Mr. Harris said. He is trying to just question him based on a statement made by somebody else that is not before this Court.

THE COURT: Sustained. Go ahead.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Sir, when you read the report, did it make any inference on you to consider the fact that Ms. Dawsey could stay at BMW and wait for the GSP job and her losses would be significantly less?

MR. MURPHY: Objection, calls for speculation, Your Honor.

THE COURT: Overruled. He can answer the question if he is able. The questions was whether he considered that.

THE WITNESS: I did not consider that.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. And you didn't consider it because they didn't ask you to consider it, did they?

A. No, I didn't consider it because it was outside of the scope of what I was asked to do.

Q. And what were you asked to you?

A. I have already stated that I was asked to determine Ms. Dawsey's earnings, benefits if she had stayed in her same role at BMW versus her alternative compensation after BMW.

Q. All right. And as you stated in your direct, you didn't care if it was a resignation or termination, the calculation would be the same for you?

A. Yes, sir.

Q. When you considered the retirement medical payments, did you consider those might be too far out in the future and speculative?

A. I assumed that they would continue on like everything else would and adjusted for an increase in the benefit.

Q. Did you consider any kind of time limitation on front-pay sir?

A. I used the front-pay from January 17th to the date of the trial.

Q. And you also used post-retirement front-pay for 47-something thousand, didn't you, sir?
A. Yes, sir.
Q. Why didn't you limit that to retirement?
A. Could you repeat the question?
Q. Why did you calculate post-retirement front-pay?
A. That was the future compensation after the trial date.
Q. And, Mr. Gibson, I am going to show you next what has been marked as Defendant's exhibit 40. Again, we went from October 31st, 2025, which was your second report, the calculation was 662,702; and then in Defendant's exhibit 40, this is a December 1st, 2025 report that I think I received the day before you were deposed. Do you recall doing this report, sir?
A. Yes, sir.
Q. And in this report, the calculation goes to 579,471, right? Do you see that on page four, sir?
A. Yes, sir.
Q. Again we see the back pay number going up to $384,415, the front-pay number to 154,170, and the post-pay -- post -- front-pay post-retirement at that 40,886 number; is that right?
A. Correct.
Q. I will go to C-1 like I did before, if I can find

it quickly.
You see that box number 579,471 would be the number that you take off and put in your summary, correct, sir?
A. Correct.
Q. Do you recall what the changes were from your second report to your third report?
A. I don't recall specifically the difference in those.
Q. Do you recall when you testified in your deposition that one of the major reasons that you did an additional report is you had reviewed what Mr. Harris had said?
A. Yes, sir.
Q. And so do you recall that you -- Mr. Harris' report was on November 20th, you looked and considered your calculations, and you moved them from starting at 829,537 down to 579,471, right?
A. I believe I went from 662 to 579 based on what he had; the 820 was an early report back in '23, two years prior to having that additional information.
Q. Okay. So, in your third report, after reviewing Mr. Harris's critique, you came to 579,471, right?
A. Yes, sir.
MR. MOODY: Your Honor, based on his

identification of his third report on December 1, 2025, we move to admit Defendant's exhibit 40.

MR. MURPHY: Same objection.

THE COURT: Overruled, it is admitted. Thank you.

MR. MOODY: Thank you, Judge.

MR. MOODY: This is, I think, identical to Plaintiff's exhibit 62. We put it on our list, I just wanted to make sure that it is there. It is the expert report of John E. Gibson, Jr., dated December 22 of 2025. And, Judge, I think it is the same as Plaintiff's exhibit 62. I had it in my list, I was using mine.

THE COURT: That is 41?

MR. MOODY: Yes, Defendant's exhibit 41.

THE COURT: Any objection to 41?

MR. MURPHY: If it is the same, no.

THE COURT: You say it is the same as Plaintiff which one?

MR. MOODY: Sixty-two (62) I think, Judge.

MR. MURPHY: Sixty-two (62).

I don't see it on their list, unless I missed it. That is possible. If it is the same I don't.

MR. MOODY: I apologize, my partner might have taken it off because it was already his exhibit.

THE COURT: So 41 is admitted without objection.

MR. MOODY: Thank you, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Mr. Gibson, I am going to ask you the same or similar questions as I did before. On December 1st, 2025, your amount was 579,471, right? What we just looked at?

A. Yes.

Q. And on December 22nd, I deposed you, and a few days before Christmas, weeks after I deposed you, you did this report, right?

A. Yes, sir.

THE COURT: This one is dated December 22nd, 2025?

MR. MOODY: Yes, Your Honor, December 22, 2025.

THE COURT: Okay. Thank you.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. And your most -- you have not provided any additional reports other than this fourth one, right?

A. Correct.

Q. So, as of December 22nd, 2025, on page four, your total amount for alleged losses is 605,118, right?

A. Correct.

Q. The back pay amount is 389,907, pay amount is 169,851, and front-pay post-retirement has gone up to 45,360; is that correct, sir?

A. Correct.

Q. And if we go to exhibit C-1, that number, that 605,118, that is your take off, correct?

A. Correct.

Q. So, after I deposed you, you did an additional report, did you have discussions with Mr. Murphy about any calculations?

A. I believe there was one minor change, the big change in the two reports was a math error I found in December 1st, 2025 report related to the present value calculation.

Q. And what was your math error, sir?

A. It had the wrong formula for the present value, which reduced the present value and future compensation lower than it should have been.

Q. All right. And we had just deposed you, there were many mistakes and oversights -- and, Your Honor, just for the record, I am not going to belabor this with Mr. Gibson, we have cited all of those on ECF 156 string cited on page three.

So, was there any other alteration to this number other than a calculation error that you made?

A. I believe there was -- I would have to have the two exhibits to compare, but I believe there was another slight change in one of the other numbers, I am not positive about comparing them.
Q. Okay, sir. Let's see if I can cut through some things.
Your damages opinion in this case has ranged from $829,537 down to $579,471, correct?
A. Those are the reports I issued, yes, sir.
Q. Those are the ranges, right?
A. Correct.
Q. So, that is a swing of over a quarter of a million dollars in those ranges of your reports, right?
A. Yes, sir.
Q. And each change occurred after receiving new information of rebuttal critique or information from Ms. Dawsey or Mr. Murphy, right?
A. Correct.
Q. Would you agree with me that your opinion has evolved materially over time and involvement in this case?
A. I would say the initial report was probably high based on not having very much information related to what that mitigating compensation might be, and not having all of the relevant information, but it was an

initial calculation.

Q. Thank you, sir.

Sir, would you agree with me that your opinion has evolved materially over time?

A. Yes, sir.

Q. Thank you.

And as of today, you are asking the Court to rely on your latest number?

A. Yes, sir.

Q. All right. I think today you said you didn't -- it didn't matter if she resigned, was terminated, whatever, you were going to do the same calculation; is that correct?

A. Yes, sir.

Q. So you did basically a termination calculation, correct?

A. Just calculated what she would have received had she stayed in the same position at BMW versus what she made in the alternative employment.

Q. What your calculation was to assume was liability, though, correct?

A. It was to be used if the trier of fact found there was discrimination and the potential for economic damages.

Q. You did no causation analysis, correct?

A. No.
Q. You are not offering to determine whether or not Ms. Dawsey's decision to take a lower-paying job at Madewell was correct or not, correct?
A. I am not finding any of that.
Q. All right. Sir, your back pay calculation, as we saw from your first calculation, that back pay number was small and you extended it all the way to the date of trial, right?
A. Yes.
Q. And you just did that based upon math, not considering any factors other than date to date; is that correct?
A. Yes, sir.
Q. And if you had considered whether she should have waited and taken a higher paying job at GSP, that obviously would impact your back pay calculation, wouldn't it?
MR. MURPHY: Objection, asked and answered. Objected to and ruled on, I think, already.
THE COURT: I overrule the objection. You may answer the question if you are able.
THE WITNESS: Could you repeat the question, please?

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Yes, sir. If you had considered whether Ms. Dawsey should have waited to take a higher-paying job at GSP, that would impact your back pay calculation, wouldn't it, sir?

A. If the date of July -- January 17th, 2022 would be have been different, the calculation would be different.

Q. Okay. Thank you.

In fact, you had extended back pay damages for almost four years beyond her resignation, right, sir?

A. Correct.

Q. And back pay damages are not discounted, are they?

A. No, sir.

Q. And so extending the back pay period of time increases the calculation dollar for dollar, right?

A. Versus -- increases dollar for dollar versus what?

Q. Having a discount?

A. It would not be dollar for dollar. A discount is not a dollar for dollar difference.

Q. Okay. Well, did you review the Madewell offer letter, sir?

A. I don't recall if I saw the offer letter from

Madewell or not.
Q. All right. Did you make any assumptions about that position from Madewell?
A. No, sir.
Q. Did you assume an upward trajectory there?
A. No, because I used GSP once it started.
Q. Did you consider the fact that leaving employment from BMW disqualified her from receiving a bonus for the prior year?
A. From BMW?
Q. Yes, sir.
A. I don't think I considered that.
Q. And, in fact, in your calculations, you give her the bonus, even though she left, right?
A. Well, I had it in my calculation, by agreement, I am including a bonus for 2022.
Q. Yeah. Even though she was not eligible for it because she wasn't employed on that day?
A. Well, this calculation was based on the assumption she would still be employed in the same position with BMW. It has nothing else to do with anything else, other than, my calculation if she had been -- some position at BMW continued past January 17th, 2022.
Q. So, in your calculations, you give her the BMW bonus even though she wouldn't have been employed,

correct? Simple question?

MR. MURPHY: Objection, Your Honor, he has already answered that. The top line assumption is based on she is employed. He keeps trying to change it and talk about she hadn't been employed, that is not the measure of his damages.

THE COURT: I overrule the objection.

THE WITNESS: I don't have an answer differently other than I calculated what her 2022 I think would have been had she continued employment at BMW in the same position.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. All right. And so but you don't do the same thing when you are talking about GSP, because when you calculate out her retirement, you say she will not be eligible for a bonus because she will retire before the bonus is paid out, do you see my point?

A. No, I don't see your point.

Q. Okay. That's fine. All right.

So the retirement assumption, your front-pay calculation, assumes she retires at age 60 on July 5th, 2028, right?

A. Yes, sir.

Q. And that retirement date is based upon discussions

with Ms. Dawsey?
A. Yes, sir.
Q. You don't have a written retirement notice from her, do you?
A. No, sir.
Q. And you are not aware of a contractual obligation requiring her to retire at age 60, correct?
A. Correct.
Q. And she is currently the VP of Human Resources at GSP, right?
A. Correct.
Q. If she works beyond age 60, your front-pay calculation changes materially, doesn't it?
A. I would think my calculation would then include BMW and the mitigating compensation, so I am not sure.
Q. You are not sure?
A. I am not sure what your calculation question is related to.
Q. If she works beyond age 60, your calculations change, don't they?
A. Yes, they would be increased for the BMW and for the mitigating.
Q. Yes. You are aware that at GSP she is pretty much equalized in compensation to what she was at BMW, right?

A. I haven't look at it beyond that so, no, I don't know the answer to that.
Q. Sir, I am going to show you Plaintiff's 57. This is Ms. Dawsey's total compensation at GSP. You weren't in the courtroom this morning when it was discussed. This is something she printed out. We don't have her year end, but this is -- well, this is 2023, it says total compensation 266,608.88; do you see that, sir?
A. Yes, sir.
Q. I am also going to show you Defendant's 55, this is compensation from BMW in 2021. Do you see this number right here, this 266,999.73?
A. Yes, sir.
Q. So, would you agree with me that by 2023 --
THE COURT: Put that back up.
MR. MOODY: I apologize, Judge.
THE COURT: It is okay. I am sorry to interrupt you.
MR. MOODY: No, no, no.
THE COURT: Thank you.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Next is Defendant's 55, it is 266,999.73 at the end of 2024. And then if We look at Plaintiff's 57, we see that in 2023, she is roughly total compensation

equivalent; do you see that, sir?
A. I see those two numbers.
Q. Do you agree those numbers are eerily close?
A. I would have to see more detail as to what goes into those two numbers.
Q. That wasn't my question. Do you agree --
A. The numbers are close, yes, sir.
Q. Thank you.
On your assumptions when you attributed income from BMW, you did not model any possible departure for other opportunities for Ms. Dawsey, did you?
A. No, sir.
Q. And you assumed uninterrupted BMW career path, correct?
A. Correct.
Q. Thank you.
You didn't model risk for voluntary departure, did you?
A. Typically don't model speculative changes in employment.
Q. You didn't model a restructure, a performance change, or promotion variability, did you?
A. You typically don't model that kind of thing in employment case or lost wage case.
Q. And this is your first employment case?

A. Yes, sir.
Q. So, you were just talking about a wage case, you don't typically model those things?
A. Correct.
Q. Thank you, sir.
Your growth rate assumption for BMW growth is 3.27 percent, right?
A. Yes, sir.
Q. And for mitigating earnings at GSP, you applied a 6.2 annual increase?
A. Yes, sir.
Q. So, you assume her GSP compensation is going twice as fast as to what she was at BMW, correct?
A. Correct.
Q. And if the compensation at GSP exceeds your projections, the loss shrinks, right?
A. Excuse me?
Q. Do you want me to repeat?
A. Yes.
Q. If the GSP compensation growth exceeds your projections, the loss shrinks, right?
A. That is a hypothetical question, which I can't answer.
Q. Well, you can't answer the question if the growth rate at GSP is higher than your projection, does the

loss shrink?
A. Yes.
Q. Thank you.
Now, you put a 30.36 percent additional compensation percentage on her BMW base earnings, right?
A. Correct.
Q. And those were all discretionary bonuses, right?
A. They are all additional compensation, which would include discretionary bonuses.
Q. And from retirement and RIA, you included a 401K match and RIA retirement contributions in your BMW future compensation model; didn't you?
A. Yes, sir.
Q. Now, we know at GSP Ms. Dawsey did not participate in 401K for several years, right?
A. Correct.
Q. And she just basically -- because she didn't participate she didn't get the employee match that GSP offered, right?
A. Right.
Q. We talked about that in your deposition, that was multiple years she didn't get the employee match because she was not participating. By you attributed losses to her as if she were participating in BMW retirement and

RIA, right?
A. Yes, she had historically done that.
Q. But although she had historically done it, she made a choice at GSP not to do it, correct?
A. Yes.
Q. Thank you.
Now this retired medical stuff you included, retired medical payments through age 65, and you assume she would have qualified for retired medical?
A. Yes.
Q. And that is that 40,000 dollar mark?
A. Yes, sir.
Q. Did you evaluate the plan at all?
A. I didn't have a copy -- was not provided a copy of the plan.
Q. Did you evaluate the fact that the plan could be amended?
A. Any of the benefit plans could be amended from the time; I did not consider any amendments to plans going forward.
Q. Thank you for that.
So, you assume nothing would ever change. So were you aware that BMW changed from a defined benefit plan in 2019 to a defined contribution plan?
A. No.

Q. So, for purposes of your opinion, you assume no change for all of these calculations?
A. Correct. I can't speculate as to what may change.
Q. All right. So your present value discount rate ranges from 3.513 percent to 3.896 percent, right?
A. Correct.
Q. And you base that on the U.S. Treasury rate, correct?
A. Correct.
Q. And would you agree with me that Treasury rates reflect risk-free government securities?
A. Yes, sir.
Q. And employment earnings are not risk free, are they, sir?
A. From what I read in the practice in growth rates, U.S. Treasury are acceptable to use.
Q. Okay. Do you consider employment earnings risk free?
A. Based on --
THE COURT: Are you talking about -- can you -- for the benefit of the witness and the Court, can you clarify what you mean by that? Are you talking about corporate earnings in general or --
MR. MOODY: I will do my best.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. You used a Government U.S. Treasury rate, generally as risk free as you get?

A. Right.

Q. From an employment perspective, employment is never guaranteed, is it, sir?

A. No, sir.

Q. Did you consider an employment risk adjusted discount rate is what I am asking?

A. No, sir.

Q. And what would an employment risk adjusted discount rate be in your profession?

A. I don't know. I never analyzed that or considered that.

Q. Would you agree with me that small changes in the discount rate can materially affect the loss?

A. What do you consider "small changes"?

Q. Let me just say this: Would you agree with me that changes in the discount rate can affect the loss amount?

A. It can affect the future losses present value back.

Q. Would you agree with me, if the Court increases the discount rate, that your alleged damages would

decrease?
A. Yes.
Q. And would you agree with me that if the Court shortens the front pay by even two years, that the damages drop significantly in this case?
A. I cannot say whether they would drop significantly or not. Like I say, they would drop.
Q. Well, you got back pay at four years, so if you put it at two years, would it be half of the number?
A. I don't know, I haven't run that calculates.
Q. Okay. If her mitigation is adjusted upwards, do the damages decrease?
A. Yes.
Q. Thank you, sir.
Would you agree with me that the damage number that you have opined on is highly sensitive to a number of factors?
A. It is sensitive to any assumption.
Q. Okay. So you calculated Ms. Dawsey's mitigating compensation at approximately 1.4 8 million, right?
A. Yes, sir.
Q. And that reflects her actual employment at Madewell and GSP, correct?
A. Correct.
Q. And if her earnings trajectory at GSP continues

upward, the loss diminishes more, doesn't it?
A. If -- repeat the question, please.
Q. If her earnings trajectory at GSP continues upward, the loss diminishes further, doesn't it?
MR. MURPHY: Your Honor, I have to object. We have gone over this now twice. I object.
THE COURT: I overrule the objection. He can answer if he is able.
THE WITNESS: Increases compared to what? I have increased it 6.2 percent each year for the trajectory, so I am not sure what you are asking, that is included, 6.2 percent per year. Are you asking would it increase more than 6.2 percent? I don't know any basis for increasing it more than 6.2 percent.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. You have omitted substantial amounts of money from your calculation on mitigating damages, haven't you, sir?
A. I am not aware of any.
Q. Well let's look at page 7 of exhibit 41. Can you see this okay Mr. Gibson?
A. Yes, sir.
Q. I am going to focus on one sentence here:
"Ms. Dawsey will not have eight

years of service upon her retirement and will not receive an annuity based upon her retirement, and as such, I have not included any South Carolina Retirement System Benefit in my analysis."
Do you see that, sir?
A. Yes, sir.
Q. What is the amount of South Carolina Retirement System that you excluded from your analysis?
A. I don't recall the number.
Q. Okay. Do you recall favoring us with your work and spreadsheets some time after all of these reports were in?
A. Yes.
MR. MURPHY: Has this been marked?
MR. MOODY: No.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Mr. Gibson, I am going to put in front of you --
MR. MURPHY: Your Honor, I am going to go ahead and object. He is now starting to use exhibits that were not marked or identified for use. I don't think ever. I don't think he should be allowed.
MR. MOODY: Your Honor, these are his working

spreadsheets. We didn't get them until a month ago. So, he can't recall his calculation, so I am using this to help him.

MR. MURPHY: No, he didn't say he needed to use it to refresh, and I am entitled to know what exhibits they are going to use so I can prepare my witnesses. And multiple times this morning he keeps bringing up documents that he has not identified, not marked, and this deprives me of the opportunity to know what to review and know what to prepare.

THE COURT: If this document was not included on the list of exhibits previously provided, then I don't believe there is a dispute about that. I am going to sustain the objection.

MR. MOODY: All right.

THE COURT: You can ask him about how he arrived at his calculations, but the objection is sustained.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Mr. Gibson, do you recall having working spreadsheets to support all of your reports?

A. Yes, sir.

Q. Do you recall some time after all of your reports were done you had sent those to Mr. Murphy?

A. Yes, sir.

Q. All right. And do you recall in doing those working spreadsheets that there were all kinds of tabs at the bottom?
A. Yes, sir.
Q. All right. And so do you -- do you recall doing a calculation of the South Carolina Retirement System benefits?
A. I recall looking at the actual numbers from, I believe, it was abase of records through GSP.
Q. Okay. And do you recall that that amount would be $262,150, if you add it to her income?
A. I don't recall that amount.
Q. You don't recall that the retirement account and amounts that were on the pay stubs that you received and you excluded from your calculation added up to $262,150?
A. I don't recall that part of the spreadsheet exactly, no, sir.
Q. Okay.
A. I stated why I didn't include it because she wasn't going to be eligible to receive it based on years of service.
Q. But you are aware that she could continue working past 60 and become eligible to receive that substantial amount of money, aren't you?
A. But my calculation cutoff at 60. If I had gone

past 60, I would have included it. Or if I had gone to the eight years, if she was going to work eight years at GSP, I would have included it.
Q. You chose not to do that, right?
A. Because my calculation cutoff before the years of service based on her projected retirement date.
Q. So, on your calculation, the amount of money sitting in the South Carolina Retirement System, it just vaporizes?
A. I believe she could potentially purchase years of service to collect the benefit.
Q. And you provided no calculation to us or this Court of that 200-something-thousand dollars sitting out there, did you?
A. As far as I know, she is not eligible to receive it, pension benefit.
Q. Thank you, sir, that wasn't my question. You provided no calculation about where that $262,000 goes, did you?
A. I don't believe she is entitled to it.
Q. Okay. And you performed no investigation as to whether she could be entitled to it, did you?
A. She could purchase it potentially, but I didn't include that in the calculation.
Q. And you didn't ask her if she was going to

purchase years of service at either, did you?
A. We had a discussion about including or not including it.
Q. Okay. And what was your discussion?
A. Based on her retirement, we -- and she wouldn't be eligible for service, I didn't go through the process of trying to calculate whether she would get it or not.
Q. As a lifelong accountant, did you ask her what is going to happen to the $260,000 sitting out there in the South Carolina Retirement System?
A. I did not ask her that.
Q. Are you aware of anybody, throughout your career, that just leaves a quarter of a million dollars sitting in a retirement system?
A. I don't remember it being $262,000. I just don't remember that number being that high.
Q. Well, sir, I got calculations and that is what it tells me. Also, the retiring medical --
MR. MURPHY: Your Honor.
MR. MOODY: I am moving on.
MR. MURPHY: No, you are testifying, and then saying you are moving on, I have to object.
THE COURT: I sustain the objection.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. As for the retiring medical stuff, your $45,000 number, that is a suspect number as well, isn't it, sir?

A. It is a number based on the assumption provided.

Q. And your assumption provided is that she would be eligible for it and receive it?

A. Yes.

Q. Okay. So, that is $45,000 that goes into the $600,000 amount that is questionable, according to me. And you also in your calculations and exhibit C-3, you did not give her her bonus on her last retirement date, you excluded a bonus of 20-something-thousand dollars; do you remember that?

A. Yes, sir.

Q. And you did that because she said she wouldn't be eligible because she wouldn't be employed on that day, right?

A. Yes, sir.

Q. That is another 20-something-thousand off of it, right?

A. Based on your calculation, yes.

Q. Of course. So, if your assumptions are wrong and she does participate in the South Carolina

Retirement System, and does receive that money that is sitting out there, that would be a material change to your report, wouldn't it, sir?

A. I am not sure how to define "material." I am not sure what you are defining "material" as.

Q. Would that be -- would that be a significant change to the amount of damages that you have opined on. And when I say "significant," I am talking about six figures plus?

A. I am not sure I am following your math.

Q. Well, my math is, retirement system there is 200-something-thousand dollars in the retirement system.

MR. MURPHY: Your Honor, I am going to have to object. He has not laid any foundation about whether she can actually purchase it, how much it would cost her to purchase this. He is not here to offer an opinion on it. This is way beyond the scope of the direct or his opinion.

He is measuring, and he has testified to this, what actually has happened based on actual data. And we have gone on now about an hour on questions about, if this happened, this would have happened; if this happened, and he is not offering opinion on speculation on what might happen. Nor, is there any evidence to support this notion of buying it. They are not bringing

an expert in, they don't have a witness identified with knowledge of this retirement system to say what the economic benefit to her would be even if she could buy it in the future. So, I have to object to this whole line. It is way beyond the scope of what he has been identified for or what he is qualified for.

THE COURT: Okay. Do you want to respond to that?

MR. MOODY: Your Honor, I have his data on the South Carolina Retirement System that he excluded.

THE COURT: His data?

MR. MOODY: I have his data.

MR. MURPHY: That doesn't answer the question. He says he has data. You just sustained an objection to them introducing that data. They do not have a witness to say that that number is a benefit to her because under the system she could do something in the future. There is no basis for that testimony. He is not offered to testify as to the retirement system, what she could in the future potentially buy, certainly hasn't been any evidence of what that buying it would cost. All of this is beyond the scope of what he has been identified for. And the only thing they are trying to do now is go back and put other numbers in, and without testimony linking that up to actual damages, suggest to

the Court that he is under value, but he has given you the scope of his report. And they have not introduced any evidence that this 262,000 reduces her damages. They would need an expert to get on the stand to do that. They are not, they are just offering Mr. Moody's opinion and his representation of what is in a document that you already sustained the objection to.

MR. MOODY: Your Honor, I am crossing him on his calculations and methodology and the fact that he excluded a big number.

THE COURT: The number you are getting from this retirement system number, are you getting that from something this witness prepared?

MR. MOODY: Partial, yes, Your Honor. I have got his worksheet that has where he entered the numbers into it, and I think that is important for the Court to know what he excluded.

THE COURT: One problem you have, Mr. Murphy, is that your expert said that he cut it off at age 60, but your client testified that she plans to work past age 60. So I think he should be given some leeway to ask him questions about how that would affect.

MR. MURPHY: But that is not the scope -- that might be a question they could have asked her about, but he is not an expert being offered in this area.

And it is not what his report is about. His report is about, what does the actual data show she would have earned at BMW versus what she has actually earned since then. We never offered him to give testimony on what options are available for her to access other monies that are not at issue in this case because none of that has anything to do with the claims of the economic damages.

They would have to provide evidence to this Court, one, she has this option; two, what that option would cost her; three, what the net effect would be if she exercised that option, assuming she worked past age 60. But what the Plaintiff testified is, her damage amount is based on her not working past sixty. If we take this past 60, she has got more damages from BMW too, he is only talking about one side of the coin.

So, we can sit here an speculate for the next five days if we want to. If we change this fact to something that didn't happen, would it have an effect? Yes. If we change this fact, would it have an effect? Yes. If we change this fact, would it have an effect? All of that is beyond his calculation.

THE COURT: It is my understanding, and y'all correct me if I am wrong, that after he completed his report dated December 22nd, 2025, which is contained in

Defendant's 41, he produced a document which he provided to you, Mr. Murphy, and I assume you provided it to the defense. I have ruled that that piece of paper can't come in, but I haven't said he can't use it to refresh his recollection or how that would impact asking him about how that would impact his damages opinion. Of course, if he says, I don't know, I can't answer that question, it is too speculative, he is free to say that. But he is asking him about something that he produced to you that you provided to them.

MR. MURPHY: Which they could have marked as an exhibit, and they didn't, and that deprives us of the opportunity of even preparing this line of questioning.

THE COURT: It was your document provided by your witness.

MR. MURPHY: I understand. I produced a document. I produced a lot of documents. I produced about 3,000 documents.

THE COURT: Well, I will let him ask about it. At the end of the day, I have to consider all of this and determine what is relevant and what is not. How much weight to be given, if any, to the testimony and evidence presented, including the testimony of this witness. And I will just have to sort that out.

So, to the extent -- for purposes of this

hearing, I overrule the objection, but we are not going to spend five days, in fact, we are not going to spend too much more time on this. Please.

MR. MOODY: I don't intend to, Judge.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. Mr. Gibson, I am going to show you what is Plaintiff's 57; do you see that, sir?

A. Yes, sir.

Q. This exhibit is in evidence, South Carolina Retirement for -- looks like the year 2025, it is not completed, but there is 35,827.32?

A. Correct.

Q. As of 11-26-25; do you see that, sir?

A. Yes, sir.

Q. For purposes of your calculations when you are doing the loss calculations, you excluded that amount on her pay stub, correct?

A. Correct. I think if you are going to look at South Carolina Retirement, that benefit, she would not start getting until she retired. And there would be an actuarial calculation as to what her annual or monthly benefit would be, and you would have to offset that against any cost to purchase the years of service. So, there is more than just taking the 35,000 because it is

not a benefit to her until the future, until she can start drawing on it.
Q. And you made that determination yourself?
A. It was just a fact of how the retirement system works. The 35,000 she can't just go get it without some penalty as far as retirement system goes. That goes into an account and then based on an actuarial computation, she would get a benefit out into the future. I didn't go back and try to calculate that and present value it back. And I didn't try to calculate what it would cost for her to get that years of service. It is a more complicated computation than you are alleging it to be.
Q. I am just talking about the numbers, sir. So, in Dawsey 2904, which is part of Plaintiff's exhibit 57, the South Carolina Retirement is $37,038.60; do you see, that sir?
A. Yes, sir.
Q. You excluded that from your calculations, correct?
A. Yes.
Q. In 2022, we have $12,153.55, do you see that?
A. Yes.
Q. On Dawsey on 2908, which is part of Plaintiff's exhibit 57, you excluded that from your calculation,

too, right?
A. Yes.
Q. And Plaintiff's 57 at Dawsey 2906, that is the year '23, you excluded the South Carolina Retirement contribution of 33,667.16, correct?
A. I mean, I have got it on the screen.
THE COURT: Which exhibit?
MR. MOODY: It is Plaintiff's 57, Judge. This is Dawsey 2906, the amount is 33,667.16.
THE WITNESS: Correct.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. So, we just went through those statements, and just asked on your spreadsheet that you provided to us, it is this line right here, sir, South Carolina Retirement; do you see that?
A. Yes, sir.
Q. So, you populated your spreadsheet with the South Carolina Retirement amounts, right?
A. Yes, sir.
Q. And you excluded all of those from your loss calculation.
MR. MURPHY: Is this the spreadsheet we just -- I have to object, Your Honor, going right back and showing the document.

THE COURT: Spreadsheet can't come in. You can ask him.

MR. MOODY: I am asking for a summary.

THE COURT: You are asking him if he excluded the South Carolina Retirement figures from the information he provided after his report was generated?

MR. MOODY: That is exactly right.

THE COURT: What is your answer to that.

THE WITNESS: I have already stated I did not include the South Carolina Retirement.

CROSS EXAM CONTINUED

BY MR. MOODY:

Q. But you included them in your working spreadsheets, so you knew about them?

A. Yes, I knew about them.

Q. And on the other side is a sheet we can talk about, BMW, you attribute all of the BMW retirement investment accounts, 401Ks and matches, even while she has substantial amounts of money going to the South Carolina Retirement system, and you give BMW no credit for that, right?

A. I have already explained my reasoning for that.

Q. I didn't ask for your reasoning, I said you give BMW no credit for the substantial monies --

THE COURT: He has answered it.

MR. MOODY: Okay. Thank you, Judge, I am slow.
THE COURT: I disagree with that, Mr. Moody, but go ahead.
MR. MOODY: May I have just a few moments?
THE COURT: Yes.

CROSS EXAM CONTINUED

BY MR. MOODY:
Q. Let's see if I can summarize real quick, Mr. Gibson, I will do my best.
You didn't give BMW any credit for the time she took off between jobs, right?
A. Correct.
Q. You didn't give BMW any credit for the fact that she took a lower paying job with Madewell, correct?
A. Correct.
Q. You did not give any credit to BMW for the money sitting in the South Carolina Retirement accounts, correct?
A. I did not include that.
Q. And you did not give BMW any credit for the bonus that she should receive at this age 60 retirement date she told you about, right?
A. Correct.
Q. And that is another 25, 20,000 dollar amount, correct?

A. I would have to look back at that calculation, I believe it would be half of that because it was half a year.

Q. All right, sir. So your 605,188 figure gives full duration and back pay through trial, right?

A. Yes.

Q. Just summarizing. Front pay through age 60?

A. Correct.

Q. Post-retirement projections?

A. Post-retirement medical, yes, sir.

Q. Of 45,000 now?

A. Yes, sir.

Q. A fixed bonus multiplier, correct? You fixed a bonus multiplier in there?

A. It is based on the average of historic, yes.

Q. You gave her risk free discounting based on T-bills?

A. Yes, sir.

Q. And you assumed uninterrupted employment, correct?

A. Yes.

Q. If any of those assumptions change, your loss calculation can change, correct?

A. Yes.

MR. MOODY: That is all the questions I have for

this witness, Judge.

MR. MURPHY: I have some redirect, Your Honor.

THE COURT: I let the time run up on us, it is 1:00 o'clock. Do you want to keep going or do you want a break?

MR. MURPHY: I am fine with plugging on.

THE COURT: You think your redirect is going to be extensive, short?

MR. MURPHY: Short.

THE COURT: Let's go ahead. I am not rushing you.

MR. MURPHY: I appreciate that.

REDIRECT EXAM

BY MR. MURPHY:

Q. Mr. Moody asked you a lot about changes in front pay and back pay numbers in each of your reports. Did the actual date you used to divide the time between front pay and back pay, did that change?

A. Yes.

Q. Does that have an effect on how much is attributed to one versus the other?

A. Yes.

Q. You were also asked whether Ms. Dawsey's pay at the airport is close or almost "eerily" equivalent to her pay at BMW; do you remember that?

