No. 26-1793

**In the United States Court of Appeals**
**for the Fourth Circuit**

KELLY DAWSEY,

*Plaintiff-Appellee*,

v.

BMW MANUFACTURING CO., LLC,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of South Carolina

# BRIEF OF APPELLANT BMW MANUFACTURING CO., LLC

Charles E. Johnson
Brendan P. Biffany
Aryana Ainolhayat
ROBINSON, BRADSHAW & HINSON, P.A.
600 South Tryon Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-2536

*Counsel for BMW Manufacturing Co., LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1793 Caption: Dawsey v. BMW Manufacturing Co., LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

BMW Manufacturing Co., LLC
(name of party/amicus)

who is appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
If yes, identify all parent corporations, including all generations of parent corporations:

BMW Manufacturing Co., LLC is a wholly owned subsidiary of BMW (US) Holding Corporation, which is a wholly owned subsidiary of Bayerische Motoren Worke Aktiengesellschaft, which is a publicy held corporation in Germany.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
If yes, identify all such owners:
Bayerische Motoren Worke Aktiengesellschaft

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Charles E. Johnson Date: September 3, 2026

Counsel for: BMW Manufacturing Co., LLC



Print to PDF for Filing

# TABLE OF CONTENTS

Page


TABLE OF CASES AND AUTHORITIES .......... iv

JURISDICTIONAL STATEMENT .......... 1

ISSUES PRESENTED .......... 3

INTRODUCTION .......... 4

STATEMENT OF THE CASE .......... 6

I. BMW MC Is Part of a Global Network. .......... 6

A. BMW MC's Spartanburg Manufacturing Plant. .......... 6

B. The BMW Network Uses Nomenclature for Locations and Departments. .......... 7

C. Each Position at BMW MC Is Assigned a Function Level, and Each Employee Is Assigned a Personal Grade. .......... 10

II. Dawsey Worked at BMW MC from 1995 Until She Resigned in January 2022. .......... 12

A. BMW MC Entered into a Transition Period in 2021, Causing Dawsey to Evaluate Other Job Opportunities. .......... 13

B. BMW MC's 2021 Leadership Changes Caused the Human Resources Department to Reorganize. .......... 14

1. Engelhorn selected Sherry McCraw as the new vice president of human resources. .......... 14

2. BMW MC selected Eva Burgmeier to become the new TX-60. .......... 15

3. In the fall of 2021, Petrasch informed Dawsey of the planned reorganization. .......... 17

4. Dawsey attended team meetings during which the reorganization was announced. .......... 19

**TABLE OF CONTENTS**
**(continued)**

**Page**


C. Dawsey Resigned and Accepted a Lower Paying Job Based on Her Unconfirmed Beliefs Regarding the TX-64 Position .......... 20

1. Dawsey resigned in January 2022 and for the first time expressed her belief that her upcoming transfer was discriminatory .......... 20

2. Dawsey believed, without evidence, that her transfer to the TX-64 position would later result in a demotion. .......... 22

3. Dawsey immediately began working at another company, taking a pay cut of more than $50,000 .......... 25

III. Dawsey Sued BMW AG and BMW MC in 2022. .......... 26

A. Dawsey's Lawsuit Culminated in a Jury Verdict against BMW MC on National Origin Discrimination .......... 26

B. The District Court Denied BMW MC's Post-Trial Motion and Awarded Back Pay. .......... 27

SUMMARY OF ARGUMENT .......... 28

STANDARD OF REVIEW .......... 31

ARGUMENT .......... 32

I. The District Court Erred by Concluding that Dawsey's Planned Transfer to the TX-64 Position Constituted an Adverse Employment Action to Sustain the Jury's Verdict. .......... 32

**TABLE OF CONTENTS**
**(continued)**

**Page**


A. Dawsey Must Prove that Her Planned Transfer to the TX-64 Position Caused Some Harm to an Identifiable Term or Condition of Her Employment. .... 32

B. Dawsey's Speculation that Her Transfer Might Have Caused Her Some Future Harm Did Not Establish Adverse Action. .... 34

C. Dawsey's Subjective Preference to Remain in the TX-60 Role Does Not Meet the "Some Harm" Standard. .... 40

II. The District Court Erred by Awarding Dawsey Back Pay Despite Her Failure to Mitigate Those Damages. .... 42

A. By Refusing the TX-64 Position, Dawsey Failed to Mitigate Her Damages. .... 42

B. The District Court's View that Dawsey Need Not Have Remained at BMW MC to Mitigate Her Damages Contravenes Supreme Court Precedent. .... 49

C. The District Court's Back-Pay Decision Disregards the Principles of Constructive Discharge. .... 51

III. The District Court Erred by Awarding Punitive Damages. .... 54

CONCLUSION .... 63

REQUEST FOR ORAL ARGUMENT .... 64

CERTIFICATE OF COMPLIANCE .... 65

## TABLE OF CASES AND AUTHORITIES

**Cases** **Page(s)**

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975) .......... 43

*Ali v. Alamo Rent-A-Car, Inc.*,
8 F. App'x 156 (4th Cir. 2001) .......... 32

*Aquilino v. Univ. of Kansas*,
268 F.3d 930 (10th Cir. 2001) .......... 34

*Benson v. Thompson Cadillac-Oldsmobile, Inc.*,
287 F. App'x 249 (4th Cir. 2008) .......... 31

*Boone v Goldin*,
178 F.3d 253 (4th Cir. 1999) .......... 33

*Brady v. Thurston Motor Lines, Inc.*,
753 F.2d 1269 (4th Cir. 1985) .......... 43, 49

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*,
333 F.3d 536 (4th Cir. 2003) .......... 31

*Caviness v. Nucor-Yamato Steel Co.*,
105 F.3d 1216 (8th Cir. 1997) .......... 44

*Clark v. Marsh*,
665 F.2d 1168 (D.C. Cir. 1981) .......... 44

*Cline v. Roadway Exp., Inc.*,
689 F.2d 481 (4th Cir. 1982) .......... 43

*Coleman v. Md. Court of Appeals*,
626 F.3d 187 (4th Cir. 2010) .......... 32

*Crump v. United States Dep't of Navy*,
205 F. Supp. 3d 730 (E.D. Va. 2016) .......... 43, 48

*Decoster v. Becerra*,
119 F.4th 332 (4th Cir. 2024) .......... 52

*Dennis v. Columbia Colleton Medical Center*,
290 F.3d 639 (4th Cir. 2002) ........................................ *passim*

*Duvall v. Novant Health, Inc.*,
95 F.4th 778 (4th Cir. 2024) ........................................ *passim*

*EEOC v. Consol Energy, Inc.*,
860 F.3d 131 (4th Cir. 2017) ........................................ 54, 55, 59, 60

*Evans v. Int'l Paper Co.*,
936 F.3d 183 (4th Cir. 2019) ........................................ 52

*Ford Motor Co. v. EEOC*,
458 U.S. 219 (1982) ........................................ 49, 50, 51, 53

*Gabriel v. DSM Biomedical, Inc.*,
No. 25-2630, __ F.4th __, 2026 WL 2347699 (3d Cir. Aug. 13, 2026) ........................................ 41

*Green v. Brennan*,
578 U.S. 547 (2016) ........................................ 52

*Harris v. L & L Wings, Inc.*,
132 F.3d 978 (4th Cir. 1997) ........................................ 55

*Herkert v. Bisignano*,
151 F.4th 157 (4th Cir. 2025) ........................................ 34, 35, 36

*Hertzberg v. SRAM Corp.*,
261 F.3d 651 (7th Cir. 2001) ........................................ 44

*James v. Booz-Allen & Hamilton, Inc.*,
368 F.3d 371 (4th Cir. 2004) ........................................ 32

*Jernigan v. Dalton Mgmt. Co., LLC*,
819 F. Supp. 2d 282 (S.D.N.Y. 2011) ........................................ 51

*Jurgens v. EEOC*,
903 F.2d 386 (5th Cir. 1990) ........................................ 44

*Kolstad v. Am. Dental Ass'n*,
527 U.S. 526 (1999) ........................................ 55

*Lowery v. Circuit City Stores, Inc.*,
206 F.3d 431 (4th Cir. 2000) .......... 31

*Lulaj v. Wackenhut Corp.*,
512 F.3d 760 (6th Cir. 2008) .......... 44

*Mallinson-Montague v. Pocrnick*,
224 F.3d 1224 (10th Cir. 2000) .......... 44

*Morrison v. Genuine Parts Co.*,
828 F.2d 708 (11th Cir. 1987) .......... 44

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) .......... 28, 33, 35, 36

*Ofoche v. Apogee Med. Grp., Va., P.C.*,
815 F. App'x 690 (4th Cir. 2020) .......... 52

*Paterakos v. City of Chicago*,
147 F.4th 787 (7th Cir. 2025) .......... 41

*Penn. State Police v. Suders*,
542 U.S. 129 (2004) .......... 52

*Robles v. Cox & Co., Inc.*,
154 F. Supp. 2d 795 (S.D.N.Y. 2001) .......... 51

*Shipley v. Lockheed Aeromod Ctr., Inc.*,
67 F.3d 296, 1995 WL 573042 (4th Cir. Sept. 29, 1995) .......... 51

