# NO. 26-1793

---

**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

---

**KELLY DAWSEY**,

*Plaintiff-Appellee*,

v.

**BMW MANUFACTURING CO., LLC**,

*Defendant-Appellant*.

---

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

---

## BRIEF OF PLAINTIFF-APPELLEE

---

SUBMITTED BY:
Brian P. Murphy
Attorney for Plaintiff-Appellee
Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400
brian@stephensonmurphy.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1793 Caption: Dawsey v. BMW Manufacturing Co., LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kelly Dawsey
(name of party/amicus)

who is Plaintiff-Appellee, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? YES ☑ NO

2. Does party/amicus have any parent corporations? YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Brian P. Murphy Date: October 1, 2026

Counsel for: Plaintiff-Appellee



Print to PDF for Filing

## TABLE OF CONTENTS


I. STATEMENT OF THE CASE ....... 1

A. Nature of the Case ....... 1

B. Standard of Review ....... 1

C. Factual Background ....... 2

1. Parties ....... 2

2. BMW's HR department and the 2021 changes ....... 3

a. Traditional structure of the Spartanburg plant and its human resources department ....... 3

b. BMW removes Dawsey from TX-60 because she is American. ....... 4

c. Burgmeier was unqualified for TX-60 ....... 9

d. BMW tells Dawsey that she will be demoted from TX-60 to TX-64. ....... 12

3. Dawsey accepts the only job offer she had in December. ....... 13

II. SUMMARY OF ARGUMENT ....... 15

III. ARGUMENT ....... 16

A. Adverse employment action ....... 17

1. Muldrow's "some harm" principle is inapplicable to Section 703(a)(2). ....... 17

2. BMW conflates adverse employment action and mitigation with the principle of when a claim accrues. ....... 19

3. BMW's Section 703(a)(1) adverse employment actions ....... 23

a. Removal from TX-60 ....... 24

b. Demotion to TX-64 .....25

1. TX-60 and TX-64 are at different function levels .....25

2. A demotion to TX-64 subjected Dawsey to personal grade, pay, and benefit reductions. .....31

4. BMW's new argument about Dawsey's subjective preference makes no sense. .....33

5. BMW's new German language rationale is baseless and contradicts BMW's other arguments. .....33

6. BMW's cited cases cannot overcome binding authority. .....35

B. Back pay and mitigation .....36

1. BMW preserved no argument regarding mitigation of damages other than the applicability of *Dennis*. .....37

2. BMW's frontal assault on *Dennis* is legally, factually, and logically devoid of merit. .....38

3. BMW failed to meet its burden of proof on mitigation. .....40

C. Punitive Damages .....46

1. BMW bases its unpreserved punitive damages arguments on a misstatement of the law. .....46

2. BMW's claim that its other top managers did not know that discrimination is unlawful .....49

3. BMW's egregious conduct also warrants punitive damages .....54

IV. CONCLUSION .....54

# TABLE OF AUTHORITIES

## Cases

*A Soc'y Without a Name v. Virginia*, 655 F.3d 342 (4th Cir. 2011).........................23

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)............................................40

*Anderson v. GDC, Inc.*, 281 F.3d 452 (4th Cir. 2002)...................................... 54, 60

*Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir. 1981) ..............................19

*Barnhill v. Bondi*, 138 F.4th 123 (4th Cir. 2025) ..................................................26

*Bibbs v. Block*, 778 F.2d 1318 (8th Cir. 1985) .......................................................20

*Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024).................52

*Blasic v. Chugach Support Servs.*, 673 F. Supp.2d 389 (D. Md. 2009)..................49

*Bostock v. Clayton Cty.*, 590 U.S. 644 (2020).........................................................20

*Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir. 1985) ............. 40, 50

*Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022).........................27

*Chardon v. Fernandez,* 454 U.S. 6 (1981)..............................................................22

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)................................................................................................21

*Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730 (E.D. Va. 2016) .......47

*Delaware State College v. Ricks*, 449 U.S. 250 (1980)..........................................22

*Dennis v. Columbia Colleton Med. Ctr.*, 2:98-cv-02694-DCN,
ECF 135 (D.S.C. Jan. 29, 2001) .............................................................................44

*Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639 (4th Cir. 2002)...... 41, 44, 48

*Duvall v. Novant Health, Inc.*, 95 F.4th 778 (4th Cir. 2024)................ 38, 47, 53, 57

*EEOC v. Consolidated Energy*, 860 F.3d 131 (4th Cir. 2017).................. 47, 59, 60

*EEOC v. FedEx,* 513 F.3d 360(4th Cir. 2008).........................................................53

*EEOC v. McLean Trucking Co.*, 834 F.2d 398 (4th Cir. 1987)..............................40

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973) ..................................................16

*Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982)......................................................45

*Gabriel v. DSM Biomedical, Inc.*, No. 25-2630, 2026 U.S. App. LEXIS 24427 (3d Cir. Aug. 13, 2026) ...........................................................39

*Gentry v. E.W. Partners Club Mgmt.*, 816 F.3d 2283 (4th Cir. 2016) .....................16

*Gibbons v. Gibbs*, 99 F.4th 211 (4th Cir. 2024) ....................................................43

*Glasser v. United States*, 315 U.S. 60 (1942). ........................................................56

*Green v. Brennan*, 578 U.S. 547 (2016) ......................................................... 21, 23

*Hairston v. McLean Trucking Co.*, 520 F.2d 226 (4th Cir. 1975)..........................46

*Herkert v. Bisig*nano, 151 F.4th 157 (4th Cir. 2025)................................ 19, 26, 49

*Holland v. Wash. Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007) ................................28

*Hollis v. Morgan State Univ.*, 153 F.4th 369 (4th Cir. 2025).......................... 32, 38

*Holsey v. Armour & Co.*, 743 F.2d 199 (4th Cir. 1984) ........................................60

*Horn v. Del Toro*, No. 23-5169, 2024 U.S. App. LEXIS 25290 (D.C. Cir. Oct. 3, 2024) ..................................................................................23

*Hospodor v. Burlington Indus.*, No. 99-2017, 2000 U.S. App. LEXIS 2679 (4th Cir. Feb. 23, 2000)..........................................................................22

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)................................22

*Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974).............46

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) ................................... 52, 56, 60

*Long v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.*,
9 F.3d 340 (4th Cir. 1993) ...........................................................................40

*Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702 (1978).............19

*Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431 (4th Cir. 2000) ..........................57

*Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343 (4th Cir. 1995) ........................ 40, 44

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004).......................................43

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004) (en banc) ......................43

*Miller v. AT & T Corp.*, 250 F.3d 820 (4th Cir. 2001) .................................... 44, 45

*Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288 (1960) ...........................41

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) ........................................ passim

*News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 683 (1983).............19

*O'Connor v. Fairfax Taxi, Inc.*, ___ F.4th ___, ____, Nos. 25-1699,
25-1702, 2026 U.S. App. LEXIS 25067 (4th Cir. Aug. 19, 2026)......................43

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998).........................33

*Ortiz-Diaz v. United States HUD*, 867 F.3d 70 (D.C. Cir. 2016)............................27

*Paterakos v. City of Chi.*, 147 F.4th 787 (7th Cir. 2025)........................................38

*Plyler v. Cox*, 145 F.4th 501 (4th Cir. 2025) ........................................................42

*Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)....................................1, 41

*Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963 (4th Cir. 1982)..................................22

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000).................................................27

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)...................................2

*Shipley v. Lockheed Aeromod Ctr.*, No. 94-2063, 1995 U.S. App. LEXIS 27645 (4th Cir. Sep. 29, 1995) .............................................................49

*Singletary v. Howard Univ.*, 939 F.3d 287 (D.C. Cir. 2019)..................................23

*Smith v. Univ. of Md. Balt.,* 770 F. App'x 50 (4th Cir. 2019) ................................22

*Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109 (4th Cir. 1981) ("*Spagnuolo I*") .....42

*Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114 (4th Cir. 1983) ("*Spagnuolo II*").....46

*Thomas v. Eotech, LLC*, 169 F.4th 259 (4th Cir. 2026) ..........................................25

*Threat v. City of Cleveland*, 6 F.4th 672 (6th Cir. 2021)........................................27

*Tinsley v. First Union Nat'l Bank*, 155 F.3d 435 (4th Cir. 1998) ...........................24

United States v. Moye, 454 F.3d 390 (4th Cir. 2006) ............................................56

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ....32

*Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 260 (4th Cir. 2025) . 32, 38

*Ward v. Autozoners*, 958 F.3d 254 (4th Cir. 2020).................................................58

*Webster v. Rumsfeld*, 156 F. App'x 571 (4th Cir. 2005) ........................................28

*Wells v. N.C. Bd. Of Alcohol Cntrl.,* 714 F.2d 340 (4th Cir. 1983).........................47

*White v. BFI Waste Servs.*, 375 F.3d 288 (4th Cir. 2004)........................................24

*Williams v. Albemarle City Bd. of Educ.*, 508 F.2d 1242 (4th Cir. 1974)...............46

*Zienni v. Mercedes Benz U.S. Intl, Inc.*, No. 24-13932, 2025 U.S. App. LEXIS 33457 (11th Cir. 2025)....................................................................................39

**Statutes**

42 U.S.C. § 2000e-2........................................................................ 16, 17, 19

42 U.S.C. § 2000e–5(g)(1)....................................................................................36

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)....................................................................................19

Beth Richardson, Thomas Vanderblomen, et al., *Practicing before the United States Court of Appeals for the Fourth Circuit: A Guide from Start to Finish*, 101-03 (2021)....................................................................................55

EEOC Guidance CM-618: Segregating, Limiting, and Classifying Employees § 618.7(a) (10/1/83) ....................................................................................18

**Regulations**

29 C.F.R. §1614.105(a)(1)....................................................................................22

29 CFR § 1606.1 ....................................................................................16

# I. STATEMENT OF THE CASE

## A. Nature of the Case

This is a direct evidence case that also involves an unlawful policy. BMW removed Dawsey from her job because it did not want an American to report to an American. Despite knowing that its conduct violates the law, BMW codified the rule in various documents. And BMW continues to follow this rule.