A. Yes.
Q. Were they talking about the same years?
A. I did not believe so. I believe it was -- '23 maybe for GSP and 2021 for BMW, if I recall right.
Q. And if we project increases in the BMW or the top line in your damage, then those numbers grow farther apart, don't they?
A. Yes.
Q. In other words, you are counting the actual increase if she got at GSP, but he is not -- his question did not include any increases in the BMW rates of pay, did it?
A. No.
Q. Now, you were asked a whole bunch about this retirement from South Carolina. And you were asked about excluding that amount. Would retirement benefits that Ms. Dawsey received from a pension fall within any time frame accomplished by your report?
A. No.
Q. And would you ever value the value of a pension benefit based on the number listed as employer contributions on a pay statement?
A. No, you would have to -- I mean, it would have to be an actuarial calculation because the actuarial has to come up with that benefit, pension benefit,

retirement benefit.
Q. Whatever that future pension benefit, that wouldn't have fallen within the time frame that we are seeking damages from BMW, is it?
A. No, sir.
Q. And if you extended the years past 60 to catch additional income, theoretical income, from the other employer, would you also have to then calculate more losses from projected growth in BMW income during the same period?
A. Yes.
Q. And likewise, if you were to assume in a damage calculation that Ms. Dawsey didn't retire at age 60, worked more years, and, therefore, received a bonus in what was scheduled to be her final year, you also have to include all projected income for BMW for that same time period, correct?
A. Correct.
Q. And in each of the years where you actually did include that income, she had losses, right?
A. Yes.
Q. So, if you extend out her employment additional years, it is fair to assume she would just have more losses?
MR. MOODY: Your Honor, I know it is a bench

trial, but the leading is a problem.

THE COURT: Please don't lead the witness.

REDIRECT EXAM CONTINUED

BY MR. MURPHY:

Q. If you extended based on the data you actually have, if you extended her retirement date out further, would her losses continue to grow?

A. Yes.

Q. That is not in the scope of your report?

A. Is it -- no.

MR. MURPHY: I don't have anything further, Your Honor.

THE COURT: Anything else for this witness?

MR. MOODY: Your Honor, I think I will save it for a closing argument.

THE COURT: Give me just a minute.

I don't believe I have any questions, but let me just make sure.

EXAM

BY THE COURT:

Q. I hesitate to bring up this topic, but there has been some testimony about it, Mr. Gibson, and if you don't know, tell me you don't know.

There has been some discussion about State Retirement benefits, Ms. Dawsey now works for the

Greenville Spartanburg Airport or whatever the proper name is, is obviously special purpose district or somehow political subdivision of the state that makes her eligible for State Retirement benefits. So does this work, does the state take out something for state retirement benefits from an employee's paycheck when they go to work for the state?

A. Yes, sir. They take out an amount and then the state also contributes to that employee's account.

Q. So, you have to work eight years to get vested, is that the situation?

A. There are different classes, class two and class three. I think it is based on the date of hire, if I recollect right. Ms. Dawsey is in class three, which requires, I think it is, eight years of service to be eligible.

THE COURT: Okay. Thank you. Any questions based on my questions?

MR. MURPHY: No, sir. Thank you.

MR. MOODY: No, Your Honor.

THE COURT: All right. Thank you. I have no other questions for Mr. Gibson. Any objection to him being allowed to leave if he wants to?

MR. MURPHY: I was just going to ask, Your Honor, appreciate that.

MR. MCCOY: No objection.

THE COURT: Thank you, you may leave or stay.

MR. MURPHY: You are off the clock.

THE COURT: Do you have any more witnesses, Mr. Murphy?

MR. MURPHY: No, sir.

THE COURT: You have one witness?

MR. MCCOY: Your Honor, can we have just a moment to consult?

THE COURT: Yes. I am trying to decide about taking a lunch break. I hate to keep harping on lunch.

MR. MCCOY: Your Honor, we will not call Ms. McCraw.

THE COURT: You want to make some closing statements/arguments? Mr. Murphy is shaking his head no.

MR. MCCOY: Well, we are either prepared to make an argument or send you a brief, whichever one you would prefer.

THE COURT: How long do you think your argument will take? Again, I am not rushing you .

MR. MOODY: I am prepared to do, one, Judge and I don't think I will be that long.

THE COURT: We will at least be able to go eat supper.

MR. MOODY: I don't think we will have to go to 7:30.

THE COURT: Well, go ahead. Be glad to hear from you. Mr. Murphy says he is not going to make one, but he may want to respond to yours.

MR. MOODY: I am sure he would like to respond to mine. Let me get myself straight.

MR. MCCOY: Would it be possible to just take a five-minute restroom break before we do this?

THE COURT: All right. Take a short break. It is 1:14.

MR. MCCOY: I will keep him in line.

(Whereupon, a short recess was held.)

THE COURT: Mr. Moody.

MR. MOODY: I thank the Court for the opportunity to provide this summary, it is important to BMW in this case.

THE COURT: Let me say this, again, y'all make whatever arguments for the record that you want to, but I am probably going to ask you both or give you the opportunity to submit proposed findings of fact and conclusions of law.

MR. MOODY: Thank for that, Judge.

Your Honor, we are now in an equitable phase. And the question before the Court is not liability, the

question is the scope of the economic remedy. And the governing principles here, according to the cases I looked at are: Causation, mitigation, reasonable certainty. And the Court's repeatedly talk about avoidance of a windfall. Unfortunately, with Mr. Gibson's report, what the Court is presented with is a windfall. Front pay, in particular, according to the guidance that we have to operate on from the higher courts, is it is discretionary and equitable, it is not automatic.

Let's talk about back pay briefly. Mr. Gibson's back pay calculation begins on January 17th, but the undisputed evidence in this case shows, and Ms. Dawsey reaffirmed it today, she accepted a position with Madewell on December 10th, she resigned on January 3rd, she remained employed at BMW through January 14th, there was no pay reduction, there was no demotion that was implemented, and no grade change occurred before her resignation. All of that was speculative, or, in her mind, as she said today, based upon a policy that she had implemented, and we know Ms. McCraw did away with, so it never happened. So, the resignation preceded implementation.

Even assuming liability, the Court must evaluate whether the separation itself was the proximate cause of

economic loss. This is not a termination case, it is not a reduction in force case, it is not a constructive discharge finding tied to intolerable conditions. And Judge, what Mr. Gibson did was a termination calculation. It was a termination calculation, which although they disavow constructive discharge in this case, that is the calculation that they have provided to this Court.

The evidence showed an accepted job before departure, and under these facts, the back pay period is suspect. We believe back pay ends when she chose to leave. Back pay should begin the day after her resignation, but she accepted Madewell on December 10th, she resigned on the 3rd, and she voluntarily chose a lower-paying job. And that is really important, Judge, for purposes of causation.

Back pay must be tied to the unlawful discrimination. And when the Plaintiff voluntarily leaves before implementation of any alleged adverse action, causation is attenuated. We have talked about the *Dennis* and *Spagnuolo* cases. And, Judge, just for the benefit of everyone, because I love paper, I have made a copy of both *Dennis* and *Spagnuolo*, and for you, your clerks, and everyone, I have highlighted the language that really plays in this case. And on that

case it is on page five to seven, and I have highlighted all of the language, and I will move through that as well as *Dennis*. I am going to give you a copy of *Dennis*, it is a little longer decision. I'm 54, looking at stuff on the screen doesn't do it for my mind, that is why I printed these.

I know there was some discussion on the motions in limine back and forth between the parties and the operative language on the *Dennis* case with a turn on page 11 and 12, and I have highlighted that to make it easier for all of us to get to.

So, Judge, when we talk about these two cases, I think it is important to look at this case and compare them to the facts that the *Spagnuolo* case had. And since I am a visual learner, I have just a demonstrative that hopefully will help me work through this and tie it into the language of these cases. So, Your Honor is very aware of the fact that the Fourth Circuit does not follow a lot of the rest of the country, and when we are talking about equitable issues here, as the Court said in *Dennis*, we simply apply the general statutory duty located 42 USC section 2000e-5(g) to mitigate employer damages. So, that is what we are talking about, Judge. Her decision to leave while she had the job and whether that is mitigation of employer damages. And we

say it is not. As this Court scrutinizes the causation, and does it heavily, we see there is a difference between this case and the facts of *Spagnuolo* and *Dennis* and Ms. Bull -- if you see this graphic, Judge, what we try to do is just give a visual picture of what the Court was dealing with in *Spagnuolo*. The gentleman was a salesman and his original job, he was being compensated at 2,285 dollars a month. He was demoted to a job that paid him 900 dollars a month. And the difference between the pay of there was 1,385 dollars a month. Because he was demoted, he went and found another job with a competitor. He resigned to take another job that was paying him 1,200 dollars a month. So I hope are you able to track with our graphic here. Then there is a carat there, the Court eventually awarded Mr. Spagnuolo the difference between the original job he had and the job he resigned to take, which was 1,200 dollars a month. And importantly, the Court, the Fourth Circuit said, Plaintiff did not resign from Whirlpool and accept employment paying him lesser compensation. That was, in the Court's determination, a discharge of his duty to mitigate because, again, the statutory requirement is to mitigate the employer damages. In this case, it would be Ms. Dawsey's responsibilities to mitigate BMW's damages.

So, we see there is a demotion, an actual demotion, where he felt the effects of it. And then he went and got another job with a competitor, made more money than where he was demoted to, and the Court was able, in equity, to award the delta between those -- what he was at before demotion and where he went and got another job.

In *Dennis* we see a similar situation, but it is inverse. It was a young lady who was seeking a job from a desk at a hospital to another position, and she was denied a promotion. And after the denial of promotion, she went and got another job that paid her more than the job she left, but it was less than the job that she desired for for the promotion. And again, there is a delta between the job she obtained and the job she wanted to be promoted to, and the Court said, and we put it in the graphic. Dennis' expert testified that she made substantially more money over the three-year period between leaving Colleton and trial than she would have made had she stayed at the hospital after being denied promotion. So, she mitigated by leaving and making more money. And either of these cases, neither of these cases did somebody leave for a job where they got paid less. No one left, took a lower-paying position, and the Court awarded them damages.

So, *Dennis* and *Spagnuolo* are the Fourth Circuit decisions that we would point to.

Here we have Dawsey at the bottom of the graphic. The difference in the pay and the position she sought was zero at BMW. She could have stayed there, she decided to leave, she voluntarily incurred losses as a result of the resignation, and she resigned to take a job at $150,000 a year. In fact I tried to ask Mr. Gibson, I said, shouldn't she have waited until the job at GSP to, you know, properly mitigate the damages because those damages, if she did, would have been nominal or not this 600,000 number he came up with, and he said that is not his charge. But this Court, in exercising equity, can observe that, you know, that the expert's charge was to run the numbers up as high as possible, especially since we had four reports of varying hundreds of thousands of dollars.

So, as courts scrutinized causation heavily, we know everything she did predated any kind of adverse employment action actually occurring. And at minimum, we think that the back pay should be -- well, we think the back pay see be zero because it should not trigger the *Dennis* and *Spagnuolo* exceptions where the Court exercised equity where people actually did go mitigate losses after a denied promotion or an actual demotion.

So, the courts routinely hold the claims by those who voluntarily leave their employment are susceptible to abuse and must be cabined. And granted, that language normally comes from constructive discharge cases, but it is legion that people leaving their job voluntarily is subject to abuse and must be cabined. I can give you a long string cite on that in our findings of fact.

She resigned and impacted her earning capacity through a decision that she made. She has an obligation to mitigate our damages, but she actually exacerbated and created damages here. Ms. McCraw testified she never gave me a chance. So, back pay should be zero.

Judge, we would also point to you and your fine clerks on ECF 156, we have a discussion on page 5 to 8 of that submission that basically summarizes that back pay liability is not to be increased by losses willingly incurred by the plaintiff, that is the *Brady* case, that is quoted language. That is what we have here, a Plaintiff who is willingly incurring damages and sending the bill to BMW.

If you do not agree with us on the zero, we maintain that the damages should be minimal reflecting her life choice to take time off, accept a lower paying job without a benefits comparison, walk away from

bonuses, and not wait for comparable employment before she resigned. Remember, she testified it was none of BMW's business that she was resigning and now she wants BMW to pay for her decisions that were none of their business.

Now, front pay: Speculation and duration. Front pay is inherently speculative, the Fourth Circuit recognizes that front pay must be limited to what is reasonably certain and necessary to make the plaintiff whole. Mr. Gibson's model assumes continuous employment with BMW through July 5th of '28, retirement at age 60, fixed annual growth of 6.27 percent, fixed additional compensation multiplier of 30.36 percent, no restructuring, no voluntary movement, no performance variability, and discounting at a Treasury base risk rate that is 3.5 and 39 percent. Each of those assumptions is intestable. Stacked together, they create a life of certainly that life and evidence does not support.

The Court heard that Ms. Dawsey is currently employed as the VP, Vice President, Chief Human Resource Officer at GSP. Her compensation has rebounded substantially. She received raises in '24 and '25, and there is no contractural requirement that she retire at age 60. There is no guarantee she would have remained

at BMW through 2028, and as this Court I am sure is aware, she testified she was tired of the 12- to 15-hour days, the chaos of communications, chaotic communications for the entire year, and that she wanted to slow down.

And so those are all issues leading to the speculative nature of the front pay calculation and it must reflect what is reasonably probable, not what is mathematically possible. Must be reasonably certain, avoid speculation, avoid the windfall, reflect mitigation success, and reflect employment risk. And his models assumes certainty where the record shows new contingencies and in fact, so many contingencies that he to do four reports. Equity requires narrowing the reward to what is reasonably prudent, not what is mathematically projected.

So, as far as the growth rates and risks, see if I can connect that, and why I mentioned it, Judge. BMW has a growth rate of 3.27 percent; GSP 6.2, so there is not symmetry there in any sense, and it is asymmetric in effect. Meaning, at GSP she is going to continue to increase, increase. And he discounted the future wages using Treasury rates, which that continued employment is much more risky than a T-bill. So, employment income is not risk free and all the cases

that I am sure this Court is aware of, but there is volatility with employment.

And at her situation, she is a Vice President, executives change roles, they increase, organizations restructure, and compensation fluctuates. So the risk-free discount rate -- basically he did it because it inflates the present value. So, the Court has discretion to adjust the duration in discounting and equity.

The additional compensation multiply the discretionary bonuses and vehicle allowances. Bonuses are never guaranteed. Vehicle allowances are policy based. And the retirement contributions and the retired medical depend on continued employment and plan stability. What we find to an be egregious aspect of his calculations is he attributes retirement, 401K, the RIA, all to BMW to pay her for while totally ignoring the South Carolina Retirement System contributions that are being squirreled away on her behalf at GSP. That is an artificial inflation of her loss numbers.

So, we would ask the Court to be cautious before converting discretionary benefits into guaranteed earning future streams as Mr. Gibson is encouraging this Court to do.

The post-retirement component, it actually

extends the front pay to 2033, and this is particularly speculative, Your Honor. It assumes she retired at 60, she is eligible -- it also assumes she is eligible for the retirement medical, no changes have been made at BMW, and it assumes uninterrupted plan terms under their plan, and assumes no continued employment beyond 60.

Now, that number, I think, is a 45,000 dollar number, it started at 40, now at are 45. What we found interesting today, for the first time that we have been involved in this case for four years, Ms. Dawsey before this Court says, I am not going to retire at 60, probably not. And this whole case has been anchored around her retirement at 60, including all of our efforts with her experts and others in trying to reach a closure of this case.

So, post-retirement front pay is rarely awarded absent a compelling certainty and that is not existing here. Here the assumptions rest solely on Plaintiff's stated intent of 60, which she disavowed today, and intent is not inevitable.

So, Judge, Mr. Gibson, I think, calculated the mitigating compensation at approximately 1.48 million, almost 1.5. That number does tell an important story that there has been a -- MS. Dawsey has secured

executive level employment. She advanced to Vice President, which she wanted, and BMW is proud for her. But her earnings trajectory has also rebounded and may exceed in the future. This is not a case of prolonged unemployment, it is not a case of career derailment. And this fact must meaningfully reduce any equitable award, especially when Mr. Gibson takes substantial South Carolina Retirement contributions, does not use them in his calculations, and then sticks BMW with all of the retirement contributions.

So, the purpose of front pay and back pay, Judge, is to make the plaintiff whole, not to provide a windfall.

The loss duration here is short. She did mitigate and has equalized or is exceeding her compensation from BMW through her employment at GSP Airport. Her earnings have rebounded, retirement is now -- or, no, it is speculative. And continued employment, whether it be she stayed at BMW or GSP continues to be uncertain, so front pay should be limited or denied.

If the Court does award any front pay, it should be limited to duration, adjusted for risk, discounted appropriately, and constrained to what is reasonably certain.

So, Mr. Gibson's figure is layered on many, many assumptions. If with even one assumption, retirement age, growth rate, employment duration, discount rate, or anything changes, that number changes else materially. We saw that during the course and trajectory of this case, even excluding substantial retirement monies, he had a number in the 800,000, it came down to 570, and, you know, days, weeks after I deposed him, it bounced back up just a little above 600. So, equity does not require mechanical adoption of a model, Judge, it requires judgment.

Your Honor, even accepting liability, the record supports, at most, a limited back pay award through 2023, and a narrowly tailored short duration front pay award not exceeding a few months. The evidence does not support extending payment to retirement age or awarding post-retirement projections. We maintain that this is a case, like Mr. Gibson acknowledged today and in his deposition, that if she stayed, her damages should be zero. She should have stayed at BMW. She chose to go to Madewell and accept a lower-paying job.

The precedent of the Fourth Circuit in awarding equitable relief is one through *Dennis* and *Spagnuolo,* where someone goes and fully mitigates by mitigating the

damages of a demotion or a denied promotion by going and making more money than the position they were leaving. Judge, she resigned. She did all of this before anything happened to her, and that is why we would maintain that, in equity, Ms. Dawsey should receive zero.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Murphy.

MR. MURPHY: Your Honor, it is good we submit proposed findings and conclusions of law because I will be interested to see where some of these proclamations I have just heard are actually based in the Fourth Circuit case law, they are not.

The easiest way to dispel their whole *Spagnuolo/Dennis* theory is looking at it at the most logical level. Basically, the conclusion they want this Court to reach is that you can only get damages if you don't have any damages. Now, that obviously makes us question why did we have a *Spagnuolo* and a *Dennis* decision and several other decisions from the Fourth Circuit if that was the case. That is because they are not fairly characterizing either decision.

In *Spagnuolo,* the measure of damages is exactly the same measure of damages we are seeking. It is what

you would have made absent discrimination versus what you have made since. In *Spagnuolo*, the person went from a higher paying job to a lower paying job, and then accepted a job elsewhere at a higher pay than the lower paying job. Obviously, there wouldn't have been any damages if the person had left and always had a higher level employment. And that is exemplified also in *Dennis*. It is very misleading to take the language from, in a three-year period, I made more at my new job than I would at my old job. Well then what was *Dennis* about? How did Judge Norton award any damages? Because *Dennis* quit and didn't have any job to go to, not that he went to a lower-paying job, he went to zero. He later got a job and worked his way up to where he got higher-paying jobs, but common sense tells you that the rule can't be, you only get damages if you quit to go to a higher-paying job because then there would have been no damages in the first place. And that is borne out in some of the other cases we have already cited to the Court and we will address in our proposed findings.

They want to go back to all of the issues of liability, he keeps peppering in, she quit here, it was -- the jury has already decided it was an adverse employment action. You charged them on that. She couldn't have been discriminated against without adverse

employment actions, that ship has sailed. The jury has already decided that.

And the standard under the *Dennis* line of cases is just whether the damages are a result of the discrimination. And you heard her testify, the reason she left was because of the discrimination. They didn't even cross her on that point. They didn't ask her a single question about that. That is all we actually have to show on any of those cases.

He used the term proximate cause, I don't remember reading that in the cases. The causation elements I have just seen is that it is the natural damages that flow under Sections 7 of Title VII.

You heard a lot of arguments in the nature of mitigation arguments. Well, here is the problem they have with that. BMW bears an affirmative burden of proof as to mitigation. What evidence did they offer on mitigation? None. They offered nothing. They bear the burden on that. They keep saying she shouldn't have quit, she shouldn't have quit, she shouldn't have quit, the jury has already addressed that. The jury has already addressed that. And you heard her testify at trial, at the time she left, she didn't have any other offers. They keep skipping over that inconvenient fact for them is that Ms. Petrasch was

telling her, you need to be looking around and start looking outside of HR, and they never made an offer. And they are playing both sides of this. They are starting again, said everything was speculative, nothing was set in stone. They said it at trial, this was all speculative. They wanted the jury to think that she should have waited to see what actually happened before she did anything. Well, that is the tactic they have taken in this case and I think that is the tactic they have to live by, but we battled about that during the jury trial that she actually didn't -- the only offer for a job that she had at the time she left was the offer with Madewell.

We have no evidence as to whether she could have gotten the GSP job if she hadn't had the top job at Madewell, that would require testimony. That would require testimony from GSP to say, well, if she had been a second tier HR manager, she wouldn't have been what we were looking for. So, by the time she got the job at GSP, she had already been the top tier person.

They say -- Mr. Moody listed a bunch of contentions for Mr. Gibson, and said each one of these are contestable, but they never contested it with anything other than Mr. Moody's argument. They have an expert. They retained one. BMW spared no expense in

this case. If there were holes in Mr. Gibson's final analysis, you better believe there would have been another can in the chair up there testifying about it today, but they chose not to do that. They chose to offer no witnesses, including an expert witness, to contradict Mr. Gibson's testimony.

I take issue with the characterizations about what Ms. Dawsey said. She said she didn't want to work 12- to 15-hour days anymore, she never said she was slowing down her career, she was trying to keep her career going forward. And after, you know, some setbacks, caused by BMW, it has moved forward. But nowhere did she ever indicate that she was taking her foot off the gas in terms of her career.

Some of these numbers I just -- I am either hearing arguments about one side of the coin or I am hearing arguments in reverse. Mr. Moody complained that the growth rate attributed to BMW is 3.2 percent and her pay increase 6.2 at Greenville airport. Well, that reduces her damages. If her growth is greater at the new job, then that is all baked into those numbers. He makes arguments about rates and risks and what should be used, they never put a witness up to say that you don't use T-bills, if you have ever read these reports, everybody uses basically the same stuff. But, again,

you can't substitute lawyer argument for actual expert testimony. They had one, but they weren't going to put him on the stand.

We have already addressed the retirement system issue program and why they are comparing apples to oranges when we are talking about a 401K benefit that hs been in place, and a retirement benefit to which she is not entitled. And at the end of the day, there is no testimony that would substantiate attributing any number to a state retirement system because we don't know what the benefit would be, we don't know under what conditions she would get the benefit, it is all beyond the scope of that report. And the scope of that report benefits BMW. Again, they only want to look at one side of the coin. But if they say you are going to retire at 60, but you should work five more years and earn more money, one, she is not obligated to do that, there is no case law obligates her to keep continuing to work. But every year that the damages were calculated, she still loses more money and that is because both BMW and GSP numbers have to be included in that.

Again, you look -- Mr. Moody makes a statement, that well, look, she get an equivalent job, she is making the same as she did at BMW. Her BMW rate is from 2021, her GSP rate is from 2025 and 2026, it is apples

and oranges again. You can't look at that. You would have to look at what she is making today at GSP and not what she made five years ago at BMW, but what she would have made today at BMW with the growth in her rates.

In terms of how speculative all this retirement stuff is, we are only talking about a couple years away. We are not taking a 32 year old and talking about what their retirement benefits are going to be at 68. We are talking about someone who is 57, 58 years old who plans on retiring at 60. And the import of that testimony, Your Honor was that without the remedy, she has to work longer with 60; with a remedy, she is fine at the retirement age of 60. In other words, if you provide me whole relief, then Mr. Gibson's number is the correct number. If you don't me provide me whole relief, then you got to take into account she is going to have to take damages because she has got to keep working, and those damages just continue to grow.

So, our damage position is very simple: If she had not been discriminated against, what would have happened? Well, you assume she would have been at the level she was at with increases at BMW until she hit 860 and then she would have retired. So, to make her whole, that is the picture we got to look at. Not all of these other pictures that Mr. Moody wants to draw for

you, but even if he wants to draw these other pictures, the Court has to take into account that if she continued working, she continued to have damages.

Your Honor, in a nutshell, that is my response to what I heard, but I think in light of what I am hearing, I think what needs to be substantiated, it probably is a good idea if we have a deadline for proposed findings of fact and conclusions of law, and a short reply deadline to address each other's submissions. I can address anything further in those papers.

THE COURT: Thank you.

All right. If there is nothing further, this matter will be deemed submitted to the Court and I will take it under advisement and ask that you submit any proposed findings of fact and conclusions of law by March 23rd, at noon, and just give me what you are going to give me with that. I don't think I need any further replies or responses, just give me your proposed findings. And if I feel like I need more, I will reach back out to you. And with that I would just ask that before you leave, you get with the Clerk and make sure we are straight on the exhibits that came in today.

Before we do that, let me ask you about something that I don't think it needs to be on the

record right now. The lawyers just come up.

(Whereupon, a bench conference was held.)

THE COURT: All right. We are back on the record and conferred briefly with the attorneys about some logistical issues, and I don't believe there is anything further, so thank you. I hope you have a pleasant evening and safe travels back to your respective destinations. Certainly, Ms. Dawsey, I wish you and Mr. Dawsey the best. I appreciate all the hard work from the lawyers and appreciate the attendance and efforts of the folks from BMW. Thank you.

(Whereupon, the hearing concluded at 2:19 p.m.)

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

S/Debra R. Bull, RPR, CRR          April 20, 2026
Date

## $

**$1,500** [1] - 25:9
**$12,153.55** [1] - 111:22
**$150,000** [3] - 25:18, 26:12, 128:8
**$150,000)** [1] - 14:11
**$164,462** [1] - 63:16
**$175,000** [1] - 29:4
**$202,450** [3] - 32:24, 33:11, 37:2
**$202,450)** [1] - 9:12
**$260,000** [1] - 103:9
**$262,000** [2] - 102:18, 103:15
**$262,150** [2] - 101:11, 101:15
**$266,000** [1] - 23:6
**$266,999.73** [1] - 22:20
**$298,416.88** [1] - 21:19
**$37,038.60** [1] - 111:16
**$384,415** [1] - 78:21
**$414,624** [1] - 65:14
**$45,000** [2] - 104:3, 104:10
**$50,000** [1] - 25:22
**$579,471** [1] - 83:8
**$6,000** [1] - 11:4
**$600,000** [1] - 104:11
**$605,118)** [1] - 57:14
**$829,537** [2] - 63:10, 83:8

## '

**'21** [2] - 13:18, 13:19
**'22** [1] - 55:11
**'23** [7] - 55:11, 55:12, 66:5, 79:20, 112:4, 117:3
**'24** [5] - 55:11, 55:12, 55:20, 66:5, 130:23
**'25** [4] - 50:8, 51:3, 66:4, 130:23
**'28** [1] - 130:11

## 1

**1** [5] - 4:4, 28:25, 41:1, 63:6, 80:1
**1,200** [2] - 126:13, 126:18
**1,385** [1] - 126:10
**1.4** [1] - 97:20
**1.48** [1] - 133:23
**1.5** [2] - 56:10, 133:24
**10** [1] - 4:15
**100** [1] - 31:18
**10th** [6] - 23:23, 25:13, 26:14, 36:13, 123:15, 124:14
**11** [6] - 33:2, 33:14, 36:6, 37:15, 44:9, 125:10
**11-26-25** [2] - 21:13, 110:14
**11.1** [1] - 54:13
**116** [1] - 3:9
**119** [1] - 3:10
**12** [4] - 24:5, 125:10, 131:2, 140:9
**12-22-25** [1] - 3:24
**12-31-21** [1] - 22:9
**120** [1] - 29:21
**122** [1] - 3:11
**13** [2] - 1:4, 3:17
**130** [1] - 25:18
**136** [1] - 3:12
**13th** [4] - 24:15, 24:18, 25:3, 25:6
**14** [1] - 3:16
**14th** [4] - 7:24, 8:1, 27:8, 123:16
**15** [3] - 1:21, 3:18, 24:5
**15-hour** [2] - 131:3, 140:9
**154,170** [1] - 78:21
**156** [3] - 38:7, 82:22, 129:15
**16** [1] - 3:19
**169,851** [1] - 82:2
**16th** [1] - 25:9
**17** [5] - 3:20, 3:21, 3:22, 3:23, 55:3
**17th** [9] - 7:23, 8:5, 27:14, 51:21, 56:12, 77:24, 86:7, 87:23, 123:12
**18** [1] - 3:4
**186** [1] - 39:6
**18th** [2] - 62:23, 64:15
**19** [3] - 10:25, 11:6, 19:4
**1914** [1] - 22:13
**1968** [1] - 17:20
**1984** [2] - 42:17, 45:24
**1995** [1] - 7:19
**1:00** [1] - 116:4
**1:14** [1] - 122:11
**1st** [7] - 13:18, 27:22, 30:11, 67:15, 78:13, 81:6, 82:13

## 2

**2** [1] - 4:6
**2,285** [1] - 126:8
**2.1** [1] - 55:2
**2.83** [2] - 54:22, 54:23
**20** [2] - 43:13, 144:23
**20,000** [1] - 114:24
**20-something-thousand** [2] - 104:14, 104:21
**200-something-thousand** [2] - 102:13, 105:12
**2000e-5(g** [1] - 125:22
**2017** [2] - 51:17, 53:22
**2019** [2] - 12:9, 94:24
**2019-2022** [1] - 4:15
**2020** [2] - 19:9, 19:10
**2021** [31] - 7:11, 10:20, 11:2, 11:3, 13:24, 19:5, 19:11, 19:12, 22:1, 22:7, 22:23, 23:6, 23:15, 23:23, 24:15, 24:18, 25:13, 25:14, 26:7, 32:3, 32:17, 34:7, 34:11, 36:13, 36:17, 51:16, 51:18, 53:22, 90:11, 117:4, 141:25
**2022** [32] - 3:18, 3:20, 7:23, 14:18, 14:20, 14:22, 15:10, 16:7, 16:16, 19:12, 20:8, 20:10, 27:22, 28:25, 30:8, 32:23, 33:1, 33:4, 33:18, 34:22, 34:23, 36:20, 36:24, 50:5, 51:21, 55:3, 55:9, 86:7, 87:16, 87:23, 88:9, 111:22
**2023** [16] - 3:21, 4:5, 16:5, 16:18, 20:20, 23:9, 23:14, 50:6, 51:2, 62:24, 63:9, 64:15, 90:7, 90:14, 90:25, 135:14
**2024** [8] - 3:22, 15:23, 16:3, 16:20, 21:3, 21:18, 21:22, 90:24
**2025** [29] - 3:23, 4:7, 4:9, 4:11, 4:13, 15:24, 16:1, 16:22, 21:9, 21:21, 39:20, 42:13, 42:17, 44:19, 50:14, 65:5, 65:12, 78:11, 78:13, 80:1, 80:11, 81:7, 81:15, 81:16, 81:23, 82:13, 108:25, 110:11, 141:25
**2026** [6] - 1:4, 40:4, 56:13, 68:21, 141:25, 144:23
**2028** [5] - 51:24, 51:25, 55:4, 88:23, 131:1
**2033** [2] - 55:4, 133:1
**207** [1] - 1:17
**207,192** [1] - 65:17
**20th** [1] - 79:16
**22** [3] - 23:4, 80:10, 81:16
**225** [1] - 39:19
**22nd** [4] - 81:10, 81:14, 81:23, 108:25
**23rd** [1] - 143:17
**25** [1] - 114:24
**262,000** [1] - 107:3
**266,608** [1] - 20:23
**266,608.88** [1] - 90:8
**266,898.88** [1] - 23:11
**266,999.73** [2] - 90:12, 90:23
**28** [1] - 4:3
**2904** [1] - 111:15
**2906** [3] - 20:19, 112:3, 112:9
**2908** [1] - 111:24
**29601** [2] - 1:18, 1:22
**29624** [1] - 2:3
**298,416.80** [1] - 21:5
**2:19** [1] - 144:12

## 3

**3** [2] - 4:8, 31:5
**3,000** [1] - 109:18
**3.2** [1] - 140:18
**3.27** [3] - 53:24, 92:7, 131:19
**3.5** [2] - 56:15, 130:16
**3.513** [1] - 95:6
**3.896** [1] - 95:6
**3.9** [1] - 56:15
**30** [1] - 43:14
**30.36** [3] - 54:6, 93:4, 130:13
**31** [1] - 13:19
**31,500** [1] - 14:2
**315** [1] - 2:2
**31st** [5] - 26:23, 27:16, 65:5, 65:12, 78:11
**32** [1] - 142:7
**33,667.16** [2] - 112:5, 112:9
**35,000** [2] - 110:25, 111:5
**35,827.32** [1] - 110:12
**3527655** [1] - 39:19
**36** [3] - 28:2, 28:9, 28:16
**36-A** [2] - 28:16, 29:7
**36a** [1] - 4:2
**37** [2] - 3:5, 40:24
**38** [6] - 4:4, 40:24, 62:17, 62:18, 64:14, 64:18
**389,907** [1] - 82:1
**39** [5] - 4:6, 40:24, 64:25, 67:7, 130:16
**3rd** [4] - 26:21, 26:25, 123:16, 124:14

## 4

**4** [1] - 4:10
**40** [6] - 4:8, 40:25, 78:10, 78:13, 80:2, 133:9
**40,000** [1] - 94:11
**40,157** [1] - 63:21
**40,886** [2] - 65:20, 78:23
**401** [2] - 13:22, 14:1
**401K** [12] - 12:18, 13:6, 13:24, 13:25, 52:16, 52:22, 54:8, 56:4, 93:11, 93:16, 132:16, 141:6
**401Ks** [1] - 113:18
**41** [7] - 4:10, 80:14, 80:15, 80:16, 81:1, 98:21, 109:1
**42** [6] - 3:7, 4:12, 68:2, 68:18, 70:19, 125:22
**447957** [1] - 40:4
**45** [1] - 133:9
**45,000** [2] - 115:11, 133:8
**45,360** [1] - 82:3
**47-something** [1] - 78:2
**4th** [2] - 59:23, 68:21