*Spagnuolo v. Whirlpool Corp.*,
641 F.2d 1109 (4th Cir. 1981) .......... *passim*

*Spencer v. Wal-Mart Stores, Inc.*,
469 F.3d 311 (3d Cir. 2006) .......... 44

*Thomsen v. Romeis*,
198 F.3d 1022 (7th Cir. 2000) .......... 34

*Ward v. AutoZoners, LLC*,
958 F.3d 254 (4th Cir. 2020) .......... 55

*Zienni v. Mercedes-Benz U.S. International, Inc.*,
No. 24-13932, 2025 WL 3708825
(11th Cir. Dec. 22, 2025) .......... 34, 35, 36

**Statutes**

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

42 U.S.C. § 1981 .......... 1, 26

42 U.S.C. § 1981a .......... 27

42 U.S.C. § 2000e-2 .......... 32

42 U.S.C. § 2000e-5 .......... 43, 45

42 U.S.C. § 2000e . .......... 1

**Rules**

Fed. R. App. P. 4 .......... 1, 2

Fed. R. Civ. P. 50 .......... 2, 26, 27, 31

Fed. R. Civ. P. 59 .......... 2, 27

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff-Appellee Kelly Dawsey asserted claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the jury reached a verdict in Dawsey's favor on her national origin discrimination claim on February 25, 2026, the district court entered a second amended judgment on April 6, 2026, and the district court denied BMW MC's post-trial motion on May 14, 2026.

This appeal is timely under Fed. R. App. P. 4(a)(1)(A) and 4(a)(4)(A)(iv). The jury issued its verdict awarding Dawsey compensatory and punitive damages on February 25, 2026. On March 13, 2026, the district court held a hearing on economic damages. On April 6, 2026, the district court entered an order awarding Dawsey back pay and entered a second amended judgment. On May 4, 2026, BMW MC timely filed a notice of appeal from the second amended judgment. *See* Fed. R. App. P. 4(a)(1)(A).

On March 25, 2026, BMW MC timely filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59. On May 14, 2026, the district court entered a text order denying BMW MC's post-trial motion. After the denial of its post-trial motion, BMW MC timely filed an amended notice of appeal on June 11, 2026. *See* Fed. R. App. P. 4(a)(4)(A)(iv).

## ISSUES PRESENTED

1. Did the district court err by upholding the jury's verdict of national origin discrimination in favor of Dawsey and against BMW MC?

2. Did the district court err by awarding back pay to Dawsey despite her failure to mitigate her damages?

3. Did the district court err by awarding punitive damages to Dawsey?

## INTRODUCTION

Dawsey worked in the human resources department at BMW MC's vehicle manufacturing plant in South Carolina for more than twenty years until she voluntarily resigned in January 2022. Dawsey testified that her resignation was prompted by BMW MC's announcement of its decision to laterally transfer her to a position that she claimed would be downgraded in rank at some unspecified future time. The three BMW MC employees who made the decision to transfer Dawsey denied doing so for any discriminatory reason and denied that the position would have been downgraded had Dawsey taken it. They testified instead that the transfer was due to business needs arising from a department-wide reorganization.

Notwithstanding this evidence, Dawsey ultimately prevailed at trial on her national origin discrimination claim under Title VII, claiming that the selection of a German national to take her former position was discriminatory. The jury awarded her compensatory and punitive damages, and the district court awarded her back-pay damages after a subsequent economic damages bench hearing. BMW MC appeals the district court's failure to grant judgment as a matter of law on Dawsey's

Title VII claim and its damages awards. The district court's decisions on these points were erroneous.

First, the district court erred in upholding the jury's verdict in Dawsey's favor on her national origin discrimination claim. Dawsey conceded at trial that as of her resignation date there had been no change to the terms and conditions of her employment. She testified that a future downgrade of the position to which she would be transferred *might* have *possibly* resulted in harm to her at some *unidentified* point in the future. But such speculation does not satisfy a plaintiff's burden to prove that she suffered an adverse employment action—some disadvantageous change from the planned transfer—as necessary to prevail on a Title VII claim. To hold otherwise would allow an individual to seek and obtain significant damages based on a fear of harm that may or may not occur in the future, a result neither contemplated nor supported by Title VII.

Second, the district court erred in awarding Dawsey back-pay damages. This Court's well-established precedent requires a Title VII plaintiff to mitigate her back-pay damages because back pay is not intended to provide a windfall recovery. Dawsey, however, refused to mitigate her damages when she resigned before BMW MC's lateral

transfer at equal pay could take effect and instead accepted alternative outside employment at a $50,000 pay cut. The district court's decision to award back pay under these circumstances disregarded precedent from this Court and the Supreme Court and abrogated her duty to mitigate.

Finally, the district court erred in awarding punitive damages to Dawsey. An award of punitive damages is an extraordinary remedy that is unwarranted here. The record lacks any evidence that BMW MC's decisionmakers acted with the recklessness or malice necessary to support such an award. To the contrary, the evidence shows that each decisionmaker lacked any discriminatory intent toward Dawsey.

The Court should reverse the district court's orders and judgment upholding the jury's finding of national origin discrimination and awarding Dawsey monetary damages.

## STATEMENT OF THE CASE

### I. BMW MC Is Part of a Global Network.

#### A. BMW MC's Spartanburg Manufacturing Plant.

BMW is a German vehicle manufacturer with manufacturing locations around the world. BMW's parent company, BMW AG (short for Bayerische Motoren Werke Aktiengesellschaft), is located in Munich,

Germany. JA351-352. BMW's only manufacturing plant in the United States is located in Spartanburg, South Carolina, and is operated by BMW MC, a subsidiary of BMW AG. JA347; JA352. The Spartanburg plant is the largest manufacturing plant in BMW's worldwide network. JA807; JA811.

Given BMW's vast global network, employees in one location often undertake assignments at other locations around the world. German employees of BMW AG commonly complete assignments at BMW MC in Spartanburg, and American employees commonly complete assignments in Germany. JA361; JA625. This global integration allows BMW MC to learn and adopt best practices from other locations and for other locations to learn and adopt BMW MC's best practices. JA625-627. Likewise, BMW MC encourages employees to switch roles every few years to gain exposure to different fields and technologies, benefiting both the business and the employee. JA609-610; JA822.

### B. The BMW Network Uses Nomenclature for Locations and Departments.

The BMW network uses alphabetical nomenclature to distinguish between locations. BMW MC is referred to by the code "TX," JA354, and,

colloquially, as "Plant Spartanburg." JA352. Robert Engelhorn has served as the president of BMW MC since 2021. JA951.

Plant Spartanburg has eight departments that report to Engelhorn. *See* JA2069. Each department is referred to as "TX" plus a single digit number. *Id.* For example, the human resources department is known as TX-6. *Id.* Each department has a vice president, who is referred to synonymously with the department he or she leads. *See id.*; JA746. BMW MC's president and the vice presidents leading the eight departments are collectively referred to as BMW MC's "senior management." JA360-361; JA418.

This case centers on the human resources department at Plant Spartanburg. At the beginning of the period relevant to this dispute, Christine Petrasch was the vice president of human resources. JA947. Petrasch is a German employee who came to Plant Spartanburg from BMW AG in 2018. JA947-948. Five managerial positions in the human resources department reported to Petrasch. *See* JA2298. Those managerial positions were held by Kelly Dawsey (TX-60), Corey Epps (TX-61), Michelle Keith (TX-62), Scott Medley (TX-64), and Paul

Sinanian (TX-65). *Id.*; JA360. The following depicts the human resources leadership structure at that time:




JA2298.

Notable are the TX-60 and TX-64 positions. The TX-60 position is responsible for human resources planning, steering, compensation, and benefits. JA343; JA347-50. The TX-60 function also "keeps the whole information line to Germany, to the BMW AG." JA1000. It is thus practical to have at least one German speaker within the TX-60 group. JA991-992. Until mid-2021, the TX-60 group had at least one fluent German speaker—Stephen Dombrowski. JA635. Dombrowski departed BMW MC in July 2021 and was replaced by a non-German-speaking employee. *See* JA635; JA640. With the exception of Petrasch leading the entire human resources department, this left the TX-60 group "void of any international associates." *Id.*

The TX-64 position brings three fields—occupational, health, and food and safety—under one role in the department. JA970. Sherry McCraw, the current vice president of human resources, described the TX-64 role as "probably the most important" to the mission of the plant. JA1363.

### C. Each Position at BMW MC Is Assigned a Function Level, and Each Employee Is Assigned a Personal Grade.

Positions at BMW MC are assigned a "function level." JA356-357; JA2103. A position's function level is designated based on its accountabilities and requirements by a formal "grading" process that evaluates its responsibilities. JA515. Although the function level typically "follows the job," JA514-515—meaning a position's function level is determined by the responsibilities associated with the position, rather than the person holding the position—BMW MC did not always follow this guideline.

BMW MC classifies jobs into seven function levels. JA2091. The president of BMW MC is the sole function level one position. JA357. The vice president positions for each of Plant Spartanburg's eight departments are the function level two positions. *Id.* Department

manager positions are typically function level three positions, and other managerial roles are generally function level four positions. JA358; JA497.