BMW now advances three arguments. It seeks to overturn Dawsey's victory by arguing that it did not discriminate. If that fails, BMW seeks to separately have this Court vacate the District Court's back pay award and the jury's capped punitive damages award.[1]

## B. Standard of Review

BMW "bears a hefty burden in establishing that the evidence is not sufficient to support the awards," as this Court should "not substitute [its] judgment for that of the jury or make credibility determinations." *Price v. City of Charlotte*, 93 F.3d 1241, 1249-50 (4th Cir. 1996). Although BMW routinely points to testimony from its own witnesses denying wrongdoing, this Court should "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000) (emphasis added).

---

[1] BMW does not seek to vacate the verdict for compensatory damages if the liability determination holds.

### C. Factual Background

#### 1. Parties

BMW MC operates an automotive assembly plant and related operations in Spartanburg, South Carolina. Kelly Dawsey is a career human resources (HR) professional who, after graduating with a business degree, worked in HR for five years before joining BMW in 1995. JA337–JA338; JA340. BMW promoted Dawsey, and she moved to different HR positions over several decades.[2]

In 2015, BMW promoted Dawsey to her last position as FL-III department manager for HR planning (TX-60), a role BMW considers "of the utmost importance." JA347–JA348; JA821; JA853. Dawsey managed six functional areas and around 15 employees. JA348. She oversaw compensation, benefits, organization, HR planning, the associate health center, and the wellness programs. JA348–JA350.

---

[2] Dawsey started as an employee relations representative in TX-61, and BMW promoted her to a coordinator role in the same department. JA341–JA343; JA2066-68. BMW promoted Dawsey again to section manager for compensation and organization, which is in the planning and steering department (TX-60). JA343–JA344. A section manager is the first level of management, also known as function level IV (FL-IV). JA344. Dawsey was responsible for all compensation programs, developing strategies to attract and retain employees, and HR data integrity. JA344–JA345. To broaden her experience, Dawsey lateralled in 2011 to human resources operations manager, which is a different section manager (FL-IV) position within TX-60, where she standardized processes to coordinate with BMW's German headquarters. JA345–JA346; JA346–JA347.

Dawsey always met or exceeded BMW's expectations. JA2122-25 & JA409–JA410; JA2117-21 & JA411; JA417. Dawsey received BMW's highest available rating in her last review, and BMW awarded her a high-performer bonus. JA2112-16 & JA412; JA2142 & JA419. BMW's president, Robert Engelhorn, was "very happy" with Dawsey, whom he said had been "doing a wonderful job in TX-60" and a "great job . . . no doubt about it." JA834; JA866; JA886. Petrasch agrees. JA1129–JA1130. Engelhorn even added that BMW "hadn't had such talented people" in HR as Dawsey. JA885.

### 2. BMW's HR department and the 2021 changes

#### a. Traditional structure of the Spartanburg plant and its human resources department

BMW designated the Spartanburg plant as "TX." JA352.[3] BMW refers to individuals by position, and it rates positions by function level (FL). For example, BMW's president is also known as TX, which is the only function-level one (FL-I) position. JA357; JA2069; JA2105. Robert Engelhorn occupies TX. JA473.

Reporting to TX are the vice presidents, who comprise FL-II. Each FL-II position has one digit following the TX. The digit indicates the function or department. The human resources (HR) department, for example, is known as TX-6, a term that also refers to both the vice president of HR position and the position's

[3] The Spartanburg plant was formerly known as "TS." JA354. BMW changed the name because the Spartanburg plant builds BMW's X models. [*Id.*]

incumbent. JA354; JA355; JA357–JA358. Christina Petrasch was TX-6 (VP HR). JA355; JA947; JA949; JA1061. She was a German expat, sent by BMW AG, BMW's German parent. JA1064.

Around 100 employees work in BMW's HR department. JA950. The management positions relevant to this appeal are TX-60, TX-61, and TX-64. JA2141. BMW rates such positions at either FL-III or FL-IV, depending on the position's breadth. JA358; *see* JA2103, 2105. *Infra* § III(A)(3)(b)(1).

Dawsey, as TX-60, reported directly to Petrasch. JA355-JA356. In early 2021, Dawsey learned that Petrasch would return to Germany. JA457. At that time, however, no one told Dawsey that this would affect her. JA458. Throughout the summer, Dawsey had frequent and chaotic discussions with Petrasch, who floated multiple options for department staffing. JA458; JA459. Still, Petrasch did not tell Dawsey she would be affected. JA460.

### b. BMW removes Dawsey from TX-60 because she is American.

In September, Engelhorn decided to bring in a German to lead the assembly department (TX-4). JA473; JA473–JA474. Sherry McCraw, an American who had been TX-4, needed to move to make way for the German. JA473. Engelhorn told Petrasch: (1) that McCraw would become the new TX-6 after Petrasch's return to

Germany, and (2) that he wanted to bring Eva Burgmeier from Germany to have "on board in the HR team." JA1073.[4]

Petrasch told Dawsey that McCraw was moving to TX-6. JA474. Petrasch added that the move required Dawsey to vacate TX-60 so an American TX-60 would not be reporting to an American TX-6. Dawsey recounted Petrasch's statement:

> [T]here was a rule that if the Vice President of Human Resources was a domestic or a local that the next line of leadership in Human Resources would have to have a German. And [Petrasch] indicated at that point that the German would either come to the role that I was in, TX-60, the role that Corey Epps was in, TX-61, or the role that Scott Medley was in, TX-64.

JA474; JA2079.[5]

On September 30, Petrasch told Dawsey that BMW would remove her from TX-60 to make way for Burgmeier. Petrasch explained that "the only way to get a local TX-6 is to have an international TX-60 to be a bridge to Germany." JA2078-79; JA475–JA476; JA476–JA477; JA1484. Petrasch proposed moving Dawsey to TX-61 because Petrasch wanted to keep Dawsey at FL-III. JA477.[6] At this point,

---

[4] Engelhorn, Petrasch, and Burgmeier are German. JA797; JA905; JA1068; JA1064. Dawsey and McCraw are American. JA337; JA1203; JA1204; JA1392; JA1484.

[5] At BMW, "domestic" or "local" refers to Americans. JA423; JA474; JA805; JA864; see JA1061; JA1063. "Expat" and "international" refer to German nationals working in Spartanburg. JA376; JA475; *see* JA1063.

[6] Corey Epps, the incumbent in TX-61, would move to TX-64 to replace Medley. JA479.

Dawsey only knew that BMW was removing her from TX-60 and replacing her with Burgmeier. JA480.

BMW admits that it used nationality in making these moves.[7] Engelhorn was candid about his desire for an American in TX-6. JA905; JA1507. BMW also admitted that Engelhorn wanted an American-German combination in TX-6 and TX-60. JA904; JA905; JA991.

BMW proudly defends designating positions based on nationality. Corey Epps was the section manager for associate relations (TX-61), which included responsibility for succession planning. JA1174–JA1175; JA1177; JA1177–JA1178. Epps explained that BMW "pegs" certain positions, like Dawsey's, to fill by nationality based on an alternating domestic/international reporting structure. JA1203–JA1204; *see* JA1204. Petrasch told Epps that "[TX-]60 and [TX-]6 should have the domestic/international combo, if possible." JA1201–JA1202.

BMW's policy is well known and documented in several places. As noted above, Petrasch told Dawsey, "there is a rule." BMW memorialized "the rule" in its "Expat Guidelines for Plant Spartanburg" (Expat Guidelines). JA2126-40; JA480; JA481; JA482; JA484. Petrasch's predecessor, Johannes Trauth, and the senior

---

[7] This is not the only instance in which BMW uses nationality. BMW also chooses to fill lower-level positions with expats and provided, for example, a list of Germans from whom Dawsey was to choose a subordinate. JA2169; JA530–JA532.

management team adopted the Expat Guidelines in 2016. JA481–JA482; JA487; JA482–JA483; JA484. Dawsey told Trauth that BMW cannot slot positions based on national origin, but BMW implemented them anyway, and it never revoked them. JA487–JA488; JA483.

The Expat Guidelines color-code positions by nationality. Green means international or domestic, red means domestic only, and orange means global.[8] *See* JA2131 (right side). The Guidelines state whether each position can be held by "domestics" or "internationals." *Id.* Next, they show "the rule" and the alternating nationality about which Epps spoke: "In general there is an alternating reporting structure of international and domestic below the Senior Management level." JA2129 (second row of the second column). They then describe how that policy applies to TX-60. JA2131. In the left column of that page, "Option 1" and "Option 2" document the alternating nationality requirement for TX-60 and TX-6. *Id.*

The purported need for a German in Dawsey's position is stated in the top right corner: "T[X]-60 has a need for an international inbound (Planner or Dept. Mgr ideally from AG – tie to network) and **should follow the status of T[X]-6**."[9] *Id.* (emphasis added); *see* JA485–JA487.

---

[8] "Global" means a candidate from any other country in the BMW Group network. JA486.

[9] All HR international employees came from Germany. JA485.

BMW documents its unlawful pegging rule elsewhere. BMW's local succession plans also classify positions by nationality. JA2183-84. BMW again color-coded HR management positions by "domestic" or "international." *Id.* at 2184; JA1061–JA1063; JA1199–JA1200; JA2209-20. In the succession plan created while Petrasch (German) was in TX-6, all identified candidates for TX-60 were American. JA2184; JA1064. But after Engelhorn decided to put the American McCraw in TX-6, all identified candidates for TX-60 became German. JA2171; JA1065–JA1068; JA1071.[10]

BMW also fails to mention that it still follows the Expat Guidelines and the alternating nationality principle. BMW has alternated the U.S./German nationality of TX-6 and TX-60 five times in a row. Even after Dawsey sued and Burgmeier later returned to Germany, BMW recently filled TX-60 with another German to comply with the alternating nationality rule. The alternating nationality lineup of TX-6 and TX-60 now spans over a decade:

---

[10] Petrasch tried to explain that this was only the "German part of the list." JA1068. But BMW produced no other list, and Petrasch finally conceded that there was no combined list with American names. JA1068–JA1070.

Although BMW continues to falsely claim that Dawsey created the Expat Guidelines, nobody can claim that she created these documents.

| TX-6 | TX-60 |
|---|---|
| Anne Marie Higgins (American) | Moritz Kippenberger (German) |
| Johannes Trauth (German) | Kelly Dawsey (American) |
| Christina Petrasch (German) | Kelly Dawsey (American) |
| Sherry McCraw (American) | Eva Burgmeier (German) |
| Sherry McCraw (American) | Bianca Siemens (German) |

JA489–JA491; JA896; JA897. And nobody testified that BMW has revoked the Expat Guidelines.