## 5

**5** [2] - 53:20, 129:15
**50** [2] - 36:17, 37:5
**500** [1] - 29:19
**500,000** [1] - 64:4

**53** [3] - 3:15, 9:4, 9:14
**54** [4] - 3:16, 13:15, 14:5, 125:4
**55** [14] - 3:17, 4:14, 9:20, 9:24, 10:4, 13:1, 13:10, 21:25, 22:12, 54:15, 54:17, 90:10, 90:23
**56** [4] - 3:18, 15:9, 15:16, 38:25
**57** [13] - 3:19, 3:24, 15:21, 16:11, 20:2, 90:3, 90:24, 110:8, 111:15, 111:25, 112:3, 112:8, 142:9
**570** [1] - 135:8
**579** [1] - 79:19
**579,471** [5] - 78:18, 79:2, 79:18, 79:23, 81:7
**58** [4] - 3:20, 16:15, 17:1, 142:9
**59** [3] - 3:8, 3:21, 16:17
**5th** [6] - 17:20, 51:24, 51:25, 55:4, 88:22, 130:11

**6**

**6.2** [8] - 55:13, 92:10, 98:10, 98:12, 98:13, 98:14, 131:19, 140:19
**6.27** [1] - 130:12
**60** [40] - 3:22, 11:20, 11:22, 12:23, 16:19, 17:25, 18:3, 18:4, 18:13, 18:16, 52:1, 52:2, 54:16, 54:18, 88:22, 89:7, 89:12, 89:19, 101:23, 101:25, 102:1, 107:19, 107:21, 108:13, 108:15, 114:21, 115:7, 118:6, 118:13, 130:12, 130:25, 133:3, 133:7, 133:12, 133:14, 133:20, 141:16, 142:10, 142:12, 142:13
**600** [1] - 135:9
**600,000** [2] - 64:4, 128:12
**605** [1] - 75:11
**605,118** [4] - 56:17, 56:19, 81:24, 82:6
**605,188** [1] - 115:4
**61** [3] - 3:23, 16:21, 17:1
**62** [13] - 3:24, 44:7, 44:10, 46:1, 46:10, 47:21, 50:1, 50:19, 57:17, 57:20, 80:8, 80:12, 80:20
**62)** [1] - 80:21
**624,918** [1] - 63:18
**64** [2] - 4:5, 34:13
**65** [2] - 9:19, 94:8
**662** [1] - 79:19
**662,702** [3] - 65:22, 66:24, 78:12
**67** [1] - 4:7
**68** [1] - 142:8
**6th** [1] - 26:7

**7**

**7** [3] - 3:3, 98:21, 138:13
**7.7** [1] - 54:13
**7/1/2022** [1] - 4:2
**70** [1] - 4:13
**700** [1] - 1:22
**7:22-CV-3738** [2] - 1:3, 5:4
**7:30** [1] - 122:2

**8**

**8** [2] - 97:20, 129:15
**80** [1] - 4:9
**800,000** [1] - 135:7
**81** [1] - 4:11
**820** [1] - 79:20
**829,537** [1] - 79:18
**860** [1] - 142:22
**88** [1] - 20:24

**9**

**9** [1] - 3:15
**900** [1] - 126:9
**93** [1] - 20:16
**992,004.09** [1] - 13:21
**9:44** [1] - 5:1

**A**

**a.m** [1] - 5:1
**abase** [1] - 101:9
**abide** [2] - 18:16, 57:18
**able** [9] - 40:15, 75:20, 75:21, 76:21, 85:22, 98:8, 121:24, 126:14, 127:5
**above-entitled** [1] - 144:18
**absent** [2] - 133:18, 137:1
**abuse** [2] - 129:3, 129:6
**accept** [3] - 126:20, 129:24, 135:21
**acceptable** [1] - 95:17
**acceptance** [1] - 26:18
**accepted** [12] - 15:5, 26:14, 26:15, 26:17, 26:19, 30:6, 36:16, 53:13, 123:14, 124:9, 124:13, 137:4
**accepting** [1] - 135:12
**access** [1] - 108:5
**accomplished** [1] - 117:18
**according** [4] - 67:2, 104:11, 123:2, 123:7
**account** [13] - 12:11, 14:1, 43:22, 50:19, 54:9, 54:11, 54:16, 59:1, 101:13, 111:7, 120:9, 142:16, 143:2
**accountant** [1] - 103:8
**Accountants** [1] - 72:19
**accounting** [1] - 45:22
**accounts** [3] - 48:21, 113:18, 114:17
**accurate** [2] - 46:7
**accurately** [1] - 47:21
**achievement** [2] - 10:12, 10:15
**acknowledged** [1] - 135:19
**acknowledging** [2] - 64:13, 67:6
**acquired** [1] - 45:7
**action** [3] - 124:20, 128:20, 137:24
**actions** [1] - 138:1
**actively** [1] - 46:14
**actual** [17] - 7:21, 55:11, 55:18, 56:3, 56:8, 56:9, 66:4, 97:22, 101:8, 105:20, 106:25, 108:2, 116:17, 117:9, 127:1, 128:25, 141:1
**actuarial** [4] - 110:22, 111:7, 117:24
**add** [2] - 5:16, 101:11
**added** [1] - 101:15
**addition** [7] - 12:16, 38:13, 38:14, 54:1, 55:22, 66:9, 67:22
**additional** [21] - 30:18, 45:6, 50:8, 50:12, 50:25, 54:2, 54:5, 55:1, 55:4, 61:1, 67:21, 79:12, 79:21, 81:21, 82:8, 93:4, 93:9, 118:7, 118:22, 130:13, 132:10
**address** [6] - 8:11, 38:17, 39:21, 137:20, 143:9, 143:10
**addressed** [3] - 138:21, 138:22, 141:4
**adjust** [1] - 132:8
**adjusted** [6] - 8:5, 77:20, 96:9, 96:12, 97:11, 134:23
**adjustment** [1] - 54:24
**admissibility** [1] - 39:22
**admissible** [1] - 73:23
**admission** [10] - 10:4, 13:9, 13:10, 14:5, 16:11, 16:25, 28:19, 57:16, 64:14, 67:7
**admit** [4] - 9:14, 41:7, 68:13, 80:2
**admitted** [19] - 9:15, 10:5, 10:24, 13:11, 14:6, 15:17, 16:12, 28:6, 28:10, 28:12, 57:21, 58:18, 58:19, 64:7, 64:18, 67:9, 74:12, 80:4, 81:1
**adoption** [1] - 135:10
**advanced** [1] - 134:1
**adverse** [4] - 124:19, 128:19, 137:23, 137:25
**advisement** [1] - 143:15
**affect** [4] - 96:17, 96:20, 96:22, 107:22
**afternoon** [1] - 6:10
**age** [29] - 11:20, 11:22, 12:15, 17:25, 18:3, 18:4, 18:13, 18:16, 52:2, 54:15, 54:17, 88:22, 89:7, 89:12, 89:19, 94:8, 107:19, 107:20, 108:13, 114:21, 115:7, 118:13, 130:12, 130:25, 135:3, 135:17, 142:13
**ago** [11] - 5:14, 19:25, 21:18, 21:24, 23:8, 26:11, 27:8, 69:19, 76:7, 100:1, 142:3
**agree** [19] - 23:13, 60:5, 60:11, 64:9, 67:20, 72:7, 73:20, 83:19, 84:3, 90:14, 91:3, 91:6, 95:11, 96:16, 96:19, 96:24, 97:3, 97:15, 129:22
**agreed** [2] - 39:1, 60:7
**agreement** [2] - 39:10, 87:15
**agrees** [1] - 58:17
**ahead** [9] - 38:16, 38:22, 70:22, 75:24, 76:11, 99:21, 114:3, 116:10, 122:3
**Aid** [5] - 72:16, 72:18, 72:20, 72:21, 72:23
**AIDED** [1] - 2:5
**Airport** [17] - 4:3, 15:4, 16:16, 16:18, 16:20, 16:22, 17:5, 17:11, 19:20, 21:2, 23:8, 23:11, 29:1, 29:3, 55:9, 120:1, 134:17
**airport** [8] - 15:24, 20:3, 20:7, 20:10, 20:20, 20:22, 116:24, 140:19
**AKTIENGESELLSCHAFT** [1] - 1:7
**alleged** [4] - 73:16, 81:24, 96:25, 124:19
**alleging** [1] - 111:13
**allowance** [7] - 29:19, 29:21, 52:16, 52:17, 55:23, 55:25, 66:11
**allowances** [2] - 132:11, 132:12
**allowed** [2] - 99:24, 120:23
**almost** [4] - 66:18, 86:12, 116:24, 133:24
**alphabet** [1] - 62:19
**alteration** [2] - 65:21, 82:24
**alternative** [3] - 72:14, 77:10, 84:19
**amended** [2] - 94:17, 94:18

**amendments** [1] - 94:19
**American** [2] - 39:18, 72:18
**amount** [26] - 37:15, 54:3, 55:2, 55:20, 57:9, 65:22, 75:4, 75:10, 81:7, 81:24, 82:1, 96:21, 99:9, 101:10, 101:12, 101:24, 102:7, 104:11, 105:7, 108:14, 110:17, 112:9, 114:24, 117:16, 120:8
**amounts** [6] - 55:25, 56:11, 98:17, 101:14, 112:19, 113:19
**analysis** [11] - 43:20, 51:23, 52:3, 55:7, 55:24, 57:9, 75:13, 84:25, 99:6, 99:10, 140:2
**analyze** [1] - 75:16
**analyzed** [2] - 75:16, 96:14
**anchored** [1] - 133:13
**AND** [1] - 1:17
**ANDERSON** [1] - 2:3
**annual** [7] - 3:19, 29:25, 30:1, 55:14, 92:10, 110:22, 130:12
**annually** [1] - 12:14
**annuity** [1] - 99:2
**answer** [13] - 61:2, 75:20, 75:21, 76:20, 85:22, 88:8, 90:2, 92:23, 92:24, 98:8, 106:13, 109:8, 113:8
**answered** [3] - 85:19, 88:3, 113:25
**anticipate** [2] - 68:23, 69:20
**anticipated** [1] - 58:7
**anyway** [1] - 58:8
**apart** [1] - 117:7
**apologize** [3] - 59:14, 80:24, 90:16
**APPEARANCES** [2] - 1:15, 2:1
**apples** [2] - 141:5, 141:25
**applied** [1] - 92:9
**apply** [2] - 39:15, 125:21
**appraisal** [2] - 43:21, 48:13
**appraisals** [1] - 43:16
**appreciate** [8] - 8:23, 58:1, 59:8, 59:19, 116:12, 120:25, 144:9, 144:10
**approach** [1] - 50:23
**appropriate** [3] - 40:16, 52:6, 53:1
**appropriately** [1] - 134:24
**April** [1] - 144:23
**arbitration** [1] - 45:10
**area** [2] - 45:15, 107:25
**arguably** [1] - 39:21
**argument** [5] - 119:15, 121:18, 121:20, 139:24, 141:1
**arguments** [6] - 122:19, 138:14, 138:15, 140:16, 140:17, 140:22
**arrived** [1] - 100:16
**artificial** [1] - 132:20
**AS** [2] - 1:8, 1:10
**aspect** [1] - 132:15
**Aspen** [1] - 39:18
**asserting** [1] - 38:20
**assets** [2] - 43:21, 43:22
**assigned** [1] - 10:18
**assist** [2] - 25:10, 46:17
**assistance** [2] - 46:12, 46:15
**assume** [10] - 84:20, 87:5, 92:12, 94:8, 94:22, 95:1, 109:2, 118:12, 118:23, 142:21
**assumed** [4] - 58:25, 77:19, 91:13, 115:19
**assumes** [7] - 88:22, 130:10, 131:12, 133:2, 133:3, 133:5, 133:6
**assuming** [2] - 108:12, 123:24
**assumption** [8] - 87:19, 88:3, 88:21, 92:6, 97:18, 104:6, 104:7, 135:2
**assumptions** [7] - 87:2, 91:9, 104:24, 115:22, 130:17, 133:19, 135:2
**asthma** [1] - 59:13
**asymmetric** [1] - 131:21
**attained** [1] - 19:23
**attendance** [1] - 144:10
**attenuated** [1] - 124:20
**attorney** [1] - 8:18
**attorney's** [2] - 5:14, 5:23
**attorneys** [2] - 5:8, 144:4
**attributable** [1] - 72:8
**attribute** [1] - 113:17
**attributed** [4] - 91:9, 93:24, 116:20, 140:18
**attributes** [1] - 132:16
**attributing** [1] - 141:9
**audit** [1] - 43:8
**August** [6] - 20:8, 20:13, 20:14, 30:8, 30:11
**automatic** [1] - 123:10
**available** [1] - 108:5
**average** [11] - 53:8, 53:10, 53:24, 54:6, 54:12, 54:14, 54:23, 55:13, 56:1, 115:15
**avoid** [3] - 5:19, 131:10
**avoidance** [1] - 123:5
**award** [7] - 39:9, 127:5, 134:7, 134:22, 135:13, 135:15, 137:11
**awarded** [4] - 10:11, 126:16, 127:25, 133:17
**awarding** [2] - 135:17, 135:23
**aware** [14] - 31:21, 31:25, 32:11, 33:18, 76:3, 89:6, 89:23, 94:23, 98:20, 101:22, 103:12, 125:18, 131:2, 132:1

**B**

**Bachelor's** [1] - 45:21
**back-dooring** [1] - 74:5
**backdoor** [3] - 69:15, 69:18, 73:23
**background** [1] - 58:24
**baked** [1] - 140:21
**balance** [3] - 13:20, 13:21, 24:6
**band** [5] - 31:1, 31:2, 31:8, 31:10, 31:14
**base** [10] - 13:8, 32:23, 52:15, 54:1, 54:5, 55:1, 55:16, 93:5, 95:8, 130:15
**based** [53] - 10:11, 10:14, 10:18, 11:20, 12:14, 18:13, 31:1, 31:2, 31:10, 35:4, 35:6, 35:9, 36:6, 47:15, 47:18, 50:12, 52:10, 53:23, 54:1, 56:2, 57:1, 64:6, 64:12, 67:5, 70:6, 72:10, 76:8, 79:19, 79:25, 83:23, 85:11, 87:19, 88:3, 88:25, 95:20, 99:3, 101:20, 102:6, 103:5, 104:6, 104:23, 105:20, 108:14, 111:7, 115:15, 115:16, 117:21, 119:5, 120:13, 120:18, 123:20, 132:13, 136:13
**basis** [6] - 25:15, 71:3, 73:2, 74:3, 98:13, 106:18
**bates** [1] - 22:13
**battled** [1] - 139:10
**BAYERISCHE** [1] - 1:6
**bear** [1] - 138:19
**bears** [1] - 138:16
**become** [3] - 24:20, 27:22, 101:23
**BEFORE** [1] - 1:13
**begin** [1] - 124:12
**beginning** [1] - 14:17
**begins** [1] - 123:12
**behalf** [3] - 38:5, 67:16, 132:19
**behind** [2] - 8:3, 62:19
**belabor** [1] - 82:21
**below** [1] - 29:18
**bench** [10] - 5:5, 38:19, 39:3, 39:12, 39:15, 39:24, 40:6, 40:9, 118:25, 144:2
**BENCH** [1] - 1:14
**benefit** [27] - 11:14, 12:5, 12:9, 12:13, 56:7, 77:21, 94:18, 94:23, 95:22, 102:11, 102:16, 106:3, 106:16, 110:20, 110:23, 111:1, 111:8, 117:21, 117:25, 118:1, 118:2, 124:22, 141:6, 141:7, 141:11, 141:12
**Benefit** [1] - 99:5
**benefits** [26] - 11:13, 13:5, 29:8, 30:15, 30:18, 30:23, 32:13, 34:2, 35:1, 51:15, 51:18, 52:15, 52:19, 54:4, 54:8, 56:14, 77:9, 101:7, 117:16, 119:25, 120:4, 120:6, 129:25, 132:22, 141:14, 142:8
**Bergmeier** [1] - 24:24
**best** [5] - 8:13, 59:16, 95:25, 114:9, 144:9
**better** [2] - 24:6, 140:2
**between** [18] - 11:22, 25:13, 50:13, 55:16, 56:15, 59:10, 60:17, 66:15, 67:13, 114:11, 116:17, 125:8, 126:3, 126:10, 126:16, 127:5, 127:15, 127:19
**beyond** [16] - 30:19, 60:14, 60:24, 71:12, 73:21, 74:18, 86:12, 89:12, 89:19, 90:1, 105:17, 106:5, 106:22, 108:22, 133:6, 141:12
**big** [2] - 82:11, 107:10
**bigger** [1] - 63:25
**bill** [2] - 129:21, 131:24
**bills** [2] - 115:17, 140:24
**birth** [1] - 17:19
**bit** [5] - 18:10, 22:19, 59:13, 60:23, 65:21
**blank** [1] - 44:12
**BMW** [136] - 1:7, 1:8, 1:9, 1:10, 1:11, 1:19, 3:15, 3:16, 4:14, 5:4, 7:10, 7:17, 7:18, 7:22, 17:21, 18:7, 19:23, 22:8, 22:23, 22:25, 23:6, 23:15, 24:4, 24:21, 24:25, 25:23, 26:22, 30:23, 30:24, 31:22, 32:11, 32:22, 33:1, 33:4, 33:17,

33:19, 34:1, 34:4, 34:6, 35:11, 36:11, 36:14, 36:21, 36:24, 38:5, 38:20, 38:23, 46:24, 47:1, 47:3, 47:6, 48:2, 50:20, 50:21, 51:15, 53:22, 54:8, 54:10, 57:12, 60:8, 60:11, 60:17, 66:9, 66:15, 67:16, 69:6, 72:9, 73:14, 75:4, 75:10, 76:16, 77:10, 77:11, 84:18, 87:8, 87:10, 87:21, 87:23, 87:24, 88:10, 89:15, 89:21, 89:24, 90:11, 91:10, 91:13, 92:6, 92:13, 93:5, 93:12, 93:25, 94:23, 108:3, 108:16, 113:17, 113:20, 113:24, 114:10, 114:13, 114:16, 114:20, 116:25, 117:4, 117:5, 117:11, 118:4, 118:9, 118:16, 122:16, 123:16, 128:5, 129:21, 130:4, 130:11, 131:1, 131:19, 132:17, 133:5, 134:2, 134:9, 134:16, 134:19, 135:21, 138:16, 139:25, 140:12, 140:18, 141:14, 141:20, 141:24, 142:3, 142:4, 142:22, 144:11

**BMW's** [2] - 126:25, 130:3

**bonus** [33] - 10:10, 10:11, 10:13, 10:14, 10:16, 10:17, 11:4, 17:6, 19:5, 19:6, 19:8, 19:11, 19:15, 29:25, 30:1, 55:18, 87:8, 87:14, 87:16, 87:25, 88:17, 88:18, 104:13, 104:14, 114:20, 115:13, 115:14, 118:14

**bonuses** [13] - 10:8, 10:21, 11:2, 11:10, 14:12, 14:13, 52:15, 54:3, 93:8, 93:10, 130:1, 132:11

**books** [1] - 69:19

**borne** [1] - 137:18

**bottom** [4] - 28:14, 29:17, 101:3, 128:3

**bounced** [1] - 135:9

**box** [2] - 42:1, 79:2

**bracket** [1] - 55:17

**Brady** [1] - 129:18

**breach** [1] - 43:25

**break** [11] - 37:24, 57:24, 58:3, 58:9, 58:10, 59:15, 59:18, 116:5, 121:11, 122:9, 122:10

**BRIAN** [1] - 1:16

**brief** [1] - 121:18

**briefing** [1] - 5:18

**briefly** [3] - 20:1, 123:11, 144:4

**briefs** [1] - 5:23

**bring** [1] - 119:21

**bringing** [3] - 57:8, 100:7, 105:25

**brings** [1] - 64:22

**brochure** [1] - 13:5

**brought** [2] - 44:21, 66:15

**bull** [2] - 126:4, 144:23

**BULL** [1] - 2:1

**bunch** [2] - 117:14, 139:21

**burden** [2] - 138:16, 138:19

**BUSINESS** [2] - 1:8, 1:10

**business** [5] - 43:16, 43:20, 48:13, 130:3, 130:5

**buy** [2] - 106:3, 106:20

**buying** [2] - 105:25, 106:21

**BY** [47] - 7:7, 9:2, 9:17, 9:23, 10:7, 11:9, 13:13, 14:8, 15:19, 16:14, 17:4, 18:23, 22:16, 28:24, 37:13, 42:4, 43:2, 44:15, 48:9, 49:24, 59:21, 64:21, 67:12, 70:24, 71:23, 72:6, 75:2, 76:2, 76:13, 77:2, 81:4, 81:19, 86:2, 88:13, 90:22, 96:2, 98:16, 99:19, 100:19, 104:2, 110:6, 112:12, 113:12, 114:7, 116:14, 119:4, 119:20

## C

**C-1** [4] - 56:11, 66:23, 78:25, 82:5

**C-3** [1] - 104:12

**CA** [1] - 1:3

**cabined** [2] - 129:3, 129:6

**CAIN** [1] - 1:13

**calculate** [7] - 53:6, 78:6, 88:16, 103:7, 111:9, 111:10, 118:8

**calculated** [7] - 53:23, 72:10, 84:17, 88:9, 97:19, 133:22, 141:19

**calculates** [1] - 97:10

**calculating** [3] - 44:23, 45:2, 45:5

**calculation** [49] - 50:6, 54:23, 72:8, 77:14, 78:12, 78:17, 82:14, 82:25, 84:1, 84:12, 84:15, 84:20, 85:6, 85:7, 85:17, 86:5, 86:8, 86:18, 87:15, 87:19, 87:22, 88:22, 89:13, 89:14, 89:17, 98:18, 100:2, 101:6, 101:15, 101:25, 102:5, 102:7, 102:12, 102:18, 102:24, 104:23, 108:22, 110:22, 111:25, 112:22, 115:1, 115:23, 117:24, 118:13, 123:12, 124:5, 124:7, 131:7

**calculations** [19] - 47:14, 47:18, 49:12, 49:14, 79:17, 82:10, 87:13, 87:24, 89:19, 95:2, 100:17, 103:17, 104:12, 107:9, 110:16, 110:17, 111:19, 132:16, 134:9

**calendar** [8] - 19:9, 19:12, 20:20, 21:2, 21:21, 22:22, 23:6, 23:9

**cannot** [1] - 97:6

**capacity** [1] - 129:8

**car** [1] - 29:19

**carat** [1] - 126:15

**care** [2] - 59:15, 77:13

**career** [8] - 45:7, 48:11, 91:13, 103:12, 134:5, 140:10, 140:11, 140:14

**CAROLINA** [1] - 1:1

**Carolina** [22] - 29:12, 29:14, 99:5, 99:9, 101:6, 102:8, 103:10, 104:25, 106:10, 110:10, 110:20, 111:16, 112:4, 112:15, 112:19, 113:5, 113:10, 113:20, 114:17, 117:15, 132:18, 134:8

**case** [48] - 5:4, 5:6, 39:18, 39:20, 40:3, 40:5, 46:22, 48:14, 49:6, 51:1, 61:5, 61:13, 61:16, 61:21, 73:8, 83:7, 83:21, 91:24, 91:25, 92:2, 97:5, 108:6, 122:17, 123:13, 124:1, 124:2, 124:7, 124:25, 125:1, 125:9, 125:13, 125:14, 126:3, 126:24, 129:18, 133:11, 133:13, 133:16, 134:4, 134:5, 135:6, 135:18, 136:14, 136:22, 139:9, 140:1, 141:18

**cases** [20] - 44:4, 44:20, 44:23, 45:9, 49:7, 61:7, 61:10, 70:14, 123:2, 124:21, 125:12, 125:17, 127:22, 127:23, 129:4, 131:25, 137:19, 138:3, 138:9, 138:11

**catch** [1] - 118:6

**causation** [7] - 84:25, 123:3, 124:16, 124:20, 126:2, 128:18, 138:11

**caused** [2] - 74:1, 140:12

**cautious** [1] - 132:21

**cellphone** [1] - 29:21

**cent** [1] - 13:7

**cents** [2] - 12:23, 20:24

**certain** [7] - 12:3, 12:21, 29:8, 52:19, 130:9, 131:9, 134:25

**certainly** [6] - 6:11, 40:13, 59:19, 106:20, 130:18, 144:8

**certainty** [3] - 123:4, 131:12, 133:18

**CERTIFICATE** [1] - 144:15

**Certified** [1] - 72:18

**certify** [1] - 144:16

**cessation** [2] - 48:2, 57:11

**cetera** [5] - 43:18, 43:23, 44:2, 48:13, 52:17

**chair** [1] - 140:3

**chance** [1] - 129:12

**change** [26] - 12:6, 32:14, 32:19, 34:5, 63:23, 73:2, 82:11, 82:12, 83:3, 83:15, 88:4, 89:20, 91:22, 94:22, 95:2, 95:4, 105:2, 105:7, 108:18, 108:20, 108:21, 115:22, 115:23, 116:18, 123:18, 132:4

**changed** [4] - 18:6, 50:23, 65:16, 94:23

**changes** [15] - 34:18, 34:21, 50:13, 67:19, 67:24, 79:6, 89:13, 91:19, 96:16, 96:18, 96:20, 116:15, 133:4, 135:4

**chaos** [1] - 131:3

**chaotic** [1] - 131:3

**characterizations** [1] - 140:7

**characterize** [1] - 60:25

**characterizing** [1] - 136:23

**charge** [2] - 128:13, 128:15

**charged** [1] - 137:24

**chat** [1] - 8:16

**Chief** [4] - 19:19, 27:23, 30:13, 130:21

**CHIEF** [1] - 1:14

**choice** [2] - 94:4, 129:24

**choose** [1] - 18:3

**chose** [6] - 102:4, 124:11, 124:14, 135:21, 140:4

**Christmas** [1] - 81:11

**circle** [1] - 30:21

**Circuit** [7] - 125:18, 126:19, 128:1, 130:7, 135:23, 136:13, 136:22

**cite** [1] - 129:7

**cited** [6] - 72:24, 73:3, 73:6, 82:22, 82:23, 137:19

**claim** [1] - 39:9

**claims** [2] - 108:7, 129:1

**clarification** [1] - 19:1
**clarify** [2] - 31:7, 95:23
**class** [3] - 120:12, 120:14
**classes** [1] - 120:12
**clear** [9] - 7:9, 8:22, 19:2, 37:14, 45:25, 48:10, 50:24, 56:22, 57:9
**CLERK** [1] - 44:11
**Clerk** [1] - 143:22
**clerk** [1] - 28:12
**clerks** [2] - 124:24, 129:15
**client** [1] - 107:20
**clock** [1] - 121:3
**close** [3] - 91:3, 91:7, 116:24
**closer** [1] - 42:20
**Closing** [2] - 3:11, 3:12
**closing** [2] - 119:15, 121:14
**closure** [1] - 133:16
**CO** [2] - 1:9, 1:20
**coin** [3] - 108:16, 140:16, 141:15
**collect** [1] - 102:11
**COLLECTIVELY** [2] - 1:7, 1:10
**college** [1] - 45:21
**Colleton** [1] - 127:19
**coming** [4] - 8:3, 50:18, 67:15, 68:5
**commenced** [2] - 5:1, 73:15
**commercial** [2] - 43:24, 48:22
**common** [3] - 50:15, 51:6, 137:15
**communicated** [5] - 25:14, 32:2, 32:5, 32:16
**communication** [2] - 10:23, 34:25
**communications** [3] - 23:19, 131:3, 131:4
**companies** [1] - 24:12
**Company** [1] - 39:18
**company** [6] - 12:12, 13:25, 27:6, 31:22, 32:12, 54:3
**comparable** [1] - 130:1
**compare** [2] - 83:2, 125:13
**compared** [3] - 54:5, 54:13, 98:9
**comparing** [2] - 83:4, 141:5
**comparison** [1] - 129:25
**compelling** [1] - 133:18
**compensate** [1] - 57:10
**compensated** [1] - 126:8
**Compensation** [1] - 29:15
**compensation** [71] - 3:19, 14:22, 15:23, 20:2, 20:3, 20:10, 20:15, 20:19, 20:22, 21:2, 21:5, 21:9, 21:19, 22:7, 23:9, 23:12, 23:14, 23:15, 31:18, 35:4, 46:25, 51:15, 52:14, 52:18, 52:20, 53:5, 53:9, 53:11, 53:21, 53:22, 54:2, 54:5, 55:2, 55:8, 55:14, 56:7, 56:8, 56:9, 56:17, 56:19, 56:25, 66:5, 66:7, 66:9, 66:21, 72:13, 72:14, 77:11, 78:7, 82:17, 83:24, 89:15, 89:24, 90:4, 90:8, 90:11, 90:25, 92:12, 92:15, 92:20, 93:5, 93:9, 93:13, 97:20, 126:21, 130:13, 130:22, 132:5, 132:10, 133:23, 134:16
**compensatory** [1] - 39:10
**competent** [1] - 39:17
**competitor** [2] - 126:12, 127:3
**complained** [1] - 140:17
**completed** [2] - 108:24, 110:12
**complicated** [1] - 111:12
**component** [1] - 132:25
**comprises** [1] - 13:22
**computation** [2] - 111:8, 111:12
**computed** [2] - 54:19, 56:13
**computer** [2] - 8:4, 27:13
**conclude** [1] - 40:9
**concluded** [2] - 56:16, 144:12
**concluding** [1] - 39:7
**conclusion** [1] - 136:17
**conclusions** [6] - 50:18, 53:18, 122:22, 136:11, 143:8, 143:16
**Concrete** [1] - 26:4
**conditions** [2] - 124:3, 141:12
**conduct** [1] - 40:16
**conducted** [1] - 39:7
**conference** [1] - 144:2
**conferred** [1] - 144:4
**confident** [1] - 40:15
**Confidential** [1] - 62:20
**confirm** [1] - 10:23
**confirmed** [1] - 19:6
**confusion** [1] - 7:21
**connect** [1] - 131:18
**consider** [18] - 40:14, 71:6, 75:3, 75:7, 76:4, 76:15, 76:23, 77:3, 77:4, 77:5, 77:17, 77:22, 87:7, 94:19, 95:18, 96:9, 96:18, 109:20
**consideration** [3] - 40:19, 60:13, 61:1
**considered** [17] - 40:14, 47:19, 50:13, 50:22, 67:18, 67:23, 68:5, 69:6, 70:1, 75:9, 76:22, 77:16, 79:16, 85:15, 86:3, 87:12, 96:15
**considering** [1] - 85:12
**consistent** [1] - 49:14
**constrained** [1] - 134:24
**constructive** [3] - 124:2, 124:6, 129:4
**consult** [5] - 72:17, 72:21, 72:24, 73:8, 121:9
**consulted** [1] - 61:12
**contacted** [2] - 50:7
**contained** [3] - 20:2, 38:8, 108:25
**contentions** [1] - 139:22
**contents** [5] - 68:8, 68:13, 68:14, 68:17, 70:25
**contestable** [1] - 139:23
**contested** [1] - 139:23
**context** [3] - 39:24, 60:16, 61:2
**contexts** [1] - 49:6
**contingencies** [2] - 131:13
**continue** [6] - 30:15, 77:19, 101:22, 119:7, 131:22, 142:18
**continued** [9] - 73:14, 87:23, 88:10, 131:23, 132:14, 133:6, 134:18, 143:2, 143:3
**CONTINUED** [41] - 2:1, 9:1, 9:16, 9:22, 10:6, 11:8, 13:12, 14:7, 15:18, 16:13, 17:3, 22:15, 28:23, 37:12, 43:1, 44:14, 49:23, 64:20, 67:11, 70:23, 71:22, 72:5, 75:1, 76:1, 76:12, 77:1, 81:3, 81:18, 86:1, 88:12, 90:21, 96:1, 98:15, 99:18, 100:18, 104:1, 110:5, 112:11, 113:11, 114:6, 119:3
**continues** [3] - 97:25, 98:3, 134:20
**continuing** [1] - 141:18
**continuous** [1] - 130:10
**contract** [1] - 43:25
**contractual** [1] - 89:6
**contractural** [1] - 130:24
**contradict** [1] - 140:6
**contribute** [1] - 13:7
**contributes** [1] - 120:9
**contributing** [1] - 56:5
**contribution** [7] - 12:10, 12:14, 12:20, 12:21, 52:23, 94:24, 112:5
**contributions** [10] - 3:17, 13:24, 54:10, 54:12, 93:12, 117:22, 132:13, 132:18, 134:8, 134:10
**conversation** [2] - 24:1, 27:4
**converting** [1] - 132:22
**copy** [6] - 4:2, 44:8, 94:14, 124:23, 125:3
**corner** [1] - 21:12
**corporate** [1] - 95:24
**Correct** [1] - 29:22
**correct** [163] - 12:18, 14:23, 15:14, 16:9, 18:13, 18:14, 19:13, 19:14, 19:16, 19:17, 19:23, 19:24, 20:11, 20:13, 20:17, 21:4, 21:6, 21:9, 21:17, 21:19, 22:24, 23:1, 23:9, 23:10, 23:20, 23:21, 23:23, 24:4, 24:12, 24:13, 24:23, 25:1, 25:5, 25:8, 25:11, 25:12, 25:16, 26:5, 26:6, 26:10, 26:13, 26:24, 27:3, 27:7, 27:10, 27:15, 27:21, 29:2, 29:4, 29:5, 29:10, 29:13, 29:16, 29:20, 30:9, 30:25, 31:9, 31:12, 32:21, 32:25, 33:3, 33:6, 33:8, 33:9, 33:12, 33:16, 33:20, 33:24, 34:9, 34:24, 35:14, 35:17, 35:19, 36:14, 36:15, 45:11, 61:22, 61:25, 62:1, 62:3, 63:6, 63:10, 63:11, 63:13, 63:19, 63:20, 63:22, 64:2, 64:5, 65:5, 65:6, 65:8, 65:9, 65:18, 65:19, 65:22, 65:23, 66:21, 66:22, 66:25, 67:3, 67:4, 68:22, 71:5, 78:24, 79:4, 79:5, 81:22, 81:25, 82:3, 82:4, 82:6, 82:7, 83:8, 83:11, 83:18, 84:13, 84:16, 84:21, 84:25, 85:4, 85:13, 86:13, 88:1, 89:7, 89:8, 89:11, 91:14, 91:15, 92:4, 92:13, 92:14, 93:7, 93:17, 94:4, 95:3, 95:7, 95:9, 95:10, 97:23, 97:24, 108:24, 110:13, 110:18, 110:19, 111:20, 112:5, 112:10, 114:12,