Employees who progress from a function level three position (department manager) to a function level two position (vice president) must undertake a formal and extensive validation process. JA360; JA1323. Once an employee is validated, the employee becomes *eligible* for promotion to a function level two position. *See* JA1323-1324.

In 2021, the five human resources managerial employees reporting directly to the vice president occupied function level three and function level four positions. JA358. Dawsey (TX-60) and Medley (TX-64) occupied function level three positions. JA438; JA513.

Medley's and Epps's employment demonstrates how BMW MC did not always determine a position's function level based on the job characteristics rather than the person in the position. Before the TX-64 position was created, Medley occupied the TX-61 role classified as function level three. JA513. When Medley moved to TX-64 upon its creation, the function level three designation followed him to the new position, even though the TX-64 position had not been formally graded.

JA513; JA517. When Medley vacated the TX-61 job and Epps stepped into it, the TX-61 role became function level four. JA514.

Whereas positions bear function levels, BMW MC assigns its employees a "personal grade" based on experience and performance. JA398; JA2103. Personal grades range from two through fifteen. JA2094. Personal grades twelve through fifteen are reserved for senior management, such that an employee in a function level three position cannot be assigned a personal grade exceeding eleven. JA563; JA1323. An employee's personal grade is the primary factor in his or her salary, bonus, and other benefits, including vehicle eligibility. JA499-500; JA567-568.

## II. Dawsey Worked at BMW MC from 1995 Until She Resigned in January 2022.

Dawsey joined BMW MC in 1995 as an employee relations representative in the human resources department. JA341. Over the years, Dawsey worked in several human resources positions before rising to the role of department manager for human resources planning, steering, and compensation (TX-60) in February 2015. JA341-348.

Dawsey was a strong performer. JA408-412; JA2112-2125. She attained a personal grade of eleven, the highest she could earn outside

the vice president level. JA563. She remained in the TX-60 position from 2015 until 2022, a length of time atypical at BMW MC given its established practice of rotating employees through different departments and jobs every few years. JA821-822.

### A. BMW MC Entered into a Transition Period in 2021, Causing Dawsey to Evaluate Other Job Opportunities.

In 2021, three significant changes launched BMW MC's human resources department into a period of transition. JA457. First, the then-president of BMW MC retired, to be succeeded by Engelhorn. JA473; JA605; JA951.

Second, Dawsey's supervisor, Petrasch, was finishing her assignment in Spartanburg, necessitating that the TX-6 department receive a new vice president. JA457.

Finally, before Petrasch left Plant Spartanburg, she began a department restructuring project aimed at promoting workforce development during a period of staffing shortages. JA457; JA2303.

Dawsey described these changes as "chaotic" and involving "uncomfortable" communications. JA545-546. During this time, Dawsey was "working extremely long hours, some days 12, 15 hours a day and . . . wanted a better work-life balance." JA548. This led her to meet

with a recruiter to evaluate other job opportunities in early September 2021. JA545-546; JA694-695.

When Dawsey first met with the recruiter, she was not aware of who the new vice president of human resources would be and did not know that any of these changes would affect her personally. JA546; JA702-703. Dawsey continued to search for a potential job outside of BMW MC for the rest of the year. JA705-710.

### B. BMW MC's 2021 Leadership Changes Caused the Human Resources Department to Reorganize.

#### 1. Engelhorn selected Sherry McCraw as the new vice president of human resources.

Engelhorn took over as BMW MC's president in September 2021. JA951. One of Engelhorn's first tasks was to select a replacement for Petrasch as vice president of human resources (TX-6). JA816. Engelhorn selected McCraw, a long-time BMW MC employee, to begin in that role in March 2022. JA816-818.

For years, Dawsey had aspired to become the TX-6. JA759-760; JA954. But promotion into senior leadership at BMW MC is competitive and requires completion of the rigorous validation process, JA1323, which Dawsey never undertook. JA605. Furthermore, validation requires

approval from key decisionmakers within the BMW network, JA1323, which Dawsey never actively sought and never obtained. JA605; JA616; JA1468.

#### 2. BMW MC selected Eva Burgmeier to become the new TX-60.

Within human resources, the TX-60 group headed by Dawsey served as a liaison between BMW MC in Spartanburg and BMW AG in Germany. JA1000. But after Dombrowski's departure and Petrasch's upcoming departure, BMW MC would be left without *any* German speaker within TX-60, hindering communication between the human resources department and BMW AG. JA636-640. Petrasch testified:

> BMW MC was a report to BMW AG for information sharing, best practice exchange. And still in Germany we used German as language so sometimes it is difficult to catch up. So, this is why it is good to have at least one German speaking and reading person within the TX-60 department.

JA991-992.

Recognizing the need to have a connection to Germany, Engelhorn requested that Eva Burgmeier, a BMW AG employee who was a human resources manager and licensed attorney in Germany, be placed on assignment in the TX-6 department. JA823-825; JA1510-1511.

Engelhorn's request prompted the need to reorganize the human resources management roles at Plant Spartanburg. *See* JA999-JA1000.

Upon receiving Engelhorn's request, Petrasch originally proposed to move Medley from the TX-64 position to the development project, Epps from TX-61 to TX-64, Dawsey from TX-60 to TX-61, and place Burgmeier in the TX-60 position. JA999. Petrasch's purpose in moving Dawsey to TX-61 was to give her an opportunity to broaden her experience. JA1000.

Petrasch discussed her proposal with Engelhorn and McCraw in September 2021. JA1000-1001. During those discussions, McCraw opined that it would be better for Epps to stay in the TX-61 role because he had been in the position for only a short period of time. JA1001. McCraw suggested that Dawsey instead move to the TX-64 role to be vacated by Medley. JA1001-1002. After these conversations, Engelhorn, Petrasch, and McCraw agreed to place Burgmeier in the TX-60 role and transfer Dawsey to the TX-64 role. JA1002. Petrasch's purpose in placing Burgmeier in TX-60 was to take advantage of her planning and steering experience, as well as her capacity to "keep the information line to Germany." JA999-1000. Dawsey, on the other hand, would assume TX-64, which Medley held as a function level three, JA513, and which is

characterized as one of the most important positions at the plant. JA1363.

Thus, the new managerial structure in human resources at Plant Spartanburg would be as follows, with McCraw also set to replace Petrasch as vice president in March 2022.




JA2305.

### 3. In the fall of 2021, Petrasch informed Dawsey of the planned reorganization.

Dawsey learned about the planned reorganization through a series of conversations with Petrasch in the fall of 2021. JA475-480. On September 15, Petrasch told Dawsey by phone that McCraw had been selected as the new vice president of human resources. JA690. On September 27, Dawsey spoke with her lawyer (whom she had retained before ever learning about the reorganization) and recorded handwritten

notes, which indicated that she believed her pay could potentially be cut and that she could be moved from her function level three position to a function level four position. JA2371. Yet at trial, Dawsey testified that by this date Petrasch had expressed a desire to "protect" Dawsey's place in a function level three role. JA720.

On September 30, Petrasch and Dawsey had a more detailed conversation about the proposed reorganization. JA2281. During this meeting, Dawsey learned that Burgmeier would be assuming the TX-60 role and that Petrasch wanted Dawsey to "maintain [her] function level three" by moving to the TX-61 role. JA475-477.

A few days later, on October 4, Dawsey received more updates from Petrasch. JA2283. In this meeting, Petrasch relayed the conversations she had with Engelhorn and McCraw about the proposed reorganization, including the final decision that Dawsey would be transferred to the TX-64 job instead of to TX-61. JA493. Dawsey testified that during this October 4 meeting, Petrasch told her—consistent with her earlier suggestion that Dawsey broaden her experience—"[B]ecause of this, you need to take this very seriously. You need to look around, even external to HR and you need to find another job." JA494.

#### 4. Dawsey attended team meetings during which the reorganization was announced.

On November 11, 2021, Engelhorn, McCraw, and Petrasch conducted a meeting during which the reorganization plan was presented to the human resources managers—Dawsey, Epps, Keith, Medley, and Sinanian. JA535-536; JA1018. In this meeting, Petrasch informed the group that Dawsey would be moved to the TX-64 position. JA1019. Dawsey expressed no concerns with the proposed reorganization during the meeting or at any later time. *Id.*

In early December 2021, Petrasch gave a presentation to the entire human resources department (totaling about 100 people) about the department reorganization including Dawsey's move to the TX-64 position. JA535-536; JA1022-1023. Neither during nor after these meetings did Dawsey express any concerns about that plan. JA1019.

The proposed changes were planned to take effect in February 2022. JA1016.

### C. Dawsey Resigned and Accepted a Lower Paying Job Based on Her Unconfirmed Beliefs Regarding the TX-64 Position.

#### 1. Dawsey resigned in January 2022 and for the first time expressed her belief that her upcoming transfer was discriminatory.

On January 3, 2022, Dawsey called Petrasch to inform her that she planned to resign from her position at BMW MC. JA1023. That same day, Dawsey tendered a written resignation to BMW MC, to be effective January 14, 2022. JA2374.