#### c. Burgmeier was unqualified for TX-60

Before Engelhorn announced he wanted a German, nobody at BMW in Spartanburg really knew Burgmeier or had worked with her. JA895; JA991; JA477; JA1189. Other than spending one year in the United States as a high school student, Burgmeier never worked or lived here. JA1484–JA1485. Burgmeier's experience was limited to positions in Germany where she had no responsibilities for HR operations in the United States. JA1485–JA1499; JA1508. Burgmeier had no HR certifications in the United States. JA1515.[11] She also took no courses in American law or human resources. JA1509–JA1510; JA1510–JA1511.

Burgmeier became TX-60 in February 2022. JA1512. The job description[12] catalogs the myriad areas in which Burgmeier had no experience. JA2175-78. TX-

---

[11] Dawsey holds the top-level certification from the Society for Human Resource Management (SHRM) for HR generalists and is active in her local chapter. JA340; JA351.

[12] BMW refers to job descriptions as job function data sheets (JFDS). JA350; JA398.

60, for example, is responsible for federal contract compliance, OFCCP matters, and ERISA compliance. JA405–JA407. Burgmeier admitted that she had no experience in these and other areas identified on the job description, including "compliance with United States or South Carolina laws," "designing, evaluating, and modifying policies to make sure that programs are competitive and in compliance with federal and state legal requirements," "obtaining cost-effective employee serving benefits, monitoring national benefits environment, or options and costs savings in the United States," "complying with all reporting requirements of relevant government rules and regulations, including ERISA," or "contributing to the development of new compensation strategies through creative input combined with data analysis and a deep understanding of the company's future challenges to the extent it related to any compensation strategies related to the United States or South Carolina." JA1513–JA1515; *see also* JA1518. Burgmeier also had no experience dealing with either ERISA or HIPAA, and she didn't even know what HIPAA is. JA1516; *see* JA1078.[13]

Burgmeier's lack of U.S. experience in compensation and benefits is important because HR in Germany is different. In Germany, BMW negotiates with

[13] Although Petrasch went through the guise of an "interview" with Burgmeier, she never asked her about experience in the areas covered by the JFDS, such as dealing with OFCCP, ERISA, or dealing with state or federal government. JA1077. Petrasch never interviewed anyone else for TX-60 because, as she explained, Engelhorn "had given me the task to work with [Burgmeier]." JA1076.

unions to determine compensation, and employers there do not provide health insurance. JA1516–JA1517; JA1500; JA890–JA891; JA891–JA892; JA892; JA893.

Still, BMW argued that Burgmeier was more qualified for TX-60 than Dawsey. Engelhorn agreed that "finding the best qualified candidate" is the most important factor in filling a position. JA885. Although Engelhorn gushed over Dawsey's performance, he had never worked with Burgmeier before deciding to hire her for Spartanburg. JA895. When asked how Burgmeier could be better qualified than Dawsey for TX-60, Engelhorn claimed: "There are a lot of duties which I am not aware." JA886–JA887. When asked then how he could determine that Burgmeier was more qualified for TX-60 than Dawsey, Engelhorn offered up what can only be generously characterized as a word salad. JA887.

Engelhorn could not explain, for example, how Burgmeier was more qualified to oversee ERISA compliance, as he didn't even know what ERISA is. JA887–JA889. Engelhorn knew Burgmeier had no training in U.S. or South Carolina employment laws, but he saw that as a non-issue because "[w]e get to learn things on the job." JA889; *see* JA889–JA890. It is easy to understand how the jury could reject the notion that Burgmeier was better qualified for TX-60 than Dawsey. And that was the jury's call to make.

**d. BMW tells Dawsey that she will be demoted from TX-60 to TX-64.**

On October 4, Petrasch announced another adverse employment action. Contrary to BMW's argument that Dawsey just assumed that TX-64 would be a demotion, Doc. 17 at 32, 46, Petrasch told Dawsey that BMW was also demoting her. Petrasch explained that McCraw didn't want experienced talent in HR, that Dawsey "would be moving to TX-64," and that TX-64 would be a FL-IV position. JA492–JA493; JA506; JA2280-JA2283. Petrasch advised Dawsey to "take this very seriously," to look around for jobs, including outside HR, and not to "show any fear." JA494. Petrasch suggested that Dawsey look for a position outside HR, where she had devoted her entire career. JA495–JA496; JA544. Petrasch even arranged interviews outside HR for Dawsey. JA495-JA496. That is unusual. Contrary to BMW's claim that it routinely transfers managers "through different departments," Doc. 17 at 23, HR managers did not transfer to other departments. JA495; JA1076. And BMW had never designated Dawsey for a move to another position or told her she should move out of HR. JA2124-JA2125 & JA410; JA2120 & JA411–JA412; JA2115 & JA417; JA495; JA1074.

BMW claims that Dawsey never expressed concerns about the plan. Doc. 17 at 29. Again, not true. JA536-538 (recounting earlier complaints to Petrasch and later complaint to Engelhorn); JA494; *see also* JA2079 (recounting Petrasch's statements

that "they don't care" when Dawsey complained and asked whether consideration was given to the people involved).

On November 11, BMW presented the anticipated changes to the HR managers, including Dawsey's anticipated demotion to TX-64. JA535; JA536. In December, BMW announced the same to the rest of the department. JA535–JA536; JA536.

### 3. Dawsey accepts the only job offer she had in December.

Although Petrasch discussed plans to demote Dawsey, BMW never offered her any job, including TX-64. JA540–JA541. BMW has a specific procedure for making offers. The hiring manager submits an offer letter request form, and HR then generates the offer letter, which includes compensation details. That letter then goes back to the hiring manager to execute. JA541; *see, e.g.*, JA2186; JA2226 & JA541–JA542. BMW never requested or issued any offer letter for Dawsey. JA542; JA836; JA1133. BMW also did not officially announce that Dawsey would move to TX-64 when it announced other moves, such as Burgmeier moving to TX-60. JA2076; JA543–JA544.

Dawsey planned to retire from BMW. JA548. But she began looking at options outside BMW when communications became chaotic. JA544–JA546. Although Dawsey began exploring external options before Petrasch told her she was

being removed from TX-60, she had not decided to leave BMW. JA546. Dawsey began looking at external options to protect herself. JA547.[14]

Dawsey's job security concerns were justified. Dawsey knew that Petrasch told her to look for another job, to "show no fear," and that McCraw did not want long-tenured employees like Dawsey in the department. JA552–JA553. Dawsey also knew Petrasch tried to help her leave HR, which Dawsey didn't want. But Dawsey was unaware of internal BMW management discussions that further explained what Petrasch knew and why she encouraged Dawsey to look outside HR. JA554. Petrasch earlier testified that she "didn't know if this would stay on a professional level if [McCraw and Dawsey] could work together," and that "it was difficult for me to judge if this would happen or not." JA1091. When Petrasch informed the German executives about Dawsey's resignation, she documented, "Sherry [McCraw] and Kelly doesn't work." JA2173; JA1086.

So why did Petrasch think that "Sherry and Kelly doesn't work," that Dawsey and McCraw could not be professional, and that it might not happen? It wasn't because of Dawsey. Petrasch confirmed that Dawsey was always professional. JA1090. McCraw never communicated with Dawsey about the reorganization.

---

[14] BMW is wrong to suggest that Dawsey began to look because she wanted a better work-life balance. Doc. 17 at 23-24. Dawsey did not say that is why she began to look. At any rate, BMW argued this below to shift the focus from its motives to Dawsey's motives. The jury apparently did not buy it.

JA553–JA554. But McCraw's apparent aversion to Dawsey explains why Petrasch urged Dawsey to look outside HR, why she tried to get Dawsey a job outside HR, and why BMW made no offer or effort to retain her. JA552; JA553.

After hearing Petrasch's ominous warnings and suggestions to leave HR, Dawsey ultimately accepted the top HR position at Madewell Concrete because of BMW's discrimination. JA548–JA549; JA551; JA1874. After Dawsey gained this experience, the Greenville-Spartanburg Airport ("GSP") hired her for its top HR role. As the District Court noted, there is "no evidence that GSP would have hired [Dawsey] had she not previously been head of HR—a position she held only at Madewell Concrete." JA15.

## II. SUMMARY OF ARGUMENT

BMW violated Title VII by classifying positions by nationality. It violated Title VII again when it informed Dawsey that she would be removed from TX-60 because of her nationality. And it again violated the statute when it told Dawsey she would be demoted to TX-64. BMW never offered Dawsey any position, and she accepted the only offer she had so she could remain employed in her chosen profession.

BMW tries to hedge its bets. On one hand, BMW argues that all the moves it announced were merely "speculation" about some possible future events. On the other hand, BMW claims that Dawsey did not mitigate damages when she rejected

TX-64. When you chase two rabbits going in different directions, you catch neither. That is what happened to BMW before the jury.

BMW's policies to "peg" jobs by nationality are a shocking, and thankfully rare, Title VII violation. But BMW refuses to acknowledge the obvious. It continues to argue that it has good business reasons for its facial Title VII violations. Neither the law nor the facts support such arguments.

## III. ARGUMENT

Title VII prohibits national origin discrimination with the same force with which it prohibits discrimination on other bases, such as race, sex, and religion. 42 U.S.C. §§ 2000e-2(a)(1)-(2).[15] BMW's policy is no more legal than a policy that says women cannot report to other women, or black employees cannot supervise black employees. BMW's violations are that blatant.

Dawsey needed only to prove that her national origin was a motivating factor in BMW's actions. 42 U.S.C. § 2000e-2(m); *Gentry v. E.W. Partners Club Mgmt.*, 816 F.3d 228, 233 (4th Cir. 2016). BMW's arguments that other issues played a role do not change the outcome. "An unlawful employment practice is established when the complaining party demonstrates that . . . national origin was a motivating factor

---

[15] "National origin" has a broad meaning that encompasses "the country where a person was born, or from which [a person's] ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). It also includes "the physical, cultural or linguistic characteristics of a national origin group." 29 CFR § 1606.1.

for any employment practice, even though other factors also motivated the practice." *Id.*

## A. Adverse employment action

### 1. Muldrow's "some harm" principle is inapplicable to Section 703(a)(2).

Dawsey pursued her national origin claim under both sections 703(a)(1) and 703(a)(2). JA154 ¶ 68; JA1693-1694; JA1805. BMW ignores Section 703(a)(2). That matters because the Section 703(a)(2) analysis does not involve *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), or its "some harm" principle.