114:14, 114:15, 114:18, 114:23, 114:25, 115:8, 115:13, 115:20, 115:23, 118:17, 118:18, 142:15, 144:16
**correctly** [1] - 31:3
**cost** [6] - 54:23, 105:15, 106:21, 108:11, 110:24, 111:11
**coughing** [1] - 59:14
**counsel** [1] - 40:16
**counted** [1] - 66:13
**counting** [1] - 117:9
**country** [1] - 125:19
**couple** [9] - 5:13, 7:8, 23:4, 30:22, 37:10, 42:17, 45:12, 51:10, 142:6
**course** [6] - 32:7, 38:23, 50:25, 104:24, 109:7, 135:5
**COURT** [132] - 1:1, 1:14, 2:1, 2:2, 5:2, 6:1, 6:5, 6:12, 6:18, 6:20, 6:25, 7:4, 8:8, 8:16, 8:23, 9:15, 10:5, 11:5, 11:7, 13:11, 14:6, 15:17, 16:12, 17:2, 28:9, 28:15, 28:20, 28:22, 37:11, 37:20, 37:24, 38:2, 38:10, 38:12, 38:16, 40:20, 41:11, 41:18, 41:21, 41:25, 42:19, 48:3, 48:7, 48:25, 49:11, 49:18, 57:20, 57:24, 58:3, 58:8, 58:13, 58:15, 59:3, 59:5, 59:7, 59:17, 64:17, 67:9, 68:10, 68:18, 69:1, 69:3, 69:23, 70:4, 70:11, 70:15, 70:17, 70:19, 70:22, 71:18, 72:3, 74:10, 74:18, 74:22, 75:18, 75:24, 76:11, 76:20, 80:4, 80:14, 80:16, 80:18, 81:1, 81:14, 81:17, 85:21, 88:7, 90:15, 90:17, 90:20, 95:21, 98:7, 100:11, 100:16, 103:23, 106:7, 106:11, 107:11, 107:18, 108:23, 109:14, 109:19, 112:7, 113:1, 113:4, 113:8, 113:25, 114:2, 114:5, 116:3, 116:7, 116:10, 119:2, 119:13, 119:16, 119:20, 120:17, 120:21, 121:2, 121:4, 121:7, 121:10, 121:14, 121:20, 121:24, 122:3, 122:10, 122:14, 122:18, 136:8, 143:12, 144:3
**Court** [57] - 3:10, 5:5, 5:17, 11:18, 16:15, 18:15, 39:4, 39:21, 41:16, 42:5, 43:3, 43:11, 44:17, 45:20, 46:4, 51:12, 53:17, 58:23, 63:1, 65:11, 73:24, 76:10, 84:7, 95:22, 96:24, 97:3, 102:13, 107:1, 107:16, 108:10, 122:15, 122:25, 123:6, 123:24, 124:8, 125:20, 126:1, 126:6, 126:15, 126:19, 127:4, 127:16, 127:25, 128:13, 128:23, 130:20, 131:1, 132:1, 132:7, 132:21, 132:24, 133:12, 134:22, 136:18, 137:20, 143:2, 143:14
**court** [5] - 28:11, 45:10, 45:17, 48:24, 59:8
**Court's** [3] - 57:19, 123:4, 126:21
**courtroom** [2] - 8:11, 90:5
**courts** [3] - 123:9, 128:18, 129:1
**cover** [2] - 65:3, 65:4
**crawfishing** [1] - 60:23
**create** [1] - 130:18
**created** [1] - 129:11
**credibility** [1] - 41:16
**credit** [7] - 59:7, 113:20, 113:24, 114:10, 114:13, 114:16, 114:20
**critique** [3] - 67:24, 79:23, 83:16
**critiques** [1] - 68:24
**cross** [8] - 40:17, 40:22, 57:19, 58:16, 60:1, 74:3, 74:9, 138:7
**Cross** [2] - 3:4, 3:8
**CROSS** [29] - 10:6, 18:22, 22:15, 28:23, 48:8, 59:20, 64:20, 67:11, 70:23, 71:22, 72:5, 75:1, 76:1, 76:12, 77:1, 81:3, 81:18, 86:1, 88:12, 90:21, 96:1, 98:15, 99:18, 100:18, 104:1, 110:5, 112:11, 113:11, 114:6
**cross-examination** [3] - 40:17, 58:16, 74:9
**cross-examine** [1] - 60:1
**cross-examined** [1] - 74:3
**crossing** [1] - 107:8
**CRR** [2] - 2:1, 144:23
**culture** [1] - 24:7
**current** [1] - 42:9
**cut** [5] - 35:2, 36:18, 37:6, 83:5, 107:19
**cutoff** [2] - 101:25, 102:5

**D**

**D/B/A** [2] - 1:7, 1:10
**damage** [6] - 75:10, 97:15, 108:14, 117:6, 118:12, 142:19
**damages** [59] - 5:12, 39:2, 39:10, 39:12, 45:15, 51:13, 51:20, 52:8, 57:6, 60:9, 60:12, 60:20, 72:16, 73:25, 75:5, 83:7, 84:24, 86:11, 86:14, 88:6, 96:25, 97:5, 97:12, 98:18, 105:7, 106:25, 107:3, 108:8, 108:15, 109:6, 118:4, 125:23, 125:25, 126:24, 126:25, 127:25, 128:11, 129:10, 129:11, 129:20, 129:23, 135:20, 136:1, 136:18, 136:19, 136:24, 136:25, 137:6, 137:11, 137:16, 137:18, 138:4, 138:13, 140:20, 141:19, 142:17, 142:18, 143:3
**data** [9] - 66:20, 105:20, 106:9, 106:11, 106:12, 106:14, 106:15, 108:2, 119:5
**date** [32] - 7:22, 8:5, 13:17, 17:19, 18:17, 21:10, 21:14, 22:9, 30:10, 43:17, 51:19, 51:22, 52:4, 52:6, 56:12, 65:4, 65:12, 66:4, 77:24, 78:8, 85:9, 85:12, 86:7, 88:25, 102:6, 104:13, 114:21, 116:17, 119:6, 120:13, 144:23
**dated** [8] - 4:5, 4:7, 4:9, 4:11, 4:13, 80:10, 81:14, 108:25
**dates** [2] - 52:3, 65:16
**Davis** [7] - 42:15, 42:16, 43:4, 46:14, 46:16, 62:20, 65:7
**Dawsey** [54] - 4:14, 5:4, 6:24, 9:4, 13:14, 18:24, 20:19, 22:17, 23:17, 28:25, 31:21, 32:22, 37:8, 44:21, 46:23, 47:6, 47:15, 48:1, 52:1, 53:12, 57:10, 58:25, 60:8, 60:17, 61:25, 62:3, 62:7, 66:20, 73:13, 75:3, 76:15, 83:17, 86:4, 89:1, 91:11, 93:15, 98:25, 111:15, 111:24, 112:3, 112:9, 117:17, 118:13, 119:25, 120:14, 123:14, 128:3, 130:20, 133:11, 133:25, 136:5, 140:8, 144:8, 144:9
**DAWSEY** [3] - 1:3, 3:2, 7:2
**Dawsey's** [11] - 51:16, 52:8, 53:7, 63:5, 66:4, 77:9, 85:3, 90:4, 97:19, 116:23, 126:24
**days** [8] - 5:14, 23:2, 81:11, 108:18, 110:2, 131:3, 135:8, 140:9
**deadline** [3] - 6:7, 143:7, 143:9
**dealing** [1] - 126:6
**DEBRA** [1] - 2:1
**December** [28] - 4:9, 4:11, 7:11, 13:18, 20:14, 25:14, 26:3, 26:7, 26:14, 36:13, 36:17, 41:1, 50:13, 59:23, 60:7, 67:15, 78:13, 80:1, 80:10, 81:6, 81:10, 81:14, 81:16, 81:23, 82:13, 108:25, 123:15, 124:13
**decide** [1] - 121:10
**decided** [3] - 128:6, 137:23, 138:2
**decides** [1] - 18:15
**decision** [9] - 7:10, 36:13, 72:9, 85:3, 125:4, 125:24, 129:9, 136:21, 136:23
**decisions** [3] - 128:2, 130:4, 136:21
**decrease** [2] - 97:1, 97:12
**decreased** [1] - 32:4
**deductions** [1] - 10:2
**deemed** [2] - 58:19, 143:14
**DEFENDANT** [1] - 1:19
**Defendant** [2] - 38:23, 40:16
**Defendant's** [21] - 9:18, 9:24, 10:4, 21:25, 28:2, 28:9, 62:16, 62:18, 64:14, 64:18, 64:25, 67:7, 68:2, 68:18, 78:10, 78:13, 80:2, 80:15, 90:10, 90:23, 109:1
**Defendants** [1] - 68:19
**DEFENDANTS** [1] - 1:12
**DEFENSE** [1] - 4:1
**defense** [1] - 109:3
**Deferred** [1] - 29:15
**define** [1] - 105:4
**defined** [5] - 12:5, 12:9, 12:10, 94:23, 94:24
**defining** [1] - 105:5
**degree** [1] - 45:21
**delta** [2] - 127:5, 127:15
**demonstrative** [1] - 125:15
**demoted** [3] - 126:9, 126:11, 127:4
**demotion** [7] - 32:14, 123:17, 127:1, 127:2, 127:6, 128:25, 136:1
**denial** [1] - 127:11
**denied** [6] - 39:5, 127:11, 127:21, 128:25, 134:21, 136:1

**Dennis** [16] - 124:21, 124:23, 125:3, 125:4, 125:9, 125:21, 126:4, 127:8, 128:1, 128:23, 135:24, 136:20, 137:8, 137:10, 137:12, 138:3
**Dennis'** [1] - 127:17
**dental** [1] - 29:9
**deny** [2] - 39:14, 40:12
**departure** [3] - 91:10, 91:17, 124:10
**deposed** [9] - 59:23, 60:6, 64:6, 78:15, 81:10, 81:11, 82:8, 82:19, 135:9
**deposition** [7] - 45:13, 48:11, 60:2, 60:3, 79:11, 93:22, 135:19
**deprives** [2] - 100:9, 109:12
**derailment** [1] - 134:5
**derived** [1] - 56:15
**description** [1] - 40:25
**desired** [1] - 127:14
**desk** [1] - 127:10
**destinations** [1] - 144:8
**detail** [3] - 20:5, 24:11, 91:4
**determination** [2] - 111:3, 126:21
**determine** [7] - 40:10, 41:17, 46:23, 55:7, 77:9, 85:2, 109:21
**determined** [2] - 39:4, 55:12
**determines** [1] - 31:13
**determining** [1] - 43:21
**detours** [1] - 42:17
**develop** [1] - 49:13
**dictated** [1] - 30:24
**difference** [7] - 66:14, 79:8, 86:22, 126:3, 126:10, 126:16, 128:4
**different** [10] - 10:8, 24:7, 31:4, 31:5, 31:6, 48:23, 65:5, 86:8, 86:9, 120:12
**differently** [1] - 88:8
**diminishes** [2] - 98:1, 98:4
**DIRECT** [14] - 7:6, 9:1, 9:16, 9:22, 11:8, 13:12, 14:7, 15:18, 16:13, 17:3, 42:3, 43:1, 44:14, 49:23
**direct** [4] - 69:22, 70:6, 77:12, 105:18
**Direct** [2] - 3:3, 3:7
**director** [1] - 26:8
**disagree** [1] - 114:2
**disavow** [1] - 124:6
**disavowed** [1] - 133:20
**discharge** [4] - 124:3, 124:6, 126:22, 129:4
**disciplines** [1] - 48:13
**discount** [12] - 56:14, 57:1, 86:20, 86:21, 95:5, 96:10, 96:13, 96:17, 96:20, 96:25, 132:6, 135:4
**discounted** [3] - 86:14, 131:22, 134:23
**discounting** [3] - 115:16, 130:15, 132:8
**discretion** [1] - 132:8
**discretionary** [6] - 10:17, 93:8, 93:10, 123:9, 132:11, 132:22
**discriminated** [4] - 7:13, 37:3, 137:25, 142:20
**discrimination** [7] - 39:9, 44:20, 84:23, 124:18, 137:1, 138:5, 138:6
**discuss** [1] - 58:10
**discussed** [1] - 90:5
**discussion** [5] - 103:2, 103:4, 119:24, 125:7, 129:15
**discussions** [3] - 23:18, 82:9, 88:25
**dispel** [1] - 136:15
**dispute** [2] - 47:6, 100:13
**disputes** [5] - 40:1, 43:18, 43:25, 44:1, 48:21
**disqualified** [1] - 87:8
**disregard** [1] - 39:16
**District** [4] - 15:4, 39:20, 40:4, 55:10
**district** [1] - 120:2
**DISTRICT** [3] - 1:1, 1:1, 1:14
**divide** [1] - 116:17
**DIVISION** [1] - 1:2
**document** [20] - 8:3, 12:24, 12:25, 13:2, 13:14, 15:8, 20:1, 21:8, 21:25, 23:7, 23:24, 33:13, 34:6, 44:6, 100:11, 107:6, 109:1, 109:14, 109:17, 112:25
**documentation** [1] - 36:9
**documents** [6] - 9:19, 9:25, 15:21, 100:8, 109:17, 109:18
**DOING** [2] - 1:8, 1:10
**dollar** [17] - 12:23, 13:7, 28:7, 29:19, 36:18, 37:6, 86:18, 86:19, 86:21, 86:22, 94:11, 114:24, 133:8
**dollars** [26] - 9:12, 14:11, 20:16, 20:23, 29:21, 55:3, 56:10, 56:14, 56:25, 57:8, 57:14, 65:25, 66:3, 66:18, 66:19, 83:13, 102:13, 103:13, 104:14, 105:12, 126:8, 126:9, 126:11, 126:13, 126:18, 128:17
**DONALD** [1] - 1:20
**done** [7] - 18:12, 48:12, 49:5, 49:6, 94:2, 94:3, 100:24
**door** [3] - 36:23, 37:5, 68:25
**dooring** [1] - 74:5
**double** [1] - 66:13
**down** [15] - 22:17, 29:17, 51:1, 51:2, 51:4, 52:8, 64:3, 65:24, 66:3, 66:16, 79:18, 83:8, 131:5, 135:8, 140:10
**Dr** [1] - 7:14
**draft** [4] - 41:1, 50:1, 50:10, 50:15
**drafts** [2] - 41:5, 50:3
**draw** [2] - 142:25, 143:1
**drawing** [1] - 111:2
**drop** [3] - 97:5, 97:6, 97:7
**dropped** [1] - 66:18
**duly** [2] - 7:2, 41:23
**duration** [7] - 115:5, 130:6, 132:8, 134:14, 134:23, 135:3, 135:14
**during** [14] - 7:9, 23:17, 24:1, 25:17, 27:4, 34:10, 45:7, 56:2, 58:10, 58:18, 59:15, 118:9, 135:5, 139:11
**duties** [1] - 43:11
**duty** [2] - 125:21, 126:22

**E**

**early** [5] - 25:13, 26:3, 52:11, 60:7, 79:20
**earn** [3] - 21:22, 23:6, 141:17
**earned** [3] - 23:11, 108:3
**earning** [3] - 33:10, 129:8, 132:23
**earnings** [20] - 4:14, 10:1, 15:11, 22:8, 22:18, 22:22, 46:23, 46:25, 51:18, 73:16, 77:9, 92:9, 93:5, 95:14, 95:18, 95:24, 97:25, 98:3, 134:3, 134:17
**easier** [1] - 125:11
**easiest** [2] - 53:18, 136:15
**eat** [1] - 121:24
**ECF** [5] - 38:7, 38:25, 39:6, 82:22, 129:15
**economic** [13] - 5:12, 39:2, 39:11, 45:15, 45:18, 48:1, 57:11, 71:10, 84:23, 106:3, 108:7, 123:1, 124:1
**economics** [1] - 45:22
**education** [2] - 45:20, 46:5
**eerily** [2] - 91:3, 116:24
**effect** [6] - 108:11, 108:19, 108:20, 108:21, 116:20, 131:21
**effects** [1] - 127:2
**efforts** [3] - 47:8, 133:15, 144:11
**egregious** [1] - 132:15
**eight** [5] - 98:25, 102:2, 120:10, 120:15
**eighteen** [1] - 57:13
**either** [6] - 59:4, 103:1, 121:17, 127:22, 136:23, 140:15
**elements** [1] - 138:12
**eligibility** [3] - 11:21, 11:23, 29:14
**eligible** [14] - 18:4, 30:3, 87:17, 88:17, 101:20, 101:23, 102:15, 103:6, 104:8, 104:18, 120:4, 120:16, 133:3
**Elliott** [7] - 42:15, 42:16, 43:3, 46:14, 46:16, 62:20, 65:7
**Ellis** [1] - 42:6
**ELLISON** [1] - 1:20
**ELMO** [1] - 18:21
**elsewhere** [1] - 137:4
**email** [1] - 68:21
**employability** [1] - 47:9
**employed** [11] - 19:18, 30:2, 30:12, 87:18, 87:20, 87:25, 88:4, 88:5, 104:18, 123:16, 130:21
**employee** [8] - 12:21, 29:23, 31:23, 32:13, 54:4, 54:17, 93:19, 93:23
**employee's** [3] - 52:22, 120:6, 120:9
**employees** [4] - 30:24, 32:2, 46:16, 46:17
**employer** [7] - 52:16, 54:11, 117:21, 118:8, 125:22, 125:25, 126:23
**employers** [1] - 52:19
**employment** [57] - 7:22, 17:12, 17:14, 26:8, 26:15, 27:2, 29:1, 42:9, 44:20, 46:6, 48:2, 48:14, 48:19, 49:6, 51:16, 55:8, 57:12, 61:5, 61:7, 61:10, 61:16, 72:14, 73:14, 73:15, 84:19, 87:7, 88:10, 91:20, 91:24, 91:25, 95:14, 95:18, 96:6, 96:9, 96:12, 97:22, 115:19, 118:22, 126:20, 128:20, 129:2, 130:1, 130:11, 131:11, 131:24,

131:25, 132:2, 132:14, 133:6, 134:1, 134:16, 134:19, 135:3, 137:7, 137:24, 138:1
**encompasses** [1] - 53:5
**encouraging** [1] - 132:23
**END** [1] - 144:13
**end** [9] - 14:18, 22:7, 50:5, 51:22, 52:4, 90:7, 90:24, 109:20, 141:8
**ending** [2] - 13:20, 14:19
**ends** [1] - 124:11
**engaged** [2] - 50:4, 75:12
**engagement** [1] - 46:13
**engagements** [1] - 43:15
**Englehorn** [1] - 7:14
**enjoy** [1] - 64:22
**entered** [2] - 28:16, 107:15
**entire** [2] - 48:11, 131:4
**entitled** [7] - 29:8, 62:18, 100:5, 102:20, 102:22, 141:8, 144:18
**equalized** [2] - 89:24, 134:15
**equitable** [5] - 122:24, 123:9, 125:20, 134:6, 135:24
**equity** [7] - 127:5, 128:14, 128:24, 131:14, 132:9, 135:10, 136:5
**equivalent** [5] - 23:14, 23:16, 91:1, 116:24, 141:23
**error** [3] - 82:12, 82:15, 82:25
**errors** [1] - 64:8
**especially** [3] - 70:13, 128:16, 134:7
**ESQ** [3] - 1:16, 1:20, 1:20
**establish** [1] - 5:18
**et** [5] - 43:18, 43:22, 44:2, 48:13, 52:17
**Eva** [2] - 8:3, 24:24
**evaluate** [3] - 94:13, 94:16, 123:24
**evaluation** [1] - 48:12
**evening** [1] - 144:7
**eventually** [1] - 126:16
**evidence** [17] - 39:17, 40:2, 40:8, 40:10, 105:24, 106:21, 107:3, 108:9, 109:23, 110:10, 123:13, 124:9, 130:18, 135:16, 138:17, 139:14
**evidentiary** [1] - 40:1
**evolved** [2] - 83:20, 84:4
**exacerbated** [1] - 129:11
**exactly** [5] - 23:4, 49:2, 101:17, 113:7, 136:24
**exam** [6] - 3:3, 3:4, 3:5, 3:7, 3:8, 3:9
**EXAM** [48] - 7:6, 9:1, 9:16, 9:22, 10:6, 11:8, 13:12, 14:7, 15:18, 16:13, 17:3, 18:22, 22:15, 28:23, 37:12, 42:3, 43:1, 44:14, 48:8, 49:10, 49:23, 59:20, 64:20, 67:11, 70:23, 71:22, 72:5, 75:1, 76:1, 76:12, 77:1, 81:3, 81:18, 86:1, 88:12, 90:21, 96:1, 98:15, 99:18, 100:18, 104:1, 110:5, 112:11, 113:11, 114:6, 116:13, 119:3, 119:19
**examination** [3] - 40:17, 58:16, 74:9
**examine** [1] - 60:1
**examined** [1] - 74:3
**examples** [1] - 61:9
**exceed** [1] - 134:4
**exceeding** [2] - 134:15, 135:15
**exceeds** [2] - 92:15, 92:20
**except** [1] - 65:4
**exceptions** [1] - 128:23
**exclude** [4] - 38:6, 38:24, 39:4, 40:12
**excluded** [13] - 40:11, 99:10, 101:15, 104:14, 106:10, 107:10, 107:17, 110:17, 111:19, 111:25, 112:4, 112:21, 113:4
**excluding** [2] - 117:16, 135:6
**excuse** [3] - 22:2, 42:19, 92:17
**executive** [1] - 134:1
**executives** [1] - 132:4
**exemplified** [1] - 137:7
**exercised** [2] - 108:12, 128:24
**exercising** [1] - 128:14
**exhibit** [61] - 9:3, 9:14, 9:19, 9:24, 10:4, 10:25, 11:5, 13:1, 13:15, 15:9, 15:21, 19:3, 19:4, 20:2, 21:25, 28:2, 28:16, 29:7, 44:7, 44:9, 44:10, 46:1, 46:9, 47:21, 49:25, 50:19, 56:11, 57:17, 62:17, 62:18, 63:2, 63:5, 64:14, 64:25, 66:12, 66:23, 67:7, 68:2, 68:12, 68:14, 69:9, 69:13, 69:18, 71:17, 74:5, 78:10, 78:13, 80:2, 80:8, 80:12, 80:15, 80:25, 82:5, 98:21, 104:12, 109:12, 110:10, 111:15, 111:25, 112:7
**Exhibit** [2] - 44:16, 45:9
**exhibits** [12] - 17:1, 40:23, 58:18, 58:20, 59:3, 68:19, 69:15, 83:2, 99:22, 100:5, 100:12, 143:23
**EXHIBITS** [1] - 3:13
**existed** [1] - 11:16
**existing** [1] - 133:18
**expect** [2] - 6:14, 57:7
**expectancy** [3] - 52:5, 52:7, 52:9
**expense** [1] - 139:25
**experience** [6] - 43:3, 44:18, 49:2, 49:7, 52:10, 61:11
**expert** [32] - 4:4, 4:6, 4:8, 4:10, 44:4, 45:14, 45:18, 46:2, 46:18, 47:25, 48:4, 48:19, 49:9, 49:20, 50:21, 51:6, 67:16, 67:22, 69:4, 69:6, 70:8, 71:10, 74:11, 80:9, 106:1, 107:4, 107:19, 107:25, 127:17, 139:25, 140:5, 141:1
**Expert** [3] - 4:12, 62:18, 73:7
**expert's** [2] - 39:22, 128:15
**expertise** [5] - 43:20, 71:12, 71:13, 71:20, 73:22
**experts** [1] - 133:15
**explain** [4] - 7:14, 8:17, 51:11, 53:18
**explained** [1] - 113:22
**extend** [2] - 6:6, 118:22
**extended** [5] - 85:8, 86:11, 118:6, 119:5, 119:6
**extending** [2] - 86:17, 135:16
**extends** [1] - 133:1
**extensive** [1] - 116:8
**extent** [2] - 39:13, 109:25

## F

**fact** [28] - 23:2, 36:23, 38:18, 61:20, 65:4, 70:13, 76:15, 84:22, 86:11, 87:7, 87:13, 94:16, 107:9, 108:18, 108:20, 108:21, 110:2, 111:4, 114:13, 122:21, 125:18, 128:8, 129:7, 131:13, 134:6, 138:25, 143:8, 143:16
**factors** [3] - 61:24, 85:12, 97:17
**facts** [6] - 7:8, 47:5, 75:22, 124:10, 125:14, 126:3
**fair** [3] - 36:4, 60:24, 118:23
**fairly** [2] - 52:11, 136:23
**fall** [3] - 34:7, 34:11, 117:17
**fallen** [1] - 118:3
**familiar** [2] - 11:14, 13:2
**family** [2] - 43:19, 48:21
**far** [5] - 65:10, 77:17, 102:15, 111:6, 131:17
**fashioned** [2] - 62:15, 64:23
**fast** [1] - 92:13
**faster** [1] - 58:6
**fault** [1] - 44:13
**favor** [1] - 39:8
**favoring** [1] - 99:12
**February** [4] - 34:22, 34:23, 40:5, 56:12
**federal** [1] - 15:10
**fees** [2] - 5:15, 5:23
**fellow** [1] - 68:24
**felt** [1] - 127:2
**few** [6] - 7:17, 21:24, 23:2, 81:10, 114:4, 135:15
**field** [1] - 49:20
**fifth** [1] - 16:4
**fifty** [2] - 9:11, 14:11
**figure** [3] - 28:6, 115:4, 135:1
**figures** [3] - 28:8, 105:9, 113:5
**file** [1] - 6:6
**filed** [4] - 5:14, 5:20, 38:6, 38:24
**final** [9] - 9:7, 41:2, 41:5, 41:6, 50:16, 50:18, 51:3, 118:15, 140:1
**finally** [1] - 21:7
**Financial** [1] - 73:7
**financial** [1] - 43:19
**findings** [7] - 122:21, 129:7, 136:11, 137:20, 143:8, 143:16, 143:20
**fine** [7] - 8:19, 28:18, 62:10, 88:20, 116:6, 129:14, 142:12
**firm** [1] - 43:7
**first** [15] - 7:2, 15:25, 16:8, 20:5, 20:8, 23:22, 30:3, 41:23, 48:14, 50:4, 73:10, 85:7, 91:25, 133:10, 137:18
**five** [14] - 27:19, 55:4, 55:5, 55:16, 56:5, 57:13, 76:7, 108:18, 110:2, 122:9, 125:1, 141:16, 142:3
**five-minute** [1] - 122:9
**fixed** [4] - 115:13, 130:12
**flip** [1] - 20:4
**Florida** [1] - 39:20
**flow** [1] - 138:13
**fluctuates** [1] - 132:5
**focus** [1] - 98:24
**folks** [1] - 144:11
**follow** [1] - 125:19

**following** [3] - 24:10, 60:3, 105:10
**follows** [2] - 7:3, 41:24
**foot** [1] - 140:14
**FOR** [3] - 1:1, 1:16, 1:19
**force** [1] - 124:2
**foregoing** [1] - 144:16
**forensic** [3] - 43:6, 43:10, 48:11
**formally** [2] - 26:14, 34:8
**forms** [1] - 51:17
**formula** [1] - 82:16
**formulating** [1] - 72:22
**forth** [2] - 30:16, 125:8
**forward** [5] - 54:14, 55:21, 94:20, 140:11, 140:12
**foundation** [2] - 58:25, 105:14
**four** [17] - 9:11, 34:14, 34:20, 35:2, 35:3, 35:8, 44:18, 63:12, 65:13, 67:2, 78:18, 81:23, 86:12, 97:8, 128:16, 131:14, 133:11
**four-hundred** [1] - 9:11
**Fourth** [7] - 125:18, 126:19, 128:1, 130:7, 135:23, 136:13, 136:21
**fourth** [1] - 81:21
**frame** [3] - 52:11, 117:18, 118:3
**free** [8] - 95:12, 95:14, 95:19, 96:4, 109:9, 115:16, 131:25, 132:6
**Friday** [1] - 8:1
**front** [32] - 40:2, 41:4, 44:8, 51:23, 63:18, 63:25, 65:17, 77:23, 77:24, 78:1, 78:6, 78:21, 78:22, 82:2, 88:21, 89:12, 97:4, 99:20, 115:7, 116:15, 116:18, 123:7, 130:6, 130:7, 130:8, 131:7, 133:1, 133:17, 134:11, 134:20, 134:22, 135:15
**front-pay** [10] - 51:23, 77:23, 77:24, 78:1, 78:6, 78:21, 78:22, 82:2, 88:21, 89:12
**frozen** [1] - 12:9
**full** [4] - 21:11, 22:25, 42:5, 115:5
**fully** [3] - 57:10, 71:1, 135:25
**function** [11] - 31:1, 31:5, 31:10, 31:17, 32:14, 32:18, 34:14, 34:20, 35:2, 35:3, 35:8
**funded** [1] - 54:9
**future** [34] - 53:7, 53:20, 53:23, 54:7, 55:2, 55:14, 55:20, 56:8, 56:9, 56:12, 56:13, 56:16, 56:17, 56:18, 56:23, 56:24, 56:25, 57:6, 57:7, 57:11, 77:18, 78:7, 82:17, 93:13, 96:22, 106:4, 106:17, 106:20, 111:1, 111:9, 118:2, 131:23, 132:23, 134:4

## G

**gas** [1] - 140:14
**general** [3] - 43:9, 95:24, 125:21
**generally** [1] - 96:4
**generated** [1] - 113:6
**gentleman** [1] - 126:7
**Germany** [1] - 59:6
**GIBSON** [2] - 3:6, 41:23
**Gibson** [50] - 3:24, 4:4, 4:6, 4:8, 4:10, 8:11, 8:14, 11:25, 18:1, 18:12, 37:22, 38:5, 38:25, 39:5, 40:13, 40:22, 41:20, 42:6, 42:9, 47:25, 48:10, 49:12, 59:22, 60:6, 62:17, 62:19, 63:4, 64:24, 67:5, 67:13, 70:25, 75:3, 78:9, 80:10, 81:5, 82:22, 98:22, 99:20, 100:20, 110:7, 114:9, 119:22, 120:22, 124:4, 128:9, 132:23, 133:22, 134:7, 135:18, 139:22
**Gibson's** [9] - 38:18, 64:12, 123:6, 123:12, 130:10, 135:1, 140:1, 140:6, 142:14
**given** [3] - 107:1, 107:21, 109:22
**glad** [5] - 5:9, 6:22, 28:1, 38:2, 122:3
**goal** [1] - 10:11
**God** [1] - 60:20
**governing** [1] - 123:2
**government** [1] - 95:12
**Government** [1] - 96:3
**grade** [17] - 30:25, 31:2, 31:4, 31:13, 31:15, 31:16, 31:17, 31:19, 31:23, 31:25, 32:3, 32:6, 33:2, 33:14, 36:6, 37:14, 123:18
**graded** [2] - 34:8, 34:13
**grades** [2] - 31:6, 32:18
**granted** [1] - 129:3
**graphic** [4] - 126:4, 126:15, 127:17, 128:4
**great** [1] - 71:7
**greater** [1] - 140:20
**GREENVILLE** [3] - 1:3, 1:18, 1:22
**Greenville** [3] - 15:3, 120:1, 140:19
**gross** [1] - 56:6
**grounds** [1] - 41:3
**GROUP** [4] - 1:8, 1:8, 1:10, 1:11
**group** [5] - 43:7, 43:13, 43:24, 55:23
**grow** [3] - 117:6, 119:7, 142:18
**growth** [16] - 53:7, 53:14, 57:7, 92:6, 92:20, 92:24, 95:16, 118:9, 130:12, 131:17, 131:19, 135:3, 140:18, 140:20, 142:4
**GSP** [74] - 3:19, 3:20, 3:21, 3:22, 3:23, 4:3, 15:24, 16:16, 16:18, 16:20, 16:22, 19:19, 20:3, 20:7, 20:10, 20:20, 20:22, 21:2, 23:8, 23:11, 23:14, 27:23, 29:1, 29:3, 30:2, 30:6, 30:13, 30:18, 55:9, 55:12, 55:15, 56:4, 56:7, 56:9, 66:5, 73:16, 75:4, 75:10, 76:16, 85:16, 86:5, 87:6, 88:15, 89:10, 89:23, 90:4, 92:9, 92:12, 92:15, 92:20, 92:25, 93:15, 93:19, 94:4, 97:23, 97:25, 98:3, 101:9, 102:3, 117:4, 117:10, 128:10, 130:22, 131:19, 131:21, 132:19, 134:16, 134:19, 139:15, 139:17, 139:20, 141:21, 141:25, 142:2
**GSP's** [1] - 55:14
**guarantee** [1] - 130:25
**guaranteed** [3] - 96:7, 132:12, 132:22
**guess** [3] - 5:15, 28:6, 29:6
**guidance** [1] - 123:8