Dawsey continued to work in the TX-60 position through her last day at BMW MC. JA716; JA1031. At the time of her resignation, her annual base salary was $202,450. JA563. In her last full calendar year at BMW MC (2021), she earned total compensation of $266,999.73. JA1889-1890. It is undisputed that neither Dawsey's salary nor her benefits were reduced at any time prior to her resignation. JA563. Likewise, Dawsey's personal grade was never decreased, and the position she occupied never experienced a reduction in function level. JA563-564; JA592.

After Dawsey resigned, Engelhorn invited her to his office to discuss her resignation. JA537. In that meeting, Dawsey expressed for

the first time that she "thought it was wrong that [she] was being displaced out of [her] job and being replaced with a German." JA537. Both before and during trial, however, Dawsey never raised constructive discharge as cause for her resignation from BMW MC. JA196 n.1; JA1592 (acknowledgment by the district court that there was no dispute the case did not involve constructive discharge).

Dawsey apparently derived her belief that she was being "displaced" because of her national origin from a document referred to as the "Expat Guidelines." JA2126-2140. Dawsey testified that she had created the Expat Guidelines some six years before her resignation at the direction of a former vice president of human resources. JA481-482. The Expat Guidelines indicate that when the TX-6 position is occupied by a domestic employee, the TX-60 manager should be international, and when the TX-6 position is occupied by an international employee, the TX-60 position should be occupied by a domestic employee. JA2131.

But Dawsey offered no evidence that the decisionmakers involved in the human resources reorganization in the fall of 2021—Engelhorn, McCraw, and Petrasch—were aware the Expat Guidelines existed. At trial, all three decisionmakers denied knowing anything about the

document. Indeed, they had never seen it. JA1351-1352 (McCraw); JA987-988 (Petrasch); JA897-900 (Engelhorn).

Engelhorn, McCraw, and Petrasch all testified that the proposal to transfer Dawsey to the TX-64 position was based on business reasons and that they did not consider her national origin in making the decision. JA845-846; JA1383; JA1031.

#### 2. Dawsey believed, without evidence, that her transfer to the TX-64 position would later result in a demotion.

Dawsey testified that she believed her transfer to TX-64 would later constitute a demotion because she believed that at some unidentified point in the future BMW MC would downgrade the role to function level four. JA720-721. Dawsey's belief was based on three points.

First, Dawsey testified that, in the fall of 2021, Petrasch told her that the TX-64 role would be downgraded at some unidentified point in the future. JA506. Petrasch, however, unequivocally denied any such statement because the reorganization needed to occur before any formal grading of the TX-64 position could be completed:

> **Q:** During your discussions with Ms. Dawsey, did you tell her that the TX-64 position was going to be a function level four position?

> **A:** No. We talked before about this review where we had the – we set up a structure together with FO, we wanted to do a review. And there are always the steps: First you need to do a new organization, then you need to do a review. And if you have a stable organization, then you need to do a grading, but we were not on the stage for grading, so we had no grading for that function yet because we did not even do the review.

JA1006.

Second, Dawsey claimed that, after her departure, the TX-64 position was later classified as function level four when occupied by two lower-level employees. JA2185-2186. But McCraw testified that after Dawsey resigned, McCraw moved responsibilities out of the position to allow up-and-coming employees with less experience to assume it, and those employees were classified at function level four. JA1399; JA1401; JA1404. Dawsey offered no evidence that the position would have been reclassified to function level four had she—a senior leader in human resources coming from a function level three role—taken it. To the contrary, Engelhorn testified that he planned for Dawsey to remain in a function level three position. JA876.

Third, after Dawsey's departure in January 2022, Petrasch wrote an email to a BMW AG employee in Germany in which she said that one of two options for the TX-64 position involved reclassifying it as function

level four. JA1081-1085. But Petrasch testified that this option was a hypothetical suggestion raised in the wake of Dawsey's departure in an attempt to fill the position. *Id.* Up to the date of trial, the TX-64 position was never formally graded. JA1362. At the time of Dawsey's resignation, it is undisputed that the position was denominated as function level three in the company's official job function data sheet. JA592-593; JA2261.

Dawsey speculated that if the position were downgraded to function level four, that could result in a decrease in her compensation. JA507. She apparently based her speculation on a document titled "US Personal Grade Guidelines Implementation Overview" (also called the "Misalignment Policy"), which addressed the scenario where an employee's personal grade falls outside the range tied to the function level of the employee's job. JA507-510; JA2146-2151. Because Dawsey's personal grade of eleven was higher than what was targeted for function level four positions, she believed that if she took the TX-64 role her personal grade—and eventually her pay—might have been affected at some point in the future due to the Misalignment Policy. JA507-508.

It is undisputed, however, that the Misalignment Policy was not implemented and that no employee's personal grade was lowered

pursuant to the policy. JA741-744; JA1352-1354. In fact, McCraw rescinded it shortly after Dawsey's resignation. JA1404-1405.

Dawsey never spoke with BMW MC's senior management about her beliefs regarding the impact of the planned reorganization. *See* JA1019. Because Dawsey resigned before the reorganization occurred, she did not stay long enough to determine whether her beliefs were correct.

**3. Dawsey immediately began working at another company, taking a pay cut of more than $50,000.**

Upon her resignation, Dawsey began working at Madewell Concrete as its director of human resources. JA2356. At Madewell, Dawsey's annual base salary was $150,000—some $50,000 less than her base salary at BMW MC. *Id.* Dawsey worked at Madewell for approximately six months. JA554.

On July 1, 2022, Dawsey received an offer from the Greenville-Spartanburg Airport District to serve as the airport's chief human resources officer. JA2375-2376. That position offered an annual base salary of $175,000 plus other benefits. *Id.* In 2024 (the last calendar year before trial for which data was available), Dawsey's total

compensation from the airport was $298,416.80.[1] JA1888. Dawsey remains employed by the airport. JA1897.

## III. Dawsey Sued BMW AG and BMW MC in 2022.

### A. Dawsey's Lawsuit Culminated in a Jury Verdict against BMW MC on National Origin Discrimination.

In October 2022, Dawsey filed this action against BMW MC and BMW AG in the District of South Carolina, asserting claims for national origin, race, and sex discrimination under Title VII and race discrimination under 42 U.S.C. § 1981. *See* JA114. Although the magistrate judge recommended granting BMW MC's motion for summary judgment on all claims, JA182-199, the district court denied the motion, JA200-218, and Dawsey's claims were tried by a jury in February 2026.

Pursuant to Fed. R. Civ. P. 50(a), BMW MC moved for judgment as a matter of law at the close of Dawsey's evidence and again at the close of all the evidence. *See* JA135. The district court denied the motions and submitted the case to the jury. *Id.* The jury returned a verdict in favor of

---

[1] Dawsey acknowledged that her total 2025 compensation exceeded her total 2024 compensation. JA1888.

Dawsey on her claim against BMW MC for national origin discrimination under Title VII and in favor of BMW MC on all other claims. JA1862-1867. On the national origin discrimination claim, the jury awarded Dawsey $100,000 in compensatory damages and $5 million in punitive damages. JA1867. The district court entered judgment in accordance with the jury's verdict. JA1.

On March 18, 2026, BMW MC filed a consent motion to amend the judgment to reduce the total award of compensatory and punitive damages to $300,000 based on the damages cap under 42 U.S.C. § 1981a. JA2031-2033. The district court granted the motion, JA2034-2035, and entered an amended judgment on March 25, 2026. JA2.

### B. The District Court Denied BMW MC's Post-Trial Motion and Awarded Back Pay.

Following entry of the amended judgment, BMW MC moved for judgment as a matter of law or, in the alternative, for a new trial under Fed. R. Civ. P. 50(b) and 59. JA2036-2037. In the motion, BMW MC argued, among other things, that Dawsey failed to present sufficient evidence to support a punitive damages award and did not show that the proposed transfer to the TX-64 position caused any harm to an identifiable term or condition of her employment. *Id.* Dawsey opposed the

motion. JA137. On May 13, 2026, the district court held a hearing on the motion. JA140. During the hearing and in a subsequent text order, the district court denied BMW MC's post-trial motion. *Id.*

After the jury trial, the district court also conducted a bench trial on the issue of economic damages. JA136. The district court denied Dawsey an award of front pay but based on the findings made in the bench trial awarded Dawsey $389,907 in back pay. JA3-21. The district court thereafter entered a second amended judgment reflecting the combined compensatory, punitive, and back-pay damages award. JA22.

## SUMMARY OF ARGUMENT

The district court erred by upholding the jury's verdict in favor of Dawsey on her claim for national origin discrimination and by awarding her back pay and punitive damages.

As a threshold matter, Dawsey failed to present sufficient evidence to support the adverse action element of her discrimination claim. Under the standard adopted by the Supreme Court in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), Dawsey was required to present evidence that she experienced a disadvantageous change to a term or condition of her employment. But all Dawsey offered at trial were layers of speculative

beliefs that events after the transfer—to a lateral position within the same department at the same pay—might have resulted in some harm at some unknown and unidentified point in the future. Such speculative evidence is insufficient to support the jury's verdict that the proposed transfer caused her some harm. Thus, BMW MC was entitled to judgment as a matter of law.