Section 703(a)(1) is the general prohibition against discrimination, which makes it "an unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). *Muldrow* and its predecessors and progeny all use the "some harm" or "adverse employment action" concept to define "discriminate against" in Section 703(a)(1). *Muldrow*, 601 U.S. at 354.

Section 703(a)(2), however, does not include the phrase "discriminate against." Rather, it forbids efforts "to limit . . . or classify . . . employees or applicants for employment in any way which would deprive or tend to deprive [them] of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e-2(a)(2). "Classification in this respect means to categorize the

employee or the job for a reason, or in a manner, prohibited under Title VII." EEOC Guidance CM-618: Segregating, Limiting, and Classifying Employees § 618.7(a) (10/1/83) ("EEOC Guidance");[16] *id.* § 618.1(a). "Limiting employees . . . means limiting the actual number of individuals in a position based on a prohibited basis." EEOC Guidance § 618.6(a).[17]

The "some harm" or adverse employment action concept is not part of the Section 703(a)(2) analysis.[18] This Court long ago recognized that an employer's "segregation of jobs by sex adversely affected [a plaintiff's] status as an employee and deprived her of the opportunity to reach the maximum salary" for her position. *Armstrong v. Index Journal Co.*, 647 F.2d 441, 444 (4th Cir. 1981). Imposing

---

[16] Available at https://www.eeoc.gov/laws/guidance/cm-618-segregating-limiting-and-classifying-employees.

[17] Section 703(a)(2) applies to both disparate treatment and adverse impact claims because the focus is not on specific adverse actions visited on an employee. While Section 703(a)(1) focuses on specific acts of discrimination, Section 703(a)(2) requires only a showing that a policy or practice "deprive[s] [a group] of employment opportunities." *Nashville Gas Co. v. Satty*, 434 U.S. 136, 142 (1977), *cited and quoted* in *Mitchell v. Bd. of Trs.*, 599 F.2d 582, 586 (4th Cir. 1979).

[18] The majority in *Muldrow* never used the term "adverse employment action" in defining the scope of actionable conduct under Title VII. Rather, it used the phrase "some harm respecting an identifiable term or condition of employment." *Id.* at 355. Only Justice Thomas referred to the phrase "adverse employment action" as the Eighth Circuit used it. *Id. at* 360, 362 (Thomas, J., concurring). This Court, however, has characterized *Muldrow* as clarifying the phrase. *Herkert v. Bisignano*, 151 F.4th 157, 160 (4th Cir. 2025).

disadvantageous terms based on a protected characteristic is the harm Congress sought to eradicate. *News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 683 (1983) (requiring only that an employee be treated "'in a manner which but for that person's [protected characteristic] would be different'") (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 711 (1978)).

Thus, Dawsey needed only to show that BMW subjected her to an unlawful classification that "tends to deprive" her of "employment opportunities or otherwise adversely affect[s] [her] status as an employee." 42 U.S.C. § 2000e-2(a)(2); *Bibbs v. Block*, 778 F.2d 1318, 1321-22 (8th Cir. 1985). Section 703(a)(2) describes what it prohibits. And "when the meaning of the statute's terms is plain," a court's "job is at an end." *Bostock v. Clayton Cty.*, 590 U.S. 644, 674 (2020); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56-58 (2012).

Because the jury verdict can rest solely on Section 703(a)(2), this Court need not address BMW's Section 703(a)(1) arguments about *Muldrow* to affirm the denial of BMW's Rule 50(b) Motion.

**2. BMW conflates adverse employment action and mitigation with the principle of when a claim accrues.**

BMW continues to argue that it did not discriminate because, when Dawsey resigned, BMW had not yet removed her from TX-60, demoted her to TX-64, or decreased her pay and benefits. BMW falsely represents: "Dawsey testified that she *believed* her transfer to TX-64 *would later constitute a demotion* because she

believed that *some unidentified point in the future* BMW MC would downgrade the role." Doc. 17 at 32 (emphases added). Dawsey never said any such thing. Dawsey quoted Petrasch about decisions already made. In the September discussion, for example, Petrasch emphasized: "It's done." JA476; JA2079.

Title VII liability arises when the employer announces a decision—not when the employer implements it. "A claim accrues when the plaintiff has the right to assert it in court." *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 804 (2024). That happens "when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief.'" *Id.* at 809 (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)).

A "complete and present cause of action" exists in the employment context when an employer announces a decision. *Delaware State College v. Ricks*, 449 U.S. 250, 256-58 (1980) (claim arose when professor notified of tenure denial and pending termination and not when the resulting termination occurred); *Chardon v. Fernandez,* 454 U.S. 6, 8 (1981) ("[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful."); *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) (noting that the discriminatory act was the employer informing plaintiff of his removal as branch manager) (citing *Ricks*); *Hospodor v. Burlington Indus.*, No. 99-2017, 2000 U.S. App. LEXIS 2679, at *3 (4th Cir. Feb. 23, 2000) (termination claim arose when

the plaintiff "received notice that he was to be terminated"); *Smith v. Univ. of Md. Balt.,* 770 F. App'x 50, 50 (4th Cir. 2019); *cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367-68 (1977) (implementing policy of filling positions based on a prohibited basis is actionable even in the absence of a showing that the plaintiff applied).

The employer's subsequent actions cannot unring the bell. *Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019). Nor can a purported voluntary resignation. *Horn v. Del Toro*, No. 23-5169, 2024 U.S. App. LEXIS 25290, at *8 (D.C. Cir. Oct. 3, 2024).

BMW nonetheless argues that employees have no claim until the employer implements the discriminatory decision. Two lines of controlling precedent expose the fallacy of BMW's argument.

The same "complete and present cause of action" standard that governs when a claim accrues also governs when the statute of limitations period begins. *Green*, 578 U.S. at 554; *accord A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) ("The applicable statute of limitations begins to run once a claim accrues."). If, contrary to *Ricks*, *Chardon*, and *Price*, no claim exists until a decision is implemented, then BMW's argument would mean that the statute of limitations runs on a claim before there is a claim. In other words, BMW's interpretation cannot be correct because it would mean that having a "complete and present cause of

action" for purposes of starting the clock would be different from having a "complete and present cause of action" to have a claim. That defies the very concept of the "complete and present cause of action."

In a deferral state such as South Carolina, BMW's proposed rule would have halved the time for Dawsey to file a charge, given BMW's September announcement of moves it implemented the following April. In an adjacent North Carolina county, a plaintiff under these facts would only have a month to file. *White v. BFI Waste Servs.*, 375 F.3d 288, 292 (4th Cir. 2004) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998)).[19] If a plaintiff worked for the government, BMW's proposed rule would make it impossible to bring any case because federal employees must commence proceedings within 45 days of an announced adverse employment action. 29 C.F.R. § 1614.105(a)(1).

Such a result would not only contravene the *Ricks* line of cases, but it also would upend a second controlling principle. "[P]arties may not prospectively render untimely a lawsuit that would otherwise be timely under Title VII or the ADEA." *Thomas v. Eotech, LLC*, 169 F.4th 259, 263 (4th Cir. 2026). Accepting BMW's

---

[19] Consider a North Carolina employer announcing that, in seven months, it will fire all women. Under BMW's theory, the clock would start ticking upon the announcement, but none of the victims could sue because the employer would not have implemented the discriminatory purge within 180 days.

argument could allow an employer to "prospectively render untimely a lawsuit that would be timely."

### 3. BMW's Section 703(a)(1) adverse employment actions

BMW's argument that no adverse employment action occurred cannot withstand even cursory scrutiny. In *Muldrow*, a police department's transfer of a plainclothes officer to a uniformed position constituted an adverse employment action even though the plaintiff's "rank and pay remained the same." *Muldrow*, 601 U.S. at 351. The plaintiff considered her new position "less prestigious." *Id.* at 361. She also testified that her new schedule was less preferable, and she lost the use of a department vehicle. *Id.* at 352. The *Muldrow* Court overruled cases finding that harm must be "significant," and it rejected the notion that harm must be tangible or economic. *Id.* at 354-55; *Herkert v. Bisig*nano, 151 F.4th 157, 165 (4th Cir. 2025) (noting that the "some harm" under *Muldrow* does not require *any* "diminution in pay grade, salary, or benefits"). Dawsey did not need to prove that "the harm was significant, serious, substantial, 'or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.'" *Barnhill v. Bondi*, 138 F.4th 123, 129 n.6 (4th Cir. 2025) (quoting *Muldrow*, 601 U.S. at 355).[20]

---

[20] As Justice Kavanaugh noted, the "some harm" standard is practically a no-harm standard. *Muldrow,* 601 U.S. at 365 (Kavanaugh, J., concurring) ("I expect that the Court's approach and my preferred approach will land in the same

It is the jury's province to assess whether Dawsey's removal and demotion were "'disadvantageous' change[s] that left her 'worse off,' even if not 'significantly so.'" *Herkert*, 151 F.4th at 165 (quoting *Muldrow*, 601 U.S. at 359). And, contrary to BMW's argument, that is so even if the move "entail[ed] no diminution in pay grade, salary, or benefits." *Id*.

BMW tries to spin *Herkert* by pointing out that a loss of supervisory status alone does not entitle a *plaintiff* to judgment as a matter of law. Doc. 17 at 44. Although this case involves more than a loss of status, this appeal is not about Dawsey's entitlement to judgment as a matter of law. The *Herkert* Court correctly noted that "this is a context-specific inquiry, and that it is for a jury to assess." *Id.* at 165. And the jury assessed it.