## H

**half** [6] - 54:14, 54:21, 54:25, 97:9, 115:2
**Handbook** [1] - 73:7
**handled** [1] - 43:15
**happy** [2] - 5:23, 6:7
**hard** [1] - 144:9
**harping** [1] - 121:11
**Harris** [10] - 4:12, 61:12, 71:4, 71:9, 71:25, 72:15, 73:3, 76:3, 76:7, 79:12
**Harris'** [1] - 79:15
**Harris's** [5] - 67:24, 68:4, 74:7, 74:15, 79:23
**hate** [2] - 44:11, 121:11
**head** [2] - 43:10, 121:15
**health** [1] - 29:9
**hear** [6] - 5:9, 6:22, 38:2, 42:22, 71:16, 122:3
**heard** [9] - 32:8, 35:18, 35:24, 130:20, 136:13, 138:5, 138:14, 138:23, 143:5
**hearing** [8] - 5:1, 48:10, 68:20, 110:1, 140:16, 140:17, 143:6, 144:12
**heavily** [2] - 126:2, 128:18
**held** [6] - 5:7, 38:1, 43:4, 58:14, 122:13, 144:2
**help** [3] - 60:19, 100:3, 125:16
**hen** [1] - 51:3
**hesitate** [1] - 119:21
**high** [6] - 10:16, 10:17, 11:4, 83:22, 103:16, 128:15
**higher** [12] - 19:22, 31:14, 31:18, 85:16, 86:4, 92:25, 123:8, 137:3, 137:4, 137:6, 137:15, 137:17
**higher-paying** [3] - 86:4, 137:15, 137:17
**highlighted** [3] - 124:24, 125:1, 125:10
**highlights** [1] - 13:5
**highly** [1] - 97:16
**hire** [1] - 120:13
**hired** [2] - 29:4, 51:7
**historic** [1] - 115:15
**historically** [2] - 94:2, 94:3
**history** [1] - 3:15
**hit** [1] - 142:22
**hold** [2] - 58:4, 129:1
**holes** [1] - 140:1
**home** [1] - 27:13
**Home** [1] - 55:9
**Honor** [68] - 5:11, 5:22, 6:23, 8:6, 8:13, 8:21, 10:3, 15:15, 16:10, 16:24, 18:19, 28:21, 37:10, 37:19, 38:11, 41:14, 47:24, 48:5, 49:1, 57:15, 57:18, 57:22, 59:4, 64:12, 64:16, 64:19, 67:5, 68:9, 68:22, 69:7, 69:17, 69:25, 70:20, 71:11, 72:4, 73:21, 74:24, 76:6, 76:19, 79:25, 81:16, 82:20, 88:2, 98:5, 99:21, 99:25, 103:19, 105:13, 106:9, 107:8, 107:14, 112:24, 116:2, 118:25, 119:12, 119:14, 120:20, 120:24, 121:8, 121:12, 122:24, 125:17, 133:2, 135:12, 136:7, 136:10, 142:11, 143:4
**HONORABLE** [1] - 1:13

**hope** [2] - 126:14, 144:6
**hopefully** [1] - 125:16
**hospital** [2] - 127:10, 127:20
**hour** [1] - 105:21
**hours** [4] - 24:3, 24:5, 75:16
**HR** [5] - 26:4, 26:8, 27:6, 139:2, 139:18
**hs** [1] - 141:6
**Human** [7] - 15:3, 19:19, 24:21, 27:23, 30:13, 89:9, 130:21
**hundred** [9] - 9:11, 14:11, 57:13, 65:24, 66:3, 66:18, 66:19
**hundreds** [1] - 128:17
**hypothetical** [1] - 92:22

**I**

**idea** [2] - 17:21, 143:7
**identical** [1] - 80:7
**identification** [1] - 80:1
**identified** [6] - 74:5, 99:23, 100:8, 106:1, 106:6, 106:23
**identify** [5] - 9:4, 9:19, 9:25, 13:15, 15:8
**ignoring** [1] - 132:17
**II** [1] - 1:20
**impact** [5] - 75:19, 85:17, 86:5, 109:5, 109:6
**impacted** [1] - 129:8
**impeachment** [2] - 68:16, 69:14
**implementation** [2] - 123:23, 124:19
**implemented** [3] - 35:13, 123:18, 123:21
**import** [1] - 142:10
**important** [5] - 107:16, 122:16, 124:15, 125:13, 133:24
**importantly** [1] - 126:18
**impression** [1] - 74:13
**IN** [1] - 1:1
**inadmissible** [1] - 39:16
**Inc** [1] - 39:19
**incentive** [5] - 17:6, 29:24, 55:15, 55:16, 55:18
**include** [11] - 54:3, 56:19, 89:14, 93:10, 101:19, 102:24, 113:10, 114:19, 117:11, 118:16, 118:20
**included** [15] - 29:6, 29:9, 52:24, 55:23, 56:4, 56:6, 93:11, 94:7, 98:11, 99:4, 100:11, 102:1, 102:3, 113:13, 141:21
**including** [7] - 52:14, 87:16, 103:2, 103:3, 109:23, 133:14, 140:5
**income** [26] - 11:11, 12:2, 12:11, 15:12, 17:9, 43:17, 43:20, 44:24, 45:2, 45:6, 48:13, 52:13, 52:21, 53:1, 53:2, 54:9, 54:16, 56:6, 91:9, 101:11, 118:7, 118:9, 118:16, 118:20, 131:25
**inconvenient** [1] - 138:25
**increase** [14] - 53:23, 54:17, 55:14, 55:24, 55:25, 56:2, 77:20, 92:10, 98:12, 117:10, 131:22, 132:4, 140:19
**increased** [7] - 54:15, 54:20, 66:6, 66:20, 89:21, 98:10, 129:17
**increases** [12] - 36:10, 53:9, 53:11, 53:24, 55:12, 86:18, 86:19, 96:24, 98:9, 117:5, 117:11, 142:22
**increasing** [2] - 57:3, 98:14
**incurred** [3] - 48:1, 128:6, 129:18
**incurring** [1] - 129:20
**indeed** [1] - 39:24
**INDEX** [1] - 3:1
**Indiana** [1] - 40:5
**indicate** [2] - 9:7, 140:13
**indicated** [5] - 7:24, 20:6, 31:8, 34:1, 52:1
**indicates** [1] - 65:13
**individual** [4] - 10:13, 10:14, 10:18, 38:6
**individual's** [1] - 30:25
**individuals** [2] - 43:14, 72:17
**industry** [1] - 42:18
**inevitable** [1] - 133:21
**inference** [1] - 76:15
**inflates** [1] - 132:7
**inflation** [1] - 132:20
**information** [27] - 11:24, 14:21, 24:14, 24:19, 28:5, 50:8, 50:12, 50:20, 50:25, 51:5, 51:7, 51:8, 61:24, 62:2, 62:5, 62:8, 64:7, 67:21, 69:11, 79:21, 83:16, 83:23, 83:25, 113:5
**inherently** [1] - 130:7
**initial** [9] - 24:1, 24:10, 50:6, 50:9, 51:2, 66:10, 66:13, 83:22, 84:1
**injury** [2] - 44:2, 48:23
**input** [1] - 50:19
**insofar** [1] - 70:5
**instance** [1] - 32:11
**instead** [2] - 39:3, 54:25
**Institute** [1] - 72:18
**Insurance** [1] - 39:18
**insurance** [3] - 29:9, 55:23, 56:1
**intellectual** [2] - 44:1, 48:22
**intend** [1] - 110:4
**intending** [1] - 40:23
**intent** [2] - 133:20, 133:21
**interested** [2] - 24:12, 136:12
**interesting** [1] - 133:10
**interrupt** [2] - 44:11, 90:17
**interviewed** [1] - 26:3
**intestable** [1] - 130:17
**intolerable** [1] - 124:3
**introduce** [2] - 8:10, 40:23
**introduced** [1] - 107:2
**introducing** [1] - 106:15
**inverse** [1] - 127:9
**investigation** [1] - 102:21
**investment** [1] - 113:18
**involuntary** [1] - 47:19
**involve** [2] - 44:23, 45:2
**involved** [2] - 70:14, 133:11
**involvement** [1] - 83:20
**involving** [1] - 72:17
**issue** [10] - 5:25, 6:5, 8:9, 39:1, 41:3, 49:2, 59:13, 108:6, 140:7, 141:5
**issued** [4] - 49:15, 50:5, 60:2, 83:9
**issues** [6] - 51:10, 62:9, 125:20, 131:6, 137:21, 144:5
**issuing** [1] - 49:25
**itself** [1] - 123:25

**J**

**Jackson** [1] - 68:21
**JACKSON** [1] - 1:21
**January** [28] - 4:5, 7:23, 13:18, 14:18, 23:4, 26:21, 26:23, 26:25, 27:8, 27:16, 32:22, 33:1, 33:4, 33:18, 36:20, 36:23, 50:5, 51:21, 55:3, 62:23, 63:9, 64:15, 77:24, 86:7, 87:23, 123:12, 123:15, 123:16
**Jay** [1] - 42:8
**job** [60] - 14:9, 14:25, 15:2, 15:5, 24:2, 25:10, 25:15, 25:17, 26:4, 26:19, 27:5, 36:16, 36:24, 37:1, 60:1, 75:4, 76:16, 85:3, 85:16, 86:5, 114:14, 124:9, 124:15, 125:24, 126:7, 126:9, 126:12, 126:13, 126:17, 127:3, 127:7, 127:9, 127:12, 127:13, 127:15, 127:23, 128:8, 128:10, 129:5, 129:25, 135:22, 137:3, 137:4, 137:5, 137:9, 137:10, 137:12, 137:13, 137:14, 137:17, 139:12, 139:15, 139:19, 140:21, 141:23
**jobs** [2] - 114:11, 137:15
**John** [9] - 3:24, 4:4, 4:6, 4:8, 4:10, 41:19, 42:6, 62:19, 80:10
**jOHN** [1] - 41:23
**JOHN** [1] - 3:6
**Jr** [8] - 4:4, 4:6, 4:8, 4:10, 41:20, 42:6, 62:19, 80:10
**JR** [2] - 3:6, 41:23
**Judge** [37] - 28:2, 39:16, 40:19, 48:17, 48:18, 58:1, 58:7, 59:19, 62:13, 70:10, 70:18, 71:21, 74:9, 80:6, 80:11, 80:20, 81:2, 90:16, 110:4, 112:8, 114:1, 116:1, 121:22, 122:23, 124:4, 124:16, 124:21, 125:12, 125:24, 126:5, 129:14, 131:18, 133:22, 134:12, 135:11, 136:3, 137:11
**JUDGE** [1] - 1:14
**judgment** [1] - 135:11
**July** [11] - 14:20, 17:20, 27:22, 28:25, 42:13, 51:24, 51:25, 55:3, 86:7, 88:22, 130:11
**jury** [20] - 5:6, 7:9, 23:17, 28:3, 34:10, 39:2, 39:7, 39:8, 40:2, 40:8, 41:4, 41:9, 58:18, 59:1, 137:23, 138:1, 138:21, 138:22, 139:6, 139:11

**K**

**keep** [10] - 57:24, 59:9, 116:4, 121:11, 122:12, 138:19, 138:24, 140:10, 141:18, 142:17
**keeping** [1] - 26:25
**keeps** [3] - 88:4, 100:7, 137:22
**Kelly** [3] - 4:14, 7:8, 47:15
**KELLY** [3] - 1:3, 3:2,

7:2
**kind** [7] - 12:17, 17:6, 52:13, 69:10, 77:22, 91:23, 128:19
**kinds** [1] - 101:2
**knowledge** [6] - 35:4, 35:6, 35:9, 49:4, 61:2, 106:2
**known** [1] - 69:12

**L**

**lady** [1] - 127:9
**laid** [1] - 105:14
**Landstar** [1] - 39:19
**language** [7] - 124:25, 125:2, 125:9, 125:17, 129:3, 129:19, 137:8
**larger** [1] - 31:14
**last** [7] - 7:21, 8:1, 22:10, 22:25, 27:9, 51:16, 104:13
**latest** [1] - 84:8
**law** [13] - 43:19, 48:14, 48:21, 61:5, 61:7, 61:10, 61:16, 122:22, 136:11, 136:14, 141:18, 143:8, 143:16
**lawyer** [1] - 141:1
**lawyers** [2] - 144:1, 144:10
**layered** [1] - 135:1
**lead** [1] - 119:2
**leader** [1] - 43:6
**leading** [2] - 119:1, 131:6
**learned** [1] - 6:13
**learner** [1] - 125:15
**least** [1] - 121:24
**leave** [13] - 7:10, 17:14, 36:14, 60:8, 60:11, 120:23, 121:2, 124:12, 125:24, 127:23, 128:6, 129:2, 143:22
**leaves** [2] - 103:13, 124:19
**leaving** [5] - 87:7, 127:19, 127:21, 129:5, 136:2
**led** [1] - 43:13
**leeway** [1] - 107:21
**left** [20] - 14:24, 18:6, 21:12, 32:7, 32:22, 33:1, 33:4, 33:7, 33:17, 33:23, 36:11, 42:1, 47:1, 87:14, 127:13, 127:24, 137:6, 138:6, 138:23, 139:13
**legion** [1] - 129:5
**less** [7] - 24:5, 25:22, 41:3, 55:19, 76:17, 127:13, 127:24
**lesser** [1] - 126:20
**letter** [8] - 4:2, 19:5, 27:25, 30:16, 30:19, 34:5, 86:24, 86:25
**letting** [1] - 41:9
**level** [15] - 19:22, 31:1, 31:5, 31:10, 31:17, 32:14, 34:14, 34:20, 35:2, 35:3, 35:8, 134:1, 136:17, 137:7, 142:22
**levels** [1] - 32:18
**LEWIS** [1] - 1:21
**Lewis** [1] - 68:21
**liability** [6] - 84:20, 122:25, 123:24, 129:17, 135:12, 137:22
**life** [9] - 24:6, 52:5, 52:7, 52:9, 55:23, 56:1, 129:24, 130:18
**lifelong** [1] - 103:8
**light** [2] - 70:13, 143:5
**likewise** [2] - 73:6, 118:12
**limine** [8] - 38:7, 38:24, 39:4, 39:15, 39:25, 40:7, 40:12, 125:8
**limit** [1] - 78:4
**limitation** [1] - 77:22
**limited** [7] - 69:23, 70:7, 74:12, 130:8, 134:21, 134:23, 135:13
**line** [8] - 40:21, 88:3, 106:5, 109:13, 112:15, 117:6, 122:12, 138:3
**lined** [1] - 14:25
**linking** [1] - 106:25
**list** [8] - 24:11, 52:20, 68:15, 68:19, 80:8, 80:12, 80:22, 100:12
**listed** [5] - 29:18, 69:13, 69:15, 117:21, 139:21
**listing** [1] - 46:5
**Litigation** [1] - 73:6
**litigation** [7] - 43:6, 43:11, 43:17, 43:24, 43:25, 48:20, 48:22
**live** [1] - 139:10
**living** [1] - 54:24
**LLC** [3] - 1:9, 1:20, 42:15
**local** [1] - 27:5
**located** [1] - 125:22
**logical** [1] - 136:17
**logistical** [1] - 144:5
**logistically** [1] - 6:21
**logo** [2] - 62:20, 65:7
**long-term** [1] - 56:1
**look** [29] - 9:3, 9:18, 9:24, 20:4, 20:18, 21:1, 21:7, 21:12, 22:4, 22:17, 29:6, 29:17, 44:8, 52:9, 62:16, 66:12, 66:23, 90:1, 90:24, 98:21, 110:19, 115:1, 125:13, 141:14, 141:22, 141:23, 142:1, 142:2, 142:24
**looked** [16] - 19:3, 19:4, 19:25, 21:18, 23:7, 32:23, 53:8, 54:4, 54:10, 55:10, 61:9, 61:18, 79:16, 81:8, 123:3
**looking** [10] - 24:7, 25:10, 53:21, 68:21, 101:8, 125:4, 136:16, 139:1, 139:2, 139:19
**looks** [2] - 45:13, 110:11
**loses** [1] - 141:20
**loss** [17] - 56:17, 56:18, 72:8, 72:10, 92:16, 92:21, 93:1, 96:17, 96:20, 98:1, 98:4, 110:17, 112:21, 115:22, 124:1, 132:20, 134:14
**losses** [17] - 48:1, 56:23, 56:25, 57:11, 63:5, 63:10, 76:17, 81:24, 93:24, 96:22, 118:9, 118:20, 118:24, 119:7, 128:7, 128:25, 129:17
**lost** [10] - 44:23, 44:24, 45:2, 45:5, 51:23, 53:2, 63:15, 73:16, 91:24
**love** [1] - 124:22
**lower** [12] - 31:19, 82:18, 85:3, 114:14, 124:15, 127:24, 129:24, 135:22, 137:3, 137:4, 137:13
**lower-paying** [5] - 85:3, 124:15, 127:24, 135:22, 137:13
**lunch** [2] - 121:11

**M**

**ma'am** [3] - 6:25, 30:5, 37:20
**Madewell** [31] - 3:18, 14:9, 14:10, 14:13, 14:15, 14:22, 14:24, 15:6, 15:11, 15:13, 26:4, 26:7, 26:15, 26:20, 26:23, 27:16, 27:19, 36:14, 36:16, 55:9, 85:4, 86:23, 87:1, 87:3, 97:23, 114:14, 123:15, 124:13, 135:21, 139:13, 139:16
**main** [1] - 41:4
**MAIN** [1] - 1:21
**maintain** [4] - 69:16, 129:23, 135:18, 136:5
**major** [1] - 79:11
**managed** [1] - 43:13
**manager** [2] - 35:4, 139:18
**MANUFACTURING** [2] - 1:9, 1:19
**Manufacturing** [14] - 22:8, 22:23, 22:25, 24:4, 24:21, 24:25, 25:23, 30:23, 30:24, 31:22, 32:12, 33:17, 33:19, 34:1
**MARCH** [1] - 1:4
**March** [4] - 11:3, 19:5, 68:21, 143:17
**marital** [2] - 43:21, 43:22
**mark** [2] - 69:8, 94:11
**marked** [15] - 12:25, 13:14, 15:9, 20:1, 21:25, 28:16, 44:7, 62:16, 62:17, 68:1, 78:10, 99:16, 99:23, 100:8, 109:11
**match** [8] - 12:20, 13:7, 13:25, 52:16, 54:11, 93:12, 93:19, 93:23
**matched** [1] - 56:5
**matches** [1] - 113:18
**matching** [1] - 54:8
**material** [4] - 67:19, 105:2, 105:4, 105:5
**materially** [6] - 46:7, 83:20, 84:4, 89:13, 96:17, 135:5
**materials** [1] - 68:16
**math** [5] - 82:12, 82:15, 85:11, 105:10, 105:11
**mathematically** [2] - 131:9, 131:16
**matter** [10] - 5:4, 5:5, 40:6, 46:2, 47:22, 50:4, 71:14, 84:11, 143:14, 144:18
**matters** [3] - 43:19, 48:21, 49:15
**MC** [5] - 4:14, 19:23, 23:7, 38:5, 38:24
**McCoy** [1] - 3:4
**MCCOY** [26] - 1:20, 5:11, 6:4, 6:10, 6:17, 8:13, 8:19, 9:20, 18:21, 18:23, 22:13, 22:16, 28:1, 28:14, 28:18, 28:21, 28:24, 37:8, 59:4, 59:6, 121:1, 121:8, 121:12, 121:17, 122:8, 122:12
**McCraw** [7] - 24:20, 32:8, 35:16, 35:25, 121:13, 123:21, 129:11
**MCDUFFIE** [1] - 2:2
**mean** [4] - 41:14, 95:23, 112:6, 117:23
**meaning** [1] - 131:21
**meaningful** [1] - 40:17
**meaningfully** [1] - 134:6
**means** [2] - 8:17, 53:13
**measure** [4] - 72:8, 88:5, 136:24, 136:25
**measuring** [5] - 51:19, 53:1, 72:16, 73:25, 105:19
**mechanical** [1] - 135:10
**medical** [13] - 11:14, 11:21, 54:19, 55:5, 77:16, 94:7, 94:8, 94:9, 103:18, 104:3, 115:10, 132:14, 133:4
**Medicare** [2] - 11:22, 52:24
**Medley** [7] - 33:8, 33:10, 33:14, 35:19, 35:25, 36:6, 36:10
**meeting** [1] - 24:10
**memories** [1] - 64:22
**mentioned** [1] - 131:18
**met** [2] - 7:15, 34:11

**methodology** [4] - 41:15, 51:11, 51:14, 107:9
**methods** [1] - 49:13
**microphone** [1] - 42:20
**microphones** [1] - 59:14
**Middle** [1] - 39:20
**middle** [3] - 14:20, 31:18, 32:2
**might** [6] - 46:24, 77:17, 80:24, 83:24, 105:24, 107:24
**Miller** [9] - 23:19, 23:22, 24:2, 24:11, 24:15, 24:19, 25:10, 25:14, 26:1
**million** [6] - 55:2, 56:10, 83:13, 97:20, 103:13, 133:23
**mind** [2] - 123:20, 125:5
**mine** [2] - 80:13, 122:7
**minimal** [1] - 129:23
**minimum** [1] - 128:20
**minor** [1] - 82:11
**minute** [8] - 19:25, 23:8, 26:11, 27:8, 42:19, 46:20, 119:16, 122:9
**minutes** [3] - 7:17, 21:24, 76:7
**misleading** [1] - 137:8
**missed** [1] - 80:22
**misstatement** [1] - 71:25
**mistakes** [2] - 64:8, 82:20
**misunderstood** [1] - 40:25
**mitigate** [8] - 125:22, 126:22, 126:23, 126:25, 128:10, 128:24, 129:10, 134:15
**mitigated** [1] - 127:21
**mitigates** [1] - 135:25
**mitigating** [13] - 55:8, 56:7, 66:7, 66:20, 72:14, 83:24, 89:15, 89:22, 92:9, 97:19, 98:18, 133:23, 135:25
**mitigation** [8] - 47:8, 97:11, 123:3, 125:25, 131:11, 138:15, 138:17, 138:18
**model** [9] - 91:10, 91:17, 91:19, 91:21, 91:23, 92:3, 93:13, 130:10, 135:11
**models** [1] - 131:12
**moment** [1] - 121:8
**moments** [1] - 114:4
**Monday** [6] - 6:11, 7:23, 8:4, 8:5, 24:15, 24:18
**money** [14] - 12:13, 13:23, 98:17, 101:24, 102:7, 105:1, 113:19, 114:16, 127:4, 127:18, 127:22, 136:2, 141:17, 141:20
**monies** [4] - 13:20, 108:5, 113:24, 135:7
**month** [8] - 21:16, 29:19, 100:1, 126:8, 126:9, 126:11, 126:14, 126:18
**Monthly** [1] - 29:21
**monthly** [2] - 55:22, 110:22
**months** [3] - 14:16, 27:20, 135:15
**moody** [8] - 59:11, 114:2, 116:15, 122:14, 139:21, 140:17, 141:22, 142:25
**MOODY** [91] - 1:20, 38:4, 38:11, 40:19, 41:14, 48:5, 48:9, 48:17, 57:18, 58:1, 58:6, 59:12, 59:19, 59:21, 64:12, 64:19, 64:21, 67:5, 67:12, 68:22, 69:2, 69:5, 69:17, 69:25, 70:3, 70:10, 70:12, 70:16, 70:18, 70:20, 70:24, 71:21, 71:23, 72:4, 72:6, 74:9, 74:17, 74:20, 74:24, 75:2, 76:2, 76:13, 77:2, 79:25, 80:6, 80:7, 80:15, 80:20, 80:24, 81:2, 81:4, 81:16, 81:19, 86:2, 88:13, 90:16, 90:19, 90:22, 95:25, 96:2, 98:16, 99:17, 99:19, 99:25, 100:15, 100:19, 103:20, 104:2, 106:9, 106:12, 107:8, 107:14, 110:4, 110:6, 112:8, 112:12, 113:3, 113:7, 113:12, 114:1, 114:4, 114:7, 115:25, 118:25, 119:14, 120:20, 121:22, 122:1, 122:6, 122:15, 122:23
**Moody** [3] - 3:8, 3:11, 59:23
**moody's** [2] - 107:5, 139:24
**moot** [4] - 38:18, 38:21, 39:6, 39:13
**morning** [6] - 18:24, 18:25, 27:11, 59:13, 90:5, 100:7
**most** [4] - 43:5, 81:20, 135:13, 136:16
**motion** [14] - 5:16, 5:20, 38:6, 38:9, 38:10, 38:18, 38:20, 38:21, 38:24, 39:4, 39:13, 39:25, 40:12
**motions** [3] - 39:15, 40:6, 125:7
**MOTOREN** [1] - 1:6
**move** [15] - 9:13, 10:4, 13:9, 14:4, 16:11, 16:25, 25:7, 41:7, 47:24, 57:15, 57:16, 64:13, 67:7, 80:2, 125:2
**moved** [5] - 17:2, 25:2, 34:19, 79:17, 140:12
**movement** [1] - 130:14
**moving** [4] - 34:12, 58:6, 103:20, 103:22
**MR** [203] - 5:11, 6:4, 6:10, 6:17, 6:19, 6:23, 7:7, 8:6, 8:9, 8:13, 8:15, 8:18, 8:19, 8:20, 8:21, 9:2, 9:13, 9:17, 9:20, 9:21, 9:23, 10:7, 11:6, 11:9, 13:9, 13:13, 14:4, 14:8, 15:15, 15:19, 16:10, 16:14, 16:24, 17:4, 18:19, 18:21, 18:23, 22:12, 22:13, 22:14, 22:16, 28:1, 28:13, 28:14, 28:18, 28:21, 28:24, 37:8, 37:10, 37:13, 37:18, 37:23, 38:4, 38:11, 38:14, 40:19, 40:21, 41:14, 41:19, 42:4, 43:2, 44:13, 44:15, 47:24, 48:5, 48:9, 48:17, 49:1, 49:22, 49:24, 57:15, 57:18, 57:22, 58:1, 58:6, 58:22, 59:4, 59:6, 59:12, 59:19, 59:21, 64:12, 64:16, 64:19, 64:21, 67:5, 67:8, 67:12, 68:9, 68:11, 68:22, 69:2, 69:5, 69:7, 69:17, 69:25, 70:2, 70:3, 70:10, 70:12, 70:16, 70:18, 70:20, 70:24, 71:11, 71:21, 71:23, 72:4, 72:6, 73:21, 74:9, 74:17, 74:20, 74:24, 75:2, 76:2, 76:6, 76:13, 76:18, 77:2, 79:25, 80:3, 80:6, 80:7, 80:15, 80:17, 80:20, 80:21, 80:24, 81:2, 81:4, 81:16, 81:19, 85:19, 86:2, 88:2, 88:13, 90:16, 90:19, 90:22, 95:25, 96:2, 98:5, 98:16, 99:16, 99:17, 99:19, 99:21, 99:25, 100:4, 100:15, 100:19, 103:19, 103:20, 103:21, 104:2, 105:13, 106:9, 106:12, 106:13, 107:8, 107:14, 107:23, 109:11, 109:16, 110:4, 110:6, 112:8, 112:12, 112:23, 113:3, 113:7, 113:12, 114:1, 114:4, 114:7, 115:25, 116:2, 116:6, 116:9, 116:12, 116:14, 118:25, 119:4, 119:11, 119:14, 120:19, 120:20, 120:24, 121:1, 121:3, 121:6, 121:8, 121:12, 121:17, 121:22, 122:1, 122:6, 122:8, 122:12, 122:15, 122:23, 136:10
**MS** [1] - 133:25
**multiple** [5] - 5:23, 61:21, 61:23, 93:23, 100:7
**multiplier** [3] - 115:13, 115:14, 130:13
**multiply** [1] - 132:10
**Murphy** [27] - 3:3, 3:5, 3:7, 3:9, 3:12, 5:13, 6:18, 7:5, 19:25, 21:24, 22:4, 38:12, 41:18, 42:2, 62:10, 62:14, 63:2, 65:11, 82:9, 83:17, 100:24, 107:18, 109:2, 121:5, 121:15, 122:4, 136:9
**MURPHY** [91] - 1:16, 1:17, 6:19, 6:23, 7:7, 8:6, 8:9, 8:15, 8:18, 8:20, 8:21, 9:2, 9:13, 9:17, 9:21, 9:23, 10:3, 10:7, 11:6, 11:9, 13:9, 13:13, 14:4, 14:8, 15:15, 15:19, 16:10, 16:14, 16:24, 17:4, 18:19, 22:12, 22:14, 28:13, 37:10, 37:13, 37:18, 37:23, 38:14, 40:21, 41:19, 42:4, 43:2, 44:13, 44:15, 47:24, 49:1, 49:22, 49:24, 57:15, 57:22, 58:22, 64:16, 67:8, 68:9, 68:11, 69:7, 70:2, 71:11, 73:21, 76:6, 76:18, 80:3, 80:17, 80:21, 85:19, 88:2, 98:5, 99:16, 99:21, 100:4, 103:19, 103:21, 105:13, 106:13, 107:23, 109:11, 109:16, 112:23, 116:2, 116:6, 116:9, 116:12, 116:14, 119:4, 119:11, 120:19, 120:24, 121:3, 121:6, 136:10
**Murphy's** [1] - 69:5
**must** [8] - 123:24, 124:17, 129:3, 129:6, 130:8, 131:8, 131:9, 134:6

**N**

**name** [3] - 33:21, 42:5, 120:2
**narrowing** [1] - 131:14
**narrowly** [1] - 135:14
**national** [1] - 39:8
**natural** [1] - 138:12
**nature** [2] - 131:7, 138:14
**necessarily** [1] - 37:16
**necessary** [2] - 40:7, 130:9

**necessity** [1] - 37:3
**need** [12] - 6:20, 17:18, 18:10, 18:21, 28:6, 57:24, 59:18, 69:20, 107:4, 139:1, 143:18, 143:20
**needed** [3] - 5:16, 24:5, 100:4
**needs** [2] - 143:6, 143:25
**Nelson** [1] - 40:4
**net** [1] - 108:11
**never** [22] - 32:8, 32:20, 33:22, 34:4, 34:5, 34:6, 34:7, 34:16, 35:1, 48:18, 61:4, 74:5, 96:7, 96:14, 108:4, 123:22, 129:12, 132:12, 139:2, 139:23, 140:9, 140:23
**new** [5] - 25:10, 83:15, 131:12, 137:9, 140:21
**next** [9] - 20:18, 21:1, 37:22, 64:24, 67:14, 71:8, 78:9, 90:23, 108:17
**Nicholas** [1] - 4:12
**Nick** [1] - 61:12
**nine** [3] - 46:3, 54:14, 73:12
**nine-and-a-half** [1] - 54:14
**NO** [1] - 1:3
**nominal** [3] - 73:17, 76:4, 128:12
**non** [1] - 43:22
**non-marital** [1] - 43:22
**none** [5] - 59:4, 108:6, 130:2, 130:4, 138:18
**nontaxable** [1] - 52:23
**noon** [1] - 143:17
**normal** [1] - 46:17
**normally** [2] - 52:3, 129:4
**Norton** [1] - 137:11
**note** [3] - 38:5, 38:7, 40:3
**noted** [4] - 39:1, 39:18, 66:10, 72:15
**notes** [1] - 144:17
**nothing** [6] - 60:19, 87:21, 94:22, 138:18, 139:5, 143:13
**notice** [3] - 26:22, 54:22, 89:3
**notified** [1] - 27:1
**noting** [1] - 40:5
**notion** [1] - 105:25
**November** [3] - 4:13, 21:14, 79:16
**nowhere** [1] - 140:13
**number** [58] - 4:4, 4:6, 4:8, 4:10, 14:2, 19:3, 22:13, 38:25, 56:19, 56:20, 57:2, 57:3, 57:4, 57:6, 61:24, 63:6, 63:25, 64:3, 64:8, 65:14, 65:21, 66:16, 66:18, 75:11, 75:18, 78:20, 78:21, 78:23, 79:2, 79:3, 82:5, 82:25, 84:8, 85:8, 90:12, 97:9, 97:15, 97:16, 99:11, 103:16, 104:4, 104:6, 106:16, 107:10, 107:11, 107:12, 117:21, 128:12, 133:8, 133:9, 133:24, 135:4, 135:7, 141:9, 142:14, 142:15
**numbers** [19] - 51:1, 63:23, 66:2, 83:3, 91:2, 91:3, 91:5, 91:7, 101:8, 106:24, 107:15, 111:14, 116:16, 117:6, 128:15, 132:20, 140:15, 140:21, 141:21
**nutshell** [1] - 143:4