Even if Dawsey had presented sufficient evidence to support her claim for national origin discrimination, the district court erred in awarding her back-pay damages. Back pay is meant to restore a plaintiff to the position she would have been if not for the unlawful discrimination. Such damages, however, are limited by the statutory duty to mitigate. Here, Dawsey would have suffered no financial loss had she remained employed with BMW MC in the TX-64 position. Moreover, even if she might have suffered a loss in the future, she failed to mitigate her damages by refusing the lateral transfer within BMW MC at the same rate of pay as she had been earning and instead opting for employment at another company at a more than $50,000 pay cut. This Court's decisions in *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109 (4th Cir. 1981) and *Dennis v. Columbia Colleton Medical Center*, 290 F.3d 639 (4th Cir.

2000) do not compel a different result because both decisions involved employees who resigned and took jobs with *higher pay*—the opposite of what Dawsey did here.

Finally, the district court erred by awarding punitive damages. As articulated in this Court's recent decision in *Duvall v. Novant Health, Inc.*, 95 F.4th 778 (4th Cir. 2024), a plaintiff seeking punitive damages must present affirmative evidence that the defendant's decisionmakers subjectively perceived a risk that their conduct would violate federal anti-discrimination law. At trial, Dawsey failed to elicit any such affirmative evidence. Her counsel never asked two of the decisionmakers about their knowledge of Title VII, and the third decisionmaker's general awareness of an anti-discrimination policy fell short of the applicable standard. The absence of evidence that BMW MC's decisionmakers perceived a risk that transferring Dawsey to the TX-64 position might violate Title VII precludes a punitive-damages award here. BMW MC was entitled to judgment as a matter of law on Dawsey's claim for punitive damages.

## STANDARD OF REVIEW

This Court reviews de novo a district court's ruling on a Rule 50(b) renewed motion for judgment as a matter of law. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). "Under Fed. R. Civ. P. 50(b), the question is whether a jury, viewing the evidence in the light most favorable to [the non-movant], 'could have properly reached the conclusion reached by th[e] jury.'" *Id.* (quoting *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d at 644-45).

The Court also reviews de novo the denial of a post-trial motion for judgment as a matter of law on the issue of punitive damages. *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000); *Duvall,* 95 F.4th at 788. The Court reviews a district court's decision to award back pay for an abuse of discretion. *Benson v. Thompson Cadillac-Oldsmobile, Inc.*, 287 F. App'x 249, 256-57 (4th Cir. 2008) (citing *Dennis*, 290 F.3d at 651).

## ARGUMENT

### I. The District Court Erred by Concluding that Dawsey's Planned Transfer to the TX-64 Position Constituted an Adverse Employment Action to Sustain the Jury's Verdict.

#### A. Dawsey Must Prove that Her Planned Transfer to the TX-64 Position Caused Some Harm to an Identifiable Term or Condition of Her Employment.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a claim under Title VII, a plaintiff must prove, among other things, that she suffered an "adverse employment action." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *see also Ali v. Alamo Rent-A-Car, Inc.*, 8 F. App'x 156, 158 (4th Cir. 2001) (noting that the adverse employment action element is "derived from the statute's requirement that the employer's practice relate to 'compensation, terms, conditions, or privileges of employment'" (quoting 42 U.S.C. § 2000e-2(a)(1))).

Historically, this Court applied a heightened-harm standard in evaluating whether a job transfer constituted an adverse employment action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th

Cir. 2004) (holding that "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect" (quoting *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir.1999)). During the pendency of this case, however, in *Muldrow v. City of St. Louis,* the Supreme Court overruled this heightened-harm standard. The Court in *Muldrow* held that a Title VII plaintiff challenging a job transfer must show "that the transfer brought about some 'disadvantageous' change in an employment term or condition" but need not show "that the harm incurred was 'significant.'" *Id.* at 354-55 (holding that a plaintiff suffered an adverse employment action when her job transfer caused her to be less involved in high-visibility matters, work a less-regular schedule, and lose her take-home patrol car).

Under *Muldrow*, a job-transferee plaintiff like Dawsey still must show "some harm respecting an identifiable term or condition of employment" to establish the adverse employment action element of her Title VII claim. *Id.* This requirement is not toothless, and the Supreme Court recognized that it still provides a way for courts "to dispose of meritless Title VII claims challenging transfer decisions." *Id.* at 358.

Moreover, whether a specific change caused by a job transfer is sufficient to meet *Muldrow*'s "some harm" standard is a "context-specific inquiry" not amenable to bright lines. *Herkert v. Bisignano*, 151 F.4th 157, 164-65 (4th Cir. 2025) (declining to hold that job transfer causing a loss of supervisory duties was an adverse employment action as a matter of law).

### B. Dawsey's Speculation that Her Transfer Might Have Caused Her Some Future Harm Did Not Establish Adverse Action.

"Speculative harm does not constitute adverse employment action." *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 936 (10th Cir. 2001). Thus, an employee's speculation that a change in employment may cause future adverse consequences is insufficient to establish the adverse employment action element. *See Thomsen v. Romeis*, 198 F.3d 1022, 1027-28 (7th Cir. 2000) (holding that written reprimands with only "speculative" consequences did not constitute adverse employment actions).

This principle is well-illustrated by the Eleventh Circuit's post-*Muldrow* decision in *Zienni v. Mercedes-Benz U.S. International, Inc.*, No. 24-13932, 2025 WL 3708825 (11th Cir. Dec. 22, 2025). In *Zienni*, the plaintiff—a practicing Muslim who prayed five times a day—worked on an assembly line in a Mercedes manufacturing plant. *Id.* at *2. One

day, a supervisor told the plaintiff that he would no longer be allowed to pray during unscheduled breaks. *Id.* The plaintiff thereafter filed a Title VII religious discrimination claim asserting that he was exposed to the risk of discipline for continuing to take prayer breaks. *Id.*

On appeal, the Eleventh Circuit affirmed the district court's grant of summary judgment to Mercedes because the plaintiff failed to establish that he suffered an adverse employment action. *Id.* at *1. The court explained:

> [The plaintiff] rests on a speculation about what would have happened if he was caught praying during an unscheduled break. *But adverse action cannot be speculative. . . . The Supreme Court's decision in Muldrow did not alter that requirement.* Thus, any risk of discipline that [the plaintiff] experienced was too speculative to show a change in a term or condition of his employment.

*Id.* (emphasis added).

The Eleventh Circuit's decision in *Zienni* contrasts with cases like *Muldrow* and this Court's decision in *Herkert*, where the negative effects of the employer's action had already occurred and thus required no speculation. In *Muldrow*, the plaintiff had already been reassigned to a uniformed officer job with a rotating schedule and lost her car privileges.

601 U.S. at 351-52. And in *Herkert*, the plaintiff had already lost her supervisory authority. 151 F.4th at 165. Not so in *Zienni*.

Like the plaintiff in *Zienni*—and unlike the plaintiffs in *Muldrow* and *Herkert*—Dawsey failed to present more than speculation about future harm to a term or condition of her employment. She thus failed to establish an adverse employment action. Each layer of evidence she presented required the jury to speculate about whether her transfer would have resulted in some harm at some unknown and unidentified point in the future.

First, Dawsey asked the jury to speculate that the TX-64 position would be downgraded to function level four in the future. Her primary evidence in support of that prediction consisted of her unilateral testimony that Petrasch told her verbally that the position's function level would be decreased at some unidentified point, JA479, which Petrasch denied. JA1006. As in *Zienni*, this verbal statement—even assuming it was made—is too speculative to support an adverse change in a term or condition of her employment. 2025 WL 3708825, at *2.

Dawsey also presented evidence concerning BMW MC's attempts to fill the TX-64 position in the wake of her departure, including that the

position was later classified as function level four when held by two less-experienced employees and that Petrasch told a German employee that one of two possibilities would be to classify the position as function level four. JA2185-2186; JA1081-1085. But none of this evidence properly allowed a jury to conclude without speculation that the position would have been classified as function level four had *Dawsey*, a high-performing senior employee, taken it. To the contrary, the evidence was uncontroverted that BMW MC president Engelhorn planned for Dawsey to remain in function level three, JA876, and that BMW MC in other instances maintained prior function levels for employees who transferred jobs. JA1399. Indeed, McCraw testified that after Dawsey's departure, the two employees who assumed the TX-64 position at function level four had less relevant experience and were given fewer responsibilities. JA1399; JA1401; JA1404.

Second, Dawsey could identify no tangible, non-speculative harm to her economic benefits that would result from any downgrade in function level even if a downgrade were to occur. She speculated that her pay would have decreased in accordance with the Misalignment Policy had she transferred from a function level three position to a function level

four position in the future, JA507-509, but she could not say if or when such a decrease would have occurred:

> **Q:** What effect would this policy have on your compensation at BMW?
>
> **A:** So, I would have been either applied to row two or row three. I would go to the salary impact column where there would have been no change during the retention period. Retention period would have either been one year or three years, and it depends on where my salary was in the range as to what the impact was. And that I cannot answer.

JA508.