**a. Removal from TX-60**

The most fundamental term or condition of employment is the job one holds. *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022); *Threat v. City of Cleveland*, 6 F.4th 672, 678-79 (6th Cir. 2021); *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000); *see Ortiz-Diaz v. United States HUD*, 867 F.3d 70, 81 (D.C. Cir. 2016) ("[T]ransferring an employee because of the employee's race (or denying an employee's requested transfer because of the employee's race) plainly constitutes

place and lead to the same result in 99 out of 100 discriminatory-transfer cases, if not in all 100.").

discrimination with respect to 'compensation, terms, conditions, or privileges of employment' . . . .") (Kavanaugh, J., concurring).

BMW's decision to remove Dawsey from TX-60 was not iffy or speculative. Petrasch told her that German executives reviewed the decision, and that "it[']s done." JA2079; JA476. And before Dawsey resigned, BMW announced to the entire company that Burgmeier was taking over TX-60. JA2076. Nobody testified that the announced removal decision was in doubt, especially by the time Dawsey resigned in January 2022.

**b. Demotion to TX-64**

Petrasch told Dawsey that BMW would be demoting her from FL-III to FL-IV. *Supra* § I(C)(2)(d). Even under pre-*Muldrow* caselaw, Dawsey established an adverse employment action based on the announced demotion. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007); *e.g.*, *Webster v. Rumsfeld*, 156 F. App'x 571, 579 (4th Cir. 2005).

**1. TX-60 and TX-64 are at different function levels**

BMW argues that Dawsey merely assumed "without evidence" that a move to TX-64 would be a demotion. Doc. 17 at 32. BMW also points to a graphic depicting all direct reports to TX-6 at the same level. *Id.* at 27. It employs these tactics to argue that the move to TX-64 was a mere lateral transfer. *Id.* at 39. But BMW omits critical facts.

For example, BMW's account of the October 4 meeting between Petrasch and Dawsey omits that Petrasch told Dawsey that TX-64 would be FL-IV. JA506; JA556. BMW's only answer to Dawsey's testimony is a passing mention that "Petrasch denied" the statement. Doc. 17 at 46. Fair enough, but the jury's job was to resolve that disputed issue.

Just as Petrasch announced in October, BMW put and has kept TX-64 at FL-IV. After Dawsey resigned, Petrasch reaffirmed that, no matter what BMW did with TX-64, it was a FL-IV position. JA2174; JA1084–JA1085. And BMW continues to rate TX-64 as FL-IV to this day. JA1206; JA1205; JA1398–JA1399; JA1401; JA2185; JA1470; JA1471; JA2187; JA1478; JA1479; JA872; JA2186; JA874.

The differences between FL-III and FL-IV are important for several reasons. BMW's own policy explains that "[f]unction Levels (FL) define the value of the job and are designated based on competencies, accountabilities, and requirements." JA2103. A FL-III position, like TX-60, is designated as a department manager role, while a position at FL-IV is designated only as manager. JA496–JA498. FL-III positions consist of "[m]anagement [l]evel responsibility for multiple functional areas and/or leads a single functional area with full operational control. Typically manages multiple managerial direct reports." JA2105 (emphasis added). By contrast,

FL-IV positions involve management of "one or several functional areas (LL only) or works highly independently on specialized tasks." *Id.*[21]

The status distinction between TX-60 and TX-64 also is reflected in the minimum requirements for those positions. TX-60 requires 10+ years of progressive leadership in HR and active affiliations with HR networks. JA2083. TX-64 does not require *any* prior HR experience or affiliations with HR networks. JA2262; JA498–JA499; JA1395.

Relegation to FL-IV was also a death knell for Dawsey's desire to advance to FL-II. BMW designates Levels I and II as "OFK," or senior management. JA360; JA377; JA484. Moving into the OFK ranks requires validation by BMW executives in Germany. JA377–JA378; JA378. Dawsey aspired to reach the VP/FL-II level, and BMW told her in 2019 that it was considering her for validation to FL-II. JA422–JA423; JA511; JA954–JA957. But BMW does not promote individuals in FL-IV positions to FL-II positions. JA511–JA512; JA1509. Thus, relegation to FL-IV doomed—or at least impaired—Dawsey's opportunities to advance and to seek validation for FL-II.

---

[21] BMW later broke "FL" into two tracks: Expert Level or "EL," and Leadership Level, or "LL," depending on whether the person was a specialist or managed others. That did not change the level system, however. JA397. Thus, for purposes of this brief, either an EL III or LL III, for example, will be referred to as FL-III.

BMW argued at trial that it sorely needed Dawsey's extensive experience and skills in TX-64 because of a critical need for "hiring a thousand people" for a new plant. JA834; JA866–JA867;[22] JA1382–JA1383. It now argues that its treatment of TX-64 results from Dawsey leaving. This assertion raises two more problems for BMW. First, the decision to remove recruiting from TX-64 was part of Petrasch's October discussion with Dawsey, so Dawsey wouldn't have been doing recruiting if she had moved to TX-64. JA506. Second, after Dawsey resigned, BMW put two individuals in TX-64 (Bailey and Gilmore) with little to no experience in managing recruiting or HR. Bailey also did not handle recruiting nonexempt employees while in TX-64. JA1209; JA1474; JA1479; JA1483–JA1484; JA2185; JA2186.

BMW also now argues that it put TX-64 at FL-IV because of the experience level of the individuals who filled it after Dawsey's resignation. Doc. 17 at 33, 47. But that makes no sense, even under BMW's own representations. BMW earlier states correctly: "[F]unction level is determined by the responsibilities associated with the position, rather than the person holding the position." *Id.* at 20; JA357; JA516. So how can BMW now argue that it determined FL by "the person holding

---

[22] Engelhorn repeatedly referred to BMW's $1.7 billion investment in a new plant and the critical hiring needs for a new plant. JA814; JA865; JA867; JA875. After repeatedly discussing how critical TX-64 was to this $1.7 billion investment, however, Engelhorn did not know who filled the position. JA870. Nor could Engelhorn explain why Gilmore, who had no HR experience, was put in such a critical position. JA880–JA881.

the position"? And what employer has ever been granted judgment as a matter of law after arguing that it does not follow its own policies? That is evidence of discrimination itself. *Hollis v. Morgan State Univ.*, 153 F.4th 369, 383 (4th Cir. 2025) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)); *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 260, 261 (4th Cir. 2025).

BMW's assertion that Dawsey "never intended to seek a promotion" is false. Doc. 17 at 49 (citing JA729); *see* JA511. And BMW mischaracterizes Dawsey's retirement plans. Dawsey said she planned to retire from BMW. JA548. Dawsey didn't testify that she wanted to retire from TX-60. Rather, she testified that was her expectation. JA729. That is not inconsistent with wanting to advance in one's career, which Dawsey not only wanted to do, but has done. But that isn't the issue. A move that makes elevation to FL-II less available is "some 'disadvantageous' change in an employment term or condition." *Muldrow*, 601 U.S. at 355 (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)). And that is all Dawsey needed to show under Section 703(a)(1).

BMW also now argues that a comment Engelhorn made during cross-examination proves that BMW would have kept Dawsey at FL-III. Doc. 17 at 33, 46-47. Engelhorn's testimony fell apart when questioned about Petrasch telling Dawsey in October that TX-64 would be a FL-IV. He quickly pivoted and claimed

not to know what was said. JA879-880. And the jury could have easily rejected his assertion about FL-III because neither Engelhorn—nor anyone else in Spartanburg—could create a third FL-III HR position. The "grading circle" at BMW AG in Germany decides job grading and structure in Spartanburg. JA395; JA2145; JA400-JA401; JA391; JA394; JA401; JA515. Spartanburg only had two FL-III positions at any time, and BMW AG limited how many HR FL-III positions it could have. JA502.[23]

BMW's argument that function level doesn't matter raises another question: Why then not designate TX-60 as FL-IV for Burgmeier? BMW's new concession that it "did not always follow this guideline," Doc. 17 at 20, favored the German at an American's expense. That is hardly a Title VII defense.

---

[23] BMW previously designated TX-64 as FL-III solely to benefit Scott Medley, who transferred to the position from TX-61. JA409; JA479; JA513–JA514; JA517; JA2085-JA2087; JA1384. During that time, BMW documented that TX-61 was FL-IV, even though it was always really a FL-III position. JA1207–JA1208; JA2179-JA2182; JA2166-JA2168; JA1384–JA1385; JA1386–JA1387. When Scott Medley moved from a FL-III position (TX-61) to a new position (TX-64), BMW treated TX-64 as a FL-III. JA2261-JA2264; JA512–JA514; JA517–JA518; JA1361–JA1362. That did not, however, create three FL-III positions. BMW put Corey Epps into TX-61 and re-designated it as FL-IV, contrary to its grading. JA514; JA2252-JA2260 & JA516. So BMW still had just two FL-III positions, but it achieved that by mis-classifying both TX-64 and TX-61 to accommodate Medley, which is improper. Function level does not follow the individual. *See* JA515–JA516. TX-64 has never been graded at FL-III since Medley left it. JA875–JA876.

### 2. A demotion to TX-64 subjected Dawsey to personal grade, pay, and benefit reductions.

A demotion to FL-IV subjected Dawsey to cuts in personal grade, pay, and benefits. Dawsey's personal grade (PG) did not fit at the FL-IV level. While function levels value a position, BMW valued individuals according to a personal grade (PG) system. JA398. Personal grade designations affect compensation, fringe benefits, and bonus opportunities. JA499–JA500.

Three personal grades fit within each function level. JA2104; JA396; JA400. FL-III consists of PGs 10-12, while FL-IV consists of PGs 8-10. JA2104; JA398. Dawsey was a PG 11. JA499. Thus, Dawsey's PG exceeds the FL-IV range. JA2104; JA500–JA501; JA524.

Earlier in 2021, BMW implemented a policy that freezes and then cuts pay and benefits when an individual's personal grade exceeds the range for the function level of his or her position. This includes changes to salary, bonus, vehicle entitlement, and paid time off (PTO). JA2149; JA501–JA505; JA508–JA509; JA741-JA742. BMW's parent insisted on the policy, which BMW implemented in mid-2021. JA501; JA502-JA503.

BMW declares: "[I]t is undisputed . . . that the [policy] was never implemented." Doc. 17 at 34, 38. Not so:

Q: So, this policy . . . was it implemented at BMW?

A: Yes, it was.