## O

**o'clock** [1] - 116:4
**oath** [1] - 60:19
**object** [9] - 68:12, 68:16, 98:5, 98:6, 99:22, 103:22, 105:14, 106:4, 112:24
**objected** [3] - 40:24, 41:2, 85:20
**Objection** [1] - 76:18
**objection** [40] - 8:15, 9:13, 9:15, 10:3, 10:5, 13:11, 14:4, 15:16, 16:11, 16:25, 28:19, 41:8, 48:3, 48:24, 49:8, 49:19, 59:1, 64:16, 64:17, 67:8, 69:16, 70:4, 71:11, 71:19, 80:3, 80:16, 81:1, 85:19, 85:21, 88:2, 88:7, 98:7, 100:14, 100:17, 103:23, 106:14, 107:7, 110:1, 120:22, 121:1
**objections** [2] - 58:20, 62:14
**obligated** [1] - 141:17
**obligates** [1] - 141:18
**obligation** [2] - 89:6, 129:10
**obligations** [1] - 6:7
**oblige** [1] - 28:1
**observe** [1] - 128:14
**obtained** [1] - 127:15
**obviously** [9] - 5:19, 20:12, 41:3, 58:24, 59:25, 85:17, 120:2, 136:19, 137:5
**occurred** [2] - 83:15, 123:18
**occurring** [1] - 128:20
**October** [8] - 4:7, 50:8, 50:13, 51:3, 65:5, 65:12, 66:4, 78:11
**OF** [3] - 1:1, 144:13, 144:15
**offer** [19] - 4:2, 15:16, 26:8, 26:15, 26:19, 27:22, 29:1, 30:6, 30:16, 30:19, 34:4, 86:23, 86:25, 105:16, 138:17, 139:2, 139:12, 139:13, 140:5
**offered** [8] - 45:1, 48:19, 68:11, 93:20, 106:19, 107:25, 108:4, 138:18
**offering** [8] - 46:21, 47:5, 47:8, 47:11, 69:23, 85:2, 105:23, 107:5
**offers** [1] - 138:24
**officer** [2] - 19:19, 27:23
**Officer** [2] - 30:13, 130:22
**offset** [1] - 110:23
**old** [6] - 62:15, 64:22, 64:23, 137:10, 142:7, 142:9
**old-fashioned** [2] - 62:15, 64:23
**omissions** [1] - 64:8
**omitted** [1] - 98:17
**once** [1] - 87:6
**one** [37] - 8:9, 19:1, 21:10, 48:5, 54:15, 54:16, 55:19, 57:13, 58:2, 62:21, 70:14, 74:1, 74:15, 79:11, 80:19, 81:14, 81:21, 82:11, 83:3, 98:24, 107:18, 108:10, 108:16, 116:21, 121:7, 121:18, 121:22, 122:4, 127:24, 135:2, 135:24, 139:22, 139:25, 140:16, 141:2, 141:14, 141:17
**One** [1] - 14:11
**one-hundred** [1] - 57:13
**opened** [1] - 68:25
**operate** [1] - 123:8
**operative** [1] - 125:9
**opine** [1] - 71:13
**opined** [3] - 63:9, 97:16, 105:7
**opinion** [26] - 46:21, 47:3, 47:5, 47:8, 47:22, 49:4, 51:6, 63:5, 63:7, 72:22, 73:2, 73:23, 73:25, 74:7, 74:8, 74:11, 83:7, 83:19, 84:3, 95:1, 105:17, 105:18, 105:23, 107:6, 109:7
**opinions** [7] - 45:1, 46:18, 68:5, 68:24, 70:8, 71:3, 71:25
**opportunities** [1] - 91:11
**opportunity** [7] - 60:4, 71:4, 71:6, 100:9, 109:13, 122:15, 122:21
**option** [3] - 108:10, 108:11, 108:12
**options** [1] - 108:5
**oranges** [2] - 141:6, 142:1
**order** [2] - 39:6, 39:21
**orders** [1] - 57:19
**organizations** [1] - 132:4
**origin** [1] - 39:9
**original** [2] - 126:7, 126:17
**outside** [3] - 32:18, 77:5, 139:2
**overrule** [6] - 49:18, 70:4, 85:21, 88:7, 98:7, 110:1
**overruled** [4] - 64:17, 67:9, 76:20, 80:4
**oversights** [1] - 82:20
**overview** [1] - 46:5

## P

**p.m** [1] - 144:12
**page** [26] - 3:17, 15:25, 16:2, 16:4, 16:6, 20:18, 21:1, 22:2, 44:9, 44:25, 53:20, 63:12, 65:13, 67:2, 71:8, 71:24, 72:3, 72:7, 73:12, 78:18, 81:23, 82:23, 98:21, 125:1, 125:10, 129:15
**pages** [1] - 46:3
**paid** [11] - 11:22, 19:12, 19:15, 25:9, 25:18, 37:1, 37:15, 88:18, 126:9, 127:12, 127:24
**paper** [3] - 44:7, 109:4, 124:22
**papers** [1] - 143:11
**paragraph** [1] - 29:7
**part** [5] - 52:20, 55:9, 101:16, 111:15, 111:24
**partial** [3] - 5:15, 20:12, 107:14
**participate** [4] - 29:11, 93:15, 93:19, 104:25
**participating** [2] - 93:24, 93:25
**particular** [2] - 40:10, 123:7
**particularly** [1] - 133:1
**particulars** [1] - 62:4
**parties** [4] - 5:8, 39:1, 39:11, 125:8
**partner** [1] - 80:24
**party** [1] - 51:7
**passage** [2] - 66:2, 66:17
**past** [10] - 56:12, 57:10, 87:23, 101:23, 102:1, 107:20, 108:13, 108:14, 108:15, 118:6
**path** [1] - 91:13
**pay** [97] - 13:8, 15:5, 17:6, 21:16, 21:22, 22:9, 29:24, 30:23, 31:1, 31:8, 31:10, 31:14, 32:12, 32:23,

34:2, 35:1, 36:10, 36:18, 37:6, 43:6, 51:14, 51:23, 52:15, 55:1, 56:20, 63:15, 63:18, 63:25, 64:1, 65:14, 65:17, 77:23, 77:24, 78:1, 78:6, 78:20, 78:21, 78:22, 82:1, 82:2, 85:6, 85:7, 85:17, 86:5, 86:11, 86:14, 86:17, 88:21, 89:12, 97:4, 97:8, 101:14, 110:18, 115:5, 115:7, 116:16, 116:18, 116:23, 116:25, 117:12, 117:22, 123:7, 123:11, 123:12, 123:17, 124:10, 124:11, 124:12, 124:17, 126:10, 128:4, 128:21, 128:22, 129:12, 129:17, 130:4, 130:6, 130:7, 130:8, 131:7, 132:17, 133:1, 133:17, 134:11, 134:20, 134:22, 135:13, 135:15, 137:4, 140:19

**paycheck** [1] - 120:6
**paying** [16] - 85:3, 85:16, 86:4, 114:14, 124:15, 126:13, 126:20, 127:24, 129:24, 135:22, 137:3, 137:5, 137:13, 137:15, 137:17
**payment** [2] - 13:25, 135:16
**payments** [5] - 17:7, 54:20, 55:5, 77:17, 94:8
**payroll** [1] - 51:17
**penalty** [1] - 111:6
**pension** [6] - 12:5, 102:16, 117:17, 117:20, 117:25, 118:2
**people** [3] - 59:9, 128:24, 129:5
**peppering** [1] - 137:22
**per** [1] - 98:12
**percent** [38] - 12:15, 12:20, 12:21, 12:22, 12:23, 13:8, 31:19, 53:24, 54:6, 54:14, 54:15, 54:17, 54:21, 54:22, 54:23, 54:25, 55:13, 55:16, 55:18, 55:19, 55:20, 56:1, 56:5, 56:6, 56:16, 92:7, 93:4, 95:6, 98:10, 98:12, 98:13, 98:14, 130:12, 130:13, 130:16, 131:19, 140:18
**percentage** [2] - 54:12, 93:5
**perfect** [1] - 6:17
**performance** [7] - 10:16, 10:17, 10:19, 11:4, 19:10, 91:21, 130:14
**performed** [2] - 47:14, 102:21
**period** [12] - 13:18, 53:25, 54:6, 55:3, 55:6, 56:3, 86:17, 118:10, 118:17, 124:10, 127:19, 137:9
**permit** [1] - 39:25
**person** [7] - 26:4, 27:6, 49:3, 71:14, 137:2, 137:6, 139:20
**person's** [1] - 71:20
**personal** [21] - 10:14, 30:25, 31:2, 31:4, 31:5, 31:13, 31:15, 31:16, 31:17, 31:19, 31:23, 31:25, 32:3, 32:6, 32:17, 33:2, 33:14, 36:6, 37:14, 44:1, 48:22
**personnel** [1] - 9:5
**perspective** [1] - 96:6
**petition** [1] - 5:14
**Petrasch** [6] - 27:1, 27:4, 34:11, 34:16, 34:25, 138:25
**phase** [1] - 122:24
**phone** [3] - 52:16, 55:22, 55:25
**picture** [2] - 126:5, 142:24
**pictures** [2] - 142:25, 143:1
**piece** [1] - 109:3
**place** [6] - 32:17, 34:21, 35:10, 35:11, 137:18, 141:7
**placement** [1] - 31:2
**PLAINTIFF** [2] - 1:4, 1:16
**plaintiff** [5] - 3:14, 41:19, 129:18, 130:9, 134:12
**Plaintiff** [6] - 39:8, 80:18, 108:13, 124:18, 126:19, 129:20
**Plaintiff's** [33] - 9:3, 9:14, 10:25, 11:6, 13:1, 13:10, 13:15, 15:9, 15:16, 15:21, 16:15, 16:17, 16:25, 19:4, 20:1, 44:7, 44:10, 45:25, 46:9, 47:21, 49:25, 50:19, 57:17, 80:8, 80:12, 90:3, 90:24, 110:8, 111:15, 111:24, 112:3, 112:8, 133:19
**plan** [23] - 11:14, 12:4, 12:5, 12:9, 12:10, 12:16, 17:24, 25:6, 26:21, 26:22, 26:25, 29:24, 33:18, 54:16, 55:15, 94:13, 94:15, 94:16, 94:24, 132:14, 133:5, 133:6
**planned** [3] - 17:22, 18:4, 52:2
**planning** [1] - 27:1
**plans** [6] - 17:14, 18:6, 94:18, 94:19, 107:20, 142:10
**plant** [4] - 10:9, 10:11, 10:12, 27:13
**Plant** [2] - 8:1, 27:9
**playing** [1] - 139:3
**plays** [1] - 124:25
**pleasant** [1] - 144:7
**plugging** [1] - 116:6
**plus** [2] - 55:4, 105:9
**point** [13] - 8:4, 12:6, 27:17, 41:5, 47:24, 51:13, 59:17, 74:1, 88:18, 88:19, 128:2, 129:14, 138:7
**policy** [6] - 32:17, 35:9, 35:11, 35:15, 123:20, 132:12
**political** [1] - 120:3
**populated** [1] - 112:18
**portfolio** [1] - 10:15
**portion** [6] - 5:6, 23:18, 28:3, 34:10, 58:18, 58:19
**position** [34] - 19:22, 25:3, 25:7, 26:12, 29:3, 31:5, 31:11, 33:5, 33:8, 33:20, 34:12, 34:13, 35:2, 35:19, 36:1, 36:14, 43:5, 43:12, 44:3, 46:24, 48:18, 69:10, 72:13, 84:18, 87:3, 87:20, 87:23, 88:11, 123:14, 127:10, 127:25, 128:4, 136:2, 142:19
**positions** [3] - 24:11, 25:18, 43:4
**positive** [1] - 83:4
**possible** [5] - 80:23, 91:10, 122:8, 128:16, 131:9
**post** [13] - 63:21, 65:20, 78:1, 78:6, 78:22, 82:2, 115:9, 115:10, 132:25, 133:17, 135:17
**post-pay** [1] - 78:22
**post-retirement** [10] - 65:20, 78:1, 78:6, 78:22, 82:2, 115:9, 115:10, 132:25, 133:17, 135:17
**potential** [1] - 84:23
**potentially** [4] - 40:2, 102:10, 102:23, 106:20
**PowerPoint** [1] - 33:21
**practice** [3] - 43:8, 43:9, 95:16
**Practice** [5] - 72:16, 72:17, 72:20, 72:21, 72:23
**preceded** [1] - 123:22
**precedent** [1] - 135:23
**predated** [1] - 128:19
**prefer** [2] - 44:8, 121:19
**prejudicial** [2] - 40:2, 40:7
**premarked** [1] - 69:19
**premiums** [1] - 11:22
**prepare** [3] - 8:2, 100:6, 100:10
**prepared** [7] - 24:11, 46:9, 46:15, 62:23, 107:13, 121:17, 121:22
**preparing** [5] - 46:18, 50:10, 54:21, 74:15, 109:13
**present** [15] - 5:8, 40:1, 56:13, 56:16, 56:18, 56:23, 56:24, 63:15, 82:13, 82:16, 82:17, 95:5, 96:22, 111:10, 132:7
**presented** [3] - 38:19, 109:23, 123:6
**President** [8] - 15:3, 19:19, 24:21, 27:23, 30:12, 130:21, 132:3, 134:2
**presumed** [1] - 39:16
**pretrial** [2] - 39:14, 39:25
**pretty** [1] - 89:23
**prevent** [1] - 40:7
**previous** [2] - 15:24, 65:15
**previously** [5] - 5:7, 38:17, 57:19, 70:14, 100:12
**principles** [1] - 123:2
**printed** [2] - 90:6, 125:6
**private** [1] - 42:17
**probable** [1] - 131:8
**problem** [3] - 107:18, 119:1, 138:15
**proceed** [1] - 5:10
**proceeded** [1] - 39:11
**process** [2] - 55:7, 103:6
**proclamations** [1] - 136:12
**produced** [9] - 21:8, 21:11, 41:15, 65:11, 109:1, 109:10, 109:16, 109:17
**profession** [1] - 96:13
**professional** [1] - 46:5
**proffered** [2] - 39:23, 49:21
**Program** [1] - 29:15
**program** [2] - 54:9, 141:5
**project** [2] - 27:12, 117:5
**projected** [4] - 102:6, 118:9, 118:16, 131:16
**projecting** [1] - 53:13
**projection** [1] - 92:25
**projections** [4] - 92:16, 92:21, 115:9, 135:17
**prolonged** [1] - 134:4
**promoted** [1] - 127:16
**promotion** [7] - 91:22, 127:11, 127:14, 127:21,

128:25, 136:1
**proof** [1] - 138:17
**proper** [1] - 120:1
**properly** [1] - 128:10
**property** [2] - 44:1, 48:22
**proposed** [6] - 122:21, 136:11, 137:20, 143:8, 143:16, 143:19
**proud** [1] - 134:2
**provide** [9] - 11:24, 12:12, 50:1, 52:19, 108:9, 122:16, 134:12, 142:14, 142:15
**provided** [20] - 50:8, 50:20, 50:21, 63:3, 68:19, 74:12, 81:20, 94:14, 100:12, 102:12, 102:18, 104:6, 104:7, 109:2, 109:10, 109:14, 112:14, 113:6, 124:7
**provides** [1] - 55:15
**providing** [1] - 70:7
**provision** [1] - 72:24
**proximate** [2] - 123:25, 138:10
**prudent** [2] - 58:16, 131:15
**Public** [1] - 72:18
**pull** [1] - 42:20
**pulled** [1] - 21:15
**punitive** [1] - 39:10
**purchase** [6] - 102:10, 102:23, 103:1, 105:15, 105:16, 110:24
**purpose** [9] - 39:24, 56:22, 69:24, 70:7, 74:6, 74:13, 120:2, 134:11
**purposes** [5] - 43:16, 95:1, 109:25, 110:16, 124:16
**pushing** [1] - 6:12
**put** [20] - 5:24, 6:1, 6:8, 6:13, 6:24, 25:21, 26:1, 35:10, 35:11, 56:24, 79:3, 80:8, 90:15, 93:4, 97:9, 99:20, 106:24, 127:17, 140:23, 141:2
**putting** [1] - 51:5

**Q**

**qualifications** [3] - 49:9, 61:16, 71:20
**qualified** [7] - 45:14, 48:4, 49:16, 49:19, 71:9, 94:9, 106:6
**qualify** [2] - 45:17, 47:25
**quarter** [2] - 83:12, 103:13
**questionable** [1] - 104:11
**questioned** [1] - 68:13
**questioning** [3] - 74:6, 74:7, 109:13
**questions** [18] - 18:20, 30:22, 37:9, 57:22, 69:3, 69:5, 70:5, 71:19, 74:14, 76:21, 81:6, 105:21, 107:22, 115:25, 119:17, 120:17, 120:18, 120:22
**quick** [4] - 20:4, 58:1, 63:4, 114:8
**quickly** [3] - 5:12, 10:9, 79:1
**quit** [6] - 137:12, 137:16, 137:22, 138:20, 138:21
**quoted** [1] - 129:19

**R**

**rails** [1] - 59:10
**raise** [3] - 5:25, 8:9, 43:6
**raises** [1] - 130:23
**RANDLE** [1] - 1:20
**Randy** [1] - 59:23
**range** [9] - 25:18, 25:20, 25:22, 25:24, 25:25, 64:4
**ranged** [1] - 83:7
**Ranger** [1] - 39:19
**ranges** [3] - 83:10, 83:13, 95:6
**rarely** [1] - 133:17
**rate** [22] - 9:7, 51:14, 56:14, 57:1, 92:6, 92:25, 95:5, 95:8, 96:3, 96:10, 96:13, 96:17, 96:20, 96:25, 130:16, 131:19, 132:6, 135:3, 135:4, 140:18, 141:24, 141:25
**rates** [8] - 56:15, 95:11, 95:16, 117:11, 131:17, 131:23, 140:22, 142:4
**rather** [1] - 6:5
**rationale** [1] - 39:14
**re** [1] - 3:17
**reach** [3] - 133:15, 136:18, 143:20
**reached** [2] - 54:15, 54:17
**read** [5] - 61:9, 71:1, 76:14, 95:16, 140:24
**reading** [3] - 72:25, 73:3, 138:11
**ready** [1] - 70:20
**reaffirmed** [1] - 123:14
**real** [5] - 5:12, 20:4, 63:4, 66:20, 114:8
**realize** [1] - 22:19
**really** [3] - 72:11, 124:15, 124:25
**reason** [4] - 38:18, 69:8, 71:9, 138:5
**reasonable** [2] - 6:3, 123:3
**reasonably** [5] - 130:9, 131:8, 131:9, 131:15, 134:24
**reasoning** [2] - 113:22, 113:23
**reasons** [2] - 38:8, 79:11
**reasserting** [1] - 38:21
**rebounded** [3] - 130:22, 134:3, 134:17
**rebuttal** [2] - 4:12, 83:16
**receive** [17] - 10:20, 14:12, 29:1, 30:15, 30:18, 33:25, 45:23, 55:17, 62:2, 99:2, 101:20, 101:23, 102:15, 104:8, 105:1, 114:21, 136:5
**received** [19] - 11:1, 11:4, 17:6, 27:22, 30:1, 34:4, 34:5, 34:6, 36:10, 50:20, 64:9, 64:25, 67:15, 78:14, 84:17, 101:14, 117:17, 118:14, 130:23
**receiving** [2] - 83:15, 87:8
**recent** [1] - 43:5
**recess** [3] - 38:1, 58:14, 122:13
**recognize** [1] - 72:20
**recognizes** [1] - 130:8
**recollect** [1] - 120:14
**recollection** [2] - 11:1, 109:5
**record** [22] - 5:3, 9:5, 17:19, 19:2, 20:10, 28:11, 28:15, 37:14, 38:4, 38:8, 41:10, 45:25, 56:22, 58:17, 59:1, 59:12, 82:21, 122:19, 131:12, 135:13, 144:1, 144:4
**records** [5] - 20:2, 20:3, 36:7, 51:17, 101:9
**recruiter** [1] - 23:20
**recruiting** [1] - 34:19
**redacted** [2] - 28:4, 28:13
**redactions** [1] - 28:12
**redirect** [2] - 116:2, 116:7
**Redirect** [2] - 3:5, 3:9
**REDIRECT** [3] - 37:12, 116:13, 119:3
**reduce** [2] - 57:4, 134:6
**reduced** [9] - 31:22, 32:1, 32:6, 32:7, 32:12, 34:2, 66:9, 75:11, 82:17
**reduces** [2] - 107:3, 140:20
**reducing** [2] - 57:2, 57:5
**reduction** [2] - 123:17, 124:2
**refer** [1] - 69:13
**reference** [2] - 29:7, 29:23
**referring** [2] - 41:1, 62:5
**reflect** [5] - 47:21, 95:12, 131:8, 131:10, 131:11
**reflected** [3] - 11:11, 52:13, 52:24
**reflecting** [1] - 129:23
**reflects** [1] - 97:22
**refresh** [3] - 10:25, 100:5, 109:5
**refused** [1] - 45:17
**regard** [1] - 74:1
**regarding** [1] - 72:16
**regardless** [1] - 11:10
**rehab** [1] - 47:11
**rehab-type** [1] - 47:11
**related** [10] - 19:12, 34:2, 43:25, 50:23, 51:18, 55:8, 75:22, 82:13, 83:23, 89:18
**relating** [1] - 10:15
**relevance** [1] - 41:3
**relevant** [3] - 41:6, 83:25, 109:21
**relied** [1] - 74:15
**relief** [3] - 135:24, 142:14, 142:16
**rely** [3] - 39:17, 51:7, 84:8
**remained** [2] - 123:16, 130:25
**remaining** [1] - 5:6
**remedy** [4] - 18:16, 123:1, 142:11, 142:12
**remember** [12] - 60:9, 60:10, 62:21, 64:6, 67:23, 67:25, 103:15, 103:16, 104:15, 116:25, 130:2, 138:11
**reminded** [1] - 59:8
**removed** [2] - 35:16, 65:8
**render** [1] - 49:4
**renewing** [1] - 38:10
**repeat** [4] - 78:5, 85:23, 92:18, 98:2
**repeatedly** [1] - 123:4
**replace** [1] - 28:7
**replies** [1] - 143:19
**reply** [2] - 71:4, 143:9
**report** [84] - 3:24, 4:4, 4:6, 4:8, 4:10, 4:12, 18:1, 18:13, 41:2, 41:5, 41:6, 44:16, 46:2, 46:9, 49:13, 49:25, 50:5, 50:9, 50:10, 50:16, 50:21, 50:23, 51:11, 52:8, 53:6, 53:17, 54:21, 59:25, 60:2, 61:12, 62:8, 62:23, 64:13, 64:14, 65:10, 65:13, 65:15, 66:6, 66:10, 66:13, 67:6, 67:14, 67:15, 67:18, 67:19, 67:22, 68:4, 71:1, 71:16, 72:25, 73:10, 74:4, 74:12, 74:15, 76:14, 78:12, 78:14, 78:15, 78:17, 79:7, 79:12, 79:16, 79:20, 79:22, 80:1, 80:10, 81:12, 82:9, 82:13, 83:22, 105:3,

107:2, 108:1, 108:25, 113:6, 117:18, 119:9, 123:6, 141:13
**Report** [1] - 62:18
**reporter** [2] - 28:11, 59:8
**REPORTER** [3] - 2:1, 2:2, 144:15
**reports** [26] - 38:25, 39:5, 40:13, 41:14, 46:14, 49:15, 50:1, 50:15, 61:21, 61:23, 62:11, 64:9, 66:15, 73:8, 74:16, 81:21, 82:12, 83:9, 83:13, 99:13, 100:21, 100:23, 116:16, 128:16, 131:14, 140:24
**represent** [2] - 63:1, 65:10
**representation** [1] - 107:6
**request** [2] - 5:17, 68:20
**REQUESTED** [1] - 144:13
**require** [3] - 135:10, 139:16, 139:17
**required** [1] - 43:19
**requirement** [2] - 126:23, 130:24
**requires** [4] - 45:6, 120:15, 131:14, 135:11
**requiring** [1] - 89:7
**requisite** [1] - 49:3
**research** [1] - 14:3
**resign** [3] - 27:1, 72:9, 126:19
**resignation** [10] - 7:25, 23:3, 47:19, 74:2, 77:13, 86:12, 123:19, 123:22, 124:13, 128:7
**resigned** [10] - 47:15, 84:11, 123:15, 124:14, 126:12, 126:17, 128:7, 129:8, 130:2, 136:3
**resigning** [3] - 72:12, 130:3
**resolution** [1] - 39:25
**Resource** [2] - 30:13, 130:22
**Resources** [5] - 15:3, 19:19, 24:21, 27:23, 89:9
**respective** [1] - 144:8
**respond** [5] - 5:20, 5:22, 106:7, 122:5, 122:6
**response** [5] - 38:12, 48:25, 68:19, 69:1, 143:4
**responses** [1] - 143:19
**responsibilities** [1] - 126:25
**rest** [2] - 125:19, 133:19
**restroom** [1] - 122:9
**restructure** [2] - 91:21, 132:5
**restructuring** [1] - 130:14
**result** [6] - 32:13, 48:1, 50:24, 61:23, 128:7, 138:4
**resulting** [1] - 5:7
**retained** [2] - 45:1, 139:25
**retire** [11] - 17:16, 17:22, 18:4, 42:12, 52:2, 88:17, 89:7, 118:13, 130:24, 133:12, 141:16
**retired** [12] - 42:11, 43:5, 46:15, 48:15, 94:7, 94:8, 94:9, 110:21, 132:13, 133:2, 142:23
**retiree** [4] - 11:14, 11:21, 54:19, 55:5
**retirement** [76] - 3:17, 11:21, 12:2, 12:10, 13:1, 13:16, 13:23, 18:6, 18:13, 18:17, 43:22, 48:21, 52:12, 54:9, 54:10, 54:12, 54:16, 56:7, 63:21, 65:20, 66:15, 77:16, 78:1, 78:4, 78:6, 78:22, 82:2, 88:16, 88:21, 88:25, 89:3, 93:11, 93:12, 93:25, 99:1, 99:3, 101:13, 102:6, 103:5, 103:14, 104:13, 105:11, 105:12, 106:2, 106:19, 107:12, 111:4, 111:6, 113:17, 114:21, 115:9, 115:10, 117:15, 117:16, 118:1, 119:6, 120:6, 130:11, 132:13, 132:16, 132:25, 133:4, 133:14, 133:17, 134:10, 134:17, 135:3, 135:7, 135:17, 141:4, 141:7, 141:10, 142:5, 142:8, 142:13
**Retirement** [22] - 29:12, 99:5, 99:9, 101:6, 102:8, 103:10, 105:1, 106:10, 110:11, 110:20, 111:16, 112:4, 112:16, 112:19, 113:5, 113:10, 113:20, 114:17, 119:25, 120:4, 132:18, 134:8
**retires** [1] - 88:22
**retiring** [4] - 42:14, 103:18, 104:3, 142:10
**return** [2] - 15:10, 37:21
**reuse** [1] - 58:23
**reverse** [1] - 140:17
**review** [5] - 7:8, 10:9, 54:1, 86:23, 100:10
**reviewed** [3] - 51:17, 72:23, 79:12
**reviewing** [1] - 79:22
**revisit** [1] - 6:14
**reward** [1] - 131:15
**RIA** [7] - 12:11, 13:25, 54:11, 93:11, 93:12, 94:1, 132:17
**risk** [13] - 91:17, 95:12, 95:14, 95:18, 96:4, 96:9, 96:12, 115:16, 130:15, 131:11, 131:25, 132:6, 134:23
**risk-free** [2] - 95:12, 132:6
**risks** [2] - 131:17, 140:22
**risky** [1] - 131:24
**role** [1] - 77:10
**Role** [1] - 73:7
**roles** [1] - 132:4
**room** [2] - 8:18, 42:22
**roughly** [2] - 25:15, 90:25
**routinely** [1] - 129:1
**RPR** [2] - 2:1, 144:23
**RSA** [1] - 3:16
**rule** [2] - 38:22, 137:16
**ruled** [6] - 38:17, 41:9, 58:21, 76:7, 85:20, 109:3
**run** [3] - 97:10, 116:3, 128:15
**rushing** [2] - 116:10, 121:21
**Rutgers** [1] - 18:21

## S

**s/Debra** [1] - 144:23
**safe** [1] - 144:7
**sailed** [1] - 138:1
**salaried** [3] - 30:23, 31:23, 32:13
**salary** [17] - 3:15, 9:7, 12:15, 14:10, 26:11, 28:5, 29:3, 29:18, 31:6, 31:13, 33:10, 53:23, 54:1, 54:13, 55:11, 55:17
**salesman** [1] - 126:7
**SAP** [2] - 9:6, 36:6
**save** [2] - 40:22, 119:14
**savings** [3] - 12:2, 12:16, 13:16
**saw** [4] - 71:3, 85:7, 86:25, 135:5
**SC** [4] - 1:3, 1:18, 1:22, 2:3
**schedule** [1] - 5:18
**scheduled** [1] - 118:15
**scope** [16] - 46:21, 60:14, 60:24, 71:12, 73:22, 73:24, 77:6, 105:17, 106:5, 106:22, 107:2, 107:23, 119:9, 123:1, 141:13
**score** [1] - 10:15
**Scott** [2] - 33:7, 35:22
**screen** [3] - 44:11, 112:6, 125:5
**scrutinized** [1] - 128:18
**scrutinizes** [1] - 126:1
**search** [2] - 25:15, 25:17
**seat** [2] - 37:21, 41:25
**seated** [2] - 5:2, 7:4
**second** [14] - 8:7, 8:10, 11:13, 21:18, 23:5, 29:6, 30:21, 50:10, 67:6, 67:14, 67:19, 78:11, 79:7, 139:18
**section** [3] - 22:18, 29:18, 125:22
**Sections** [1] - 138:13
**secured** [1] - 133:25
**securities** [1] - 95:12
**Security** [1] - 54:24
**see** [56] - 5:22, 10:22, 12:24, 22:5, 22:6, 22:19, 22:20, 23:24, 27:24, 33:12, 41:1, 59:22, 60:4, 62:13, 63:3, 65:1, 68:2, 68:18, 70:25, 71:8, 71:18, 71:24, 72:15, 73:12, 73:18, 74:20, 78:18, 78:20, 79:2, 80:22, 83:5, 88:18, 88:19, 90:8, 90:11, 90:25, 91:1, 91:2, 91:4, 98:22, 99:7, 110:8, 110:14, 111:16, 111:22, 112:16, 114:8, 126:2, 126:4, 127:1, 127:8, 128:22, 131:17, 136:12, 139:7
**seeing** [3] - 36:5, 36:9, 68:8
**seeking** [5] - 25:17, 47:2, 118:4, 127:9, 136:25
**semi** [1] - 42:11
**semi-retired** [1] - 42:11
**send** [1] - 121:18
**sending** [1] - 129:20
**sense** [3] - 39:23, 131:20, 137:15
**sensitive** [2] - 97:16, 97:18
**sent** [3] - 24:14, 24:19, 100:24
**sentence** [1] - 98:24
**separation** [1] - 123:25
**September** [7] - 23:23, 24:15, 24:18, 25:3, 25:6, 25:9, 25:13
**sequestered** [1] - 8:14
**sequestration** [1] - 8:12
**service** [9] - 99:1, 101:21, 102:6, 102:11, 103:1, 103:6, 110:24, 111:11, 120:15
**Services** [2] - 55:9, 73:6
**set** [2] - 30:16, 139:5