Dawsey also could not testify that the Misalignment Policy—on which she based her speculation that her pay would be decreased—was ever implemented. JA744 ("Q: And as for any of these folks in the PG Alignment that you sent letters to, you don't have any information that they were adversely affected, do you? A: I don't know that it was implemented, correct."). Indeed, it is undisputed that the Misalignment Policy was *not implemented* and that McCraw revoked the policy when she became the vice president of human resources. JA241-242.

Third, Dawsey also asked the jury to speculate as to whether a decrease in function level (which, again, itself was speculative) might impact her prospects for promotion. Both Dawsey and Burgmeier

testified that they were not aware of anyone at BMW MC who had been promoted from a function level four position into senior management. JA511-512; JA1519. But Dawsey also testified that she was not aware of any policy that prevented such a promotion. JA744. That's because there is no such policy—instead, "[p]romotions are based on your [personal grade]." JA1367. Rather than a position in a lower function level, the evidence showed that the two principal obstacles standing between Dawsey and a promotion to senior management were (1) her failure to complete the validation process required to obtain a senior management position, JA1367 ("Q: So, as a personal grade 11, she had hit the top without being validated? A: Yes."), and (2) her lack of diverse work experiences within BMW MC. JA957 ("[I]t was clear, broad experience would be very important for her and this was the next step."). In any event, Dawsey testified that she never intended to seek a promotion, and instead intended to retire in the TX-60 role. JA729.

That the evidence of any adverse employment action here was wholly speculative is equally apparent from the proceedings on BMW MC's renewed motion for judgment as a matter of law. The only evidence

cited by the district court in Dawsey's favor on adverse employment action relied on conditional language and qualifiers:

- "BMW, through its management, informed the Plaintiff that she *was going to be moved* from the TX-60 to TX-64 position and evidence was submitted that moving the Plaintiff to the new position *would have* adverse impacts on her." JA73 (emphasis added).

- "In this case, evidence was presented that Ms. Dawsey *was going to* suffer an adverse employment action." JA74 (emphasis added).

- "[E]vidence was submitted evidencing the custom, practice, policy, and course of dealing that being placed at a function level four position *would* impact an employee's ability to advance to the function level two level." JA73-74 (emphasis added).

In sum, the only evidence that Dawsey suffered an adverse employment action by her transfer to the TX-64 position consisted of layers of speculation about future harm that might befall her. That speculative evidence is insufficient to allow a jury to properly conclude that the transfer caused some harm to Dawsey, as required to establish her claim.

### C. Dawsey's Subjective Preference to Remain in the TX-60 Role Does Not Meet the "Some Harm" Standard.

Without concrete evidence that Dawsey's transfer to the TX-64 position caused her some harm, all that remains is Dawsey's subjective preference to remain in the TX-60 position rather than be transferred to

the TX-64 role. JA408; JA417-418 (Dawsey testifying that she liked the TX-60 position and was generally "happy" in the role). But to constitute an adverse employment action, the change must be "more than a mere subjective preference"; rather, "[a]n adverse employment action is some quantitative or qualitative change in the terms or conditions of the plaintiff's employment." *Paterakos v. City of Chicago*, 147 F.4th 787, 796-97 (7th Cir. 2025) (holding that a plaintiff's temporary reassignment did not satisfy *Muldrow*'s "some harm" standard because the reassignment did not diminish the plaintiff's "responsibilities, compensation, or benefits or make her otherwise worse off"). In other words, "not every change that makes an employee unhappy is an actionable adverse action." *Id.*; *see also Gabriel v. DSM Biomedical, Inc.*, No. 25-2630, __ F.4th __, 2026 WL 2347699, at *3 (3d Cir. Aug. 13, 2026) (affirming summary judgment for employer when the plaintiff's alleged harms were merely subjective and did not impact "an objective condition of his employment").

Here, Dawsey's subjective desire to remain in the TX-60 position did not establish that her transfer to the TX-64 position caused her some harm to an identifiable term or condition of employment.

Because Dawsey's evidence of an adverse employment action relied on speculation about potential future negative events and her own subjective preference to remain in the TX-60 position, the evidence was insufficient for a reasonable juror to conclude that she had suffered an adverse employment action. The district court, therefore, erred in denying BMW MC's motion for judgment as a matter of law.

## II. The District Court Erred by Awarding Dawsey Back Pay Despite Her Failure to Mitigate Those Damages.

### A. By Refusing the TX-64 Position, Dawsey Failed to Mitigate Her Damages.

After the jury found BMW MC liable for national origin discrimination, the district court held a separate bench hearing regarding economic damages and thereafter entered a written order awarding Dawsey $389,907 in back-pay damages. JA10-16. In awarding back-pay damages to Dawsey, the district court ignored well-settled principles requiring a Title VII plaintiff to mitigate her damages and misapplied this Court's precedent. The district court should have measured Dawsey's losses as the difference between her pay in the TX-60 role and her pay in the TX-64 role, but it failed to do so. Measured properly, Dawsey suffered no economic harm.

Title VII's purpose is to provide remedies to make victims of discrimination whole. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). To that end, Title VII authorizes courts to "order such affirmative action as may be appropriate" to remedy discrimination, including back pay and other equitable relief. 42 U.S.C. § 2000e-5(g)(1). An award of back pay is meant to make a victim of unlawful discrimination whole by restoring him or her "so far as possible . . . to a position where [he or she] would have been were it not for the unlawful discrimination." *Albemarle Paper*, 422 U.S. at 421. Thus, back pay is generally calculated as "the difference between what the employee would have earned had the wrongful conduct not occurred from the period of termination to judgment, and the actual earnings during that period." *Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730, 746 (E.D. Va. 2016).

A back-pay award "should not provide a windfall" to the plaintiff. *Cline v. Roadway Exp., Inc.*, 689 F.2d 481, 490 (4th Cir. 1982). Therefore, a back-pay award is subject to a plaintiff's duty to mitigate her damages and must be offset by the amount of any "earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1); *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985) (stating that "the

right of a successful Title VII plaintiff to claim back pay is limited in degree by the statutory duty to mitigate employer damages").

In cases like this one where an employee resigns voluntarily, the overwhelming majority of Circuit Courts of Appeals have adopted the "constructive discharge rule" barring an award of back pay absent evidence sufficient to establish constructive discharge. *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236 (10th Cir. 2000) ("[T]he Tenth Circuit has long held that an award of back pay is not available absent a showing of constructive discharge."); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001) ("A victim of discrimination that leaves his or her employment as a result of the discrimination must show either an actual or constructive discharge in order to receive the equitable remedy of reinstatement, or back and front pay in lieu of reinstatement.").[2] The Fourth Circuit, however, has declined to "apply the 'constructive discharge rule' . . . . Instead, we

---

[2] *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006); *Jurgens v. EEOC*, 903 F.2d 386, 389 (5th Cir. 1990); *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 767 (6th Cir. 2008); *Caviness v. Nucor-Yamato Steel Co.*, 105 F.3d 1216, 1219 (8th Cir. 1997); *Morrison v. Genuine Parts Co.*, 828 F.2d 708, 709 n. 1 (11th Cir. 1987); *Clark v. Marsh*, 665 F.2d 1168, 1172 (D.C. Cir. 1981).

simply apply the general statutory duty located at 42 U.S.C. § 2000e-5(g) to mitigate employer damages." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651 (4th Cir. 2002). Whether or not the "constructive discharge rule" applies, the result in this case should have been the same: no back-pay award.

Here, the district court erroneously determined that Dawsey was entitled to a back-pay award and that she had not failed to mitigate her damages. JA10-16. In reaching that conclusion, the district court relied on this Court's decisions in *Spagnuolo v. Whirlpool Corp.* and *Dennis*. JA13-14. The district court, however, misapplied those decisions. Neither case supports a back-pay award to Dawsey. Rather, the principles underlying both cases make clear that the district court's back-pay award to Dawsey is contrary to the law.

In *Spagnuolo*, a long-time Whirlpool employee was demoted from his position as manager of the builder department in Charlotte to the position of territory manager over the Greensboro-Durham territory. 641 F.2d at 1111. Before the demotion, the employee earned $2,285 per month. *Id.* at 1114. After the demotion, the employee earned $900 per month. *Id.* The employee began working in the new position, but resigned

shortly thereafter and accepted employment at one of Whirlpool's competitors in a job paying $1,200 per month. *Id.* at 1111, 1114. The employee then sued Whirlpool, alleging that he had been demoted unlawfully because of his age. *Id.* at 1111. At trial, a jury found for the plaintiff and awarded actual damages of approximately $52,000, which included back-pay damages for lost wages resulting from the demotion. *Id.* On appeal, this Court affirmed the back-pay award, holding both that the employee need not have proven constructive discharge to obtain a back-pay award and that the employee had properly mitigated his damages. *Id.* at 1114. Critically, the court observed that "consistent with his obligation to mitigate damages, plaintiff sought and obtained a better paying job. Plaintiff did not resign from Whirlpool and accept employment paying him lesser compensation." *Id.*

This Court reached the same conclusion on similar facts in *Dennis*. There, an employee applied for but was denied a promotion. 290 F.3d at 643-44. After learning of the promotion decision, the employee resigned and filed suit alleging discriminatory failure to promote due to her sex. *Id.* at 644. A jury eventually found in favor of the employee on the discrimination claim, and the district court awarded the employee

$31,302 in back-pay damages. *Id.* This Court affirmed the back-pay award, reasoning that the employee reasonably mitigated her damages because the employee "quickly did find comparable alternative employment" and in fact "made substantially more money over the three year period between leaving [her employer] and trial than she would have made had she stayed at the hospital after being denied promotion." *Id.* at 651-52.