JA510. Dawsey met with personnel affected by the policy and informed them of its effect on their PGs and compensation. JA509-JA510. So the notion that BMW did not implement the policy is demonstrably false.[24]

BMW argues that McCraw later "rescinded" and "revoked" the policy after Dawsey resigned. Doc. 17 at 35, 48. BMW does not explain how it rescinded or revoked something it never implemented. In any event, BMW never told Dawsey that it would not reduce her PG, compensation, and benefits under the implemented policy. JA553.

BMW also misstates the evidence in claiming that Dawsey "could not say if or when such a decrease would occur." Doc. 17 at 47-48. Dawsey never wavered as to whether the policy applied. Dawsey merely stated that she would have to know where, after the waiting period, her salary was in the pertinent range before she could answer *how much* the policy would ultimately affect her compensation and benefits. JA508. That aside, the PG reduction alone would be more than just "some harm" under *Muldrow*.

---

[24] Dawsey could not testify as to how the policy reduced the pay and PG of employees after her departure, but she never wavered on whether BMW implemented the policy.

### 4. BMW's new argument about Dawsey's subjective preference makes no sense.

BMW raises another unpreserved argument. BMW argues that Dawsey's subjective preference to remain in TX-60 is not an adverse employment action. Doc. 17 at 50-52. This straw man makes no sense. Adverse employment actions turn on the employer's actions.

### 5. BMW's new German language rationale is baseless and contradicts BMW's other arguments.

Another example of BMW's shifting arguments is its new assertion that having a German speaker in the department makes sense. Even if true, however, that does not dispel the notion that nationality was a motivating factor. 42 U.S.C. § 2000e-2(m).

BMW bases this issue on a passing comment Engelhorn made during cross-examination. *See* Doc. 17 at 9, 15. But speaking German was *never* the issue, and no BMW policy supports this assertion. Both BMW's Expat Guidelines and its succession plan color-code positions by *nationality*, not by the ability to speak German. Fluency in German was never a qualification or preference in the job description. JA2081-2084. Nor was reading German ever an issue because BMW uses translation software for written communications. JA543.

BMW's witnesses never said that Dawsey was removed from TX-60 or demoted to TX-64 because of language. To the contrary, BMW later argues that

bringing Burgmeier to Spartanburg had *nothing* to do with her being German. Doc. 17 at 62. And Engelhorn testified that, as a "bridge to Germany," Dawsey did a great job. JA865-JA866.

And Burgmeier could have come to a different management position (TX-61 or TX-64), which was Petrasch's plan. Dawsey would not have to leave her job and be demoted for BMW just to bring in a German speaker. But that is beside the point.

BMW also points to the earlier departure of Stephan Dombrowski, a German and former Dawsey subordinate. Doc. 17 at 9. Not only was that issue never raised before, but there is no evidence that Dombrowski provided any language-related services, spoke German, or interfaced with German counterparts on BMW's behalf. Even if he did, none of that proves any need for a German speaker at FL-III, let alone TX-60. That is likely why BMW never made this argument before the jury.

At trial, Engelhorn claimed he had wanted Dawsey in TX-64 for recruiting, but, as discussed above, Petrasch had already stated that BMW removed recruiting from TX-64 in October. BMW's efforts to try different arguments after earlier ones fell flat are themselves evidence of discrimination. *Hollis*, 153 F.4th at 383; *Wannamaker-Amos*, 126 F.4th at 258; *Duvall v. Novant Health, Inc.*, 95 F.4th 778, 791 (4th Cir. 2024).

### 6. BMW's cited cases cannot overcome binding authority.

BMW continues to try to equate FL-III and FL-IV even though its own policies delineate the important distinction between them. *Supra* § III(A)(3)(b)(1). BMW's reliance on cases like *Paterakos* and *Gabriel* highlights how far BMW reaches to skirt *Herkert*, *Barnhill*, and *Muldrow*. *See* Doc. 17 at 51. *Paterakos* involved a one-week temporary transfer during the pandemic. The plaintiff's position did not change. The only difference for the one week was a "shift[ in] working hours by half an hour," and the plaintiff had to "report to a different location." *Paterakos v. City of Chi.*, 147 F.4th 787, 797 (7th Cir. 2025). *Gabriel* is even more attenuated because the purported adverse employment actions were: (1) the employer publishing a list of sites with injuries and safety issues; (2) the employer conducting safety audits; (3) the appointment of a new supervisor; and (4) alleged "bullying" that did not amount to a hostile work environment. *Gabriel v. DSM Biomedical, Inc.*, No. 25-2630, 2026 U.S. App. LEXIS 24427, at *7 (3d Cir. Aug. 13, 2026). None of these issues resemble removing Dawsey from her position or demoting her.

BMW also continues to cite *Zienni v. Mercedes Benz U.S. Intl, Inc.*, No. 24-13932, 2025 U.S. App. LEXIS 33457 (11th Cir. 2025), Doc. 17 at 45-46, even though the District Court explained its inapplicability. JA74:3-12. *Zienni* involved a Muslim, who alleged that his employer "denied him a religious accommodation to

take breaks to pray at specific times throughout the workday." 2025 U.S. App. LEXIS 33457, at *1. None of that was true. Team leaders covered the plaintiff's breaks. *Id.* at *4. Nobody stopped the plaintiff from taking prayer breaks. *Id.* at *5. And the employer "never disciplined or threatened to discipline" the plaintiff. *Id.* The plaintiff's theory was not that the employer said it would discipline him, but that praying more than allowed break time merely "exposed [him] to the risk of discipline." *Id.* Again, this theory has nothing to do with the issues here because the employer in *Zienni* never announced or threatened an adverse employment action.

**B. Back pay and mitigation**

Section 706(g) provides for back pay and other benefits. 42 U.S.C. § 2000e–5(g)(1); *Long v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.*, 9 F.3d 340, 343 (4th Cir. 1993); *EEOC v. McLean Trucking Co.*, 834 F.2d 398, 402 (4th Cir. 1987). Back pay is awarded "as a matter of course." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420 (1975)). Unless a defendant can carry its burden of proving a failure to mitigate, "a Title VII plaintiff is generally entitled to back pay." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995). Back pay "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle*

*Paper*, 422 U.S. at 421. Congress left "'little room for the exercise of discretion not to order'" relief. *Albemarle Paper*, 422 U.S. at 417 (quoting *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 296 (1960)).

**1. BMW preserved no argument regarding mitigation of damages other than the applicability of *Dennis*.**

BMW appears to argue that its mitigation argument forecloses liability itself. Putting aside the wrongness of that, BMW never argued mitigation in either its Rule 50(a) or Rule 50(b) arguments. At the back pay/front pay bench trial, BMW made no mitigation argument other than its quarrel with *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639 (4th Cir. 2002).

This Court should foreclose BMW from arguing mitigation, other than its *Dennis* argument, because a moving party "is required to have raised the reason for which it is entitled to judgment as a matter of law in its Rule 50(a) motion before the case is submitted to the jury and reassert that reason in its Rule 50(b) motion after trial if the Rule 50(a) motion proves unsuccessful." *Price v. City of Charlotte,* 93 F.3d 1241, 1248–49 (4th Cir. 1996) (citing *Singer v. Dungan,* 45 F.3d 823, 828–29 (4th Cir. 1995)). The moving party must make the same argument, not different arguments on the same subject matter. *Plyler v. Cox*, 145 F.4th 501, 509 (4th Cir. 2025).

**2. BMW's frontal assault on *Dennis* is legally, factually, and logically devoid of merit.**

BMW's argument that Dawsey had to prove constructive discharge cannot withstand the 45-year tide of controlling precedent. This Court has made clear that it "does not apply the 'constructive discharge rule' denying such pay to persons who leave an employer who has committed intentional discrimination unless it is under conditions of a constructive discharge." *Dennis*, 290 F.3d at 651; *accord Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir. 1981) ("*Spagnuolo I*").[25] BMW's urging that this Court sidestep *Dennis* improperly seeks to overrule published precedent. *O'Connor v. Fairfax Taxi, Inc.*, Nos. 25-1699, 25-1702, 2026 U.S. App. LEXIS 25067, at *19 (4th Cir. Aug. 19, 2026) (citing *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc)). Different facts change nothing because "'the rule that one panel cannot overrule' another would be weak tea indeed if all a later panel had to do was identify a fact, theory, or argument a previous panel did not address." *Gibbons v. Gibbs*, 99 F.4th 211, 215 (4th Cir. 2024) (quoting *McMellon v. United States*, 387 F.3d 329, 356 (4th Cir. 2004) (en banc)).

---

[25] The *Spagnuolo-Dennis* rule does not render superfluous the constructive discharge doctrine. Constructive discharge is an important doctrine when the employer may not have taken any action. For example, the constructive discharge doctrine is commonly invoked in hostile environment cases, including co-worker or third-party harassment cases, that might involve no action by the employer. *Russell v. Driscoll*, 157 F.4th 1348, 1352 (10th Cir. 2025); *see, e.g.*, *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

BMW is wrong to claim that *Dennis* applies only when a plaintiff resigns to take a higher-paying job. Doc. 17 at 46. BMW effectively posits that a plaintiff can obtain economic damages only when he or she incurred none. Because BMW's proposed rule makes no sense, it is unsurprising that it rests on a complete misstatement of *Dennis*'s facts. The plaintiff in *Dennis* quit without *any* job. She was unemployed for some period and *then* obtained a succession of jobs in which she ultimately earned more. *Dennis*, 290 F.3d at 651–52 ("*After* leaving Colleton, Dennis *actively applied* for other work and quickly did find comparable alternative employment") (emphasis added). The reference to higher income in *Dennis* related to earnings "over the three-year period of time" after employment ended, not to whether the plaintiff had losses immediately after resigning. *Id.* at 652. The *Dennis* Court affirmed the district court's award of $31,302 in back pay, which would have been impossible if the plaintiff had no damages. *See Dennis v. Columbia Colleton Med. Ctr.*, 2:98-cv-02694-DCN, ECF 135, at 3–6 (D.S.C. Jan. 29, 2001), *aff'd*, 290 F.3d 639 (4th Cir. 2002). And if periods of unemployment after a resignation, like those in *Dennis*, are compensable, then periods in which a plaintiff immediately mitigates most of her losses must be compensable as well. BMW's efforts to argue otherwise defy both *Dennis* and simple logic.