**setbacks** [1] - 140:12
**seven** [2] - 72:7, 125:1
**seventh** [1] - 16:6
**several** [3] - 32:2, 93:16, 136:21
**shaking** [1] - 121:15
**shareholder** [3] - 43:7, 43:18, 48:20
**sheet** [5] - 63:12, 65:3, 65:4, 65:13, 113:16
**Sherrill** [2] - 23:19, 25:21
**Sherry** [1] - 24:20
**shifted** [1] - 12:10
**ship** [1] - 138:1
**short** [11] - 37:24, 38:1, 58:3, 58:14, 116:8, 116:9, 122:10, 122:13, 134:14, 135:14, 143:9
**shortens** [1] - 97:4
**show** [14] - 10:24, 12:24, 12:25, 20:5, 44:6, 49:3, 64:24, 68:1, 78:9, 90:3, 90:10, 108:2, 110:7, 138:9
**showed** [4] - 20:1, 21:24, 22:4, 124:9
**showing** [7] - 13:14, 15:25, 16:2, 16:4, 16:6, 28:9, 112:25
**shown** [1] - 40:8
**shows** [5] - 21:8, 28:7, 41:15, 123:13, 131:12
**shrink** [1] - 93:1
**shrinks** [2] - 92:16, 92:21
**shy** [1] - 20:16
**sic)** [1] - 38:25
**side** [5] - 42:21, 108:16, 113:16, 140:16, 141:15
**sides** [1] - 139:3
**significant** [2] - 105:6, 105:8
**significantly** [5] - 65:15, 75:11, 76:17, 97:5, 97:6
**similar** [4] - 49:17, 52:11, 81:6, 127:8
**simple** [3] - 75:15, 88:1, 142:19
**simply** [3] - 73:13, 73:25, 125:21
**single** [2] - 12:14, 138:8
**sit** [1] - 108:17
**sitting** [6] - 102:8, 102:13, 103:9, 103:13, 105:2, 114:17
**situation** [5] - 31:22, 75:17, 120:11, 127:8, 132:3
**six** [9] - 12:23, 13:8, 14:16, 27:19, 56:1, 57:13, 71:24, 72:3, 105:8
**sixty** [5] - 13:7, 57:20, 80:20, 80:21, 108:14
**sixty-two** [3] - 57:20, 80:20, 80:21
**skills** [1] - 49:4
**skipping** [1] - 138:24
**slight** [2] - 66:14, 83:3
**slightly** [1] - 66:10
**slow** [2] - 114:1, 131:5
**slowing** [1] - 140:10
**small** [4] - 22:19, 85:8, 96:16, 96:18
**smaller** [1] - 64:1
**Social** [1] - 54:24
**solely** [1] - 133:19
**someone** [2] - 135:25, 142:9
**somewhere** [1] - 59:24
**sorry** [5] - 8:21, 17:18, 22:2, 22:14, 90:17
**sort** [3] - 5:18, 43:9, 109:24
**sought** [1] - 128:5
**sound** [2] - 23:23, 24:16
**sounds** [2] - 21:20, 32:25
**SOUTH** [3] - 1:1, 1:21, 2:2
**South** [22] - 29:11, 29:14, 99:4, 99:9, 101:6, 102:8, 103:10, 104:25, 106:10, 110:10, 110:20, 111:16, 112:4, 112:15, 112:18, 113:5, 113:10, 113:19, 114:17, 117:15, 132:18, 134:8
**Southern** [1] - 40:4
**Spagnuolo** [12] - 124:21, 124:23, 125:14, 126:3, 126:6, 126:16, 128:1, 128:23, 135:24, 136:20, 136:24, 137:2
**Spagnuolo/Dennis** [1] - 136:16
**spared** [1] - 139:25
**Spartanburg** [2] - 15:4, 120:1
**SPARTANBURG** [1] - 1:2
**special** [2] - 45:6, 120:2
**specific** [1] - 30:10
**specifically** [2] - 40:24, 79:8
**speculate** [2] - 95:3, 108:17
**speculation** [4] - 76:18, 105:23, 130:6, 131:10
**speculative** [11] - 77:18, 91:19, 109:8, 123:19, 130:7, 131:7, 133:2, 134:18, 139:4, 139:6, 142:5
**spend** [2] - 110:2
**spirit** [1] - 41:8
**spot** [1] - 42:21
**spreadsheet** [5] - 101:16, 112:14, 112:18, 112:23, 113:1
**spreadsheets** [5] - 99:13, 100:1, 100:21, 101:2, 113:14
**squirreled** [1] - 132:19
**stability** [1] - 132:15
**stacked** [1] - 130:17
**stand** [3] - 6:24, 107:4, 141:3
**standard** [1] - 138:3
**start** [13] - 5:11, 7:18, 20:7, 20:13, 26:22, 27:16, 37:25, 40:11, 51:19, 58:15, 110:21, 111:2, 139:1
**started** [9] - 6:21, 12:4, 30:8, 30:10, 46:13, 51:15, 53:21, 87:6, 133:9
**starting** [5] - 14:10, 51:13, 79:17, 99:22, 139:4
**State** [2] - 119:24, 120:4
**state** [7] - 41:10, 120:3, 120:5, 120:7, 120:9, 141:10
**statement** [15] - 3:11, 3:12, 3:16, 4:14, 10:1, 13:16, 13:18, 15:23, 22:8, 73:12, 73:18, 73:20, 76:9, 117:22, 141:22
**statements** [4] - 3:19, 52:20, 61:15, 112:13
**statements/ arguments** [1] - 121:15
**STATES** [3] - 1:1, 1:14, 2:2
**status** [1] - 42:10
**statutory** [2] - 125:21, 126:23
**stay** [2] - 76:16, 121:2
**stayed** [12] - 46:24, 72:11, 72:12, 75:4, 75:9, 77:10, 84:18, 127:20, 128:5, 134:19, 135:20, 135:21
**stenographic** [1] - 144:17
**STENOTYPE/ COMPUTER** [1] - 2:5
**STENOTYPE/ COMPUTER-AIDED** [1] - 2:5
**STEPHENSON** [1] - 1:17
**sticks** [1] - 134:9
**still** [9] - 18:16, 30:12, 33:5, 36:6, 36:24, 44:12, 52:23, 87:20, 141:20
**stipulated** [1] - 57:16
**stone** [1] - 139:5
**story** [1] - 133:24
**straight** [2] - 122:7, 143:23
**streams** [1] - 132:23
**STREET** [3] - 1:17, 1:21, 2:2
**string** [2] - 82:23, 129:7
**stub** [1] - 110:18
**stubs** [1] - 101:14
**stuff** [7] - 41:9, 61:9, 94:7, 104:3, 125:5, 140:25, 142:6
**subdivision** [1] - 120:3
**subject** [3] - 41:7, 58:20, 129:6
**submission** [1] - 129:16
**submissions** [1] - 143:10
**submit** [3] - 122:21, 136:10, 143:15
**submitted** [4] - 38:13, 38:15, 39:2, 143:14
**subsequent** [1] - 68:5
**subsequently** [1] - 39:1
**substantial** [6] - 98:17, 101:23, 113:19, 113:24, 134:7, 135:6
**substantially** [2] - 127:18, 130:23
**substantiate** [1] - 141:9
**substantiated** [1] - 143:6
**substitute** [1] - 141:1
**success** [1] - 131:11
**suffer** [1] - 21:21
**suggest** [1] - 106:25
**suit** [1] - 6:18
**SUITE** [1] - 1:22
**suits** [2] - 6:2, 28:17
**summarize** [1] - 114:8
**summarizes** [1] - 129:16
**summarizing** [1] - 115:7
**summary** [7] - 63:5, 63:12, 65:13, 67:2, 79:3, 113:3, 122:16
**Summary** [1] - 3:17
**supervisor** [1] - 10:18
**supper** [1] - 121:25
**supplement** [1] - 5:21
**supplemental** [1] - 62:8
**supplemented** [1] - 66:6
**support** [7] - 43:6, 43:11, 43:24, 100:21, 105:25, 130:19, 135:16
**supports** [1] - 135:13
**surprise** [1] - 69:9
**susceptible** [1] - 129:2
**suspect** [2] - 104:4, 124:11
**sustain** [3] - 71:19, 100:14, 103:23
**sustained** [4] - 76:11, 100:17,

106:14, 107:7
**sweet** [1] - 42:20
**swing** [1] - 83:12
**sworn** [4] - 7:1, 7:2, 41:22, 41:24
**symmetry** [1] - 131:20
**System** [9] - 29:12, 99:5, 99:10, 101:6, 102:8, 103:10, 105:1, 106:10, 132:18
**system** [12] - 103:14, 105:11, 105:12, 106:2, 106:17, 106:19, 107:12, 111:4, 111:6, 113:20, 141:4, 141:10

**T**

**T-bill** [1] - 131:24
**T-bills** [2] - 115:17, 140:24
**table** [2] - 68:8, 70:25
**tables** [1] - 52:9
**tabs** [1] - 101:2
**tactic** [2] - 139:9, 139:10
**tailored** [1] - 135:14
**takeoff** [1] - 66:24
**target** [2] - 31:18, 31:20
**targets** [1] - 10:12
**tax** [3] - 15:10, 43:17, 48:13
**taxable** [4] - 52:14, 52:15, 52:17, 53:5
**taxes** [1] - 43:17
**ten** [5] - 46:3, 55:16, 55:18, 55:19, 55:20
**tenure** [2] - 11:20, 12:15
**term** [3] - 55:23, 56:1, 138:10
**terminated** [3] - 36:20, 47:16, 84:11
**termination** [5] - 77:13, 84:15, 124:1, 124:4, 124:5
**terms** [6] - 12:2, 18:15, 51:13, 133:5, 140:14, 142:5
**testified** [24] - 7:3, 12:3, 19:18, 22:1, 26:11, 41:24, 45:10, 48:15, 48:19, 49:5, 60:18, 61:4, 67:13, 68:25, 69:1, 73:24, 79:10, 105:19, 107:20, 108:13, 127:17, 129:12, 130:2, 131:2
**testify** [9] - 32:8, 44:3, 47:25, 49:16, 49:20, 71:14, 106:19, 138:5, 138:23
**testifying** [6] - 67:6, 67:23, 70:9, 74:11, 103:21, 140:3
**testimony** [34] - 19:1, 27:11, 34:10, 35:18, 35:24, 38:19, 38:24, 39:5, 39:22, 40:12, 40:15, 44:18, 47:12, 49:2, 58:10, 58:23, 59:3, 61:10, 69:7, 70:6, 71:12, 106:18, 106:25, 108:4, 109:22, 109:23, 119:22, 139:16, 139:17, 140:6, 141:2, 141:9, 142:11
**THE** [143] - 1:1, 1:1, 1:13, 1:16, 1:19, 5:2, 6:1, 6:5, 6:12, 6:18, 6:20, 6:25, 7:4, 8:8, 8:16, 8:23, 9:15, 10:5, 11:5, 11:7, 13:11, 14:6, 15:17, 16:12, 17:2, 28:9, 28:15, 28:20, 28:22, 37:11, 37:20, 37:24, 38:2, 38:10, 38:12, 38:16, 40:20, 41:11, 41:18, 41:21, 41:25, 42:19, 42:23, 44:11, 48:3, 48:7, 48:25, 49:11, 49:18, 57:20, 57:24, 58:3, 58:8, 58:12, 58:13, 58:15, 59:3, 59:5, 59:7, 59:17, 64:17, 67:9, 68:10, 68:18, 69:1, 69:3, 69:23, 70:4, 70:11, 70:15, 70:17, 70:19, 70:22, 71:18, 72:3, 74:10, 74:18, 74:22, 75:18, 75:21, 75:24, 76:11, 76:20, 76:23, 80:4, 80:14, 80:16, 80:18, 81:1, 81:14, 81:17, 85:21, 85:23, 88:7, 88:8, 90:15, 90:17, 90:20, 95:21, 98:7, 98:9, 100:11, 100:16, 103:23, 106:7, 106:11, 107:11, 107:18, 108:23, 109:14, 109:19, 112:7, 112:10, 113:1, 113:4, 113:8, 113:9, 113:25, 114:2, 114:5, 116:3, 116:7, 116:10, 119:2, 119:13, 119:16, 119:20, 120:17, 120:21, 121:2, 121:4, 121:7, 121:10, 121:14, 121:20, 121:24, 122:3, 122:10, 122:14, 122:18, 136:8, 143:12, 144:3
**theoretical** [1] - 118:7
**theory** [2] - 57:5, 136:16
**therefore** [2] - 39:3, 118:14
**third** [5] - 16:2, 67:19, 79:7, 79:22, 80:1
**thousand** [11] - 9:11, 14:11, 20:16, 36:18, 37:5, 57:13, 65:25, 66:3, 66:18, 66:19, 78:2
**thousands** [1] - 128:17
**three** [8] - 10:20, 11:1, 82:23, 108:11, 120:13, 120:14, 127:18, 137:9
**three-year** [2] - 127:18, 137:9
**throughout** [1] - 103:12
**tie** [1] - 125:16
**tied** [3] - 74:2, 124:3, 124:17
**tier** [2] - 139:18, 139:20
**TIMOTHY** [1] - 1:13
**tired** [1] - 131:2
**Title** [2] - 48:23, 138:13
**today** [18] - 30:13, 39:11, 48:11, 60:23, 69:2, 69:20, 70:9, 84:7, 84:10, 123:14, 123:20, 133:10, 133:20, 135:19, 140:4, 142:2, 142:4, 143:23
**today's** [3] - 56:14, 56:25, 57:8
**together** [6] - 5:24, 6:1, 6:2, 6:9, 51:6, 130:17
**took** [9] - 53:9, 54:2, 56:11, 66:13, 75:4, 75:15, 114:11, 114:14, 127:24
**top** [6] - 26:4, 27:6, 88:3, 117:5, 139:15, 139:20
**topic** [1] - 119:21
**total** [20] - 15:23, 20:3, 20:9, 20:15, 20:19, 20:22, 21:2, 21:5, 21:9, 22:18, 23:12, 23:13, 55:1, 56:8, 64:3, 65:22, 81:24, 90:4, 90:8, 90:25
**totality** [1] - 9:5
**totally** [2] - 48:23, 132:17
**touched** [1] - 7:9
**track** [1] - 126:14
**training** [2] - 45:6, 61:7
**trajectory** [6] - 87:5, 97:25, 98:3, 98:10, 134:3, 135:6
**TRANSCRIPT** [1] - 144:13
**transcript** [1] - 144:17
**TRANSCRIPTION** [1] - 2:5
**transfer** [3] - 32:14, 33:19, 34:3
**transferred** [2] - 25:3, 33:22
**travels** [1] - 144:7
**Treasury** [7] - 56:15, 95:8, 95:11, 95:17, 96:3, 130:15, 131:23
**treatise** [1] - 73:3
**treatises** [1] - 72:15
**TRIAL** [1] - 1:14
**trial** [34] - 5:5, 5:6, 7:9, 10:8, 12:3, 23:18, 28:3, 34:11, 35:18, 35:25, 36:5, 36:9, 38:19, 38:23, 39:7, 39:12, 39:15, 39:24, 40:6, 40:10, 40:11, 56:12, 58:18, 58:20, 59:1, 77:25, 78:7, 85:9, 115:5, 119:1, 127:19, 138:23, 139:5, 139:11
**tried** [3] - 39:3, 59:14, 128:8
**trier** [1] - 84:22
**trigger** [1] - 128:22
**truth** [2] - 60:19
**try** [7] - 22:3, 69:9, 69:12, 71:15, 111:9, 111:10, 126:5
**trying** [16] - 5:19, 58:4, 68:13, 69:15, 69:17, 69:25, 70:10, 70:16, 73:22, 76:8, 88:4, 103:7, 106:23, 121:10, 133:15, 140:10
**Tuesday** [1] - 6:15
**turn** [1] - 125:9
**turned** [2] - 8:4, 23:2
**turnover** [1] - 8:2
**turns** [1] - 52:1
**twice** [2] - 92:12, 98:6
**two** [22] - 5:21, 9:11, 26:21, 45:13, 50:11, 54:21, 54:25, 57:20, 66:19, 79:20, 80:20, 80:21, 82:12, 83:2, 91:2, 91:5, 97:4, 97:9, 108:10, 120:12, 125:12
**two-and-a-half** [2] - 54:21, 54:25
**TX-60** [4] - 25:3, 33:5, 34:13, 35:12
**TX-64** [12] - 25:7, 33:8, 33:19, 33:22, 34:3, 34:7, 34:12, 34:13, 34:19, 35:2, 35:19, 36:1
**type** [5] - 12:3, 43:25, 47:11, 49:7, 49:12
**types** [5] - 10:20, 11:1, 43:15, 49:14, 49:15
**typically** [3] - 91:19, 91:23, 92:3

**U**

**U.S** [4] - 56:15, 95:8, 95:17, 96:3
**uncertain** [1] - 134:20
**under** [11] - 13:1, 57:9, 60:18, 106:17, 107:1, 124:10, 133:5, 138:3, 138:13, 141:11, 143:15
**underlying** [1] - 39:14
**undisputed** [1] - 123:13
**unemployment** [1] - 134:5

**unfortunately** [1] - 123:5
**uninterrupted** [3] - 91:13, 115:19, 133:5
**unique** [1] - 45:5
**UNITED** [3] - 1:1, 1:14, 2:2
**unlawful** [1] - 124:17
**unless** [1] - 80:22
**unnecessary** [1] - 40:9
**unredacted** [1] - 28:16
**Unredacted** [1] - 4:2
**up** [29] - 6:21, 6:25, 8:22, 12:21, 12:23, 13:7, 14:25, 51:1, 52:8, 54:2, 56:5, 58:4, 65:14, 78:20, 82:2, 90:15, 100:7, 101:15, 106:25, 116:3, 117:25, 119:21, 128:12, 128:15, 135:9, 137:14, 140:3, 140:23, 144:1
**updated** [1] - 46:14
**upper** [3] - 21:12, 22:18, 31:17
**upward** [3] - 87:5, 98:1, 98:4
**upwards** [1] - 97:11
**USC** [1] - 125:22
**uses** [1] - 140:25
**utilized** [1] - 50:10

### V

**valuation** [1] - 43:10
**valuations** [1] - 43:22
**value** [16] - 56:13, 56:16, 56:17, 56:18, 56:24, 63:15, 82:13, 82:16, 82:17, 95:5, 96:22, 107:1, 111:10, 117:20, 132:7
**valuing** [1] - 56:23
**vaporizes** [1] - 102:9
**variability** [2] - 91:22, 130:15
**various** [3] - 11:10, 43:15, 43:16
**vary** [2] - 47:15, 47:18
**varying** [1] - 128:17
**vehicle** [7] - 52:16, 54:4, 55:22, 55:24, 66:11, 132:11, 132:12
**verbally** [2] - 26:17, 26:19
**verdict** [2] - 5:7, 39:8
**version** [5] - 28:7, 51:2, 51:3, 51:4
**versions** [1] - 50:12
**VERSUS** [1] - 1:5
**versus** [13] - 5:4, 39:19, 40:3, 43:21, 46:25, 72:13, 77:10, 84:18, 86:19, 108:3, 116:21, 137:1
**vested** [2] - 13:21, 120:10
**Vice** [8] - 15:3, 19:18, 24:20, 27:23, 30:12, 130:21, 132:3, 134:1
**VII** [2] - 48:24, 138:13
**vision** [1] - 29:9
**visual** [2] - 125:15, 126:5
**vocational** [1] - 47:11
**volatility** [1] - 132:2
**voluntarily** [5] - 124:14, 124:18, 128:6, 129:2, 129:5
**voluntary** [3] - 47:19, 91:17, 130:14
**VP** [2] - 89:9, 130:21

### W

**W-2** [19] - 3:18, 3:20, 3:21, 3:22, 3:23, 11:11, 15:12, 16:16, 16:18, 16:20, 16:22, 17:9, 51:17, 52:13, 52:20, 52:24, 53:1, 54:2, 54:3
**wage** [3] - 53:7, 91:24, 92:2
**wages** [4] - 44:24, 45:3, 52:25, 131:23
**wait** [4] - 8:20, 26:21, 76:16, 130:1
**waited** [5] - 75:10, 85:16, 86:4, 128:9, 139:7
**walk** [4] - 15:20, 53:17, 71:15, 129:25
**walked** [3] - 36:23, 37:1, 37:5
**wants** [5] - 58:23, 120:23, 130:3, 142:25, 143:1
**Wednesday** [1] - 5:20
**weekend** [2] - 8:2, 27:12
**weekly** [1] - 25:15
**weeks** [3] - 5:21, 81:11, 135:8
**weeks'** [1] - 26:22
**weight** [3] - 40:14, 49:8, 109:22
**WERKE** [1] - 1:6
**Westlaw** [2] - 39:19, 40:4
**whichever** [1] - 121:18
**Whirlpool** [1] - 126:20
**WHITSETT** [1] - 1:17
**whole** [10] - 18:15, 106:4, 117:14, 130:10, 133:13, 134:12, 136:15, 142:14, 142:15, 142:24
**willing** [1] - 18:16
**willingly** [2] - 129:17, 129:20
**windfall** [4] - 123:5, 123:7, 131:10, 134:13
**wise** [1] - 17:12
**wish** [1] - 144:8
**withdrawing** [1] - 74:22
**WITNESS** [9] - 42:23, 58:12, 75:21, 76:23, 85:23, 88:8, 98:9, 112:10, 113:9
**witness** [19] - 8:10, 37:22, 42:1, 48:3, 48:6, 49:19, 68:23, 95:22, 106:1, 106:15, 107:13, 109:15, 109:24, 116:1, 119:2, 119:13, 121:7, 140:5, 140:23
**witnesses** [3] - 100:6, 121:4, 140:5
**Wofford** [1] - 45:21
**wonderful** [1] - 59:9
**words** [2] - 117:9, 142:13
**work-life** [1] - 24:6
**works** [6] - 55:10, 71:7, 89:12, 89:19, 111:5, 119:25
**worksheet** [1] - 107:15
**world** [1] - 70:12
**Wright** [1] - 40:3
**writing** [1] - 33:25
**written** [1] - 89:3

### Y

**y'all** [4] - 6:15, 28:17, 108:23, 122:18
**year** [50] - 7:18, 10:19, 14:22, 15:25, 16:2, 16:4, 16:6, 16:8, 19:9, 19:10, 19:12, 20:12, 20:20, 20:22, 21:2, 21:11, 21:21, 22:7, 22:10, 22:22, 22:25, 23:6, 23:9, 23:11, 30:3, 35:10, 36:10, 40:5, 45:23, 51:16, 53:9, 53:11, 55:5, 55:19, 87:9, 90:7, 98:10, 98:12, 110:11, 112:4, 115:3, 118:15, 127:18, 128:8, 131:4, 137:9, 141:19, 142:7
**years** [32] - 42:16, 43:15, 44:19, 55:4, 79:20, 86:12, 93:16, 93:23, 97:4, 97:8, 97:9, 99:1, 101:20, 102:2, 102:5, 102:10, 103:1, 110:24, 111:11, 117:2, 118:6, 118:14, 118:19, 118:23, 120:10, 120:15, 133:11, 141:16, 142:3, 142:6, 142:9
**yesterday** [1] - 54:22
**young** [1] - 127:9
**yourself** [2] - 71:10, 111:3

### Z

**zero** [10] - 60:8, 60:12, 60:20, 128:5, 128:22, 129:13, 129:22, 135:20, 136:6, 137:13

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP,"<br><br>Defendants. | C.A. No. 7:22-cv-03738-TMC |

**DEFENDANT BMW MANUFACTURING CO. LLC'S
CONSENT MOTION TO AMEND THE JUDGMENT**

COMES NOW Defendant BMW Manufacturing Co., LLC ("BMW MC"), with consent of Plaintiff and Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), and requests that the Court issue an amended judgment applying the damages cap established by 42 U.S.C. § 1981a.

On February 17, 2026, a jury trial commenced in this action. The jury rendered a verdict on February 25, 2026, finding that Defendant BMW MC discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000-e, *et seq*. ("Title VII") (ECF No. 216). The jury awarded Plaintiff compensatory damages in the amount of $100,000 and punitive damages in the amount of $5,000,000 (ECF No. 216). On February 25, 2026, this Court entered a judgment on the jury verdict (ECF No. 217).

Damage awards under Title VII are subject to the damage caps set forth in 42 U.S.C. § 1981a(b)(3). *See Saski v. Class*, 92 F.3d 232, 235 (4th Cir. 1996); *see also Hylind v. Xerox*

*Corp.*, 481 Fed. App'x 819, 823 (4th Cir. 2012) (unpublished) (affirming the district court's decision to reduce the jury award on the plaintiff's successful claims to the $300,000 statutory cap). Pursuant to that statutory provision, the sum of compensatory damages plus punitive damages is capped depending on the size of the employer. *See* 42 U.S.C. § 1981a(b)(3). For employers with more than 500 employees, the maximum amount of combined compensatory and punitive damages that can be awarded is $300,000. *Id.* Here, it is undisputed that Defendant BMW MC had more than 500 employes during the relevant timeframe. As a result, the maximum amount of compensatory and punitive damages that Plaintiff can be awarded on her Title VII claim is $300,000. Because the jury awarded a total of $5,100,000 in compensatory and punitive damages combined, the jury award for compensatory and punitive damages must be reduced to comply with the statutory cap.

On Friday, March 13, 2026, at the conclusion of a bench trial on damages, the Court raised the issue of the statutory cap and requested that a motion be submitted to amend the judgment. Accordingly, Defendant BMW MC hereby submits this motion requesting that the Court amend the judgment to reduce the total amount of the compensatory and punitive damages award to $300,000 to comply with the applicable statutory damage cap. Counsel for Defendant BMW MC has conferred with counsel for Plaintiff and Defendant BMW AG, both of whom consent to this Motion. Plaintiff conditions her agreement on the understanding that the cap will apply to the aggregate of compensatory and punitive damages and that this Motion does not seek the reduction of punitive damages solely. In other words, should BMW MC challenge the availability or amount of compensatory damages in the verdict, and this or another court accepts BMW MC's argument, the aggregate cap would still apply to the remaining compensatory and punitive damages.

The Parties further agree that the filing of this Consent Motion is made without prejudice to the rights of any party to file any applicable post-trial motions, specifically including, but not limited to, a motion pursuant to Rule 50 or 59 of the Federal Rules of Civil Procedure.

WHEREFORE, Defendant BMW MC respectfully requests that the Court grant this Consent Motion to Amend the Judgment for Application of the Statutory Damages Cap and amend the judgment to reduce the award of compensatory and punitive damages to a total of $300,000 to comply with the statutory damages cap under 42 U.S.C. § 1981a(b)(3).

Respectfully submitted this the 18th day of March, 2026.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*

7:22-cv-03738-TMC Date Filed 03/25/26 Entry Number 235 Page 1 of 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| Kelly Dawsey,<br><br>Plaintiff,<br><br>v.<br><br>Bayerische Motoren Werke Aktiengesellschaft; and BMW Manufacturing Co LLC, *collectively d/b/a "BMW Group,"*<br><br>Defendants. | C.A. No. 7:22-cv-3738-TMC |

**ORDER**

This matter is before the Court on Defendant BMW Manufacturing Co., LLC's Consent Motion to Amend the Judgment (ECF No. 231). In that uncontested Motion, Defendant BMW Manufacturing asks the Court to amend the judgment entered on February 25, 2026 (ECF No. 217) by applying the statutory damages cap under 42 U.S.C. § 1981a.

Damage awards under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e, *et seq*. ("Title VII"), are subject to the damage caps set forth in 42 U.S.C. § 1981a(b)(3). *See Saski v. Class*, 92 F.3d 232, 235 (4th Cir. 1996). This statute, among other things, limits the total amount of compensatory and punitive damages a party may recover in an action under Title VII. Here, there is no dispute that Defendant BMW Manufacturing had more than 500 employes during the relevant timeframe. As a result, under 42 U.S.C. § 1981a(b)(3), the maximum amount of compensatory and punitive damages that Plaintiff can be awarded in this case is $300,000.

In this case, the jury awarded a total of $5,100,000 in compensatory and punitive damages to Plaintiff on her claim under Title VII. Because that award exceeds the statutory cap, the Court

7:22-cv-03738-TMC Date Filed 03/25/26 Entry Number 235 Page 2 of 2

finds that the award of compensatory and punitive damages must be reduced to a total of $300,000. Therefore, having thoroughly considered the Motion, the record, and relevant authority, the Court GRANTS Defendant BMW Manufacturing's Consent Motion to Amend the Judgment to apply the statutory damages cap under 42 U.S.C. § 1981a.

**IT IS SO ORDERED.**

s/Timothy M. Cain
Honorable Timothy M. Cain
Chief United States District Judge

March 25, 2026
Spartanburg, South Carolina

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP,"<br><br>Defendants. | ) | C.A. No. 7:22-cv-03738-TMC |

**DEFENDANT BMW MANUFACTURING CO. LLC'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

COMES NOW Defendant BMW Manufacturing Co., LLC ("BMW MC"), pursuant to Federal Rules of Civil Procedure 50(b) and 59, and moves for judgment as a matter of law or, in the alternative, for a new trial. The grounds for this Motion are fully set forth in the attached Memorandum in Support of Defendant BMW Manufacturing Co., LLC's Motion for Judgment as a Matter of Law or, In the Alternative, for a New Trial.

WHEREFORE, Defendant BMW MC respectfully requests that the Court grant its Motion for Judgment as a Matter of Law or, In the Alternative, for a New Trial.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Respectfully submitted this the 25th day of March, 2026.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WORKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP,"<br><br>Defendants. | C.A. No. 7:22-cv-03738-TMC |

**MEMORANDUM IN SUPPORT OF DEFENDANT BMW MANUFACTURING'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

COMES NOW Defendant BMW Manufacturing Co., LLC ("BMW MC"), pursuant to Federal Rules of Civil Procedure 50(b) and 59, and moves for judgment as a matter of law or, in the alternative, for a new trial for the reasons set forth herein.

## I. BACKGROUND

Plaintiff Kelly Dawsey filed this lawsuit in October 2022 asserting four causes of action against Defendant BMW MC and Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"). (ECF No. 1.) Plaintiff's causes of action included national origin discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), race discrimination under Title VII, race discrimination under 42 U.S.C. § 1981 ("Section 1981"), and sex discrimination under Title VII. *Id.* A jury trial in this matter was held from February 17, 2026, through February 25, 2026. On February 25, 2026, the jury rendered a verdict in favor of Plaintiff as to her cause of

action against BMW MC for national origin discrimination under Title VII.[1] (ECF No. 216.) The jury awarded Plaintiff compensatory damages in the amount of $100,000 and punitive damages in the amount of $5 million. *Id*. On March 18, 2021, BMW MC filed a Consent Motion to Amend the Judgment requesting that the Court reduce the total award of compensatory and punitive damages to $300,000 based upon the damages cap established by 42 U.S.C. § 1981a. (ECF No. 231.) The Court granted the Motion and entered an Amended Judgment on March 25, 2026. (ECF Nos. 235, 236.)

For the reasons set forth herein, BMW MC submits that it is entitled to judgment as a matter of law or, alternatively, a new trial on Plaintiff's cause of action for national origin discrimination and claim for punitive damages. BMW MC further submits that it is entitled to a new trial based upon the Court's errors related to the admission of evidence and instructions to the jury.

## II. <u>LEGAL STANDARD</u>

The Court may grant judgment as a matter of law under Rule 50(b) if the "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on that issue." *See Moskos v. Hardee*, 24 F.4th 289, 294 (4th Cir. 2022). In deciding a Rule 50(b) motion, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Horne v. WTVR, LLC*, 893 F.3d 201, 210 (4th Cir. 2018). However, "[u]nless there is substantial evidence to support the verdict asked of the jury, the reviewing court must direct the verdict upon request." *Id*. (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

[1] The jury ruled in favor of BMW MC on Plaintiff's causes of action for sex discrimination and race discrimination (under both Title VII and Section 1981). (ECF No. 216.) The jury ruled in favor of BMW AG as to all of Plaintiff's claims. *Id.*

evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

To avoid judgment as a matter of law, Plaintiff must have presented sufficient evidence to establish a *prima facie* case. *Gairola,* 753 F.2d at 1285. In other words, "if the nonmoving party failed to make a showing *on an essential element of his case* with respect to which he had the burden of proof," judgment as a matter of law is properly granted. *Wheatley v. Wicomico Cnty*., 390 F.3d 328, 332 (4th Cir. 2004) (internal quotation marks omitted) (emphasis added). "'As a consequence, the case should be withdrawn from the jury when any verdict in favor of the nonmoving party necessarily will be premised upon speculation and conjecture.'" *Horne*, 893 F.3d at 210 (quoting *Gairola*, 753 F.2d at 1285 (4th Cir. 1985)).

"Under Rule 59(a), a motion for new trial should be granted if '1) the verdict is against the clear weight of the evidence, or 2) is based upon evidence which is false, or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Arroyo v. North Carolina*, No. 5:22-CV-161-FL, 2023 U.S. Dist. LEXIS 59551, at *2 (E.D.N.C. Apr. 4, 2023) (quoting *Doe v. Fairfax County School Board*, 1 F.4th 257, 269 (4th Cir. 2021)). "While according due respect to the findings of the jury, the judge should not hesitate to set aside a jury verdict and grant a new trial in any case where the ends of justice so require." *Frizzell Constr. Co. v. First Citizens Bank & Tr. Co.*, 759 F. Supp. 286, 289 (E.D.N.C. 1991) (citing *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 353-54 (4th Cir. 1941)).

## III. <u>ARGUMENT</u>

### A. BMW MC Is Entitled to Judgment as a Matter of Law or a New Trial on Plaintiff's Claim for Punitive Damages.

The Fourth Circuit has held that "[a] successful Title VII plaintiff may recover punitive damages, but only in limited circumstances." *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 792 (4th

Cir. 2024). 42 U.S.C. § 1981a authorizes punitive damages for Title VII plaintiffs only if they can demonstrate that an employer engaged in unlawful intentional discrimination and acted "with malice or with reckless indifference to [a plaintiff's] federally protected rights. . . ." 42 U.S.C. § 1981a(b)(1) (2003); *Ward v. AutoZoners, LLC*, 958 F.3d 254, 263 (4th Cir. 2020). This standard requires proof that the employer discriminated "in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 535-36, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999). This "is a high standard to meet." *United States EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 151 (4th Cir. 2017). Here, because Plaintiff has failed to meet that high standard, BMW MC is entitled to judgment as a matter of law on the issue of punitive damages.

The Fourth Circuit's opinion in *Duvall v. Novant Health, Inc.*, 95 F.4th 778 (4th Cir. 2024), resolves the issues here and establishes that there was no evidence on which the jury could have reached its conclusion. In *Duvall*, the Fourth Circuit vacated the punitive damage award because the plaintiff failed to present sufficient evidence to establish that the employer discriminated in the face of a perceived risk that its actions would violate federal law. *Id*. In particular, the Court found that the plaintiff had failed to produce any affirmative evidence at trial to show that the employer's managerial agent had at least a rudimentary knowledge of the federal anti-discrimination statute that the employer violated. The Court noted that counsel for the plaintiff had cross-examined the decision maker but "never elicited from him testimony establishing his personal knowledge of federal anti-discrimination law, let alone that he perceived a risk that his decision to fire [the plaintiff] would violate it." In reversing the award of punitive damages to the plaintiff, the Fourth Circuit stated the following:

> Duvall doesn't contest this lack of direct evidence. He instead relies solely on an inference that [the decision maker] had the requisite knowledge given his career as a corporate executive. But Duvall hasn't identified any case in which this Court, or any other, has

> affirmed an award of punitive damages based solely on that kind of inference. That's not surprising. After all, "[p]unitive damages are an extraordinary remedy." *Ward*, 958 F.3d at 269. And we are not persuaded that extraordinary remedy is proper here merely because [the decision maker] is a "highly educated . . . executive with a long career in corporate America." Response Br. 59. Indeed, to affirm the punitive damages award on that basis alone would water down the "high standard" imposed on a Title VII plaintiff, *Consol Energy, Inc.*, 860 F.3d at 151, and contradict Congress's clear directive that punitive damages are "not to be awarded automatically in every successful Title VII suit," *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997).
>
> It was Duvall's burden to come forward with sufficient evidence at trial that [the decision maker] acted "in the face of a perceived risk that [his] actions [would] violate federal law." *Ward*, 958 F.3d at 263 (citation omitted). Based on our review of this record, Duvall failed to meet that high burden. Accordingly, the jury's award of punitive damages must be set aside.

95 F.4th at 792-93.

Here, just as in *Duvall*, Plaintiff has presented no evidence to establish that BMW MC discriminated "in the face of a perceived risk that its actions [would] violate federal law." *Ward*, 958 F.3d at 263. Plaintiff's sole evidence relating to punitive damages was her testimony that BMW MC has an anti-discrimination policy in its employee handbook and that BMW MC regularly conducts training on that policy for its employees. (TT, 2/18/26, pp. 84:9-85:8.)[2] However, such evidence that BMW MC made a good-faith effort to prevent discrimination in the workplace cuts against an award of punitive damages in this case. *See Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536, 548 (4th Cir. 2003) (overturning an award of punitive damages to the plaintiff where the employer had "an extensively implemented organization-wide Equal

[2] Citations to the trial transcript will be referenced herein as "TT" followed by the date and page number. Citations to Plaintiff's trial exhibits will be referenced herein as "Pl. Ex." followed by the exhibit number. Citations to Defendant's trial exhibits will be referenced herein as "Def. Ex." followed by the exhibit number.