*Spagnuolo* and *Dennis* both stand for the unremarkable proposition that an employee reasonably mitigates her damages when she resigns employment after a discriminatory decision and takes a job with *higher pay* than the job she vacated. Neither case, however, is applicable here because Dawsey resigned and took a job with *lower pay* than BMW MC offered through the TX-64 position. At the time of her resignation, Dawsey earned base pay of $202,450 per year at BMW MC in the TX-60 position. JA1876. Dawsey was set to make the same amount in the TX-64 position. *See* JA875; JA584-587. Yet, rather than accept BMW MC's transfer at the same pay, Dawsey resigned her position and accepted a job at Madewell Concrete earning a base salary of $150,000 per year—a more than $50,000 pay *cut*. JA2356; JA709-710. The facts here are thus

unlike those in *Spagnuolo* and *Dennis,* where employees left their employers to take jobs at higher rates of pay, and the district court wrongly concluded that those cases support a back-pay award here.

Instead, by refusing the TX-64 position and choosing to take a lower paying position outside BMW MC, Dawsey failed to mitigate her damages. On this point, the Eastern District of Virginia's decision in *Crump v. United States Department of the Navy* is instructive. In *Crump*, the Navy denied an employee's request for accommodation, after which she accepted employment with another healthcare provider at a lower rate of pay. 205 F. Supp. 3d at 737-41. Approximately one year after the physician assistant ceased working for the Navy, the Navy offered her a substantially equivalent position as the one she held before with the accommodation she requested, but she turned it down. *Id.* at 754-55. Because she turned down the Navy's offer, the district court determined that she had failed to mitigate her damages from the point she turned down the offer and therefore could not collect back pay accruing after that date. *Id.* at 757.

*Crump* is analogous to the facts here, except that BMW MC planned to transfer Dawsey *immediately* to the TX-64 position at the same rate of

pay as the TX-60 position. Had Dawsey continued her employment in the TX-64 position, she would have suffered *no* economic damages. Thus, by refusing that position and instead resigning to take a lower-paying job she failed to mitigate her damages and cannot receive a back-pay award. *Brady*, 753 F.2d at 1273 ("the right of a successful Title VII plaintiff to claim back pay is limited in degree by the statutory duty to mitigate employer damages").

### B. The District Court's View that Dawsey Need Not Have Remained at BMW MC to Mitigate Her Damages Contravenes Supreme Court Precedent.

The district court determined that Dawsey did not fail to mitigate her back-pay damages because the jury found that BMW MC had discriminated against her. As a result, the district court concluded, Dawsey was not required to remain at BMW MC and could instead take a job elsewhere even if it was at lower pay. JA15 (stating that Dawsey was not "required to remain employed at BMW MC where she experienced discrimination").

This conclusion, however, contravenes the Supreme Court's decision in *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982). In *Ford Motor*, women applied for jobs at a Ford warehouse but were denied them

because of their sex. *Id.* at 221-22. Eighteen months later—after the women had taken jobs at another company's warehouse and filed charges of discrimination with the EEOC—Ford unconditionally offered the women the jobs they had originally sought but the women declined Ford's job offers. *Id.* at 222. On appeal, the Supreme Court held that Ford's unconditional offers of employment cut off the plaintiffs' right to back pay from the point of the job offers. *Id.* at 241. This was so because a "claimant's statutory obligation to minimize damages requires him to accept an unconditional offer of the job originally sought" and requiring a claimant to accept the job originally sought "comports with Title VII's policy of making discrimination victims whole." *Id.* at 234, 239. A contrary rule, the Court reasoned, could "grant [the women] something more than compensation for their injuries" and "require, in effect, that Ford insure [the women] against the risks of underemployment in a new and independent undertaking." *Id.* at 234-35.

Thus, in *Ford Motor*, the Supreme Court unequivocally expressed that even though an employer discriminated against the plaintiff, the plaintiff is nevertheless *required* to accept a substantially equivalent job offer with that employer to mitigate her back-pay damages. *See also*

*Jernigan v. Dalton Mgmt. Co., LLC*, 819 F. Supp. 2d 282, 291 (S.D.N.Y. 2011) ("To toll the accrual of backpay as of the date of the employee's rejection, an employer need only offer reinstatement to 'a job substantially equivalent to the one he was denied.'" (quoting *Robles v. Cox & Co., Inc.*, 154 F. Supp. 2d 795, 807 (S.D.N.Y. 2001)).

Here, that principle required Dawsey to accept the TX-64 position in order to mitigate her back-pay damages. The district court's conclusion that she need not have accepted the job at BMW MC to mitigate her damages because the jury had found she had been discriminated against directly contravenes *Ford Motor* and its principles. *See Shipley v. Lockheed Aeromod Ctr., Inc.*, 67 F.3d 296 (Table), 1995 WL 573042, at *3 (4th Cir. Sept. 29, 1995) (citing *Ford Motor* and observing that a plaintiff's failure to accept an offer of rehire by his employer after having been laid off for allegedly discriminatory reasons would "undermine any claim for damages").

### C. The District Court's Back-Pay Decision Disregards the Principles of Constructive Discharge.

Finally, the district court's decision that Dawsey could decline a transfer into a job at the same rate of pay, take a lower paying job outside BMW MC, and still receive a back-pay award turns the concept of

constructive discharge on its head. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004)). In those circumstances, "Title VII treats that resignation as tantamount to an actual discharge." *Id.*

Thus, the constructive-discharge doctrine sets the standard under which an employee can be expected to leave a discriminating employer, and it sets a high bar: working conditions must be "intolerable." *Decoster v. Becerra*, 119 F.4th 332, 339-40 (4th Cir. 2024); *see also Ofoche v. Apogee Med. Grp., Va., P.C.*, 815 F. App'x 690, 692 (4th Cir. 2020) ("To establish constructive discharge, an employee must meet a high standard."). Unless an employee can meet the constructive-discharge standard, she is "expected to remain on the job while seeking redress." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Suders*, 542 U.S. at 147).

Dawsey disavowed any claim of constructive discharge as cause for her resignation from BMW MC. JA196 n.1; JA1592. In doing so, Dawsey implicitly acknowledged that she could be expected to remain at BMW MC (taking the transfer to the TX-64 position) while seeking redress for her claim of discrimination, as her working conditions there were not so intolerable as to require her to seek outside employment.

By concluding that Dawsey need not have accepted the TX-64 position to avoid or mitigate her damages because she had been discriminated against, the district court ignored the entire concept of constructive discharge. Under the district court's reasoning, any employee who believes she has been discriminated against could leave her employer for a lower-paying job and, if successful in court, hold the former employer responsible for the pay differential regardless of the intolerability of the working conditions at her former job. This, however, would incorrectly require an employer to insure "against the risks of unemployment in a new and independent undertaking." *Ford Motor*, 458 U.S. at 234.

It would also render the constructive-discharge doctrine a nullity, which is not and cannot be the case. In fact, the constructive-discharge

doctrine provides a clear boundary demarcating when an employee may be expected to remain employed by her employer to mitigate her damages and when the employee by contrast can be expected to leave, even if to a lower-paying job. By holding that Dawsey could mitigate her damages by taking a lower-paying job outside BMW MC over a higher-paying job within the company while disclaiming constructive discharge, the district court flouted this boundary and abrogated the concept of constructive discharge.

For all of these reasons, Dawsey failed to mitigate her back-pay damages when she refused to accept the transfer to the TX-64 position and instead accepted a position outside BMW MC at a pay cut of more than $50,000 per year. The district court's decision to award Dawsey back pay despite her failure to mitigate those damages was erroneous and should be reversed.

## III. The District Court Erred by Awarding Punitive Damages.

Punitive damages are "an extraordinary remedy" awarded only under "limited circumstances" in Title VII cases. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 150-52 (4th Cir. 2017); *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 792 (4th Cir. 2024). Both "the text and background of the

Civil Rights Act of 1991, which authorizes punitive damages, emphasize that this extraordinary remedy is not to be awarded automatically in every successful Title VII suit." *Ward v. AutoZoners, LLC*, 958 F.3d 254, 269 (4th Cir. 2020) (quoting *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997)).

To obtain punitive damages, a plaintiff must show that her employer engaged in unlawful, intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Duvall*, 95 F.4th at 792 (quoting *Ward*, 958 F.3d at 263); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). In other words, for a plaintiff to obtain punitive damages, the "employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Duvall*, 95 F.4th at 792 (quoting *Ward*, 958 F.3d at 263). This "is a high standard to meet." *Consol Energy*, 860 F.3d at 151. It asks not merely whether the decisionmaker's actions fell short of the requirements of federal anti-discrimination law, but whether the decisionmaker subjectively perceived a risk of a legal violation and nevertheless "acted despite that subjective knowledge." *Id.*

Dawsey failed to adduce any evidence sufficient to meet this standard. No evidence indicates that Engelhorn, McCraw, or Petrasch—the decisionmakers who established the proposed human resources reorganization plan—perceived any risk that transferring Dawsey to the TX-64 position might violate Title VII. Thus, the district court erred by failing to set aside the punitive damages award.