### 3. BMW failed to meet its burden of proof on mitigation.

BMW bore the burden of proving any failure to mitigate. *Miller v. AT & T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001) (citing *Martin*, 48 F.3d at 1358). But BMW's position is built entirely on disputed facts and fallacious legal arguments.

Factually, for example, the underlying premise of BMW's argument is that Dawsey "refus[ed] the TX-64 position," Doc. 17 at 58, when, in fact, BMW never offered it. *Supra* § I(C)(3). Several of this Court's decisions legally foreclose BMW's arguments. The first fallacy in BMW's theory is the notion that mitigation turns on salary comparison—a proposition this Court has repeatedly rejected. Thus, even if BMW had carried its burden of proving that it offered Dawsey TX-64, the *Miller* Court, the *Duvall* Court, and the Supreme Court have all stressed that "a plaintiff 'need not . . . accept a demotion'" to fully mitigate. *Miller*, 250 F.3d at 838 (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982)); *Duvall*, 95 F.4th at 794-95 (citing and quoting *Miller*).

The position Dawsey accepted at Madewell Concrete was higher in rank than the FL-IV position that BMW never offered. Although the Madewell Concrete position paid less than what Dawsey earned in TX-60, that is not an issue for two reasons.

First, BMW never proved what it would have paid Dawsey if it had offered her TX-64 because it never issued an offer letter. *Supra* § I(C)(3). And

"'uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer.'" *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975) (quoting *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1380, n. 53 (5th Cir. 1974)). This also precludes BMW's new argument that the District Court should have imputed TX-64 income to Dawsey. Doc. 17 at 52. BMW not only failed to offer evidence on this point, but it also did not preserve this argument below.

Second, pay is not the most important factor in the mitigation analysis. "[T]he comparability of any alternative position must be judged by a broad range of factors, and not merely any one criterion alone." *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 117 (4th Cir. 1983) ("*Spagnuolo II*") (citing *Williams v. Albemarle City Bd. of Educ.*, 508 F.2d 1242, 1243 (4th Cir. 1974)). "Comparability in salary . . . is only one fact to be considered . . . . Comparability in status is often of *far more importance*—especially as it relates to opportunities for advancement or for other employment." *Williams*, 508 F.2d at 1243 (emphasis added). The *Duvall* Court recently reaffirmed that, under *Williams*, "the duty to mitigate does not require a plaintiff to accept a position that could 'injuriously affect [his] future career or reputation.'" *Duvall*, 95 F.4th at 795 (quoting *Williams*, 508 F.2d at 1243). And it is for the fact finder to apply the factors: "Whether the discharged or demoted teacher reasonably refused the alternative employment for any of these reasons is ordinarily

a factual issue to be resolved by the District Court, whose decision will be reversed only for clear error." *Williams*, 508 F.2d at 1243; *see also EEOC v. Consolidated Energy*, 860 F.3d 131, 149 (4th Cir. 2017) (noting that the mitigation analysis "takes into account both economic and personal circumstances," which is a fact determination) (citation omitted); *Wells v. N.C. Bd. of Alcohol Cntrl.,* 714 F.2d 340, 342 (4th Cir. 1983) (rejecting a constructive discharge requirement for damages and determining that accepting alternate employment for physical reasons was appropriate mitigation under the circumstances).

BMW argues that *Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730 (E.D. Va. 2016), justifies a departure from *Dennis*. But C*rump* acknowledges *Dennis* and never suggests it has such holes. In *Crump*, the plaintiff resigned after being dissatisfied with the employer's failure to accommodate her disability. *Id.* at 739. But the employer had offered an appropriate accommodation almost two months before. *Id.* at 755. The trial court found that the plaintiff's back pay period ended on the resignation date because the employer had offered accommodations by that point. *Id.* at 738-39, 754. The *Crump* Court recognized that "[o]ur Court of Appeals does not apply the 'constructive discharge rule,' which denies back pay to 'persons who leave an employer who has committed intentional discrimination unless it is under conditions of a constructive discharge.'" *Id.* at 746 (quoting *Dennis*, 290 F.3d at 651). It added that "a plaintiff does not sacrifice an award of back pay simply

because he or she was not constructively discharged." *Id.* But that was not the issue in *Crump* because the employer offered the plaintiff the opportunity to "return to her position . . . with an accommodation almost identical to the one [she] sought." *Id.* at 755. Here, not only did BMW not make Dawsey an offer, but what it claims it would offer her is not a "return to her position." As this Court recognized in *Herkert*, these cases are fact-intensive, and the fact finder should decide job equivalency and resolve disputed testimony about whether the employer made an offer. *Herkert*, 151 F.4th at 165.[26]

BMW raises a new argument that this Court's precedent also forecloses. BMW now cites *Ford Motor Co.* to argue that the District Court erred in concluding that "Dawsey was not required to remain at BMW MC and could instead take a job elsewhere." Doc. 17 at 59.[27] This statement is riddled with problems, including that

---

[26] Likewise, BMW relies on an unreported pro se case from 1995 that deals with an hourly worker being recalled from a layoff. Doc. 17 at 61 (citing *Shipley v. Lockheed Aeromod Ctr.*). But under those circumstances, this Court merely said that "a refusal by [the plaintiff] to return to work would also undermine any claim for damages." *Shipley v. Lockheed Aeromod Ctr.*, No. 94-2063, 1995 U.S. App. LEXIS 27645, at *7 (4th Cir. Sep. 29, 1995). That has nothing to do with this case.

[27] *Ford Motor* was the seminal case for the unconditional reinstatement offer line of cases, which involve different mitigation issues arising in different contexts. Even that line of cases, however, stresses that mitigation arguments like this are for the finder of fact. *Blasic v. Chugach Support Servs.*, 673 F. Supp.2d 389, 403 (D. Md. 2009). So, this new and unpreserved argument still gets BMW nowhere.

BMW did not offer Dawsey a job and, unlike the employer in *Ford Motor*, did nothing to retain or rehire her. Moreover, the district court's actual point was: "BMW MC has not offered any authority indicating Plaintiff was required to remain employed at BMW MC where she experienced discrimination rather than accept the top HR position at Madewell Concrete . . . ." JA15. BMW still has offered no such authority.

BMW instead now argues that *Ford Motor* requires former employees to quit lower-paying jobs and accept re-employment with an employer that discriminates unlawfully. Doc. 17 at 59-60.[28] But *Ford Motor* does not address Dawsey's situation. Instead, it involved tolling back pay "when a claimant rejects the offer of a job he originally sought." *Ford Motor, 458 U.S.* at 238. That is not this case. *Ford Motor* addressed only arguments about comparative wage rates and whether an "unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages." *Id.* at 231. In other words, *Ford Motor* addressed back pay accrual only for unemployed or underemployed former employees who rejected the same job they sought. *Id.* at 231-32.

---

[28] BMW fails to recognize that *Ford Motor* is the source of the principle that a victim of discrimination "need not go into another line of work [or] accept a demotion" to mitigate damages. *Ford Motor Co.*, 458 U.S. at 231.

The jury already addressed the parties' disputed narratives about whether BMW offered Dawsey any job, let alone the job she sought. That said, *Ford Motor* does not require employees to seek or accept the highest-paying job available. *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1274 (4th Cir. 1985) (noting that the duty to mitigate does not "require that a claimant continue to search for higher paid employment").

After leaving BMW, Dawsey was neither unemployed nor underemployed, and BMW never offered reinstatement or a higher-paying job. BMW also did not make her an offer post-separation. It certainly did not offer Dawsey a job she sought. Dawsey left for a top HR position with another company which, as the district court noted, allowed her to obtain the top position at GSP. *Ford Motor* did not involve the principle discussed in *Spagnuolo II*, *Williams*, and *Duvall*. They make clear that the fact finder considers pay as just one factor. Career progression is often more important, especially in the white-collar world. *Cf. Hairston*, 520 F.2d at 232 (refusing a promotion does not preclude a plaintiff from seeking damages if the promotion continues to subject the plaintiff to an unlawful policy).

BMW also fails to mention that this principle worked to its advantage when the District Court denied front pay. Although Dawsey still earned less than she would have if she had remained in TX-60, the District Court found that she had mitigated fully because she was in a higher-level job. JA20.

## C. Punitive Damages

### 1. BMW bases its unpreserved punitive damages arguments on a misstatement of the law.

Title VII provides for punitive damages when a defendant discriminates against the plaintiff "'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). BMW still argues that it should not be subject to punitive damages because its actors claim they didn't believe they were violating the law. That's not the issue. The issue is whether an employer might believe that its "discrimination is lawful." *Kolstad*, 527 U.S. at 537 (emphasis added). For example, the Court cited situations in which discrimination occurred, but an affirmative defense could apply. *Id.*[29]

That was never BMW's argument. Instead, it litigated and tried this case on the theory that it did not discriminate at all. This Court should not give BMW a mulligan to try a different approach on appeal.

[29] In *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024), for example, the employer did not deny discriminating based on religion. It successfully argued that the ministerial exception applied. Other examples might include a joint or integrated employer case where an employer may agree it failed to hire a woman for a position because of her sex and age but believed that such discrimination is lawful because the particular entity employed fewer than fifteen employees.

BMW improperly tries to fit the square peg of *Duvall* into the round hole of these facts. It somehow claims that it was blissfully unaware that national origin discrimination is unlawful. But that argument is baseless. *Duvall* involved discriminatory conduct by a marketing and communications executive, whom the defendant represented to be "the sole decisionmaker." Brief of Appellant [Doc. 23] at 70, Duvall v. Novant Health, No. 22-2142 (4th Cir. Apr. 6, 2023). The plaintiff merely argued that an experienced executive must have known the law. *Duvall*, 95 F.4th at 792. Dawsey never relied on such an argument, and the Record forecloses any notion that BMW's top HR decision maker was unaware that discrimination was unlawful.

To prove "perceived risk," Dawsey was only required to prove that a BMW actor had "rudimentary knowledge" of the law. *Duvall*, 95 F.4th at 792 (citing *EEOC v. FedEx,* 513 F.3d 360, 372–73 (4th Cir. 2008)). The rudimentary knowledge or perceived risk concept is well developed, and the evidentiary bar is low. In *FedEx*, for example, this Court focused on a senior operations manager's knowledge because he had ultimate responsibility for the ramp at BWI airport. *FedEx*, 513 F.3d at 373; *see id.* at 365. This Court found that the EEOC proved perceived risk because the manager: (1) was aware of the employer's policy, (2) had been trained on the law, (3) was "responsible for all personnel matters," and (4) was aware of the employee's disability. *Id.* at 373.