Employment Opportunity Policy" that was published in its employee handbook and provided training for all employees on its anti-discrimination policies). "As the Court noted in Kolstad, giving protection from punitive damages to 'employers who make good-faith efforts to prevent discrimination in the workplace accomplishes Title VII's objective of motivating employers to detect and deter Title VII violations.'" *Id.* at 549 (citing *Kolstad*, 527 U.S. at 545-46).

At trial, Plaintiff presented no evidence that any of the BMW MC managers involved in the pertinent decisions in this case – Robert Engelhorn, Christine Petrasch, and Sherry McCraw – were aware that their actions would potentially violate federal law. All three of those decisions makers testified at trial, but none were questioned by Plaintiff's counsel regarding their understanding of federal employment law or their knowledge that BMW MC's actions with regard to Plaintiff would potentially violate the law. Finally, to the extent that Plaintiff relies on the existence of the "Expat Guidelines for Plant Spartanburg" ("Expat Guidelines") to provide support for her punitive damages argument, the undisputed evidence in the record shows that none of the decision makers in this case were even aware that the Expat Guidelines document existed in the fall of 2021 when those decisions were made.[3] (Pl. Ex. 17; TT, 2/19/26, pp. 202:16-203:1-3, p. 204:1-11; TT, 2/20/26, p. 43:20-23; TT, 2/23/26, pp. 176:13-15, 242:16-243:10.)

Because punitive damages require proof that the decisionmaker acted "in the face of a perceived risk" that its conduct violated federal law, courts routinely deny such damages where the employer lacked clear notice that its conduct was unlawful. *See Kolstad,* 527 U.S. at 535-36; *Ward,* 958 F.3d at 264; *Bryant*, 333 F.3d at 548. Therefore, where the governing law is unsettled

---

[3] Plaintiff testified that she drafted the document in January 2016 at the direction of Johannes Trauth, who at that time was the Vice President of Human Resources at BMW MC. (TT, 2/18/26, p. 27:13-22.) However, Mr. Trauth left BMW MC in January 2018 and thus was not involved in the decision made in 2021. (TT, 2/20/26, p. 5:1-3.)

or later clarified, the requisite state of mind cannot be established as a matter of law. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 (2007) (finding that where no court of appeals had spoken on the issue and no authoritative guidance had come from the FTC on the issue, SafeCo's reading "was not objectively unreasonable and falls short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability"). Here, the decisions on which Plaintiff's national origin discrimination claim are based were all made in the fall of 2021. In June 2024, the Supreme Court issued its decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), which altered the standard of proof under Title VII in a discriminatory transfer case. Given this change in the law nearly three years after the transfer decision in this case, there is no reasonable basis for a finding that BMW MC discriminated against Plaintiff "in the face of a perceived risk that its actions [would] violate federal law." *See, e.g.*, *Kolstad*, 527 U.S. at 537 (noting that punitive damages are not appropriate where the "underlying theory of discrimination may be novel or otherwise poorly recognized").

The Fourth Circuit has clearly held that in employment discrimination cases, "punitive damages are an extraordinary remedy" and should only be permitted in limited circumstances. *Duvall*, 95 F.4th at 793 (citing *Ward*, 958 F.3d at 269); *Consol Energy, Inc.*, 860 F.3d at 151; *Harris v. L & L Wings, Inc.*, 132 F.3d at 982. In the absence of any affirmative evidence that BMW MC acted with malice or with reckless indifference to Plaintiff's federally protected rights, those limited circumstances are not present in this case. Accordingly, the Court should grant BMW MC's Motion for Judgment as a Matter of Law and set aside the award of punitive damages to Plaintiff. *See Duvall*, 95 F.4th at 793 (holding that because the plaintiff failed to meet the "high burden" to prove punitive damages, the jury's award of such damages must be set aside). In the

alternative, the Court should grant BMW MC's Motion for a New Trial because the jury's verdict as to punitive damages was against the clear weight of the evidence.

**B. BMW MC is Entitled to Judgment as a Matter of Law or a New Trial because Plaintiff Failed to Produce Sufficient Evidence of Harm to an Identifiable Term or Condition of Employment.**

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). In *Muldrow v. City of St. Louis*, the Supreme Court held that in order "[t]o make out a Title VII discrimination claim, a transferee must show some harm *respecting an identifiable term or condition of employment*." 144 S. Ct. 967, 974 (2024) (emphasis added). In *Muldrow*, the plaintiff, a police sergeant, alleged sex discrimination after she was transferred from a job in the intelligence division to a different role in the department and her intelligence position was taken by a male employee. *Id.* at 977. The plaintiff alleged that she suffered harm because the new role involved primarily administrative work and because she lost certain job benefits when she was transferred, including a preferable schedule and a vehicle she could drive home when off duty. *Id.* Based upon this evidence that the transfer resulted in some actual harm to the terms and conditions of the plaintiff's employment, the Supreme Court held that she had met the burden under Title VII to establish an adverse employment action. *Id.*

In this case, Plaintiff alleges national origin discrimination because BMW MC communicated to her that it planned to take her out of the TX-60 Department Manager role and assign her to the TX-64 Department Manager position. At trial, Plaintiff provided the following evidence related to the harm that potentially would have resulted from the transfer:

- At the time that Plaintiff resigned from employment at BMW MC, TX-64 was a Function Level III position. (TT, 2/18/26, p. 62:2-7; TT, 2/20/26, p. 66:2-11; TT 2/23/26, p. 184:10-16.)
- Plaintiff testified that Ms. Petrasch told her that the TX-64 role would be changed to a Function Level IV position at some unidentified time in the future because recruiting would move to a different department. (TT, 2/18/26, p. 51:15-19.)
- Plaintiff testified that if she was moved to TX-64 and if TX-64 was downgraded to a Function Level IV position, then that might have a negative impact on her earnings at BMW MC in future years. Specifically, Plaintiff testified that a policy she had implemented at BMW MC in July 2021 referred to as "Misaligned Personal Grade" would result in BMW MC reducing her Personal Grade one to three years following the downgrade of the TX-64 position, further resulting in a loss of compensation to her. (TT, 2/18/26, p. 53:16-24.)
- When asked by her own attorney to identify how that change in Function Level would impact her from a financial standpoint, she said, "I cannot answer that." (TT, 2/18/26, p. 53:18-24.)
- Plaintiff also claims that moving to TX-64 would have impacted her chance for promotion, based on her testimony that she was not aware of any employee who has been promoted from a Function Level IV position to a Function Level II position. (TT, 2/18/26, p. 56:17-19; TT, 2/19/26, p. 55:4-11.)

None of this evidence, however, shows harm to an identifiable term or condition of employment. Plaintiff's admission that she "cannot answer" the extent to which, if at all, her pay would have been affected in the one to three years following her transfer cannot be evidence of

7:22-cv-03738-TMC Date Filed 03/25/26 Entry Number 237-1 Page 10 of 21

harm to an identifiable term or condition of employment. This is especially true in view of the uniformly contrary evidence presented by BMW MC that her compensation would not have been affected by her move to the TX-64 position. (TT, 2/19/26, p. 180:8-10; TT, 2/23/26, pp. 171:10-12, 173:10-15, 197:4-15, 204:7-10.)

Similarly, any contention that the transfer would have impaired Plaintiff's opportunity for promotion is unsupported by the evidence. The fact that Plaintiff could not identify an individual who had been promoted from a Function Level IV position to a Function Level II position is not evidence of a company policy or practice that prohibited it. In fact, BMW MC executives that testified at trial uniformly rejected Plaintiff's contention. (TT, 2/23/26, p.189:18-23.) Furthermore, Plaintiff acknowledged that, during the seven years she held the TX-60 position, she had never taken any step to seek validation for promotion to a Function Level II role. (TT, 2/19/26, p. 55:12-24, 56:1-4.) She further testified that she intended to stay in the TX-60 role, a Function Level III role, until her retirement. (TT, 2/19/26, p. 41:8-9.) In the absence of any documentary evidence or concession from BMW MC, there was no evidence that Plaintiff's unsupported speculation about impaired promotion prospects—for positions she never sought and testified she did not intend to seek—amounts to a change in an identifiable term or condition of employment.

Plaintiff resigned from employment on January 3, 2022, and her last day working for BMW MC was January 17, 2022. (TT, 2/19/26, p. 62:15-22.) There is no dispute that when Plaintiff left BMW MC in January 2022, she was still in the TX-60 position, and there had been no change to any of the terms, conditions, or privileges of her employment. The evidence presented at trial established that Plaintiff never suffered any actual harm in this case. Instead, this case is based solely upon speculation about the harm that might have occurred had she remained at

BMW MC instead of resigning to take the job at Madewell Concrete. As detailed below, such speculation fails to meet the legal standard required to prove discrimination under Title VII.

In denying BMW MC's summary judgment motion, this Court relied upon the ruling of the DC Circuit in *Van Horn v. Del Toro*, 2024 U.S. App. LEXIS 25290 (D.C. Cir. June 21, 2024). In *Van Horn*, the plaintiff was told that she was being transferred to a position that would require her to relocate and that was less desirable than the position that she previously held. *Id*. at *7. The DC Circuit ruled that even though the plaintiff never actually took another assignment, the announcement of the transfer constituted an adverse employment action under the "some harm" standard established in *Muldrow*. *Id.* at *8. Specifically, the Court in *Van Horn* found that there was no dispute that the plaintiff would have suffered harm had she accepted the transfer as it would have required her to physically relocate for work. *Id*. at *7.

Here, Plaintiff alleged that the notice of transfer to the TX-64 position was an adverse employment action because TX-64 was a less desirable position with a lower salary range and less prospects for advancement than the TX-60 position that she was in at the time. However, the testimony presented during the trial provided no support for these allegations. In October 2021, when Plaintiff was told that she would be moved to TX-64, Plaintiff admits (and the documented evidence shows) that the position was a Function Level III position – therefore, it was not a less desirable position with a lower salary range and less prospect for advancement. (Def. Ex. 13; TT, 2/18/26, p. 110:10-16; TT, 2/20/26, pp. 65:12-66:1-11.)

Instead, Plaintiff's entire case is built upon her testimony that Ms. Petrasch told her that TX-64 would be downgraded to a Function Level IV position at some unknown time in the future. However, even Plaintiff could not specify under oath when her supposed downgrade of Function Level would occur. As a result, the "harm" alleged by Plaintiff in this case is completely

speculative. In the *Van Horn* case, there was no such speculation required – the role to which the plaintiff was being transferred was already in existence, and there was no doubt that the plaintiff would suffer "some harm" by being required to move to that new role. In this case, the only way to get to the same conclusion that the Court reached in *Van Horn* is to speculate about what would happen to the TX-64 role in the future. Such speculation is clearly prohibited by decades of Fourth Circuit law. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Consistent with BMW MC's position, the Eleventh Circuit recently upheld summary judgment for an employer in a Title VII case where the plaintiff's allegation of harm was based upon speculation. *Zienni v. Mercedes-Benz U.S. Int'l, Inc.*, No. 24-13932, 2025 U.S. App. LEXIS 33457 (11th Cir. Dec. 22, 2025). Zienni, a Muslim employee at the Mercedes facility in Alabama, needed to take breaks throughout the workday to pray and, at times, the prayer breaks did not coincide with the time of his scheduled breaks. *Id.* at *4. A supervisor at Mercedes caught Zienni praying outside of a schedule break and told him that he was not allowed to take a prayer break while the line was running. *Id*. at *4-5. Zienni alleges that he was subjected to harm because if he was caught praying outside of breaks, he would be subject to discipline, including potential termination. *Id*. at *5. However, there was no evidence that Zienni was ever disciplined by Mercedes. *Id*. at *5. During the two-week winter shutdown at the Mercedes plant, Zienni decided to resign and seek other employment. *Zienni v. Mercedes Benz United States Int'l, Inc*., No. 7:23-cv-01002-LSC, 2024 LX 251159, *6 (N.D. Ala. Nov. 19, 2024). He then sued Mercedes, alleging religious discrimination under Title VII. *Id.* at *1.

The U.S. District Court for the Northern District of Alabama granted Mercedes' motion for summary judgment on the basis that Zienni could not establish an adverse employment action.

*Id.* at *15-16. In reaching that conclusion, District Judge Coogler stated that "these hypothetical actions did not occur and thus caused no actual harm to an identifiable term or condition of Zienni's employment. . . . In reality, the only change to Zienni's employment occurred when he made the choice to resign from MBUSI and look for work elsewhere." *Id.* at *18. In upholding the award of summary judgment to Mercedes, the Eleventh Circuit, in an unpublished opinion, stated the following:

> Zienni argues he experienced harm because he was exposed to the risk of discipline for taking additional breaks. But MBUSI never disciplined or threatened to discipline Zienni . . . . Zienni rests on a speculation about what would have happened if he was caught praying during an unscheduled break. But adverse action cannot be speculative. The Supreme Court's decision in Muldrow did not alter that requirement. Thus, any risk of discipline that Zienni experienced was too speculative to show a change in a term or condition of his employment.

2025 U.S. App LEXIS 33457 at *5.

The opinions from the Northern District of Alabama and Eleventh Circuit are instructive here, since Plaintiff's claim of national origin discrimination in this case is built entirely upon speculation. There is no dispute in this case that Plaintiff never moved out of the TX-60 position prior to her resignation from BMW MC. Plaintiff's entire case is based upon what might have happened had she transferred into the TX-64 position, which never happened. Given the requirement to speculate about the potential harm to Plaintiff, no reasonable jury could conclude that BMW MC's communication to her that it would transfer her to the TX-64 position impaired an identifiable term or condition of employment.

To establish a claim for national origin discrimination under Title VII, Plaintiff must prove that BMW MC discriminated against her with respect to the compensation, terms, conditions, or privileges of her employment because of her national origin. 42 U.S.C. § 2000e-2(a)(1). Because

Plaintiff resigned from employment before there was any change to her compensation, terms, conditions, or privileges of employment at BMW MC, and before there was any definitive statement from the company about what would happen to her compensation, terms, conditions or privileges of employment in the future, no reasonable jury could find that she has met her legal burden to establish discrimination. Accordingly, Defendant BMW MC is entitled to judgment as a matter of law as to Plaintiff's claim for national origin discrimination under Title VII. In the alternative, should the Court deny BMW MC's Motion for judgment as a matter of law, the Court should grant a new trial on the basis that the jury verdict was against the clear weight of the evidence.

**C. BMW MC Is Entitled to a New Trial Because The Court Erred By Allowing Admission of the Expat Guidelines Document Into Evidence at Trial.**

In asserting a claim of national origin discrimination against BMW MC, Plaintiff's primary evidence of discriminatory intent was a document titled Expat Guidelines, which was drafted by Plaintiff in January 2016. (Pl. Ex. 17.) Prior to trial, BMW MC filed a Motion in Limine (ECF No. 154) seeking to exclude this document from being introduced at trial pursuant to Rules 401 through 403 of the Federal Rules of Evidence. The Court denied BMW MC's Motion in Limine, finding that it was the responsibility of the jury to weigh this evidence. (ECF No. 185.) During trial, BMW MC renewed its objection to the introduction of this document as evidence, but the Court overruled the objection for the reasons previously articulated in response to BMW MC's Motion in Limine. (TT, 2/18/26, p. 26:9-18.) BMW MC asserts that the introduction of this document at trial to establish discriminatory intent was erroneous, and thus the Court must grant a new trial as to Plaintiff's claim of national origin discrimination.

Plaintiff's bases her claim upon BMW MC's decision to reassign her to a new Department Manager position (TX-64) and bring in a German employee from BMW AG to fill her current

Department Manager position (TX-60). Plaintiff contends that BMW MC's discriminatory intent is revealed by the Expat Guidelines document, which supposedly required BMW MC to hire a German for the TX-60 position after BMW MC made the decision to select an American, Sherry McCraw, for the Vice President of Human Resources position. The evidence presented at trial revealed that the Expat Guidelines were drafted by Plaintiff in January 2016, more than five years before the planned job changes at issue this case. (TT, 2/18/26, pp. 18:13-22, 28:9-12; TT, 2/19/26, pp. 38:24-39:12.) Moreover, the testimony from Plaintiff and BMW MC officials at trial revealed that the Expat Guidelines document resulted from a workshop of the Human Resources Department and was never established as a policy of BMW MC. (TT, 2/19/26, p. 40:16-18; TT, 2/20/26, p. 43:20-23; TT, 2/23/26, p. 176:1-15.) Plaintiff testified that she drafted the document at the direction of Johannes Trauth, who at that time was the Vice President of Human Resources at BMW MC. (TT, 2/18/26, p. 27:13-22.) However, Mr. Trauth has not worked at BMW MC since January 2018. (TT, 2/20/26, p. 5:1-3.) At trial, the BMW MC executives involved in making the decisions related to the 2021 HR Department reorganization – Dr. Engelhorn, Ms. Petrasch, and Ms. McCraw – were asked about the Expat Guidelines document. None of them were even aware that the document existed. (TT, 2/19/26, pp. 202:16-203:1-3, 204:1-11; TT, 2/20/26, p. 43:20-23; TT, 2/23/26, pp. 176:13-15, 242:16-243:10.)

During trial, Plaintiff argued to the jury that the Expat Guidelines document established discriminatory intent by BMW MC, even going so far as to show a chart to the jury in closing argument that was premised upon the language from that document. However, in assessing such evidence of discriminatory intent, the Fourth Circuit has held that such documentation must be both proximate in time to the adverse employment decision at issue and related to that employment decision. *See Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023). Here, the Expat Guidelines

fail to meet the relevancy requirements applied by the Fourth Circuit for at least three separate reasons:

- The Expat Guidelines document was prepared in January 2016, more than five years before the decision at issue in this case. As a result, the document is not sufficiently proximate to the alleged employment decision to provide admissible evidence of discrimination. *See Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 155 (4th Cir. 2023) (holding that discriminatory statements made six to eighteen months before the alleged adverse action were not valid evidence of discrimination); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994) (citing *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993) (stating that a discriminatory statement made one year before an adverse employment decision was too remote in time)).
- According to Plaintiff, she prepared the Expat Guidelines document at the direction of Johannes Trauth, a former Vice President of Human Resources who has not worked at BMW MC since January 2018. Neither Plaintiff nor Mr. Trauth were involved in making the decision at issue in this case.
- There is no evidence that any of the decision makers – Dr. Engelhorn, Ms. Petrasch, and Ms. McCraw – had any knowledge of the Expat Guidelines document or in any way relied on that document in making the decision to transfer Plaintiff from the TX-60 position to the TX-64 position.

Therefore, based upon relevancy principles and applicable Fourth Circuit case law applying those principles, the Expat Guidelines document should have been excluded by the Court on the grounds that it was not sufficiently related to the adverse employment action at issue in this case. Because the Court's decision to allow this document into evidence was clear error that affected the

substantial rights of BMW MC and swayed the verdict, this error can only be remedied through the granting of a new trial to BMW MC as to Plaintiff's claim of national origin discrimination. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

Moreover, the Expat Guidelines document should have been excluded on the grounds that any probative value is greatly outweighed by the danger of unfair prejudice and because such evidence confused the trier of fact. *See* Fed. R. Evid. 403. Specifically, the Court's decision to allow Plaintiff to introduce this document into evidence misled the jury into believing that a document created in 2016 was used as the basis for an employment decision in 2021, when there is no evidence in the record to support such a conclusion. Furthermore, BMW MC suffered prejudice because Plaintiff was allowed to establish discriminatory intent through a document that she herself authored many years before the alleged discriminatory action accompanied by Plaintiff's explanations of the meaning she subjectively ascribed to its terms.[4] For these reasons, Rule 403 dictates that the Expat Guidelines document should have been excluded by the Court. Accordingly, BMW MC is entitled to a new trial on Plaintiff's claim of national origin discrimination because of the erroneous admission of this prejudicial evidence.

**D. BMW MC Is Entitled to a New Trial Because The Court's Jury Instruction on Adverse Employment Action was Improper and Confused the Jury.**

In order to recover under Title VII, Plaintiff must prove that BMW MC discriminated against her with respect to the "compensation, terms, conditions, or privileges of her employment." 42 U.S.C. § 2000e-2(a)(1). As discussed above in detail in Section III.B., the Supreme Court and

---

[4] The Expat Guidelines did not reference national origin on their face in any way. However, Plaintiff claims that the terms "Domestic" and "International" used in the guidelines were intended to convey national origin. In *Douglas v. Eaton Corp.*, 577 F. App'x 520, 523 (6th Cir. 2014), the Sixth Circuit rejected a similar attempt to create a national origin discrimination claim where the employer had a stated preference for "local" candidates.

Fourth Circuit have interpreted this language in Title VII to require a plaintiff to establish the existence of harm to an identifiable term or condition of employment. *See Muldrow*, 144 S. Ct. at 974; *Coleman*, 626 F.3d at 190. At trial, the Court improperly instructed the jury regarding the "adverse employment action" standard, and that improper instruction resulted in confusion for the jury as to Plaintiff's claim of national origin discrimination. As a result, BMW MC is entitled to a new trial on this claim.

In this case, the facts are undisputed that prior to her resignation from BMW MC in January 2022, Plaintiff never actually suffered any change to the terms, conditions, or privileges of employment because she remained in the TX-60 Department Manager position until her last day. However, Plaintiff testified that in early October 2021, Ms. Petrasch told Plaintiff that she would move from the TX-60 Department Manager position to the TX-64 Department Manager position and that the TX-64 position would be downgraded to a Function Level IV position at some unspecified time in the future. (TT, 2/19/26, pp. 33:4-34:1.) Based upon this evidence, Plaintiff requested that the Court issue an instruction to the jury stating that "act of discrimination occurs when the employer announces the decision about which the employee complains, and not when the employer implements the decision." Plaintiff's Request to Charge No. 5 ("When Cause of Action Accrues"). In support of this proposed instruction, Plaintiff cites to the rulings of the Supreme Court in *Delaware State College v. Ricks*, 449 U.S. 250 (1980), and *Chardon v. Fernandez*, 454 U.S. 6 (1981). BMW MC submitted written objections to the Court regarding this proposed instruction from Plaintiff, as well as to Plaintiff's Request to Charge No. 4, which provided a proposed instruction regarding "Adverse Employment Action."

After considering the arguments of both parties, the Court crafted a jury instruction on "Adverse Employment Action" that incorporated, in part, Plaintiff's request for an instruction as

to when a cause of action accrues. During the charge conference prior to closing arguments, BMW MC objected to this proposed jury instruction. (TT, 2/24/26, pp. 158:6-160:24.) Over BMW MC's objection, the Court issued the following instruction to the jury regarding Adverse Employment Action:

> Title VII prohibits employers from taking adverse actions against an employee based on a protected characteristic, such as national origin, race, or sex. Thus, Plaintiff must show by a preponderance of evidence, as part of her discrimination claims, that she suffered an adverse employment action.
>
> To do so, Plaintiff must show she suffered some disadvantageous change in an employment term or condition. You may find that an adverse employment action occurs when an employer provides notice of or communicates a future action to the employee rather than when such future action actually goes into effect if you find that the notice was of a non-speculative disadvantageous change in an employment term or condition.

(TT, 2/25/26, p. 131:2-16.)

BMW MC submits that the instruction issued by the Court on adverse employment action was improper for two reasons. First, the concept of adverse employment action was developed by the federal courts as an element of the plaintiff's prima facie case at summary judgment. The Fourth Circuit has regularly cautioned trial courts against charging juries on summary judgment standards. *See, e.g., Smith v. Univ of N.C.*, 632 F.2d 316, 334 (4th Cir. 1980).

Moreover, even if it was proper to charge the jury on adverse employment action, the instruction issued by the Court was improper because it misstates the legal standard established by the Supreme Court in *Muldrow*. In advocating for this instruction, Plaintiff argued that such language is proper under the Supreme Court's decisions in *Ricks* and *Chardon*. However, those cases are factually distinguishable from the present case because they both involved an unequivocal, written notice of termination by the employer. *Ricks*, 449 U.S. at 258; *Chardon*, 454

U.S. at 7. Because of the nature of such notice, the Supreme Court found that the statute of limitations for a discrimination claim began to run at the date of notice, not at the subsequent date when the termination actually took effect. *Ricks*, 449 U.S. at 258; *Chardon*, 454 U.S. at 7-8. It is undisputed in this case that no such unequivocal notice of demotion was ever issued to Plaintiff, as demonstrated by Plaintiff's own testimony on direct examination that she could not specify when she would suffer harm as a result of BMW MC's plan to move her to the TX-64 Department Manager position. (TT, 2/19/26, pp. 33:4-34:1.) Furthermore, the Court in *Muldrow* held that the plaintiff in a discriminatory transfer case "must show some harm respecting an identifiable term or condition of employment." 144 S. Ct. at 974. Under this standard, it is not sufficient for Plaintiff to simply show the possibility of some future harm, she must establish actual harm. Therefore, the Court's instruction that lowers Plaintiff's burden of proof on this issue was improper.

In addition, the "Adverse Employment Action" instruction issued to the jury was confusing. This fact was borne out by the second note that the jurors sent to the Court during deliberations. (ECF No. 211.) In that note, the jurors asked the following: "What is it that she never actually went to TX-64 but it was said in a meeting? You said something about the potential move." (TT, 2/25/26, p. 153:2-10.) The only reasonable conclusion that can be drawn from the jury's reference to the Court saying "something about the potential move" is that they were confused by the language in the Adverse Employment Action instruction. The Court's response to the question confirms this conclusion by specifically referring the jury to the Adverse Employment Action instruction. (TT, 2/25/26, p. 153:10-23.) Shortly after the note was sent by the jury and the Court provided a response, the jury rendered a verdict for Plaintiff on the national origin discrimination claim.

Therefore, the Court's instruction to the jury regarding Adverse Employment Action was both legally deficient and confusing. As a result of this error, BMW MC is entitled to a new trial on Plaintiff's claim of national origin discrimination.[5]

## IV. CONCLUSION

For the reasons set forth above, BMW MC respectfully requests that this Court grant its Motion for Judgment as a Matter of Law or, in the alternative grant its Motion for a New Trial.

Respectfully submitted this the 25th day of March, 2026.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*

[5] The erroneous instruction regarding adverse action plainly affected only the jury's verdict on Plaintiff's claim of national origin discrimination. The jury necessarily determined that an adverse action had occurred in reaching its verdict. It follows then that its decisions in favor of BMW MC on Plaintiff's race and sex discrimination claims necessarily turned on its conclusion that the adverse action it identified did not occur because of Plaintiff's race or sex. Accordingly, a new trial is necessary only on Plaintiff's claim of national origin discrimination so that the jury may be properly instructed on the statutory requirements for harm under Title VII.

**Brian Murphy**

**From:** Rozelsky, Kurt <krozelsky@spencerfane.com>
**Sent:** Tuesday, January 20, 2026 6:04 PM
**To:** cain_ecf@scd.uscourts.gov
**Cc:** Kay McAlister; Brian Murphy; Ellison.McCoy@jacksonlewis.com; Moody, D. Randle, II (Greenville)
**Subject:** Dawsey v. BMW: Joint Proposed Jury Charges (with objections) and Proposed Verdict forms (with objections)
**Attachments:** Dawsey v. BMW - Joint Charges with objections (Pltf redline)(10945727.2).docx; Dawsey v. BMW - Proposed Verdict forms (final)(10946882.1).docx

Please see attached Joint Proposed Jury Charges (with objections) and Proposed Verdict forms (with objections) in the above matter.

Kurt

**Kurt M. Rozelsky** Partner
Spencer Fane LLP

PO Box 294 | Greenville, SC 29602-0294
27 Cleveland St., Suite 201 | Greenville, SC 29601
**D** 864.695.5202 **M** 864.906.7694 **O** 864.695.5200
krozelsky@spencerfane.com | www.spencerfane.com

**In the United States District Court**
**District of South Carolina**
**Spartanburg Division**

| | | |
|---|---|---|
| **Kelly Dawsey,**<br><br>**Plaintiff,**<br>**v.**<br><br>**Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC collectively d/b/a "BMW Group,"**<br><br>**Defendants.** | ) | **7:22-03738-TMC-KFM**<br><br>**Joint Requests to Charge No. 9**<br><br>**Punitive Damages** |

If you find that Plaintiff has proven aTitle VII or Section 1981claim, then you may consider whether punitive damages are appropriate, and if so, what amount. A plaintiff seeking punitive damages on aTitle VII or Section 1981 claim must prove that her employer acted with the requisite state of mind -- that is, that it engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of the plaintiff. The terms "malice" and "reckless indifference" refer to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

"Malice and reckless indifference" means:

(1) That the employer's decision maker discriminated in the face of a perceived risk that the decision would violate federal law;

(2) That the decision maker was a principal or served the employer in a managerial capacity;

(3) That the decision maker acted within the scope of his employment in making the challenged decision; and

(4) That the employer failed to engage in good-faith efforts to comply with the law.

An employer cannot be liable for a discriminatory employment decision of a managerial employee where their decision was contrary to the employer's good faith efforts to comply with [Title VII or Section 1981]. In other words, you cannot award punitive damages if you find that the decision-maker's malice or reckless indifference was contrary to Defendants' good-faith efforts to prevent discrimination in the workplace. It is Defendants' burden to establish that it has engaged in a good-faith effort to comply with the law such that it may

avoid punitive damages for conduct by one of its managers or supervisors that might otherwise warrant a punitive damages award. In determining whether Defendants made good faith efforts to prevent discrimination in the workplace, you may consider whether it had any antidiscrimination policies, trainings, and education for its employees. However, the mere existence of a compliance policy will not alone insulate an employer from punitive damages liability. Rather, in order to avoid liability for the discriminatory acts of one of its managerial officials, an employer maintaining such compliance policy must also take affirmative steps to ensure its implementation.

If you find that Plaintiff is entitled to an award of punitive damages, some relevant factors to consider in determining the amount of punitive damages that should be awarded include: 1) whether Defendants should be punished for the conduct; 2) whether punitive damages are necessary to deter future similar wrongful conduct by the Defendants; 3) whether an award of punitive damages will deter others from engaging in similar wrongful conduct; 4) the degree to which a Defendant should be punished, or the degree to which a punitive damages award will act as a deterrent; and 5) the financial resources of Defendants.

*Carter v. Ascend*, 8:20-cv-04379-TMC Docket Entry 211 at 19-20 (Filed 05/24/24); *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008) (citing 42 U.S.C. § 1981a(b)(1)); *Notter v. North Hand Protection*, 1996 WL 342008, **2-3 (4th Cir. 1996) (citing *Bird v. Figel*, 725 F. Supp. 406, 412 (N.D.Ind.1989); *Patrykus v. Gomilla*, 1989 WL 8610, *3 (N.D.Ill.1989); *Norris v. City of Easton*, 1989 WL 49520 (E.D.Pa.1989)); *Kolstad v. American Dental Assn.*, 527 U.S. 526, 535-36, 539 (1999); *EEOC v. Federal Express*, 513 F.3d 360, 372 (4th Cir. 2008) (citing *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443-45 (4th Cir. 2000)); *Federal Express*, 513 F.3d at 374; *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d at 1248-49 (concluding that "written policy against discrimination ... alone is not enough," where "[o]ur review of the record leaves us unconvinced that [the employer] made a good faith effort to educate its employees about the ADA's prohibitions").

_X__ Plaintiff Agrees

_X__ Defendants Agree[3]

[3] For the reasons set forth in their Motion in Limine (ECF No. 153), it is the position of Defendants that a punitive damage charge should not be issued in this case. If the Court determines that a punitive damage instruction should be given, Defendants agree that this proposed charge is proper.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP,"<br><br>Defendants. | C.A. No. 7:22-cv-03738-TMC |

**DEFENDANT BMW MANUFACTURING CO., LLC'S NOTICE OF APPEAL**

NOTICE IS HEREBY GIVEN that Defendant BMW Manufacturing Co., LLC ("BMW MC") appeals to the United States Court of Appeals for the Fourth Circuit from the Second Amended Judgment (ECF No. 239), which was entered in this action on April 6, 2026.

BMW MC has previously filed post-trial motions pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure. Therefore, as set forth in Federal Rule of Appellate Procedure 4(a)(4)(B)(i), this Notice will become effective upon issuance of the Court's order disposing of the last such pending motion. Pursuant to Federal Rule of Appellate Procedure 4(a)(4)(B)(ii), BMW MC reserves its right to file a new or amended notice of appeal following the Court's ruling on any pending motions.

Respectfully submitted this the 4th day of May, 2026.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| KELLY DAWSEY,<br><br>Plaintiff,<br><br>v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP,"<br><br>Defendants. | ) | C.A. No. 7:22-cv-03738-TMC |

**DEFENDANT BMW MANUFACTURING CO., LLC'S AMENDED NOTICE OF APPEAL**

COMES NOW Defendant-Appellant BMW Manufacturing Co., LLC ("BMW MC"), and files this Amended Notice of Appeal to the United States Court of Appeals for the Fourth Circuit.

On May 4, 2026, BMW MC filed a Notice of Appeal (ECF No. 265) in which it appealed to the United States Court of Appeals for the Fourth Circuit from this Court's Second Amended Judgment (ECF No. 239), which was entered on April 6, 2026. BMW MC hereby amends its Notice of Appeal to include the appeal of the District Court's Order denying BMW MC's Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial (ECF No. 271), which was entered on May 14, 2026.

Respectfully submitted this the 11th day of June, 2026.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*