This Court's opinion in *Duvall* compels the conclusion that there is no evidence to support the jury's punitive damages award here. In *Duvall*, a former Novant executive sued Novant and obtained a jury verdict including $10 million in punitive damages (subsequently reduced to $300,000 by the district court) based on his claim that Novant discriminated against him because of his race and gender when it terminated his employment. 95 F.4th at 787. On appeal, Novant challenged the punitive damages award, which was based predominantly on the inference that because the decisionmaker who terminated the plaintiff was a highly educated executive with a long corporate career, the decisionmaker must have understood that his termination decision entailed a perceived risk of violating Title VII. *Id.* at 792.

This Court held that evidence to be insufficient to support punitive damages because it did not establish that the decisionmaker discriminated against the plaintiff in the face of a perceived risk that his decision would violate federal law. *Id.* at 792-93. The Court explained that while a decisionmaker's rudimentary knowledge of the import of a federal anti-discrimination statute may under certain circumstances support a jury finding of a perceived risk, punitive damages could only be warranted "where *affirmative evidence* of that rudimentary knowledge was presented at trial." *Id.* at 792 (emphasis in original). In other words, to support punitive damages a plaintiff must point to some documentary evidence or elicit some testimony "establishing [the decisionmaker's] personal knowledge of federal anti-discrimination law" and that the decisionmaker "perceived a risk that his decision . . . would violate it." *Id.* The plaintiff, however, failed to elicit any such evidence. *Id.* Allowing punitive damages under those circumstances, the Court concluded, would "water down the 'high standard' imposed on a Title VII plaintiff." *Id.* at 793 (quoting *Consol Energy*, 860 F.3d at 151).

Here, just as in *Duvall*, Dawsey's counsel cross-examined decisionmakers Engelhorn and McCraw but never asked them whether

they knew about Title VII or any similar anti-discrimination law. By failing to ask these questions, Dawsey did not elicit any affirmative evidence showing that Engelhorn or McCraw had even a rudimentary knowledge of federal anti-discrimination law, let alone that either of them perceived a risk that their actions could violate the law. Dawsey thus cannot point to Engelhorn's or McCraw's testimony to meet the high standard required to support punitive damages. *See Duvall*, 95 F.4th at 792 (observing that the plaintiff "cross-examined [the decisionmaker] yet never elicited from him testimony establishing his personal knowledge of federal anti-discrimination law, let alone that he perceived a risk that his decision to fire Duvall would violate it").

Petrasch's testimony was equally unavailing for Dawsey. On this topic, Petrasch testified only that BMW MC has a general anti-discrimination policy on which it has offered training to its employees:

> **Q:** Ms. Petrasch, you testified earlier that when you – during the time period you were at BMW MC, you had access to policies and I believe you referenced the associate handbook.
>
> **A:** Yes.

> **Q:** Did BMW Manufacturing have a policy that prevents discrimination?
>
> **A:** Yes, it is part of the associate handbook.
>
> **Q:** And do you know if that policy prevents discrimination based on national origin?
>
> **A:** Yes.
>
> . . . .
>
> **Q:** When you were at BMW MC, did the Human Resources department conduct training on the nondiscrimination policy?
>
> **A:** Yes, we got training. HR did it together with the legal department.

JA1028-1029.

But Petrasch's basic knowledge of the existence of BMW MC's anti-discrimination policy does not speak to her knowledge of Title VII, nor does it speak to her subjective knowledge as to whether the decision to transfer Dawsey to the TX-64 role might violate that statute. *See Consol Energy*, 860 F.3d at 151 (holding that evidence was insufficient to support punitive damages despite evidence that the employer was generally aware of Title VII's requirements, because "there was no similar evidence to suggest that [the defendant] subjectively appreciated a risk that it failed to meet those obligations" toward the plaintiff). Dawsey's counsel failed to elicit specific testimony from Petrasch

sufficient to show that she "discriminated despite perceiving a risk" that her conduct would violate Title VII. *Duvall*, 95 F.4th at 792.

Even if Dawsey could point to evidence that Engelhorn, Petrasch, or McCraw had rudimentary knowledge of Title VII's requirements, that knowledge alone would be insufficient to support a punitive damages award. *Consol Energy*, 860 F.3d at 151. Rather, "basic knowledge of Title VII's requirements" must *also* be accompanied by evidence to support the inference that the decisionmakers "subjectively appreciated a risk" that they failed to meet Title VII's requirements. *Id.* No such evidence exists here.

The evidence presented by Dawsey regarding the Expat Guidelines does not support a different conclusion. Dawsey helped create the Expat Guidelines at the instruction of Trauth, the former vice president of human resources before Petrasch. JA481-482. The guidelines provide that when the vice president of human resources is a domestic employee, the TX-60 position should be filled by an international employee and vice versa. JA2131. At trial, Dawsey testified that she advised Trauth against implementing the guidelines because "slot[ting] positions based on national origin" was not allowed in the United States. JA487-488. She

also testified that she believed the guidelines were discussed at a senior management meeting that she did not attend. JA482.

But whether Trauth was aware of the Expat Guidelines and their potential illegality is irrelevant to the punitive damages analysis here because he played no part in the decision to transfer Dawsey to the TX-64 position. In fact, Trauth left BMW MC *three years* before Engelhorn, McCraw, and Petrasch created their proposed reorganization plan for TX-6. JA725 (noting that Trauth completed his assignment in 2018). Trauth's knowledge, if any, of Title VII's requirements as a result of his work with Dawsey before his departure has no bearing on the subjective knowledge of Engelhorn, Petrasch, or McCraw in 2021. This is particularly so because there is no evidence suggesting that Trauth told those decisionmakers—or anyone else at BMW MC—about Dawsey's warning.

It is undisputed that none of the three BMW MC decisionmakers were even aware that the Expat Guidelines existed when they proposed to transfer Dawsey to the TX-64 position. JA1351-1352 (McCraw); JA987-988 (Petrasch); JA897-900 (Engelhorn). Although Dawsey offered testimony that McCraw was on BMW MC's senior management team

when the guidelines were created, JA489, McCraw unequivocally testified that she had not seen the document before trial. JA1351-1352. McCraw's testimony is also consistent with the document itself, which states it was presented at a "TX-6 Workshop" in 2015. JA2126. McCraw was not at that time a member of the TX-6 department. JA1352.

Finally, this is not a case in which the decisionmakers' conduct itself evidences reckless indifference to Dawsey's Title VII rights. In fact, all three decisionmakers testified that they proposed to transfer Dawsey for business reasons and did not intend to discriminate against her based on her national origin. Engelhorn testified:

> **Q:** Sir, did you have any intent to replace Kelly Dawsey with a German?
>
> **A:** No.
>
> Q: Did nationality of any of these people on the team ever enter your mind?
>
> **A:** No.
>
> . . .
>
> **Q:** What was your intent in building up this team that would serve alongside you as the President and CEO?
>
> **A:** The intent to build this team, like I described, was to fit to the business needs, to cope with expertise, the knowledge of the management team, and to create a solid environment in the HR to cope with the challenges.

JA845-846. Likewise, McCraw testified:

> **Q:** Were your decisions on putting Kelly Dawsey in 64 in your reorganization based on business needs?
>
> **A:** Yes.

JA1383. And Petrasch testified:

> **Q:** During the reorganization of the TX-6 Department in the fall of 2021, did you make any decision based upon Kelly Dawsey's national origin?
>
> **A:** No.

JA1031. None of the three decisionmakers were aware that Dawsey believed she was being discriminated against until Dawsey raised that concern to Engelhorn after tendering her resignation. JA537.

In sum, because of the complete absence of evidence that any of BMW MC's three decisionmakers perceived a risk that their actions in transferring Dawsey to the TX-64 position would violate Title VII, the district court erred by awarding punitive damages.

## CONCLUSION

For the foregoing reasons, BMW MC respectfully requests that the Court reverse the orders and judgment denying BMW MC's renewed

motion for judgment as a matter of law and granting Dawsey's request for back pay.

## REQUEST FOR ORAL ARGUMENT

BMW MC requests oral argument because oral argument will be helpful to the Court. This case presents important questions about the interpretation of recent Supreme Court precedent on federal anti-discrimination law, as well as this Circuit's precedents on recovery of back pay and punitive damages.

This 3rd day of September, 2026.

Respectfully submitted,

/s/ Charles E. Johnson
Charles E. Johnson
cejohnson@rbh.com

Brendan P. Biffany
bbiffany@rbh.com

Aryana Ainolhayat
aainolhayat@rbh.com

ROBINSON, BRADSHAW & HINSON, P.A.
600 South Tryon Street, Suite 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536

*Counsel for Defendant-Appellant*
*BMW Manufacturing Co., LLC*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,764 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, using Microsoft Word, in 14-point Century Schoolbook type.

This 3rd day of September, 2026.

/s/ Charles E. Johnson
Charles E. Johnson
*Counsel for Defendant-Appellant*
*BMW Manufacturing Co., LLC*