BMW maintains a policy against national origin discrimination, which it published in the employee handbook. JA539–JA540; JA984. As HR VP (TX-6), Petrasch was ultimately responsible for administering BMW's discrimination policies and for training managers about them. JA540; JA1028–JA1029. Petrasch also handled discrimination-related legal matters, such as EEOC charges. *Id.* BMW's HR and legal departments trained all managers on anti-discrimination prohibitions that included "protected classes under the law . . . all of those that are named in the law." JA539-JA540; JA1029. And BMW knew its policy was illegal when it developed and implemented the Expat Guidelines because Dawsey told BMW so. JA487–JA488.[30]

Both the FedEx manager and Petrasch knew the applicable policy. Both had been trained in applicable law. Both were responsible for all personnel matters. And both knew that the plaintiff belonged to a classification protected by law. So Dawsey's proof suffices under *FedEx*, even though she need not prove all this.

---

[30] BMW continues to falsely represent that Dawsey "testified that she had created the Expat Guidelines." Doc. 17 at 31. Nobody, including Dawsey, testified that she "created" the Expat Guidelines. At trial, BMW not only pretended not to know about the Expat Guidelines, but BMW's counsel accused Dawsey of both creating and then absconding with them to build a case. JA374-JA375. She didn't have them. BMW produced them in discovery (as shown by the Bates stamps), and McCraw acknowledged that BMW still maintains them in BMW's database of guidelines, policies, and procedures. JA51; JA1416–JA1417.

*FedEx* does not even represent *Kolstad*'s floor. In *Anderson v. GDC, Inc.*, 281 F.3d 452 (4th Cir. 2002), a harassing supervisor admitted seeing an anti-discrimination poster, but denied reading it. The *Anderson* Court emphasized that a jury has no obligation to believe such a witness. Even though the supervisor "denied having read the poster," this Court held that "a reasonable jury could nevertheless infer that [his] awareness of the poster suggested at least a rudimentary knowledge of its import." *Id.* at 460. So, if a non-HR person "glancing at" a poster is enough, then Petrasch's direct involvement easily clears the hurdle.

### 2. BMW's claim that its other top managers did not know that discrimination is unlawful

BMW now apparently disputes that McCraw, its current HR VP, and Engelhorn knew discrimination was unlawful. This claim has several problems, aside from its absurdity.

BMW never made this argument before, so it is unpreserved. *Plyler*, 145 F.4th at 509. BMW also never made this argument to the jury. Whether BMW could escape liability based on what witnesses said, or didn't say, is precisely the kind of issue a jury must address.

This argument is just another example of BMW changing its tune. BMW took the position throughout the case that its actions were "good-faith efforts to prevent discrimination in the workplace and to *comply with Title VII* . . . and all other

applicable *employment laws*." JA169 (emphasis added). BMW even argued that it "had reasonable grounds for believing that its actions did not violate Title VII." *Id.*

In its Rule 50(b) Motion, BMW reiterated that affirmative defense. BMW argued that BMW's anti-discrimination policies proved that it "made a good-faith effort to prevent discrimination," which proved its effort to "'accomplish[] Title VII's objective of . . . detect[ing] and deter[ring] Title VII violations.'" JA2043 (quoting *Kolstad*, 527 U.S. at 549).

Those arguments failed to sway either the jury or the District Court. The jury assessed witness credibility after observing BMW's decision makers repeatedly impeach themselves. JA892-JA895; JA905; JA1074, JA1084-JA1085; JA1090-JA1091; JA1119; JA1124-JA1125; JA1135; JA1398; JA1413. The jury could also observe differences in demeanor and forthrightness when answering questions on direct versus cross-examination. *E.g.*, JA875-76. After assessing the witnesses, including their mannerisms and explanations, that jury returned a $5,000,000 punitive damages verdict. This Court should not retry the case based on a cold record. *United States v. Moye*, 454 F.3d 390, 396 (4th Cir. 2006) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

That aside, BMW's latest assertion is untrue. Dawsey established that BMW's HR and legal departments train all managers on the non-discrimination prohibitions. And neither Engelhorn nor McCraw tried to refute this testimony. Petrasch certainly

did not. Central to *Duvall* is that the plaintiff "offered no evidence as to the training . . . to establish the requisite knowledge of federal anti-discrimination law." *Duvall*, 95 F.4th at 792. The *Duvall* Court used this fact to distinguish both *FedEx* (discussed above) and *Lowery v. Circuit City*. *Id.* at 792-93.

In *Lowery*, the plaintiff met this Court's proof requirements by providing "evidence that it required every person in management to attend a week-long training seminar that included education on the federal anti-discrimination laws." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000). Dawsey offered proof that HR and the legal department trained all managers on the legal issues. Nobody said otherwise.

This is also different from the discrete decisions in *Duvall* and typical disparate treatment cases. Unlike a situation involving the motives for a single decision, this case involves an unlawful policy. As TX-6, Trauth had senior management adopt a facially unlawful policy. Petrasch, Trauth's successor, applied the unlawful policy and announced the decisions it dictated. BMW's argument that every other manager must affirmatively know that discrimination is unlawful is baseless.

Petrasch, whose knowledge BMW does not contest, told Dawsey about both her removal from TX-60 and her demotion to make room for a German. And Petrasch testified she was involved in both decisions. Nothing more is required.

Engelhorn is not unaware of the employment laws, as BMW now claims. In addition to the training provided to management, Engelhorn mentioned the unique aspects "with regard to the laws" that apply in the United States. JA820-JA821.

BMW's focus on each individual's ability to feign ignorance is misguided in a case involving a facially unlawful policy. Under BMW's theory, an employer can adopt a policy of not hiring Catholics or women and then avoid punitive damages by arguing that a particular hiring manager didn't admit knowing the law. But that is what BMW expects this Court to hold, even though no court has ever said that.

BMW provides no authority that every person involved in carrying out a decision under an unlawful policy must admit knowing that discrimination is unlawful. BMW cites *Ward v. Autozoners*, 958 F.3d 254 (4th Cir. 2020), but that case does not support the proposition. *Ward* is a nonmanagerial coworker harassment case, not a case about discriminatory policies implemented and applied at the C-suite level. In other words, this case involves the very situation the *Ward* Court relied on to distinguish cases like *Lowery*. *Id.* at 264-65.

*Consolidated Energy* also does not suggest a defense for BMW. The employer was attempting to comply with the ADA by offering a compliant accommodation. The issue was whether the offered accommodation met ADA standards, not whether the employer knew that discrimination was unlawful. *Consolidated Energy*, 860 F.3d at 151.

BMW also appears to argue that knowing a policy is designed to comply with the law is different from knowing there is a law. Doc. 17 at 69. This is another unpreserved argument, and the Record again belies it. BMW's training by its own legal department is on the "protected classes under the law . . . all of those that are named in the law." JA539-JA540. Further, knowledge of an anti-discrimination policy is all that is required, as shown by the poster at which the supervisor "glanced" in *Anderson*. Neither this nor any other court requires further knowledge of Title 42 of the United States Code.

BMW's argument that it can obtain judgment as a matter of law if its decision makers disavow knowledge of its own policy is novel, to say the least. BMW already tried this with the jury, which spoke clearly about what it thought of BMW's tactics. Petrasch discussed "the rule," Epps described it candidly, and McCraw confirmed that the rule was still on the books. No court has ever said that an employer can obtain judgment as a matter of law by claiming ignorance of its own policy. Such a notion is especially ludicrous when the unlawful policy appears in other documents, and a decision maker admits nationality drove the decision. BMW's penchant for such arguments likely explains why the jury determined it needed to send a $5,000,000 message.

### 3. BMW's egregious conduct also warrants punitive damages

Punitive damages require no proof of egregiousness. *Kolstad*, 527 U.S. at 534-35. A plaintiff, however, may prove reckless indifference by showing that "employer conduct is so 'egregious' that by itself it is evidence of reckless indifference to Title VII rights." *Consolidated Energy*, 860 F.3d at 152 (citing *Kolstad*, 527 U.S. at 535 and *Anderson*, 281 F.3d at 460). Although such a showing is unusual these days, Dawsey has made it here. BMW knowingly adopted an unlawful policy. It also documented that it uses forbidden criteria in its succession plans. BMW's HR VP admitted that BMW removed Dawsey because of her nationality. And, to this day, BMW managers continue and defend the practice.

This is no different from adopting a policy that a black employee cannot report to another black employee, that a woman cannot report to another woman, or, as this Court has addressed in *Holsey*, a policy that white employees need not report to a black supervisor. *See Holsey v. Armour & Co.*, 743 F.2d 199, 212 (4th Cir. 1984) (an employer barring a black supervisor from supervising white employees violates Section 703(a)(2)). BMW's Title VII violations are so egregious that contemporary caselaw offers no strong analogs. For this separate and independent reason, this Court should reject BMW's punitive damages argument.

## IV. CONCLUSION

This Court should affirm the orders from which BMW appeals. Dawsey further respectfully requests guidance on whether Dawsey should seek additional fees and costs

at this stage or on remand. Beth Richardson, Thomas Vanderblomen, et al., *Practicing before the United States Court of Appeals for the Fourth Circuit: A Guide from Start to Finish*, 101-03 (2021).

Respectfully submitted this 1st day of October, 2026

_/s/ Brian P. Murphy______________________
Brian P. Murphy
Attorney for Plaintiff-Appellee

Stephenson & Murphy, LLC

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 26-1793 **Caption:** Dawsey v. BMW Manufacturing Co., LLC

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [x] this brief or other document contains 12,799 [*state number of*] words
- [ ] this brief uses monospaced type and contains ______ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [x] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word [*identify word processing program*] in Times New Roman, 14 pt. [*identify font, size, and type style*];

**or**

- [ ] this brief or other document has been prepared in a monospaced typeface using ______ [*identify word processing program*] in ______ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Brian P. Murphy

Party Name Kelly Dawsey, Plaintiff-Appellee Date: October 1, 2026